DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:    (415) 554-4748
Facsimile:    (415) 554-4715
E-Mail:        brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| CITY AND COUNTY OF SAN FRANCISCO, | Case No. |
|---|---|
| Plaintiff, | |
| vs. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, JOHN F. KELLY, Secretary of United States Department of Homeland Security, DANA J. BOENTE, Acting Attorney General of the United States, DOES 1-100, | |
| Defendants. | |

## INTRODUCTION

1.      The City and County of San Francisco ("San Francisco") seeks declaratory and injunctive relief against the United States of America and the above-named federal officials for violating the Tenth Amendment, U.S. Const. amend. X. San Francisco further seeks a declaration that it complies with Title 8, Section 1373 of the United States Code ("Section 1373") under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq.*

2.      In blatant disregard of the law, the President of the United States seeks to coerce local authorities into abandoning what are known as "Sanctuary City" laws and policies. To accomplish this objective, on January 25, 2017, the President issued an Executive Order entitled, "Enhancing Public Safety in the Interior of the United States." Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ("Executive Order"). The Executive Order announces that it is the Executive Branch's policy to withhold federal funds from "sanctuary jurisdictions," and directs the Attorney General and Secretary of Homeland Security to ensure that sanctuary jurisdictions do not receive Federal grants, and directs the Attorney General to take enforcement action against any local entity that "hinders the enforcement of Federal law." This strikes at the heart of established principles of federalism and violates the United States Constitution.

3.      The President and San Francisco agree that San Francisco is a Sanctuary City, but disagree about what that means. San Francisco laws limit when city employees and agencies may assist with the enforcement of federal immigration law. These laws generally prohibit city employees from using city funds or resources to assist in the enforcement of federal immigration law, unless required by federal or state law. They specifically prohibit local law enforcement officers from cooperating with Immigration and Customs Enforcement ("ICE") detainer requests, which are voluntary, and limit when local law enforcement officers may give ICE advance notice of a person's release from local jail.

4.      Like many other cities, San Francisco is a city of immigrants, many of whom are undocumented, who come here to live, work, and raise families. San Francisco is safer when all people, including undocumented immigrants, feel safe reporting crimes. San Francisco is healthier when all residents, including undocumented immigrants, access public health programs. And San

Francisco is economically and socially stronger when all children, including undocumented immigrants, attend school. Using city and county resources for federal immigration enforcement breeds distrust of local government and officials who have no power to change federal laws, and can also wrench apart family and community structures that support residents and thus conserve resources. For these reasons, among others, San Francisco has directed its employees and officers not to assist the Federal government in enforcing federal immigration law, with limited exceptions.

5.      San Francisco faces the imminent loss of federal funds and impending enforcement action if it does not capitulate to the President's demand that it help enforce federal immigration law. At least one jurisdiction has already succumbed to this presidential fiat.

6.      The Executive Order relies on Title 8, Section 1373 of the United States Code ("Section 1373"), which provides that local governments may not prohibit or restrict any government entity or official from "sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual." San Francisco seeks declaratory relief that its Sanctuary City laws comply with Section 1373. San Francisco does not prohibit or restrict its employees from sharing information about the citizenship or immigration status of any individual with federal immigration officials.

7.      The Executive Order is a severe invasion of San Francisco's sovereignty. The Executive Order not only interferes with San Francisco's ability to direct the official actions of its officers and employees but also threatens new consequences for failing to comply with 1373. In this action, San Francisco seeks declaratory relief that Section 1373 is unconstitutional on its face and as applied to state and local Sanctuary City laws such as San Francisco's. The Executive Branch may not commandeer state and local officials to enforce federal law.

8.      The Constitution establishes a balance of power between the state and Federal governments, as well as among the coordinate branches of Federal government, to prevent the excessive accumulation of power in any single entity and reduce the risk of tyranny and abuse from any government office. In so doing, the Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States

respectively, or to the people." This state sovereignty extends to political subdivisions of the State, including cities and counties such as San Francisco.

9.     This lawsuit is about state sovereignty and a local government's autonomy to devote resources to local priorities and to control the exercise of its own police powers, rather than being forced to carry out the agenda of the Federal government. Under the Constitution and established principles of federalism, state and local governments have this autonomy. The Executive Order purports otherwise to wrest this autonomy from state and local governments, and a court order is needed to resolve this controversy.

10.    San Francisco recognizes that there will be additional developments related to the Executive Order in the weeks and months to come. But the consequences threatened by the Executive Order are too severe for San Francisco to wait. The Executive Order threatens the loss of more than $1 billion in federal funds that support vital services, the loss of community trust, and the loss of San Francisco's sovereign authority to set and follow its own laws on matters appropriately and historically within the control of local government. San Francisco has no choice but to seek the intervention of this Court to ensure that its rights and residents are protected, and that the Administration complies with Federal law and the Constitution.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq*.

12.    Venue properly lies within the Northern District of California because Plaintiff, City and County of San Francisco, resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District. 28 U.S.C. §1391(e).

## PARTIES

13.    Plaintiff, City and County of San Francisco ("San Francisco"), is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

14.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

15.     Defendant United States of America is sued under 28 U.S.C. Section 1346.

16.     The U.S. Department of Homeland Security ("DHS") is a cabinet department of the United States Federal government with the primary mission of securing the United States. Defendant John F. Kelly is the Secretary of DHS. Secretary Kelly is responsible for executing relevant provisions of the Executive Order. Secretary Kelly is sued in his official capacity.

17.     The Attorney General ("AG") is a cabinet department of the United States Federal government overseeing the Department of Justice. Defendant Dana J. Boente is the Acting Attorney General. Acting Attorney General Boente is responsible for executing relevant provisions of the Executive Order. Acting Attorney General Dana J. Boente is sued in his official capacity.[1]

18.     Doe 1 through Doe 100 are sued under fictitious names. Plaintiffs do not now know the true names or capacities of said Defendants, who were responsible for the alleged violations alleged, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

### I.     SAN FRANCISCO'S SANCTUARY CITY LAWS

19.     San Francisco is a Sanctuary City and has been since 1989. In the 1980s, thousands of Central American refugees fled countries in the midst of violent civil wars to seek legal protection in the United States. Against the backdrop of this humanitarian crisis, San Francisco began enacting the ordinances that, as later amended, make up San Francisco's Sanctuary City laws.

20.     Numerous other municipalities—including New York, D.C., Chicago, Los Angeles, New Orleans, Santa Clara, Minneapolis, and Houston—have also enacted Sanctuary City laws. Although the details of their ordinances differ, all of these jurisdictions have adopted laws or policies that limit using local resources to implement and enforce federal immigration laws.

21.     Today, San Francisco's body of Sanctuary City law is contained in two chapters of San Francisco's Administrative Code: Chapters 12H and 12I.

---

[1] Jeff Sessions has been nominated to serve as Attorney General and will replace Acting Attorney General Dana J. Boente, if confirmed.

22.     Importantly, these chapters do not protect criminals or prevent people from being prosecuted for illegal acts. Instead, they protect children by ensuring that their parents feel safe taking them to playgrounds,  to schools, and to hospitals. They protect families from being split up when parents of children born in the United States are deported. And they protect the safety and health of all residents of San Francisco by helping to ensure that everyone, including undocumented immigrants, feels safe reporting crimes, cooperating with police investigations, and seeking medical treatment. Specifically, Chapters 12H and 12I apply as follows.

23.     San Francisco Administrative Code Chapter 12H—the full text of which is attached as Exhibit 1—prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by Federal or state law.

24.     San Francisco Administrative Code Chapter 12I—the full text of which is attached as Exhibit 2—prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the Federal government.

25.     Section 287.7 of Title 8 of the Code of Federal Regulations provides that such a detainer "serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." Subsection (d) provides that "[u]pon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department."

26.     A detainer request issued under this section is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary City laws. A detainer request is not issued by a judge and is not based on a finding of probable cause. It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them.

