DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
CHRISTINE VAN AKEN, State Bar #241755
TARA M. STEELEY, State Bar #231775
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
MATTHEW S. LEE, State Bar #295247
NEHA GUPTA, State Bar #308864
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4748
Facsimile:      (415) 554-4715
E-Mail:         brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>Plaintiff,<br><br>vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, JOHN F. KELLY, Secretary of United States Department of Homeland Security, JEFFERSON B. SESSIONS, Attorney General of the United States, DOES 1-100,<br><br>Defendants. | Case No. 3:17-cv-00485-WHO<br><br>**CITY AND COUNTY OF SAN FRANCISCO'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        April 12, 2017<br>Time:       2:00 p.m.<br>Judge:     Honorable William H. Orrick<br>Dept:       Courtroom 2<br><br>Date Filed:   January 31, 2017<br><br>Trial Date:   Not set |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION .......................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

INTRODUCTION ....................................................................................... 1

FACTS ................................................................................................... 2

     A.    San Francisco's Sanctuary City Laws And Policies. .................................. 2

     B.    The Executive Order. .................................................................. 4

     C.    The Executive Order Creates An Imminent Hobson's Choice For
          San Francisco. ........................................................................ 6

PRELIMINARY INJUNCTION STANDARD ........................................................... 8

ARGUMENT .......................................................................................... 8

    I.    San Francisco Is Likely To Succeed On The Merits Of Its Claims. .................... 8

         A.    San Francisco Is Likely To Succeed On Its Arguments That
             Section 9(a) Of The Executive Order Is Unconstitutional. ........................ 8

             1.    The Funding Restriction Violates The Separation Of Powers. ......... 9

             2.    The Funding Restriction Violates The Spending Clause. .............. 10

                  a.    It Imposes New Conditions On Existing
                       Federal Funding. ................................................ 10

                  b.    It Imposes Conditions Unrelated To The Purpose
                       Of The Funding. ................................................. 11

                  c.    It Is Unconstitutionally Coercive. ............................... 12

                  d.    It Induces San Francisco To Engage In
                       Unconstitutional Activity. ....................................... 13

             3.    The Executive Order Violates The Tenth Amendment. ................ 14

         B.    San Francisco Is Likely To Succeed On Its Arguments Concerning
              The Unconstitutionality Of—And San Francisco's Compliance With—
             Section 1373. ....................................................................... 16

             1.    Section 1373 Is Facially Unconstitutional. ........................... 16

              2.    Section 1373 Is Unconstitutional As Applied
                 To San Francisco. ................................................. 18

              3.    San Francisco Complies With Section 1373
                 As Properly Interpreted. ......................................... 19

    II.    San Francisco Will Suffer Irreparable Harm In The Absence Of
         Preliminary Relief. ..................................................................... 21

         A.    San Francisco Faces Imminent And Irreparable Budgetary Harm. .......... 21

|   | B. | San Francisco Faces An Imminent Deprivation Of Constitutional Rights. | .................22 |
|   | C. | San Francisco Residents And Employees Face Community Injury. | .........24 |
| III. | | The Balance Of Equities And Public Interest Favor A Preliminary Injunction. | ...25 |
| CONCLUSION | | | .................25 |

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ................................................................8

*Ariz. v. United States*
    132 S. Ct. 2492 (2012) ..............................................................13, 25

*Bassidji v. Goe*
    413 F.3d 928 (9th Cir. 2005) ................................................................6

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*
    179 F.3d 725 (9th Cir. 1999) ..............................................................25

*Califano v. Yamaski*
    442 U.S. 682 (1979) ................................................................8

*Campbell v. Allied Van Lines Inc.*
    410 F.3d 618 (9th Cir. 2005) ..............................................................16

*City of New York v. United States*
    179 F.3d 29 (2d Cir. 1999) ..........................................................18, 19

*Clinton v. City of New York*
    524 U.S. 417 (1998) ................................................................9

*Coalition for Econ. Equity v. Wilson*
    122 F.3d 718 (9th Cir. 1997) ..............................................................24

*Conant v. Walters*
    309 F.3d 629 (9th Cir. 2002) ..............................................................17

*Davila v. N. Reg'l Joint Police Bd.*
    979 F. Supp. 2d 612 (W.D. Pa. 2013) ..............................................................14

*Decker v. O'Donnell*
    661 F.2d 598 (7th Cir. 1980) ................................................................8

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ..............................................................25

*Galarza v. Szalczyk*
    745 F.3d 634 (3d Cir. 2014) ..........................................................14, 15

*Garcia v. San Antonio Metro. Transit Auth.*
    469 U.S. 528 (1985) ................................................................16

*Gregory v. Ashcroft*
   501 U.S. 452 (1991)..............................................................................................17

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*
   4 F.3d 819 (9th Cir. 1993) ..................................................................................25

*Mass. v. United States*
   435 U.S. 444 (1978)..............................................................................................11

*Melendres v. Arpaio*
   695 F.3d 990, 1000 (9th Cir. 2012) ........................................................13, 22, 25

*Mendia v. Garcia*
   768 F.3d 1009 (9th Cir. 2014) .............................................................................14

*Miranda-Olivares v. Clackamas Cnty.*
   2014 WL 1414305 (D. Or. Apr. 11, 2014) ..............................................14, 15, 16

*Morales v. Chadbourne*
   No. CV 12-301-M-LDA, 2017 WL 354292 (D.R.I. Jan. 24, 2017) ..........................13

*Morales v. Chadbourne*
   793 F.3d 208 (1st Cir. 2015) ...............................................................................14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
   132 S. Ct. 2566 (2012)...................................................................................12, 13

*Nelson v. Nat'l Aeronautics & Space Admin.*
   530 F.3d 865 (9th Cir. 2008) ..............................................................................23

*Nevada v. Hicks*
   533 U.S. 353 (2001)..............................................................................................17

*New York v. United States*
   505 U.S. 144 (1992).................................................................................11, 14, 16, 17

*Pennhurst State Sch. & Hosp. v. Halderman*
   451 U.S. 1 (1981)............................................................................................10, 11

*Printz v. United States*
   521 U.S. 898 (1997).................................................................................14, 15, 17

*Reno v. Condon*
   528 U.S. 141 (2000)..............................................................................................17

*Scott v. Roberts*
   612 F.3d 1279 (11th Cir. 2010) ...........................................................................25

*Sea-Land Serv., Inc. v. I.C.C.*
   738 F.2d 1311 (D.C. Cir. 1984) ..............................................................................6

*South Dakota v. Dole*
    483 U.S. 203 (1987)..................................................................................................10, 11, 13

*Steinle v. City & Cty. of San Francisco*
    16-CV-02859-JCS, 2017 WL 67064 (N.D. Cal. Jan. 6, 2017)...........................................10, 21

*Texas v. United States*
    No. 7:16-cv-00054-O, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016)....................................24

*Texas v. United States*
    809 F.3d 134 (5th Cir. 2015) ...............................................................................................8

*United States v. North Carolina*
    192 F. Supp. 3d 620 (M.D.N.C. 2016) ...............................................................................22

*Utley v. Varian Assocs., Inc.*
    811 F.2d 1279 (9th Cir. 1987) ...............................................................................................6

*Valle del Sol Inc. v. Whiting*
    732 F.3d 1006 (9th Cir. 2013) .............................................................................................24

*Winter v. Nat'l Res. Def. Council, Inc.*
    555 U.S. 7 (2008)...................................................................................................................8

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952)..............................................................................................................10

*Zivotofsky ex rel. Zivotofsky v. Kerry*
    135 S. Ct. 2076 (2015)..........................................................................................................10

**Federal Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1...................................................................................................9

U.S. Const. amend. IV ..............................................................................................3, 14, 24

U.S. Const. amend. X...............................................................8, 14, 15, 16, 17, 18, 23, 24

**Federal Statutes**

8 U.S.C.
    Section 1373 ........................................................................................................ *passim*

**Federal Rules**

Federal Rule of Civil Procedure 65 ........................................................................................1

**Federal Regulations**

8 C.F.R.
    § 287.7 ...................................................................................................................3

