1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   JESSE C. SMITH, State Bar #122517
    Chief Assistant City Attorney
3   RONALD P. FLYNN, State Bar #184186
    Chief Deputy City Attorney
4   YVONNE R. MERÉ, State Bar #173594
    Chief of Complex and Affirmative Litigation
5   CHRISTINE VAN AKEN, State Bar #241755
    TARA M. STEELEY, State Bar #231775
6   MOLLIE M. LEE, State Bar #251404
    SARA J. EISENBERG, State Bar #269303
7   MATTHEW S. LEE, State Bar #295247
    NEHA GUPTA, State Bar #308864
8   Deputy City Attorneys
    City Hall, Room 234
9   1 Dr. Carlton B. Goodlett Place
    San Francisco, California 94102-4602
10  Telephone:    (415) 554-4748
    Facsimile:    (415) 554-4715
11  E-Mail:       brittany.feitelberg@sfgov.org

12  Attorneys for Plaintiff
    CITY AND COUNTY OF SAN FRANCISCO

13

14

15                    UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17  CITY AND COUNTY OF SAN          Case No. 3:17-cv-00485-WHO
    FRANCISCO,
18                                  **DECLARATION OF MELISSA WHITEHOUSE
          Plaintiff,                IN SUPPORT OF CITY AND COUNTY OF
19                                  SAN FRANCISCO'S MOTION FOR
          vs.                       PRELIMINARY INJUNCTION**
20
    DONALD J. TRUMP, President of the United   Date:      April 12, 2017
21  States, UNITED STATES OF AMERICA,          Time:      2:00 p.m.
    JOHN F. KELLY, Secretary of United States  Judge:     Honorable William H. Orrick
22  Department of Homeland Security,           Dept:      Courtroom 2
    JEFFERSON B. SESSIONS, Attorney General
23  of the United States, DOES 1-100,          Date Filed: January 31, 2017

24        Defendants.                          Trial Date: Not set

25

26

27

28

Whitehouse Decl. ISO CCSF's Motion for PI;
Case # 17-00485

I, Melissa Whitehouse, declare as follows:

1.      I am a resident of the State of California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to the matters set forth below.

2.      I am the Mayor's Budget Director for the City and County of San Francisco. Among many policy and budgetary responsibilities, my main charge is developing and submitting the City's balanced budget each June. Over the course of six years with the Mayor's Office of Public Policy and Finance, I have worked on six adopted budgets and multiple long-term financial planning documents, including the City's Five-Year Financial Plan and Ten Year Capital Plan.

3.      I am familiar with Executive Order 13768, dated January 25, 2017, and titled "Enhancing Public Safety in the Interior of the United States" (the "Executive Order").

4.      The Executive Order threatens San Francisco with the loss of federal funds. The threatened cuts are unrelated to immigration enforcement and counter to the goals of public safety stated in the Executive Order, and they would have far reaching consequences. As the Mayor's Budget Director, I must decide how to handle this possible loss of funds in the budget for the fiscal year beginning on July 1, 2017.

5.      San Francisco has already begun the seven-month process of adopting the annual budget for the fiscal year beginning on July 1, 2017. On December 13, 2016, the Mayor and the Controller (San Francisco's chief financial officer) issued budget instructions to all San Francisco departments with detailed guidance on the preparation of departments' budget requests.  Most San Francisco departments held public hearings on their budget proposals in January and February and submitted their budget requests for the coming fiscal year to the Controller by February 21. San Francisco law requires the Controller to submit a consolidated budget proposal to the Mayor by March 1, the Mayor to submit a balanced budget to the Board of Supervisors by June 1, and the Board of Supervisors to approve a balanced budget by August 1.

6.      To meet the June 1 deadline, the Mayor must make fundamental budget decisions by May 15, and input these decisions into San Francisco's budget software by May 24. During the last week of May, the Controller's Office reconciles and confirms all financial calculations in the Mayor's

proposed budget, while the Mayor's Budget Office finalizes the narrative publication that accompanies the proposed budget.

