CHAD A. READLER
Acting Assistant Attorney General
BRIAN STRETCH
United States Attorney
JOHN R. TYLER
Assistant Director
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
Department of Justice, Room 7210
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C.  20044
Telephone:    (202) 514-3495
Facsimile:    (202) 616-8470
E-mail:       scott.simpson@usdoj.gov
COUNSEL FOR DEFENDANTS
DONALD J. TRUMP, President of the
United States; UNITED STATES OF
AMERICA; JOHN F. KELLY, Secretary of
Homeland Security; JEFFERSON B.
SESSIONS, III, Attorney General of the
United States

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, | No. 3:17-cv-00485-WHO |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, *et al.*, | Date:      April 12, 2017 |
| Defendants. | Time:      2:00 p.m. |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ISSUES PRESENTED ........................................................................................................ 3

BACKGROUND .................................................................................................................. 4

    I.      Broad Executive Discretion in Enforcement of Immigration Law ........................ 4

    II.     Executive Order 13,768 ........................................................................................ 6

    III.    San Francisco's Claims for Emergency Relief ..................................................... 7

ARGUMENT ....................................................................................................................... 8

    I.      Plaintiff Cannot Show Irreparable Harm ............................................................. 9

         A.      The Supreme Court Requires a Likelihood of Immediate
                 Concrete Irreparable Harm Before an Injunction May Issue ..................... 9

         B.      The City Cannot Demonstrate a Likelihood of Immediate,
                 Concrete Irreparable Harm Given the Absence of Any
                 Action under Section 9 or 8 U.S.C. § 1373 ............................................... 11

    II.     The City Cannot Establish a Likelihood of Success on the Merits
            Because, Among Other Things, Its Claims are Non-Justiciable ......................... 17

    III.    The Public Interest and the Balance of Harms Militate
           Against the Injunction Sought ............................................................................ 21

    IV.    No Injunction Should Issue Against the President ............................................. 22

    V.     Any Preliminary Injunction Herein Should Be
          Limited to the Plaintiff ...................................................................................... 22

CONCLUSION .................................................................................................................. 23

1

<u>TABLE OF AUTHORITIES</u>

2

3

<u>CONSTITUTION</u>

4

U.S. Const. art. II, § 3 ................................................................................................... 3

5

U.S. Const. art. III, § 2, cl. 1 ........................................................................................ 17

6

7

<u>CASES</u>

8

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ................................................... 3, 18-20

9

*Ali v. United States*, 932 F. Supp. 1206 (N.D. Cal. 1996) ............................................ 16

10

*Am. Trucking Ass'ns v. City of Los Angeles*, 577 F. Supp. 2d 1110 (C.D. Cal. 2008) ................. 16

11

*Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ................................ 9

12

*Arc of Cal. v. Douglas*, 757 F.3d 975 (9th Cir. 2014)................................................... 10

13

*Arcsoft, Inc. v. Cyberlink Corp.*, 153 F. Supp. 3d 1057 (N.D. Cal. 2015)............................... 2, 10

14

*Arizona Dream Act Coal. v. Brewer*, ___ F.3d ___, No. 15-15307,
2017 WL 461503 (9th Cir. Feb. 2, 2017) ............................................................ 4, 12

15

*Arizona v. United States*, 567 U.S. 387, 132 S. Ct. 2492 (2012) ............................... 4, 12

16

*Bigelow v. Virginia*, 421 U.S. 809 (1975)................................................................ 18, 19

17

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) ................................. 10

18

*Cal. Pawnbrokers Ass'n v. Carter*, No. 216CV02141JAMKJN,
2016 WL 6599819 (E.D. Cal. Nov. 8, 2016).......................................................... 15

19

*Campbell v. Feld Entm't Inc.*, No. 12-CV-4233-LHK,
2013 WL 4510629 (N.D. Cal. Aug. 22, 2013) ........................................................ 9

20

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988)................................ 2, 10

21

*City of N.Y. v. United States*, 179 F.3d 29 (2d Cir. 1999)........................................ 21

22

*Coal. for a Healthy Cal. v. FCC*, 87 F.3d 383 (9th Cir. 1996) .................................... 22

23

*Connecticut v. Massachusetts*, 282 U.S. 660 (1931) .................................................. 13

24

*Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993)......................................................... 22

25

*Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905 (D.C. Cir. 1985).......................... 18, 20

26

*Elrod v. Burns*, 427 U.S. 347 (1976)......................................................................... 17

27

*Envtl. Def. Fund v. Marsh*, 651 F.2d 983 (5th Cir. 1981)........................................ 23

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ................................................................ 18

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ............................................................................... 14

*Haw. Cty. Green Party v. Clinton*, 14 F. Supp. 2d 1198 (D. Haw. 1998) ..................................... 17

*Kitazato v. Black Diamond Hosp. Invs., LLC*, 655 F. Supp. 2d 1139 (D. Haw. 2009) .................. 15

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) .......................................................................... 8

*Los Angeles Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197 (9th Cir. 1980) ..................... 10, 14

*Mazurek v. Armstrong,* 520 U.S. 968 (1997) ............................................................................... 8

*McCreary County, Ky. v. ACLU of Ky.,* 545 U.S. 844 (2005) ....................................................... 14

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ..................................................................... 16

*Miller ex rel. NLRB v. California Pac. Med. Ctr.*, 991 F.2d 536 (9th Cir. 1993) ............................ 9

*Mississippi v. Johnson*, 71 U.S. 475 (1866) ............................................................................... 22

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...................................................... 23

*N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104 (9th Cir. 2010) ....................................................... 22

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 545 F. Supp. 2d 363 (S.D.N.Y. 2008) ............. 16

*Nat'l Inst. of Family & Life Advocates v. Harris*, 839 F.3d 823 (9th Cir. 2016) ........................... 17

*Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344 (D. Mont. 2014) ........................... 10

*Nelson v. NASA*, 530 F.3d 865 (9th Cir. 2008) ........................................................................... 16

*Newdow v. Bush*, 391 F. Supp. 2d 95 (D.D.C. 2005) .................................................................. 22

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................ 21

*Ore. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc.*,
    288 F.3d 414, 416 (9th Cir. 2002) ........................................................................................ 17

*Painsolvers, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    685 F. Supp. 2d 1123 (D. Haw. 2010) ............................................................................. 2, 10

*Pollara v. Radiant Logistics Inc.*, No. CV 12-0344 GAF (SPX),
    2012 WL 12887095 (C.D. Cal. Sept. 13, 2012) ..................................................................... 17

*Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004) ............................................................. 22

*Prof'l Towing & Recovery Operators of Ill. v. Box*, No. 08 C 4096,
    2008 WL 5211192 (N.D. Ill. Dec. 11, 2008) .......................................................................... 16

*RasterOps v. Radius, Inc.*, 861 F. Supp. 1479 (N.D. Cal. 1994) ................................................. 11

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ............................................................ 14

*Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Servs., Inc.*,
   80 F. Supp. 3d 1058 (C.D. Cal. 2015) ............................................................................ 22

*Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081 (10th Cir. 2003) .................. 15

*Sampson v. Murray*, 415 U.S. 61 (1974) ........................................................................... 16

*Second City Music, Inc. v. City of Chicago, Ill.*, 333 F.3d 846 (7th Cir. 2003) ............................ 15

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) .......................................... 22

*Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624 (9th Cir. 1989) .................................. 18, 20

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ........................................... 18, 19

*Steinle v. City & Cty. of San Francisco*, No. 16-CV-02859-JCS,
   2017 WL 67064 (N.D. Cal. Jan. 6, 2017) ........................................................................ 5

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) .................................................................... 22

*Texas v. United States*, 523 U.S. 296 (1998) ................................................................... 18, 20

*Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) ............................................... 13

*Timbisha Shoshone Tribe v. Salazar*, 697 F. Supp. 2d 1181 (E.D. Cal. 2010) ............................ 17

*U.S. Bank, N.A. v. SFR Invs. Pool 1, LLC*, 124 F. Supp. 3d 1063 (D. Nev. 2015) ........................ 8

*U.S. W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112 (9th Cir. 1999) ............................ 18, 20

*United States v. AMC Entm't, Inc.*, 549 F.3d 760 (9th Cir. 2008) ............................................. 23

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) ...................................................... 12

