1  MATTHEW J. PIERS (IL #2206161)
2  CHIRAG G. BADLANI (IL # 6308523)
   CARYN C. LEDERER (IL # 6304495)
3  HUGHES SOCOL PIERS RESNICK & DYM, LTD.
   70 West Madison St., Suite 4000
4  Chicago, IL 60602
   Telephone: (312) 580-0100
5  Fax: (312) 604-2623
6  E-mail: mpiers@hsplegal.com

7  *Attorneys for Amici Curiae Individual Sheriffs
   and Police Chiefs*
8

9           UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, | Case No. 3:17-cv-00485-WHO |
| Plaintiff, | **BRIEF *AMICI CURIAE* OF INDIVIDUAL SHERIFFS AND POLICE CHIEFS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, et al., | Date: April 14, 2017 |
| Defendants. | Time: 2:00 p.m. |
| | Dep't: Courtroom 2 |
| | Judge: Hon. William H. Orrick |
| | Date Filed: March 29, 2017 |
| | Trial Date: Not yet set |

BRIEF AMICI CURIAE OF INDIVIDUAL SHERIFFS AND POLICE CHIEFS
Case No. 3:17-cv-00485-WHO

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE*……………………………………………………......1

INTRODUCTION……………………………………………………………………….2

ARGUMENT…………………………………………………………………………….3

    I.     The Executive Order Impedes Effective Law Enforcement…………..3

        A.  Trust and Respect Between Communities and Police Is Essential to Effective Law Enforcement, and is Thwarted When Local Officers are Forced to Partake in Federal Immigration Enforcement…..……………………………………………………...3

        B.  Policies Limiting Local and State Involvement in Federal Immigration Enforcement Seek to Maintain and Build Trust Between the Community and the Police and Preserve Local Resources….………………………..…………………………..8

    II.    The Executive Order Seeks to Force Local Law Enforcement Agencies to Engage in Conduct that Violates the Constitution and Subjects Local Law Enforcement Officers and Agencies to Potential Liability…...……………………………………………..10

CONCLUSION…………………….………..…………………………………………12

**INTEREST OF *AMICI CURIAE***

*Amici* are individual police chiefs and sheriffs from cities and counties in eleven states. *Amici* have extensive expertise in local law enforcement and in cooperative federal-state law enforcement activities. They are intimately familiar with the challenges of performing critical law enforcement functions in communities where immigrants fear the police and are vulnerable to exploitation and crime. *Amici* represent some of the more than 400 jurisdictions that have policies limiting local involvement in federal immigration operations.

*Amici's* experience in keeping their communities safe has taught the critical importance of bringing immigrants and their families out of the shadows. Community trust and cooperation are essential to public safety, and sound police work is undermined by undocumented immigrants' fears of interacting with law enforcement. This dynamic, moreover, leaves undocumented immigrants more vulnerable to crime and exploitation, leading to more violence in the communities *amici* are charged with protecting.

*Amici* have concluded that Executive Order 13768 (the "Executive Order") is an attempt to compel jurisdictions such as the City and County of San Francisco to take part in federal immigration enforcement, including honoring civil detainers—requests from Immigration and Customs Enforcement ("ICE") to hold an individual in local governmental custody to allow ICE to take the individual into federal custody—or risk losing vital federal funding. Greater local involvement in immigration enforcement would cause community members to mistrust the police and result in a decrease in cooperation, hindering the ability of local law enforcement agencies to keep their communities safe. It would also drain scarce resources that would otherwise be used to enhance public safety. Further, detention of individuals under ICE detainers who would otherwise be released from custody has been found by federal courts across the country to violate the Fourth

Amendment of the United States Constitution. Thus, *amici* have concluded that a preliminary injunction is necessary to halt this attempt to coerce local law enforcement officers and agencies into a practice that would likely result in widespread constitutional violations and substantial civil liability. A full list of *amici* is attached as Exhibit A.

**INTRODUCTION**

The lessons *amici* have learned in protecting their communities shed important light on the issues raised in these cases. When community residents live in constant fear that interactions with local police could result in deportation, there is a fundamental breakdown in trust that impedes the police from doing their jobs and threatens public safety. Extensive evidence shows that undocumented immigrants—and their lawfully present family and neighbors—fear that turning to the police will bring adverse immigration consequences. As a result, immigrant communities are less willing to report crime or cooperate with police investigations. This fundamental breakdown in trust poses a major challenge both to investigation of individual crimes and to proper allocation of public safety resources.

