UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COUNTY OF SANTA CLARA,

      Plaintiff,

    v.

DONALD J. TRUMP, et al.,

      Defendants.

**ORDER GRANTING THE COUNTY OF SANTA CLARA'S AND CITY AND COUNTY OF SAN FRANCISCO'S MOTIONS TO ENJOIN SECTION 9(a) OF EXECUTIVE ORDER 13768**

Case No. 17-cv-00574-WHO

CITY AND COUNTY OF SAN FRANCISCO,

      Plaintiff,

    v.

DONALD J. TRUMP, et al.,

      Defendants.

Case No. 17-cv-00485-WHO

## INTRODUCTION

This case involves Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," which, in addition to outlining a number of immigration enforcement policies, purports to "[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law" and to establish a procedure whereby "sanctuary jurisdictions" shall be ineligible to receive federal grants. Executive Order 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017) (the "Executive Order"). In two related actions, the County of Santa Clara and the City and County of San Francisco have challenged Section 9 of the Executive Order as facially unconstitutional and have brought motions for preliminary injunction seeking to enjoin its enforcement. *See County of Santa Clara v. Trump*, No. 17-cv-0574-WHO; *City and County of San Francisco v. Trump*, 17-cv-0485-WHO.

The Counties challenge the enforcement provision of the Order, Section 9(a), on several grounds: first, it violates the separation of powers doctrine enshrined in the Constitution because it improperly seeks to wield congressional spending powers; second, it is so overbroad and coercive that even if the President had spending powers, the Order would clearly exceed them and violate the Tenth Amendment's prohibition against commandeering local jurisdictions; third, it is so vague and standardless that it violates the Fifth Amendment's Due Process Clause and is void for vagueness; and, finally, because it seeks to deprive local jurisdictions of congressionally allocated funds without any notice or opportunity to be heard, it violates the procedural due process requirements of the Fifth Amendment.[1]

The Government does not respond to the Counties' constitutional challenges but argues that the Counties lack standing because the Executive Order did not change existing law and because the Counties have not been named "sanctuary jurisdictions" pursuant to the Order. It explained for the first time at oral argument that the Order is merely an exercise of the President's "bully pulpit" to highlight a changed approach to immigration enforcement. Under this interpretation, Section 9(a) applies only to three federal grants in the Departments of Justice and Homeland Security that already have conditions requiring compliance with 8 U.S.C. 1373. This interpretation renders the Order toothless; the Government can already enforce these three grants by the terms of those grants and can enforce 8 U.S.C. 1373 to the extent legally possible under the terms of existing law. Counsel disavowed any right through the Order for the Government to affect any other part of the billions of dollars in federal funds the Counties receive every year.

It is heartening that the Government's lawyers recognize that the Order cannot do more constitutionally than enforce existing law. But Section 9(a), by its plain language, attempts to

---

[1] San Francisco also brings a facial challenge to 8 U.S.C. § 1373, arguing that the statute is unconstitutional under the Tenth Amendment because "the whole object" of that section is to "direct the functioning" of state governments. It seeks an injunction enjoining enforcement of Section 1373, or alternatively, because it believes it complies with Section 1373, an injunction preventing the Government from taking adverse action against it on the basis that it has failed to comply with that Section. Briefing on this issue was intermingled with the attack on the Executive Order, and did not adequately address the important issues raised. At the Case Management Conference on May 2, 2017, at 1:30 p.m. we will discuss litigation of this portion of the City's case.

reach all federal grants, not merely the three mentioned at the hearing. The rest of the Order is broader still, addressing all federal funding. And if there was doubt about the scope of the Order, the President and Attorney General have erased it with their public comments. The President has called it "a weapon" to use against jurisdictions that disagree with his preferred policies of immigration enforcement, and his press secretary has reiterated that the President intends to ensure that "counties and other institutions that remain sanctuary cites don't get federal government funding in compliance with the executive order." The Attorney General has warned that jurisdictions that do not comply with Section 1373 would suffer "withholding grants, termination of grants, and disbarment or ineligibility for future grants," and the "claw back" of any funds previously awarded. Section 9(a) is not reasonably susceptible to the new, narrow interpretation offered at the hearing.

Although the Government's new interpretation of the Order is not legally plausible, in effect it appears to put the parties in general agreement regarding the Order's constitutional limitations. The Constitution vests the spending powers in Congress, not the President, so the Order cannot constitutionally place new conditions on federal funds. Further, the Tenth Amendment requires that conditions on federal funds be unambiguous and timely made; that they bear some relation to the funds at issue; and that the total financial incentive not be coercive. Federal funding that bears no meaningful relationship to immigration enforcement cannot be threatened merely because a jurisdiction chooses an immigration enforcement strategy of which the President disapproves.

To succeed in their motions, the Counties must show that they are likely to face immediate irreparable harm absent an injunction, that they are likely to succeed on the merits, and that the balance of harms and public interest weighs in their favor. The Counties have met this burden. They have demonstrated that they have standing to challenge the Order and are currently suffering irreparable harm, not only because the Order has caused and will cause them constitutional injuries by violating the separation of powers doctrine and depriving them of their Tenth and Fifth Amendment rights, but also because the Order has caused budget uncertainty by threatening to deprive the Counties of hundreds of millions of dollars in federal grants that support core services

3

in their jurisdictions. They have established that they are likely to succeed on the merits of their claims and that the balance of harms and public interest decisively weigh in favor of an injunction. The Counties' motions for preliminary injunction against Section 9(a) of the Executive Order are GRANTED as further described below.

That said, this injunction does nothing more than implement the effect of the Government's flawed interpretation of the Order. It does not affect the ability of the Attorney General or the Secretary to enforce existing conditions of federal grants or 8 U.S.C. 1373, nor does it impact the Secretary's ability to develop regulations or other guidance defining what a sanctuary jurisdiction is or designating a jurisdiction as such. It does prohibit the Government from exercising Section 9(a) in a way that violates the Constitution.

## BACKGROUND

### I. THE EXECUTIVE ORDER

On January 25, 2017, President Donald J. Trump issued Executive Order 13768, "Enhancing Public Safety in the Interior of the United States." *See* Harris Decl. ¶ 2; Ex. A ("EO") (SC Dkt. No. 36-1). In outlining the Executive Order's purpose, Section 1 reads, in part, "Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States." EO §1. Section 2 states that the policy of the executive branch is to "[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." EO §2(c).

Section 9, titled "Sanctuary Jurisdictions" lays out this policy in more detail. It reads:

> Sec. 9. Sanctuary Jurisdictions. It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.
>
> (a) In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement

of Federal law.

(b) To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

(c) The Director of the Office of Management and Budget is directed to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction.

EO §9.

Section 3 of the Order, titled "Definitions," incorporates the definitions listed in 8 U.S.C. § 1101. EO §3. Section 1101 does not define "sanctuary jurisdiction." The term is not defined anywhere in the Executive Order. Similarly, neither section 1101 nor the Order defines what it means for a jurisdiction to "willfully refuse to comply" with Section 1373 or for a policy to "prevent[] or hinder[] the enforcement of Federal law." EO §9(a).

## II.    SECTION 1373

Section 1373, to which Section 9 refers, prohibits local governments from restricting government officials or entities from communicating immigration status information to ICE. It states in relevant part:

(a) In General.   Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional Authority of Government Entities. Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

5

8 U.S.C. 1373.

In July, 2016, the U.S. Department of Justice issued guidance linking two federal grant programs, the State Criminal Alien Assistance Program ("SCAAP") and Edward Byrne Memorial Justice Assistance Grant ("JAG") to compliance with Section 1373.[2] This guidance states that all applicants for these two grant programs are required to "assure and certify compliance with all applicable federal statutes, including Section 1373, as well as all applicable federal regulations, policies, guidelines, and requirements." *Id.* The Department has indicated that the Community Oriented Policing Services Grant (COPS) is also conditioned on compliance with Section 1373.

## III. CIVIL DETAINER REQUESTS

An ICE civil detainer request asks a local law enforcement agency to continue to hold an inmate who is in local jail because of actual or suspected violations of state criminal laws for up to 48 hours after his or her scheduled release so that ICE can determine if it wants to take that individual into custody. *See* 8 C.F.R. § 287.7; Neusel Decl. ¶9; Marquez Decl., Ex. C at 3 (SC Dkt. No. 29-3). ICE civil detainer requests are voluntary and local governments are not required to honor them. *See* 8 C.F.R. § 287.7(a); *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014) ("[S]ettled constitutional law clearly establishes that [immigration detainers] must be deemed requests" because any other interpretation would render them unconstitutional under the Tenth Amendment). Several courts have held that it is a violation of the Fourth Amendment for local jurisdictions to hold suspected or actual removable aliens subject to civil detainer requests because civil detainer requests are often not supported by an individualized determination of probable cause that a crime has been committed. *See Morales v. Chadbourne*, 793 F.3d 208, 215-217 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, No. 3:12-cv-02317-ST, 2014 WL 1414305, at *9-11 (D. Or. Apr. 11, 2014). ICE does not reimburse local jurisdictions for the cost of detaining individuals in response to a civil detainer request and does not indemnify local jurisdictions for

---

[2] *See* Letter from Peter J. Kadzik, Asst. Att'y Gen. U.S. Dep't of Justice, to Hon John A. Culberson, Chairman of the Subcomm. On Commerce, Justice, Sci & Related Agencies, (Jul. 7, 2016), http://culberson.house.gov/uploadedfiles/2016-7-7_section_1373-_doj_letter_to_culberson.pdf. I take judicial notice of Peter Kadzik's letter as courts may judicially notice information and official documents contained on official government websites. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-999 (9th Cir. 2010).

potential liability they could face for related Fourth Amendment violations.  *See* 8 C.F.R. § 287.7(e); Marquez Decl. ¶¶ 21-15 & Exs. B-D.

## IV.     THE COUNTIES' POLICIES

### A.     Santa Clara's Policies

Santa Clara asserts that its local policies and practices with regard to federal immigration enforcement are at odds with the Executive Order's provisions regarding Section 1373.  SC Mot. at 5.  (SC Dkt. No. 26).  In 2010, the Santa Clara County Board of Supervisors adopted a Resolution prohibiting Santa Clara employees from using County resources to transmit any information to ICE that was collected in the course of providing critical services or benefits. Marquez Decl. ¶27 (SC Dkt. No. 29) & Ex. G (SC Dkt. No. 29-7); Neusel Decl. ¶7 (SC Dkt. No. 31); L. Smith Decl. ¶6 (SC Dkt. No. 35).  The Resolution also prohibits employees from initiating an inquiry or enforcement action based solely on the individual's actual or suspected immigration status, national origin, race or ethnicity, or English-speaking ability, or from using County resources to pursue an individual solely because of an actual or suspected violation of immigration law.  *Id.*  In October, 2016, after receiving DOJ guidance that JAG and SCAAP funds would be conditioned on compliance with Section 1373, Santa Clara decided not to participate in those programs.  Marquez Decl. ¶ 29 & Ex. H (SC Dkt. No. 29-8).

