DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
CHRISTINE VAN AKEN, State Bar #241755
TARA M. STEELEY, State Bar #231775
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
MATTHEW S. LEE, State Bar #295247
NEHA GUPTA, State Bar #308864
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4748
Facsimile:      (415) 554-4715
E-Mail:         brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Plaintiff,<br><br>    vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, JOHN F. KELLY, Secretary of United States Department of Homeland Security, JEFFERSON B. SESSIONS III, Attorney General of the United States, DOES 1-100,<br><br>    Defendants. | Case No. 3:17-cv-00485-WHO<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      In blatant disregard of the law, the President of the United States seeks to coerce local authorities to bend to his will and abandon "Sanctuary City" laws and policies. To that end, on January 25, 2017, the President issued an Executive Order entitled "Enhancing Public Safety in the Interior of the United States." Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ("Executive Order"). The Executive Order announces that it is the Executive Branch's policy to withhold federal funds from "sanctuary jurisdictions," directs the Attorney General and Secretary of Homeland Security to ensure that sanctuary jurisdictions do not receive federal grants, and directs the Attorney General to take enforcement action against any local entity that "hinders the enforcement of Federal law." The Executive Order undermines established principles of federalism and separation of powers, violates the United States Constitution, and impermissibly threatens cities with catastrophic financial consequences.

2.      The President and San Francisco agree that the City and County of San Francisco ("San Francisco") is a Sanctuary City, but disagree about what that means. San Francisco laws limit when city employees and agencies may assist with the enforcement of federal immigration law. These laws generally prohibit city employees from using city funds or resources to assist in the enforcement of federal immigration law, unless required by federal or state law. They specifically prohibit local law enforcement officers from cooperating with Immigration and Customs Enforcement ("ICE") detainer requests, which are voluntary, and limit when local law enforcement officers may give ICE advance notice of a person's release from local jail.

3.      Like many other cities, San Francisco is a city of immigrants—many of whom are undocumented—who come here to live, work, and raise families. San Francisco's Sanctuary City laws make San Francisco safer, healthier, and economically stronger. San Francisco is safer when all people, including undocumented immigrants, feel safe reporting crimes. San Francisco is healthier when all residents, including undocumented immigrants, access public health programs. And San Francisco is economically and socially stronger when all children, including undocumented immigrants, attend school. Using city and county resources for federal immigration enforcement breeds distrust of local government and officials who have no power to change federal laws, and can

also wrench apart family and community structures that support residents and thus conserve resources. For these reasons, among others, San Francisco has directed its employees and officers not to assist the Federal government in enforcing federal immigration law, with limited exceptions.

4.    San Francisco faces the imminent loss of more than $2 billion in federal funds and impending enforcement action if it does not capitulate to the President's demand that it help enforce federal immigration law. At least one jurisdiction has already succumbed to this presidential fiat.

5.    The threat San Francisco faces now is particularly troubling given that San Francisco already complies with all federal immigration laws. The Executive Order relies on Title 8, Section 1373 of the United States Code ("Section 1373"), which provides that local governments may not prohibit or restrict any government entity or official from "sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual."

6.    San Francisco's laws comply with Section 1373. San Francisco previously prohibited employees and officials from sharing information regarding immigration status but amended this language to ensure compliance with Section 1373. Under current law, San Francisco does not prohibit or restrict its employees from sharing information about the citizenship or immigration status of any individual with federal immigration officials.

7.    The Constitution establishes a balance of power between the state and Federal governments, as well as among the coordinate branches of Federal government, to prevent the excessive accumulation of power in any single entity and reduce the risk of tyranny and abuse from any government office. In so doing, the Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." This state sovereignty extends to political subdivisions of the State, including cities and counties such as San Francisco.

8.    The Executive Order invades San Francisco's sovereignty and seeks to commandeer state and local officials to enforce federal law. Under the Constitution and established principles of federalism, state and local governments have the autonomy to devote resources to local priorities and to control the exercise of their own police powers, rather than being forced to carry out the agenda of

the Federal government. The Executive Order purports otherwise to wrest this autonomy from state and local governments.

9.      In addition to violating the Tenth Amendment, the Executive Order violates the Constitution's separation of powers and the Spending Power that Article I, Section 8 of the Constitution grants exclusively to Congress. Congress, not the Executive Branch, has the authority to determine how federal funds will be spent.

10.     San Francisco recognizes that there will be additional developments related to the Executive Order in the weeks and months to come. But the consequences threatened by the Executive Order are too severe for San Francisco to wait. The Executive Order threatens funds that support vital services, the loss of community trust, and the loss of San Francisco's sovereign authority to set and follow its own laws on matters appropriately and historically within the control of local government. San Francisco has no choice but to seek the intervention of this Court to ensure that its rights and residents are protected, and that the Administration complies with Federal law and the Constitution.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq.*

12.     Venue properly lies within the Northern District of California because Plaintiff, San Francisco, resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District. 28 U.S.C. § 1391(e).

## PARTIES

13.     Plaintiff San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

14.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

15.     Defendant United States of America is sued under 28 U.S.C. Section 1346.

//

16.     The U.S. Department of Homeland Security ("DHS") is a cabinet department of the United States Federal government with the primary mission of securing the United States. Defendant John F. Kelly is the Secretary of DHS. Secretary Kelly is responsible for executing relevant provisions of the Executive Order. Secretary Kelly is sued in his official capacity.

17.     The Attorney General ("AG") is a cabinet department of the United States Federal government overseeing the Department of Justice. Defendant Jefferson B. Sessions is the Attorney General. Attorney General Sessions is responsible for executing relevant provisions of the Executive Order. Attorney General Sessions is sued in his official capacity.[1]

18.     Doe 1 through Doe 100 are sued under fictitious names. Plaintiffs do not now know the true names or capacities of said Defendants, who were responsible for the alleged violations alleged, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

### I.     SAN FRANCISCO'S SANCTUARY CITY LAWS

19.     San Francisco has been a Sanctuary City since 1989. In the 1980s, thousands of Central American refugees fled countries in the midst of violent civil wars to seek legal protection in the United States. Against the backdrop of this humanitarian crisis, San Francisco began enacting the ordinances that, as later amended, make up San Francisco's Sanctuary City laws.

20.     Numerous other municipalities have also enacted Sanctuary City laws. Although the details of their ordinances differ, all of these jurisdictions have adopted laws or policies that limit using local resources to implement and enforce federal immigration laws.

21.     Today, San Francisco's body of Sanctuary City law is contained in two chapters of San Francisco's Administrative Code: Chapters 12H and 12I. Importantly, these chapters do not protect criminals or prevent people from being prosecuted for illegal acts. Instead, they protect children by ensuring that their parents feel safe taking them to playgrounds, to schools, and to hospitals. They support family stability and community engagement. And they protect the safety and health of all residents of San Francisco by helping to ensure that everyone, including undocumented

---

[1] Attorney General Sessions assumed office on February 9, 2017, thereby replacing Acting Attorney General Dana J. Boente as a defendant, pursuant to Fed. R. Civ. P. 25(d).

immigrants, feels safe reporting crimes, cooperating with police investigations, and seeking medical care.

22.    San Francisco Administrative Code Chapter 12H—the full text of which is attached as Exhibit 1—prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by Federal or state law.

23.    Chapter 12H previously prohibited disseminating information regarding the immigration status of any individual, but the Board of Supervisors amended Chapter 12H in July 2016 to, *inter alia*, delete that prohibition in order to ensure compliance with Section 1373.

24.    San Francisco Administrative Code Chapter 12I—the full text of which is attached as Exhibit 2—prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the Federal government.[2]

25.    A detainer request is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary City laws. A detainer request is not issued by a judge based on a finding of probable cause. It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them.

26.    Complying with detainer requests requires municipalities to commit scarce law enforcement personnel and resources to track and respond to requests, detain individuals in holding cells, and supervise and feed individuals during the prolonged detention. And the Federal government has made clear that the local agency bears the financial burden of the detention, providing that "[n]o

---

[2] Section 287.7 of Title 8 of the Code of Federal Regulations allows ICE to issue detainer requests to local jurisdictions. Section 287.7 provides that such a detainer "serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." Subsection (d) provides that "[u]pon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department."

1  detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal

2  obligation on the part of the Department." 8 C.F.R. § 287.7(e).

3      27.    Further, complying with civil immigration detainer requests, in the absence of a

4  probable cause determination, violates the Fourth Amendment to the United States Constitution and

5  could subject San Francisco to civil liability. *See Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir.

6  2015); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305 (D. Or. Apr. 11, 2014); *see also*

7  *Melendres v. Arpaio*, 695 F.3d 990, 1000-01 (9th Cir. 2012) (applying the Fourth Amendment to

8  immigration arrests).

9      28.    Chapter 12I also prohibits San Francisco law enforcement officials from responding to

10  a federal immigration officer's request for advance notification of the date and time an individual in

11  San Francisco's custody is being released, unless the individual in question meets certain criteria. *See*

12  S.F. Admin. Code § 12I.3(c), (d).

13     29.    Finally, as relevant here, Chapter 12I provides that "[l]aw enforcement officials shall

14  not arrest or detain an individual, or provide any individual's personal information to a federal

15  immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil

16  immigration document based solely on alleged violations of the civil provisions of immigration laws."

17  *See* Section 12I.3(e). "Personal information" is defined as "any confidential, identifying information

18  about an individual, including, but not limited to, home or work contact information, and family or

19  emergency contact information." *See* Section 12I.2.

20     30.    Chapter 12I makes clear that its purpose and effect are limited to matters "relating to

21  federal civil immigration detainers, notification of release of individuals, transmission of personal

22  information, or civil immigration documents, based solely on alleged violations of the civil provisions

23  of immigration laws." Chapter 12I expressly states that "[i]n all other respects, local law enforcement

24  agencies may continue to collaborate with federal authorities to protect public safety." *See* Section

25  12I.4.

26     31.    San Francisco's Sanctuary City laws arise from San Francisco's commitment and

27  responsibility to ensure public safety and welfare. The Board of Supervisors, as San Francisco's

28  legislative body, found that public safety is "founded on trust and cooperation of community residents

and local law enforcement." Section 12I.1. Citing a study by the University of Illinois, which found that at least 40% of Latinos surveyed were less likely to provide information to police because they feared exposing themselves, family, or friends to a risk of deportation, the Legislature stated that "civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies." *Id.*; *see also id.* ("The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies."). Indeed, a recent study shows that crime is statistically significantly lower in sanctuary counties compared to non-sanctuary counties. *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, CTR. FOR AM. PROGRESS (Jan. 26, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-ofsanctuary-policies-on-crime-and-the-economy/.

