CHAD A. READLER
Acting Assistant Attorney General
BRIAN STRETCH
United States Attorney
JOHN R. TYLER
Assistant Director
STEPHEN J. BUCKINGHAM (Md. Bar)
Special Counsel
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
Department of Justice, Room 7210
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C.  20044
Telephone:      (202) 514-3495
Facsimile:       (202) 616-8470
E-mail:          scott.simpson@usdoj.gov
COUNSEL FOR DEFENDANTS
DONALD J. TRUMP, President of the
United States; UNITED STATES OF
AMERICA; JOHN F. KELLY, Secretary of
Homeland Security; JEFFERSON B.
SESSIONS, III, Attorney General of the
United States

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>                    Plaintiff,<br><br>          v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>                    Defendants. | No. 3:17-cv-00485-WHO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, CLARIFICATION OF THE COURT'S ORDER OF APRIL 25, 2017; MEMORANDUM OF POINTS AND AUTHORITIES** |

1
2

## TABLE OF CONTENTS

3
4

NOTICE OF MOTION ............................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

INTRODUCTION .................................................................................................................. 1

ISSUES PRESENTED ........................................................................................................... 2

BACKGROUND ................................................................................................................... 3

ARGUMENT .......................................................................................................................... 7

    I.     The AG Memorandum Provides a Basis for the Court
         to Reconsider Its Justiciability Determination ........................................................ 8

    II.    The AG Memorandum Provides a Basis for the Court to Reconsider
         Its Determination that the Plaintiff is Likely to Succeed
         on the Merits of Its Claims ....................................................................................... 12

         A.     The AG Memorandum Alleviates the Court's Separation
              of Powers Concerns ................................................................................... 13

         B.     The AG Memorandum Alleviates the Court's Spending
              Clause Concerns ......................................................................................... 14

         C.     The AG Memorandum Alleviates the Court's Tenth
              Amendment Concerns ................................................................................ 16

         D.     The AG Memorandum Alleviates the Court's Vagueness Concerns........ 18

         E.     The AG Memorandum Alleviates the Court's Due Process
              Clause Concerns ......................................................................................... 19

    III.   The Injunction Should Not Restrict Defendants' Independent
         Authority to Impose Conditions on Grant Programming ...................................... 20

CONCLUSION ...................................................................................................................... 21

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2

3

<u>CASES</u>

4

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28
(D.C. Cir. 2002) ......................................................................................... 4, 9, 14, 18

5

*De La Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1105 (N.D. Cal. 2014) ......................................... 7

6

*DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275 (D.C. Cir. 1989)................................................. 6, 13

7

*Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006) ...................................................... 15

8

*Gaynard v. City of Rockford*, 408 U.S. 104 (1972) ....................................................... 18

9

*Morton v. Ruiz*, 415 U.S. 199 (1974) ............................................................................. 6

10

*Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012) ...................................... 15

11

*Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255 (9th Cir. 1993) .................. 7

12

*S. Dakota v. Dole*, 483 U.S. 203 (1987)................................................................. 11, 17

13

*Thornton v. City of Helens*, 425 F.3d 1158 (9th Cir. 2005) ......................................... 19

14

15

<u>STATUTES</u>

16

8 U.S.C. § 1103(c)(1)............................................................................................. 5

17

8 U.S.C. § 1373 ............................................................................................ passim

18

42 U.S.C. § 3712(a) .......................................................................................... 7

19

42 U.S.C. § 3712(a)(6) ...................................................................................... 6

20

42 U.S.C. § 3752(a)(5)(D) ................................................................................. 6

21

22

<u>REGULATIONS</u>

23

2 C.F.R. § 200.207(a)........................................................................................ 7

2 C.F.R. § 2800.101 ......................................................................................... 7

24

28 C.F.R. § 0.5(c)............................................................................................. 5

25

26

<u>EXECUTIVE ORDERS</u>

27

Exec. Order 13,536, 76 Fed. Reg. 3,821 (Jan. 18, 2011) ...................................... 10

28

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

Exec. Order No. 13,768, 82 Fed. Reg. 8,799 (Jan. 30, 2017) .................................................. passim

Exec. Order No. 13,768, § 9, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ......................................... passim

Exec. Order No. 13,768, § 10(a), 82 Fed. Reg. 8,799 (Jan. 30, 2017)............................................. 9

OTHER AUTHORITIES

*2015 COPS Hiring Program Fact Sheet*, DOJ Community Oriented Policing Services .............. 13

*2016 COPS Hiring Program Fact Sheet*, DOJ Community Oriented Policing Services ............. 13

Ltr. from Peter J. Kadzik, Asst. Att'y Gen. U.S. Dep't of Justice, to Hon.
John A. Culberson, Chairman for the Subcomm. on Commerce, Justice,
Sci. & Related Agencies (Jul. 7, 2016) ........................................................................................ 7

Mem. from DHS Sec'y Jeh Johnson to Acting Dir. U.S. Immigration &
Customs Enforcement Thomas Winkowski, et al.  (Nov. 20, 2014) ............................................. 9

Mem. from the Attorney General for All Department Grant-Making
Components (May 22, 2017) .................................................................................................. passim

Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from
the Office of Legal Counsel*, 52 Admin. L. Rev. 1303 (2000) ........................................................ 5

iv

1   NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OR, IN THE

2   ALTERNATIVE, FOR CLARIFICATION

3       PLEASE TAKE NOTICE that defendants hereby move for reconsideration or, in the

4   alternative, for clarification of the Court's Order of April 25, 2017, granting plaintiff's motion for

5   preliminary injunction (Doc. 82).  This motion is based on the following Memorandum of Points

6   and Authorities, the evidence and records on file in this action, and any other written or oral

7   evidence or argument that may be presented at or before the time this motion is heard.

8   MEMORANDUM OF POINTS AND AUTHORITIES

9   INTRODUCTION

10       On May 22, 2017, the Attorney General issued a Memorandum ("AG Memorandum")

11   concerning the implementation of Executive Order 13,768.  *See* AG Mem. at 1 (Attachment 1

12   hereto); Exec. Order No. 13,768 ("Executive Order"), 82 Fed. Reg. 8,799-8,803 (Jan. 30, 2017).

13   The AG Memorandum sets forth the Attorney General's conclusive interpretation of the scope of

14   the grant-eligibility provision in Section 9(a) of the Executive Order.  The Memorandum provides

15   (1) that the grant-eligibility provision applies "solely to federal grants administered by the

16   Department of Justice or the Department of Homeland Security ["DHS"], and not to other sources

17   of federal funding[,]" (2) that the Department of Justice ("DOJ") will require jurisdictions

18   applying for certain DOJ-administered grants "to certify their compliance with federal law,

19   including 8 U.S.C. § 1373," and (3) that only "jurisdiction[s] that fail[] to certify compliance with

20   section 1373 will be ineligible to receive [an] award[]."  AG Mem. at 1-2.  The AG Memorandum

21   provides the decisive interpretation of the administration, and it reaffirms the representations

22   made by government counsel at oral argument that the grant-eligibility provision applies only to

23   federal grant programs administered by DOJ or DHS that contain terms that expressly obligate a

24   grant applicant or recipient to certify of compliance with 8 U.S.C. § 1373.  *See* Tr. of Oral Arg. at

25   24:4-6, *City & Cnty. of San Francisco v. Trump*, No. 3:17-cv-00485 (N.D. Cal. Apr. 14, 2017).

26       The authoritative position set forth in the AG Memorandum squarely contradicts the

27   Court's determination, which was based in part on non-binding press statements and public

28   speeches, that the grant-eligibility provision "attempts to reach all federal grants[.]"  Order of

Apr. 25, 2017 at 2-3 (Doc. 82).  That finding, in turn, served as the foundation for the Court's

analysis of the justiciability of plaintiff's claims and the Court's conclusions regarding the

constitutional infirmity of the Executive Order.  However, because the Attorney General has now

issued binding guidance that undermines many of the factual bases supporting the Court's

opinion, including the Court's interpretation of press statements and public speeches, defendants

respectfully request that the Court reconsider its holding in light of the recently-issued

Memorandum.

