DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
CHRISTINE VAN AKEN, State Bar #241755
TARA M. STEELEY, State Bar #231775
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
MATTHEW S. LEE, State Bar #295247
NEHA GUPTA, State Bar #308864
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:      (415) 554-4748
Facsimile:      (415) 554-4715
E-Mail:         brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, JOHN F. KELLY, Secretary of United States Department of Homeland Security, JEFFERSON B. SESSIONS III, Attorney General of the United States, DOES 1-100,<br><br>　　　　Defendants. | Case No. 3:17-cv-00485-WHO<br><br>**PLAINTIFF CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS**<br><br>Date:　　　　July 12, 2017<br>Time:　　　　2:00 p.m.<br>Judge:　　　Honorable William H. Orrick<br>Dept:　　　　Courtroom 2<br><br>Date Filed:　　January 31, 2017<br>Trial Date:　　April 23, 2018 |

1

## **TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES ..................................................................................... iii

3   INTRODUCTION ................................................................................................... 1

    LEGAL STANDARD ............................................................................................. 1

4   FACTUAL BACKGROUND .................................................................................. 2

5   ARGUMENT ......................................................................................................... 5

6       I.     San Francisco's Claims Are Justiciable. .................................................. 5

7           A.     Claims Challenging The Executive Order Are Justiciable. ........................ 6

           B.     The Claim For Declaratory Relief Is Justiciable. .......................... 8

8

9       II.    Count One States A Viable Claim For Declaratory Relief That San Francisco Complies with Section 1373. ................................................................. 10

10      III.   Count Two States A Viable Claim That The Funding Restriction Violates Separation Of Powers Principles, The Spending Clause, And The Tenth

11           Amendment. ....................................................................................... 11

12           A.     The Executive Order Is More Than An Internal Directive, And It Is Subject To Judicial Review. ................................................ 12

13           B.     The Funding Restriction Is Facially Unconstitutional. ............................. 14

14              1.     The Court Already Found That The Funding Restriction Likely Violates Separation Of Powers, The Spending Clause,

15                   And The Tenth Amendment. ................................................ 14

16              2.     The Court Should Not Rely On The "Elucidations" Offered By The AG Memorandum. .......................................................... 15

17

18                  a.     The AG Memorandum Is Not An Authoritative Interpretation Of The Executive Order. ............................ 16

19                  b.     The AG Memorandum Is Not Binding Guidance About Implementation Of The Executive Order. .............. 17

20              3.     The AG Memorandum Is Not A Constitutional Application

21                   Of The Executive Order That Defeats A Facial Challenge Under *Salerno*. .............................................................. 20

22              4.     The AG Memorandum Does Not Eliminate The

23                   Constitutional Violations Identified By The Executive Order. ..... 21

24                  a.     The Funding Restriction Still Violates The Separation Of Powers. ................................................................. 22

25                  b.     The Funding Restriction Still Violates The Spending Clause. ....................................................................... 23

26

27                  c.     The Funding Restriction Still Violates The Tenth Amendment. .............................................................. 24

28

IV.   Count Three States A Viable Claim That The Enforcement Directive Is Unconstitutional..................................................................................................25

CONCLUSION....................................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**

3
*Alexander v. Sandoval*
   532 U.S. 275 (2001).............................................................................................11

4
*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
5
   458 U.S. 592 (1982)..........................................................................................6, 12

6
*Ariz. Right to Life Political Action Comm. v. Bayless*
   320 F.3d 1002 (9th Cir. 2003) ...............................................................................6

7
*Ashcroft v. Iqbal*
8
   556 U.S. 662 (2009)...............................................................................................11

9
*Bell Atl. Corp. v. Twombly*
10
   550 U.S. 544 (2007)...........................................................................................2, 11

11
*Chen v. Schiltgen*
   No. C-94-4094 MHP, 1995 WL 317023 (N.D. Cal. May 19, 1995) .......................13
12

13
*City of Los Angeles, Calif. v. Patel*
   135 S. Ct. 2443 (2015)............................................................................................21

14
*Clinton v. City of N.Y.*
15
   524 U.S. 417 (1998)................................................................................................14

16
*Collin County, Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods*
   *(HAVEN)* 915 F.2d 167 (5th Cir. 1990)................................................................10
17

18
*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*
   657 F.3d 936 (9th Cir. 2011) .................................................................................16

19
*Cook v. Brewer*
20
   637 F.3d 1002 (9th Cir. 2011) .................................................................................1

21
*Foti v. City of Menlo Park*
   146 F.3d 629 (9th Cir. 1998) .................................................................................17
22

23
*Harris Cty. Texas v. MERSCORP Inc.*
   791 F.3d 545 (5th Cir. 2015) .................................................................................11

24
*Knox v. Service Employees Intern. Union*
25
   567 U.S. 298 (2012)................................................................................................15

26
*Lee v. City of Los Angeles*
   250 F.3d 668 (9th Cir. 2001) ...................................................................................2

27
*Legal Aid Society of Alameda County v. Brennan*
28
   608 F.2d 1319 (9th Cir. 1979) ...............................................................................13

*Libas Ltd. v. Carillo*
   329 F.3d 1128 (9th Cir. 2003) ............................................................2

*LSO, Ltd. v. Stroh*
   205 F.3d 1146 (9th Cir. 2000) ............................................................6

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1997)............................................................................1

*Maya v. Centex Corp.*
   658 F.3d 1060 (9th Cir. 2011). ..........................................................1

*MedImmune, Inc. v. Genentech, Inc.*
   549 U.S. 118 (2007)........................................................................9, 10

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*
   134 S. Ct. 843 (2014) .......................................................................10

*Muhammad v. Berreth*
   No. C 12-02407 CRB, 2012 WL 4838427 (N.D. Cal. Oct. 10, 2012)........................................11

*Narenji v. Civiletti*
   617 F.2d 745 (D.C. Cir. 1980) ..........................................................18

*Nat'l Fed. of Indep. Bus. v. Sebelius*
   132 S. Ct. 2566 (2012) .....................................................................15

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*
   766 F.2d 228 (6th Cir. 1985) .............................................................6

*Organized Village of Kake v. U.S. Dep't of Agric.*
   795 F.3d 956 (9th Cir. 2015) .............................................................6

*Patel v. City of Los Angeles*
   738 F.3d 1058 (9th Cir. 2013) (en banc). ........................................21

*S. Dakota v. Dole*
   483 U.S. 203 (1987)......................................................................14, 15

*Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*
   343 F.3d 1036  (9th Cir. 2003) ..........................................................1

*Shell Gulf of Mexico Inc. v. Center for Biological Diversity, Inc.*
   771 F.3d 632 (9th Cir. 2014) ...........................................................10

*Societe de Conditionnement v. Hunter Engineering Co.*
   655 F.2d 938 (9th Cir. 1981) ...........................................................11

*Somers v. Apple, Inc.*
   729 F.3d 953 (9th Cir. 2013) .............................................................2

*Stapley v. Pestalozzi*
  733 F.3d 804 (9th Cir. 2013) .................................................................................2, 23

*Strong v. Ford*
  108 F.3d 1386 (9th Cir. 1997) (unpublished) ..................................................................11

*Susan B. Anthony List v. Driehaus*
  134 S. Ct. 2334 (2014) ...............................................................................................8

*Tenaska Washington Partners II, L.P. v. United States*
  34 Fed. Cl. 434 (1995) ............................................................................................18

*Texas v. United States*
  787 F.3d 733 (5th Cir. 2015) .......................................................................................6

*United States v. Pickard*
  100 F. Supp. 3d 981 (E.D. Cal. 2015) ...........................................................................14

*United States v. Salerno*
  481 U.S. 739 (1987) .................................................................................................20

*United States v. Stevens*
  559 U.S. 460 (2010) .................................................................................................16

*Valle del Sol Inc. v. Whiting*
  732 F.3d 1006 (9th Cir. 2013) .......................................................................................6

*Virginia v. American Booksellers*
  484 U.S. 383, 392 (1988) .............................................................................................7

*Virginia ex rel. Cuccinelli v. Sebelius*
  656 F.3d 253 (4th Cir. 2011) .......................................................................................6

*Washington v. Trump*
  847 F.3d 1151 (9th Cir. 2017) .....................................................................................20

*White v. Paulsen*
  997 F. Supp. 1380 (E.D. Wash. 1998) ............................................................................11

