DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
CHRISTINE VAN AKEN, State Bar #241755
TARA M. STEELEY, State Bar #231775
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
AILEEN M. McGRATH, State Bar #280846
MATTHEW S. LEE, State Bar #295247
NEHA GUPTA, State Bar #308864
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:      (415) 554-4748
Facsimile:      (415) 554-4715
E-Mail:         brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>        Plaintiff,<br><br>    vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, ELAINE C. DUKE, Acting Secretary of the United States Department of Homeland Security, JEFFERSON B. SESSIONS III, Attorney General of the United States, DOES 1-100,<br><br>        Defendants. | Case No. 3:17-cv-00485-WHO<br><br>**PLAINTIFF CITY AND COUNTY OF SAN FRANCISCO'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:  October 4, 2017<br>Time: 2:00 p.m.<br>Judge: Honorable William H. Orrick<br>Department: Courtroom 2, 17th Floor<br><br>Date Filed:  January 31, 2017<br>Trial Date:  April 23, 2018 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

NOTICE OF MOTION AND MOTION ......................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

INTRODUCTION ............................................................................................................ 1

LEGAL STANDARD ...................................................................................................... 2

BACKGROUND .............................................................................................................. 3

    I.      The Executive Order And Section 1373 ............................................................... 3

    II.     San Francisco's Irreparable Injury .................................................................... 5

    III.    Procedural History .............................................................................................. 7

    IV.    Continued Threats ............................................................................................... 8

ARGUMENT .................................................................................................................... 8

    I.      San Francisco Complies With Section 1373 ........................................................ 8

            A.      Section 1373 Imposes Narrow Obligations About Citizenship Or Immigration Status Information ................................................................. 9

            B.      San Francisco's Laws Comply with Section 1373. ................................. 10

    II.     The Executive Order Is Unconstitutional. ........................................................ 12

            A.      The Executive Order Violates Separation Of Powers Principles .............. 12

            B.      The Executive Order Violates The Spending Clause. .............................. 13

                  1.      The Funding Restriction Violates The Unambiguousness Requirement. ................................................................................ 13

                  2.      The Funding Restriction Is Not Reasonably Related To Congress's Purpose In Spending The Funds. ................................. 14

                  3.      The Funding Restriction Is Unduly Coercive. ............................... 16

                  4.      The Funding Restriction Seeks To Compel The States To Engage In Unconstitutional Conduct. ............................................ 17

                  5.      Congress Has Not Determined That Defunding Sanctuary Jurisdictions Promotes The General Welfare. ............................... 17

            C.      The Executive Order Violates The Tenth Amendment. ......................... 18

            D.      The AG Memorandum Does Not Narrow the Executive Order. .............. 20

                  1.      The AG Memorandum Is Not Binding Authority About The Executive Order. ................................................................... 20

                  2.      Even If The AG Memorandum Were Binding, It Would Not Alter The Plain Language Of The Executive Order Or Eliminate Its Coercive Force. ........................................................ 22

    III.    San Francisco Is Entitled To Declaratory And Injunctive Relief. ..................... 23

A.  Defendants Have Created An "Actual Controversy" That Entitles San Francisco To Declaratory Relief On All Counts...........................................23

B.  Defendants' Ongoing Threats, Together With The Balance Of Equities And Public Interest, Entitle San Francisco To A Permanent Injunction Of The Executive Order. ...........................................................................23

CONCLUSION......................................................................................................................25

### TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Haworth*
    300 U.S. 227 (1937)..............................................................................................23

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
    458 U.S. 592 (1982)..............................................................................................20

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)................................................................................................3

*Chevron, U.S.A., v. Natural Res. Def. Council, Inc.*
    467 U.S. 837 (1984)................................................................................................9

*City of Lakewood v. Plain Dealer Publ'g Co.*
    486 U.S. 750 (1988)..............................................................................................22

*Clinton v. City of New York*
    524 U.S. 417 (1998)..............................................................................................12

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*
    657 F.3d 936 (9th Cir. 2011) ...............................................................................22

*Delbon Radiology v. Turlock Diagnostic Ctr.*
    839 F. Supp. 1388 (E.D. Cal. 1993) ......................................................................3

*Doe v. Harris*
    772 F.3d 563 (9th Cir. 2014) ...............................................................................22

*eBay Inc. v. MercExchange, L.L.C.*
    547 U.S. 388 (2006)..............................................................................................24

*Env'tl Def. Ctr., Inc. v. U.S. E.P.A.*
    344 F.3d 832 (9th Cir. 2003) ...............................................................................18

*Galarza v. Szalczyk*
    745 F.3d 634 (3d Cir. 2014) .................................................................................19

*Gregory v. Ashcroft*
    501 U.S. 452 (1991)..............................................................................................10

*Knox v. Serv. Emps. Int'l Union*
    567 U.S. 298 (2012)..............................................................................................22

*LaCroix v. Junior*
    Case No. F17-376, 2017 WL 837477 (Fla Cir. Ct. Mar. 3, 2017)....................18, 19

*Lunn v. Commonwealth*
    78 N.E.3d 1143 (Mass. 2017) ................................................................................4

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*
  312 U.S. 270 (1941)..................................................................................................23

*Massachusetts v. U.S.*
  435 U.S. 444 (1978)..................................................................................................14

*Mayweathers v. Newland*
  314 F.3d 1062 (9th Cir. 2002) ..................................................................................15

*Melendres v. Arpaio*
  695 F.3d 990 (9th Cir. 2012) ....................................................................................25

*Miranda–Olivares v. Clackamas Cty.*
  No. 3:12-cv-02317-ST, 2014 WL 1414305 (D. Or. Apr. 11, 2014)....................17, 19

*Monsanto Co. v. Geertson Seed Farms*
  561 U.S. 139 (2010)..................................................................................................24

*Morales v. Chadbourne*
  793 F.3d 208 (1st Cir. 2015)......................................................................................17

*New York v. U.S.*
  505 U.S. 144 (1992).................................................................14, 15, 18, 19, 20

*Pennhurst State Sch. & Hospital v. Halderman*
  451 U.S. 1 (1981)................................................................................................10, 14

*Printz v. United States*
  521 U.S. 898 (1997)......................................................................................18, 19, 20

*Reno v. Condon*
  528 U.S. 141 (2000)..................................................................................................19

*Robinson v. Shell Oil Co.*
  519 U.S. 337 (1997)....................................................................................................9

*Rosenbaum v. Washoe County*
  663 F.3d 1071 (9th Cir. 2011) ..................................................................................17

*Rust v. Sullivan*
  500 U.S. 173 (1991)..................................................................................................10

*South Dakota v. Dole*
  483 U.S. 203 (1987)....................................................................................12, 13, 14, 17

*State Dep't of Pub. Health v. Superior Court*
  60 Cal. 4th 940 (2015)..............................................................................................11

*Steinle v. City and Cty. of San Francisco*
  230 F. Supp. 3d 994 (N.D. Cal. 2017) ........................................................................9

*Sturgeon v. Bratton*
 174 Cal. App. 4th 1407 (2009) ................................................................10

*Train v. City of New York*
 420 U.S. 35 (1975) ........................................................................................12

*Trujillo-Santoyo v. United States*
 No. 5:16-CV-855-OLG, 2017 WL 2896021 (W.D. Tex. June 5, 2017) ...............17

*United States v. North Carolina*
 192 F. Supp. 3d 620 (M.D.N.C. 2016) ......................................................24

*United States v. Nosal*
 676 F.3d 854 (9th Cir. 2012) ......................................................................22

*United States v. Stevens*
 559 U.S. 460 (2010) ....................................................................................22

*Western Watersheds Project v. Abbey*
 719 F.3d 1035 (9th Cir. 2013) ....................................................................21

*Whitman v. Am. Trucking Ass'ns*
 531 U.S. 457 (2001) ...............................................................................22, 23

*Winter v. Natural Res. Def. Council, Inc.*
 555 U.S. 7 (2008) ........................................................................................24

*Yates v. United States*
 135 S. Ct. 1074 (2015) ................................................................................11

*Youngstown Sheet & Tube Co. v. Sawyer*
 343 U.S. 579 (1952) ....................................................................................13

*Zivotofsky ex rel. Zivotofsky v. Kerry*
 135 S. Ct. 2076 (2015) ................................................................................13

**Federal Statutes**
8 U.S.C. § 1373 ........................................................................... *passim*

28 U.S.C. § 512 ............................................................................................21

28 U.S.C. § 2201 ..........................................................................................23

42 U.S.C. § 10602 ........................................................................................15

42 U.S.C. § 10603 ........................................................................................15

42 U.S.C. § 3752(5)(D) ..................................................................................6

**Federal Rules**
Fed. R. Civ. P. 25 ..........................................................................................2

Fed. R. Civ. P. 56 ................................................................................................2

**Federal Regulations**

28 C.F.R. § .25 ...............................................................................................21

8 C.F.R. § 287.7 .......................................................................................4, 19

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1............................................................................12

**State Statute**s

Cal. Civ. Code § 1798.92 ............................................................................. 11

Cal. Civ. Code § 56.05 ................................................................................. 11

**San Francisco Administrative Code**

S.F. Admin. Code § 12H ................................................................ 5, 10, 11, 12

S.F. Admin Code § 12H.2 ...................................................................... 10, 11

S.F. Admin. Code § 12I ............................................................... 5, 10, 12

S.F. Admin. Code § 12I.3 ......................................................... 5, 10, 12

**Other References**

Randolph Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*
    52 Admin. L. Rev. 1303 (2000) ............................................................21

Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) (as rejected by Senate, Jul. 6, 2016) ........................................................................................13

Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) (as rejected by Senate, Oct. 20, 2015)..........................................................13

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on Wednesday, October 4, 2017, at 2:00 p.m., or as soon thereafter as the matter can be heard, in Courtroom 2 on the 17th Floor of the United States District Court for the Northern District of California, in San Francisco, California, the Honorable William H. Orrick presiding, Plaintiff City and County of San Francisco will move for summary judgment or, in the alternative, partial summary judgment. San Francisco bases this motion on this Notice of Motion and Motion; the accompanying memorandum of points and authorities; the declarations and request for judicial notice, and the exhibits thereto; the records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

San Francisco respectfully requests that the Court enter judgment in its favor as to each of its claims for relief on the grounds that the undisputed evidence shows that: (1) San Francisco's laws comply with 8 U.S.C. § 1373, (2) the funding restriction in Executive Order 13,768 violates the United States Constitution's separation of powers principles, Spending Clause, and Tenth Amendment, and (3) the enforcement directive in Executive Order 13,768 violates the Tenth Amendment to the United States Constitution. In the alternative, San Francisco respectfully requests that the Court enter judgment as to those claims that the Court sees as fit for resolution at this time.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

San Francisco's lawmakers have determined that San Francisco is safer, healthier, and stronger when all of its residents—including undocumented immigrants—can use city services like public health programs and schools, and can report crimes and aid the police as witnesses, without fearing deportation. Accordingly, San Francisco's sanctuary laws limit its employees' assistance with federal immigration enforcement, leaving it to the federal government to implement its immigration laws.

This local policy choice offends President Trump and his Administration, which has persistently and perniciously sought to coerce San Francisco and other jurisdictions into abandoning their sanctuary laws. On his fifth day in office President Trump issued an Executive Order that directs

withholding federal funds from sanctuary cities and bringing enforcement actions against them, specifically targeting cities that the federal government determines do not comply with 8 U.S.C. § 1373 ("Section 1373"). And the threats have not abated. Throughout this litigation President Trump and his Administration have continued to threaten action under the Executive Order to coerce compliance with their demands—notwithstanding the Court's preliminary injunction order and an Attorney General memorandum purporting to limit implementation of the Executive Order.

The Trump Administration and Defendants have also tried to coerce local jurisdictions to enforce federal immigration policy by asserting an overly broad interpretation of Section 1373 that is unmoored from its text. This limited statute concerns only how local jurisdictions may regulate communications with ICE about individuals' immigration status, and says nothing at all about other kinds of local assistance with immigration enforcement. While the Court has not yet had the opportunity to consider San Francisco's claim that its laws comport with Section 1373, a definitive interpretation of Section 1373 as applied to San Francisco's sanctuary laws is an essential bulwark against the Administration's continued coercive efforts. So long as President Trump and his Administration perpetuate uncertainty about what Section 1373 requires—by, for example, suggesting that jurisdictions violate Section 1373 by not complying with immigration detainers or otherwise actively assisting ICE agents—then they can use threats to try to bully jurisdictions into submission.

To put an end to these unconstitutional threats and protect its legitimate local policy decisions, San Francisco moves for summary judgment and seeks declaratory relief and a permanent injunction against all Defendants.[1]

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477

---

[1] Elaine C. Duke became Acting Secretary of the Department of Homeland Security on July 31, 2017, thereby replacing former Secretary of the Department of Homeland Security John F. Kelly as a Defendant, pursuant to Fed. R. Civ. P. 25(d).

U.S. 317, 323–24 (1986). Here, there are no disputed facts related to San Francisco's claims, and those claims present pure questions of law that are appropriate and ripe for the entry of judgment. *See Delbon Radiology v. Turlock Diagnostic Ctr.*, 839 F. Supp. 1388, 1391 (E.D. Cal. 1993).

## BACKGROUND

### I.    The Executive Order And Section 1373

On January 25, 2017, President Trump issued Executive Order 13,768, titled "Enhancing Public Safety in the Interior of the United States." *See* Request for Judicial Notice in Support of Mot. for Summary Judgment, or in the Alternative, Partial Summary Judgment ("RJN") Exh. A ("Executive Order"). The Executive Order carried out President Trump's longstanding vow to put an "end" to sanctuary cities by ensuring that "[c]ities that refuse to cooperate with federal authorities will not receive taxpayer dollars." RJN Exh. B at 3; *see also* RJN Exh. C at 2. The Executive Order states that "[s]anctuary jurisdictions across the United States willfully violate Federal law," Executive Order § 1, and announces an Executive Branch policy to "[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law," *id.* § 2. To that end, Section 9(a) of the Executive Order contains a Funding Restriction stating:

> [T]he Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

Section 9(a) also contains an Enforcement Directive instructing that "[t]he Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law."

President Trump tethered his Executive Order to Section 1373, which provides that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual," or from "maintaining such information." In the Executive Order and elsewhere, Defendants have indicated an expansive view of Section 1373. Section 9(a) of the Executive Order defines "sanctuary jurisdictions" as those that "willfully refuse to

comply with 8 U.S.C. 1373," and Section 9(b) equates sanctuary jurisdictions with those listed on Immigration and Customs Enforcement ("ICE") Declined Detainer Outcome Reports.[2] The White House has characterized sanctuary cities as violating Section 1373 and criticized "[s]anctuary cities, like San Francisco" for "block[ing] their jails from turning over criminal aliens to Federal authorities for deportation." RJN Exh. E at 1. The Department of Justice specifically linked Section 1373 to ICE detainers in a 2016 Office of the Inspector General memorandum that analyzed ten jurisdictions' compliance with Section 1373 and stated that detainer policies "may be causing local officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE in all respects . . . [which], of course, would be inconsistent with and prohibited by Section 1373." RJN Exh. F at 8. And in recent congressional hearings, ICE Director Thomas Homan testified that over 100 additional jurisdictions violated Section 1373 under the Executive Order because they "have some sort of policy where they don't honor detainers or allow us access to the jails."[3] RJN Exh. G at 34.

The Executive Order threatens enforcement action and massive funding cuts for jurisdictions that do not comply with Section 1373. The plain language of the Executive Order, as well as Defendants' own statements, indicate that the Funding Restriction applies to *all* current and future federal funds, or at least to all current and future federal grants. *See* Executive Order § 2(c) (referring to "Federal funds"); *id.* § 9(c) (referring to "all Federal grant money that currently is received by any sanctuary jurisdiction"). The press statement announcing the Executive Order declared: "We are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The

---

[2] ICE detainers are requests by ICE that a state or local law enforcement agency voluntarily hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them. *See* 8 C.F.R. § 287.7. ICE's Declined Detainer Outcome Report lists jurisdictions that "Restrict Cooperation with ICE," RJN Exh. D at 10, and identifies detention centers with the "highest volume of detainers issued" that "do not comply with detainers on a routine basis," *id.* at 2.

[3] This contrasts with Defendants' representation in certain court papers, where they appear to concede that "8 U.S.C. § 1373 relates only to the sharing of information," Reply ISO Defs' Motion to Dismiss at p. 8 (internal punctuation omitted), and "that compliance by State authorities with immigration detainers is voluntary, not mandatory," *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1152 (Mass. 2017). These shifting interpretations in court and outside court—coupled with Defendants' steadfast refusal to admit that San Francisco complies with Section 1373—leave San Francisco in need of a court order clarifying the scope of Section 1373.

American people are no longer going to have to be forced to subsidize this disregard for our laws." RJN ¶ 8. President Trump described "defunding" as a "weapon" that could deprive sanctuary cities of "the money they need to properly operate as a city or a state." RJN Exh. H at 4. And Attorney General Sessions stated that the Department of Justice would "take all lawful steps to claw-back any funds awarded to a jurisdiction that willfully violates Section 1373." RJN Exh. I at 2.[4]

Through these threats, President Trump used the Executive Order to coerce some jurisdictions into abandoning their sanctuary policies and complying with detainer requests. For instance, the day after the President issued the Executive Order, Miami-Dade County Mayor Carlos Giménez instructed the county's interim corrections director to "fully cooperate" with the federal government and comply with all immigration detainer requests, changing its previous policy of not complying with detainers unless reimbursed by the federal government. *See* RJN Exh. J. The White House responded by praising Miami-Dade County for "understanding the importance of this order," RJN Exh. K at 4, and the Attorney General held a press conference there announcing "that Miami-Dade is now in full compliance and eligible for federal law enforcement grant dollars." RJN Exh. L at 1.

## II.      San Francisco's Irreparable Injury

San Francisco has had sanctuary laws in place for nearly three decades. Those laws were most recently amended in July 2016, and are currently codified in two chapters of the Administrative Code: Chapters 12H and 12I. Chapter 12H prohibits San Francisco departments, agencies, officers, and employees from using San Francisco funds or resources to assist in enforcing federal immigration law or to gather or disseminate information regarding an individual's release status, or other confidential identifying information, unless such assistance is required by federal or state law. Chapter 12I prohibits San Francisco law enforcement officials from detaining an individual, otherwise eligible for release from custody, solely on the basis of a civil detainer request. S.F. Admin. Code § 12I.3. It further provides that law enforcement officers shall not provide ICE with advance notice that an individual will be released from custody, unless the individual meets certain criteria. *Id.*

---

[4] As the Court is aware, Defendants offered a narrower construction of the Executive Order in an Attorney General Memorandum issued during the course of this litigation. RJN Exh. S. As discussed further in Section III, *infra*, this construction should not be credited.

San Francisco relies on federal funds for critical programs and services. In the 2016–17 fiscal year, San Francisco's annual operating budget included $1.2 billion in federal funds, or 13 percent of the total budget. *See* Declaration of Ben Rosenfeld in Support of CCSF's Mot. for Summary Judgment ("Rosenfield Decl.") ¶ 10. San Francisco also receives approximately $800 million in federal multi-year grants that are not reflected in the annual budget. *Id.* ¶ 13. In total, San Francisco expects to receive approximately one billion dollars in federal grants ($200 million in annual federal grants plus $800 million in multi-year federal grants) and another one billion dollars in annual entitlement payments from the federal government. Rosenfield Decl. ¶ 51. San Francisco uses these federal funds to pay for core services including medical care and social services for its most vulnerable residents, *id.* ¶ 11; public infrastructure projects such as bridges, roads, and public transportation, *id.* ¶ 13; and public safety programs, *id.* ¶ 33–35. Losing substantial federal funding would have catastrophic effects on critical programs: Federal funding accounts for 100 percent of the City's Medicare funding, *id.* ¶ 42; almost 40 percent of the budget for the City's Department of Public Health, *id.* ¶ 26; approximately 33 percent of the budget for San Francisco's Human Services Agency, *id.* ¶ 20; and nearly 30 percent of the budget for San Francisco's Department of Emergency Management, *id.* ¶ 31. The Executive Order thus creates extreme pressure for San Francisco to change its laws in order to remain eligible for federal funds.

Additionally, as a recipient of certain federal grants, San Francisco must certify under penalty of perjury that it complies with Section 1373.[5] San Francisco has taken steps to ensure compliance with Section 1373, and believes that it complies, but Defendants' shifting interpretations of Section 1373 give San Francisco pause in making this certification. The Executive Order defines sanctuary jurisdictions as those that willfully violate Section 1373, and Defendants "hold up San Francisco as an exemplar of a sanctuary jurisdiction." Order Granting Motion to Enjoin Section 9(a) of Executive

---

[5] For instance, San Francisco receives funding under the Edward Byrne Memorial Justice Assistance Grant Program ("JAG"). Rosenfield Decl. ¶ 33. JAG grant recipients are required to certify compliance with applicable federal statutes, see 42 U.S.C. § 3752(5)(D), and in 2016, DOJ issued guidance stating that Section 1373 is an applicable federal law. RJN Exh. M and N. In 2017, DOJ announced a specific 1373 compliance condition, with detailed requirements and an additional certification of compliance with Section 1373 that must be signed under penalty of perjury by a jurisdiction's chief legal officer (*e.g.*, the Attorney General or City Attorney). RJN Exh. O and P.

1   Order 13768 (Dkt. No. 82) ("PI Order") at 26, *see generally id.* at 22-27. The Attorney General has

2   specifically criticized San Francisco for its "sanctuary policies," suggested that these policies "violate

3   federal law," and argued that "this disregard for the law must end." RJN Exh. I at 2. Representative

4   John Culberson—the self-proclaimed "CFO of the Department of Justice," RJN Exh. Q at 6, who

5   chairs the House of Representatives subcommittee that controls DOJ spending—classifies San

6   Francisco as a sanctuary city and claims that sanctuary cities "violate a federal law enacted in 1996 [8

7   U.S.C. § 1373] to ensure total cooperation between local, state and federal agencies." RJN Exh. R at 5.

8   The Department of Justice itself issued a memorandum that identifies San Francisco as having laws

9   that could run afoul of Section 1373. RJN Exh. F at 6 n.7.

10  **III.   Procedural History**

11          The Executive Order poses a grave threat to San Francisco, whose sanctuary city policies

12  comply with Section 1373, but not with Defendants' strained interpretation of this section. In response

13  to this threat, San Francisco filed suit on January 31, 2017. San Francisco's Second Amended

14  Complaint ("SAC") raises three claims. First, the SAC seeks declaratory relief that San Francisco's

15  sanctuary laws comply with Section 1373. SAC ¶¶ 144-48. Second, the SAC claims that the Executive

16  Order's Funding Restriction violates the U.S. Constitution's Tenth Amendment, Spending Clause, and

17  separation of powers structure. SAC ¶¶ 149-53. Third, the SAC alleges that the Executive Order's

18  Enforcement Directive violates the Tenth Amendment. SAC ¶¶ 154-57.

19          Shortly after filing its complaint, San Francisco moved for a preliminary injunction, which the

20  Court granted on April 25, 2017. *See* PI Order (Dkt. 82). One month later, the Attorney General

21  published a two-page Memorandum to Grant-Making Components of the Department of Justice ("AG

22  Memorandum"), which purported to narrow application of the Executive Order. *See* RJN Exh. S.

23  Defendants moved for reconsideration of the PI Order and for dismissal of the case based in large part

24  on the AG Memorandum. *See* Dkt. Nos. 107, 111. The Court rejected this effort and denied both

25  motions. *See* Order Denying the Government's Motions for Reconsideration and to Dismiss with

26  Regards to the City and County of San Francisco and County of Santa Clara (Dkt. No. 146) ("Recon.

27  Order"). While Defendants characterized the AG Memorandum as "binding" and "authoritative,"

28  Defs' Motion to Dismiss (Dkt. No. 111) at 2, this Court found it to be nothing of the sort. The Court

"conclude[d] that the AG Memorandum is functionally an 'illusory promise' to enforce the Executive Order narrowly and, as such, does not resolve the constitutional claims that the Counties have brought based on the Order's language." Recon. Order at 13-14. Ultimately, as the Court recognized, the AG Memorandum leaves Defendants perfectly free to continue to implement the Executive Order according to its plain language, and to strip federal funding from jurisdictions like San Francisco.

## IV.     Continued Threats

Indeed, the Administration's recent statements confirm that it will continue to threaten San Francisco and other sanctuary cities with exactly these consequences. On June 28, 2017, President Trump reiterated his plan to "end[] the practice of sanctuary cities that refuse to turn over criminal illegal aliens to Federal authorities." RJN Exh. B at 2. On July 12, 2017, the Attorney General once again criticized San Francisco for having sanctuary city policies, which he described as a "refus[al] to cooperate with federal immigration authorities regarding illegal aliens who commit crimes." RJN Exh. T at 2. And on August 16, 2017, the White House issued a "Fact Sheet" titled "Donald J. Trump and Attorney General Sessions Stand Up Against Lawless Sanctuary Cities." RJN Exh. U. The Fact Sheet characterizes sanctuary cities as "lawless" and states that "[o]ne of President Trump's first Executive Orders informed sanctuary cities that failure to fully abide by Federal immigration laws would jeopardize their access to certain Federal grant money." *Id*. at 2. The "Fact Sheet" fails to mention that this part of the Executive Order is enjoined, and instead suggests that the Attorney General is enforcing the Executive Order, with a sub-bullet point stating that "[l]ast month, DOJ laid out new guidelines requiring jurisdictions to cooperate with Federal immigration authorities in order to receive Edward Byrne Memorial Justice Assistance Grants, a leading source of Federal law enforcement funding." *Id*. These statements maintain the coercive threat of the Executive Order—and Defendants' broad interpretation of Section 1373—notwithstanding the narrower interpretations Defendants have at times expressed in court and in the AG Memorandum.

## ARGUMENT

## I.     San Francisco Complies With Section 1373.

Defendants seek to compel assistance with federal immigration enforcement by imposing Section 1373 compliance conditions on an increasing number of federal grants, while maintaining a

cloud of uncertainty about Section 1373's scope. This puts San Francisco and other jurisdictions in an

untenable position. Defendants concede that whether San Francisco complies with Section 1373 is a

purely legal question, but steadfastly refuse to admit what is clear from the text of San Francisco's

sanctuary city laws: these laws comply with Section 1373. Defs. Answer (Dkt. No. 152) ¶ 38.

A.      **Section 1373 Imposes Narrow Obligations About Citizenship Or Immigration Status Information.**

The plain text of Section 1373 imposes specific and narrow obligations. It requires that San

Francisco "not prohibit, or in any way restrict" any of its departments or officials from "sending to, or

receiving from, the Immigration and Naturalization Service information regarding the citizenship or

immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), "maintaining such

information," *id.* § 1373(b), or "exchanging such information with any other Federal, State, or local

government entity," *id.* Because San Francisco's laws create no such prohibitions or restrictions, they

are consistent with Section 1373.

By its plain terms, Section 1373 does not address any information other than citizenship or

immigration status, nor does it impose any other obligations. It does not require state or local

governments to collect citizenship or immigration status information. RJN Exh. M at 1. It does not

require them to take any action when they receive such information. *Id.* And it does not require them

to comply with detainer requests. *See* Reply ISO Defs' Motion to Dismiss at 7-8.

Because Section 1373's text shows that it addresses only prohibitions or restrictions on

exchanging citizenship or immigration status information, or maintaining this information, this Court

need look no further in interpreting Section 1373. *Chevron, U.S.A., v. Natural Res. Def. Council, Inc.*,

467 U.S. 837, 842-44 (1984); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our

inquiry must cease if the statutory language is unambiguous . . . ."). Indeed, other cases construing

Section 1373 have found that its plain text cabins its reach. For instance, *Steinle v. City and County of

San Francisco*, 230 F. Supp. 3d 994 (N.D. Cal. 2017), held that "no plausible reading of 'information

regarding . . . citizenship or immigration status' encompasses the release date of an undocumented

inmate." *Id.* at 1015. Further, if Congress "had intended to bar *all* restriction of communication

between local law enforcement and federal immigration authorities . . . it could have included such

language in the statute." *Id.* Similarly, the California Court of Appeal held that Section 1373 governs "only communications with ICE." *Sturgeon v. Bratton*, 174 Cal. App. 4th 1407, 1421 (2009). The court rejected the argument that Section 1373 imposes additional prohibitions, namely, "restrictions on local entities *obtaining* . . . [immigration] information." *Id.* (emphasis in original).

Although Section 1373's statutory language contains no ambiguity, Defendants have at times advanced a broader construction that would require local jurisdictions to respond to ICE detainer or notification requests. *See* pp. 3–4, *supra*. But to read Section 1373 so broadly would raise serious constitutional concerns. As this Court has observed, treating detainer requests as mandatory "violates the Tenth Amendment's provisions against conscription." PI Order at 40. And as described more fully below, the Tenth Amendment precludes the federal government from compelling state and local government agencies to enforce federal law. *See* pp. 18–20, *infra*. Accordingly, even if Section 1373 were ambiguous as to whether it imposes affirmative obligations on localities—and it is not—the established principle of constitutional avoidance would require that Section 1373 be construed narrowly, in accordance with its plain text, to avoid these concerns. *See Rust v. Sullivan*, 500 U.S. 173, 191 (1991). Because a broader interpretation would raise serious constitutional questions, at a minimum, the constitutional avoidance doctrine must apply. *Id.*; *see also Gregory v. Ashcroft*, 501 U.S. 452, 469 (1991) (declining to interpret statute in a way that might "intrude[] on traditional state authority" (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16 (1981))).

**B.  San Francisco's Laws Comply with Section 1373.**

The plain text of San Francisco's sanctuary laws imposes other restrictions, but allows the communications that Section 1373 addresses. Chapter 12H generally forbids use of City resources to "assist in the enforcement of Federal immigration law" and specifically prohibits using City resources to "gather or disseminate information regarding release status of individuals or any other such personal information." S.F. Admin. Code § 12H.2. Chapter 12I prohibits responding to civil immigration detainer requests from federal immigration officials and provides that San Francisco employees may only respond to requests for notification of release status in certain circumstances. *Id.* § 12I.3.

These terms comply with Section 1373 because they do not prohibit, or in any way restrict, San Francisco employees from communicating information related to citizenship or immigration status.

Nor do they prohibit maintaining this information. Rather, Chapter 12H restricts San Francisco employees from "disseminat[ing] information regarding *release status* of any individual *or any other such personal information*" unless required to do so by federal law. S.F. Admin. Code § 12H.2 (emphases added).[6] Neither "release status" nor "personal information" is information about "immigration" or "citizenship status" under Section 1373. "Release status" refers to whether an individual is in law enforcement custody—a status unrelated to immigration status. And "personal information" means "any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family emergency contact information." This does not include more general descriptors such as citizenship or immigration status, which cannot be used to identify or contact an individual. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (relying "on the principle of *noscitur a sociis*—a word is known by the company it keeps").[7]

To the extent there could be any ambiguity about the meaning of "release status or any other such personal information," the legislative history of Chapter 12H confirms that this phrase does not mean an individual's immigration status. Chapter 12H previously prohibited sharing information about "immigration status," but that prohibition was amended in July 2016 to*, inter alia*, ensure compliance with Section 1373. The 2016 amendments replaced "immigration status" with "release status and other such personal information," and the current text *allows* employees to share information about an individual's citizenship or immigration status. Indeed, San Francisco explicitly advised all employees about their ability to share information about an individual's citizenship or immigration status information in a January 2017 memorandum from the Director of the San Francisco Department of

---

[6] Chapter 12H's general prohibition against "using City funds or resources to assist in the enforcement of Federal immigration law" does not prohibit employees from sharing immigration information with ICE. The more specific language about "release status" and other "personal information" controls over this general language. *See, e.g.*, *State Dep't of Pub. Health v. Superior Court*, 60 Cal. 4th 940, 960 (2015). And even if the language were ambiguous, the Board of Supervisors' 2016 amendments, discussed below, show a clear intent to allow the communications Section 1373 requires. *See* pp. 11–12, *infra*.

[7] Similar definitions of "personal" and "confidential, identifying information" in other laws confirm that these terms do not include an individual's citizenship or immigration status. For instance, California law uses these terms to refer to information that should be protected because it can reveal a person's identity. *See, e.g.*, Cal. Civ. Code § 56.05(j) (defining "personal identifying information" to include a patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the individual's identity"); *id.* § 1798.92(c) (providing a similar definition).

Human Resources. RJN Exh. V. The memorandum summarized the requirements of Chapters 12H and 12I but also reminded San Francisco employees that "federal law states that a 'local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual (8 U.S.C. § 1373)." *Id*. at 1.

Chapter 12I, similarly, does not restrict or prohibit sharing immigration-related information with the federal government. Rather, Chapter 12I is directed to ICE detainer and notification requests, and limits the circumstances in which San Francisco officials may respond to these requests. S.F. Admin. Code § 12I.3. This Chapter reflects San Francisco's considered judgment that these requests threaten community stability and strain San Francisco's resources. *See* pp. 19–20, *infra*. But the provision does not prohibit any San Francisco officer or employee from communicating an individual's immigration or citizenship status. And under the only permissible reading of Section 1373, *see* p. 10, *supra*, San Francisco's restrictions on carrying out detainer requests do not "in any way restrict" the sharing of immigration-related information with ICE.

## II. The Executive Order Is Unconstitutional.

### A. The Executive Order Violates Separation Of Powers Principles.

By declaring "sanctuary jurisdictions" ineligible to receive federal grants, the Executive Order violates fundamental separation of powers principles. The Constitution grants *Congress*—not the President—the federal spending power, including the power to impose conditions on federal funds. *See* U.S. Const. art. I, § 8, cl. 1; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Incident to [the spending power], *Congress* may attach conditions on the receipt of federal funds . . . .") (emphasis added). While the President may veto an appropriations bill in its entirety, the President may not amend, repeal, or alter the terms of Congressional appropriations. *Clinton v. City of New York,* 524 U.S. 417, 438 (1998). Nor may the President withhold funds that Congress has appropriated. Indeed, "[w]here Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligations to faithfully execute the laws duly enacted by Congress if he does so." PI Order at 36 (citing *City of New York*, 524 U.S. at 439; U.S. Const. art. I, § 8, cl. 1.); *see also Train v. City of New York*, 420 U.S. 35, 41 (1975) (holding

Administrator of Environmental Protection Agency violated the Constitution by declining to allot to the states the entire amount Congress appropriated).

Here, there can be no question that the Executive Order violates these constitutional principles by purporting to give the Attorney General and the Secretary the power to condition receipt of federal funds on compliance with Section 1373. Executive Order § 9(a). Congress has not specifically conditioned the receipt of *any* federal funds on compliance with Section 1373, or delegated to the Executive Branch the authority to impose an eligibility requirement based on Section 1373. To the contrary, Congress has repeatedly *rejected* legislation that would defund or impose funding restrictions on sanctuary jurisdictions. *See, e.g.*, Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) (as rejected by Senate, Jul. 6, 2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) (as rejected by Senate, Oct. 20, 2015). Thus, the Executive Order seeks to take measures "incompatible with the expressed or implied will of Congress," leaving the President's power "at its lowest ebb . . . ." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). In these situations, the President can act only when the executive's power is "exclusive" and "conclusive." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2084 (2015). Because the President does not have the spending power—let alone any "exclusive" or "conclusive" power over federal spending – the Executive Order's Funding Restriction is unconstitutional.

### B.      The Executive Order Violates The Spending Clause.

The Executive Order is also unconstitutional because it purports to exercise the spending power in ways that even Congress could not. Congress's spending power is not unlimited. *Dole*, 483 U.S. at 207. Rather, the Constitution provides that Congress may enact spending conditions that (1) are unambiguous and clearly stated in advance, (2) relate to Congress's purpose in spending the funds, (3) are not unduly coercive, (4) do not compel local governments to engage in unconstitutional conduct, and (5) promote the general welfare. *Id.* at 207–08. Violating any one of these requirements would render the Funding Restriction unconstitutional. *Id.* Here, the Funding Restriction violates all of them.

### 1.      The Funding Restriction Violates The Unambiguousness Requirement.

The Funding Restriction fails because it imposes a new funding condition without stating that condition unambiguously and in advance so that states and local jurisdictions can "exercise their

choice" about whether to accept the funds "knowingly, cognizant of their participation." *Dole*, 483 U.S. at 203 (internal quotation marks omitted); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2602-04 (2012) ("*Sebelius*"); *Pennhurst*, 451 U.S. at 17 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.") "[L]egislation enacted pursuant to the spending power is much in the nature of a contract." *Pennhurst*, 451 U.S. at 17. Thus, "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" Congress's terms. *Id.*

Here, San Francisco could not "voluntarily and knowingly" accept the terms set forth in the Executive Order for two reasons. First, the Funding Restriction is far from unambiguous. As this Court recognized, "because the Order does not clearly define 'sanctuary jurisdictions,' the conduct that will subject a jurisdiction to defunding under the Order is not fully outlined." PI Order at 42. Even the government officials charged with enforcing the Executive Order cannot explain what jurisdictions need to do to avoid defunding. *See* RJN Exh. W at 17 (former DHS Secretary Kelly stating, with respect to the meaning of "sanctuary cities," "[f]rankly, I don't really know what it means. I don't think anyone out there knows what it means . . ."); PI Order at 42 (noting that former DHS Secretary Kelly "stated that he does not 'have a clue' how to define 'sanctuary city'").

Second, the Executive Order seeks to impose a retroactive funding restriction that did not exist when San Francisco agreed to accept the federal funds it is currently slated to receive. San Francisco could not have knowingly accepted the Executive Order's funding condition when it was "unaware of the condition[]" when it accepted the grants and to this day remains "unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17. The "unclear and untimely conditions in the Executive Order" violate the Constitution's limits on the spending power. PI Order at 38.

### 2. The Funding Restriction Is Not Reasonably Related To Congress's Purpose In Spending The Funds.

The Funding Restriction also violates the requirement that conditions imposed on federal grants must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992); *see also Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (holding that

the "Federal Government . . . may require that state instrumentalities comply with conditions that are reasonably related to the federal interest in particular national projects or programs").[8]

Here there is no reasonable relationship between funds threatened by the Executive Order and San Francisco's compliance with Section 1373. The vast majority of federal funds received by San Francisco each year are used to provide critical benefits and services to some of San Francisco's most needy residents through programs such as Medicare, Medicaid, Temporary Assistance to Needy Families, and Supplemental Nutrition Assistance Programs. *See* Rosenfield Decl. ¶ 42. There is no conceivable relationship between these entitlement programs and immigration enforcement. Indeed, undocumented persons are not even eligible to participate in most of these programs. *Id*. Similarly, of the approximately $800 million that San Francisco receives in multi-year grants, most goes to capital projects such as building bridges and public transportation, *see* Rosenfield Decl. ¶ 13—projects that have no relationship to the immigration enforcement goals of Section 1373.

Even grants administered by DHS and the Department of Justice ("DOJ") usually have no relationship to immigration enforcement. For instance, under the authority of DHS, the Federal Emergency Management Agency ("FEMA") provides billions of dollars in funding to provide relief from disasters such as earthquakes and fires, and to help local governments develop emergency preparedness systems. *See* RJN Exh. X. DOJ's Office on Violence Against Women provides grant funding "designed to develop the nation's capacity to reduce domestic violence, dating violence, sexual assault, and stalking by strengthening services to victims and holding offenders accountable." RJN Exh. Y at 1. Likewise, DOJ administers billions of dollars in grant funding under the Victims of Crime Act to help local governments provide compensation and services to victims of child abuse, sexual assault, domestic violence, or other crimes. *See* 42 U.S.C. §§ 10602(b), 10603(b). None of these programs is "reasonably related" to the funding restriction the Executive Order seeks to impose.

---

[8] Relying on *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002), Defendants have asserted that the nexus factor is not a "requirement." But the Supreme Court itself has noted that the "reasonable relationship" standard exists "among other *requirements*" that limit Congress's ability to exercise its spending power. *New York v. United States*, 505 U.S. 144, 167 (1992) (emphasis added). Indeed, the nexus requirement is particularly important because, without it, "the spending power could render academic the Constitution's other grants and limits of federal authority." *Id.*

### 3.    The Funding Restriction Is Unduly Coercive.

While the federal government "may use its spending power to create incentives for States," the spending power may not be used to "exert a power akin to undue influence." *Sebelius*, 132 S. Ct. at 2602 (opinion of Roberts, C.J.) (internal quotation marks omitted). Thus, when "pressure turns into compulsion, the legislation runs contrary to our system of federalism." *Id.*

The Funding Restriction crosses that line by threatening a substantial percentage of San Francisco's budget, and a large portion of the funding stream for certain programs and services. Federal funds constitute approximately 13 percent of the City's total annual operating budget, and an additional $800 million in federal multi-year grants. Rosenfield Decl. ¶¶ 10, 13. Threatened funds include 100 percent of funding for certain programs, such as Medicare, that are critical to the lives of San Francisco's residents. Rosenfield Decl. ¶ 29. Federal funds constitute approximately 30 percent of the budget for San Francisco's Department of Emergency Management, *id*. ¶¶ 25–27, 33 percent of the budget for San Francisco's Human Services Agency, *id*. ¶¶ 13–18, and nearly 40 percent of the budget for San Francisco's Department of Public Health ("DPH"), *id*. ¶¶ 19–24, to name just a few examples. San Francisco simply cannot make up for this loss with local revenue sources. *Id.* ¶¶ 36–37. Indeed, the Funding Restriction could implicate $2 billion in funds that San Francisco expects to receive—and in many cases, has already spent. *Id.* ¶¶ 11, 34.

It would be catastrophic for San Francisco to lose all—or a substantial amount of—federal funds threatened by the Executive Order. *Id.* ¶ 36; Declaration of Melissa Whitehouse in Support of CCSF's Mot. for Summary Judgement ("Whitehouse Decl.") ¶ 16-17. Thus, a threat of this magnitude "crosse[s] the line distinguishing encouragement from coercion." *Sebelius*, 132 S. Ct. at 2603 (opinion of Roberts, C.J.). In *Sebelius*, the impending loss of over 10 percent of a state's budget was deemed "economic dragooning that leaves the States with no real option but to acquiesce." *Id*. at 2605. Here, the Funding Restriction threatens over 13 percent of San Francisco's budget, plus an additional $800 million in off-budget grants. As in *Sebelius*, the Funding Restriction "is much more than 'relatively mild encouragement'—it is a gun to the head." *Id*. at 2604.

4. **The Funding Restriction Seeks To Compel The States To Engage In Unconstitutional Conduct.**

Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole,* 483 U.S. at 210. The Executive Order does exactly that by threatening to withdraw federal funds from "sanctuary jurisdictions," which the Attorney General equates with jurisdictions that refuse to comply with all ICE detainer requests. *See* pp. 3–4, *supra.*

"It is well established that an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (internal quotation marks omitted). Because ICE detainer requests need not—and often do not—establish probable cause for a local jurisdiction to detain an individual, to "blindly honor" these requests risk violating the Fourth Amendment rights of detainees. *Morales v. Chadbourne*, 793 F.3d 208, 215–217 (1st Cir. 2015); *see also Miranda-Olivares v. Clackamas Cty.*, No. 3:12-cv-02317-ST, 2014 WL 1414305, at *9–11 (D. Or. Apr. 11, 2014). Thus, the Funding Restriction seeks to compel jurisdictions to adopt policies that violate—or at least show deliberate indifference to—Fourth Amendment rights. *See Trujillo-Santoyo v. United States*, No. 5:16-cv-855-OLG, 2017 WL 2896021, at *13 (W.D. Tex. June 5, 2017) (holding county's policy of "honoring ICE detainer requests and of assuming the existence of probable cause based on the existence of a detainer request" constitutes "deliberate indifference" to constitutional rights sufficient to establish municipal liability).

5. **Congress Has Not Determined That Defunding Sanctuary Jurisdictions Promotes The General Welfare.**

Finally, the Funding Restriction fails because Defendants cannot establish that the Funding Restriction promotes the General Welfare. "In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress." *Dole*, 483 U.S. at 207. Congress has repeatedly rejected attempts to defund sanctuary jurisdictions or condition receipt of federal funds on compliance with Section 1373. *See* p. 13, *supra*. The President cannot impose funding restrictions that are contrary to the will of Congress. Although the President disagrees with Congress's policy choice, decisions about whether spending promotes the general welfare appropriately rest with Congress—not the President. *Dole*, 483 U.S. at 207.

### C.     The Executive Order Violates The Tenth Amendment.

The Executive Order also offends the Tenth Amendment's guarantee that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[9] The Tenth Amendment embodies the basic principle that the "Federal Government may not compel the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188. But that is the very purpose of the Executive Order. As described above, the Funding Restriction puts a "gun to the head" of state governments by threatening to withhold billions of dollars in federal funding. *See* p. 16, *supra*.; *see also LaCroix v. Junior*, Case No. F17-376, 2017 WL 837477, at *5 (Fla. Cir. Ct. Mar. 3, 2017) ("[C]oercion achieved by financial starvation is no less effective than coercion achieved at sword's point. The former may take a little longer than the latter; but it may be more painful too."). The Enforcement Provision is similarly coercive, threatening unspecified "enforcement action" against any jurisdiction that the Attorney General deems to be in violation of Section 1373, or which "has in effect a statute, policy, or practice that prevents or hinders the enforcement of federal law." Executive Order § 9(a). Through these threats of defunding and enforcement action, the Executive Order coerces state and local governments to change their sanctuary policies, thereby impermissibly "forcing the States to submit to another federal instruction," *New York*, 505 U.S. at 176, and commandeering local officials to administer federal immigration law, *see Printz v. United States*, 521 U.S. 898, 935 (1997).

This commandeering is particularly stark in the context of detainers, although it also exists in other applications of the Executive Order.[10] The Executive Order coerces local jurisdictions to comply with civil detainer requests by threatening the withdrawal of federal funding or another unspecified

---

[9] Local governments are treated the same as state governments for purposes of the Tenth Amendment. *Printz v. United States*, 521 U.S. 898, 931 n.15 (1997); *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 847 (9th Cir. 2003).

[10] The Administration has suggested that local governments must take other steps to administer federal immigration law, such as providing ICE access to jails and informing personnel about the content of Section 1373. *See* pp. 3–4, *supra*; *see also* RJN Exh. M at 1 ("Your personnel must be informed that . . . federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials.").

form of punishment if they do not comply. *See* pp. 3–4, *supra*; *see also* RJN Exh. I at 1 (providing that the failure to honor civil detainer requests is a policy that "frustrate[s] th[e] enforcement of immigration laws"). Put simply, the Executive Order seeks to turn detainer "requests" into detainer demands, in violation of the Tenth Amendment. *Galarza v. Szalczyk*, 745 F.3d 634, 643-45 (3d Cir. 2014) (holding that ICE detainer requests cannot be mandatory and create no obligation on the part of state or local officials to take any action); *Miranda-Olivares*, 2014 WL 1414305, at *9–11 (same); *LaCroix*, 2017 WL 837477, at *10 (Fla. Cir. Ct. Mar. 3, 2017) (same). "The Federal Government may . . . no[t] command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935. Compliance with detainers would demand far more of state and local officials than the background checks at issue in *Printz*. Whereas the Brady Act provision required no affirmative action by state and local officials beyond making "reasonable efforts" to determine the legality of a handgun sale, compliance with ICE detainer requests would require local personnel to commit significant resources to jail their residents—in their own facilities and at their own cost—on civil immigration grounds at the federal government's direction. *See* Declaration of Sheriff Vicki Hennessy in Support of CCSF's Mot. for Summary Judgment and Declaration of Lieutenant James Quanico in Support of CCSF's Mot. for Summary Judgment; *see also* 8 C.F.R. § 287.7(e) (providing that "[n]o detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the Department").

But even if the Executive Order did not conscript local officials to serve federal interests, it would still violate the Tenth Amendment. The Tenth Amendment not only prohibits circumstances like that at issue in *Printz*, where local officials are enlisted into the service of a federal regulatory scheme; it also forbids the federal government from "requir[ing] the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162. Under the Tenth Amendment, the federal government may require states to comply with generally applicable laws, but it may not regulate states "in their sovereign capacity" by compelling them to legislate in a particular manner. *Reno v. Condon*, 528 U.S. 141, 151 (2000). Thus, where the "whole object of [a] law [is] to direct the functioning of the state executive" or the state legislative program, it will intrude on state sovereignty in the very way the

Tenth Amendment aims to prevent. *Printz*, 521 U.S. at 932; *New York*, 505 U.S. at 176. The "whole object" of the Executive Order is to direct the functioning of state and local governments. By threatening "enforcement action" of unspecified nature against any "entity . . . which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law," and by threatening wholesale defunding against entities deemed to be sanctuary jurisdictions, the Enforcement Directive attempts to interfere with local governments' autonomy to legislate for themselves.

The Tenth Amendment prevents the Executive Order from accomplishing this end. San Francisco's sanctuary city laws lie at the heart of San Francisco's core governmental interests. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). The federal government may no more coerce San Francisco to change these policies than it could directly order it to do so. *New York*, 505 U.S. at 176 (providing that where "an instruction to state governments . . . standing alone, would be beyond the authority of Congress," it "follows that Congress lacks the power" to coerce States to enact the instruction themselves). Because the Executive Order attempts to do exactly this, it is unconstitutional.

### D.      The AG Memorandum Does Not Narrow the Executive Order.

Defendants acknowledge the constitutional limitations discussed above, RJN Exh. Z at 33–34, but rely on the narrowing construction offered in the AG Memorandum to argue that the Executive Order has a dramatically narrower scope at odds with its plain text. *See* Dkt. Nos. 107, 111. As this Court has already determined, however, the AG Memorandum fails to save the Executive Order.

#### 1.      The AG Memorandum Is Not Binding Authority About The Executive Order.

Contrary to Defendants' repeated assertions, the AG Memorandum is not conclusive guidance binding on all Executive Branch agencies. Indeed, the AG Memorandum is not binding even on the Attorney General. "[T]he Attorney General could, at any time, revoke the AG Memorandum and issue new guidance. Or the President could replace the Attorney General to revoke it." Recon. Order at 13. Here, the Attorney General has not disavowed the constitutionality of a broader construction, leaving him—or a future Attorney General—free to embrace a different construction in the future.

Further, there is no reason for other agencies to act as if the AG Memorandum is directed at

them, when it is addressed only to components within DOJ. As its title states, it is a "Memorandum for All Department Grant-Making Components." This stands in stark contrast with memoranda that are, in fact, addressed to all Executive Branch agencies. *See, e.g.*, RJN Exh. AA. If the Memorandum were truly intended to "advise executive department heads" in a "formal, conclusive manner [about] the administration's interpretation of Section 9(a) of the Executive Order," Defs' Mot. to Dismiss at 7, it would fail at the outset by not being directed to those department heads.

Additionally, the AG Memorandum bears none of the traditional hallmarks of a formal legal opinion by the Attorney General. It "is labeled as an 'implementation' memorandum, is only two pages long, does not engage in substantive legal analysis, and primarily outlines plans to enforce the order, rather than an opinion on its meaning or scope." Recon. Order at 11. It was not requested by an executive department head pursuant to 28 U.S.C. § 512, nor issued by the Office of Legal Counsel pursuant to 28 C.F.R. § 0.25. In short, there is nothing on the face of the memo suggesting that it is a formal legal opinion of the Attorney General.

Even if the AG Memorandum were a formal legal opinion—which it is not—that would not establish that it is binding or controlling on Executive Branch agencies. Indeed, "the question of whether (and in what sense) the opinions of the Attorney General, and, more recently, the Office of Legal Counsel, are legally binding within the executive branch remains somewhat unsettled." Randolph Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1318 (2000).

Nor is the AG Memorandum binding or persuasive authority for this Court. Defendants have acknowledged that "the issue here is not whether *this Court* is bound by the Attorney General's determination as to the scope and meaning of the grant eligibility provision, but rather whether other federal agencies are bound by it." Recon. Reply at 5 n.6. Thus, according to Defendants, "the rules of judicial deference are inapplicable." *Id*. This is a wise concession, as courts give deference only to an agency's "reasonable" interpretation of an executive order it is charged with administering. *See Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1042–43 (9th Cir. 2013). But here, the Court has already rejected Defendants' narrow interpretation as unreasonable. PI Order at 14–15; Recon. Order at 7. In sum, even construed in the light most favorable to Defendants, the AG Memorandum

is—as it says—an implementation document within the DOJ. It is not a legal opinion that binds other Executive Branch agencies.

### 2.   Even If The AG Memorandum Were Binding, It Would Not Alter The Plain Language Of The Executive Order Or Eliminate Its Coercive Force.

Even if the AG Memorandum were binding on all Executive Branch agencies, it would simply constitute a promise to enforce the Executive Order more narrowly than it is written. Yet as the Court recognized, "similar promises are routinely rejected by the courts as illusory and should not impact the analysis here." Recon. Order at 8 (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988); *United States v. Stevens*, 559 U.S. 460, 480 (2010); *Doe v. Harris*, 772 F.3d 563, 579–80 (9th Cir. 2014); *United States v. Nosal*, 676 F.3d 854, 862 (9th Cir. 2012)). An en banc panel of the Ninth Circuit, for example, rejected a similar attempt to adopt a narrowing construction in order to save an unconstitutional law in *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 946–47 (9th Cir. 2011) (en banc). There, the Redondo Beach City Attorney submitted a sworn affidavit stating the City had only applied a challenged ordinance to conduct, not speech, and had no intention of applying it more broadly. The Court rejected this promise, holding that a narrowing construction can save a statute only where the text is "readily susceptible" to such a construction. *Id*. Similarly, here, the Court has declined to adopt the AG Memorandum's narrowing construction because the Executive Order's text is not "readily susceptible" to that construction. PI Order at 14. The text has not changed since the PI Order issued, and the Court's determination holds true.

In a related line of cases, the Supreme Court has held that an agency's "voluntary self-denial" of powers granted by an unconstitutional law does not save that law. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001); *see also Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). In *American Trucking Associations*, for instance, the D.C. Circuit held that the Clean Air Act made an unconstitutional delegation of authority to the Environmental Protection Agency, but remanded on the theory that this delegation could be fixed by the agency adopting a

narrow construction of the Act. 531 U.S. at 472–73. The Supreme Court rejected this approach, stating

"[w]e have never suggested that an agency can cure an unlawful delegation of legislative power by

adopting in its discretion a limiting construction of the statute." *Id.* at 472. It explained, "[w]hether the

statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial

has no bearing upon the answer." *Id.* at 473.

      The same reasoning applies here. One of the central legal defects of the Executive Order is that

it delegates to DOJ and DHS powers that the President himself lacks, and this delegation cannot be

fixed by DOJ declining to exercise those powers. The AG Memorandum is not akin to a statutory

amendment that might in theory fix constitutional problems or render a case moot. It is, at best, an

implementation document that leaves the offending Order in place.

## III.   San Francisco Is Entitled To Declaratory And Injunctive Relief.

### A.   Defendants Have Created An "Actual Controversy" That Entitles San Francisco To Declaratory Relief On All Counts.

      This Court may issue declaratory relief "[i]n a case of actual controversy within its

jurisdiction." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937); 28 U.S.C. § 2201(a).

"Basically, the question in each case is whether the facts alleged, under all the circumstances, show

that there is a substantial controversy, between parties having adverse legal interests, of sufficient

immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac.

Coal & Oil Co.*, 312 U.S. 270, 273 (1941). This standard is satisfied here, where an actual controversy

exists about both Section 1373 and the Executive Order. *See* Defs. Answer ¶ 38 (denying that San

Francisco complies with Section 1373); Recon. Order at 17–19 (finding San Francisco has

demonstrated an actual controversy regarding its compliance with Section 1373); PI Order at 11–35

(concluding San Francisco has ripe claims against the Executive Order).

### B.   Defendants' Ongoing Threats, Together With The Balance Of Equities And Public Interest, Entitle San Francisco To A Permanent Injunction Of The Executive Order.

      Just four months ago, this Court granted a preliminary injunction of the Executive Order.

Specifically, the Court held that San Francisco and Santa Clara County were

      currently suffering irreparable harm, not only because the Order has caused and
      will cause them constitutional injuries by violating the separation of powers
      doctrine and depriving them of their Tenth and Fifth Amendment rights, but

> also because the Order has caused budget uncertainty by threatening to deprive the Counties of hundreds of millions of dollars in federal grants that support core services in their jurisdictions. They have established that they are likely to succeed on the merits of their claims and that the balance of harms and public interest decisively weigh in favor of an injunction.

PI Order at 3-4.

Nothing has changed since the Court issued the preliminary injunction,[11] and the standard for a permanent injunction is the same except that a plaintiff must show actual success on the merits instead of a likelihood of success.[12] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). The Executive Order remains extant, leaving San Francisco to suffer from the same uncertainty and duress that necessitated the preliminary injunction. And San Francisco's budgetary and constitutional injury continues to be irreparable and ongoing.

As detailed in the Whitehouse Declaration, the uncertainty of the Executive Order factored into San Francisco's decision to set aside a special budget reserve of $10 million, making those funds unavailable for any non-reserve purpose for the entire fiscal year. Whitehouse Decl. ¶ 7. San Francisco continues to be unable to use these monies to fund other budgetary priorities such as housing and social services. San Francisco's budgetary harm is not purely monetary. It impacts San Francisco's ability to provide programs and services to its residents. *See United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) (finding irreparable harm where the unavailability of federal funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

Similarly, San Francisco continues to suffer constitutional harm. Defendants' statements continue to make clear not only that the Executive Order requires compliance with Section 1373, but also that compliance with Section 1373 means honoring civil immigration detainer requests. *See* pp. 3–4, *supra*. As long as the Executive Order remains outstanding, San Francisco faces an impossible

---

[11] Recon. Order at 14.

[12] A party seeking a permanent injunction must "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; . . . (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms* 561 U.S. 139, 156–57 (2010) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

choice: either comply with detainer requests and hold individuals without probable cause in violation of the Fourth Amendment, or risk violating the terms of the Executive Order. This, coupled with the Executive Order's other constitutional infirmities—violation of the separation of powers doctrine, the Spending Clause, and the Tenth Amendment—constitutes irreparable harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (holding that "the deprivation of constitutional rights unquestionably constitutes irreparable injury") (internal quotation marks and citation omitted).

Lastly, the public interest and the balance of the equities favor the entry of a permanent injunction against all Defendants. As long as the Executive Order remains in place, San Francisco cannot escape Defendants' threats. San Francisco will continue to face the possibility that its budget could be crippled at any time and that it will be coerced into choosing to violate the Constitution or maintain its federal funds. Since this case was filed, almost eight months ago, Defendants have failed to take any decisive steps to eliminate or mitigate the uncertainty caused by the Executive Order. Defendants have taken no effective action to rescind, modify or amend the Executive Order. Without a permanent injunction, there will be no end to the threat, and the budgetary sword of Damocles will continue to hover ominously over San Francisco's head.

## CONCLUSION

For the foregoing reasons, San Francisco asks that the Court grant its Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment, and order declaratory and injunctive relief.

Dated: August 30, 2017

DENNIS J. HERRERA
City Attorney

By: */s/ Mollie M. Lee*
MOLLIE M. LEE
Deputy City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO