DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
TARA M. STEELEY, State Bar #231775
SARA J. EISENBERG, State Bar #269303
AILEEN M. McGRATH, State Bar #280846
MATTHEW S. LEE, State Bar #295247
NEHA GUPTA, State Bar #308864
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4748
Facsimile:     (415) 554-4715
E-Mail:        brittany.feitelberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Plaintiff,<br><br>    vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, ELAINE DUKE, Acting Secretary of United States Department of Homeland Security, JEFFERSON B. SESSIONS III, Attorney General of the United States, DOES 1-100,<br><br>    Defendants. | Case No. 3:17-cv-00485-WHO<br><br>**DECLARATION OF SARA J. EISENBERG IN SUPPORT OF UNOPPOSED ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED**<br><br>Date Filed:     January 31, 2017 |

1  I, Sara J. Eisenberg, declare and state as follows:

2  1.  I am an attorney duly licensed in the State of California.  I am a Deputy City Attorney

3  in the San Francisco City Attorney's Office, which is counsel for the City and County of

4  San Francisco, sole plaintiff in the *City and County of San Francisco v. Sessions, et al.*, Case No. 3:17-

5  CV-04642 ("*San Francisco v. Sessions I*"); the *City and County of San Francisco v. v. Trump et al.*,

6  Case No. 3:17-CV-00485-WHO ("*San Francisco v. Trump*"); and *City and County of San Francisco v.*

7  *Sessions, et al.*, Case No. 3:18-cv-05146-JCS ("*San Francisco v. Sessions II*").  I have personal

8  knowledge of the facts stated herein and, if called as a witness, I would testify competently thereto.

9  2.  I file this Declaration in support of San Francisco's Administrative Motion to Consider

10  Whether Cases Should Be Related Pursuant to N.D. Cal. Civil L.R. 3-12(B) ("Motion to Relate").

11  3.  Attached hereto as **Exhibit 1** is a true and correct copy of the First Amended Complaint

12  in this action, *San Francisco v. Sessions I*.

13  4.  Attached hereto as **Exhibit 2** is a true and correct copy of the Complaint in

14  *San Francisco v. Sessions II*.

15  5.  Attached hereto as **Exhibit 3** is a true and correct copy of the Second Amended

16  Complaint in *San Francisco v. Trump*.

17  6.  I discussed this Motion to Relate with Scott Simpson, Senior Trial Counsel at the

18  United States Department of Justice, via email on August 28, 2018.  He informed me that Defendants

19  have no objection to San Francisco's request that *San Francisco v. Sessions II* be related to the

20  previously-filed cases.

21

22  I declare under penalty of perjury under the laws of the United States that the foregoing is true

23  and correct and that this declaration was executed on August 29, 2018 at San Francisco, California.

24

25

26  SARA J. EISENBERG

27

28

# EXHIBIT 1

1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  JESSE C. SMITH, State Bar #122517
   Chief Assistant City Attorney
3  RONALD P. FLYNN, State Bar #184186
   Chief Deputy City Attorney
4  YVONNE R. MERÉ, State Bar #173594
   Chief of Complex and Affirmative Litigation
5  CHRISTINE VAN AKEN, State Bar #241755
   TARA M. STEELEY, State Bar #231775
6  MOLLIE M. LEE, State Bar #251404
   SARA J. EISENBERG, State Bar #269303
7  AILEEN M. McGRATH, State Bar #280846
   Deputy City Attorneys
8  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
9  San Francisco, California 94102-4602
   Telephone:     (415) 554-4748
10 Facsimile:     (415) 554-4715
   E-Mail:        brittany.feitelberg@sfcityatty.org
11
   Attorneys for Plaintiff
12 CITY AND COUNTY OF SAN FRANCISCO

13

14

15                    UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17 CITY AND COUNTY OF SAN                    Case No. 3:17-CV-04642-WHO
   FRANCISCO,
18                                           **FIRST AMENDED COMPLAINT FOR**
          Plaintiff,                         **DECLARATORY AND INJUNCTIVE RELIEF**
19
          vs.
20                                           Date Action Filed: August 11, 2017
   JEFFERSON B. SESSIONS III, Attorney       Trial Date: December 10, 2018
21 General of the United States, ALAN R.
   HANSON, Acting Assist. Attorney General of
22 the United States, UNITED STATES
   DEPARTMENT OF JUSTICE, DOES 1-100,
23
          Defendants.
24

25

26

27

28

# INTRODUCTION

1. The City and County of San Francisco brings this action to challenge the Attorney General of the United States' attempt to use a longstanding federal grant program—the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") Program—as a cudgel to force San Francisco to abandon its sanctuary city policies. The Attorney General and other members of the Trump Administration have threatened to withhold congressionally appropriated federal funds unless San Francisco—and other jurisdictions across the country—accede to the Administration's immigration-related policy demands. In doing so, the Defendants have grossly misinterpreted federal law and have seized for themselves power that belongs only to Congress. Defendants' behavior is unlawful and unconstitutional, and must be prohibited.

2. Like many cities, San Francisco has a vibrant immigrant community, many members of which are undocumented. San Francisco has long endeavored to foster cooperation and trust between its immigrant community and city employees and agencies by lawfully limiting when city employees and agencies may assist with the enforcement of federal immigration laws. San Francisco's laws ("Sanctuary City Laws") and policies generally prohibit city employees from using city funds or resources to assist in enforcing federal immigration law, unless required by federal or state law. They specifically prohibit local law enforcement officers from cooperating with Immigration and Customs Enforcement ("ICE") voluntary detainer requests, limit when local law enforcement officers may give the federal government advance notice of a person's release from jail, and do not allow ICE representatives conducting civil immigration enforcement free access to inmates in jail. But at the same time, San Francisco law expressly states that "[i]n all other respects, local law enforcement agencies may continue to collaborate with federal authorities to protect public safety."

3. San Francisco enacted its Sanctuary City Laws based on evidence showing that San Francisco is a safer, healthier, and stronger city when its officials do not enforce federal immigration laws. San Francisco is safer when all people, including undocumented immigrants, feel comfortable reporting crimes to authorities. San Francisco is healthier when all residents, including undocumented immigrants, access public health programs. San Francisco is economically and socially stronger when all children, including undocumented immigrants, attend school. And San Francisco

communities are strengthened when members of the public, including undocumented immigrants, can use public transit, visit libraries, or take their children to the playground without fear. For these reasons, among others, San Francisco has made the considered judgment not to comply with voluntary detainer requests, not to allow federal civil immigration authorities access to jails, and not to provide federal officials with information about the date and time of a person's release from local custody.

4.　　But San Francisco, and other jurisdictions, have found themselves targeted by Attorney General Sessions and other members of President Donald Trump's Administration, who make no secret of their intent to undo these considered policy choices, even in the absence of congressional action. The Attorney General has repeatedly condemned "sanctuary cities" that "refus[e] to detain known felons under federal detainer requests" or otherwise refuse to use local resources to carry out demands from federal immigration authorities.[1] Similarly, the acting Director of ICE told Congress in June that the federal government expects local governments "[to] allow us access to the jails."[2] Likewise, President Trump has criticized "[s]anctuary cities, like San Francisco, [that] block their jails from turning over criminal aliens to Federal authorities for deportation."[3]

5.　　Since taking office, the President, directly and through his Administration, has tried various coercive tactics to require local jurisdictions to abandon their sanctuary city policies. The President issued Executive Order 13,768, targeting sanctuary cities and commanding federal agencies to withhold federal funding from these cities unless they changed their policies to begin enforcing federal immigration law. Exec. Order No. 13,768, 82 Fed. Reg. 8799 at 8799 (Jan. 25, 2017) ("Executive Order"). The order was permanently enjoined by this Court for violating numerous constitutional provisions. *City and County of San Francisco v. Donald J. Trump*, --- F. Supp. 3d ---,

---

[1] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions (Mar. 27, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions ("March 27 Sessions remarks").

[2] H. Approps, Subcommittee on Homeland Security Hearing on the ICE and CBP F.Y. 2018 Budget (June 13, 2017), 2017 WLNR 18737622 (testimony of Acting ICE Director Thomas Homan).

[3] Press Release, The White House, Office of the Press Secretary, Statement on Sanctuary Cities Ruling (Apr. 25, 2017), https://www.whitehouse.gov/the-press-office/2017/04/25/statement-sanctuary-cities-ruling.

No. 3:17-cv-00485-WHO, 2017 WL 5569835, at *11-*16 (N.D. Cal. Nov. 20, 2017) ("*San Francisco v. Trump*").

6.    The Attorney General has also tried to create a stigma surrounding sanctuary jurisdictions by falsely claiming that sanctuary city policies undermine public safety and by calling "a sanctuary city a trafficker, smuggler, or gang member's best friend."[4]  The Attorney General has sent letters to San Francisco, as well as several other jurisdictions with sanctuary policies, threatening to withdraw or claw back federal funding if they do not certify that their laws comply with federal requirements.[5]

7.    In the Administration's most recent effort to end sanctuary policies, the Office of Justice Programs ("OJP")—a Department of Justice ("DOJ") agency that oversees the administration of the Byrne JAG program—announced on July 25, 2017, that the FY 2017 Byrne JAG application would impose three immigration-related conditions on funding recipients.

8.    The first condition relates to a federal statute, 8 U.S.C. Section 1373 ("Section 1373"). The FY 2017 Byrne JAG award requires San Francisco to certify that, with respect to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect, purport to have in effect, or is subject to or bound by "any prohibition or any restriction . . . that deals with either (1) a government entity or –official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. § 1373(a); or (2) a government entity or –agency sending to, requesting //

---

[4] Press Release, U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks to Federal Law Enforcement Authorities About Sanctuary Cities (Sept. 19, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-federal-law-enforcement-authorities; *see also* Press Release, U.S. Dep't of Justice, Statement by Attorney General Sessions on the City of Chicago's Lawsuit Against the U.S. Department of Justice (Aug. 7, 2017), https://www.justice.gov/opa/pr/statement-attorney-general-sessions-city-chicago-s-lawsuit-against-us-department-justice (characterizing sanctuary city laws as "an official policy of protecting criminal aliens who prey on their own residents").

[5] Press Release, U.S. Dep't of Justice, Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373 (Apr. 21, 2017), https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373; Press Release, U.S. Dep't of Justice, Justice Department Sends Letters to 29 Jurisdictions Regarding Their Compliance with 8 U.S.C. 1373 (Nov. 15, 2017), https://www.justice.gov/opa/pr/justice-department-sends-letters-29-jurisdictions-regarding-their-compliance-8-usc-1373.  The letter San Francisco received is attached to this Amended Complaint as Exhibit A.

or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b)" ("Section 1373 Requirement").

9. DOJ lacks the constitutional power to require San Francisco to certify that it complies with Section 1373 in order to receive Byrne JAG funds. Only Congress may attach requirements to federal grants—not DOJ. DOJ's attempt to use Byrne JAG as a weapon to require Section 1373 compliance exceeds what the Constitution allows.

10. But even if DOJ could impose the Section 1373 Requirement, DOJ may not deny San Francisco Byrne JAG funding because of purported non-compliance with Section 1373 because San Francisco fully conforms with Section 1373's mandate.

11. San Francisco does not prohibit or restrict its employees, or any departments or officials, from sharing information about the citizenship or immigration status of any individual with federal immigration officials. To the contrary, San Francisco has advised all of its employees that Section 1373 prohibits it from imposing any such restrictions. And in any case, San Francisco has a general policy of not collecting immigration status information in the first instance.

12. Nevertheless, the Attorney General has made clear that he believes San Francisco violates Section 1373, and has threatened to claw back FY 2016 Byrne JAG funding that San Francisco has already received. The Attorney General has also threatened to deny San Francisco's FY 2017 Byrne JAG funding. The Attorney General has further taken the incorrect position that Section 1373 applies not only to immigration status information—as its text provides—but also to vast swaths of other information like location, date of birth, and custody status.

13. The Attorney General's threats to withhold San Francisco's Byrne JAG funding, together with its erroneous interpretation of Section 1373, unlawfully attempt to force San Francisco to comply with the Trump Administration's political agenda. Declaratory relief from this Court is needed to put a stop to DOJ's coercion involving Section 1373.

14. The other two Byrne JAG conditions also unlawfully seek to interfere with San Francisco's considered policy judgments. The "Access Requirement" demands that San Francisco provide federal immigration officials unfettered access to local detention facilities to interrogate any suspected aliens held there. The "Notice Requirement" directs San Francisco to provide the

Department of Homeland Security ("DHS") with at least 48 hours' advance notice—or at least as much notice as is practicable—of the scheduled release date and time of an individual, where the federal government has requested notice to take that individual into custody for immigration reasons.

15. San Francisco does not comply with the Notice and Access Requirements, and for good reason: in practice, the Notice and Access Requirements could, and in many instances would, require San Francisco officials to unlawfully hold inmates longer than they otherwise would to ensure that DHS receives adequate advance notice. And they would compel San Francisco to abandon its longstanding laws and policies that deny federal immigration officials freewheeling access to local detention facilities.

16. The Notice and Access Requirements—like the Section 1373 Requirement—also violate the United States Constitution. The Constitution establishes a balance of power between the state and federal governments, as well as among the coordinate branches of federal government. This balance prevents the excessive accumulation of power in any single entity and reduces the risk of tyranny and abuse from any government office. Accordingly, an executive branch agency of the federal government may not seize for itself the power that the Constitution reserves for Congress. Nor may it intrude on authority that the Constitution has reserved for state and local governments. Yet the Notice and Access Requirements violate both of these precepts. DOJ is improperly attempting to wield powers that only Congress may invoke, and is seeking to compel San Francisco to cede its sovereign decision making to the federal government.

17. San Francisco faces the immediate prospect of losing over $1.4 million in this fiscal year if it does not receive FY 2017 Byrne JAG funds. Defendants have also made clear that they are contemplating clawing back up to $1.5 million in FY 2016 Byrne JAG monies from San Francisco. San Francisco uses these funds for a variety of important law enforcement purposes, including a pioneering Young Adult Court program that works to prevent at-risk youth from entering a "lifelong entanglement with the criminal justice system,"[6] and to fund other initiatives designed to reduce

---

[6] Tim Requarth, *A California Court for Young Adults Calls on Science*, N.Y. Times (Apr. 17, 2017), https://www.nytimes.com/2017/04/17/health/young-adult-court-san-francisco-california-neuroscience.html.

recidivism, deter drug use, provide services to at-risk youth, and supervise probationers with substance abuse and/or mental health issues.

18.   San Francisco faces an unacceptable choice: either comply with DOJ's unconstitutional new grant conditions and abandon local policies that San Francisco has found to promote public safety and foster trust and cooperation between law enforcement and the public, or maintain these policies but forfeit critical funds that it relies on to provide essential services to San Francisco residents.

19.   That choice is particularly stark with respect to the Section 1373 Requirement, which asks San Francisco to certify under penalty of perjury that its laws comply with Section 1373.  While San Francisco firmly believes that it complies with Section 1373, DOJ's recent pronouncements and threats to San Francisco require San Francisco to make that certification under a cloud of uncertainty.

20.   San Francisco accordingly seeks declaratory and injunctive relief to ensure that San Francisco and other sanctuary jurisdictions continue to be eligible for Byrne JAG funds—which serve a critical public safety purpose—instead of being coerced into enforcing federal immigration law, which it has no obligation to do.

San Francisco seeks a declaration that:

- San Francisco's Sanctuary City Laws—San Francisco Administrative Code Chapters 12H and 12I—comply with Section 1373;
- San Francisco does not have in place a prohibition or restriction that applies to the program or activity funded under the Byrne JAG program, and which deals with sending to, receiving from, requesting, or maintaining immigration status information with the federal government; and
- The Notice, Access, and Section 1373 Requirements are unconstitutional.

San Francisco further seeks an injunction that:

- Defendants cannot use the Notice, Access, and Section 1373 Requirements as funding restrictions for any Byrne JAG award;
- Defendants cannot withhold Byrne JAG funding from San Francisco on the basis of its compliance with Section 1373; and

//

- Defendants cannot claw back Byrne JAG funding already awarded to San Francisco because of asserted non-compliance with Section 1373.

## JURISDICTION AND VENUE

21. The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq*.

22. Venue properly lies within the Northern District of California because Plaintiff, San Francisco, resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District. 28 U.S.C. §1391(e).

## INTRADISTRICT ASSIGNMENT

23. Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions that give rise to this action occurred in the City and County of San Francisco.

## PARTIES

24. Plaintiff San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

25. Defendant Jefferson B. Sessions is the Attorney General of the United States. He is sued in his official capacity. The Attorney General is the federal official leading DOJ, which is responsible for the governmental actions at issue in this lawsuit.

26. Defendant Alan R. Hanson is Acting Assistant Attorney General of the United States in charge of OJP, which administers Byrne JAG funding. He is sued in his official capacity.

27. Defendant DOJ is an executive department of the United States of America that is responsible for administering the Byrne JAG program.

28. Doe 1 through Doe 100 are sued under fictitious names. Plaintiff San Francisco does not now know the true names or capacities of said Defendants, who were responsible for the alleged violations alleged, but pray that the same may be alleged in this complaint when ascertained.

//

//

**FACTUAL ALLEGATIONS**

**I.      San Francisco's Sanctuary City Laws And Policies.**

29.     San Francisco has been a Sanctuary City since 1989, when it first enacted ordinances to protect Central American refugees who were escaping violent civil wars in their home countries and seeking legal protections in the United States.  Since then, San Francisco's Sanctuary City Laws, codified in Chapters 12H and 12I of the San Francisco Administrative Code, have been amended to reflect San Francisco's broad dedication and commitment to promote public safety, public health, and community integrity.

30.     San Francisco's Sanctuary City Laws do not protect criminals.  They do not interfere with or hinder criminal prosecutions.  They do not prohibit law enforcement in all other respects from collaborating with federal authorities to "protect public safety."  *See* S.F. Admin. Code § 12I.4.

31.     Instead, San Francisco's Sanctuary City Laws arise from San Francisco's commitment and responsibility to ensure public safety and welfare.  The Board of Supervisors, as San Francisco's legislative body, found that public safety is "founded on trust and cooperation of community residents and local law enforcement." S.F. Admin Code § 12I.1.  Citing a study by the University of Illinois, which found that at least 40 percent of Latinos surveyed were less likely to provide information to police because they feared exposing themselves, family, or friends to a risk of deportation, the Board of Supervisors stated that "civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies." *Id.*; *see also id.*  ("The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement.  Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.").  Indeed, a recent study shows that crime is statistically significantly lower in sanctuary counties compared to non-sanctuary counties. *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, CTR. FOR AM. PROGRESS (Jan. 26, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.

//

32.     The legislative findings set forth in Chapter 12I confirm the important purpose of San Francisco's Sanctuary City Laws.  For example, the Board of Supervisors declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants.  The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all.  (*See* Section 12I.2.)

33.     San Francisco's Sanctuary City Laws perform several important functions.  San Francisco Administrative Code Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by federal or state law.

34.     Chapter 12H previously prohibited disseminating information regarding the immigration status of any individual, but the Board of Supervisors amended Chapter 12H in July 2016 to, *inter alia*, delete that prohibition to ensure compliance with Section 1373.

35.     San Francisco Administrative Code Chapter 12I prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the federal government.  A detainer request is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary City Laws.  A detainer request is not issued by a judge based on a finding of probable cause.  It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them.

36.     Chapter 12I also prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released, unless the individual in question meets certain criteria. *See* S.F. Admin. Code § 12I.3(c)-(d).

37. Finally, as relevant here, Chapter 12I provides that "[l]aw enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws." *See* S.F. Admin. Code § 12I.3(e). "Personal information" is defined as "any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information." *See* S.F. Admin. Code § 12I.2. Personal information does not include immigration status information.

38. Chapter 12I makes clear that its purpose and effect are limited to matters "relating to federal civil immigration detainers, notification of release of individuals, transmission of personal information, or civil immigration documents, based solely on alleged violations of the civil provisions of immigration laws." Chapter 12I expressly states that "[i]n all other respects, local law enforcement agencies may continue to collaborate with federal authorities to protect public safety." *See* S.F. Admin. Code § 12I.4.

39. San Francisco departments and agencies have adopted and implemented policies and practices consistent with Chapters 12H and 12I.

40. Specifically, the departments and agencies that administer Byrne JAG programs do not have in place any prohibitions or restrictions that apply to programs or activities funded under the Byrne JAG Program, and which deal with sending to, receiving from, requesting, or maintaining immigration status information with the federal government.

41. In addition, San Francisco has affirmatively instructed personnel regarding the substance of Section 1373 in a January 2017 memorandum sent to all San Francisco employees from the San Francisco Human Resources Director.

## II. The Trump Administration Has Engaged In A Sustained Campaign To Eradicate Sanctuary City Policies.

42. San Francisco is far from the only jurisdiction to enact sanctuary policies that seek to promote public safety and build trusting and supportive relationships with immigrant communities. Numerous jurisdictions across the country have enacted similar policies. But despite the widespread

enactment of these policies, and the studies that justify their use (*see supra* ¶ 31), the Attorney General and other members of the Trump Administration have repeatedly criticized San Francisco, and other jurisdictions, for failing to allow ICE officials access to jails, provide notification of inmate release dates, or otherwise enforce federal immigration law.

43.     For instance, in statements to the Daily Caller on July 7, 2015, then-Senator and now-Attorney General Sessions criticized San Francisco and other sanctuary jurisdictions for failing to carry out voluntary detainer requests.  Sessions stated, "This disregarding of detainers and releasing persons that ICE has put a hold on—it goes against all traditions of law enforcement.  Laws and courtesies within departments—if you have somebody charged with a crime in one city, you hold them until you complete your business with them . . . .  So what was happening was, ICE authorities were filing detainers and sanctuary cities were saying, 'We're not gonna honor them.  They finished paying for the crime they committed in our city—we've released them.'"[7]

44.     After the President appointed him to office, the Attorney General continued to take the same position targeting sanctuary cities.  On July 12, 2017, the Attorney General described sanctuary city "policies" as those requiring law enforcement officials to "refuse to cooperate with federal immigration authorities regarding illegal aliens who commit crimes."[8]  And he has frequently suggested that he will use every means necessary to withhold federal funding from "sanctuary cities."  *See* March 27 Sessions remarks.

45.     The Trump Administration has incorporated these views into its political agenda.  President Trump has frequently promised to "defund" sanctuary cities, and to use the threat of withholding federal funds as "a weapon" to coerce local jurisdictions to change their policies.[9]  Then-

---

[7] Kerry Picket, *Sen. Sessions: City Officials Harboring Illegal Immigrant Felons Could Be Charged with Crime*, Daily Caller (July 7, 2015), http://dailycaller.com/2015/07/07/sen-sessions-city-officials-harboring-illegal-immigrant-felons-could-be-charged-with-crime/#ixzz4XE9I12Ux.

[8] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks in Las Vegas to Federal, State and Local Law Enforcement About Sanctuary Cities and Efforts to Combat Violent Crime (July 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-las-vegas-federal-state-and-local-law.

[9] Alexander Mallin and Lissette Rodriguez, *Trump Threatens Defunding Sanctuary Cities as 'Weapon'*, ABC News (Feb. 5, 2017), http://abcnews.go.com/Politics/trump-threatens-%20defunding-sanctuary-states-weapon/story?id=45286642.

White House Press Secretary Sean Spicer also confirmed that "[w]e are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws."[10]

46. The Administration carried through on these threats during President Trump's first week in office. President Trump issued Executive Order 13,768, which threatened to deny all federal funding to sanctuary jurisdictions and to authorize the Attorney General to take unspecified enforcement action against sanctuary cities. The Executive Order declared that "[s]anctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic." Executive Order at 8799.

47. To address that purported harm, the Executive Order established the policy that "jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." Executive Order at 8799. In furtherance of this policy, the Executive Order provided that:

> [T]he Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary.

Executive Order § 9(a).

48. The Executive Order also mandated enforcement action: "The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." *Id.*

49. The Executive Order made clear that Section 1373 is the foundation for the Administration's efforts to deprive sanctuary cities of federal funds and to take unspecified punitive actions against them.

//

//

---

[10] The White House, *1/25/17: White House Press Briefing*, YouTube (Jan. 25, 2017), https://www.youtube.com/watch?v=OaPriMVvtZA.

50.     The Administration touted the Executive Order as a means for achieving the President's goal of "ending sanctuary cities . . . . [T]he President has been very clear through his executive order that federal funds, paid for by hardworking taxpayers, should not be used to help fund sanctuary cities."[11]  The Administration vowed that "the President is going to do everything he can within the scope of the executive order to make sure that cities who don't comply with it—counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order."[12]

51.     The Administration's efforts were stopped by this Court, which permanently enjoined Section 9(a) of the Executive Order for violating the Constitution.  *San Francisco v. Trump*, 2017 WL 5569835, at *17.   The Court held, *inter alia*, that the President—and in turn, the Attorney General and the Secretary of DHS—lacked the authority "to place a new condition on federal funds . . . not authorized by Congress," and thus had violated the "fundamental constitutional structure" of the separation of powers.  *Id.* at *11.  And the Court further held that even if the executive branch could exercise that spending power, the Executive Order was unconstitutional because it (1) used vague language that left localities unclear how to comply with the funding conditions; (2) lacked any nexus between the funds at issue and immigration enforcement; and (3) sought to compel local governments to "adopt certain policies" that they had determined, in their considered judgment, to be unwise.  *Id.* at *12-*13.  The Court found these violations to warrant a nationwide injunction.  *Id.* at *17.

**III.   The Administration Is Attempting To Use The Byrne JAG Program To Coerce Cities Like San Francisco To Abandon Their Sanctuary City Policies.**

   **A.     The Byrne JAG Program Is A Longstanding Federal Formula Grant Program.**

52.     With its efforts to more broadly withhold federal funds stymied by this Court, the Administration adopted a more targeted approach: it identified an existing congressional program, the

//

---

[11] Press Release, The White House, Office of the Press Secretary, Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6 (Feb. 1, 2017), https://www.whitehouse.gov/the-press-office/2017/02/01/press-briefing-press-secretary-sean-spicer-212017-6.

[12] Press Release, The White House, Office of the Press Secretary, Press Briefing by Press Secretary Sean Spicer, 2/8/2017, #10 (Feb. 8, 2017), https://www.whitehouse.gov/the-press-office/2017/02/08/press-briefing-press-secretary-sean-spicer-282017-10.

Byrne JAG program, as another device to pressure cities, states, and other local governments to abandon their sanctuary city policies.

53.     Byrne JAG's origins trace back over three decades to the Anti-Drug Abuse Act of 1988, H.R. 5210, 100th Cong. (1988), which created the Byrne Formula Grant program.  In its original form, the Byrne Formula Grant program provided states with block grants based on population.  *See* Anti-Drug Abuse Act § 6091(a), 42 U.S.C. § 3756 (1994).  The program encouraged states to use those funds for very specific enumerated purposes, such as "disrupting illicit commerce in stolen goods and property," "developing and implementing programs which provide assistance to jurors and witnesses," and "addressing the problems of drug trafficking and the illegal manufacture of controlled substances in public housing."  *See* 42 U.S.C. § 3751 (2000).

54.     Several years after the Byrne Formula Grant program was enacted, Congress also authorized the creation of the Local Law Enforcement Block Grant ("LLEBG") program, through the FY 1996 law appropriating funding to DOJ.  Omnibus Consolidated Rescissions and Appropriations Act of 1996, H.R. 3019, 194th Cong. (1996).  The LLEBG program provided money to states and localities based on their crime rates.[13]  Each year, the LLEBG and Byrne Formula Grant programs disbursed as much as $1 billion to states and local governments.

55.     In 2006 Congress consolidated the LLEBG and Byrne Formula Grant programs as part of an effort to reduce duplication and streamline the programs.  The consolidated program was renamed as today's Edward Byrne Memorial Justice Assistance Grant program.  *See* Violence Against Women and Department of Justice Reauthorization Act of 2005, H.R. 3402, 109th Cong. (2006); U.S. House of Representatives, Committee on the Judiciary, *Department of Justice Appropriations Authorization Act, Fiscal Years 2006 Through 2009, Report to accompany H.R. 3402*, 109th Cong., 1st Sess., H.R. Rep. No. 109-233, at 89 (2005) ("Judiciary Committee Report").

56.     Congress's core purpose in reformulating the existing grant programs was "to cover the same ground" as the previous grant programs while allowing recipients more freedom "to use the

---

[13] *See* Nathan James, *Edward Byrne Memorial Justice Assistance Grant Program: Legislative and Funding History*, Congressional Research Service at 2-3 (Feb. 1, 2008), http://research.policyarchive.org/18740.pdf.

1   grants constructively." Judiciary Committee Report at 89. The reforms would "lessen the

2   administrative burden of applying for the grants." *Id.* And the resulting program would be

3   streamlined and would ensure that "the same authorized funding levels and uses will be available."

4   150 Cong. Rec. S9,950 (daily ed. Sept. 29, 2004) (statement of Sen. Leahy) (discussing similar,

5   precursor version of 2005 Act).

6        57.    To that end, Byrne JAG is structured as a formula grant, awarding funds to all eligible

7   grantees according to a prescribed metric. Unlike discretionary grants, which agencies award pursuant

8   to agency discretion, "'formula' grants . . . are not awarded at the discretion of a state or federal

9   agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865

10   F.2d 1084, 1088 (9th Cir. 1989). The Bureau of Justice Assistance ("BJA")—a department within

11   OJP—awards Byrne JAG funds to all eligible grantees in amounts based on Bureau of Justice

12   Statistics ("BJS") calculations derived from the Byrne JAG statutory formula. *See* 34 U.S.C. §

13   10156(d)(2)(A) (providing that the Attorney General "*shall* allocate to each unit of local government"

14   funds consistent with the established formula) (emphasis added).

15        58.    The formula for state allocations is a function of population and violent crime. *See id.*

16   § 10156(a). For local governments, the allocation is a function of the state's allocation and the ratio of

17   violent crime in the locality to violent crime in the state. *See id.* § 10156(d).

18        59.    BJS first computes a preliminary allocation for each state and United States territory

19   based on its share of violent crime and population (weighted equally). BJS then reviews that initial

20   allocation amount to determine if it is less than the minimum amount defined in the statutory formula

21   (0.25 percent of the total). U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice

22   Statistics, Technical Report, *Justice Assistance Grant Program*, 2016 at 2 (Sept. 2016),

23   https://www.bja.gov/jag/pdfs/JAG-Technical-Report.pdf. If this is the case, the state or territory is

24   funded at the minimum level. *Id.* Each of the remaining states receives the minimum award plus an

25   additional amount based on its share of violent crime and population. *Id.*

26        60.    Once each state's final amount is determined, 60 percent is allocated to the state in the

27   first instance, and 40 percent is allocated for direct grants to local governments. 34 U.S.C. § 10156(d).

28   //

States are obligated to pass at least a certain percentage of the "state" grant to local governments within the state. *Id.* § 10156(c)(2).

61.     For example, in FY 2017, California's total allocation is $28.3 million.  Of this, $17.7 million (60 percent) is allocated to the State.[14]  The other $10.6 million (40 percent) is allocated for direct grants to local jurisdictions.[15]  Of the $17.7 million allocated to the State, a minimum of 62.9 percent must be passed through to local jurisdictions.[16]  In recent years, California has passed through over 85 percent of JAG funds to local jurisdictions.[17]

62.     Under the Byrne JAG statute, award recipients are entitled to their share of the formula allocation as long as their proposed programs satisfy one of the statutory purpose areas.  In contrast to the Byrne Formula Grant statutory requirements—which enumerated dozens of specific purposes—the Byrne JAG program allows recipients to allocate their funds in furtherance of eight purpose areas: (1) law enforcement, (2) prosecution and courts, (3) prevention and education, (4) corrections and community corrections, (5) drug treatment, (6) planning, evaluation, and technology improvement, (7) crime victim and witness programs, and (8) mental health programs, including behavioral programs and crisis intervention teams.  34 U.S.C. § 10152(a)(1)(A)-(H).

63.     None of these program purposes include federal immigration enforcement.

64.     Congress imposed only a limited number of requirements on Byrne JAG applicants. First, applicants are required to supply information about their intended use of grant funding, to demonstrate that they will spend the money on programs supporting the purposes identified in the statute.  *See* 34 U.S.C. § 10153(a)(2) & (a)(5)(A)-(C).  Second, applicants must maintain and be prepared to report information demonstrating that they possess programmatic and financial integrity. //

---

[14] *See* https://www.bja.gov/Funding/17JAGStateAllocations.pdf.

[15] *See* https://www.bja.gov/Programs/JAG/jag17/17CA.pdf.

[16] Byrne JAG Frequently Asked Questions (FAQs)–Updated August 2017, at 2, https://www.bja.gov/Funding/JAGFAQ.pdf; *see also* FY 2014 Justice Assistance Grant (JAG) Program Variable Passthrough (VPT) percentages, https://www.bja.gov/Funding/JAGvpt.pdf.

[17] *See, e.g.,* Byrne JAG Fiscal Year 2016 California State Application, at 26, http://www.bscc.ca.gov/downloads/2016%20BSCC%20Application%20to%20BJA%20for%20Byrne%20JAG%20Funding.pdf.

*Id.* § 10153(a)(4).  Finally, applicants must "certif[y]," that they "will comply with all provisions of this part and all other applicable Federal laws."  *Id.* § 10153(a)(5)(D).

65.     The current Byrne JAG statute contains no immigration-related requirements.  Indeed, Congress specifically removed an immigration-related funding requirement when it merged the Byrne Formula Grant program with LLEBG to create Byrne JAG.  Congress eliminated the Byrne Formula Grant requirement that recipients make "[a]n assurance that the State has established a plan under which the State will provide without fee to the Immigration and Naturalization Service, within 30 days of the date of their conviction, notice of conviction of aliens who have been convicted of violating the criminal laws of the State and under which the State will provide the Service with the certified record of such a conviction within 30 days of the date of a request by the Service for such record."  42 U.S.C. § 3753(a)(11) (2002).

**B.     San Francisco Uses Byrne JAG Funds To Support Vital City Services.**

66.     The San Francisco Department of Children, Youth and their Families ("DCYF") applies for local Byrne JAG funds and state pass-through funds on behalf of the City.  DCYF keeps a portion of the grant and also administers grant funds to the following departments: Adult Probation, District Attorney, Juvenile Probation, Public Defender, Police, and Sheriff.  DCYF also passes through funds from the local grant to San Francisco Superior Court and a third party evaluator.

67.     Consistent with the Byrne JAG statute, San Francisco uses its Byrne JAG funds to support critical law enforcement programs designed to reduce criminal behavior and improve public safety.  Specific programs funded with this grant include: (1) Law Enforcement Assisted Diversion, an innovative approach that seeks to accomplish the goals of reduced criminal behavior and improved public safety by connecting appropriate low-level drug offenders with services; (2) Focused Drug Deterrence, short and long term proactive activities including targeted investigations and enforcement and social network analysis to increase the identification of individuals involved in high-level drug markets; (3) Drug Court Prosecution, which seeks to connect criminal defendants who suffer from a substantial substance abuse problem to treatment services in the community in order to enhance public safety, reduce recidivism, and to find appropriate dispositions to the criminal charges; (4) Targeted Drug Treatment for Underserved Populations, a treatment intervention conducted by the Sheriff's

Department for individuals in custody; (5) Intensive Probation Supervision, a targeted caseload of probationers with substance abuse and/or mental health issues; (6) Reentry Social Work through the Public Defender's Office, which provides legal and wraparound support to help indigent clients charged with felony drug cases and other felony offenses successfully exit the criminal justice system; and (7) Citywide Justice-Involved Youth Planning, which examines current criminal justice trends impacting youth and young adults and strengthens partnerships and collaboration at various levels to create a continuum of support for youth and young adults.

68.     San Francisco uses Byrne JAG pass-through funds for two pilot projects designed to reduce recidivism for juveniles and young adults.  One project works with the San Francisco Unified School District to create an alternative to suspension for at-risk youth.  Students facing suspension—or exhibiting behaviors that put them at risk for suspension—are paired with trained role models who help them learn de-escalation skills and keep them from missing needed instruction time.

69.     The other project is a Young Adult Court aimed at reducing recidivism for youth ages 18-25.  This Court was designed in response to a growing body of neuroscience research showing that young adults are fundamentally different from both juveniles and older adults in how they process information and make decisions.  Our traditional justice system is not well-equipped to address cases involving these individuals, who are qualitatively different in development, skills, and needs from both children and older adults.  The Young Adult Court fills this gap by providing case management and other support for eligible young adult offenders from high-risk backgrounds.

70.     These City programs span seven departments, and a total of approximately ten full time equivalent positions for these programs are funded with Byrne JAG funds.  Without local and state Byrne JAG funds, San Francisco could be forced to reduce or eliminate these programs, including eliminating staff positions, unless other funding sources could be identified.

**C.      The Department Of Justice Unlawfully Requires San Francisco To Certify Compliance With Section 1373 As A Condition Of Receiving Byrne JAG Funding.**

71.     For many years, OJP administered the Byrne JAG program consistent with congressional intent: local jurisdictions received federal funding according to a formula to support law

//

enforcement initiatives, and the federal government imposed few restrictions on state and local governments wishing to receive these grant funds.

72.     But 2016, OJP began to change course.  As noted above, the Byrne JAG authorizing statute requires a "certification" that "the applicant will comply with all provisions of this part and all other applicable federal laws."  34 U.S.C. § 10153(a)(5)(D).  OJP issued guidance in July 2016 that Section 1373 was such an "applicable law" for which jurisdictions had to certify compliance to receive Byrne JAG funds.

73.     Section 1373 provides that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual."  8 U.S.C. § 1373(a).  Section 1373 further provides that, "with respect to information regarding the immigration status . . . of any individual,"  "no person or agency may prohibit, or in any way restrict, a . . . local government entity from . . . (1) sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service[,] (2) maintaining such information[, or] (3) exchanging such information with any other Federal, State, or local government entity."  *Id.* § 1373(b).

74.     In July and October 2016, DOJ indicated that it viewed Section 1373 as an applicable federal law for the Byrne JAG program.  *See* Office of Justice Programs, *Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. Dep't Just. (July 7, 2016), https://www.bja.gov/funding/8uscsection1373.pdf ("OJP July Guidance"); Office of Justice Programs, *Additional Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. Dep't Just. (Oct. 6, 2016), https://www.bja.gov/funding/Additional-BJA-Guidance-on-Section-1373-October-6-2016.pdf ("OJP October Guidance").

75.     In the OJP July Guidance, OJP suggested that Section 1373 imposes an affirmative obligation on state and local governments.  The Guidance states that to comply with Section 1373, "[y]our personnel *must* be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of

//

information about an individual's citizenship or immigration status with any federal, state or local

government entity and officials." OJP July Guidance at 1 (emphasis added).

76. In the October 2016 Guidance, OJP indicated that all Byrne JAG recipients needed "to examine their policies and procedures" to ensure compliance with Section 1373. OJP reiterated that "all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373, as part of the Byrne/JAG grant application process." OJP October Guidance at 1.

77. But OJP made clear at the time that "[n]o FY 2016 or prior year Byrne/JAG . . . funding will be impacted." OJP October Guidance at 1. OJP stated that its "goal is to ensure that our JAG . . . recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities." *Id.*

78. Beginning in FY 2017, DOJ expanded upon this mandate, requiring a detailed Certification of Compliance ("Section 1373 Certification") to be completed by an applicant's Chief Legal Officer and submitted to OJP before it can accept the award of any Byrne JAG funds. *See* Byrne JAG FY 2017 Local Solicitation (attached hereto as Exhibit B) ("Local Solicitation") at 38.

79. Among other things, the Section 1373 Certification requires the applicant's Chief Legal Officer to certify under penalty of perjury that he or she has carefully reviewed Section 1373 and understands that DOJ requires local governments to comply with Section 1373 "with respect to any 'program or activity' funded in whole or in part" with Byrne JAG dollars. The Chief Legal Officer is required to conduct—or cause to be conducted—a "diligent inquiry and review" concerning both (1) the "program or activity" to be funded with Byrne JAG funds and (2) "any prohibitions or restrictions potentially applicable to the 'program or activity' sought to be funded . . . that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in [Section 1373]."

80. The Section 1373 Certification further requires that the Chief Legal Officer certify under penalty of perjury that:

> [N]either the jurisdiction, nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2017 [Byrne JAG Program], and that deals with either—(1) a government entity or –official sending or receiving

information regarding citizenship or immigration status as described in 8 U.S.C. § 1373(a); or (2) a government entity or –agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

81. The Section 1373 Certification further provides that the Chief Legal Officer must acknowledge that a "materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact)" in the certification will potentially subject him or her to criminal prosecution and the applicant entity to civil penalties and administrative remedies for false claims.

82. The Section 1373 Certification is not the only time that jurisdictions will be required to assure DOJ that they comply with Section 1373. In addition, OJP has informed potential grant recipients that beginning on October 1, 2017, all Byrne JAG award recipients will be required to "certify each payment request before submission" to the federal Grant Payment Request System. That is, each time a grant recipient wishes to draw-down funds from a Byrne JAG award, the recipient must again certify compliance with Section 1373.

83. Specifically, OJP has informed recipients that they must make the following declaration, in addition to other assurances:

To the best of my knowledge and belief, on behalf of myself and the award recipient, I certify to DOJ, under penalty of perjury, that the following are true as of the date of this request—(1) The recipient is in compliance with all award conditions that affect the obligation, expenditure, and drawdown of award funds, as well as all related requirements that appear in the certifications and assurances for this award, specifically including any restrictions concerning obligations set out in requirements related to 8 U.S.C. § 1373.

84. Further, DOJ has indicated that it will conduct ongoing monitoring of a jurisdiction's compliance with Section 1373, and will deny and/or claw back funds if it deems a jurisdiction out of compliance with Section 1373. In a November 15, 2017 letter to San Francisco Mayor Edwin Lee, Defendant Hanson informed San Francisco that its "FY 2016 Byrne JAG grant award required you to comply with 8 U.S.C. § 1373. Section 1373 compliance is an ongoing requirement that the Department of Justice monitors." Exhibit A at 1.

85. The November 15, 2017 letter further informed San Francisco that the Department "is concerned that the following San Francisco laws, policies, or practices may violate section 1373." The

//

letter identified San Francisco Administrative Code Sections 12H.2 and 12I.3 as such "laws, policies, or practices" that may violate Section 1373.

86.     The letter directed San Francisco to submit a response to this letter by December 8, 2017, addressing whether San Francisco's laws, policies, or practices violate Section 1373. The letter further asked San Francisco to "address whether [it] would comply with section 1373 throughout the award period, should [it] receive an FY 2017 Byrne JAG grant award."

87.     On December 7, 2017, San Francisco City Attorney Dennis Herrera responded to OJP's letter on behalf of San Francisco. San Francisco informed OJP that San Francisco has no laws, policies, or practices that violate Section 1373, as it is properly construed. San Francisco directed OJP to its briefing in *San Francisco v. Trump* for further explanation of its legal position. A copy of San Francisco's response letter is attached to this Amended Complaint as Exhibit C.

88.     DOJ sent similar letters to 29 other jurisdictions on November 15, 2017. In a press release issued that same day, the Attorney General stated that "[j]urisdictions that adopt so-called 'sanctuary policies' also adopt the view that the protection of criminal aliens is more important than the protection of law-abiding citizens and the rule of law." Press Release, U.S. Dep't of Justice, Justice Department Sends Letters to 29 Jurisdictions Regarding Their Compliance with 8 U.S.C. 1373 (Nov. 15, 2017), https://www.justice.gov/opa/pr/justice-department-sends-letters-29-jurisdictions-regarding-their-compliance-8-usc-1373. The Attorney General further stated "I urge all jurisdictions found to be potentially out of compliance in this preliminary review to reconsider their policies that undermine the safety of their residents. We urge jurisdictions to not only comply with Section 1373, but also to establish sensible and effective partnerships to properly process criminal aliens." *Id.*

89.     These letters were consistent with letters that DOJ sent to nine jurisdictions on April 21, 2017, "alert[ing]" the recipients that they were required to submit "documentation to OJP that validates your jurisdiction is in compliance with 8 U.S.C. § 1373." DOJ has engaged in a protracted back-and-forth with several of these jurisdictions—including New York City, Philadelphia, and Chicago—and has repeatedly communicated that these jurisdictions "appear[] have laws, policies, or practices that violate 8 U.S.C. § 1373." In a speech delivered on the same day that he sent the April 21, 2017 letters, the Attorney General reiterated that "the Department of Justice sent letters to

jurisdictions that were identified (by the Obama administration) as having policies that potentially violate federal law to receive millions in federal grants." Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks Before Media Availability in San Diego, California (Apr. 21, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-media-availability-san-diego-california.

90. These letters stand in stark contrast to DOJ's earlier representation that FY 2016 funding would *not* be implicated by DOJ's new decision to require compliance with Section 1373. DOJ has not offered any explanation for this change, or explained how it can retroactively attach grant conditions to award documents issued well over a year ago.

91. The Administration lacks the statutory authority to require Byrne JAG applicants and recipients to certify compliance with Section 1373. Although the Byrne JAG statute requires that recipients certify compliance with "all applicable laws," Section 1373 is not an applicable law for the Byrne JAG Program or for federal grants more generally. DOJ has unilaterally imposed the Section 1373 Requirement to further its own political ends of eradicating sanctuary cities.

92. Indeed, Congress has repeatedly considered and rejected legislation that would punish cities for setting their own law enforcement priorities by allowing federal agencies to withhold certain grants. *See, e.g.,* Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016). None of this legislation has been enacted.

93. In July 2015, then-Senator and now-Attorney General Sessions introduced Senate Bill 1842, "Protecting American Lives Act." That bill would in part have expanded existing federal law to deprive jurisdictions having "in effect a statute, policy, or practice that prohibits law enforcement officers of the State, or of a political subdivision of the State, from assisting or cooperating with Federal immigration law enforcement in the course of carrying out the officers' routine law enforcement duties" of "any . . . law enforcement or Department of Homeland Security grant." S. 1842, 114th Cong. § 3 (2015). The bill never made it out of committee.

//

//

### D. The Department Of Justice Also Announced Two Additional Unlawful Requirements For The FY 2017 Byrne JAG Program.

94. In late July 2017, DOJ went even further when it announced two additional new requirements that it would unilaterally impose on Byrne JAG grant applicants. The Attorney General announced that "[r]ecipients for FY 2017 will be notified of new conditions of their grants."[18]

95. The Attorney General stated that:

> From now on, the Department will only provide Byrne JAG grants to cities and states that comply with federal law, allow federal immigration access to detention facilities, and provide 48 hours notice before they release an illegal alien wanted by federal authorities. This is consistent with long-established cooperative principles among law enforcement agencies. This is what the American people should be able to expect from their cities and states, and these long overdue requirements will help us take down MS-13 and other violent transnational gangs, and make our country safer.[19]

96. DOJ made clear that the Notice and Access Requirements are distinct from Section 1373. The new conditions are not included as part of the existing requirement that recipient jurisdictions certify compliance with Section 1373. Byrne JAG FY 2017 State Solicitation (attached hereto as Exhibit D) ("State Solicitation") at 21; Local Solicitation at 20. Rather, they are independent "award conditions" not connected to any statutory requirement. State Solicitation at 32; Local Solicitation at 30.

97. OJP first included the Notice and Access Requirements in the State Solicitation. The State Solicitation was posted on OJP's website on July 25, 2017, and provided that applications were to be submitted no later than August 25, 2017.

98. The State Solicitation provided, first, that OJP will require grant applicants to "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." State Solicitation at 32.

---

[18] *See* Press Release, U.S. Dep't of Justice, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017), https://www.justice.gov/opa/pr/attorney-general-sessions-announces-immigration-compliance-requirements-edward-byrne-memorial.

[19] *Id.*

99.     Further, the State Solicitation provided that OJP will require grant applicants to "permit personnel of the [DHS] to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States."  State Solicitation at 32.

100.     OJP included the same two requirements in the Local Solicitation, which was made available for applicants on August 3, 2017.  Local Solicitation at 30.  The Local Solicitation required that applications for FY 2017 Byrne JAG funding be submitted no later than September 5, 2017.  As described in more detail below (*see infra* ¶¶ 126-27), San Francisco submitted its FY 2017 Byrne JAG application on September 5, 2017.

101.     The Local Solicitation describes these two new requirements as "award requirements." Local Solicitation at 29.  It provides that "[i]f selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with all award requirements (including all award conditions)."  *Id.*  The Local Solicitation further provides that "[c]ompliance with the requirements of the two foregoing new award conditions will be an authorized and priority purpose of the award."  Local Solicitation at 30.

102.     San Francisco has not received a Byrne JAG award document at this time.

103.     But DOJ has issued award documents to two other jurisdictions.  *See* Dkt. No. 46-1, Declaration of Alan Hanson ("Hanson Decl.") ¶¶ 5-6 & Exh. B.  Those award documents contain DOJ's description of the Notice and Access Requirements.

104.     DOJ has asserted that it will describe the Notice and Access Requirements the same way in any future award documents.  Hanson Decl. ¶¶ 5-6 ("Represented Final Conditions").

105.     Paragraph 55 of one such award document describes the Notice and Access Requirements as requiring jurisdictions to have an affirmative statute, rule, regulation, policy, or practice "designed to ensure" compliance with the conditions for state or state-contracted correctional facilities "[w]ith respect to the 'program or activity' that is funded."  The "[r]equirement" states in full:

> With respect to the "program or activity" that is funded (in whole or in part) by this award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award—

A. A State statute, or a State rule, -regulation, -policy, or –practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given to access any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

B. A State statute, or a State rule, -regulation, -policy, or –practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable (see para. 4.B. of this condition)—provide the requested notice to DHS.

Hanson Decl., Exh. B at 18.

106.    DOJ lacks statutory authority for imposing the Notice and Access Requirements on Byrne JAG recipients.  As described above, the Byrne JAG authorizing legislation requires program applicants to certify that they will "comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D).  But no federal law requires that local jurisdictions provide advance notice before releasing a purported alien from their custody, or that they grant federal officials unfettered access to local detention facilities to interrogate individuals in local custody.  Nor does any federal law give the Attorney General—or any division of DOJ—the authority to impose conditions of his choice.

107.    Indeed, as described above (*see supra* ¶¶ 92-93), Congress has repeatedly considered and rejected legislation that would punish cities for setting their own law enforcement priorities by allowing federal agencies to withhold certain grants.  Congress has never passed legislation requiring local jurisdictions to comply with the Notice Requirement or the Access Requirement, or any similar requirement for Byrne JAG grants.  Nor has it authorized the executive branch to penalize local jurisdictions—by withholding funds or through any other form of punishment—based on their refusal to comply with the Notice or Access Requirements.  Defendants' unilateral imposition of the Notice and Access Requirements, in these circumstances, is unprecedented, unauthorized, and unlawful.

108.    Furthermore, the Notice and Access Requirements are ambiguous as to what jurisdictions must do to be in compliance.  For example, the Notice Requirement as set forth in the Local Solicitation does not explain whether notice must be given only when the scheduled release date

and time is known at least 48 hours in advance, or whether it requires jurisdictions to hold inmates in custody for additional time to provide a full 48-hour period of notice to ICE.

109.    DOJ has now taken the position in the Represented Final Conditions that the Notice Requirement does not authorize or require Byrne JAG funding recipients to maintain an individual in custody beyond the date and time the individual would otherwise be released. *See* Hanson Decl., Exh. B at 18.  DOJ states in the Represented Final Conditions that "[i]n the event that . . . the scheduled release date and time for an alien are such as not to permit the advance notice [of scheduled release] that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable." *Id.*

110.    This post-hoc retreat from the Local Solicitation's broad language does not cure the ambiguity.  It still leaves San Francisco uncertain about how much notice is "practicable" to provide, and thus leaves San Francisco with no way of knowing how it can ensure compliance with the Notice Requirement.  The Represented Final Conditions still refer to a "scheduled release date and time," and do not acknowledge that inmates may at times be released with little or no notice.  In these circumstances, San Francisco would have little or no opportunity to provide DOJ with any advance notice.  The Represented Final Conditions do not suggest that this would be sufficient.

111.    And in any event, DOJ's more recent characterization of the Notice Requirement suggests that the Requirement may still operate as a detainer requirement in disguise.  Although Defendants now appear to be attempting to narrow the Notice Requirement's reach, there is no certainty that they will not at some future point revert to the broader, unqualified language that appeared in the Local Solicitation or adopt a similar interpretation.

112.    Likewise, the Access Requirement is unclear on its face as to whether jurisdictions are required to provide access to inmates in custody only when those individuals consent, or instead whether jurisdictions are required to compel unwilling inmates to meet with ICE representatives.

113.    In litigation DOJ has attempted to define the Access Requirement's scope.  DOJ has stated in briefing in a case pending in the Eastern District of Pennsylvania that there is no ambiguity about what the Access Requirement demands.  Defs.' Memo. in Opp. to Pltf.'s Mot. for Prelim. Inj., *Philadelphia v. Sessions*, No. 2:17-cv-03894-MMB, Dkt. No. 28, at 32.  DOJ stated that the plaintiff in

that matter "wishfully identifies a supposed ambiguity about whether the [Access Requirement] requires allowing ICE agents access to visit an inmate even when the inmate has told the facility that the inmate does not consent to an interview. The answer is yes. The condition does require allowing access in this scenario, even if the inmate might decline to answer questions." *Id.*

114. Even with DOJ's qualification, the Access Requirement is still ambiguous regarding what type of access San Francisco must provide. The Requirement does not identify any limiting principle on the access that ICE agents must receive. For instance, must San Francisco allow ICE agents to use a jail interview room to "access" an uncooperative inmate for as long as ICE wishes? The Access Requirement does not answer this and similar questions.

115. The Access Requirement is particularly ambiguous in light of San Francisco's state law obligations under the Transparent Review of Unjust Transfers and Holds Act ("TRUTH Act"), Cal. Gov't Code § 7283 *et seq.* The TRUTH Act requires that, before an interview with ICE takes place, a local law enforcement officer must provide the detained individual with a "written consent form that explains the purpose of the interview, that the interview is voluntary, and that he or she may decline to be interviewed or may choose to be interviewed only with his or her attorney present." *Id.* § 7283.1(a). It is unclear whether the Access Requirement would preclude San Francisco from complying with the TRUTH Act. For example, it is ambiguous whether the Access Requirement prohibits San Francisco from informing inmates of their right to have a lawyer present or decline an interview with ICE officials, as the TRUTH Act requires it to do.

116. Further, it is unclear what DOJ will consider an adequate rule, regulation, policy, or practice for purposes of compliance with either the Notice or Access Requirements. The conditions provide no guidance or further information as to the meaning of these terms.

**IV.     San Francisco Faces Immediate Injury From DOJ's Newly Announced Requirements.**

**A.     DOJ Has Threatened To Claw Back San Francisco's FY 2016 Byrne JAG Funding.**

117. In FY 2016, San Francisco received a direct Byrne JAG grant of $522,943. San Francisco also received a state pass-through of Byrne JAG funds of $981,202.

//

118.    DOJ did not include a Section 1373 Requirement in its FY 2016 Byrne JAG award to San Francisco.  In contrast, on information and belief DOJ did include a Section 1373 condition in certain Byrne JAG awards made to other recipients.

119.    In July 2016—after San Francisco applied for the FY 2016 award—OJP issued its July 2016 Guidance expressing its view that Section 1373 is an "applicable law" for Byrne JAG award purposes.

120.    But in October 2016—after San Francisco accepted its FY 2016 award—OJP issued its October 2016 Guidance stating that its determination that Section 1373 is an applicable law would not impact FY 2016 funding.

121.    Despite this, DOJ's November 2017 letter to San Francisco threatens to claw back FY 2016 Byrne JAG funding on the basis of San Francisco's purported failure to comply with Section 1373.

122.    In its about-face, DOJ did not acknowledge its change in position, nor explain how it can attach a retroactive new requirement to FY 2016 funds that San Francisco has already accepted.

123.    San Francisco's FY 2016 funding has already been allocated to support a number of vital city services.  The unlawful claw back of these funds threatens to disrupt San Francisco's ability to continue these critical city programs.

**B.     The Section 1373 Certification And Additional FY 2017 Requirements Put San Francisco To An Unconstitutional Choice.**

**1.     San Francisco Will Soon Be Required To Execute The Section 1373 Certification And Agree To The Notice And Access Requirements.**

124.    San Francisco has received state and local Byrne JAG funds every year for decades, and has applied for Byrne JAG funds for the FY 2017 grant cycle.

125.    For FY 2017, San Francisco is entitled to a direct Byrne JAG formula grant of $524,845.  San Francisco also expects to receive a state pass-through of Byrne JAG funds in the amount of $923,401.

126.    OJP posted the FY 2017 Local Solicitation on August 3, 2017, with an application deadline of September 5, 2017.

//

127. On September 5, 2017, San Francisco submitted its FY 2017 Byrne JAG application. In connection with that application, San Francisco made clear that it was not certifying that it would comply with the Notice and Access Requirements, and stated that it was challenging those requirements in litigation. San Francisco informed DOJ that San Francisco DCYF submitted the application "without confirming that it complies with the access condition or notice condition, and without agreeing as part of this application to comply with those conditions."

128. OJP posted the FY 2017 State Solicitation on July 25, 2017, with an application deadline of August 25, 2017.

129. OJP has also posted state allocations showing that the State of California is entitled to $17.7 million in Byrne JAG funds for FY 2017. *See* www.bja.gov/Funding/17JAGStateAllocations.pdf.

130. On information and belief, the State of California has applied for Byrne JAG funds for FY 2017.

131. States must pass through a portion of state Byrne JAG awards to local jurisdictions in the state. *See* 34 U.S.C. § 10156(c). The California Board of State and Community Corrections ("BSCC") is the State Administering Agency responsible for oversight of Byrne JAG funding in California. The BSCC has adopted a multi-year strategy for Byrne JAG funding that prioritizes law enforcement; prevention and education programs; and courts, prosecution and defense. This multi-year strategy does not include or prioritize enforcement of federal immigration laws.

132. Once the State of California receives Byrne JAG funds, it issues a request for proposals ("RFP") for local jurisdictions to apply for pass-through funds. In 2014, California invited proposals for a three year funding cycle beginning on March 1, 2015, and ending on December 31, 2017. The initial RFP was released on September 15, 2014, with a Notice of Intent to Apply due October 3, 2014, and proposals due November 21, 2014. After the initial award, local jurisdictions were required to re-apply for the second and third year funds. San Francisco was awarded a grant for the Young Adult Court and alternative to suspension projects discussed above, with $1,045,624 awarded in 2015, $983,971 in 2016, and $981,202 in 2017.

//

133. To receive pass-through Byrne JAG funds, San Francisco will be required to submit assurances that it will comply with all award requirements. This obligation flows from the requirement that sub-recipients of state Byrne JAG awards must certify their compliance with Section 1373, as applicable to the program and award to be funded, and assure that they will comply with all award conditions, including the Notice and Access Requirements.

134. DOJ has not yet issued a final award document to San Francisco. As of the date of this filing, San Francisco's 2017 Byrne JAG application appears as "submitted" in the federal grant processing system.

135. DOJ has stated that grant recipients will have 45 days from the date they receive award documents to accept or reject a FY 2017 Byrne JAG award. To accept a FY 2017 Byrne JAG award, recipients will be required to certify that they comply with all applicable award conditions—including the Notice and Access Requirements—and to submit an executed Section 1373 Certification.

### 2. The Notice, Access, And Section 1373 Requirements Create An Unconstitutional Choice For San Francisco.

136. The Notice, Access, and Section 1373 Requirements will create an untenable choice for San Francisco, when it is faced with the decision whether to accept the FY 2017 Byrne JAG award.

137. As to the Notice and Access Requirements, San Francisco is unable to comply with those Requirements, as is necessary to accept a FY 2017 Byrne JAG award and draw down the related funds. San Francisco cannot assure DOJ that it complies with these Requirements for three reasons.

138. First, San Francisco does not have in place any laws, rules, regulations, or policies that fulfill the Notice and Access Requirements, as DOJ has made clear is necessary for San Francisco to accept an award. Indeed, San Francisco's Sanctuary City Laws and policies conflict with the Notice and Access Requirements, as DOJ has described them.

139. Second, practical difficulties also prevent San Francisco from complying with the Notice and Access Requirements.

140. As to the Notice Requirement, the Sheriff's Department frequently does not know whether and when an inmate will be released with enough time to provide federal officials with 48 hours' advance notice, or very much notice at all. And those release dates and times are often dictated

by factors outside of San Francisco's control. For instance, an inmate's release is often controlled by a court order that requires San Francisco to release the inmate as quickly as possible. San Francisco and its officials potentially face liability for delaying an inmate's release once a court has ordered it. *See Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004) (noting that local governments may violate the constitutional rights of inmates when they continue to hold inmates after a court has authorized their release).

141.     As to the Access Requirement, the Sheriff's Department does not provide federal immigration officials access to inmates. Under the Sheriff's Department policy, Sheriff staff are not authorized to provide ICE representatives conducting civil immigration enforcement access to inmates in jail.

142.     Third, San Francisco's uncertainty regarding what the Notice and Access Requirements demand in practice threatens to interfere with its ability to administer its jails. Although DOJ now disclaims the argument that the Notice Requirement functions as a de facto detainer request, the Notice and Access Requirements in fact could prolong an inmate's detention. DOJ's insistence that it receive access to inmates could delay an inmate's release, if ICE seeks to interview inmates when they would otherwise be released. Likewise, the Notice Requirement could delay an inmate's release in circumstances where an inmate is ordered to be released immediately. Although DOJ has suggested that it need not receive a full 48 hours' notice when that amount of time is "impracticable," the Notice Requirement still requires that *some* form of advance notice may be given. Thus, San Francisco may be forced to adjust inmates' release times to ensure that it can provide the federal government with the required period of notice. And San Francisco remains uncertain that DOJ will adhere to the "as early as practicable" limitation, which was not included in the Solicitations.

143.     Coercing San Francisco to detain individuals past their projected release date—as the Notice Requirement could do at least in practice—likely violates the Fourth Amendment. Given the reality of how inmates' release times are determined, and the uncertainty regarding how DOJ will administer the Notice and Access Requirements, San Francisco fears that it may be unable to comply with these Requirements without running afoul of the Fourth Amendment.

//

144. San Francisco is thus put in an untenable situation: it cannot comply with the Notice and Access Requirements without changing its local laws and policies. And even if it were willing to change its laws and policies—which it is not—those changes would expose it to potential constitutional liability. But if San Francisco refuses to change its laws and policies to enable it to accept the FY 2017 Byrne JAG award, it will be forced to forgo millions of dollars of vital law enforcement funding. Ironically, DOJ would deprive San Francisco of money for public safety because it questions San Francisco's legitimate exercise of judgment—consistent with the allocation of power under the Constitution—about what best serves the public safety of its own residents.

145. The Section 1373 Requirement likewise requires San Francisco to make another untenable choice: either sign the Section 1373 Certification under the cloud of DOJ's incorrect assertion that San Francisco's laws—in particular, Chapters 12H and 12I of the San Francisco Administrative Code—fail to satisfy Section 1373's demands, or decline to sign the certification and give up funding that City departments depend on.

146. Although San Francisco firmly believes that its laws, policies, and practices comply with Section 1373, Defendants' statements give rise to a credible fear that DOJ will either deny the application, accept the application and later claw back funds, or attempt to hold San Francisco or its officials civilly or criminally liable for signing the Certification.

147. Defendants' November 15, 2017 letter, mentioning DOJ's "concern[s]" that Chapters 12H and 12I of the Administrative Code "may violate section 1373," exacerbates this fear.

148. This credible fear is compounded by the Administration's additional statements suggesting that San Francisco violates Section 1373. The White House has characterized "[s]anctuary cities, like San Francisco" as violating Section 1373 by "block[ing] their jails from turning over criminal aliens to Federal authorities for deportation."[20] The Attorney General has criticized San Francisco for having sanctuary city policies, which he described as a "refus[al] to cooperate with

//

---

[20] Press Release, The White House, Office of the Press Secretary, Statement on Sanctuary Cities Ruling (Apr. 25, 2017), https://www.whitehouse.gov/the-press-office/2017/04/25/statement-sanctuary-cities-ruling.

federal immigration authorities regarding illegal aliens who commit crimes."[21]  And more recently, the

Attorney General identified San Francisco's Sanctuary City Laws as having "led to the preventable

and heartbreaking death of Kate Steinle" and vowed to "ensure that all jurisdictions place the safety

and security of their communities above the convenience of criminal aliens."[22]  These threats create

substantial uncertainty for San Francisco about signing the Section 1373 Certification.

149.    This uncertainty is compounded by the Trump Administration's continually changing

interpretation of what Section 1373 requires.  That interpretation has expanded repeatedly over the

past year, creating apprehension for San Francisco about whether the Administration may refuse to

accept San Francisco's Section 1373 Certification, or later take punitive action against San Francisco.

150.    For instance, the Administration has repeatedly, and incorrectly, suggested that a local

government violates Section 1373 when it refuses to honor detainer requests or allow access to jails.

DOJ specifically linked Section 1373 to ICE detainers in a 2016 Office of the Inspector General

memorandum that analyzed ten jurisdictions' compliance with Section 1373 and stated that detainer

policies "may be causing local officials to believe and apply the policies in a manner that prohibits or

restricts cooperation with ICE in all respects . . . [which], of course, would be inconsistent with and

prohibited by Section 1373."  May 2016 OJP Guidance.  ICE Director Thomas Homan also testified to

Congress that over 100 jurisdictions violated Section 1373 because they "have some sort of policy

where they don't honor detainers or allow us access to the jails."[23]

151.    More recently, DOJ has adopted an even broader interpretation of Section 1373 as

preventing jurisdictions from prohibiting or restricting their employees from sharing vast swaths of

information, far removed from Section 1373's reference to "immigration status."

---

[21] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks in Las Vegas to Federal, State and Local Law Enforcement About Sanctuary Cities and Efforts to Combat Violent Crime (July 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-las-vegas-federal-state-and-local-law.

[22] Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on the Verdict in People of the State of California vs. Jose Ines Garcia Zarate aka Juan Francisco Lopez Sanchez (Nov. 30, 2017), https://www.justice.gov/opa/pr/attorney-general-sessions-statement-verdict-people-state-california-vs-jose-ines-garcia.

[23] H. Approps. Comm. Hr'g Tr., Fed. News Serv. Transcripts, 2017 WLNR 18737622 (June 13, 2017).

152.     For instance, in letters Defendant Hanson has sent to other jurisdictions regarding their supposed violations of Section 1373, DOJ indicated that it believes Section 1373 requires local governments to allow their employees to share not only immigration status information, but also information regarding a person's custody status and release date. *See* Ltr. to Eddie T. Johnson, Chicago Superintendent of Police, from Alan R. Hanson (Oct. 11, 2017), https://www.justice.gov/opa/press-release/file/1003016/download. DOJ, in those letters, also made clear that it expects local jurisdictions not only to avoid having in place a "prohibition or any restriction" regarding the sending of immigration-status information—as the Section 1373 Certification suggests—but also to make affirmative communications to their employees. Ltr. to Hon. Jim Kenney, City of Philadelphia, from Alan R. Hanson (Oct. 11, 2017), https://www.justice.gov/opa/press-release/file/1003046/download.

153.     And in just the past few weeks, DOJ's incorrect interpretation of Section 1373 has expanded again. In an October 2017 hearing on San Francisco's Motion for Summary Judgment in the related *San Francisco v. Trump* case, counsel for DOJ stated that Section 1373's reference to "immigration status" information includes a person's custody status, release date, a person's "identity and age," date of birth, residence, and home address. Hr'g Tr. (Oct. 23, 2017) at 21:8-23:3. Further, in recent briefing in the related *California v. Sessions* case, No. 3:17-cv-04701-WHO, DOJ took the view that Section 1373 also includes information about familial relationships. Dkt. No. 42, Defs.' Opp. to Pltf.'s Amended Mot. for Prelim Inj. at 21. In addition, at the same *San Francisco v. Trump* hearing, counsel for DOJ further stated that a "restriction" might include a jurisdiction's failure to inform its employees about Section 1373 to ensure that they "honor 1373." *Id.* at 20:22-21:5.

154.     Although Defendants' overbroad reading of Section 1373 is incorrect, it nonetheless creates undue pressure for San Francisco. Although San Francisco knows that it complies with Section 1373 as properly interpreted, it has a credible fear of denial of its 2017 Byrne JAG application, the subsequent claw back of its FY 2017 Byrne JAG funds, or future enforcement actions against it or its officials if it executes the Section 1373 Certification in the face of Defendants' representations.

//

//

155.    But at the same time, San Francisco will suffer harm if it declines to execute the Section 1373 Certification.  Doing so will render San Francisco ineligible for FY 2017 Byrne JAG funding.

156.    Together, these conditions harm San Francisco, no matter what choices San Francisco makes regarding Byrne JAG grants.  It can sacrifice its sovereignty and accede to the Administration's demands.  And in doing so, it can potentially expose itself to criminal penalties, if the Administration later rejects its Section 1373 Certification, or to civil liability, if the Administration's Notice and Access Requirements intrude on individual's constitutional rights.  Or it can refuse to change its considered and constitutionally protected policy judgments but forgo law enforcement dollars that are important to the community's public safety.

**V.    San Francisco Needs Declaratory Relief That It Properly Can Certify Compliance with Section 1373 As Required To Receive Byrne JAG Funds.**

157.    There is an actual controversy between San Francisco and DOJ regarding San Francisco's compliance with Section 1373, particularly in light of San Francisco's fear that DOJ will reject San Francisco's FY 2017 Section 1373 Certification, accept the Certification and later take enforcement action against San Francisco, or attempt to claw back FY 2016 Byrne JAG grant funds.

158.    Even if DOJ could lawfully require San Francisco to execute the Section 1373 Certification, it cannot withhold funding from San Francisco based on San Francisco's purported non-compliance with Section 1373 because San Francisco fully satisfies the Section 1373 Certification's requirements.

159.    Nothing in San Francisco Administrative Code Chapters 12H or 12I limits communications regarding citizenship or immigration status in any way, and these laws therefore comply with Section 1373.

160.    San Francisco's laws do not restrict the sharing of immigration status information.  Neither San Francisco nor any entity, agency, or official therein has in effect, or is subject to or bound by, any prohibition or restriction that applies to the programs or activities funded by the Byrne JAG program, and which concerns the government entity or official's sending to, or receiving from, the federal government any information regarding citizenship or immigration status.

161.    None of the San Francisco departments administering a Byrne JAG-funded program has in place a prohibition or restriction on the sending to, or receiving from, the federal government any information regarding citizenship or immigration status, or on the maintaining of such information.

162.    The departments administering Byrne JAG-funded programs are subject to and bound by Administrative Code Chapters 12H and 12I, and conduct their practices in accordance with those laws.

163.    San Francisco has adopted policies and practices consistent with Administrative Code Chapters 12H and 12I.

164.    San Francisco does not enforce detainer requests (as distinct from warrants), does not provide ICE access to its jails, and does not respond to notification requests from the federal government unless certain conditions are met.  But compliance with these requests is not required by Section 1373, which speaks only to communications regarding citizenship and immigration status.  Construing Section 1373 to extend to these activities would raise serious constitutional concerns.

165.    San Francisco does not prohibit or in any way restrict the sharing of citizenship or immigration status information.  San Francisco also does not provide a person's home address, residence, date of birth, or similar sensitive personal information to federal immigration officials.  But the sharing of this information with the federal government is not required by Section 1373, which speaks only to communications regarding citizenship and immigration status.

### COUNT ONE:

### DECLARATORY RELIEF – SAN FRANCISCO COMPLIES WITH THE REQUIREMENTS OF THE SECTION 1373 CERTIFICATION

166.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

167.    San Francisco disputes Defendants' authority to require it to execute the Section 1373 Certification.  But even if Defendants could require the Section 1373 Certification, they cannot withhold Byrne JAG funding from San Francisco in connection with that Certification because San Francisco complies with Section 1373.

168.     San Francisco does not have in effect, purport to have in effect, or is subject to or bound by any prohibition or restriction that applies to the program or activity funded with Byrne JAG monies that deals with either the sending to, or receipt of, information regarding an individual's immigration status information with the federal government, or the maintenance of such information.

169.     San Francisco's laws comply with Section 1373.  San Francisco Administrative Code Chapters 12H and 12I do not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, immigration officials information regarding the citizenship or immigration status of any individual, or maintaining such information.

170.     The departments administering Byrne JAG-funded programs are subject to and bound by these laws.  These departments have policies and practices in place that are consistent with these laws.

171.     Defendants contend that Chapters 12H and 12I of the San Francisco Administrative Code do not comply with Section 1373, based on their incorrect interpretation of Section 1373.

172.     Defendants have not identified any other San Francisco laws, policies, or practices that do not comply with Section 1373.

173.     Defendants' interpretation of Section 1373 is incorrect.  Section 1373 only governs restrictions on the sharing and receiving of information related to citizenship and immigration status, and requesting from federal immigration enforcement agents, and maintaining of, information related to citizenship and immigration status.  Section 1373 does not prohibit restrictions on detainer requests, notification requests, civil immigration authorities' access to jails, or requests for sensitive information like date of birth, residence, or home address.  *See Steinle v. City and County of San Francisco*, 230 F. Supp. 3d 994, 1015-16 (N.D. Cal. 2017).

174.     An actual controversy presently exists between San Francisco and Defendants about whether San Francisco's laws comply with Section 1373.

175.     An actual controversy presently exists between San Francisco and Defendants regarding whether San Francisco has in effect, purports to have in effect, or is subject to or bound by any prohibition or restriction that applies to the program or activity funded with Byrne JAG monies

//

that deals with either the sending to, or receiving from, immigration status information with the federal government, or the maintaining of such information.

176. A judicial determination resolving this controversy is necessary and appropriate.

## COUNT TWO:
## SEPARATION OF POWERS
### (Notice, Access, and Section 1373 Requirements)

177. Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

178. In July and August 2017, Defendants issued solicitations seeking applications for the Byrne JAG program.

179. San Francisco has applied for the FY 2017 Byrne JAG program, but has not yet received a response to its application.

180. The solicitations state: "Individual FY 2017 JAG awards will include two new express conditions that, with respect to the 'program or activity' that would be funded by the FY 2017 award, are designed to ensure that States and units of local government that receive funds from the FY 2017 JAG award: (1) permit personnel of the U.S. Department of Homeland Security (DHS) to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States; and (2) provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." State Solicitation at 32; Local Solicitation at 30.

181. DOJ has subsequently stated that any FY 2017 award document San Francisco receives will require that:

> With respect to the "program or activity" that is funded (in whole or in part) by this award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award—
>
> A. A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given to access any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

B.  A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable (see para. 4.B. of this condition)—provide the requested notice to DHS.

182.    DOJ has also instructed that jurisdictions wishing to accept 2017 Byrne JAG funds will have to execute a Certification of Compliance with 8 U.S.C. § 1373.

183.    The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, and the spending power, *see* U.S. Const. art. 1, § 8, cl. 1.  Absent a statutory provision or an express delegation, only Congress is entitled to attach conditions to federal funds.

184.    Congress has not enacted the Notice, Access, and Section 1373 Requirements as part of any statutory scheme.

185.    Congress has not enacted the Section 1373 Requirement as applicable to Byrne JAG funds.

186.    Congress has not delegated to Defendants the ability to impose the Notice, Access, and Section 1373 Requirements on Byrne JAG funds.

187.    Defendants are unilaterally imposing the Notice, Access, and Section 1373 Requirements without authorization from Congress.

188.    For these reasons, the Notice, Access, and Section 1373 Requirements unlawfully and unconstitutionally intrude upon and usurp powers that have been assigned to Congress, violating principles of separation of powers.

## COUNT THREE:
## SPENDING CLAUSE
### (Notice, Access, and Section 1373 Requirements)

189.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

190.    As described above, the Notice, Access, and Section 1373 Requirements violate separation of powers principles because they are not authorized by Congress, expressly or impliedly.

191.    Even if Congress had delegated its authority to impose conditions on Byrne JAG funds, the Notice, Access, and Section 1373 Requirements would violate the Spending Clause by:

a.      imposing conditions that are ambiguous, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously…The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts [Congress' conditions]… There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." ); and

b.      imposing conditions that are not germane to the stated purposes of the Byrne JAG funds, *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987) ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'").

192.    The Notice and Access Requirements additionally violate the Spending Clause by imposing conditions that would require Byrne JAG recipients to engage in unconstitutional activity such as detaining individuals without probable cause in violation of the Fourth Amendment, *see Dole*, 483 U.S. at 210 (Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional.").

## PRAYER FOR RELIEF

Wherefore, San Francisco prays that the Court grant the following relief:

1.      Declare that Chapters 12H and 12I of the San Francisco Administrative Code comply with Section 1373;

2.      Declare that San Francisco does not have in place a prohibition or restriction that applies to the program or activity funded under the Byrne JAG program, and which deals with sending to, receiving from, or requesting immigration status information with the federal government, or maintaining such information;

3.      Declare the Notice, Access, and Section 1373 Requirements Defendants have imposed on the Byrne JAG program unconstitutional;

4.      Permanently enjoin Defendants from using the Notice, Access, and Section 1373 Requirements as funding restrictions for any Byrne JAG awards;

1      5.      Enjoin Defendants from denying San Francisco Byrne JAG funding on the basis of

2   Defendants' assertion that San Francisco does not comply with Section 1373;

3      6.      Enjoin Defendants from clawing back San Francisco's Byrne JAG funds on the basis of

4   Defendants' assertion that San Francisco does not comply with Section 1373;

5      7.      Award San Francisco reasonable costs and attorneys' fees; and

6      8.      Grant any other further relief that the Court deems fit and proper.

7

8   Dated: December 12, 2017

9                              DENNIS J. HERRERA
                               City Attorney
10                             JESSE C. SMITH
                               RONALD P. FLYNN
11                             YVONNE R. MERÉ
                               CHRISTINE VAN AKEN
12                             TARA M. STEELEY
                               MOLLIE M. LEE
13                             SARA J. EISENBERG
                               AILEEN M. McGRATH
14
                               Deputy City Attorneys
15

16

17
                           By: */s/ Dennis J. Herrera*
18                             DENNIS J. HERRERA
                               City Attorney
19
                               Attorneys for Plaintiff
20                             CITY AND COUNTY OF SAN FRANCISCO

21

22

23

24

25

26

27

28

---

# EXHIBIT 2

DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
TARA M. STEELEY, State Bar #231775
SARA J. EISENBERG, State Bar #269303
AILEEN M. McGRATH, State Bar #280846
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4748
Facsimile:     (415) 554-4715
E-Mail:        brittany.feitelberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Plaintiff,<br><br>    vs.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, LAURA L. ROGERS, Acting Assist. Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, DOES 1-100,<br><br>    Defendants. | Case No. 18-5146<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.       During his campaign, President Trump pledged to end federal funding to sanctuary cities.  Despite the determination by these cities that their sanctuary laws and policies make their own communities safer, healthier and stronger, his Administration has spent more than eighteen months trying to coerce them to abandon those laws and policies by threatening to defund them.  The Trump Administration's two attempts to do so have been rebuffed by the federal courts.

2.       First, President Trump signed an executive order directing the Attorney General and Secretary of Homeland Security to ensure that "sanctuary jurisdictions" did not receive federal funds.  A court in this district struck it down.  Next, the Department of Justice ("DOJ") attempted to impose immigration-related requirements on FY 2017 Byrne JAG funds.  Every single court that has examined the validity of these requirements has found them to be unconstitutional.

3.       DOJ's latest effort should fare no better.  DOJ recently announced that it is again attempting to coerce sanctuary jurisdictions into changing their laws and policies by imposing unconstitutional requirements on important criminal justice grant funding.  Some of the new requirements DOJ has imposed on the FY 2018 Byrne JAG funds (*e.g.*, those that require jurisdictions to give immigration authorities both unfettered access to their jails and 48 hours' notice before releasing an individual believed to be in the country illegally) are nothing more than repackaged versions of the FY 2017 requirements that courts across the country have struck down.  But others go much further.  Indeed, the new requirements cast a threatening pall over sanctuary jurisdictions by implying that they may be violating federal criminal laws simply by having laws or policies that limit entanglement with federal immigration policies.

4.       These extortive requirements are unlawful.  As a threshold matter, DOJ lacks the statutory authority to impose them.  The Constitution establishes a balance of power between the state and federal governments, as well as among the coordinate branches of federal government, to prevent the excessive accumulation of power in any single entity and reduce the risk of tyranny and abuse from any government office.  An executive branch agency of the federal government may not seize for itself the power that the Constitution reserves for Congress.  Nor may it intrude on authority that the Constitution has preserved for state and local governments.  The FY 2018 grant requirements violate

both of these precepts. DOJ is improperly attempting to wield powers that only Congress is entitled to invoke, and is seeking to compel San Francisco to bend its considered policy judgments, which the Constitution allows it to make for its community, to the federal government's will.

5. And even if DOJ has the authority to impose *some* conditions on the FY 2018 Byrne JAG funds, each of the Challenged Requirements at issue here relating to federal immigration enforcement would still be unlawful under other constitutional limits. Those limits prevent DOJ from requiring compliance with the funding requirements because (1) they leave localities unclear about how to comply with each of the requirements, and (2) they lack a nexus between the congressionally mandated purpose of Byrne JAG funds and immigration enforcement.

6. San Francisco faces the immediate prospect of losing over $1.4 million in this fiscal year if it does not receive FY 2018 Byrne JAG funds. San Francisco uses these funds for a variety of important law enforcement purposes, including programs designed to reduce recidivism, provide alternative forms of prosecution, or enable drug treatment for underserved populations.

7. San Francisco faces an unacceptable choice that is precisely what the Trump Administration wishes it to have: either comply with DOJ's unconstitutional new grant conditions and abandon local policies that San Francisco adopted to promote public safety and foster trust and cooperation between law enforcement and the public; or, maintain these policies but forfeit critical funds that it relies on to provide essential services to San Francisco residents.

8. San Francisco is not obligated to enforce federal immigration law. San Francisco seeks declaratory and injunctive relief to ensure that San Francisco and other sanctuary jurisdictions continue to be eligible for these funds, instead of being coerced into accepting conditions that on their face violate bedrock constitutional principles of separation of powers, as well as constitutional vagueness and germaneness restrictions on grant requirements.

## JURISDICTION AND VENUE

9. The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201(a) and 2202 *et seq*.

//

10. Venue properly lies within the Northern District of California because Plaintiff, San Francisco, resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District. 28 U.S.C. §1391(e)(1).

## INTRADISTRICT ASSIGNMENT

11. Assignment to the San Francisco or Oakland Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions that give rise to this action occurred in the City and County of San Francisco.

## PARTIES

12. Plaintiff San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

13. Defendant Jefferson B. Sessions III is the Attorney General of the United States. He is sued in his official capacity. The Attorney General is the federal official leading the DOJ, which is responsible for the governmental actions at issue in this lawsuit.

14. Defendant Laura L. Rogers is Acting Assistant Attorney General of the United States in charge of the Office of Justice Programs, which administers Byrne JAG funding. She is sued in her official capacity.

15. Defendant DOJ is an executive department of the United States of America that is responsible for administering the Byrne JAG program.

16. Doe 1 through Doe 100 are sued under fictitious names. Plaintiff San Francisco does not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

**I.  The Byrne JAG Program Provides Important Criminal Justice Funds To San Francisco.**

**A.  The Byrne JAG Program.**

17. The Byrne JAG program is "the leading source of federal justice funding to state and local jurisdictions." Office of Justice Programs, *Welcome to BJA's Edward Byrne Memorial Assistance Grant (JAG) Program*, https://www.bja.gov/jag/ (last visited August 20, 2018). The program provides state and local governments with "critical funding necessary to support a range of

program areas including law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections, drug treatment and enforcement, . . . crime victim and witness initiatives and mental health programs." *Id.*

18.    The program is structured as a formula grant, awarding funds to all eligible grantees according to a prescribed metric.  Unlike discretionary grants, which agencies award under agency discretion, "'formula' grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula."  *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).  Specifically, the Bureau of Justice Assistance ("BJA")—a department within Office of Justice Programs ("OJP")—awards Byrne JAG funds to all eligible grantees in amounts based on Bureau of Justice Statistics ("BJS") calculations derived from the Byrne JAG statutory formula.  *See* 34 U.S.C. § 10156(d)(2)(A) (providing that the Attorney General "*shall* allocate to each unit of local government" funds consistent with the established formula) (emphasis added).

19.    The formula for state allocations is a function of population and violent crime.  *See id.* § 10156(a).  For local governments, the allocation is based on the state's allocation and the ratio of violent crime in the locality to violent crime in the state.  *See id.* § 10156(d).  For example, in FY 2018, California's total allocation is $28.9 million.  Of this, $17.4 million (60 percent) is allocated to the State (*see id.* § 10156(b)-(d))—but a minimum of 62.9 percent of these funds must be passed through to local jurisdictions.[1]  The other $11.6 million (40 percent) is allocated for direct grants to local jurisdictions.  *See id.* § 10156(b)-(d).

20.    Congress imposed only a limited number of requirements on Byrne JAG applicants.

21.    First, Congress has required applicants to supply information about their intended use of grant funding, to demonstrate that they will spend the money on programs supporting one of the eight statutory purpose areas.  *See* 34 U.S.C. § 10153(a)(2) & (a)(5)(A)-(C).  Those purpose areas are: (1) law enforcement, (2) prosecution and courts, (3) prevention and education, (4) corrections and

---

[1] U.S. Dep't of Justice, *Edward Byrne Memorial Justice Assistance Grant (JAG) Program Frequently Asked Questions (FAQs)–Updated August 2017*, at 2, https://www.bja.gov/Funding/JAGFAQ.pdf; *see also* U.S. Dep't of Justice,  FY 2014 Justice Assistance Grant (JAG) Program Variable Pass-through (VPT) Percentages, https://www.bja.gov/Funding/JAGvpt.pdf.

community corrections, (5) drug treatment, (6) planning, evaluation, and technology improvement, (7) crime victim and witness programs, and (8) mental health programs, including behavioral programs and crisis intervention. 34 U.S.C. § 10152(a)(1)(A)-(H). None of these program purposes include federal immigration enforcement.

22. Second, Congress requires applicants to maintain and be prepared to report information demonstrating that they possess programmatic and financial integrity. *Id.* § 10153(a)(4).

23. Finally, Congress requires applicants to "certif[y]" that they "will comply with all provisions of this part and all other applicable Federal laws." *Id.* § 10153(a)(5)(D).

24. Not one of these requirements relates to immigration. Indeed, over a decade ago, Congress removed the only requirement in the Byrne JAG statute that touched on immigration-related issues. In 2006, Congress specifically eliminated a funding requirement that recipients make "[a]n assurance that the State has established a plan under which the State will provide without fee to the Immigration and Naturalization Service, within 30 days of the date of their conviction, notice of conviction of aliens who have been convicted of violating the criminal laws of the State and under which the State will provide the Service with the certified record of such a conviction within 30 days of the date of a request by the Service for such record." 42 U.S.C. § 3753(a)(11) (2002).

25. Given the limited discretion Congress has bestowed upon DOJ under the Byrne JAG statute for these formula grants, the Attorney General has no authority to withhold or reduce federal grant funding a state or local government is entitled to receive. DOJ officials acknowledged as much in the recent past, when then-Assistant Attorney General Peter Kadzik wrote a letter to Senator Richard Shelby regarding the Senator's request that DOJ tie federal grant funding to federal immigration priorities. Kadzik stated that DOJ could not do so because "many Department grant funds are formula based" such that "the Department does not have the discretion to suspend funding at all."[2]

//

//

---

[2] Defendants' Administrative Record, *City and County of San Francisco v. Sessions*, No. 3:17-cv-4642-WHO ("*San Francisco v. Sessions*") (N.D. Cal. Mar. 23, 2018), Dkt. No. 84-2 at AR00113.

**B.** **San Francisco Uses Byrne JAG Funding To Support Important City Programs.**

26.    The San Francisco Department of Children, Youth and their Families ("DCYF")

applies for local Byrne JAG funds and state pass-through funds on behalf of the City.  DCYF keeps a

portion of the grant and also administers grant funds to the following departments: the Adult Probation

Department, District Attorney, Public Defender, Police Department, and Sheriff.  DCYF also passes

through funds from the local grant to the San Francisco Superior Court and a third party evaluator.

27.    Before FY 2017, San Francisco received state and local Byrne JAG funds every year

for well over a decade.

28.    San Francisco submitted its FY 2017 Byrne JAG application on September 5, 2017, but

OJP has not yet taken action on it.[3]

29.    San Francisco submitted its FY 2018 Byrne JAG application on August 21, 2018.

30.    For FY 2018, San Francisco is entitled to a direct Byrne JAG formula grant of

$489,966.  San Francisco also expects to receive a state pass-through of Byrne JAG funds in the

amount of $941,915.

31.    Consistent with the Byrne JAG statute, San Francisco uses its Byrne JAG funds to

support critical law enforcement programs designed to reduce criminal behavior and improve public

safety.  Specific programs funded with this grant include: (1) Law Enforcement Assisted Diversion, an

innovative approach that seeks to accomplish the goals of reduced criminal behavior and improved

public safety by connecting appropriate low-level drug offenders with services; (2) Focused Drug

Deterrence, short and long term proactive activities including targeted investigations and enforcement

and social network analysis to increase the identification of individuals involved in high-level drug

markets; (3) Drug Court Prosecution, which seeks to connect criminal defendants who suffer from a

---

[3] DOJ has, on information and belief, awarded FY 2017 Byrne JAG grants to hundreds of other jurisdictions—"jurisdictions that share the Department's commitment to keeping criminal aliens off our streets and our law abiding citizens safe."  Press Release, U.S. Dep't of Justice, DOJ Releases FY17 JAG Funding (June 27, 2018) https://content.govdelivery.com/accounts/USDOJOJP/bulletins/1fa6e57.  DOJ has stated that "[r]eviews of some applications remain ongoing."  *Id.*  In litigation, DOJ has stated that it is withholding FY 2017 Byrne JAG awards from states and localities, like San Francisco, whose compliance with Section 1373 is under review.  Decl. of Marilyn Atsatt at ¶¶ 3-4, *San Francisco v. Sessions*, Dkt. No. 113-3.

substantial substance abuse problem to treatment services in the community in order to enhance public safety, reduce recidivism, and find appropriate dispositions to the criminal charges; (4) Targeted Drug Treatment for Underserved Populations, a treatment intervention conducted by the Sheriff's Department for individuals in custody; (5) Intensive Probation Supervision, a targeted caseload of probationers with substance abuse and/or mental health issues; (6) Reentry Social Work through the Public Defender's Office, which provides legal and wraparound support to help indigent clients charged with felony drug cases and other felony offenses successfully exit the criminal justice system; and (7) Citywide Justice-Involved Youth Planning, which examines current criminal justice trends impacting youth and young adults and strengthens partnerships and collaboration at various levels to create a continuum of support for youth and young adults.

32. San Francisco uses Byrne JAG pass-through funds to support a Young Adult Court aimed at reducing recidivism for youth ages 18-25. This Court was designed in response to a growing body of neuroscience research showing that young adults are fundamentally different from both juveniles and older adults in how they process information and make decisions. Our traditional justice system is not well-equipped to address cases involving these individuals, who are qualitatively different in development, skills, and needs from both children and older adults. The Young Adult Court fills this gap by providing case management and other support for eligible young adult offenders from high-risk backgrounds.

33. These City programs span six departments, and a total of approximately ten full-time equivalent positions for these programs are funded with Byrne JAG funds. Without local and state Byrne JAG funds, San Francisco could be forced to reduce or eliminate these programs, including eliminating staff positions, unless other funding sources could be identified.

## II.   The Trump Administration Has Engaged In Ongoing Attempts To Coerce Sanctuary Jurisdictions To Change Their Policies By Threatening To Withhold Federal Funding.

34. Despite the Byrne JAG program being a formula grant—which means that Congress alone can decide who receives federal funding, and how much—and in disregard of the important local purposes that Byrne JAG funding serves, President Trump's Administration has engaged in a longstanding campaign to unlawfully withhold federal funding from so-called sanctuary jurisdictions.

The Attorney General has furthered this effort by adding an ever-expanding set of immigration-related requirements to Byrne JAG funding. These requirements are designed to coerce state and local jurisdictions to participate in enforcing federal immigration law and abandon any state or local policies that limit or prohibit such participation. That is, the requirements aim to eradicate sanctuary cities, consistent with President Trump's longstanding threats.

### A. President Trump First Attempted To Act By Executive Fiat.

35. San Francisco is one of many jurisdictions across the country that has enacted sanctuary policies that seek to promote public safety locally and build trusting and supportive relationships with immigrant communities. Many jurisdictions believe—and studies have shown[4]—that communities are stronger, healthier, and safer when state and local employees decline to participate in the federal government's responsibility to enforce federal immigration law.

36. Nevertheless, the Trump Administration has made it their mission to eradicate sanctuary cities. President Trump frequently promised to "defund" sanctuary cities, and to use the threat of withholding federal funds as "a weapon" to coerce local jurisdictions to change their policies.[5] Shortly after President Trump took office, his press secretary confirmed that "[w]e are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws."[6]

37. The Attorney General echoed this position. Soon after taking office, the Attorney General suggested that he would use every means necessary to withhold federal funding from "sanctuary cities."[7] He has broadly described sanctuary city "policies" as those requiring local law

---

[4] *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, CTR. FOR AM. PROGRESS (Jan. 26, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (concluding that crime rates in sanctuary counties are statistically significantly lower than crime rates in non-sanctuary counties).

[5] Alexander Mallin and Lissette Rodriguez, *Trump Threatens Defunding Sanctuary Cities as 'Weapon'*, ABC News (Feb. 5, 2017), http://abcnews.go.com/Politics/trump-threatens-%20defunding-sanctuary-states-weapon/story?id=45286642.

[6] The White House, *1/25/17: White House Press Briefing*, YouTube (Jan. 25, 2017), https://www.youtube.com/watch?v=OaPriMVvtZA.

[7] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions (Mar. 27, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

---

enforcement officials to "refuse to cooperate with federal immigration authorities regarding illegal aliens who commit crimes."[8]

38.     The Administration tried to carry through on these threats during President Trump's first week in office.  President Trump issued Executive Order 13,768, which called for denying all federal funding to sanctuary jurisdictions and further authorized the Attorney General to take unspecified enforcement action against sanctuary cities.

39.     The Administration touted the Executive Order as a means to achieving the President's goal of "ending sanctuary cities . . . .  [T]he President has been very clear through his executive order that federal funds, paid for by hardworking taxpayers, should not be used to help fund sanctuary cities."[9]  The Administration vowed that "the President is going to do everything he can within the scope of the executive order to make sure that cities who don't comply with it—counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order."[10]

40.     The Administration's efforts here were stopped by a court in this district, which permanently enjoined Section 9(a) of the Executive Order for violating the Constitution.  *City and County of San Francisco v. Donald J. Trump*, 275 F. Supp. 3d 1196, 1219 (N.D. Cal. 2017).  The court held, *inter alia*, that the President—and in turn, the Attorney General and the Secretary of DHS— lacked the authority "to place a new condition on federal funds . . . not authorized by Congress," and thus had violated the "fundamental constitutional structure" of the separation of powers.  *Id.* at 1213. And the court further held that even if the executive branch could exercise that spending power, the Executive Order was unconstitutional because it (1) used vague language that left localities unclear

---

[8] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks in Las Vegas to Federal, State and Local Law Enforcement About Sanctuary Cities and Efforts to Combat Violent Crime (July 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-las-vegas-federal-state-and-local-law.

[9] Press Release, The White House, Office of the Press Secretary, Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6 (Feb. 1, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sean-spicer-020117/.

[10] Press Release, The White House, Office of the Press Secretary, Press Briefing by Press Secretary Sean Spicer, 2/8/2017, #10 (Feb. 8, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sean-spicer-020817/.

how to comply with the funding conditions; (2) lacked any nexus between the funds at issue and immigration enforcement; and (3) sought to compel local governments to "adopt certain policies" that they had determined, in their considered judgment, to be unwise.  *Id.* at 1214–16.

41.     The Ninth Circuit Court of Appeals upheld substantially all of the district court's order. *City and County of San Francisco v. Trump*, No. 17-17478, 2018 WL 3637911 (9th Cir. Aug. 1, 2018).  The Ninth Circuit affirmed that "[t]he Separation of Powers was an integral part of the Founders' design."  *Id.* at *2.  And it found that "the Administration has not even attempted to show that Congress authorized it to withdraw federal grant moneys from jurisdictions that do not agree with the current Administration's immigration strategies."  *Id.* at *4.  It therefore upheld the district court's judgment in favor of San Francisco on the merits.  *Id.*  The Ninth Circuit remanded the cases for additional factual findings about the proper scope of relief.  *Id.* at *13.

**B.     The Attorney General Unilaterally Imposes Immigration-Related Requirements On The FY 2017 Byrne JAG Program.**

42.     With its initially broad efforts to withhold federal funds to sanctuary cities put in check by the courts, the Administration adopted a more targeted approach focusing on the Byrne JAG program and similar grant programs that DOJ administers.  As relevant here, the Attorney General unilaterally imposed three new immigration-related requirements on the 2017 Byrne JAG awards— requirements designed to coerce Byrne JAG recipients into enforcing federal immigration law.

43.     **First**, the FY 2017 Byrne JAG Local Solicitation provided that OJP would require grant applicants to "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien under the Immigration and Nationality Act."  FY 2017 Local Solicitation at 30 (attached as Exh. 1).

44.     In the FY 2017 award documents that DOJ eventually issued, DOJ expanded on this requirement (the "FY 2017 Notice Requirement"), explaining that:

> A State statute, or a State rule, -regulation, -policy, or –practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in

1    such facility, then such facility will honor such request and—as early as practicable
2    (see para. 4.B. of this condition)—provide the requested notice to DHS.

3    Decl. of Alan Hanson at ¶¶ 5-6 & Exh. B at 18, *San Francisco v. Sessions*, Dkt. No. 46-1 ("Hanson

4    Decl.").

5    45.    **Second**, the FY 2017 Local Solicitation provided that OJP would require grant

6    applicants to "permit personnel of the U.S. Department of Homeland Security (DHS) to access any

7    correctional or detention facility in order to meet with an alien (or an individual believed to be an

8    alien) and inquire as to his or her right to be or remain in the United States." FY 2017 Local

9    Solicitation at 30 (attached as Exh. 1).

10   46.    In the FY 2017 award documents, DOJ described this requirement regarding access to

11   correctional facilities (the "FY 2017 Access Requirement") as requiring that:

12       A State statute, or a State rule, -regulation, -policy, or –practice, must be in
         place that is designed to ensure that agents of the United States acting under
13       color of federal law in fact are given to access any State (or State-
         contracted) correctional facility for the purpose of permitting such agents to
14       meet with individuals who are (or are believed by such agents to be) aliens
         and to inquire as to such individuals' right to be or remain in the United
15       States.

16   Hanson Decl. at ¶¶ 5-6 & Exh. B at 18.

17   47.    **Third**, DOJ stated that it would require jurisdictions to certify their compliance with

18   8 U.S.C. Section 1373, which provides that a "local government entity or official may not prohibit, or

19   in any way restrict, any government entity or official from sending to, or receiving from, [federal

20   immigration officials] information regarding the citizenship or immigration status . . . of any

21   individual." 8 U.S.C. § 1373(a). Although DOJ's move toward requiring jurisdictions to certify

22   compliance with this section had been in progress since 2016, it was not until the FY 2017 Byrne JAG

23   application that DOJ expressly applied this requirement (the "FY 2017 Section 1373 Requirement") to

24   all jurisdictions.

25   48.    Critically, since the Trump Administration has come into office, DOJ has declared that

26   it interprets Section 1373 much more broadly than local jurisdictions like San Francisco could have

27   previously imagined—specifically, that it reads "information regarding the citizenship or immigration

28   status" to include all information that would assist federal immigration authorities to determine a

person's immigration status and take that individual into custody, if appropriate.[11] (The FY 2017 Section 1373 Requirement, FY 2017 Notice Requirement, and FY 2017 Access Requirements are referred to collectively as the "FY 2017 Requirements.")

49. DOJ claimed that two different general statutory provisions gave the Attorney General the authority to impose these FY 2017 Requirements on Byrne JAG recipients. DOJ claimed that 34 U.S.C. § 10153(a)(5)(D), which requires Byrne JAG grant recipients to certify that they "will comply with all provisions of this part and all other applicable Federal laws" (*see* ¶ 23, *supra*), allowed the Attorney General to require that grant recipients comply with Section 1373. Defs.' Mot. for Summ. J. at 17-18, *San Francisco v. Sessions*, Dkt. No. 113.

50. DOJ took a different approach with respect to the FY 2017 Notice and Access Requirements. DOJ did not argue that either Requirement stemmed from an existing statutory obligation, and thus did not assert that Section 10153(a)(5)(D)'s "all applicable laws" language allowed the Attorney General to impose them. Instead, DOJ relied on a different statutory provision, 34 U.S.C. § 10102(a)(6)—which allows the Assistant Attorney General overseeing OJP to "exercise such other powers and functions as may be vested in [him or her] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *See* Defs.' Mot. for Summ. J. at 9-14 *San Francisco v. Sessions*, Dkt. No. 113. DOJ asserted that the FY 2017 Notice and Access Requirements were special conditions covered by this provision.

51. The new FY 2017 Requirements elicited a wave of legal challenges, and several courts have already struck them down—indeed to date all the federal courts that have considered those requirements have found them unlawful. *See City of Chicago v. Sessions*, 888 F.3d 272, 276 (7th Cir. 2018) (invalidating FY 2017 Notice and Access Requirements); *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 321 (E.D. Pa. 2018) (striking down all three FY 2017 Requirements);

---

[11] Defs.' Mot. for Summ. J. at 26, *San Francisco v. Sessions*, Dkt. No. 113 (asserting that Section 1373 "reach[es] the types of information critical in applying the 'immigration laws,' including the 'removal of aliens.'")

*City of Chicago v. Sessions*, No. 17-C 5720, 2018 WL 3608564, *12 (N.D. Ill. July 27, 2018) (striking down all three FY 2017 Requirements).

52.     Various other lawsuits challenging the FY 2017 Requirements remain pending[12] — including San Francisco's lawsuit currently pending in this district.[13]

**III.     The Attorney General Imposes New Requirements On FY 2018 Byrne JAG Recipients.**

53.     Now that its previous efforts to withhold federal grant funds have been held unlawful by courts around the country, President Trump's Administration is trying another approach to turn the Byrne JAG program into a weapon against sanctuary jurisdictions.

54.     On July 20, 2018, DOJ announced that it would impose a number of immigration-related conditions on jurisdictions seeking 2018 Byrne JAG funding.[14]

55.     Some of these new requirements are little more than a dressed up version of the Administration's earlier efforts: The 2018 Local Solicitation includes a Section 1373 Requirement that

---

[12] *State of California v. Sessions*, No. 17-CV-4701 (N.D. Cal. filed Aug. 14, 2017); *City of Evanston v. Sessions*, No. 18-cv-4853 (N.D. Ill. filed July 16, 2018), *City of Los Angeles v. Sessions*, No.2:17-cv-07215-R-JCx (C.D. Cal. filed Sept. 29, 2018); *City of New York v. Sessions*, No. 18-cv-06474 (S.D.N.Y. filed July 18, 2018); *State of Illinois v. Sessions*, No. 1:18-cv-04791 (N.D. Ill. filed July 12, 2018): *State of New York v. U.S. Dep't of Justice,* No. 1:18-cv-06471 (S.D.N.Y. filed July 18, 2018).

[13] *San Francisco v. Sessions*, No. 3:17-cv-04642 (N.D. Cal filed Aug. 11, 2017). San Francisco's First Amended Complaint in that lawsuit challenges DOJ's authority to impose the three FY 2017 Requirements. The district court has already denied DOJ's efforts to dismiss the case. Order Den. Mot. to Dismiss, *San Francisco v. Sessions,* Dkt. No. 78. Cross-motions for summary judgment are currently pending in that case, and are presently scheduled to be heard on September 5, 2018. In its Motion for Summary Judgment, San Francisco seeks a declaratory judgment that the three FY 2017 Requirements are unlawful, as well as a permanent injunction prohibiting DOJ from imposing those Requirements on any current or future Byrne JAG awards. City and Cty. of S.F.'s Notice of Mot. and Mot. for Summ. J., *San Francisco v. Sessions,* Dkt. No. 99.

[14] DOJ has also announced that it will impose similar grant requirements on a number of other public safety grants, including (1) Supporting Innovation: Field-Initiated Programs to Improve Officer and Public Safety; (2) Justice Accountability Initiative: Pilot Projects Using Data-driven Systems to Reduce Crime; (3) Gang Suppression Planning: Build Capacity for a Multilateral Data-Driven Strategy to Promote Public Safety; and (4) A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children program. Press Release, U.S. Dep't of Justice, Department of Justice Announces New Immigration Compliance Requirements for FY 2018 Grants (June 28, 2018) https://www.justice.gov/opa/pr/department-justice-announces-new-immigration-compliance-requirements-fy-2018-grants In addition to imposing these requirements, DOJ has also stated that it will "allow for preferential consideration of a grant application where the applicant plans to use immigration-cooperation tactics to address public safety in their jurisdiction." *Id.* In the course of announcing those new requirements, the Attorney General stated that they are designed to "encourage these 'sanctuary' jurisdictions to change their policies that undermine public safety." *Id.*

is virtually indistinguishable from the FY 2017 version—even though that Certification has now been

held invalid by multiple courts. *See* ¶ 51, *supra*. And it includes repackaged efforts to require

jurisdictions to provide notice of an inmate's release and access to correctional facilities when

immigration officials request it—requirements that DOJ now attempts to tie to a statutory obligation,

despite its inability to do so over the previous year of litigation regarding the FY 2017 Notice and

Access Requirements.

56.    But other new FY 2018 Requirements go much further. DOJ has added several new

requirements that imply that sanctuary jurisdictions interfere with various federal laws and

regulations—even though those laws and regulations impose *no obligations whatsoever* on states and

local jurisdictions. And they further suggest that sanctuary jurisdictions may violate federal criminal

laws simply by having laws that limit entanglement with federal immigration policies. This is a

considerable escalation in the level of the threat the Trump Administration has sought to achieve.

57.    Each of these FY 2018 Requirements is unlawful because DOJ lacks the statutory

authority to impose it. And even if DOJ had that authority, constitutional limits would still prevent it

from requiring compliance with these particular conditions.

**A.     The FY 2018 Section 1373 Requirement.**

58.    Although multiple courts have found the FY 2017 Section 1373 Requirement invalid,

DOJ is attempting to impose a virtually identical requirement on 2018 Byrne JAG funds.[15]  *See* FY

2018 Local Solicitation at 36 (attached as Exh. 2).

59.    As it did for FY 2017, DOJ is requiring San Francisco to certify that, as to the "program

or activity" funded with Byrne JAG dollars, San Francisco does not have in effect, purport to have in

effect, or is subject to or bound by "any prohibition or any restriction . . . that deals with either (1) a

government entity or –official sending or receiving information regarding citizenship or immigration

---

[15] The FY 2018 Section 1373 Requirement differs from the FY 2017 version in only two ways. First, the FY 2018 Section 1373 Requirement also requires that Byrne JAG recipients certify that they do not violate 8 U.S.C. § 1644 ("Section 1644"), which imposes identical obligations to those that Section 1373 itself mandates. FY 2018 Local Solicitation at 36 (attached as Exh. 2); *see also id*. at 42 (attached as Exh. 2). Second, the FY 2018 Section 1373 Requirement demands that jurisdictions seeking to accept a FY 2018 Byrne JAG award provide OJP with "[i]nformation regarding Communications with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)." FY 2018 Local Solicitation at 27 (attached as Exh. 2).

1   status as described in 8 U.S.C. §§ 1373(a) and 1644; or (2) a government entity or agency sending to,

2   requesting or receiving from, maintaining, or exchanging information of the types (and with respect to

3   the entities) described in 8 U.S.C. § 1373(b)." FY 2018 Local Solicitation at 43 (attached as Exh. 2);

4   *see also* FY 2017 Local Solicitation at 38 (attached as Exh. 1).

5         60.     Although a FY 2018 Byrne JAG applicant is not required to execute the Section 1373

6   Certification to *apply* for a FY 2018 Byrne JAG award, OJP has stated that an applicants will be

7   unable to *accept* an award until the certification is completed and received by OJP. FY 2018 Local

8   Solicitation at 27 (emphasis added) (attached as Exh. 2).

9         61.     San Francisco has already challenged the legality of the FY 2017 Section 1373

10  Requirement in *San Francisco v. Sessions*. *Id.,* First Am. Compl. at ¶¶ 78-93, 177-192, Dkt. No. 61.

11  San Francisco has sought relief that would enjoin Defendants from imposing the requirement on "*any*

12  Byrne JAG awards" and would declare the requirement unconstitutional. *Id.* at 41-42 (emphasis

13  added). San Francisco's pending motion for summary judgment seeks a permanent nationwide

14  injunction on this issue. City and Cty. of S.F.'s Notice of Mot. and Mot. for Summ. J. at 1, *San*

15  *Francisco v. Sessions*, Dkt. No. 99.

16        62.     Because the legality of DOJ's attempts to require jurisdictions to certify compliance

17  with Section 1373 is already the subject of pending litigation between the parties, San Francisco is not

18  now bringing a separate challenge to the FY 2018 Section 1373 Requirement in this case. But San

19  Francisco reserves its right to seek to amend this Complaint later to add a challenge to the FY 2018

20  Section 1373 Requirement as appropriate. The focus of this case is on the other immigration-related

21  conditions.

22       **B.**     **The Section 1226 (Notice) Requirement.**

23        63.     OJP has also stated that it will require Byrne JAG recipients to make certifications

24  related to a host of other federal laws contained in the Immigration and Nationality Act. Specifically,

25  Byrne JAG applicants' Chief Legal Officer will have to execute a document called "Local

26  Government: FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a),

27  1357(a) & 1366(1) & (3)" (hereafter, "Immigration-Related Certification"). A copy of the

28

Immigration-Related Certification can be found at page 45 of the FY 2018 Local Solicitation. For ease of reference, it is also attached independently as Exhibit 3 to this Complaint.

64. A FY 2018 Byrne JAG applicant is not required to submit the Immigration-Related Certification in order to apply for a FY 2018 Byrne JAG award. But an "applicant will be unable to make a valid award acceptance" until the certification is completed and "received by OJP on or before the day the unit of local government submits an executed award document." FY 2018 Local Solicitation at 27 (emphasis omitted) (attached as Exh. 2).

65. Among other things, the Immigration-Related Certification requires the Chief Legal Officer—in San Francisco's case, City Attorney Dennis J. Herrera—to certify that San Francisco has no policies or practices that would or do impede federal officers' exercise of authority relating to 8 U.S.C. Section 1226. Specifically, City Attorney Herrera has to certify:

  a. that he has conducted a "careful[] review[]" of Section 1226;

  b. that he has conducted (or caused to be conducted) a diligent inquiry and review of "the 'program or activity' to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program" as well as "any laws, rules, policies, or practices . . . that implicate any of the requirements related to" Section 1226; and

  c. that, as to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect or purport to have in effect, and is not subject to or bound by, "any law, rule, policy, or practice . . . that would or does . . . impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) & (c)." (Together, these are referred to in this Complaint as "Section 1226 Requirement.")

66. The Section 1226 Requirement appears to be nothing more than a repackaged version of the FY 2017 Notice Requirement, which DOJ now for the first time attempts to connect to a statutory provision.

67. Section 1226 authorizes arresting and detaining certain undocumented immigrants, and provides that the federal government "shall take into custody" certain criminal aliens "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation . . . ." 8 U.S.C. § 1226(a) & (c)(1); *see also* FY 2018 Local Solicitation at 47 (attached as Exh. 2).

68.     Section 1226's terms apply solely to the federal government—indeed, solely to the Attorney General himself.  It does not impose *any obligations whatsoever* on local governments.

69.     Nonetheless, OJP is attempting to use it as a hook to require state and local jurisdictions to provide notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody.

70.     In the body of the FY 2018 Local Solicitation, OJP has given one example of conduct that it believes "impedes" federal officials' exercise of their duties under Section 1226.  OJP states that grant recipients will be required to not "impede" the exercise of the authority of the federal government under Section 1226 "*specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody* when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act."  FY 2018 Local Solicitation at 36-37 (emphasis added) (attached as Exh. 2).

71.     DOJ lacks the authority to impose the Section 1226 Requirement on Byrne JAG recipients.  Nothing in the Byrne JAG statute—or any other federal law—gives the Attorney General the authority to impose this condition.

72.     Furthermore, the Section 1226 Requirement is ambiguous as to what jurisdictions must do to be in compliance.  Although OJP offers one example of what it might mean to "impede" federal officials in performing their duties under Section 1226, San Francisco has no way to know whether OJP might consider other practices to so "impede" the federal government.  This is particularly true given that OJP's example of what jurisdictions must do to avoid impeding the Attorney General's performance of his Section 1226 duties is far afield from anything that provision itself requires.

73.     Indeed, even the example OJP gives is itself ambiguous.  For example, DOJ's request for 48 hours' advance notice does not explain whether notice must be given only when the scheduled release date and time is known at least 48 hours in advance, or whether it requires jurisdictions to hold inmates in custody for additional time to provide a full 48-hour period of notice to ICE.  Actual release dates and time often deviate from scheduled release dates and times.

74.     Also, the Section 1226 Requirement is not germane to the purposes of the Byrne JAG program.  Section 1226 is a federal civil immigration requirement that has nothing to do with local criminal justice, or with any of the other purposes of the Byrne JAG program.

**C.     The Section 1231 (Notice) Requirement.**

75.     The Immigration-Related Certification appears to require local jurisdictions to make a certification related to 8 U.S.C. §1231(a)(4) ("Section 1231 Requirement").

76.     In the header to the Immigration-Related Certification, OJP states that it is a "Certification Relating to 8 U.S.C. §§ 1226(a) & (c), *1231(a)(4)*, 1324(a), 1357(a) & 1366(1) & (3)." Exh. 3.

77.     Furthermore, the Chief Legal Officer must certify that she or he has "carefully reviewed" Section 1231(a)(4) (*id.*), which provides that the federal government—specifically, the Attorney General—"may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment" (8 U.S.C. § 1231(a)(4)(A)).

78.     And in the body of the FY 2018 Local Solicitation, OJP refers to Section 1231 and states that grant recipients will be required to agree "[n]ot to impede the exercise of the authority of the federal government under . . . [Section 1226 and] 8 U.S.C. § 1231(a)(4) (relating to removal from the United States of aliens after detention/confinement at the federal, state, and local level), specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act."  FY 2018 Local Solicitation at 36-37 (attached as Exh. 2).

79.     But the Immigration-Related Certification contains no other substantive references to Section 1231.  The Immigration-Related Certification—as it appears in the Local Solicitation—does not require the Chief Legal Officer to certify that he or she has reviewed "any laws, rules, policies, or practices potentially applicable to the 'program or activity' sought to be funded under the FY 2018 OJP Program" that "implicate" Section 1231.  Exh. 3 (¶ 5).  Nor does the Certification require the Chief Legal Officer to certify that, as to the "program or activity" funded with Byrne JAG dollars, San

1   Francisco does not have in effect any law, policy, or practice that "would or does . . . impede the

2   exercise by federal officers of . . . authority" relating to Section 1231. *Id.* (¶ 6).

3         80.     Like the Section 1226 Requirement discussed above (*see* ¶¶ 63-76, *supra*), the Section

4   1231 Requirement appears to be nothing more than a repackaged version of the FY 2017 Notice

5   Requirement. And it fails for the same reasons. *Id.*

6       **D.**    **The Section 1357 (Access) Requirement.**

7         81.     The Immigration-Related Certification also requires Byrne JAG recipients to make

8   assurances "relating to" 8 U.S.C. § 1357(a). It requires the Chief Legal Officer to certify that San

9   Francisco has no policies or practices that would or do impede federal officers' exercise of authority

10   relating to Section 1357. Specifically, the City Attorney Herrera will have to certify:

11            a.     that he has conducted a "careful[] review[]" of Section 1357;

12            b.     that he has conducted (or caused to be conducted) a diligent inquiry and review

13   of "the 'program or activity' to be funded (in whole or in part) with the federal financial assistance

14   sought by the applicant entity under this FY 2018 OJP Program" as well as "any laws, rules, policies,

15   or practices . . . that implicate any of the requirements related to" Section 1357; and

16            c.     that, as to the "program or activity" funded with Byrne JAG dollars, San

17   Francisco does not have in effect or purport to have in effect, and is not subject to or bound by, "any

18   law, rule, policy, or practice . . . that would or does . . . impede the exercise by federal officers of

19   authority under 8 U.S.C. § 1357(a)." (Together, these are referred to in this Complaint as the "Section

20   1357 Requirement.")

21         82.     The Section 1357 Requirement appears to be nothing more than a repackaged version

22   of the FY 2018 Access Requirement, which DOJ now—for the first time—attempts to connect directly

23   to a statutory provision rather than to the general authority for "special conditions."

24         83.     Section 1357 provides, *inter alia*, that "[a]ny officer or employee of the [federal]

25   Service . . . shall have power without warrant to interrogate any alien or person believed to be an alien

26   as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1); *see also* FY 2018 Local

27   Solicitation at 50-51 (attached as Exh. 2). DOJ appears to read this section in conjunction with 8

28   C.F.R. § 287.5(a)(1)—which states that an immigration officer can exercise this interrogation power

"anywhere in or outside the United States"—to mean that immigration officials have a right to interrogate anyone believed to be an alien any place and any time, without obtaining any form of warrant. *See* FY 2018 Local Solicitation at 37 (attached as Exh. 2).

84. Section 1357 does not impose *any obligations* at all on local governments. Section 1357's terms apply solely to the federal government—specifically to federal immigration officers and federal immigration employees.

85. Nonetheless, OJP attempts to use it as a hook to require state and local jurisdictions to permit personnel of the Department of Homeland Security to access any correctional or detention facility to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States. As set forth in the body of the FY 2018 Local Solicitation, OJP takes the position that restricting immigration officials' access to suspected aliens in correctional facilities "impedes" federal officials' exercise of their duties under Section 1357. *See* FY 2018 Local Solicitation at 37 (attached as Exh. 2).

86. DOJ lacks the authority to impose the Section 1357 Requirement on Byrne JAG recipients. Nothing in the Byrne JAG statute—or any other federal law—gives the Attorney General the authority to impose this condition.

87. And again, the Section 1357 Requirement is ambiguous as to what jurisdictions must do to be in compliance. Although OJP offers one example of what it might mean to "impede" federal officials in performing their Section 1357 duties, San Francisco has no way to know whether OJP might consider other practices to similarly "impede" the federal government. This is particularly true given that OJP's example of what jurisdictions must do to avoid impeding federal immigration officers' performance of their Section 1357 duties is far afield from anything that a plain reading of the provision would require.

88. Indeed, even the example OJP gives is itself ambiguous. For instance, is San Francisco required to provide access to inmates in custody only when those inmates consent? Or must the City compel unwilling inmates to meet with ICE representatives? Does San Francisco have to allow ICE agents to use a jail interview room to "access" an uncooperative inmate when ICE wishes and for as long as its agents wish? The Section 1357 Requirement does not answer these and similar questions.

89. Also, the Section 1357 Requirement is not germane to the purposes of the Byrne JAG program. Section 1357 is a federal civil immigration requirement that has nothing to do with local criminal justice, or with any of the other purposes of the Byrne JAG program.

**E. The Section 1324 Requirement.**

90. The Immigration-Related Certification requires Byrne JAG recipients to make assurances "relating to" 8 U.S.C. § 1324(a). Specifically, the Immigration-Related Certification requires the Chief Legal Officer to certify that, as to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect or purport to have in effect, and is not subject to or bound by, "any law, rule, policy, or practice . . . that would or does . . . violate, or aid or abet any violation of, 8 U.S.C. § 1324(a) ("Section 1324 Requirement"). Exh. 3.

91. Section 1324 forbids any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal[], harbor[], or shield[] from detection or attempt[] to conceal, harbor, or shield from detection, such alien in any such place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts . . . or aid[] or abet[] the commission of any of the preceding acts." 8 U.S.C. § 1324(a); *see also* FY 2018 Local Solicitation at 48-50 (attached as Exh. 2).

92. DOJ lacks the statutory authority to impose the Section 1324 Requirement on Byrne JAG recipients. Nothing in the Byrne JAG statute—nor any other federal law—gives the Attorney General the authority to impose this condition.

93. Furthermore, the Section 1324 Requirement is ambiguous as to what jurisdictions must do to be in compliance. OJP offers no guidance about what laws, policies, or practices might be deemed to violate, or aid and abet the violation of, Section 1324. Beyond citing the statutory provision itself, OJP offers no guidance in the Local Solicitation about how local jurisdictions could run afoul of the Section 1324 Requirement.

94. But elsewhere members of the Trump Administration have offered exceedingly broad interpretations of Section 1324—interpretations that could embrace any local policy that limits local enforcement of federal immigration laws.

95.     For instance, former ICE acting director Thomas Homan has stated on multiple occasions that cities with sanctuary laws or policies are, or may be, violating Section 1324.

- In a July 27, 2017 interview regarding "sanctuaries," Homan suggested that sanctuary cities potentially violate Section 1324: "I think these sanctuary cities need to make sure they're on the right side of the law. They need to look at this. Because I am."[16]

- In an August 2017 interview, Homan said: "And the third thing I talked to the attorney general today about was, you know, we need to look at these jurisdictions, are they crossing a legal line, are they committing a statutory crime by 8 U.S.C. 1324, alien smuggling? There's a part of the law that says that if you harbor, conceal or shield, knowingly shield an illegal alien from law enforcement, that's a crime. So I have asked the attorney general. We need to look at this and find out, are these jurisdictions on the right side of that law?"[17]

- And as recently as January 2018, Homan suggested that jurisdictions violate Section 1324 simply by having policies that deny federal immigration officials access to inmates in jails. Homan stated "we're going to enforce the law without apology. What I'm also doing is working with the Department of Justice. For these sanctuary cities that knowingly shield and harbor an illegal alien in their jail and don't allow us access, that is, in my opinion, a violation of 8 U.S.C. 1324. That's an alien smuggling statute."[18]

96.     Similarly, the Secretary of Homeland Security, Kirstjen Nielsen, has stated that her department has requested that DOJ "look into" whether elected officials in sanctuary jurisdictions are

---

[16] Stephen Dinan, *ICE Chief wants to Slap Smuggling Charges on Leaders of Sanctuary Cities,* The Washington Times (July 26, 2017) https://www.washingtontimes.com/news/2017/jul/26/thomas-homan-ice-chief-says-immigrant-sanctuaries-/.

[17] Interview by Trish Regan with U.S. Acting Immigration and Customs Enforcement Director Thomas Homan, *Acting ICE chief: Sanctuary cities put politics above safety,* Fox News (Aug. 16, 2017) http://www.foxnews.com/transcript/2017/08/16/acting-ice-chief-sanctuary-cities-put-politics-above-safety.html.

[18] Interview by Neil Cavuto with U.S. Acting ICE Director Thomas Homan, *Acting ICE director: California made a foolish decision,* Fox News (Jan. 2, 2018), http://www.foxnews.com/transcript/2018/01/02/acting-ice-director-california-made-foolish-decision.html.

violating Section 1324 and "review[] what avenues might be available" as part of their efforts to "find[] an efficient and effective way to enforce our immigration laws."[19]

97. These comments suggest DOJ could embrace an expansive reading of Section 1324—a reading that would view every jurisdiction with any sanctuary law or policy as potentially violating Section 1324.[20] This creates an ambiguity that makes it impossible for San Francisco—and other local jurisdictions, particularly those with sanctuary policies—to understand what is required to comply with the Section 1324 Requirement.

98. As a result of this ambiguity, San Francisco and other local jurisdictions are left with no specific guidance on how to comply with the Section 1324 Requirement, and a generalized threat that their sanctuary laws and policies put them at risk not only for a loss of Byrne JAG funds, but also for criminal penalties.

99. Also, the Section 1324 Requirement is not germane to the purposes of the Byrne JAG program. Section 1324 is a portion of the federal immigration code that has nothing to do with local criminal justice, or any of the other purposes of the Byrne JAG program.

**F.    The Section 1366 Requirement.**

100. Finally, the Immigration-Related Certification requires local jurisdictions to make assurances "relating to" 8 U.S.C. § 1366(1) & (3). Specifically, the Immigration-Related Certification requires the Chief Legal Officer to certify that, as to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect or purport to have in effect, and is not subject to or bound by, "any law, rule, policy, or practice . . . that would or does . . . impede the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3)" ("Section 1366 Requirement"). *See* Exh. 3.

---

[19] *Oversight of the United Stated Department of Homeland Security: Before the S. Comm. on the Judiciary*, 115th Cong. (Jan. 16, 2018), https://www.judiciary.senate.gov/meetings/oversight-of-the-united-states-department-of-homeland-security, at 4:02:51.

[20] San Francisco does not "harbor" criminals and its sanctuary city laws do not prevent federal authorities from taking custody of individuals with outstanding criminal warrants. San Francisco law prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the federal government. A detainer request is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary City Laws. A detainer request is not issued by a judge based on a finding of probable cause. It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them.

101.     Section 1366 requires the Attorney General to submit an annual report to the House and Senate Judiciary Committees detailing (1) "the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies," and (2) the "programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal."  8 U.S.C. § 1366(1) & (3); *see also* FY 2018 Local Solicitation at 51 (attached as Exh. 2).

102.     Again, Section 1366 does not impose *any obligations on local governments themselves*. Section 1366's terms apply solely to the federal government—specifically to the Attorney General himself.  It imposes a reporting requirement that *only* the Attorney General can perform.

103.     And OJP has given local jurisdictions *no guidance* about what it means to "impede" federal officials' exercise of authority relating to Section 1366.  While the body of the FY 2018 Local Solicitation discusses each other statutory provision (*see* FY 2018 Local Solicitation at 36-37 (attached as Exh. 2)), the FY 2018 Local Solicitation contains no other references to Section 1366 beyond those set forth in the Immigration-Related Certification.

104.     DOJ lacks the statutory authority to impose the Section 1366 Requirement on Byrne JAG recipients.  Nothing in the Byrne JAG statute—nor any other federal law—gives the Attorney General the authority to impose conditions of his choice.

105.     Furthermore, the Section 1366 Requirement is ambiguous as to what jurisdictions must do to be in compliance.  Again, OJP has given local jurisdictions no guidance about what types of local laws, policies, or practices impede the Attorney General in the exercise of his Section 1366 responsibilities.  Accordingly, local jurisdictions can only speculate about what local laws, policies, or practices the federal government may decide interfere with federal officers' conduct "relating to" their obligations under Section 1366.  And this speculation is made all the more difficult by the fact that Section 1366's text provides no role for local governments to play in the Attorney General's reporting obligations.

106.     Also, the Section 1366 Requirement is not germane to the purposes of the Byrne JAG program.  Section 1366 is a federal immigration reporting requirement that has nothing to do with local criminal justice, or any of the other purposes of the Byrne JAG program.

107.    Collectively, the Complaint refers to the Requirements set forth in the Immigration-Related Certification as the "Challenged FY 2018 Requirements."  *See* ¶¶ 63-106, *supra*.

**IV.    San Francisco Faces Immediate Injury From The Challenged FY 2018 Byrne JAG Requirements.**

   **A.    San Francisco Cannot Certify Compliance With The Immigration-Related Requirements Without Changing Its Laws And Policies.**

108.    San Francisco is unable to execute the Immigration-Related Certification.  San Francisco's existing laws and policies prevent it from certifying that it complies with several of the new requirements that DOJ has imposed.  And as to others, the ambiguity regarding the meaning and scope of the requirements creates significant uncertainty for San Francisco—uncertainty that makes it impossible for San Francisco to execute the Immigration-Related Certification.

109.    The San Francisco Sheriff's Department has policies regarding access to jails for ICE officials enforcing the civil immigration laws.  Specifically, the Sheriff's Department policy prohibits Sheriff's Department employees from providing ICE agency representatives, or any other individual conducting civil immigration enforcement, access to inmates in jail, access to SFSD computers, databases and logs, release dates and times for inmates, and home or work contact information.[21]

110.    These policies make it difficult, if not impossible, for San Francisco to comply with the Section 1357 Requirement, which DOJ interprets to mandate that recipients permit DHS agents to have unfettered access to inmates in jails.  *See* ¶¶ 83-88, *supra*.

111.    Similarly, San Francisco has laws regarding City employees' authority to provide advance notification of an individual in custody's release date.  Specifically, Chapter 12I of San Francisco's Administrative Code—part of San Francisco's Sanctuary City laws—prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released, unless the individual in custody meets certain criteria.  *See* S.F. Admin. Code § 12I.3(c)-(d).

112.    This law make it difficult, if not impossible, for San Francisco to comply with the Section 1226 and Section 1231 Requirements, which DOJ interprets to require that recipients provide

---

[21] ICE requests for assistance with criminal investigations are directed to the Sheriff, who directs any assistance to ICE agents as she deems appropriate.

at least 48 hours' advance notice regarding the date and time an individual is scheduled to be released from the San Francisco's custody. *See* ¶¶ 69-73, 78, *supra*.

113. Also, ambiguity regarding the meaning and scope of the Section 1324 Requirement makes it difficult for San Francisco to certify that it complies with the Section 1324 Requirement.

114. As described above (*see* ¶¶ 93-97, *supra*), the Trump Administration has interpreted Section 1324 broadly to mean that jurisdictions potentially violate Section 1324 simply by having sanctuary city laws or policies that limit cooperation with federal immigration authorities.

115. San Francisco has such laws and policies that limit cooperation with federal immigration officials. San Francisco has been a Sanctuary City since 1989, when it first enacted ordinances to protect Central American refugees who were escaping violent civil wars in their home countries and seeking legal protections in the United States. In addition to the policies described above, San Francisco's current Sanctuary City Laws, codified in Chapters 12H and 12I of the San Francisco Administrative Code, continue to reflect San Francisco's broad dedication and commitment to promote public safety, public health, and community integrity.[22]

116. In light of these laws and policies, the Trump Administration's statements regarding Section 1324 create a cloud of uncertainty for San Francisco. San Francisco cannot sign the Immigration-Related Certification—particularly in light of the penalties that attach to that Certification (*see* Exh. 3 (explaining that a "materially false, fictitious, or fraudulent statement" in the certification will potentially subject the certifying Chief Legal Officer to criminal prosecution and the applicant entity to civil penalties and administrative remedies for false claims)—under that cloud of uncertainty.

---

[22] These laws serve important public purposes, as the legislative findings set forth in Chapter 12I confirm. The Board of Supervisors has declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all.

*See* Section 12I.2.

117.    Likewise, significant ambiguities prevent San Francisco from certifying that it complies with the Section 1366 Requirement.  DOJ has offered no guidance as to the meaning of that Requirement.  *See* ¶ 103, *supra*.  As a result, San Francisco cannot certify that it complies with that Requirement, as it has no way to know what the Requirement demands of it.

**B.**    **The Challenged FY 2018 Requirements Put San Francisco To An Unconstitutional Choice.**

118.    The Challenged FY 2018 Requirements create an untenable choice for San Francisco, when it is faced with the decision whether to accept the FY 2018 Byrne JAG award.  San Francisco must choose between amending its laws and policies to allow it to execute the Immigration-Related Certification, or forgoing hundreds of thousands of dollars in important criminal justice funding.

119.    As described above, San Francisco cannot sign the Immigration-Related Certification in light of various ambiguities and potential conflicts with San Francisco's laws and policies.  If San Francisco maintains those laws and policies and declines to execute the Immigration-Related Certification, it will have to forgo direct FY 2018 Byrne JAG funding.  This is because recipients are required to certify that they comply with all applicable award conditions and execute all necessary certifications in order to accept a FY 2018 Byrne JAG award.[23]

120.    San Francisco will also have to forgo the pass-through grant it expects to receive from the State of California.

121.    On information and belief, the State of California has applied for FY 2018 Byrne JAG funds, or will do so in the near future.  Once the State of California receives Byrne JAG funds, it issues a request for proposals ("RFP") for local jurisdictions to apply for pass-through funds.  San Francisco has applied for, and received, pass-through Byrne JAG funds in the past pursuant to this RFP process.  But to receive pass-through Byrne JAG funds, San Francisco would be required to submit assurances that it will comply with all award requirements.

122.    The loss of this funding will have significant negative impacts on San Francisco.  The variety of programs that Byrne JAG funding supports will be placed in jeopardy.  San Francisco could

---

[23] When it submitted its application for FY 2018 Byrne JAG funding, San Francisco included a reservation of rights regarding the Challenged FY 2018 Requirements.  San Francisco made clear that it was not certifying that it would comply with the Challenged FY 2018 Requirements, and stated that it was planning to challenge those requirements in litigation.

1    be forced to reduce or eliminate these programs, and the staff positions they support, unless additional

2    funding sources could be identified.

3         123.    Alternatively, San Francisco could change its local laws and policies to attempt to

4    comply with the Challenged FY 2018 Requirements—a difficult endeavor given the significant

5    ambiguities about the scope and meaning of many of those Requirements.

6         124.    More significantly, changing its local laws and policies would also harm San Francisco

7    by forcing it to abandon its considered and constitutionally protected policy judgments.  San

8    Francisco's Sanctuary City laws and policies reflect lawmakers' considered judgment that public

9    safety, public health, and community cohesion are best served by limiting local employees'

10   entanglement with federal immigration priorities to the extent possible under federal law.  By

11   threatening to withhold funds, DOJ seeks to intrude on San Francisco's sovereign authority to make

12   such policy choices.

13                      **COUNT ONE:  SEPARATION OF POWERS**

14        125.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as

15   if fully set forth herein.

16        126.    In July 2018, Defendants issued a solicitation seeking applications for the FY 2018

17   Byrne JAG program.

18        127.    San Francisco has applied for the FY 2018 Byrne JAG program.

19        128.    The FY 2018 Local Solicitation makes clear that jurisdictions wishing to accept 2018

20   Byrne JAG funds will have to execute a "Certification Relating to 8 U.S.C. §§ 1226(a) & (c),

21   1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3)."  This Certification imposes the Challenged FY 2018

22   Requirements.

23   //

24   //

25        129.    The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, and

26   the spending power, *see* U.S. Const. art. 1, § 8, cl. 1.  Absent a statutory provision or an express

27   delegation, only Congress is entitled to attach conditions to federal funds.

28

130.    Congress has not enacted the Challenged FY 2018 Requirements as part of any statutory scheme.

131.    Congress has not enacted the Challenged FY 2018 Requirements as applicable to Byrne JAG funds.

132.    Congress has not delegated to Defendants the authority to impose the Challenged FY 2018 Requirements on Byrne JAG funds.

133.    Defendants are unilaterally imposing the Challenged FY 2018 Requirements without authorization from Congress.

134.    For these reasons, DOJ in imposing the Challenged FY 2018 Requirements unconstitutionally intrudes upon and usurps powers that belong to Congress, violating principles of separation of powers.

**COUNT TWO:  SPENDING CLAUSE**

135.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

136.    As described above, the Challenged FY 2018 Requirements violate separation of powers principles because they are not authorized by Congress, expressly or impliedly.

137.    Even if Congress had delegated its authority to impose conditions on Byrne JAG funds, the Challenged FY 2018 Requirements would violate the Spending Clause by:

a.    imposing conditions that are ambiguous, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts [Congress' conditions]…   There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it…   [I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." ); and

b.    imposing conditions that are not germane to the stated purposes of the Byrne JAG funds, *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987) ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PRAYER FOR RELIEF**

Wherefore, San Francisco prays that the Court grant the following relief:

1.    Declare the Challenged FY 2018 Requirements Defendants have imposed on the Byrne JAG program unconstitutional;

2.    Permanently enjoin Defendants from using the Challenged FY 2018 Requirements as funding restrictions for any Byrne JAG awards, now or in the future;

3.    Award San Francisco reasonable costs and attorneys' fees; and

4.    Grant any other further relief that the Court deems fit and proper.


Dated:   August 22, 2018

DENNIS J. HERRERA
City Attorney
JESSE C. SMITH
RONALD P. FLYNN
YVONNE R. MERÉ
TARA M. STEELEY
SARA J. EISENBERG
AILEEN M. McGRATH
Deputy City Attorneys


By: /s/ Dennis J. Herrera
DENNIS J. HERRERA
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

**EXHIBIT 3**

1 | DENNIS J. HERRERA, State Bar #139669
City Attorney
2 | JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
3 | RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
4 | YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
5 | CHRISTINE VAN AKEN, State Bar #241755
TARA M. STEELEY, State Bar #231775
6 | MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
7 | MATTHEW S. LEE, State Bar #295247
NEHA GUPTA, State Bar #308864
8 | Deputy City Attorneys
City Hall, Room 234
9 | 1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
10 | Telephone:     (415) 554-4748
Facsimile:      (415) 554-4715
11 | E-Mail:          brittany.feitelberg@sfgov.org

12 | Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

13

14

15 |                    UNITED STATES DISTRICT COURT

16 |                  NORTHERN DISTRICT OF CALIFORNIA

17 | CITY AND COUNTY OF SAN                    Case No. 3:17-cv-00485-WHO
     FRANCISCO,
18
              Plaintiff,                       **SECOND AMENDED COMPLAINT FOR
19 |                                            DECLARATORY AND INJUNCTIVE RELIEF**
              vs.
20
     DONALD J. TRUMP, President of the United
21 | States, UNITED STATES OF AMERICA,
     JOHN F. KELLY, Secretary of United States
22 | Department of Homeland Security,
     JEFFERSON B. SESSIONS III, Attorney
23 | General of the United States, DOES 1-100,

24 |          Defendants.

25

26

27

28

---

Second Amended Complaint; Case # 3:17-cv-00485-WHO          N:\CXLIT\LI2017\171027\01192679.docx

**INTRODUCTION**

1.      In blatant disregard of the law, the President of the United States seeks to coerce local authorities to bend to his will and abandon "Sanctuary City" laws and policies. To that end, on January 25, 2017, the President issued an Executive Order entitled "Enhancing Public Safety in the Interior of the United States." Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ("Executive Order"). The Executive Order announces that it is the Executive Branch's policy to withhold federal funds from "sanctuary jurisdictions," directs the Attorney General and Secretary of Homeland Security to ensure that sanctuary jurisdictions do not receive federal grants, and directs the Attorney General to take enforcement action against any local entity that "hinders the enforcement of Federal law." The Executive Order undermines established principles of federalism and separation of powers, violates the United States Constitution, and impermissibly threatens cities with catastrophic financial consequences.

2.      The President and San Francisco agree that the City and County of San Francisco ("San Francisco") is a Sanctuary City, but disagree about what that means. San Francisco laws limit when city employees and agencies may assist with the enforcement of federal immigration law. These laws generally prohibit city employees from using city funds or resources to assist in the enforcement of federal immigration law, unless required by federal or state law. They specifically prohibit local law enforcement officers from cooperating with Immigration and Customs Enforcement ("ICE") detainer requests, which are voluntary, and limit when local law enforcement officers may give ICE advance notice of a person's release from local jail.

3.      Like many other cities, San Francisco is a city of immigrants—many of whom are undocumented—who come here to live, work, and raise families. San Francisco's Sanctuary City laws make San Francisco safer, healthier, and economically stronger. San Francisco is safer when all people, including undocumented immigrants, feel safe reporting crimes. San Francisco is healthier when all residents, including undocumented immigrants, access public health programs. And San Francisco is economically and socially stronger when all children, including undocumented immigrants, attend school. Using city and county resources for federal immigration enforcement breeds distrust of local government and officials who have no power to change federal laws, and can

also wrench apart family and community structures that support residents and thus conserve resources. For these reasons, among others, San Francisco has directed its employees and officers not to assist the Federal government in enforcing federal immigration law, with limited exceptions.

4.     San Francisco faces the imminent loss of more than $2 billion in federal funds and impending enforcement action if it does not capitulate to the President's demand that it help enforce federal immigration law. At least one jurisdiction has already succumbed to this presidential fiat.

5.     The threat San Francisco faces now is particularly troubling given that San Francisco already complies with all federal immigration laws. The Executive Order relies on Title 8, Section 1373 of the United States Code ("Section 1373"), which provides that local governments may not prohibit or restrict any government entity or official from "sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual."

6.     San Francisco's laws comply with Section 1373. San Francisco previously prohibited employees and officials from sharing information regarding immigration status but amended this language to ensure compliance with Section 1373. Under current law, San Francisco does not prohibit or restrict its employees from sharing information about the citizenship or immigration status of any individual with federal immigration officials.

7.     The Constitution establishes a balance of power between the state and Federal governments, as well as among the coordinate branches of Federal government, to prevent the excessive accumulation of power in any single entity and reduce the risk of tyranny and abuse from any government office. In so doing, the Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." This state sovereignty extends to political subdivisions of the State, including cities and counties such as San Francisco.

8.     The Executive Order invades San Francisco's sovereignty and seeks to commandeer state and local officials to enforce federal law. Under the Constitution and established principles of federalism, state and local governments have the autonomy to devote resources to local priorities and to control the exercise of their own police powers, rather than being forced to carry out the agenda of

the Federal government. The Executive Order purports otherwise to wrest this autonomy from state and local governments.

9.     In addition to violating the Tenth Amendment, the Executive Order violates the Constitution's separation of powers and the Spending Power that Article I, Section 8 of the Constitution grants exclusively to Congress. Congress, not the Executive Branch, has the authority to determine how federal funds will be spent.

10.    San Francisco recognizes that there will be additional developments related to the Executive Order in the weeks and months to come. But the consequences threatened by the Executive Order are too severe for San Francisco to wait. The Executive Order threatens funds that support vital services, the loss of community trust, and the loss of San Francisco's sovereign authority to set and follow its own laws on matters appropriately and historically within the control of local government. San Francisco has no choice but to seek the intervention of this Court to ensure that its rights and residents are protected, and that the Administration complies with Federal law and the Constitution.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq*.

12.    Venue properly lies within the Northern District of California because Plaintiff, San Francisco, resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District. 28 U.S.C. § 1391(e).

## PARTIES

13.    Plaintiff San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

14.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

15.    Defendant United States of America is sued under 28 U.S.C. Section 1346.

//

16.     The U.S. Department of Homeland Security ("DHS") is a cabinet department of the United States Federal government with the primary mission of securing the United States. Defendant John F. Kelly is the Secretary of DHS. Secretary Kelly is responsible for executing relevant provisions of the Executive Order. Secretary Kelly is sued in his official capacity.

17.     The Attorney General ("AG") is a cabinet department of the United States Federal government overseeing the Department of Justice. Defendant Jefferson B. Sessions is the Attorney General. Attorney General Sessions is responsible for executing relevant provisions of the Executive Order. Attorney General Sessions is sued in his official capacity.[1]

18.     Doe 1 through Doe 100 are sued under fictitious names. Plaintiffs do not now know the true names or capacities of said Defendants, who were responsible for the alleged violations alleged, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

### I.     SAN FRANCISCO'S SANCTUARY CITY LAWS

19.     San Francisco has been a Sanctuary City since 1989. In the 1980s, thousands of Central American refugees fled countries in the midst of violent civil wars to seek legal protection in the United States. Against the backdrop of this humanitarian crisis, San Francisco began enacting the ordinances that, as later amended, make up San Francisco's Sanctuary City laws.

20.     Numerous other municipalities have also enacted Sanctuary City laws. Although the details of their ordinances differ, all of these jurisdictions have adopted laws or policies that limit using local resources to implement and enforce federal immigration laws.

21.     Today, San Francisco's body of Sanctuary City law is contained in two chapters of San Francisco's Administrative Code: Chapters 12H and 12I. Importantly, these chapters do not protect criminals or prevent people from being prosecuted for illegal acts. Instead, they protect children by ensuring that their parents feel safe taking them to playgrounds, to schools, and to hospitals. They support family stability and community engagement. And they protect the safety and health of all residents of San Francisco by helping to ensure that everyone, including undocumented

---

[1] Attorney General Sessions assumed office on February 9, 2017, thereby replacing Acting Attorney General Dana J. Boente as a defendant, pursuant to Fed. R. Civ. P. 25(d).

immigrants, feels safe reporting crimes, cooperating with police investigations, and seeking medical care.

22.    San Francisco Administrative Code Chapter 12H—the full text of which is attached as Exhibit 1—prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by Federal or state law.

23.    Chapter 12H previously prohibited disseminating information regarding the immigration status of any individual, but the Board of Supervisors amended Chapter 12H in July 2016 to, *inter alia*, delete that prohibition in order to ensure compliance with Section 1373.

24.    San Francisco Administrative Code Chapter 12I—the full text of which is attached as Exhibit 2—prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the Federal government.[2]

25.    A detainer request is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary City laws. A detainer request is not issued by a judge based on a finding of probable cause. It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them.

26.    Complying with detainer requests requires municipalities to commit scarce law enforcement personnel and resources to track and respond to requests, detain individuals in holding cells, and supervise and feed individuals during the prolonged detention. And the Federal government has made clear that the local agency bears the financial burden of the detention, providing that "[n]o

---

[2] Section 287.7 of Title 8 of the Code of Federal Regulations allows ICE to issue detainer requests to local jurisdictions. Section 287.7 provides that such a detainer "serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." Subsection (d) provides that "[u]pon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department."

detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal

obligation on the part of the Department." 8 C.F.R. § 287.7(e).

27. Further, complying with civil immigration detainer requests, in the absence of a

probable cause determination, violates the Fourth Amendment to the United States Constitution and

could subject San Francisco to civil liability. *See Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir.

2015); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305 (D. Or. Apr. 11, 2014); *see also*

*Melendres v. Arpaio*, 695 F.3d 990, 1000-01 (9th Cir. 2012) (applying the Fourth Amendment to

immigration arrests).

28. Chapter 12I also prohibits San Francisco law enforcement officials from responding to

a federal immigration officer's request for advance notification of the date and time an individual in

San Francisco's custody is being released, unless the individual in question meets certain criteria. *See*

S.F. Admin. Code § 12I.3(c), (d).

29. Finally, as relevant here, Chapter 12I provides that "[l]aw enforcement officials shall

not arrest or detain an individual, or provide any individual's personal information to a federal

immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil

immigration document based solely on alleged violations of the civil provisions of immigration laws."

*See* Section 12I.3(e). "Personal information" is defined as "any confidential, identifying information

about an individual, including, but not limited to, home or work contact information, and family or

emergency contact information." *See* Section 12I.2.

30. Chapter 12I makes clear that its purpose and effect are limited to matters "relating to

federal civil immigration detainers, notification of release of individuals, transmission of personal

information, or civil immigration documents, based solely on alleged violations of the civil provisions

of immigration laws." Chapter 12I expressly states that "[i]n all other respects, local law enforcement

agencies may continue to collaborate with federal authorities to protect public safety." *See* Section

12I.4.

31. San Francisco's Sanctuary City laws arise from San Francisco's commitment and

responsibility to ensure public safety and welfare. The Board of Supervisors, as San Francisco's

legislative body, found that public safety is "founded on trust and cooperation of community residents

and local law enforcement." Section 12I.1. Citing a study by the University of Illinois, which found that at least 40% of Latinos surveyed were less likely to provide information to police because they feared exposing themselves, family, or friends to a risk of deportation, the Legislature stated that "civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies." *Id.*; *see also id.* ("The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies."). Indeed, a recent study shows that crime is statistically significantly lower in sanctuary counties compared to non-sanctuary counties. *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, CTR. FOR AM. PROGRESS (Jan. 26, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-ofsanctuary-policies-on-crime-and-the-economy/.

32. The legislative findings set forth in Chapter 12I evidence the legitimate local purpose of San Francisco's Sanctuary City laws. For example, the Legislature declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all. (*See* Section 12I.2.)

33. The Board of Supervisors also had a public health purpose for its decision to restrict disclosure of confidential information: "To carry out public health programs, the City must be able to reliably collect confidential information from all residents . . . . Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody." Section 12I.1.

34. Finally, the Board of Supervisors determined that enforcing immigration detainer requests would require San Francisco to redirect scarce local law enforcement personnel and resources—noting that the costs of "responding to a civil immigration detainer can include, but [are]

not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer." *Id.* In short, the Board of Supervisors concluded that "[c]ompliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City." *Id.*

35. California law incorporates local Sanctuary City laws such as Chapters 12H and 12I. The TRUST Act states that local law enforcement officials may comply with ICE detainer requests only if (1) the continued detention would not violate any federal, state, or local law, or any local policy, and (2) the defendant's criminal history meets specified conditions. Cal. Gov't Code §§ 7282, 7282.5. Thus, because in San Francisco ICE detentions are prohibited under local law, they are also prohibited under state law.

## II.   SECTION 1373

### A.   San Francisco Complies With Section 1373 By Not Prohibiting Its Employees From Sharing "Citizenship Or Immigration Status" Information With The Federal Government

36. Section 1373 provides that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual." 8 U.S.C. § 1373(a). This restriction exclusively regulates government entities.

37. Section 1373 requires San Francisco to allow its employees to use city resources, including San Francisco tax dollars, to respond to requests for information about citizenship and immigration status.

38. San Francisco complies with Section 1373.

39. Nothing in San Francisco Administrative Code Chapters 12H or 12I limits communications regarding citizenship or immigration status in any way.

40. And, indeed, under ICE's recently restored Secure Communities program (also known as "S-Comm"), whenever an individual is taken into custody, the person is digitally fingerprinted and those fingerprints are sent to the California Department of Justice and ultimately the FBI. The FBI

//

forwards the fingerprints to DHS, which allows ICE to determine the immigration status of everyone in San Francisco custody.

41.     Under Chapter 12I and the TRUST Act, San Francisco does not enforce detainer requests (*see* ¶26, *supra*), and does not respond to notification requests from the Federal government unless certain conditions are met (*see* ¶30, *supra*). But compliance with such requests is not required by Section 1373, which speaks only to communications regarding *citizenship and immigration status*.

42.     San Francisco has affirmatively instructed personnel regarding the substance of Section 1373 in a recent memorandum to all San Francisco employees from the San Francisco Human Resources Director.

**B.     The United States Improperly Interprets Section 1373 To Require Compliance With Detainer Requests**

43.     On May 31, 2016, in response to a request from the Office of the Attorney General, the Office of the Inspector General ("OIG") of the Department of Justice issued a memorandum ("OIG Memo") regarding potential violations of Section 1373 by recipients of funding from the Edward Byrne Memorial Justice Assistance Grant Program ("JAG"). Memorandum from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen. for the Office of Justice Programs, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients* (May 31, 2016), https://oig.justice.gov/reports/2016/1607.pdf.[3]

44.     In analyzing the local laws and policies of ten selected state and local jurisdictions, OIG demonstrated how the Federal government interprets Section 1373.

45.     Although Section 1373 does not expressly address immigration detainers, OIG expressed concern that local laws concerning the handling of detainer requests "may have a broader practical impact on the level of cooperation afforded to ICE by these jurisdictions and may, therefore, be inconsistent with at least the intent of Section 1373." OIG Memo at 7. It went on to state that local laws and policies that "purport to be focused on civil immigration detainer requests [and say nothing

---

[3] The authorizing legislation for the JAG program requires that all grant applicants certify compliance with the provisions of the authorizing legislation and all other "applicable federal laws." 42 U.S.C. § 3750 *et seq.* The U.S. Department of Justice, Office of Justice Programs has recently announced that Section 1373 is an "applicable" law under the JAG authorizing legislation.

1  about sharing immigration status with ICE] . . . may nevertheless be affecting ICE's interactions with

2  the local officials regarding ICE immigration status requests." *Id.*

3      46.    OIG also stated that such immigration detainer request policies "may be causing local

4  officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE

5  in all respects . . . . [which], of course, would be inconsistent with and prohibited by Section 1373." *Id.*

6  at 8.

7      47.    In the OIG Memo, the Federal government also endorses the view that local

8  jurisdictions hinder the enforcement of Federal immigration law if they do not honor detainer requests

9  or if they place any other limitations on cooperation with ICE. *See, e.g.*, *id.* at 4 (stating that even

10  though Section 1373 does not specifically address restrictions by state or local entities on cooperation

11  with ICE regarding detainers, "[a] primary and frequently cited indicator of limitations placed on

12  cooperation by state and local jurisdictions with ICE is how the particular state or local jurisdiction

13  handles immigration detainer requests issued by ICE").

14      48.    Yet, San Francisco cannot lawfully comply with ICE detainer requests. Complying with

15  civil immigration detainer requests, in the absence of a determination of probable cause, would violate

16  the Fourth Amendment to the United States Constitution and could subject San Francisco to civil

17  liability for this harm. *See Arizona v. United States*, 132 S. Ct. 2492, 2509 (2012) (noting that

18  "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns");

19  *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*,

20  2014 WL 1414305 (D. Or. Apr. 11, 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000-01 (9th

21  Cir. 2012) (applying the Fourth Amendment to immigration arrests).

22      49.    In the OIG Memo, OIG recommended that the U.S. Department of Justice, Office of

23  Justice Programs ("OJP") provide JAG recipients clear guidance on their obligation to comply with

24  Section 1373 and require them to certify that they comply with that section. *See* OIG Memo at 9.

25      50.    In response to these recommendations, in July and October 2016 OJP issued guidance

26  regarding compliance with Section 1373. *See* Office of Justice Programs, *Guidance Regarding*

27  *Compliance with 8 U.S.C. § 1373*, U.S. DEP'T JUST. (July 7, 2016) ("OJP July Guidance"); Office of

28  //

Justice Programs, *Additional Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. DEP'T JUST. (October 6, 2016) ("OJP October Guidance").

51. In the OJP July Guidance, OJP reads Section 1373 to impose an affirmative obligation on state and local governments. The Guidance states that to comply with Section 1373, "[y]our personnel *must* be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials." OJP July Guidance at 1 (emphasis added). Accordingly, OJP reads into the law an affirmative obligation to instruct personnel regarding the substance of Section 1373.

52. In the October 2016 Guidance, OIG stated that all JAG applicants must comply with— and certify their compliance with—Section 1373. OJP October Guidance at 1.

53. As a grantee of JAG grants, San Francisco is required to certify its compliance with Section 1373.

## III. THE EXECUTIVE ORDER

### A. The Executive Order Cuts Off Federal Funding From Sanctuary Jurisdictions And Directs Enforcement Action Against Them

54. On January 25, 2017, President Donald J. Trump issued the Executive Order attached as Exhibit 3.

55. The Executive Order declares, "Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic." Executive Order at 8799.

56. To address the purported harm caused by Sanctuary Cities, the Executive Order establishes the policy that "jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.*

57. Specifically, Section 9(a) of the Executive Order states: "It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." *Id.* at 8801.

58. Section 9(a) of the Executive Order establishes a funding restriction (the "Funding Restriction"):

> In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

*Id.*

59. Section 9(a) of the Executive Order also mandates enforcement action (the "Enforcement Directive"):

> The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

*Id.*

60. Section 9(a) of the Executive Order defines "sanctuary jurisdictions" as those jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373." But Section 9(b) indicates that Defendants in fact define that category quite broadly as including any jurisdiction that declines to comply with ICE detainer requests:

> To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

61. The Executive Order thus attempts to mandate compliance with detainer requests as part of Section 1373 compliance, with the consequence that a jurisdiction such as San Francisco that does not comply with ICE detainer requests will lose federal funds under the Executive Order.

62. A jurisdiction that fails to comply with detainer requests also faces enforcement action under Section 9(a)'s Enforcement Provision. As discussed further below, Defendants view the local decision not to comply with ICE detainer requests as a "statute, policy, or practice that prevents or hinders the enforcement of Federal law."

**B.    Defendants Have Labeled San Francisco A Sanctuary Jurisdiction Within The Meaning Of The Executive Order**

63.    As discussed above, San Francisco *does* comply with Section 1373, properly construed. Nonetheless, Defendants deem San Francisco a sanctuary jurisdiction pursuant to their overly broad definition of that term.

64.    If there were any question about whether Defendants deem San Francisco as a "sanctuary jurisdiction," that question is answered by Defendants' own statements, which clearly characterize San Francisco as a Sanctuary City.

65.    For example, in a written campaign speech, then-candidate Donald J. Trump gave in Phoenix, Arizona on August 31, 2016, he expressly referred to San Francisco as a Sanctuary City. *See Donald J. Trump: Address on Immigration*, Donald J. Trump for President (Aug. 31, 2016), https://www.donaldjtrump.com/press-releases/donald-j.-trump-address-on-immigration ("Another victim is Kate Steinle, gunned down in the Sanctuary City of San Francisco by an illegal immigrant deported five previous times.").

66.    Further, Defendants have repeatedly identified Sanctuary Cities, and specifically San Francisco, as those that decline detainer requests and otherwise do not affirmatively support federal immigration enforcement.

- In statements to the Daily Caller on July 7, 2015, Congressman Darrell Issa and now-Attorney General Sessions criticized San Francisco and other sanctuary jurisdictions for failing to honor detainers. Sessions stated, "This disregarding of detainers and releasing persons that ICE has put a hold on—it goes against all traditions of law enforcement. Laws and courtesies within departments— if you have somebody charged with a crime in one city, you hold them until you complete your business with them . . . . So what was happening was, ICE authorities were filing detainers and sanctuary cities were saying, 'We're not gonna honor them. They finished paying for the crime they committed in our city— we've released them.'" Kerry Picket, *Sen. Sessions: City Officials Harboring Illegal Immigrant Felons Could Be Charged with Crime*, Daily Caller (July 7, 2015, 10:07 PM),

http://dailycaller.com/2015/07/07/sen-sessions-city-officials-harboring-illegal-immigrant-felons-could-be-charged-with-crime/#ixzz4XE9I12Ux.

- On July 8, 2015, Sessions gave a speech to Congress describing San Francisco as "a jurisdiction that is known to release illegal immigrants back into the public," and one which refused to "honor" a detainer sought by federal authorities. News Release, Office of Senator Jeff Sessions, Senator Sessions Calls on Congress To Take Up Immigration Reform for Americans (July 9, 2015), http://www.sessions.senate.gov/public/index.cfm/news-releases?ID=B7A98B63-8ECA-4A4E-B5C8-4A665F2343DE.

- In an interview with Breitbart News in May 2016, then-candidate Donald J. Trump stated, "Sanctuary cities are a disaster . . . . They're a safe-haven for criminals and people that should not have a safe-haven in many cases. It's just unacceptable. We'll be looking at sanctuary cities very hard." Matthew Boyle, *Exclusive — Donald J. Trump to San Francisco: Sanctuary Cities 'Unacceptable,' A 'Disaster' Creating 'Safe-Haven for Criminals'*, Breitbart News (May 16, 2016), http://www.breitbart.com/2016-presidential-race/2016/05/16/exclusive-donald-j-trump-to-san-francisco-sanctuary-cities-unacceptable-a-disaster-creating-safe-haven-for-criminals/. This Breitbart news report further stated that "Trump's comments . . . come in response to efforts by far left progressive organizations in San Francisco to expand that city's sanctuary city laws." *Id.*

- Another Breitbart News article published on November 21, 2016 regarding Sanctuary Cities quoted Texas Republican Congressman John Culberson as stating, "The law requires cooperation with immigration officials 100 percent of the time." Bob Price, *Sanctuary Cities Risk Losing DOJ Funds in 2017, Texas Congressman Says*, Breitbart News (Nov. 21, 2016), http://www.breitbart.com/texas/2016/11/21/sanctuary-cities-risk-losing-doj-funds-2017-texas-congressman-says/.

//

67.     Defendants have also repeatedly stated their intent to strip federal funding from Sanctuary Cities.

- In a statement by White House Press Secretary Sean Spicer on January 25, 2017 announcing the issuance of the Executive Order, Spicer stated, "We are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws." White House, 1/25/17: White House Press Briefing, YouTube (Jan. 25, 2017), https://www.youtube.com/watch?v=OaPriMVvtZA.

- A press release from the Office of the Press Secretary for the White House issued on January 28, 2017 detailing President Trump's First Week of Action, reads in relevant part: "President Trump signed an executive order to ensure that immigration laws are enforced throughout the United States, including halting federal funding for sanctuary cities." Press Release, The White House, Office of the Press Secretary, President Trump's First Week of Action (Jan. 28, 2017), https://www.whitehouse.gov/the-press-office/2017/01/28/president-trumps-first-week-action.

- Press Secretary Sean Spicer reiterated this goal on February 1, 2017, stating "I think the President's goal in ending sanctuary cities is pretty clear. . . . [T]he President has been very clear through his executive order that federal funds, paid for by hardworking taxpayers, should not be used to help fund sanctuary cities." Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6* (Feb. 1, 2017), https://www.whitehouse.gov/the-pressoffice/2017/02/01/press-briefing-press-secretary-sean-spicer-212017-6.

68.     Indeed, Defendants have explicitly stated their intent to use federal funding cuts as a "weapon" against Sanctuary Cities, in an attempt to coerce jurisdictions to bend to their will.

//

- In an interview with Bill O'Reilly on February 5, 2017, President Trump called the efforts of California lawmakers to propose legislation that could stop state police and sheriffs from enforcing federal immigration laws "ridiculous." Alexander Mallin and Lissette Rodriguez, *Trump Threatens Defunding Sanctuary States as 'Weapon'*, ABC News (Feb. 5, 2017, 6:01 PM), http://abcnews.go.com/Politics/trump-threatens-defunding-sanctuary-states-weapon/story?id=45286642. He stated: "I don't want to defund anybody. I want to give them the money they need to properly operate as a city or a state." But he said, "If they're going to have sanctuary cities, we may have to do that. Certainly that would be a weapon." *Id.* "Sanctuary cities, as you know I'm very much opposed to sanctuary cities -- they breed crime, there's lots of problems." *Id.* "We give tremendous amounts of money to California," Trump said. "Obviously the voters agree or otherwise they wouldn't have voted for me." *Id.*

- When asked at a press briefing whether Cincinnati would face sanctions for voting to become a Sanctuary City, Sean Spicer, the President's press secretary stated:

> As I've noted before, at the end of the day, this order is about two things: one, keeping our cities safe, and two, respecting the hard-earned taxpayers who send their money to the federal government. And the President is going to do everything he can within the scope of the executive order to make sure that cities who don't comply with it -- counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order. I think more areas like Miami-Dade, down in Florida, understand the importance of this order, and we hope cities like Cincinnati and other communities around the country follow their lead and comply with that.

Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/8/2017, #10* (Feb. 8, 2017), https://www.whitehouse.gov/the-press-office/2017/02/08/press-briefing-press-secretary-sean-spicer-282017-10.

69.    The White House's public website states that President Trump "is dedicated to enforcing our border laws, ***ending sanctuary cities***, and stemming the tide of lawlessness associated with illegal immigration." *Standing Up For Our Law Enforcement Community*, The White House,

//

https://www.whitehouse.gov/law-enforcement-community (last visited on Feb. 27, 2017) (emphasis added).

70.   Defendants' statements demonstrate their belief that Sanctuary Cities, like San Francisco, violate Section 1373 and their intent that Sanctuary Cities will lose federal funding— apparently all or almost all federal funding—and be subject to enforcement action under the Executive Order.

71.   There is a "credible threat" that Defendants will seek to enforce the unconstitutional Executive Order against San Francisco.

## IV.   SECTION 1373 AND THE EXECUTIVE ORDER HARM SAN FRANCISCO

### A.   Constitutional Injury

#### 1.   The Executive Order Violates The Tenth Amendment, Separation Of Powers, And The Spending Clause

##### a.   The Executive Order Funding Restriction Is Unconstitutional

###### i.   Separation of Powers

72.   As a threshold matter, the Funding Restriction purports to exercise Spending Power that Article I, Section 8 of the Constitution grants exclusively to Congress.

73.   The Executive Order violates the separation of powers by creating a penalty for Section 1373 that Congress did not authorize, without regard to statutory rules on grant programs put in place by Congress. The Executive Order effectively legislates a sanction for violations of Section 1373 by using the statute as a basis to broadly deny federal grants to municipalities that have made a policy decision to focus law enforcement resources on local problems and limit their entanglement with federal immigration enforcement. The President's unilateral imposition of this new sanction and condition on spending is not supported by any act of Congress, including the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, or by the Constitution.

74.   The Funding Restriction additionally violates the separation of powers by imposing a new restriction on jurisdictions' eligibility to receive federal funds: "jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants,

//

1  except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary."

2  Executive Order at 8801.

3      75.    The President may not unilaterally impose new restrictions on jurisdictions' eligibility

4  for federal funding. Any restriction on eligibility for federal funds must be imposed—clearly,

5  unambiguously, and in advance—by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S.

6  1, 17 (1981). When Congress has not imposed such a restriction by statute, the President may not do

7  so by fiat. The President does not have "unilateral power to change the text of duly enacted statutes."

8  *Clinton v. City of New York*, 524 U.S. 417, 447 (1998).

9      76.    Congress has spoken to reject the imposition of such funding restrictions, including

10  when it declined to enact Senate Bill 1842, "Protecting American Lives Act," introduced in July 2015

11  by then-Senator Attorney General Jeff Sessions. The bill would in part have expanded Section 1373 to

12  deprive jurisdictions having "in effect a statute, policy, or practice that prohibits law enforcement

13  officers of the State, or of a political subdivision of the State, from assisting or cooperating with

14  Federal immigration law enforcement in the course of carrying out the officers' routine law

15  enforcement duties" of "any . . . law enforcement or Department of Homeland Security grant." S.

16  1842, 114th Cong. § 3 (2015). Senate Bill 1842 did not make it out of committee, nor did the identical

17  House of Representatives Bill 3437. Where the President "takes measures incompatible with

18  the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown Sheet & Tube*

19  *Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

20      77.    By imposing conditions or limitations on federal spending without express statutory

21  authority, the Executive Order also unlawfully exceeds the President's powers under other provisions

22  of the Constitution that establish the separation of powers among the branches of our government,

23  including: (i) the President's obligation to "take Care that the Laws be faithfully executed," U.S.

24  Const. art. II, § 3, cl. 5 (Take Care Clause), and (ii) the limitation that Congressional enactments must

25  "be presented to the President of the United States," who then may sign that enactment or veto it, but

26  has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7,

27  cls. 2-3 (Presentment Clause).

28  //

## ii.    Spending Clause and Tenth Amendment

78.    Further, the Funding Restriction purports to exercise Spending Power in ways that even Congress could not.

79.    The Funding Restriction violates the Spending Clause by imposing new funding conditions on existing appropriations of federal funds. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," in advance. *Pennhurst*, 451 U.S. at 17. "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" Congress's conditions. *Id.* "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.*

80.    The Funding Restriction also violates the Spending Clause by imposing funding conditions that are not germane to the purpose of the funds. "[T]he imposition of conditions under the spending power" must be "germane" or "related" to the purpose of federal funding. *South Dakota v. Dole*, 483 U.S. 203, 208-09 & n.3 (1987); *see also Massachusetts v. United States*, 435 U.S. 444, 461 (1978). Here, the Funding Restriction conditions eligibility for federal funding on compliance with Section 1373, without regard for whether Section 1373 is germane to any federal funds at issue. In fact, the Funding Restriction specifically exempts those federal funds—funds "deemed necessary for law enforcement purposes"—that might arguably be germane to Section 1373.

81.    The Funding Restriction also imposes conditions so severe that they "cross[] the line distinguishing encouragement from coercion." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2603 (2012) (opinion of Roberts, C.J.); *New York v. United States*, 505 U.S. 144, 175 (1992). The Funding Restriction "is much more than 'relatively mild encouragement'—it is a gun to the head." *Sebelius*, 132 S. Ct. at 2604 (opinion of Roberts, C.J.). The Funding Restriction threatens a substantial percentage of San Francisco's overall budget—approximately 13% of its total annual operating budget, even without considering federal multi-year grants. Threatened funds include the entire funding stream for programs, such as Medicaid, that are critical to the lives of San Francisco's residents. Threats of this magnitude, and to such critical programs, constitute "economic dragooning that leaves the States with no real option but to acquiesce" to federal dictates. *Id.* at 2605.

82. Finally, because Defendants interpret Section 1373 to require jurisdictions to comply with immigration detainers, the Funding Restriction imposes a new funding condition that requires jurisdictions to act unconstitutionally. Under the Fourth Amendment, detention of an individual must be supported by a determination of probable cause. *See Morales v. Chadbourne*, 793 F.3d 208, 215–17 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305 (D. Or. Apr. 11, 2014). Requiring state and local governments (including San Francisco) to establish blanket policies of compliance with immigration detainers could thus cause them to violate the Fourth Amendment. But Congress's Spending Power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210.

83. This concern is heightened by the fact that state and local governments, including San Francisco, generally lack authority to make warrantless arrests under the Federal government's civil immigration laws. *See Arizona v. United States*, 132 S. Ct. 2492, 2506 (2012). It is further heightened by the prospect that "ICE's issuance of detainers that seek to detain individuals without a warrant goes beyond its statutory authority to make warrantless arrests." *Moreno v. Napolitano*, No. 11-C-5452, 2016 WL 5720465, at *8 (N.D. Ill. Sept. 30, 2016).

84. For all these reasons, the Funding Restriction violates the Constitution's separation of powers (and, in particular, the Constitution's grant of legislative power to Congress in Article I, Section 1); the Spending Clause of Article I, Section 8; and the Tenth Amendment.

**b. The Executive Order Enforcement Directive Is Unconstitutional**

85. The Executive Order's Enforcement Directive violates the Tenth Amendment. The Enforcement Directive commandeers state and local governments by, *inter alia*, compelling them to enforce federal law under threat of legal action.

86. The Enforcement Directive mandates that "[t]he Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373." Executive Order at 8801. As discussed above, Defendants interpret Section 1373 to require jurisdictions to comply with immigration detainers.

87. The Enforcement Directive also mandates "enforcement action against any entity that . . . has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal

law." Executive Order at 8801. As discussed above, Defendants interpret a state or local government's decision not to comply with ICE detainer requests as a "statute, policy, or practice that prevents or hinders the enforcement of Federal law."

88. The Enforcement Directive thus mandates that the Attorney General take enforcement action against state and local governments that do not detain individuals at the behest of the Federal government.

89. Compelling state and local governments to detain individuals at the behest of the Federal government violates the Tenth Amendment. "[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). To "command state or local officials to assist in the implementation of federal law" is to engage in impermissible commandeering. *Id.* at 927.

**B.    Community Injury**

90. The Executive Order fosters an atmosphere of fear and distrust between undocumented immigrants and local government officials in San Francisco. Its sweeping terms, combined with recent ICE activity in San Francisco, and compounded by the Trump administration's statements about immigration enforcement, have generated a maelstrom of fear and confusion that San Francisco agencies have had to move quickly to contain.

91. The Executive Order is designed to—and does—create public confusion about whether San Francisco is and will remain a Sanctuary City, and what that means.

92. San Francisco has been forced to spend resources to counteract the effect of the Executive Order. Since the Executive Order issued, San Francisco officials and employees have responded to questions from San Francisco departments, non-profit partners, and members of the public about topics such as whether the Executive Order modifies ICE's authority to enter public facilities, jails, and residences; whether individuals' personal identifying information on applications for benefit programs remains protected; and whether the Executive Order changes the way San Francisco law enforcement officers interact with ICE. San Francisco departments have held numerous meetings discussing the impact of the Executive Order and have developed new educational materials about San Francisco Chapters 12H and 12I.

93.     Given the Executive Order's broad language, even San Francisco's extensive and ongoing efforts to offer clear answers leave the public far from reassured.

94.     By heightening undocumented immigrants' concerns that any interaction with San Francisco officials will lead to their information being turned over to ICE, the Executive Order discourages undocumented immigrants from reporting crimes, seeking public health services, and otherwise engaging with San Francisco programs and services. This threat harms public safety, public health, and San Francisco's ability to act in what San Francisco has determined to be the best interest of its residents, consistent with federal and state law.

95.     The Executive Order undermines San Francisco's ability to provide critical services not just to undocumented immigrants, but to all residents. When witnesses and crime victims will not talk to the police, law enforcement suffers and the entire community is less safe. When children are not vaccinated or the sick are not treated for communicable diseases, illness spreads throughout the community.

96.     As a result, the Executive Order causes the very harms San Francisco's Sanctuary City laws were designed to prevent. The Executive Order destroys rather than "foster[s] respect and trust between law enforcement and residents," wastes rather than "protect[s] limited local resources," and discourages rather than "encourage[s] cooperation between residents and City officials, including especially law enforcement and public health officers and employees." S.F. Admin. Code § 12I.1.

**C.     Budgetary Injury**

        **1.     San Francisco Relies On Federal Funding For Essential Public Services.**

97.     San Francisco is home to about 865,000 residents and has a total daytime population of about 1,250,000. People who live in, work in or visit San Francisco rely on—in addition to other public services—law enforcement provided by the San Francisco Police Department; public infrastructure projects such as roads, bridges and public transit; and the availability of high quality emergency care from San Francisco General Hospital. Residents also rely on public health programs such as Medi-Cal and public assistance programs like CalWORKS. While San Francisco has benefitted from a recent economic boom, over 12% of San Franciscans live in poverty, and depend on public assistance to make ends meet and put food on the table.

98.     San Francisco contributes disproportionately to national economic growth and job creation. Between 2010 and 2015, San Francisco ranked second among all U.S. counties in percentage change in employment, generating over 125,000 new jobs, a growth rate of 28%. A significant portion of this growth has been in the technology sector, a source of high wage jobs with important multiplier effects and potential for future growth.

99.     The State of California, including San Francisco, pays more to the Federal government in taxes than it receives in federal spending. In 2014, California residents and businesses paid a total of $369.2 billion in federal business and personal income, estate, gift, and excise taxes to the Internal Revenue Services and were the beneficiaries of $355.8 billion in federal expenditures. California ranked 38th among states in the ratio of federal spending to collections.

100.    In turn, San Francisco relies on federal funding to provide essential services and build and maintain public infrastructure projects.

101.    San Francisco budgets by a fiscal year that runs from July 1 to June 30. The current fiscal year began July 1, 2016, and will end June 30, 2017 ("FY16-17"). The next fiscal year will run from July 1, 2017 to June 30, 2018 ("FY17-18").

102.    San Francisco's annual operating budget for FY16-17 includes over $1.2 billion in federal funds. This is approximately 13% of the total annual operating budget.

103.    On top of the federal funds allocated in the annual operating budget, San Francisco expects to receive an additional $800 million in federal multi-year grants, largely for public infrastructure projects.

104.    The programs, projects, and services described below are just a few examples of how San Francisco uses federal funds.

### a.     Human Services Agency

105.    San Francisco's Human Services Agency ("HSA") provides critical services to San Francisco's most vulnerable residents. It works with over 200,000 residents each year to provide needed nutrition assistance, income support, and child welfare services, among other support services. Approximately one in four San Franciscans is a client of HSA. HSA also manages numerous programs

//

that serve young children and their families, older adults, and individuals with disabilities. HSA relies on federal funding to provide these services.

106.     For example, the In-Home Supportive Services ("IHSS") program assists about 23,000 low-income elderly, disabled, or blind San Franciscans to live safely in their own homes and communities. For some recipients, the IHSS program reduces acute health care and institutional long-term care costs that would otherwise be incurred by the state and Federal governments through Medi-Cal. About 19,000 individuals work as independent providers for IHSS recipients. For FY16-17, the County's IHSS program is budgeted to receive approximately $64 million in federal funds, accounting for nearly 40% of the program's budget. Virtually all of these funds are provided as reimbursements. This amount does not include the approximately $200 million of federal funds that the State of California pays directly to independent IHSS providers.

107.     HSA also provides financial assistance and services to San Francisco's neediest residents, including children and families living in poverty. For example, through California Work Opportunity and Responsibility to Kids (CalWORKS), HSA provides financial assistance, family stabilization, case management, vocational counseling, job readiness assistance, behavioral health treatment, transportation, and other services designed to help parents of low-income families meet welfare-to-work requirements, secure and retain employment, and become self-sufficient.
San Francisco's CalWORKS program is budgeted to receive approximately $58 million in federal funding in FY16-17, accounting for over 50% of the County's CalWORKS and Welfare-to-Work FY16-17 budget. Virtually all of these funds are provided as reimbursements.

108.     HSA offers numerous other social services, including child welfare programs and services, early childhood care and education services, adult protective services and a County Veteran's Service Office that helps veterans and their families receive benefits to which they are entitled.

109.     In FY16-17, HSA expects to receive a total of approximately $286 million in federal funding. This represents approximately 33% of its FY16-17 budget.

110.     HSA directly employs nearly 2,000 employees.  It also funds hundreds of additional jobs through contracts to service providers. Loss of federal funds would threaten many of these jobs, as well as the underlying services, that depend on HSA funds.

**b.     Department of Public Health**

111.     The Zuckerberg San Francisco General Hospital ("ZSFGH") is a licensed general acute care hospital owned and operated by San Francisco. ZSFGH has 284 beds and provides a full complement of inpatient, outpatient, emergency, skilled nursing, diagnostic, mental health, and rehabilitation services for adults and children. ZSFGH is the largest safety net provider in San Francisco and is the designated trauma center for the 1.5 million residents of San Francisco and northern San Mateo County. In FY16-17, ZSFGH expects to receive approximately $450 million in federal funding for Medi-Cal and Medicare patient services. This accounts for over half of the ZSFGH FY16-17 budget of nearly $840 million. Virtually all of these funds are provided as reimbursements.

112.     Laguna Honda Hospital provides a full range of skilled nursing services to adult residents of San Francisco who are disabled or chronically ill, including specialized care for those with wounds, head trauma, stroke, spinal cord and orthopedic injuries, HIV/AIDS, and dementia. In FY16-17, Laguna Honda Hospital expects to receive approximately $160 million in federal funding for Medi-Cal and Medicare patient services, accounting for nearly 60% of its budget. Virtually all of these funds are provided as reimbursements.

113.     The San Francisco Department of Public Health ("DPH") also provides direct services through its primary care clinics, HIV/AIDS health services, mental health and substance abuse treatment, housing and homelessness assistance, maternal and child healthcare, and jail health services.

114.     Additionally, the DPH Population Health Division addresses public health concerns, including consumer safety, health promotion, and disease prevention. DPH also monitors threats to public health.

115.     Overall, in FY16-17, DPH expects to receive approximately $800 million in federal funding. This represents almost 40% of the Department's FY16-17 budget.

116.     DPH has approximately 6,800 full-time equivalent employees, and it funds hundreds of additional jobs through contracts to service providers. Loss of federal funds would threaten many of the thousands of jobs that depend on DPH funds.

//

1

### c.   Department of Emergency Management

2      117.    The Department of Emergency Management ("DEM") leads San Francisco in planning,

3 preparedness, communication, response, and recovery for daily emergencies, large scale citywide

4 events, and major disasters. DEM is the vital link in emergency communication between the public

5 and first responders.

6      118.    One of the programs DEM administers is the Bay Area Urban Areas Security Initiative

7 ("UASI"), which sustains and improves regional capacity to prevent, mitigate, respond to, and recover

8 from terrorist attacks and catastrophic disasters. UASI funds training exercises and regional

9 emergency management and disaster response. This program is funded entirely by federal funds.

10      119.    In FY16-17, DEM anticipates receiving about $25 million in federal funding, mostly

11 supporting the UASI program. This represents nearly 30% of the Department's FY16-17 budget.

12
### d.   San Francisco Municipal Transportation Agency's Vehicle Replacement Program
13

14      120.    San Francisco Municipal Transportation Authority ("SFMTA") operates over 1,000

15 vehicles across 75 transit lines, carrying on average 700,000 passengers each workday. Replacing and

16 rehabilitating vehicles as they near the end of their useful life helps avoid costly repairs and service

17 interruptions. Growing the vehicle fleet also alleviates overcrowding and enables the transit system to

18 carry more passengers.

19      121.    Nearly 80% of SFMTA's vehicle replacement and rehabilitation funding comes from

20 the Federal government. Based on the latest Metropolitan Transportation Commission's

21 Transportation Improvement Program, which is a comprehensive spending plan for the Bay Area

22 region, SFMTA expects to receive over $500 million for this purpose from FY 2016-17 through FY

23 2019-20. These funds are subject to "Buy American" provisions.  For example, San Francisco's most

24 recently purchased light-rail vehicles are manufactured in Sacramento, California and New Flyer

25 trolley buses are manufactured in Minnesota.  The funds are expected to replace the system's

26 approximately 1,000 aging vehicles over the four-year period.

27 //

28 //

**D.     Federal Funding Streams**

122.     San Francisco receives federal funds in the form of grants, as well as though payments for entitlement programs. These entitlement programs include Medicaid and Medicare, Temporary Assistance for Needy Families, Supplemental Nutrition Assistance Program, Foster Care, and various child welfare programs. Undocumented immigrants are not eligible to receive benefits from most entitlement programs. Approximately 80% of the federal funds budgeted for FY16-17 are for entitlement programs.

123.     San Francisco receives federal funds directly from the Federal government, as well as indirectly through the State of California and other pass-through entities. For FY16-17, San Francisco's budget includes over $1.1 billion in pass-through funds, the vast majority of which is passed through the State of California. President Trump has identified California as a possible sanctuary jurisdiction.  Because California does not prohibit voluntary communications about immigration status, it should be deemed to comply with Section 1373. If Defendants nonetheless cut off funds to California, this could result in the loss of pass-through funds to San Francisco.

124.     San Francisco receives most federal funds—for both grants and entitlement programs—as reimbursements. San Francisco is currently providing services and benefits that the Federal government has agreed to reimburse. San Francisco is also building major transit expansions and other public infrastructure projects, as well as running programs across a variety of San Francisco agencies, based on the Federal governments' commitment to pay for these projects and programs. The Executive Order calls into question whether the Federal government will in fact reimburse San Francisco for these funds.

125.     Congress has established numerous conditions governing eligibility for federal funds. For instance, to receive Medicaid funds, a state must create a state plan that includes assurances to the Federal government that the state will provide specified types of care and that the state regulates health insurance providers to ensure access to medical assistance, among many other requirements. 42 U.S.C. § 1396(a).

126.     In another example, the United States Department of Housing and Urban Development Community Development Block Grants fund many projects to combat unlawful evictions, maintain

1    stable housing occupancy and supply, and incentivize affordable unit construction. These grants

2    require the grantee to prepare a statement of community development objectives and projected use of

3    funds, provide a citizen participation plan, and certify other enumerated criteria. 42 U.S.C. § 5304.

4        127.    No federal funds received by San Francisco have statutory conditions specifically

5    requiring compliance with Section 1373.

6        **E.    Coercive Effect Of The Executive Order**

7        128.    The Executive Order threatens not to pay San Francisco over $2 billion in federal funds

8    that is money already spent by San Francisco—money San Francisco is spending today and money

9    San Francisco has reasonably relied on receiving. As set forth in this Complaint, the Executive Order

10   is unconstitutional in numerous respects. Nonetheless, San Francisco currently faces the prospect of

11   sweeping cuts in necessary federal funding.

12       129.    It would be catastrophic for San Francisco to lose all federal funds. It would not be

13   possible for San Francisco to backfill the loss of $1.2 billion with local revenue sources.

14       130.    San Francisco's reserves are insufficient to cover the loss of all federal funds.

15   San Francisco currently has contingency reserves of approximately $350 million, in a Rainy Day Fund

16   and a Stabilization Fund, which were created and funded over the last decade for the purpose of

17   managing local tax revenue volatility created by economic conditions. These reserve levels, totaling

18   less than 8% of general fund revenues, remain below levels recommended by the Government Finance

19   Officers Association for local governments and the 10% target established by San Francisco law.

20   There are restrictions on the use of these reserves, and even if entirely depleted, their levels would be

21   inadequate to cover a shortfall in federal funds for even a single year. To fully absorb the loss of all

22   federal funds, San Francisco would also have to suspend capital projects—causing significant job

23   loss—and make drastic service cuts in order to maintain a balanced budget, as it is legally required to

24   do.

25       131.    Even a loss of 10% of annual federal funds would be calamitous for San Francisco. A

26   cut of $120 million would lead to severe public health and public safety impacts. San Francisco

27   currently has approximately 1,971 police officers, a level mandated by the Charter, but a $120 million

28   cut would likely require San Francisco to reduce that number significantly, with similar reductions in

the number of firefighters. Capital programs would be postponed, resulting in lost jobs, and social service programs would be reduced or eliminated. General Fund Departments have identified specific programs and services that they will need to cut if they must reduce their General Fund Support for FY17-18 to help the Mayor's Office balance the budget. These include, for example, services for women that are domestic violence survivors, programming for low-income children and families, and housing programs to support low-income residents.

132.    The Executive Order's threat to cut federal funds is manifestly coercive. This is why at least one jurisdiction has already changed its policy about immigration detainers in response to the Executive Order. The day after the Executive Order was issued, Miami-Dade County Mayor Carlos Giménez instructed the county's interim corrections director to "fully cooperate" with the Federal government and comply with all immigration detainer requests, eliminating a previous requirement that the Federal government reimburse detainer costs. "It's really not worth the risk of losing millions of dollars to the residents of Miami-Dade County in discretionary money from the feds," said Mayor Giménez. Ray Sanchez, *Florida's Largest County to Comply with Trump's Sanctuary Crackdown*, CNN Politics (Jan. 27, 2017, 6:34 PM ET), http://www.cnn.com/2017/01/27/politics/miami-dade-mayor-sanctuary-crackdown/. There is little doubt that is exactly what the President intends this coercive effect with his promise to defund Sanctuary Cities.

### F.    Budget Impact of the Executive Order

133.    For FY16-17, San Francisco's annual operating budget is approximately $9.6 billion. Of this, approximately $1.2 billion is money provided by the Federal government for entitlement programs, grants, and contracts, and other items. For the vast majority of the federal funds received by San Francisco, there is no nexus between the purpose of the funds and immigration enforcement. Only a small percentage of all federal funds received by San Francisco relate to either immigration or law enforcement.

134.    The concern about losing federal funds is so acute that the Board of Supervisors has established the Budget and Finance Federal Select Committee, a new committee that will consider issues related to the possible loss of federal funds as a result of the Executive Order and other federal action.

135.    San Francisco has already begun the seven-month process of adopting the annual budget for the fiscal year beginning on July 1, 2017. On December 13, 2016, the Mayor and the Controller (San Francisco's chief financial officer) issued budget instructions to all San Francisco departments with detailed guidance on the preparation of departments' budget requests. Most San Francisco departments held public hearings on their budget proposals in January and February and submitted their budget requests for the coming fiscal year to the Controller by February 21. San Francisco law requires the Controller to submit a consolidated budget proposal to the Mayor by March 1, the Mayor to submit a balanced budget to the Board of Supervisors by June 1, and the Board of Supervisors to approve a balanced budget by August 1.

136.    To meet the June 1 deadline, the Mayor must make fundamental budget decisions by May 15, and input these decisions into San Francisco's budget software by May 24. During the last week of May, the Controller's Office reconciles and confirms all financial calculations in the Mayor's proposed budget, while the Mayor's Budget Office finalizes the narrative publication that accompanies the proposed budget.

137.    The budget for the fiscal year beginning July 1, 2017 will be approximately $10 billion, approximately $5 billion of which is in San Francisco's General Fund. The remainder of the budget is comprised of self-supporting activities at San Francisco's enterprise departments, which focus on city-related business operations and include the Port, the Municipal Transportation Agency, the Airport, the Public Utilities Commission, and others. The use of funds in these operations is legally restricted and cannot be redirected to backfill a shortfall in the General Fund. Money in San Francisco's General Fund is used to support public services such as public health, human services, police and fire services, and public works. Approximately $2 billion of General Fund money is legally dedicated for specific purposes, leaving approximately $3 billion in discretionary funds.

138.    One of the fundamental budget decisions the Mayor must make by May 15, 2017, is whether to create a budget reserve to account for the possible loss of federal and state funds in the coming fiscal year. This presents a Hobson's choice. San Francisco, facing possible reductions, could place funds into reserve at the beginning of the fiscal year, harming the public by reducing the amount of money in San Francisco's General Fund. Or San Francisco could budget based on the continued

receipt of federal and state funds, knowing that cuts could come suddenly, outside of the budget process.

139. If unanticipated cuts come mid-year, the General Fund will take an even bigger hit at that time, as there will be less time to absorb the loss of funds. Depending on the nature of the cuts, they could lead to immediate service cuts, layoffs, or cancellation of contracts and associated penalties.

140. If current levels of uncertainty remain by May 15, 2017, the Mayor will be forced to propose a federal and state budget reserve. The final amount of the reserve will depend on the Mayor's assessment of the amount of funding at risk and the likelihood that federal or state funds will be cut. Money used to fund the reserve is money that will not be available for General Fund programs and services.

141. A May 15, 2017, decision to set the reserve at a specified amount will have a real world impact when the new fiscal year begins on July 1, 2017. Beginning on this date, funds allocated for the reserve will sit in the reserve instead of being available for General Fund services and programs. Once funds are placed in a federal and state budget reserve, they will remain there for the entire fiscal year unless they are released in response to reliably detailed information about the timing and size of federal or state funding cuts.

142. The Mayor must make a trade-off between putting money into a reserve and using it for other San Francisco priorities, some of which are currently unfunded. For instance, the Department of Homelessness and Supportive Housing needs an additional $19.5 million in the next two fiscal years to make an impact in reducing homelessness in San Francisco. This money would fund a family shelter expansion, youth housing subsidies, a resource center, and shelter maintenance and security. A reserve would set money aside instead of using it for purposes like this.

143. Since the Executive Order issued, San Francisco has received inquiries from credit rating agencies about the impact of the Executive Order on San Francisco's finances. If credit rating agencies downgrade their assessment of San Francisco, it will increase San Francisco's borrowing costs. The Executive Order imposes a "substantial contingent liability" to the extent that it

//

"immediately and directly affects the borrowing power, financial strength, and fiscal planning" of San Francisco. *See Clinton v. City of N.Y.*, 524 U.S. 417, 430-31 (1998).

## CAUSES OF ACTION

### COUNT ONE

### DECLARATORY RELIEF – SAN FRANCISCO LAW COMPLIES WITH 8 U.S.C. § 1373

144.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

145.    San Francisco contends that its laws comply with Section 1373. San Francisco Administrative Code Chapters 12H and 12I do not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, immigration officials information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

146.    Defendants contend that San Francisco's laws do not comply with Section 1373.

147.    An actual controversy presently exists between San Francisco and Defendants about whether San Francisco's laws comply with Section 1373.

148.    A judicial determination resolving this controversy is necessary and appropriate at this time.

### COUNT TWO

### TENTH AMENDMENT, SEPARATION OF POWERS, AND SPENDING CLAUSE – EXECUTIVE ORDER SECTION 9(A)'S FUNDING RESTRICTIONS ARE UNCONSTITUTIONAL

149.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

150.    Executive Order Section 2(c) states: "It is the policy of the executive branch to . . . Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." Executive Order at 8799.

151.    Executive Order Section 9 states: "It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." *Id.* at 8801.

//

152.    Executive Order Section 9(a) contains a Funding Restriction stating: "In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary.  The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction." *Id.*

153.    The Funding Restriction violates the Tenth Amendment, the Spending Clause, and Article I, sec. 1 of the United States Constitution by:

        a.    Exercising Spending Power that the Constitution grants to Congress;

        b.    Imposing new funding conditions on existing federal funds;

        c.    Imposing funding conditions not germane to the purpose of the funds;

        d.    Imposing funding conditions so severe as to coerce compliance; and

        e.    Imposing funding conditions that require jurisdictions to act unconstitutionally.

## COUNT THREE

### TENTH AMENDMENT – EXECUTIVE ORDER SECTION 9(A)'S ENFORCEMENT DIRECTIVE IS UNCONSTITUTIONAL

154.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

155.    Executive Order Section 9(a) contains an Enforcement Directive stating: "The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." Executive Order at 8801.

156.    The Federal government has taken the position that a state or local jurisdiction that fails to affirmatively assist federal immigration officials—by, for example, refusing to comply with a detainer request issued under Section 287.7 of Title 8 of the Code of Federal Regulations—hinders the enforcement of federal law and violates Section 1373.

//

157.     Accordingly, the Enforcement Directive commandeers state and local governments, violating Tenth Amendment to the United States Constitution by, *inter alia*, compelling them to enforce a federal program by imprisoning individuals subject to removal at the request of the Federal government when those individuals would otherwise be released from custody.

## PRAYER FOR RELIEF

Wherefore, San Francisco prays that the Court grant the following relief:

San Francisco Laws Comply With Section 1373 (Count One)

1.     Declare that San Francisco laws comply with Section 1373;

Executive Order Section 9(a)'s Funding Restriction Is Unconstitutional (Count Two)

2.     Declare the Funding Restriction in Executive Order invalid;

3.     Preliminarily and permanently enjoin Defendants from enforcing the Funding Restriction in the Executive Order;

Executive Order Section 9(a)'s Enforcement Directive Is Unconstitutional (Count Three)

4.     Declare the Enforcement Directive in Executive Order invalid;

5.     Preliminarily and permanently enjoin unconstitutional applications of the Enforcement Directive in Executive Order Section 9(a);

Other Relief

6.     Award San Francisco reasonable costs and attorney's fees; and

//
//
//
//
//
//
//
//
//

1    7.    Grant any other further relief that the Court deems fit and proper.

2    Dated:  May 23, 2017

3                                    DENNIS J. HERRERA
                                     City Attorney
4                                    RONALD FLYNN
                                     JESSE C. SMITH
5                                    YVONNE R. MERÉ
                                     MOLLIE M. LEE
6                                    SARA J. EISENBERG
                                     Deputy City Attorneys
7

8                              By:  /s/ Dennis J. Herrera
9                                   DENNIS J. HERRERA
                                    City Attorney
10

11                             By:  /s/ Mollie M. Lee
                                    MOLLIE M. LEE
12                                  Deputy City Attorney

13                                  Attorneys for Plaintiff
                                    CITY AND COUNTY OF SAN FRANCISCO
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**FILER'S ATTESTATION**

2       I, Mollie M. Lee, am the ECF user whose identification and password are being used to file

3 this SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF.

4 Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in

5 this filing.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

## CHAPTER 12H:
## IMMIGRATION STATUS

Sec. 12H.1.     City and County of Refuge.

Sec. 12H.2.     Use of City Funds Prohibited.

Sec. 12H.3.     Clerk of Board to Transmit Copies of this Chapter;
Informing City Employees.

Sec. 12H.4.     Enforcement.

Sec. 12H.5.     City Undertaking Limited to Promotion of General
Welfare.

Sec. 12H.6.     Severability.

### SEC. 12H.1.  CITY AND COUNTY OF REFUGE.

It is hereby affirmed that the City and County of San Francisco is a City and County of Refuge.

(Added by Ord. 375-89, App. 10/24/89)

### SEC. 12H.2.  USE OF CITY FUNDS PROHIBITED.

No department, agency, commission, officer, or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding release status of individuals or any other such personal information as defined in Chapter 12I in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation, or court decision. The prohibition set forth in this Chapter 12H shall include, but shall not be limited to:

(a)   Assisting or cooperating, in one's official capacity, with any investigation, detention, or arrest procedures, public or clandestine, conducted by the Federal agency charged with enforcement of the Federal immigration law and relating to alleged violations of the civil provisions of the Federal immigration law, except as permitted under Administrative Code Section 12I.3.

(b)   Assisting or cooperating, in one's official capacity, with any investigation, surveillance, or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State, or Federal criminal laws.

(c)   Requesting information about, or disseminating information, in one's official capacity, regarding the release status of any individual or any other such personal information as defined in Chapter 12I, except as permitted under Administrative Code Section 12I.3, or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except as required by Federal or State statute or regulation, City and County public assistance criteria, or court decision.

(d)   Including on any application, questionnaire, or interview form used in relation to benefits, services, or opportunities provided by the City and County of San Francisco any question regarding immigration status other than those required by Federal or State statute, regulation, or court decision. Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

(Added by Ord. 375-89, App. 10/24/89; amended by Ord. 228-09, File No. 091032, App. 10-28-2009; Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

### SEC. 12H.2-1.  [REPEALED.]

(Added by Ord. 282-92, App. 9/4/92; amended by Ord. 238-93, App. 8/4/93; Ord. 228-09, File No. 091032, App. 10-28-2009; repealed by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

### SEC. 12H.3.  CLERK OF BOARD TO TRANSMIT COPIES OF THIS CHAPTER; INFORMING CITY

**EMPLOYEES.**

The Clerk of the Board of Supervisors shall send copies of this Chapter, including any future amendments thereto that may be made, to every department, agency and commission of the City and County of San Francisco, to California's United States Senators, and to the California Congressional delegation, the Commissioner of the Federal agency charged with enforcement of the Federal immigration law, the United States Attorney General, and the Secretary of State and the President of the United States. Each appointing officer of the City and County of San Francisco shall inform all employees under her or his jurisdiction of the prohibitions in this ordinance, the duty of all of her or his employees to comply with the prohibitions in this ordinance, and that employees who fail to comply with the prohibitions of the ordinance shall be subject to appropriate disciplinary action. Each City and County employee shall be given a written directive with instructions for implementing the provisions of this Chapter.

(Added by Ord. 375-89, App. 10/24/89; Ord. 228-09, File No. 091032, App. 10-28-2009)

## SEC. 12H.4.  ENFORCEMENT.

The Human Rights Commission shall review the compliance of the City and County departments, agencies, commissions and employees with the mandates of this ordinance in particular instances in which there is question of noncompliance or when a complaint alleging noncompliance has been lodged.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.5.  CITY UNDERTAKING LIMITED TO PROMOTION OF GENERAL WELFARE.

In undertaking the adoption and enforcement of this Chapter, the City is assuming an undertaking only to promote the general welfare. This Chapter is not intended to create any new rights for breach of which the City is liable in money damages to any person who claims that such breach proximately caused injury. This section shall not be construed to limit or proscribe any other existing rights or remedies possessed by such person.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.6.  SEVERABILITY.

If any part of this ordinance, or the application thereof, is held to be invalid, the remainder of this ordinance shall not be affected thereby, and this ordinance shall otherwise continue in full force and effect. To this end, the provisions of this ordinance, and each of them, are severable.

(Added by Ord. 375-89, App. 10/24/89)

# EXHIBIT 2

## CHAPTER 12I:
## CIVIL IMMIGRATION DETAINERS

Sec. 12I.1.    Findings.

Sec. 12I.2.    Definitions.

Sec. 12I.3.    Restrictions on Law Enforcement Officials.

Sec. 12I.4.    Purpose of this Chapter.

Sec. 12I.5.    Semiannual Report.

Sec. 12I.6.    Severability.

Sec. 12I.7.    Undertaking for the General Welfare.

### SEC. 12I.1.  FINDINGS.

The City and County of San Francisco (the "City") is home to persons of diverse racial, ethnic, and national backgrounds, including a large immigrant population. The City respects, upholds, and values equal protection and equal treatment for all of our residents, regardless of immigration status. Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all.

The United States Immigration and Customs Enforcement ("ICE") is responsible for enforcing the civil immigration laws. ICE's programs, including Secure Communities and its replacement, the Priority Enforcement Program ("PEP"), seek to enlist local law enforcement's voluntary cooperation and assistance in its enforcement efforts. In its description of PEP, ICE explains that all requests under PEP are for voluntary action and that any request is not an authorization to detain persons at the expense of the federal government. The federal government should not shift the financial burden of federal civil immigration enforcement, including personnel time and costs relating to notification and detention, onto local law enforcement by requesting that local law enforcement agencies continue detaining persons based on non-mandatory civil immigration detainers or cooperating and assisting with requests to notify ICE that a person will be released from local custody. It is not a wise and effective use of valuable City resources at a time when vital services are being cut.

ICE's Secure Communities program (also known as "S-Comm") shifted the burden of federal civil immigration enforcement onto local law enforcement. S-Comm came into operation after the state sent fingerprints that state and local law enforcement agencies had transmitted to the California Department of Justice ("Cal DOJ") to positively identify the arrestees and to check their criminal history. The FBI would forward the fingerprints to the Department of Homeland Security ("DHS") to be checked against immigration and other databases. To give itself time to take a detainee into immigration custody, ICE would send an Immigration Detainer - Notice of Action (DHS Form I-247) to the local law enforcement official requesting that the local law enforcement official hold the individual for up to 48 hours after that individual would otherwise be released ("civil immigration detainers"). Civil Immigration detainers may be issued without evidentiary support or probable cause by border patrol agents, aircraft pilots, special agents, deportation officers, immigration inspectors, and immigration adjudication officers.

Given that civil immigration detainers are issued by immigration officers without judicial oversight, and the regulation authorizing civil immigration detainers provides no minimum standard of proof for their issuance, there are serious questions as to their constitutionality. Unlike criminal warrants, which must be supported by probable cause and issued by a neutral magistrate, there are no such requirements for the issuance of a civil immigration detainer. Several federal courts have ruled that because civil immigration detainers and other ICE "Notice of Action" documents are issued without probable cause of criminal conduct, they do not meet the Fourth Amendment requirements for state or local law enforcement officials to arrest and hold an individual in custody. (*Miranda-Olivares v. Clackamas Co.*, No. 3:12-cv-02317-ST *17 (D.Or. April 11, 2014) (finding that detention pursuant to an immigration detainer is a seizure that must comport with the Fourth Amendment). *See also Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I 2014); *Villars v. Kubiatowski*, No. 12-cv-4586 *10-12 (N.D. Ill. filed May 5, 2014).)

On December 4, 2012, the Attorney General of California, Kamala Harris, clarified the responsibilities of local law enforcement agencies under S-Comm. The Attorney General clarified that S-Comm did not require state or local law enforcement officials to determine an individual's immigration status or to enforce federal immigration laws. The Attorney General also clarified that civil immigration detainers are voluntary requests to local law enforcement agencies that do not mandate compliance. California local law enforcement agencies may determine on their own whether to comply with non-mandatory civil immigration detainers. In a June 25, 2014, bulletin, the Attorney General warned that a federal court outside of California had held a county liable for damages where it voluntarily complied with an ICE request to detain an individual, and the individual was otherwise eligible for release and that local law enforcement agencies may also be held liable for such conduct. Over 350 jurisdictions, including Washington, D.C., Cook County, Illinois, and many of California's 58 counties, have already acknowledged the discretionary nature of civil immigration detainers and are declining to hold people in their jails for the additional 48 hours as requested by ICE. Local law enforcement agencies' responsibilities, duties, and powers are regulated by state law. However, complying with non-mandatory civil immigration detainers frequently raises due process concerns.

According to Section 287.7 of Title 8 of the Code of Federal Regulations, the City is not reimbursed by the federal government for the costs associated with civil immigration detainers alone. The full cost of responding to a civil immigration detainer can include, but is not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer. Compliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City.

The City seeks to protect public safety, which is founded on trust and cooperation of community residents and local law enforcement. However, civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies. A 2013 study by the University of Illinois, entitled "Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," found that at least 40% of Latinos surveyed are less likely to provide information to police because they fear exposing themselves, family, or friends to a risk of deportation. Indeed, civil immigration detainers have resulted in the transfer of victims of crime, including domestic violence victims, to ICE.

The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.

In 2014, DHS ended the Secure Communities program and replaced it with PEP. PEP and S-Comm share many similarities. Just as with S-Comm, PEP uses state and federal databases to check an individual's fingerprints against immigration and other databases. PEP employs a number of tactics to facilitate transfers of individuals from local jails to immigration custody.

First, PEP uses a new form (known as DHS Form I-247N), which requests notification from local jails about an individual's release date prior to his or her release from local custody. As with civil immigration detainers, these notification requests are issued by immigration officers without judicial oversight, thus raising questions about local law enforcement's liability for constitutional violations if any person is overdetained when immigration agents are unable to be present at the time of the person's release from local custody.

Second, under PEP, ICE will continue to issue civil immigration detainer requests where local law enforcement officials are willing to respond to the requests, and in instances of "special circumstances," a term that has yet to be defined by DHS. Despite federal courts finding civil immigration detainers do not meet Fourth Amendment requirements, local jurisdictions are often unable to confirm whether or not a detention request is supported by probable cause or has been reviewed by a neutral magistrate.

The increase in information-sharing between local law enforcement and immigration officials raises serious concerns about privacy rights. Across the country, including in the California Central Valley, there has been an increase of ICE agents stationed in jails, who often have unrestricted access to jail databases, booking logs, and other documents that contain personal information of all jail inmates.

The City has an interest in ensuring that confidential information collected in the course of carrying out its municipal functions, including but not limited to public health programs and criminal investigations, is not used for unintended purposes that could hamper collection of information vital to those functions. To carry out public health programs, the City must be able to reliably collect confidential information from all residents. To solve crimes and protect the public, local law enforcement depends on the cooperation of all City residents. Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody.

In late 2015, Pedro Figueroa, an immigrant father of an 8-year-old U.S. citizen, sought the San Francisco Police Department's help in locating his stolen vehicle. When Mr. Figueroa went to the police station to retrieve his car, which police had located, he was detained for some time by police officers before being released, and an ICE agent was waiting to take him into immigration custody immediately as he left the police station. It was later reported that both the Police Department and the San Francisco Sheriff's Department had contact with ICE officials while Mr. Figueroa was at the police station. He spent over two months in an immigration detention facility and remains in deportation proceedings. Mr. Figueroa's case has raised major concerns about local law enforcement's relationship with

immigration authorities, and has weakened the immigrant community's confidence in policing practices. Community cooperation with local law enforcement is critical to investigating and prosecuting crimes. Without the cooperation of crime victims - like Mr. Figueroa - and witnesses, local law enforcement's ability to investigate and prosecute crime, particularly in communities with large immigrant populations, will be seriously compromised.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.1 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.2.  DEFINITIONS.

"Administrative warrant" means a document issued by the federal agency charged with the enforcement of the Federal immigration law that is used as a non-criminal, civil warrant for immigration purposes.

"Eligible for release from custody" means that the individual may be released from custody because one of the following conditions has occurred:

(a)  All criminal charges against the individual have been dropped or dismissed.

(b)  The individual has been acquitted of all criminal charges filed against him or her.

(c)  The individual has served all the time required for his or her sentence.

(d)  The individual has posted a bond, or has been released on his or her own recognizance.

(e)  The individual has been referred to pre-trial diversion services.

(f)  The individual is otherwise eligible for release under state or local law.

"Civil immigration detainer" means a non-mandatory request issued by an authorized federal immigration officer under Section 287.7 of Title 8 of the Code of Federal Regulations, to a local law enforcement official to maintain custody of an individual for a period not to exceed 48 hours and advise the authorized federal immigration officer prior to the release of that individual.

"Convicted" means the state of having been proved guilty in a judicial proceeding, unless the convictions have been expunged or vacated pursuant to applicable law. The date that an individual is Convicted starts from the date of release.

"Firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion as defined in Penal Code Section 16520.

"Law enforcement official" means any City Department or officer or employee of a City Department, authorized to enforce criminal statutes, regulations, or local ordinances; operate jails or maintain custody of individuals in jails; and operate juvenile detention facilities or maintain custody of individuals in juvenile detention facilities.

"Notification request" means a non-mandatory request issued by an authorized federal immigration officer to a local law enforcement official asking for notification to the authorized immigration officer of an individual's release from local custody prior to the release of an individual from local custody. Notification requests may also include informal requests for release information by the Federal agency charged with enforcement of the Federal immigration law.

"Personal information" means any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information.

"Serious Felony" means all serious felonies listed under Penal Code Section 1192.7(c) that also are defined as violent felonies under Penal Code Section 667.5(c); rape as defined in Penal Code Sections 261, and 262; exploding a destructive device with intent to injure as defined in Penal Code Section 18740; assault on a person with caustic chemicals or flammable substances as defined in Penal Code Section 244; shooting from a vehicle at a person outside the vehicle or with great bodily injury as defined in Penal Code Sections 26100(c) and (d).

"Violent Felony" means any crime listed in Penal Code Section 667.5(c); human trafficking as defined in Penal Code Section 236.1; felony assault with a deadly weapon as defined in Penal Code Section 245; any crime involving use of a firearm, assault weapon, machine gun, or .50 BMG rifle, while committing or attempting to commit a felony that is charged as a sentencing enhancement as listed in Penal Code Sections 12022.4 and 12022.5.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

Case 3:17-cv-00485-WHO   Document 2133   Filed 08/29/18   Page 46 of 54

(Former Sec. 12I.2 added by Ord. 391-90, App. 12/6/90; amended by Ord. 278-96, App. 7/3/96; Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.3.  RESTRICTIONS ON LAW ENFORCEMENT OFFICIALS.

(a)  Except as provided in subsection (b), a law enforcement official shall not detain an individual on the basis of a civil immigration detainer after that individual becomes eligible for release from custody.

(b)  Law enforcement officials may continue to detain an individual in response to a civil immigration detainer for up to 48 hours after that individual becomes eligible for release if the continued detention is consistent with state and federal law, and the individual meets both of the following criteria:

(1)  The individual has been Convicted of a Violent Felony in the seven years immediately prior to the date of the civil immigration detainer; and

(2)  A magistrate has determined that there is probable cause to believe the individual is guilty of a Violent Felony and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to continue to detain an individual based solely on a civil immigration detainer as permitted in this subsection (b), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to: the individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

This subsection (b) shall expire by operation of law on October 1, 2016, or upon a resolution passed by the Board of Supervisors that finds for purposes of this Chapter, the federal government has enacted comprehensive immigration reform that diminishes the need for this subsection (b), whichever comes first.

(c)  Except as provided in subsection (d), a law enforcement official shall not respond to a federal immigration officer's notification request.

(d)  Law Enforcement officials may respond to a federal immigration officer's notification request if the individual meets both of the following criteria:

(1)  The individual either:

(A)  has been Convicted of a Violent Felony in the seven years immediately prior to the date of the notification request; or

(B)  has been Convicted of a Serious Felony in the five years immediately prior to the date of the notification request; or

(C)  has been Convicted of three felonies identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, arising out of three separate incidents in the five years immediately prior to the date of the notification request; and

(2)  A magistrate has determined that there is probable cause to believe the individual is guilty of a felony identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to respond to a notification request as permitted by this subsection (d), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to, the  individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

(e)  Law enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws.

(f)  Law enforcement officials shall make good faith efforts to seek federal reimbursement for all costs incurred in continuing to detain an individual, after that individual becomes eligible for release, in response each civil immigration detainer.

(Former Sec. 12I.3 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.4. PURPOSE OF THIS CHAPTER.

The intent of this Chapter 12I is to address requests for non-mandatory civil immigration detainers, voluntary notification of release of individuals, transmission of personal information, and civil immigration documents based solely on alleged violations of the civil provisions of immigration laws. Nothing in this Chapter shall be construed to apply to matters other than those relating to federal civil immigration detainers, notification of release of individuals, transmission of personal information, or civil immigration documents, based solely on alleged violations of the civil provisions of immigration laws. In all other respects, local law enforcement agencies may continue to collaborate with federal authorities to protect public safety. This collaboration includes, but is not limited to, participation in joint criminal investigations that are permitted under local policy or applicable city or state law.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.4 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.5. SEMIANNUAL REPORT.

By no later than July 1, 2014, the Sheriff and Juvenile Probation Officer shall each provide to the Board of Supervisors and the Mayor a written report stating the number of detentions that were solely based on civil immigration detainers during the first six months following the effective date of this Chapter, and detailing the rationale behind each of those civil immigration detainers. Thereafter, the Sheriff and Juvenile Probation Officer shall each submit a written report to the Board of Supervisors and the Mayor, by January 1st and July 1st of each year, addressing the following issues for the time period covered by the report:

(a) a description of all communications received from the Federal agency charged with enforcement of the Federal immigration law, including but not limited to the number of civil immigration detainers, notification requests, or other types of communications.

(b) a description of any communications the Department made to the Federal agency charged with enforcement of the Federal immigration law, including but not limited to any Department's responses to inquires as described in subsection 12I.5 and the Department's determination of the applicability of subsections 12I.3(b), 12I.3(d) and 12I.3(e).

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.5 added by Ord. 391-90, App. 12/6/90; amended by Ord. 304-92, App. 9/29/92; Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.6. SEVERABILITY.

If any section, subsection, sentence, clause, phrase, or word of this Chapter 12I or it[1] application, is for any reason held to be invalid or unconstitutional by a decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Chapter 12I. The Board of Supervisors hereby declares that it would have passed this Chapter 12I and each and every section, subsection, sentence, clause, phrase, and word not declared invalid or unconstitutional without regard to whether any other portion of this Chapter 12I would be subsequently declared invalid or unconstitutional.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013)

(Former Sec. 12I.6 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

CODIFICATION NOTE

1. So in Ord. 204-13.

## SEC. 12I.7. UNDERTAKING FOR THE GENERAL WELFARE.

In enacting and implementing this Chapter 12I the City is assuming an undertaking only to promote the general welfare. It is not assuming, nor is it imposing on its officers and employees, an obligation for breach of which it is liable in money damages to any person who claims that such breach proximately caused injury.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013)

(Former Sec. 12I.7 added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.8.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.10.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.11.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

# EXHIBIT 3


# Presidential Documents

### Executive Order 13768 of January 25, 2017

### Enhancing Public Safety in the Interior of the United States

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*), and in order to ensure the public safety of the American people in communities across the United States as well as to ensure that our Nation's immigration laws are faithfully executed, I hereby declare the policy of the executive branch to be, and order, as follows:

**Section 1**. *Purpose.* Interior enforcement of our Nation's immigration laws is critically important to the national security and public safety of the United States. Many aliens who illegally enter the United States and those who overstay or otherwise violate the terms of their visas present a significant threat to national security and public safety. This is particularly so for aliens who engage in criminal conduct in the United States.

Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic.

Tens of thousands of removable aliens have been released into communities across the country, solely because their home countries refuse to accept their repatriation. Many of these aliens are criminals who have served time in our Federal, State, and local jails. The presence of such individuals in the United States, and the practices of foreign nations that refuse the repatriation of their nationals, are contrary to the national interest.

Although Federal immigration law provides a framework for Federal-State partnerships in enforcing our immigration laws to ensure the removal of aliens who have no right to be in the United States, the Federal Government has failed to discharge this basic sovereign responsibility. We cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement. The purpose of this order is to direct executive departments and agencies (agencies) to employ all lawful means to enforce the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the executive branch to:

(a) Ensure the faithful execution of the immigration laws of the United States, including the INA, against all removable aliens, consistent with Article II, Section 3 of the United States Constitution and section 3331 of title 5, United States Code;

(b) Make use of all available systems and resources to ensure the efficient and faithful execution of the immigration laws of the United States;

(c) Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law;

(d) Ensure that aliens ordered removed from the United States are promptly removed; and

(e) Support victims, and the families of victims, of crimes committed by removable aliens.

**Sec. 3**. *Definitions.* The terms of this order, where applicable, shall have the meaning provided by section 1101 of title 8, United States Code.

**Sec. 4**. *Enforcement of the Immigration Laws in the Interior of the United States*. In furtherance of the policy described in section 2 of this order, I hereby direct agencies to employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all removable aliens.

**Sec. 5**. *Enforcement Priorities*. In executing faithfully the immigration laws of the United States, the Secretary of Homeland Security (Secretary) shall prioritize for removal those aliens described by the Congress in sections 212(a)(2), (a)(3), and (a)(6)(C), 235, and 237(a)(2) and (4) of the INA (8 U.S.C. 1182(a)(2), (a)(3), and (a)(6)(C), 1225, and 1227(a)(2) and (4)), as well as removable aliens who:

(a) Have been convicted of any criminal offense;

(b) Have been charged with any criminal offense, where such charge has not been resolved;

(c) Have committed acts that constitute a chargeable criminal offense;

(d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;

(e) Have abused any program related to receipt of public benefits;

(f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or

(g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

**Sec. 6**. *Civil Fines and Penalties*. As soon as practicable, and by no later than one year after the date of this order, the Secretary shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties that the Secretary is authorized under the law to assess and collect from aliens unlawfully present in the United States and from those who facilitate their presence in the United States.

**Sec. 7**. *Additional Enforcement and Removal Officers*. The Secretary, through the Director of U.S. Immigration and Customs Enforcement, shall, to the extent permitted by law and subject to the availability of appropriations, take all appropriate action to hire 10,000 additional immigration officers, who shall complete relevant training and be authorized to perform the law enforcement functions described in section 287 of the INA (8 U.S.C. 1357).

**Sec. 8**. *Federal-State Agreements*. It is the policy of the executive branch to empower State and local law enforcement agencies across the country to perform the functions of an immigration officer in the interior of the United States to the maximum extent permitted by law.

(a) In furtherance of this policy, the Secretary shall immediately take appropriate action to engage with the Governors of the States, as well as local officials, for the purpose of preparing to enter into agreements under section 287(g) of the INA (8 U.S.C. 1357(g)).

(b) To the extent permitted by law and with the consent of State or local officials, as appropriate, the Secretary shall take appropriate action, through agreements under section 287(g) of the INA, or otherwise, to authorize State and local law enforcement officials, as the Secretary determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties.

(c) To the extent permitted by law, the Secretary may structure each agreement under section 287(g) of the INA in a manner that provides the most effective model for enforcing Federal immigration laws for that jurisdiction.

**Sec. 9**. *Sanctuary Jurisdictions.* It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.

(a) In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

(b) To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

(c) The Director of the Office of Management and Budget is directed to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction.

**Sec. 10**. *Review of Previous Immigration Actions and Policies.* (a) The Secretary shall immediately take all appropriate action to terminate the Priority Enforcement Program (PEP) described in the memorandum issued by the Secretary on November 20, 2014, and to reinstitute the immigration program known as ''Secure Communities'' referenced in that memorandum.

(b) The Secretary shall review agency regulations, policies, and procedures for consistency with this order and, if required, publish for notice and comment proposed regulations rescinding or revising any regulations inconsistent with this order and shall consider whether to withdraw or modify any inconsistent policies and procedures, as appropriate and consistent with the law.

(c) To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Secretary shall consolidate and revise any applicable forms to more effectively communicate with recipient law enforcement agencies.

**Sec. 11**. *Department of Justice Prosecutions of Immigration Violators.* The Attorney General and the Secretary shall work together to develop and implement a program that ensures that adequate resources are devoted to the prosecution of criminal immigration offenses in the United States, and to develop cooperative strategies to reduce violent crime and the reach of transnational criminal organizations into the United States.

**Sec. 12**. *Recalcitrant Countries.* The Secretary of Homeland Security and the Secretary of State shall cooperate to effectively implement the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), as appropriate. The Secretary of State shall, to the maximum extent permitted by law, ensure that diplomatic efforts and negotiations with foreign states include as a condition precedent the acceptance by those foreign states of their nationals who are subject to removal from the United States.

**Sec. 13**. *Office for Victims of Crimes Committed by Removable Aliens.* The Secretary shall direct the Director of U.S. Immigration and Customs Enforcement to take all appropriate and lawful action to establish within U.S. Immigration and Customs Enforcement an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens and the family members of such victims. This office shall provide quarterly reports studying the effects of the victimization by criminal aliens present in the United States.

**Sec. 14.** *Privacy Act.* Agencies shall, to the extent consistent with applicable law, ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information.

**Sec. 15.** *Reporting.* Except as otherwise provided in this order, the Secretary and the Attorney General shall each submit to the President a report on the progress of the directives contained in this order within 90 days of the date of this order and again within 180 days of the date of this order.

**Sec. 16.** *Transparency.* To promote the transparency and situational awareness of criminal aliens in the United States, the Secretary and the Attorney General are hereby directed to collect relevant data and provide quarterly reports on the following:

(a) the immigration status of all aliens incarcerated under the supervision of the Federal Bureau of Prisons;

(b) the immigration status of all aliens incarcerated as Federal pretrial detainees under the supervision of the United States Marshals Service; and

(c) the immigration status of all convicted aliens incarcerated in State prisons and local detention centers throughout the United States.

**Sec. 17.** *Personnel Actions.* The Office of Personnel Management shall take appropriate and lawful action to facilitate hiring personnel to implement this order.

**Sec. 18.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 25, 2017.*

[FR Doc. 2017–02102
Filed 1–27–17; 11:15 am]
Billing code 3295–F7–P