27.     Complying with such a detainer request requires committing scarce law enforcement personnel and resources to track and respond to requests, detain individuals in holding cells, and supervise and feed individuals during the prolonged detention. And the Federal government has made clear that the local agency bears the financial burden of the detention, providing that "[n]o detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the Department." 8 C.F.R. 287(e).

28.     Chapter 12I also prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released, unless the in question meets certain criteria. *See* Section 12I.3(c), (d).

29.     Finally, as relevant here, Chapter 12I provides that "[l]aw enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws." *See* Section 12I.3(e). "Personal information" is defined as "any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information." *See* Section 12I.2.

30.     The legislative findings set forth in Chapter 12I evidence the legitimate local purpose of San Francisco's Sanctuary City laws. For example, the Legislature declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all. (*See* Section 12I.2.)

31.     Chapter 12I makes clear that its purpose and effect are limited to matters "relating to federal civil immigration detainers, notification of release of individuals, transmission of personal information, or civil immigration documents, based solely on alleged violations of the civil provisions of immigration laws." Chapter 12I expressly states that "[i]n all other respects, local law enforcement

agencies may continue to collaborate with federal authorities to protect public safety." *See* Section 12I.4.

32.     Further underscoring that San Francisco's Sanctuary City laws arise from San Francisco's commitment and responsibility to ensure public safety and welfare, the Board of Supervisors, as San Francisco's legislative body, found that public safety is "founded on trust and cooperation of community residents and local law enforcement." Section 12I.1. Citing a study by the University of Illinois, which found that at least 40% of Latinos surveyed were less likely to provide information to police because they feared exposing themselves, family, or friends to a risk of deportation, the Legislature stated that "civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies." *Id.*; *see also id.* ("The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.").

33.     The Board of Supervisors also had a public health purpose for its decision to restrict disclosure of confidential information: "To carry out public health programs, the City must be able to reliably collect confidential information from all residents . . . . Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody." *Id.*

34.     Finally, the Board of Supervisors determined that enforcing immigration detainer requests would require San Francisco to redirect scarce local law enforcement personnel and resources—noting that the costs of "responding to a civil immigration detainer can include, but [are] not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer." *Id.* In short, the Board of Supervisors concluded that "[c]ompliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City." *Id.*

35.     San Francisco departments have adopted policies and practices consistent with Chapters 12H and 12I.

36.     California law incorporates local Sanctuary City laws such as Chapters 12H and 12I. The TRUST Act states that that local law enforcement officials may comply with ICE detainer requests only if (1) the continued detention would not violate any federal, state, or local law, or any local policy, and (2) the defendant's criminal history meets specified conditions. Cal. Gov't Code §§ 7282, 7282.5. Thus, because in San Francisco ICE detentions are prohibited under local law, they are also prohibited under state law.

## II.    SECTION 1373

37.     Section 1373 provides that "a local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual." 8 U.S.C. § 1373(a). This restriction exclusively regulates government entities.

38.     Section 1373 requires San Francisco to allow its employees to use city resources, including San Francisco tax dollars, to respond to requests for information about citizenship and immigration status.

39.     On May 31, 2016, in response to a request from the Office of the Attorney General, the Office of the Inspector General ("OIG") of the Department of Justice issued a memorandum ("OIG Memo") regarding potential violations of Section 1373 by recipients of funding from the Edward Byrne Memorial Justice Assistance Grant Program ("JAG"). Memorandum from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen. for the Office of Justice Programs, "Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients" (May 31, 2016), https://oig.justice.gov/reports/2016/1607.pdf.[2]

40.     In analyzing the local laws and policies of ten selected state and local jurisdictions, the OIG demonstrated how the Federal government interprets Section 1373.

---

[2] The authorizing legislation for the JAG program requires that all grant applicants certify compliance with the provisions of the authorizing legislation and all other "applicable federal laws." 42 U.S.C. § 3750 et seq. The U.S. Department of Justice, Office of Justice Programs has recently announced that Section 1373 is an "applicable" law under the JAG authorizing legislation.

41.     For example, though Section 1373 does not expressly address immigration detainers, OIG expressed concern that local laws concerning the handling of detainer requests "may have a broader practical impact on the level of cooperation afforded to ICE by these jurisdictions and may, therefore, be inconsistent with at least the intent of Section 1373." OIG Memo at 7. It went on to state that local laws and policies that "purport to be focused on civil immigration detainer requests [and say nothing about sharing immigration status with ICE] . . . may nevertheless be affecting ICE's interactions with the local officials regarding ICE immigration status requests." *Id.*

42.     OIG also stated that such immigration detainer request policies "may be causing local officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE in all respects . . . . [which], of course, would be inconsistent with and prohibited by Section 1373." *Id.* at 8.

43.     In the OIG Memo, the Federal government also endorses the view that local jurisdictions hinder the enforcement of Federal immigration law if they do not honor detainer requests or if they place any other limitations on cooperation with ICE. *See, e.g.*, *id.* at 4 (stating that even though Section 1373 does not specifically address restrictions by state or local entities on cooperation with ICE regarding detainers, "[a] primary and frequently cited indicator of limitations placed on cooperation by state and local jurisdictions with ICE is how the particular state or local jurisdiction handles immigration detainer requests issued by ICE").

44.     In the OIG Memo, OIG recommended that the U.S. Department of Justice, Office of Justice Programs ("OJP") provide JAG recipients clear guidance on their obligation to comply with Section 1373 and require them to certify that they comply with that section. *See id.* at 9.

45.     In response to these recommendations, in July and October 2016 OJP issued guidance regarding compliance with Section 1373. *See* Office of Justice Programs, *Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. Dep't Just. (July 7, 2016) ("OJP July Guidance"); Office of Justice Programs, *Additional Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. Dep't Just. (October 6, 2016) ("OJP October Guidance").

46.     In the OJP July Guidance, OJP stated that to comply with Section 1373, "[y]our personnel *must* be informed that notwithstanding any state or local policies to the contrary, federal law

does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials." OJP July Guidance at 1 (emphasis added). Accordingly, OJP reads into the law an affirmative obligation to instruct personnel regarding the substance of Section 1373.

47.     In the October 2016 Guidance, OIG stated that all JAG applicants must comply with—and certify their compliance with—Section 1373. OJP October Guidance at 1.

48.     As a subgrantee of a JAG grant, San Francisco is required to certify its compliance with Section 1373.

**III.     SAN FRANCISCO COMPLIES WITH SECTION 1373**

49.     San Francisco complies with Section 1373.

50.     The plain language of Section 1373 states that "a local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual." 8 U.S.C. § 1373(a). Nothing in San Francisco Administrative Code Chapters 12H or 12I limits communications regarding *citizenship or immigration status* in any way.

51.     And, indeed, under ICE's Secure Communities program (also known as "S-Comm") whenever an individual is taken into custody, the person is digitally fingerprinted and those fingerprints are sent to the California Department of Justice and ultimately the FBI. The FBI forwards the fingerprints to DHS, which allows ICE to determine the immigration status of everyone in San Francisco custody.

52.     Under Chapter 12I and the TRUST Act, San Francisco does not enforce detainer requests (*see* ¶24, *supra*), and does not respond to notification requests from the Federal government unless certain conditions are met (*see* ¶28, *supra*)—but compliance with such requests is not, in fact, required by Section 1373, which speaks only to communications regarding *citizenship and immigration status*. By contrast, San Francisco does comply with criminal warrants.

53.     Also, complying with civil immigration detainer requests alone, in the absence of probable cause for the detainer, would violate the Fourth Amendment to the United States Constitution and could subject San Francisco to civil liability for this harm. *See Arizona v. United States*, 132 S. Ct.

2492, 2509 (2012) (noting that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns"); *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000-01 (9th Cir. 2012) (applying the Fourth Amendment to immigration arrests).

54.     San Francisco has affirmatively instructed personnel regarding the substance of Section 1373. For example, in a recent memorandum to all San Francisco employees, the San Francisco Human Resources Director explained: "Although federal law states that a 'local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual' (8 U.S.C. § 1373), Chapters 12H and 12I impose other types of restrictions, which are consistent with federal law and are summarized below."

**IV.     THE EXECUTIVE ORDER**

55.     On January 25, 2017, President Donald J. Trump issued the Executive Order attached as Exhibit 3.[3]

56.     The Executive Order declares that "Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic." Executive Order, at 8799.

57.     To address the purported harm caused by Sanctuary Cities, the Executive Order establishes the policy that "jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.*

---

[3] On January 27, 2017, President Trump issued a second Executive Order relating to immigration issues entitled, "Protecting The Nation From Foreign Terrorist Entry Into The United States." The January 27, 2017 Executive Order barred individuals from certain countries from entering the United States. Since its issuance, five courts have issued orders granting temporary relief against the January 27, 2017 Executive Order. *See Darweesh v. Trump*, United States District Court, Eastern District of New York, Case No. 17 Civ. 480; *Tootkaboni v. Trump*, United States District Court, District of Massachusetts, Case No. 17-cv-10154; *Aziz v. Trump*, United States District Court, Eastern District of Virginia, Case No. 1:17-cv-116; *Doe v. Trump*, United States District Court, Western District of Washington, Case No. 17-cv-00126; *Vayeghan v. Trump*, United States District Court, Central District of California, Case No. CV 17-0702.

58.     Specifically, Section 9(a) of the Executive Order states: "It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." *Id.* at 8801.

59.     The Executive Order establishes a funding restriction:

> In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

*Id.* (the "Funding Restriction").

60.     The Funding Restriction imposes new funding conditions on existing federal funds that go beyond the statutory conditions imposed by Congress.

61.     Also, the Funding Restriction imposes funding conditions that are not germane to the purpose of the funds insofar as it reaches funds that are unrelated to law enforcement or immigration.

62.     The Funding Restriction also imposes conditions so severe that they cross the line distinguishing encouragement from coercion. The Funding Restriction threatens a significant percent of San Francisco's overall budget, including virtually the entire funding stream for critical programs to its residents, such as Medicaid.

63.     Finally, the Funding Restriction imposes new funding conditions that require jurisdictions to act unconstitutionally insofar as Defendants interpret Section 1373 to require San Francisco to detain individuals who would otherwise be released from custody. Such detentions would violate, *inter alia*, the Fourth Amendment.

64.     For all these reasons, the Funding Restriction violates the Tenth Amendment, the Spending Clause, and Article 1, sec. 1 of the United States Constitution.

65.     The Executive Order also mandates enforcement action:

> The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

*Id.* (the "Enforcement Directive").

66.     The Enforcement Directive commandeers state and local governments by, *inter alia*, compelling them to enforce federal law under threat of legal action, violating Tenth Amendment to the United States Constitution.

## V.     DEFENDANTS CHARACTERIZE SAN FRANCISCO AS A SANCTUARY CITY THAT WILL LOSE FEDERAL FUNDING

67.     In the Executive Order, Defendants equate Sanctuary Cities with jurisdictions that fail to comply with Section 1373.

68.     Defendants characterize San Francisco as a Sanctuary City.

69.     For example, in a written campaign speech then-candidate Donald J. Trump gave in Phoenix, Arizona on August 31, 2016, he expressly referred to San Francisco as a Sanctuary City. *See Donald J. Trump: Address on Immigration*, Donald J. Trump for President (Aug. 31, 2016), https://www.donaldjtrump.com/press-releases/donald-j.-trump-address-on-immigration ("Another victim is Kate Steinle, gunned down in the Sanctuary City of San Francisco by an illegal immigrant deported five previous times.").

70.     Not only have Defendants made clear that they consider San Francisco a Sanctuary City, but they have also repeatedly indicated that Sanctuary Cities, like San Francisco, violate federal law and should have their federal funding revoked.

> • In statements to the Daily Caller on July 7, 2015, Congressman Darrell Issa and Attorney General nominee Senator Jeff Sessions criticized San Francisco and other sanctuary jurisdictions for failing to honor detainers. Attorney General nominee Senator Jeff Sessions stated, "This disregarding of detainers and releasing persons that ICE has put a hold on — it goes against all traditions of law enforcement. Laws and courtesies within departments — if you have somebody charged with a crime in one city, you hold them until you complete your business with them . . . . So what was happening was, ICE authorities were filing detainers and sanctuary cities were saying, 'We're not gonna honor them. They finished paying for the crime they committed in our city — we've released them.'" Kerry Picket, *Sen. Sessions: City Officials Harboring Illegal Immigrant Felons Could Be Charged with Crime*, Daily

Caller (July 7, 2015, 10:07 PM), http://dailycaller.com/2015/07/07/sen-sessions-city-officials-harboring-illegal-immigrant-felons-could-be-charged-with-crime/#ixzz4XE9I12Ux.

- On July 8, 2015, Attorney General nominee Senator Jeff Sessions gave a speech to Congress describing San Francisco as "a jurisdiction that is known to release illegal immigrants back into the public," and one which refused to "honor" a detainer sought by federal authorities. News Release, Office of Senator Jeff Sessions, *Senator Sessions Calls on Congress To Take Up Immigration Reform for Americans* (July 9, 2015), http://www.sessions.senate.gov/public/index.cfm/news-releases?ID=B7A98B63-8ECA-4A4E-B5C8-4A665F2343DE.

- In an interview with Breitbart News in May 2016, then-candidate Donald J. Trump stated, "Sanctuary cities are a disaster . . . . They're a safe-haven for criminals and people that should not have a safe-haven in many cases. It's just unacceptable. We'll be looking at sanctuary cities very hard." Matthew Boyle, *Exclusive — Donald J. Trump to San Francisco: Sanctuary Cities 'Unacceptable,' A 'Disaster' Creating 'Safe-Haven for Criminals'*, Breitbart News (May 16, 2016), http://www.breitbart.com/2016-presidential-race/2016/05/16/exclusive-donald-j-trump-to-san-francisco-sanctuary-cities-unacceptable-a-disaster-creating-safe-haven-for-criminals/. This Breitbart news report further stated that, "Trump's comments . . . come in response to efforts by far left progressive organizations in San Francisco to expand that city's sanctuary city laws." *Id.*

- Another Breitbart News article published on November 21, 2016 regarding Sanctuary Cities quoted Texas Republican Congressman John Culberson as stating, "The law requires cooperation with immigration officials 100 percent of the time." Bob Price, *Sanctuary Cities Risk Losing DOJ Funds in 2017, Texas Congressman Says*, Breitbart News (Nov. 21, 2016), http://www.breitbart.com/texas/2016/11/21/sanctuary-cities-risk-losing-doj-funds-2017-texas-congressman-says/.

- In a statement by White House Press Secretary Sean Spicer on January 25, 2017 announcing the issuance of the Executive Order, Spicer stated, "We are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws." White House, *1/25/17: White House Press Briefing*, YouTube (Jan. 25, 2017), https://www.youtube.com/watch?v=OaPriMVvtZA.

71. In a speech at the GOP Congressional Republican Retreat in Philadelphia on January 26, 2017, President Trump reiterated his views on Sanctuary Cities: "And finally, at long last, cracking down on Sanctuary Cities. It's time to restore the civil rights of Americans to protect their jobs, their hopes, and their dreams for a much better future. Congress passed these laws to serve our citizens. It is about time those laws were properly enforced. They are not enforced." *See* Donald J. Trump, President Trump Remarks at Congressional Republican Retreat, C-Span (Jan 26, 2017), https://www.c-span.org/video/?422829-1/president-trump-tells-congressional-republicans-now-deliver.

72. A press release from the Office of the Press Secretary for the White House issued on January 28, 2017 detailing President Trump's First Week of Action, reads in relevant part: "President Trump signed an executive order to ensure that immigration laws are enforced throughout the United States, including halting federal funding for sanctuary cities." Press Release, The White House, Office of the Press Secretary, President Trump's First Week of Action (Jan. 28, 2017), https://www.whitehouse.gov/the-press-office/2017/01/28/president-trumps-first-week-action.

73. Defendants' statements establish their view that Sanctuary Cities, like San Francisco, violate Section 1373 and will lose federal funding—apparently all or almost all federal funding—under the Executive Order.

## VI.   SECTION 1373 AND THE EXECUTIVE ORDER HARM SAN FRANCISCO

### A.   Section 1373(a) Impermissibly Intrudes on State Sovereignty

74. Section 1373(a) unconstitutionally regulates "States in their sovereign capacity." *Reno, v. Condon*, 528 U.S. 141, 151 (2000). It necessarily regulates governments in their capacities as

governments. It does not "subject state governments to generally applicable laws." *New York v. U.S.*, 505 U.S. 144, 160 (1992). On the contrary, in every possible application, it targets "government entit[ies] or official[s]" for special treatment. 8 U.S.C. § 1373(a).

75.     Congress may not command States to provide the Federal government with information "that only state officials have access to," *Printz v. United States*, 521 U.S. 898, 932 n.17 (1997). The Federal government must not regulate its fellow governments in their capacities as governments.

76.     Also, Section 1373 targets government entities' and officials' authority to control their subordinates—an authority at the heart of a government's existence as a government. "[A] State can act only through its officers and agents." *Nevada v. Hicks*, 533 U.S. 353, 365 (2001). "Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

77.     By preventing state and local governments from directing employees how to handle information about citizenship and immigration status, Section 1373 makes it impossible for local jurisdictions freely to choose and clearly to establish how they will handle this information. Under Section 1373, San Francisco cannot legislate or regulate that government officials and employees will never share citizenship or immigration information. Yet Congress has no power "to require the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162 (emphasis added).

78.     Section 1373 mandates uncertainty where Sanctuary City laws seek to provide certainty. Because of Section 1373, San Francisco cannot tell the public that it will never share information about citizenship or immigration status. Any attempt to impose a uniform rule is fettered by the individual discretion of over 30,000 employees and officials. This is not the way San Francisco chooses to govern. It is chaos imposed by the Federal government.

79.     To the extent the Executive Order incorporates Section 1373(a), it is invalid for all of the reasons described above.

**B.     Federal Funds Received by San Francisco**

80.     San Francisco receives in excess of $1.2 billion annually in federal funds. This is approximately 13% of San Francisco's annual budget.

81.     Only a small percentage of all federal funds received by San Francisco relate to immigration or law enforcement.

82.     San Francisco receives federal funds for entitlement programs for its residents including Medicaid and Medicare, Temporary Assistance to Needy Families, Supplemental Nutrition Assistance Program, Foster Care, Child Welfare Programs, and Child Support Services.

83.     San Francisco also receives federal grants for infrastructure and transportation projects, public health programs, workforce development, supportive housing, and veterans' services, among other things.

84.     Congress has established numerous conditions governing eligibility for these funds. For instance, to receive Medicaid funds, a state must create a state plan that includes assurances to the Federal government that the state will provide specified types of care and that the state regulates health insurance providers to ensure access to medical assistance, among many other requirements. 42 U.S.C. § 1396(a).

85.     As with entitlement programs, most federal grants are awarded based on statutory eligibility criteria. For example, HUD Community Development Block Grants fund many projects to combat evictions, maintain stable housing occupancy and supply, and incentivize affordable unit construction. These grants require the grantee to prepare a statement of community development objectives and projected use of funds, provide a citizen participation plan, and certify other enumerated criteria. 42 U.S.C. § 5304.

86.     No federal funds received by San Francisco have statutory conditions specifically requiring compliance with Section 1373.

87.     San Francisco receives most federal funds as reimbursements. Thus, San Francisco is currently providing services and benefits that the Federal government has agreed to reimburse. The Executive Order calls into question whether the Federal government will in fact reimburse San Francisco for these funds. This presents San Francisco with a Hobson's choice. San Francisco, facing possible reductions, could cut services now, harming the public. Or San Francisco could continue to spend knowing that if cuts come they could come suddenly, outside of the budget process, and the San

Francisco will have to impose service cuts even more radically at that time, given that funds have already been spent in anticipation of federal reimbursement.

**C.    Budget Impact of the Executive Order**

88.    The Executive Order's threat to cut federal funds impairs San Francisco's internal government operations by hampering its budget process. The threatened loss of federal funds renders San Francisco unable to prepare a balanced budget for the next fiscal year.

89.    San Francisco has already begun the seven-month process of adopting the annual budget for the fiscal year beginning on July 1, 2017. On December 13, 2016, the Mayor and the Controller (San Francisco's chief financial officer) issued budget instructions to all San Francisco departments with detailed guidance on the preparation of departments' budget requests. Public hearings have begun to consider departmental budget proposals. Most San Francisco departments must submit their budget requests for the coming fiscal year to the Controller by February 21. The Controller must submit a consolidated budget proposal to the Mayor by March 1, the Mayor must submit budget proposal to the Board of Supervisors by June 1, and the Board must approve a balanced budget by August 1.

90.    The Executive Order's threat to cut federal funds is manifestly coercive. This is why at least one jurisdiction has already changed its policy about immigration detainers in response to the Executive Order. The day after the Executive Order was issued, Miami-Dade County Mayor Carlos Gimenez instructed the county's interim corrections director to "fully cooperate" with the Federal government and comply with all immigration detainer requests, eliminating a previous federal reimbursement requirement. "It's really not worth the risk of losing millions of dollars to the residents of Miami-Dade County in discretionary money from the feds," said Mayor Gimenez. Ray Sanchez, *Trump's Sanctuary Crackdown*, CNN Politics (Jan. 27, 2017, 6:34 PM ET), http://www.cnn.com/2017/01/27/politics/miami-dade-mayor-sanctuary-crackdown/. There is little doubt that is exactly what the President intends in his promise to end sanctuary cities.

**D.    Community Relations Impact of the Executive Order**

91.    The Executive Order fosters an atmosphere of fear and distrust between undocumented immigrants and local government officials in San Francisco.

92.     By heightening undocumented immigrants' concerns that any interaction with San Francisco officials will lead to their information being turned over to ICE, the Executive Order discourages undocumented immigrants from reporting crimes, seeking public health services, and otherwise engaging with San Francisco programs and services. This threat harms public safety, public health, and San Francisco's ability to act in what San Francisco has determined to be the best interest of its residents, consistent with federal and state law.

93.     The Executive Order undermines San Francisco's ability to provide critical services not just to undocumented immigrants, but to all residents. When witnesses and crime victims will not talk to the police, law enforcement suffers and the entire community is less safe. When children are not vaccinated or the sick are not treated for communicable diseases, illness spreads throughout the community. The United States Constitution guarantees states and local governments, such as San Francisco, that they may make those decisions and do not have to carry out the Federal government's immigration programs.

94.     San Francisco has been forced to expend its tax dollars educating San Francisco officials and reassuring residents in response to the Executive Order.

95.     As a result, the Executive Order causes the very harms San Francisco's Sanctuary City laws were designed to prevent. The Executive Order destroys rather than "foster[s] respect and trust between law enforcement and residents," wastes rather than "protect[s] limited local resources," and discourages rather than "encourage[s] cooperation between residents and City officials, including especially law enforcement and public health officers and employees." San Francisco Administrative Code Ch. 12I.1.

## CAUSES OF ACTION

### COUNT ONE

### DECLARATORY RELIEF – SAN FRANCISCO COMPLIES WITH 8 U.S.C. § 1373

96.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

97.     San Francisco contends that it complies with Section 1373. San Francisco Administrative Code Chapters 12H and 12I do not prohibit, or in any way restrict, any government

entity or official from sending to, or receiving from, the Immigration and Naturalization Service

information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

98.    Defendants contend that San Francisco does not comply with Section 1373.

99.    An actual controversy presently exists between San Francisco and Defendants about

whether San Francisco complies with Section 1373.

100.    A judicial determination resolving this controversy is necessary and appropriate at this

time.

**COUNT TWO**
**TENTH AMENDMENT – 8 U.S.C. § 1373(a) IS UNCONSTITUTIONAL**

101.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as

if fully set forth herein.

102.    On its face, Section 1373 commandeers state and local governments in violation of the

Tenth Amendment to the Constitution by, *inter alia*, regulating the "States in their sovereign

capacity," *Reno*, 528 U.S. at 151, limiting state authority to regulate internal affairs and determine the

duties and responsibilities of state employees, *Gregory*, 501 U.S. at 460, and ultimately forcing States

to allow their employees to use state time and state resources to assist in the enforcement of federal

statutes regulating private individuals, *Reno*, 528 U.S. at 151, and to provide information that belongs

to the State and is available to them only in their official capacity, *Printz*, 521 U.S. at 932-33 & n.17.

103.    As applied to invalidate state and local Sanctuary City laws, like San Francisco

Administrative Code Chapters 12H and 12I, which were enacted to further legitimate local interests

grounded in the basic police powers of local government and related to public health and safety,

Section 1373(a) commandeers state and local governments and violates the Tenth Amendment to the

United States Constitution.

**COUNT THREE**
**TENTH AMENDMENT – EXECUTIVE ORDER SECTION 9(A)'S ENFORCEMENT**
**DIRECTIVE IS UNCONSTITUTIONAL**

104.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as

if fully set forth herein.

105.    Executive Order Section 9(a) contains an Enforcement Directive stating: "The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." Executive Order, at 8801.

106.    The Federal government has taken the position that a state or local jurisdiction that fails to affirmatively assist federal immigration officials—by, for example, refusing to comply with a detainer request issued under Section 287.7 of Title 8 of the Code of Federal Regulations—hinders the enforcement of federal law and violates Section 1373.

107.    Accordingly, the Enforcement Directive commandeers state and local governments, violating Tenth Amendment to the United States Constitution by, *inter alia*, compelling them to enforce a federal program by imprisoning individuals subject to removal at the request of the Federal government when those individuals would otherwise be released from custody.

## PRAYER FOR RELIEF

Wherefore, San Francisco prays that the Court grant the following relief:

1.    Declare that 8 U.S.C. Section 1373(a) is unconstitutional and invalid on its face;

2.    Enjoin Defendants from enforcing Section 1373(a) or using it as a condition for receiving federal funds;

3.    Declare that Section 1373(a) is invalid as applied to state and local Sanctuary City laws, like San Francisco Administrative Code Chapters 12H and 12I, which were enacted for legitimate local purposes related to public health and safety;

4.    Enjoin Defendants from enforcing Section 1373(a) against jurisdictions that enact Sanctuary City laws for legitimate local purposes;

5.    Declare that San Francisco complies with Section 1373;

6.    Enjoin Defendants from designating San Francisco as a jurisdiction that fails to comply with Section 1373;

7.    Enjoin unconstitutional applications of the Enforcement Directive in Executive Order Section 9(a);

8.    Award San Francisco reasonable costs and attorney's fees; and

9.      Grant any other further relief that the Court deems fit and proper.

Dated:  January 31, 2017

DENNIS J. HERRERA
City Attorney
RONALD FLYNN
JESSE C. SMITH
YVONNE R. MERÉ
MOLLIE M. LEE
SARA J. EISENBERG
Deputy City Attorneys

By:  */s/ Dennis J. Herrera*
DENNIS J. HERRERA
City Attorney

By:  */s/ Mollie M. Lee*
MOLLIE M. LEE
Deputy City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

**FILER'S ATTESTATION**

I, Mollie M. Lee, am the ECF user whose identification and password are being used to file this COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

# EXHIBIT 1

Print

San Francisco Administrative Code

# CHAPTER 12H:
# IMMIGRATION STATUS

Sec. 12H.1.        City and County of Refuge.
Sec. 12H.2.        Use of City Funds Prohibited.
Sec. 12H.3.        Clerk of Board to Transmit Copies of this Chapter; Informing City Employees.
Sec. 12H.4.        Enforcement.
Sec. 12H.5.        City Undertaking Limited to Promotion of General Welfare.
Sec. 12H.6.        Severability.

## SEC. 12H.1.  CITY AND COUNTY OF REFUGE.

It is hereby affirmed that the City and County of San Francisco is a City and County of Refuge.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.2.  USE OF CITY FUNDS PROHIBITED.

No department, agency, commission, officer, or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding release status of individuals or any other such personal information as defined in Chapter 12I in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation, or court decision. The prohibition set forth in this Chapter 12H shall include, but shall not be limited to:

(a)   Assisting or cooperating, in one's official capacity, with any investigation, detention, or arrest procedures, public or clandestine, conducted by the Federal agency charged with enforcement of the Federal immigration law and relating to alleged violations of the civil provisions of the Federal immigration law, except as permitted under Administrative Code Section 12I.3.

(b)   Assisting or cooperating, in one's official capacity, with any investigation, surveillance, or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State, or Federal criminal laws.

(c)   Requesting information about, or disseminating information, in one's official capacity, regarding the release status of any individual or any other such personal information as defined in Chapter 12I, except as permitted under Administrative Code Section 12I.3, or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except as required by Federal or State statute or regulation, City and County public assistance criteria, or court decision.

(d)   Including on any application, questionnaire, or interview form used in relation to benefits, services, or opportunities provided by the City and County of San Francisco any question regarding immigration status other than those required by Federal or State statute, regulation, or court decision. Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

(Added by Ord. 375-89, App. 10/24/89; amended by Ord. 228-09, File No. 091032, App. 10-28-2009; Ord. 96-16, File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

## SEC. 12H.2-1.  [REPEALED.]

(Added by Ord. 282-92, App. 9/4/92; amended by Ord. 238-93, App. 8/4/93; Ord. 228-09, File No. 091032, App. 10-28-2009; repealed by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

## SEC. 12H.3.  CLERK OF BOARD TO TRANSMIT COPIES OF THIS CHAPTER; INFORMING CITY EMPLOYEES.

The Clerk of the Board of Supervisors shall send copies of this Chapter, including any future amendments thereto that may be made, to every department, agency and commission of the City and County of San Francisco, to California's United States Senators, and to the California Congressional delegation, the Commissioner of the Federal agency charged with enforcement of the Federal immigration law, the United States Attorney General, and the Secretary of State and the President of the United States. Each appointing officer of the City and County of San Francisco shall inform all employees under her or his jurisdiction of the prohibitions in this ordinance, the duty of all of her or his employees to comply with the prohibitions in this ordinance, and that employees who fail to comply with the prohibitions of the ordinance shall be subject to appropriate disciplinary action. Each City and County employee shall be given a written directive with instructions for implementing the provisions of this Chapter.

(Added by Ord. 375-89, App. 10/24/89; Ord. 228-09, File No. 091032, App. 10-28-2009)

## SEC. 12H.4.  ENFORCEMENT.

The Human Rights Commission shall review the compliance of the City and County departments, agencies, commissions and employees with the mandates of this ordinance in particular instances in which there is question of noncompliance or when a complaint alleging noncompliance has been lodged.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.5.  CITY UNDERTAKING LIMITED TO PROMOTION OF GENERAL WELFARE.

In undertaking the adoption and enforcement of this Chapter, the City is assuming an undertaking only to promote the general welfare. This Chapter is not intended to create any new rights for breach of which the City is liable in money damages to any person who claims that such breach proximately caused injury. This section shall not be construed to limit or proscribe any other existing rights or remedies possessed by such person.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.6.  SEVERABILITY.

If any part of this ordinance, or the application thereof, is held to be invalid, the remainder of this ordinance shall not be affected thereby, and this ordinance shall otherwise continue in full force and effect. To this end, the provisions of this ordinance, and each of them, are severable.

(Added by Ord. 375-89, App. 10/24/89)

# EXHIBIT 2

Print

San Francisco Administrative Code

# CHAPTER 12I:
# CIVIL IMMIGRATION DETAINERS

Sec. 12I.1.       Findings.
Sec. 12I.2.       Definitions.
Sec. 12I.3.       Restrictions on Law Enforcement Officials.
Sec. 12I.4.       Purpose of this Chapter.
Sec. 12I.5.       Semiannual Report.
Sec. 12I.6.       Severability.
Sec. 12I.7.       Undertaking for the General Welfare.

## SEC. 12I.1.  FINDINGS.

The City and County of San Francisco (the "City") is home to persons of diverse racial, ethnic, and national backgrounds, including a large immigrant population. The City respects, upholds, and values equal protection and equal treatment for all of our residents, regardless of immigration status. Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all.

The United States Immigration and Customs Enforcement ("ICE") is responsible for enforcing the civil immigration laws. ICE's programs, including Secure Communities and its replacement, the Priority Enforcement Program ("PEP"), seek to enlist local law enforcement's voluntary cooperation and assistance in its enforcement efforts. In its description of PEP, ICE explains that all requests under PEP are for voluntary action and that any request is not an authorization to detain persons at the expense of the federal government. The federal government should not shift the financial burden of federal civil immigration enforcement, including personnel time and costs relating to notification and detention, onto local law enforcement by requesting that local law enforcement agencies continue detaining persons based on non-mandatory civil immigration detainers or cooperating and assisting with requests to notify ICE that a person will be released from local custody. It is not a wise and effective use of valuable City resources at a time when vital services are being cut.

ICE's Secure Communities program (also known as "S-Comm") shifted the burden of federal civil immigration enforcement onto local law enforcement. S-Comm came into operation after the state sent fingerprints that state and local law enforcement agencies had transmitted to the California Department of Justice ("Cal DOJ") to positively identify the arrestees and to check their criminal history. The FBI would forward the fingerprints to the Department of Homeland Security ("DHS") to be checked against immigration and other databases. To give itself time to take a detainee into immigration custody, ICE would send an Immigration Detainer – Notice of Action (DHS Form I-247) to the local law enforcement official requesting that the local law enforcement official hold the individual for up to 48 hours after that individual would otherwise be released ("civil immigration detainers"). Civil Immigration detainers may be issued without evidentiary support or probable cause by border patrol agents, aircraft pilots, special agents, deportation officers, immigration inspectors, and immigration adjudication officers.

Case 3:17-cv-00485   Document 1   Filed 01/31/17   Page 30 of 41

Given that civil immigration detainers are issued by immigration officers without judicial oversight, and the regulation authorizing civil immigration detainers provides no minimum standard of proof for their issuance, there are serious questions as to their constitutionality. Unlike criminal warrants, which must be supported by probable cause and issued by a neutral magistrate, there are no such requirements for the issuance of a civil immigration detainer. Several federal courts have ruled that because civil immigration detainers and other ICE "Notice of Action" documents are issued without probable cause of criminal conduct, they do not meet the Fourth Amendment requirements for state or local law enforcement officials to arrest and hold an individual in custody. (*Miranda-Olivares v. Clackamas Co.*, No. 3:12-cv-02317-ST *17 (D.Or. April 11, 2014) (finding that detention pursuant to an immigration detainer is a seizure that must comport with the Fourth Amendment). *See also Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I 2014); *Villars v. Kubiatowski*, No. 12-cv-4586 *10-12 (N.D. Ill. filed May 5, 2014).)

On December 4, 2012, the Attorney General of California, Kamala Harris, clarified the responsibilities of local law enforcement agencies under S-Comm. The Attorney General clarified that S-Comm did not require state or local law enforcement officials to determine an individual's immigration status or to enforce federal immigration laws. The Attorney General also clarified that civil immigration detainers are voluntary requests to local law enforcement agencies that do not mandate compliance. California local law enforcement agencies may determine on their own whether to comply with non-mandatory civil immigration detainers. In a June 25, 2014, bulletin, the Attorney General warned that a federal court outside of California had held a county liable for damages where it voluntarily complied with an ICE request to detain an individual, and the individual was otherwise eligible for release and that local law enforcement agencies may also be held liable for such conduct. Over 350 jurisdictions, including Washington, D.C., Cook County, Illinois, and many of California's 58 counties, have already acknowledged the discretionary nature of civil immigration detainers and are declining to hold people in their jails for the additional 48 hours as requested by ICE. Local law enforcement agencies' responsibilities, duties, and powers are regulated by state law. However, complying with non-mandatory civil immigration detainers frequently raises due process concerns.

According to Section 287.7 of Title 8 of the Code of Federal Regulations, the City is not reimbursed by the federal government for the costs associated with civil immigration detainers alone. The full cost of responding to a civil immigration detainer can include, but is not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer. Compliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City.

The City seeks to protect public safety, which is founded on trust and cooperation of community residents and local law enforcement. However, civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies. A 2013 study by the University of Illinois, entitled "Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," found that at least 40% of Latinos surveyed are less likely to provide information to police because they fear exposing themselves, family, or friends to a risk of deportation. Indeed, civil immigration detainers have resulted in the transfer of victims of crime, including domestic violence victims, to ICE.

The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.

In 2014, DHS ended the Secure Communities program and replaced it with PEP. PEP and S-Comm share many similarities. Just as with S-Comm, PEP uses state and federal databases to check an individual's fingerprints against immigration and other databases. PEP employs a number of tactics to facilitate transfers of individuals from local jails to immigration custody.

First, PEP uses a new form (known as DHS Form I-247N), which requests notification from local jails about an individual's release date prior to his or her release from local custody. As with civil immigration detainers, these notification requests are issued by immigration officers without judicial oversight, thus raising questions

Case 3:17-cv-00485   Document 1   Filed 01/31/17   Page 31 of 41

about local law enforcement's liability for constitutional violations if any person is overdetained when immigration agents are unable to be present at the time of the person's release from local custody.

Second, under PEP, ICE will continue to issue civil immigration detainer requests where local law enforcement officials are willing to respond to the requests, and in instances of "special circumstances," a term that has yet to be defined by DHS. Despite federal courts finding civil immigration detainers do not meet Fourth Amendment requirements, local jurisdictions are often unable to confirm whether or not a detention request is supported by probable cause or has been reviewed by a neutral magistrate.

The increase in information-sharing between local law enforcement and immigration officials raises serious concerns about privacy rights. Across the country, including in the California Central Valley, there has been an increase of ICE agents stationed in jails, who often have unrestricted access to jail databases, booking logs, and other documents that contain personal information of all jail inmates.

The City has an interest in ensuring that confidential information collected in the course of carrying out its municipal functions, including but not limited to public health programs and criminal investigations, is not used for unintended purposes that could hamper collection of information vital to those functions. To carry out public health programs, the City must be able to reliably collect confidential information from all residents. To solve crimes and protect the public, local law enforcement depends on the cooperation of all City residents. Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody.

In late 2015, Pedro Figueroa, an immigrant father of an 8-year-old U.S. citizen, sought the San Francisco Police Department's help in locating his stolen vehicle. When Mr. Figueroa went to the police station to retrieve his car, which police had located, he was detained for some time by police officers before being released, and an ICE agent was waiting to take him into immigration custody immediately as he left the police station. It was later reported that both the Police Department and the San Francisco Sheriff's Department had contact with ICE officials while Mr. Figueroa was at the police station. He spent over two months in an immigration detention facility and remains in deportation proceedings. Mr. Figueroa's case has raised major concerns about local law enforcement's relationship with immigration authorities, and has weakened the immigrant community's confidence in policing practices. Community cooperation with local law enforcement is critical to investigating and prosecuting crimes. Without the cooperation of crime victims – like Mr. Figueroa – and witnesses, local law enforcement's ability to investigate and prosecute crime, particularly in communities with large immigrant populations, will be seriously compromised.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16, File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.1 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.2.  DEFINITIONS.

"Administrative warrant" means a document issued by the federal agency charged with the enforcement of the Federal immigration law that is used as a non-criminal, civil warrant for immigration purposes.

"Eligible for release from custody" means that the individual may be released from custody because one of the following conditions has occurred:

(a)   All criminal charges against the individual have been dropped or dismissed.

(b)   The individual has been acquitted of all criminal charges filed against him or her.

(c)   The individual has served all the time required for his or her sentence.

(d)   The individual has posted a bond, or has been released on his or her own recognizance.

(e)   The individual has been referred to pre-trial diversion services.

Case 3:17-cv-00485 · Document 1 · Filed 01/31/17 · Page 32 of 41

(f)   The individual is otherwise eligible for release under state or local law.

"Civil immigration detainer" means a non-mandatory request issued by an authorized federal immigration officer under Section 287.7 of Title 8 of the Code of Federal Regulations, to a local law enforcement official to maintain custody of an individual for a period not to exceed 48 hours and advise the authorized federal immigration officer prior to the release of that individual.

"Convicted" means the state of having been proved guilty in a judicial proceeding, unless the convictions have been expunged or vacated pursuant to applicable law. The date that an individual is Convicted starts from the date of release.

"Firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion as defined in Penal Code Section 16520.

"Law enforcement official" means any City Department or officer or employee of a City Department, authorized to enforce criminal statutes, regulations, or local ordinances; operate jails or maintain custody of individuals in jails; and operate juvenile detention facilities or maintain custody of individuals in juvenile detention facilities.

"Notification request" means a non-mandatory request issued by an authorized federal immigration officer to a local law enforcement official asking for notification to the authorized immigration officer of an individual's release from local custody prior to the release of an individual from local custody. Notification requests may also include informal requests for release information by the Federal agency charged with enforcement of the Federal immigration law.

"Personal information" means any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information.

"Serious Felony" means all serious felonies listed under Penal Code Section 1192.7(c) that also are defined as violent felonies under Penal Code Section 667.5(c); rape as defined in Penal Code Sections 261, and 262; exploding a destructive device with intent to injure as defined in Penal Code Section 18740; assault on a person with caustic chemicals or flammable substances as defined in Penal Code Section 244; shooting from a vehicle at a person outside the vehicle or with great bodily injury as defined in Penal Code Sections 26100(c) and (d).

"Violent Felony" means any crime listed in Penal Code Section 667.5(c); human trafficking as defined in Penal Code Section 236.1; felony assault with a deadly weapon as defined in Penal Code Section 245; any crime involving use of a firearm, assault weapon, machine gun, or .50 BMG rifle, while committing or attempting to commit a felony that is charged as a sentencing enhancement as listed in Penal Code Sections 12022.4 and 12022.5.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.2 added by Ord. 391-90, App. 12/6/90; amended by Ord. 278-96, App. 7/3/96; Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.3.  RESTRICTIONS ON LAW ENFORCEMENT OFFICIALS.

(a)   Except as provided in subsection (b), a law enforcement official shall not detain an individual on the basis of a civil immigration detainer after that individual becomes eligible for release from custody.

(b)   Law enforcement officials may continue to detain an individual in response to a civil immigration detainer for up to 48 hours after that individual becomes eligible for release if the continued detention is consistent with state and federal law, and the individual meets both of the following criteria:

(1)   The individual has been Convicted of a Violent Felony in the seven years immediately prior to the date of the civil immigration detainer; and

(2)   A magistrate has determined that there is probable cause to believe the individual is guilty of a Violent Felony and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to continue to detain an individual based solely on a civil immigration detainer as permitted in this subsection (b), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to: the individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

This subsection (b) shall expire by operation of law on October 1, 2016, or upon a resolution passed by the Board of Supervisors that finds for purposes of this Chapter, the federal government has enacted comprehensive immigration reform that diminishes the need for this subsection (b), whichever comes first.

(c)   Except as provided in subsection (d), a law enforcement official shall not respond to a federal immigration officer's notification request.

(d)   Law Enforcement officials may respond to a federal immigration officer's notification request if the individual meets both of the following criteria:

(1)   The individual either:

(A)   has been Convicted of a Violent Felony in the seven years immediately prior to the date of the notification request; or

(B)   has been Convicted of a Serious Felony in the five years immediately prior to the date of the notification request; or

(C)   has been Convicted of three felonies identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, arising out of three separate incidents in the five years immediately prior to the date of the notification request; and

(2)   A magistrate has determined that there is probable cause to believe the individual is guilty of a felony identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to respond to a notification request as permitted by this subsection (d), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to, the  individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

(e)   Law enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws.

(f)   Law enforcement officials shall make good faith efforts to seek federal reimbursement for all costs incurred in continuing to detain an individual, after that individual becomes eligible for release, in response each civil immigration detainer.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.3 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.4.  PURPOSE OF THIS CHAPTER.

The intent of this Chapter 12I is to address requests for non-mandatory civil immigration detainers, voluntary notification of release of individuals, transmission of personal information, and civil immigration documents based solely on alleged violations of the civil provisions of immigration laws. Nothing in this Chapter shall be construed to apply to matters other than those relating to federal civil immigration detainers, notification of release of individuals, transmission of personal information, or civil immigration documents, based solely on alleged violations of the civil provisions of immigration laws. In all other respects, local law enforcement agencies may continue to collaborate with federal authorities to protect public safety. This collaboration includes, but is not limited to, participation in joint criminal investigations that are permitted under local policy or applicable city or state law.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.4 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.5.  SEMIANNUAL REPORT.

By no later than July 1, 2014, the Sheriff and Juvenile Probation Officer shall each provide to the Board of Supervisors and the Mayor a written report stating the number of detentions that were solely based on civil immigration detainers during the first six months following the effective date of this Chapter, and detailing the rationale behind each of those civil immigration detainers. Thereafter, the Sheriff and Juvenile Probation Officer shall each submit a written report to the Board of Supervisors and the Mayor, by January 1st and July 1st of each year, addressing the following issues for the time period covered by the report:

(a)   a description of all communications received from the Federal agency charged with enforcement of the Federal immigration law, including but not limited to the number of civil immigration detainers, notification requests, or other types of communications.

(b)   a description of any communications the Department made to the Federal agency charged with enforcement of the Federal immigration law, including but not limited to any Department's responses to inquires as described in subsection 12I.5 and the Department's determination of the applicability of subsections 12I.3(b), 12I.3(d) and 12I.3(e).

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.5 added by Ord. 391-90, App. 12/6/90; amended by Ord. 304-92, App. 9/29/92; Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.6.  SEVERABILITY.

If any section, subsection, sentence, clause, phrase, or word of this Chapter 12I or it[1] application, is for any reason held to be invalid or unconstitutional by a decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Chapter 12I. The Board of Supervisors hereby declares that it would have passed this Chapter 12I and each and every section, subsection, sentence, clause, phrase, and word not declared invalid or unconstitutional without regard to whether any other portion of this Chapter 12I would be subsequently declared invalid or unconstitutional.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013)

(Former Sec. 12I.6 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

CODIFICATION NOTE

1.  So in Ord. 204-13.

## SEC. 12I.7.  UNDERTAKING FOR THE GENERAL WELFARE.

Case 3:17-cv-00485  Document 1  Filed 01/31/17  Page 35 of 41

In enacting and implementing this Chapter 12I the City is assuming an undertaking only to promote the general welfare. It is not assuming, nor is it imposing on its officers and employees, an obligation for breach of which it is liable in money damages to any person who claims that such breach proximately caused injury.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013)

(Former Sec. 12I.7 added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.8.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.10.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.11.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

# EXHIBIT 3



# Presidential Documents

Executive Order 13768 of January 25, 2017

## Enhancing Public Safety in the Interior of the United States

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*), and in order to ensure the public safety of the American people in communities across the United States as well as to ensure that our Nation's immigration laws are faithfully executed, I hereby declare the policy of the executive branch to be, and order, as follows:

**Section 1**. *Purpose.* Interior enforcement of our Nation's immigration laws is critically important to the national security and public safety of the United States. Many aliens who illegally enter the United States and those who overstay or otherwise violate the terms of their visas present a significant threat to national security and public safety. This is particularly so for aliens who engage in criminal conduct in the United States.

Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic.

Tens of thousands of removable aliens have been released into communities across the country, solely because their home countries refuse to accept their repatriation. Many of these aliens are criminals who have served time in our Federal, State, and local jails. The presence of such individuals in the United States, and the practices of foreign nations that refuse the repatriation of their nationals, are contrary to the national interest.

Although Federal immigration law provides a framework for Federal-State partnerships in enforcing our immigration laws to ensure the removal of aliens who have no right to be in the United States, the Federal Government has failed to discharge this basic sovereign responsibility. We cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement. The purpose of this order is to direct executive departments and agencies (agencies) to employ all lawful means to enforce the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the executive branch to:

(a) Ensure the faithful execution of the immigration laws of the United States, including the INA, against all removable aliens, consistent with Article II, Section 3 of the United States Constitution and section 3331 of title 5, United States Code;

(b) Make use of all available systems and resources to ensure the efficient and faithful execution of the immigration laws of the United States;

(c) Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law;

(d) Ensure that aliens ordered removed from the United States are promptly removed; and

(e) Support victims, and the families of victims, of crimes committed by removable aliens.

**Sec. 3**. *Definitions.* The terms of this order, where applicable, shall have the meaning provided by section 1101 of title 8, United States Code.

**Sec. 4**. *Enforcement of the Immigration Laws in the Interior of the United States.* In furtherance of the policy described in section 2 of this order, I hereby direct agencies to employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all removable aliens.

**Sec. 5**. *Enforcement Priorities.* In executing faithfully the immigration laws of the United States, the Secretary of Homeland Security (Secretary) shall prioritize for removal those aliens described by the Congress in sections 212(a)(2), (a)(3), and (a)(6)(C), 235, and 237(a)(2) and (4) of the INA (8 U.S.C. 1182(a)(2), (a)(3), and (a)(6)(C), 1225, and 1227(a)(2) and (4)), as well as removable aliens who:

(a) Have been convicted of any criminal offense;

(b) Have been charged with any criminal offense, where such charge has not been resolved;

(c) Have committed acts that constitute a chargeable criminal offense;

(d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;

(e) Have abused any program related to receipt of public benefits;

(f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or

(g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

**Sec. 6**. *Civil Fines and Penalties.* As soon as practicable, and by no later than one year after the date of this order, the Secretary shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties that the Secretary is authorized under the law to assess and collect from aliens unlawfully present in the United States and from those who facilitate their presence in the United States.

**Sec. 7**. *Additional Enforcement and Removal Officers.* The Secretary, through the Director of U.S. Immigration and Customs Enforcement, shall, to the extent permitted by law and subject to the availability of appropriations, take all appropriate action to hire 10,000 additional immigration officers, who shall complete relevant training and be authorized to perform the law enforcement functions described in section 287 of the INA (8 U.S.C. 1357).

**Sec. 8**. *Federal-State Agreements.* It is the policy of the executive branch to empower State and local law enforcement agencies across the country to perform the functions of an immigration officer in the interior of the United States to the maximum extent permitted by law.

(a) In furtherance of this policy, the Secretary shall immediately take appropriate action to engage with the Governors of the States, as well as local officials, for the purpose of preparing to enter into agreements under section 287(g) of the INA (8 U.S.C. 1357(g)).

(b) To the extent permitted by law and with the consent of State or local officials, as appropriate, the Secretary shall take appropriate action, through agreements under section 287(g) of the INA, or otherwise, to authorize State and local law enforcement officials, as the Secretary determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties.

(c) To the extent permitted by law, the Secretary may structure each agreement under section 287(g) of the INA in a manner that provides the most effective model for enforcing Federal immigration laws for that jurisdiction.

**Sec. 9**. *Sanctuary Jurisdictions.* It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.

(a) In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

(b) To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

(c) The Director of the Office of Management and Budget is directed to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction.

**Sec. 10**. *Review of Previous Immigration Actions and Policies.* (a) The Secretary shall immediately take all appropriate action to terminate the Priority Enforcement Program (PEP) described in the memorandum issued by the Secretary on November 20, 2014, and to reinstitute the immigration program known as ''Secure Communities'' referenced in that memorandum.

(b) The Secretary shall review agency regulations, policies, and procedures for consistency with this order and, if required, publish for notice and comment proposed regulations rescinding or revising any regulations inconsistent with this order and shall consider whether to withdraw or modify any inconsistent policies and procedures, as appropriate and consistent with the law.

(c) To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Secretary shall consolidate and revise any applicable forms to more effectively communicate with recipient law enforcement agencies.

**Sec. 11**. *Department of Justice Prosecutions of Immigration Violators.* The Attorney General and the Secretary shall work together to develop and implement a program that ensures that adequate resources are devoted to the prosecution of criminal immigration offenses in the United States, and to develop cooperative strategies to reduce violent crime and the reach of transnational criminal organizations into the United States.

**Sec. 12**. *Recalcitrant Countries.* The Secretary of Homeland Security and the Secretary of State shall cooperate to effectively implement the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), as appropriate. The Secretary of State shall, to the maximum extent permitted by law, ensure that diplomatic efforts and negotiations with foreign states include as a condition precedent the acceptance by those foreign states of their nationals who are subject to removal from the United States.

**Sec. 13**. *Office for Victims of Crimes Committed by Removable Aliens.* The Secretary shall direct the Director of U.S. Immigration and Customs Enforcement to take all appropriate and lawful action to establish within U.S. Immigration and Customs Enforcement an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens and the family members of such victims. This office shall provide quarterly reports studying the effects of the victimization by criminal aliens present in the United States.

**Sec. 14**. *Privacy Act.* Agencies shall, to the extent consistent with applicable law, ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information.

**Sec. 15**. *Reporting.* Except as otherwise provided in this order, the Secretary and the Attorney General shall each submit to the President a report on the progress of the directives contained in this order within 90 days of the date of this order and again within 180 days of the date of this order.

**Sec. 16**. *Transparency.* To promote the transparency and situational awareness of criminal aliens in the United States, the Secretary and the Attorney General are hereby directed to collect relevant data and provide quarterly reports on the following:

(a) the immigration status of all aliens incarcerated under the supervision of the Federal Bureau of Prisons;

(b) the immigration status of all aliens incarcerated as Federal pretrial detainees under the supervision of the United States Marshals Service; and

(c) the immigration status of all convicted aliens incarcerated in State prisons and local detention centers throughout the United States.

**Sec. 17**. *Personnel Actions.* The Office of Personnel Management shall take appropriate and lawful action to facilitate hiring personnel to implement this order.

**Sec. 18**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**Federal Register** / Vol. 82, No. 18 / Monday, January 30, 2017 / Presidential Documents    **8803**

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 25, 2017.*

[FR Doc. 2017–02102
Filed 1–27–17; 11:15 am]
Billing code 3295–F7–P