§ 287.7 (a)-(b) ............................................................................................................13
§ 287.7 (e) ...................................................................................................................4

**State Cases**

*Bologna v. City & Cty. of San Francisco*
    192 Cal. App. 4th 429 (2011) ..................................................................10

*Dep't of Pub. Health v. Super. Ct,*
    60 Cal. 4th 940 (2015) .............................................................................20

*LaCroix v. Junior*
    Case No. F17-376 (Fla. Cir. Ct. Mar. 3, 2017) ...............................3, 15

**State Statutes**

California Civil Code
    § 56.05(j) ...................................................................................................20
    § 1798.92(c) ..............................................................................................20

California Welf. & Inst. Code
    § 831 ..........................................................................................................19

**San Francisco Codes**

San Francisco Administrative Code
    § 2A.83 ......................................................................................................19
    Chapter 12H ...........................................................................3, 19, 20, 23
    Chapter 12I .............................................................................3, 4, 19, 20

**San Francisco Ordinances**

San Francisco, Cal. Ordinance
    No. 96-16 (June 7, 2016) ..........................................................................18

**Other Authorities**

Eyder Peralta, *You Say You're An American, But What If You Had To
    Prove It Or Be Deported?*, NPR (Dec. 22, 2016, 12:29 PM) .................14

Senate Report No. 104-249 (1996). .............................................................17

Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. ......................9

Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. .............................9, 10

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on Wednesday, April 12, 2017, at 2:00 p.m. or as soon thereafter as they may be heard before the Honorable William H. Orrick in Courtroom 2 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff City and County of San Francisco ("San Francisco") will and hereby does move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants Donald J. Trump, President of the United States of America; John F. Kelly, in his official capacity as Secretary of the United States Department of Homeland Security; Jefferson B. Sessions, in his official capacity as Attorney General of the United States; and the United States of America (collectively, "Defendants"); and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them.

San Francisco respectfully moves the Court to enter a nationwide preliminary injunction prohibiting Defendants from enforcing Section 9(a) of Executive Order 13768, entitled "Enhancing Public Safety in the Interior of the United States" ("Executive Order"), and 8 U.S.C. Section 1373 ("Section 1373") against any jurisdiction in the United States.  In the alternative, because San Francisco's laws comply with Section 1373, San Francisco seeks an order enjoining Defendants from taking any action under the Executive Order to declare San Francisco a "sanctuary jurisdiction" that is ineligible for federal funds.  This motion is based on this Notice of Motion and Motion, the accompanying supporting Memorandum of Points and Authorities, the accompanying supporting declarations, as well as the papers, evidence and records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

During his campaign, President Trump pledged to end federal funding to sanctuary cities. Once in office, he moved quickly to do so, signing an executive order that directed the Attorney General and Secretary of Homeland Security to compile a list of "sanctuary jurisdictions" and ensure that they do not receive federal funds.  With this stroke of his pen, President Trump purported to seize the spending power that the United States Constitution entrusts to Congress.  Indeed, he sought to give

himself the authority to wield that pen in ways that exceed even the legislative branch's lawful spending power.  And he assumed for the federal government the right to commandeer state and local governments to do the federal government's job and dictate how they must conduct their internal affairs on matters squarely within the traditional police powers of local government.  In so doing, President Trump not only violated the Constitution, but also undermined the principles that form the bedrock of our democracy: separation of powers, a federal government limited by enumerated powers, and independent state sovereignty.

The consequences of this presidential fiat are potentially catastrophic.  Although the Executive Order is unclear about which funds are at stake, it appears to direct the withdrawal of all federal funding from "sanctuary jurisdictions."  Withdrawing all—or even a substantial amount—of federal funding would be devastating to San Francisco: the City would be forced to reduce the number of first responders, suspend capital projects, and slash critical service programs.  And if the cuts were to come mid-fiscal year, the impact would be even more severe as there would be less time to absorb the loss.

San Francisco cannot stand idly by waiting for the Executive Order's uncertain process to unfold.  Accordingly, unless the Court grants the requested relief—or Defendants make clear that the Executive Order applies considerably more narrowly than it appears—San Francisco will have to place money into a budget reserve to account for the potential loss of significant funds.  Money placed in a reserve is money that will not be available for other services and programs when the new fiscal year begins on July 1, 2017.  San Francisco recognizes that Defendants may clarify the scope of the Executive Order in the weeks and months to come, but there is no assurance they will, and San Francisco must make decisions about a budget reserve by May 15, 2017.  San Francisco therefore has no choice but to seek this Court's intervention now.[1]

## FACTS

### A.    San Francisco's Sanctuary City Laws And Policies.

San Francisco's body of Sanctuary City law is contained in two chapters of its Administrative

---

[1] If Defendants clarify that the Executive Order is narrower than it appears—e.g., that it applies only to a specific subset of federal funds, such as future grants directly related to immigration enforcement—San Francisco will reconsider the need for immediate preliminary relief.

Code: Chapters 12H and 12I.[2]  As set forth in the legislative findings in Chapter 12I, the Board of Supervisors enacted these laws to serve a critical local purpose: "to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all."  S.F. Admin. Code § 12I.1.

Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in enforcing federal immigration law or gathering or disseminating information regarding an individual's release status, or other confidential identifying information, unless such assistance is required by federal or state law.  *Id.* § 12H.2.[3]

As relevant here, Chapter 12I prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody solely on the basis of a civil immigration detainer request issued by U.S. Immigration and Customs Enforcement ("ICE").  *Id.* § 12I.3.  Importantly, an ICE detainer request is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary City law.  Detainer requests are not issued by a judge based on a finding of probable cause.  They are simply requests by ICE that a state or local law enforcement agency voluntarily hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them.  *See* 8 C.F.R. § 287.7.[4]  Complying with such requests would potentially expose San Francisco to civil liability for Fourth Amendment violations.  *See* Section I(A)(2)(d), *infra*.  Even if an obligation to comply with detainer requests were constitutional, doing so would require San Francisco to commit scarce law enforcement personnel and resources to detain individuals in holding cells, to supervise and feed individuals during

---

[2] The full text of Chapters 12H and 12I are attached as Exhibits A and B, respectively, to the accompanying Declaration of Sara J. Eisenberg ("Eisenberg Decl.").

[3] Chapter 12H previously prohibited the dissemination of information regarding the immigration status of any individual, but the Board of Supervisors amended the law in July 2016 to delete that prohibition.  Nothing in the current version of Chapter 12H or 12I limits communications regarding citizenship or immigration status in any way.

[4] As one judge recently explained: "Such detainers or requests are not evidence that a crime has been committed, or that someone is in this country illegally.  They are not evidence of anything.  They simply indicate that ICE believes it has a basis to inquire further as to the status of the person sought."  *LaCroix v. Junior*, Case No. F17-376, slip op. at 2 (Fla. Cir. Ct. Mar. 3, 2017).  For the Court's convenience, a copy of this opinion is attached to the Eisenberg Declaration as Exhibit G.

the prolonged detention, and to invest in additional administration and training.  Declaration of

Vicki Hennessy in Support of CCSF's Mot. for Prelim. Inj. ("Hennessy Decl.") ¶ 11.[5]

Chapter 12I also prohibits San Francisco law enforcement officials from responding to a

federal immigration officer's request for advance notification of the date and time an individual in San

Francisco's custody is being released, unless the individual meets certain criteria.  S.F. Admin Code

§ 12I.3(c), (d).  Finally, Chapter 12I provides that "[l]aw enforcement officials shall not arrest or

detain an individual, or provide any individual's personal information to a federal immigration officer,

on the basis of an administrative warrant, prior deportation order, or other civil immigration document

based solely on alleged violations of the civil provisions of immigration laws."  *Id.* § 12I.3(e).

## B.     The Executive Order.

On January 25, 2017, President Trump issued Executive Order 13768, entitled "Enhancing

Public Safety in the Interior of the United States."  *See* Eisenberg Decl. Exh. C.  The Executive Order

condemns jurisdictions with sanctuary policies as "willfully" violating federal law and asserts that

"[t]hese jurisdictions have caused immeasurable harm to the American people and to the very fabric of

our republic."  Executive Order § 1.  The Executive Order directs the Attorney General and the

Secretary of the Department of Homeland Security to strip "sanctuary jurisdictions" of federal funds.

*See id.* §§ 1, 2, 9(a).  The "Funding Restriction" of Section 9(a) states:

> [T]he Attorney General and the Secretary, in their discretion and to the extent
> consistent with law, shall ensure that jurisdictions that willfully refuse to
> comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive
> Federal grants, except as deemed necessary for law enforcement purposes by
> the Attorney General or the Secretary. The Secretary has the authority to
> designate, in his discretion and to the extent consistent with law, a jurisdiction
> as a sanctuary jurisdiction. (*Id.* § 9(a).)

This language raises two threshold questions: What jurisdictions will be considered "sanctuary

jurisdictions" within the meaning of the Executive Order?  And what funds will be stripped from

jurisdictions that are so designated?

As to the former question, Section 9(a) of the Executive Order defines a "sanctuary

jurisdiction" as any jurisdiction that "willfully refuse[s] to comply with 8 U.S.C. 1373."  *Id.*  Section

---

[5] The local agency bears the financial burden of the detention: "No detainer issued as a result
of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the
Department."  8 C.F.R. § 287.7(e).

1373 in turn provides that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual."  Although Section 1373 does not mention compliance with ICE civil detainer requests, the Executive Order improperly links the two.  *See* Executive Order § 9(b) (equating "sanctuary jurisdictions" with jurisdictions "that ignored or otherwise failed to honor any detainers with respect to such aliens").[6]  It is therefore apparent that the Trump administration intends to designate all jurisdictions that fail to comply with detainer requests—including San Francisco—as "sanctuary jurisdictions" to be stripped of federal funds.  If there were any question about whether Defendants deem San Francisco a "sanctuary jurisdiction," that question is answered by Defendants' own statements, which characterize San Francisco as a Sanctuary City.  *See, e.g.*, Eisenberg Decl. Exh. D [Donald J. Trump: Address on Immigration, Donald J. Trump for President (Aug. 31, 2016) ("Another victim is Kate Steinle, gunned down in the Sanctuary City of San Francisco . . . .")].

As to what funds will be stripped from "sanctuary jurisdictions," the Executive Order is similarly vague, and seemingly sweeping.  Conceivably, it could refer only to grants, and not to entitlement programs like Medicaid that rightfully belong to their recipients and not local governments.  It could be limited only to funds administered by the Attorney General or the Department of Homeland Security.  Or it could apply only prospectively and not as a bar to reimbursing jurisdictions for services already provided in reliance on previously committed funds.

But the plain language of the Executive Order, as well as the President's own statements,

---

[6] This misguided interpretation of Section 1373 is also reflected in a memorandum prepared by the Department of Justice, Office of the Inspector General ("OIG") in May 2016, regarding potential violations of Section 1373 by recipients of funding from the Edward Byrne Memorial Justice Assistance Grant Program ("OIG Memo").  *See* Request for Judicial Notice in Support of Mot. for Prelim. Inj. ("RJN") Exh. A.  In that memo, OIG expressed concern that local laws concerning detainer requests "may have a broader practical impact on the level of cooperation afforded to ICE by these jurisdictions and may, therefore, be inconsistent with at least the intent of Section 1373."  *Id.* at 7.  It went on to state that local laws and policies that "purport to be focused on civil immigration detainer requests [and say nothing about sharing immigration status with ICE] . . . may nevertheless be affecting ICE's interactions with the local officials regarding ICE immigration status requests."  *Id.* OIG also stated that such immigration detainer request policies "may be causing local officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE in all respects . . . . [which], of course, would be inconsistent with and prohibited by Section 1373."  *Id.* at 8.

strongly indicate that Defendants intend to interpret and implement it to withdraw *all* current and future federal funds from "sanctuary jurisdictions."  The Executive Order directs the Office of Management and Budget to "obtain and provide relevant and responsive information on *all* Federal grant money that *currently* is received by any sanctuary jurisdiction."  Executive Order § 9(c) (emphasis added).  And it describes the executive's policy as "[e]nsur[ing] that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." Executive Order § 2(c); *see generally Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005) (explaining that the text of an executive order "must be construed consistently with the Order's 'object and policy'").  And to the extent the Executive Order's plain language may be ambiguous, statements by President Trump and his spokesperson indicate an intent to use defunding as a "weapon" to deprive jurisdictions of "the money they need to properly operate as a city or state" (Eisenberg Decl. Exh. E) to "end[] sanctuary cities."  *Id.* Exh. F.[7]

Finally, as relevant here, the Executive Order includes a far-reaching "Enforcement Directive," ordering the Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law."  Executive Order § 9(a).

**C.     The Executive Order Creates An Imminent Hobson's Choice For San Francisco.**

San Francisco acknowledges that it is not yet certain when—or precisely which—federal funds will be withdrawn under the Executive Order.  But if Defendants strip all federal funds from San Francisco, the result will be "catastrophic."  Declaration of Ben Rosenfield in Support of CCSF's Mot. for Prelim. Inj. ("Rosenfield Decl.") ¶ 36; *see also* Declaration of Melissa Whitehouse in Support of CCSF's Mot. for Prelim. Inj. ("Whitehouse Decl.") ¶ 16.  For FY16-17, San Francisco's annual operating budget is approximately $9.6 billion.  Rosenfield Decl. ¶ 9.  Of this, approximately $1.2 billion is money provided by the federal government.  *Id.*  On top of the federal funds allocated in the annual operating budget, San Francisco expects to receive an additional $800 million in federal multi-

---

[7] In construing an executive order issued by the President, it is appropriate to look to evidence of the President's intent.  *See Utley v. Varian Assocs., Inc.*, 811 F.2d 1279, 1285 (9th Cir. 1987); *Sea-Land Serv., Inc. v. I.C.C.*, 738 F.2d 1311, 1314 (D.C. Cir. 1984).

year grants, largely for job-creating public infrastructure projects.  *Id.* ¶ 11.

San Francisco receives the majority of federal funds on a reimbursement basis, meaning the City first spends its own money before being repaid with federal funds.  *Id.* ¶ 30.  If federal funds were withdrawn, thousands of San Francisco's most vulnerable residents would lose access to meals, medical care, and other lifesaving social services.  The City would have to lay off thousands of employees and cancel contracts that create thousands of additional jobs.  Roads and public transportation would fall into disrepair, and seismic upgrades would be postponed, rendering San Francisco vulnerable during the next earthquake.  Whitehouse Decl. ¶ 16.

Under this cloud of uncertainty and budgetary sword of Damocles, San Francisco must adopt an annual budget for the fiscal year beginning July 1, 2017.  San Francisco law requires the Controller to submit a consolidated budget proposal to the Mayor by March 1, the Mayor to submit a balanced budget to the Board of Supervisors by June 1, and the Board of Supervisors to approve a balanced budget by August 1.  *Id.* ¶ 5.  To meet the June 1 deadline, the Mayor must make fundamental budget decisions by May 15.  *Id.* ¶ 6.  One of the fundamental decisions the Mayor must make by May 15 is whether to create a budget reserve to account for the potential loss of significant funds in the coming fiscal year.  *Id.* ¶ 8.  This presents a Hobson's choice.

San Francisco could place funds into reserve at the beginning of the fiscal year (*i.e.*, July 1) or could budget based on the continued receipt of federal and state funds, knowing that potentially devastating cuts could come suddenly at any time.  But if unanticipated cuts come mid-fiscal year, the impact will be even more severe, as there will be less time to absorb the loss of funds.  *Id.* ¶ 9.  Depending on the nature of the cuts, they could lead to immediate service cuts, layoffs, or cancellation of contracts and associated penalties.  *Id.*  Accordingly, given the uncertainty the Executive Order creates, in the absence of action by this Court or clarification from Defendants the Mayor will have no real choice but to place millions of dollars into a federal and state budget reserve.  *Id.* ¶¶ 10, 15.  Because there is a finite amount of money available in San Francisco's budget, any money used to fund the reserve will dollar-for-dollar decrease the funds available for programs and services in the coming fiscal year.  *Id.* ¶ 10.

The amount of money to be placed in the reserve will depend on the Mayor's assessment of the

likelihood, and likely extent, of potential funding cuts.  *Id.* ¶¶ 10-11.  The reserve amount will therefore be affected by direction from Defendants or the Court about the intended or permissible scope of the Executive Order.  *Id.* ¶ 12.  A preliminary injunction enjoining Defendants from enforcing Section 9(a) (or guidance from Defendants indicating that the potential cuts to San Francisco are much less severe than the Executive Order indicates) would lead to a lower reserve and allow the City to have more money in its General Fund to fund critical programs and services.  *Id.*

## PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).  Alternatively, a plaintiff may obtain an injunction if it shows that it has raised "serious questions going to the merits" and that the balance of hardships "tips sharply" in its favor, so long as it also shows that the other two *Winter* factors are satisfied, *i.e.*, that there is a likelihood of irreparable injury and that the injunction is in the public interest.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

San Francisco seeks a nationwide injunction.  This court has discretion to issue a nationwide injunction in the circumstances presented here.  *See Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).  An injunction's scope "is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."  *Califano v. Yamaski*, 442 U.S. 682, 702 (1979).  Nationwide relief is appropriate when, as here, the challenged rule is invalid on its face.  *See Decker v. O'Donnell*, 661 F.2d 598, 604 (7th Cir. 1980).

## ARGUMENT

**I.      San Francisco Is Likely To Succeed On The Merits Of Its Claims.**

      **A.      San Francisco Is Likely To Succeed On Its Arguments That Section 9(a) Of The Executive Order Is Unconstitutional.**

Section 9(a) of the Executive Order is unconstitutional for three independent reasons.  It purports to assert legislative power that the Constitution vests exclusively in Congress (*see* Part I(A)(1), *infra*)—and exercises that spending power in ways that even Congress may not (*see* Part I(A)(2), *infra*).  It commandeers local jurisdictions, violating the Tenth Amendment by requiring them

to comply with ICE detainer requests. *See* Part I(A)(3), *infra*. And it is inextricably intertwined with Section 1373, which is unconstitutional even when read narrowly according to its plain text. *See id*.[8] As explained below, San Francisco is likely to succeed on the merits of each of these arguments.

### 1. The Funding Restriction Violates The Separation Of Powers.

In directing that sanctuary jurisdictions are not eligible to receive federal funds, the Executive Order asserts legislative power that the Constitution vests exclusively in Congress. The Constitution empowers Congress, not the President, to appropriate funding as part of the charge to "provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The President may veto a bill passed by Congress under its Appropriations authority, but the President may not amend or repeal only a portion of an appropriation. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (holding that the line-item veto violates the separation of powers principle).

The defunding "weapon" that President Trump wields in the Executive Order is strikingly similar to the line item veto declared unconstitutional in *Clinton*. While Congress may give the Executive Branch discretion about how to spend appropriated funds, this discretion cannot be so expansive that it "gives the President the unilateral power to change the text of duly enacted statutes." *Id.* at 447. The Funding Restriction does precisely that, by imposing a new eligibility condition on some, or potentially all, congressional spending legislation. Put differently, the funding restriction is "a new mechanism which gives the President the sole ability to hurt a group that is a visible target, in order to disfavor the group." *Id.* at 451 (Kennedy, J., concurring). It thus functions as "a line item veto and enhances the President's powers beyond what the Framers would have endorsed." *Id.*

Further, Defendants cannot argue that there has been any delegation of the spending power here. Congress has repeatedly considered and rejected legislation to defund sanctuary cities or require them to cooperate with federal immigration authorities, including proposals by the Senate in July of 2016 and October of 2015. *See* Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (as rejected by Senate, Jul. 6, 2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th

---

[8] Notably, at least two United States Senators have publicly expressed many of these concerns. In recent letters to the heads of several federal agencies, Senators Elizabeth Warren and Edward Markey explained their view that the Executive Order is unconstitutional and requested more information about whether and how the agency heads intend to comply with it. *See* RJN Exh. B.

Cong. (as rejected by Senate, Oct. 20, 2015).  "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).  In these situations, the President can act only when the executive's power is "exclusive" and "conclusive."  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2084 (2015).  Executive power over federal spending is neither, and the Executive Order's attempt to control such spending must fail.

### 2.    The Funding Restriction Violates The Spending Clause.

The Funding Restriction exercises the spending power in ways that even Congress could not.[9]

### a.    It Imposes New Conditions On Existing Federal Funding.

The plain text of the Executive Order indicates that it applies to *existing* awards of federal funds.[10]  It therefore violates the Spending Clause by imposing a new condition not included in the statutory language of the appropriations.  "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also South Dakota v. Dole*, 483 U.S. 203, 207 (1987). "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" Congress's terms.  *Pennhurst*, 451 U.S. at 17.  "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it."  *Id.*

The Executive Order establishes a new condition for receiving federal funds—namely, that a jurisdiction must comply with Section 1373, as interpreted by Defendants.[11]  This new condition is

---

[9] If Defendants clarify that the scope of the Executive Order is narrower than it appears—e.g., if it applies only to a limited subset of government funds, such as only future grants or funds directly related to immigration—some of these arguments may no longer be applicable.

[10] Section 9(a) uses the present tense to state that sanctuary jurisdictions "are not eligible to receive Federal grants."  Executive Order § 9(a).  Section 9(c) reiterates this focus on existing awards by directing the Office of Management and Budget to obtain "information on all Federal grant money that *currently* is received by any sanctuary jurisdiction."  *Id.* (emphasis added).

[11] This condition is ambiguous in multiple respects. As a threshold matter, courts disagree about what is required to comply with Section 1373. *Compare, e.g.*, *Bologna v. City & Cty. of San Francisco*, 192 Cal. App. 4th 429, 438-39 (2011), *with Steinle v. City & Cty. of San Francisco*, No. 16-cv-02859, 2017 WL 67064, at *11 (N.D. Cal. Jan. 6, 2017) (disagreeing "with the *Bologna* court's characterization of the scope of § 1373(a)").  The Executive Order goes a step further than any judicial interpretation of Section 1373, reading the statute to require compliance with ICE detainer requests.  *See* p. 5, *supra*. Ultimately, the Executive Order vests the Secretary of Homeland Security

---

unlawful for at least two reasons.  First, as discussed in Part I(A)(1), *supra*, it violates separation of powers by adding a new condition that amends appropriations made by Congress.  Second, this new condition was not and could not have been agreed to by San Francisco because it did not exist when San Francisco accepted the $2 billion in federal funds that it is currently receiving.  The statutory language governing these appropriations does not reference Section 1373, ICE detainer requests, or sanctuary jurisdictions.  Even as the Executive Order describes it, the condition is at best unclear and ambiguous.  San Francisco could not have knowingly accepted this condition when it was "unaware of the condition[]"—and had no reason to be aware of it—when it accepted federal funds and to this day remains "unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17.

> ### b.      It Imposes Conditions Unrelated To The Purpose Of The Funding.

The Funding Restriction also violates the requirement that conditions imposed on federal funds must relate to Congress's purpose in spending the funds.  *New York v. United States*, 505 U.S. 144, 167 (1992); *see also Dole*, 483 U.S. at 208-09 & n.3.  More specifically, a nexus must exist between "the federal interest in particular national projects or programs" and any funding conditions.  *Dole*, 483 U.S. at 207 (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)).

Here, the Funding Restriction appears to condition eligibility for *all* federal funds on compliance with Section 1373.  But this condition is "unrelated to the federal interest" in the vast majority of federal funding flowing to San Francisco.  Of the $1.2 billion in federal funds that San Francisco receives for its annual operating budget, 92% goes to entitlement programs such as Medicare, Medicaid, Temporary Assistance to Needy Families, and Supplemental Nutrition Assistance Programs (Rosenfield Decl. ¶ 10).  For those programs the true beneficiaries are the individuals who receive benefits under the program—not the City, which acts solely as a pass-through for its eligible residents.  These programs are unrelated to immigration or to Section 1373.  Indeed, undocumented immigrants are not even eligible to participate in most of these programs.  *Id.* ¶ 29.  Of the $800 million that San Francisco receives in multi-year grants, the vast majority goes to capital projects such as building bridges and public transportation that create jobs.  Again, there is no relationship between

---

with the discretion to designate sanctuary jurisdictions, requiring jurisdictions to avoid doing anything that might lead the Secretary to put them on this list.

Section 1373 and these projects.

Only a small percentage of federal funds received by San Francisco goes to local law enforcement (*id.* ¶ 10), and the Executive Order contemplates that these are the only federal funds that San Francisco might continue to receive. *See* Executive Order § 9(a) (directing the AG and the Secretary to ensure that "sanctuary jurisdictions" are not eligible for federal grants "except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary"). San Francisco does not concede that any or all of these funds are germane to the conditions the Executive Order imposes. But even if they were, allowing San Francisco to receive these funds—while eliminating all other federal funding—would turn the germaneness requirement on its head.

### c.       It Is Unconstitutionally Coercive.

By threatening all federal funds received by sanctuary jurisdictions, the President through the Funding Restriction seeks to coerce these jurisdictions into governing according to federal dictates. While the federal government "may use its spending power to create incentives for States," it may not use them to "indirectly coerce[] a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*Sebelius*"), 132 S. Ct. 2566, 2602 (2012) (opinion of Roberts, C.J.).

The Funding Restriction threatens a substantial percentage of San Francisco's budget, and the entire funding stream for certain programs and services. Federal funds constitute approximately 13% of the City's total annual operating budget, and an additional $800 million in federal multi-year grants. Rosenfield Decl. ¶¶ 9, 11. In total, the Funding Restriction could implicate $2 billion in funds that San Francisco expects to receive—and in many cases, has already spent. *Id.* ¶¶ 11, 34.

It would be catastrophic for San Francisco to lose all—or a substantial amount of—federal funds. *Id.* ¶ 36; Whitehouse Decl. ¶ 16-17. Threatened funds include 100% of funding for certain programs, such as Medicare, that are critical to the lives of San Francisco's residents. Rosenfield Decl. ¶ 29. Federal funds constitute approximately 30% of the budget for San Francisco's Department of Emergency Management (*id.* ¶¶ 25-27), 33% of the budget for San Francisco's Human Services Agency (*id.* ¶¶ 13-18), and nearly 40% of the budget for San Francisco's Department of Public Health ("DPH") (*id.* ¶¶ 19-24), to name just a few examples. There is no way for San Francisco to make up for this loss with local revenue sources. *Id.* ¶¶ 36-37.

A threat of this magnitude "crosse[s] the line distinguishing encouragement from coercion." *Sebelius*, 132 S. Ct. at 2603 (opinion of Roberts, C.J.).  Indeed, at least one jurisdiction has already changed its policy about immigration detainers in response to the Executive Order.  The day after the President issued the Executive Order, Miami-Dade County Mayor Carlos Giménez instructed the county's interim corrections director to "fully cooperate" with the federal government and comply with all immigration detainer requests.  *See* RJN Exh. C.

In *Sebelius*, seven justices agreed that the federal government had unconstitutionally coerced states by conditioning all future Medicaid funds upon state expansion of Medicaid.  *Id*. at 2604 (opinion of Roberts, C.J.), *id.* at 2666-67 (opinion of Scalia, Kennedy, Thomas, and Alito, JJ.).  The federal coercion here is even more severe.  While the proposed condition in *Sebelius* threatened only Medicaid funding, the Funding Restriction threatens San Francisco's eligibility for Medicaid funding *and all other federal funds*.  Further, in *Sebelius* the impending loss of over ten percent of a state's budget was deemed "economic dragooning that leaves the States with no real option but to acquiesce." *Id*. at 2605.  Here, the Funding Restriction threatens over 13% of San Francisco's budget, plus an additional $800 million in off-budget grants.  As in *Sebelius*, the Funding Restriction "is much more than 'relatively mild encouragement'—it is a gun to the head."  *Id*. at 2604.

### d.    It Induces San Francisco To Engage In Unconstitutional Activity.

Finally, Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional."  *Dole*, 483 U.S. at 210.  Yet the Funding Restriction does just that by threatening to withdraw federal funds from "sanctuary jurisdictions," which it equates with jurisdictions that refuse to comply with ICE detainer requests.  *See* p. 5, *supra*. ICE detainer requests are distinct from criminal warrants.  They are not issued by a judge, but by individual ICE agents.  *See* 8 C.F.R. § 287.7 (a)-(b).  They need not be (and often are not) based on any individualized determination of probable cause that a crime has been committed.[12]  And, in an alarming number of cases, they are erroneously issued against United States citizens.  *See, e.g.*, *Morales v. Chadbourne*, No. CV 12-301-M-LDA, 2017 WL 354292, at *8 (D.R.I. Jan. 24, 2017)

---

[12] Notably, "mere unauthorized presence in the United States is *not* a crime."  *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) (emphasis added); *see also Ariz. v. United States*, 132 S. Ct. 2492, 2505 (2012) ("[I]t is not a crime for a removable alien to remain present in the [U.S.].").

(noting that 50% of the detainer requests issued by the ICE agent involved in that case were later cancelled, indicating that the individual subject to the detainer was either a United States citizen or a lawful permanent resident).[13]

In the absence of probable cause, detaining individuals for up to 48 hours after they would otherwise have been released from custody violates the Fourth Amendment.  *See Morales*, 793 F.3d 208, 215-17 (1st Cit. 2015); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305, at *9-11 (D. Or. Apr. 11, 2014) (unpublished).  Accordingly, by threatening to withdraw federal funds unless jurisdictions adopt blanket policies of compliance with immigration detainer requests, the Funding Restriction induces—indeed coerces (*see* Part I(A)(2)(c), *supra*)—jurisdictions to engage in conduct that will violate individuals' Fourth Amendment rights.  This is an unlawful use of the spending power and could expose local jurisdictions like San Francisco to significant civil liability.

### 3.   The Executive Order Violates The Tenth Amendment.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law.  *See Printz v. United States*, 521 U.S. 898 (1997); *New York*, 505 U.S. 144.[14]  But the Executive Order does precisely this, in three ways.

First, as discussed above, the Executive Order commandeers state and local governments by attempting to use the spending power to dragoon them into acting as arms of the federal government.

Second, the Executive Order effectively requires state and local jurisdictions to comply with

---

[13] *See also, e.g., Mendia v. Garcia*, 768 F.3d 1009, 1010 (9th Cir. 2014) (U.S. citizen spent two years in pre-trial detention as a result of the detainer); *Galarza v. Szalczyk*, 745 F.3d 634, 636-38 (3d Cir. 2014) (U.S. citizen held in jail for three days pursuant to erroneous detainer); *Davila v. N. Reg'l Joint Police Bd.*, 979 F. Supp. 2d 612, 622-23 (W.D. Pa. 2013), *opinion vacated in part on reconsideration*, No. 2:13-CV-00070, 2014 WL 3735631 (W.D. Pa. July 28, 2014) (U.S. citizen held in jail overnight pursuant to erroneous detainer); Eyder Peralta, *You Say You're An American, But What If You Had To Prove It Or Be Deported?*, NPR (Dec. 22, 2016, 12:29 PM), available at http://www.npr.org/sections/thetwo-way/2016/12/22/504031635/you-say-you-re-an-american-but-what-if-you-had-to-prove-it-or-be-deported#foot1 (Data obtained through a Freedom of Information Act Request showed that from October 2007 through July 2015, 693 detainers issued to local law enforcement agencies were lifted or resolved, with the outcome "United States Citizen Interviewed.").

[14] Local governments are treated the same as state governments for purposes of the Tenth Amendment.  *Printz*, 521 U.S. at 931 n.15.

ICE detainer requests.  It does so by threatening to withhold federal funds from jurisdictions that refuse to comply with such requests.  *See generally LaCroix v. Junior*, Case No. F17-376, slip op. at 10 (Fla. Cir. Ct. Mar. 3, 2017) (exhibit G to Eisenberg Decl.) ("[C]oercion achieved by financial starvation is no less effective than coercion achieved at sword's point.  The former may take a little longer than the latter; but it may be more painful, too.").  And it does so by threatening "enforcement action" against any jurisdiction that the Attorney General deems to be in violation of Section 1373— which the federal government reads overly broadly to require compliance with detainer requests (*see* p. 5 & n.6, *supra*)—or that "has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law."  Executive Order § 9(a).  This runs afoul of the Tenth Amendment.

In *Printz*, the Supreme Court considered the constitutionality of interim provisions of the Brady Handgun Violence Prevention Act, which required state and local law enforcement officers to make "reasonable efforts" to determine whether a prospective purchaser was barred from purchasing a handgun.  521 U.S. at 904.  The Court found Congress lacked the authority to impose this forced participation, holding that under the Tenth Amendment, "[t]he Federal Government may . . . no[t] command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."  *Id.* at 935.  Requiring state and local officials to hold an individual in their custody at the behest of the federal government is an even more flagrant violation of the Constitution.  Compliance with ICE detainer requests would require far more of state and local officials than the provision at issue in *Printz*.  Whereas the Brady Act provision required no affirmative action by state and local officials beyond making "reasonable efforts" to determine the legality of a handgun sale, compliance with ICE detainer requests would require local personnel to commit significant resources to jail their own residents—in their own facilities and at their own cost—on civil immigration grounds at the federal government's direct order.  Hennessy Decl. ¶ 11.

It is therefore unsurprising that several courts and a number of state and local governments have concluded that the anti-commandeering principle of the Tenth Amendment ensures that ICE detainer requests *cannot* be mandatory and create no obligation on the part of state or local officials to take any action.  *See, e.g.*, *Galarza v. Szalczyk*, 745 F.3d 634, 643-45 (3d Cir. 2014); *LaCroix v. Junior*, Case No. F17-376 (Fla. Cir. Ct. Mar. 3, 2017) (exhibit G to Eisenberg Decl.); *Miranda-*

1    *Olivares*, 2014 WL 1414305, at *6; RJN Exh. D at 2.  This Court should conclude the same.

2        Third, the Executive Order is inextricably intertwined with Section 1373.  Putting aside the

3    federal government's overly-broad interpretation of the Section, even Section 1373's plain-text

4    mandate constitutes unlawful commandeering for the reasons discussed below.  *See* Part I(B), *infra*.

5    Because both the Funding Restriction and Enforcement Directive mandate compliance with Section

6    1373, Section 9(a) of the Executive Order violates the Tenth Amendment for this reason as well.

7        **B.    San Francisco Is Likely To Succeed On Its Arguments Concerning The
             Unconstitutionality Of—And San Francisco's Compliance With—Section 1373.**

8

9        Section 1373 provides that a "local government entity or official may not prohibit, or in any

10   way restrict, any government entity or official from sending to, or receiving from, [federal

11   immigration officials] information regarding the citizenship or immigration status . . . of any

12   individual."  8 U.S.C. § 1373(a).  Where, as here, the statutory language is clear, the law should be

13   interpreted and applied according to its plain meaning.  *See, e.g.*, *Campbell v. Allied Van Lines Inc.*,

14   410 F.3d 618, 620–21 (9th Cir. 2005).  Accordingly, and because Section 1373 says nothing at all

15   about compliance with ICE detainer requests, Defendants' interpretation of the section as requiring

16   jurisdictions to comply with such requests is not just unconstitutional, but is also incorrect.

17       But even interpreted narrowly, Section 1373 still violates the Tenth Amendment by

18   impermissibly directing how state and local governments function.  *See* Part I(B)(1)-(2), *infra*.  And

19   even it were constitutional, Defendants should be enjoined from cutting funds from San Francisco on

20   the ground that it "willfully refuse[s] to comply with [Section] 1373" (Executive Order § 9(a)) because

21   San Francisco, in fact, complies with the Section as properly interpreted.  *See* Part I(B)(3), *infra*.

22       **1.    Section 1373 Is Facially Unconstitutional.**

23       By regulating state and local governments in their capacities as sovereign governments,

24   Section 1373(a) engages in unconstitutional commandeering.  Congress may not target state

25   governments in their capacities as governments.  Congress may "subject state governments to

26   generally applicable laws"—"the same legislation applicable to private parties."  *New York*, 505 U.S.

27   at 160; *see also, e.g.*, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554 (1985).  But

28   Congress must not "require the States to govern according to Congress' instructions" (*New York*, 505

U.S. at 162), and thus must not regulate states "in their sovereign capacity" (*Reno v. Condon*, 528 U.S. 141, 151 (2000)).  Although "a federal law of general applicability" may sometimes be permissible even if it "excessively interfere[s] with the functioning of state governments," the Tenth Amendment flatly forbids federal laws where "the whole *object* . . . is to direct the functioning" of state governments.  *Printz*, 521 U.S. at 932 (emphasis in original).

The "whole object" of Section 1373(a) is to direct the functioning of state and local governments.  By its terms, Section 1373(a) specifically targets only "Federal, State, or local government entit[ies] or official[s]."  This is no accident: Section 1373(a) is meant to ensure that the federal government may rely on state resources to enforce federal immigration law.  Congress enacted Section 1373(a) on the belief that "[e]ffective immigration law enforcement requires a cooperative effort between all levels of government" (S. Rep. No. 104-249, at 19 (1996))—whether or not state and local governments want to cooperate.  Congress specifically sought to ensure that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies" could be used to enforce federal law.  *Id.* at 19-20.  In seeking to conscript "information that belongs to the State and is available to [state officials] only in their official capacity" from "databases and records that only state officials have access to," Congress engaged in impermissible commandeering.  *Printz*, 521 U.S. at 932 n.17.

The commandeering inherent in Section 1373(a) is especially grave because it targets an authority basic to how a government functions—the authority to control its own officials.  "[A] State 'can act only through its officers and agents.'"  *Nevada v. Hicks*, 533 U.S. 353, 365 (2001); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  The authority to control state officials is the predicate for all other exercises of state power.  A state cannot maintain its sovereignty if it cannot control its officials.

It does not matter that Section 1373(a) purports to prohibit certain actions, rather than to impose affirmative duties.  The Tenth Amendment does not turn on artificial distinctions between negative prohibitions and affirmative obligations: laws may "direct the functioning" of state governments (*Printz*, 521 U.S. at 932), without explicitly stating affirmative obligations.  *See Conant v. Walters*, 309 F.3d 629, 646 (9th Cir. 2002) (Kozinski, J., concurring); *Gregory*, 501 U.S. at 457–64

(acknowledging possible Tenth Amendment problems in a statute framed in prohibitory terms).  Any distinction between negative prohibitions and affirmative obligations is especially unworkable here.  Section 1373(a) affirmatively requires that state governments allow their officials to spend state resources—including time and money—to communicate with the federal government, even when the State would otherwise prohibit these communications.  This affirmative obligation is underscored by Defendants' own interpretation of Section 1373(a) affirmatively to require state governments to instruct their personnel about Section 1373 (Whitehouse Decl. Exh. A at 1)—and even, arguably, to comply with civil detainer requests (RJN Exh. A at 7-8).

This concern is not merely theoretical.  Section 1373(a) has, in fact, compelled San Francisco to take affirmative action.  San Francisco was forced to amend its Sanctuary City law to remove a prohibition that once restricted its officials from using City resources to share information about immigration status.  San Francisco, Cal. Ordinance No. 96-16 (June 7, 2016).  It was forced to add language about Section 1373 to pending legislation that would prohibit using City resources to help the federal government develop a registry based on religion or national origin.  *See* RJN Exh. E at 8, 10.  And San Francisco has been forced to expend resources to educate City personnel about the contents of Section 1373(a)—as the federal government has declared it must.  *See, e.g.*, Eisenberg Decl. Exh. H; Whitehouse Decl. Exh. A at 1.

These facts illustrate why the Second Circuit wrongly decided this issue in rejecting a facial challenge to Section 1373.  In *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), "the City . . . chose[] to litigate this issue in a way that fails to demonstrate an impermissible intrusion on state and local power to control information obtained in the course of official business or to regulate the duties and responsibilities of state and local governmental employees." *Id.* at 36.  This Court is not bound by the Second Circuit's determination, and should reject it.  The facts that were missing in *City of New York* are fully evident here, and establish that Section 1373 does constitute "an impermissible intrusion" on state sovereignty.  It both imposes an affirmative obligation on states and impermissibly interferes with the operation of state government.

### 2.   Section 1373 Is Unconstitutional As Applied To San Francisco.

Even if Section 1373 could be constitutionally applied to a jurisdiction that acted solely to

"frustrate[] federal programs" (*City of New York*, 179 F.3d at 35), it cannot be constitutionally applied to a jurisdiction such as San Francisco, which has enacted confidentiality requirements in its Sanctuary City law and elsewhere in order to further legitimate—and compelling—municipal interests.  San Francisco's Sanctuary City law is designed to promote the local interest in maintaining the health and safety of the community, not to prevent the federal government from pursuing federal objectives.  As San Francisco has long recognized, confidentiality is the bedrock of mutual trust between government and community—trust that is necessary for the effective delivery of City services.  For instance, DPH generally protects identifying health information from disclosure, with only narrow exceptions not at issue here. *See* Eisenberg Decl. Exh. I.  The San Francisco Police Department ("SFPD") recognizes the importance of community policing, and the mutual trust and respect on which it depends.  *See* S.F. Admin Code § 2A.83; Eisenberg Decl. Exh. J.  City agencies also comply with a host of other confidentiality requirements—regarding, for example, the confidentiality of juvenile court records regardless of immigration status. *See* Welf. & Inst. Code § 831.  Such policies protect the privacy, and earn the trust, of all City residents, promoting the health and safety of the City as a whole.

San Francisco's broad commitment to confidentiality of personal information—embodied in Chapters 12H and 12I—distinguishes its laws from the local law considered in *City of New York*, which "single[d] out a particular federal policy for non-cooperation while allowing City employees to share freely the information in question with the rest of the world."  179 F.3d at 37.  Unlike that local law, San Francisco has "general polic[ies]" limiting "the disclosure of confidential information." *Id.* at 36.  These policies reflect local determinations about the best way to promote public health and safety.  They are not designed to frustrate federal officials from taking action in their own sovereign sphere.

Accordingly, the Court should enjoin Defendants from enforcing Section 1373 against, or using it as the basis for withholding funds from, San Francisco.

### 3.  San Francisco Complies With Section 1373 As Properly Interpreted.

Even if Section were 1373 constitutional, San Francisco complies with it under a proper interpretation of the law.  Chapter 12H generally forbids use of City resources to "assist in the enforcement of Federal immigration law" and specifically prohibits using City resources to "gather or disseminate information regarding release status of individuals or any other such personal

1    information."  S.F. Admin. Code § 12H.2.  "Personal information" is defined as "any confidential,

2    identifying information about an individual, including, but not limited to, home or work contact

3    information, and family or emergency contact information."  *Id.* § 12I.2.  Neither "release status" nor

4    "personal information" includes citizenship or immigration status.[15]

5         Chapter 12I prohibits responding to federal immigration officials' civil immigration detainer

6    requests and limits responses to requests for notification of release status.  *Id.* § 12I.3.  Neither Chapter

7    12H nor Chapter 12I makes mention of—let alone restricts—communicating about, maintaining, or

8    exchanging with other government entities "*information regarding . . . citizenship or immigration*

9    *status . . . .*"  8 U.S.C. § 1373(a), (b) (emphasis added).  No further analysis is needed to conclude that

10   San Francisco complies with Section 1373.

11        But if there were a need to look beyond the plain text of the statutes, the legislative intent is

12   clear.  Chapter 12H previously prohibited sharing information about "immigration status," but that

13   prohibition was deleted in July 2016 to, *inter alia*, ensure compliance with Section 1373.  The current

14   prohibition against sharing information about "release status" and "other such personal information"

15   *allows* employees to share information about an individual's citizenship or immigration status.[16]  Thus,

16   there is no conflict with Section 1373.

17        Nor do Chapters 12H and 12I run afoul of Section 1373's prohibition against "in any way

18   restrict[ing]" communications about citizenship or immigration status.  8 U.S.C. § 1373(a).  Congress

19   chose to itemize in Section 1373 the specific activities it sought to prevent governments from

20   restricting: "sending to, or receiving from" federal immigration officials, the citizenship or

21

22        [15] To the extent Chapter 12I's definition of "personal," "confidential, identifying information"
     is not exhaustive, California laws ascribe this term to information that ought to be protected because it
23   can reveal a person's identity.  *See, e.g.*, Cal. Civ. Code § 56.05(j) (defining "personal identifying
     information" to include a "patient's name, address, electronic mail address, telephone number, or
24   social security number, or other information that, alone or in combination with other publicly available
     information, reveals the individual's identity"), *id.* § 1798.92(c) (providing a similar definition). This
25   does not include an individual's citizenship or immigration status.

26        [16] The general prohibition in Chapter 12H against "using City funds or resources to assist in the
     enforcement of Federal immigration law" does not prohibit employees from sharing immigration
27   information with ICE.  The more specific language about "release status" and other "personal
     information" controls over this general language (*see, e.g.*, *Dep't of Pub. Health v. Super. Ct.*, 60 Cal.
28   4th 940, 960 (2015)), and the 2016 amendments indicate a clear legislative intent to allow the
     communications required by Section 1373.

immigration status information of any individual.  *Id.*  Had Congress "intended to bar *all* restriction of communication between local law enforcement and federal immigration authorities . . . it could have," but the "plain language of the statute is clear" that "[i]t did not."  *Steinle*, Case No. 16-CV-02859-JCS, 2017 WL 67064, at *11-12.

In short, because San Francisco's Sanctuary City law does not prohibit or restrict officials from communicating with ICE about citizenship or immigration status, San Francisco complies with Section 1373.  Accordingly, Defendants should not be able to declare San Francisco ineligible for federal funds under the Executive Order.

## II.   San Francisco Will Suffer Irreparable Harm In The Absence Of Preliminary Relief.

### A.   San Francisco Faces Imminent And Irreparable Budgetary Harm.

San Francisco acknowledges that the withdrawal of federal funds called for by the Executive Order may or may not be imminent.  Defendants could announce tomorrow that all federal funds are being cut from San Francisco immediately and that the City will not be reimbursed for costs already incurred in reliance on federal commitments to repay San Francisco for these projects and programs. But they could also take no affirmative steps to implement the Executive Order for weeks or even months.  In short, the timing and extent of funding cuts under the Executive Order is not yet certain. Nonetheless, San Francisco faces imminent and irreparable harm as a direct result of the uncertainty created by Executive Order Section 9(a).

San Francisco does not know when federal funding cuts will take effect under the Executive Order, or how severe those cuts will be.  But if all federal funds are withdrawn, the result will be devastating.  Rosenfield Decl. ¶ 36; Whitehouse Decl. ¶ 16.  And the impact of any cuts will be much worse if they come mid-fiscal year since there will be less time to absorb the loss of funds. Whitehouse Decl. ¶ 9.  For example, a $1 billion cut that must be absorbed over six months would feel like a $2 billion cut spread out over 12 months.  *Id.*  Also, sudden and unanticipated cuts create additional harm because there is no time to plan how to manage the loss of funds.  *Id.*  Depending on the nature of the cuts, they could lead to immediate service cuts, layoffs, or cancellation of contracts and associated penalties.  *Id.*  To mitigate the risk inherent in this state of fiscal uncertainty, in the absence of action by this Court or clarification from Defendants, the Mayor will have no real choice

but to allocate millions of dollars to a budget reserve on May 15, 2017, to account for the potential loss of significant funds in the coming fiscal year. *Id.* ¶¶ 8, 10, 15.

The money that is placed in reserve will not be available to fund other General Fund programs and services when the new fiscal year begins on July 1, 2017. *Id.* ¶ 10. Thus, putting money into reserve will make it impossible for San Francisco to fund other budget priorities in the coming year such as reducing homelessness in San Francisco through family shelter expansions, youth housing subsidies, a resource center, and homeless shelter maintenance and security. *Id.* ¶ 14. And once these millions of dollars are taken out of play by being placed in the budget reserve, they must remain there for the entire fiscal year unless and until they are needed to backfill funding cuts. *Id.* ¶ 13.

Even if San Francisco were to prevail in this lawsuit mid-fiscal year, the funds could not be reallocated for other purposes until the following fiscal year. *Id.* Thus, even if San Francisco ultimately prevails, the City and its residents will have been irreparably harmed by having been deprived of these critical funds—and the programs and services they would have funded—for a significant period of time. *See United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) (finding irreparable harm where the unavailability of federal funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

Importantly, the amount of money to be tied up in the reserve will depend on the Mayor's assessment of the likelihood, and likely extent, of potential funding cuts. Whitehouse Decl. ¶¶ 10-11. That assessment will be affected by direction from Defendants or the Court about the Executive Order's intended or permissible scope. *Id.* ¶ 12. A preliminary injunction enjoining Defendants from enforcing Section 9(a) (or guidance from Defendants indicating that the potential cuts to San Francisco are much more limited than the Executive Order indicates) would thus lead to a lower reserve and allow the City to have more money to fund critical programs and services. *Id.*

**B.    San Francisco Faces An Imminent Deprivation Of Constitutional Rights.**

The Ninth Circuit has repeatedly held that where a plaintiff seeking a preliminary injunction demonstrates a likelihood of establishing injury to its constitutional rights, such injury, standing alone, generally constitutes irreparable harm. *See, e.g.*, *Melendres*, 695 F.3d at 1002 (holding that "the

deprivation of constitutional rights unquestionably constitutes irreparable injury") (internal quotation marks and citation omitted); *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), rev'd on other grounds, 562 U.S. 134 (2011).  Such is the case here.

As shown above, San Francisco is likely to succeed on the merits of its claim that Section 1373 is unconstitutional because it deprives San Francisco of its sovereign rights under the Tenth Amendment.  But unless and until this Court grants an injunction, San Francisco will be forced— against its will—to continue complying with Section 1373.  This is not an abstract issue for the City.

Last year, the Board of Supervisors amended San Francisco's Sanctuary City law to ensure compliance with Section 1373.  Right now, the Board of Supervisors is considering a proposed ordinance that would prohibit San Francisco officers and employees from using City resources to assist with the creation or enforcement of any registry of individuals on the basis of religious affiliation, national origin, or ethnicity.  *See* RJN Exh. E.  The proposed ordinance specifically exempts from its scope communications about citizenship or immigration status authorized by Section 1373, and allows those communications until a court of competent jurisdiction declares Section 1373 unconstitutional.  *Id.* at 10.  Findings for the proposed ordinance explain that it is San Francisco's position that Section 1373 is unconstitutional, but that San Francisco will continue to comply with Section 1373 until it obtains court relief.  *Id.* at 8.  And within the next few months, San Francisco will have to certify its compliance with Section 1373 to continue receiving funding from the Edward Byrne Memorial Justice Assistance Grant Program.  Whitehouse Decl. ¶ 20; *id.* at Exh. B.

In the absence of Section 1373, San Francisco would not do any of these things.  And it would direct its departments, agencies, commissions, officers, and employees that—as set forth in Chapter 12H—they may *never* use City funds or resources to assist in the enforcement of federal immigration law.  But Section 1373 prevents San Francisco from giving that clear direction and instead requires the City to give a different and more confusing directive, namely, that San Francisco employees cannot use City resources to assist in the enforcement of federal immigration law unless they voluntarily choose to share immigration information with ICE.  This exception threatens to swallow the rule and make it impossible to provide clear direction to employees about when they may and may not share immigration information.

San Francisco has also demonstrated that it is likely to succeed on the merits of its claim that Section 9(a) of the Executive Order is unconstitutional under the Separation of Powers, the Spending Clause, and the Tenth Amendment.  Although San Francisco has not yet been subjected to funding cuts or enforcement action under the Executive Order, the City need not wait until concrete action is taken to seek a preliminary injunction to prevent the constitutional harm it will suffer when that action comes.  To the contrary, injunctive relief is appropriate once a party has shown a "credible threat of prosecution" under an unconstitutional law.  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (granting a preliminary injunction based on a "a credible threat of prosecution" in a case challenging a state law under the Supremacy Clause).

The fact that San Francisco law prohibits compliance with ICE detainers, paired with President Trump's statements singling San Francisco out as a target of his anti-Sanctuary City policies, leaves no doubt that San Francisco has a credible fear of being targeted under the Executive Order.  Moreover, where, as here, a federal mandate would prevent a state from "'effectuating statutes enacted by representatives of its people,'" irreparable harm exists regardless of whether any direct enforcement action has yet been initiated.  *See Tex. v. U.S.*, No. 7:16-cv-00054-O, 2016 WL 4426495, at *16 (N.D. Tex. Aug. 21, 2016) (quoting *Coal. for Econ. Equity v. Wilson,* 122 F.3d 718, 719 (9th Cir. 1997)).

### C.    San Francisco Residents And Employees Face Community Injury.

The Executive Order is a threat: comply with its terms or reap catastrophic consequences.  This has created an uncertainty that is harming both San Francisco residents and public employees.  San Francisco's Police Department reports that witnesses and victims of crime are increasingly concerned about contacting law enforcement due to confusion surrounding SFPD's relationship with ICE.  Declaration of Peter Walsh in Support of CCSF's Mot. for Prelim. Inj. ¶ 8.  Patients of San Francisco's Department of Public Health are frightened to access local health clinics for fear that their personal information will be shared with immigration officials.  Declaration of Colleen Chawla in Support of CCSF's Mot. for Prelim. Inj. ¶ 7.  The Executive Order puts San Francisco Sheriff Department employees in a position to either comply with ICE detainer requests and violate the Fourth Amendment or violate the Executive Order's terms.  Hennessy Decl. ¶ 10.

The Executive Order is thus preventing San Francisco from meeting an essential municipal

function, protecting its residents.  When victims and witnesses of crime feel unsafe contacting law enforcement, all San Franciscans are less safe.  When patients do not access health care, public health departments are unable to treat, contain, and address public health crises.  These harms are tangible, ongoing, and irreparable.  *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 737 (9th Cir. 1999).

## III.   The Balance Of Equities And Public Interest Favor A Preliminary Injunction.

It is neither equitable nor in the public's interest to allow the President to violate the U.S. Constitution.  In a case against the government, the third and fourth preliminary injunction factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  "[B]y establishing a likelihood" of a constitutional violation, "Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction."  *Ariz. Dream Act Coal. v. Brewer,* 757 F.3d 1053, 1069 (9th Cir. 2014); *see also Melendres*, 695 F.3d at 1002 (finding that "it is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks and citation omitted).

While the inquiry should end there, courts have also advised that "[i]n evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises."  *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 827 (9th Cir. 1993).  There can be no harm in enjoining an unconstitutional act. *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010).  But even apart from the constitutional impermissibility of Section 1373 and the Executive Order, granting a preliminary injunction would cause no actual harm to the President, the Attorney General or the Director of Homeland Security, who retain the ability to enforce federal immigration law through federal agents.  In contrast, San Francisco faces immediate budget and planning consequences, the resolution of which could impact students, seniors, bus riders, hospital patients, individuals lacking stable housing, and more, as well as the general health and welfare of San Francisco as a city and county.

## CONCLUSION

For the foregoing reasons, San Francisco requests that this Court grant the relief requested.

1    Dated:  March 8, 2017

2                                        DENNIS J. HERRERA
                                         City Attorney
3                                        RONALD FLYNN
                                         JESSE C. SMITH
4                                        YVONNE R. MERÉ
                                         CHRISTINE VAN AKEN
5                                        TARA M. STEELEY
                                         MOLLIE M. LEE
6                                        SARA J. EISENBERG
                                         MATTHEW S. LEE
7                                        NEHA GUPTA

8

9                                 By:  */s/ Sara J. Eisenberg*_____
                                         SARA J. EISENBERG
10                                       Deputy City Attorney

11                                       Attorneys for Plaintiff
                                         CITY AND COUNTY OF SAN FRANCISCO
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28