7.    The budget for the fiscal year beginning July 1, 2017, will be approximately $10 billion, approximately $5 billion of which is in San Francisco's General Fund. Money in San Francisco's General Fund is used to support public services such as public health, human services, police and fire services, and public works. Approximately $2 billion of General Fund money is legally dedicated for specific purposes, leaving approximately $3 billion in discretionary funds. The remainder of the budget is comprised of self-supporting activities at San Francisco's enterprise departments, which focus on city-related business operations and include the Port, the Municipal Transportation Agency, the Airport, the Public Utilities Commission, and others. The use of funds in these operations is legally restricted and cannot be redirected to backfill a shortfall in the General Fund.

8.    One of the fundamental budget decisions the Mayor must make by May 15, 2017, is whether to create a budget reserve to account for the possible loss of federal and state funds in the coming fiscal year. This presents a Hobson's choice. San Francisco, facing possible reductions, could place funds into reserve at the beginning of the fiscal year, harming the public by reducing the amount of money in San Francisco's General Fund. Or San Francisco could budget based on the continued receipt of federal and state funds, knowing that cuts could come suddenly, outside of the budget process.

9.    If unanticipated cuts come mid-year, the General Fund will take an even bigger hit at that time, as there will be less time to absorb the loss of funds. For example, a $1 billion cut that must be absorbed over six months would feel like a $2 billion cut spread out over 12 months. Additionally, sudden and unanticipated cuts create additional harm because there is no time to plan how to manage the loss of funds. Depending on the nature of the cuts, they could lead to immediate service cuts, layoffs, or cancellation of contracts and associated penalties.

10.    If current levels of uncertainty remain by May 15, 2017, the Mayor will be forced to propose a federal and state budget reserve. The final amount of the reserve will depend on the Mayor's assessment of the amount of funding at risk and the likelihood that federal or state funds will be cut.

1    Money used to fund the reserve is money that will not be available for General Fund programs and

2    services.

3        11.      A portion of the federal and state budget reserve will reflect the possible loss of federal

4    funds that could result from the Executive Order. Assuming the Executive Order is still in place by

5    May 15, 2017, and there is no further clarity about the funds at risk, the Mayor must account for the

6    possibility that some or all applications of the Executive Order might be upheld, and set the reserve

7    accordingly.

8        12.      The reserve amount will be affected by direction from Defendants or the Court about

9    the intended or permissible scope of the Executive Order. A preliminary injunction enjoining

10   Defendants from enforcing Section 1373 or Section 9(a) of the Executive Order would lead to a lower

11   reserve and allow the City to have more money in its General Fund to fund critical programs and

12   services.

13       13.      A May 15, 2017, decision to set the reserve at a specified amount will have a real world

14   impact when the new fiscal year begins on July 1, 2017. Beginning on this date, funds allocated for the

15   reserve will sit in the reserve instead of being available for General Fund services and programs.  Once

16   funds are placed in a federal and state budget reserve, they will remain there for the entire fiscal year

17   unless they are needed to backfill federal or state funding cuts.

18       14.      The Mayor must make a trade-off between putting money into a reserve and using it for

19   other San Francisco priorities, some of which are currently unfunded. For instance, the Department of

20   Homelessness and Supportive Housing needs an additional $19.5 million in the next two fiscal years

21   to make an impact in reducing homelessness in San Francisco. This money would fund a family

22   shelter expansion, youth housing subsidies, a resource center, and shelter maintenance and security. A

23   reserve would set money aside instead of using it for purposes like this.

24       15.      While the exact amount has not yet been determined, the reserve will be in the millions,

25   not billions. It will reflect just a small portion of the federal funds received by San Francisco. The

26   reserve will help San Francisco maintain budgeted operations if it loses a relatively small amount of

27   federal funding. It will not, however, be adequate to compensate for the loss of significant federal

28   funds.

16.     It would decimate San Francisco to lose all federal funds. Thousands of San Francisco's most vulnerable residents would lose access to meals, medical care and other lifesaving social safety net services. Required reductions in police, fire, and emergency medical response functions would impair core public safety services for those that work, visit, or live in the City.  The City would have to lay off thousands of employees and cancel contracts that create thousands of additional jobs. Roads, public transportation, and other infrastructure necessary to support the City and region's economy would fall into disrepair, causing longer-term damage beyond San Francisco's borders.  Seismic upgrades would be postponed, rendering San Francisco vulnerable during the next earthquake.

17.     Even a mid-year loss of, for illustrative purposes, 10% of annual federal funds would have a significant negative impact on the safety of our City and residents. A cut of $120 million would require the Mayor to make significant reductions to critical government services and spending. Specifically, mid-year cuts of this magnitude would require reductions in the number of first responders, including police officers, firefighters, paramedics, and 911 operators. Our Muni bus and train system would experience significant crowding and delays due to reductions in service and deferral of vehicle maintenance. The Bay Area's regional economy depends on a functioning Muni system, and service cuts would significantly hamper our economic growth. Furthermore, infrastructure safety would be compromised, as the City would be forced to consider cuts to road repaving, building inspection services, and fire safety programs. The Mayor has significantly increased the City's investment in homeless services with a goal of reducing San Francisco's street homeless population, including ending chronic veterans' homelessness by 2018. San Francisco's progress in housing the homeless – and especially housing homeless veterans – would be imperiled by unexpected mid-year reductions of this magnitude. Furthermore, San Francisco would likely be forced to cut social service safety net programs such as senior meal programs, services for low-income children, violence prevention services and programs for domestic violence survivors.

18.     One of the federal grants San Francisco currently receives is from the Edward Byrne Memorial Justice Assistance Grant Program ("JAG"), administered by the Attorney General's Office

1   of Justice Programs ("OJP"). The JAG application form includes a certification of compliance with all

2   federal statutes, regulations, policies, guidelines, and requirements.

3        19.    In July 2016, OJP issued "Guidance Regarding Compliance with 8 U.S.C. 1373," a true

4   and correct copy of which is attached hereto as Exhibit A.  Among other things, this Guidance states

5   that 8 U.S.C. 1373 requires personnel to "be informed that notwithstanding any state or local policies

6   to the contrary, federal law does not allow any government entity or official to prohibit the sending or

7   receiving of information about an individual's citizenship or immigration status with any federal, state

8   or local government entity and officials."

9        20.    In October 2016, OJP issued "Additional Guidance Regarding Compliance with 8

10   U.S.C. 1373," a true and correct copy of which is attached hereto as Exhibit B.  In the October

11   Guidance, OJP specified that 8 U.S.C. 1373 "is an applicable federal law under the Byrne/JAG

12   authorizing legislation" and therefore JAG recipients will be required to certify compliance with

13   Section 1373 as part of the JAG application process when applying for funding in FY 2017. San

14   Francisco plans to apply for further JAG funding within the next few months, and will be required to

15   certify compliance with 8 U.S.C. 1373 at that time.

16        I declare under penalty of perjury that the foregoing is true and correct and that this declaration

17   was executed on March 7, 2017 at San Francisco, California.

18

19

20   _____

    MELISSA WHITEHOUSE

21

22

23

24

25

26

27

28

# EXHIBIT A

## OFFICE OF JUSTICE PROGRAMS GUIDANCE REGARDING
## COMPLIANCE WITH 8 U.S.C. § 1373

*1.  Q.  What does 8 U.S.C. § 1373 require?*

A.  Title 8, United States Code, Section 1373 (Section 1373) addresses the exchange of information regarding citizenship and immigration status among federal, state, and local government entities and officials.  Subsection (a) prevents federal, state and local government entities and officials from "prohibit[ing] or in any way restrict[ing]" government officials or entities from sending to, or receiving from, federal immigration officers information concerning an individual's citizenship or immigration status.  Subsection (b) provides that no person or agency may "prohibit, or in any way restrict," a federal, state, or local government entity from (1) sending to, or requesting or receiving from, federal immigration officers information regarding an individual's immigration status, (2) maintaining such information, or (3) exchanging such information with any other federal, state, or local government entity.  Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information.  Rather, the statute prohibits government entities and officials from taking action to prohibit or in any way restrict the maintenance or intergovernmental exchange of such information, including through written or unwritten policies or practices.

Your personnel must be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials.

*2.  Q.  May a state make a subgrant to a city that the state knows to be violating an applicable law or regulation (e.g. Section 1373), or a programmatic requirement?*

A.  No.  A JAG grantee is required to assure and certify compliance with all applicable federal statues, including Section 1373, as well as all applicable federal regulations, policies, guidelines and requirements.  This requirement passes through to any subgrants that may be made and to any subgranteees that receive funds under the grant.

*3.  Q.  Is there a specific report or source BJA is using to determine whether a jurisdiction has violated an applicable Federal law (e.g. Section 1373)?*

A.  The Office of Justice Programs (OJP) will take seriously credible evidence of a violation of applicable Federal law, including a violation of Section 1373, from any source.   In the ordinary course, OJP will refer such evidence to the Department of Justice's Office of the Inspector General for appropriate action.

**4.  Q.   How would a determination that a subgrantee is in violation of federal law affect the state's designation and ability to receive future awards?**

A.   A grantee is responsible to the federal government for the duration of the award. As the primary recipient of the award, the grantee is responsible for ensuring that subgrantees assure and certify compliance with federal program and grant requirements, laws, or regulations (*e.g.* Section 1373).  If a grantee or subgrantee has policies or practices in effect that violate Section 1373, the grantee or subgrantee will be given a reasonable amount of time to remedy or clarify such policies to ensure compliance with applicable law.  Failure to remedy any violations could result in the withholding of grant funds or ineligibility for future OJP grants or subgrants, or other administrative, civil, or criminal penalties, as appropriate. Our goal is to ensure that JAG grantees and subgrantees are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities.

**5.  Q.   Does the "JAG Sanctuary Policy Guidance" notice apply to all active grants?**

A.   The Policy Guidance applies to all JAG grantees and subgrantees.

**6.  Q.   What should a state be doing to ensure that subgrantees are complying with the legal requirements for receiving JAG funds?**

A.   The state must comply with all of the requirements of 2 C.F.R. § 200.331.  See also Section 3.14 (Subrecipient Monitoring) of the Department of Justice Financial Guide.

**7.  Q.   The "JAG Sanctuary Policy Guidance" cited Section 1373.  Are there other components of Title 8 of the United States Code that are required for compliance?**

A.   All grantees are required to assure and certify compliance with all applicable federal statutes, regulations, policies, guidelines, and requirements.  States may wish to consult with their legal counsel if they have any questions or concerns as to the scope of this requirement.

**EXHIBIT B**

### OFFICE OF JUSTICE PROGRAMS
### ADDITIONAL GUIDANCE REGARDING COMPLIANCE WITH 8 U.S.C. § 1373

**1. Why is OJP using Byrne/JAG grant funds to enforce 8 U.S.C. § 1373?**

Authorizing legislation for the Byrne/JAG grant program requires that all grant applicants certify compliance both with the provisions of that authorizing legislation and all other applicable federal laws. The Office of Justice Programs has determined that 8 U.S.C. § 1373 (Section 1373) is an applicable federal law under the Byrne/JAG authorizing legislation. Therefore, all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373, as part of the Byrne/JAG grant application process.

**2. Does OJP's guidance on 8 U.S.C. § 1373 impact FY 2016 funding?**

No FY 2016 or prior year Byrne/JAG or SCAAP funding will be impacted. However, OJP expects that JAG and SCAAP recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG and SCAAP funding in FY 2017. As previously stated, our goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

**3. What is the process of determining if a recipient of JAG or SCAAP funds is not in compliance with 8 U.S.C. § 1373?**

As OJP has previously stated, our goal is to ensure that JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373. If OJP becomes aware of credible evidence of a violation of Section 1373, the recipient must agree to undertake a review to validate its compliance with 8 U.S.C. § 1373. If the recipient determines that it is in compliance with Section 1373 at the time of review, then it must submit documentation that contains a validation to that effect and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. If the recipient determines that it is not in compliance with Section 1373 at the time of review, then it must take sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the recipient has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. Failure to remedy any violations could result in a referral to the Department of Justice Office of the Inspector General, the withholding of grant funds or ineligibility for future OJP grants or subgrants, or other administrative, civil, or criminal penalties, as appropriate.

**4. What will happen if a recipient of JAG or SCAAP funds is found to be out of compliance with 8 U.S.C. § 1373?**

If a recipient is found out of compliance with Section 1373, the recipient must take sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the recipient has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. Failure to remedy any violations could result in a referral to the Department of Justice Inspector

General, the withholding of grant funds or ineligibility for future OJP grants or subgrants, suspension or termination of the grant, or other administrative, civil, or criminal penalties, as appropriate.

As previously stated, our goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

   5.   *Does OJP expect State Administering Agencies or their subgrantees to submit additional certifications specific to 8 U.S.C. § 1373?*

No, OJP does not expect grantees to submit additional assurances in FY 2016, nor does OJP expect grantees to require additional assurances from subgrantees, unless the grantees choose to do so.   However, OJP expects that JAG grantees and subgrantees will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG funding in FY 2017.

   6.   *Will a locality risk its entire Byrne/JAG funding if it refuses to certify compliance with federal law, including 8 U.S.C. § 1373?*

Yes, a JAG grantee is required to assure and certify compliance with all applicable federal statutes, including Section 1373, as well as all applicable federal regulations, policies, guidelines and requirements, as a prerequisite to obtaining funding. OJP expects that JAG recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG funding in FY 2017.  By providing this additional guidance and the prior guidance on 8 U.S.C. § 1373, the Department has made clear that its goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

   7.   *Will a State risk its entire Byrne/JAG funding if a subgrantee is found to be out of compliance?*

No, only the jurisdiction that fails to comply with Section 1373 is at risk for not being funded after being provided an opportunity to correct its policies or practices.  It is the State's legal responsibility as the prime grantee to monitor its subgrantees adequately and take appropriate action if 1) a subgrantee does not certify compliance with Section 1373, or 2) the State becomes aware (after making the subaward) of credible evidence of a violation of Section 1373 by a subgrantee. In general, however, a subgrantee's continuing violation would not ordinarily result in imposition of penalties against the State, or put the State's entire Byrne/JAG funding at risk. If the State disburses funds to an ineligible subgrantee, however, such that the State itself could be said to have participated in the violation (e.g. by having made the subaward knowing that the subgrantee was ineligible) or failed to take appropriate action to remedy a violation, then that State would be responsible for repayment of the dispersed funding.

In addition, if OJP becomes aware of credible evidence that a subgrantee may be in violation of Section 1373, OJP will forward that evidence to the State, and the State will need to take steps to determine if the subgrantee is in violation, and (if it is) to require the subgrantees to take

sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the subgrantee has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation.

***Additional guidance regarding compliance with Section 1373 can be found at:***

Question and Answer document provided to all JAG grantees and SCAAP recipients on July 7, 2016:  https://www.bja.gov/ProgramDetails.aspx?Program_ID=59.

DOJ Office of the Inspector General Memorandum posted on July 28, 2016 at: https://oig.justice.gov/reports/2016/1607.pdf.