*United States v. Salerno*, 481 U.S. 739 (1987) ...................................................................... 21

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) ................................................ 12

*United States v. Stacy*, 734 F. Supp. 2d 1074 (S.D. Cal. 2010) ............................................... 14

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................... passim

*Winter v. California Med. Review, Inc.*, 900 F.2d 1322 (9th Cir. 1989) .................................. 19, 20

*Winter v. Natural Res. Def. Council*, 530 F. Supp. 2d 1110 (C.D. Cal. 2008) ............................ 10

*Winter v. Natural Res. Def. Council*, 518 F.3d 658 (9th Cir. 2008) ........................................... 10

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ..................................................... passim

STATUTES

8 U.S.C. § 1373 ............................................................................................. passim

8 U.S.C. § 1357(g)(1) ............................................................................................ 5

8 U.S.C. § 1357(g)(10)(B) ..................................................................................... 5

Pub. L. No. 104-208, Div. C, Title VI, § 642, 110 Stat. 3009 (1996) ................... 5


REGULATIONS

28 C.F.R. pt. 18 .................................................................................................... 11

44 C.F.R. § 206.440 ............................................................................................. 11

EXECUTIVE ORDERS

Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (1992) ........................................... 4

Exec. Order No. 13,608, 77 Fed. Reg. 26,409 (2012) ........................................... 4

Exec. Order No. 13,726, 81 Fed. Reg. 23,559 (2016) ........................................... 4

Exec. Order No. 13,768, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ....................... passim

Exec. Order No. 13,768, § 1, 82 Fed. Reg. 8,799 (Jan. 30, 2017) .................... 1, 6

Exec. Order No. 13,768, § 2(a), 82 Fed. Reg. 8,799 (Jan. 30, 2017) ..................... 6

Exec. Order No. 13,768, § 4, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ..................... 6, 9

Exec. Order No. 13,768, § 5, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ......................... 6

Exec. Order No. 13,768, § 6, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ............. 6, 11, 13

Exec. Order No. 13,768, § 7, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ......................... 6

Exec. Order No. 13,768, § 8, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ................... 6, 13

Exec. Order No. 13,768, § 9, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ................. passim

Exec. Order No. 13,768, § 10(b), 82 Fed. Reg. 8,799 (Jan. 30, 2017) ................... 6

Exec. Order No. 13,768, § 11, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ........... 6, 11, 13

Exec. Order No. 13,768, § 12, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ....................... 6

Exec. Order No. 13,768, § 13, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ....................... 6

Exec. Order No. 13,768, § 14, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ....................... 6

Exec. Order No. 13,768, § 15, 82 Fed. Reg. 8,799 (Jan. 30, 2017) .............. 1, 7, 13

Exec. Order No. 13,768, § 17, 82 Fed. Reg. 8,799 (Jan. 30, 2017) .................................................. 6

Exec. Order No. 13,768, § 18(b), 82 Fed. Reg. 8,799 (Jan. 30, 2017) ........................................... 6

OTHER AUTHORITIES

Ltr. from Samuel R. Ramer, Acting Ass't Att'y Gen., Office of Legis.
Affairs, to Sens. Elizabeth Warren and Edward J. Markey (Mar. 7, 2017) .............................. 2, 13

Mem. from John Kelly, Sec'y of Homeland Sec., to Kevin McAleenan, Acting
Comm'r, U.S. Customs and Border Protection, et al., *Enforcement of the
Immigration Laws to Serve the National Interest* (Feb. 20, 2017),
https://www.dhs.gov/ sites/ default/ files/ publications/ 17_0220_S1_
Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf .................................. 4

Mem. from Michael E. Horowitz, Inspector Gen., to Karol V. Mason,
Assistant Att'y Gen., Office of Justice Programs, *Department of Justice
Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant
Recipients* (May 31, 2016), https:// oig.justice.gov/ reports/ 2016/ 1607.pdf................................. 5

Weekly Declined Detainer Outcome Report (Jan. 28 - Feb. 3, 2017),
https://www.ice.gov/ doclib/ ddor/ ddor2017_01-28to02-03.pdf ..................................................... 7

INTRODUCTION

On January 25, 2017, the President signed Executive Order 13,768 for the declared purpose of "direct[ing] executive departments and agencies . . . to employ all lawful means to enforce the immigration laws of the United States." *See* Exec. Order No. 13,768, § 1, 82 Fed. Reg. 8,799 (Jan. 30, 2017).  As explained in the Order, aliens who enter the United States illegally and those who overstay or otherwise violate the terms of their admission and engage in criminal conduct present a particularly "significant threat to national security and public safety." *Id.*  Those threats are heightened when jurisdictions choose to violate federal law to shield illegal aliens – many of whom have been incarcerated by federal, state, or local authorities – from federal immigration authorities.  *See id.*

To address this threat, the Executive Order states that the Executive Branch's policy is to ensure that States and their political subdivisions comply with existing federal laws.  For example, Section 9 of the Order establishes a policy of ensuring that state and local jurisdictions comply with 8 U.S.C. § 1373, which provides that no government entity or official may prohibit or restrict, among other things, the sending or receiving of information regarding the citizenship or immigration status of any individual to federal immigration authorities.  *Id*. § 9, 82 Fed. Reg. at 8,801.  The Order is a presidential directive, directed to the Attorney General, the Secretary of Homeland Security, and other federal officials.  It does not purport to alter the existing requirements of Section 1373 (or any other federal law), impose new burdens on state or local jurisdictions, or expand the legal authority of the Secretary or the Attorney General.  Rather, it simply announces the policy of the Executive Branch and directs the Secretary and Attorney General, in their discretion and consistent with their existing legal authority, to ensure that jurisdictions that willfully refuse to comply with Section 1373 not be eligible to receive federal grants, except as deemed necessary for law enforcement purposes.  *Id.*  The Order also instructs the Secretary and the Attorney General to take appropriate actions, and directs them to report to the President on their progress in implementing this and other directives in the Order, first within 90 days and then again within 180 days.  *Id.* § 15, 82 Fed. Reg. at 8,802.  Executive Order 13,768

1   is not self-executing, however, and the Secretary and Attorney General have not yet taken the

2   several steps necessary to implement the directives of Section 9.[1]

3        Yet, before such steps or other action have been taken under the Executive Order, the City

4   and County of San Francisco ("City" or "San Francisco") has moved for immediate, emergency

5   injunctive relief to prevent defendants from taking hypothetical future actions against it pursuant

6   to Section 9 of the Order.  The City's lawsuit is premature.  San Francisco does not claim the loss

7   of any federal funds or, for that matter, contend that *any* action has been taken against it under the

8   Order.  The City does not even allege that such action has been threatened.  Indeed, the Secretary

9   has not designated (or even indicated an intent to designate) San Francisco as a "sanctuary

10  jurisdiction" in accordance with the process contemplated in Section 9.  San Francisco also

11  alleges that 8 U.S.C. § 1373 itself is unconstitutional, but the City cannot show any immediate

12  threat of injury due to the statute.

13       For these reasons, the City cannot show the likelihood of "immediate" irreparable harm,

14  an "essential element" of the standard required to obtain emergency injunctive relief.  *See*

15  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Arcsoft, Inc. v.*

16  *Cyberlink Corp.*, 153 F. Supp. 3d 1057, 1071 (N.D. Cal. 2015); *see also Painsolvers, Inc. v. State*

17  *Farm Mut. Auto. Ins. Co.*, 685 F. Supp. 2d 1123, 1139 (D. Haw. 2010).  Rather than meet this

18  standard, the City instead bases its motion on nothing more than speculation concerning the

19  Order's scope and how the Secretary and Attorney General might interpret and implement it,

20  along with speculation that San Francisco will be a subject of enforcement and might lose federal

21  funds.  Such speculative assertions fall far short of demonstrating immediate irreparable harm,

22  which by itself requires that plaintiff's requested emergency relief be denied.

23       In addition, the City also fails to establish a substantial likelihood of success on the merits

24  of its claims, which are subject to dismissal under the justiciability doctrines of ripeness and

25

26  _____

    [1] In this regard, the Department of Justice sent a letter to members of Congress, on March
27  7, 2017, stating that the Department was "in the process of identifying, in its discretion, what
    actions, if any, can lawfully be taken in order to encourage state and local jurisdictions to comply
28  with federal law."  *See* Ltr. from Samuel R. Ramer, Acting Ass't Att'y Gen., Office of Legis.
    Affairs, to Sens. Elizabeth Warren and Edward J. Markey (Mar. 7, 2017) (Attachment 1 hereto).

Opposition Prelim. Inj.                    2
No. 3:17-cv-00485-WHO

1    standing.  Article III of the Constitution requires that a plaintiff have standing and that its claims

2    be ripe for judicial consideration.  Because a series of steps remain to implement Section 9, the

3    City cannot show the "concrete," "palpable" injury needed for standing, *see Whitmore v.*

4    *Arkansas*, 495 U.S. 149, 155 (1990), and the Executive Order has not been "formalized and its

5    effects felt in a concrete way" as needed for ripeness.  *See Abbott Labs. v. Gardner*, 387 U.S. 136,

6    148-49 (1967).  Similarly, the City cannot show any concrete injury attributable to Section 1373

7    itself, which has been in effect since 1996.

8          Notably, the Executive Order does not alter or expand the existing law that governs when

9    the Federal Government may revoke a federal grant where the grantee violates legal

10   requirements.  Instead, the President – pursuant to his express constitutional authority to ensure

11   that federal agencies "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3 –

12   has directed agency heads to utilize their existing legal authorities "to the extent consistent with

13   law," *see* Exec. Order No. 13,768, § 9, in connection with local violations of Section 1373.  In

14   other words, the Executive Order does nothing more than direct enforcement of preexisting duties

15   under federal law.  San Francisco's conjecture to the contrary does not satisfy its burden of

16   justifying the extraordinary relief it seeks, and the Court should accordingly deny plaintiff's

17   motion for preliminary injunction.

18                                  <u>ISSUES PRESENTED</u>

19         1.  Whether the plaintiff has established that it will suffer immediate, concrete irreparable

20   harm in absence of a preliminary injunction.

21         2.  Whether the plaintiff has established that it can satisfy the requirements of

22   justiciability, including standing and ripeness.

23         3.  Whether the public interest and the balance of equities militate against the preliminary

24   injunction sought.

25         4.  Whether the plaintiff can seek a nationwide preliminary injunction or only an

26   injunction limited to the plaintiff itself.

27

28

1

2

BACKGROUND

I.      Broad Executive Discretion in Enforcement of Immigration Law

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."  *Arizona v. United States*, 567 U.S. 387, 132 S. Ct. 2492, 2497 (2012).  Through the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, Congress has granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States.

Under the INA, the Department of Homeland Security ("DHS"), the Department of Justice, and other agencies of the Executive Branch administer and enforce the immigration laws. Likewise, the INA permits the Executive Branch to exercise considerable executive discretion to direct enforcement pursuant to federal policy objectives.  *See Arizona Dream Act Coal. v. Brewer*, ___ F.3d ___, No. 15-15307, 2017 WL 461503, at *9-10 (9th Cir. Feb. 2, 2017) ("By necessity, the federal statutory and regulatory scheme, as well as federal case law, vest the Executive with very broad discretion to determine enforcement priorities.").  Several Presidents have exercised this discretion by Executive Order.  And they have done so in differing ways, reflecting their individual judgments as to how best to take care that the laws of the United States be faithfully executed.  *See, e.g.*, Exec. Order No. 13,726, 81 Fed. Reg. 23,559 (2016) ("Suspending Entry Into the United States of Persons Contributing to the Situation in Libya"); Exec. Order No. 13,608, 77 Fed. Reg. 26,409 (2012) ("Suspending Entry Into the United States of Foreign Sanctions Evaders With Respect to Iran and Syria"); Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (1992) (interdiction of undocumented aliens on oceangoing vessels).  Following the President's lead, the Secretary of Homeland Security has also consistently exercised similar executive discretion in the enforcement of federal immigration law.  *See, e.g.*, Mem. from John Kelly, Sec'y of Homeland Sec., to Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Protection, et al., *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017), https://www.dhs.gov/ sites/ default/ files/ publications/ 17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

1    The INA contains a number of provisions regarding the involvement of state and local

2 authorities in the enforcement of immigration law.  For example, Section 287(g) of the INA

3 authorizes the Secretary to enter into written agreements with a state or local government under

4 which officers of such government may "perform a function of an immigration officer in relation

5 to the investigation, apprehension, or detention of aliens in the United States."  8 U.S.C.

6 § 1357(g)(1).  Likewise, the INA provides for cooperation with DHS in the "identification,

7 apprehension, detention, or removal of aliens not lawfully present in the United States[,]" even

8 without a formal cooperation agreement.  *Id*. § 1357(g)(10)(B).  Another provision, 8 U.S.C.

9 § 1373, ensures the sharing of immigration information between federal and state actors:

> Notwithstanding any other provision of Federal, State, or local law, a Federal,
> State, or local government entity or official may not prohibit, or in any way
> restrict, any government entity or official from sending to, or receiving from,
> [federal immigration authorities] information regarding the citizenship or
> immigration status, lawful or unlawful, of any individual.

*Id*. § 1373(a);[2] *see* Pub. L. No. 104-208, Div. C, Title VI, § 642, 110 Stat. 3009, 3009-707 (1996).

Section 1373 also proscribes prohibiting or restricting any government entity from "maintaining"

information regarding the immigration status of any individual.  8 U.S.C. § 1373(b).

    Well before the issuance of Executive Order 13,768, the compliance of state and local

governments with Section 1373 has been of interest to federal agencies because such govern-

ments are recipients of federal grants.  For example, the Inspector General of the Department of

Justice issued a memorandum on May 31, 2016, as plaintiff notes (Doc. 20 ¶¶ 47-51), describing

a concern that several state and local governments receiving federal grants were not complying

with 8 U.S.C. § 1373.  *See* Mem. from Michael E. Horowitz, Inspector Gen., to Karol V. Mason,

Assistant Att'y Gen., Office of Justice Programs, *Department of Justice Referral of Allegations of*

*Potential Violations of 8 U.S.C. § 1373 by Grant Recipients* (May 31, 2016), https://

oig.justice.gov/ reports/ 2016/ 1607.pdf.  After reviewing a sample of local ordinances regarding

---

[2] *Cf. Steinle v. City & Cty. of San Francisco*, No. 16-CV-02859-JCS, 2017 WL 67064, at
*12 (N.D. Cal. Jan. 6, 2017) (holding, on motions to dismiss, that Section 1373 did not require
defendant to notify federal officials of alien's date of release from local custody).  The Federal
Government had no occasion to address the scope of Section 1373 on the motions to dismiss in
*Steinle*.

communication with federal immigration officials, the Inspector General observed that some

applications of the ordinances appeared to be inconsistent with Section 1373. *Id*. at 4-8.

Nevertheless, the report noted, "[N]o one at DHS or [Immigration and Customs Enforcement] has

made a formal legal determination whether certain state and local laws or policies violate Section

1373, and we are unaware of any Department of Justice decision in that regard." *Id*. at 8 n.12.

II.    Executive Order 13,768

The President signed Executive Order 13,768, *Enhancing Public Safety in the Interior of

the United States*, on January 25, 2017.  82 Fed. Reg. 8,799 (Jan. 30, 2017).  The Order seeks to

"[e]nsure the faithful execution of the immigration laws," including the INA.  *See id*. § 2(a), 82

Fed. Reg. at 8,799.  It sets forth several policies and priorities regarding enforcement of federal

immigration law within the United States.  The Order likewise instructs federal officials,

including the Secretary of Homeland Security, the Attorney General, and the Director of the

Office of Management and Budget ("OMB"), to use "all lawful means" to enforce those laws.

*See id*. §§ 1, 4, 82 Fed. Reg. at 8,799-800.

As permitted by the INA, Executive Order 13,768 establishes priorities regarding aliens

who are subject to removal from the United States under the immigration laws.  *Id*. § 5, 82 Fed.

Reg. at 8,800.  Several provisions of the Order instruct officials to take actions directing future

conduct, including instructions to promulgate certain regulations within one year, to take "all

appropriate action" to hire additional immigration officers, to seek agreements with state and

local officials under Section 287(g) of the INA (referred to above), to develop a program to

ensure adequate prosecution of criminal immigration offenses, and to establish an office to

provide certain services to victims of crimes committed by removable aliens.  *Id*. §§ 6, 7, 8, 11,

13, 82 Fed. Reg. at 8,799-802.  Throughout, the Order specifies that federal officials are to take

these actions as "permitted by law" or as "consistent with law."  *Id*. §§ 7, 8, 9(a), 10(b), 12, 14,

17, 18(b), 82 Fed. Reg. at 8,799-802.

Section 9 of the Executive Order establishes "the policy of the executive branch to ensure,

to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with

8 U.S.C. 1373."  Section 9(a) directs federal agencies to achieve that policy:

1

2

3

4

5

6

7

> In furtherance of this policy, the Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary.  The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.  The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

8

9

10

11

12

13

*Id.* § 9(a), 82 Fed. Reg. at 8,801.  Section 9 further directs the Secretary to publicize, each week, "a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens."  *Id.* § 9(b), 82 Fed. Reg. at 8,801.[3]  It also instructs the Director of OMB to "obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction."  *Id.* § 9(c), 82 Fed. Reg. at 8,801.

14

15

16

Finally, the Executive Order directs the Secretary of Homeland Security and the Attorney General to report on their progress in implementing the Order, first "within 90 days of the date of [the] order and again within 180 days of the date of [the] order."  *Id.* § 15, 82 Fed. Reg. at 8,802.

17

III.   San Francisco's Claims for Emergency Relief

18

19

20

San Francisco seeks a preliminary injunction to prohibit defendants from "enforcing" 8 U.S.C. § 1373 or Section 9 of the Executive Order (Doc. 21 at 1).  The City acknowledges that the Order does not clearly delineate the term "sanctuary jurisdiction" (Doc. 20 ¶ 64).  And the

21

22

23

24

25

26

27

28

---

[3] U.S. Immigration and Customs Enforcement of DHS published the first weekly report pursuant to this directive on March 20, 2017.  *See* Declined Detainer Outcome Report, https://www.ice.gov/ declined-detainer-outcome-report.  The report and accompanying materials make clear that its publication does not constitute a designation of any "sanctuary jurisdiction" under Section 9.  *See id.*, FAQs ("As set forth in the Executive Order, the Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.  DHS continues to evaluate the appropriate criteria for such designation. . . . ICE does not administer grants, and inclusion on the DDOR will not automatically result in ineligibility for grants. . . . DHS is currently working to develop a process, in coordination with the Department of Justice and other interagency partners, to address this requirement of the EO."); *see also* Weekly Declined Detainer Outcome Report (Jan. 28 - Feb. 3, 2017), at 34, https://www.ice.gov/ doclib/ ddor/ ddor2017_01-28to02-03.pdf ("This report should not be considered an exclusive factor in determining a jurisdiction's level of cooperation with and support of ICE or the law enforcement community").

Opposition Prelim. Inj.                                       7
No. 3:17-cv-00485-WHO

1   City does not claim that the Secretary of Homeland Security has designated it as a "sanctuary

2   jurisdiction" in accordance with the process contemplated in Section 9.  The plaintiff nevertheless

3   asserts that the "administration intends to designate" San Francisco as a sanctuary jurisdiction

4   (Doc. 21 at 5).

5          Similarly, the City acknowledges that the Order "is unclear about which [federal] funds

6   are at stake" and that it "could refer only to grants, and not to entitlement programs like Medi-

7   caid" and "could be limited only to funds administered by the Attorney General or the Depart-

8   ment of Homeland Security" (*id*. at 2, 5).  Nevertheless, the City also speculates that the Order

9   "appears to direct the withdrawal of all federal funding" and to "condition eligibility for *all*

10  federal funds on compliance with Section 1373" (*id*. at 2, 11).  Thus, even though Section 9(a)

11  refers only to "Federal grants" and to the Secretary of Homeland Security and Attorney General,

12  the City alleges that it stands to lose *all* of its federal funding – both grants and reimbursements –

13  in areas including social services, health care, and emergency services, such as Medicaid

14  reimbursements for a local hospital (Doc. 20 ¶¶ 109-136).  The City does not allege, however,

15  that any of its federal funding has been withheld or revoked, or that any federal agency has

16  threatened such action.

17                                   <u>ARGUMENT</u>

18          A preliminary injunction is "an extraordinary and drastic remedy" that should not be

19  granted "unless the movant, *by a clear showing*, carries the burden of persuasion.'"  *Lopez v.*

20  *Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972

21  (1997) (per curiam)).  The Supreme Court has clarified the requirements for a preliminary

22  injunction in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008).  Under *Winter*,

23  "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the

24  merits, that he is *likely* to suffer irreparable harm in the absence of preliminary relief, that the

25  balance of equities tips in his favor, *and* that an injunction is in the public interest."  *Id*. at 20

26  (emphasis added).  Critically, this is "a four-part conjunctive test, not . . . a four-factor balancing

27  test"; thus, *Winter* "reject[ed] the sliding-scale test as to the irreparable-injury prong" previously

28  used by some courts.  *U.S. Bank, N.A. v. SFR Invs. Pool 1, LLC*, 124 F. Supp. 3d 1063, 1070 (D.

1   Nev. 2015); *see Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)

2   ("To the extent that our cases have suggested a lesser standard, they are no longer controlling, or

3   even viable.") (footnote omitted).  Further, "[t]he party seeking the injunction bears the burden of

4   proving these elements."  *Campbell v. Feld Entm't Inc.*, No. 12-CV-4233-LHK, 2013 WL

5   4510629, at *4 (N.D. Cal. Aug. 22, 2013).

6          Plaintiff's motion fails for at least three reasons.  First, the Executive Order does not

7   change existing law, but merely instructs the Attorney General and the Secretary of Homeland

8   Security to "employ all lawful means to ensure the faithful execution" of federal law, including

9   8 U.S.C. § 1373.  *See* Exec. Order No. 13,768, §§ 4, 9, 82 Fed. Reg. at 8,800, 8,801.  Second, San

10  Francisco cannot show the imminent irreparable harm necessary for emergency relief because the

11  Secretary and the Attorney General must take a series of steps before Section 9 of Executive

12  Order 13,768 could have any tangible effect on the City.  Finally, and relatedly, plaintiff lacks a

13  "likelihood of success" given the justiciability flaws in its complaint.  Among them, San

14  Francisco has failed to establish that (1) it has suffered "concrete" injury, as it must under the

15  standing doctrine; (2) it has suffered the kind of substantial harm that the Supreme Court has

16  identified as necessary to overcome ripeness concerns in cases asserting pre-enforcement

17  challenges to agency action; and (3) its claims satisfy the "fitness" element of the ripeness inquiry

18  because unimplemented directives contained in an Executive Order are not fit for judicial review

19  under binding precedent.  Thus, because plaintiff's claims are subject to dismissal on several

20  grounds, it necessarily cannot show a "likelihood of success" on the merits of those claims.

21         For these reasons, the motion for preliminary injunction must be denied.

22  I.     Plaintiff Cannot Show Irreparable Harm

23         A.      The Supreme Court Requires a Likelihood of Immediate,
24                 Concrete Irreparable Harm Before an Injunction May Issue

25         As reflected in *Winter*, which focused on irreparable harm, *see* 555 U.S. at 22, satisfying

26  the requirement of immediate and irreparable harm is "crucial" to securing a preliminary

27  injunction.  *Miller ex rel. NLRB v. California Pac. Med. Ctr.*, 991 F.2d 536, 543 (9th Cir. 1993).

28  The district court in *Winter* had granted a preliminary injunction, relying on a "'sliding scale'

1  whereby the required degree of harm increases as the likelihood of success decreases," and vice

2  versa.  *Winter v. Natural Res. Def. Council*, 530 F. Supp. 2d 1110, 1113 n.4 (C.D. Cal. 2008).

3  Preliminary relief was appropriate, the court held, because plaintiffs had demonstrated "a strong

4  likelihood of prevailing on the merits . . . and there [was] a possibility of irreparable harm."  *Id*. at

5  1118.  The Ninth Circuit affirmed on the same basis.  *Winter v. Natural Res. Def. Council*, 518

6  F.3d 658, 697 (9th Cir. 2008).

7       The Supreme Court reversed.  In doing so, the Court noted that its "frequently reiterated

8  standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is

9  *likely* in the absence of an injunction."  555 U.S. at 22.  "Issuing a preliminary injunction based

10  only on a possibility of irreparable harm," the Supreme Court said, "is inconsistent with our

11  characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a

12  clear showing that the plaintiff is entitled to such relief."  *Id*.  Thus, a party seeking a preliminary

13  injunction must establish both that "he is *likely* to succeed on the merits [and] that he is *likely* to

14  suffer irreparable harm in the absence of preliminary relief" – as well as "that the balance of

15  equities tips in his favor, and that an injunction is in the public interest."  *Id*. at 20 (emphasis

16  added); *see Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (plaintiff "must demon-

17  strate that irreparable injury is likely . . . not merely . . . possible").

18       Further, "[t]he threat of irreparable harm must . . . be 'immediate.'"  *Arcsoft, Inc. v.*

19  *Cyberlink Corp*., 153 F. Supp. 3d 1057, 1071 (N.D. Cal. 2015) (quoting *Caribbean Marine Servs.*

20  *Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)).  "A plaintiff must do more than merely allege

21  imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened

22  injury as a prerequisite to preliminary injunctive relief."  *Boardman v. Pac. Seafood Grp.*, 822

23  F.3d 1011, 1022 (9th Cir. 2016).  That injury, moreover, must be "real and concrete" rather than

24  merely "abstract."  *See Los Angeles Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1201 (9th

25  Cir. 1980); *Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014).

26       Finally, where the plaintiff "has failed to establish a likelihood of irreparable harm," a

27  court need not even consider the other requirements.  *Painsolvers, Inc. v. State Farm Mut. Auto.*

28

Opposition Prelim. Inj.          10
No. 3:17-cv-00485-WHO

*Ins. Co.*, 685 F. Supp. 2d 1123, 1139 (D. Haw. 2010); *see RasterOps v. Radius, Inc*., 861 F. Supp. 1479, 1498 (N.D. Cal. 1994).

B. The City Cannot Demonstrate a Likelihood of Immediate, Concrete Irreparable Harm Given the Absence of Any Action under Section 9 or 8 U.S.C. § 1373

Measured against this legal backdrop, San Francisco has not established the threat of "immediate" and "concrete" irreparable harm necessary to secure a preliminary injunction. The Executive Order subjects the City not to new law, but only to the bounds of existing law. Section 9 directs the Secretary and Attorney General to use their existing legal authority to ensure that jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373" will not be eligible to receive Federal grants "to the extent consistent with law." By its terms, that provision incorporates the body of law that governs federal grants and defines when they can be declined for failing to satisfy a condition – here, compliance with Section 1373. By specifying that the authority under Section 9 be exercised "to the extent consistent with law," the President has directed the Secretary and the Attorney General to follow the governing legal limitations, such as the procedural requirements for making or revoking the federal grants. *See*, *e.g*., 28 C.F.R. pt. 18 (Office of Justice Programs Hearing and Appeal Procedures); 44 C.F.R. § 206.440 (appeals in Hazard Mitigation Grant Program). There is no indication that the Order will be implemented inconsistent with those limitations or with any other applicable laws.

Furthermore, Executive Order 13,768 is not self-executing. Rather, the Order sets forth policies and priorities, and directs certain federal agencies to take additional discretionary actions going forward to enforce federal immigration laws more fully. Many of the Order's provisions thus merely direct federal agencies to begin internal preparations to fully enforce federal law. For example, the Order directs the Secretary of Homeland Security to promulgate certain regulations within a year, and it directs the Secretary and the Attorney General to develop a program to ensure adequate prosecution of criminal immigration offenses. *See* Exec. Order No. 13,768, §§ 6, 11, 82 Fed. Reg. at 8,800, 8,801. In several other respects, the Order is a presidential directive to the Secretary and Attorney General guiding their future exercise of discretion in the enforcement

1  of immigration law.  *See Arizona Dream Act Coal.*, ___ F.3d at ___, 2017 WL 461503, at \*10

2  ("By necessity, the federal statutory and regulatory scheme, as well as federal case law, vest the

3  Executive with very broad discretion to determine enforcement priorities.").  Similarly, 8 U.S.C.

4  § 1373 sets forth a federal policy and several prohibitions, but does not provide a concrete

5  enforcement mechanism.

6      Section 9 of the Order directs the Secretary to designate a state or local government as a

7  "sanctuary jurisdiction."  Section 9 likewise directs the Secretary and the Attorney General to

8  ensure that such jurisdictions are ineligible to receive federal grants, "except as deemed necessary

9  for law enforcement purposes."  By expressly directing that such future discretionary agency

10  actions be exercised "consistent with law," *see* Exec. Order No. 13,768, § 9, the Order

11  incorporates, among other things, the law regarding grant conditions and procedures.

12      The same is true of the Order's direction that the Attorney General "take appropriate

13  enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute,

14  policy, or practice that prevents or hinders the enforcement of Federal law."  *Id.* § 9(a), 82 Fed.

15  Reg. at 8,801.  The City fails to acknowledge, however, that existing law and practice already

16  contemplate certain federal actions against state and local laws that frustrate the federal regulation

17  of immigration.  For example, the Federal Government may seek to enjoin a state or local statute

18  that impermissibly conflicts with the government's "broad, undoubted power over the subject of

19  immigration and the status of aliens."  *Arizona v. United States*, 567 U.S. 387, 132 S. Ct. 2492,

20  2497 (2012); *see*, *e.g.*, *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013); *United*

21  *States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012).

22      As a result, a series of future actions must occur before Section 9 or 8 U.S.C. § 1373 could

23  have any concrete effect on San Francisco:  Among other things, (1) the Attorney General and the

24  Secretary of Homeland Security must determine exactly what constitutes "willful refusal to

25  comply with 8 U.S.C. § 1373"; (2) the Secretary must identify any state or local governments that

26  constitute "sanctuary jurisdictions" and make formal designations to that effect; (3) the Secretary

27  and the Attorney General must decide which federal funding sources are "necessary for law

28  enforcement purposes"; (4) the Secretary and the Attorney General must then determine how to

1    "ensure" that sanctuary jurisdictions are ineligible to receive the relevant grant funds; (5) the

2    Secretary and the Attorney General must determine how to implement those actions "consistent

3    with law"; and (6) the Attorney General must determine what appropriate actions he can take in

4    relation to any violation of Section 1373 or any statute, policy, or practice that otherwise hinders

5    the enforcement of federal law.  The Order thus explicitly contemplates that some time will be

6    required for implementation.[4]  Accordingly, this case is distinguishable from *Texas v. United*

7    *States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016), on which the City relies (Doc. 21 at 24).  There,

8    the federal defendants "appear[ed] to concede [that the challenged federal enactment] conflict[ed]

9    with Plaintiffs' policies and practices," 201 F. Supp. 3d at 834, whereas here, the precise reach of

10   the Executive Order is not yet known.

11        San Francisco does not allege that the Federal Government has taken any of these actions.

12   Nor does the City claim that it has been designated as a "sanctuary jurisdiction" or that it has been

13   denied any federal funds.  The City likewise does not allege that it has been notified that any

14   funds will be denied.  None of those actions has occurred, and those events may never occur.

15   Indeed, the City expressly "acknowledges that the withdrawal of federal funds called for by the

16   Executive Order may or may not be imminent" (Doc. 21 at 21).  The City's conjecture about the

17   possibility of future harm does not justify preliminary injunctive relief.  *See Winter*, 555 U.S. at

18   22; *see also Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) (An injunction "will not be

19   granted against something merely feared as liable to occur at some indefinite time in the future.").

20

21

22        [4] *See, e.g.*, Exec. Order No. 13,768, § 6 (requiring Secretary to promulgate regulations "to
     ensure the assessment and collection of all fines and penalties that the Secretary is authorized

23   under the law to assess and collect from aliens unlawfully present in the United States and from
     those who facilitate their presence in the United States"); § 8 (requiring Secretary to enter into

24   agreements with state and local officials under Section 287(g) of INA); § 11 (requiring Secretary
     and Attorney General "to develop and implement a program that ensures that adequate resources

25   are devoted to the prosecution of criminal immigration offenses"); § 15 (requiring Secretary and
     Attorney General to "report on the progress of the directives contained in this order within 90

26   days . . . and again within 180 days."); *see also* Ltr. from Samuel R. Ramer, Acting Ass't Att'y
     Gen., Office of Legis. Affairs, to Sens. Elizabeth Warren and Edward J. Markey (Mar. 7, 2017)

27   (Attachment 1 hereto); Declined Detainer Outcome Report, FAQs, https://www.ice.gov/ declined-
     detainer-outcome-report.

28
     Opposition Prelim. Inj.                        13
     No. 3:17-cv-00485-WHO

1    Nor has the City identified any credible grounds to assert irreparable harm. First, plaintiff

2    contends it is "apparent" that the administration "intends" to designate San Francisco as a

3    sanctuary jurisdiction because the President – as a presidential candidate – referred to San

4    Francisco as a "sanctuary jurisdiction" (Doc. 21 at 5). Candidates are not government actors,

5    however, and statements of what they might undertake if elected, which are often simplified and

6    imprecise, are not "official act[s]." *See McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 862

7    (2005). A presidential candidate "clearly is not empowered to speak for the federal government,"

8    and "[n]o reasonable person believes that campaign [statements] bind the candidate in the event

9    that he or she is elected." *United States v. Stacy*, 734 F. Supp. 2d 1074, 1078 (S.D. Cal. 2010).

10   Such statements generally are made without the benefit of advice from an as-yet-unformed

11   Administration, and they cannot bind elected officials who later conclude that a different course is

12   warranted. *See Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002).[5] Therefore, the

13   statements of the President as a presidential candidate, regarding the status of San Francisco,

14   cannot establish an immediate risk of irreparable harm.

15   Second, the City asserts that the Executive Order subjects San Francisco to a "cloud of

16   uncertainty" over its budgetary decision-making (Doc. 21 at 7). Budgetary "uncertainty,"

17   however, is not the "real and concrete injury" sufficient to justify a preliminary injunction. *See*

18   *Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1201. Moreover, governmental budgeting

19   always suffers from some amount of uncertainty, in relation to both costs (which are based on

20   services provided) and income (which is based in part on tax revenues). In other words, the

21   plaintiff cannot accurately claim that an otherwise certain endeavor is now less certain. Legal

22   restrictions, moreover, always create some risk, whether the likelihood of enforcement is low or

23   high.

24   Furthermore, even if any hypothetical "uncertainty" regarding the City's future receipt of

25   federal funds constituted irreparable harm (which it does not), an injunction setting aside the

26

27   [5] The Supreme Court has declined to rely on media statements and other informal
     communications even by *incumbent* government officials, recognizing that they may not
28   accurately reflect the government's position. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 623 n.52
     (2006).

1    Order would not remedy any such harm.  As noted already, the Order does not alter or expand

2    existing law governing the Federal Government's discretion to revoke or deny a grant where the

3    grantee violates legal requirements.  Thus, any uncertainty the plaintiff might hypothetically face

4    would exist regardless of whether the Court were to enjoin the Order itself.  Additionally, the

5    terms and conditions of an existing grant are governed by the grant documents, and any forced

6    return of grant funds already provided could occur only pursuant to those terms and conditions.

7           Third, plaintiff asserts that it suffers immediate irreparable harm because this alleged

8    uncertainty requires the City to place funds in a budgetary "reserve" for the upcoming Fiscal Year

9    in case it loses expected federal funds (Doc. 21 at 7).  Any harm from the creation of such a

10   reserve, however, would be caused by the City itself, not by the defendants or the Executive

11   Order or 8 U.S.C. § 1373.  This is, therefore, essentially "self-inflicted" harm, which does not

12   constitute irreparable harm for purposes of seeking a preliminary injunction.  *See Cal. Pawn-*

13   *brokers Ass'n v. Carter*, No. 216CV02141JAMKJN, 2016 WL 6599819, at *10 (E.D. Cal. Nov.

14   8, 2016) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm

15   complained of is self-inflicted."); *see also*, *e.g.*, *Second City Music, Inc. v. City of Chicago, Ill.*,

16   333 F.3d 846, 850 (7th Cir. 2003) (noting that "self-inflicted wounds are not irreparable injury");

17   *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We

18   will not consider a self-inflicted harm to be irreparable . . . .").

19          Moreover, plaintiff's argument is based on a risk that grant recipients always face:  If the

20   terms of the grant require compliance with certain federal laws, such as Section 1373, and those

21   terms are not followed, then the recipient is in violation of the grant conditions, and there is a risk

22   that the Federal Government may enforce those terms to the detriment of the grantee and its

23   financial planning.  If the grant language does not require compliance with Section 1373, the

24   Executive Order does not purport to give the Secretary or Attorney General the unilateral

25   authority to alter those terms.  This is underscored by the fact that Executive Order 13,768 does

26   not change the law, but only instructs the Attorney General and the Secretary of Homeland

27   Security to enforce existing law.  Moreover, the City's claimed harm is economic in nature, and

28   "[i]t is well established that mere economic injury does not constitute irreparable harm." *Kitazato*

Opposition Prelim. Inj.                           15
No. 3:17-cv-00485-WHO

1    *v. Black Diamond Hosp. Invs.*, *LLC*, 655 F. Supp. 2d 1139, 1147 (D. Haw. 2009); *see Sampson v.*

2    *Murray*, 415 U.S. 61, 89 (1974) ("Mere injuries, however substantial, in terms of money, time

3    and energy necessarily expended in the absence of a[n] [injunction], are not enough."); *Ali v.*

4    *United States*, 932 F. Supp. 1206, 1210 (N.D. Cal. 1996) ("Economic injury alone does not

5    support a finding of irreparable harm.").

6        Fourth, the City asserts that "the deprivation of constitutional rights unquestionably

7    constitutes irreparable injury" (Doc. 21 at 22-23, internal quotation marks omitted).  The City,

8    however, does not allege a "deprivation" of its "constitutional rights."  Instead, the City primarily

9    points to a claimed violation of the constitutional *structures* that govern relationships among the

10   branches of the Federal Government and between the federal and state governments, which is

11   insufficient to establish irreparable injury.  "[W]hile a violation of constitutional rights can

12   constitute *per se* irreparable harm . . . *per se* irreparable harm is caused only by violations of

13   'personal' constitutional rights . . . to be distinguished from provisions of the Constitution that

14   serve 'structural' purposes, like the Supremacy Clause."  *N.Y. State Rest. Ass'n v. N.Y. City Bd. of*

15   *Health*, 545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008) (internal quotation marks omitted), *rev'd on*

16   *other grounds*, 556 F.3d 114 (2d Cir. 2009); *accord Prof'l Towing & Recovery Operators of Ill.*

17   *v. Box*, No. 08 C 4096, 2008 WL 5211192, at *13 (N.D. Ill. Dec. 11, 2008) ("[T]he Court

18   concludes that Plaintiffs are not entitled to a presumption of irreparable harm because the

19   constitutional rights at stake here are not 'personal' in nature."); *see Am. Trucking Ass'ns v. City*

20   *of Los Angeles*, 577 F. Supp. 2d 1110, 1127 (C.D. Cal. 2008) (noting that "[i]n the case of

21   Supremacy Clause violations," the presumption of irreparable harm "is not necessarily

22   warranted"), *rev'd on other grounds*, 559 F.3d 1046 (9th Cir. 2009).  Not surprisingly, therefore,

23   the cases on which plaintiff relies address alleged violations of *individual* constitutional rights,

24   none of which are involved here (Doc. 21 at 22-23).  *See Melendres v. Arpaio*, 695 F.3d 990, 994-

25   95, 1002 (9th Cir. 2012) (alleging that local law enforcement officers had engaged in racial

26   profiling in violation of plaintiffs' individual Fourth and Fourteenth Amendment rights); *Nelson*

27   *v. NASA*, 530 F.3d 865, 872 (9th Cir. 2008) (alleging that screening and investigation required for

28   contractors violated their Fourth Amendment and privacy rights), *rev'd on other grounds*, 562

1   U.S. 134 (2011); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that "[t]he loss of

2   *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes

3   irreparable injury") (emphasis added).

4        In sum, the plaintiff has not demonstrated, and cannot "demonstrate[,] that irreparable

5   injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

6   II.    The City Cannot Establish a Likelihood of Success on the Merits

7         Because, Among Other Things, Its Claims Are Non-Justiciable

8        A party seeking a preliminary injunction must also "establish that [it] is *likely* to succeed

9   on the merits." *Winter*, 555 U.S. at 20 (emphasis added).  The City cannot establish such a

10  likelihood in this case because its claims are non-justiciable under principles of ripeness and

11  standing. *See Pollara v. Radiant Logistics Inc.*, No. CV 12-0344 GAF (SPX), 2012 WL

12  12887095, at *5 (C.D. Cal. Sept. 13, 2012) (noting that "standing to bring a claim . . . is a

13  necessary predicate to demonstrate a likelihood of success on the merits"); *Timbisha Shoshone*

14  *Tribe v. Salazar*, 697 F. Supp. 2d 1181, 1188 (E.D. Cal. 2010) ("Because [Defendant] raises

15  serious questions as to the Court's subject matter jurisdiction over Plaintiffs' claim, Plaintiffs fail

16  to establish the likelihood of success on the merits of their claims.").  For the same reasons that

17  plaintiff cannot establish the "irreparable injury" needed for a preliminary injunction, it also

18  cannot show a likelihood of success on the merits because its claims are subject to dismissal.

19  *Winter*, 555 U.S. at 20.

20       Under Article III of the Constitution, the jurisdiction of the federal courts extends only to

21  "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  Matters outside this rubric are "non-

22  justiciable." *Ore. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc*., 288

23  F.3d 414, 416 (9th Cir. 2002).  Two principles of justiciability are involved here:  standing and

24  ripeness.  "While standing is concerned with *who* is a proper party to litigate a particular matter,

25  the doctrines of mootness and ripeness determine *when* that litigation may occur." *Haw. Cty.*

26  *Green Party v. Clinton*, 14 F. Supp. 2d 1198, 1201 (D. Haw. 1998).  Where a plaintiff lacks

27  standing or its claims are unripe, the court lacks jurisdiction. *See Nat'l Inst. of Family & Life*

28  *Advocates v. Harris*, 839 F.3d 823, 832 (9th Cir. 2016).

1     To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must

2   demonstrate an "injury in fact," a "fairly traceable" causal connection between the injury and

3   defendant's conduct, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

4   102-03 (1998). The injury needed for constitutional standing must be "concrete," "objective,"

5   and "palpable," not merely "abstract" or "subjective." *See Whitmore v. Arkansas*, 495 U.S. 149,

6   155 (1990); *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975). Additionally, the injury must be

7   "certainly impending" rather than "speculative." *Whitmore*, 495 U.S. at 157, 158. "[S]tanding is

8   perhaps the most important of [the jurisdictional] doctrines." *FW/PBS, Inc. v. City of Dallas*, 493

9   U.S. 215, 231 (1990) (internal quotation marks omitted).

10     Constitutional justiciability also requires that a dispute be ripe for judicial consideration –

11   that is, that the challenged action "has been formalized and its effects felt in a concrete way by the

12   challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). In other words, "[a]

13   claim is not ripe for adjudication [under the Constitution] if it rests upon contingent future events

14   that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523

15   U.S. 296, 300 (1998) (internal quotation marks omitted).

16     In assessing constitutional ripeness in the context of a "pre-enforcement challenge" to a

17   statutory or administrative enactment, the courts consider "both the fitness of the issues for

18   judicial decision and the hardship to the parties of withholding court consideration." *Abbott

19   Labs.*, 387 U.S. at 149. "A claim is fit for decision if the issues raised are primarily legal, do not

20   require further factual development, and the challenged action is final." *Standard Alaska Prod.

21   Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989). In other words, a court considers whether the

22   court and the parties would "benefit from deferring review until the agency's policies have

23   crystallized and the question arises in some more concrete and final form." *Eagle-Picher Indus.,

24   Inc. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985) (internal quotation marks omitted); *see U.S. W.

25   Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1119 (9th Cir. 1999) (finding that claim was not

26   fit for decision where administrative proceedings had not concluded and court would "benefit"

27   from outcome of those proceedings). Finally, "[t]o meet the hardship requirement, a litigant must

28   show that withholding review would result in direct and immediate hardship and would entail

1  more than possible financial loss." *Winter v. California Med. Review, Inc.*, 900 F.2d 1322, 1325

2  (9th Cir. 1989) (internal quotation marks omitted).

3  Applying these standards here, the plaintiff cannot show the "injury in fact" needed for

4  constitutional standing, *Steel Co.*, 523 U.S. at 102-03, and its claims are not constitutionally ripe

5  for judicial review, *Abbott Labs.*, 387 U.S. at 148-49.  Given the many steps that must be taken

6  before any federal funds might be withheld under Section 9 of the Executive Order and 8 U.S.C.

7  § 1373, the City has not suffered any "concrete," "objective," and "palpable" injury.  *See*

8  *Whitmore*, 495 U.S. at 155; *Bigelow*, 421 U.S. at 816-17.  Although plaintiff alleges that the

9  Order has created a "cloud of financial uncertainty" (Doc. 21 at 23), any such "cloud" would be

10  "abstract" and "subjective" rather than "concrete."  *See Whitmore*, 495 U.S. at 155; *Bigelow*, 421

11  U.S. at 816-17.  The same is true of the City's assertion that the Order "fosters an atmosphere of

12  fear and distrust between undocumented immigrants and local government officials in San

13  Francisco" (Doc. 20 ¶ 102):  "fear and distrust" are obviously "abstract" and "subjective" rather

14  than "concrete."

15  San Francisco's other alleged harms are speculative and not "certainly impending," and

16  thus cannot constitute Article III injury.  *See Whitmore*, 495 U.S. at 157, 158.  For example, given

17  the several questions that must be resolved regarding the very meaning of the Order, *see supra* at

18  12-13, the City cannot rely on case law regarding a "credible threat of prosecution" (Doc. 21 at

19  24).  Until those questions are resolved, it is unknown what could prompt the Secretary of

20  Homeland Security and Attorney General to take action against any jurisdiction under Section 9,

21  much less whether they might take action against San Francisco specifically.

22  Additionally, the City asserts that the Order "harms public safety" by "discourag[ing]

23  undocumented immigrants from reporting crimes, seeking public health services, and otherwise

24  engaging with San Francisco programs and services" (Doc. 20 ¶ 106).  The Order, however,

25  reflects a judgment that public safety is best served by identifying and removing aliens who are

26  unlawfully present, and the City's contrary assertion is speculative.  The City also complains that

27  the Order may prompt "credit rating agencies" to downgrade their assessment of San Francisco

28  and thus increase the City's borrowing costs (Doc. 20 ¶ 155).  This assertion is also speculative,

1    both in relation to any downgrade in the City's creditworthiness and the effect of such a change

2    on the City's borrowing costs. *See Whitmore*, 495 U.S. at 157.[6]

3        Further, the plaintiff's claims are not constitutionally ripe because Section 9 of the Order

4    "has [not] been formalized and its effects felt in a concrete way." *Abbott Labs.*, 387 U.S. at 148-

5    49. Implementation of Section 9 "rests upon [several] contingent future events" – including

6    clarification of some of its terms – and those terms may ultimately be defined to exclude the City

7    or its grants or otherwise to greatly diminish the Order's "anticipated" impact. *See Texas*, 523

8    U.S. at 300. Because Section 9 has not yet been implemented and the Secretary of Homeland

9    Security and Attorney General must take several actions before that can occur, this Court would

10   greatly "benefit from deferring review" until the parameters of its implementation "have

11   crystallized and the question arises in some more concrete and final form" that is "fit" for judicial

12   decision. *Eagle-Picher Indus., Inc.*, 759 F.2d at 915; *see U.S. W. Commc'ns*, 193 F.3d at 1119;

13   *see also Abbott Labs.*, 387 U.S. at 149.

14       Finally, the uncertainties surrounding the implementation of Section 9 and the need for

15   "factual development" greatly outweigh any "hardship" to the City from awaiting those

16   developments. *Standard Alaska Prod. Co.*, 874 F.2d at 627. As noted already, several steps must

17   be taken before Section 9 can be implemented, including a determination as to what constitutes a

18   "sanctuary jurisdiction," the federal grants covered, and how to limit those grants "consistent with

19   law." Those determinations will have a bearing on whether Section 9 is eventually applied to the

20   plaintiff or some federal grants that currently benefit the plaintiff. Thus, any "hardship" to the

21   City is far from "immediate," and its protestation of budgetary "uncertainty" does not constitute

22   actual "financial loss" – which, even where it occurs, does not qualify as "hardship" under this

23   analysis. *See Winter*, 900 F.2d at 1325.

24

25   _____

26   [6] The City also asserts that it has had to amend its laws to comply with Section 1373, to "educate City personnel" about the statute (Doc. 21 at 18), and to "respond[] to questions" about

27   the Order (Doc. 20 ¶ 104). But monitoring and implementing the boundary between federal and state/local government is an unavoidable cost of functioning as a governmental entity. In any

28   event, these past actions on the part of the plaintiff cannot justify prospective relief against the defendants.

1    Aside from the lack of justiciability of all of the City's claims, plaintiff cannot succeed on

2    the merits of its claim that 8 U.S.C. § 1373 violates the Tenth Amendment on its face (Doc. 20

3    §§ 166-168).  As the Supreme Court has said, "[a] facial challenge to a legislative Act is, of

4    course, the most difficult challenge to mount successfully, since the challenger must establish that

5    no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*,

6    481 U.S. 739, 745 (1987).  In enacting Section 1373, Congress determined that a state or local

7    government policy barring voluntary cooperation with federal immigration officials is incom-

8    patible with the effective implementation of federal law.  As the Second Circuit has held in

9    rejecting another claim against this statute, San Francisco is asking the Court "to turn the Tenth

10   Amendment's shield against the federal government's using state and local governments to enact

11   and administer federal programs into a sword allowing states and localities to engage in passive

12   resistance that frustrates federal programs."  *City of N.Y. v. United States*, 179 F.3d 29, 35 (2d Cir.

13   1999).  "A system of dual sovereignties," the court observed, "cannot work without informed,

14   extensive, and cooperative interaction of a voluntary nature," and the Supremacy Clause resolves

15   any conflicts by "bar[ring] [States] from taking actions that frustrate federal laws."  *Id*.  The

16   Tenth Amendment does not, therefore, give States and their subdivisions "an untrammeled right

17   to forbid all voluntary cooperation by state or local officials with particular federal programs."

18   *Id*.

19   III.   The Public Interest and the Balance of Equities Militate
            Against the Injunction Sought

20

21   Lastly, a party seeking a preliminary injunction must "establish . . . that the balance of

22   equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

23   Where the Federal Government is the defendant, these factors "merge" into one.  *Nken v. Holder*,

24   556 U.S. 418, 435 (2009).  The most pertinent and concretely expressed public interest in relation

25   to this case is contained in 8 U.S.C. § 1373, which expresses the public interest in supporting the

26   enforcement of federal immigration law.  Section 9 of the Order is meant simply to "ensure"

27   compliance with that statute.  *See* Exec. Order No. 13,768, § 9(a), 82 Fed. Reg. at 8,801.

28   Therefore, the public interest lies in allowing the Executive Branch to pursue the necessary steps

1   to implement this Order.  *See N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010)

2   (noting that "it is obvious that compliance with the law is in the public interest"); *Rubin ex rel.*

3   *NLRB v. Vista del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1108 (C.D. Cal. 2015) (stating

4   that "the public interest favors ensuring compliance with federal law").  Additionally, the public

5   interest prohibits judicial "advisory opinions," which the City's motion would require this Court

6   to render in relation to an Executive Order that has not yet been implemented.  *See Coal. for a*

7   *Healthy Cal. v. FCC*, 87 F.3d 383, 386 (9th Cir. 1996).

8   IV.   <u>No Injunction Should Issue Against the President</u>

9       Even if an injunction were otherwise appropriate, it should not be issued against the

10  President of the United States, whom the City has chosen to name as a defendant.  A request to

11  enjoin the President "draws the Court into serious separation-of-powers issues. . . . [T]he

12  Supreme Court has sent a clear message that an injunction should not be issued against the

13  President for official acts."  *Newdow v. Bush*, 391 F. Supp. 2d 95, 105, 106 (D.D.C. 2005); *see*

14  *Mississippi v. Johnson*, 71 U.S. 475, 500 (1866); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir.

15  1996) (noting that the Supreme Court has issued a "stern admonition" that injunctive relief

16  against the President personally is an "extraordinary measure not lightly to be undertaken").

17  V.   Any Preliminary Injunction Herein Should Be

18       <u>Limited to the Plaintiff</u>

19       Even if the Court were to conclude that plaintiff has satisfied the requirements for a

20  preliminary injunction, the Court should not enter the "nationwide" injunction that the City seeks

21  (Doc. 21 at 1).  "[A]n injunction must be narrowly tailored to affect only those persons over

22  which [the court] has power, and to remedy only the specific harms shown by the plaintiffs, rather

23  than to enjoin all possible breaches of the law."  *Price v. City of Stockton*, 390 F.3d 1105, 1117

24  (9th Cir. 2004) (internal quotation marks omitted).  Thus, courts routinely deny requests for

25  nationwide injunctive relief.  *See Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (staying

26  nationwide injunction insofar as it "grants relief to persons other than" named plaintiff); *Skydive*

27  *Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012) (affirming district court's

28  refusal to grant nationwide relief).

1    Here, the preliminary injunction is sought by the City and County of San Francisco, which

2    has no legitimate interest in the Executive Order's effect on any other jurisdiction.  Thus, the

3    Court should not enter an injunction that is broader than necessary to prevent any irreparable

4    harm to the plaintiff (although, as discussed above, there is none).  Any injunction should not

5    extend to any other state or local governments.  *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*,

6    561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a

7    class, so they could not seek to enjoin such an order on the ground that it might cause harm to

8    other parties"); *see also Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 1006 (5th Cir. 1981) (court

9    must take into account "the larger interests of society that might be adversely affected by an

10   overly broad injunction").  A nationwide injunction would not only be overbroad; it also would

11   effectively enable one district judge to prevent the government from defending the constitu-

12   tionality of the Executive Order in any other court, and interfere with the development of the law

13   in other circuits.  *See United States v. AMC Entm't, Inc.*, 549 F.3d 760, 773 (9th Cir. 2008).

14       Furthermore, a nationwide injunction would be especially inappropriate here because

15   Section 9 of the Order would impact different jurisdictions differently, once steps are taken to

16   implement it "consistent with law."  The way in which the Order might eventually apply to any

17   individual jurisdiction will depend on that jurisdiction's policies and practices and the specific

18   federal grant terms and procedures that are at issue with respect to the grants received or applied

19   for by the jurisdiction.[7]  No nationwide, universal injunction could possibly account for that

20   diversity.

21                                          <u>CONCLUSION</u>

22       Accordingly, plaintiff's motion for preliminary injunction should be denied.

23   Dated:  March 22, 2017

24

25                                  Respectfully submitted,

26                                  CHAD A. READLER
                                    Acting Assistant Attorney General

27   _____

28       [7] Thus, the City is not correct that nationwide relief is appropriate here because "the
     challenged rule is [allegedly] invalid on its face" (Doc. 21 at 8).

1

2      BRIAN STRETCH
       United States Attorney

3
       JOHN R. TYLER
4      Assistant Director

5      /s/ W. Scott Simpson

6      _____
       W. SCOTT SIMPSON (Va. Bar #27487)
7      Senior Trial Counsel

8      Attorneys, Department of Justice
       Civil Division, Room 7210
9      Federal Programs Branch
       Post Office Box 883
10     Washington, D.C. 20044
       Telephone:   (202) 514-3495
11     Facsimile:   (202) 616-8470
       E-mail:       scott.simpson@usdoj.gov
12

13     COUNSEL FOR DEFENDANTS
       DONALD J. TRUMP, President of the
14     United States; UNITED STATES OF
       AMERICA; JOHN F. KELLY, Secretary of
15     Homeland Security; JEFFERSON B.
       SESSIONS, III, Attorney General of the
16     United States

17

18

19

20

21

22

23

24

25

26

27

28