Current policies limiting local and state involvement in federal immigration enforcement address this issue of trust. Though they take several different forms, these policies generally aim to preserve local and state resources and improve public safety by promoting cooperation between law enforcement and the communities they serve.[1] Many jurisdictions include a policy or law

---

[1] *See Oversight of the Administration's Misdirected Immigration Enforcement Policies: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the S. Comm. on the Judiciary,* 2 (July 21, 2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n), *available at* http://www.judiciary.senate.gov/imo/media/doc/07-21-15%20Manger%20Testimony.pdf.

limiting continued detention pursuant to an ICE detainer.[2] The Executive Order upends these policies, to the detriment of community safety.

Further, the Executive Order threatens to withdraw federal funds from "sanctuary jurisdictions," which it equates with jurisdictions that refuse to comply with ICE detainer requests, among other factors.[3] Detentions pursuant to ICE detainers have been held by numerous courts to violate the probable cause requirement of the Fourth Amendment. Thus, the Executive Order seeks to compel local jurisdictions to take part in conduct that could result in unconstitutional detentions and civil liability, or face the loss of federal funds. The federal government cannot force local communities into such a Hobson's choice.

## ARGUMENT

### I. The Executive Order Impedes Effective Law Enforcement.

#### A. Trust and Respect Between Communities and Police Is Essential to Effective Law Enforcement, and is Thwarted When Local Officers are Forced to Partake in Federal Immigration Enforcement.

The experience of policing cities across the country has taught law enforcement officers that "[t]o do our job, we must have the trust and respect of the communities we serve."[4] In order to stop crime, police officers "need the full cooperation of victims and witnesses."[5]

---

[2] 8 C.F.R. § 287.7; *see also* Jasmine C. Lee, Rudy Omri, and Julia Preston, *What Are Sanctuary Cities?*, N.Y. TIMES Feb. 6, 2017, http://www.nytimes.com/interactive/2016/09/02/us/sanctuary-cities.html; *Detainer Polices*, IMMIGRANT LEGAL RESOURCE CENTER (Mar. 21, 2017), *available at* https://www.ilrc.org/detainer-policies [hereinafter *ILRC Detainer Policies*]

[3] Exec. Order No. 13768, 82 Fed. Reg. 8799, 8801 at § 9(a) (Jan. 30, 2017) [hereinafter "Executive Order"].

[4] *Oversight of the Administration's Misdirected Immigration Enforcement Policies: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the S. Comm. on the Judiciary,* 2 (July 21, 2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n), *available at* http://www.judiciary.senate.gov/imo/media/doc/07-21-15%20Manger%20Testimony.pdf.

[5] *Id.*

This common-sense philosophy is sometimes called "community policing." Community policing is an approach to policing where police officers engage communities in a working partnership to reduce crime and promote public safety.[6] It thus requires police to interact with neighborhood residents in a manner that will build trust and improve the level of cooperation with the police department.[7] When that relationship of trust is missing–as it is when people believe that contacting police could lead to deportation for themselves or others–community policing breaks down and the entire community is harmed.

According to a Pew survey, 57% percent of Latinos in the United States indicate that they worry about deportation–of themselves, family members, or close friends–and 40% worry about it "a lot."[8] This fear necessarily affects cooperation and communication with the police. Immigrants–and their family members and neighbors who may be U.S. citizens or lawfully present–often assume that interaction with police could have adverse consequences for themselves or a loved one.

As a result, immigrant communities in general, and undocumented immigrants in particular, are less likely to trust and cooperate with local police. One study of Latinos in four major cities found that 70% of undocumented immigrants and 44% of all Latinos are less likely to contact law enforcement authorities if they were victims of a crime for fear that the police will ask

---

[6] *See* Anita Khashu, *The Role Of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties,* POLICE FOUND., (Apr. 2009) (citing Mark H. Moore, "Problem-Solving and Community Policing," MODERN POLICING (Michael Tonry & Norval Morris eds., 1992)), available at https://www.policefoundation.org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf.
[7] *Id.*
[8] Mark Hugo Lopez & Susan Minushkin, *2008 National Survey of Latinos: Hispanics See Their Situation in U.S. Deteriorating; Oppose Key Immigration Enforcement Measures,* PEW HISPANIC CENTER, (Sept. 18, 2008), at ii, *available at* http://pewhispanic.org/reports/report.php?ReportID=93.

them or people they know about their immigration status; and 67% of undocumented immigrants and 45% of all Latinos are less likely to voluntarily offer information about, or report, crimes because of the same fear.[9]

This study (among others) highlights that fears of immigration enforcement and the resulting damage to law enforcement cooperation affects not just the undocumented community but also individuals with citizenship or lawful status, in particular in "mixed-status" households.[10]

This problematic atmosphere of mistrust is felt by police as well.  In one study, two-thirds of the law enforcement officers polled held the view that recent immigrants reported crimes less frequently than others.[11] Those surveyed also indicated that the crimes that are underreported by immigrants most often are serious ones, with domestic violence and gang violence at the top.[12]

The widely-recognized fear among immigrants of interacting with law enforcement poses a fundamental challenge for community policing. Police cannot prevent or solve crimes if victims or witnesses are unwilling to talk to them because of concerns that they or their loved ones or neighbors will face adverse immigration consequences. As the president of the Major Cities Chiefs

---

[9] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (May 2013), *available at* www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF; *see also id.* at 1 ("Survey results indicate that the greater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, . . . exacerbating their mistrust of law enforcement authorities.").
[10] An estimated 85% of immigrants live in mixed-status families. *See* Anita Khashu, *The Role Of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, POLICE FOUND., (Apr. 2009), at 24, *available at* http://www.policefoundation.org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf. *See also* Jill Theresa Messing, et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015) ("The results indicate that for each 1-point increase in fear of deportation [e.g., from 'not much' to 'some' worry, or from 'some' to 'a lot'], Latina participants were 15% less willing to report being victim of a violent crime to police.").
[11] Robert C. Davis, Edna Erez & Nancy Avitabile, *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183, 187 (Sept. 2001).
[12] *Id.* at 188-9.

Association has explained to Congress, "[c]ooperation is not forthcoming from persons who see their police as immigration agents."[13]

Recent incidents in jurisdictions with policies targeted by the Executive Order demonstrate the public safety benefits of these policies. For example, last year Los Angeles Police Department officers had an encounter with a suspected gang member that resulted in a vehicle chase, a foot pursuit, and shots fired. An undocumented immigrant helped police locate the suspect by providing a description and vehicle information.[14] In Tucson, Arizona, an undocumented man confronted and struggled with a man who tried to steal a car with children inside. The immigrant held the individual until police arrived, then cooperated with detectives in the follow-up investigation, resulting in charges of kidnapping, auto theft, and burglary.[15] These examples show why crime is statistically significantly lower in counties that do not hold people in custody beyond their release date pursuant to an ICE detainer compared to those that do.[16] The Executive Order threatens to penalize local agencies for developing these common sense policing policies. But as cautioned by one official, "immigrants will never help their local police to fight crime once they fear we have become immigration officers."[17]

---

[13] Statement of Tom Manger, *supra* note 1, at 2.
[14] Chuck Wexler, *Commentary: Why police support sanctuaries*, PHILA. INQUIRER, March 10, 2017, *available at* http://www.philly.com/philly/opinion/20170310_Commentary__Why_police_support_sanctuaries.html.
[15] *Id.*
[16] Tom K. Wong, "The Effects of Sanctuary Policies on Crime and the Economy," CENTER FOR AMERICAN PROGRESS, (Jan. 26, 2017), available at https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ ("The results of the CEM analysis show that there are, on average, 35.5 fewer crimes per 10,000 people in sanctuary counties—a result that is highly statistically significant.").
[17] *Local Law Enforcement Leaders Oppose Mandates to Engage in Immigration Enforcement*, NATIONAL IMMIGRATION LAW CENTER, (Aug. 2013), at 2 (statement of Chief Acevedo), *available at* https://www.nilc.org/wp-content/uploads/2017/02/Law-Enforcement-Opposition-to-Mandates-2013-08-30.pdf.

The underreporting of crimes by recent immigrants is a problem for the criminal justice system.[18] The most immediate consequence, of course, is that serious crimes go unreported and unpunished. At a broader level, undercounting the incidence of crime in areas where immigrant communities live leads to the under-allocation of law enforcement resources to those communities.[19] As one official explained, when criminal behavior goes unreported "[c]rime multiplies" and "[u]nresolved resentments grow in the community."[20] Another added that the under-reporting of crime "keeps fear at very high levels and diminishes quality of life."[21]

Distrust between immigrants and the police also results in greater victimization of immigrants. "When immigrants come to view their local police and sheriffs with distrust because they fear deportation, it creates conditions that encourage criminals to prey upon victims and witnesses alike."[22] This phenomenon has been termed the "deportation threat dynamic," where an individual does not report a crime of which they are the victim, fearing immigration consequences.[23] Nearly two-thirds of undocumented migrant workers participating in a study in Memphis, Tennessee reported being the victim of at least one crime, with the most common being theft and robbery.[24] Respondents indicated that fewer than a quarter of these crimes were reported to the police, and *only one* was reported by the victim himself.[25]

---

[18] Davis et al., *supra* note 11, at 188.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] Statement of Tom Manger, *supra* note 1, at 2.
[23] Elizabeth Fussell, *The Deportation Threat Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Soc. Q. 593, 610 (2011).
[24] Jacob Bucher, Michelle Manasse & Beth Tarasawa, *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 (2010).
[25] *Id.* at 165.

Undocumented immigrants are especially vulnerable to domestic violence. A number of studies have shown that abusive partners may utilize the threat of deportation in order to maintain power and control.[26] When the abusing partner has lawful status, financial dependence on a partner with stable immigration status may similarly facilitate violence.[27] Seventy percent of participants in one study of domestic abuse victims said that immigration status was a major reason keeping them from seeking help or reporting their abuse to the authorities—and thereby permitting the violence to continue.[28] In another study, the single largest factor independently affecting the rate at which battered immigrant Latina women called the police was identified as immigration status.[29]

### B. Policies Limiting Local and State Involvement in Federal Immigration Enforcement Seek to Maintain and Build Trust Between the Community and the Police and Preserve Local Resources.

Current policies limiting local and state involvement in federal immigration enforcement, while varying by jurisdiction, universally aim to enhance community trust and preserve local resources. These policies seek to improve public safety by promoting cooperation between law enforcement and the communities they serve.

Some administrative policies or laws include formal restrictions on local law enforcement's ability to apprehend or arrest an individual for federal immigration violations, including

---

[26] *See, e.g.*, Messing, *supra* note 10, at 330 (citing several studies); Angelica S. Reina, Brenda J. Lohman & Marta María Maldonado, *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013). The latter study cited a participant who explained that a partner "beat me up and I could have called the police because that was what I thought to do… but he threatened me…he told me that if I called the police I was going to lose out…because they [police officers] …would … take me, because I didn't have legal documents." Reina, Lohman & Maldonado at 601.
[27] *See, e.g.*, Messing, *supra* note 10, at 330.
[28] Reina, Lohman & Maldonado, *supra* note 26, at 600.
[29] Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230, 237 (2005).

restrictions on arrests for civil violations of federal immigration law.[30] Other policies include restrictions on local law enforcement inquiries or investigations into a person's immigration status or the gathering of such information on a local level.[31] Additionally, many jurisdictions have adopted policies against continued detention of an individual based on immigration detainer requests for at least some categories of noncitizens.[32] Several states, including California, limit the extent to which local police can cooperate with detainer requests, and more than 400 counties have policies limiting cooperation with detainers.[33]

These policies also play an important role in preserving local law enforcement resources. Complying with ICE detainer requests alone can add staggering costs—in some cases, tens of

---

[30] See MICHAEL JOHN GARCIA AND KATE M. MANUEL, CONG. RESEARCH SERV., R43457, STATE AND LOCAL "SANCTUARY" POLICIES LIMITING PARTICIPATION IN IMMIGRATION ENFORCEMENT, 9 (July 10, 2015), *available at* https://www.fas.org/sgp/crs/homesec/R43457.pdf; *see also* OR. REV. STAT. ANN. § 181A.820 ("No law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws."); Washington, DC, Mayor's Order 2011-174: Disclosure of Status of Individuals: Policies and Procedures of District of Columbia Agencies (Oct. 19, 2011), at 2 ("No person shall be detained solely on the belief that he or she is not present legally in the United States or that he or she has committed a civil immigration violation."), available at http://dcregs.dc.gov/Gateway/NoticeHome.aspx?NoticeID=1784041 [hereinafter *DC Order*]; Phoenix, AZ, Police Dep't Operations Order Manual, (Jan. 2011) at 1.4, ("The investigation and enforcement of federal laws relating to illegal entry and residence in the United States is specifically assigned to [Immigration and Customs Enforcement within DHS]."), *available at* https://www.phoenix.gov/policesite/Documents/089035.pdf; *see also Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012) ("[the sheriff] may not detain individuals solely because of unlawful presence.").

[31] *See, e.g.*, DC Order, *supra* note 30 (public safety employees "shall not inquire about a person's immigration status. . . for the purpose of initiating civil enforcement of immigration proceedings that have no nexus to a criminal investigation").

[32] GARCIA AND MANUEL, *supra* note 30 at 14.

[33] *See* California Transparency and Responsibility Using State Tools (TRUST) Act, Cal. Gov't Code § 7282.5 (West 2014) (prohibiting local law enforcement agencies from honoring ICE detainer requests for individuals without specific prior criminal convictions or charges as to which a judge has made a finding of probable cause); *see also* Omri and Preston, *supra* note 2; *see also ILCR Detainer Policies, supra* note 2.

millions of dollars annually.[34] Communities carefully allocate resources such as funds, training, and officer duties to best serve local law enforcement needs; forced redistribution to immigration enforcement would siphon limited resources away from where they are most needed while simultaneously damaging community engagement and protection.[35]

The Executive Order seeks to wholly disrupt the policies that many communities, including the City and County of San Francisco, have put in place to specifically ensure that immigrants do not fear interactions with local law enforcement and prevent diversion of resources from effective public safety efforts. Further, the Executive Order has the effect of preventing those communities that want to adopt such policies from moving forward. By forcing jurisdictions to honor detainer requests and further entangle themselves with federal immigration enforcement, the Executive Order reduces the ability of local law enforcement agencies to build trust with immigrant communities, leading the underreporting of crime and greater victimization described above.

**II. The Executive Order Seeks to Force Local Law Enforcement Agencies to Engage in Conduct that Violates the Constitution and Subjects Local Law Enforcement Officers and Agencies to Potential Liability.**

The Executive Order seeks to require jurisdictions to honor ICE detainers or risk losing federal funding. However, numerous courts have found that continuing to detain an individual under an ICE detainer for longer than they otherwise would be held violates the Fourth Amendment. Cities and counties should not be faced with the stark choice of losing federal funds or committing constitutional violations for which they will be subject to civil liability.

---

[34] *See Legislative Threats to Undermine Community Safety Policies: The Costs of Entangling Local Policing and Immigration Law*, NATIONAL IMMIGRANT JUSTICE CENTER AND NATIONAL IMMIGRATION LAW CENTER, (Aug. 2015), *available at* http://immigrantjustice.org/sites/ immigrantjustice.org/files/201508_05_NIJC_NILC_EnforcementCosts.pdf.

[35] *See* Letter from Law Enforcement Task Force to Hon. Trey Gowdy and Hon. Zoe Lofgren (July 20, 2015) *available at* https://immigrationforum.org/wp-content/uploads/2015/07/072015-LEITF-Letter-House.pdf.

The Fourth Amendment's most basic requirement is that all arrests must be supported by probable cause.[36] Probable cause requires that "the facts and circumstances within . . . the officers' knowledge and of which they ha[ve] reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."[37] Under long-standing Fourth Amendment precedent, numerous federal courts have found that continued detention under an ICE detainer, absent probable cause, gives rise to a claim for a violation of the Fourth Amendment and subjects the detaining officer or jurisdiction to civil liability.[38] These courts have found that local jails must have a warrant or probable cause of a new offense to detain a person after they would otherwise be released from custody.[39]

---

[36] *See Dunaway v. New York*, 442 U.S. 200, 213 (1979).

[37] *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (internal quotation marks, brackets, and citation omitted).

[38] *See Morales v. Chadbourne*, 996 F. Supp. 2d 19 (D. R.I. 2014), *aff'd on appeal*, 793 F.3d 208 (1st Cir. 2015) (plaintiff stated Fourth Amendment claim where she was held for 24 hours on ICE detainer issued without probable cause); *Galarza v. Szalczyk*, No. 10-cv-06815, 2012 WL 1080020, at *10, *13 (E.D. Pa. Mar. 30, 2012) (where plaintiff was held for 3 days after posting bail based on an ICE detainer, he stated a Fourth Amendment claim against both federal and local defendants), *rev'd on other grounds*, 745 F.3d 634 (3d Cir. 2014); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-02317-ST, 2014 WL 1414305, at *10 (D. Or. Apr. 11, 2014) (plaintiff's detention on an ICE detainer after she would otherwise have been released "constituted a new arrest, and must be analyzed under the Fourth Amendment"); *Mendoza v. Osterberg*, No. 13CV65, 2014 WL 3784141, at *6 (D. Neb. July 31, 2014) (recognizing that "[t]he Fourth Amendment applies to all seizures of the person," and thus, "[i]n order to issue a detainer[,] there must be probable cause") (internal quotation marks, ellipses, and citations omitted); *Villars v. Kubiatowski*, 45 F.Supp.3d 791 (N.D. Ill. 2014) (holding that plaintiff stated a Fourth Amendment claim where he was held on an ICE detainer that "lacked probable cause); *Uroza v. Salt Lake Cnty.*, No. 11CV713DAK, 2013 WL 653968, at *5-6 (D. Ut. Feb. 21, 2013) (holding that plaintiff stated a Fourth Amendment claim where ICE issued his detainer without probable cause); *Vohra v. United States*, No. 04-cv-00972-DSF-RZ, 2010 U.S. Dist. LEXIS 34363, *25 (C.D. Cal. Feb. 4, 2010) (magistrate's report and recommendation) ("Plaintiff was kept in formal detention for at least several hours longer due to the ICE detainer. In plain terms, he was subjected to the functional equivalent of a warrantless arrest" to which the "'probable cause' standard . . . applies"), adopted, 2010 U.S. Dist. LEXIS 34088 (C.D. Cal. Mar. 29, 2010).

[39] *See, e.g., Morales*, 793 F.3d at 217 (1st Cir. 2015) ("Because Morales was kept in custody for a new purpose after she was entitled to release, she was subjected to a new seizure for Fourth

The Executive Order contains no guidance or directive that detainers will issue only with a showing of probable cause or a judicial warrant. There is thus no lawful way for local jurisdictions to comply with the Executive Order's requirement to honor ICE detainers. Further, the Supreme Court has held that the federal government's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional."[40] The Executive Order's attempt to strip jurisdictions of funding if they do not honor ICE detainers is unlawful, and forces localities to choose between funding and committing and subjecting themselves to liability for constitutional violations. As such, the Executive Order should be preliminarily enjoined.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Plaintiff's Motion, this Court should grant the nationwide preliminary injunction against the Executive Order.

March 29, 2017                    Respectfully Submitted,

/s/ Matthew J. Piers

Matthew J. Piers
Chirag G. Badlani
Caryn C. Lederer
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 West Madison St., Suite 4000
Chicago, IL 60602
Phone: (312) 580-0100
*Counsel for Amici Curiae*

---

Amendment purposes— one that must be supported by a new probable cause justification."); *Vohra*, 2010 U.S. Dist. LEXIS 34363 (C.D. Cal. 2010).
[40] *South Dakota v. Dole*, 483 U.S. 203, 210–11 (1987).

# EXHIBIT A

**EXHIBIT A**

*Amici* Individual Sheriffs and Police Chiefs are:

- Chief Art Acevedo, Houston, Texas, Police Department;

- Chief Charles Beck, Los Angeles, California, Police Department;

- Chief Chris Burbank (retired), Salt Lake City, Utah, Police Department;

- Sheriff Jerry Clayton, Washtenaw County, Michigan, Sheriff's Office;

- Sheriff Mark Curran, Lake County, Illinois, Sheriff's Office;

- Sheriff Tony Estrada, Santa Cruz County, Arizona, Sheriff's Office;

- Sheriff Michael Haley (retired), Washoe County, Nevada, Sheriff's Office;

- Sheriff Bill McCarthy, Polk County, Iowa, Sheriff's Office;

- Sheriff Joe Pelle, Boulder County, Colorado, Sheriff's Office;

- Chief Celestino Rivera, Lorain, Ohio, Police Department;

- Sheriff John Urquhart, King County, Washington, Sheriff's Office;

- Sheriff Lupe Valdez, Dallas County, Texas, Sheriff's Department; and

- Sheriff Richard Wiles, El Paso County, Texas, Sheriff's Office.