Santa Clara also asserts that its policies with regard to ICE civil detainer requests are inconsistent with the Executive Order and the President's stated immigration enforcement agenda. Prior to late 2011, Santa Clara responded to and honored ICE civil detainer requests, housing an average of 135 additional inmates each day at a daily cost of approximately $159 per inmate. Neusel Decl. ¶4.  When the County raised concerns about the costs associated with complying with detainer requests and potential civil liability, ICE confirmed that it would not reimburse the County or indemnify it for the associated costs and liabilities.  Marquez Decl. ¶¶ 21-15 & Exs. B-D.

Santa Clara subsequently convened a task force and adopted a new policy where the County agreed to honor requests for individuals with serious or violent felony convictions, but only if ICE would reimburse the County for the cost of holding those individuals.  Neusel Decl.

¶6; Marquez Decl. ¶26 & Ex. E.  ICE has never agreed to reimburse the County for any costs, so since November 2011 the County has declined to honor all ICE detainer requests.  *Id.*

### B.  San Francisco's Policies

San Francisco's sanctuary city policies are contained in Chapters 12H and 12I of its Administrative Code.  Eisenberg Decl. Exs. A-B (SF Dkt. No. 28).  The stated purpose of these laws is "to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all."  S.F. Admin Code § 12I.1.

As relevant to Section 1373, Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in enforcing federal immigration law or gathering or disseminating information regarding an individual's release status, or other confidential identifying information (which as defined does not include immigration status), unless such assistance is required by federal or state law. S.F. Admin Code § 12H.2.  Although Chapter 12H previously prohibited city employees from sharing information regarding individuals' immigration status, the San Francisco Board of Supervisors removed this restriction in July, 2016, due to concerns that the provision violated Section 1373.

With regard to civil detainer requests, Chapter 12I prohibits San Francisco law enforcement from detaining an individual, otherwise eligible for release from custody, solely on the basis of a civil immigration detainer request.  S.F. Admin Code § 12I.3.  It also prohibits local law enforcement from providing ICE with advanced notice that an individual will be released from custody, unless the individual meets certain criteria.  S.F. Admin Code § 12I.3.  Chapter 12I.3.(e) provides that a "[l]aw enforcement official shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws."  S.F. Admin Code § 12I.3.(e).  San Francisco explains that it adopted these policies due to concerns that holding people in response to civil detainers would violate the Fourth Amendment and require it to dedicate scarce

law enforcement personnel and resources to holding these individuals. Hennessy Decl. ¶11 (SF Dkt. No. 24).

## V. THE COUNTIES' FEDERAL FUNDING

### A. Santa Clara's Federal Funding

In the 2015-2016 fiscal year, Santa Clara received approximately $1.7 billion in federal and federally dependent funds, making up roughly 35% of the County's total revenues. J. Smith Decl. ¶6; Marquez Decl. ¶8. This figure includes federal funds provided through entitlement programs.

Most of the County's federal funds are used to provide essential services to its residents. Marquez Decl. ¶¶ 5-8. In support of its motion, the County includes a number of declarations outlining how a loss of any substantial amount of federal funding would force it to make substantial cut backs to safety-net programs and essential services and would require it to lay off thousands of employees. It highlights that the County's Valley Medical Center, the only public safety-net healthcare provider in the County, relies on $1 billion in federal funds each year, which covers up to 70% of its total annual costs. Lorenz Decl. ¶¶ 3, 7 (SC Dkt. No. 28). A loss of all federal funds would shut down Valley Medical Center and cut off the only healthcare option for thousands of poor, elderly, and vulnerable people in the County. *Id.* ¶ 8. It further highlights that Santa Clara's Social Services Agency, which provides various services to vulnerable residents, including child welfare and protection, aid to needy families, and support for disabled children, adults and the elderly, receives roughly 40% of its budget, $300 million, from federal funds. Menicocci Decl. ¶5 (SC Dkt. No. 30). The County's Public Health Department receives 40% of its budget and $38 million in federal funds. And the County's Office of Emergency Services, whose job is to prepare for and respond to disasters such as earthquakes and terrorism, receives more than two-thirds of its budget from federal funds. Reed Decl. ¶¶ 3-20 (SC Dkt. No. 32).

In the 2014-2015 fiscal year, the County received over $565 million in non-entitlement federal grants. *See* Marquez Decl. Ex. A at 11-12 (SC Dkt. No. 29-1) (showing $338 million in federal grants subject to OMB auditing requirements and an additional $227 million in federal grants through the Department of Housing and Urban Development). This $565 million

9

represents approximately 11% of the County's budget.

**B.    San Francisco's Federal Funding**

San Francisco's yearly budget is approximately $9.6 billion; it receives approximately $1.2 billion of this from the federal government. Rosenfield Decl. ¶9 (SF Dkt. No. 22). San Francisco uses these federal funds to provide vital services such as medical care, social services, and meals to vulnerable residents, to maintain and upgrade roads and public transportation, and to make needed seismic upgrades. Whitehouse Decl. ¶16 (SF Dkt. No. 23). Losing all, or a substantial amount, of federal funds would have significant effects on core San Francisco programs: federal funds make up 100% of Medicare for San Francisco residents, Rosenfield Decl. ¶ 29; 30% of the budget for San Francisco's Department of Emergency Management, *id.* ¶¶25-27; 33% of the budget for San Francisco's Human Services Agency, *id.* ¶¶13-18; and 40% of the budget for San Francisco's Department of Public Health, *id.* ¶¶19-24.

Approximately 20% of these federal funds, or $240 million, are from federal grants. *Id.* ¶29. San Francisco also receives $800 million each year in federal multi-year grants, primarily for public infrastructure projects. *Id.* ¶11.

San Francisco must adopt a balanced budget for the fiscal year beginning July 1, 2017. Whitehouse Decl. ¶16. Under local law, the Mayor must submit a balanced budget to the Board of Supervisors by June 1 and make fundamental budget decisions by May 15, including whether to create a budget reserve to account for the potential loss of significant funds. *Id.* ¶5-6, 8. Any money placed in the budget reserve would not be available to be used for other programs or services in the coming fiscal year. *Id.* ¶9.

### LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This has been interpreted as a four-part conjunctive test, not a four-factor balancing test. However, the Ninth Circuit has held that a plaintiff may also obtain an injunction if he has demonstrated "serious questions going to the

merits" that the balance of hardships "tips sharply" in his favor, that he is likely to suffer irreparable harm, and that an injunction is in the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

## DISCUSSION

## I. JUSTICIABILITY

The Government argues that the Counties' claims against the Executive Order are not justiciable because the Counties cannot establish an injury-in-fact, which is necessary to establish standing, and because their claims are not ripe for review. These principles of standing and ripeness go to whether this court has jurisdiction to hear the Counties' claims. I conclude that the Counties have demonstrated Article III standing to challenge the Executive Order and that their claims are ripe for review.

### A. Standing

Article III, section 2 of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007); *see* U.S. Const. art. III, §, cl. 1. "Standing is an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing a plaintiff must demonstrate "that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts*, 549 U.S. at 517 (citing *Lujan*, 504 U.S. at 560-61).

The Counties contend that they have standing to challenge the Executive Order because the Order threatens to defund, or otherwise bring enforcement action against, states and local jurisdictions that are "sanctuary jurisdictions." Although the Order does not clearly define "sanctuary jurisdictions," it directs the Attorney General and Secretary to ensure that jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants" and elsewhere equates jurisdictions that refuse to honor detainer requests with the term "sanctuary jurisdictions." It further directs the Attorney General to bring "enforcement action" against jurisdictions with policies that "hinder[] the enforcement of Federal

law."

The Counties represent that they have "sanctuary policies" that are likely to subject them to enforcement or defunding under the Order.  They assert that enforcement under the Order would result in injury-in-fact in the form of cuts to federal funds and whatever other penalty the Government seeks to impose through its "enforcement action."  As a result of this threat of major cuts to federal funding, the Order is also causing present injury-in-fact in the form of budget uncertainty.  Alternatively, attempting to comply with the Order would also cause injury, as it would require them to change their local policies in ways that conflict with their local judgment on how best to ensure public safety and require them to commit substantial resources to assist in enforcing federal immigration laws.

The Government raises two primary arguments against the Counties' claims of standing.  First, it asserts that the Counties cannot demonstrate injury-in-fact traceable to the Executive Order because the Order does not change the law in any way, but merely directs the Attorney General and Secretary to enforce existing law.  Second, it argues that the Counties' claims of injury are not sufficiently "concrete" or "imminent" because the Government has not designated either County as a "sanctuary jurisdiction" and has not withheld any federal funds.  I will address these arguments in turn.

### 1.        Whether the Executive Order Changes the Law

The Government's primary defense is that the Order does not change the law, but merely directs the Attorney General and Secretary to enforce existing law.  In its briefing, the Government emphasized Section 9(a)'s provision that it will be implemented "to the extent consistent with law."  It argued that to the extent the Order directs the Attorney General and Secretary to newly condition federal funds on compliance with Section 1373, it could not lawfully do so and so it does not.  It asserted, "If the grant language does not require compliance with Section 1373, the Executive Order does not purport to give the Secretary or Attorney General the unilateral authority to alter those terms."  SC Oppo. at 13.  By this interpretation, Section 9 simply directs the Attorney General and Secretary to ensure that grants that are already conditioned on compliance with Section 1373 are not remitted to jurisdictions that fail to meet that requirement.

At the hearing, the Government went further and explicitly disclaimed the ability under the Executive Order to add conditions to grants authorized by Congress or to enforce the Order against any but three grant programs, SCAAP, JAG and COPS. Government counsel urged me to adopt this narrow reading of the Order, arguing that well-established rules of construction require courts to adopt narrow readings when broader ones would read in constitutional problems.

Where a construction of a statute "would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).[3] "[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." *Blodgett v. Holden*, 275 U.S. 142, 148 (1927). The primary purpose of the doctrine is to "minimize disagreement between the branches by preserving congressional enactments that might otherwise founder on constitutional objections." *Almendarez-Torres v. U.S.*, 523 U.S. 224, 238 (1998).

"This canon is followed out of respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991). This canon of construction is limited; to adopt an alternate construction the statute must be "readily susceptible" to that construction. *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 409 (1909). It is not the job of the courts "to insert missing terms into the statute or adopt an interpretation precluded by [its] plain language." *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998).

As a preliminary matter, a narrow construction does not limit a plaintiffs' standing to challenge a law that is subject to multiple interpretations. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (noting that a plaintiff's standing may be based on its interpretation of the statute even when a narrower interpretation is offered). Therefore, the

---

[3] The Supreme Court has declined to apply this canon of construction to agency actions and it is unclear that it would apply to an Executive Order. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("We know of no precedent for applying [the canon of constitutional avoidance] to limit the scope of an authorized executive action.").

Government's proposed narrow construction does not destroy justiciability.

With regards to the merits of the Government's construction, the Order is not readily susceptible to the Government's narrow interpretation. Indeed, "[t]o read [the Order] as the Government desires requires rewriting, not just reinterpretation." *U.S. v. Stevens*, 559 U.S. 460, 481 (2010).

While the Government urges that the Order "does not purport to give the Secretary or Attorney General the unilateral authority" to impose new conditions on federal grants, that is exactly what the Order purports to do. It directs the Attorney General and the Secretary to ensure that "sanctuary jurisdictions" are "*not eligible to receive*" federal grants. EO §9(a)(emphasis added). Whether a jurisdiction is eligible to receive federal grants is determined by the conditions on those grants and the characteristics, acts, and choices of the jurisdiction. *See* Black's Law Dictionary 634 (10th ed. 2014) (defining "eligible" as "Fit and proper to be selected or to receive a benefit."). Section 9(a)'s language directing the Attorney General and Secretary to ensure that jurisdictions that "willfully refuse to comply" with Section 1373 are "not eligible" for federal grants therefore purports to delegate to the Attorney General and the Secretary the authority to place a new condition on federal grants, compliance with Section 1373. And as Government counsel agreed at the hearing, the power to place conditions on funds belongs exclusively to Congress.

The Government attempts to read out all of Section 9(a)'s unconstitutional directives to render it an ominous, misleading, and ultimately toothless threat. It urges that Section 9(a) can be saved by reading the defunding provision narrowly and "consistent with law," so that all it does is direct the Attorney General and Secretary to enforce existing grant conditions. But this interpretation is in conflict with the Order's express language and is plainly not what the Order says. The defunding provision is entirely inconsistent with law in its stated purpose and directives because it instructs the Attorney General and the Secretary to do something that only Congress has the authority to do–place new conditions on federal funds. If Section 9(a) does not direct the Attorney General and Secretary to place new conditions on federal funds then it only authorizes them to do something they already have the power to do, enforce existing grant requirements.

14

Effectively, the Government argues that Section 9(a) is "valid" and does not raise constitutional issues as long as it does nothing at all. But a construction so narrow that it renders a legal action legally meaningless cannot possibly be reasonable and is clearly inconsistent with the Order's broad intent.

At the hearing, Government counsel argued that the Order applies only to grants issued by the Department of Justice and the Department of Homeland Security because it is directed only at the Attorney General and Secretary of Homeland Security. This reading is similarly implausible. Nothing in Section 9(a) limits the "Federal grants" affected to those only given though the Departments of Justice and Homeland Security. The Department of Justice is responsible for federal law enforcement throughout the country, not just within its own Department. So when the Attorney General is directed to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary" and to "take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law," it is not reasonable to interpret the directive as applying solely to law enforcement grants that the Attorney General and Secretary are specifically given authority to exempt from the Order.

Nor is counsel's narrow interpretation supported by the rest of the Order. Two examples suffice. Section 9(c) instructs the Director of the Office of Management and Budget "to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction." This directive is not limited to grants issued by the Departments of Justice and Homeland Security. And Section 2(c) announces a policy to "ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." The Order's structure and language make clear that a "sanctuary jurisdiction," which the Secretary will eventually define, should change its policies or risk loss of all federal grants, and Section 9(a) provides the means to do so.

The purpose of adopting a plausible valid construction over one that would result in constitutional issues is to *save* an Act that would otherwise fall on constitutional grounds. A

15

construction so narrow that it reads out any legal force does not save the Act and obviates the entire purpose of adopting a narrow reading.  At the hearing, Government counsel explained that the Order is an example of the President's use of the bully pulpit and, even if read narrowly to have no legal effect, serves the purpose of highlighting the President's focus on immigration enforcement.  While the President is entitled to highlight his policy priorities, an Executive Order carries the force of law.  Adopting the Government's proposed reading would transform an Order that purports to create real legal obligations into a mere policy statement and would work to mislead individuals who are not able to conclude, by reading Section 9(a) itself, that it is fully self-cancelling and carries no legal weight.

The Supreme Court has acknowledged that applying a narrow construction to an unconstitutionally overbroad statute does not address the confusion and potential deterrent effect caused by the language of the law itself.  *See*, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975) (concluding, in a First Amendment case, that a narrow construction of an overbroad statute was likely inappropriate because the "deterrent effect on legitimate expression is both real and substantial.").  As discussed below, the coercive effects of the Order's broad language counsel against adopting a narrow construction that deprives it of any legal meaning.

The Government's construction is not reasonable.  It requires a complete rewriting of the Order's language and does not "save" any part of Section 9(a)'s legal effect.  There is no doubt that Section 9(a), as written, changes the law.

## 2.    Pre-enforcement Standing

The Counties argue that they have standing to challenge the Executive Order because they have demonstrated a well-founded belief that the Order will be enforced against them.  In turn, the Government argues that the Counties lack standing because the Government has not yet designated the Counties as "sanctuary jurisdictions" or withheld funds.

Because the Counties have not yet suffered a loss of funds or other enforcement action under the Executive Order, this case is analogous to the many cases addressing pre-enforcement standing.  These cases establish that a plaintiff may demonstrate pre-enforcement standing by showing "an intention to engage in a course of conduct arguably affected with a constitutional

16

interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979); *see Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"); *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (plaintiffs can demonstrate standing by alleging "a credible threat of enforcement"); *American Booksellers*, 484 U.S. at 392 (plaintiffs can establish standing by demonstrating a "well-founded fear that the law will be enforced against them.").

At the hearing, the Government suggested that pre-enforcement review is generally only available when there are criminal penalties or First Amendment issues at stake. While pre-enforcement cases often fall into these categories, pre-enforcement review is not so limited. In a pre-enforcement case, just like any other case, courts are limited by "the primary conception that federal judicial power is to be exercised . . . only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." *Poe v. Ullman*, 367 U.S. 497, 504 (1961). The Court has repeatedly recognized that "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). When a threatened injury has not yet been felt, "the question becomes whether any perceived threat to respondents is sufficiently real and immediate to show an existing controversy" *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974), or whether it is merely "imaginary or speculative," *Younger v. Harris*, 401 U.S. 37, 42 (1971).

The pre-enforcement line of cases outlines a framework for answering this question in the context of threatened civil or criminal enforcement action. Just as Article III standing is not reserved for individuals who have suffered criminal penalties or First Amendment restrictions, pre-enforcement review is not reserved for such individuals. *See e.g. Terrace v. Thompson*, 263 U.S. 197, 214 (1923) (noting that a plaintiff has standing to enjoin a law when the government "threatens and is about to commence proceedings, either civil or criminal, to enforce such a law

17

against parties affected"); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926) (holding that a landowner bringing Fourteenth Amendment claims and facing only civil penalties had pre-enforcement standing).

Many of the pre-enforcement cases recognize that First Amendment challenges raise an additional consideration for standing purposes because a statute restricting First Amendment rights may cause harm without any enforcement by "chilling speech." *See American Booksellers*, at 393 ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."). While this "chilling" effect is particularly important in the First Amendment context, analogous concerns have been recognized in other situations. For example, that a threat of legal action may coerce individuals to abandon their legal rights is well recognized outside of First Amendment restrictions and was one of the driving factors behind the creation of the Declaratory Judgment Act. *See MedImmune*, 549 U.S. at 129 ("The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate."). And courts have recognized that, outside the First Amendment context, a law's threat of enforcement may, on its own, cause present injury. *See Village of Euclid*, 272 U.S. at 386. In *Village of Euclid*, the Court considered whether a landowner had pre-enforcement standing to challenge a local zoning ordinance that it alleged had drastically reduced the market value of a particular piece of property by limiting its use and threatening to impose penalties for zoning violations. *Id.* at 384. Although the landowner had not faced any enforcement under the ordinance, the Court concluded the claims were justiciable because "injury is inflicted by the mere existence and threatened enforcement of the ordinance" as "prospective buyers . . . are deterred from buying any part of this land." *Id.* 384-385.

In sum, the pre-enforcement cases reveal that an individual facing enforcement action may establish standing by demonstrating a well-founded fear of enforcement and a threatened injury that is "sufficiently real and imminent." *O'Shea*, 414 U.S. at 496. One may also establish standing by demonstrating that a well-founded fear of enforcement action is itself causing present injury. *See American Booksellers*, at 393; *Village of Euclid*, 272 U.S. at 385.

As I discuss below, review of the Counties' allegations demonstrates that they have a well-founded fear of enforcement under the Executive Order. They have further demonstrated that enforcement under the Order would deprive them of federal grants that they use to provide critical services to their residents and that the "mere existence and threatened enforcement" of the Order is causing them present injury in the form of budget uncertainty. They have demonstrated Article III standing to challenge the Order.

### a. The Counties' policies are proscribed by the language of the Executive Order

Where it is not fully clear what conduct is proscribed by a statute, a well-founded fear of enforcement may be based in part on a plaintiff's reasonable interpretation of what conduct is proscribed. *See American Booksellers*, 484 U.S. at 392. This is true even if a narrower reading of the statute may be available. *Id.* at 397.

In *American Booksellers*, the Supreme Court concluded that a group of booksellers had standing to challenge a Virginia law that made it unlawful for any person to "knowingly display for commercial purpose" visual or written material depicting sexual conduct "which is harmful to juveniles." *Id.* at 386 (citing Va. Code § 18.2-391(a) (Supp. 1987)). The booksellers challenged the statute on First Amendment grounds and alleged that they had standing because they had identified 16 books that they intended to display and that they believed would be covered by the statute. *Id.* Even though the statute had not been made effective and the State had not identified specific materials that would be implicated by the statute, the Court concluded that this was sufficient to establish Article III standing because "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Id.* at 392. Further, while the government put forward a narrow construction of the law that would have made the burden to booksellers and the public "significantly less than that feared and asserted by plaintiffs," the Court did not consider this construction in assessing the plaintiffs' standing. *Id.* at 397.

The Counties' policies are likely to subject them to enforcement given their reasonable interpretation of what conduct and policies the Order purports to proscribe. Section 9(a) of the

Executive Order directs the Attorney General and the Secretary to "ensure" that "sanctuary jurisdictions" are "not eligible to receive Federal grants." EO §9(a). The Counties acknowledge that the Executive Order does not clearly define "sanctuary jurisdictions" but note that the Order's language indicates that a "sanctuary jurisdiction" is, at a minimum, any jurisdiction that "willfully refuse[s] to comply with 8 U.S.C. 1373." The Government has not clarified what it means to "willfully refuse to comply" with Section 1373, and indeed argues that the Counties lack standing because the Attorney General and Secretary of Homeland Security have not yet figured that out. SC Oppo. at 11 ("[T]he Attorney General and the Secretary of Homeland Security must determine exactly what constitutes 'willful refusal to comply with 8 U.S.C. § 1373'"). Despite this, on March 27, 2017, Attorney General Sessions "urg[ed] states and local jurisdictions to comply with these federal laws, including 8 U.S.C. Section 1373" and confirmed that "failure to remedy violations could result in withholding grants, termination of grants, and disbarment or ineligibility for future grants." *See* RJN-2, Ex. D ("Sessions Press Conference") (SF Dkt. No. 61-4).[4]

The Attorney General also stated that this policy was "entirely consistent with the Department of Justice's Office of Justice Program's guidance that was issued just last summer under the previous government." *Id.* In the process of developing that guidance, the Inspector General of the Department of Justice, Michael Horowitz, prepared a memorandum entitled "Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients." *See* RJN-1, Ex. A (Dkt. No. 29-1).[5] The memorandum studies the policies of several jurisdictions and discusses whether they might violate Section 1373. It supports a broad reading of Section 1373 and specifically notes that San Francisco's policy prohibiting City employees from using "City funds or resources to assist in the enforcement of federal immigration law or to

---

[4] I take judicial notice of Attorney General Sessions's press conference statements which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. § 201 (b)(2).

[5] I take judicial notice of the Horowitz memorandum as a government memorandum that is not subject to reasonable dispute. *Mack v. S. Bay Beer Distribs., Inc.*, 789 F.2d 1279, 1282 (9th Cir. 1986) (courts may judicially notice records and reports prepared by administrative bodies); *Daniels-Hall*, 629 F.3d at 998-999 (courts may judicially notice information contained on official government websites).

gather or disseminate information regarding the immigration status of individuals . . . unless such assistance is required by federal or State statute" could run afoul of Section 1373 unless San Francisco employees are aware that they are permitted to share immigration status information with ICE. *Id.* The memo further suggests that policies prohibiting civil detainer requests, even if they do not explicitly restrict sharing of immigration status information, may nevertheless affect ICE's interactions with local officials regarding immigration status requests and therefore raise Section 1373 concerns. *Id.*

In addition to the potential that, under the Order, compliance with Section 1373 requires compliance with detainer requests, the Order may also directly require states and local governments to honor ICE detainer requests to avoid being designated "sanctuary jurisdictions." While the defunding provision in Section 9(a) seems to define "sanctuary jurisdictions" as those that run afoul of Section 1373, Section 9(b) equates "sanctuary jurisdictions" with "any jurisdiction that ignored or otherwise failed to honor any detainers with respect to [aliens that have committed criminal actions]." This language raises the reasonable concern that a state or local government may be designated a sanctuary jurisdiction, and subject to defunding, if it fails to honor ICE detainer requests. This interpretation is supported by Section 9(a)'s broad grant of discretion to the Secretary to designate jurisdictions as "sanctuary jurisdictions." While the Order states that the Secretary's designation authority must be exercised "consistent with law," with the exception of the Order there are no laws regarding "sanctuary jurisdiction" designations: Section 9 gives the Secretary unlimited discretion.

This reading is also supported by Section 9(a)'s directive to the Attorney General to take "appropriate enforcement action" against any jurisdiction that has a policy or practice that "hinders the enforcement of federal law." While the Order does not outline what policies "hinder[] the enforcement of Federal law," Attorney General Sessions recently suggested that a local policy that prohibits compliance with detainer requests would constitute a "policy, or practice that prevents or hinders the enforcement of Federal law." *See* Sessions Press Conference at 2 ("Unfortunately, some states and cities have adopted policies designed to frustrate this enforcement of immigration laws. This includes refusing to detain known felons on the federal

21

detainer request, or otherwise failing to comply with these laws.").  Given Section 9(b)'s language equating "sanctuary jurisdictions" with jurisdictions that fail to honor detainer requests, the Secretary's unlimited discretion in designating jurisdictions as "sanctuary jurisdictions," and the Order's instruction that the Attorney General shall take "enforcement action" against jurisdictions that hinder the enforcement of federal law, which the Attorney General has indicated includes, at a minimum, failure to honor detainer requests, the Order appears to proscribe states and local jurisdictions from adopting policies that refuse to honor detainer requests.

Santa Clara's policy, prohibiting local officials from using County funds to transmit information collected in the course of providing critical services or benefits, could be considered a restriction on the intergovernmental exchange of information regarding immigration status in violation of Section 1373.  Similar to Santa Clara, San Francisco prohibits the use of City funds or resources "to assist in the enforcement of Federal immigration law."  S.F. Admin. Code § 12H.2.  Although these policies do not directly prohibit communications with ICE, given the breadth of the Order and the statements of the Attorney General, the Counties have a well-founded fear that the Government may argue that they may sufficiently interfere with those communications in a way that violates Section 1373.  Further, the Counties do not honor civil detainer requests.  Under a broad reading, these policies may be considered an improper restriction on the intergovernmental exchange of information in violation of Section 1373, falling within Section 9(b)'s language that jurisdictions that fail to honor detainer requests are "sanctuary jurisdictions."

In short, the Counties are likely to be designated "sanctuary jurisdictions" under their reasonable interpretation of the Executive Order.

### b.     The Government has indicated an intent to enforce the Order generally and against the Counties more specifically

In assessing whether enforcement action is likely, courts look to the past conduct of the government, as well as the government's statements and representations, to determine whether enforcement is likely or simply "chimerical."  *See Steffel*, 415 U.S. at 459 (petitioner that had twice been warned to stop handbilling, and whose companion had been arrested, had well-founded fear of enforcement); *Poe*, 367 U.S. at 508 (1961) ("the fear of enforcement of provisions that

have during so many years gone uniformly and without exception unenforced" was "chimerical").

A plaintiff does not need to have been specifically threatened with enforcement action to show that enforcement action is likely. *See Susan B. Anthony List*, 134 S. Ct. at 2345 (plaintiffs demonstrated credible threat of enforcement where the law had previously been enforced against them); *American Booksellers*, 484 U.S. at 393 (plaintiffs had credible threat of enforcement even though newly enacted law had not become effective and no enforcement action had been brought or threatened under it). However, "the threat of enforcement must at least be 'credible,' not simply 'imaginary or speculative.' " *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1140 (9th Cir. 2000) (en banc) (citing *Babbitt*, 442 U.S. at 298).

Although the Government now takes the position that the Order carries no legal force, in its public statements and through its actions it has repeatedly indicated its intent to enforce the Order. The Executive Order was passed on January 27, 2017. Although the defunding provision has not yet been enforced against any jurisdiction, governmental leaders have made numerous statements reaffirming the Government's intent to enforce the Order and to use the threat of withholding federal funds as a tool to coerce states and local jurisdictions to change their policies. On February 5, 2017, after signing the Executive Order, President Trump confirmed that he was willing and able to use "defunding" as a "weapon" so that sanctuary cities would change their policies. *See* Harris Decl. Ex. B (Tr. of Feb. 5, 2017 Bill O'Reilly Interview with President Donald J. Trump) at 4 (SC Dkt. No. 36-2) ("I don't want to defund anybody. I want to give them the money they need to properly operate as a city or a state. If they're going to have sanctuary cities, we may have to do that. Certainly that would be a weapon.").[6]

Sean Spicer, the White House press secretary, has confirmed that the Government intends to enforce the order, stating that the President intended to ensure that "counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with

---

[6] I take judicial notice of President Trump's interview statements as the veracity of these statements "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. § 201 (b)(2).

the executive order." Harris Decl. Ex. C at 4-5 (SC Dkt. No. 36-3).[7]  In the same briefing, Spicer

cited favorably the actions of Miami-Dade County Mayor Carlos Giménez who, one day after the

Executive Order, instructed his Interim Director of Corrections to "honor all immigration detainer

requests" "[i]n light of the Executive Order."  *See* RJN-1, Ex. C (SF Dkt. No. 29-3).[8]  Lauding

Miami-Dade's actions, Spicer noted that Miami-Dade "understand[s] the importance of this order"

and encouraged other jurisdictions to follow its lead.  Harris Decl. Ex. C at 4-5.

      Attorney General Sessions recently reaffirmed the Government's intent to enforce the

defunding provisions, stating that if jurisdictions do not comply with Section 1373, such violations

would result in "withholding grants, termination of grants, and disbarment or ineligibility for

future grants," and that the Government would seek to "claw back any funds awarded to a

jurisdiction that willfully violates 1373."  Sessions Press Conference at 2.[9]  When asked at a

subsequent press briefing about this claw back process, Spicer confirmed that the Government's

"priority is clear, is to get cities into – into compliance and to make sure we understand there's not

just a financial impact of this, but also a very clear security aspect of this."  RJN-3, Ex. C at 15

(SF Dkt. No. 74-3).[10]

      The statements of the President, his press secretary and the Attorney General belie the

---

[7] I take judicial notice of Spicer's February 8, 2017 press briefing as courts may judicially notice information contained on official government websites.  *See Daniels-Hall*, 629 F.3d at 998-999.

[8] I take judicial notice of Mayor Giménez's memorandum as a government memorandum and record.  *See Mack*, 789 F.2d at 1282.

[9] In addition to these statements, the Government began to implement Section 9(b) of the Executive Order, which is designed to "better inform the public regarding the public safety threats associated with sanctuary jurisdictions" and requires ICE to publish a weekly "Declined Detainer Outcome Report" containing a public list of all "criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens." *See* RJN-2, Ex. H. (SF Dkt. No. 61-8).  Due to concerns that the weekly reports contained inaccurate information, the Declined Detainer Outcome Report has been "temporarily suspended" but "ICE remains committed to publishing the most accurate information available regarding declined detainers across the country."  *Declined Detainer Outcome Report*, ICE, https://www.ice.gov/declined-detainer-outcome-report (last visited April 12, 2017).  I take judicial notice of the ICE's Declined Detainer Outcome Reports as courts may judicially notice information contained on official government websites.  *See Daniels-Hall*, 629 F.3d at 998-999.

[10] I take judicial notice of Spicer's March 31, 2017 press briefing as courts may judicially notice information contained on official government websites.  *See Daniels-Hall*, 629 F.3d at 998-999.

Government's argument in the briefing that the Order does not change the law. They have repeatedly indicated an intent to defund sanctuary jurisdictions in compliance with the Executive Order. The Counties' concerns that the Government will enforce the defunding provision are well supported by the Government's public statements and actions, all of which are consistent with enforcing the Order.

Finally, in addition to demonstrating that the Government is likely to enforce the Order, the Counties have demonstrated that the Government is particularly likely to target them and the funds on which they rely. In a February 5, 2017 interview, President Trump specifically threatened to defund California, stating: "I'm very much opposed to sanctuary cities. They breed crime. There's a lot of problems. If we have to we'll defund, we give tremendous amounts of money to California . . . California in many ways is out of control." *See* Harris Decl. Ex. B. The Counties have established that they both receive large percentages of their federal funding through the State of California, and that they would suffer injury if California was "defunded." In a recent joint letter to Chief Justice Cantil-Sakauye of the California Supreme Court, Attorney General Sessions and Secretary Kelly again called out the State of California, as well as its cities and counties, for their sanctuary policies: "Some jurisdictions, including the State of California and many of its largest counties and cities, have enacted statutes and ordinances designed to specifically prohibit or hinder ICE from enforcing immigration law by prohibiting communication with ICE, and denying requests by ICE officers and agents to enter prisons and jails to make arrests." RJN-3, Ex. A (SF Dkt. No. 74-1).[11] ICE has identified California, Santa Clara County, and San Francisco as jurisdictions with policies that "Restrict Cooperation with ICE" and has identified Santa Clara County Main Jail and San Francisco County Jail as two of eleven detention centers with the "highest volume of detainers issued" that "do not comply with detainers on a routine basis." RJN-3, Ex. B (SF Dkt. No. 74-2).

The President and the Attorney General have also repeatedly held up San Francisco

---

[11] I take judicial notice of Attorney General Sessions's and Secretary Kelly's letter as an official government document. *See Mack*, 789 F.2d at 1282.

specifically as an example of how sanctuary policies threaten public safety. In his statements to the press on March 27, 2017, Attorney General Sessions referenced the tragic death of Kate Steinle and noted that her killer "admitted the only reason he came to San Francisco was because it was a sanctuary city." Sessions Press Conference at 1. In an op-ed recently published in the San Francisco Chronicle, the Attorney General wrote that "Kathryn Steinle might be alive today if she had not lived in a 'sanctuary city' " and implored "San Francisco and other cities to re-evaluate these policies." RJN-3, Ex. D (SF Dkt. No. 74-4).[12] These statements indicate not only the belief that San Francisco is a "sanctuary jurisdiction" but that its policies are particularly dangerous and in need of change. They also reveal a choice by the Government to hold up San Francisco as an exemplar of a sanctuary jurisdiction.

The Government argues that despite these public statements, San Francisco and Santa Clara cannot demonstrate a credible threat of enforcement because the Government has not actually threatened to enforce the Executive Order against them. It points to *Thomas v. Anchorage Equal Rights Commission*, in which the Ninth Circuit, sitting *en banc*, concluded that plaintiffs lacked standing to challenge an Alaska law prohibiting landlords from discriminating against tenants on the basis of their marital status. *Thomas*, 220 F.3d at 1137. In finding the case was non-justiciable, the court highlighted that "[n]o action has ever been brought against the landlords to enforce the marital status provision." *Id.* at 1140. However, this was not the only fact informing the court's analysis: it also noted that plaintiffs could not point to concrete facts showing that they had ever violated the law or were planning to violate it, it stressed that the enforcement agency tasked with enforcing the Alaska law had never heard of plaintiffs before the case was filed, and it emphasized that in 25-years on the books the law had been minimally enforced (resulting in only two civil enforcement actions and no criminal prosecutions). *Id.* None of these facts are present here.

The Government's specific criticisms of San Francisco, Santa Clara, and California

---

[12] I take judicial notice of Attorney General Sessions's statements in his op-ed as the veracity of these statements "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. § 201 (b)(2).

support a well-founded fear that San Francisco and Santa Clara will face enforcement directly under the Executive Order, or could be subject to defunding indirectly through enforcement against California.[13]  San Francisco and Santa Clara have shown that their current practices and policies are targeted by the Order.  They have demonstrated that, in the less-than-three months since the Order was signed, the Government has repeatedly indicated its intent to enforce it.  And they have established that the Government has specifically highlighted Santa Clara and San Francisco as jurisdictions with sanctuary policies.  On these facts, Santa Clara and San Francisco have demonstrated that the "threat of enforcement [is] credible, not simply imaginary or speculative."  *Id.* (internal quotation marks omitted).

### c. The Counties' claims implicate a constitutional interest

The Counties' claims implicate a constitutional interest, the rights of states and local governments to determine their own local policies and enforcement priorities pursuant to the Tenth Amendment.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (highlighting that states have a sovereign interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal"); *see also New York v. United States*, 505 U.S. 144, 157-158 (1992) ("[T]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States.").

The Counties explain that their sanctuary policies "reflect local determinations about the best way to promote public health and safety."  SF Mot. at 19 (SF Dkt. No. 21).  In contrast to the Order's assertion that sanctuary jurisdictions are a "public safety threat[]," the Counties contend that, in their judgment and experience, sanctuary policies make the community safer by fostering trust between residents and local law enforcement.  Among other things, this community trust encourages undocumented residents to cooperate with police and report crimes, *see* Individual Sheriffs and Police Chiefs' Amicus Brief at 3-10 (SF Dkt. No. 59-1); Southern Poverty Law

---

[13] Amicus briefs on behalf of numerous California cities and counties, public school districts and the State Superintendent of Instruction echo the reasons given by the Counties to demonstrate standing here.

Center Amicus Brief at 5 (SF Dkt. No. 38-2) and to obtain preventative medical care and immunizations, which has major implications for public health and works to reduce emergency medical care costs, *see* Nonprofit Associations' Amicus Brief at 11(SF Dkt. No. 68-1); SEIU Amicus Brief at 5-6 (SF Dkt. No. 33-1). It also improves schools' ability to provide quality education to all children. *See* State Superintendent of Public Instruction's Amicus Brief at 1-2 (SF Dkt. No. 64-1); Public Schools' Amicus Brief at 7 (SF Dkt. No. 58-1).[14]

The Counties have demonstrated that their sanctuary policies reflect their local judgment of what policies and practices are most effective for maintaining public safety and community health. Because they argue that the Executive Order seeks to undermine this judgment by attempting to compel them to change their policies and enforce the Federal government's immigration laws in violation of the Tenth Amendment, their claims implicate a constitutional interest. *See Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) ("when a federal law interferes with a state's exercise of its sovereign 'power to create and enforce a legal code' [] it inflict[s] on the state the requisite injury-in-fact."); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985) (Ohio had standing to litigate the constitutionality of its own law where "effective enforcement of the Ohio statute" was rendered "uncertain by the formal position of the [U.S. Department of Transportation] that the Ohio statute is preempted" as "threatened injury to a State's enforcement of its safety laws" constitutes an injury-in-fact).

---

[14] The Counties have received support from dozens of Amici, who collectively filed 16 briefs in support of each motion for preliminary injunction. *See*, SEIU Amicus Brief (SF Dkt. No. 33-1)(SF Dkt. No. 59-1); Professors of Constitutional Law Amicus Brief (SF Dkt. No. 36-1) (SC Dkt. No. 68-1); Southern Poverty Law Center, et al. Amicus Brief (SF Dkt. No. 38-1)(SC Dkt. No. 67-1); Technology Companies Amicus Brief (SF Dkt. No. 39-1)(SC Dkt. No. 73-1); California Cities and Counties Amicus Brief (SF Dkt. No. 40)(SC Dkt. No. 74-1); Tahirih Justice Center et al. Amicus Brief (SF Dkt. No. 41-1)(SC Dkt. No. 76-1); International Municipal Lawyers Amicus Brief (SF Dkt. No. 47-1); Public Schools Amicus Brief (SF Dkt. No. 58-1)(SC Dkt. No. 77-1); Individual Sheriffs and Police Chiefs Amicus Brief (SF Dkt. No. 59-1)(SC Dkt. No. 65-1); 34 Cities and Counties Amicus Brief (SF Dkt. No. 62-1)(SC Dkt. No. 61-1); Constitutional Law Scholars Amicus Brief (SF Dkt. No. 63-1)(SC Dkt. No. 69-1); California Superintendent of Public Instruction Amicus Brief (SF Dkt. No. 64-1)(SC Dkt. No. 75); State of California Amicus Brief (SF Dkt. No. 66-1)(SC Dkt. No. 71-1); Anti-Defamation League Amicus Brief (SF Dkt. No. 67-1)(SC Dkt. No. 72-1); Bay Area Non-Profits (SF Dkt. No. 68-1)(SC Dkt. No. 78-1); SIREN Amicus Brief (SC Dkt. No. 64-1); *see also* NAACP Joinder re Southern Poverty Law Amicus Brief (SF Dkt. No. 69)(SC Dkt. No. 86); Young Women's Christian Association Joinder re Motion for Preliminary Injunction (SC Dkt. No. 43-3). I GRANT all of Amici's administrative motions for leave to file Amicus Briefs.

### d. The Counties are threatened with the loss of federal grants and face a present injury in the form of budgetary uncertainty

The Counties assert that the Order threatens to penalize them for failing to comply with Section 1373 and for failing to honor detainer requests by withholding all federal funds, or at least all federal grants. Section 9(a) does not threaten all federal funding, but it does include all federal grants, which still make up a significant part of the Counties' budgets. This threatened injury meets Article III's standing requirements. A "loss of funds promised under federal law [] satisfies Article III's standing requirement." *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015).

The Counties also explain that the need to mitigate a potential sudden loss of federal funds has thrown their budgeting processes into uproar: they cannot make informed decisions about whether to keep spending federal funds on needed services for which they may not be reimbursed; they are forced to make contingency plans to deal with a potential loss of funds, including placing funds in a budget reserve in lieu of spending that money on needed programs; and the obligation to mitigate potential harm to their residents and drastic cuts to services may ultimately compel them to change their local policies to comply with what they believe to be an unconstitutional Order. The potential loss of all federal grants creates a contingent liability large enough to have real and concrete impacts on the Counties' ability to budget and plan for the future. As discussed in more detail below, the Counties have demonstrated that they are suffering a present "injury [] inflicted by the mere existence and threatened enforcement of the [Order]." *Village of Euclid*, 272 U.S. at 385. In addition to the threatened loss of funds, this may also establish Article III standing.

A sudden loss of grant funding would have another effect. The Counties receive large portions of their federal grants through reimbursement structures – the Counties first spend their own money on particular services and then receive reimbursements from the federal government based on the actual services provided. Marquez Decl. ¶ 15. Because these funds are spent on an ongoing basis, at all times the Counties are expecting, and relying on, millions of dollars in federal reimbursements for services already provided. A sudden cut to funding, including a cut to these reimbursements, could place them immediately in significant debt. A sudden and unanticipated cut mid-fiscal year would substantially increase the injury to the Counties by forcing them to make

1  even more drastic cuts to absorb the loss of funds during a truncated period in order to stay on

2  budget.  Whitehouse Decl. ¶ 9.

3       San Francisco explains that a mid-year loss of only $120 million in federal funding would:

4  require the City to make significant cuts to critical services and would result in reductions in the

5  numbers of first responders, such as police officers, firefighters, and paramedics; require severe

6  cuts to the City's MUNI transportation system; threaten the Mayor's program to end chronic

7  veterans' homelessness by 2018; and likely require cuts to social services, such as senior meals,

8  safety net services for low-income children, and domestic violence prevention services.

9  Whitehouse Decl. ¶17.  Because federal grants support key government services, San Francisco

10  asserts that, without clarity about the funds the Order could withhold or claw back, it will need to

11  allocate millions of dollars to a budget reserve on May 15, 2017 to prepare for the potential loss of

12  significant funds during the 2017 fiscal year.  Whitehouse Decl. ¶8, 10, 15.  Any funds placed in a

13  reserve fund will not be available to fund other City programs and services for the 2017 fiscal

14  year, which would result in a dollar-for-dollar reduction in services the City is able to provide its

15  residents.  *Id.*  13-14.

16       Santa Clara asserts that the current budgetary uncertainty puts it in an "untenable position."

17  Marquez Decl. ¶4.  It explains that Santa Clara's budget for the current fiscal year is already in

18  place and was developed based on careful weighing of various factors, including anticipated

19  revenues, specific service needs, salary and benefits for the County's 19,000 employees, and the

20  County's fiscal priorities.  *Id.* ¶12.  Because Santa Clara operates federally funded programs on a

21  daily basis, and incurs costs in anticipation that it will be reimbursed, its ability to provide these

22  services depends on the County having some confidence that it will continue to receive the federal

23  reimbursements and funds on which it depends.  With the Order's unclear and broad language

24  threatening a significant cut to funding, the County does not know "whether to (1) continue

25  incurring hundreds of millions of dollars in costs that may never be reimbursed by the federal

26  government, (2) discontinue basic safety-net services delivered to its most vulnerable residents, or

27  (3) in an attempt to avoid either of these outcomes, be effectively conscripted into using local law

28  enforcement and other resources to assist the federal government in its immigration enforcement

United States District Court
Northern District of California

efforts." *Id.* at 11.

The Government argues that governmental budgeting always suffers from some uncertainty due to fluctuations in cost and tax revenues so any uncertainty caused by the Executive Order does not make "an otherwise certain endeavor [] less certain." While local budgeting always suffers from some uncertainty, as addressed immediately above, it is the magnitude of the present uncertainty and the fact that the Executive Order places at risk funds on which the Counties could previously rely that is causing them harm. The Government also argues that the Counties' concerns would not be addressed by enjoining the Executive Order because "the Order does not alter or expand existing law governing the Federal Government's discretion to revoke or deny a grant where the grantee violates legal requirements." As discussed *supra* in Section I.A.1, I reject this unpersuasive interpretation of the Order.

Finally, the Government asserts that budgetary uncertainty is too abstract to meet Article III's standing requirements and cites *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980). The facts of that case are not analogous to this one. There, the Coliseum Commission alleged that there was a reasonable likelihood that the Raiders were "seriously interested" in moving to Los Angeles but that they were unlikely to get the necessary votes from the NFL to approve a transfer under the existing rules. The Ninth Circuit concluded that the Commission's speculative allegations were not sufficient to establish standing to challenge the transfer approval rules. *Id.* While the Commission alleged it was likely to suffer losses in revenues as a result of the transfer rules, it made no argument that the NFL's rules caused the type of significant budget uncertainty alleged here.

The Counties cite *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), which is on point. There, the Court considered whether the City of New York was injured when President Clinton cancelled a section of the Balanced Budget Act of 1997 that waived the federal government's right to recover certain past taxes from New York. *Id.* at 422. This cancellation meant that the state was again potentially liable for remitting close to $2.6 billion to the Department of Health and Human Services ("HHS"), and would have to wait for a determination from the HHS as to whether it would grant the state's requests to waive those taxes. *Id.* The

Court rejected the government's argument that the City's injuries were too speculative. It concluded that although there was still a potential that New York's taxes would be waived, the President's cancellation had deprived New York of the benefits of the law, which were akin to the certainty of a favorable final judgment. *Id.* at 430-31. It reasoned, "the revival of a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor" and constitutes an injury-in-fact. *Id.* at 430-31.

While President Clinton's cancellation in *City of New York* revived a contingent liability, President Trump's Executive Order creates a contingent liability, potentially placing hundreds of millions of dollars of the Counties' federal grants at risk. The Counties have explained the concrete impact this new liability has had in disrupting their ability to budget, make decisions regarding what services to provide, and plan for the future. The potential loss of funds also impacts the Counties potential borrowing power and financial strength – San Francisco notes that it has already received inquiries from credit rating agencies about the Executive Order and its impact on San Francisco's finances. Rosenfield Decl. ¶31. This budget uncertainty is not abstract. It has caused the Counties real and tangible harms. They have adequately demonstrated that budgetary uncertainty of the type threatened by the Executive Order can constitute an injury-in-fact sufficient for Article III standing.

### e. The Counties meet the requirements for pre-enforcement standing

In sum, the Counties have established a well-founded fear of enforcement under the Executive Order. They have demonstrated that, under their reasonable interpretation of the Order, their local policies are proscribed by Section 9's language. They have demonstrated that the Government intends to enforce the Order against them specifically. And they have demonstrated that their claims against the Order implicate a constitutional interest – their Tenth Amendment rights to self-governance. The Counties have shown "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt*, 442 U.S. at 298. Further, the Counties have demonstrated that the Order threatens to withhold federal grant money and that the

32

threat of the Order is presently causing the Counties injury in the form of significant budget uncertainty. The Counties' well-founded fear of enforcement of Section 9(a) is sufficient to demonstrate Article III standing.

### B. Ripeness

The Government also argues that the Counties' claims are not justiciable because they are not "prudentially ripe." In assessing prudential ripeness, a court considers "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (9th Cir. 1989). The Supreme Court has called into question "the continuing vitality of the prudential ripeness doctrine" and highlighted that prudential ripeness is distinct from constitutional ripeness. *Susan B. Anthony List*, 134 S. Ct. at 2347 (holding that a claim was justiciable, even though the Court had not yet assessed its prudential ripeness, because "we have already concluded that petitioners have alleged a sufficient Article III injury"). Regardless, the Counties' claims meet the "fitness" and "hardship" factors of prudential ripeness.

"A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989). The Government asserts that the Counties' claims are not yet fit for review because "[i]mplementation of Section 9 'rests upon [several] contingent future events'– including clarification of some of its terms – and those terms may ultimately be defined such as to exclude the County or its grants or otherwise to greatly diminish the Order's 'anticipated' impact." SC Oppo. at 17 (citing *Texas v. United States*, 523 U.S. 296, 300 (1998)).

In *Texas v. United States*, Texas sought a declaration that a state provision allowing the State Commissioner of Education to appoint a special master to impose sanctions against school districts falling below the state's accreditation requirements did not violate Section 5 of the Voting Rights Act. 523 U.S. at 299. The Court concluded that this claim was not ripe for review because the relevant statute would only come into play if a school district fell below the state's standard, if the Commissioner had unsuccessfully attempted to impose a number of other less intrusive measures first, and if the Commissioner then decided a special master was necessary. *Id.* at 300.

Given the various uncertain future events, and that the state could not identify any school district to which the Commissioner was likely to appoint a special master, the Court concluded that the claim was not yet fit for review. *Id.*

The Government argues that, because it must still determine what the terms of the Order mean and how it will enforce it, the Counties' claims are not fit for review, just like the state's claim in *Texas*. This argument is not convincing. The "contingent future events" the Government identifies are always at issue in a pre-enforcement case; before actual enforcement occurs the enforcing agency must determine what the statute means and to whom it applies. Under the Government's line of reasoning, virtually all pre-enforcement cases would be non-justiciable on prudential ripeness grounds. But the possibility that the Government "may" choose to interpret the Order's broad language narrowly or "may" choose not to enforce it against the Counties does not justify deferring review. This is especially true here because, as the Counties highlight, the uncertainty concerning how the Government will enforce the Order is currently causing them injury. Given the statements of the President and Attorney General, the Counties have every reason to be concerned about budgeting decisions, are struggling to determine whether to continue to provide, or cut services, and are expending time and resources planning for the contingency of losing federal funds. The Counties challenge the Executive Order as written; a decision to enforce it sparingly cannot impact whether it is unconstitutional on its face. The Counties' claims do not require further factual development, are legal in nature, and are brought against a final Executive Order. They are fit for review.

"To meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Winter v. Cal. Med. Review, Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1989) (internal quotation marks omitted). The Government argues that the "uncertainties surrounding the implementation of Section 9 and the need for 'factual development' greatly outweigh any 'hardship' to the Count[ies] from awaiting those developments." SC Oppo. at 17-18. But the "uncertainties" created by the broad, vague language of the Order, its unconstitutional directives, and the comments of the President and Attorney General about what type of conduct and which jurisdictions it targets are

34

1    causing the Counties present harm.  Without clarity the Counties do not know whether they should

2    start slashing essential programs or continue to spend millions of dollars and risk a financial crisis

3    in the near future.  They are forced to choose "between taking immediate action to [their]

4    detriment and risking substantial future penalties for non-compliance." *Chamber of Commerce of*

5    *U.S. v. Reich*, 57 F.3d 1099, 1100-01 (D.C. Cir. 1995).  Waiting for the Government to decide

6    how it wants to apply the Order would only cause more hardship and would not resolve the legal

7    question at issue: whether Section 9(a) as written is unconstitutional.  The Counties' claims are

8    prudentially ripe.

9        The Counties have established Article III standing and their claims are justiciable.  They

10   have also demonstrated that their claims are prudentially ripe for review.

## II.    LIKELIHOOD OF SUCCESS ON THE MERITS

12       The Counties challenge the Executive Order on several constitutional grounds and bear the

13   burden of demonstrating a likelihood of success on the merits.  The Government presents no

14   defense to these constitutional arguments; it focused on standing and ripeness.  I conclude that the

15   Counties have demonstrated likely success on the merits in several ways.

### A.    Separation of Powers

17       The Counties argue that the Executive Order is unconstitutional because it seeks to wield

18   powers that belong exclusively to Congress, the spending powers.  Article I of the Constitution

19   grants Congress the federal spending powers.  *See* U.S. Const. art. I, § 8, cl. 1.  "Incident to this

20   power, *Congress* may attach conditions on the receipt of federal funds, and has repeatedly

21   employed the power 'to further broad policy objectives by conditioning receipt of federal moneys

22   upon compliance by the recipient with federal statutory and administrative directives.' " *South*

23   *Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citing *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)

24   (emphasis added).  While the President may veto a Congressional enactment under the

25   Presentment Clause, he must "either 'approve all the parts of a Bill, or reject it in toto.' " *City of*

26   *New York*, 524 U.S. at 438 (quoting 33 Writings of George Washington 96 (J. Fitzpatrick ed.,

27   1940)).  He cannot "repeal[] or amend[] parts of duly enacted statues" after they become law.  *Id.*

28   at 439.

This is true even if Congress has attempted to expressly delegate such power to the President. *Id.* In *City of New York*, the Supreme Court concluded that the Line Item Veto Act, which sought to grant the President the power to cancel particular direct spending and tax benefit provisions in bills, was unconstitutional as it ran afoul of the " 'finely wrought' procedures commanded by the Constitution" for enacting laws. *Id.* at 448 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). While Congress can delegate some discretion to the President to decide how to spend appropriated funds, any delegation and discretion is cabined by these constitutional boundaries.

After a bill becomes law, the President is required to "take Care that the Law be faithfully executed." *See* U.S. Const. art. II, § 3, cl. 5. Where Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so. *See City of New York*, 524 U.S. at 439; U.S. Const. art. I, § 8, cl. 1. Further, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . ." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Congress has intentionally limited the ability of the President to withhold or "impound" appropriated funds and has provided that the President may only do so after following particular procedures and after receiving Congress's express permission. S*ee* Impoundment Control Act of 1974, 2 U.S.C. §§ 683 *et seq.*

The Executive Order runs afoul of these basic and fundamental constitutional structures. The Order's stated purpose is to "ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." EO §2. To effectuate this purpose, the Order directs that "the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." EO §9(a). Section 9 purports to give the Attorney General and the Secretary the power to place a new condition on federal funds (compliance with Section 1373) not provided for by Congress. But the

President does not have the power to place conditions on federal funds and so cannot delegate this power.

Section 9 is particularly problematic as Congress has repeatedly, and frequently, declined to broadly condition federal funds or grants on compliance with Section 1373 or other federal immigration laws as the Executive Order purports to do. *See, e.g.*, Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2016). This puts the President's power "at its lowest ebb." *Youngstown*, 343 U.S. at 637. The Order's attempt to place new conditions on federal funds is an improper attempt to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles.

**B.      Spending Clause Violations**

The Counties also argue that, even if the President had the spending power, the Executive Order would be unconstitutional under the Tenth Amendment as it exceeds those powers. The Counties are likely to succeed on this claim as well.

While Congress has significant authority to encourage policy through its spending power, the Supreme Court has articulated a number of limitations to the conditions Congress can place on federal funds. The Executive Order likely violates at least three of these restrictions: (1) conditions must be unambiguous and cannot be imposed after funds have already been accepted; (2) there must be a nexus between the federal funds at issue and the federal program's purpose; and (3) the financial inducement cannot be coercive.

**1.      Unambiguous Requirement**

When Congress places conditions on federal funds "it must do so unambiguously" so that states and local jurisdictions contemplating whether to accept such funds can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 203 (internal quotation marks omitted). Because states must opt-in to a federal program willingly, fully aware of the associated conditions, Congress cannot implement new conditions after-the-fact. *See Nat'l Fed. of Indep. Bus. v. Sebelius ("NFIB")*, 132 S. Ct. 2566, 2602-04 (2012). "The

legitimacy of Congress's exercise of the spending power thus rests on whether the state voluntarily and knowingly accepts the terms of the contract" at the time Congress offers the money. *Id.* at 2602.

The Executive Order purports to retroactively condition all "federal grants" on compliance with Section 1373. As this condition was not an unambiguous condition that the states and local jurisdictions voluntarily and knowingly accepted at the time Congress appropriated these funds, it cannot be imposed now by the Order. In addition, while the Order's language refers to all federal grants, the Government's lawyers say it only applies to three grants issued through the Departments of Justice and Homeland Security. If the funds at stake are not clear, the Counties cannot voluntarily and knowingly choose to accept the conditions on those funds.

Finally, as discussed *infra* in Section II.D., the Order's vague language does not make clear what conduct it proscribes or give jurisdictions a reasonable opportunity to avoid its penalties. *See* discussion re vagueness *infra* Section II.D. The unclear and untimely conditions in the Executive Order fail the "unambiguous" restriction because the Order does not make clear to states and local governments what funds are at issue and what conditions apply to those funds, making it impossible for them to "voluntarily and knowingly accept[] the terms of the contract." *NFIB*, 132 S. Ct. at 2602.

### 2. Nexus Requirement

The conditions placed on congressional spending must have some nexus with the purpose of the implicated funds. "Congress may condition grants under the spending power only in ways reasonable related to the purpose of the federal program." *Dole*, 483 U.S. at 213. This means that funds conditioned on compliance with Section 1373 must have some nexus to immigration enforcement.

The Executive Order's attempt to condition all federal grants on compliance with Section 1373 clearly runs afoul of the nexus requirement: there is no nexus between Section 1373 and most categories of federal funding, including without limitation funding related to Medicare, Medicaid, transportation, child welfare services, immunization and vaccination programs, and emergency preparedness. The Executive Order inverts the nexus requirement, directing the

38

Attorney General and Secretary to cut off all federal grants to "sanctuary jurisdictions" but giving them discretion to allow "sanctuary jurisdictions" to receive grants "deemed necessary for law enforcement purposes." EO § 9(a). As the subset of grants "deemed necessary for law enforcement purposes" likely includes any federal funds related to immigration enforcement, the Executive Order expressly targets for defunding grants with no nexus to immigration enforcement at all. This is the precise opposite of what the nexus test requires.

### 3. Not Coercive Requirement

Finally, Congress cannot use the spending power in a way that compels local jurisdictions to adopt certain policies. Congress cannot offer "financial inducement . . . so coercive as to pass the point at which pressure turns to compulsion." *Dole*, 483 U.S. at 211 (internal quotation marks omitted). Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *NFIB*, 132 S. Ct. at 2602. States must have a "legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id.* at 2602-2603.

In *NFIB*, the Supreme Court concluded that the Affordable Care Act's threat of denying Medicaid funds, which constituted over 10 percent of the State's overall budget, was unconstitutionally coercive and represented a "gun to the head." *Id.* at 2604. The Executive Order threatens to deny sanctuary jurisdictions all federal grants, hundreds of millions of dollars on which the Counties rely. The threat is unconstitutionally coercive.

### C. Tenth Amendment Violations

The Counties argue that Section 9(a) violates the Tenth Amendment because it attempts to conscript states and local jurisdictions into carrying out federal immigration law. The Counties are likely to succeed on this claim as well.

"The Federal Government may not compel the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188. "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own."

*NFIB*, 132 S. Ct. at 2602.

As discussed with regard to the Counties' standing arguments, the Counties have demonstrated that under their reasonable interpretation, the Order equates "sanctuary jurisdictions" with "any jurisdiction that ignored or otherwise failed to honor any detainers" and therefore places such jurisdictions at risk of losing all federal grants. *See* EO §9(b). The Counties have shown that losing all of their federal grant funding would have significant effects on their ability to provide services to their residents and that they may have no legitimate choice regarding whether to accept the government's conditions in exchange for those funds. To the extent the Executive Order seeks to condition all federal grants on honoring civil detainer requests, it is likely unconstitutional under the Tenth Amendment because it seeks to compel the states and local jurisdictions to enforce a federal regulatory program through coercion.

Even if the Order does not condition federal grants on honoring detainer requests, it certainly seeks to compel states and local jurisdictions to comply with civil detainers by directing the Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." EO §9(a). Although the Order provides no further clarification on what this "enforcement" might entail or what policies might "hinder[] the enforcement of Federal law," Attorney General Sessions, who is tasked with implementing this provision, has equated failure to honor civil detainer requests with policies that "frustrate th[e] enforcement of immigration laws." *See* Sessions Press Conference at 2. Reading the Order in light of the Attorney General's public statements, it threatens "enforcement action" against any jurisdiction that refuses to comply with detainer requests or otherwise fails to enforce federal immigration law. While this threat of "enforcement" is left vague and unexplained, "enforcement" by its own definition means to "compel[] compliance." *See* BLACK'S LAW DICTIONARY 645 (10th ed. 2014) (defining "enforcement" as "The act or process of compelling compliance with a law, mandate, command, decree, or agreement.") By seeking to compel states and local jurisdictions to honor civil detainer requests by threatening enforcement action, the Executive Order violates the Tenth Amendment's provisions against conscription.

The Supreme Court has repeatedly held that, "The Federal Government cannot compel the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188. The Government cannot command them to adopt certain policies, *id.* at 188, command them to carry out federal programs, *Printz*, 521 U.S. at 935, or otherwise to "coerce them into adopting a federal regulatory system as their own," *NFIB*, 132 S. Ct. at 2602. The Executive Order uses coercive means in an attempt to force states and local jurisdictions to honor civil detainer requests, which are voluntary "requests" precisely because the federal government cannot command states to comply with them under the Tenth Amendment. The Executive Order attempts to use coercive methods to circumvent the Tenth Amendment's direct prohibition against conscription. While the federal government may incentivize states to adopt federal programs voluntarily, it cannot use means that are so coercive as to compel their compliance. The Executive Order's threat to pull all federal grants from jurisdictions that refuse to honor detainer requests or to bring "enforcement action" against them violates the Tenth Amendment's prohibitions against commandeering.

### D. Fifth Amendment Void for Vagueness

The Counties assert that the Executive Order is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause. A law is unconstitutionally vague and void under the Fifth Amendment if it fails to make clear what conduct it prohibits and if it fails to lay out clear standards for enforcement. *See Gaynard v. City of Rockford*, 408 U.S. 104, 108 (1972). To satisfy due process we insist that laws (1) "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and (2) "provide explicit standards for those who apply them." *Id.* The Executive Order does not meet either of these requirements.

The Executive Order does not make clear what conduct might subject a state or local jurisdiction to defunding or enforcement action, making it impossible for jurisdictions to determine how to modify their conduct, if at all, to avoid the Order's penalties. The Order clearly directs the Attorney General and Secretary to ensure that jurisdictions that "willfully refuse to comply" with Section 1373, "sanctuary jurisdictions," are not eligible to receive federal grants. The Government repeatedly emphasizes in its briefing that it does not know what it means to

41

United States District Court
Northern District of California

"willfully refuse to comply" with Section 1373. *See,* SC Oppo. at 11. Past DOJ guidance and various court cases interpreting Section 1373 have not reached consistent conclusions as to what 1373 requires. In the face of conflicting guidance, and no clear standard from the Government, jurisdictions do not know how to avoid the Order's defunding penalty.

Further, because the Order does not clearly define "sanctuary jurisdictions" the conduct that will subject a jurisdiction to defunding under the Order is not fully outlined. This is further complicated because the Order gives the Secretary unlimited discretion to make "sanctuary jurisdiction" designations. But, at least as of two months ago, the Secretary himself stated that he "do[esn't] have a clue" how to define "sanctuary city." Harris Decl. ex. D (Dep't of Homeland Sec., *Pool Notes from Secretary Kelly's Trip to San Diego*, Feb. 10, 2017) at 3 (SC Dkt. No. 36-4). If the Secretary has unbounded discretion to designate "sanctuary jurisdictions" but has no idea how to define that term, states and local jurisdictions have no hope of deciphering what conduct might result in an unfavorable "sanctuary jurisdiction" designation.

In addition, the Order directs the Attorney General to take "appropriate enforcement action" against any jurisdiction that willfully refuses to comply with Section 1373 or otherwise has a policy or practice that "hinders the enforcement of Federal law." This provision vastly expands the scope of the Order. What does it mean to "hinder" the enforcement of federal law? What federal law is at issue: immigration laws? All federal laws? The Order offers no clarification.

The Order also fails to provide clear standards to the Secretary and the Attorney General to prevent "arbitrary and discriminatory enforcement." *Id.* As discussed above, the Order gives the Secretary discretion to designate jurisdictions as "sanctuary jurisdictions" to the extent consistent with law. But there are no laws, besides the Order, outlining what a sanctuary jurisdiction is, leaving the Secretary with unfettered discretion and the Order's vague language to make "sanctuary jurisdiction" designations. Similarly, the Order directs the Attorney General to take "appropriate enforcement action" against any jurisdiction that "hinders the enforcement of Federal law." This expansive, standardless language creates huge potential for arbitrary and discriminatory enforcement, leaving the Attorney General to figure out what "appropriate

42

enforcement action" might entail and what policies and practices might "hinder[] the enforcement of Federal law." This language is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

The Order gives the Counties no clear guidance on how to comply with its provisions or what penalties will result from non-compliance. Its standardless guidance and enforcement provisions are also likely to result in arbitrary and discriminatory enforcement. It does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Gaynard*, 408 U.S. at 108. The Counties are likely to succeed in their argument that Section 9(a) is void for vagueness under the Fifth Amendment.

### E. Fifth Amendment Procedural Due Process Violations

The Counties assert that the Executive Order fails to provide them with procedural due process in violation of the Fifth Amendment. To sustain a valid procedural due process claim a person must demonstrate that he has a legally protectable property interest and that he has suffered or will suffer a deprivation of that property without adequate process. *See Thorton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005).

To have a legitimate property interest, a person "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). A state or local government has a legitimate claim of entitlement to congressionally appropriated funds, which are akin to funds owed on a contract. *See NFIB*, 132 S. Ct. at 2602 ("The legitimacy of Congress' power to legislate under the spending power [] rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' "). The Counties have a legitimate property interest in federal funds that Congress has already appropriated and that the Counties have accepted.

The Executive Order purports to make the Counties ineligible to receive these funds through a discretionary and undefined process. The Order directs the Attorney General and Secretary to designate various states and local jurisdictions as "sanctuary jurisdictions," ensure that such jurisdictions are "not eligible" to receive federal grants, and "take enforcement action" against them. EO §9(a). It does not direct the Attorney General or Secretary to provide

43

"sanctuary jurisdictions" with any notice of an unfavorable designation or impending cut to funding. And it does not set up any administrative or judicial procedure for states and local jurisdictions to be heard, to challenge enforcement action, or to appeal any action taken against them under the Order. This complete lack of process violates the Fifth Amendment's due process requirements. *Matthew v. Eldridge*, 424 U.S. 319, 349 (1976) ("The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.") (internal alterations and quotations omitted).

The Government's only defense of the Order's lack of process is to claim that Section 9's provision that it be implemented "consistent with law" reads in all necessary procedural requirements. Again, the Government's attempt to resolve all of the Order's constitutional infirmities with a "consistent with law" bandage is not convincing. There is no dispute that while the Order commands the Secretary to designate certain jurisdictions as ineligible for federal grants and directs the Attorney General to bring an "enforcement action" against them, it provides no process at all for notifying jurisdictions about such a determination and provides them no opportunity to be heard. The Counties are likely to succeed on their claim that the Order fails to provide adequate due process in violation of the Fifth Amendment.

## III.  IRREPARABLE HARM

The Counties assert that, absent an injunction enjoining Section 9, they are likely to suffer irreparable harm resulting from their current budget uncertainty. Alternatively, they argue that they are suffering a constitutional injury, as the Order improperly seeks to coerce them into changing their policies in violation of the Tenth Amendment. The Counties have adequately demonstrated that they are likely to suffer irreparable harm under both of these theories.

### A.  Budgetary Uncertainty

The Counties allege that they are currently suffering irreparable injury resulting from the substantial uncertainty caused by the Order's unclear terms and its broad and undefined scope. As discussed above, this uncertainty is causing the Counties present injury sufficient to satisfy Article III's standing requirements. *See* discussion *supra* Section I.A.2.d.

This budget uncertainty is also causing the Counties irreparable harm, and it will continue

44

to do so absent an injunction.  The Order's uncertainty interferes with the Counties' ability to budget, plan for the future, and properly serve their residents.  Without clarification regarding the Order's scope or legality, the Counties will be obligated to take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services.  These mitigating steps will cause the Counties irreparable harm.  *See United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) (there was irreparable harm where the unavailability of funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

Although Government counsel has represented that the Order will be implemented consistent with law, this assurance is undermined by Section 9(a)'s clearly unconstitutional directives.  Further, through public statements, the President and Attorney General have appeared to endorse the broadest reading of the Order.  Is the Order merely a rhetorical device, as counsel suggested at the hearing, or a "weapon" to defund the Counties and those who have implemented a different law enforcement strategy than the Government currently believes is desirable?  The result of this schizophrenic approach to the Order is that the Counties' worst fears are not allayed and the Counties reasonably fear enforcement under the Order.

The Order's broad directive and unclear terms, and the President's and Attorney General's endorsement of them, has caused substantial confusion and justified fear among states and local jurisdictions that they will lose all federal grant funding at the very least.  The threat of the Order and the uncertainty it is causing impermissibly interferes with the Counties' ability to operate, to provide key services, to plan for the future, and to budget.  The Counties have established that, absent an injunction, they are likely to suffer irreparable harm.

### B.  Constitutional Injury

The Counties also argue that they are likely to suffer irreparable harm because the Executive Order contravenes the separation of powers, conscripts the Counties to carry out federal immigration enforcement policies, and seeks to coerce the Counties into changing their local policies by imposing overwhelming financial penalties without due process.  This "constitutional

injury" also constitutes irreparable harm.

The Ninth Circuit has repeatedly held that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144-45 (9th Cir. 2013). A plaintiff can suffer a constitutional injury by being forced to comply with an unconstitutional law or else face financial injury or enforcement action. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009) (plaintiffs were injured where they were faced with the choice of signing unconstitutional agreements or facing a loss of customer goodwill and significant business). The Supreme Court has similarly indicated that plaintiffs suffer irreparable injury under such circumstances. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 380-381 (1992) (injunctive relief was available where "respondents were faced with a Hobson's choice: continually violate the Texas law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review"). Where an executive action causes constitutional injuries, injunctive relief is appropriate. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (refusing to stay a preliminary injunction on Executive Order 13769 and reaffirming that a "deprivation of constitutional rights unquestionably constitutes irreparable injury").

The Counties currently must choose either to attempt to comply with the Executive Order, which they have alleged is unconstitutional under the Constitution's separation of powers structures and violates their Tenth and Fifth Amendment rights, or to defy the Order and risk losing hundreds of millions of dollars in federal grants. By forcing the Counties to make this unreasonable choice, the Order results in a constitutional injury sufficient to establish standing *and* irreparable harm.

The Government argues that while a "deprivation of constitutional rights unquestionably constitutes irreparable injury," the Counties have not alleged a "deprivation" of their constitutional rights but have instead alleged a violation of the constitutional structures that govern relationships among the branches of the Federal Government. It asserts that there is a distinction between violations of personal constitutional rights and violations of structural provisions. *See N.Y. State*

*Rest. Ass'n v. N.Y. City Bd. of Health*, 545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008) ("[W]hile a violation of constitutional rights can constitute *per se* irreparable harm . . . *per se* irreparable harm is caused only by violations of 'personal' constitutional rights . . . to be distinguished from provisions of the Constitution that serve 'structural' purposes, like the Supremacy Clause.").

This argument fails for two reasons. First, this distinction between personal and structural constitutional rights is not recognized in the Ninth Circuit. Although the Government cites to *American Trucking Ass'ns v. City of Los Angeles*, 577 F. Supp. 2d 1110, 1127 (C.D. Cal. 2008) for the proposition that "in the case of Supremacy Clause violations," the presumption of irreparable harm "is not necessarily warranted," that case was reversed by the Ninth Circuit. On appeal the court concluded that, even where the constitutional injury is structural, "the constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm." *American Trucking*, 559 F.3d at 1058. Second, the Counties *have* alleged a deprivation of their personal constitutional rights; they have alleged that the Executive Order is unconstitutionally coercive in violation of the Tenth Amendment and fails to provide them with Due Process in violation of the Fifth Amendment. The Government's challenges to the Counties' claims of constitutional injury are not supported by the facts of this case or the precedent that is binding on this court.

The Counties have adequately demonstrated a constitutional injury sufficient to establish a likelihood of irreparable harm.

## IV.     BALANCE OF HARMS AND PUBLIC INTEREST

A party seeking a preliminary injunction must "establish . . . that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. When the federal government is a party, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Government argues that the balance of harms and the public interest weigh against a preliminary injunction because the "most pertinent and concretely expressed public interest" in this case is contained in Section 1373, and Section 9 simply seeks to ensure compliance with that section. This argument is unconvincing given the Government's flawed argument that Section 9 does not change the law. If Section 9 does not change the law, or if the Government does not

intend to enforce Section 9's unlawful directives, then it provides the Government with no concrete benefit but to highlight the President's enforcement priorities. The President certainly has the right to use the bully pulpit to encourage his policies. But Section 9(a) is not simply rhetorical. The Counties have a strong interest in avoiding unconstitutional federal enforcement and the significant budget uncertainty that has resulted from the Order's broad and threatening language. To the extent the Government wishes to use all lawful means to enforce 8 U.S.C. 1373, it does not need Section 9(a) to do so. The confusion caused by Section 9(a)'s facially unconstitutional directives and its coercive effects weigh heavily against leaving it in place. The balance of harms weighs in favor of an injunction.

## V. NATIONWIDE INJUNCTION

The Government argues that, if an injunction is issued, it should be issued only with regards to the plaintiffs and should not apply nationwide. But where a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff."); *Washington*, 847 F.3d at 1166-67 (affirming nationwide injunction against executive travel ban order). The Counties have demonstrated that they are likely to succeed on their claims that the Executive Order purports to wield powers exclusive to Congress, and violates the Tenth and Fifth Amendments. These constitutional violations are not limited to San Francisco or Santa Clara, but apply equally to all states and local jurisdictions. Given the nationwide scope of the Order, and its apparent constitutional flaws, a nationwide injunction is appropriate.

## VI. INJUNCTION AGAINST THE PRESIDENT

The Government also argues that, if an injunction is issued, it should not issue against the President. An injunction against the President personally is an "extraordinary measure not lightly to be undertaken." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996); *see Newdow v. Bush*, 391 F. Supp. 2d 95, 106 (D.D.C. 2005) ("[T]he Supreme Court has sent a clear message that an injunction should not be issued against the President for official acts."). The Counties assert that the court "has discretion to determine whether the constitutional violations in the Executive Order

48

may be remedied by an injunction against the named inferior officers, or whether this is an extraordinary circumstance where injunctive relief against the President himself is warranted."

I conclude that an injunction against the President is not appropriate. The Counties seek to enjoin the Executive Order which directs the Attorney General and the Secretary to carry out the provisions of Section 9. The President has no role in implementing Section 9. It is not clear how an injunction against the President would remedy the constitutional violations the Counties have alleged. On these facts, the extraordinary remedy of enjoining the President himself is not appropriate.

### CONCLUSION

The Counties have demonstrated that they are likely to succeed on the merits of their challenge to Section 9(a) of the Executive Order, that they will suffer irreparable harm absent an injunction, and that the balance of harms and public interest weigh in their favor. The Counties' motions for a nationwide preliminary injunction, enjoining enforcement of Section 9(a), are GRANTED. The defendants (other than the President) are enjoined from enforcing Section 9(a) of the Executive Order against jurisdictions they deem as sanctuary jurisdictions. This injunction does not impact the Government's ability to use lawful means to enforce existing conditions of federal grants or 8 U.S.C. 1373, nor does it restrict the Secretary from developing regulations or preparing guidance on designating a jurisdiction as a "sanctuary jurisdiction."

**IT IS SO ORDERED.**

Dated: April 25, 2017

William H. Orrick
United States District Judge