32. The legislative findings set forth in Chapter 12I evidence the legitimate local purpose of San Francisco's Sanctuary City laws. For example, the Legislature declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all. (*See* Section 12I.2.)

33. The Board of Supervisors also had a public health purpose for its decision to restrict disclosure of confidential information: "To carry out public health programs, the City must be able to reliably collect confidential information from all residents . . . . Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody." Section 12I.1.

34. Finally, the Board of Supervisors determined that enforcing immigration detainer requests would require San Francisco to redirect scarce local law enforcement personnel and resources—noting that the costs of "responding to a civil immigration detainer can include, but [are]

not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer." *Id.* In short, the Board of Supervisors concluded that "[c]ompliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City." *Id.*

35.     California law incorporates local Sanctuary City laws such as Chapters 12H and 12I. The TRUST Act states that local law enforcement officials may comply with ICE detainer requests only if (1) the continued detention would not violate any federal, state, or local law, or any local policy, and (2) the defendant's criminal history meets specified conditions. Cal. Gov't Code §§ 7282, 7282.5. Thus, because in San Francisco ICE detentions are prohibited under local law, they are also prohibited under state law.

## II.     SECTION 1373

### A.     San Francisco Complies With Section 1373 By Not Prohibiting Its Employees From Sharing "Citizenship Or Immigration Status" Information With The Federal Government

36.     Section 1373 provides that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual." 8 U.S.C. § 1373(a). This restriction exclusively regulates government entities.

37.     Section 1373 requires San Francisco to allow its employees to use city resources, including San Francisco tax dollars, to respond to requests for information about citizenship and immigration status.

38.     San Francisco complies with Section 1373.

39.     Nothing in San Francisco Administrative Code Chapters 12H or 12I limits communications regarding citizenship or immigration status in any way.

40.     And, indeed, under ICE's recently restored Secure Communities program (also known as "S-Comm"), whenever an individual is taken into custody, the person is digitally fingerprinted and those fingerprints are sent to the California Department of Justice and ultimately the FBI. The FBI

//

forwards the fingerprints to DHS, which allows ICE to determine the immigration status of everyone in San Francisco custody.

41.     Under Chapter 12I and the TRUST Act, San Francisco does not enforce detainer requests (*see* ¶26, *supra*), and does not respond to notification requests from the Federal government unless certain conditions are met (*see* ¶30, *supra*). But compliance with such requests is not required by Section 1373, which speaks only to communications regarding *citizenship and immigration status*.

42.     San Francisco has affirmatively instructed personnel regarding the substance of Section 1373 in a recent memorandum to all San Francisco employees from the San Francisco Human Resources Director.

**B.     The United States Improperly Interprets Section 1373 To Require Compliance With Detainer Requests**

43.     On May 31, 2016, in response to a request from the Office of the Attorney General, the Office of the Inspector General ("OIG") of the Department of Justice issued a memorandum ("OIG Memo") regarding potential violations of Section 1373 by recipients of funding from the Edward Byrne Memorial Justice Assistance Grant Program ("JAG"). Memorandum from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen. for the Office of Justice Programs, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients* (May 31, 2016), https://oig.justice.gov/reports/2016/1607.pdf.[3]

44.     In analyzing the local laws and policies of ten selected state and local jurisdictions, OIG demonstrated how the Federal government interprets Section 1373.

45.     Although Section 1373 does not expressly address immigration detainers, OIG expressed concern that local laws concerning the handling of detainer requests "may have a broader practical impact on the level of cooperation afforded to ICE by these jurisdictions and may, therefore, be inconsistent with at least the intent of Section 1373." OIG Memo at 7. It went on to state that local laws and policies that "purport to be focused on civil immigration detainer requests [and say nothing

---

[3] The authorizing legislation for the JAG program requires that all grant applicants certify compliance with the provisions of the authorizing legislation and all other "applicable federal laws." 42 U.S.C. § 3750 *et seq.* The U.S. Department of Justice, Office of Justice Programs has recently announced that Section 1373 is an "applicable" law under the JAG authorizing legislation.

about sharing immigration status with ICE] . . . may nevertheless be affecting ICE's interactions with the local officials regarding ICE immigration status requests." *Id.*

46.     OIG also stated that such immigration detainer request policies "may be causing local officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE in all respects . . . . [which], of course, would be inconsistent with and prohibited by Section 1373." *Id.* at 8.

47.     In the OIG Memo, the Federal government also endorses the view that local jurisdictions hinder the enforcement of Federal immigration law if they do not honor detainer requests or if they place any other limitations on cooperation with ICE. *See, e.g.*, *id.* at 4 (stating that even though Section 1373 does not specifically address restrictions by state or local entities on cooperation with ICE regarding detainers, "[a] primary and frequently cited indicator of limitations placed on cooperation by state and local jurisdictions with ICE is how the particular state or local jurisdiction handles immigration detainer requests issued by ICE").

48.     Yet, San Francisco cannot lawfully comply with ICE detainer requests. Complying with civil immigration detainer requests, in the absence of a determination of probable cause, would violate the Fourth Amendment to the United States Constitution and could subject San Francisco to civil liability for this harm. *See Arizona v. United States*, 132 S. Ct. 2492, 2509 (2012) (noting that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns"); *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305 (D. Or. Apr. 11, 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000-01 (9th Cir. 2012) (applying the Fourth Amendment to immigration arrests).

49.     In the OIG Memo, OIG recommended that the U.S. Department of Justice, Office of Justice Programs ("OJP") provide JAG recipients clear guidance on their obligation to comply with Section 1373 and require them to certify that they comply with that section. *See* OIG Memo at 9.

50.     In response to these recommendations, in July and October 2016 OJP issued guidance regarding compliance with Section 1373. *See* Office of Justice Programs, *Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. DEP'T JUST. (July 7, 2016) ("OJP July Guidance"); Office of
//

Justice Programs, *Additional Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. DEP'T JUST. (October 6, 2016) ("OJP October Guidance").

51.     In the OJP July Guidance, OJP reads Section 1373 to impose an affirmative obligation on state and local governments. The Guidance states that to comply with Section 1373, "[y]our personnel *must* be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials." OJP July Guidance at 1 (emphasis added). Accordingly, OJP reads into the law an affirmative obligation to instruct personnel regarding the substance of Section 1373.

52.     In the October 2016 Guidance, OIG stated that all JAG applicants must comply with— and certify their compliance with—Section 1373. OJP October Guidance at 1.

53.     As a grantee of JAG grants, San Francisco is required to certify its compliance with Section 1373.

## III.   THE EXECUTIVE ORDER

### A.   The Executive Order Cuts Off Federal Funding From Sanctuary Jurisdictions And Directs Enforcement Action Against Them

54.     On January 25, 2017, President Donald J. Trump issued the Executive Order attached as Exhibit 3.

55.     The Executive Order declares, "Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic." Executive Order at 8799.

56.     To address the purported harm caused by Sanctuary Cities, the Executive Order establishes the policy that "jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.*

57.     Specifically, Section 9(a) of the Executive Order states: "It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." *Id.* at 8801.

58.     Section 9(a) of the Executive Order establishes a funding restriction (the "Funding Restriction"):

> In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

*Id.*

59.     Section 9(a) of the Executive Order also mandates enforcement action (the "Enforcement Directive"):

> The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

*Id.*

60.     Section 9(a) of the Executive Order defines "sanctuary jurisdictions" as those jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373." But Section 9(b) indicates that Defendants in fact define that category quite broadly as including any jurisdiction that declines to comply with ICE detainer requests:

> To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

61.     The Executive Order thus attempts to mandate compliance with detainer requests as part of Section 1373 compliance, with the consequence that a jurisdiction such as San Francisco that does not comply with ICE detainer requests will lose federal funds under the Executive Order.

62.     A jurisdiction that fails to comply with detainer requests also faces enforcement action under Section 9(a)'s Enforcement Provision. As discussed further below, Defendants view the local decision not to comply with ICE detainer requests as a "statute, policy, or practice that prevents or hinders the enforcement of Federal law."

**B.      Defendants Have Labeled San Francisco A Sanctuary Jurisdiction Within The Meaning Of The Executive Order**

63.      As discussed above, San Francisco *does* comply with Section 1373, properly construed. Nonetheless, Defendants deem San Francisco a sanctuary jurisdiction pursuant to their overly broad definition of that term.

64.      If there were any question about whether Defendants deem San Francisco as a "sanctuary jurisdiction," that question is answered by Defendants' own statements, which clearly characterize San Francisco as a Sanctuary City.

65.      For example, in a written campaign speech, then-candidate Donald J. Trump gave in Phoenix, Arizona on August 31, 2016, he expressly referred to San Francisco as a Sanctuary City. *See Donald J. Trump: Address on Immigration*, Donald J. Trump for President (Aug. 31, 2016), https://www.donaldjtrump.com/press-releases/donald-j.-trump-address-on-immigration ("Another victim is Kate Steinle, gunned down in the Sanctuary City of San Francisco by an illegal immigrant deported five previous times.").

66.      Further, Defendants have repeatedly identified Sanctuary Cities, and specifically San Francisco, as those that decline detainer requests and otherwise do not affirmatively support federal immigration enforcement.

- In statements to the Daily Caller on July 7, 2015, Congressman Darrell Issa and now-Attorney General Sessions criticized San Francisco and other sanctuary jurisdictions for failing to honor detainers. Sessions stated, "This disregarding of detainers and releasing persons that ICE has put a hold on—it goes against all traditions of law enforcement. Laws and courtesies within departments— if you have somebody charged with a crime in one city, you hold them until you complete your business with them . . . . So what was happening was, ICE authorities were filing detainers and sanctuary cities were saying, 'We're not gonna honor them. They finished paying for the crime they committed in our city— we've released them.'" Kerry Picket, *Sen. Sessions: City Officials Harboring Illegal Immigrant Felons Could Be Charged with Crime*, Daily Caller (July 7, 2015, 10:07 PM),

http://dailycaller.com/2015/07/07/sen-sessions-city-officials-harboring-illegal-immigrant-felons-could-be-charged-with-crime/#ixzz4XE9I12Ux.

- On July 8, 2015, Sessions gave a speech to Congress describing San Francisco as "a jurisdiction that is known to release illegal immigrants back into the public," and one which refused to "honor" a detainer sought by federal authorities. News Release, Office of Senator Jeff Sessions, Senator Sessions Calls on Congress To Take Up Immigration Reform for Americans (July 9, 2015), http://www.sessions.senate.gov/public/index.cfm/news-releases?ID=B7A98B63-8ECA-4A4E-B5C8-4A665F2343DE.

- In an interview with Breitbart News in May 2016, then-candidate Donald J. Trump stated, "Sanctuary cities are a disaster . . . . They're a safe-haven for criminals and people that should not have a safe-haven in many cases. It's just unacceptable. We'll be looking at sanctuary cities very hard." Matthew Boyle, *Exclusive — Donald J. Trump to San Francisco: Sanctuary Cities 'Unacceptable,' A 'Disaster' Creating 'Safe-Haven for Criminals'*, Breitbart News (May 16, 2016), http://www.breitbart.com/2016-presidential-race/2016/05/16/exclusive-donald-j-trump-to-san-francisco-sanctuary-cities-unacceptable-a-disaster-creating-safe-haven-for-criminals/. This Breitbart news report further stated that "Trump's comments . . . come in response to efforts by far left progressive organizations in San Francisco to expand that city's sanctuary city laws." *Id.*

- Another Breitbart News article published on November 21, 2016 regarding Sanctuary Cities quoted Texas Republican Congressman John Culberson as stating, "The law requires cooperation with immigration officials 100 percent of the time." Bob Price, *Sanctuary Cities Risk Losing DOJ Funds in 2017, Texas Congressman Says*, Breitbart News (Nov. 21, 2016), http://www.breitbart.com/texas/2016/11/21/sanctuary-cities-risk-losing-doj-funds-2017-texas-congressman-says/.

//

67.     Defendants have also repeatedly stated their intent to strip federal funding from Sanctuary Cities.

- In a statement by White House Press Secretary Sean Spicer on January 25, 2017 announcing the issuance of the Executive Order, Spicer stated, "We are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws." White House, 1/25/17: White House Press Briefing, YouTube (Jan. 25, 2017), https://www.youtube.com/watch?v=OaPriMVvtZA.

- A press release from the Office of the Press Secretary for the White House issued on January 28, 2017 detailing President Trump's First Week of Action, reads in relevant part: "President Trump signed an executive order to ensure that immigration laws are enforced throughout the United States, including halting federal funding for sanctuary cities." Press Release, The White House, Office of the Press Secretary, President Trump's First Week of Action (Jan. 28, 2017), https://www.whitehouse.gov/the-press-office/2017/01/28/president-trumps-first-week-action.

- Press Secretary Sean Spicer reiterated this goal on February 1, 2017, stating "I think the President's goal in ending sanctuary cities is pretty clear. . . . [T]he President has been very clear through his executive order that federal funds, paid for by hardworking taxpayers, should not be used to help fund sanctuary cities." Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6* (Feb. 1, 2017), https://www.whitehouse.gov/the-pressoffice/2017/02/01/press-briefing-press-secretary-sean-spicer-212017-6.

68.     Indeed, Defendants have explicitly stated their intent to use federal funding cuts as a "weapon" against Sanctuary Cities, in an attempt to coerce jurisdictions to bend to their will.

//

- In an interview with Bill O'Reilly on February 5, 2017, President Trump called the efforts of California lawmakers to propose legislation that could stop state police and sheriffs from enforcing federal immigration laws "ridiculous." Alexander Mallin and Lissette Rodriguez, *Trump Threatens Defunding Sanctuary States as 'Weapon'*, ABC News (Feb. 5, 2017, 6:01 PM), http://abcnews.go.com/Politics/trump-threatens-defunding-sanctuary-states-weapon/story?id=45286642. He stated: "I don't want to defund anybody. I want to give them the money they need to properly operate as a city or a state." But he said, "If they're going to have sanctuary cities, we may have to do that. Certainly that would be a weapon." *Id.* "Sanctuary cities, as you know I'm very much opposed to sanctuary cities -- they breed crime, there's lots of problems." *Id.* "We give tremendous amounts of money to California," Trump said. "Obviously the voters agree or otherwise they wouldn't have voted for me." *Id.*

- When asked at a press briefing whether Cincinnati would face sanctions for voting to become a Sanctuary City, Sean Spicer, the President's press secretary stated:

> As I've noted before, at the end of the day, this order is about two things: one, keeping our cities safe, and two, respecting the hard-earned taxpayers who send their money to the federal government. And the President is going to do everything he can within the scope of the executive order to make sure that cities who don't comply with it -- counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order.  I think more areas like Miami-Dade, down in Florida, understand the importance of this order, and we hope cities like Cincinnati and other communities around the country follow their lead and comply with that.

Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/8/2017, #10* (Feb. 8, 2017), https://www.whitehouse.gov/the-press-office/2017/02/08/press-briefing-press-secretary-sean-spicer-282017-10.

69.   The White House's public website states that President Trump "is dedicated to enforcing our border laws, ***ending sanctuary cities***, and stemming the tide of lawlessness associated with illegal immigration." *Standing Up For Our Law Enforcement Community*, The White House,

//

https://www.whitehouse.gov/law-enforcement-community (last visited on Feb. 27, 2017) (emphasis added).

70.     Defendants' statements demonstrate their belief that Sanctuary Cities, like San Francisco, violate Section 1373 and their intent that Sanctuary Cities will lose federal funding—apparently all or almost all federal funding—and be subject to enforcement action under the Executive Order.

71.     There is a "credible threat" that Defendants will seek to enforce the unconstitutional Executive Order against San Francisco.

## IV.   SECTION 1373 AND THE EXECUTIVE ORDER HARM SAN FRANCISCO

### A.   Constitutional Injury

#### 1.   The Executive Order Violates The Tenth Amendment, Separation Of Powers, And The Spending Clause

##### a.   The Executive Order Funding Restriction Is Unconstitutional

###### i.   Separation of Powers

72.     As a threshold matter, the Funding Restriction purports to exercise Spending Power that Article I, Section 8 of the Constitution grants exclusively to Congress.

73.     The Executive Order violates the separation of powers by creating a penalty for Section 1373 that Congress did not authorize, without regard to statutory rules on grant programs put in place by Congress. The Executive Order effectively legislates a sanction for violations of Section 1373 by using the statute as a basis to broadly deny federal grants to municipalities that have made a policy decision to focus law enforcement resources on local problems and limit their entanglement with federal immigration enforcement. The President's unilateral imposition of this new sanction and condition on spending is not supported by any act of Congress, including the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, or by the Constitution.

74.     The Funding Restriction additionally violates the separation of powers by imposing a new restriction on jurisdictions' eligibility to receive federal funds: "jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants,

//

1  except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary."

2  Executive Order at 8801.

3        75.     The President may not unilaterally impose new restrictions on jurisdictions' eligibility

4  for federal funding. Any restriction on eligibility for federal funds must be imposed—clearly,

5  unambiguously, and in advance—by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S.

6  1, 17 (1981). When Congress has not imposed such a restriction by statute, the President may not do

7  so by fiat. The President does not have "unilateral power to change the text of duly enacted statutes."

8  *Clinton v. City of New York*, 524 U.S. 417, 447 (1998).

9        76.     Congress has spoken to reject the imposition of such funding restrictions, including

10  when it declined to enact Senate Bill 1842, "Protecting American Lives Act," introduced in July 2015

11  by then-Senator Attorney General Jeff Sessions. The bill would in part have expanded Section 1373 to

12  deprive jurisdictions having "in effect a statute, policy, or practice that prohibits law enforcement

13  officers of the State, or of a political subdivision of the State, from assisting or cooperating with

14  Federal immigration law enforcement in the course of carrying out the officers' routine law

15  enforcement duties" of "any . . . law enforcement or Department of Homeland Security grant."  S.

16  1842, 114th Cong. § 3 (2015). Senate Bill 1842 did not make it out of committee, nor did the identical

17  House of Representatives Bill 3437. Where the President "takes measures incompatible with

18  the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown Sheet & Tube*

19  *Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

20        77.     By imposing conditions or limitations on federal spending without express statutory

21  authority, the Executive Order also unlawfully exceeds the President's powers under other provisions

22  of the Constitution that establish the separation of powers among the branches of our government,

23  including: (i) the President's obligation to "take Care that the Laws be faithfully executed," U.S.

24  Const. art. II, § 3, cl. 5 (Take Care Clause), and (ii) the limitation that Congressional enactments must

25  "be presented to the President of the United States," who then may sign that enactment or veto it, but

26  has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7,

27  cls. 2-3 (Presentment Clause).

28  //

1

## ii.    Spending Clause and Tenth Amendment

2    78.    Further, the Funding Restriction purports to exercise Spending Power in ways that even

3    Congress could not.

4    79.    The Funding Restriction violates the Spending Clause by imposing new funding

5    conditions on existing appropriations of federal funds. "[I]f Congress intends to impose a condition on

6    the grant of federal moneys, it must do so unambiguously," in advance. *Pennhurst*, 451 U.S. at 17.

7    "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the

8    State voluntarily and knowingly accepts" Congress's conditions. *Id.* "There can, of course, be no

9    knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of

10   it." *Id.*

11   80.    The Funding Restriction also violates the Spending Clause by imposing funding

12   conditions that are not germane to the purpose of the funds. "[T]he imposition of conditions under the

13   spending power" must be "germane" or "related" to the purpose of federal funding. *South Dakota v.*

14   *Dole*, 483 U.S. 203, 208-09 & n.3 (1987); *see also Massachusetts v. United States*, 435 U.S. 444, 461

15   (1978). Here, the Funding Restriction conditions eligibility for federal funding on compliance with

16   Section 1373, without regard for whether Section 1373 is germane to any federal funds at issue. In

17   fact, the Funding Restriction specifically exempts those federal funds—funds "deemed necessary for

18   law enforcement purposes"—that might arguably be germane to Section 1373.

19   81.    The Funding Restriction also imposes conditions so severe that they "cross[] the line

20   distinguishing encouragement from coercion." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566,

21   2603 (2012) (opinion of Roberts, C.J.); *New York v. United States*, 505 U.S. 144, 175 (1992). The

22   Funding Restriction "is much more than 'relatively mild encouragement'—it is a gun to the head."

23   *Sebelius*, 132 S. Ct. at 2604 (opinion of Roberts, C.J.). The Funding Restriction threatens a substantial

24   percentage of San Francisco's overall budget—approximately 13% of its total annual operating

25   budget, even without considering federal multi-year grants. Threatened funds include the entire

26   funding stream for programs, such as Medicaid, that are critical to the lives of San Francisco's

27   residents. Threats of this magnitude, and to such critical programs, constitute "economic dragooning

28   that leaves the States with no real option but to acquiesce" to federal dictates. *Id.* at 2605.

82. Finally, because Defendants interpret Section 1373 to require jurisdictions to comply with immigration detainers, the Funding Restriction imposes a new funding condition that requires jurisdictions to act unconstitutionally. Under the Fourth Amendment, detention of an individual must be supported by a determination of probable cause. *See Morales v. Chadbourne*, 793 F.3d 208, 215–17 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305 (D. Or. Apr. 11, 2014). Requiring state and local governments (including San Francisco) to establish blanket policies of compliance with immigration detainers could thus cause them to violate the Fourth Amendment. But Congress's Spending Power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210.

83. This concern is heightened by the fact that state and local governments, including San Francisco, generally lack authority to make warrantless arrests under the Federal government's civil immigration laws. *See Arizona v. United States*, 132 S. Ct. 2492, 2506 (2012). It is further heightened by the prospect that "ICE's issuance of detainers that seek to detain individuals without a warrant goes beyond its statutory authority to make warrantless arrests." *Moreno v. Napolitano*, No. 11-C-5452, 2016 WL 5720465, at *8 (N.D. Ill. Sept. 30, 2016).

84. For all these reasons, the Funding Restriction violates the Constitution's separation of powers (and, in particular, the Constitution's grant of legislative power to Congress in Article I, Section 1); the Spending Clause of Article I, Section 8; and the Tenth Amendment.

**b.    The Executive Order Enforcement Directive Is Unconstitutional**

85. The Executive Order's Enforcement Directive violates the Tenth Amendment. The Enforcement Directive commandeers state and local governments by, *inter alia*, compelling them to enforce federal law under threat of legal action.

86. The Enforcement Directive mandates that "[t]he Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373." Executive Order at 8801. As discussed above, Defendants interpret Section 1373 to require jurisdictions to comply with immigration detainers.

87. The Enforcement Directive also mandates "enforcement action against any entity that . . . has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal

1   law." Executive Order at 8801. As discussed above, Defendants interpret a state or local government's

2   decision not to comply with ICE detainer requests as a "statute, policy, or practice that prevents or

3   hinders the enforcement of Federal law."

4       88.    The Enforcement Directive thus mandates that the Attorney General take enforcement

5   action against state and local governments that do not detain individuals at the behest of the Federal

6   government.

7       89.    Compelling state and local governments to detain individuals at the behest of the

8   Federal government violates the Tenth Amendment. "[T]he Federal Government may not compel the

9   States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United*

10  *States*, 521 U.S. 898, 925 (1997). To "command state or local officials to assist in the implementation

11  of federal law" is to engage in impermissible commandeering. *Id.* at 927.

12     **B.**    **Community Injury**

13       90.    The Executive Order fosters an atmosphere of fear and distrust between undocumented

14  immigrants and local government officials in San Francisco. Its sweeping terms, combined with recent

15  ICE activity in San Francisco, and compounded by the Trump administration's statements about

16  immigration enforcement, have generated a maelstrom of fear and confusion that San Francisco

17  agencies have had to move quickly to contain.

18       91.    The Executive Order is designed to—and does—create public confusion about whether

19  San Francisco is and will remain a Sanctuary City, and what that means.

20       92.    San Francisco has been forced to spend resources to counteract the effect of the

21  Executive Order. Since the Executive Order issued, San Francisco officials and employees have

22  responded to questions from San Francisco departments, non-profit partners, and members of the

23  public about topics such as whether the Executive Order modifies ICE's authority to enter public

24  facilities, jails, and residences; whether individuals' personal identifying information on applications

25  for benefit programs remains protected; and whether the Executive Order changes the way

26  San Francisco law enforcement officers interact with ICE. San Francisco departments have held

27  numerous meetings discussing the impact of the Executive Order and have developed new educational

28  materials about San Francisco Chapters 12H and 12I.

93.     Given the Executive Order's broad language, even San Francisco's extensive and ongoing efforts to offer clear answers leave the public far from reassured.

94.     By heightening undocumented immigrants' concerns that any interaction with San Francisco officials will lead to their information being turned over to ICE, the Executive Order discourages undocumented immigrants from reporting crimes, seeking public health services, and otherwise engaging with San Francisco programs and services. This threat harms public safety, public health, and San Francisco's ability to act in what San Francisco has determined to be the best interest of its residents, consistent with federal and state law.

95.     The Executive Order undermines San Francisco's ability to provide critical services not just to undocumented immigrants, but to all residents. When witnesses and crime victims will not talk to the police, law enforcement suffers and the entire community is less safe. When children are not vaccinated or the sick are not treated for communicable diseases, illness spreads throughout the community.

96.     As a result, the Executive Order causes the very harms San Francisco's Sanctuary City laws were designed to prevent. The Executive Order destroys rather than "foster[s] respect and trust between law enforcement and residents," wastes rather than "protect[s] limited local resources," and discourages rather than "encourage[s] cooperation between residents and City officials, including especially law enforcement and public health officers and employees." S.F. Admin. Code § 12I.1.

C.     **Budgetary Injury**

     1.     **San Francisco Relies On Federal Funding For Essential Public Services.**

97.     San Francisco is home to about 865,000 residents and has a total daytime population of about 1,250,000. People who live in, work in or visit San Francisco rely on—in addition to other public services—law enforcement provided by the San Francisco Police Department; public infrastructure projects such as roads, bridges and public transit; and the availability of high quality emergency care from San Francisco General Hospital. Residents also rely on public health programs such as Medi-Cal and public assistance programs like CalWORKS. While San Francisco has benefitted from a recent economic boom, over 12% of San Franciscans live in poverty, and depend on public assistance to make ends meet and put food on the table.

98.     San Francisco contributes disproportionately to national economic growth and job creation. Between 2010 and 2015, San Francisco ranked second among all U.S. counties in percentage change in employment, generating over 125,000 new jobs, a growth rate of 28%. A significant portion of this growth has been in the technology sector, a source of high wage jobs with important multiplier effects and potential for future growth.

99.     The State of California, including San Francisco, pays more to the Federal government in taxes than it receives in federal spending. In 2014, California residents and businesses paid a total of $369.2 billion in federal business and personal income, estate, gift, and excise taxes to the Internal Revenue Services and were the beneficiaries of $355.8 billion in federal expenditures. California ranked 38th among states in the ratio of federal spending to collections.

100.     In turn, San Francisco relies on federal funding to provide essential services and build and maintain public infrastructure projects.

101.     San Francisco budgets by a fiscal year that runs from July 1 to June 30. The current fiscal year began July 1, 2016, and will end June 30, 2017 ("FY16-17"). The next fiscal year will run from July 1, 2017 to June 30, 2018 ("FY17-18").

102.     San Francisco's annual operating budget for FY16-17 includes over $1.2 billion in federal funds. This is approximately 13% of the total annual operating budget.

103.     On top of the federal funds allocated in the annual operating budget, San Francisco expects to receive an additional $800 million in federal multi-year grants, largely for public infrastructure projects.

104.     The programs, projects, and services described below are just a few examples of how San Francisco uses federal funds.

a.     **Human Services Agency**

105.     San Francisco's Human Services Agency ("HSA") provides critical services to San Francisco's most vulnerable residents. It works with over 200,000 residents each year to provide needed nutrition assistance, income support, and child welfare services, among other support services. Approximately one in four San Franciscans is a client of HSA. HSA also manages numerous programs

//

that serve young children and their families, older adults, and individuals with disabilities. HSA relies on federal funding to provide these services.

106.    For example, the In-Home Supportive Services ("IHSS") program assists about 23,000 low-income elderly, disabled, or blind San Franciscans to live safely in their own homes and communities. For some recipients, the IHSS program reduces acute health care and institutional long-term care costs that would otherwise be incurred by the state and Federal governments through Medi-Cal. About 19,000 individuals work as independent providers for IHSS recipients. For FY16-17, the County's IHSS program is budgeted to receive approximately $64 million in federal funds, accounting for nearly 40% of the program's budget. Virtually all of these funds are provided as reimbursements. This amount does not include the approximately $200 million of federal funds that the State of California pays directly to independent IHSS providers.

107.    HSA also provides financial assistance and services to San Francisco's neediest residents, including children and families living in poverty. For example, through California Work Opportunity and Responsibility to Kids (CalWORKS), HSA provides financial assistance, family stabilization, case management, vocational counseling, job readiness assistance, behavioral health treatment, transportation, and other services designed to help parents of low-income families meet welfare-to-work requirements, secure and retain employment, and become self-sufficient. San Francisco's CalWORKS program is budgeted to receive approximately $58 million in federal funding in FY16-17, accounting for over 50% of the County's CalWORKS and Welfare-to-Work FY16-17 budget. Virtually all of these funds are provided as reimbursements.

108.    HSA offers numerous other social services, including child welfare programs and services, early childhood care and education services, adult protective services and a County Veteran's Service Office that helps veterans and their families receive benefits to which they are entitled.

109.    In FY16-17, HSA expects to receive a total of approximately $286 million in federal funding. This represents approximately 33% of its FY16-17 budget.

110.    HSA directly employs nearly 2,000 employees.  It also funds hundreds of additional jobs through contracts to service providers. Loss of federal funds would threaten many of these jobs, as well as the underlying services, that depend on HSA funds.

### b.      Department of Public Health

111.     The Zuckerberg San Francisco General Hospital ("ZSFGH") is a licensed general acute care hospital owned and operated by San Francisco. ZSFGH has 284 beds and provides a full complement of inpatient, outpatient, emergency, skilled nursing, diagnostic, mental health, and rehabilitation services for adults and children. ZSFGH is the largest safety net provider in San Francisco and is the designated trauma center for the 1.5 million residents of San Francisco and northern San Mateo County. In FY16-17, ZSFGH expects to receive approximately $450 million in federal funding for Medi-Cal and Medicare patient services. This accounts for over half of the ZSFGH FY16-17 budget of nearly $840 million. Virtually all of these funds are provided as reimbursements.

112.     Laguna Honda Hospital provides a full range of skilled nursing services to adult residents of San Francisco who are disabled or chronically ill, including specialized care for those with wounds, head trauma, stroke, spinal cord and orthopedic injuries, HIV/AIDS, and dementia. In FY16-17, Laguna Honda Hospital expects to receive approximately $160 million in federal funding for Medi-Cal and Medicare patient services, accounting for nearly 60% of its budget. Virtually all of these funds are provided as reimbursements.

113.     The San Francisco Department of Public Health ("DPH") also provides direct services through its primary care clinics, HIV/AIDS health services, mental health and substance abuse treatment, housing and homelessness assistance, maternal and child healthcare, and jail health services.

114.     Additionally, the DPH Population Health Division addresses public health concerns, including consumer safety, health promotion, and disease prevention. DPH also monitors threats to public health.

115.     Overall, in FY16-17, DPH expects to receive approximately $800 million in federal funding. This represents almost 40% of the Department's FY16-17 budget.

116.     DPH has approximately 6,800 full-time equivalent employees, and it funds hundreds of additional jobs through contracts to service providers. Loss of federal funds would threaten many of the thousands of jobs that depend on DPH funds.

//

1

### c.   Department of Emergency Management

117.   The Department of Emergency Management ("DEM") leads San Francisco in planning, preparedness, communication, response, and recovery for daily emergencies, large scale citywide events, and major disasters. DEM is the vital link in emergency communication between the public and first responders.

118.   One of the programs DEM administers is the Bay Area Urban Areas Security Initiative ("UASI"), which sustains and improves regional capacity to prevent, mitigate, respond to, and recover from terrorist attacks and catastrophic disasters. UASI funds training exercises and regional emergency management and disaster response. This program is funded entirely by federal funds.

119.   In FY16-17, DEM anticipates receiving about $25 million in federal funding, mostly supporting the UASI program. This represents nearly 30% of the Department's FY16-17 budget.

### d.   San Francisco Municipal Transportation Agency's Vehicle Replacement Program

120.   San Francisco Municipal Transportation Authority ("SFMTA") operates over 1,000 vehicles across 75 transit lines, carrying on average 700,000 passengers each workday. Replacing and rehabilitating vehicles as they near the end of their useful life helps avoid costly repairs and service interruptions. Growing the vehicle fleet also alleviates overcrowding and enables the transit system to carry more passengers.

121.   Nearly 80% of SFMTA's vehicle replacement and rehabilitation funding comes from the Federal government. Based on the latest Metropolitan Transportation Commission's Transportation Improvement Program, which is a comprehensive spending plan for the Bay Area region, SFMTA expects to receive over $500 million for this purpose from FY 2016-17 through FY 2019-20. These funds are subject to "Buy American" provisions.  For example, San Francisco's most recently purchased light-rail vehicles are manufactured in Sacramento, California and New Flyer trolley buses are manufactured in Minnesota.  The funds are expected to replace the system's approximately 1,000 aging vehicles over the four-year period.

//

//

**D.      Federal Funding Streams**

122.    San Francisco receives federal funds in the form of grants, as well as though payments for entitlement programs. These entitlement programs include Medicaid and Medicare, Temporary Assistance for Needy Families, Supplemental Nutrition Assistance Program, Foster Care, and various child welfare programs. Undocumented immigrants are not eligible to receive benefits from most entitlement programs. Approximately 80% of the federal funds budgeted for FY16-17 are for entitlement programs.

123.    San Francisco receives federal funds directly from the Federal government, as well as indirectly through the State of California and other pass-through entities. For FY16-17, San Francisco's budget includes over $1.1 billion in pass-through funds, the vast majority of which is passed through the State of California. President Trump has identified California as a possible sanctuary jurisdiction.  Because California does not prohibit voluntary communications about immigration status, it should be deemed to comply with Section 1373. If Defendants nonetheless cut off funds to California, this could result in the loss of pass-through funds to San Francisco.

124.    San Francisco receives most federal funds—for both grants and entitlement programs—as reimbursements. San Francisco is currently providing services and benefits that the Federal government has agreed to reimburse. San Francisco is also building major transit expansions and other public infrastructure projects, as well as running programs across a variety of San Francisco agencies, based on the Federal governments' commitment to pay for these projects and programs. The Executive Order calls into question whether the Federal government will in fact reimburse San Francisco for these funds.

125.    Congress has established numerous conditions governing eligibility for federal funds. For instance, to receive Medicaid funds, a state must create a state plan that includes assurances to the Federal government that the state will provide specified types of care and that the state regulates health insurance providers to ensure access to medical assistance, among many other requirements. 42 U.S.C. § 1396(a).

126.    In another example, the United States Department of Housing and Urban Development Community Development Block Grants fund many projects to combat unlawful evictions, maintain

stable housing occupancy and supply, and incentivize affordable unit construction. These grants require the grantee to prepare a statement of community development objectives and projected use of funds, provide a citizen participation plan, and certify other enumerated criteria. 42 U.S.C. § 5304.

127.    No federal funds received by San Francisco have statutory conditions specifically requiring compliance with Section 1373.

### E.    Coercive Effect Of The Executive Order

128.    The Executive Order threatens not to pay San Francisco over $2 billion in federal funds that is money already spent by San Francisco—money San Francisco is spending today and money San Francisco has reasonably relied on receiving. As set forth in this Complaint, the Executive Order is unconstitutional in numerous respects. Nonetheless, San Francisco currently faces the prospect of sweeping cuts in necessary federal funding.

129.    It would be catastrophic for San Francisco to lose all federal funds. It would not be possible for San Francisco to backfill the loss of $1.2 billion with local revenue sources.

130.    San Francisco's reserves are insufficient to cover the loss of all federal funds. San Francisco currently has contingency reserves of approximately $350 million, in a Rainy Day Fund and a Stabilization Fund, which were created and funded over the last decade for the purpose of managing local tax revenue volatility created by economic conditions. These reserve levels, totaling less than 8% of general fund revenues, remain below levels recommended by the Government Finance Officers Association for local governments and the 10% target established by San Francisco law. There are restrictions on the use of these reserves, and even if entirely depleted, their levels would be inadequate to cover a shortfall in federal funds for even a single year. To fully absorb the loss of all federal funds, San Francisco would also have to suspend capital projects—causing significant job loss—and make drastic service cuts in order to maintain a balanced budget, as it is legally required to do.

131.    Even a loss of 10% of annual federal funds would be calamitous for San Francisco. A cut of $120 million would lead to severe public health and public safety impacts. San Francisco currently has approximately 1,971 police officers, a level mandated by the Charter, but a $120 million cut would likely require San Francisco to reduce that number significantly, with similar reductions in

the number of firefighters. Capital programs would be postponed, resulting in lost jobs, and social service programs would be reduced or eliminated. General Fund Departments have identified specific programs and services that they will need to cut if they must reduce their General Fund Support for FY17-18 to help the Mayor's Office balance the budget. These include, for example, services for women that are domestic violence survivors, programming for low-income children and families, and housing programs to support low-income residents.

132.    The Executive Order's threat to cut federal funds is manifestly coercive. This is why at least one jurisdiction has already changed its policy about immigration detainers in response to the Executive Order. The day after the Executive Order was issued, Miami-Dade County Mayor Carlos Giménez instructed the county's interim corrections director to "fully cooperate" with the Federal government and comply with all immigration detainer requests, eliminating a previous requirement that the Federal government reimburse detainer costs. "It's really not worth the risk of losing millions of dollars to the residents of Miami-Dade County in discretionary money from the feds," said Mayor Giménez. Ray Sanchez, *Florida's Largest County to Comply with Trump's Sanctuary Crackdown*, CNN Politics (Jan. 27, 2017, 6:34 PM ET), http://www.cnn.com/2017/01/27/politics/miami-dade-mayor-sanctuary-crackdown/. There is little doubt that is exactly what the President intends this coercive effect with his promise to defund Sanctuary Cities.

### F.    Budget Impact of the Executive Order

133.    For FY16-17, San Francisco's annual operating budget is approximately $9.6 billion. Of this, approximately $1.2 billion is money provided by the Federal government for entitlement programs, grants, and contracts, and other items. For the vast majority of the federal funds received by San Francisco, there is no nexus between the purpose of the funds and immigration enforcement. Only a small percentage of all federal funds received by San Francisco relate to either immigration or law enforcement.

134.    The concern about losing federal funds is so acute that the Board of Supervisors has established the Budget and Finance Federal Select Committee, a new committee that will consider issues related to the possible loss of federal funds as a result of the Executive Order and other federal action.

135.    San Francisco has already begun the seven-month process of adopting the annual budget for the fiscal year beginning on July 1, 2017. On December 13, 2016, the Mayor and the Controller (San Francisco's chief financial officer) issued budget instructions to all San Francisco departments with detailed guidance on the preparation of departments' budget requests. Most San Francisco departments held public hearings on their budget proposals in January and February and submitted their budget requests for the coming fiscal year to the Controller by February 21. San Francisco law requires the Controller to submit a consolidated budget proposal to the Mayor by March 1, the Mayor to submit a balanced budget to the Board of Supervisors by June 1, and the Board of Supervisors to approve a balanced budget by August 1.

136.    To meet the June 1 deadline, the Mayor must make fundamental budget decisions by May 15, and input these decisions into San Francisco's budget software by May 24. During the last week of May, the Controller's Office reconciles and confirms all financial calculations in the Mayor's proposed budget, while the Mayor's Budget Office finalizes the narrative publication that accompanies the proposed budget.

137.    The budget for the fiscal year beginning July 1, 2017 will be approximately $10 billion, approximately $5 billion of which is in San Francisco's General Fund. The remainder of the budget is comprised of self-supporting activities at San Francisco's enterprise departments, which focus on city-related business operations and include the Port, the Municipal Transportation Agency, the Airport, the Public Utilities Commission, and others. The use of funds in these operations is legally restricted and cannot be redirected to backfill a shortfall in the General Fund. Money in San Francisco's General Fund is used to support public services such as public health, human services, police and fire services, and public works. Approximately $2 billion of General Fund money is legally dedicated for specific purposes, leaving approximately $3 billion in discretionary funds.

138.    One of the fundamental budget decisions the Mayor must make by May 15, 2017, is whether to create a budget reserve to account for the possible loss of federal and state funds in the coming fiscal year. This presents a Hobson's choice. San Francisco, facing possible reductions, could place funds into reserve at the beginning of the fiscal year, harming the public by reducing the amount of money in San Francisco's General Fund. Or San Francisco could budget based on the continued

1   receipt of federal and state funds, knowing that cuts could come suddenly, outside of the budget

2   process.

3       139.    If unanticipated cuts come mid-year, the General Fund will take an even bigger hit at

4   that time, as there will be less time to absorb the loss of funds. Depending on the nature of the cuts,

5   they could lead to immediate service cuts, layoffs, or cancellation of contracts and associated

6   penalties.

7       140.    If current levels of uncertainty remain by May 15, 2017, the Mayor will be forced to

8   propose a federal and state budget reserve. The final amount of the reserve will depend on the Mayor's

9   assessment of the amount of funding at risk and the likelihood that federal or state funds will be cut.

10  Money used to fund the reserve is money that will not be available for General Fund programs and

11  services.

12      141.    A May 15, 2017, decision to set the reserve at a specified amount will have a real world

13  impact when the new fiscal year begins on July 1, 2017. Beginning on this date, funds allocated for the

14  reserve will sit in the reserve instead of being available for General Fund services and programs. Once

15  funds are placed in a federal and state budget reserve, they will remain there for the entire fiscal year

16  unless they are released in response to reliably detailed information about the timing and size of

17  federal or state funding cuts.

18      142.    The Mayor must make a trade-off between putting money into a reserve and using it for

19  other San Francisco priorities, some of which are currently unfunded. For instance, the Department of

20  Homelessness and Supportive Housing needs an additional $19.5 million in the next two fiscal years

21  to make an impact in reducing homelessness in San Francisco. This money would fund a family

22  shelter expansion, youth housing subsidies, a resource center, and shelter maintenance and security. A

23  reserve would set money aside instead of using it for purposes like this.

24      143.    Since the Executive Order issued, San Francisco has received inquiries from credit

25  rating agencies about the impact of the Executive Order on San Francisco's finances. If credit

26  rating agencies downgrade their assessment of San Francisco, it will increase San Francisco's borrowing

27  costs.  The Executive Order imposes a "substantial contingent liability" to the extent that it

28  //

"immediately and directly affects the borrowing power, financial strength, and fiscal planning" of San Francisco. *See Clinton v. City of N.Y.*, 524 U.S. 417, 430-31 (1998).

**CAUSES OF ACTION**

**COUNT ONE**

**DECLARATORY RELIEF – SAN FRANCISCO LAW COMPLIES WITH 8 U.S.C. § 1373**

144.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

145.    San Francisco contends that its laws comply with Section 1373. San Francisco Administrative Code Chapters 12H and 12I do not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, immigration officials information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

146.    Defendants contend that San Francisco's laws do not comply with Section 1373.

147.    An actual controversy presently exists between San Francisco and Defendants about whether San Francisco's laws comply with Section 1373.

148.    A judicial determination resolving this controversy is necessary and appropriate at this time.

**COUNT TWO**

**TENTH AMENDMENT, SEPARATION OF POWERS, AND SPENDING CLAUSE – EXECUTIVE ORDER SECTION 9(A)'S FUNDING RESTRICTIONS ARE UNCONSTITUTIONAL**

149.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

150.    Executive Order Section 2(c) states: "It is the policy of the executive branch to . . . Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." Executive Order at 8799.

151.    Executive Order Section 9 states: "It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." *Id.* at 8801.

//

152.     Executive Order Section 9(a) contains a Funding Restriction stating: "In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary.  The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction." *Id.*

153.     The Funding Restriction violates the Tenth Amendment, the Spending Clause, and Article I, sec. 1 of the United States Constitution by:

        a.   Exercising Spending Power that the Constitution grants to Congress;

        b.   Imposing new funding conditions on existing federal funds;

        c.   Imposing funding conditions not germane to the purpose of the funds;

        d.   Imposing funding conditions so severe as to coerce compliance; and

        e.   Imposing funding conditions that require jurisdictions to act unconstitutionally.

## COUNT THREE

### TENTH AMENDMENT – EXECUTIVE ORDER SECTION 9(A)'S ENFORCEMENT DIRECTIVE IS UNCONSTITUTIONAL

154.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

155.     Executive Order Section 9(a) contains an Enforcement Directive stating: "The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." Executive Order at 8801.

156.     The Federal government has taken the position that a state or local jurisdiction that fails to affirmatively assist federal immigration officials—by, for example, refusing to comply with a detainer request issued under Section 287.7 of Title 8 of the Code of Federal Regulations—hinders the enforcement of federal law and violates Section 1373.

//

157. Accordingly, the Enforcement Directive commandeers state and local governments, violating Tenth Amendment to the United States Constitution by, *inter alia*, compelling them to enforce a federal program by imprisoning individuals subject to removal at the request of the Federal government when those individuals would otherwise be released from custody.

**PRAYER FOR RELIEF**

Wherefore, San Francisco prays that the Court grant the following relief:

San Francisco Laws Comply With Section 1373 (Count One)

1. Declare that San Francisco laws comply with Section 1373;

Executive Order Section 9(a)'s Funding Restriction Is Unconstitutional (Count Two)

2. Declare the Funding Restriction in Executive Order invalid;

3. Preliminarily and permanently enjoin Defendants from enforcing the Funding Restriction in the Executive Order;

Executive Order Section 9(a)'s Enforcement Directive Is Unconstitutional (Count Three)

4. Declare the Enforcement Directive in Executive Order invalid;

5. Preliminarily and permanently enjoin unconstitutional applications of the Enforcement Directive in Executive Order Section 9(a);

Other Relief

6. Award San Francisco reasonable costs and attorney's fees; and

//
//
//
//
//
//
//
//
//

7.       Grant any other further relief that the Court deems fit and proper.

Dated:  May 23, 2017

                                        DENNIS J. HERRERA
                                        City Attorney
                                        RONALD FLYNN
                                        JESSE C. SMITH
                                        YVONNE R. MERÉ
                                        MOLLIE M. LEE
                                        SARA J. EISENBERG
                                        Deputy City Attorneys


                              By:  */s/ Dennis J. Herrera*
                                        DENNIS J. HERRERA
                                        City Attorney


                              By:  */s/ Mollie M. Lee*
                                        MOLLIE M. LEE
                                        Deputy City Attorney

                                        Attorneys for Plaintiff
                                        CITY AND COUNTY OF SAN FRANCISCO

1

## **FILER'S ATTESTATION**

2         I, Mollie M. Lee, am the ECF user whose identification and password are being used to file

3 this SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF.

4 Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in

5 this filing.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

## CHAPTER 12H:
## IMMIGRATION STATUS

Sec. 12H.1.    City and County of Refuge.

Sec. 12H.2.    Use of City Funds Prohibited.

Sec. 12H.3.    Clerk of Board to Transmit Copies of this Chapter;
Informing City Employees.

Sec. 12H.4.    Enforcement.

Sec. 12H.5.    City Undertaking Limited to Promotion of General
Welfare.

Sec. 12H.6.    Severability.

### SEC. 12H.1.  CITY AND COUNTY OF REFUGE.

It is hereby affirmed that the City and County of San Francisco is a City and County of Refuge.

(Added by Ord. 375-89, App. 10/24/89)

### SEC. 12H.2.  USE OF CITY FUNDS PROHIBITED.

No department, agency, commission, officer, or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding release status of individuals or any other such personal information as defined in Chapter 12I in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation, or court decision. The prohibition set forth in this Chapter 12H shall include, but shall not be limited to:

(a)   Assisting or cooperating, in one's official capacity, with any investigation, detention, or arrest procedures, public or clandestine, conducted by the Federal agency charged with enforcement of the Federal immigration law and relating to alleged violations of the civil provisions of the Federal immigration law, except as permitted under Administrative Code Section 12I.3.

(b)   Assisting or cooperating, in one's official capacity, with any investigation, surveillance, or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State, or Federal criminal laws.

(c)   Requesting information about, or disseminating information, in one's official capacity, regarding the release status of any individual or any other such personal information as defined in Chapter 12I, except as permitted under Administrative Code Section 12I.3, or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except as required by Federal or State statute or regulation, City and County public assistance criteria, or court decision.

(d)   Including on any application, questionnaire, or interview form used in relation to benefits, services, or opportunities provided by the City and County of San Francisco any question regarding immigration status other than those required by Federal or State statute, regulation, or court decision. Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

(Added by Ord. 375-89, App. 10/24/89; amended by Ord. 228-09, File No. 091032, App. 10-28-2009; Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

### SEC. 12H.2-1.  [REPEALED.]

(Added by Ord. 282-92, App. 9/4/92; amended by Ord. 238-93, App. 8/4/93; Ord. 228-09, File No. 091032, App. 10-28-2009; repealed by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

### SEC. 12H.3.  CLERK OF BOARD TO TRANSMIT COPIES OF THIS CHAPTER; INFORMING CITY

The Clerk of the Board of Supervisors shall send copies of this Chapter, including any future amendments thereto that may be made, to every department, agency and commission of the City and County of San Francisco, to California's United States Senators, and to the California Congressional delegation, the Commissioner of the Federal agency charged with enforcement of the Federal immigration law, the United States Attorney General, and the Secretary of State and the President of the United States. Each appointing officer of the City and County of San Francisco shall inform all employees under her or his jurisdiction of the prohibitions in this ordinance, the duty of all of her or his employees to comply with the prohibitions in this ordinance, and that employees who fail to comply with the prohibitions of the ordinance shall be subject to appropriate disciplinary action. Each City and County employee shall be given a written directive with instructions for implementing the provisions of this Chapter.

(Added by Ord. 375-89, App. 10/24/89; Ord. 228-09, File No. 091032, App. 10-28-2009)

## SEC. 12H.4.  ENFORCEMENT.

The Human Rights Commission shall review the compliance of the City and County departments, agencies, commissions and employees with the mandates of this ordinance in particular instances in which there is question of noncompliance or when a complaint alleging noncompliance has been lodged.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.5.  CITY UNDERTAKING LIMITED TO PROMOTION OF GENERAL WELFARE.

In undertaking the adoption and enforcement of this Chapter, the City is assuming an undertaking only to promote the general welfare. This Chapter is not intended to create any new rights for breach of which the City is liable in money damages to any person who claims that such breach proximately caused injury. This section shall not be construed to limit or proscribe any other existing rights or remedies possessed by such person.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.6.  SEVERABILITY.

If any part of this ordinance, or the application thereof, is held to be invalid, the remainder of this ordinance shall not be affected thereby, and this ordinance shall otherwise continue in full force and effect. To this end, the provisions of this ordinance, and each of them, are severable.

(Added by Ord. 375-89, App. 10/24/89)

# EXHIBIT 2

## CHAPTER 12I:
## CIVIL IMMIGRATION DETAINERS

Sec. 12I.1.      Findings.

Sec. 12I.2.      Definitions.

Sec. 12I.3.      Restrictions on Law Enforcement Officials.

Sec. 12I.4.      Purpose of this Chapter.

Sec. 12I.5.      Semiannual Report.

Sec. 12I.6.      Severability.

Sec. 12I.7.      Undertaking for the General Welfare.

### SEC. 12I.1.  FINDINGS.

The City and County of San Francisco (the "City") is home to persons of diverse racial, ethnic, and national backgrounds, including a large immigrant population. The City respects, upholds, and values equal protection and equal treatment for all of our residents, regardless of immigration status. Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all.

The United States Immigration and Customs Enforcement ("ICE") is responsible for enforcing the civil immigration laws. ICE's programs, including Secure Communities and its replacement, the Priority Enforcement Program ("PEP"), seek to enlist local law enforcement's voluntary cooperation and assistance in its enforcement efforts. In its description of PEP, ICE explains that all requests under PEP are for voluntary action and that any request is not an authorization to detain persons at the expense of the federal government. The federal government should not shift the financial burden of federal civil immigration enforcement, including personnel time and costs relating to notification and detention, onto local law enforcement by requesting that local law enforcement agencies continue detaining persons based on non-mandatory civil immigration detainers or cooperating and assisting with requests to notify ICE that a person will be released from local custody. It is not a wise and effective use of valuable City resources at a time when vital services are being cut.

ICE's Secure Communities program (also known as "S-Comm") shifted the burden of federal civil immigration enforcement onto local law enforcement. S-Comm came into operation after the state sent fingerprints that state and local law enforcement agencies had transmitted to the California Department of Justice ("Cal DOJ") to positively identify the arrestees and to check their criminal history. The FBI would forward the fingerprints to the Department of Homeland Security ("DHS") to be checked against immigration and other databases. To give itself time to take a detainee into immigration custody, ICE would send an Immigration Detainer - Notice of Action (DHS Form I-247) to the local law enforcement official requesting that the local law enforcement official hold the individual for up to 48 hours after that individual would otherwise be released ("civil immigration detainers"). Civil Immigration detainers may be issued without evidentiary support or probable cause by border patrol agents, aircraft pilots, special agents, deportation officers, immigration inspectors, and immigration adjudication officers.

Given that civil immigration detainers are issued by immigration officers without judicial oversight, and the regulation authorizing civil immigration detainers provides no minimum standard of proof for their issuance, there are serious questions as to their constitutionality. Unlike criminal warrants, which must be supported by probable cause and issued by a neutral magistrate, there are no such requirements for the issuance of a civil immigration detainer. Several federal courts have ruled that because civil immigration detainers and other ICE "Notice of Action" documents are issued without probable cause of criminal conduct, they do not meet the Fourth Amendment requirements for state or local law enforcement officials to arrest and hold an individual in custody. (*Miranda-Olivares v. Clackamas Co.*, No. 3:12-cv-02317-ST *17 (D.Or. April 11, 2014) (finding that detention pursuant to an immigration detainer is a seizure that must comport with the Fourth Amendment). *See also Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I 2014); *Villars v. Kubiatowski*, No. 12-cv-4586 *10-12 (N.D. Ill. filed May 5, 2014).)

On December 4, 2012, the Attorney General of California, Kamala Harris, clarified the responsibilities of local law enforcement agencies under S-Comm. The Attorney General clarified that S-Comm did not require state or local law enforcement officials to determine an individual's immigration status or to enforce federal immigration laws. The Attorney General also clarified that civil immigration detainers are voluntary requests to local law enforcement agencies that do not mandate compliance. California local law enforcement agencies may determine on their own whether to comply with non-mandatory civil immigration detainers. In a June 25, 2014, bulletin, the Attorney General warned that a federal court outside of California had held a county liable for damages where it voluntarily complied with an ICE request to detain an individual, and the individual was otherwise eligible for release and that local law enforcement agencies may also be held liable for such conduct. Over 350 jurisdictions, including Washington, D.C., Cook County, Illinois, and many of California's 58 counties, have already acknowledged the discretionary nature of civil immigration detainers and are declining to hold people in their jails for the additional 48 hours as requested by ICE. Local law enforcement agencies' responsibilities, duties, and powers are regulated by state law. However, complying with non-mandatory civil immigration detainers frequently raises due process concerns.

According to Section 287.7 of Title 8 of the Code of Federal Regulations, the City is not reimbursed by the federal government for the costs associated with civil immigration detainers alone. The full cost of responding to a civil immigration detainer can include, but is not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer. Compliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City.

The City seeks to protect public safety, which is founded on trust and cooperation of community residents and local law enforcement. However, civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies. A 2013 study by the University of Illinois, entitled "Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," found that at least 40% of Latinos surveyed are less likely to provide information to police because they fear exposing themselves, family, or friends to a risk of deportation. Indeed, civil immigration detainers have resulted in the transfer of victims of crime, including domestic violence victims, to ICE.

The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.

In 2014, DHS ended the Secure Communities program and replaced it with PEP. PEP and S-Comm share many similarities. Just as with S-Comm, PEP uses state and federal databases to check an individual's fingerprints against immigration and other databases. PEP employs a number of tactics to facilitate transfers of individuals from local jails to immigration custody.

First, PEP uses a new form (known as DHS Form I-247N), which requests notification from local jails about an individual's release date prior to his or her release from local custody. As with civil immigration detainers, these notification requests are issued by immigration officers without judicial oversight, thus raising questions about local law enforcement's liability for constitutional violations if any person is overdetained when immigration agents are unable to be present at the time of the person's release from local custody.

Second, under PEP, ICE will continue to issue civil immigration detainer requests where local law enforcement officials are willing to respond to the requests, and in instances of "special circumstances," a term that has yet to be defined by DHS. Despite federal courts finding civil immigration detainers do not meet Fourth Amendment requirements, local jurisdictions are often unable to confirm whether or not a detention request is supported by probable cause or has been reviewed by a neutral magistrate.

The increase in information-sharing between local law enforcement and immigration officials raises serious concerns about privacy rights. Across the country, including in the California Central Valley, there has been an increase of ICE agents stationed in jails, who often have unrestricted access to jail databases, booking logs, and other documents that contain personal information of all jail inmates.

The City has an interest in ensuring that confidential information collected in the course of carrying out its municipal functions, including but not limited to public health programs and criminal investigations, is not used for unintended purposes that could hamper collection of information vital to those functions. To carry out public health programs, the City must be able to reliably collect confidential information from all residents. To solve crimes and protect the public, local law enforcement depends on the cooperation of all City residents. Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody.

In late 2015, Pedro Figueroa, an immigrant father of an 8-year-old U.S. citizen, sought the San Francisco Police Department's help in locating his stolen vehicle. When Mr. Figueroa went to the police station to retrieve his car, which police had located, he was detained for some time by police officers before being released, and an ICE agent was waiting to take him into immigration custody immediately as he left the police station. It was later reported that both the Police Department and the San Francisco Sheriff's Department had contact with ICE officials while Mr. Figueroa was at the police station. He spent over two months in an immigration detention facility and remains in deportation proceedings. Mr. Figueroa's case has raised major concerns about local law enforcement's relationship with

immigration authorities, and has weakened the immigrant community's confidence in policing practices. Community cooperation with local law enforcement is critical to investigating and prosecuting crimes. Without the cooperation of crime victims - like Mr. Figueroa - and witnesses, local law enforcement's ability to investigate and prosecute crime, particularly in communities with large immigrant populations, will be seriously compromised.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.1 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.2.  DEFINITIONS.

"Administrative warrant" means a document issued by the federal agency charged with the enforcement of the Federal immigration law that is used as a non-criminal, civil warrant for immigration purposes.

"Eligible for release from custody" means that the individual may be released from custody because one of the following conditions has occurred:

(a)   All criminal charges against the individual have been dropped or dismissed.

(b)   The individual has been acquitted of all criminal charges filed against him or her.

(c)   The individual has served all the time required for his or her sentence.

(d)   The individual has posted a bond, or has been released on his or her own recognizance.

(e)   The individual has been referred to pre-trial diversion services.

(f)   The individual is otherwise eligible for release under state or local law.

"Civil immigration detainer" means a non-mandatory request issued by an authorized federal immigration officer under Section 287.7 of Title 8 of the Code of Federal Regulations, to a local law enforcement official to maintain custody of an individual for a period not to exceed 48 hours and advise the authorized federal immigration officer prior to the release of that individual.

"Convicted" means the state of having been proved guilty in a judicial proceeding, unless the convictions have been expunged or vacated pursuant to applicable law. The date that an individual is Convicted starts from the date of release.

"Firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion as defined in Penal Code Section 16520.

"Law enforcement official" means any City Department or officer or employee of a City Department, authorized to enforce criminal statutes, regulations, or local ordinances; operate jails or maintain custody of individuals in jails; and operate juvenile detention facilities or maintain custody of individuals in juvenile detention facilities.

"Notification request" means a non-mandatory request issued by an authorized federal immigration officer to a local law enforcement official asking for notification to the authorized immigration officer of an individual's release from local custody prior to the release of an individual from local custody. Notification requests may also include informal requests for release information by the Federal agency charged with enforcement of the Federal immigration law.

"Personal information" means any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information.

"Serious Felony" means all serious felonies listed under Penal Code Section 1192.7(c) that also are defined as violent felonies under Penal Code Section 667.5(c); rape as defined in Penal Code Sections 261, and 262; exploding a destructive device with intent to injure as defined in Penal Code Section 18740; assault on a person with caustic chemicals or flammable substances as defined in Penal Code Section 244; shooting from a vehicle at a person outside the vehicle or with great bodily injury as defined in Penal Code Sections 26100(c) and (d).

"Violent Felony" means any crime listed in Penal Code Section 667.5(c); human trafficking as defined in Penal Code Section 236.1; felony assault with a deadly weapon as defined in Penal Code Section 245; any crime involving use of a firearm, assault weapon, machine gun, or .50 BMG rifle, while committing or attempting to commit a felony that is charged as a sentencing enhancement as listed in Penal Code Sections 12022.4 and 12022.5.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.2 added by Ord. 391-90, App. 12/6/90; amended by Ord. 278-96, App. 7/3/96; Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.3.  RESTRICTIONS ON LAW ENFORCEMENT OFFICIALS.

(a)   Except as provided in subsection (b), a law enforcement official shall not detain an individual on the basis of a civil immigration detainer after that individual becomes eligible for release from custody.

(b)   Law enforcement officials may continue to detain an individual in response to a civil immigration detainer for up to 48 hours after that individual becomes eligible for release if the continued detention is consistent with state and federal law, and the individual meets both of the following criteria:

(1)   The individual has been Convicted of a Violent Felony in the seven years immediately prior to the date of the civil immigration detainer; and

(2)   A magistrate has determined that there is probable cause to believe the individual is guilty of a Violent Felony and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to continue to detain an individual based solely on a civil immigration detainer as permitted in this subsection (b), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to: the individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

This subsection (b) shall expire by operation of law on October 1, 2016, or upon a resolution passed by the Board of Supervisors that finds for purposes of this Chapter, the federal government has enacted comprehensive immigration reform that diminishes the need for this subsection (b), whichever comes first.

(c)   Except as provided in subsection (d), a law enforcement official shall not respond to a federal immigration officer's notification request.

(d)   Law Enforcement officials may respond to a federal immigration officer's notification request if the individual meets both of the following criteria:

(1)   The individual either:

(A)   has been Convicted of a Violent Felony in the seven years immediately prior to the date of the notification request; or

(B)   has been Convicted of a Serious Felony in the five years immediately prior to the date of the notification request; or

(C)   has been Convicted of three felonies identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, arising out of three separate incidents in the five years immediately prior to the date of the notification request; and

(2)   A magistrate has determined that there is probable cause to believe the individual is guilty of a felony identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to respond to a notification request as permitted by this subsection (d), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to, the  individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

(e)   Law enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws.

(f)   Law enforcement officials shall make good faith efforts to seek federal reimbursement for all costs incurred in continuing to detain an individual, after that individual becomes eligible for release, in response each civil immigration detainer.

(Former Sec. 12I.3 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.4.  PURPOSE OF THIS CHAPTER.

The intent of this Chapter 12I is to address requests for non-mandatory civil immigration  detainers, voluntary notification of release of individuals, transmission of personal information, and civil immigration documents based solely on alleged violations of the civil provisions of immigration laws. Nothing in this Chapter shall be construed to apply to matters other than those relating to federal civil immigration detainers, notification of release of individuals, transmission of personal information, or civil immigration documents, based solely on alleged violations of the civil provisions of immigration laws. In all other respects, local law enforcement agencies may continue to collaborate with federal authorities to protect public safety. This collaboration includes, but is not limited to, participation in joint criminal investigations that are permitted under local policy or applicable city or state law.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.4 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.5.  SEMIANNUAL REPORT.

By no later than July 1, 2014, the Sheriff and Juvenile Probation Officer shall each provide to the Board of Supervisors and the Mayor a written report stating the number of detentions that were solely based on civil immigration detainers during the first six months following the effective date of this Chapter, and detailing the rationale behind each of those civil immigration detainers. Thereafter, the Sheriff and Juvenile Probation Officer shall each submit a written report to the Board of Supervisors and the Mayor, by January 1st and July 1st of each year, addressing the following issues for the time period covered by the report:

(a)   a description of all communications received from the Federal agency charged with enforcement of the Federal immigration law, including but not limited to the number of civil immigration detainers, notification requests, or other types of communications.

(b)   a description of any communications the Department made to the Federal agency charged with enforcement of the Federal immigration law, including but not limited to any Department's responses to inquires as described in subsection 12I.5 and the Department's determination of the applicability of subsections 12I.3(b), 12I.3(d) and 12I.3(e).

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.5 added by Ord. 391-90, App. 12/6/90; amended by Ord. 304-92, App. 9/29/92; Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.6.  SEVERABILITY.

If any section, subsection, sentence, clause, phrase, or word of this Chapter 12I or it[1] application, is for any reason held to be invalid or unconstitutional by a decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Chapter 12I. The Board of Supervisors hereby declares that it would have passed this Chapter 12I and each and every section, subsection, sentence, clause, phrase, and word not declared invalid or unconstitutional without regard to whether any other portion of this Chapter 12I would be subsequently declared invalid or unconstitutional.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013)

(Former Sec. 12I.6 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

### CODIFICATION NOTE

1.   So in Ord. 204-13.

## SEC. 12I.7.  UNDERTAKING FOR THE GENERAL WELFARE.

In enacting and implementing this Chapter 12I the City is assuming an undertaking only to promote the general welfare. It is not assuming, nor is it imposing on its officers and employees, an obligation for breach of which it is liable in money damages to any person who claims that such breach proximately caused injury.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013)

(Former Sec. 12I.7 added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.8.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.10.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.11.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

# EXHIBIT 3


# Presidential Documents

Executive Order 13768 of January 25, 2017

## Enhancing Public Safety in the Interior of the United States

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq*.), and in order to ensure the public safety of the American people in communities across the United States as well as to ensure that our Nation's immigration laws are faithfully executed, I hereby declare the policy of the executive branch to be, and order, as follows:

**Section 1**. *Purpose*. Interior enforcement of our Nation's immigration laws is critically important to the national security and public safety of the United States. Many aliens who illegally enter the United States and those who overstay or otherwise violate the terms of their visas present a significant threat to national security and public safety. This is particularly so for aliens who engage in criminal conduct in the United States.

Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic.

Tens of thousands of removable aliens have been released into communities across the country, solely because their home countries refuse to accept their repatriation. Many of these aliens are criminals who have served time in our Federal, State, and local jails. The presence of such individuals in the United States, and the practices of foreign nations that refuse the repatriation of their nationals, are contrary to the national interest.

Although Federal immigration law provides a framework for Federal-State partnerships in enforcing our immigration laws to ensure the removal of aliens who have no right to be in the United States, the Federal Government has failed to discharge this basic sovereign responsibility. We cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement. The purpose of this order is to direct executive departments and agencies (agencies) to employ all lawful means to enforce the immigration laws of the United States.

**Sec. 2**. *Policy*. It is the policy of the executive branch to:

(a) Ensure the faithful execution of the immigration laws of the United States, including the INA, against all removable aliens, consistent with Article II, Section 3 of the United States Constitution and section 3331 of title 5, United States Code;

(b) Make use of all available systems and resources to ensure the efficient and faithful execution of the immigration laws of the United States;

(c) Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law;

(d) Ensure that aliens ordered removed from the United States are promptly removed; and

(e) Support victims, and the families of victims, of crimes committed by removable aliens.

**Sec. 3**. *Definitions*. The terms of this order, where applicable, shall have the meaning provided by section 1101 of title 8, United States Code.

**Sec. 4**. *Enforcement of the Immigration Laws in the Interior of the United States.* In furtherance of the policy described in section 2 of this order, I hereby direct agencies to employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all removable aliens.

**Sec. 5**. *Enforcement Priorities.* In executing faithfully the immigration laws of the United States, the Secretary of Homeland Security (Secretary) shall prioritize for removal those aliens described by the Congress in sections 212(a)(2), (a)(3), and (a)(6)(C), 235, and 237(a)(2) and (4) of the INA (8 U.S.C. 1182(a)(2), (a)(3), and (a)(6)(C), 1225, and 1227(a)(2) and (4)), as well as removable aliens who:

(a) Have been convicted of any criminal offense;

(b) Have been charged with any criminal offense, where such charge has not been resolved;

(c) Have committed acts that constitute a chargeable criminal offense;

(d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;

(e) Have abused any program related to receipt of public benefits;

(f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or

(g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

**Sec. 6**. *Civil Fines and Penalties.* As soon as practicable, and by no later than one year after the date of this order, the Secretary shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties that the Secretary is authorized under the law to assess and collect from aliens unlawfully present in the United States and from those who facilitate their presence in the United States.

**Sec. 7**. *Additional Enforcement and Removal Officers.* The Secretary, through the Director of U.S. Immigration and Customs Enforcement, shall, to the extent permitted by law and subject to the availability of appropriations, take all appropriate action to hire 10,000 additional immigration officers, who shall complete relevant training and be authorized to perform the law enforcement functions described in section 287 of the INA (8 U.S.C. 1357).

**Sec. 8**. *Federal-State Agreements.* It is the policy of the executive branch to empower State and local law enforcement agencies across the country to perform the functions of an immigration officer in the interior of the United States to the maximum extent permitted by law.

(a) In furtherance of this policy, the Secretary shall immediately take appropriate action to engage with the Governors of the States, as well as local officials, for the purpose of preparing to enter into agreements under section 287(g) of the INA (8 U.S.C. 1357(g)).

(b) To the extent permitted by law and with the consent of State or local officials, as appropriate, the Secretary shall take appropriate action, through agreements under section 287(g) of the INA, or otherwise, to authorize State and local law enforcement officials, as the Secretary determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties.

(c) To the extent permitted by law, the Secretary may structure each agreement under section 287(g) of the INA in a manner that provides the most effective model for enforcing Federal immigration laws for that jurisdiction.

**Sec. 9**. *Sanctuary Jurisdictions.* It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.

(a) In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

(b) To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

(c) The Director of the Office of Management and Budget is directed to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction.

**Sec. 10**. *Review of Previous Immigration Actions and Policies.* (a) The Secretary shall immediately take all appropriate action to terminate the Priority Enforcement Program (PEP) described in the memorandum issued by the Secretary on November 20, 2014, and to reinstitute the immigration program known as ''Secure Communities'' referenced in that memorandum.

(b) The Secretary shall review agency regulations, policies, and procedures for consistency with this order and, if required, publish for notice and comment proposed regulations rescinding or revising any regulations inconsistent with this order and shall consider whether to withdraw or modify any inconsistent policies and procedures, as appropriate and consistent with the law.

(c) To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Secretary shall consolidate and revise any applicable forms to more effectively communicate with recipient law enforcement agencies.

**Sec. 11**. *Department of Justice Prosecutions of Immigration Violators.* The Attorney General and the Secretary shall work together to develop and implement a program that ensures that adequate resources are devoted to the prosecution of criminal immigration offenses in the United States, and to develop cooperative strategies to reduce violent crime and the reach of transnational criminal organizations into the United States.

**Sec. 12**. *Recalcitrant Countries.* The Secretary of Homeland Security and the Secretary of State shall cooperate to effectively implement the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), as appropriate. The Secretary of State shall, to the maximum extent permitted by law, ensure that diplomatic efforts and negotiations with foreign states include as a condition precedent the acceptance by those foreign states of their nationals who are subject to removal from the United States.

**Sec. 13**. *Office for Victims of Crimes Committed by Removable Aliens.* The Secretary shall direct the Director of U.S. Immigration and Customs Enforcement to take all appropriate and lawful action to establish within U.S. Immigration and Customs Enforcement an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens and the family members of such victims. This office shall provide quarterly reports studying the effects of the victimization by criminal aliens present in the United States.

**Sec. 14**. *Privacy Act.* Agencies shall, to the extent consistent with applicable law, ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information.

**Sec. 15**. *Reporting.* Except as otherwise provided in this order, the Secretary and the Attorney General shall each submit to the President a report on the progress of the directives contained in this order within 90 days of the date of this order and again within 180 days of the date of this order.

**Sec. 16**. *Transparency.* To promote the transparency and situational awareness of criminal aliens in the United States, the Secretary and the Attorney General are hereby directed to collect relevant data and provide quarterly reports on the following:

(a) the immigration status of all aliens incarcerated under the supervision of the Federal Bureau of Prisons;

(b) the immigration status of all aliens incarcerated as Federal pretrial detainees under the supervision of the United States Marshals Service; and

(c) the immigration status of all convicted aliens incarcerated in State prisons and local detention centers throughout the United States.

**Sec. 17**. *Personnel Actions.* The Office of Personnel Management shall take appropriate and lawful action to facilitate hiring personnel to implement this order.

**Sec. 18**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 25, 2017.*

[FR Doc. 2017–02102
Filed 1–27–17; 11:15 am]
Billing code 3295–F7–P