Should the Court determine that an injunction remains appropriate despite the issuance of

the AG Memorandum, defendants respectfully seek clarification regarding the scope of the

injunction.  The Court's Order provides that defendants may "use lawful means to enforce

*existing* conditions of federal grants or 8 U.S.C. 1373."  *Id.* at 49 (emphasis added).  Defendants

do not interpret the Court's Order as prohibiting defendants from imposing additional conditions

on grant programming for future federal grant awards pursuant to the direction contained in

Section 9(a), where defendants are legally authorized to do so under authority that exists

independent of the Executive Order.  Nevertheless, out of an abundance of caution, in the event

the Court determines to maintain the injunction currently in place in this matter, defendants

respectfully seek confirmation that DOJ and DHS are not enjoined from imposing conditions on

grant programs administered by those agencies where such conditions are permissible under

independent legal authority.

ISSUES PRESENTED

1.  Whether the Court should reconsider its entry of injunctive relief in light of recently

issued authority concerning the scope of the Executive Order.

2.  Whether, in the event the Court determines that injunctive relief remains appropriate,

the Court should nevertheless clarify the scope of its Order to specify that DOJ and DHS are not

enjoined from including conditions on DOJ and DHS-administered grant programs pursuant to

legal authority that exists independent of the Executive Order.

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BACKGROUND

On March 8, 2017, the City and County of San Francisco ("City" or "San Francisco") moved for a preliminary injunction to prevent the implementation of Section 9(a) of the Executive Order (Doc. 21). Section 9(a) provides, in relevant part, that the Attorney General and the Secretary of Homeland Security ("Secretary"), "in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 . . . are not eligible to receive Federal grants[.]" Exec. Order 13,768, § 9(a). Despite the fact that the grant-eligibility provision of Section 9(a) is directed solely to the Attorney General and the Secretary, San Francisco had urged an expansive reading of that provision, arguing that it applied to the entirety of the Executive Branch. Specifically, San Francisco contended that the Order purported to "condition eligibility for *all* federal funds on compliance with Section 1373," not just federal grants administered by DOJ or DHS (Doc. 21 at 11).

At oral argument on the motion for preliminary injunction, the government stated that, because the grant-eligibility provision of Section 9(a) directs action only by the Department of Justice or the Department of Homeland Security, that provision only applied to grants adminis-tered by DOJ or DHS. The government further stated that, consistent with governing authority and past practice, DHS or DOJ would only take adverse action against a grant recipient for failure to comply with Section 1373 where the terms of the grant program expressly required such compliance. *See* Tr. of Oral Arg. at 24:4-6; *see also* Order of Apr. 25, 2017 at 13 (summarizing the government's position). The government further stated that only three grant programs, all of which are administered by DOJ, currently identify Section 1373 as an applicable federal law with which grantees are required to comply. *See, e.g.*, Tr. of Oral Arg. at 35:2-9. The government acknowledged, however, that "[g]oing forward . . . DOJ and, potentially, DHS" may choose to include similar conditions in their grant-eligibility terms, where authorized to do so, and that, in all cases, those conditions "will be known to the [grantee]" in advance of the grantee's decision to participate in the grant program. *Id.* at 25:14-16.

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

3

On April 25, 2017, the Court granted San Francisco's motion and enjoined the defendants (other than the President) "from enforcing Section 9(a) of the Executive Order against jurisdictions they deem as sanctuary jurisdictions." Order of Apr. 25, 2017 at 49. The Court made clear, however, that defendants may "use lawful means to enforce existing conditions of federal grants or 8 U.S.C. 1373." *Id.*[1] The Court found injunctive relief appropriate because, like the plaintiff, it interpreted the grant-eligibility provision of Section 9(a) as referring to "*all* federal grants[.]" *Id.* at 3 (emphasis added). In reaching that interpretation, the Court relied heavily on public comments by the President, the White House Press Secretary, and the Attorney General to conclude that "Section 9(a) is not reasonably susceptible to the new, narrow interpretation offered at the hearing." *Id.* Based on its broad interpretation of Section 9(a), the Court held that the City's claims were justiciable and that the provisions of Section 9(a) violated a variety of constitutional doctrines. *See generally id.* at 49.

The AG Memorandum sets forth in a formal, conclusive manner the administration's interpretation of the scope of the grant-eligibility provision of Section 9(a). The Memorandum specifies that the Executive Order does not "purport to expand the existing statutory or constitutional authority of the Attorney General and the Secretary of Homeland Security in any respect," but rather instructs those officials to take certain action, "to the extent consistent with the law." AG Mem. at 2; *see Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (noting that the President is merely wielding his "supervisory authority over the Executive Branch" where he "directs his subordinates" to take certain action "but only '[t]o the extent permitted by law'"). The AG Memorandum further clarifies that the grant-eligibility provision is limited "solely to federal grants administered by [DOJ] or [DHS]," and to grants requiring the applicant to "certify . . . compliance with federal law, including 8 U.S.C. § 1373, as

[1]As mentioned, the Court has only enjoined defendants (other than the President) from "enforcing Section 9(a) of the Executive Order against jurisdictions they deem as sanctuary jurisdictions." Order of Apr. 25, 2017 at 49. It has not limited defendants' ability to use "lawful means [of] enforc[ing]" federal law, *id.*, and defendants do not understand the Court's Order as precluding their ability to utilize legal authority independent of the Executive Order to initiate legal proceedings or advance defendants' law enforcement priorities.

4

a condition for receiving an award." AG Mem. at 1, 2.  Only "jurisdiction[s] that fail[] to certify

compliance with [8 U.S.C. § 1373] will be ineligible to receive [an] award[]" pursuant to the

grant-eligibility provision.  *Id.*  In other words, the provision applies only in instances in which an

applicant or grant recipient has had the choice either to certify compliance with 8 U.S.C. § 1373

as an express condition of eligibility to participate in a certain grant program, or to refuse to

certify compliance and thereby render itself ineligible to participate in the grant program.  The

AG Memorandum also makes clear that, with respect to Section 1373 compliance conditions,

DOJ and DHS may impose such conditions only pursuant to the exercise of "existing statutory or

constitutional authority," and only where "grantees will receive notice of their obligation to

comply with section 1373."  AG Mem. at 2.

The interpretation set forth in the AG Memorandum is conclusive here.  Section 9(a) of

the Executive Order directs only two officials, the Attorney General and the Secretary of

Homeland Security, to implement its provisions, and the Attorney General has now clarified that

he does not interpret the challenged portion of the Executive Order as applying to grant programs

administered by agencies other than DOJ and DHS.  Moreover, by longstanding tradition and

practice, the Attorney General's legal opinions are treated as authoritative by the heads of

executive agencies.  *See, e.g.*, *Tenaska Washington Partners II, L.P. v. United States*, 34 Fed. Cl.

434, 439 (1995); Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from

the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1319-20 (2000).  The Attorney General has

a statutory duty to advise executive department heads on "questions of law," 28 U.S.C. § 512, and

furnishes formal legal opinions to executive agencies, 28 C.F.R. § 0.5(c).  And although the

Secretary of Homeland Security principally administers the immigration laws, the Immigration

and Nationality Act provides that a "determination and ruling by the Attorney General with

respect to all questions of law shall be controlling."  8 U.S.C. § 1103(c)(1).  The AG Memoran-

dum thus conclusively establishes that section 9(a) is limited to grant programs administered by

DOJ or DHS.  Moreover, the AG Memorandum sets forth clear and consistent guidance for the

applicable components of DOJ as to the parameters of the grant-eligibility provision.

1    In addition to setting forth the authoritative interpretation of the grant-eligibility provision

2    of section 9(a), the Attorney General also recognized that, "[s]eparate and apart from the

3    Executive Order, statutes may authorize the Department to tailor grants or to impose additional

4    conditions on grantees to advance the Department's law enforcement priorities."  AG Mem. at 2.

5    Pursuant to those authorities, administrations have historically focused federal resources on

6    addressing concerns of high priority, such as homeland security, violent crime, domestic violence,

7    or immigration.  As this Court recognized in its Order, "Congress can delegate some discretion to

8    the President to decide how to spend appropriated funds" so long as any such "delegation and

9    discretion is cabined" by relevant constitutional boundaries.  *See* Order of Apr. 25, 2017 at 36;

10   *see* Tr. of Oral Arg. at 34:4-8; *see also DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C.

11   Cir. 1989) (upholding conditions on spending imposed by the Executive where the underlying

12   statute unambiguously authorized the Executive to set certain "terms and conditions as he may

13   determine").

14   Many of the spending statutes governing DOJ or DHS, including those that authorize

15   particular grant programs or that otherwise govern the spending powers of the agency, allow for

16   those agencies to impose certain conditions on certain federal grant programs they administer.

17   *See, e.g.*, 42 U.S.C. § 3712(a)(6) (authorizing certain DOJ officials to place "special conditions"

18   on particular grants); *Morton v. Ruiz*, 415 U.S. 199, 230 (1974) (finding that, in certain instances,

19   such as where a congressional appropriation is insufficient to carry out its purpose, the agency

20   administering the program is deemed authorized "to create reasonable classifications and

21   eligibility requirements in order to allocate the limited funds available").  For example, the statute

22   authorizing the Edward Byrne Memorial Justice Assistance Grant program ("JAG"), which is

23   administered by DOJ's Office of Justice Programs ("OJP"), requires grant applicants to certify to

24   the Attorney General that they "comply with all provisions of this part and all other applicable

25   Federal laws."  42 U.S.C. § 3752(a)(5)(D).  That statutory provision allows the Attorney General

26   the discretion to determine whether a particular federal law is "applicable" to the receipt of a JAG

27   award.  Additionally, a provision of OJP's organic statute authorizes the head of OJP to "exercise

28

6

1   such other powers and functions as may be vested in [him or her] pursuant to this chapter or by

2   delegation of the Attorney General, *including placing special conditions on all grants*, and

3   determining priority purposes for formula grants." *Id.* § 3712(a) (emphasis added).[2]  Pursuant to

4   those statutory authorities, since 2016, DOJ has identified Section 1373 as federal law applicable

5   to the JAG program.  *See generally* Order of Apr. 25, 2017 at 6 (citing Ltr. from Peter J. Kadzik,

6   Asst. Att'y Gen. U.S. Dep't of Justice, to Hon. John A. Culberson, Chairman for the Subcomm.

7   on Commerce, Justice, Sci. & Related Agencies (Jul. 7, 2016)); *see also* Declaration of Ralph

8   Martin ¶ 17 (Attachment 2 hereto).  Thus, consistent with the Court's Order, the AG

9   Memorandum acknowledges, as defendants' counsel did at oral argument, that going forward,

10   where legally authorized, defendants "may seek to tailor grants to promote a lawful system of

11   immigration." AG Mem. at 2.

12 ARGUMENT

13       "A district court has inherent jurisdiction to modify, alter, or revoke a prior order." *De La*

14   *Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1105, 1107 (N.D. Cal. 2014).  The Ninth Circuit has held

15   that "[r]econsideration is appropriate if the district court (1) is presented with newly discovered

16   evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is

17   an intervening change in controlling law." *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS,*

18   *Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).  Under this Court's Civil Local Rule 7-9(b), a motion for

19   reconsideration may be proper where, for example, "a material difference in fact or law exists

20   from that which was presented to the Court before entry of the interlocutory order for which

21   reconsideration is sought."  The AG Memorandum constitutes a material difference in controlling

22   authority.  As explained in more detail below, that Memorandum eliminates many of the

23   conclusions that served as the foundation for the Court's decision to grant plaintiff's motion for

24

25

---

26        [2] Similarly, DOJ regulations provide for the imposition of "additional specific award
conditions" under certain circumstances, such as where "an applicant or recipient has a history of

27   failure to comply with the general or specific terms and conditions of a Federal award." *See* 2
C.F.R. § 2800.101 (adopting, *inter alia*, 2 C.F.R. § 200.207(a)).

28

7

1    preliminary injunction.  Accordingly, defendants respectfully request that the Court reconsider its

2    decision in light of the guidance contained in the AG Memorandum.

3    I.    The AG Memorandum Provides a Basis for the Court to
            Reconsider Its Justiciability Determination
4

5    The AG Memorandum expressly contradicts many of the conclusions underlying the

6    Court's decision regarding the justiciability of San Francisco's claims.  Contrary to those

7    conclusions, the Memorandum makes clear that the grant-eligibility provision in Section 9(a) of

8    the Executive Order applies only to grant programs administered by DOJ or DHS and, with

9    respect to DOJ grants, only to those programs where explicit terms condition eligibility on

10   certification of compliance with 8 U.S.C. § 1373.  *See* AG Mem. at 1-2.  Because the AG

11   Memorandum's clarification of the scope of the grant-eligibility provision conflicts with several

12   bases essential to the Court's justiciability determination, the Court should reconsider that

13   determination in light of the position set forth in the Memorandum, which are binding on the

14   relevant Executive Branch officials.

15   In determining that the City had established the justiciability of its claims, the Court first

16   found that the grant-eligibility provision of Section 9(a) improperly attempted to effectuate a

17   change in the law because that provision "purport[ed] to delegate to the Attorney General and the

18   Secretary the authority to place a new condition on federal grants," in contravention of the

19   Constitution, and because the Order did not explicitly limit its scope to grants administered by

20   DHS or DOJ.  Order of Apr. 25, 2017 at 14-15.  The Court reasoned that a contrary reading of the

21   Executive Order – one that simply required the Attorney General and the Secretary to use their

22   existing statutory authority to enforce the President's policies – rendered the Order "legally

23   meaningless" and was thus "clearly inconsistent with the Order's broad intent."  *Id.* at 15.

24   The AG Memorandum contradicts those determinations.  As the Memorandum makes

25   clear, for example, the purpose of the Executive Order was to "establish[] immigration enforce-

26   ment as a priority for this Administration," not to direct the Attorney General or the Secretary to

27   act *ultra vires*.  *See* AG Mem. at 1.  Far from being "legally meaningless," the Executive Order

28

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

1    represents a dramatic departure from the prior administration's policy of non-enforcement of

2    certain immigration programs.  *Compare, e.g.*, Mem. from DHS Sec'y Jeh Johnson to Acting Dir.

3    U.S. Immigration & Customs Enforcement Thomas Winkowski, *et al.* (Nov. 20, 2014)

4    (explaining that the "Secure Communities" program will be discontinued), *available at*

5    https://www.dhs.gov/ sites/ default/ files/ publications/14_1120_memo_secure_communities.pdf,

6    *with* Exec. Order 13,768, § 10(a) ("The Secretary shall immediately take all appropriate action to

7    terminate the Priority Enforcement Program (PEP) described in the memorandum issued by the

8    Secretary on November 20, 2014, and to reinstitute the immigration program known as "Secure

9    Communities.").  The Executive Order thus "ensure[s] that our Nation's immigration laws are

10   faithfully executed," *see* Exec. Order 13,768 at 1, and directs the appropriate executive officials

11   to prioritize, to the fullest extent of the law, means for achieving that priority.   Those means may

12   include, for example, more aggressive enforcement of existing grant conditions, or, as the AG

13   Memorandum suggests, tailoring future grant awards in a manner that promotes the

14   administration's law enforcement priorities.  *See* AG Mem. at 2.

15         What is more, as the AG Memorandum recognizes, the Executive Order itself provides

16   that the Attorney General and the Secretary are only to enforce the Order "to the extent permitted

17   by law."  Exec. Order 13,768, § 9(a).  In this respect, the Order is analogous to orders issued by

18   past administrations that set forth specific executive priorities and directed the manner in which

19   federal agencies might implement those priorities, "to the extent permitted by law."  In *Building

20   & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), for

21   example, the President had issued an executive order providing that, "[t]o the extent permitted by

22   law," no federal agency or entity receiving federal assistance for a construction project could

23   require contractors to enter into a project labor agreement or prohibit them from doing so.  *Id*. at

24   30.  Plaintiffs challenged the facial validity of the order.  The district court enjoined its

25   enforcement, finding that it was beyond the President's authority and violated the National Labor

26   Relations Act.  *Id*. at 31.  The D.C. Circuit reversed, holding that, in the "faithful execution of the

27   laws," the President may "provide guidance and supervision to his subordinates" and may instruct

28

9

1    his subordinates to follow that guidance only "to the extent permitted by law." *Id*. at 32-33.

2    "Thus," the court observed, "if an executive agency … may lawfully implement the Executive

3    Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing

4    the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id*.

5    at 33; *see* Exec. Order 13,536, 76 Fed. Reg. 3,821-3,823 (Jan. 18, 2011) (reaffirming as a policy

6    priority certain principles of contemporary regulatory review and directing agencies "to the extent

7    permitted by law" to take steps to promote those principles).

8          Consistent with this framework, the AG Memorandum makes clear that the grant-

9    eligibility provision of Section 9(a) "applie[s] *solely* to federal grants administered by [DOJ] or

10    [DHS], and not to other sources of federal funding." *See* AG Mem. at 1 (emphasis added).  It

11    further clarifies that, where DOJ imposes obligations on a grant program, such as the requirement

12    that an applicant certify compliance with 8 U.S.C. § 1373, those obligations have been or will be

13    imposed where legally authorized and only where grantees are given "notice of their

14    obligation[s]." *Id*. at 2.  Thus, the AG Memorandum provides a basis for the Court to reconsider

15    its conclusion that the grant-eligibility provision of the Executive Order extends beyond DOJ and

16    DHS grants, and that the provision purports to delegate new authority from the President to

17    agency heads regarding the imposition of conditions on federal grants.

18          In its justiciability analysis, the Court also determined that the grant-eligibility provision

19    of the Executive Order attempted to render state and local jurisdictions that declined to comply

20    with federal civil detainer requests ineligible to receive federal grants.  Order of Apr. 25, 2017 at

21    23-27.  The Court reached this determination by relying on public comments made by the

22    President, the White House Press Secretary, and the Attorney General.  *Id.*  That determination

23    served as the primary basis for the Court's conclusion that San Francisco, which had adopted a

24    policy of noncompliance with federal civil detainer requests, showed a likelihood of enforcement

25    under the grant-eligibility provision of Section 9(a).  *Id.*

26          Unlike public comments, however, the AG Memorandum constitutes formal and binding

27    guidance.  The Memorandum clarifies that the grant-eligibility provision applies only to grant

28

10

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

1    programs administered by DOJ or DHS that have grant terms explicitly requiring certification of

2    compliance with Section 1373 as a condition on the receipt of funding.  *See, e.g.*, AG Mem. at 1-

3    2.  Contrary to this Court's findings, the AG Memorandum concludes that "jurisdiction[s] that

4    fail[] to certify compliance with section 1373 will be ineligible to receive [an] award[]."  AG

5    Mem. at 2.  The Memorandum does not mention detainer requests.  Rather, it confirms that

6    defendants may impose conditions on grant programming only under "existing statutory or

7    constitutional authority" and only where "grantees . . . receive notice of their obligation to

8    comply" with specific eligibility conditions.  AG Mem. at 2.  Because one of the primary bases

9    for this Court's ruling – namely, non-binding press statements – has been supplanted, the Court

10   should reconsider its holding.

11        The Court also relied on its conclusion regarding forced compliance with federal civil

12   detainer requests in holding that San Francisco could show justiciable harm.  Specifically, the

13   Court held that the purported requirement to comply with detainer requests compromised the

14   City's Tenth Amendment rights by effectively forcing the City "to enforce the Federal

15   government's immigration laws[.]"  Order of Apr. 25, 2017 at 28.  The Court should reconsider

16   that position for two reasons.  First, conditioning the receipt of federal funds on whether a State

17   takes a particular action does not alone raise Tenth Amendment concerns, so long as the "State

18   could . . . adopt the simple expedient of not yielding to what she urges is federal coercion."  *See S.

19   Dakota v. Dole*, 483 U.S. 203, 210 (1987) (internal quotation marks omitted).  But in any event,

20   as explained above, the AG Memorandum clarifies that the grant-eligibility provision does not

21   create a retroactive grant condition requiring compliance with federal civil detainer requests.  AG

22   Mem. at 2.  Accordingly, the Court should reconsider its holding that the grant-eligibility

23   provision forces local jurisdictions "to enforce the Federal government's immigration laws" in a

24   manner that violates the Tenth Amendment.  Order of Apr. 25, 2017 at 23-28.

25        In addressing the justiciability of San Francisco's claims, the Court also held – based on

26   its broad interpretation of the grant-eligibility provision – that the City had established justiciable

27   harm because the provision purportedly jeopardized *all* federal grant funding received by the

28

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

1  City, not just grants administered by DOJ and DHS.  Order of Apr. 25, 2017 at 29-32.  Based on

2  the presumption that the grant-eligibility provision encompassed all federal grant programs,

3  including those funded through reimbursement structures, the Court concluded that the City faced

4  budgetary uncertainty and potentially grave financial harm.  *Id.* at 30.

5      Again, the AG Memorandum contradicts the Court's interpretation of the scope of the

6  grant-eligibility provision, and consequently undermines plaintiff's ability to establish justiciable

7  harm.  As noted, the AG Memorandum confirms the limited scope of the grant-eligibility

8  provision:  that provision applies only to grants administered by DHS or DOJ, and, with respect

9  to DOJ grants, only where the recipient fails to comply with an express obligation to certify

10 compliance with 8 U.S.C. § 1373.  *See* AG Mem. at 1-2.  Only with respect to three grant

11 programs, all of which are administered by DOJ, have defendants identified Section 1373 as an

12 applicable federal law with which grantees are required to comply.  *See, e.g.*, Tr. of Oral Arg. at

13 35:2-9.  At no point has San Francisco averred that this limited construction of the grant-

14 eligibility provision would cause the severe, concrete financial harm contemplated in the Court's

15 Order.  Moreover, the AG Memorandum mitigates the City's claims of budgetary uncertainty by

16 clarifying the specific grant programs currently subject to the provision, and by confirming that

17 grant applicants or recipients will have prior notice of any conditions that might be placed in the

18 future on DOJ or DHS-administered grant programs.  AG Mem. at 1-2.

19     Because the AG Memorandum's clarification of the scope of the grant-eligibility

20 provision of Section 9(a) supplants many of the fundamental bases underlying the Court's

21 determinations regarding justiciability, defendants respectfully request that the Court reconsider

22 those determinations in light of the conclusive position articulated in the Memorandum.

23 II.   The AG Memorandum Provides a Basis for the Court to
24       Reconsider Its Determination that the Plaintiff is Likely to
         Succeed on the Merits of Its Claims

25     Many of the Court's determinations regarding plaintiff's likelihood of success on the

26 merits are based on a reading of the Executive Order that is inconsistent with the position set forth

27 in the AG Memorandum.  Under the conclusive interpretation of the Executive Order set forth in

28

12

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

1   the Memorandum, plaintiff cannot establish a likelihood of success on any of its claims.

2   Accordingly, the Court should reconsider its previous determinations with respect to the merits of

3   plaintiff's constitutional claims.

4       A.   The AG Memorandum Alleviates the Court's Separation of Powers Concerns

5       The AG Memorandum provides grounds for the Court to reconsider its conclusion that

6   "Section 9 [of the Executive Order] purports to give the Attorney General and the Secretary the

7   power to place a new condition on federal funds . . . not provided for by Congress."  Order of

8   Apr. 25, 2017 at 36.  Based on that interpretation of the grant-eligibility provision, the Court

9   reasoned that the provision constituted an attempt by the President to "wield Congress's exclusive

10  spending power," in a manner that violated the constitutional separation of powers.  *Id.* at 37.

11      The AG Memorandum, however, refutes the Court's interpretation of the grant-eligibility

12  provision, and consequently undermines the Court's separation of powers analysis.  As the Court

13  recognized, "Congress can delegate some discretion to the President to decide how to spend

14  appropriated funds" so long as "any delegation and discretion is cabined by [relevant] constitu-

15  tional boundaries."  *Id*. at 36; *see DKT Mem'l Fund Ltd.*, 887 F.2d at 280-81.  Indeed, executive

16  agencies like DOJ have frequently utilized their congressionally delegated authority to tailor

17  grants to advance agency priorities.  *See, e.g.*, *2016 COPS Hiring Program Fact Sheet*, DOJ

18  Community Oriented Policing Services, https://cops.usdoj.gov/ pdf/ 2016AwardDocs/ chp/

19  2016_CHP_FactSheet_v3.pdf  (last visited May 22, 2017) ("Applicants that choose 'Homicide'

20  and 'Gun Violence' as a problem area in their 2016 [COPS Hiring Program] application will

21  receive additional consideration for funding."); *2015 COPS Hiring Program Fact Sheet*, DOJ

22  Community Oriented Policing Services, https://cops.usdoj.gov/ pdf/ 2015AwardDocs/

23  chp/2015_CHP_PostAward_FactSheet.pdf (last visited May 22, 2017) (noting priority for

24  applicants whose applications focused on "school-based policing through School Resource

25  Officers").

26

27

28

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

1    The AG Memorandum makes clear that the grant-eligibility provision is not an attempt by

2    the President to unilaterally impose new conditions on federal grants.  Rather, just as administra-

3    tions have in the past, the Executive Order "declare[s] the policy of the executive branch."  Exec.

4    Order 13,768 at 1.  The grant-eligibility provision furthers the implementation of that policy by

5    directing the Secretary and the Attorney General to use lawful means to ensure compliance with

6    Section 1373.  With respect to the imposition of conditions on federal grant programming, the AG

7    Memorandum confirms that such conditions would not be imposed pursuant to a purported

8    unilateral executive authority, but rather where "existing statutory or constitutional authority"

9    permits the imposition of such conditions.  *See* AG Mem. at 2; *see also Allbaugh*, 295 F.3d at 33.

10              B.   The AG Memorandum Alleviates the Court's Spending Clause Concerns

11    The AG Memorandum also provides grounds for the Court to reconsider its conclusion

12   that the grant-eligibility provision violates constitutional Spending Clause restrictions.  *See* Order

13   of Apr. 25, 2017 at 37-39.  The Court relied on its broad interpretation of the grant-eligibility

14   provision in concluding that plaintiff established a likely violation of three specific Spending

15   Clause limitations: "(1) conditions must be unambiguous and cannot be imposed after funds have

16   already been accepted; (2) there must be a nexus between the federal funds at issue and the

17   federal program's purpose; and (3) the financial inducement cannot be coercive."  *Id.* at 37.

18    With respect to its ambiguity concerns, the Court found that because the Executive Order

19   purported to "*retroactively* condition all 'federal grants' on compliance with Section 1373," and

20   because the grant-eligibility provision lacked clarity as to the specific "Federal grants" that fell

21   within its scope, the Executive Order deprived plaintiff of the ability to "voluntarily and

22   knowingly choose to accept conditions on those funds."  *Id.* at 38 (emphasis added).  The AG

23   Memorandum makes clear, however, that the grant-eligibility provision applies only to grant

24   programs administered by DOJ or DHS; that, in relation to DOJ grants, any conditions imposed

25   pursuant to the directives contained in the Executive Order will apply "to *future* grants"; and that

26   grant recipients or applicants "will receive notice" of their obligations.  AG Mem. at 2 (emphasis

27   added).  In other words, the grant-eligibility provision does not create retroactive conditions on

28

14

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

1    federal grants.  The position set forth in the AG Memorandum is thus consistent with the Supreme

2    Court's oft-repeated presumption against retroactivity.  *See generally Fernandez-Vargas v.*

3    *Gonzales*, 548 U.S. 30, 37 (2006).

4         The interpretation of the scope of the Executive Order provided in the AG Memorandum

5    also alleviates the Court's concerns regarding the existence of a nexus between the federal funds

6    at issue and the federal program's purpose.  Relying on its interpretation of the term "Federal

7    grants" as applying to *all* federal funding, the Court found that a sufficient nexus could not exist

8    between compliance with Section 1373 and federal programs unrelated to law enforcement, such

9    as child welfare programs or vaccination programs.  *See* Order of Apr. 25, 2017 at 38.  But, as the

10   AG Memorandum establishes, the term "Federal grants" is not so broad.  AG Mem. at 2.  Rather,

11   it applies only to DHS or DOJ administered grant programs, and, with respect to DOJ grants, only

12   those programs that contain grant-eligibility terms that explicitly require compliance with Section

13   1373 as a condition of grant-eligibility.  *Id.*  Indeed, as the AG Memorandum explicitly

14   acknowledges, because "Section 9(a) expressly requires enforcement 'to the extent consistent

15   with law,' [it] does not call for the imposition of grant conditions that would violate any

16   applicable constitutional or statutory limitation," *id.* at 1-2, which would include the "nexus"

17   requirement.

18        The position set forth in the AG Memorandum also mitigates the Court's concern that the

19   grant-eligibility provision creates an unconstitutionally coercive financial inducement.  As the

20   Court acknowledged, recent Supreme Court precedent on the Spending Clause's coercion

21   limitation has held that the threat of denying federal funding that amounts to ten percent of a

22   state's overall budget may be sufficiently severe to constitute unconstitutional coercion.  Order of

23   Apr. 25, 2017 at 39 (citing *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2604 (2012)).

24   Because the Court determined that the grant-eligibility provision of Section 9(a) threatens

25   defunding of "all federal grants" to San Francisco, amounting in the "hundreds of millions of

26   dollars," it held that the provision was unconstitutionally coercive.  *Id.*

27

28

15

Defs' Motion for Reconsideration
No. 3:17-cv-00485-WHO

1     Again, the AG Memorandum contravenes this determination.  In confirming that the term
2   "Federal grants" is limited to grant programs administered by DHS or DOJ that have grant terms
3   requiring compliance with Section 1373, the AG Memorandum drastically reduces the potential
4   coercive effect of the grant-eligibility provision.  As mentioned, only three grant programs
5   currently fall within the scope of the provision, and plaintiff has put forth *no evidence* demon-
6   strating that the funding levels encompassed by those programs are so significant as to constitute
7   unconstitutional coercion.
8           Accordingly, because the AG Memorandum directly addresses and alleviates the
9   Spending Clause concerns that the Court articulated, defendants respectfully request that the
10  Court reconsider its analysis on those points.
11                  C.  The AG Memorandum Alleviates the Court's Tenth Amendment Concerns
12          In analyzing San Francisco's likelihood of success on the merits of its Tenth Amendment
13  claims, the Court held that the Executive Order "equates 'sanctuary jurisdictions' with 'any
14  jurisdiction that ignored or otherwise failed to honor any [federal civil] detainer[] [requests]' and
15  therefore places such jurisdictions at risk of losing all federal grants."  Order of Apr. 25, 2017 at
16  40.  As a result of that interpretation, the Court found that the grant-eligibility provision of
17  Section 9(a) was likely unconstitutional under the Tenth Amendment because it effectively
18  sought "to compel the states and local jurisdictions to enforce a federal regulatory program
19  through coercion."  *Id.*  The Court also found that the separate provision of Section 9(a)
20  instructing the Attorney General to "take appropriate enforcement action against any entity that
21  violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders
22  the enforcement of Federal law," should be interpreted as an attempt to force state and local
23  jurisdictions to comply with civil detainer requests.  *Id.*  The Court relied on that interpretation as
24  additional support for the conclusion that San Francisco was likely to succeed in its Tenth
25  Amendment challenge.
26
27
28
                                                            16

The AG Memorandum, however, undermines this conclusion.[3]  As an initial matter, the Memorandum provides a definition of "sanctuary jurisdiction" that is untethered to compliance with federal civil detainer requests.  *See* AG Mem. at 2 (stating that, "for purposes of enforcing the Executive Order, the term 'sanctuary jurisdiction' will refer only to jurisdictions that 'willfully refuse to comply with 8 U.S.C. 1373'").  The AG Memorandum further clarifies that Section 1373 compliance obligations (as well as any other grant programming obligations) may be imposed only pursuant to "existing statutory or constitutional authority," and that "grantees will receive notice of their obligation to comply with section 1373."  AG Mem. at 2.

The Court also held that mandating compliance with federal civil detainer requests in a coercive manner or compelling compliance through enforcement actions "violates the Tenth Amendment's provisions against conscription."  Order of Apr. 25, 2017 at 40.  Despite acknowledging that noncompliance with federal civil detainer requests frustrates federal enforcement of immigration laws, the Attorney General has not, to date, taken any enforcement action against any jurisdiction for noncompliance with such requests, and the Attorney General is prohibited from compelling compliance with federal civil detainer requests in a constitutionally impermissible manner.  Moreover, the government has recently confirmed its position that federal civil detainer requests "are voluntary . . . rather than mandatory commands."  *See* Br. of the United States as Amicus Curiae at 22, *Mass. v. Lunn*, No. SJC-12276, 2017 WL 1240651 at *22 (Mass. Mar. 27, 2017).  To the extent the plaintiff is concerned that the Attorney General might one day engage in an enforcement action that the City believes is unconstitutional, it will undoubtedly have an opportunity to assert its challenges in response to that hypothetical action, if it occurs.

Accordingly, because the AG Memorandum establishes that compliance with federal civil detainer requests is not a precondition to the receipt of all federal grant funding, defendants

---

[3] Indeed, even if compliance with federal civil detainer requests were an explicit condition on the receipt of a federal grant award, the mere existence of such a condition would not alone violate Spending Clause or Tenth Amendment principles.  *See Dole,* 483 U.S. at 210 (holding that a condition that might otherwise be deemed as infringing on State sovereignty does not violate that sovereignty where the State can "adopt the simple expedient" of rejecting the funding).

17

1   respectfully request that the Court reconsider its holding that San Francisco has established a

2   likelihood of success on the merits of its Tenth Amendment claims.

3                    D.   The AG Memorandum Alleviates the Court's Vagueness Concerns

4            Much of the Court's vagueness analysis is predicated on the presumption that Section 9(a)

5   of the Executive Order effectively renders state and local jurisdictions that fail to comply with

6   Section 1373 automatically ineligible to receive any federal grants.  *See* Order of Apr. 25, 2017 at

7   41-43.  The Court found that, because the Order does not define the terms "sanctuary jurisdiction"

8   or "compliance with Section 1373," federal grant recipients "do not know how to avoid the

9   Order's defunding penalty," thereby implicating constitutional vagueness concerns.  *Id.* at 42.

10          Contrary to the Court's interpretation, however, the AG Memorandum specifies that the

11  grant-eligibility provision does not create a self-effectuating defunding penalty.  *See, e.g.*,

12  *Allbaugh*, 295 F.3d at 33 (noting that an executive order that required action "to the extent

13  consistent with law" was "not selfexecuting").  Section 9(a) of the Executive Order does not

14  impose retroactive conditions on all federal grants, nor does it attempt to alter the existing

15  requirements of Section 1373 (or any other federal law).  *See* AG Mem. at 1-2.  Rather, the AG

16  Memorandum specifies that the grant-eligibility provision applies only to DOJ or DHS grants

17  and, with respect to DOJ grants, only to those that contain grant terms requiring certification of

18  compliance with Section 1373.  *Id.*  Moreover, the Memorandum confirms that jurisdictions will

19  have notice of Section 1373 compliance obligations prior to the imposition of those obligations.

20  *Id.*  Thus, the AG Memorandum "provide[s] explicit standards" governing the scope of the grant-

21  eligibility provision, thereby mitigating the Court's vagueness concerns with that provision.  *See*

22  *Gaynard v. City of Rockford*, 408 U.S. 104, 108 (1972).

23          The Court also identified vagueness concerns regarding the separate provision of Section

24  9(a) that directs the Attorney General to take appropriate enforcement action against jurisdictions

25  that hinder enforcement of federal law (the "appropriate enforcement provision").  Although the

26  AG Memorandum does not directly address the appropriate enforcement provision of Section

27  9(a), the provision itself limits the Attorney General to taking "appropriate" action; the Attorney

28

                                                    18

1   General has taken no action whatsoever against San Francisco pursuant to the provision; and, in

2   any event, any jurisdiction subject to an enforcement action under that provision would

3   undoubtedly have the opportunity to challenge such action once it occurs.  More importantly,

4   because the AG Memorandum sets forth the parameters of the grant-eligibility provision, and

5   because the harm identified by the City consists primarily of the potential loss of federal funding

6   and resultant budgetary uncertainty, the AG Memorandum mitigates any harm that the plaintiff

7   might assert as a result of the alleged vagueness contained in the appropriate enforcement

8   provision of Section 9(a).

9          Accordingly, defendants respectfully request that the Court reconsider its conclusion

10  under the Fifth Amendment vagueness doctrine in light of the guidance provided in the AG

11  Memorandum.

12              E.   The AG Memorandum Alleviates the Court's Due Process Concerns

13         The position set forth in the AG Memorandum also contradicts the Court's procedural due

14  process analysis.  As the Court explained, to state a procedural due process claim, a litigant must

15  identify "a legally protectable property interest and that he has suffered or will suffer a deprava-

16  tion of that property without adequate process."  Order of Apr. 25, 2017 at 43 (citing *Thornton v.*

17  *City of Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005)).  Here, the Court found that San Francisco

18  has a legally protectable property interest "in federal funds that Congress has already appropriated

19  and that the [plaintiffs] have accepted."  Order of Apr. 25, 2017 at 43.  The Court further held that

20  the grant-eligibility provision of Section 9(a) purported to render the City ineligible to receive

21  those funds without appropriate process.  *Id.*

22         The AG Memorandum undermines those determinations.  As an initial matter, the AG

23  Memorandum makes clear that the grant-eligibility provision does not encompass all "funds that

24  Congress has already appropriated and that the [plaintiffs] have accepted."  *Id.*   Rather, the

25  provision encompasses only grant programs administered by DHS or DOJ and only where the

26  grant-eligibility terms explicitly require compliance with Section 1373.  *See* AG Mem. at 1-2.

27  Moreover, the grant-eligibility provision does not purport to create an automatic defunding

28

19

1    mechanism that would effectively terminate federal funding to San Francisco with no process of

2    law.  Rather, only those jurisdictions "that fail[] to certify compliance with section 1373 will be

3    ineligible receive [an] award[]" under the specific grant programs that fall within the scope of the

4    provision.  *See* AG Mem. at 2.  Thus, based on the conclusive guidance contained in the AG

5    Memorandum, the City cannot establish that it is likely to succeed on its claim that the Executive

6    Order deprives it of a legally protected property interest without sufficient process of law.

7           Accordingly, defendants respectfully request that the Court reconsider its Fifth

8    Amendment procedural due process analysis.

9    III.    The Injunction Should Not Restrict Defendants' Independent
10           Authority to Impose Conditions on Grant Programming

11           Although defendants believe the Court should lift the injunction in this matter for the

12    above-stated reasons, should the Court determine that an injunction remains appropriate,

13    defendants respectfully seek clarification regarding the scope of the injunction's prohibitions.

14    The Court has made clear that defendants may "use lawful means to enforce existing conditions

15    of federal grants or 8 U.S.C. 1373."  Order of Apr. 25, 2017 at 49.  Defendants respectfully

16    request confirmation, however, that DOJ or DHS are not enjoined from exercising legal authority

17    independent of the Executive Order to impose conditions on grant programming for future DOJ

18    or DHS-administered grants.

19           As detailed above and in the accompanying declaration from the Office of Justice

20    Programs, with respect to certain grant programs, DOJ and DHS are legally authorized,

21    independent of Section 9(a) of the Executive Order, to impose certain conditions in grant

22    programming.  *See* Declaration of Ralph Martin ¶¶ 5-11 (Attachment 2 hereto); *see also* Order of

23    Apr. 25, 2017 at 36 (acknowledging that executive agencies may have "some discretion . . . to

24    decide how to spend appropriated funds").  For example, prior to the issuance of the Executive

25    Order, DOJ had identified Section 1373 as an applicable federal law with which grantees are

26    required to comply in the JAG program, as well as under two other DOJ-administered grant

27    programs.  *See*, *e.g.*, Tr. of Oral Arg. at 35:2-9; Martin Decl. ¶ 17.  Moreover, as the government

28

20

1   indicated at oral argument, "[g]oing forward . . . DOJ and, potentially, DHS" may choose to

2   impose similar conditions, where authorized to do so.  *See* Tr. of Oral Arg. at 25:14-16; *see also*

3   AG Mem. at 2 (providing that, where legally authorized, defendants "may seek to tailor grants to

4   promote a lawful system of immigration").  To ensure that DHS and DOJ retain their ability to

5   exercise that previously existing authority, which is independent of the Executive Order,

6   defendants respectfully request that, should the Court decline to lift the injunction in this matter, it

7   clarify that the injunction does not prohibit defendants from utilizing grant-related legal

8   authorities that exist independent of the Executive Order.

9                                         <u>CONCLUSION</u>

10          For the foregoing reasons, defendants respectfully request that the Court reconsider its

11   entry of preliminary injunctive relief in light of the binding guidance articulated in the AG

12   Memorandum.  Alternatively, defendants request that the Court clarify the scope of its Order to

13   specify that defendants are not enjoined from exercising their independent, constitutionally

14   permissible authority to impose conditions on certain grant programs they administer.

15   Dated:  May 22, 2017

16                                            Respectfully submitted,

17                                            CHAD A. READLER
18                                            Acting Assistant Attorney General

19                                            BRIAN STRETCH
20                                            United States Attorney

21                                            JOHN R. TYLER
22                                            Assistant Director

23                                            STEPHEN J. BUCKINGHAM
     Special Counsel

24                                            /s/ W. Scott Simpson

25                                            _____
                                              W. SCOTT SIMPSON (Va. Bar #27487)
26                                            Senior Trial Counsel

27

28                                                    21

     Defs' Motion for Reconsideration
     No. 3:17-cv-00485-WHO

1

2                                                Attorneys, Department of Justice
                                                 Civil Division, Room 7210
                                                 Federal Programs Branch
3                                                Post Office Box 883
                                                 Washington, D.C. 20044
4                                                Telephone:   (202) 514-3330
                                                 Facsimile:   (202) 616-8470
5                                                E-mail:      scott.simpson@usdoj.gov

6
                                                 COUNSEL FOR DEFENDANTS
7                                                DONALD J. TRUMP, President of the
                                                 United States; UNITED STATES OF
8                                                AMERICA; JOHN F. KELLY, Secretary of
                                                 Homeland Security; JEFFERSON B.
9                                                SESSIONS, III, Attorney General of the
                                                 United States
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          22

*City & County of San Francisco v. Donald J. Trump,*
*et al.,*
No. 3:17-cv-00485-WHO (N.D. Cal.)

Defendants' Motion for Reconsideration or, in the
Alternative, Clarification of the Court's
Order of April 25, 2017

Attachment 1

Memorandum from the Attorney General
for All Department Grant-Making
Components (May 22, 2017)



**Office of the Attorney General**
**Washington, D.C. 20530**
May 22, 2017

MEMORANDUM FOR ALL DEPARTMENT GRANT-MAKING COMPONENTS

FROM:                    THE ATTORNEY GENERAL

SUBJECT:             Implementation of Executive Order 13768,
                            "Enhancing Public Safety in the Interior of the United States"

Federal law provides a process for foreign citizens to lawfully enter the country. Circumventing that process and crossing our borders unlawfully is a federal crime. It is the role of federal agencies, including the Department of Justice, to enforce our immigration laws, prosecute violations, and secure our borders.

The President has established immigration enforcement as a priority for this Administration and, in furtherance of that priority, issued Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," on January 25, 2017. The Executive Order makes clear that "[i]t is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." To accomplish this policy, section 9(a) of the Executive Order provides, in part:

> [T]he Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

Section 1373 provides in part that state and local jurisdictions "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officers] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).

In accordance with my duties as Attorney General, I have determined that section 9(a) of the Executive Order, which is directed to the Attorney General and the Secretary of Homeland Security, will be applied solely to federal grants administered by the Department of Justice or the Department of Homeland Security, and not to other sources of federal funding. Section 9(a) expressly requires enforcement "to the extent consistent with law," and therefore does not call for the imposition of grant conditions that would violate any applicable constitutional or

Memorandum for All Department Grant-Making Components                    Page 2
Subject:  Implementation of Executive Order 13768,
          "Enhancing Public Safety in the Interior of the United States"

statutory limitation.  Nor does the Executive Order purport to expand the existing statutory or constitutional authority of the Attorney General and the Secretary of Homeland Security in any respect.  Indeed, apart from the Executive Order, the Department of Justice and the Department of Homeland Security, in certain circumstances, may lawfully exercise discretion over grants that they administer.  Section 9(a) directs the Attorney General and the Secretary of Homeland Security to exercise, as appropriate, their lawful discretion to ensure that jurisdictions that willfully refuse to comply with section 1373 are not eligible to receive Department of Justice or Department of Homeland Security grants.

Consistent with the Executive Order, statutory authority, and past practice, the Department of Justice will require jurisdictions applying for certain Department grants to certify their compliance with federal law, including 8 U.S.C. § 1373, as a condition for receiving an award.  Any jurisdiction that fails to certify compliance with section 1373 will be ineligible to receive such awards.  This certification requirement will apply to any existing grant administered by the Office of Justice Programs and the Office of Community Oriented Policing Services that expressly contains this certification condition and to future grants for which the Department is statutorily authorized to impose such a condition.  All grantees will receive notice of their obligation to comply with section 1373.  The Department will administer this certification requirement in accordance with the law and will comply with any binding court order.

After consultation with the Secretary of Homeland Security, I have determined that, for purposes of enforcing the Executive Order, the term "sanctuary jurisdiction" will refer only to jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373."  A jurisdiction that does not willfully refuse to comply with section 1373 is not a "sanctuary jurisdiction" as that term is used in section 9(a).  While the Executive Order's definition of "sanctuary jurisdiction" is narrow, nothing in the Executive Order limits the Department's ability to point out ways that state and local jurisdictions are undermining our lawful system of immigration or to take enforcement action where state or local practices violate federal laws, regulations, or grant conditions.

The provisions of the Executive Order quoted above address only 8 U.S.C. § 1373. Separate and apart from the Executive Order, statutes may authorize the Department to tailor grants or to impose additional conditions on grantees to advance the Department's law enforcement priorities.  Consistent with this authority, over the years, the Department has tailored grants to focus on, among other things, homeland security, violent crime (including drug and gang activity), and domestic violence.  Going forward, the Department, where authorized, may seek to tailor grants to promote a lawful system of immigration.

*City & County of San Francisco v. Donald J. Trump,
et al.*,
No. 3:17-cv-00485-WHO (N.D. Cal.)

Defendants' Motion for Reconsideration or, in the
Alternative, Clarification of the Court's
Order of April 25, 2017

Attachment 2

Declaration of Ralph Martin
Office of Justice Programs
U.S. Department of Justice

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CITY AND COUNTY OF SAN
FRANCISCO,

                Plaintiff,

      v.

DONALD J. TRUMP, *et al.*,

                Defendants.

No. 3:17-cv-00485-WHO

**DECLARATION OF RALPH MARTIN**

I, Ralph Martin, do hereby state and declare the following:

1. I am Director of Office of Audit, Assessment, and Management ("OAAM") within the Office of Justice Programs ("OJP") at the United States Department of Justice ("DOJ"). I submit this declaration to describe and, and put into context, the effect – on awards OJP awards makes in the future, and on recipient requirements and conditions associated with those future awards – of the Attorney General's recent memorandum (dated May 22, 2017) concerning his various determinations regarding Executive Order 13768, which I have today reviewed.

2. In addition to over two decades of military service, I have served in the federal government for approximately 15 years, in various capacities, at the Environmental Protection Agency, the Department of Commerce, and DOJ. I am a member of the career "senior executive

service." Prior to being named Director of OJP's OAAM in February 2015, I was OJP's Deputy

Chief Financial Officer for four years. Before that, I was OJP's Budget Officer for over five

years. Among other things, OJP's OAAM is charged by statute to "take actions to ensure

compliance with the terms of … grants" made by OJP and by the Community Oriented Policing

Services Office (the "COPS" Office), another grant-making office within DOJ. I hold a master's

degree in business administration. The statements made in this declaration are based upon my

personal knowledge gained in my current and previous positions within OJP, and on information

available to me in my official capacity.

3.  I am familiar with the entire life cycle of grants awarded by OJP—solicitation of

applications (*e.g.*, preparation and electronic posting of solicitations), review of applications

(including peer review), making of award decisions within OJP, preparation of award packages

(including award documents), award acceptance by applicants, post-award monitoring and audit

of awardees, and final close-out of awards after work under an award is complete. I am familiar

with the many and varied requirements outlined in each year's solicitations for applications to

OJP's numerous grant programs. I also am familiar with OJP's automated Grants Management

System ("GMS"), which is used (among other things) to generate an OJP "award letter" and

"award document." The award document is the instrument through which OJP offers an award

to an applicant and sets out various requirements and conditions that will apply throughout the

period of the award, should the applicant accept the award; those conditions – the substance of

which is broader than (and complementary to) that of certain "standard assurances" made by

prospective recipients of OJP prior to any award – are (and must be) encompassed by an

applicant's formal acceptance of the award. I am familiar with numerous conditions OJP

includes, as appropriate, in its award documents. I also am familiar with the standard

"assurances" that must be executed (in OJP's electronic GMS) by applicants at or before the time of award acceptance.

OJP Grants Generally

4. OJP is the largest of the three primary grant-making agencies within DOJ.[1]  For the past few years, appropriations for OJP's grant and reimbursement programs have been between approximately $4 billion and $4.7 billion annually (including funds made available from the Crime Victims Fund).  Over the course of a year, OJP makes thousands of awards to State and local governments, federally-recognized Indian tribes, nonprofit organizations, public and nonprofit institutions of higher education, and (less commonly) for-profit businesses and individuals.  Apart from its awards to States for victim compensation and victim assistance programs (which are made from the Crime Victims Fund), OJP's single largest program is the Edward Byrne Justice Assistance Grant Program (the "Byrne JAG" program), which makes awards to States and units of local government for a broad range of law enforcement purposes.

Varying Bases for Grant Programming Requirements and Conditions

5. Some of OJP's grant and reimbursement programs are authorized by what may be called a "program" (or "authorizing") statute; the level of detail that appears in such program statutes varies a great deal.  The Byrne JAG program, for example, has a quite detailed program statute.  The requirements that appear in a program statute, however, are far from the only requirements that apply to a recipient of an OJP grant awarded pursuant to that program statute.

6. Even as to OJP grants made under a specific program statute, such as the Byrne JAG program statute, the award document through which OJP offers the award to an applicant

---

[1]        The others are the COPS Office and the Office on Violence against Women ("OVW").

includes conditions and requirements that do not appear in the program statute itself, but are

included pursuant to other authority.  A prospective recipient must execute a set of "standard

assurances" concerning compliance (during the period of the award, if one is made by OJP and

accepted).[2]  What follows are just a few examples of the types of conditions OJP may include in

an award document, and of the types of bases for those conditions.

7.   When OJP awards grant funds pursuant to a specific program statute (such as the

Byrne JAG program), throughout the period of the award, those grant funds will be subject to

any prohibitions or restrictions applicable to such federal funds that appear in the pertinent

appropriations act (*e.g.*, as general provisions).  For some years, OJP's practice has been to

specifically identify such appropriations provisions to a prospective recipient through conditions

in the award document.

8.   Apart from appropriations-related requirements, a grant that OJP awards pursuant to a

specific program statute, such as the Byrne JAG program, also may include conditions (*e.g.*, in

the award document) that reflect requirements or restrictions that appear in other applicable

statutes i (*e.g.*, restrictions that appear in administrative provisions of title I of the Omnibus

Crime Control and Safe Streets Act of 1968, which title establishes OJP and several – but not all

– of its component offices).

9.   As yet another example, as a form of federal financial assistance, all OJP grants –

including those made pursuant to a specific program statute – are subject to the "cross-cutting"

federal statutes that apply to all such assistance.  The provisions of title VI of the Civil Rights

---

[2]     Prospective OJP grant recipients must electronically execute (in OJP's GMS) the "Standard Assurances" with respect to each OJP award, at or before the time of award acceptance.  The required "Standard Assurances" (which vary somewhat for awards to Indian tribes) include a broad assurance and certification of compliance with all applicable federal statutes and regulations, as well as specific assurances and certifications with respect to a number of other matters.

Act of 1964 are one important example.  In addition, federal statutes such as the National

Environmental Policy Act of 1969 ("NEPA") and the National Historic Preservation Act of 1966

("NHPA") extend to OJP grant recipients, in that recipients must provide the information

necessary for OJP to meets its obligations under those laws.

10.  Other conditions typically included in an award document include those that concern

various grants-administration-related responsibilities a prospective recipient will have throughout

the period of the grant, such as financial and programmatic reporting, reporting of performance

metrics, required audits, systems of internal controls (*e.g.*, for financial responsibility and

accountability), certain training requirements, monitoring obligations (*e.g.*, of subrecipients),

record-keeping obligations, and obligations related to reporting and appropriately addressing

conflicts of interest.

11.  Many such grants-administration responsibilities and requirements are set out in the

DOJ "Part 200 Uniform Requirements" – the DOJ regulation that adopts (with certain

modifications) the "Uniform Administrative Requirements, Cost Principles, and Audit

Requirements for Federal Awards" published by the Office of Management and Budget

("OMB").  With few exceptions (*e.g.*, awards to for-profit businesses or to individuals), all

award documents require recipients of OJP grants to comply with these requirements.[3]

---

[3]     The (DOJ) Part 200 Uniform Requirements apply to virtually all recipients of OJP grants awarded since the start of calendar year 2015.  *See* 2 C.F.R. Part 2800, adopting 2 C.F.R Part 200 as a DOJ regulation (with certain exceptions).  Generally speaking, recipients of OJP awards made prior to 2015 have similar responsibilities, governed by earlier iterations of similar rules that were set out in a set of OMB Circulars and in DOJ regulations that reflected those circulars.

In addition to directly setting out requirements and conditions applicable to DOJ grant applicants and recipients, the Part 200 Uniform Requirements also expressly contemplate that awarding agencies may place appropriate requirements and conditions on awards.

OJP's Practice with respect to Grant Programming Requirements and Conditions

12.  From the foregoing, it should not be surprising that – as has been the case for years – in the ordinary course, numerous requirements and conditions apply to both OJP grant applicants and OJP grant recipients.  The basis for each such requirement and condition may (and does) vary depending on such factors as the precise requirement/condition at issue, the particular grant program involved, the type of applicant/recipient, and (in some cases) the past performance of the applicant/recipient itself in connection with other federal awards.

13.  Generally speaking, application-related requirements and conditions for OJP grant programs are set out in individual program solicitations, and on associated webpages on the OJP website.  The "standard assurances" are required to be executed at or before the time of award acceptance.  And, as noted earlier, award requirements and conditions are set out in the award document sent to a prospective recipient; these requirements and conditions also may incorporate by express reference particular material set out on the OJP website.

14.  In any decision regarding whether to apply requirements and conditions related to 8 U.S.C. § 1373 to some or all OJP applicants, or to some or all OJP recipients of future awards, OJP will follow the Attorney General's just-issued determination (referred to at the beginning of this declaration) that, for purposes of Executive Order 13768 and OJP, the term "sanctuary jurisdiction" refers only to jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373." Also, consistent with the Attorney General's determination, OJP understands  section 9(a) of that Executive Order *not* to call for OJP to impose grant conditions that would violate any applicable constitutional or statutory limitations, and *not* to purport to expand the existing statutory or constitutional authority of the Attorney General or DOJ.

15.  With respect to 8 U.S.C. § 1373 and the Byrne JAG program in particular, in FY

2016, prior to the making of any FY 2016 Byrne JAG awards, OJP notified (through various communications) prospective recipients under the FY 2016 program of the provisions of 8 U.S.C. § 1373, and that they were "required to assure and certify compliance with all applicable federal statu[t]es, including Section 1373, as well as all applicable regulations...." Such notification was relevant to the OJP "standard assurances" and to a specific provision in the Byrne JAG program statute that requires an application to the Byrne JAG program to include a certification on behalf of the applicant that the State or unit of local government will comply with all provisions of the Byrne JAG program statute and *all other applicable* federal laws.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of May, 2017.

Ralph Martin