*Whitman v. Am. Trucking Associations*
  531 U.S. 457 (2001) .................................................................................................15

*Williams v. Cty. of Alameda*
  26 F. Supp. 3d 925 (N.D. Cal. 2014). ..............................................................................5

*Wolfson v. Brammer*
  616 F.3d 1045 (9th Cir. 2010) .......................................................................................8

*Youngstown Sheet & Tube Co. v. Sawyer*
  343 U.S. 579 (1952) .................................................................................................13

**Federal Constitutional Provisions**

U.S. Const.
   art. I, § 8, cl.1 .................................................................................................14

**Federal Statutes**

2 U.S.C.
   §§ 683 et seq. ...............................................................................................14

8 U.S.C.
   § 1103(a)(1) ..................................................................................................18
   § 1103(c)(1) ..................................................................................................18
   § 1373 ...................................................................................................... *passim*

28 U.S.C.
   § 512 .............................................................................................................18
   § 1331 ...........................................................................................................10
   § 1346 ...........................................................................................................10
   § 2201(a) ........................................................................................................9

**Federal Rules**

Federal Rule of Civil Procedure
   12(b)(1) .......................................................................................................... 9

Federal Rules of Evidence
   201 ..................................................................................................................2

**Federal Regulations**

28 C.F.R.
   § 0.25 ............................................................................................................18
   § 0.5(c) ..........................................................................................................18

**San Francisco Administrative Code**

S.F. Admin. Code
   § 12H ..........................................................................................................3, 4
   § 12H.2 ...........................................................................................................3
   § 12I .........................................................................................................3, 4, 7
   § 12I.3 .............................................................................................................7

**Other References**

Black's Law Dictionary
   634 (10th ed. 2014) ......................................................................................13

*Discontinued Official Action*
   13C Fed. Prac. & Proc. Juris. § 3533.7 (3d ed. 2017) (collecting cases) ...................................19

Peter L. Strauss, *Overseer or "The Decider"? The President in Administrative Law*
    75 Geo. Wash. L. Rev. 696, 739 (2007) .............................................................................18, 19

Randolph Moss' article, *Executive Branch Legal Interpretation: A Perspective from
    the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1318 (2000)........................................19

Trevor W. Morrison, *Book Review: Constitutional Alarmism*
    124 Harv. L. Rev. 1688 (2011)....................................................................................................19

# INTRODUCTION

The President issued an Executive Order rife with constitutional violations, threatening to strip all federal funds from sanctuary jurisdictions and directing unspecified enforcement action against them. The Attorney General now attempts to rescue this Order by saying that the Federal Government will disregard it. According the Attorney General, the Department of Justice and the Department of Homeland Security will merely continue to exercise authority conferred by other laws, and more specifically will enforce grant conditions requiring compliance with 8 U.S.C. § 1373 only where authorized by statutes independent of the Executive Order. Defendants move to dismiss San Francisco's complaint against the Executive Order based, in large part, on the Attorney General's implicit abandonment of its terms. This rescue attempt must fail. The government cannot keep an unconstitutional law on the books by promising, for the time being, not to apply it according to its plain text. San Francisco—and other jurisdictions—are entitled to know whether the Executive Order is in effect.

# LEGAL STANDARD

A Rule 12(b)(1) motion to dismiss tests the court's subject matter jurisdiction, including Article III standing and ripeness. Where, as here, a defendant mounts a facial attack arguing that the allegations contained in a complaint are insufficient to invoke federal jurisdiction, the motion should be granted only if "the complaint, when considered in its entirety, on its face, fails to allege facts sufficient to establish subject matter jurisdiction." *See, e.g., Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1040 n. 2 (9th Cir. 2003). The court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). Moreover, "general factual allegations of injury resulting from the defendant's conduct may suffice," to establish justiciability "for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561(1997) (alteration in original)).

"A Rule 12(b)(6) motion tests the legal sufficiency of a claim." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (internal quotations and citation omitted). The court should dismiss a claim

only if it "(1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc*., 729 F.3d 953, 959 (9th Cir. 2013). When considering a Rule 12(b)(6) motion to dismiss a complaint, the court accepts as true all allegations of material fact and construes them in the light most favorable to the plaintiff. *Stapley v. Pestalozzi*, 733 F.3d 804, 809 (9th Cir. 2013). The court "determine[s] whether, assuming all facts and inferences in favor of the nonmoving party, it appears beyond doubt that [the plaintiff] can prove no set of facts to support its claims." *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1130 (9th Cir. 2003). The motion must be denied if the plaintiff alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

In both Rule 12(b)(1) and 12(b)(6) motions, the Court may consider—in addition to the allegations of the complaint—documents and facts that are proper subjects of judicial notice. *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001) (noting that a court reviewing a Rule 12(b)(6) motion may take judicial notice of "matters of public record" under Fed. R. Evid. 201). In addition, a court reviewing a Rule 12(b)(6) motion may consider documents attached to the complaint or materials that the complaint necessarily relies upon and are of undisputed authenticity. *Lee v. City of Los Angeles*, 250 F.3d at 688-89.

## FACTUAL BACKGROUND

During his campaign, Donald Trump repeatedly condemned sanctuary cities, singling out San Francisco in particular as a jurisdiction whose policies he believed threatened public safety. San Francisco's Second Amended Complaint (Dkt. No. 105) ("SAC") ¶¶ 66, 65. Within a week after being sworn in as President of the United States, he took action to carry out his threats.

On January 25, 2017, the President issued Executive Order 13768, entitled "Enhancing Public Safety in the Interior of the United States" ("Executive Order"). SAC ¶ 1. The Executive Order directs the Attorney General and the Secretary of the Department of Homeland Security ("DHS") to ensure that "sanctuary jurisdictions" are not eligible for federal funds (the "Funding Restriction") and to "take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law" (the "Enforcement Directive"). SAC Exh. 3 ("Executive Order") § 9(a).

The plain language of the Executive Order indicates that it seeks to withhold almost all current and future federal funds from "sanctuary jurisdictions," including any jurisdiction that refuses to comply with ICE detainer requests. *See* SAC ¶¶ 60-61. And concurrent statements by President Trump's press secretary echo this broad sweep. For example, the press statement announcing the issuance of the Executive Order stated: "We are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws." *Id.* ¶ 67.

San Francisco's annual operating budget for FY16-17 includes over $1.2 billion in federal funds. *Id.* ¶ 102. This accounts for approximately 13% of the total annual operating budget. On top of this, San Francisco expects to receive an additional $800 million in federal multi-year grants, largely for public infrastructure projects. *Id.* ¶ 103. San Francisco uses federal funds to pay for critical services such as in-home supportive services for about 23,000 low-income elderly, disabled, or blind San Franciscans (*id.* ¶ 106); nursing services for adult residents of San Francisco who are disabled or chronically ill, including specialized care for those with wounds, head trauma, stroke, spinal cord and orthopedic injuries, HIV/AIDS, and dementia (*id.* ¶ 112); and the Bay Area Urban Areas Security Initiative, which sustains and improves regional capacity to prevent, mitigate, respond to, and recover from terrorist attacks and catastrophic disasters (*id.* ¶ 118).

And San Francisco has sanctuary laws, which are currently codified in two chapters of San Francisco's Administrative Code: Chapters 12H and 12I. *Id.* ¶ 21. Chapter 12H prohibits San Francisco departments, agencies, officers, and employees from using City funds or resources to assist in enforcing federal immigration law or to gather or disseminate information regarding an individual's release status, or other confidential identifying information, unless such assistance is required by federal or state law. S.F. Admin. Code § 12H.2; SAC ¶¶ 22-23. As relevant here, Chapter 12I prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody solely on the basis of a civil immigration detainer request issued by U.S. Immigration and Customs Enforcement ("ICE"). S.F. Admin. Code § 12H.2; SAC ¶ 24.

Accordingly, and given the severe consequences threatened by the Executive Order (SAC ¶ 10), San Francisco filed suit on January 31, 2017. San Francisco's Second Amended Complaint

raises three claims. First, the SAC seeks declaratory relief that San Francisco's sanctuary city laws—Administrative Code Chapters 12H and 12I—comply with 8 U.S.C. § 1373 ("Section 1373"). SAC ¶¶ 144-48. Second, the SAC claims that the Executive Order's Funding Restriction violates the Tenth Amendment, the Spending Clause, and separation of powers. SAC ¶¶ 149-53. Third, the SAC claims that the Executive Order's Enforcement Directive violates the Tenth Amendment. SAC ¶¶ 154-57. Shortly after filing its complaint, San Francisco filed a motion for a preliminary injunction seeking to have section 9(a) of the Executive Order enjoined. Dkt. No. 21.

In the weeks and months following issuance of the Executive Order—and the filing of San Francisco's lawsuit—Defendants continued to threaten severe consequences for sanctuary cities:

- President Trump confirmed that he intended to use "defunding" as a "weapon" to get sanctuary cities to change their policies. Request for Judicial Notice In Support Of San Francisco's Opposition to Motion to Dismiss ("RJN") Exh. A at 4.

- The President's press secretary informed the nation that President Trump intended to ensure that "counties and other institutions that remain sanctuary cities don't get federal government funding," and praised Miami-Dade County, which had swiftly abandoned its policy of not complying with detainers unless reimbursed by the federal government, for "understand[ing] the importance of this order." *Id*. Exh. B at 4.

- Attorney General Jefferson Sessions stated at a press conference that failure to comply with Section 1373 would result in "withholding grants, termination of grants, and disbarment or ineligibility for future grants," and that the Government would even seek to "claw back" funds awarded to sanctuary jurisdictions. RJN Exh. C at 3.  In these remarks, he specifically classified San Francisco as a "sanctuary city." *Id* at 2; *see also* RJN Exh. D.

But during the hearing on Plaintiffs' motion for a preliminary injunction, Defendants executed a last-minute about-face, orally proposing a new and narrow interpretation of the Executive Order. *See* Order Granting Motion to Enjoin Section 9(a) of Executive Order 13768 (Dkt. No. 82) ("PI Order") at 2. This Court rejected that interpretation as "not legally plausible" (*id.* at 3), and preliminarily enjoined Section 9(a) on April 25, 2017, after concluding that San Francisco was likely to succeed on the merits

//

1  of its separation of powers, Spending Clause, and Tenth Amendment challenges to the Order (*id.* at

2  35-49).

3        On May 22—approximately four months after President Trump signed the Executive Order—

4  the Attorney General published an "implementation" memorandum purporting to narrow the

5  Executive Order's reach consistent with defense counsel's statements at the hearing. *See* Defendants'

6  Motion to Dismiss (Dkt. No. 111) ("Mot.") at Attachment 1 ("AG Memorandum"). Notably, however,

7  the AG Memorandum does not address several critical issues. It repeats that "sanctuary jurisdictions"

8  will be defined as those jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373" (*id.* at 2),

9  but does not provide any guidance on what Defendants believe Section 1373 requires, and in

10 particular, whether Defendants believe it requires compliance with ICE detainer requests. It does not

11 state how DHS will implement the Executive Order. And it does not indicate how the Attorney

12 General will implement the Enforcement Directive.

13       Shortly after issuing the AG Memorandum, Defendants filed a motion for reconsideration

14 arguing that the Memorandum undermined several aspects of the Court's PI Order. *See* Defendants'

15 Motion for Leave to File a Motion for Reconsideration (Dkt. No. 102). This motion has been fully

16 briefed and remains pending.

17                                   **ARGUMENT**

18 **I.    San Francisco's Claims Are Justiciable.**

19       In Part I of their Motion, Defendants perfunctorily assert that all three of San Francisco's

20 claims should be dismissed because San Francisco lacks standing and its claims are unripe.[1] Mot. at

21 10. In subsequent sections, Defendants repackage and restate their justiciability argument concerning

22 Counts One (San Francisco law complies with 8 U.S.C. § 1373) and Three (the Enforcement Directive

23 is unconstitutional). Mot. at 11-12, 22-24. Defendants' argument fails on all fronts.

24 //

25 _____

26 [1] Defendants' entire "argument" in this regard consists of two sentences stating the standing and ripeness requirements, and a third sentence directing the Court to the arguments made in Defendants' Motion for Reconsideration. Mot. at 10. But "[i]t is wholly improper for Plaintiff to

27 incorporate by reference legal arguments made in a brief filed in connection with a motion that is not before the Court" as it would allow for circumvention of page limits imposed by the local rules.

28 *Williams v. Cty. of Alameda*, 26 F. Supp. 3d 925, 947 (N.D. Cal. 2014).

**A.     Claims Challenging The Executive Order Are Justiciable.**

With respect to San Francisco's counts concerning the constitutionality of the Executive Order (Counts Two and Three), the Court has already rejected Defendants' justiciability argument in its order granting San Francisco's motion for a preliminary injunction. PI Order at 11-34. And for good reason. The Executive Order threatens San Francisco with the loss of at least some federal grant funds (SAC ¶¶ 58-61) and, as the Court correctly held, this "'loss of funds promised under federal law []satisfies Article III's standing requirement.'" PI Order at 29 (quoting *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)). Moreover, there can be no dispute that the purpose of the Executive Order is to pressure jurisdictions to change their laws (*see, e.g.*, SAC ¶ 68)— and that this, too, constitutes an injury sufficient to satisfy the Article III case or controversy requirement. *See* PI Order at 27-28 (concluding that the "Counties' claims implicate a constitutional interest" because the "Executive Order seeks to compel them to change their policies and enforce the Federal government's immigration laws"); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (states have a sovereign interest in "the power to create and enforce a legal code"); *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) ("when a federal law interferes with a state's exercise of its sovereign 'power to create and enforce a legal code' [] it inflict[s] on the state the requisite injury-in-fact."); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985); *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015).

And although Defendants have not yet officially declared San Francisco a "sanctuary jurisdiction," withheld any funds pursuant to the Funding Restriction, or initiated other enforcement action against San Francisco, this does not defeat the Court's jurisdiction. A plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) (internal quotation omitted). Rather, "it is 'sufficient for standing purposes that the plaintiff intends to engage in a 'course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the provision will be invoked against the plaintiff.' " *Id.* (citing *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000). As this Court previously explained, San Francisco has standing to bring a pre-enforcement challenge to Section 9(a)

of the Executive Order because it has a well-founded fear of enforcement. PI Order at 19-33. Three sets of facts alleged in the Complaint—and supported by exhibits in the RJN—support this conclusion.

First, it is beyond dispute that San Francisco law generally restricts employees from assisting in the enforcement of federal immigration law and specifically prohibits law enforcement officials from detaining an individual who is otherwise eligible for release from custody solely on the basis of an ICE detainer request. S.F. Admin. Code § 12I.3; SAC ¶¶ 22-24.[2] As the Court recognized, "the rights of states and local governments to determine their own local policies and enforcement priorities" implicates a constitutional interest under the Tenth Amendment. PI Order at 27.

Second, the Executive Order appears to require jurisdictions to comply with detainer requests or face loss of federal funds and other enforcement action. The Executive Order—and the AG Memorandum—define "sanctuary jurisdictions" as jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373." Section 9(b) equates "sanctuary jurisdictions" with jurisdictions that refuse to comply with detainers. And Attorney General Sessions has suggested that a policy prohibiting compliance with detainers would violate Section 1373 as well as "hinder the enforcement of federal law." PI Order at 20-21 (citing Sessions Press Conference at 2). San Francisco thus has a reasonable belief that its laws will trigger defunding and enforcement action under the Executive Order.[3]

Third, Defendants have indicated a specific intent to enforce the Executive Order against San Francisco. In a recent joint letter to Chief Justice Cantil-Sakauye of the California Supreme Court, Attorney General Sessions and Secretary Kelly stated: "Some jurisdictions, including the State of California and many of its largest counties and cities, have enacted statutes and ordinances designed to

---

[2] Importantly, an ICE detainer request is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary City laws. *See* SAC ¶ 25.

[3] In other filings with this Court, Defendants have referenced the Government's brief filed in the Supreme Court of Massachusetts stating that detainers "are voluntary . . . rather than mandatory commands." Reply ISO Motion for Reconsideration (Dkt. No. 113) at 11. But on the same day that Attorney General Sessions filed that brief, he also stated in public remarks that failure to comply with detainer requests violates federal law and will render jurisdictions ineligible for DOJ grants under Section 1373. RJN Exh. C. The AG Memorandum, meanwhile, does not even mention detainers— much less clarify that federal funds will not be denied to jurisdictions that fail to comply with such requests. But even if it did, it would not defeat San Francisco's standing to bring a pre-enforcement challenge. A well-founded fear of enforcement may be based on a reasonable interpretation of what conduct is proscribed—even if a narrower interpretation of the statute is also available. *See* PI Order at 19 (citing *Virginia v. American Booksellers*, 484 U.S. 383, 392 (1988)).

1  specifically prohibit or hinder ICE from enforcing immigration law by prohibiting communication

2  with ICE, and denying requests by ICE officers and agents to enter prisons and jails to make arrests."

3  RJN Exh. T. ICE has specifically identified San Francisco as a jurisdiction with policies that "Restrict

4  Cooperation with ICE." RJN Exh. S. A memo by the Office of the Inspector General "notes that

5  San Francisco's policy . . . could run afoul of Section 1373 unless San Francisco employees are aware

6  that they are permitted to share immigration status information with ICE." PI Order at 20-21 (citing

7  OIG Memo [RJN Exh. F]). During a March 27, 2017 press conference, Attorney General Sessions

8  described San Francisco as a "sanctuary city." RJN Exh. C at 1. In an op-ed recently published in the

9  San Francisco Chronicle, the Attorney General again characterized San Francisco as a "sanctuary city"

10 and implored "San Francisco and other cities to reevaluate [their] policies." RJN Exh. U. As this Court

11 explained, "[t]hese statements indicate not only the [Government's] belief that San Francisco is a

12 'sanctuary jurisdiction' but that its policies are particularly dangerous and in need of change." PI

13 Order at 26.

14       Accordingly, San Francisco has established a well-founded fear of enforcement sufficient to

15 demonstrate Article III standing. And because "[t]he constitutional component of ripeness overlaps

16 with the 'injury in fact' analysis for Article III standing" (*Wolfson v. Brammer*, 616 F.3d 1045, 1058

17 (9th Cir. 2010)), San Francisco has established constitutional ripeness as well. With respect to the

18 prudential component of ripeness, the Supreme Court has questioned the "continuing vitality of the

19 prudential ripeness doctrine" in light of courts' "virtually unflagging" obligation to "decide cases

20 within [their] jurisdiction." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014).

21 Nonetheless, as this Court has already held, San Francisco's claims are prudentially ripe:

22 "[San Francisco] challenge[s] the Executive Order as written; a decision to enforce it sparingly cannot

23 impact whether it is unconstitutional on its face. [San Francisco's] claims do not require further factual

24 development, are legal in nature, and are brought against a final Executive Order. They are fit for

25 review." PI Order at 34.

26       **B.    The Claim For Declaratory Relief Is Justiciable.**

27       San Francisco has also demonstrated a well-founded fear that Defendants will take

28 enforcement action against it based on alleged violations of Section 1373. *See generally* PI Order at

11, 20-21. For example, Attorney General Sessions' March 27 statement urging jurisdictions to comply with Section 1373—or face consequences—singled out San Francisco and its "sanctuary policies." RJN Exh. D. Representative John Culberson—the self-proclaimed "CFO of the Department of Justice," who chairs the House of Representatives subcommittee that controls DOJ spending— stated that Section 1373 "bars state and local officials from interfering 'in any way' with requests for personal immigration information by federal authorities" and that "starting this year" San Francisco and other jurisdictions deemed out of compliance with Section 1373 are "in for a very unpleasant surprise." RJN Exh. E at 3-4. The OIG Memo discussed above (*see* p. 8, *supra*) specifically calls out San Francisco as having laws that could run afoul of Section 1373. RJN Exh. F at 6 n.7. The Supreme Court has made clear that this type of threatened action is sufficient to satisfy Article III. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced."). To the extent that Defendants' Motion challenges Count One based on standing and ripeness, Mot. at 10, the Court should therefore reject this challenge.

Defendants' statements also belie their argument that there is "no live, concrete controversy regarding whether San Francisco complies with Section 1373," and thus any ruling on this issue would "constitute a prohibited advisory opinion." Mot. at 11. As pled in the SAC, San Francisco believes— and seeks a judicial determination—that its laws comply with Section 1373. SAC ¶ 125. Defendants, meanwhile, take the position that San Francisco does not comply with Section 1373. SAC ¶ 146. And as noted above, they have repeatedly threatened enforcement action on this basis.

These facts establish both Article III jurisdiction and an actual controversy within the meaning of the Declaratory Judgment Act ("Act"), 28 U.S.C. § 2201(a). The term "actual controversy" in the Act refers to "'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune*, 549 U.S. at 127. As required by Article III, the dispute over whether San Francisco complies with Section 1373 is "real and substantial," and not merely "an opinion advising what the law would be upon a hypothetical set of facts." *Id*. Defendants' request to dismiss San Francisco's claims under Federal Rule of Civil Procedure 12(b)(1) should be denied.

**II.     Count One States A Viable Claim For Declaratory Relief That San Francisco Complies with Section 1373.**

Count One of San Francisco's Second Amended Complaint requests a declaration from this Court that its laws comply with 8 U.S.C. § 1373 ("Count One"). In moving to discuss Count One, Defendants conflate three separate concepts: Article III jurisdiction, federal subject matter jurisdiction, and the existence of a private right of action. But San Francisco has established Article III jurisdiction and federal subject matter jurisdiction, and the Declaratory Judgment Act does not require plaintiffs to invoke a right of action separate from the cause of action a defendant would have against the plaintiff.

First, as described in Section I(B), *supra*, San Francisco has demonstrated that there is an "actual controversy" about whether its laws comply with Section 1373. This establishes Article III jurisdiction and defeats Defendants' argument that judicial resolution of Count One would be a prohibited advisory opinion. *See MedImmune*, 549 U.S. at 127.

Second, the Court has subject matter jurisdiction under 28 U.S.C. § 1331. To determine federal question jurisdiction in a declaratory relief action, courts "look to the 'character of the threatened action'. . .[t]hat is to say. . . whether 'a coercive action' brought by 'the declaratory judgment defendant'. . . 'would necessarily present a federal question.'" *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014) (internal citations omitted). Here, if Defendants brought an action against San Francisco to secure compliance with 8 U.S.C. § 1373, it would be an action "arising under the Constitution, laws, or treaties of the United States" and by definition would present a federal question that this Court has jurisdiction to adjudicate. *See* 28 U.S.C § 1331.[4]

Third, "'it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action.'" *Shell Gulf of Mexico Inc. v. Center for Biological Diversity, Inc.*, 771 F.3d 632, 636 (9th Cir. 2014) (quoting *Collin County, Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN)* 915 F.2d 167 (5th Cir. 1990). As Defendants have repeatedly noted, they could bring civil preemption actions against jurisdictions to enforce Section 1373. *See, e.g.*, RJN Exh. G at 8. Accordingly, San Francisco does not need a separate cause of action

---

[4] Defendants argue that "[t]he general jurisdictional statutes that [San Francisco] cites, 28 U.S.C. §§ 1331 and 1346 [], do not create independent causes of action." Mot. at 11. This is correct, but irrelevant. San Francisco does not argue that they create an independent cause of action, simply that they confer subject matter jurisdiction.

to litigate its declaratory judgment claim. Defendants' argument that a plaintiff must assert an

independent cause of action to bring a claim for declaratory relief ignores the purpose of the

Declaratory Judgment Act and attempts to create an obligation that does not exist. *See generally*

*Societe de Conditionnement v. Hunter Engineering Co.*, 655 F.2d 938, 943 (9th Cir. 1981) (noting that

the purpose of the Declaratory Judgment Act is "to relieve potential defendants from the Damoclean

threat of impending litigation which a harassing adversary might brandish, while initiating suit at his

leisure—or never").

None of Defendants' authority is to the contrary. Most of the cited cases do not concern

declaratory relief at all. *See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001); *Strong v. Ford*, 108

F.3d 1386 (9th Cir. 1997) (unpublished); *White v. Paulsen*, 997 F. Supp. 1380, 1382 (E.D. Wash.

1998). In one Fifth Circuit case, the plaintiff did not contend that the underlying state statute created a

cause of action that could be enforced by anyone, plaintiff or defendant. *Harris Cty. Texas v.

MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015). And in a district court case, the court simply

observed that "[d]eclaratory relief is not an independent cause of action" and the Declaratory

Judgment Act "does not itself confer federal subject-matter jurisdiction." *Muhammad v. Berreth*, No.

C 12-02407 CRB, 2012 WL 4838427, at *5 (N.D. Cal. Oct. 10, 2012). No one disagrees with this

straightforward proposition. It is simply irrelevant. As noted above, there is federal question

jurisdiction here and a cause of action exists because Defendants could sue San Francisco to ensure

compliance with Section 1373.

**III.    Count Two States A Viable Claim That The Funding Restriction Violates Separation Of Powers Principles, The Spending Clause, And The Tenth Amendment.**

Count Two states that the Executive Order's funding restriction violates the United States

Constitution's separation of powers principles, Spending Clause, and Tenth Amendment. To survive

Defendants' motion to dismiss, San Francisco need only show that this claim is "'plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The claims

alleged in the SAC more than meet this burden. Indeed, the Court has already reviewed these claims

under the more exacting preliminary injunction standard and held that San Francisco is likely to

succeed on merits of each claim. *See* PI Order at 35-44. Defendants nonetheless argue that

San Francisco cannot plead viable challenges against the Executive Order because it "is an internal

Executive Branch policy directive." Mot. at 12-13. Defendants also argue that San Francisco's

challenge to the Funding Restriction should be dismissed because the Funding Restriction—"as

elucidated by the AG Memorandum"—is not facially unconstitutional. Mot. at 13-22. They are wrong.

The Executive Order is more than an internal policy directive and has a direct impact on

San Francisco. The AG Memorandum does not "elucidate" the Executive Order because it is not an

authoritative interpretation, a binding statement about implementation, or even a conceivable

constitutional application of the Executive Order. Instead, the AG Memorandum simply indicates that

the DOJ will not implement the plain text of the Executive Order and says nothing about how other

agencies will implement it. This does not cure the constitutional infirmities identified by the Court.

### A.      The Executive Order Is More Than An Internal Directive, And It Is Subject To Judicial Review.

Defendants argue that the Court should dismiss both of San Francisco's counts concerning the

constitutionality of the Executive Order (Counts Two and Three) because the Order is merely an

internal policy directive concerning implementation of existing law and does not directly affect

San Francisco. This argument is both factually and legally flawed.

Defendants' argument is factually flawed because it fails in its underlying premises. As an

initial matter, the notion that the Executive Order does not affect San Francisco is spurious. The Order

seeks to "undermine [local policy] judgment by attempting to compel [jurisdictions] to change their

policies and enforce the Federal government's immigration laws" (PI Order at 28) by threatening to

withhold federal funds and initiate unspecified enforcement action. As the Court has already

concluded, this directly harms San Francisco by impairing its sovereign interest in creating and

enforcing its own legal code (*id*. at 27 (citing *Alfred L. Snapp & Son*, 458 U.S. at 601)) and by creating

budgetary uncertainty that impacts the City's ability to budget and plan for the future (*id.* at 29-30).

Moreover, the plain text of the Executive Order makes clear that it does more than just provide

the Attorney General and Secretary of DHS direction "regarding their exercise of *existing* statutory

and constitutional authority." Mot. at 12 (emphasis on original). As this Court explained, Section 9(a)

//

directs the Attorney General and the Secretary to ensure that "sanctuary jurisdictions" are "*not eligible to receive*" federal grants. EO §9(a)(emphasis added). Whether a jurisdiction is eligible to receive federal grants is determined by the conditions on those grants and the characteristics, acts, and choices of the jurisdiction. See BLACK'S LAW DICTIONARY 634 (10th ed. 2014) (defining "eligible" as "Fit and proper to be selected or to receive a benefit."). Section 9(a)'s language directing the Attorney General and Secretary to ensure that jurisdictions that "willfully refuse to comply" with Section 1373 are "not eligible" for federal grants therefore purports to delegate to the Attorney General and the Secretary the authority to place a new condition on federal grants, compliance with Section 1373.

PI Order at 14. The ability to place new conditions on federal grants is an (unconstitutional) expansion of the authority of the Attorney General and Secretary. Thus, the Executive Order—which purports to hand them this authority—is more than an internal policy directive concerning implementation of existing law. Defendants' attempt to characterize it as such fails. *See generally* PI Order at 14-15 ("If Section 9(a) does not direct the Attorney General and Secretary to place new conditions on federal funds then it only authorizes them to do something they already have the power to do, enforce existing grant requirements. . . But a construction so narrow that it renders a legal action legally meaningless cannot possibly be reasonable and is clearly inconsistent with the Order's broad intent.").

Defendants' argument is legally flawed as well. To the extent Defendants argue that the fact the Executive Order is framed as a direction to other officers of the U.S. federal government precludes judicial review, they are wrong. Indeed, the executive order at issue in the seminal case of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), was similarly framed as a directive to an Executive Branch official, yet the Supreme Court reviewed—and ultimately struck down—the order. And Defendants' reliance on *Chen v. Schiltgen*, No. C-94-4094 MHP, 1995 WL 317023 (N.D. Cal. May 19, 1995), and *Legal Aid Society of Alameda County v. Brennan*, 608 F.2d 1319 (9th Cir. 1979), is perplexing. *See* Mot. at 12. Those cases state that executive orders lacking specific statutory or congressional authorization do not have the full force of law—meaning they create no private right of action that can be *enforced* in court. *Chen*, 1995 WL 317023, at *5; *Legal Aid Society of Alameda County*, 608 F.2d at 1330 & n.14. But this is irrelevant. San Francisco's complaint does not seek to

//

//

//

*enforce* the Executive Order; it *challenges* the Executive Order. Defendants cite *no* authority supporting the proposition that the validity of such orders cannot be *challenged* in court.[5]

For all of these reasons, the Court should reject Defendants' argument that San Francisco fails to state a viable claim challenging the Executive Order because the order is an internal directive.

**B.    The Funding Restriction Is Facially Unconstitutional.**

**1.    The Court Already Found That The Funding Restriction Likely Violates Separation of Powers, The Spending Clause, And The Tenth Amendment.**

As the Court recognized in its PI Order, "Section 9 purports to give the Attorney General and the Secretary the power to place a new condition on federal funds (compliance with Section 1373) not provided for by Congress." *Id*. at 36. But the federal spending power belongs to Congress, not the President. U.S. Const. art. I, § 8, cl.1. The President cannot amend funding statutes (*Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998)), and cannot withhold appropriated funds without Congress's approval, Impoundment Control Act of 1974, 2 U.S.C. §§ 683 et seq. Section 9's attempt to impose a new funding condition "is an improper attempt to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles." PI Order at 37.

Even if the President did have the Spending Power, Section 9 would exceed the scope of that power and therefore violate the Tenth Amendment. *Id*. at 37. As the Court held, Section 9 violates the Spending Clause in at least three different ways. First, it imposes a new funding condition without stating that condition unambiguously and in advance "so that states and local jurisdictions contemplating whether to accept such funds can 'exercise their choice knowingly, cognizant of their participation.'" *Id*. (quoting *S. Dakota v. Dole*, 483 U.S. 203, 203 (1987)). Second, "its attempt to condition all federal grants on compliance with Section 1373 clearly runs afoul of the nexus

---

[5] The only case they cite in this regard—*United States v. Pickard*, 100 F. Supp. 3d 981 (E.D. Cal. 2015)—is entirely inapposite. There, several individuals who had been indicted for conspiracy to manufacture marijuana sought to dismiss their indictments. *Id.* at 988-89. They argued, *inter alia*, that a memorandum to United States Attorneys from the Deputy Attorney General, which described eight enforcement priorities to guide enforcement of the Controlled Substances Act ("CSA"), violated the Tenth Amendment by imposing a disparate impact on states depending on the legal status of marijuana within the jurisdiction. *Id.* at 1011. The court concluded that it did not, noting that the memorandum did "not circumscribe the DOJ's ability to prosecute drug offenses under the CSA in any state," that it was not binding and was instead "'intended solely as a guide' for prosecutors in their exercise of discretion," and that "federal prosecutors retain[ed] exclusive authority and absolute discretion to decide whether to prosecute a case." *Id.* (internal quotation marks omitted). This says nothing about whether a viable claim can be raised challenging the Executive Order at issue here.

1    requirement" that "'Congress may condition grants under the spending power only in ways

2    reasonabl[y] related to the purpose of the federal program.'" *Id.* at 38 (quoting *Dole*, 483 U.S. at 213).

3    Third, threatening to withhold all federal grants is an unconstitutionally coercive "gun to the head." *Id.*

4    at 39 (quoting *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2604 (2012)).

5         Finally, the court held that San Francisco was likely to succeed on its claim that the Executive

6    Order violates the Tenth Amendment by seeking to compel state and local jurisdictions to comply with

7    detainer requests, under threat of losing federal grants or facing enforcement action. *Id.* at 40. As the

8    Court recognized, this is an unconstitutional attempt to force state and local jurisdictions to administer

9    federal immigration law. *Id.* at 39.

10         **2.    The Court Should Not Rely On The "Elucidations" Offered By The AG Memorandum.**

11

12         Defendants make no attempt to defend this plain text reading of the Executive Order or

13    respond to the Court's analysis. Instead, they argue that "as elucidated by the AG Memorandum," the

14    Funding Restriction is constitutional. Yet the AG Memorandum does not and cannot rewrite the

15    Executive Order, which is what would be required to cure the constitutional infirmities identified by

16    the Court. When the Administration has recognized constitutional problems with an Executive Order

17    in similar cases, it has withdrawn the offending Order or issued a clarifying memorandum from the

18    President himself to attempt to address the issue. *See* RJN Exhs. H at Section 1(i), I. Defendants'

19    failure to follow those procedures here underscore the limited import of the AG Memorandum.

20         Instead of rewriting the Executive Order, the AG Memorandum effectively states that *DOJ will*

21    *not implement the Executive Order* as required by its text and will instead implement other statutes—

22    namely, existing funding statutes that permit 1373 funding conditions. Yet an agency's "voluntary

23    self-denial" of powers granted by an unconstitutional law does not save that law. *Whitman v. Am.*

24    *Trucking Associations*, 531 U.S. 457, 472–73 (2001); *see also Knox v. Service Employees Intern.*

25    *Union*, 567 U.S. 298, 307 (2012) ("The voluntary cessation of challenged conduct does not ordinarily

26    render a case moot because a dismissal for mootness would permit a resumption of the challenged

27    conduct as soon as the case is dismissed."). As Supreme Court has explained, it "would not uphold an

28    unconstitutional statute merely because the Government promised to use it responsibly." *United States*

1    *v. Stevens*, 559 U.S. 460, 480 (2010). The Constitution "protects against the Government; it does not

2    leave us at the mercy of *noblesse oblige*." *Id.*; *see also Comite de Jornaleros de Redondo Beach v. City*

3    *of Redondo Beach*, 657 F.3d 936, 946–47 (9th Cir. 2011) ("We cannot simply 'presume[] the [City]

4    will act in good faith and adhere to standards absent from the ordinance's face.'").

5    　　　Defendants attempt to characterize the AG Memorandum as something other than a promise

6    not to implement the Executive Order, but none of their characterizations are persuasive. It is unclear

7    whether Defendants rely on the AG Memorandum as a narrowing construction of the Executive Order

8    or a binding directive about implementation of the Executive Order, but the AG Memorandum cannot

9    do the work Defendants would have it do under any of these theories.

10    　　　　**a.    The AG Memorandum Is Not An Authoritative Interpretation Of**
**The Executive Order.**

11

12    　　　For the most part, the AG Memo simply repeats the arguments Defendants made at the PI

13    Hearing. The Court has already determined that the Executive Order is "not readily susceptible to the

14    Government's narrow interpretation," and that reading it as the Government proposed would

15    "'require[] rewriting, not just reinterpretation.'" PI Order at 14 (quoting *U.S. v. Stevens*, 559 U.S. 460,

16    481 (2010)). Specifically, the Court concluded that reading the Executive Order as Defendants

17    proposed—*i.e.*, as not giving the Attorney General or the Secretary of DHS any new authority and

18    applying only to limited grants administered by DOJ or DHS—is inconsistent with the plain text of

19    Section 9(a) as well as the "structure and language" of other provisions of the Executive Order. *Id.* at

20    15; *see also id.* at 14 ("While the Government urges that the Order 'does not purport to give the

21    Secretary or Attorney General the unilateral authority' to impose new conditions on federal grants, that

22    is exactly what the Order purports to do."); *id.* at 15 ("At the hearing, Government counsel argued that

23    the Order applies only to grants issued by the Department of Justice and the Department of Homeland

24    Security because it is directed only at the Attorney General and Secretary of Homeland Security. This

25    reading is similarly implausible.").

26    　　　The Court therefore rejected the narrowing construction proposed by the Attorney General at

27    the preliminary injunction hearing, and reiterated in the AG Memorandum. As the Court recognized,

28    "[i]t is not the job of the courts 'to insert missing terms into the statute or adopt an interpretation

1   precluded by [its] plain language.'" PI Order at 13 (quoting *Foti v. City of Menlo Park*, 146 F.3d 629,

2   639 (9th Cir. 1998)). And to what end? Adopting the Attorney General's construction would so narrow

3   the Executive Order that it would deprive it of any legal force. *Id*. at 15-16. It would also "transform

4   an Order that purports to create real legal obligations into a mere policy statement and would work to

5   mislead individuals who are not able to conclude, by reading Section 9(a) itself, that it is fully self

6   cancelling and carries no legal weight." *Id*. at 16.

7          Defendants offer no reason for the Court to reconsider this analysis, and do not argue that the

8   Court must defer to the AG Memo as an agency interpretation. *See* Reply ISO Motion for

9   Reconsideration at 5 fn. 6 ("[T]he rules of judicial deference are inapplicable."). Instead, they argue

10  that the AG memorandum is relevant because it purportedly binds other agencies. *Id*. ("[T]the issue

11  here is not whether this Court is bound by the Attorney General's determination as to the scope and

12  meaning of the grant eligibility provision, but rather whether other federal agencies are bound by it.)

13  Yet as discussed below, the AG Memorandum does not bind anyone.

14                    **b.      The AG Memorandum Is Not Binding Guidance About**
                              **Implementation Of The Executive Order.**
15

16         Defendants characterize the AG Memorandum as "authoritative, binding guidance" for all

17  executive agencies (Mot. at 2), but it is neither authoritative nor binding. As a threshold matter, the

18  Memorandum is not guidance for anyone outside DOJ because it is not directed to anyone outside the

19  DOJ. As its title states, it is a "Memorandum for All Department Grant-Making Components." This

20  stands in stark contrast with memoranda that are, in fact, addressed to all Executive Departments and

21  Agencies. *See, e.g.*, RJN Exh. J ("Memorandum for Heads of All Federal Departments and Agencies"

22  regarding Section 508 of the Rehabilitation Act). If the Memorandum were truly intended to "advise

23  executive department heads" in a "formal, conclusive manner [about] the administration's

24  interpretation of Section 9(a) of the Executive Order" (Mot. at 7), it would fail at the outset by not

25  being directed to these department heads.

26         Even if the Memorandum were addressed more broadly, it would still be an implementation

27  memorandum, not a formal opinion. It does little more than summarize the relevant terms of the

28  Executive Order and direct the DOJ how to implement it. It offers no legal analysis or opinion

---

regarding, for example, the scope of 1373 or constitutional limits of the Executive Order.

Accordingly, none of the authority Defendants cite is relevant to whether and to what extent the AG Memorandum binds other Executive Branch agencies and officials. Defendants rely on 28 U.S.C. § 512, which permits a department head to request and obtain an AG opinion on a "question of law arising in the administration of his department," but they do not suggest that the AG Memorandum issued in response to such a request. *See* Mot. at 7. Nor is the memo a controlling ruling about a question of immigration law, as described by the INA.[6] *See* 8 U.S.C. § 1103(a)(1); *see, e.g., Narenji v. Civiletti*, 617 F.2d 745 (D.C. Cir. 1980). Defendants also cite 28 C.F.R. Section 0.5(c), which describes the AG's role in providing "formal and informal" advice and opinions "on legal matters."

At best, these statutes and regulations raise the question of what it looks like when the Attorney General issues formal opinions and advice. That question is answered by 28 C.F.R. Section .25—not cited by Defendants—which delegates to the Office of Legal Counsel responsibility for the duties described in 28 U.S.C. § 512 and 28 C.F.R. Section 0.5(c).[7] Indeed, the one case cited by Defendants to demonstrate that "the Attorney General's legal opinions are treated as authoritative by the heads of executive agencies" involved a formal memorandum issued by the Office of Legal Counsel ("OLC") concerning a matter of law, namely the "Constitutional Limitations on Federal Government Participation in Binding Arbitration." *Tenaska Washington Partners II, L.P. v. United States*, 34 Fed. Cl. 434, 439 (1995). Yet despite Defendants' insistence that the AG Memorandum is a "formal" and "conclusive" legal opinion, there is no indication here that it was prepared or rendered by OLC.

Further, even if this were a formal opinion, that would not establish that it is binding or controlling on other executive branch agencies. Defendants rely on Randolph Moss' article, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, but this article concludes that, "the question of whether (and in what sense) the opinions of the Attorney General, and,

---

[6] Defendants cite to 8 U.S.C. § 1103(c)(1), but that appears to be a typo. 8 U.S.C. § 1103(c)(1) concerns the definition of a "child."

[7] The Attorney General's website explains that the Attorney General has, by regulation, "delegated to the Office of Legal Counsel responsibility for preparing the formal opinions of the Attorney General, rendering opinions and legal advice to the various Executive Branch agencies, assisting the Attorney General in the performance of his function as legal adviser to the President, and rendering opinions to the Attorney General and the heads of the various organizational units of the Department of Justice." RJN Exh. K (citing 28 C.F.R. § 0.25).

more recently, the Office of Legal Counsel, are legally binding within the executive branch remains somewhat unsettled." 52 Admin. L. Rev. 1303, 1318 (2000); *see also* Trevor W. Morrison, *Book Review: Constitutional Alarmism*, 124 Harv. L. Rev. 1688, 1711 n.90 (2011) ("[T]here has long been some uncertainty about the technical legal bindingness of Attorney General and OLC legal advice."); Peter L. Strauss, *Overseer, or "The Decider"? The President in Administrative Law*, 75 Geo. Wash. L. Rev. 696, 739 (2007) (noting that "strikingly limited statutory or even executive authority supports the proposition that the Attorney General's opinions on legal matters are entitled to controlling status").

Defendants do not even argue that the issuance of the AG Memorandum binds the Attorney General's hands going forward. Nor could they. In the absence of a court order, nothing at all prevents the Attorney General from interpreting or applying the Executive Order more broadly in the future. And there is particular reason to be concerned about the possibility here. The current narrow construction appears to have been formulated in response to this lawsuit and the Court's ruling. The Executive Order issued on January 25, 2017. But Defendants did not articulate any narrowing principles until the hearing on the preliminary injunction, and the Attorney General did not issue the AG Memorandum until the eve of the deadline to file a motion for reconsideration of the Court's PI Order. In similar circumstances, courts have looked askance at changes in conduct adopted in response to litigation and judicial scrutiny. *See Discontinued Official Action*, 13C Fed. Prac. & Proc. Juris. § 3533.7 (3d ed. 2017) (collecting cases).

Moreover, the Attorney General has not disavowed the constitutionality of a broader construction or even repeated counsel's prior assertion that the narrow construction is the only fair reading of the text. The AG Memorandum simply states how he has "determined Section 9(a) of the Executive Order . . . will be applied" (AG Memorandum at 1)—leaving him free to embrace a different construction in the future. And there is good reason to think that the Attorney General will later change course. Defendants' current assertion that the Executive Order applies to only limited funds is inconsistent with their prior statements indicating that the Order was significantly more far reaching. *See* p. 3, *supra*; PI Order at 3 (noting that "if there was doubt about the [broad] scope of the Order, the President and the Attorney General have erased it with their public comments"). And on the same day that Attorney General Sessions stated in public remarks that failure to comply with detainer

requests violates federal law and will render jurisdictions ineligible for Department of Justice ("DOJ") grants under Section 1373 (RJN Exh. C at 2-3), he also filed a brief in the Supreme Court of Massachusetts stating that detainers are "voluntary." *See* Br. of the United States as Amicus Curiae at 22, *Mass. v. Lunn*, No. SJC-12276, 2017 WL 1240651 at *22 (Mass. Mar. 27, 2017). As the Ninth Circuit recently held in *Washington v. Trump*, 847 F.3d 1151 (2017), such "shifting interpretations" of an Executive Order render it impossible to conclude that "the current interpretation . . . even if authoritative and binding, will persist past the immediate stage of these proceedings." *Id.* at 1166.[8]

As discussed above, Defendants could have amended or reissued the Executive Order, but they did not. Defendants could have offered a formal Attorney General opinion through OLC or authoritative guidance in a Presidential memorandum, but they did not. If Defendants were truly willing to be bound by the AG Memorandum's proposed implementation, they could have proposed incorporating these terms into a stipulated injunction, but they have not. The failure to take such actions leaves Defendants completely free to change their implementation at any time.

### 3. The AG Memorandum Is Not A Constitutional Application Of The Executive Order That Defeats A Facial Challenge Under *Salerno*.

Finally, Defendants rely on *United States v. Salerno*, 481 U.S. 739 (1987), to argue that the SAC "fails to establish that Section 9 of the Executive Order would be invalid under all circumstances," Mot. at 14, but Defendants do not identify a single circumstance under which application of the Executive Order itself would be valid. Instead, they point to the AG Memorandum's proposed application of Congressional funding statutes that exist independently of the Executive Order. *See, e.g.*, Mot. at 15. The validity of these statutes is not at issue in this litigation, and application of these statutes is not an application of the Executive Order.

---

[8] Notably, President Trump's recent tweets concerning the "travel ban" at issue in *Washington v. Trump* highlight the frequency with which Defendants change position with respect to Executive Orders. Although President Trump issued an amended order in March 2017, he declared in a June 5th Twitter post that "'[t]he Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to S.C.'" He continued by stating that "[t]he Justice Dept. should ask for an expedited hearing of the watered down Travel Ban before the Supreme Court - & seek much tougher version!'" Gabrielle Levy, *Trump Criticizes Justice Department Over His Travel Ban*, US News & World Report (June 5, 2017), https://www.usnews.com/news/national-news/articles/2017-06-05/trump-criticizes-justice-department-over-his-travel-ban (quoting President Trump's June 5, 2017 tweets").

The Ninth Circuit and Supreme Court rejected an almost identical argument in *Patel v. City of Los Angeles*, 738 F.3d 1058, 1065 (9th Cir. 2013) (en banc), aff'd sub nom. *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443 (2015). There, Plaintiffs brought a Fourth Amendment facial challenge to a municipal law that provided that hotel guest records "shall be made available to any officer of the Los Angeles Police Department for inspection." The City argued the law could be constitutionally applied if, for example, there were exigent circumstances, the hotel consented to the search, or the police acted pursuant to a valid warrant. *Id*. at 2450-51.  The Court observed this "misunderstands how courts analyze facial challenges." *Id*. at 2451. It explained that when assessing whether a law can be applied constitutionally the Court considers only applications where the challenged law itself authorizes or prohibits the conduct at issue. Actions authorized by other statutes are irrelevant to this analysis:

> [W]hen addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant. If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented. Accordingly, the constitutional "applications" that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute.

*Id*.

Similarly, here, the existence of other laws that might allow Defendants to condition specific grants on compliance with Section 1373 does not mean that the Executive Order is immune from a facial challenge. Defendants can continue to do whatever *other provisions* of law allow them to do whether the Executive Order exists or not.[9] San Francisco is not challenging those applications of the law. San Francisco challenges only the Executive Order and the actions specifically authorized by that Order, which the Court can resolve on a facial challenge.

### 4.     The AG Memorandum Does Not Eliminate The Constitutional Violations Identified By The Executive Order.

The AG Memorandum is, at its core, simply a statement by DOJ that it will not enforce the plain terms of the Executive Order. As discussed above, the Memorandum does not and cannot rewrite

---

[9] Defendants recognize as much in continuing to impose conditions under these statutes even while they are enjoined from enforcing the Executive Order. See RJN Exh. L.

the Executive Order, which is what would be required to save it. Yet even if the Court did view the AG Memorandum as successfully editing—or, as Defendants put it, "elucidating"— the Executive Order, the Executive Order would still violate the Constitution.

Despite Defendants' representations to the contrary, the AG Memorandum elucidates less than it obscures. It does not describe how DHS will apply the Funding Restriction. It does not describe how DOJ will apply the Enforcement Provision. And it says nothing about detainers, maintaining the threat that jurisdictions must comply with them in order to avoid sanctions under the Executive Order. Thus, as described below, the Executive Order—even as "elucidated" by the AG Memorandum—would still violate constitutional separation of powers, the Spending Clause, and the Tenth Amendment.

> **a.    The Funding Restriction Still Violates The Separation Of Powers.**

This Court previously held that "[t]he [Executive] Order's attempt to place new conditions on federal funds is an improper attempt to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles." PI Order at 37. The AG Memorandum does not eliminate this concern.

The SAC alleges that the Executive Order violates the separation of powers by imposing a new condition on jurisdictions' eligibility to receive federal funds and creating a penalty for Section 1373 violations, both without Congressional authorization. SAC ¶¶ 73-74. The Memorandum states that Section 9(a) will apply to DOJ and DHS grants, and it limits application to DOJ grants to those that currently have express Section 1373 certification conditions and "to future grants for which the Department is statutorily authorized to impose such a condition." AG Memorandum at 2.[10] The Memorandum does not, however, include any such limitation for DHS grants. *See* Mot. at 8 (lines 7-10), 14 (lines 6-9), 15 (9-13). Thus, even as purportedly narrowed by the Memorandum, the Executive Order still directs DHS to withhold funds from sanctuary jurisdictions, regardless of whether Congress has authorized this as a funding condition. This attempt to impose a new funding condition violates the separation of powers principles identified in the Court's Order. *See* PI Order at 35-37.

//

---

[10] San Francisco does not concede that DOJ is statutorily authorized to impose such a condition on any grants.

**b.    The Funding Restriction Still Violates The Spending Clause.**

The Court's PI Order recognized that the Executive Order violates the Spending Clause in at least three ways. The Court found that the Executive Order imposes Section 1373 compliance (1) as a vague and retroactive funding condition, (2) on funds that have nothing to do with immigration enforcement, and (3) on such a large quantity of federal funds that it is unconstitutionally coercive. While the AG Memorandum purports to narrow the federal funds at risk, it does not diminish the first and second concerns. Nor does it address the allegations in the Complaint that the Funding Restriction induces state and local jurisdictions to violate the Fourth Amendment by requiring them to comply with detainers, which often lack probable cause. *See* SAC ¶¶ 48, 82.

The SAC alleges that the Funding Restriction violates the Spending Clause by imposing a new funding condition, without stating that condition unambiguously and in advance so that a State could voluntarily and knowingly decide whether to accept the condition. *See* SAC ¶ 79.[11] Like the Executive Order, however, the AG Memorandum's "vague language does not make clear what conduct it proscribes," leaving jurisdictions unable to "exercise their choice knowingly." PI Order at 37-38. As the Court recognized, it is not clear what conduct will lead a jurisdiction to be deemed a "sanctuary jurisdiction" that "willfully refuses to comply with Section 1373." *Id.* at 19-22, 41-43. The Memorandum offers scant guidance on this point, merely parroting the language of the Executive Order and stating that after consulting with the Secretary of Homeland Security, the Attorney General has "determined that the term 'sanctuary jurisdiction' will refer only to jurisdictions that 'willfully refuse to comply with Section 1373.'" AG Memorandum at 2. As a threshold matter, jurisdictions cannot rely on the Attorney General's definition because the Executive Order gives the Secretary—not the Attorney General—the authority and discretion to designate sanctuary jurisdictions. See Executive Order § 9(a). Further, the Memorandum nowhere indicates what Section 1373 requires, leaving in place the threat that jurisdictions will be deemed to willfully violate Section 1373 if they have a policy

[11] Defendants misread the SAC in arguing that San Francisco did not allege that the Executive Order failed to state conditions "unambiguously." Mot. at 17 fn. 4. San Francisco used that exact word in paragraph 79 of the SAC, and even if there were doubts about how to construe the allegations of that paragraph, the Court must resolve them in favor of San Francisco, the plaintiff. *See Stapley v. Pestalozzi*, 733 F.3d 804, 809 (9th Cir. 2013).

of not complying with detainer requests. *See* PI Order at 19-22. Additionally, the AG Memorandum does not eliminate the concern that DHS will apply the Executive Order retroactively. The plain language of the Executive Order suggests it applies to past and future funds, and unlike DOJ, DHS has not offered to limit its application of the Executive Order in any way. *See generally* AG Memorandum at 1-2.

The Memorandum also does not limit application of the Executive Order to funds related to immigration enforcement, as required to satisfy the nexus requirement. *See* PI Order at 38. The SAC alleges that the Funding Restriction imposes funding conditions that are not germane to the purpose of the funds. SAC ¶ 80. For DHS funds, the AG Memorandum does not limit the scope of funds in any way, and for DOJ funds, the Memorandum offers only vague assurances that conditions must be authorized by Congress. Yet both DHS and DOJ make grants unrelated to immigration enforcement.[12] Indeed, even some of the grants specifically identified by the AG Memorandum have nothing to do with immigration enforcement.[13]

Finally, the SAC alleges that the Funding Restriction induces state and local jurisdictions to violate the Fourth Amendment by requiring them to comply with detainers, which often lack probable cause. *See* SAC ¶¶ 48, 82. Yet the AG Memorandum offers no clarity on this point.

### c. The Funding Restriction Still Violates The Tenth Amendment.

In the PI Order, the Court held that "[t]he Executive Order's threat to pull all federal grants from jurisdictions that refuse to honor detainer requests or to bring 'enforcement action' against them

---

[12] For instance, DHS, via the Federal Emergency Management Agency ("FEMA"), administers grants to prepare against and provide relief from natural disasters such as earthquakes and fires. *See, e.g.*, RJN Exhs. M-O. In another example, DOJ's Office on Violence Against Women ("OVW") administers grants "designed to develop the nation's capacity to reduce domestic violence, dating violence, sexual assault, and stalking by strengthening services to victims and holding offenders accountable." *See* RJN Exh. P.

[13] *See, e.g.*, Office of Justice Programs, Bureau of Justice Assistance, "Edward Byrne Memorial Justice Assistance Grant Program," https://www.bja.gov/jag/ ("The JAG Program provides . . . critical funding necessary to support a range of program areas including law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections, drug treatment and enforcement, planning, evaluation, technology improvement, and crime victim and witness initiatives.") (RJN Exh. Q); Community Oriented Policing Services, "About," https://cops.usdoj.gov/about ("The COPS Office awards grants to hire community policing professionals, develop and test innovative policing strategies, and provide training and technical assistance . . . .") (RJN Exh. R).

---

violates the Tenth Amendment's prohibitions against commandeering." PI Order at 41. The AG

Memorandum purports to limit the funds at risk, but otherwise leaves fully in place this threat to

jurisdictions that do not comply with detainers. Because the AG Memorandum is silent with respect to

detainer requests it does not—and indeed cannot—clarify that federal funds will not be withheld from

jurisdictions that fail to comply with such requests. Accordingly, even as interpreted by the AG

Memorandum, the Executive Order continues to violate the Tenth Amendment by coercing state and

local jurisdictions to comply with detainer requests.

**IV.    Count Three States A Viable Claim That The Enforcement Directive Is Unconstitutional.**

Defendants' arguments regarding the enforcement provision are both addressed above. First,

the court has jurisdiction to hear San Francisco's claims as a pre-enforcement challenge, and

Defendants' 12(b)(1) argument to the contrary fails. *See* Section I(A), *supra*. Second, the Enforcement

Provision can be challenged even though it is an "internal directive," and Defendants' 12(b)(6)

argument to the contrary fails. *See* Section III(A), *supra*. Defendants offer no substantive challenge to

this Count, and have waived any other arguments to dismiss Count Three.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated: June 20, 2017

DENNIS J. HERRERA
City Attorney
RONALD FLYNN
JESSE C. SMITH
YVONNE R. MERÉ
CHRISTINE VAN AKEN
TARA STEELEY
MOLLIE M. LEE
SARA J. EISENBERG
MATTHEW S. LEE
NEHA GUPTA
Deputy City Attorneys

By: */s/ Mollie M. Lee*
MOLLIE M. LEE
Deputy City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO