1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   SARAH E. BELTON
    Supervising Deputy Attorney General
4   KRISTI GUDOSKI COOK
    LISA C. EHRLICH
5   XIYUN YANG
    LEE I. SHERMAN (SBN 272271)
6   Deputy Attorneys General
      300 S. Spring St., Suite 1702
7     Los Angeles, CA  90013
      Telephone:  (213) 269-6404
8     Fax:  (213) 897-7605
      E-mail:  Lee.Sherman@doj.ca.gov
9   *Attorneys for the State of California*

10                  IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

| | |
|---|---|
| **CITY AND COUNTY OF SAN FRANCISCO,** | Case No.  3:17-cv-00485-WHO |
| Plaintiff, | **CALIFORNIA'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO N.D. CAL. CIVIL L.R. 3-12(B)** |
| v. | |
| **DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, ELAINE DUKE, Acting Secretary of United States Department of Homeland Security, JEFFERSON B. SESSIONS III, Attorney General of the United States, DOES 1-100,** | Action Filed:        January 31, 2017 |
| Defendants. | |

1   **I.     INTRODUCTION**

2          Pursuant to Civil Local Rule 3-12(b), the State of California respectfully requests that the

3   Court relate the action *State of California v. Barr et al.*, Case No. 19-cv-6189 (*California v. Barr*)

4   filed on September 30, 2019 in the Northern District of California to *California v. Sessions et al.*,

5   Case No. 18-cv-5169 (*California v. Sessions II*, with *California v. Barr*, the "Actions"), and thus,

6   to the previous cases that the Court has found related.[1]  This case involves the imposition of

7   immigration enforcement funding conditions on federal grants.  Prior cases involving the same or

8   similar issues have previously been related to each other.  *California v. Sessions II* is related to

9   *City and County of San Francisco v. Trump*, 17-cv-485 (*San Francisco v. Trump*), pursuant to an

10  order granted on September 10, 2018 (ECF No. 217), in that matter.  *California v. Sessions et al.*,

11  Case No. 17-cv-4701 (*California v. Sessions I*), is related to *City and County of San Francisco v.*

12  *Sessions et al.*, Case No. 17-cv-4642 (*San Francisco v. Sessions*), pursuant to an order granted on

13  August 23, 2017 (ECF No. 32), in that matter.  *San Francisco v. Sessions* is related to *San*

14  *Francisco v. Trump* pursuant to an order granted on August 23, 2017 (ECF No. 156) in that

15  matter.

16         "An action is related to another when: (1) The actions concern substantially the same

17  parties, property, transaction or event; and (2) It appears likely that there will be an unduly

18  burdensome duplication of labor and expense or conflicting results if the cases are conducted

19  before different Judges."  N.D. Cal. Civ. L.R. 3-12(a).  Counsel for Defendants have

20  communicated that they do not have a position as to California's motion at this time.

21  **II.    DISCUSSION**

22         The Actions concern substantially the same parties and events.  Both cases challenge the

23  federal government's ongoing attempts to condition federal funds on federal immigration

24  enforcement priorities.  Specifically, *California v. Sessions I*, *California v. Sessions II*, and

---

26  [1] The operative complaints in *California v. Sessions II* and *California v. Barr* are attached
as Exhibits 1 and 2 respectively, to the Declaration of Lee I. Sherman ("Sherman Decl.") filed
27  herewith.  Per N.D. Cal. Civ. L.R. 3-12(b), California files this motion in the original case to
which these later cases have been related, *City and County of San Francisco v. Trump*, Case No.
28  17-cv-485.

1

1    *California v. Barr* involve the U.S. Department of Justice's efforts to add immigration

2    enforcement requirements to Edward Byrne Memorial Justice Assistance Grants (JAG).  JAG is a

3    formula grant created by Congress to fund state and local governments to support one of eight

4    types of enumerated criminal justice programs.

5        In FY 2017 and FY 2018, Defendants sought to impose immigration enforcement

6    requirements on JAG funding.  In FY 2019, Defendants seek to impose the same requirements on

7    JAG funding that they attempted to impose in FY 2018 (the JAG Immigration Enforcement

8    Requirements).  Specifically, for both fiscal years, Defendants seek to require grant recipients to:

9    • Not violate 8 U.S.C. §§ 1373 and 1644, federal statutes which prohibits restrictions on the

10       exchange of information regarding immigration and/or citizenship status, *compare*

11       Sherman Decl. Ex. 3 ¶¶ 42-43, *with* Sherman Decl. Ex. 5 ¶¶ 31-34;

12   • Not publicly disclose law enforcement information "in a direct or indirect attempt to

13       conceal, harbor, or shield from detection . . . any alien who has come to, entered, or

14       remains in the United States . . . without regard to whether such disclosure would

15       constitute . . . a violation of . . . 8 U.S.C. § 1324(a)," *compare* Sherman Decl. Ex. 3 ¶ 44

16       *with* Sherman Decl. Ex. 5 ¶¶ 35-36;

17   • Not "imped[e] access to any State or local government . . . correctional facility by

18       [Department of Homeland Security (DHS)] agents for the purpose [of] interrogating any

19       alien or person believed to be an alien as to his or her right to be or to remain in the United

20       States," *compare* Sherman Decl. Ex. 3 ¶ 45 *with* Sherman Decl. Ex. 5 ¶¶ 37-38 (internal

21       notations omitted for both exhibits);

22   • Provide at least 48 hours' advance notice to DHS regarding the scheduled release date and

23       time of an "alien" in the jurisdiction's custody when DHS requests such notice in order to

24       take custody of the individual, *compare* Sherman Decl. Ex. 3, ¶ 46 *with* Sherman Decl.

25       Ex. 5 ¶ 39-40; and

26   • Respond to questions about a jurisdiction's laws and policies around "Communication

27       with the Department of Homeland Security (DHS) and/or Immigration and Customs

28

2

1  Enforcement (ICE)," *compare* Sherman Decl. Ex. 5 at 27-28 *with* Sherman Decl. Ex. 6 at

2  22-23.

3  Defendants also seek to impose the same requirement to not violate § 1373 to the State's Title II

4  Juvenile Justice Formula Grant (1373 Title II Requirement) as they have attempted to impose on

5  JAG in FY 2017, 2018, and 2019. *Compare* Sherman Decl. Ex. 3 ¶¶ 42-43 & Ex. 5 ¶¶ 31-34 *with*

6  Sherman Decl. Ex. 7 ¶¶ 38-41.

7  In addition, Defendants have added a new requirement to "virtually all" USDOJ grants,

8  including JAG and the State's Title II Juvenile Justice Formula Grant.  This funding condition

9  requires grant recipients and subrecipients to "[e]nsure that, as part of the hiring process for any

10  position within the United States that is or will be funded (in whole or in part) with award funds,

11  [that they] properly verif[y] the employment eligibility of the individual who is being hired,

12  consistent with the provisions of 8 U.S.C. § 1324a(a)(1) and (2)" (1324a Requirement).  Sherman

13  Decl. Ex. 5 ¶ 9; Ex. 7 ¶ 9 (examples of grant awards with 1324a Requirement).  In addition to

14  JAG and the Title II Juvenile Justice Formula Grant, USDOJ has thus far imposed this

15  Requirement on various other grants that the State receives from USDOJ: California's Victims of

16  Crime Act (VOCA) Assistance and Compensation Grants, Violence Against Women Act

17  Services, Training, Officers, Prosecutors Grant, Violence Against Women Act Sexual Assault

18  Services Program Grant, Paul Coverdell Forensic Science Improvement Grant, Residential

19  Substance Abuse Treatment Grant, DNA Capacity Enhancement and Backlog Reduction Program

20  Grant, and Prison Rape Elimination Act funding.  All of these grants, like JAG and Title II, are

21  formula grants.

22  Both *California v. Barr* and *California v. Sessions II* challenge the constitutionality and

23  lawfulness of JAG Immigration Enforcement Requirements on the same grounds. *California v.*

24  *Barr*, like *California v. Sessions II*, argues the JAG Immigration Enforcement Requirements at

25  issue: (a) violate the constitutional separation of powers by allowing the executive branch to

26  inappropriately wield Congress's exclusive spending power; (b) violate the Spending Clause

27  because the conditions are ambiguous and are not germane to the stated purpose of the JAG

28  program; and (c) violate the Administrative Procedure Act because Defendants exceeded

3

1  congressional authorization and acted in an arbitrary and capricious manner in adding the

2  conditions.  *Compare* Sherman Decl. Ex. A ¶¶ 108-19, 128-44 *with* Sherman Decl. Ex. B ¶¶ 201-

3  228.  *California v. Barr* also challenges the constitutionality and lawfulness of the 1373 Title II

4  Requirement and the new 1324a Requirement on all USDOJ formula grants under similar legal

5  theories.  *Compare* Sherman Decl. Ex. A ¶¶ 108-19, 128-44 *with* Sherman Decl. Ex. B ¶¶ 201-52.

6  Moreover, *California v. Barr* also seeks a declaration that California Labor Code § 1019.2, as

7  applied to public employees, does not conflict with 8 U.S.C. § 1324a(a)(2).  Sherman Decl. Ex. B

8  ¶¶ 253-57.

9      Both cases involve similar parties: the State of California, as plaintiff, and the United States

10  Attorney General, the Principal Deputy Assistant Attorney General, and USDOJ as defendants,

11  with additional USDOJ defendants in *California v. Barr* due to the inclusion of other conditioned

12  grants.  There is substantial factual overlap, as both cases involve funding requirements for FY

13  2019 funding that are substantially similar to the FY 2018 funding conditions.  While the FY

14  2019 case also includes a new condition, new grants at issue, and an additional California statute

15  at issue, many of the underlying legal arguments that were presented in *California v. Sessions I*

16  and *California v. Sessions II* apply to the imposition of the 1373 Title II Requirement and the

17  1324a Requirement on USDOJ formula grants.  And in both cases, the State is seeking

18  declaratory, injunctive, and mandamus relief.  Given the overlap in parties, factual and legal

19  issues involved, and the relief sought in both cases, it is likely that conducting the Actions in two

20  courts simultaneously may lead to unnecessary duplication of effort and the potential for

21  conflicting results.  Defendants have conveyed that they do not have a position as to this motion

22  at this time.  Sherman Decl. ¶ 10.

23  **III.   CONCLUSION**

24      For the reasons set forth above, California respectfully requests that the Court relate

25  *California v. Barr* to *California v. Sessions II*.

26

27

28

4

1    Dated:  October 2, 2019                         Respectfully Submitted,

2                                                    XAVIER BECERRA
                                                     Attorney General of California
3                                                    MICHAEL L. NEWMAN
                                                     Senior Assistant Attorney General
4                                                    SARAH E. BELTON
                                                     Supervising Deputy Attorney General
5                                                    KRISTI GUDOSKI COOK
                                                     LISA C. EHRLICH
6                                                    XIYUN YANG

7                                                    /s/ Lee I. Sherman

8                                                    LEE SHERMAN
                                                     Deputy Attorneys General
9                                                    Attorneys for State of California

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Calif.'s Admin. Mot. To Consider Whether Cases Should Be Related
(Case No.  3:17-cv-00485-WHO)

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  KRISTI GUDOSKI COOK
   LISA C. EHRLICH
5  XIYUN YANG
   LEE I. SHERMAN (SBN 272271)
6  Deputy Attorneys General
    300 S. Spring St., Suite 1702
7  Los Angeles, CA  90013
    Telephone:  (213) 269-6404
8  Fax:  (213) 897-7605
    E-mail:  Lee.Sherman@doj.ca.gov
9  *Attorneys for the State of California*

10               IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13

14
   **CITY AND COUNTY OF SAN**          Case No.  3:17-cv-00485-WHO
15 **FRANCISCO,**
                                       **DECLARATION OF LEE I. SHERMAN**
16                        Plaintiff,   **IN SUPPORT OF CALIFORNIA'S**
                                       **ADMINISTRATIVE MOTION TO**
17          v.                         **CONSIDER WHETHER CASES**
                                       **SHOULD BE RELATED**
18
   **DONALD J. TRUMP, President of the**  Action Filed:      January 31, 2017
19 **United States, UNITED STATES OF**
   **AMERICA, ELAINE DUKE, Acting**
20 **Secretary of United States Department of**
   **Homeland Security, JEFFERSON B.**
21 **SESSIONS III, Attorney General of the**
   **United States, DOES 1-100,**
22
                          Defendants.
23

24

25

26

27

28

1    I, LEE I. SHERMAN, declare and state as follows:

2         1.    I am an attorney licensed to practice law in the State of California and before

3    this Court. I am a Deputy Attorney General with the California Department of Justice, counsel

4    for the State of California, plaintiff in the action *State of California v. Sessions, et al.*, Case No.

5    17-cv-4701 (*California v. Sessions I*), filed in this District on August 14, 2017, *State of California*

6    *v. Sessions, et al.*, Case No. 18-cv-5169 (*California v. Sessions II*), filed in this District on August

7    23, 2018, and *State of California v. Barr, et al.*, Case No. 19-cv-6189 (*California v. Barr*), filed in

8    this District on September 30, 2019. I have personal knowledge of the facts stated herein, and if

9    called as a witness, I would testify competently thereto.

10        2.    I file this Declaration in support of the State of California's Administrative

11   Motion to Consider Whether Cases Should Be Related (the "Motion to Relate").

12        3.    Attached hereto as **Exhibit 1** is a true and correct copy of the First Amended

13   Complaint filed by the State of California in *California v. Sessions II*.

14        4.    Attached hereto as **Exhibit 2** is a true and correct copy of the Complaint filed

15   by the State of California in *California v. Barr*.

16        5.    Attached hereto as **Exhibit 3** is a true and correct copy of the Board of State and

17   Community Correction's FY 2018 JAG award.

18        6.    Attached hereto as **Exhibit 4** is a true and correct copy of the Edward Byrne

19   Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation that is available on

20   the webpage of the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice

21   Assistance at https://www.bja.gov/Funding/JAGState18.pdf.

22        7.    Attached hereto as **Exhibit 5** is a true and correct copy of the Board of State and

23   Community Correction's FY 2019 JAG award.

24        8.    Attached hereto as **Exhibit 6** is a true and correct copy of the Edward Byrne

25   Memorial Justice Assistance Grant (JAG) Program FY 2019 State Solicitation that is available on

26   the webpage of the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice

27   Assistance at https://www.bja.gov/Funding/JAGState19.pdf.

28
                                            1

9.     Attached hereto as **Exhibit 7** is a true and correct copy of the Board of State and Community Correction's FY 2019 Title II Juvenile Justice Formula Grant award.

10.    On September 30, 2019, I e-mailed Dan Mauler, counsel for Defendants in *California v. Sessions II* and *City and County of San Francisco v. Trump*, Case No. 17-cv-485, to ask him about Defendants' position on the Motion to Relate. On October 2, I had a telephone conversation with Mr. Mauler, in which he conveyed that Defendants do not have a position with respect to California's Motion to Relate at this time.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 2, 2019 at Los Angeles, California.

Lee I. Sherman

2

Exhibit 1

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorney General
3  SARAH E. BELTON
   Supervising Deputy Attorney General
4  CHEROKEE DM MELTON
   LEE I. SHERMAN (SBN 272271)
5  Deputy Attorneys General
     300 S. Spring St., Suite 1702
6    Los Angeles, CA 90013
     Telephone: (213) 269-6404
7    Fax: (213) 897-7605
     E-mail: Lee.Sherman@doj.ca.gov
8  *Attorneys for Plaintiff State of California*

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO DIVISION

12

13

14  **STATE OF CALIFORNIA, ex rel, XAVIER**      Case No. 18-cv-5169
    **BECERRA, in his official capacity as**
    **Attorney General of the State of California,**
15

16                                       Plaintiff,   **FIRST AMENDED COMPLAINT FOR**
                                                      **DECLARATORY, INJUNCTIVE, AND**
17        v.                                          **MANDAMUS RELIEF**

18  **JEFFERSON B. SESSIONS, in his official**
    **capacity as Attorney General of the United**
19  **States; MATT M. DUMMERMUTH, in his**
    **official capacity as Principal Deputy**
20  **Assistant Attorney General; UNITED**
    **STATES DEPARTMENT OF JUSTICE;**
21  **and DOES 1-100,**

22                                      Defendants.

23

24

25

26

27

28

1      1.    Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General

2    ("Plaintiff" or "California"), brings this complaint to protect California from the latest attempt by

3    the Trump Administration to strip law enforcement funding from the State unless the State and

4    local governments in California agree to participate in the Administration's immigration

5    enforcement program.  For fiscal year (FY) 2017, this Court held that the immigration-

6    enforcement requirements that Defendants sought to impose on the State's law enforcement

7    grants to be unconstitutional, and permanently enjoined their implementation against California.

8    In FY 2018, not only have Defendants continued to impress the same or similar requirements in

9    disregard of the decisions reached by this and other courts, but they have doubled down by adding

10    more onerous immigration enforcement requirements on law enforcement funding.

11        2.    The Edward Byrne Memorial Justice Assistance Grant ("JAG") program remains the

12    centerpiece of Defendants' efforts to disqualify California law enforcement from receiving

13    federal funding.  For FY 2018, Congress appropriated $28.9 million in JAG funding to California

14    and its political subdivisions.  The United States Department of Justice ("USDOJ"), led by

15    Attorney General Jefferson B. Sessions III, and the Office of Justice Programs ("OJP"), led by

16    Principal Deputy Assistant Attorney General Matt M. Dummermuth[1] (collectively, with USDOJ

17    and Attorney General Sessions, the "Defendants"), are responsible for administering this

18    program.  JAG awards are provided to each state, and certain local jurisdictions within each state,

19    to, among other things, support law enforcement programs, reduce recidivism, conduct crime

20    prevention and education programs for at-risk youth, and support programs for crime victims and

21    witnesses.  Every state is entitled by law to a share of these funds.

22        3.    In FY 2017, Defendants added unprecedented immigration enforcement conditions to

23    JAG funding.  On October 5, 2018, this Court struck down all of the immigration enforcement

24    conditions added to FY 2017 JAG funding.  Order re: Mots. for Summ. Judg., *California, ex rel*

---

[1] On October 5, 2018, Defendants announced Matt M. Dummermuth as the new head of the Office of Justice Programs.  *See* Press Release, U.S. Dep't of Justice, *Department of Justice Announces Matt Dummermuth to Head the Office of Justice Programs* (Oct. 5, 2018), https://www.justice.gov/opa/pr/department-justice-announces-matt-dummermuth-head-office-justice-programs.  He automatically substitutes for Laura L. Rogers as a defendant pursuant to Federal Rule of Civil Procedure 25(d).

1

1  *Becerra v. Sessions* ("*Becerra I*"), No. 17-cv-4701 (N.D. Cal. Oct. 5, 2018) ECF No. 137 ("MSJ

2  Order").  Courts across the country have likewise unanimously found those conditions to be

3  unconstitutional.  *See Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018); Order Granting Pl.'s

4  Appl. for Prelim. Inj., *Los Angeles v. Sessions*, No. 17-cv-7215 (C.D. Cal. Sept. 13, 2018) ECF

5  No. 93, *appeal docketed*, 18-56292 (9th Cir. Oct. 1, 2018); *Chicago v. Sessions*, 321 F. Supp. 3d

6  855, 874 (N.D. Ill. 2018), *appeal docketed*, 18-2885 (7th Cir. Aug. 28, 2018); *Philadelphia v.*

7  *Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018), *appeal docketed*, 18-2648 (3d Cir. July 26, 2018).

8      4.    Rather than re-consider the lawfulness of the conditions, for FY 2018 JAG funding,[2]

9  Defendants have maintained a requirement that the chief legal officer of the jurisdiction applying

10  for funding (the Attorney General in the case of the State) must certify compliance with 8 U.S.C.

11  § 1373, which prohibits restrictions on certain exchanges of information regarding a person's

12  immigration or citizenship status.  But Defendants cannot require compliance with § 1373 as a

13  condition for federal funding for the simple reason that § 1373 itself is unconstitutional under the

14  Tenth Amendment of the U.S. Constitution.  Four federal courts, including this one, have recently

15  called into question the legality of § 1373 or declared it unconstitutional.

16      5.    For JAG, Defendants demand more than compliance with § 1373.  In order to receive

17  FY 2018 JAG funding, Defendants also require that jurisdictions certify compliance with 8

18  U.S.C. § 1644, certify to not "imped[ing] the exercise by federal officers of authority" under or

19  relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a), 1357(a), and 1366(1) & (3).  Defendants also seek

20  to broadly prohibit jurisdictions from publicly disclosing information provided, and requests

21  made, by immigration authorities, which Defendants claim relates to 8 U.S.C. § 1324, a federal

22  statute that prohibits persons from concealing, harboring, or shielding "aliens."  Plaintiff refers to

23  all of these requirements collectively as the "Immigration Enforcement Requirements."  The

24  Immigration Enforcement Requirements, as described in the FY 2018 JAG Awards, effectively

25  _____

26      [2] U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY
2018 State Solicitation (2018) ("JAG State Solicitation) (attached as Ex. A); *see also* U.S. Dep't

27  of Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY 2018 Local
Solicitation (2018) ("JAG Local Solicitation," collectively with the JAG State Solicitation, "JAG

28  Solicitations") (attached as Ex. B).  An example of a FY 2018 JAG award is attached as Exhibit C
and referred to as the "FY 2018 JAG Award."

require law enforcement to respond to requests from immigration authorities for a person's release date from custody, to provide immigration authorities with access, without delay, to detention facilities, and to limit transparency about requests made by immigration authorities.

6. Defendants claim that these Immigration Enforcement Requirements reflect "applicable Federal laws." They do not. First, these Immigration Enforcement Requirements are not an accurate reflection of federal immigration law; there is no requirement in federal immigration law for state or local governments to assist in immigration enforcement and, aside from the narrow prohibitions in §§ 1373 and 1644, no broad requirement for state or local governments to allow use of their personnel and resources for immigration enforcement. Second, Defendants are constrained in adding conditions to formula grants, such as JAG, that are not tethered to federal law. Congress has not tied any of these laws, including § 1373, to federal grant-making. Most of these laws have no applicability to state and local governments. In addition, these requirements conflict with Congress's intent to not condition federal funding on immigration enforcement related activities.

7. Since Congress did not attach these requirements to federal funding, Defendants lack authority to interpret "applicable Federal laws" in a manner that would result in commandeering state and local government functions in violation of the Tenth Amendment of the U.S. Constitution. These Immigration Enforcement Requirements intrude on the sovereignty of California and its local jurisdictions by interpreting federal law as requiring state and local governmental participation in federal immigration enforcement and preventing the State from declining participation in federal immigration enforcement.

8. To the extent Defendants have statutory authority to impose the Immigration Enforcement Requirements, Defendants have exceeded constitutional limits under the Spending Clause of the U.S. Constitution. The Immigration Enforcement Requirements are not sufficiently related to the federal purposes that Congress designed for those funding schemes and are too ambiguous to provide clear notice to the State or its political subdivisions as to what is needed to comply. The Immigration Enforcement Requirements also violate the Administrative Procedure

1  Act ("APA") because of their constitutional infirmities, and because Defendants acted in excess
2  of their statutory authority and in an arbitrary and capricious manner.
3      9.    California complies with all of the requirements identified in the JAG authorizing
4  statute, and that apply to federal grantees under federal law.  Nevertheless, while California's
5  laws comply with the Immigration and Nationality Act ("INA"), since the Immigration
6  Enforcement Requirements exceed what may be required under "applicable Federal law,"
7  California will most certainly face an enforcement action if it agrees to the Immigration
8  Enforcement Requirements.  Defendants have already tried to withhold JAG awards from all state
9  entities and local jurisdictions in California because under their theory, California does not
10  comply with § 1373.  The United States sued California in the Eastern District of California,
11  unsuccessfully claiming that Senate Bill 54, which consists of the Amended Transparency and
12  Responsibility Using State Tools Act ("TRUST Act"), Cal. Gov't Code §§ 7282-7282.5, and the
13  California Values Act, Cal. Gov't Code §§ 7284-7284.12, "impedes" federal immigration
14  officials in violation of federal law.  However, as that court found, California's laws do not stand
15  as an obstacle to prevent immigration authorities from doing their jobs using their own resources.
16  Instead, California's laws are designed to foster community trust between law enforcement and
17  the communities they serve, and to allocate limited law enforcement resources in a manner that is
18  in the best interest of the State's public safety.  Likewise, California's Transparent Review of
19  Unjust Transfers and Holds ("TRUTH") Act, Cal. Gov't Code §§ 7283-7283.2, does not
20  "impede" federal law enforcement merely because California has determined that transparency by
21  state and local law enforcement regarding immigration enforcement is an important method to
22  promote public safety, trust, and community policing.  Defendants cannot enforce the "applicable
23  Federal laws" in the manner that they intend because such an erroneous interpretation of these
24  federal laws would allow the federal government to commandeer the State's direction of its law
25  enforcement.
26      10.   Not only are these Immigration Enforcement Requirements unlawful, but agreeing to
27  them will cause California harm by requiring that the State and local jurisdictions terminate their
28  public safety oriented laws and policies.  This means that the State and its localities will lose

4

1    control of their ability to focus their resources on fighting crime and instead will devote resources

2    to federal immigration enforcement.  The trust and cooperation that the State's laws and local

3    ordinances are intended to build between law enforcement and immigrant communities will be

4    eroded.  Alternatively, if the State refuses to comply with the Immigration Enforcement

5    Requirements, or if Defendants refuse to provide funding to California on the basis of these

6    unlawful requirements, important public safety programs will likely need to be cut to the

7    detriment of state and local law enforcement agencies and their budgets.

8        11.    For these reasons, and those discussed below, the Court should declare the

9    Immigration Enforcement Requirements are unconstitutional and/or a violation of the APA,

10   enjoin their imposition, and pursuant to 28 U.S.C. § 1361 require that Defendants issue JAG

11   awards and funding to the State and its local jurisdictions that comply with the requirements

12   enumerated by Congress.

13                            **JURISDICTION AND VENUE**

14       12.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this case arises

15   under the Constitution and the laws of the United States.  The Court also has jurisdiction under 28

16   U.S.C. § 1346 because this is a civil action against the federal government founded upon the

17   Constitution and an Act of Congress.  Jurisdiction is proper under the judicial review provisions

18   of the Administrative Procedure Act, 5 U.S.C. §§ 701-06.  The Court has authority to provide

19   relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Mandamus Statute, 28

20   U.S.C. § 1361.

21       13.    Under 28 U.S.C. § 1391(e)(1), venue is proper in the Northern District of California

22   because the Attorney General and the State of California have offices at 455 Golden Gate

23   Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and Defendants

24   have offices at 450 Golden Gate Avenue, San Francisco, California.

25                            **INTRADISTRICT ASSIGNMENT**

26       14.    Assignment to the San Francisco Division of this District is proper pursuant to Civil

27   Local Rule 3-2(c)-(d) because Plaintiff and Defendants both maintain offices in the District in

28   San Francisco.

**PARTIES**

15.     Plaintiff State of California is a sovereign state in the United States of America.

16.     California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its sovereignty as a State caused by the challenged federal actions. The inclusion of unconstitutional and unlawful Immigration Enforcement Requirements impairs the State's exercise of its police power in a manner it deems necessary to protect the public safety.  The Immigration Enforcement Requirements burden California's exercise of its sovereign power to enforce its laws, and place a regulatory burden on California as a funding recipient, obligating the State to continuously monitor compliance of all subgrantees throughout the State, which will result in increased staff time and expenses.

17.     As a result of Defendants' unconstitutional and unlawful actions, the State of California, including its political subdivisions, is in imminent danger of losing $28.9 million for JAG this fiscal year, including $18 million that is owed to the State itself.

18.     Plaintiff Attorney General Xavier Becerra is the chief law officer of the State and the head of the California Department of Justice.  Cal. Const., art. V, § 13; Cal. Gov't Code § 12510. Attorney General Becerra, on behalf of California, has standing to bring this action because funding for law enforcement throughout the State is at stake.  *See Pierce v. Super. Ct.*, 1 Cal.2d 759, 761-62 (1934) (Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests.").  As the State's Chief Law Officer, the Attorney General is responsible for ensuring that the laws of the State are enforced.  Cal. Const., art. V, § 13.  The Immigration Enforcement Requirements undermine California statutes.  In addition, the Attorney General has standing on the basis of the requirement that he personally agree to the Immigration Enforcement Requirements.

19.     Defendant U.S. Department of Justice ("USDOJ") is an executive department of the United States of America pursuant to 5 U.S.C. § 101, and a federal agency within the meaning of 28 U.S.C. § 2671.  As such, it engages in agency action within the meaning of 5 U.S.C. § 702,

1    and is named as a defendant in this action pursuant to 5 U.S.C. § 702.  USDOJ is responsible for

2    administering the JAG funds appropriated by Congress.

3         20.    Defendant Jefferson B. Sessions III, is Attorney General of the United States, and

4    oversees USDOJ, including the Office of Justice Programs ("OJP").  He is sued in his official

5    capacity pursuant to 5 U.S.C. § 702.

6         21.    Defendant Matt M. Dummermuth is Principal Deputy Assistant Attorney General in

7    charge of OJP, which administers JAG funding.  He is sued in his official capacity pursuant to 5

8    U.S.C. § 702.

9         22.    Each of the Defendants named in this Complaint are acting in their official capacity

10   for the United States government bearing responsibility, in whole or in part, for the acts

11   enumerated in this Complaint.

12        23.    The true names and capacities of Defendants identified as DOES 1-100 are unknown

13   to Plaintiff, and Plaintiff will amend this Complaint to insert the true names and capacities of

14   those fictitiously named Defendants when they are ascertained.

15                              **FACTUAL ALLEGATIONS**

16   **I.    CALIFORNIA'S LAWS SEEK TO PROTECT THE SAFETY AND WELFARE OF THE
          STATE'S RESIDENTS BY FOCUSING LAW ENFORCEMENT ON CRIMINAL ACTIVITY
17        AND BUILDING TRUST BETWEEN LAW ENFORCEMENT AND COMMUNITIES**

18        24.    California state and local law enforcement agencies ("LEAs"), guided by the duly

19   enacted laws of the State and ordinances of local jurisdictions, are tasked with effectively

20   policing, protecting, and serving all residents, including more than 10 million foreign-born

21   individuals who live in the State.  California's laws implicated in this suit are a valid exercise of

22   the State's police power to regulate regarding the health, welfare, and public safety of its

23   residents.  These laws strengthen community policing efforts by encouraging undocumented

24   victims to report crimes to local law enforcement so that perpetrators are apprehended before

25   harming others.

26        25.    The purpose of these California laws is to ensure that law enforcement resources are

27   focused on a core public safety mission and to build trust and cooperation between law

28   enforcement and the State's immigrant communities.  When local and state LEAs engage in

                                        7

1   immigration enforcement, as Defendants contemplate, vulnerable victims and witnesses are less

2   likely to come forward to report crimes.

3       26.     California's laws are not unique.  Many jurisdictions across the country, including

4   local jurisdictions in California, have policies that define the circumstances under which local law

5   enforcement personnel may expend time and resources in furtherance of federal immigration

6   enforcement.  Those jurisdictions variously impose limits on compliance with Immigration and

7   Customs Enforcement ("ICE") detainer requests, ICE notification requests about release dates,

8   and ICE's access to detainees, or provide additional procedural protections for individuals prior to

9   an interview with immigration authorities.

10      **A.    The TRUST Act**

11      27.     In 2013, California enacted the TRUST Act, Cal. Gov't Code §§ 7282-7282.5. The

12  TRUST Act defined the circumstances under which local LEAs may detain an individual at the

13  request of federal immigration authorities.  The TRUST Act went into effect on January 1, 2014.

14      28.     The TRUST Act was intended to address numerous public safety concerns regarding

15  the federal practice of issuing detainers to local law enforcement.  Among the Legislature's

16  concerns were that federal courts have concluded that detainer requests do not provide sufficient

17  probable cause to satisfy the requirements of the Fourth Amendment of the U.S. Constitution, and

18  data showing that detainer requests "have erroneously been placed on United States citizens, as

19  well as immigrants who are not deportable."  Assem. Bill No. 4, 1st Reg. Sess. (Cal. 2013) § 1(c).

20      29.     The TRUST Act previously set forth two conditions that local law enforcement must

21  meet to have discretion to detain a person pursuant to an "immigration hold" (also known as a

22  "detainer request" or "detainer hold"), which is when an immigration authority requests that the

23  law enforcement official "maintain custody of the individual for a period not to exceed 48 hours,

24  excluding Saturdays, Sundays, and holidays."  Cal. Gov't Code § 7282(c) (prior to amendments

25  codified on Oct. 5, 2017).  First, the detention could not "violate any federal, state, or local law,

26  or any local policy," which includes the Fourth Amendment of the U.S. Constitution.  *Id.* §

27  7282.5(a) (prior to amendments codified on Oct. 5, 2017).  Second, law enforcement could only

28  detain someone with certain, specified criminal backgrounds, an individual on the California Sex

8

1   and Arson Registry, or a person charged with a serious or violent felony who was the subject of a

2   probable cause determination from a magistrate judge. *Id.* § 7282.5(a)(1)-(6) (prior to

3   amendments codified on Oct. 5, 2017). Only when both of these conditions were met could local

4   law enforcement detain an individual "on the basis of an immigration hold after the individual

5   becomes eligible for release from custody." *Id.* § 7282.5(b).

6       **B.    The TRUTH Act**

7       30.    In 2016, California enacted the TRUTH Act, Cal. Gov't Code §§ 7283-7283.2, which

8   took effect on January 1, 2017. The purpose of the TRUTH Act is to increase transparency about

9   immigration enforcement and "to promote public safety and preserve limited local resources

10  because entanglement between local law enforcement and ICE undermines community policing

11  strategies and drains local resources." Assem. Bill No. 2792, Reg. Sess. (Cal. 2016) § 2(a)-(c),

12  (g)-(i).

13      31.    Under the TRUTH Act, prior to ICE interviewing someone being held in custody, a

14  law enforcement officer must provide the detained individual with a "written consent form that

15  explains the purpose of the interview, that the interview is voluntary, and that he or she may

16  decline to be interviewed or may choose to be interviewed only with his or her attorney present."

17  Cal. Gov't Code § 7283.1(a). In addition, when a LEA receives a detainer, notification, or

18  transfer request, the LEA must "provide a copy of the request to the [detained] individual and

19  inform him or her whether the law enforcement agency intends to comply with the request." *Id.* §

20  7283.1(b). If the LEA complies with ICE's request to notify ICE as to when the individual will

21  be released, it must also "promptly provide the same notification in writing to the individual and

22  to his or her attorney or to one additional person who the individual shall be permitted to

23  designate." *Id.*

24      **C.    The California Values Act**

25      32.    On October 5, 2017, Governor Edmund G. Brown Jr. signed into law the California

26  Values Act, Cal. Gov't Code §§ 7284-7284.12, which took effect on January 4, 2018. In

27  conjunction with this measure, California amended the TRUST Act.

28

First Amended Complaint for Declaratory, Injunctive, and Mandamus Relief (18-cv-5169)

33.     The Values Act sets the parameters under which California law enforcement agencies may participate in immigration enforcement.  The California Department of Corrections and Rehabilitation ("CDCR") is not considered a "California law enforcement agency" for purposes of the Values Act.  Cal. Gov't Code § 7284.4(a).

34.     Consistent with the Legislature's purpose in passing the TRUST and TRUTH Acts, in its findings, the Legislature emphasized that "[a] relationship of trust between California's immigrant community and state and local agencies is central to the public safety of the people of California."  *Id.* § 7284.2(b).  The Legislature recognized "[t]his trust is threatened when state and local agencies are entangled with federal immigration enforcement, with the result that immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, seeking basic health services, or attending school, to the detriment of public safety and the well-being of all Californians."  *Id.* § 7284.2(c).  The Legislature declared that the focus of the Values Act is "to ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments."  *Id.* § 7284.2(f).

35.     The Values Act generally prohibits California law enforcement agencies from using agency money or personnel to ask an individual about his or her immigration status for immigration enforcement purposes.  *Id.* § 7284.6(a)(1)(A).

36.     The Values Act, expanding upon the limitations contained in the prior iteration of the TRUST Act, prohibits compliance with detainer requests.  *See id.* § 7284.6(a)(1)(B).  In doing so, the Legislature recognized that federal courts have found state and local law enforcement compliance with detainer holds to be in violation of the Fourth Amendment when the detainer holds are not supported by the requisite probable cause.  *See id.* § 7284.2(e).  Presently, it is ICE policy to attach an administrative warrant to a detainer hold.[3]  However, that administrative warrant is signed by an administrative officer, and not a federal judge.  *See id.*  The administrative warrant only provides "probable cause . . . that the subject is an alien who is removable from the

---

[3] U.S. Immigration and Customs Enforcement, Issuance of Immigration Detainers by ICE Immigration Officers, § 2.4 (Mar. 24, 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf.

1  United States," but does not provide probable cause that the subject of the detainer hold is

2  believed to have violated a criminal offense.  *Id.*

3       37.    In conjunction with the passage of the Values Act, the TRUST Act was amended to

4  identify the circumstances when local law enforcement has discretion to respond to notification

5  requests.  *Id.* § 7282.5(a).  "Notification request[s]" are requests by an immigration authority

6  asking that a law enforcement official inform it "of the release date and time in advance of the

7  public of an individual in its custody."  *Id.* §§ 7282(c), 7283(f).  Notification requests are made by

8  immigration authorities on the I-247A form that also includes a detainer request.[4]

9       38.    Under the Values Act, LEAs have discretion to comply with notification requests if

10  doing so would not "violate any federal, state, or local law, or local policy."  Cal. Gov't Code §

11  7282.5(a); *see id.* § 7284.6(a)(1)(C).  In addition, the Values Act allows LEAs to comply with

12  notification requests under one of two scenarios.  First, LEAs may respond to notification

13  requests regarding someone who was previously convicted of one or more of a multitude of

14  felonies or misdemeanors identified in the TRUST Act, a person charged with one or more of an

15  array of felonies who was subject to a probable cause determination from a magistrate judge, or

16  an individual on the California Sex and Arson Registry.  *Id.* § 7282.5.  Alternatively, LEAs may

17  comply with a notification request if the information requested is already "available to the

18  public."  *Id.* § 7284.6(a)(1)(C).

19       39.    The Values Act prohibits LEAs from using agency or department money or personnel

20  to "[p]rovid[e] personal information, as defined in Section 1798.3 of the Civil Code, about an

21  individual" "for immigration enforcement purposes," unless that information is publicly

22  available.  *Id.* § 7284.6(a)(1)(D).  "Personal information" is defined in the Civil Code as any

23  information "that identifies or describes an individual, including, but not limited to, his or her

24  name, social security number, physical description, home address, home telephone number,

25  education, financial matters, and medical or employment history" and "includes statements made

26  by, or attributed to, the individual."  Cal. Civ. Code § 1798.3(a).

27

28       [4] Department of Homeland Security, Immigration Detainer - Notice of Action,
https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

40. The Values Act also limits when a LEA may transfer an individual to immigration authorities. Cal. Gov't Code § 7284.6(a)(4). Under the Values Act, LEAs may transfer a person to immigration authorities under two scenarios. First, the LEA may transfer a person to immigration authorities if the immigration authority presents a judicial warrant or judicial probable cause determination by a federal judge or a federal magistrate judge for a violation of federal criminal immigration law. *Id.* §§ 7284.4(h) & (i), 7284.6(a)(4). Second, LEAs may respond to transfer requests regarding someone who was previously convicted of one or more of a multitude of felonies or misdemeanors identified in the TRUST Act, or an individual on the California Sex and Arson Registry. *Id.* § 7282.5(a).

41. The Values Act expressly authorizes compliance with all aspects of §§ 1373 and 1644. *Id.* § 7284.6(e).

42. Neither the Values nor TRUTH Acts prohibit a jurisdiction from allowing ICE to access its jails to interview inmates. The Values Act explicitly reaffirms the absence of any such restriction, and requires only that state and local law enforcement, including CDCR, comply with the TRUTH Act when providing such access to immigration authorities. *Id.* §§ 7284.6(b)(5), 7284.10(a).

## II. CONGRESS DID NOT INTEND JAG TO BE CONDITIONED ON STATE AND LOCAL LAW ENFORCEMENT ASSISTING IN FEDERAL IMMIGRATION ENFORCEMENT

43. JAG is administered by OJP within USDOJ. JAG funding is authorized by Congress under 34 U.S.C. §§ 10151-10158. The authorizing statute has been amended numerous times since its inception in 1988, evolving into the JAG program as it exists today.

44. The Anti-Drug Abuse Act of 1988 amended the Omnibus Crime Control and Safe Streets Act of 1968 to create the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs grants ("Byrne Grants") "to assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system." Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4328 (1988) (repealed 2006). Congress placed a "special emphasis" on programs that support national drug control priorities across states and jurisdictions. *Id.* Congress

1   identified 21 "purpose areas" for which Byrne Grants could be used. Many of the purpose areas

2   relate to the investigation, enforcement, and prosecution of drug offenses. *See id.* Immigration

3   enforcement was never specified in any of the grant purpose areas.

4           45.     In amendments between 1994 and 2000, Congress identified eight more purpose areas

5   for which Byrne funding could be used, bringing the total to 29. 42 U.S.C. § 3751(b) (as it

6   existed on Dec. 21, 2000) (repealed 2006). Immigration enforcement was not specified in any of

7   these eight additional purpose areas.

8           46.     For FY 1996, Congress separately authorized Local Law Enforcement Block Grants

9   ("LLEBG") that directed payment to units of local government for the purpose of hiring more

10  police officers or "reducing crime and improving public safety." Local Government Law

11  Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995). Congress identified nine

12  "purpose areas" for LLEBG, none of which were immigration enforcement. *Id.*

13          47.     The Byrne Grant and LLEBG programs were then merged to eliminate duplication,

14  improve their administration, and to provide state and local governments "more flexibility to

15  spend money for programs that work for them rather than to impose a 'one size fits all' solution"

16  to local law enforcement. H.R. Rep. No. 109-233, at 89 (2005); *see also* Pub. L. No. 108-447,

17  118 Stat. 2809, 2863 (2004); 34 U.S.C. § 10151(a), (b)(1).

18          48.     Currently, the JAG authorizing statute enumerates eight purpose areas for: (A) law

19  enforcement programs; (B) prosecution and court programs; (C) prevention and education

20  programs; (D) corrections and community corrections programs; (E) drug treatments and

21  enforcement programs; (F) planning, evaluation, and technology improvement programs; (G)

22  crime victim and witness programs; and (H) mental health programs related to law enforcement

23  and corrections. 34 U.S.C. § 10152(a)(1).

24          49.     The purpose areas for these grants are to support criminal justice programs.

25  Immigration enforcement and removal procedures, however, are generally civil in nature. *See*

26  *Arizona v. U.S.*, 567 U.S. 387, 396 (2012). Immigration enforcement was never specified in the

27  purpose areas for any of these grants throughout this entire legislative history.

28

First Amended Complaint for Declaratory, Injunctive, and Mandamus Relief (18-cv-5169)

50. In 2006, Congress repealed the only immigration enforcement related requirement that had ever existed for JAG funding, a requirement that the chief executive officer of the state receiving JAG funding provide certified records of criminal convictions of "aliens." *See* Immigration Act of 1990, Pub. L. No. 101-649, tit. V, § 507(a), 104 Stat. 4978, 5050-51 (1990); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, tit. III, § 306(a)(6), 105 Stat. 1733, 1751 (1991) (repealed 2006). This is consistent with the statutory scheme that does not include a purpose area connected to immigration enforcement The repeal of this provision also evidences Congress' intent *not* to condition JAG funding on immigration enforcement related activities.

51. In addition, more recently, Congress has considered but repeatedly declined to adopt legislation that would penalize cities for setting their own law enforcement priorities and attempt to impose conditions similar to those here.[5]

### III. JAG'S STRUCTURE REQUIRES THAT STATE AND LOCAL JURISDICTIONS RECEIVE FORMULA GRANTS

#### A. The JAG Formula Structure and Conditions

52. When creating the merged JAG funding structure in 2006, Congress set a formula to apportion JAG funds to state and local jurisdictions. 34 U.S.C. § 10156. Population and violent crime rates are used to calculate each state's allocation. *Id.* § 10156(a)(1). Congress guarantees to each state a minimum allocation of JAG funds. *Id.* § 10156(a)(2).

53. In addition to determining the amount of money received by grantees within each state, Congress set forth how that money is to be shared between state and local jurisdictions. Under the statutory formula, 60 percent of the total allocation to a state must be given directly to the state. *Id.* § 10156(b)(1).

---

[5] *See* Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018) (voted down by the House by a vote of 231-193); *see also, e.g.*, No Sanctuary for Criminals Act, H.R. 3003, 115th Cong. (2017); Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015); Sanctuary City All Funding Elimination Act of 2015, H.R. 3073, 114th Cong. (2015).

14

54.     The statutory formula also provides that 40 percent of the total allocation to a state must be given to local governments within the state.  *Id.* § 10156(d)(1).  Each unit of local government receives funds based on its crime rate.  *Id.* § 10156(d)(2)(A).

55.     According to Congress' JAG funding scheme, states and local governments that apply for JAG funds are required to make limited certifications and assurances.  Beyond ministerial requirements identified in the authorizing statute, the chief executive officer of each applicant must certify that: (A) the law enforcement programs to be funded meet all requirements of the JAG authorizing statute; (B) all information in the application is correct; (C) there was coordination with affected agencies; and (D) the applicant will comply with all provisions of the JAG authorizing statute and all other applicable Federal laws.  *Id.* § 10153(a)(5).  The requirement for applicants to comply with "all other applicable Federal laws" has existed in federal statute since Byrne-JAG was created in 1988.  Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4332-33 (1988).

**B.     California's Allocation and Use of the JAG Award**

56.     Based on the formula prescribed by statute, California is expected to receive approximately $28.9 million in JAG funding in FY 2018, with $18 million going to the Board of State and Community Corrections ("BSCC"), the entity that receives the formula grant funds that are allocated to the State.

57.     The BSCC has disbursed JAG funding using subgrants predominately to local jurisdictions throughout California to fund programs that meet the purpose areas identified in the JAG authorizing statute.  Between Fiscal Years 2015-17, the BSCC funded 32 local jurisdictions and the California Department of Justice.

58.     In the past, the BSCC prioritized subgrants to those jurisdictions that focus on education and crime prevention programs, law enforcement programs, and court programs, including indigent defense.  Some examples of California jurisdictions' purpose-driven use of JAG funds include: (a) implementing programs to improve educational outcomes, increase graduation rates, and curb truancy; (b) providing youth and adult gang members with multi-disciplinary education, employment, treatment, and other support services to prevent gang

15

involvement, reduce substance abuse, and curtail delinquency and recidivism; (c) implementing

school-wide prevention and intervention initiatives for high-risk students; (d) providing

comprehensive post-dispositional advocacy and reentry services to improve outcomes and reduce

recidivism for juvenile probationers; (e) providing a continuum of detention alternatives to

juvenile offenders who do not require secure detention, which includes assessment, referral, case

advocacy, home detention, reporting centers, intensive case management, and wraparound family

support services; and (f) funding diversion and re-entry programs for both minors and young

adult offenders.

## IV. DEFENDANTS' ESCALATING ADDITION OF IMMIGRATION ENFORCEMENT REQUIREMENTS TO JAG

### A. The Addition of the § 1373 Requirements and Subsequent Actions to Withhold Funding from the State

59.     In FY 2016, OJP first announced that 8 U.S.C. § 1373 was an "applicable Federal

law" under JAG, the compliance of which would be a required condition for grantees receiving

JAG funds.  Section 1373(a) provides:

60.     Notwithstanding any other provision of Federal, State, or local law, a Federal, State,

or local government entity or official may not prohibit, or in any way restrict, any government

entity or official from sending to, or receiving from [federal immigration enforcement authorities]

information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

61.     Section 1373(b) prohibits any "person or agency" from restricting federal, state, or

local government entities from "requesting" information regarding a person's immigration status,

"maintaining" such information, or "exchanging" such information with federal, state, or local

government entities.

62.     For FY 2016, OJP required that the BSCC submit a legal opinion validating its

compliance with § 1373.  On April 21, 2017, OJP sent a letter to the BSCC, as well as eight other

jurisdictions nationwide, demanding that it submit that legal opinion.[6]  On June 29, 2017, the

---

[6] Press Release, U.S. Dep't of Justice, *Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373* (Apr. 21, 2017), https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373.

1    BSCC submitted the requested legal opinion explaining that the State's laws, including the

2    TRUST and TRUTH Acts, do not violate § 1373.

3         63.    On July 25, 2017, OJP announced the FY 2017 State JAG Solicitation, and on August

4    3, 2017, OJP announced the FY 2017 JAG Local Solicitation.  For the first time, the Solicitations

5    required that state and local jurisdictions make the following certifications with respect to § 1373

6    in order to receive a grant or subgrant:

7         •    The chief legal officer of the jurisdiction, including the California Attorney General in the

8              case of California, must sign an affidavit certifying compliance with § 1373 on behalf of

9              the State and "any entity, agency, or official" of the State as applicable to the "program or

10             activity" to be funded.

11        •    The chief executive officer of the jurisdiction, including the Governor of the State of

12             California, must sign an affidavit making a number of assurances, including that the chief

13             executive adopts the chief legal officer's certification of compliance with § 1373.

14        •    The subrecipients must certify compliance with § 1373, as applicable to the program and

15             award to be funded, and assure that they will comply with all award conditions.

16        64.    On August 25, 2017, the BSCC submitted the State's application for JAG.  In that

17   application, the BSCC stated that it "withholds any commitment at this time concerning new

18   grant conditions, pending receipt of the award documents."

19        65.    On November 1, 2017, after the enactment of the Values Act, OJP sent the State a

20   preliminary compliance assessment letter asserting that three provisions of the Values Act may

21   "violate 8 U.S.C. § 1373, depending on how [the State] interprets and applies them."  Those are

22   the provisions regulating: (i) inquiries into an individual's immigration status (Cal. Gov't Code §

23   7284.6(a)(1)(A)); (ii) responses to notification requests (*id.* § 7284.6(a)(1)(C)); and (iii) the

24   sharing of "personal information" (*id.* § 7284.6(a)(1)(D)).  As to the first provision, OJP said that

25   to comply with § 1373, the State must certify that it interprets that provision as "not restrict[ing]

26   California officers and employees from requesting information regarding immigration status from

27   federal immigration officers."  For the notification request and personal information provisions to

28   comply with § 1373, OJP said the State must certify that "it interprets and applies these

                                            17

1   provisions to not restrict California officers from sharing information regarding immigration

2   status with federal immigration officers, including information regarding release date[s] and

3   home address[es]."  If the State cannot so "certify," then "[USDOJ] has determined that these

4   provisions violate [Section 1373]."  OJP further "reserve[d] [its] right to identify additional bases

5   of potential violation of 8 U.S.C. § 1373."

6          66.    On November 13, 2017, the BSCC responded and certified that the Values Act does

7   not restrict law enforcement from inquiring about an individual's immigration status with other

8   governmental entities.  The BSCC could not provide the requested certification as to the other

9   two provisions, and informed OJP that the Values Act regulates the sharing of release date

10  information and home addresses because that information is not covered by § 1373.

11         67.    On January 24, 2018, OJP responded that it still has concerns about the State's

12  compliance with § 1373, and asked the BSCC, and simultaneously, eight other local jurisdictions

13  in California, to produce by February 23, under threat of subpoena, "orders, directives

14  instructions, or guidance to your law enforcement employees" about communicating with

15  USDOJ, the Department of Homeland Security ("DHS"), and ICE.[7]  The BSCC responded to that

16  letter asserting that it is not a law enforcement agency, so has limited requested documents, but

17  produced the documents that were responsive.  In the meantime, the State filed a lawsuit

18  challenging, among other things, the FY 2017 § 1373 Requirement as unconstitutional and

19  unlawful, and seeking a declaration that the State's laws comply with § 1373.  Am. Compl. for

20  Decl. and Inj. Relief, *Becerra I* (Oct. 13, 2017), ECF No. 11.

21         68.    On March 6, 2018, the United States filed a lawsuit against the State of California in

22  the Eastern District of California alleging that the provisions of SB 54 [the Values Act] that

23  regulate compliance with notification requests, restrict the sharing of personal information for

24  immigration enforcement purposes, and limit transfers of individuals to immigration authorities

25  are preempted under federal immigration law, and that the notification request and personal

26  _____

27  [7] Press Release, U.S. Dep't of Justice, *Justice Department Demands Documents and
    Threatens to Subpoena 23 Jurisdictions As Part of 8 U.S.C. § 1373 Compliance Review* (Jan. 24,
    2018), https://www.justice.gov/opa/pr/justice-department-demands-documents-and-threatens-
28  subpoena-23-jurisdictions-part-8-usc-1373.

18

1   information provisions also violate § 1373.  *See* Compl., *United States v. California*, No. 18-cv-

2   490, ECF No. 1, ¶ 65 (E.D. Cal. Mar. 6, 2018).  In its motion to preliminarily enjoin SB 54, the

3   United States argued that these provisions "impede[]" the United States' enforcement of the

4   immigration laws.  Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Supp., *United States v.*

5   *California*, No. 18-cv-490, ECF No. 2-1 at 4, 27, 29, 32, 35, 37 (E.D. Cal. Mar. 6, 2018).

6       69.    The Eastern District court disagreed.  In denying the federal government's motion to

7   enjoin the Values Act, Judge Mendez concluded that § 1373 does not encompass addresses and

8   release dates, "Section 1373 and the information sharing provisions of SB 54 do not directly

9   conflict," and SB 54 was not an obstacle to the federal government's goals because "[s]tanding

10  aside does not equate to standing in the way."  *United States v. California*, 314 F. Supp. 3d 1077,

11  1104-05 (E.D. Cal. 2018), *appeal docketed*, No. 18-16496 (9th Cir. Aug. 9, 2018).  The court

12  found the constitutionality of § 1373 "highly suspect," *id.* at 1101, and "that a Congressional

13  mandate prohibiting states from restricting their law enforcement agencies' involvement in

14  immigration enforcement activities—apart from, perhaps a narrowly drawn information sharing

15  provision—would likely violate the Tenth Amendment . . . . If Congress lacks the authority to

16  direct state action in this manner, then preemption cannot and should not be used to achieve the

17  same result."  *Id.* at 1109.  The court further dismissed the United States' claim against the Values

18  Act without leave to amend.  Order re: State of California's Mot. to Dismiss, *United States v.*

19  *California*, No. 18-cv-490, ECF No. 197 at 5, 7 (E.D. Cal. July 9, 2018).

20      70.    Two other federal courts, when considering challenges to the FY 2017 § 1373 JAG

21  Requirement, declared § 1373 unconstitutional on its face, holding that the statute therefore

22  cannot be an "applicable Federal law" for JAG funding.  *Chicago*, 321 F. Supp. 3d at 868-73;

23  *Philadelphia*, 309 F. Supp. 3d at 329-31.  Recently, this Court likewise determined that § 1373 is

24  unconstitutional on its face, and ordered Defendants to issue FY 2017 JAG awards to the BSCC

25  and all California political subdivisions that applied for JAG.  MSJ Order, *Becerra I*, ECF No.

26  137, slip op. at 23-30.  This court also found the § 1373 Requirement to violate the separation of

27  powers, *id.* at 30-32, the Spending Clause for being insufficiently related to the purpose of JAG

28  and ambiguous in light of Defendants' "evolving interpretations of the [§ 1373] condition," *id.* at

19

1   32-41, and arbitrary and capricious in violation of the Administrative and Procedure Act.  *Id.* at

2   41-48.

3       **B.    The Addition of the Access and Notification Requirements to JAG Funding**

4       71.    In addition to the requirement that jurisdictions certify compliance with § 1373, for

5   the first time in FY 2017, OJP announced two substantive "special conditions" related to federal

6   immigration enforcement.  To receive a JAG award, Defendants sought to require jurisdictions to:

7       •   permit personnel of DHS to access any correctional or detention facility in order to meet

8           with an "alien" (or an individual believed to be an "alien") and inquire as to his or her

9           right to be or remain in the United States (the "Access Condition"); and

10      •   provide at least 48 hours' advance notice to DHS regarding the scheduled release date and

11          time of an "alien" in the jurisdiction's custody when DHS requests such notice in order to

12          take custody of the individual pursuant to the INA (the "Notification Condition").

13  Defendants later identified what the final award conditions would consist of in court filings,

14  which confirmed the imposition of the Access and Notification Conditions for FY 2017 JAG

15  funding.  *See, e.g.*, *Becerra I*, ECF No. 125-2, ¶ 55(1) (July 31, 2018).

16      72.    Paragraph 56 of the represented final conditions sough to impose similar obligations

17  on local government recipients and subrecipients.  According to the condition, recipients that

18  disburse funding to subrecipients must "monitor[] subrecipient compliance with the requirements

19  of this condition." *Id.* ¶ 55(2).

20      73.    This Court concluded that the Access and Notifications Conditions, as well as the FY

21  2017 § 1373 Requirement, violate the separation of powers, the Spending Clause, and the

22  Administrative Procedure Act.  MSJ Order, *Becerra I*, ECF No. 137, slip op. at 17-23, 30-48.

23  Three other federal district courts have determined that the Access and Notification Conditions

24  are unconstitutional because USDOJ exceeded its statutory authority in imposing them.  Order

25  Granting Pl.'s Appl. for Prelim. Inj., *Los Angeles* (Sept. 13, 2018) ECF No. 93, slip op. at 2-4;

26  *Chicago*, 321 F. Supp. 3d at 874; *Philadelphia*, 309 F. Supp. 3d at 321.  The Seventh Circuit

27  affirmed the district court's decision to preliminarily enjoin the Access and Notification

28  Conditions.  *Chicago*, 888 F.3d. at 293 (7th Cir. 2018).

20

### C. FY 2018 JAG State and Local Solicitations

74.     On July 20, 2018, Defendants released the FY 2018 JAG Solicitations.  The chief legal officer of the jurisdiction must execute two certifications in order for that jurisdiction to receive JAG funding.  The first certification is entitled "FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644."  As with FY 2017, the first certification requires each grant recipient's chief legal officer to sign a standard affidavit, affirming compliance with § 1373 on behalf of the State and "any entity, agency, or official" of the State as applicable to the "program or activity to be funded."  Ex. A, Appx. B; Ex. B, Appx. B.  Unlike last year, applicants must also submit an answer to the following questions surrounding the jurisdiction's "Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)":

- Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
- Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meets the description in question 1?
- If yes to either:
  - Please provide a copy of each law or policy.
  - Please describe each practice.
  - Please explain how the law, policy, or practice complies with section 1373.

Ex. A at 27-28; Ex. B at 27-28.  A jurisdiction will "not receive award funds (and its award will include a condition that withholds funds) until it submits these responses."  Ex. A at 28; Ex. B at 28.[8]

75.     In this certification, for the first time this year, the chief legal officer must certify compliance with 8 U.S.C. § 1644.  Ex. A, Appx. B; Ex. B, Appx. B.  Section 1644 exists in a chapter within the INA for "Restricting Welfare and Public Benefits for Aliens."  Like § 1373, §

---

[8] For purposes of this action, these required responses are part of the Immigration Enforcement Requirements that California is challenging.

21

1644 prohibits state and local governments from restricting the "sending to or receiving" from immigration authorities "information regarding the immigration status" of "an alien."

76.     Also, for the first time this year, Defendants require that the chief legal officer separately execute a second certification entitled relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3).  Ex. A, Appx. C; Ex. B, Appx. C.  As of October 25, 2018, Defendants revised this certification from the one identified in the JAG Solicitations, and is now entitled "State or Local Government: FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a), 1324(a), 1357(a), & 1366(1) & (3)."[9]

77.     In this second certification, Defendants replace the Access Condition that has been struck down by the courts with a requirement that the chief legal officer certify that the jurisdiction does not have in effect or is bound to any law, rule, policy, or practice, applicable to the "program or activity" to be funded, which "impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a)."  Ex. A, Appx. C; Ex. B, Appx. C; Ex. D ¶ 6.  The certification describes § 1357(a) as providing authority to immigration officers to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  Ex. A, Appx. C; Ex. B, Appx. C; Ex. D ¶ 2(d).  The JAG Solicitations describe the certification as "requiring . . . recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States."  Ex. A at 37; Ex. B at 37.

78.     In addition, in this second certification, Defendants replace the Notification Condition that has been struck down by the courts with a requirement that the chief legal officer certify that the jurisdiction does not have in effect or is bound to any law, rule, policy, or practice, applicable to the "program or activity" to be funded, which "impede[s] the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) & (c)."  Ex. A, Appx. C; Ex. B, Appx. C; Ex. D ¶ 6. Section 1226 directs the U.S. Attorney General to take custody of inadmissible and deportable

---

[9] U.S. Dep't of Justice, OJP, State or Local Government: FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a), 1324(a), 1357(a), & 1366(1) & (3), https://ojp.gov/funding/Explore/pdf/FY18JAG_STATE_VARIOUS_Rev1025.pdf (attached as Ex. D).

1    persons after they have committed certain offenses or have been sentenced to a term of

2    imprisonment.  The certification also identifies 8 U.S.C. § 1231(a)(4), which the certification

3    represents as limiting the federal government from "remov[ing] an alien who is sentenced to

4    imprisonment until the alien is released from imprisonment."  Ex. A, Appx. C; Ex. B, Appx. C;

5    Ex. D ¶ 2(b).  The JAG Solicitations describe the certification as "requiring . . . recipients to

6    provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release

7    date and time of an alien in the recipient's custody when DHS requests such notice in order to

8    take custody of the alien pursuant to the Immigration and Nationality Act."  Ex. A at 37; Ex. B at

9    36-37.[10]

10       79.    That second certification requires that the chief legal officer certify for the first time

11   that the jurisdiction does not have in effect or is bound to any law, rule, policy, or practice,

12   applicable to the "program or activity" to be funded," which "impede[s] the exercise by federal

13   officers of authority relating to 8 U.S.C. § 1366(1) & (3)."  Ex. A, Appx. C; Ex. B, Appx. C; Ex.

14   D ¶ 6.  The 8 U.S.C. § 1366 certification requirement is not described anywhere else in the JAG

15   Solicitations, and Defendants do not explain why they are adding this statute as an "applicable

16   law."  The Certification describes § 1366 as "requiring the Attorney General annually to submit

17   to Congress 'a report detailing . . . (1) the number of illegal aliens incarcerated in Federal and

18   State prisons for having committed felonies, stating the number incarcerated for each type of

19   offense, [and] (3) programs and plans underway in the Department of Justice to ensure the prompt

20   removal from the United States of criminal aliens subject to removal.'"  Ex. A, Appx. C; Ex. B,

21   Appx. C; Ex. D ¶ 2(e).

22       80.    That second certification further requires that the chief legal officer certify that he

23   understands that the JAG award requires recipient states and local governments, with respect to

24   any "program or activity" funded, "not to publicly disclose federal law enforcement information

25   in an attempt to conceal, harbor, or shield certain individuals from detection, whether or not in

26   violation of 8 U.S.C. § 1324(a) or other laws."  Ex. D ¶ 3.  The certification describes § 1324(a)

---

[10] The JAG Solicitations identify "8 U.S.C. § 1266(a) & (c)" on this page, but since that law does not exist, and does not appear anywhere else in the Solicitations, California presumes that Defendants meant to cite to 8 U.S.C. § 1226 here instead.

23

1  as "forbidding the concealing, harboring, or shielding from detection of aliens illegally in the

2  United States." *Id.* ¶ 2(c).

3      81.  Section 1324(a) does not apply to states.  The INA defines "person" as an

4  "individual" or an "organization."  8 U.S.C. § 1101(b)(3).  A "State" is defined separately in 8

5  U.S.C. § 1101(a)(36), and the term "State" is not in any way part of 8 U.S.C. § 1324(a).

6      82.  The chief executive of the applicant government, identified as the governor for states,

7  must execute a separate certification acknowledging that the chief executive examined the

8  Certification of Compliance with 8 U.S.C. §§ 1373 & 1644 and the State or Local Government:

9  FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a), 1324(a), 1357(a), &

10  1366(1) & (3), and "adopt th[e] certification[s] as my own on behalf of that government."  Ex. A,

11  Appx. A; Ex. B, Appx. A.

12      83.  The JAG State Solicitation provides that "in order to validly accept a fiscal year (FY)

13  2018 JAG award, the chief legal officer of the applicant state must properly execute, and the state

14  must submit, the specific certifications regarding compliance with certain federal laws attached to

15  this solicitation as Appendix B and Appendix C."  Ex. A at 1, 18, 27, 35-36.  The same applies to

16  local governments.  Ex. B at 1, 18, 27, 35.  State recipients are required to collect these

17  certifications from all subrecipients.  Ex. A at 24.

18      84.  Underneath the FY 2018 JAG Solicitations on the OJP website, there is a link to

19  Frequently Asked Questions with respect to the § 1373 Certification.[11]  These represent that the

20  certification "must be signed by the jurisdiction's chief legal officer, who may not delegate,

21  assign, or designate the task to another."[12]  The document states that the "State 'Attorney

22  General' typically will be the title of the chief legal officer."  *Id.* No. 8.

23      85.  Defendants have provided no explanation as to how the new Immigration

24  Enforcement Requirements are consistent with Congress's intent in adopting and authorizing

25  funds for JAG.

26  _____

[11] *See* Office of Justice Programs, BJA Edward Byrne Memorial Justice Assistance Grant
Program, https://www.bja.gov/jag/.

27  [12] Bureau of Justice Assistance, Questions & Answers on Specific Requirements related to
Criminal Alien Law Enforcement for Fiscal Years 2017 and 2018 OJP Grant Programs, Nos. 8 &

28  10, https://www.bja.gov/publications/8U.S.C.1373QuestionsandAnswers.pdf.

86.     On August 21, 2018, the BSCC submitted a FY 2018 JAG application.  As part of that application, the BSCC was required to certify compliance that "the Applicant will comply with . . . all federal statutes and regulations applicable to the award" and that it will "require all subrecipients to comply with all applicable award requirements and all applicable federal statutes and regulations."  OJP informed the BSCC that it had to make that certification at the time of application.  In a supplemental document submitted with its application, the BSCC stated that it would so certify as to any laws that were lawfully identified as applicable laws.  But the BSCC disavowed the inclusion of the new Immigration Enforcement Requirements, and asserted that it was not making any "certifications or assurances about any federal statutes that have been selected by the Office of Justice Programs (OJP) as 'applicable' to the JAG program and imposed unlawfully."  The BSCC continued that it "does not agree to comply with any other unlawfully imposed award conditions or requirements."

**D.     Defendants' Issuance of FY 2018 JAG Awards to Most Jurisdictions in the United States, but not California**

87.     On or about October 1, 2018 Defendants released FY 2018 JAG awards to state and local jurisdictions throughout the United States.  Defendants issued JAG awards to 46 states and the District of Columbia, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the Virgin Islands.  Defendants also issued 752 JAG awards to local jurisdictions throughout the country.  However, Plaintiff is not aware of any California state or local jurisdiction that has received a FY 2018 JAG Award as of the date of this filing.

88.     The FY 2018 JAG Awards formalize the requirements described in the JAG Solicitations.  Paragraphs 41-43 describe the §§ 1373 and 1644 Requirements.  In addition to completing the §§ 1373 and 1644 certifications, the grant recipient for the state must obtain a certification of compliance with §§ 1373 and 1644 from any subgrantees before issuing an award.  Ex. C ¶ 42(2).  The grant recipient must also monitor each JAG subgrantee's compliance with the §§ 1373 and 1644 Requirements.  *Id.* ¶ 43(1)(D).  These requirements are similar to the FY 2017 JAG § 1373 Requirement that this Court, and other courts throughout the country, found to be unconstitutional and unlawful.  *Compare id.* ¶¶ 41-43 *with Becerra I*, ECF No. 125-2, ¶¶ 52-54

25

(July 31, 2018).  And all governmental grant recipients and subrecipients must submit responses

to the "Information regarding Communications with the Department of Homeland Security

(DHS) and/or Immigration and Customs Enforcement (ICE)" questions identified in the JAG

Solicitations.  Ex. C ¶ 47.

89.    Paragraph 44 of the FY 2018 JAG award describes the § 1324 Requirement, which

provides:

> Consistent with the purposes and objectives of federal law enforcement statutes and
> federal criminal law (including 8 U.S.C. 1324 and 18 U.S.C. chs. 1, 49, 227), no
> public disclosure may be made of any federal law enforcement information in a direct
> or indirect attempt to conceal, harbor, or shield from detection any fugitive from
> justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in
> the United States in violation of 8 U.S.C. ch. 12 – without regard to whether such
> disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C.
> 1071 or 1072 or of 8 U.S.C. 1324(a).

*Id.* ¶ 44(1).

90.    Grantees and subgrantees must comply with the § 1324 Requirement with respect to

the program or activity to be funded.  *Id.*  Defendants broadly define "federal law enforcement

information" within the Requirement to include "records or information complied for any law

enforcement purpose" from the federal government to a State or local government submitted

through any means including: "(1) through any database; (2) in connection with any law

enforcement partnership or task-force; (3) in connection with any request for law enforcement

assistance or –cooperation; or (4) through any deconfliction (or courtesy) notice of planned,

imminent, commencing, continuing, or impending federal law enforcement activity."  *Id.* ¶

44(4)(A)(2).  The "public disclosure" prohibited by the Requirement includes any communication

to a recipient or subrecipient that is not a government agency.  *Id.* ¶ 44(4)(A)(4).

The § 1324 Requirement does not describe what constitutes "a direct or indirect attempt to

conceal, harbor, or shield from detection" a non-citizen, making it unclear what conduct the

Requirement prohibits.

91.    Paragraph 45 describes the FY 2018 Access Requirement, which Defendants claim

is consistent with 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.5(a).  That requirement prohibits any

recipient or subrecipient State or local governmental entity, agency, or official, with respect to the

26

"program or activity" to be funded, from "interfer[ing]" with immigration authorities "by impeding access to any State or local government (or government-contracted correctional facility by such agents for the purposes [of] 'interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States.'" Ex. C ¶ 45(1). This requirement is similar to the FY 2017 JAG Access Condition that this Court, and other courts throughout the country, found to be unconstitutional and unlawful. *Compare id.* ¶ 45 *with Becerra I*, ECF No. 125-2, ¶¶ 55-56 (July 31, 2018). This year, Defendants define "impeding" as preventing any state or local government from "taking or continuing any action, or implementing or maintaining any law, policy, rule, or practice, that- (a) is designed to prevent or to significantly delay or complicate, or (b) has the effect of preventing or of significantly delaying or complicating" immigration authorities' access to detention facilities. *Id.* ¶ 45(4)(A)(3). Although the TRUTH Act does not deny immigration authorities' access to detention facilities, it requires LEAs to provide a consent form to an inmate to sign prior to an interview with immigration authorities. *See* Cal. Gov't Code § 7283.1(a). It is unclear whether Defendants interpret the FY 2018 Access Requirement as prohibiting jurisdictions from informing inmates of their rights prior to an ICE interview, as required under the TRUTH Act.

92.     Paragraph 46 describes the FY 2018 Notification Requirement, which Defendants claim is consistent with 8 U.S.C. §§ 1226, 1231, and 1366. That requirement prohibits any recipient or subrecipient State or local governmental entity, agency, or official, with respect to the "program or activity" to be funded, from "interfere[ing]" with immigration authorities "by failing to provide – as early as practicable (see para. 4.C. below) – advance notice to DHS of the scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from DHS a formal written request pursuant to the INA that seeks such advance notice." Ex. C ¶ 46(1). This requirement is similar to the FY 2017 JAG Notification Condition that this Court, and other courts throughout the country, found to be unconstitutional and unlawful. *Compare id.* ¶ 46 *with Becerra I*, ECF No. 125-2, ¶¶ 55-56 (July 31, 2018). The Values Act provides LEA discretion to comply with immigration authorities' notification requests under enumerated circumstances, but does not require the

27

provision of release dates, as Defendants ostensibly seek through this requirement.  *See* Cal. Gov't Code § 7284.6(a)(1)(C).

93.    Defendants have updated the certifications to mirror the FY 2018 JAG Award requirements.  The chief legal officer of the grant recipient's jurisdiction now must certify the following after conducing a "diligent inquiry":

> As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program . . . and that would or does – (a) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); or (b) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) or (c), 8 U.S.C. § 1231(a), or 8 U.S.C. § 1366(1) or (3).

Ex. D ¶ 6.

94.    The FY 2018 JAG Award admonishes recipients that:

> Any materially false, fictitious, or fraudulent statement to the federal government related to the award (or concealment or omission of a material fact) may be the subject of criminal prosecution (including under 18 U.S.C. 1001 and/or 1621, and/or 34 U.S.C. 10271-10273), and also may lead to imposition of civil penalties and administrative remedies for false claims or otherwise (including those under 31 U.S.C. 3729-3730 and 3801-3812).

Ex. C ¶ 1.

## V.    THE IMMIGRATION ENFORCEMENT REQUIREMENTS ARE UNCONSTITUTIONAL AND UNLAWFUL

95.    JAG's authorizing statute provides no authority for OJP to impose the Immigration Enforcement Requirements.  Interpreting OJP's authority to permit it to impose these substantive conditions with respect to formula grants, like JAG, beyond what is allowed under federal law conflicts with congressional intent in establishing a prescribed formula grant structure.  Congress designed JAG so that "*each State*" receives an allocation according to a precise statutory formula. 34 U.S.C. § 10156(a) (emphasis added).  Likewise, Congress's formula provides allocation to "*each* unit of local government.*"  Id.* § 10156(d)(2) (emphasis added).  As such, if USDOJ makes grants from funds that Congress appropriated to JAG, OJP must disburse the funds according to

1   the statutory formula enacted by Congress so long as the jurisdiction complies with the conditions

2   that exist in federal law.

3       96.   The Immigration Enforcement Requirements are also contrary to congressional intent

4   as immigration enforcement has never been a purpose area for JAG funding, and Congress has

5   repeatedly rejected numerous attempts to attach immigration enforcement requirements to receipt

6   of JAG funding.

7       97.   Defendants claim that all of the statutes identified in the certification are "applicable

8   Federal laws" that applicants must comply with under 34 U.S.C. § 10153(a)(5) in the JAG

9   authorizing statute.  *See* Ex. A at 10; Ex. B. at 10.  The JAG authorizing statute does not permit

10  Defendants to add these statutes as "applicable Federal laws."

11      98.   8 U.S.C. §§ 1373 and 1644 cannot be "applicable Federal laws" because they are

12  unconstitutional under the Tenth Amendment's anti-commandeering doctrine, and thus,

13  Defendants lack the statutory authority to identify those statutes as "applicable laws."

14      99.   8 U.S.C. §§ 1226, 1231, 1357, and 1366 are not "applicable Federal laws" as they are

15  not laws that are applicable to applicant state and local jurisdictions.  These laws only impose

16  obligations on the federal government.  In addition, 8 U.S.C. § 1324 only applies to individuals

17  and organizations, not to state and local jurisdictions.

18      100.  None of the federal laws identified in the certifications are "applicable" because the

19  term "other applicable Federal laws" is best understood as referring to laws that are expressly

20  connected to federal grant-making.  Prior to 2016, the only laws that USDOJ identified as

21  "applicable" were those that specifically address the administration of federal funding in the text

22  of the statute.  There is no provision in the INA, or any federal law, that requires jurisdictions to

23  assist with otherwise voluntary immigration enforcement related activities in order to receive

24  these federal funds.

25      101.  Defendants exceed their statutory authority by adding Immigration Enforcement

26  Requirements as purported "applicable Federal laws" that cannot be constitutionally applied to

27  California's laws under the anti-commandeering doctrine.  Defendants exceed their statutory

28  authority by interpreting statutes such as 8 U.S.C. §§ 1226, 1231, and 1357, as requiring state and

29

1    local jurisdictions to comply with notification requests or allowing immigration authorities access

2    to detention facilities, although those statutes impose no requirements on state and local

3    jurisdictions.

4        102.   Defendants also cannot rely on OJP's authority to add "special conditions on all

5    grants," 34 U.S.C. § 10102(a)(6), as a basis for adding the Immigration Enforcement

6    Requirements.  In 2006, when this provision was amended to create its current language, the term

7    "special conditions" had a precise meaning.  According to a USDOJ regulation in place at the

8    time, the agency could impose "special grant or subgrant conditions" on "high-risk grantees" if

9    the grant applicant: (a) had a history of poor performance; (b) was not financially stable; (c) had a

10   management system that did not meet certain federal standards; (d) had not conformed to the

11   terms and conditions of a previous grant award; or (e) was not otherwise responsible.  28 C.F.R. §

12   66.12 (removed December 25, 2014).

13       103.   These Immigration Enforcement Requirements are further undercut by 34 U.S.C. §

14   10228(a), which is codified in the same chapter as the JAG authorizing statute, and prohibits the

15   use of federal law enforcement grants to exercise "any direction, supervision, or control over any

16   police force or any other criminal justice agency of any State or any political subdivision

17   thereof."

18   **VI.   THE IMPOSITION OF THE IMMIGRATION ENFORCEMENT REQUIREMENTS CREATES
          IRREPARABLE HARM TO THE STATE AND ITS LOCAL JURISDICTIONS**

19

20       104.   The Immigration Enforcement Requirements mean that the State and its local

21   jurisdictions will have to decide whether they can or should accept federal funds for their law

22   enforcement agencies that are subject to unlawful and unconstitutional requirements.  If the State

23   and its local jurisdictions cannot accept the awards, or if Defendants withhold funding from the

24   State on the basis of these requirements, the State will lose $28.9 million in critical funds that

25   would otherwise go toward programs throughout the State that reduce recidivism for at-risk

26   youth, counter the distribution of illegal drugs, advance community policing, and improve

27   educational outcomes.

28

105.   It is likely that in order for the State and many of its localities to accept the funding, they will have to change their public safety oriented laws and policies in order to ensure they are viewed as complying with the Immigration Enforcement Requirements and Defendants' erroneous view of § 1373.  Abandoning these policies that law enforcement has found to be effective in their communities would divert resources away from fighting crime and erode trust between the State and local governments and their immigrant communities that the TRUST, TRUTH, and Values Acts, as well as local ordinances, are intended to build.

106.   California and its local jurisdictions must make their decision about whether to accept these law enforcement funds under the shadow of the federal government's actions that they have already taken and threats they have made against California on the basis of the State's laws.  In addition to suing the State for adopting laws that the United States alleges "impede" immigration authorities, after the Values Act went into effect, then-ICE Acting Director Thomas Homan called for USDOJ to "charge" elected officials for jurisdictions with policies like California for violating 8 U.S.C. § 1324(a) if they do not meet the Administration's immigration enforcement demands.[13] The DHS Secretary Kirstjen Nielsen later confirmed in congressional testimony that USDOJ was "reviewing" ways to charge state and local official as Acting Director Homan suggested.  By trying to make § 1324(a) an "applicable Federal law" through the Immigration Enforcement Requirements, and imposing the § 1324 Requirement as a condition for funding, Defendants are unlawfully attempting to force elected officials to make representations, under the threat of criminal prosecutions, about that federal statute.

107.   The State should not be faced with this Hobson's Choice of agreeing to these unconstitutional Immigration Enforcement Requirements and facing a certain enforcement action, or not agreeing to these Requirements and losing critical public safety dollars to the detriment of the State's communities.  Defendants' scheme undermines public safety, is unconstitutional, and should be halted.

---

[13] Fox News Interview with Thomas Homan, *Acting ICE director: California made a foolish decision* (Jan. 2, 2018), http://www.foxnews.com/transcript/2018/01/02/acting-ice-director-california-made-foolish-decision.html.

### FIRST CLAIM FOR RELIEF

### VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS

108. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

109. Article I, Section I of the United States Constitution enumerates that "[a]ll legislative Powers herein granted shall be vested in [the] Congress."

110. Article I, Section VIII of the United States Constitution vests exclusively in Congress the spending power to "provide for . . . the General Welfare of the United States."

111. Defendants have exceeded congressional authority by adding substantive Immigration Enforcement Requirements that are not conferred by the JAG authorizing statute or any other federal law. *See* 34 U.S.C. §§ 10151-58. The Immigration Enforcement Requirements therefore unlawfully exceed the Executive Branch's powers and intrude upon the powers of Congress.

112. For the reasons stated herein, the Immigration Enforcement Requirements are unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Immigration Enforcement Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

### SECOND CLAIM FOR RELIEF

### ULTRA VIRES

113. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

114. An agency acts ultra vires when it exceeds its statutory authority conferred by Congress.

115. None of the identified laws in the Immigration Enforcement Requirements are "applicable Federal laws" within the meaning of the JAG authorizing statute because they do not govern by their express terms the administration of federal funding.

116. Additionally, 8 U.S.C. §§ 1226, 1231, 1324, 1357, and 1366 cannot be applicable laws for applicants to JAG funding because these laws impose no obligations on state and local jurisdictions.

32

117.   Alternatively, even if these statutes were deemed to be "applicable Federal laws," Defendants exceed their authority under the JAG authorizing statute by imposing requirements on state and local governments that are not found in these federal statutes.  For example, Defendants seek to "require[] . . . recipients to provide (where feasible) at least 48 hours' notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act," although there is no such requirement in federal law.  Similarly, Defendants "requir[e] . . . recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States," which again is not a requirement that exists in federal law.

118.   Furthermore, Defendants have identified no separate statutory authority that would justify imposing the Immigration Enforcement Requirements.

119.   For the reasons stated herein, the Immigration Enforcement Requirements are ultra vires, and should be set aside under 28 U.S.C. § 2201.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Immigration Enforcement Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

## THIRD CLAIM FOR RELIEF

### ULTRA VIRES/ANTI-COMMANDEERING

**(The §§ 1226, 1231, 1357, 1366, 1373, and 1644 Immigration Enforcement Requirements Cannot be Constitutionally Applied to California's Laws under the Tenth Amendment of the U.S. Constitution)**

120.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

121.   Defendants' basis for adding the Immigration Enforcement Requirements are that they are premised on being "applicable Federal laws."  If the laws identified in the Immigration Enforcement Requirements are "applicable Federal laws," then the breadth of what Congress permitted Defendants to condition funding on is confined to what the "applicable laws" require or prohibit, as limited by the Tenth Amendment, and nothing more.

33

122.   The Tenth Amendment prohibits the federal government from requiring states and localities "to govern according to Congress's instructions," *New York v. United States*, 505 U.S. 144, 162 (1992), or "command[ing] the State's officers . . . to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).  Specifically, where the "whole object" of a provision of a federal statute is to "direct the functioning" of state and local governments, that provision is unconstitutional.  *Id.* at 932.

123.   The Tenth Amendment guarantees that states have a "legitimate choice" to "decline to administer the federal program." *New York*, 505 U.S. at 177, 185.  Prohibitions that "unequivocally dictate[] what a state legislature may and may not do" violate the anti-commandeering doctrine as much as affirmative commands. *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018).

124.   Two of the laws that are part of the Immigration Enforcement Requirements, 8 U.S.C. §§ 1373 and 1644, violate the Tenth Amendment on their face or as applied under Defendants' interpretation of them.  Therefore, those laws are invalid and cannot be identified as "applicable Federal laws." *See Chicago*, 2018 WL 3608564, at 7-11; *Philadelphia*, 309 F. Supp. 3d at 329-31.

125.   In *United States v. California*, the United States has already made clear its view that the Values and TRUST Acts "impede" immigration authorities, which would run afoul of the Immigration Enforcement Requirements.  As was found in that case, an interpretation of federal law that "prohibit[s] states from restricting their law enforcement agencies' involvement in immigration activities—apart from, perhaps, a narrowly drawn information sharing provision—would likely violate the Tenth Amendment." *California*, 314 F. Supp. 3d at 1109.

126.   Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants do not possess the statutory authority to apply the §§ 1226, 1231, 1357, 1366, 1373, and 1644 Immigration Enforcement Requirements as to the TRUST, TRUTH, and Values Acts, as to do so, Defendants would be applying federal law in a manner that violates the Tenth Amendment of the Constitution.  Defendants' statutory authority to use funding conditions to commandeer the State is also limited by 34 U.S.C. § 10228(a), which prohibits the use of federal law enforcement grants

34

1    to exercise "any direction, supervision, or control over any police force or any other criminal

2    justice agency."

3        127.    For the reasons stated herein, the §§ 1226, 1231, 1357, 1366, 1373, and 1644

4    Immigration Enforcement Requirements in the JAG Solicitations are ultra vires, and should be set

5    aside, or alternatively, should be set aside as to California and its local jurisdictions.

6    Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel

7    Defendants to issue California's FY 2018 JAG award without the Immigration Enforcement

8    Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula

9    in the JAG authorizing statute.

10                              **FOURTH CLAIM FOR RELIEF**

11                                   **SPENDING CLAUSE**

12        128.    Plaintiff incorporates the allegations of the preceding paragraphs by reference.

13        129.    Congress' spending power is not unlimited.  When "Congress desires to condition the

14    States' receipt of federal funds," it must do so (a) "unambiguously . . ., enabl[ing] the States to

15    exercise their choice knowingly, cognizant of the consequences of their participation;" and (b) by

16    placing conditions that are related "to the federal interest in particular national projects or

17    programs."  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citation omitted).

18        130.    To the extent that Congress delegated its authority to impose conditions on JAG

19    funding (which Plaintiff does not concede), the Immigration Enforcement Requirements violate

20    the Spending Clause of the U.S. Constitution.  The Immigration Enforcement Requirements are

21    unrelated to the "federal interest in particular national projects or programs" for which Congress

22    intended JAG funding to be used.

23        131.    The Immigration Enforcement Requirements also violate the Spending Clause

24    because they are ambiguous and do not provide the State and local jurisdictions with notice to

25    make a "choice knowingly" of whether to comply.

26        132.    For the reasons stated herein, the Immigration Enforcement Requirements are

27    unlawful, and should be set aside under 28 U.S.C. § 2201.  Additionally, Plaintiff is entitled to a

28    writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018

35

JAG award without the Immigration Enforcement Requirements, and disbursal of California's FY

2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

### FIFTH CLAIM FOR RELIEF

### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
**(Constitutional Violations and Excess of Statutory Authority)**

133.    Plaintiff incorporates the allegations of the preceding paragraphs by reference.

134.    Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the

imposition of the Immigration Enforcement Requirements is an "agency action" under the APA,

*id.* § 551(13).

135.    The imposition of the Immigration Enforcement Requirements constitutes an

"[a]gency action made reviewable by statute and final agency action for which there is no other

adequate remedy in a court." *Id.* § 704.

136.    The APA requires that a court "hold unlawful and set aside agency action, findings,

and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity,"

or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* §

706(2)(B)-(C).

137.    Defendants' imposition of the Immigration Enforcement Requirements is

unconstitutional because Defendants overstepped their powers by exercising lawmaking authority

that is solely reserved to Congress under Article I, Section I of the U.S. Constitution.  Also,

Defendants' imposition of the Immigration Enforcement Requirements was ultra vires in excess

of their statutory authority.  Furthermore, the Immigration Enforcement Requirements violate the

Spending Clause because they are unrelated to the federal purpose of the grant and/or are

ambiguous.

138.    Because Defendants acted unconstitutionally and in excess of their statutory authority

in the imposition of the Immigration Enforcement Requirements, these actions are unlawful and

should be set aside under 5 U.S.C. § 706.  Additionally, Plaintiff is entitled to a writ of mandamus

under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without

1  the Immigration Enforcement Requirements, and disbursal of California's FY 2018 JAG funds, in

2  accordance with the formula in the JAG authorizing statute.

3  ## SIXTH CLAIM FOR RELIEF

4  ## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
   ### (Arbitrary and Capricious)

5  
6  139.  Plaintiff incorporates the allegations of the preceding paragraphs by reference.

7  140.  Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the

8  imposition of the Immigration Enforcement Requirements is an "agency action" under the APA,

   *id.* § 551(13).

9  141.  The imposition of the Immigration Enforcement Requirements constitutes an

10 "[a]gency action made reviewable by statute and final agency action for which there is no other

11 adequate remedy in a court." *Id.* § 704.

12 142.  The APA requires that a court "hold unlawful and set aside agency action, findings,

13 and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

14 accordance with law." *Id.* § 706(2)(A).

15 143.  The imposition of the Immigration Enforcement Requirements is arbitrary and

16 capricious and an abuse of discretion because Defendants have relied on factors that Congress did

17 not intend, failed to consider an important aspect of the program the agency is addressing, and has

18 offered no explanation for adding the Immigration Enforcement Requirements that is consistent

19 with the evidence that is before the agency. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State*

20 *Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

21 144.  For the reasons discussed herein, the Immigration Enforcement Requirements are

22 unlawful and should be set aside under 5 U.S.C. § 706 for being arbitrary and capricious and an

23 abuse of discretion.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. §

24 1361 to compel Defendants to issue California's FY 2018 JAG award without the Immigration

25 Enforcement Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with

26 the formula in the JAG authorizing statute.

27

28

First Amended Complaint for Declaratory, Injunctive, and Mandamus Relief (18-cv-5169)

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the State of California, respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.    Issue a declaration that the Immigration Enforcement Requirements are unconstitutional and/or unlawful because: (a) they violate the separation of powers; (b) they exceed congressional authority conferred to the Executive Branch and are ultra vires on their face and as applied to the TRUST, TRUTH, and Values Acts; (c) to the extent there is congressional authority, they exceed Congress's spending powers under Article I of the Constitution; and/or (d) they violate the Administrative Procedure Act;

2.    Permanently enjoin Defendants from using the Immigration Enforcement Requirements;

3.    Permanently enjoin Defendants from withholding and terminating JAG funding, or disbarring and making any state entity or local jurisdiction ineligible for JAG funding on account of the TRUST, TRUTH, and Values Acts;

4.    Issue a writ of mandamus compelling Defendants to issue California and its political subdivisions' FY 2018 JAG awards without the Immigration Enforcement Requirements, and disbursal of California and its political subdivisions' FY 2018 JAG funds;

5.    Award attorney's fees and costs as appropriate; and

6.    Grant such other relief as the Court may deem just and proper.

Dated: November 1, 2018

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SARAH E. BELTON
Supervising Deputy Attorney General
CHEROKEE DM MELTON

*/s/ Lee I. Sherman*

LEE I. SHERMAN
Deputy Attorneys General
*Attorneys for Plaintiff*
*State of California*

39

Exhibit 2

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
SARAH E. BELTON
Supervising Deputy Attorney General
KRISTI GUDOSKI COOK
LISA C. EHRLICH
XIYUN YANG
LEE I. SHERMAN (SBN 272271)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 269-6404
  Fax:  (213) 897-7605
  E-mail:  Lee.Sherman@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA,** | Case No.  19-cv-6189 |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF** |
| **WILLIAM P. BARR, in his official capacity as Attorney General of the United States; KATHARINE SULLIVAN, in her official capacity as Principal Deputy Assistant Attorney General; DARLENE HUTCHINSON BIEHL, in her official capacity as Director of the Office for Victims of Crime; CAREN HARP, in her official capacity as the Administrator of the Office of Juvenile Justice and Delinquency Prevention; and UNITED STATES DEPARTMENT OF JUSTICE,** | |
| Defendants. | |

1.     Plaintiff State of California (Plaintiff, California, or State), brings this complaint to prevent the Trump Administration from illegally using a wide variety of formula grant programs totaling $327.7 million to coerce the State into satisfying this Administration's aggressive immigration enforcement demands.  The grants that Defendants have attached these conditions to provide critical support and assistance for victims of crime and sexual assault, state and local law enforcement, juvenile justice, and the criminal justice system generally.  These conditions are part of Defendants' escalating effort to unilaterally and fundamentally remake formula grant structures created by Congress into discretionary funding streams to be exploited for the Administration's immigration enforcement priorities.  The conditions placed on these grants are unauthorized by Congress and are unrelated to the purposes of these otherwise salutary programs.  The imposition of all of these immigration enforcement requirements in contravention of congressional intent is unlawful and unconstitutional, and should be halted.

2.     Previously, a court in the Northern District of California (Northern District Court) concluded that Defendant U.S. Department of Justice (USDOJ) exceeded its statutory authority and violated the U.S. Constitution and the Administrative Procedure Act (APA), 5 U.S.C. § 706, when it sought to impose immigration enforcement requirements on $28.3 million worth of Edward Byrne Memorial Justice Assistance Grants (JAG) awarded to California and its political subdivisions in fiscal year (FY) 2017, and $28.9 million in JAG awards in FY 2018.  JAG awards are provided to each state, and certain local jurisdictions within each state, to, among other things, support law enforcement programs, reduce recidivism, conduct crime prevention and education programs for at-risk youth, and support programs for crime victims and witnesses.  Every state is entitled by law to a share of these funds.  On October 5, 2018, the Northern District Court struck down all of the immigration enforcement requirements added to FY 2017 JAG funding.  *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018), *appeal docketed*, Nos. 18-17308 & 18-17311 (9th Cir. Dec. 4, 2018).  Courts across the country have likewise unanimously found these funding conditions to be unconstitutional.[1]  In FY 2018, Defendants

_____

[1] *See City of Philadelphia v. Attorney Gen. of the United States*, 916 F.3d 276 (3d Cir. 2019); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018); *Oregon v. Trump*, No. 18-cv-

1

imposed the same and additional immigration enforcement requirements on JAG. The Northern

District Court again struck down all of the immigration enforcement requirements. *City & Cty. of*

*San Francisco v. Sessions*, 372 F. Supp. 3d 928 (N.D. Cal. 2019), *appeal docketed* Nos. 19-15947

& 19-15950 (9th Cir. May 3, 2019). Other courts have as well.[2]

       3.      Undaunted, Defendants seek to impose the same funding conditions—the JAG

Immigration Enforcement Requirements—on $28.6 million in FY 2019 JAG funding that the

State and its political subdivisions are expected to receive—disregarding the decisions of this and

other courts.[3] Also, in FY 2019, Defendants impose a requirement to comply with 8 U.S.C.

§ 1373 (§ 1373) on JAG and the State's $4.5 million Title II juvenile justice formula grant (Title

II Grant).[4] The Northern District Court, and other courts, have already determined that a

requirement to comply with § 1373 was unlawful for JAG, and that § 1373 is unconstitutional on

its face under the Tenth Amendment's anti-commandeering doctrine. *See, e.g.*, *San Francisco*,

349 F. Supp. 3d at 949-53. The Northern District Court specifically enjoined Defendants from

requiring compliance with § 1373 as a grant condition on the basis of it being an "applicable

Federal law" or on the basis of § 1373's "independent statutory obligations." Amended Judgment

and Order, *State of California ex rel. Becerra v. Sessions* (*Becerra I*), No. 17-cv-4701 (N.D. Cal.

Nov. 20, 2018), ECF No. 154 at 3. The imposition of the § 1373 compliance condition on the

---

1959, 2019 WL 3716932 (D. Or. Aug. 7, 2019); *City of Providence v. Barr*, No. 385 F. Supp. 3d 160 (D. R.I. 2019), *appeal docketed*, No. 19-1802 (1st Cir. Aug. 15, 2019); *New York v. Dep't of Justice*, 343 F. Supp. 3d 213 (S.D. N.Y. 2018), *appeal docketed*, No. 19-275 (2nd Cir. Jan. 28, 2019); *City of Los Angeles v. Sessions*, No. 17-cv-7215, 2018 WL 6071071 (C.D. Cal. Sept. 17, 2018), *appeal docketed*, No. 18-56292 (9th Cir. Oct. 1, 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) *appeal docketed*, No. 18-2885 (7th Cir. Aug. 28, 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018).

    [2] *City of Chicago v. Barr*, No. 18-cv-6859, 2019 WL 4511546 (N.D. Ill. Sept. 19, 2019); *City of Los Angeles v. Sessions*, No. 18-cv-7347, 2019 WL 1957966 (C.D. Cal. Feb. 15, 2019) *appeal docketed*, No. 19-55314 (9th Cir. Mar. 13, 2019).

    [3] U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2019 State Solicitation (2019) (JAG State Solicitation) (attached as Exhibit A); *see also* U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2019 Local Solicitation (2019) (JAG Local Solicitation, collectively with the JAG State Solicitation, JAG Solicitations) (attached as Ex. B). California's FY 2019 JAG award is attached as Ex. C.

    [4] U.S. Dep't of Justice, Office of Juvenile Justice and Delinquency Prevention FY 2019 Title II Formula Grants Program Solicitation (2019) (attached as Ex. D). California's FY 2019 Title II award is attached as Ex. E.

1    State's Title II Grant (1373 Title II Requirement) is unlawful and unconstitutional for the same

2    reasons.[5]

3          4.    Separately, Defendants seek to impose a new requirement on "all (or virtually all)

4    awards made in FY 2019" by the Office of Justice Programs (OJP) and the Office of Violence

5    Against Women (OVW).  Under this new requirement, grant recipients and subrecipients must

6    "[e]nsure that, as part of the hiring process for any position within the United States that is or will

7    be funded (in whole or in part) with award funds [that they] properly verif[y] the employment

8    eligibility of the individual who is being hired, consistent with the provisions of 8 U.S.C.

9    1324a(a)(1) and (2)" (1324a Requirement, and together with the JAG Immigration Enforcement

10   Requirements and the 1373 Title II Requirement, the FY 2019 Immigration Enforcement

11   Requirements).[6]  The 1324a Requirement imposes obligations on the grant recipient to notify and

12   train individuals involved in the hiring process for the grantee and subgrantees about 8 U.S.C.

13   § 1324a (§ 1324a) and the funding condition, and to monitor subgrantee compliance with the

14   1324 Requirement.

15         5.    Thus far, OJP has awarded $446 million in grants to entities in California, mostly to

16   state and local governments agencies.[7]  Specifically, USDOJ has sought to impose the 1324a

17   Requirement on $327.7 million on the following ten formula grants that the State receives and

18   that the State and/or its governmental and non-profit subgrantees use toward the "fund[ing]" of

19   employees[8]:

20         [5] The JAG Immigration Enforcement Requirements and the 1373 Title II Requirement are
     also in violation of the Amended Judgment and Order in *Becerra I* and the Judgment and Order
21   Granting Plaintiffs' Motions for Summary Judgment in *State of California ex rel. Becerra v.
     Sessions* (*Becerra II*), No. 18-cv-5160 (N.D. Cal. Mar. 26, 2019).  California reserves its right to
22   move to enforce the final judgments in those cases, but brings claims challenging these conditions
     here to raise all issues with respect to the JAG and Title II Grants in one complaint.
23         [6] U.S. Dep't of Justice, OJP, "General Conditions" for OJP Awards in FY 2019,
     Employment eligibility verification for hiring under the award (Aug. 2019),
24   https://ojp.gov/funding/Explore/LegalOverview2019/MandatoryTermsConditions.htm.
           [7] A list from OJP's website identifying the grants that have been issued to entities in
25   California as of the filing of this complaint is attached as Ex. F.  This chart does not include grant
     awards that have been made by OVW.
26         [8] California does not raise in this complaint Defendants' authority to impose the 1324a
     Requirement on those grants that the State of California has received that will not be used toward
27   the funding, in whole or in part, of employees.  California does not concede Defendants have
     authority to impose the 1324 Requirement to those grants, and California expressly reserves its
28

- Victims of Crime Act (VOCA) Assistance and Compensation formula grants totaling $282.4 million that the State uses to fund subgrants to local jurisdictions and service providers to provide compensation and critical assistance to crime victims;[9]

- The State's $17.8 million JAG award (discussed above);

- Violence Against Women Act (VAWA) formula grants totaling $15.9 million that the State uses to combat violent crimes against women and to develop and strengthen victim services in cases involving domestic violence, dating violence, sexual assault, and stalking;[10]

- The State's $4.5 million Title II Grant (discussed above);

- A $2.264 million Paul Coverdell Forensic Science Improvement Grant (Coverdell Grant) that the State uses to improve its forensic science services;[11]

- A $2.219 million Residential Substance Abuse Treatment (RSAT) Grant that the State uses to provide substance abuse programs to inmates in local detention facilities during incarceration and upon reentry into the community;[12]

- A $2.059 million DNA Capacity Enhancement and Backlog Reduction Grant (DNA Backlog Reduction Grant) that the State uses to increase the State's capacity and efficiency in handling, screening, analyzing, and reviewing DNA samples for criminal justice purposes;[13] and

---

right to challenge Defendants' authority to impose the 1324a Requirement on those grants if Defendants seek to enforce the condition against the State, or if Defendants impose this condition in the future as to those grants.

[9] U.S. Dep't of Justice, Office for Victims of Crime FY 2019 VOCA Victim Assistance Solicitation (2019) (attached as Ex. G); U.S. Dep't of Justice, Office for Victims of Crime FY 2019 VOCA Victim Compensation Solicitation (2019) (attached as Ex. H). California's FY 2019 VOCA Assistance and Compensation awards are attached as Exs. I and J, respectively.

[10] U.S. Dep't of Justice, OVW Fiscal Year 2019 STOP Formula Grant Program Solicitation (2019) (attached as Ex. K); U.S. Dep't of Justice, OVW Fiscal Year 2019 SASP Formula Program Solicitation (2019) (attached as Ex. L). California's FY 2019 STOP Formula Grant Program and SASP Formula Program awards are attached as Exs. M and N, respectively.

[11] U.S. Dep't of Justice, Paul Coverdell Forensic Science Improvement Grants Program - Formula (2019) (attached as Ex. O). California's FY 2019 Coverdell Grant award is attached as Ex. P).

[12] U.S. Dep't of Justice, Residential Substance Abuse Treatment (RSAT) for State Prisoners Program FY 2019 Formula Grant Announcement (2019) (attached as Ex. Q). California's FY 2019 RSAT award is attached as Ex. R.

[13] U.S. Dep't of Justice, FY 2019 DNA Capacity Enhancement for Backlog Reduction

4

1    • $407,813 Prison Rape Elimination Act (PREA) funding that the State uses toward PREA

2        compliance.[14]

3        6.    The 1324a Requirement, like the immigration enforcement requirements that

4    Defendants have added to JAG and the Title II Grant, was not created by Congress.  There is no

5    requirement in federal law for grant recipients to comply with § 1324a to receive these formula

6    grants.  Federal law delineates specific monetary penalties for violations of § 1324a that range

7    from $559 per violation to $22,363 per violation for repeat offenders.  The 1324a Requirement

8    subverts that statutory scheme by subjecting the State to the possible withholding of *hundreds of*

9    *millions of dollars* of grant funding for failing to comply with § 1324a.  Further, when designing

10   the formula grant structure for these grants, Congress explicitly set out the conditions for grant

11   recipients.  It did not delegate authority to Defendants to impose their own requirements that do

12   not advance these grants' purposes.

13       7.    Defendants have also exceeded constitutional limits under the Spending Clause in

14   Article I, Section 8 of the U.S. Constitution.  The FY 2019 Immigration Enforcement

15   Requirements are not sufficiently related to the federal purposes that Congress designed for the

16   funding schemes named above, and are too ambiguous to provide clear notice to the State or its

17   political subdivisions as to what is needed to comply.  The sudden imposition of the 1324a

18   Requirement on hundreds of millions of dollars of "virtually all" USDOJ grants that have never

19   been subject to this condition also violates the Spending Clause for being impermissibly coercive.

20       8.    For all of these reasons, and because they are arbitrary and capricious, the FY 2019

21   Immigration Enforcement Requirements violate the APA as well.

22       9.    To be sure, California complies with all of the requirements identified in the

23   authorizing statues for each of the grants, and the requirements that generally apply to grantees

24   under federal law.  California state law also complies with § 1324a; employers in California are

25   _____

26   (CEBR) Program (Formula) (2019) (attached as Ex. S).  California's FY 2019 DNA Backlog
     Grant award is attached as Ex. T.

27   [14] U.S. Dep't of Justice, FY 2019 Guidance for Invited Applications for Prison Rape
     Elimination Act (PREA) Reallocation Funds, Edward Byrne Memorial Justice Assistance Grant

28   (JAG) Program (2019) (attached as Ex. U).  California's FY 2019 PREA award is attached as Ex.
     V.

5

1    authorized to: (a) verify employees' eligibility to be employed in the United States as required

2    under federal law, and (b) re-verify that eligibility when required to do so under federal law.  But,

3    the federal government has previously made clear that it is not satisfied with California following

4    federal law.  Specifically, the federal government has claimed that a predecessor version of

5    California Labor Code § 1019.2, which restricts employers from re-verifying employees'

6    eligibility to be employed in the United States beyond what is required by federal law, actually

7    conflicts with § 1324a(a)(2).  In the federal government's stated view of § 1324a(a)(2), the 1324a

8    Requirement would seek to impose an obligation on the State to reverify its employees even when

9    not required under federal law, making California's obligations under the new condition unclear.

10   Because California law does not allow for unnecessary reverification (nor must it), the federal

11   government's erroneous view of federal law raises doubt as to whether Defendants will find the

12   State to be in compliance with this new condition

13       10.    Not only are the FY 2019 Immigration Enforcement Requirements unlawful, but

14   agreeing to them will harm California.  As part of the State's police powers, California has

15   enacted laws to regulate the health, welfare, and public safety of its residents, and to manage the

16   State's workplaces.  The JAG Immigration Enforcement Requirements would require that the

17   State and local jurisdictions terminate their public safety oriented laws and policies.  The Trump

18   Administration's increased targeting of immigrant populations has intensified fear among

19   immigrant communities, making it more difficult for California and its political subdivisions to

20   build trust with the State's over 10 million immigrant residents.  Agreeing to the JAG

21   Immigration Enforcement Requirements will only exacerbate this challenge.  It would mean that

22   the State and its localities will lose control of their ability to focus their resources on fighting

23   crime and instead will devote resources to federal immigration enforcement.  The trust and

24   cooperation that the State's laws and local ordinances are intended to build between law

25   enforcement and immigrant communities will be eroded.

26       11.    Agreeing to the 1324a Requirement as interpreted by the federal government will

27   impermissibly force the State to abandon its statutory workplace protections designed to protect

28   authorized employees against discrimination, retaliation, and harassment by employers who

6

1    exceed the reverification requirements mandated by federal law.  Like other Trump

2    Administration immigration enforcement actions, the Administration's expanded focus on

3    workplace immigration raids has precipitated fear among immigrants.  California's statutory

4    protections provide some modest measure of security to authorized immigrant workers by

5    restricting employers from engaging in unjustified reverification that goes beyond the

6    requirements of federal law.  The 1324a Requirement, as interpreted by the federal government,

7    bars the State from complying with its own laws and will erode the trust between the State and its

8    employees, undermining the State's ability to construct relationships with its employees, a

9    fundamental element of its sovereignty.  Aside from the 1324 Requirement's impact on the

10   State's laws, through its monitoring obligations, the 1324a Requirement seeks to conscript the

11   State to oversee hundreds of public and non-profit entities' compliance with a federal

12   immigration law regarding employment verification.

13       12.    Alternatively, if the State refuses to comply with the FY 2019 Immigration

14   Enforcement Requirements, or if Defendants refuse to provide funding to California on the basis

15   of these unlawful requirements, critical programs will likely need to be cut to the detriment of

16   state and local governments, the criminal justice system, and crime victims throughout California.

17       13.    For these reasons, and those discussed below, the Court should declare the FY 2019

18   Immigration Enforcement Requirements are unconstitutional, ultra vires, and/or a violation of the

19   APA, enjoin their imposition, require that Defendants issue JAG, VOCA, VAWA, Title II,

20   Coverdell, RSAT, DNA Backlog Reduction, and PREA grant awards and funding to the State and

21   its local jurisdictions that comply with the requirements enumerated by Congress, and prohibit

22   Defendants from withholding funding on the basis of Labor Code § 1019.2.

23                          **JURISDICTION AND VENUE**

24       14.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this case arises

25   under the Constitution and the laws of the United States.  The Court also has jurisdiction under 28

26   U.S.C. § 1346 because this is a civil action against the federal government founded upon the U.S.

27   Constitution and acts of Congress.  Jurisdiction is proper under the judicial review provisions of

28

1   the APA, 5 U.S.C. §§ 701-706.  The Court has authority to provide relief under the Declaratory

2   Judgment Act, 28 U.S.C. § 2201, and the Mandamus Statute, 28 U.S.C. § 1361.

3       15.     Under 28 U.S.C. § 1391(e)(1), venue is proper in the Northern District of California

4   because the State of California and its Attorney General have offices at 455 Golden Gate Avenue,

5   San Francisco, California, and at 1515 Clay Street, Oakland, California, and Defendants have

6   offices at 450 Golden Gate Avenue, San Francisco, California.

7                          **INTRADISTRICT ASSIGNMENT**

8       16.     Assignment to the San Francisco Division of this District is proper pursuant to Civil

9   Local Rule 3-2(c)-(d) because Plaintiff and Defendants both maintain offices in the District in

10  San Francisco.

11                                  **PARTIES**

12      17.     Plaintiff State of California is a sovereign state in the United States of America.

13  California is aggrieved by the actions of Defendants and has standing to bring this action because

14  of the injury to its sovereignty as a state caused by the challenged federal actions.  The inclusion

15  of unconstitutional and unlawful FY 2019 Immigration Enforcement Requirements impairs the

16  State's exercise of its police powers in a manner it deems necessary to protect the public safety

17  and manage its workplaces.  The FY 2019 Immigration Enforcement Requirements burden

18  California's exercise of its sovereign power to enforce its laws.  They also place a regulatory

19  burden on California as a funding recipient, obligating the State to continuously monitor

20  compliance of all subgrantees throughout the State, which will result in increased staff time and

21  expenses.

22      18.     As a result of Defendants' unconstitutional and unlawful actions, and their erroneous

23  interpretation of federal law, the State of California's Governor's Office of Emergency Services

24  (Cal OES), Board of State and Community Corrections (BSCC), California Victims

25  Compensation Board (Cal VCB), California Department of Justice (Cal DOJ), and the California

26  Department of Corrections and Rehabilitation (CDCR) are, collectively, at risk of losing $327.7

27  million in federal funding for this fiscal year.

28

Complaint for Declaratory, Injunctive, and Mandamus Relief (19-cv-6189)

19.     The State of California, and its local jurisdictions that rely upon these grants, spend millions of dollars from these grants, in part, to fund employees who assist in the administration of the programs that these grants support.  The loss of these funds will harm public safety and the criminal justice system in the State.  Otherwise, agreeing to the FY 2019 Immigration Enforcement Requirements, as interpreted by Defendants, undermines California's statutes.

20.     Defendant USDOJ is an executive department of the United States of America pursuant to 5 U.S.C. § 101, a federal agency within the meaning of 28 U.S.C. § 2671, and engages in agency action within the meaning of 5 U.S.C. § 702.  USDOJ is responsible for administering the JAG, VOCA, VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA grant funds appropriated by Congress.

21.     Defendant William P. Barr, is Attorney General of the United States, and oversees USDOJ, including the OJP and OVW.  He is sued in his official capacity pursuant to 5 U.S.C. § 702.

22.     Defendant Katharine Sullivan is Principal Deputy Assistant Attorney General in charge of OJP, which oversees the JAG, VOCA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA grant funds at issue in this complaint.  She is sued in her official capacity pursuant to 5 U.S.C. § 702.

23.     Defendant Darlene Hutchinson Biehl is the Director of the Office for Victims of Crime (OVC), which is specifically responsible for the VOCA grants at issue in this complaint.  She is sued in her official capacity pursuant to 5 U.S.C. § 702.

24.     Defendant Caren Harp is the Administrator of the Office of Juvenile Delinquency and Prevention (OJJDP), which is specifically responsible for the Title II Grant at issue in this complaint.  She is sued in her official capacity pursuant to 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

### I.     CALIFORNIA'S LAWS SEEK TO PROTECT THE SAFETY AND WELFARE OF THE STATE'S RESIDENTS

25.     California state and local law enforcement agencies (LEAs), guided by the duly enacted laws of the State and ordinances of local jurisdictions, are tasked with effectively

9

policing, protecting, and serving all residents, including more than 10 million foreign-born individuals who live in the State. In their relations with employees, California state and local agencies are also guided by state law designed to prevent discrimination in the workplace and promote trust between employers and their employees. The California laws implicated in this suit are a valid exercise of the State's police power to regulate regarding the health, welfare, and public safety of its residents, and to manage the State's relationships with its employees.

**A.    California's Public Safety Laws Focus Law Enforcement on Criminal Activity and Build Trust Between Law Enforcement and the Communities They Serve**

26.    California has adopted laws that strengthen community policing efforts by encouraging undocumented victims to report crimes to local law enforcement so that perpetrators are apprehended before harming others. These laws ensure that law enforcement resources are focused on a core public safety mission and used to build trust and cooperation between law enforcement and the State's immigrant communities. When local and state LEAs engage in immigration enforcement, as Defendants contemplate, vulnerable victims and witnesses are less likely to come forward to report crimes.

27.    California's laws are not unique. Many jurisdictions across the country, including local jurisdictions in California, have policies that define the circumstances under which local law enforcement personnel may expend time and resources in furtherance of federal immigration enforcement. Those jurisdictions impose limits on compliance with Immigration and Customs Enforcement (ICE) detainer requests, ICE notification requests about release dates, and ICE's access to detainees, or provide additional procedural protections for individuals prior to an interview with immigration authorities.

**1.    The TRUST Act**

28.    In 2013, California enacted the TRUST Act, Cal. Gov't Code §§ 7282-7282.5, that sought to address numerous public safety concerns regarding the federal practice of issuing detainers to local law enforcement. The TRUST Act defined the circumstances under which local LEAs may detain an individual at the request of federal immigration authorities. The TRUST Act previously set forth two conditions that local law enforcement must meet to have discretion to

10

1  detain a person pursuant to an "immigration hold" (also known as a "detainer request" or

2  "detainer hold"), which is when an immigration authority requests that the law enforcement

3  official "maintain custody of the individual for a period not to exceed 48 hours, excluding

4  Saturdays, Sundays, and holidays."  Cal. Gov't Code § 7282(c) (prior to amendments codified on

5  Oct. 5, 2017).  First, the detention could not "violate any federal, state, or local law, or any local

6  policy." *Id.* § 7282.5(a) (prior to amendments codified on Oct. 5, 2017).  Second, law

7  enforcement could only detain someone with certain, specified criminal backgrounds, an

8  individual on the California Sex and Arson Registry, or a person charged with a serious or violent

9  felony who was the subject of a probable cause determination from a magistrate judge.  *Id.* §

10  7282.5(a)(1)-(6) (prior to amendments codified on Oct. 5, 2017).

11              2.      **The TRUTH Act**

12          29.     In 2016, California enacted the TRUTH Act, Cal. Gov't Code §§ 7283-7283.2, to

13  increase transparency about immigration enforcement and "to promote public safety and preserve

14  limited local resources because entanglement between local law enforcement and ICE undermines

15  community policing strategies and drains local resources."  Assem. Bill No. 2792, Reg. Sess.

16  (Cal. 2016) § 2(a)-(c), (g)-(i).  Under the TRUTH Act, prior to ICE interviewing someone being

17  held in the custody of a California local LEA, a local law enforcement officer must provide the

18  detained individual with a "written consent form that explains the purpose of the interview, that

19  the interview is voluntary, and that he or she may decline to be interviewed or may choose to be

20  interviewed only with his or her attorney present."  Cal. Gov't Code § 7283.1(a).  In addition,

21  when an LEA receives a detainer, notification, or transfer request, the LEA must "provide a copy

22  of the request to the [detained] individual and inform him or her whether the law enforcement

23  agency intends to comply with the request."  *Id.* § 7283.1(b).  If the LEA complies with ICE's

24  request to notify ICE as to when the individual will be released, it must also "promptly provide

25  the same notification in writing to the individual and to his or her attorney or to one additional

26  person who the individual shall be permitted to designate."  *Id.*

27          30.     Although the TRUTH Act does not restrict communications with immigration

28  authorities or prohibit LEAs from providing immigration authorities with access to detention

1    facilities, the federal government has indicated that it views the TRUTH Act as conflicting with

2    federal law.  On June 13, 2017, then-Acting Director of ICE, Thomas Homan, testified before

3    Congress that jurisdictions that "have some sort of policy where they don't . . . allow [ICE] access

4    to the jails" violate 8 U.S.C. § 1373 (§ 1373).  Former U.S. Attorney General Jefferson Sessions

5    separately asserted that "the State of California . . . [has] enacted statutes . . . designed to

6    specifically prohibit or hinder ICE from enforcing immigration law by . . . denying requests by

7    ICE officers and agents to enter prisons and jails to make arrests."

8                   **3.    The California Values Act**

9          31.    On October 5, 2017, California enacted Senate Bill 54 (SB 54), known as the

10   California Values Act, Cal. Gov't Code §§ 7284-7284.12, which also amended the TRUST Act.

11   The Values Act sets the parameters under which California LEAs may participate in immigration

12   enforcement.  The California Department of Corrections and Rehabilitation (CDCR) is not

13   considered a "California law enforcement agency" for purposes of the Values Act.  Cal. Gov't

14   Code § 7284.4(a).

15         32.    The Legislature emphasized that "[a] relationship of trust between California's

16   immigrant community and state and local agencies is central to the public safety of the people of

17   California."  *Id.* § 7284.2(b).  The Legislature recognized "[t]his trust is threatened when state and

18   local agencies are entangled with federal immigration enforcement, with the result that immigrant

19   community members fear approaching police when they are victims of, and witnesses to, crimes,

20   seeking basic health services, or attending school, to the detriment of public safety and the well-

21   being of all Californians."  *Id.* § 7284.2(c).  The Legislature declared that the focus of the Values

22   Act is "to ensure effective policing, to protect the safety, well-being, and constitutional rights of

23   the people of California, and to direct the state's limited resources to matters of greatest concern

24   to state and local governments."  *Id.* § 7284.2(f).

25         33.    Among other things, the Values Act: (a) expands upon the limitations contained in the

26   prior iteration of the TRUST Act by prohibiting compliance with detainer requests, *see id.*

27   § 7284.6(a)(1)(B); (b) defines when LEAs may comply with requests by immigration authorities

28   seeking the release date and time of a person in custody in advance of the person's release, i.e.,

1    notification requests, to those instances when the individual in custody meets the criteria in

2    California Government Code § 7282.5 or when the release date information is available to the

3    public, *id* § 7284.6(a)(1)(C);[15] and (c) prohibits LEAs from using agency or department money or

4    personnel to "[p]rovid[e] personal information, as defined in Section 1798.3 of the Civil Code,

5    about an individual" "for immigration enforcement purposes," unless that information available

6    to the public, *id.* § 7284.6(a)(1)(D).

7        34.    The Values Act expressly authorizes compliance with all aspects of § 1373 and 8

8    U.S.C. § 1644 (§ 1644).  Cal. Gov't Code § 7284.6(e).

9        35.    The Values Act, like the TRUTH Act, does not prohibit a jurisdiction from allowing

10   immigration authorities to access its jails to interview inmates.  The Values Act explicitly

11   reaffirms the absence of any such restriction, and requires only that state and local law

12   enforcement, including CDCR, comply with the requirements in the TRUTH Act when providing

13   such access to immigration authorities.  *Id.* §§ 7284.6(b)(5), 7284.10(a).

14       36.    On March 6, 2018, the United States filed a lawsuit against the State of California in

15   the Eastern District of California affirmatively seeking to block specific provisions of SB 54 [the

16   Values Act], including the provisions regulating the sharing of release dates and personal

17   information for immigration enforcement purposes, on the grounds that they are preempted by

18   federal law and violate § 1373.  *See* Complaint, *United States v. California*, No. 18-cv-490 (E.D.

19   Cal. Mar. 6, 2018), ECF No. 1, ¶ 65.  In its motion to preliminarily enjoin those provisions of SB

20   54, the United States argued that the provisions "impede[]" the United States's enforcement of the

21   immigration laws.  Plaintiff's Motion for Preliminary Injunction and Memorandum of Law in

22   Support, *United States v. California*, No. 18-v-490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 at 4,

23   27, 29, 32, 35, 37.

24       37.    The United States's request for an injunction was rejected by the district court and

25   affirmed by the Ninth Circuit.  *United States v. California*, 921 F.3d 865, 886-93 (9th Cir. 2019);

26   *United States v. California*, 314 F. Supp. 3d 1077, 1098-1110 (E.D. Cal. 2018).  The district court

27   ───────────────
         [15] Notification requests are made by immigration authorities on the I-247A form that also
28   includes a detainer request.  Department of Homeland Security, Immigration Detainer - Notice of
     Action (Mar. 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

13

1     subsequently dismissed the United States's claim against the Values Act.  Order re: State of

2     California's Motion to Dismiss, *United States v. California*, No. 18-cv-490 (E.D. Cal. July 9,

3     2018), ECF No. 197 at 5, 7.

4         **B.**     **California's Workplace Protections Seek to Curtail Fear, Discrimination,**
                **Harassment, and Retaliation in the Workplace**
5

6       38.     It is the policy of the State of California to make employment protections available

7     for all employees regardless of immigration status where permitted under federal law.  Cal. Labor

8     Code § 1171.5.  In furtherance of this policy to provide workplace protections for immigrant

9     employees, in 2017, the Legislature enacted Assembly Bill 450 (AB 450), which went into effect

10     on January 1, 2018.  AB 450 was adopted to ensure that all workers in California will enjoy the

11     rights and protections afforded to them under California law without fear of harassment,

12     detention, or deportation.  Assem. Bill No. 450, Assem. Appropriations Committee, 1st Reg.

13     Sess., at 2 (May 17, 2017).  AB 450 was informed by the effect of immigration enforcement

14     actions in the workplace to "drive down wages and labor conditions for all workers, regardless of

15     immigration status," "interfere with workers' ability to freely exercise their workplace rights,"

16     and "undermine" the enforcement of state labor and employment laws.  Assem. Bill No. 450, Sen.

17     Labor and Indus. Relations Comm., 1st Reg. Sess., at 7 (June 28, 2017) (internal quotations

18     omitted).

19       39.     Relevant to this complaint is California Labor Code § 1019.2, which was added by

20     AB 450.  That section directs, "[e]xcept as otherwise required by federal law," that a public or

21     private employer "shall not reverify the employment eligibility of a current employee at a time or

22     in a manner not required by Section 1324a(b) of Title 8 of the United States Code."  Cal. Lab.

23     Code § 1019.2(a).  Employers who violate this provision are subject to a civil penalty of up to

24     $10,000.  *Id.* § 1019.2(b)(1).  The Legislature found this provision is needed because "[l]imiting

25     unnecessary reverification reduces the likelihood that reverification will be misused to intimidate,

26     retaliate, or discriminate against employees who are lawfully authorized to be employed in the

27     United States."  Senate Bill No. 112, Reg. Sess., (Cal. 2019) § 1(d).  Labor Code § 1019.2 is

28

1  intended to "foster[] trust between employers and their employees" and "further[] California's

2  interest in promoting a diverse workforce."  Senate Bill No. 112, Reg. Sess., (Cal. 2019) § 1(d).

3    40.    On September 13, 2019, the Legislature amended Labor Code § 1019.2 to clarify that

4  the law "is not in any way intended to interfere with any employer's obligations under federal

5  law" or "prohibit employer actions that may be authorized under federal law."  Senate Bill No.

6  112, Reg. Sess, (Cal. 2019) § 1(f).  Amended Labor Code § 1019.2 states that the section "shall

7  be interpreted and applied consistent with federal law and regulation."  Cal. Lab. Code

8  § 1019.2(c).  The amendment was signed into law on September 27, 2019, and went into effect

9  immediately.

10    41.    Amended Labor Code § 1019.2 directs that the section "shall be interpreted and

11  applied consistent with federal law and regulation" and expressly "does not prohibit" employers

12  from taking any of the following actions: (1) reverifying an employee's employment

13  authorization in a "time and manner consistent with" 8 C.F.R. § 274a.2(b)(1)(vii); (2) "[t]aking

14  any lawful action to review the employment authorization of an employee upon knowing that the

15  employee is, or has become, unauthorized to be employed in the United States, consistent with"

16  § 1324a(a)(2); (3) "[r]eminding an employee, at least 90 days before the date reverification is

17  required," that the employee will be required to provide documentation to establish his or her

18  work authorization; and (4) "[t]aking any lawful action to correct errors or omissions in a missing

19  or incomplete I-9 Employment Eligibility Form."  Cal. Lab. Code § 1019.2(c).  The amended

20  state law adopts the federal definition of the term "knowing" in 8 C.F.R. § 274a.1(l), and the

21  terms "reverify" or "reverifying" are defined to encompass the actions described in 8 C.F.R.

22  § 274a.2(b)(1)(vii).  Cal. Lab. Code §§ 1019.2(e), 1019.4.  These terms "shall be interpreted

23  consistently with any applicable federal rules, regulations, and controlling federal case law."  *Id.*

24    42.    Labor Code § 1019.2 does not in any way conflict with federal law.  The federal

25  Immigration Reform and Control Act of 1986 (IRCA) prohibits employers from employing an

26  individual knowing that the person is unauthorized to be employed in the United States and

27  requires that employers verify that employee's eligibility to be employed in the United States

28

1   (which is done through a Form I-9).[16]  8 U.S.C. § 1324a(a)-(b).  Section 1324a(a)(1) provides that

2   it is unlawful for a person or entity to hire "for employment in the United States an alien knowing

3   the alien is an unauthorized alien . . . with respect to such employment," and to hire an individual

4   without following the verification requirements identified in 8 U.S.C. § 1324a(b).  Section

5   1324a(a)(2) makes it "unlawful for a person or other entity, after hiring an alien for employment

6   in accordance with paragraph (1), to continue to employ the alien in the United States knowing

7   the alien is (or has become) an unauthorized alien with respect to such employment."

8        43.    Consistent with IRCA, California law authorizes employers to verify employees upon

9   hiring and to decline to hire or terminate an employee if he or she does not have lawful

10  employment authorization.  Cal. Lab. Code § 1019.2(d) (authorizing compliance with federal E-

11  Verify memorandum of understanding); Cal. Gov. Code § 19585(c) (directing termination to be

12  carried out under this section if a state employee is no longer authorized to be employed in the

13  United States under IRCA).  Labor Code § 1019.2 restricts reverification only when reverification

14  is not required under federal law.  The statute prevents employers from using unnecessary

15  reverification as a mechanism to gain an unfair advantage over employees—for instance, when

16  employers selectively reverify an employee's employment eligibility in response to an employee

17  "engag[ing] in union organizing or enforcement of labor or health and safety protections."

18  Assem. Bill No. 450, Assem. Labor and Employment Comm., 1st Reg. Sess., at 4 (Apr. 19,

19  2017).

20       44.    These limitations on reverification are consistent with federal law that prohibits

21  certain unlawful immigration-related employment practices, such as discrimination on the basis

22  of national origin and immigration status, intimidation, and retaliation.  8 U.S.C. § 1324b(a).  No

23  provision in IRCA prevents states from adopting more expansive employee workplace

24  protections, and indeed, IRCA was not intended to "undermine or diminish" labor protections.

25  H.R. Rep. No. 99-682(I), at 58 (1986).  Furthermore, federal law "does not intend to impose a

26  continuing verification obligation on employers."  *Id.* at 57.

27

28  _____
    [16] Department of Homeland Security, Employment Eligibility Verification, Form I-9 (July 17, 2017), https://www.uscis.gov/system/files_force/files/form/i-9-paper-version.pdf.

45.     Labor Code § 1019.2 is also consistent with federal guidance, including from

Defendant USDOJ, that reverification under certain circumstances can constitute discrimination

in violation of federal law.  For example, USDOJ has informed employers that they "may be

discriminating in the e-verify process" if they "use[] E-Verify to confirm the continuing

employment authorization of non-U.S. citizen workers who are not subject to reverification."[17]

USDOJ instructs employers to "not reverify U.S. citizens' documents, U.S. nationals' documents,

Permanent Resident Cards, or List B documents for Section 3" of the I-9 Form.[18]  USDOJ has

provided reverification guidance to employers who receive a letter from the Social Security

Administration claiming that there is no match for the social security number provided by the

employee, i.e., a no match notice.  USDOJ has directed employers to not "[a]ttempt to

immediately reverify the employee's employment eligibility by requesting the completion of a

new Form I-9 based solely on the no-match notice."

46.     In its preemption lawsuit, *United States v. California*, *see supra*, the federal

government argued that an earlier version of Labor Code § 1019.2, as applied to private

employers, violated federal law on the ground that it conflicted with § 1324a(a)(2).  Plaintiff's

Motion for Preliminary Injunction Plaintiff's and Memorandum of Law in Support, *United States

v. California*, No. 18-cv-490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 at 17-18.  The district court

preliminarily enjoined the predecessor version of 1019.2 as applied to private employers, but with

the "caveat" that the court's conclusion might change based on additional "information on how

the verification system currently works in practice and how the new [state] law does or does not

change those practices."  *California*, 314 F. Supp. 3d at 1098.

47.     The *United States v. California* court has not considered the amended Labor Code

§ 1019.2 because the district court proceedings are stayed pending the United States's appeal of

the parts of California law where the district court denied its motion for preliminary injunction.

---

[17] U.S. Dep't of Justice, Civil Rights Division, Office of Special Counsel for Immigration-Related Unfair Employment Practices, *Citizenship/Immigration Status and National Origin Discrimination in Employment*  (June 16, 2014), at 3, https://www.justice.gov/sites/default/files/crt/legacy/2014/06/16/Factpatterns_2.pdf.

[18] U.S. Dep't of Justice, Immigrant & Employee Rights Section, Civil Rights Division, *How Employers Can Avoid Discrimination in the Form I-9 and E-Verify Process* (Jan. 2019), at 2, https://www.justice.gov/crt/page/file/1132606/download.

17

1    Labor Code § 1019.2 remains preliminarily enjoined as applied to private employers, and in force

2    as applied to public employers. The question of Labor Code § 1019.2's application to public

3    employers or funding restrictions is not presented in *United States v. California*.

4    **II.    THE FY 2019 IMMIGRATION ENFORCEMENT REQUIREMENTS IMPACT $327.7 MILLION IN FORMULA GRANTS THAT CALIFORNIA RECEIVES**

5

6         48.    The FY 2019 Immigration Enforcement Requirements impact $327.7 million in

7    formula grants that the State of California receives. While the statutory authority is different for

8    each of these grants, they each share common features—(a) Congress designed a formula setting

9    a minimum and, oftentimes, precise amount that each state jurisdiction must receive; (b) Congress

10   delineated the eligibility requirements for grantees; (c) Congress limited Defendants' discretion to

11   impose their own conditions on the grants; and (d) Congress has not made immigration

12   enforcement a purpose for any of these grants.

13        **A.    California Annually Receives JAG and PREA Funding Pursuant to the Formula Designed by Congress**

14

15        49.    JAG is administered by the Bureau of Justice Assistance (BJA), a component of OJP

16   within USDOJ. JAG funding is authorized by Congress under 34 U.S.C. §§ 10151-10158. The

17   authorizing statute has been amended numerous times since its inception in 1988, evolving into

18   the JAG program as it exists today.

19        50.    The Anti-Drug Abuse Act of 1988 amended the Omnibus Crime Control and Safe

20   Streets Act of 1968 to create the Edward Byrne Memorial State and Local Law Enforcement

21   Assistance Programs grants (Byrne Grants) "to assist States and units of local government in

22   carrying out specific programs which offer a high probability of improving the functioning of the

23   criminal justice system." Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VI, § 6091(a),

24   102 Stat. 4181, 4328 (1988) (repealed 2006). Congress placed a "special emphasis" on programs

25   that support national drug control priorities across states and jurisdictions. *Id.* Congress

26   identified twenty "purpose areas" for which Byrne Grants could be used. Many of the purpose

27   areas relate to the investigation, enforcement, and prosecution of drug offenses. *See id.*

28   Immigration enforcement was never specified in any of the grant purpose areas.

51.     In amendments between 1994 and 2000, Congress identified eight more purpose areas for which Byrne Grants funding could be used, bringing the total to 28.  42 U.S.C. § 3751(b) (as it existed on Dec. 20, 2000) (repealed 2006).  Immigration enforcement was not specified in any of these eight additional purpose areas.

52.     For FY 1996, Congress separately authorized Local Law Enforcement Block Grants ("LLEBG") that directed payment to units of local government for the purpose of hiring more police officers or "reducing crime and improving public safety."  Local Government Law Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995).  Congress identified nine "purpose areas" for LLEBG, none of which were immigration enforcement.  *Id.*

53.     In 2006, the Byrne Grant and LLEBG programs were merged to eliminate duplication, improve their administration, and to provide state and local governments "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" to local law enforcement.  H.R. Rep. No. 109-233, at 89 (2005); *see also* Pub. L. No. 108-447, 118 Stat. 2809, 2863 (2004); 34 U.S.C. § 10151(a)-(b)(1).

54.     When creating the merged JAG funding structure in 2006, Congress set a formula to apportion JAG funds to state and local jurisdictions.  34 U.S.C. § 10156.  Population and violent crime rates are used to calculate each state's allocation.  *Id.* § 10156(a)(1).  Congress guarantees to each state a minimum allocation of JAG funds.  *Id.* § 10156(a)(2).

55.     In addition to determining the amount of money received by grantees within each state, Congress set forth how that money is to be shared between state and local jurisdictions.  Under the statutory formula, sixty percent of the total allocation to a state must be given directly to the state.  *Id.* § 10156(b)(1).  The statutory formula provides that forty percent of the total allocation to a state must be given to local governments within the state.  *Id.* § 10156(b)(2), (d)(1).  Each unit of local government receives funds based on its violent crime rate.  *Id.* § 10156(d)(2)(A).

56.     According to the funding scheme created by Congress, states and local governments that apply for JAG funds are required to make limited certifications and assurances.  The chief executive officer of each applicant must certify that: (1) the law enforcement programs to be

19

1  funded meet all requirements of the JAG authorizing statute; (2) all information in the application

2  is correct; (3) there was coordination with affected agencies; and (4) the applicant will comply

3  with all provisions of the JAG authorizing statute and all other applicable Federal laws. *Id.*

4  § 10153(a)(5). The requirement for applicants to comply with "all other applicable Federal laws"

5  was part of the statute that created Byrne-JAG in 1988. Anti-Drug Abuse Act of 1988, Pub. L.

6  No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4332-33 (1988). The JAG statute does not allow

7  Defendants to impose their own independent funding conditions on JAG awards.

8      57.    Currently, the JAG authorizing statute enumerates eight purpose areas for which JAG

9  funds may be used. They are: (1) law enforcement programs; (2) prosecution and court

10  programs; (3) prevention and education programs; (4) corrections and community corrections

11  programs; (5) drug treatment and enforcement programs; (6) planning, evaluation, and technology

12  improvement programs; (7) crime victim and witness programs; and (8) mental health programs

13  related to law enforcement and corrections. 34 U.S.C. § 10152(a)(1).

14      58.    Congress identified the discrete circumstances under which the Attorney General is

15  authorized to depart from JAG's formula structure. For instance, under PREA, the State's grant

16  amount is reduced by five percent unless the chief executive officer of the State submits a proof

17  of compliance with PREA or an assurance that the State "intends to adopt and achieve full

18  compliance" with PREA. *Id.* § 30307(e)(2)(A). Defendants have identified JAG as one of the

19  USDOJ programs subject to PREA. *See* Ex. U. If the State provides an assurance of its intent to

20  comply with PREA, the statute provides that the State may choose to use no less than five percent

21  of its JAG formula allocation toward PREA compliance. 34 U.S.C. § 30307(e)(2)(A)(ii)(I). The

22  statute specifies the requirements for receiving PREA reallocation funding; they are all tied to

23  demonstrating how the State will use the funds to achieve PREA compliance, and how the State

24  will conduct audits to measure compliance. *Id.* § 30307(e)(2)(B)-(C), (F). Neither the JAG nor

25  PREA statutes allow Defendants to impose their own independent funding conditions on

26  recipients of PREA funding.

27      59.    Based on the formula prescribed by statute, $28.6 million in JAG funding is allocated

28  to California in FY 2019, with $17.8 million going to the Board of State and Community

20

Corrections (BSCC), the entity that receives the JAG funds that are allocated to the State. Of this amount, the BSCC expects to use $654,863 to partially or fully fund the salaries and benefits for twelve BSCC employees who assist in the administration of JAG.

60.     The BSCC subgrants JAG funds predominately to local jurisdictions throughout California to fund programs that meet the purpose areas identified in the JAG authorizing statute. BSCC selects subgrantees on three-year cycles. For the current JAG cycle, which will run from October 1, 2019 through September 30, 2022, the BSCC is funding 27 local jurisdictions and Cal DOJ. During that cycle, 24 local jurisdictions plan to use their JAG subgrants from the BSCC to, collectively, partially or fully fund 89 employees for a total of approximately $18.3 million.

61.     The BSCC prioritizes subgrants to those jurisdictions that focus on education and crime prevention programs, law enforcement programs, and court programs, including indigent defense. Some examples of California jurisdictions' purpose-driven use of JAG funds include: (1) expanding a multi-systemic model to support neighborhood vitality and public safety; (2) establishing an innovative interdisciplinary defense system that focuses on early intervention for individuals at the time of first police contact; (3) providing evidence-based case management services for gang suppression activities that includes education, employment, and support services for young adults to reduce gang involvement; (4) creating a Juvenile Trauma Response Court to reduce juvenile recidivism and delinquency; (5) supporting a multi-disciplinary program aimed at increasing high school graduation rates; (6) creating evidence-based models to reduce serious violent crime among youth; and (7) developing a comprehensive multi-agency school safety program that features school threat assessment, bullying prevention and juvenile delinquency intervention.

62.     In accordance with the formula for JAG and PREA, California is allocated $407,813 for PREA compliance. The BSCC is the state entity that administers PREA funds. For FY 2019, the BSCC has represented that it will use its PREA allocation to issue a subgrant to CDCR to conduct training of its staff to ensure the safety and wellbeing of the transgender population in custody. CDCR will utilize its PREA allocation to offset overtime coverage for its staff to attend this training.

21

63.     The BSCC does not, and has not, used JAG or PREA awards for immigration enforcement.  The BSCC has received JAG funds every year since 2012 when it was designated the State administering agency for JAG, and California has never been denied JAG funds for which it applied.  The BSCC has also received its PREA reallocation award every year that it has been eligible to receive PREA funding.

## B.     California Annually Receives Victims of Crime Act Funding Pursuant to a Formula Designed by Congress

64.     In 1984, Congress adopted the Victims of Crime Act (VOCA), through which Congress created the Crime Victims Fund to make funds available to the states for providing assistance and compensation for victims of crime.  Pub. L. No. 98-473, § 1402, 98 Stat. 1837, 2170 (1984).  The Crime Victims Fund is financed by fines and penalties that are paid by convicted offenders.  Congress determined that "many State compensation and assistance programs [were] currently encountering problems due to inadequate funding," resulting in the creation of the Crime Victims Fund to provide needed funding to the states.  S. Rep. No. 98-497, at 3 (1984).

65.     The underlying purpose of VOCA is to address this funding shortage with federal dollars to the States "with minimal bureaucratic 'strings attached,' for direct compensation and service programs to assist victims of crime, including victims of Federal crime."  *Id.* at 1.  The Senate made clear that "[u]nlike some past compensation bills," the Victims of Crime Act was "intended to keep conditions on Federal Aid to a bare minimum."  *Id.* at 9.  The "[c]onditions imposed [by Congress] [were] essentially designed to further legitimate Federal interests or to maximize the amount of funds available to victims."  *Id.*

66.     To carry out these purposes, after setting aside funds for select programs, the VOCA authorizing statute directs the OVC Director to distribute from the Crime Victims Funds: (1) two formula grants to the states; and (2) several OVC-designed non-formula, i.e. discretionary, victim assistance grants.  34 U.S.C. § 20101(d).  At issue in this complaint are the two formula grants that California receives from the Crime Victims Fund: the VOCA crime victim compensation formula grant program (VOCA Compensation Formula Grants), which is authorized under 34

22

U.S.C. § 20102, and the VOCA crime victim assistance formula grant program (VOCA

Assistance Formula Grants), which is authorized under 34 U.S.C. § 20103(a).

67.     After financing certain programs, Congress directs OVC to distribute the remaining

balance of the Crime Victim Fund as follows: (1) 47.5 percent to the VOCA Compensation

Formula Grants; (2) 47.5 percent, plus any funds not used for the VOCA Compensation Formula

Grants, to the VOCA Assistance Formula Grants; and (3) five percent to the OVC-designed

discretionary grants authorized by 34 U.S.C. § 20103(c)) (OVC Discretionary Assistance Grants).

*Id.* §§ 20101(d)(4), 20103(a)(1).

68.     Of the amount available for VOCA Compensation Formula Grants, "the [OVC]

Director shall make an annual grant" to eligible state crime victim compensation programs equal

to sixty percent of what the state program disbursed to victims of crime in the previous year, other

than amounts awarded for property damage.  *Id.* § 20102(a)(1).  If the sums available are

insufficient to provide grants equal to sixty percent of what the state program disbursed to victims

of crime the prior year, the OVC Director shall make a grant to eligible state victim compensation

programs "so that all such programs receive the same percentage of the amounts awarded by such

program during the preceding fiscal year."  *Id.* § 20102(a)(2).

69.     The VOCA authorizing statute enumerates the requirements that grantees must satisfy

in order to receive VOCA Compensation Formula Grants.  Grantees must: (1) compensate

victims of criminal violence for medical expenses, loss of wages, and funeral expenses; (2)

promote victim cooperation with reasonable law enforcement requests; (3) not use these VOCA

federal funds to supplant state funds; (4) not discriminate between residents and nonresidents of

the state; (5) not discriminate between victims of state crimes and victims of federal crimes; (6)

compensate residents of states that do not have victim compensation programs; (7) not deny

victim compensation based on the victim's relationship or shared residence with the offender; (8)

not compensate an individual who has been convicted of a federal offense, but has not paid their

monetary penalty; and (9) provide "such other information and assurances related to the purposes

of this section as the Director may reasonably require."  *Id.* § 20102(b).

70.     Of the amount available for VOCA Assistance Formula Grants, the OVC Director "shall make an annual grant . . . to the chief executive of each State for the financial support of eligible crime victim assistance programs." *Id.* § 20103(a)(1).  Each state receives a base amount of $500,000 and an additional amount based on each state's population relative to the population of all states.  *Id.* § 20103(a)(3), (5).  If the amount available is insufficient to provide the base amount to each state, the "funds available shall be distributed equally among the States." *Id.* § 20103(a)(4).

71.     As with the VOCA Compensation Formula Grants, Congress set clear requirements for VOCA Assistance Formula Grants.  In order to be an eligible program, the grant recipient must: (1) operate as a public agency, a nonprofit organization or both and provide victim services; (2) demonstrate a record of providing effective victim services and financial support from other sources, or it must receive substantial financial support from other sources; (3) utilize volunteers, unless this requirement is waived by the governor for compelling reasons; (4) promote and coordinate joint public-private efforts to help crime victims; (5) assist victims to seek compensation benefits; and (6) not discriminate against victims who disagree with the way the State prosecutes the criminal case.  *Id.* § 20103(b)(1).  The chief executive of each state must: (1) certify that VOCA funds will be used to prioritize programs assisting victims of sexual assault, spousal abuse, or child abuse; (2) certify that VOCA funds will be made available to serve previously underserved populations of victims of violent crime; (3) certify VOCA funds will not supplant state funds; and (4) "provide such other information and assurances related to the purposes of this section as the Director may reasonably require." *Id.* § 20103(a)(2).

72.     The VOCA authorizing statute states that the "[t]he Director may establish such rules, regulations, guidelines, and procedures as are necessary to carry out any function of the Director under this subchapter." *Id.* § 20110(a).  Those functions are set forth as the "Duties of Director" in 34 U.S.C. § 20111(c).  With regard to the VOCA Assistance and Compensation Formula Grants, the OVC Director's duties consist of "[p]roviding funds to eligible States pursuant to sections 20102 and 20103 of this title," which the VOCA Director is required to do under the formula created by Congress.  *Id.* § 20111(c)(2).

24

73.     Conversely, the Director's duties for the OVC Discretionary Assistance Grants consist of "[e]stablishing programs in accordance with section 20103(c) of this title on terms and conditions determined by the Director to be consistent with that subdivision," *id.* § 20111(c)(3). Section 20103(c) only governs OVC Discretionary Assistance Grants, and not VOCA Assistance and Compensation Formula Grants.  There is no comparable provision in the VOCA authorizing statute that allows the OVC Director to set terms and conditions on the VOCA Assistance and Compensation Formula Grants.

74.     None of these statutory requirements for VOCA Compensation or Assistance Formula Grants relate to the enforcement of immigration laws.  *See id.* §§ 20102(b), 20103(b). Never has Congress made immigration enforcement a requirement for VOCA Compensation or Assistance Formula Grants, nor indicated that immigration enforcement is a purpose of the grant program.

75.     California has received both formula grants every year since the inception of the Crime Victims Fund in 1984.  Cal VCB receives and administers the State's VOCA Compensation Formula Grant.  Based on the formula prescribed by statute, for FY 2019, $15.75 million in VOCA Compensation Formula Grant funding is allocated for the State of California.

76.     Cal VCB uses the VOCA Compensation Formula Grant to reimburse victims of violent crimes, their families, and service providers for crime related expenses like medical and funeral expenses; and to partially fund the salaries and benefits for approximately 27 public employees at three California county governments who review victim compensation applications and conduct other related administrative tasks.  Cal VCB does not, and has not, used its VOCA Compensation Formula Grant for immigration enforcement purposes.

77.     In FY 2018, California's VOCA Compensation Formula Grant reimbursed 26,681 applications from victims of assault, homicide, child abuse, and other crimes for funeral, medical, mental health, relocation and other costs incurred as a result of the crime.  For FY 2019, Cal VCB plans to use VOCA Compensation Formula Grants for these same purposes.

Complaint for Declaratory, Injunctive, and Mandamus Relief (19-cv-6189)

78.     Cal OES receives and administers the VOCA Assistance Formula Grant.  Based on the formula prescribed by statute, for FY 2019, $266.78 million in VOCA Assistance Formula Grant funding is allocated for the State of California.

79.     Cal OES uses VOCA Assistance Formula Grants to distribute subgrants on multi-year cycles in accordance with nationally recognized best practices in victim services, and based on the expectation that Cal OES will annually receive grant funds in accordance with the formula created by Congress.  Indeed, Congress has structured VOCA to provide "greater certainty" that the states' funding "will not wax and wane with events. . . . [The States] need to be able to plan and hire and have a sense of stability if these measures are to achieve their fullest potential."  S. Rep. No. 104-179, at 29 (1995).  Numerous Cal OES VOCA programs are currently in the middle of their grant cycle.

80.     Between October 1, 2017 and September 30, 2018, the VOCA Assistance Formula Grant funded the operational costs of domestic violence shelters and rape crisis centers; it paid for the salaries and benefits of lawyers, social workers, and victim advocates to provide 817,534 crime victims, including victims of sexual assault, child abuse, and human trafficking, with emotional support, safety planning, and legal services.  For FY 2019, Cal OES plans on issuing over 900 subawards to 382 unique state and local government or non-profit subrecipients for these same purposes.

81.     The VOCA Assistance Formula Grant partially or fully funds the salaries of approximately 1,260 state and local employees in California.  In FY 2019, Cal OES plans on using its VOCA Assistance Formula Grant to fund the salaries and benefits for 86 employees at Cal OES.  Most of these Cal OES employees administer the grant by working with subrecipients to maintain compliance with federal and state laws and regulations and to meet program deadlines and goals.

82.     Cal OES does not, and has not, used its VOCA Assistance Formula Grant for immigration enforcement purposes.

### C. California Annually Receives Violence Against Women Act Funding Pursuant to a Formula Designed by Congress

83.     California receives two grants authorized by VAWA that are at issue here: the VAWA Services, Training, Officers, Prosecutors Program (VAWA STOP Grant), created in 1994, and the VAWA Sexual Assault Services Program (VAWA SASP Grant), created in 2005. Congress first authorized VAWA in 1994 as a comprehensive legislative package aimed at ending violence against women.  Violent Crime Control and Law Enforcement Act of 1994, Title IV, Pub. L. No. 103-322, 108 Stat. 1796 (1994).  VAWA was designed to improve criminal justice system responses to domestic violence, sexual assault, and stalking, and to increase the availability of services for victims of these crimes.  S. Rep. No. 103-138, at 38 (1993).  VAWA was reauthorized and amended in 2000, 2005, and 2013.  Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. No. 106-386, Division B, 114 Stat 1464 (2000); Violence Against Women and Department of Justice Reauthorization Act, Pub. L. No. 109-162, 119 Stat. 2960 (2006); Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (2013).

84.     The original 1994 VAWA statute authorized four grant programs administered by the OVW, including VAWA STOP Grants.  Violent Crime Control and Law Enforcement Act § 40121(a)(3).  Since 1994, the purpose of VAWA STOP Grants has been "to assist States, State and local courts (including juvenile courts), Indian tribal governments, tribal courts, and units of local government to develop and strengthen effective law enforcement and prosecution strategies to combat violent crimes against women, and to develop and strengthen victim services in cases involving violent crimes against women."  34 U.S.C. § 10441; *see also* S. Rep. No. 103-138, at 57 (1993) (same).

85.     After financing certain programs, Congress has directed that the Attorney General "shall" use available funds to make VAWA STOP Grants to the States through a formula "in an amount that bears the same ratio to the amount of remaining funds as the population of the State bears to the population of all of the states that results from distribution among the States on the

basis of each State's population in relation to the population of all States."  34 U.S.C.
§ 10446(b)(6).

86.    The statute currently sets out twenty specific purpose areas for which VAWA STOP Grants may be used.  These areas include the development, training, and hiring of law enforcement officers, prosecutors, judges, and other court personnel to specifically target violent crimes against women; the training of sexual assault forensic medical personnel; and the provision of core support services for victims and their families.  *Id.* § 10441(b).

87.    The VAWA authorizing statute enumerates both application requirements and "qualification" requirements for VAWA STOP grants.  *Id.* § 10446(c)-(d).  The applicant must provide proof of compliance with specific statutory requirements regarding payment of forensic medical examinations, court costs for domestic violence and protection order cases, requirements prohibiting polygraph examinations of victims of sexual assault, an implementation plan that meets enumerated statutory requirements, and other documentation the Attorney General may require.  *Id.* § 10446(d).  To "qualify" for VAWA STOP Grants, grantees must: (1) use the funds for a specific purpose as described in the statute; (2) develop a detailed implementation plan for the funds after consultation and coordination with identified stakeholders; (3) allocate at least 25 percent of the funds for law enforcement, 25 percent for prosecutors, thirty percent for victim services, and five percent for courts; (4) not use VAWA STOP federal funds to supplant state funds; and (5) allocate not less than twenty percent of funds to programs that address sexual assault.  *Id.* § 10446(c).  The statute directs the Attorney General to promulgate VAWA STOP regulations for the specific purpose of ensuring that States will: (1) prioritize areas with the greatest showing of need; (2) determine the amount of subgrants based on the population and geographic area to be served; (3) equitably distribute funds on a geographic basis; and (4) recognize and meaningfully respond to the needs of underserved populations and allocate funds equitably among those populations.  *Id.* § 10446(e)(2).  And the statute points to a detailed list of conditions that apply to the grant.  *Id.* §§ 10447, 12291(b).

88.    In furtherance of that elaborate statutory scheme, in 2013, Congress provided that the Attorney General may "impose reasonable conditions on grant awards to ensure that the States

28

1    meet statutory, regulatory, and other program requirements." *Id.* § 10446(e)(3); Violence Against

2    Women Reauthorization Act of 2013, § 3.  In 2016, after Congress authorized the Attorney

3    General to "impose reasonable conditions on grant awards," OVW promulgated updated

4    regulations to incorporate and expand upon the specific grant conditions required to meet the new

5    statutory requirements. *Id.*; 28 C.F.R. §§ 90.10-.25 (2016).   The 1324a Requirement was not part

6    of any of those regulations.

7         89.    In 2005, Congress created a different formula grant to provide assistance to the

8    States: The Sexual Assault Services Program (VAWA SASP Grant).  The VAWA SASP Grants

9    are designed to assist States in providing intervention, advocacy, accompaniment, and support

10   services for victims of sexual assault and their families, and to provide technical assistance and

11   training on sexual assault to legal, healthcare, and nonprofit entities.  Violence Against Women

12   and Department of Justice Reauthorization Act—Technical Corrections, Pub. L. No. 109-271,

13   § 3(b), 120 Stat. 750 (2006); 34 U.S.C. § 12511(a); H.R. Rep. No. 109-233, at 111 (2005).  To

14   achieve these purposes, the statute authorizes grants to States "to support the establishment,

15   maintenance, and expansion of rape crisis centers and other nongovernmental and tribal programs

16   and projects to assist individuals who have been victimized by sexual assault, without regard to

17   the age of the individual."  34 U.S.C. § 12511(b)(1).

18        90.    The VAWA statute delineates a formula for the portion of money that each state

19   "shall" receive pursuant to VAWA SASP.  Each state must receive a "minimum amount" "not

20   less than 1.50 percent of the total amount appropriated in a fiscal year for grants under this

21   section," with certain U.S. territories receiving 0.25 percent of the total appropriations.  *Id.*

22   § 12511(b)(4).  Congress directs that any remaining funds are allocated based on a ratio of the

23   population of each state or territory to the total population of the country.  *Id.*

24        91.    Under the statute, states that apply for VAWA SASP Grants are required to make

25   limited certifications and assurances.  Specifically, the state application must set forth procedures

26   designed to ensure meaningful involvement of the state sexual assault coalition and

27   representatives of underserved communities in the application development and program

28   implementation, and that an equitable distribution of grants is made between urban and rural

29

1    areas. *Id.* § 12511(b)(3)(B)(i)-(iii). The statute provides limited authority for the Attorney

2    General to structure the application to require States to meet other such requirements "necessary

3    to carry out the purposes and provisions of this section." *Id.* § 12511(b)(3)(B)(iv). No provision

4    in the VAWA authorizing statute, however, allows the Attorney General to impose his own

5    independent conditions on the VAWA SASP grant awards that are not necessary to carry out the

6    purpose of assisting victims of sexual assault.

7         92. None of the purposes and statutory requirements for VAWA STOP and SASP Grants

8    relate to enforcement of immigration laws. *Id.* §§ 10441, 10446-51, 12511. Congress has never

9    made immigration enforcement a requirement of VAWA STOP and SASP Grants, nor indicated

10   that immigration enforcement is a purpose of these grant programs through all of Congress's

11   reauthorizations of VAWA.

12        93. In contrast, VAWA STOP is intended to protect immigrant victims of violence. *Id.*

13   § 10441(b)(1), (10). This includes "providing assistance to victims of domestic violence and

14   sexual assault in immigration matters," and "training law enforcement officer, judges, other court

15   personnel, and prosecutors to more effectively identify and respond to violent crimes against

16   women, including the crimes of domestic violence, dating violence, sexual assault, and stalking,

17   including the appropriate use of nonimmigrant status under subparagraphs (T) and (U) of section

18   1101(a)(15) of Title 8." *Id.* § 10441(b)(10), (1). Likewise, for VAWA SASP, the VAWA statute

19   requires coordination with "underserved populations," otherwise defined to include those

20   potentially underserved due to "language barriers" or "alienage status." *Id.* §§ 12511,

21   12291(a)(39).

22        94. California has received VAWA STOP and VAWA SASP Grants every year since the

23   inception of the program. Based on the formula prescribed by statute, for FY 2019, $14.9 million

24   is allocated for California in VAWA STOP Grant funding, and $996,924 is allocated for

25   California in VAWA SASP Grant funding.

26        95. Cal OES receives and administers the VAWA STOP and VAWA SASP Grants. Cal

27   OES uses VAWA STOP and VAWA SASP Grants to distribute subgrants on multi-year cycles in

28   accordance with nationally recognized best practices in victim services, and based on the

expectation that the Cal OES will annually receive grant funds in accordance with the formula

created by Congress.  Multiple Cal OES VAWA programs are currently in the middle of their

grant cycle.

96.    Cal OES uses the VAWA STOP Formula Grant to fund training for district attorney

and law enforcement offices, specialized sexual assault law enforcement and prosecution units,

domestic violence and sexual assault victim services at local non-profit and health organizations,

rape crisis centers, and campus sexual assault and teen dating violence prevention programs.  For

FY 2019, Cal OES plans to distribute 63 VAWA STOP subgrants to 54 unique state and local

governmental and nonprofit subrecipients for these same purposes.

97.    The VAWA STOP grant partially or fully funds the salaries and benefits of 68 state

and local employees in California, including 17 employees at Cal OES.  As with VOCA, most of

these employees help administer the grant by ensuring compliance with federal and state law and

regulations, and program objectives and deadlines.

98.    For VAWA SASP, in FY 2019, Cal OES plans to issue subgrants to six community

based organizations to fund rape crisis response centers, all of whom use VAWA SASP funds to

partially or fully fund employees.

99.    Cal OES does not, and has not, used its VAWA STOP or SASP Grants for

immigration enforcement purposes.

**D.    California Annually Receives a Title II Grant Pursuant to a Formula
       Designed by Congress**

100.    Title II Grants are awarded by the Administrator of the Office of Juvenile Justice and

Delinquency Prevention (OJJDP), a component of OJP, and are authorized under Title II of the

Juvenile Justice and Delinquency Prevention Act of 1974 (JJDPA), codified under 34 U.S.C.

§§ 11131-33.  Pub. L. No. 93-415, 88 Stat. 1109 (1974).  Congress passed the JJDPA "to provide

a comprehensive, coordinated approach to the problems of juvenile delinquency." *Id*.

101.    To that end, the JJDPA authorizes grants to states and local governments "to

encourage the development of comprehensive programs and services designed to prevent juvenile

delinquency, to divert juveniles from the juvenile justice system, and to provide community-

based alternatives to traditional detention and correctional facilities used for the confinement of juveniles." S. Rep. No. 93-1011, at 5283-84 (1974). These grants are intended "to increase the capacity of state and local governments . . . to conduct effective juvenile justice and delinquency prevention and rehabilitation programs and to provide research, evaluation, and training services in the field of juvenile delinquency prevention." JJDPA, § 102(a)(7)(b)(4).

102. While the JJDPA has been amended numerous times over the years, most recently in 2018, Title II has remained a formula grant throughout all of those amendments. Juvenile Justice Reform Act of 2018, Pub. L. No. 115-385, 132 Stat. 5123, 5127 (2018). Congress directed that the Administrator "shall" allocate annually to each state a grant by formula "on the basis of relative population of people under 18 years of age [and] based on the most recent data available from the Bureau of the Census." 34 U.S.C. § 11132(a)(1). The formula guarantees that each state is to receive a minimum amount. *Id.* § 11132(a)(2). Congress intends that these "block grants" be distributed to the states by the formula for them to be spent "according to criteria and priorities determined by the States . . . themselves." S. Rep. No. 93-1101, at 5300 (1974).

103. Defendants are required to make a grant to the State so long as it "has an approved comprehensive plan which conforms with the purposes and requirements of the Act and with rules, regulations, and procedures established by [the agency] consistent with the Act." *Id.* The authorizing statute, in 33 subsections that contain numerous subparts, sets out the requirements for that state plan in extensive detail. 34 U.S.C. § 11133(a)(1)-(33). Among those requirements are four core mandates: (1) deinstitutionalization of status offenders; (2) separation of juveniles from adult inmates in secure facilities; (3) removal of juveniles from adult jails and lockups; and (4) reduction of disproportionate minority contact with the juvenile justice system. S. Rep. No. 102-393, at 23 (1992); *see also* 34 U.S.C. §§ 11103(30), 11133(a)(11)-(13), (15). The authorizing statute does not allow Defendants to impose their own independent funding conditions on Title II Grant awards.

104. None of these requirements relate to immigration enforcement. The only requirement that touches upon immigrants is one prohibiting the state from placing a non-citizen minor who has not been charged with any offense in a secure detention or correction facility. 34 U.S.C.

32

§ 11133(a)(11). This requirement is designed to protect immigrant youth rather than require Title II participants to enforce federal immigration laws against youth.

105. The statute identified the specific circumstances in which a state's formula allocation could be reduced. A state's share may be reduced by no less than twenty percent for each core requirement that has not been satisfied. *Id.* § 11133(c)(1)(A). Even then, a state may still receive its allocation if it agrees to spend half of the state's allocation toward compliance with the core requirement or if the OJJDP Administrator determines that the state has achieved substantial compliance or has committed to full compliance with the core requirement. *Id.* § 11133(c)(1)(B). The Administrator may also reallocate a state's allocation if the state does not submit a state plan, fails to submit a plan, or submits a plan that does not meet the requirements of the section. *Id.* § 11133(d).

106. The statute authorizes the Administrator "to establish such rules, regulations, guidance, and procedures as are *necessary* for the exercise of the functions of the Office and only to the extent *necessary* to ensure that there is compliance with the specific requirements of this subchapter or to respond to requests for clarification and guidance relating to such compliance." *Id.* § 11182(d)(1) (emphasis added). The Administrator is required to consult with representatives of states and local governments before issuing any guidance and procedures. *Id.*

107. The regulations governing the Title II Grants are designed to ensure compliance with those statutory requirements that govern the grant and that apply to grantees under federal law. *See* 28 C.F.R. §§ 31.200-31.203, 31.300-31.304, 31.400-31.404. Among those requirements is one that requires "[t]he applicant State [to] further assure and certify that the State and its subgrantees and contractors will adhere to other applicable Federal laws, orders, and OMB circulars" as described in a particular USDOJ grant manual. *Id.* § 31.401.

108. The BSCC receives and administers the State's Title II Grant. Based on the formula prescribed by statute, California is allocated $4.5 Title II Grant funding in FY 2019. Of this amount, the BSCC expects to use $692,875 to partially or fully fund the salaries and benefits for 22 BSCC employees. These employees assist in the administration of the grant and are critical to monitoring California's compliance with the four core requirements of Title II.

33

109.   The BSCC subgrants Title II funds to local LEAs and community based organizations.  BSCC selects subgrantees on four-year cycles.  For the 2015-19 cycle that just ended, the BSCC funded twelve subgrantees, including five LEAs that used their Title II subgrants to partially or fully fund fifty employees totaling approximately $4,456,691 million.  $689,813 was used toward six employees from public entities.

110.   The BSCC prioritizes subgrants to those entities that focus on aftercare and re-entry, alternatives to detention, community-based programs and services, diversion, mental health services, and mentoring and counseling.  Some examples include: (1) expanding a restorative justice program for youth; (2) structuring employment opportunities for court involved teenagers; (3) designing or enhancing an aftercare and reentry system for youth transitioning from juvenile halls and treatment centers back to their home communities; (4) expanding direct intervention, diversion, and intensive case management services to keep youth out of the criminal justice system; (5) providing a trauma-informed services program to reduce juvenile offending; and (6) offering mental health treatment services for youth in the juvenile justice system and their families.

111.   The BSCC does not, and has not, used Title II Grant awards for immigration enforcement.  The BSCC and its predecessor, the Corrections Standards Authority (CSA), received Title II Grant funds every year since 2004 when it was designated the State administering agency for the grant.  Neither the BSCC nor the CSA has ever been denied Title II Grant funds for which it applied.

**E.    California Annually Receives a Coverdell Grant Pursuant to a Formula Designed by Congress**

112.   USDOJ's National Institute of Justice (NIJ) administers Coverdell Grants under its authority in the Paul Coverdell National Forensic Sciences Improvement Act of 2000.  *See* 34 U.S.C. §§ 10561-10566; Paul Coverdell National Forensic Sciences Improvements Act of 2000, Pub. L. No. 106-561, 114 Stat. 2787 (2000).  The purpose of the grant program is "to improve the quality, timeliness, and credibility of the forensic science services for criminal justice purposes . . . ."  *Id*.  Eighty-five percent of grant funds "shall be allocated to each State" that meets the

34

application requirements pursuant to a population-based formula, while the Attorney General may
distribute the remaining fifteen percent of funds as discretionary grants.  34 U.S.C § 10563(a).  At
issue here is California's allotment of funds under the formula grant program.

113.   States "shall" use these grant funds for certain enumerated statutory purposes,
including: (1) carrying out all or a substantial part of a program intended to improve the quality
and timeliness of forensic science or medical examiner services; (2) eliminating a backlog in the
analysis of forensic science evidence; (3) training, assisting, and employing forensic laboratory
personnel; (4) addressing emerging forensic science issues and technology; (5) educating and
training forensic pathologists; (6) and funding medicolegal death investigation systems and
accreditation and certification of investigators and offices.  *Id.* § 10564(a).  Grant funds may only
be used for expenses relating to "facilities, personnel, computerization, equipment, supplies,
accreditation, certification, education, and training," and cannot be used for "any general law
enforcement or nonforensic investigatory function."  *Id.* § 10564(b).

114.   To apply for a grant under the program, a state must: (1) certify the State has
developed a plan for forensic science laboratories compliant with the statutory purposes set out
above; (2) certify that any laboratory or office receiving grant fund must use generally accepted
laboratory practices and procedures and is accredited; (3) provide a specific description of any
new facility to be construction as part of the program; and (4) certify that a government entity
exists and an appropriate process is in place to conduct independent external investigations into
allegations of serious negligence or misconduct substantially affecting the integrity of the forensic
results produced by a funded facility.  *Id.* § 10562.

115.   The Attorney General may promulgate guidelines, regulations, and procedures "as
may be *necessary* to carry out this subchapter, including guidelines, regulations, and procedures
relating to the submission and review of applications for grants under section 10562 of this title."
*Id.* § 10565(a) (emphasis added).

116.   No provision in the authorizing statute allows the Attorney General to impose his
own independent funding conditions on recipients of Coverdell Grants.  And immigration
enforcement has never been one of the purposes of the grant.

117.   Cal OES receives and administers the Coverdell Grant.  Based on the formula prescribed by statue, for FY 2019, $2,264,423 in Coverdell Grant funding is allocated to California, $234,490 of which is used to partially fund Cal OES employees to assist in the administration of the Coverdell Grant.

118.   Cal OES plans to use the funds to issue 26 subgrants to law enforcement agencies throughout the State, including Cal DOJ, to support their forensic laboratories.  The subgrantees use funds for, among other purposes, to reduce backlogged forensic cases and to improve the turnaround time for case analysis.  Cal DOJ and five other subgrantees use Coverdell subgrants to partially or fully fund salaries or benefits for employees.

**F.   California Annually Receives a Residential Substance Abuse Treatment Grant Pursuant to a Formula Designed by Congress**

119.   RSAT is administered by the BJA within USDOJ and OJP.  RSAT funding is authorized by Congress under 34 U.S.C. §§ 10421-10426, and was created by the Violent Crime Control and Law Enforcement Act of 1994.  Pub. L. No. 103-322, § 32101, 108 Stat. 1898 (1994).  RSAT was developed based on findings that "the link between substance abuse and crime is well established[,]" and "[s]ubstance abuse treatment for incarcerated individuals is a powerful tool for reducing recidivism, easing overcrowding in correctional facilities, and ultimately preventing crime."  H.R. Rep. No. 103-323, at 5 (1993).

120.   Congress set a formula to apportion RSAT funds to states.  Under the statute, 0.4 percent of the total amount appropriated for RSAT is allocated to each participating state.  34 U.S.C. § 10424(a).  The remaining funds are allocated to each participating state based on the ratio of that state's prison population to the total prison population of all participating states.  *Id.* The state must use at least ten percent of the total amount allocated in any fiscal year to make grants to local correctional and detention facilities within the state to assist jail-based substance abuse treatment programs established by the local facilities.  *Id.* § 10424(c).

121.   Under the RSAT authorizing statute, the Attorney General is authorized to make grants to states that may be used by state and local governments, for three enumerated purposes: (1) to develop and implement residential substance abuse treatment programs in state correctional

36

1  facilities and local correctional and detention facilities; (2) to encourage establishment and

2  maintenance of drug-free prisons and jails; and (3) to develop and implement specialized

3  residential substance abuse treatment programs that identify and treat inmates who have both

4  mental health and substance abuse disorders.  *Id.* § 10421(a).

5        122.   Under the statute, states and local governments that apply for RSAT funds must

6  submit an application "in such form and containing such information as the Attorney General

7  may reasonably require."  *Id.* § 10422(a)(1).  Applicants must also: (1) assure that RSAT funds

8  will not supplant state funds, (2) coordinate the design and implementation of treatment programs

9  between state correctional representatives and the state alcohol and drug abuse agency; and (3)

10  describe how RSAT funds "will be coordinated with Federal assistance for substance abuse

11  treatment and aftercare services currently provided by the Department of Health and Human

12  Services' Substance Abuse and Mental Health Services Administration."  *Id.* § 10422(a)(2), (d).

13  To be eligible for funding, the State must: (1) agree to require periodic and random substance

14  abuse testing of program participants at proscribed junctures; and (2) ensure participants in the

15  substance abuse treatment program are provided aftercare services, as described in the statute,

16  with providers approved or licensed by the applicable state or local agency to provide medical

17  treatment or other health services.  *Id.* § 10422(b)-(c).

18        123.   No provision in the RSAT authorizing statute allows the Attorney General to impose

19  his own independent conditions on RSAT grant awards.  And immigration enforcement has never

20  been a purpose of RSAT.

21        124.   The BSCC has received RSAT funds every year since FY 2012 when it became the

22  designated state administering agency for RSAT.  The BSCC awards RSAT funds through a

23  competitive bid process to approximately four subgrantee local adult detention facilities to assist

24  them in providing substance abuse programs to inmates during incarceration and upon reentry

25  into the community.  The BSCC does not, and has not, used RSAT funds for immigration

26  enforcement.

27        125.   The BSCC selects subgrantees on a three-year cycle.  The BSCC started a new three-

28  year grant cycle in FY 2018.

126. According to the RSAT statutory formula, $2,219,442 is allocated to California for FY 2019. Of this amount, the BSCC expects to use $180,576 to partially fund the salaries and benefits for seven BSCC employees who assist in the administration of RSAT.

### G. California Annually Receives a DNA Backlog Reduction Grant Pursuant to the Formula Set by Congress

127. NIJ within USDOJ administers the DNA Capacity Enhancement and Backlog Reduction Program Grant (the DNA Backlog Reduction Grant) under the Debbie Smith DNA Backlog Grant Program. *See* 34 U.S.C. § 40701. The purpose of this grant program is "to eliminate the substantial backlog of DNA samples collected from crime scenes and convicted offenders, to improve and expand the DNA testing capacity of Federal, State, and local crime laboratories, to increase research and development of new DNA testing technologies, to develop new training programs regarding the collection and use of DNA evidence . . . ." H.R. Rep. No. 108-711, at 1 (2004).

128. The Attorney General is authorized to make grants to eligible states or units of local governments for nine purposes, consistent with that mission of DNA backlog reduction and improving and expanding DNA testing. 34 U.S.C. § 40701(a). Congress has directed that "[t]he Attorney General shall distribute grant amounts" pursuant to "a formula or formulas that are designed to effectuate a distribution of funds among eligible States and units of local governments" to achieve the following objectives: (1) maximizing effectiveness of DNA technology to solve crimes and protect public safety; and (2) "fairly and efficiently" allocating money to jurisdictions with significant backlogs by considering the size of the backlog, the population, and the number of part 1 violent crimes in the jurisdiction. *Id.* § 40701(c)(1). Immigration enforcement has never been a purpose of this grant.

129. "The Attorney General shall allocate to each State not less than 0.5 percent of the total amount appropriated in a fiscal year for grants under this section…." *Id.* § 40701(c)(2). The Attorney General may "establish appropriate grant conditions" that are "in conformity" with the formula intended by Congress. *Id.* § 40701(c)(1)

130.   Under the statute, states and local governments that apply for DNA Backlog Reduction Grants funds are required to make limited certifications and assurances that: (1) the grantee will implement a DNA analysis plan within 120 days of the application in accordance with the section; (2) each DNA analysis will be carried out pursuant to the privacy protections delineated in 34 U.S.C. § 12592(b)(3); (3) the grantee has determined which offenses are to be treated as qualifying state offenses for purposes of the section; (4) the grantee will specify the allocation of grant funds that will be used for select purposes identified in § 470701(a); and (5) local government grantees take all necessary steps to ensure they are eligible to include their DNA samples in the national DNA database.  *Id.* § 40701(b).  The statute imposes specific restrictions on the use of grant funds for supplanting and administrative costs, and imposes certain administrative requirements.  *Id.* § 40701(e), (f), (h).

131.   After USDOJ sets the formula allocation for California, the California Association of Crime Laboratory Directors directs how funds will be distributed within California based on its review of crime statistics for every crime laboratory in the State.  Based on information and belief, USDOJ then makes grants to California LEAs consistent with both the grant's formula and the distribution scheme proposed by the California Association of Crime Laboratory Directors.

132.   Cal DOJ's Bureau of Forensic Services (BFS) has received a DNA Backlog Reduction Grant every year since 2008.  BFS is the scientific arm of Cal DOJ and employs forensic scientists to collect, analyze, and compare physical evidence from suspected crimes and to testify in state and federal criminal trials about their analyses.

133.   BFS uses the DNA Backlog Reduction Grant to pay employee overtime to perform DNA analysis, to purchase and maintain necessary equipment and software, and to fund continuing education for DNA analysts.  For FY 2019, BFS requested $2,059,373 to fund the analysis of an additional 330 cases and decrease turnaround time for each case.  BFS estimates that $330,054 will be used for overtime salaries and benefits to more quickly process, record, screen, and analyze DNA samples.  During the last fiscal year, there were 41 different BFS employees whose overtime payments were funded by this grant.  Their work in analyzing DNA samples resulted in the reduction of the State's DNA backlog by 365 cases.

134.  Local LEAs throughout California directly receive DNA Backlog Reduction Grants as part of the formula allocated to California.  In FY 2019, 17 California local LEAs have received DNA Backlog Reduction Grants totaling $7.5 million.

**III.  DEFENDANTS' ESCALATING USE OF IMMIGRATION ENFORCEMENT REQUIREMENT ON FEDERAL GRANTS TO TARGET "SANCTUARY JURISDICTIONS"**

135.  The conduct that California challenges in this complaint is part of a systematic effort by the Trump Administration to withhold funding from jurisdictions that it believes do not cooperate in immigration enforcement to the degree it desires.  Every time that the Trump Administration has attempted to impose immigration enforcement requirements on substantial amounts of federal funding, including every time that the Trump Administration has imposed immigration enforcement requirements on formula grants, courts have held that the Administration cannot add such requirements without statutory authority.

**A.  The Trump Administration's Executive Order Seeking to Withhold Funding from Sanctuary Jurisdictions**

136.  Throughout his presidential campaign, President Trump repeated his intention to withhold funding from what he called "sanctuary jurisdictions."  On January 25, 2017, days after being sworn into office, President Trump signed an Executive Order that announced the policy of the Trump Administration to "[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law."  Exec. Order No. 13,768, 82 Fed. Reg. 8799, § 2(c) (2017).  President Trump directed the Attorney General and the Department of Homeland Security (DHS) Secretary "to ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary."  *Id.* § 9(a).  Days after signing the Executive Order, President Trump specifically threatened to use de-funding "as a weapon" against California, which he views as a "sanctuary" jurisdiction.[19]

---

[19] Donald Trump Super Bowl interview transcript with Fox News' Bill O' Reilly, SBNation (Feb. 5, 2017), https//www.sbnation.com/2017/2/5/14516156/donald-trump-interview-transcript-bill-oreilly-super-bowl-2017.

40

137.    The City and County of San Francisco and the County of Santa Clara filed lawsuits challenging the constitutionality of the Executive Order.  The Northern District Court preliminarily enjoined the Trump Administration from enforcing the Executive Order to withhold federal funds from jurisdictions that the Trump Administration deems as "sanctuary jurisdictions."  *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 508 (N.D. Cal. 2017).  The Northern District Court determined that the Executive Order violates the separation of powers principles because it "purports to give the Attorney General and the Secretary the power to place a new condition on federal funds . . . not provided for by Congress."  *Id.* at 531.  The Northern District Court later granted the counties' motion for summary judgment on the same basis.  *Cty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1219 (N.D. Cal. 2017).

138.    The Ninth Circuit affirmed the Northern District Court's injunction as it applies to California jurisdictions, holding that "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.  Because Congress did not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers."  *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).

139.    In the litigation surrounding the Executive Order, Defendant USDOJ represented that the Executive Order only affected three federal grants, JAG, Community Oriented Policing Services (COPS) grants, and the State Criminal Alien Assistance Program (SCAAP).  *Cty. of Santa Clara*, 250 F. Supp. 3d. at 515.  The Northern District Court determined it would be an unreasonable interpretation of the plain language of the Order to interpret it so narrowly.  *Id.* at 516-17.  Indeed, between 2017 and 2018, USDOJ added a requirement to comply with § 1373 and other additional immigration enforcement requirements to at least six other grant programs that OJP administers.[20]

---

[20] U.S. Dep't of Justice, Office of Justice Programs, Forms: Certifications relating to 8 U.S.C. § 1373 and certain other federal statutes related to immigration (Nov. 2018), https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.

41

**B.    The Addition of the § 1373 Requirement on JAG and Subsequent Actions to Withhold Funding from California**

140.   In FY 2016, OJP first announced that § 1373 was an "applicable Federal law" under JAG, the compliance of which would be a required condition for grantees receiving JAG funds. Section 1373(a) provides:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration enforcement authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. § 1373(a).  Section 1373(b) prohibits any "person or agency" from restricting any federal, state, or local government entity from "requesting" information regarding a person's immigration status, "maintaining" such information, or "exchanging" such information with federal, state, or local government entities.  *Id*. § 1373(b).

141.   For FY 2016, OJP required that the BSCC, the state entity that receives JAG funds, submit a legal opinion validating its compliance with § 1373.  On April 21, 2017, OJP sent a letter to the BSCC demanding that it submit that legal opinion.[21]  On June 29, 2017, the BSCC submitted the requested legal opinion explaining that the State's laws, including the TRUST and TRUTH Acts, do not violate § 1373.

142.   On July 25, 2017, OJP released the FY 2017 State JAG Solicitation, and on August 3, 2017, OJP released the FY 2017 JAG Local Solicitation.  For the first time, the Solicitations required that the chief law officer of the jurisdiction sign an affidavit certifying compliance with § 1373 on behalf of the State.  The chief executive officer of the jurisdiction was required to sign an affidavit making a number of assurances, including that the chief executive adopts the chief law officer's certification of compliance with § 1373.  This new requirement applied both to the grant recipient and subgrantees.

---

[21] Press Release, U.S. Dep't of Justice, Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373 (Apr. 21, 2017), https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373.

42

143.   On November 1, 2017, after the enactment of the Values Act and after the BSCC submitted its FY 2017 JAG application, OJP sent the State a preliminary compliance assessment letter asserting that three provisions of the Values Act may "violate 8 U.S.C. § 1373, depending on how [the State] interprets and applies them."  Relevant here, OJP stated that the State must certify that "it interprets and applies" the Values Act "to not restrict California officers from sharing information regarding immigration status with federal immigration officers, including information regarding release date[s] and home address[es]."  If the State could not so "certify," then "[USDOJ] ha[d] determined that these provisions violate [§ 1373]."  On November 13, 2017, the BSCC responded and stated that it could not provide the requested certification as to these two provisions, and informed OJP that the Values Act regulates the sharing of release date information and home addresses because that information is not covered by § 1373.

144.   On January 24, 2018, OJP responded that it still had concerns about the State's compliance with § 1373, and asked the BSCC, and simultaneously, eight other local jurisdictions in California, to produce by February 23, under threat of subpoena, "orders, directives instructions, or guidance to your law enforcement employees" about communicating with USDOJ, DHS, and ICE.[22]  The BSCC responded to that letter asserting that it is not a law enforcement agency, so has limited requested documents, but it produced the documents that were responsive.

145.   The State filed a lawsuit challenging, among other things, the § 1373 Requirement as unconstitutional and unlawful, and seeking a declaration that the State's laws comply with § 1373.  Amended Complaint for Declaratory and Injunctive Relief, *Becerra I*, No. 17-cv-470 (N.D. Cal. Oct. 13, 2017), ECF No. 11.  After the State filed its lawsuit, as discussed above, the United States filed its own lawsuit against the State of California in the Eastern District of California alleging that the provisions of the Values Act that regulate compliance with notification requests and restrict the sharing of personal information for immigration enforcement

---

[22] Press Release, U.S. Dep't of Justice, Justice Department Demands Documents and Threatens to Subpoena 23 Jurisdictions As Part of 8 U.S.C. § 1373 Compliance Review (Jan. 24, 2018), https://www.justice.gov/opa/pr/justice-department-demands-documents-and-threatens-subpoena-23-jurisdictions-part-8-usc-1373.

43

1   purposes conflict with § 1373. Complaint, *United States v. California*, No. 18-cv-490 (E.D. Cal.

2   Mar. 6, 2018), ECF No. 1. Both the Northern District and Eastern District courts found the

3   Values Act complies with § 1373. *San Francisco*, 349 F. Supp. 3d at 968; *California*, 314 F.

4   Supp. 3d at 1104. The Northern District Courts also determined that § 1373 is unconstitutional

5   on its face, and ordered Defendants to issue FY 2017 JAG awards to the BSCC and all California

6   political subdivisions that applied for JAG. *San Francisco*, 349 F. Supp. 3d at 953, 974. Since

7   that time, the Ninth Circuit in *United States v. California* affirmed the district court's

8   determination that the Values Act complies with § 1373. *California*, 921 F.3d at 893. And

9   several courts have determined that § 1373 is unconstitutional.[23]

10          **C.     The Addition of the Access and Notification Requirements to JAG Funding**

11          146.   In addition to the requirement that jurisdictions certify compliance with § 1373, for

12  the first time in FY 2017, OJP announced two "special conditions" requiring grant recipients and

13  subrecipients to: (i) permit personnel of DHS to access any correctional or detention facility in

14  order to meet with an "alien" (or an individual believed to be an "alien") and inquire as to his or

15  her right to be or remain in the United States (the Access Requirement); and (ii) provide at least

16  48 hours' advance notice to DHS regarding the scheduled release date and time of an "alien" in

17  the jurisdiction's custody when DHS requests such notice in order to take custody of the

18  individual pursuant to the Immigration and Nationality Act (INA) (the Notification Requirement).

19  *See, e.g.*, Defendants' Request for Judicial Notice, Ex. B, *Becerra I* (N.D. Cal. July 31, 2018),

20  ECF No. 125-2, ¶ 55(1).

21          147.   The Northern District Court concluded that the Access and Notification

22  Requirements, as well as the FY 2017 § 1373 Requirement, violate separation of powers

23  principles, the Spending Clause, and the APA. *San Francisco*, 349 F. Supp. 3d at 975. As

24  discussed above, six other federal district courts, and the Third and Seventh Circuits, have

25  determined that the Access and Notification Requirements are unlawful, at minimum, because

26  USDOJ exceeded its statutory authority in imposing them. *See supra* n.1.

27  _____

28          [23] *Oregon*, 2019 WL 3716932, at *18-19; *New York*, 343 F. Supp. 3d at 237; *Chicago*, 321
    F. Supp. 3d at 872-73; *Philadelphia*, 309 F. Supp. 3d at 286-288.

44

**D.   FY 2018 JAG Immigration Enforcement Requirements**

148.   On or about July 20, 2018, Defendants released the FY 2018 JAG Solicitations, and on or about November 16, 2018, Defendants released JAG awards to California and its political subdivisions.  Those awards contained substantially similar requirements to the § 1373, Notice, and Access Requirements, that Defendants sought to add to FY 2017 JAG awards.  In connection with those requirements, Defendants also identified 8 U.S.C. §§ 1226, 1231, 1357, 1366, and 1644[24] as "applicable federal laws" under the JAG authorizing statue.  *See, e.g.*, First Amended Complaint for Declaratory, Injunctive, and Mandamus Relief, Ex. A, *Becerra II*, No. 18-cv-5169 (N.D. Cal. Nov. 1, 2018), ECF No. 20-1 at 11, 41-52.

149.   Defendants added two new requirements as well.  First, Defendants sought to require applicants to respond to questions about the jurisdiction's laws and policies around "Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)."  *Id.* at 28-29, 53.  Second, Defendants sought to require that JAG recipient jurisdictions, with respect to any "program or activity" funded, "not . . . publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield certain individuals from detection, whether or not in violation of 8 U.S.C. § 1324(a) or other laws." Defendants' Request for Judicial Notice, Ex. D, *Becerra II* (N.D. Cal. Dec. 3, 2018), ECF No. 25-1, ¶ 44.  Defendants also identified 8 U.S.C. § 1324 as an "applicable federal law."  *See, e.g.*, First Amended Complaint for Declaratory, Injunctive, and Mandamus Relief, Ex. A, *Becerra II* (N.D. Cal. Nov. 1, 2018), ECF No. 20-1 at 11, 41, 45, 48-50.

150.   Like in FY 2017, the chief law officer of the jurisdiction was required to certify compliance with all applicable laws, and the chief executive officer was required to execute a separate certification acknowledging that he or she adopted the chief law officer's certification. *Id.* at 41-45.

151.   California filed a lawsuit challenging all of these FY 2018 JAG Immigration Enforcement Requirements.  The Northern District Court granted California's motion for

---

[24] Section 1644, like § 1373, prohibits restrictions on the sending to or receiving of information regarding immigration status information between state and local government entities and immigration authorities.

45

summary judgment, concluded that all of the FY 2018 JAG Immigration Enforcement

Requirements violated separation of powers principles, the Spending Clause, and the APA, and

enjoined Defendants' enforcement of the challenged conditions. *See generally San Francisco*,

372 F. Supp. 3d at 940-56.

**IV.  DEFENDANTS IMPOSE IMMIGRATION ENFORCEMENT REQUIREMENTS ON VARIOUS FY 2019 GRANTS**

    **A.  Defendants Imposed Substantially Similar Immigration Enforcement Requirements on JAG that have Been Struck Down by This and Other Courts**

    152.   On or about April 24, 2019, Defendants released the FY 2019 JAG State Solicitation,

and on or about July 25, 2019, Defendants released the FY 2019 JAG Local Solicitations.  Both

Solicitations are substantively similar.  *See* Exs. A-B.

    153.   As they did last year, Defendants again require applicants to provide answers to the

following questions "regarding Communication with the Department of Homeland Security

(DHS) and/or Immigration and Customs Enforcement (ICE)" (1373 Addendum):

- Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?

- Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meets the description in question 1?

- If yes to either:

  o  Please provide a copy of each law or policy.

  o  Please describe each practice.

  o  Please explain how the law, policy, or practice complies with Section 1373.

Ex. A at 22-23; Ex. B at 21-22.  A jurisdiction "will not receive award funds (and its award will

include a condition that withholds funds) until it submits these responses."  Ex. A at 23.

    154.   The FY 2019 JAG Solicitations indicated that JAG awards would include

immigration enforcement requirements similar to those that Defendants have tried to impose on

FY 2017 and 2018 JAG awards.  Those requirements are: (1) not violating 8 U.S.C. §§ 1373 or

1644 (1373/1644 Requirement); (2) not "publicly disclos[ing] federal law enforcement

46

1 information in an attempt to conceal, harbor, or shield certain individuals from detection,

2 including in violation of 18 U.S.C. §§ 1071, 1072, or 8 U.S.C. § 1324(a)" (Harboring

3 Requirement) (3) "provid[ing] (where feasible) at least 48 hours' advance notice to DHS

4 regarding the scheduled release date and time of an alien in the recipient's custody when DHS

5 requests such notice in order to take custody of the alien pursuant to the Immigration and

6 Nationality Act" (Notification Requirement); and (4) "permit[ing] DHS agents to have access to

7 any correctional facility in order to meet with an alien (or an individual believed to be an alien)

8 and inquire as to his right to be or remain in the United States" (Access Requirement).  Ex. A at

9 25-26; Ex. B at 23-24.

10      155.   Like last year's solicitations, the FY 2019 JAG Solicitations indicate that recipients

11 are required to comply with "all applicable requirements of federal statutes and regulations."  Ex.

12 A at 25; Ex. B at 23.  In connection with the JAG Immigration Enforcement Requirements,

13 Defendants identify various statutes within the INA that they identify as "relevant" to JAG,

14 namely, 8 U.S.C. §§ 1226(a) & (c); 1231(a)(4); 1324(a), 1357(a)(1), 1366, 1373, and 1644.  Ex.

15 A at 25-26, 30-35; Ex. B at 23-24, 27-32.  In addition to requiring compliance with §§ 1373 and

16 1644, Defendants connect compliance with the Harboring Requirement to § 1324(a) (Ex. A at 26;

17 Ex. B at 23); frame the Notification Requirement as a requirement to "[n]ot . . . impede the

18 exercise of the authority of the Federal government" under 8 U.S.C. § 1226(a) & (c) and 8 U.S.C.

19 § 1231(a)(4) (Ex. A at 26, 30-31; Ex. B at 23, 27-28);[25] and frame the Access Requirement as a

20 requirement to "[n]ot . . . impede the exercise of DHS agents" of their authority under 8 U.S.C.

21 § 1357(a)(1).  Ex. A at 26; Ex. B at 23-24.  Defendants also identify 8 U.S.C. § 1366(1) & (3) as a

22 "relevant" law, but the Solicitations do not connect that law to any particular immigration

23 enforcement funding requirement.  Ex. A at 35; Ex. B at 32.

24      156.   The FY 2019 JAG Solicitations require that the chief executive of the applicant

25 government submit a certification representing, among other things, that the chief executive has

26 "carefully reviewed 34 U.S.C. § 10153(a)(5), and with respect to the programs to be funded" and

---

27      [25] The FY 2019 State JAG Solicitations identify '8 U.S.C. § 1266(a) & (c)," but since that

28 law does not exist, and does not appear anywhere else in the Solicitation, California presumes that Defendants meant to cite to 8 U.S.C. § 1226 here instead.  Ex. A at 26; Ex. B at 23.

1    "make the certification required by section 10153(a)(5), as to each of the items specified therein."

2    Ex. A at 29; Ex. B at 26.

3        157.  Under § 10153, the chief executive must certify that "the applicant will comply with

4    all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D).  It

5    is unclear whether Defendants still consider 8 U.S.C. §§ 1226, 1231, 1324, 1357, 1366, 1373, and

6    1644 "applicable Federal laws" for purposes of that section.  None of these provisions apply to

7    federal grant-making, and 8 U.S.C. §§ 1226, 1231, 1324, 1357, and 1366 are not "applicable" to

8    states at all.

9        158.  On August 7, 2019, the BSCC submitted its FY 2019 JAG application.  As part of

10   that application, the BSCC expressly "made no certifications or assurances about any federal

11   statutes that have been unlawfully identified by the Office of Justice Programs (OJP) as

12   'applicable' to JAG."  The BSCC continued that it "does not agree to comply with any other

13   unlawfully imposed award requirements."

14       159.  On or about September 18, 2019, the BSCC received its $17.8 million FY 2019 JAG

15   award, which formalized the JAG Immigration Enforcement Requirements described in the

16   Solicitations.  Ex. C.  The 1373/1644, 1373 Addendum, Access, Notification, and Harboring

17   Requirements in the FY 2019 JAG awards—the JAG Immigration Enforcement Requirements—

18   contain materially the same language as appears in the FY 2018 awards, while also prohibiting

19   use of JAG funds to violate each of the conditions.  *Compare* Ex. C ¶¶ 31-41 *with* Defendants'

20   Request for Judicial Notice, Ex. D, *Becerra II* (N.D. Cal. Dec. 3, 2018), ECF No. 25-1, ¶¶ 41-47.

21       160.  The USDOJ Financial Guide explains that jurisdictions "have 45 days from the award

22   date to accept [an] OJP . . . award document or the award may be rescinded."[26]

23       161.  Defendants have not provided any explanation as to how the JAG Immigration

24   Enforcement Requirements are consistent with Congress's intent in adopting and authorizing

25   funds for JAG.  The JAG Immigration Enforcement Requirements are also ambiguous and do not

26   provide the State with fair notice about what is required to comply with them.

27

28   [26] U.S. Dep't of Justice, DOJ Grants Financial Guide, § 2,2,
     https://ojp.gov/financialguide/doj/pdfs/DOJ_FinancialGuide.pdf.

**B. Defendants Impose the 1373 Requirement on Title II Grants**

162. In August 2018, Defendants released the FY 2019 Title II Grant Solicitation. Ex. D. In that Solicitation, Defendants indicated that they would include a requirement that "will require the recipient (and any subrecipient) that accepts the award not to violate (with regard to criminal aliens) 8 U.S.C. § 1373." *Id.* at 27.

163. The BSCC applied for its FY 2019 Title II Grant on March 6, 2019. As part of that application, the BSCC expressly reserved its rights to challenge any unlawful conditions and made "no certifications or assurances about any federal statutes that have been selected or will be selected by the Office of Justice Programs (OJP) as 'applicable' to the Title II program and imposed unlawfully."

164. On or about September 24, 2019, the BSCC received its $4.5 million FY 2019 Title II Grant award. The award contains the same requirements to comply with § 1373 as exists in the FY 2019 JAG award with little variation in language. *Compare* Ex. C ¶¶ 31-34 *with* Ex. E ¶¶ 38-41.[27] There is no language in the condition indicating that it only applies to "criminal aliens."

165. As with JAG, the BSCC understands that it has 45 days from the date of the award to accept the Title II Grant.[28]

166. Defendants have not provided any explanation as to how the 1373 Title II Requirement for Title II Grants is consistent with the authorizing statute. The 1373 Title II Requirement is also ambiguous and does not provide the State with fair notice about what is required to comply with it.

**C. Defendants Impose the 1324a Requirement on USDOJ Grants**

167. As discussed above, Defendants released the FY 2019 Title II Grant Solicitation in August 2018, Ex. D, and the FY 2019 JAG State and Local Solicitations in April and July 2019, respectively, Exs. A, B. In February 2019, Defendants released the FY 2019 RSAT Solicitation, Ex. Q, and the BSCC submitted its application for RSAT on April 26, 2019. In July 2019,

---

[27] The only difference is that while the JAG award requires compliance with § 1644, the Title II Grant does not. *Compare* Ex. C ¶¶ 31-34 *with* Ex. E ¶¶ 38-41.
[28] U.S. Dep't of Justice, DOJ Grants Financial Guide, § 2,2, https://ojp.gov/financialguide/doj/pdfs/DOJ_FinancialGuide.pdf.

49

1    Defendants released the FY 2019 PREA Solicitation, and the BSCC submitted its application for

2    PREA on August 19, 2019.  USDOJ did not indicate in any of those solicitations that it would be

3    imposing the 1324a Requirement on these grants, and thus, the applications for these grants by

4    the BSCC were submitted before Defendants indicated their intent to require compliance with

5    § 1324a(a)(2) as a condition of the grants.

6         168.   In March 2019, Defendants released the FY 2019 VAWA SASP and STOP Grant

7    Solicitations.  Exs. K, L.  USDOJ did not indicate in the solicitations that it would be imposing

8    the 1324a Requirement on either VAWA grant.  *See id*.  On April 19, 2019, Cal OES submitted

9    its application for the VAWA SASP Grant and on May 3, 2019, Cal OES submitted its

10   application for the VAWA STOP Grant.  These applications were submitted before Defendants

11   indicated their intent to require compliance with § 1324a(a)(2) as a condition of the grants.

12        169.   Defendants released the FY 2019 VOCA Compensation Formula Grant Solicitation in

13   March 2019, Ex. H, the FY 2019 Paul Coverdell Grant Solicitation in April 2019, Ex. O, and the

14   FY 2019 VOCA Assistance Formula Grant and FY 2019 DNA Backlog Reduction Grant in May

15   2019, Exs. G, S.  In each of those solicitations, Defendants indicated that the awards will include

16   a condition requiring recipients "to verify the employment eligibility of any individual hired

17   under the award, consonant with 8 U.S.C. § 1324a(1)."  Ex. H at 20, Ex. O at 36, Ex. G at 26, Ex.

18   S at 40.  But none of those solicitations specifies that awards would include a condition requiring

19   compliance with § 1324a(a)(2).

20        170.   On April 23, 2019, Cal VCB submitted its application for a VOCA Compensation

21   Formula Grant.  On May 13, 2019, Cal OES submitted its application for the Coverdell Grant,

22   and on July 29, 2019, Cal OES submitted its application for a VOCA Assistance Formula Grant.

23   On May 10, 2019, Cal DOJ submitted its application for the DNA Backlog Reduction Grant.

24   These applications were submitted before Defendants indicated their intent to require compliance

25   with § 1324a(a)(2) as a condition of those grants.

26        171.   On or about August 23 and August 26, 2019, Cal OES received its FY 2019 $996,924

27   VAWA SASP Grant award and $14.9 million VAWA STOP Grant award, respectively.  Both of

28

these awards contain the 1324a Requirement surrounding "[e]mployment eligibility verification
for hiring under the award" providing:

> The recipient must ensure that, as part of the hiring process for any position within the
> United States that is or will be funded (in whole or in part) with award funds, the recipient
> (or any subrecipient) properly verifies the employment eligibility of the individual who is
> being hired, consistent with the provisions of 8 U.S.C. 1324a(a)(1) and (2).

Ex. M ¶ 5, Ex. N ¶ 5.

172.   On or about September 12, 2019, Cal OES received its $2.264 million Coverdell
Grant award, and Cal DOJ received its FY 2019 $2.059 million DNA Backlog Reduction Grant
award.  On or about September 13, 2019 Cal VCB received its FY 2019 $15.75 million VOCA
Compensation Formula Grant award to Cal VCB, and Cal OES received its FY 2019 $266.68
million VOCA Assistance Formula Grant award.  The BSCC received its FY 2019 $17.8 million
JAG award on or about September 18, 2019, its FY 2019 $407,813 PREA award on or about
September 23, 2019, its FY 2019 Title II Grant on or about September 24, 2019, and its $2.219
million RSAT Grant award on or about September 28, 2019.  Each of these grants contain the
1324a Requirement as appears in the State's VAWA grants.  Ex. C ¶ 9, Ex. E ¶ 9, Ex. I ¶ 9, Ex. J
¶ 9, Ex. P ¶ 9, Ex. R   ¶ 9, Ex. T ¶ 9, Ex. V ¶ 9.  In addition, the 1324a Requirement on these
grants includes additional requirements that do not appear in the VAWA awards.  The 1324a
Requirement for these grants requires that the recipient notify and "[p]rovide training (to the
extent necessary)" about the 1324a Requirement and the underlying requirements of
§ 1324a(a)(1) and (2) to all persons who are involved in the hiring process for the recipient and
subrecipients.  *Id.*  The recipient is required to maintain records of all I-9 forms, notifications, and
trainings in connection with this condition.  *Id.*  And the 1324a Requirement imposes on
recipients "monitoring responsibilities" surrounding subgrantee compliance with the condition.
*Id.*

173. As discussed above with respect to JAG and the Title II Grants, Cal OES, Cal VCB, BSCC, and Cal DOJ understand that they have 45 days from the award date to accept the awards with the 1324a Requirement or the awards may be rescinded.[29]

174. On information and belief, before FY 2019 Defendants had never included a grant condition requiring compliance with § 1324a. Defendants have provided no explanation as to how the 1324a Requirement is consistent with Congress's intent for each of the grants.

**V.   THE FY 2019 IMMIGRATION ENFORCEMENT REQUIREMENTS ARE UNLAWFUL**

    **A.   The JAG Immigration Enforcement Requirements and 1373 Title II Requirement Are Unlawful**

175. The JAG and Title II authorizing statutes do not authorize the JAG Immigration Enforcement Requirements or the 1373 Title II Requirement added to those grants. Interpreting Defendants' authority to permit them to impose these substantive conditions with respect to formula grants, like JAG and Title II, beyond what is allowed under federal law, conflicts with the prescribed formula grant structure intended by Congress. Congress designed JAG and Title II so that "*each State*" receives an allocation according to a precise statutory formula. 34 U.S.C. §§ 10156(a), 11132(a) (emphasis added). Likewise, for JAG, Congress's formula provides allocation to "*each* unit of local government." *Id.* § 10156(d)(2) (emphasis added). As such, if Defendants make grants from funds that Congress appropriated to JAG and Title II, they must disburse the funds according to the statutory formula enacted by Congress so long as the jurisdiction complies with the conditions that exist for grantees under federal law.

176. The JAG Immigration Enforcement Requirements and 1373 Title II Requirement are also contrary to congressional intent as immigration enforcement has never been a purpose for those grants. The purpose areas for JAG are to support criminal justice programs. Immigration enforcement and removal procedures, however, are generally civil in nature. *See Arizona v. United States*, 567 U.S. 387, 396 (2012). Immigration enforcement has never been specified as a purpose area throughout this entire history for JAG, and Congress has repeatedly rejected

---

[29] U.S. Dep't of Justice, DOJ Grants Financial Guide, § 2,2, https://ojp.gov/financialguide/doj/pdfs/DOJ_FinancialGuide.pdf.

1  numerous attempts to attach immigration enforcement requirements to receipt of JAG funding.[30]

2  The purpose of Title II Grants is to improve the juvenile justice system, not immigration

3  enforcement.

4      177.   Defendants seem to claim that all of the statutes identified in the certification are

5  "applicable Federal laws" that applicants must comply with under § 10153(a)(5) in the JAG

6  authorizing statute.  *See* Ex. A at 10; Ex. B. at 10.  The JAG authorizing statute does not permit

7  Defendants to add these provisions as "applicable Federal laws."  Sections 1373 and 1644 cannot

8  be "applicable Federal laws" because they are unconstitutional under the Tenth Amendment's

9  anti-commandeering doctrine, and thus, Defendants lack the statutory authority to identify those

10  statutes as "applicable laws."  And 8 U.S.C. §§ 1226, 1231, 1324, 1357, and 1366 are not

11  "applicable Federal laws" as they are not laws that are applicable to the State.

12      178.   None of the federal laws identified by Defendants are "applicable" because the term

13  "other applicable Federal laws" is best understood as referring to laws that are expressly

14  connected to federal grant-making.  Prior to 2016, the only laws that USDOJ identified as

15  "applicable" were those that specifically address the administration of federal funding in the text

16  of the statute.  There is no provision in the INA, or any federal law, that requires jurisdictions to

17  comply with any of the federal laws identified by Defendants in order to receive these federal

18  funds.

19      179.   Because of its unconstitutionality and because it is not federal law connected to the

20  administration of grant funding, § 1373 is not an "applicable Federal law" for Title II Grants

21  either.  *See* 28 C.F.R. § 31.401.

22      180.   Defendants also cannot rely on OJP's authority to add "special conditions on all

23  grants," 34 U.S.C. § 10102(a)(6), as a basis for adding the JAG Immigration Enforcement

24  Requirements and the 1373 Title II Requirement.  Section 10102(a)(6) does not provide

---

[30] *See, e.g.*, Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018) (voted down by the House by a vote of 231-193); *see also, e.g.*, No Sanctuary for Criminals Act, H.R. 3003, 115th Cong. (2017); Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015); Sanctuary City All Funding Elimination Act of 2015, H.R. 3073, 114th Cong. (2015).

53

1    independent authority for Defendants to add conditions to grants.  *See, e.g.*, *San Francisco*, 372 F.

2    Supp. 3d at 942-43; *San Francisco*, 349 F. Supp. 3d at 947-48.  Rather, in 2006, when this

3    provision was amended to create its current language, the term "special conditions" had a precise

4    meaning.  According to a USDOJ regulation in place at the time, the agency could impose

5    "special grant or subgrant conditions" on "high-risk grantees" if the grant applicant: (1) had a

6    history of poor performance; (2) was not financially stable; (3) had a management system that did

7    not meet certain federal standards; (4) had not conformed to the terms and conditions of a

8    previous grant award; or (5) was not otherwise responsible.  28 C.F.R. § 66.12 (removed

9    December 25, 2014).

10       181.   The JAG Immigration Enforcement Requirements are further undercut by 34 U.S.C.

11   § 10228(a), which is codified in the same chapter as the JAG authorizing statute, and prohibits the

12   use of federal law enforcement grants to exercise "any direction, supervision, or control over any

13   police force or any other criminal justice agency of any State or any political subdivision

14   thereof."

15       182.   The JAG Immigration Enforcement Requirements and 1373 Title II Requirement are

16   ambiguous as they fail to provide the State with clear notice of what is required to comply with

17   them.  In particular, the Harboring Condition is ambiguous as to what type of public disclosure of

18   law enforcement information would constitute an "indirect attempt to conceal, harbor, or shield"

19   non-citizens, and whether Defendants would consider California law and policies to conflict with

20   this condition.  Ex. C ¶¶ 35-36.  For instance, in order to promote trust in law enforcement and

21   foster a safe and welcoming environment in K-12 schools, California law requires that law

22   enforcement and school personnel disclose to community members certain requests made by

23   immigration authorities in specific circumstances.[31]  These laws and policies reflect the State's

24   considered view on the appropriate use of state and local government resources to preserve the

25   State's relationships with immigrant communities and safeguard the right of immigrant families'

26   _____

27       [31] California Attorney General, *Promoting a Safe and Secure Learning Environment for All: Guidance and Model Policies to Assist California's K-12 Schools in Responding to Immigration Issues* 20, 31 (April 2018), available at

28   https://oag.ca.gov/sites/all/files/agweb/pdfs/bcj/school-guidance-model-k12.pdf.

54

1    to access a free public education for their children.  Due to the ambiguity of the Harboring

2    Condition, however, it is unclear whether the State would have to revise such state laws and

3    policies that foster transparency and community trust.

4         **B.     The Imposition of the 1324a Requirement on Formula Grants Is Unlawful**

5         183.   Defendants lack authority to impose the 1324a Requirement on VOCA, JAG,

6    VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA formula grant funding.

7    As with JAG and Title II, *see supra*, for each of these grants, Congress directed that Defendants

8    "shall" make an annual grant to each of the states subject to the precise formula set by Congress.

9    *See* 34 U.S.C. §§ 10423(a), 10446(b), 10563(a)(1), 12511(b)(4), 20102(a)(1), 20103(a)(1),

10   40701(c)(1).  As such, Defendants must disburse these grants to the State according to the

11   statutory formula created by Congress so long as the State complies with the requirements that

12   exist for grantees under federal law.

13        184.   These grants are designed to provide support to victims of crime and sexual assault,

14   improve the State's criminal justice system, develop and implement residential substance abuse

15   treatment programs for inmates, improve the State's forensic services capacity, and assist the

16   State in becoming PREA compliant.  Immigration enforcement has never been a purpose of any

17   of these grants, and the 1324a Requirement does not advance the objectives of these grants.

18        185.   VOCA, JAG, Title II, Coverdell, RSAT, VAWA SASP, and PREA grants do not

19   provide any authority for Defendants to impose their own funding conditions.  For example, the

20   VOCA authorizing statute provides discretion to the OVC Director to set the "terms and

21   conditions" for *discretionary grants* under her purview, *i.e.*, the OVC Discretionary Assistance

22   Grants.  34 U.S.C. § 20111(c)(3).  But in the immediately preceding subprovision detailing the

23   OVC Director's authority with regard to VOCA Assistance and Compensation Formula Grants,

24   the statute provides only that the OVC Director shall "provid[e] funds to eligible States pursuant

25   to sections 20102 and 20103 of this title," without providing any authority to impose funding

26   conditions.  *Id.* § 20111(c)(2).

27        186.   While Defendants possess some authority to add funding conditions to VAWA STOP

28   and DNA Backlog Reduction Grants, *id.* §§ 10446(e)(3), 40701(c)(1), that authority is also

limited.  The VAWA STOP Program includes many detailed and specific programmatic requirements.  *Id.* §§ 10446(c), (d), (h), and (i), 10447, 12291.  To meet these program purposes and requirements set out in the statute and any implementing regulations, the Attorney General may "impose reasonable conditions on grant awards to ensure that the States meet statutory, regulatory, and other programmatic requirements."  *Id.* § 10446(e)(3).  These authorized conditions are targeted explicitly at the specific and detailed statutory requirements as set by Congress, and do not include requirements not related to the statutory aims of protecting victims of sexual assault and other forms of violence against women.  Likewise, for DNA Backlog Reduction Grants, the Attorney General may "establish appropriate grant conditions . . . in conformity with a formula or formulas that are designed to effectuate a distribution of funds among eligible States and units of local government" to achieve the objectives of that section.  *Id.* § 40701(c)(1).  Neither statute provides authority to unilaterally impose additional conditions that are not tethered to the purposes of those grants.

187.  To the extent Defendants rely on § 10102(a)(6) as a basis for adding the 1324a Requirement, as discussed above, § 10102(a)(6) does not provide independent authority to add conditions to grants, and thus does not authorize the imposition of the 1324a Requirement.

188.  Not only is the 1324a Requirement incompatible with the formula structure that Congress created in the authorizing statue for each of these grants, it also runs afoul of § 1324a itself.  Congress has never required grantees to comply with § 1324a as a condition for receiving USDOJ grants.  An employer who violates § 1324a(a)(1)(A) or (a)(2) is subject to an administrative hearing, where an administrative judge may issue a cease and desist order with civil monetary penalties.  8 U.S.C. § 1324a(e)(3) & (4).  Those monetary penalties are set in statue, and have been adjusted for inflation by regulation ranging from $559-$4,473 for a first-time offender's violation to $6,709-$22,363 for a repeat offender's violation.  *See id.*; 28 C.F.R. § 85.5.  Tying § 1324a compliance to *hundreds of millions of dollars* in grant funding contravenes congressional intent.

189.  And, in recent years, Congress has considered numerous bills authorizing federal agencies to "consider[] for debarment from the receipt of Federal contracts, grants, or cooperative

1    agreements," for a person or entity who is a repeat violator of § 1324a(a)(1)(A) or (a)(2).  All of

2    those bills failed.[32]

3        190.  The 1324a Requirement is also ambiguous.  For example, although the 1324a

4    Requirement indicates that it seeks only to govern verification "as part of the hiring process," the

5    1324a Requirement invokes § 1324a(a)(2) which governs employers' actions "*after* hiring" an

6    employee.  § 1324a(a)(2) (emphasis added).  The reference to § 1324a(a)(2), thus, appears to

7    broaden the scope of the condition to apply not only to funds that are used for the hiring of an

8    employee, but to any funds that are used toward an employee.  The conflicting language in the

9    condition, therefore, makes it unclear what a grantee or subgrantee must do to comply with the

10   condition.  It is further unclear what a grantee must do to "monitor" subgrantee compliance with

11   the condition.

12       191.  In addition, the United States argued in *United States v. California* that an employer's

13   obligations under § 1324a(a)(2) encompass reverification.  The 1324a Requirement is unclear

14   about whether the condition requires grant recipients to "reverify" employees' eligibility after

15   hiring an employee, and if so, how often and when.

16       192.  The federal government's conflicting messages about how to comply with

17   § 1324a(a)(2) create additional ambiguities.  As discussed above, USDOJ has instructed

18   employers not to reverify an employee's eligibility to be employed in the United States under

19          [32] *See, e.g.*, Accountability Through Electronic Verification Act, H.R. 1399, 116th Cong.
20   (2019) (referred to subcommittee on Immigration and Citizenship; no further action);
     Accountability Through Electronic Verification Act, S. 556, 116th Cong. (2019) (referred to the
21   Committee on the Judiciary; no further action); Legal Workforce Act, H.R. 250, 116th Cong.
     (2019) (referred to subcommittee on Immigration and Citizenship; no further action); AG and
     Legal Workforce Act, H.R. 6417, 115th Cong. (2018) (referred to the Subcommittee on
22   Immigration and Border Security; no further action); Securing America's Future Act of 2018,
     H.R. 4760, 115th Cong. (2018) (voted down by House 231 to 193); American LAWS Act, H.R.
23   4340, 115th Cong. (2017) (referred to the Subcommittee on Immigration and Border Security; no
     further action); Legal Workforce Act, H.R. 3711, 115th Cong. (2017) (ordered to be reported out
24   of committee; no further action); Accountability Through Electronic Verification Act, H.R. 2461,
     115th Cong. (2017) (referred to the Subcommittee on Social Security; no further action taken);
25   Accountability Through Electronic Verification Act, S. 179, 115th Cong. (2017) (referred to the
     Committee on the Judiciary; no further action); Immigration for a Competitive America Act of
26   2016, H.R. 5398, 114th Cong. (2016) (referred to the Subcommittee on Border and Maritime
     Security; no further action); Accountability Through Electronic Verification Act, S. 2032, 114th
27   Cong. (2015) (referred to the Committee on the Judiciary; no further action taken); Legal
     Workforce Act, H.R. 1147, 114th Cong. (2015) (referred to the Subcommittee on Social Security;
28   no further action).

57

1    certain circumstances.  But, in *United States v. California*, the federal government argued Labor

2    Code § 1019.2 conflicts with § 1324a(a)(2) because it "prohibit[s] employers from reverifying

3    work authorization when they deem it appropriate to remain in compliance with the law," even

4    though it authorizes employers to reverify when required by federal law.  Plaintiff's Motion for

5    Preliminary Injunction and Memorandum of Law in Support, *United States v. California*, No. 18-

6    cv-490 (E. D. Cal. Mar. 6, 2018), ECF No. 2-1 at 17-18.  The federal government has incorrectly

7    indicated that under federal law employers must reverify based on "a suspicion" that, for

8    whatever reason, an employee may not be permitted to work there.  And although federal law

9    makes clear that there is no continuing obligation to reverify under federal law, H.R. Rep. No. 99-

10   682(I), at 57 (1986), the federal government has suggested that there are some continuing

11   obligations on employers, which could include reverification.

12        193.   Although federal law is clear as to when employers must reverify an employee, the

13   federal government's statements in *United States v. California* obscure what recipients must do to

14   comply with the 1324a Requirement.  It is likewise unclear as to how the State will provide the

15   "training" required by the funding condition in light of Defendants' erroneous and unclear

16   interpretation of § 1324a(a)(2).

17        194.   The 1324a Requirement is coercive as well.  Never has this funding condition been a

18   requirement on any USDOJ grant; yet (at once), Defendants impose this new condition, with, at

19   most, limited warning, on "virtually all" of its formula grants that the State has received for years,

20   and upon which the State depends.  This immigration enforcement requirement placed on

21   hundreds of millions of dollars of existing grants, unrelated to immigration enforcement,

22   "pass[es] the point at which pressure turns into compulsion."  *South Dakota v. Dole*, 483 U.S.

23   207, 211 (1987) (internal quotation marks omitted).

24   **VI.   THE IMPOSITION OF THE FY 2019 IMMIGRATION ENFORCEMENT REQUIREMENTS
       CREATE IRREPARABLE HARM TO THE STATE AND ITS LOCAL JURISDICTIONS**

25

26        195.   The FY 2019 Immigration Enforcement Requirements present an impermissible

27   dilemma to the State: it has to decide whether it can or should accept $327.7 million in federal

28   funds that are subject to unlawful and unconstitutional requirements.  If the State cannot accept

                                              58

1    JAG or Title II awards, or if Defendants withhold funding from the State on the basis of the JAG

2    Immigration Enforcement Requirements, 1373 Title II Requirement, or the 1324a Requirement,

3    the State will lose $22.3 million in critical funds that would otherwise go toward programs

4    throughout the State that reduce recidivism for at-risk youth, support gang suppression activities,

5    advance community policing, boost educational outcomes, and improve the juvenile justice

6    system.  If the State cannot accept the VOCA Assistance and Compensation Formula Grant

7    awards on the basis of the 1324a Requirement, the State will lose $282.4 million that would

8    otherwise go toward assisting and compensating victims of crime.  If the State cannot accept the

9    VAWA STOP and SASP Grant awards on the basis of the 1324a Requirement, the State will lose

10   $15.9 million that would otherwise go toward assisting victims of violence against women and

11   sexual assault.  If the State cannot accept the Coverdell and DNA Backlog Reduction Grants, the

12   State will lose $4.3 million that would otherwise go toward enhancing the State's forensic science

13   services capabilities to solve crimes and improve the criminal justice system.  If the State cannot

14   accept the RSAT Grant, the State will lose $2.219 million that would otherwise go toward

15   providing needed substance abuse programs to inmates during incarceration and upon reentry into

16   the community. And if the State cannot accept its PREA funding, the State will lose over

17   $400,000 that would otherwise go toward staff training to ensure the safety and wellbeing of

18   transgender inmates in State custody.

19        196.   For JAG and Title II, it is likely that in order for the State and many of its localities to

20   accept the funding, they will have to change their public safety oriented laws and policies in order

21   to ensure they are viewed as complying with the JAG Immigration Enforcement Requirements

22   and 1373 Title II Requirement, as well as Defendants' erroneous view of § 1373.  Abandoning

23   these policies that law enforcement has found to be effective in their communities would divert

24   resources away from fighting crime and erode the trust between the State and local governments

25   and their immigrant communities that state laws like the TRUST, TRUTH, and Values Acts, as

26   well as local ordinances, are intended to build.

27        197.   Likewise, for all of the grants, the State faces the dilemma of whether to change its

28   workplace protection law, Labor Code § 1019.2, in order to ensure it is perceived by Defendants

59

as complying with the 1324a Requirement and Defendants' erroneous interpretation of § 1324a, or risk losing hundreds of millions of dollars in grant funding. Abandoning this law will undermine the State's ability to ensure those who are authorized to be employed in the United States will not face discrimination, retaliation, or harassment in the workplace. Moreover, to require public agencies to reverify their employees' work authorization (or at minimum, require that the State allow public employers to reverify employees' work authorization) even when the employer does not possess actual or constructive knowledge that the employee no longer has work authorization, is an excessive interference with a critical aspect of the State's sovereignty—the management of its relationships with its employees.

198.    Separate and apart from the State law, the 1324a Requirement imposes on the State the obligation to monitor and train hundreds of subgrantees throughout the State about compliance with § 1324a, forcing the State into the role of immigration enforcement monitors for the federal government, which is another infringement on the State's sovereignty.

199.    California and its local jurisdictions must make their decision about whether to accept these grant funds under the shadow of the federal government's past actions and threats it has made against California on the basis of the State's laws. The United States sued California claiming that the Values Act conflicts with § 1373 and "impede[s]" immigration authorities, and that Labor Code § 1019.2 is preempted under IRCA, and specifically, § 1324a. Then-ICE Acting Director Thomas Homan called for USDOJ to "charge" elected officials for jurisdictions with policies like California's for violating 8 U.S.C. § 1324(a) if they do not meet the Administration's immigration enforcement demands.[33] Former DHS Secretary Kirstjen Nielsen later confirmed in congressional testimony that USDOJ was "reviewing" ways to charge state and local officials as Acting Director Homan suggested.

200.    The State understands that Defendants will not accept a qualified acceptance of the grant awards. The State submitted a supplemental statement in connection with its acceptance of

---

[33] Fox News Interview with Thomas Homan, *Acting ICE director: California made a foolish decision* (Jan. 2, 2018), http://www.foxnews.com/transcript/2018/01/02/acting-ice-director-california-made-foolish-decision.html.

1    one USDOJ grant award containing the 1324a Requirement making clear that it would not be

2    using the award in whole or in part to fund an employee.  USDOJ rejected the State's submission

3    and said the State was required to submit that award without any supplemental statement.  The

4    State should not be faced with this Hobson's Choice of agreeing to these unconstitutional

5    Immigration Enforcement Requirements, or not agreeing to these Requirements and losing

6    funding critical to the State's communities.

7                              **FIRST CLAIM FOR RELIEF**

8                **VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

9        **(JAG Immigration Enforcement Requirements and 1373 Title II Requirement)**

10           201.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

11           202.   Article I, Section I of the U.S. Constitution enumerates that "[a]ll legislative Powers

12    herein granted shall be vested in [the] Congress."

13           203.   Article I, Section VIII of the U.S. Constitution vests exclusively in Congress the

14    spending power to "provide for . . . the general Welfare of the United States."

15           204.   Defendants have exceeded congressional authority by adding substantive immigration

16    enforcement requirements that are not conferred by the JAG authorizing statute, 34 U.S.C.

17    §§ 10151-58, the Title II authorizing statute, 34 U.S.C. §§ 11131-33, or any other federal law.

18    The JAG Immigration Enforcement Requirements and 1373 Title II Requirement therefore

19    unlawfully exceed the executive branch's powers and intrude upon the powers of Congress.

20           205.   For the reasons stated herein, the JAG Immigration Enforcement Requirements and

21    1373 Title II Requirement are unlawful, unconstitutional, and should be set aside under 28 U.S.C.

22    § 2201.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to

23    compel Defendants to issue FY 2019 JAG awards to the State and its political subdivisions

24    without the JAG Immigration Enforcement Requirements and 1373 Tittle II Requirement, and

25    disburse FY 2019 JAG and Title II funds in accordance with the formulas in the JAG and Title II

26    authorizing statutes.

27

28

**SECOND CLAIM FOR RELIEF**

**ULTRA VIRES**

(**JAG Immigration Enforcement Requirements and 1373 Title II Requirement**)

206.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

207.   An agency acts ultra vires when it exceeds its statutory authority conferred by Congress.

208.   There is no statutory authority that authorizes the imposition of the JAG Immigration Enforcement Requirements.  Further, Congress has not delegated to Defendants the authority to impose the JAG Immigration Enforcement Requirements.

209.   In particular, none of the identified laws in the JAG Immigration Enforcement Requirements are "applicable Federal laws" within the meaning of the JAG authorizing statute. Additionally, 8 U.S.C. §§ 1226, 1231, 1324, 1357, and 1366 cannot be applicable laws for applicants to JAG funding because these laws impose no obligations on state and local jurisdictions.  For the same reasons, § 1373 cannot be an "applicable Federal law" for Title II Grants.

210.   Two of the laws that are part of the JAG Immigration Enforcement Requirements and the 1373 Title II Requirement, 8 U.S.C. §§ 1373 and 1644, violate the Tenth Amendment's anti-commandeering doctrine.  Therefore, those laws are invalid and cannot be identified as "applicable Federal laws." *See, e.g.*, *San Francisco*, 349 F. Supp. 3d at 953-54.

211.   For the reasons stated herein, the JAG Immigration Enforcement Requirements and 1373 Title II Requirement are ultra vires, and should be set aside under 28 U.S.C. § 2201. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 JAG and Title II awards to the State and its political subdivisions without the JAG Immigration Enforcement Requirements and 1373 Title II Requirement, and disburse FY 2019 JAG and Title II funds in accordance with the formulas in the JAG and Title II authorizing statutes.

### THIRD CLAIM FOR RELIEF

### SPENDING CLAUSE

### (**JAG Immigration Enforcement Requirements and 1373 Tile II Requirement**)

212. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

213. Congress' spending power is not unlimited. When "Congress desires to condition the States' receipt of federal funds," it must do so (a) "unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation;" and (b) by placing conditions that are related "to the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207 (internal citation omitted).

214. To the extent that Congress delegated its authority to impose conditions on JAG and Title II funding (which it has not), the JAG Immigration Enforcement Requirements and 1373 Title II Requirement violate the Spending Clause of the U.S. Constitution. The JAG Immigration Enforcement Requirements and 1373 Title II Requirement are unrelated to the "federal interest in particular national projects or programs" for which Congress intended JAG and Title II funding to be used.

215. The JAG Immigration Enforcement Requirements and 1373 Title II Requirement also violate the Spending Clause because Congress has not unambiguously imposed the funding condition and it does not provide the State and local jurisdictions with the requisite notice so the State can make a "choice knowingly" of how to comply with the condition.

216. For the reasons stated herein, the JAG Immigration Enforcement Requirements and 1373 Title II Requirement are unlawful, and should be set aside under 28 U.S.C. § 2201. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 JAG and Title II awards to the State and its political subdivisions without the JAG Immigration Enforcement Requirements and 1373 Title II Requirement, and disburse FY 2019 JAG and Title II funds in accordance with the formulas in the JAG and Title II authorizing statutes.

1

## FOURTH CLAIM FOR RELIEF

2

### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT

3

**(JAG Immigration Enforcement Requirements and 1373 Title II Requirement -
Constitutional Violations and Excess of Statutory Authority)**

4

217.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

5

218.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the

6

imposition of the JAG Immigration Enforcement Requirements and the 1373 Title II Requirement

7

are "agency action[s]" under the APA, *id.* § 551(13).

8

219.   The imposition of the JAG Immigration Enforcement Requirements and 1373 Title II

9

Requirement constitute "[a]gency action[s] made reviewable by statute and final agency action

10

for which there is no other adequate remedy in a court." *Id.* § 704.

11

220.   The APA requires that a court "hold unlawful and set aside agency action, findings,

12

and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity,"

13

or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.*

14

§ 706(2)(B)-(C).

15

221.   Defendants' imposition of the JAG Immigration Enforcement Requirements and 1373

16

Title II Requirement is unconstitutional because Defendants overstepped their powers by

17

exercising lawmaking authority that is solely reserved to Congress under Article I, Section I of

18

the Constitution.  Also, Defendants' imposition of the JAG Immigration Enforcement

19

Requirements and 1373 Title II Requirement is in excess of their statutory authority.

20

Furthermore, the JAG Immigration Enforcement Requirements and 1373 Title II Requirement

21

violate the Spending Clause because they are unrelated to the federal purpose of the grant and/or

22

fail the clause's unambiguous requirement.

23

222.   Because Defendants acted unconstitutionally and in excess of their statutory authority

24

in the imposition of the JAG Immigration Enforcement Requirements and 1373 Title II

25

Requirement, these actions are unlawful and should be set aside under 5 U.S.C. § 706.

26

Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel

27

Defendants to issue FY 2019 JAG and Title II awards to the State and its political subdivisions

28

Complaint for Declaratory, Injunctive, and Mandamus Relief (19-cv-6189)

1  without the JAG Immigration Enforcement Requirements and 1373 Title II Requirement, and

2  disburse FY 2019 JAG and Title II funds in accordance with the formulas in the JAG and Title II

3  authorizing statutes.

**FIFTH CLAIM FOR RELIEF**

4

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
5  **(JAG Immigration Enforcement Requirements and 1373 Title II Requirement- Arbitrary**
6  **and Capricious)**

7      223.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

8      224.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the

9  imposition of the Immigration Enforcement Requirements and the 1373 Title II Requirement are

10  "agency action[s]" under the APA, *id.* § 551(13).

11      225.   The imposition of the JAG Immigration Enforcement Requirements and 1373 Title II

12  Requirement constitute "[a]gency action[s] made reviewable by statute and final agency action

13  for which there is no other adequate remedy in a court." *Id.* § 704.

14      226.   The APA requires that a court "hold unlawful and set aside agency action, findings,

15  and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

16  accordance with law." *Id.* § 706(2)(A).

17      227.   The imposition of the JAG Immigration Enforcement Requirements and 1373 Title II

18  Requirement is arbitrary and capricious and an abuse of discretion because Defendants have

19  relied on factors that Congress did not intend, failed to consider an important aspect of the

20  program the agency is addressing, and has offered no explanation for adding the JAG

21  Immigration Enforcement Requirements and 1373 Title II Requirement that is consistent with the

22  evidence that is before the agency. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut.*

23  *Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

24      228.   For the reasons discussed herein, the JAG Immigration Enforcement Requirements

25  and the Title II 1373 Requirement are unlawful and should be set aside under 5 U.S.C. § 706 for

26  being arbitrary and capricious and an abuse of discretion.  Additionally, Plaintiff is entitled to a

27  writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 JAG and Title

28

Complaint for Declaratory, Injunctive, and Mandamus Relief (19-cv-6189)

1    II awards to the State and its political subdivisions without the JAG Immigration Enforcement

2    Requirements and 1373 Title II Requirement, and disburse FY 2019 JAG and Title II funds in

3    accordance with the formulas in the JAG and Title II authorizing statutes.

4                                   **SIXTH CLAIM FOR RELIEF**

5                    **VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

6                                      (**1324a Requirement**)

7          229.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

8          230.   Defendants have exceeded congressional authority by adding the 1324a Requirement

9    without authority to do so in the VOCA authorizing statute, 34 U.S.C. §§ 20101-11, the JAG

10   authorizing statute, 34 U.S.C. §§ 10151-58, the VAWA authorizing statutes, 34 U.S.C. §§ 10441-

11   51, 12511, the Title II authorizing statute, 34 U.S.C. §§ 11131-33, the Coverdell authorizing

12   statute, 34 U.S.C. §§ 10561-10566, the RSAT authorizing statute, 34 U.S.C. §§ 10421-26, the

13   DNA Backlog Reduction authorizing statute, 34 U.S.C. § 40701, the PREA authorizing statute,

14   34 U.S.C. § 30307, or any other federal law.  The 1324a Requirement also runs afoul of the

15   specific penalty structure created by Congress in § 1324a and the refusal by Congress to tie

16   § 1324a compliance to receipt of federal grants.  The 1324a Requirement therefore unlawfully

17   exceeds the executive branch's powers and intrudes upon the powers of Congress in violation of

18   the constitutional separation of powers.

19         231.   For the reasons stated herein, the 1324a Requirement is unlawful, unconstitutional,

20   and should be set aside under 28 U.S.C. § 2201.  Additionally, Plaintiff is entitled to a writ of

21   mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 grant awards to

22   California and its local jurisdictions without the 1324a Requirement, and disburse FY 2019 grant

23   funds, without regard to Labor Code § 1019.2, in accordance with the formula in each grant's

24   authorizing statutes.

25                                 **SEVENTH CLAIM FOR RELIEF**

26                                         **ULTRA VIRES**

27                                      (**1324a Requirement**)

28         232.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

66

233.   Defendants have acted ultra vires in imposing the 1324a Requirement.  There is no statutory authority that authorizes the imposition of the 1324a Requirement on the VOCA, JAG, VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA Grants.  Further, Congress has not delegated to Defendants the authority to impose the 1324a Requirement on these grants.

234.   For the reasons stated herein, the 1324a Requirement is unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 grant awards to California and its local jurisdictions without the 1324a Requirement, and disburse grant funds, without regard to Labor Code § 1019.2, in accordance with the formula in each grant's authorizing statutes.

## EIGHTH CLAIM FOR RELIEF

### SPENDING CLAUSE

### (1324a Requirement)

235.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

236.   To the extent that Congress delegated its authority to impose the 1324a Requirement on the grants (which it has not), the 1324a Requirement violates the Spending Clause of the Constitution.

237.   The 1324a Requirement is unrelated to the "federal interest in particular national projects or programs" for which Congress intended VOCA funding to be used: to provide assistance and compensation for victims of crime.  The 1324a Requirement is likewise unrelated to the federal interest in VAWA funding, which is to improve criminal justice system responses to domestic violence, sexual assault, and stalking, and to increase the availability of services for victims of these crimes.  The 1324a Requirement is unrelated to the criminal justice purposes of JAG and the juvenile justice purposes of Title II.  The 1324a Requirement is unrelated to the purposes of improving forensic science and DNA sampling capabilities for the Coverdell and DNA Backlog Reduction Grants.  The 1324a Requirement is unrelated to the purposes of RSAT

67

1    to provide substance abuse treatment for people in custody and upon re-entry into the community.

2    And the 1324a Requirement is unrelated to PREA compliance.

3    238.   The 1324a Requirement violates the Spending Clause because Congress has not

4    unambiguously imposed the funding condition and its vagueness does not provide the State and

5    local jurisdictions with the requisite notice so the State can make a "choice knowingly" of how to

6    comply with the condition.

7    239.   The 1324a Requirement also violates the Spending Clause because the manner in

8    which Defendants have tied hundreds of millions of dollars to compliance with the 1324a

9    Requirement is "so coercive as to pass the point at which pressure turns into compulsion." *Nat'l*

10   *Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) (quoting *Dole*, 483 U.S. at 211)

11   (internal quotation marks omitted)).

12   240.   For the reasons stated herein, the 1324a Requirement is unlawful, and should be set

13   aside under 28 U.S.C. § 2201.  Additionally, Plaintiff is entitled to a writ of mandamus under 28

14   U.S.C. § 1361 to compel Defendants to issue FY 2019 grant awards to California and its local

15   jurisdictions without the 1324a Requirement, and disburse grant funds, without regard to Labor

16   Code § 1019.2, in accordance with the formula in each grant's authorizing statutes.

17                                   **NINTH CLAIM FOR RELIEF**

18                      **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
                 **(1324a Requirement - Constitutional Violations and Excess of Statutory Authority)**
19

20   241.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

21   242.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the

22   imposition of the 1324a Requirement is an "agency action" under the APA, *id.* § 551(13).

23   243.   The imposition of the 1324a Requirement on each of the grants constitute "[a]gency

24   action[s] made reviewable by statute and final agency action for which there is no other adequate

25   remedy in a court." *Id.* § 704.

26   244.   The APA requires that a court "hold unlawful and set aside agency action, findings,

27   and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity,"

28

                                              68

1   or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.*

2   § 706(2)(B)-(C).

3       245.   Defendants' imposition of the 1324a Requirement is unconstitutional because

4   Defendants overstepped their powers by exercising lawmaking authority that is solely reserved to

5   Congress under Article I, Section I of the Constitution.  Also, Defendants' imposition of the

6   1324a Requirement is in excess of their statutory authority.  Furthermore, the 1324a Requirement

7   violates the Spending Clause because it is unrelated to the federal purpose of the grants, fails the

8   clause's unambiguous requirement, and/or is impermissibly coercive.

9       246.   Because Defendants acted unconstitutionally and in excess of their statutory authority

10  in the imposition of the 1324a Requirement, these actions are unlawful and should be set aside

11  under 5 U.S.C. § 706.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C.

12  § 1361 to compel Defendants to issue FY 2019 grant awards to California and its local

13  jurisdictions without the 1324a Requirement, and disburse FY 2019 grant funds, without regard to

14  Labor Code § 1019.2, in accordance with the formula in each of the grant's authorizing statutes.

**TENTH CLAIM FOR RELIEF**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
**(1324a Requirement - Arbitrary and Capricious)**

18      247.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

19      248.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the

20  imposition of the 1324a Requirement is an "agency action" under the APA, *id.* § 551(13).

21      249.   The imposition of the 1324a Requirement on each of the grants constitute "[a]gency

22  action[s] made reviewable by statute and final agency action for which there is no other adequate

23  remedy in a court." *Id.* § 704.

24      250.   The APA requires that a court "hold unlawful and set aside agency action, findings,

25  and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

26  accordance with law." *Id.* § 706(2)(A).

27

28

69

251.   The imposition of the 1324a Requirement is arbitrary and capricious and an abuse of discretion because Defendants have relied on factors that Congress did not intend, failed to consider an important aspect of the program the agency is addressing, and has offered no explanation for adding the 1324a Requirement that is consistent with the evidence that is before the agency.  *See State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43.

252.   For the reasons discussed herein, the 1324a Requirement is unlawful and should be set aside under 5 U.S.C. § 706 for being arbitrary and capricious and an abuse of discretion.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 grant awards to California and its local jurisdictions without the 1324a Requirement, and disburse FY 2019 grant funds, without regard to Labor Code § 1019.2, in accordance with the formula in each of the grant's authorizing statutes.

## ELEVENTH CLAIM FOR RELIEF

### DECLARATORY RELIEF

**(Labor Code § 1019.2 Complies with 8 U.S.C. § 1324a for purposes of the 1324a Requirement Imposed on Grants to California and its Political Subdivisions)**

253.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

254.   An actual controversy exists as to whether the State of California can comply with the 1324a Requirement on the basis of Labor Code § 1019.2.  Although California law complies with § 1324a, Defendants' statements and actions create a credible threat that they will determine that California cannot comply with the 1324a Requirement.

255.   Labor Code § 1019.2 does not in any way restrict employers from verifying an employee's eligibility to be employed in the United States.  Labor Code § 1019.2 also does not affect an employer's obligations to reverify an employee's eligibility to be employed in the United States when required to do so under federal law.  Labor Code § 1019.2 only prohibits employers from reverifying an employee's eligibility to be employed in the United States when they are not required to do so under federal law.

256.   Labor Code § 1019.2 is consistent with and expands upon the anti-discrimination provisions in federal law.  IRCA does not preempt a state from adopting more robust employee

1  workplace protections, so long as those employee protections do not conflict with federal law.

2  Therefore, there is no conflict between Labor Code § 1019.2 and 8 U.S.C. § 1324a.

3      257.   For the reasons stated herein, pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a

4  declaration that Labor Code § 1019.2, as applied to public employers, complies with 8 U.S.C.

5  § 1324a as a matter of law, and thus, should not be a basis for withholding and terminating

6  federal funding, or disbarring and making any state entity or local jurisdiction ineligible for

7  federal funding.

8                                    **PRAYER FOR RELIEF**

9      WHEREFORE, Plaintiff, the State of California, respectfully requests that this Court enter

10  judgment in its favor, and grant the following relief:

11     1.     Issue a declaration that the JAG Immigration Enforcement Requirements and the

12  1373 Title II Requirement are unconstitutional and/or unlawful because: (a) they violate the

13  separation of powers; (b) they exceed congressional authority conferred to the Executive Branch

14  and are ultra vires on their face; (c) to the extent there is congressional authority, they exceed

15  Congress's spending powers under Article I of the Constitution; and/or (d) they violate the APA;

16     2.     Issue a declaration that the 1324a Requirement imposed on VOCA, JAG, VAWA,

17  Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA Grants is unconstitutional and/or

18  unlawful because: (a) it violates the separation of powers; (b) it exceeds congressional authority

19  conferred to the Executive Branch and is ultra vires on its face and as applied to Labor Code §

20  1019.2; (c) to the extent there is congressional authority, it exceeds Congress's spending powers

21  under Article I of the Constitution; and/or (d) it violates the APA;

22     3.     Permanently enjoin Defendants from using the JAG Immigration Enforcement and

23  1373 Title II Requirements;

24     4.     Permanently enjoin Defendants from using the 1324a Requirement imposed on

25  VOCA, JAG VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA Grants;

26     5.     Permanently enjoin Defendants from withholding and terminating federal funding,

27  including VOCA, JAG, VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA

28

71

1    Grants, or disbarring and making any state entity or local jurisdiction ineligible for federal

2    funding on account of the Labor Code § 1019.2;

3        6.    Issue a writ of mandamus compelling Defendants to issue California and its political

4    subdivisions' FY 2019 JAG and Title II awards and disburse funds without the JAG Immigration

5    Enforcement Requirements and the 1373 Title II Requirement;

6        7.    Issue a writ of mandamus compelling Defendants to issue California and its political

7    subdivisions' FY 2019 VOCA, JAG, VAWA, Title II, Coverdell, RSAT, DNA Backlog

8    Reduction, and PREA Grants without the 1324a Requirement, and disbursing FY 2019 funds

9    pursuant to those grants to the State and its political subdivisions, without regard to Labor Code §

10   1019.2;

11       8.    In the alternative, issue a declaration that Labor Code § 1019.2 as applied to public

12   employers, complies with 8 U.S.C. § 1324a as a matter of law;

13       9.    Award attorney's fees and costs as appropriate; and

14       10.   Grant such other relief as the Court may deem just and proper.

15

16

17   Dated:  September 30, 2019                    Respectfully Submitted,

18                                                XAVIER BECERRA
                                                  Attorney General of California
19                                                MICHAEL L. NEWMAN
                                                  Senior Assistant Attorney General
20                                                SARAH E. BELTON
                                                  Supervising Deputy Attorney General
21                                                KRISTI GUDOSKI COOK
                                                  LISA C. EHRLICH
22                                                XIYUN YANG

23                                                */s/ Lee I. Sherman*

24                                                LEE I. SHERMAN
                                                  Deputy Attorneys General
25                                                *Attorneys for Plaintiff*
                                                  *State of California*
26

27

28
                                      72

Exhibit 3



**U.S. Department of Justice**

Office of Justice Programs

---

Office of the Assistant Attorney General          *Washington, D.C.  20531*

November 16, 2018

Ms. Kathleen T. Howard
California Board of State and Community Corrections
2590 Venture Oaks Way, Ste. 200
Sacramento, CA 95833-3288

Dear Ms. Howard:

On behalf of Attorney General Jefferson Sessions III, it is my pleasure to inform you that the Office of Justice Programs has
approved your application for funding under the FY 18 Edward Byrne Memorial Justice Assistance Grant (JAG) Program -
State Solicitation in the amount of $18,056,180 for California Board of State and Community Corrections.

Enclosed you will find the Grant Award and Special Conditions documents.  This award is subject to all administrative and
financial requirements, including the timely submission of all financial and programmatic reports, resolution of all interim
audit findings, and the maintenance of a minimum level of cash-on-hand.  Should you not adhere to these requirements, you
will be in violation of the terms of this agreement and the award will be subject to termination for cause or other administrative
action as appropriate.

If you have questions regarding this award, please contact:

- Program Questions, Linda Hill-Franklijn, Program Manager at (202) 514-0712; and

- Financial Questions, the Office of the Chief Financial Officer, Customer Service Center (CSC) at
  (800) 458-0786, or you may contact the CSC at ask.ocfo@usdoj.gov.

Congratulations, and we look forward to working with you.

Sincerely,

Matt Dummermuth
Principal Deputy Assistant Attorney General

Enclosures



# OFFICE FOR CIVIL RIGHTS

Office of Justice Programs

U.S. Department of Justice

810 7th Street, NW
Washington, DC 20531

Tel: (202) 307-0690
TTY: (202) 307-2027
E-mail: askOCR@usdoj.gov
Website: www.ojp.usdoj.gov/ocr

---

**OCR Letter to All Recipients**

November 16, 2018

Ms. Kathleen T. Howard
California Board of State and Community Corrections
2590 Venture Oaks Way, Ste. 200
Sacramento, CA 95833-3288

Dear Ms. Howard:

Congratulations on your recent award.  In establishing financial assistance programs, Congress linked the receipt of federal funding to compliance with federal civil rights laws.  The Office for Civil Rights (OCR), Office of Justice Programs (OJP), U.S. Department of Justice (DOJ) is responsible for ensuring that recipients of financial assistance from the OJP, the Office of Community Oriented Policing Services (COPS), and the Office on Violence Against Women (OVW) comply with the applicable federal civil rights laws.  We at the OCR are available to help you and your organization meet the civil rights requirements that come with DOJ funding.

**Ensuring Access to Federally Assisted Programs**

Federal laws that apply to recipients of financial assistance from the DOJ prohibit discrimination on the basis of race, color, national origin, religion, sex, or disability in funded programs or activities, not only in employment but also in the delivery of services or benefits.  A federal law also prohibits recipients from discriminating on the basis of age in the delivery of services or benefits.

In March of 2013, President Obama signed the Violence Against Women Reauthorization Act of 2013.  The statute amends the Violence Against Women Act of 1994 (VAWA) by including a nondiscrimination grant condition that prohibits discrimination based on actual or perceived race, color, national origin, religion, sex, disability, sexual orientation, or gender identity.  The new nondiscrimination grant condition applies to certain programs funded after October 1, 2013.  The OCR and the OVW have developed answers to some frequently asked questions about this provision to assist recipients of VAWA funds to understand their obligations.  The Frequently Asked Questions are available at https://ojp.gov/about/ocr/vawafaqs.htm.

**Enforcing Civil Rights Laws**

All recipients of federal financial assistance, regardless of the particular funding source, the amount of the grant award, or the number of employees in the workforce, are subject to prohibitions against unlawful discrimination.  Accordingly, the OCR investigates recipients that are the subject of discrimination complaints from both individuals and groups.  In addition, based on regulatory criteria, the OCR selects a number of recipients each year for compliance reviews, audits that require recipients to submit data showing that they are providing services equitably to all segments of their service population and that their employment practices meet equal opportunity standards.

**Providing Services to Limited English Proficiency (LEP) Individuals**

In accordance with DOJ guidance pertaining to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, recipients of federal financial assistance must take reasonable steps to provide meaningful access to their programs and activities for persons with limited English proficiency (LEP).  See U.S. Department of Justice, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455 (2002).  For more information on the civil rights responsibilities that recipients have in providing language services to LEP individuals, please see the website https://www.lep.gov.

**Ensuring Equal Treatment of Faith-Based Organizations and Safeguarding Constitutional Protections Related to Religion**

The DOJ regulation, Partnerships with Faith-Based and Other Neighborhood Organizations, 28 C.F.R. pt. 38, updated in April 2016, prohibits all recipient organizations, whether they are law enforcement agencies, governmental agencies, educational institutions, houses of worship, or faith-based organizations, from using financial assistance from the DOJ to fund explicitly religious activities.  Explicitly religious activities include worship, religious instruction, or proselytization.  While funded organizations may engage in non-funded explicitly religious activities (e.g., prayer), they must hold them separately from the activities funded by the DOJ, and recipients cannot compel beneficiaries to participate in them.  The regulation also makes clear that organizations participating in programs funded by the DOJ are not permitted to discriminate in the provision of services on the basis of a beneficiary's religion, religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.  Funded faith-based organizations must also provide written notice to beneficiaries, advising them that if they should object to the religious character of the funded faith based organization, the funded faith-based organization will take reasonable steps to refer the beneficiary to an alternative service provider.  For more information on the regulation, please see the OCR's website at https://ojp.gov/about/ocr/partnerships.htm.

SAAs and faith-based organizations should also note that the Omnibus Crime Control and Safe Streets Act (Safe Streets Act) of 1968, as amended, 34 U.S.C. § 10228(c); the Victims of Crime Act of 1984, as amended, 34 U.S.C. § 20110(e); the Juvenile Justice and Delinquency Prevention Act of 1974, as amended, 34 U.S.C. § 11182(b); and VAWA, as amended, 34 U.S.C. § 12291(b)(13), contain prohibitions against discrimination on the basis of religion in employment.  Despite these nondiscrimination provisions, the DOJ has concluded that it may construe the Religious Freedom Restoration Act (RFRA) on a case-by-case basis to permit some faith-based organizations to receive DOJ funds while taking into account religion when hiring staff, even if the statute that authorizes the funding program generally forbids recipients from considering religion in employment decisions.  Please consult with the OCR if you have any questions about the regulation or the application of RFRA to the statutes that prohibit discrimination in employment.

**Using Arrest and Conviction Records in Making Employment Decisions**

The OCR issued an advisory document for recipients on the proper use of arrest and conviction records in making hiring decisions.  See Advisory for Recipients of Financial Assistance from the U.S. Department of Justice on the U.S. Equal Employment Opportunity Commission's Enforcement Guidance: *Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964 (June 2013)*, available at https://ojp.gov/about/ocr/pdfs/UseofConviction_Advisory.pdf.  Recipients should be mindful that the misuse of arrest or conviction records to screen either applicants for employment or employees for retention or promotion may have a disparate impact based on race or national origin, resulting in unlawful employment discrimination.  In light of the Advisory, recipients should consult local counsel in reviewing their employment practices.  If warranted, recipients should also incorporate an analysis of the use of arrest and conviction records in their Equal Employment Opportunity Plans (EEOPs) (see below).

**Complying with the Safe Streets Act**

An organization that is a recipient of financial assistance subject to the nondiscrimination provisions of the Safe Streets Act, must meet two obligations: (1) complying with the federal regulation pertaining to the development of an EEOP (see 28 C.F.R. pt. 42, subpt. E) and (2) submitting to the OCR findings of discrimination (see 28 C.F.R. §§ 42.204(c), .205(c)(5)).

**Meeting the EEOP Requiremen**t

An EEOP is a comprehensive document that analyzes a recipient's relevant labor market data, as well as the recipient's employment practices, to identify possible barriers to the participation of women and minorities in all levels of a recipient's workforce.  As a recipient of DOJ funding, you may be required to submit an EEOP Certification Report or an EEOP Utilization Report to the OCR.  For more information on whether your organization is subject to the EEOP requirements, see https://ojp.gov/about/ocr/eeop.htm.  Additionally, you may request technical assistance from an EEOP specialist at the OCR by telephone at (202) 616-1771 or by e-mail at EEOPforms@usdoj.gov.

**Meeting the Requirement to Submit Findings of Discrimination**

If in the three years prior to the date of the grant award, your organization has received an adverse finding of discrimination based on race, color, national origin, religion, or sex, after a due-process hearing, from a state or federal court or from a state or federal administrative agency, your organization must send a copy of the finding to the OCR.

**Ensuring the Compliance of Subrecipients**

SAAs must have standard assurances to notify subrecipients of their civil rights obligations, written procedures to address discrimination complaints filed against subrecipients, methods to monitor subrecipients' compliance with civil rights requirements, and a program to train subrecipients on applicable civil rights laws.  In addition, SAAs must submit to the OCR every three years written Methods of Administration (MOA) that summarize the policies and procedures that they have implemented to ensure the civil rights compliance of subrecipients.  For more information on the MOA requirement, see https://ojp.gov/funding/Explore/StateMethodsAdmin-FY2017update.htm.

If the OCR can assist you in any way in fulfilling your organization's civil rights responsibilities as a recipient of federal financial assistance, please contact us.

Sincerely,

Michael L. Alston
Director

  cc:   Grant Manager
          Financial Analyst

| | | |
|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **Grant** | PAGE 1 OF 23 |

| | |
|---|---|
| 1. RECIPIENT NAME AND ADDRESS (Including Zip Code)<br><br>California Board of State and Community Corrections<br>2590 Venture Oaks Way, Ste. 200<br>Sacramento, CA 95833-3288 | 4. AWARD NUMBER:    2018-DJ-BX-0744 |
| | 5. PROJECT PERIOD: FROM       10/01/2017   TO   09/30/2021<br><br>BUDGET PERIOD: FROM       10/01/2017   TO   09/30/2021 |

| | | |
|---|---|---|
| | 6. AWARD DATE    11/16/2018 | 7. ACTION |
| 2a. GRANTEE IRS/VENDOR NO.<br>680282717 | 8. SUPPLEMENT NUMBER<br>00 | Initial |
| 2b. GRANTEE DUNS NO.<br>949095731 | 9. PREVIOUS AWARD AMOUNT | $ 0 |
| 3. PROJECT TITLE<br>2018 JAG Program | 10. AMOUNT OF THIS AWARD | $ 18,056,180 |
| | 11. TOTAL AWARD | $ 18,056,180 |

12. SPECIAL CONDITIONS

THE ABOVE GRANT PROJECT IS APPROVED SUBJECT TO SUCH CONDITIONS OR LIMITATIONS AS ARE SET FORTH
ON THE ATTACHED PAGE(S).

13. STATUTORY AUTHORITY FOR GRANT

This project is supported under FY18(BJA - JAG State & JAG Local) Title I of Pub. L. No. 90-351 (generally codified at 34 U.S.C. 10101 - 10726), including
subpart I of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a)

14 . CATALOG OF DOMESTIC FEDERAL ASSISTANCE (CFDA Number)

16.738 - Edward Byrne Memorial Justice Assistance Grant Program

15. METHOD OF PAYMENT

GPRS

| AGENCY APPROVAL | GRANTEE ACCEPTANCE |
|---|---|
| 16. TYPED NAME AND TITLE OF APPROVING OFFICIAL<br><br>Matt Dummermuth<br><br>Principal Deputy Assistant Attorney General | 18. TYPED NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL<br><br>Kathleen T. Howard<br>Executive Director |

| 17. SIGNATURE OF APPROVING OFFICIAL | 19. SIGNATURE OF AUTHORIZED RECIPIENT OFFICIAL | 19A. DATE |
|---|---|---|
| *Matt Dummermuth* | | |

| AGENCY USE ONLY | |
|---|---|
| 20. ACCOUNTING CLASSIFICATION CODES | 21.  TDJUGT1117 |

| FISCAL<br>YEAR | FUND<br>CODE | BUD.<br>ACT. | OFC. | DIV.<br>REG. | SUB. | POMS | AMOUNT |
|---|---|---|---|---|---|---|---|
| X | B | DJ | 80 | 00 | 00 | | 18056180 |

OJP FORM 4000/2 (REV. 5-87) PREVIOUS EDITIONS ARE OBSOLETE.


OJP FORM 4000/2 (REV. 4-88)



| | | |
|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE   2   OF   23 |

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

1.  Requirements of the award; remedies for non-compliance or for materially false statements

    The conditions of this award are material requirements of the award.  Compliance with any certifications or assurances submitted by or on behalf of the recipient that relate to conduct during the period of performance also is a material requirement of this award.

    Failure to comply with any one or more of these award requirements -- whether a condition set out in full below, a condition incorporated by reference below, or a certification or assurance related to conduct during the award period -- may result in the Office of Justice Programs ("OJP") taking appropriate action with respect to the recipient and the award.  Among other things, the OJP may withhold award funds, disallow costs, or suspend or terminate the award. The Department of Justice ("DOJ"), including OJP, also may take other legal action as appropriate.

    Any materially false, fictitious, or fraudulent statement to the federal government related to this award (or concealment or omission of a material fact) may be the subject of criminal prosecution (including under 18 U.S.C. 1001 and/or 1621, and/or 34 U.S.C. 10271-10273), and also may lead to imposition of civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. 3729-3730 and 3801-3812).

    Should any provision of a requirement of this award be held to be invalid or unenforceable by its terms, that provision shall first be applied with a limited construction so as to give it the maximum effect permitted by law.  Should it be held, instead, that the provision is utterly invalid or -unenforceable, such provision shall be deemed severable from this award.

2.  Applicability of Part 200 Uniform Requirements

    The Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted and supplemented by DOJ in 2 C.F.R. Part 2800 (together, the "Part 200 Uniform Requirements") apply to this FY 2018 award from OJP.

    The Part 200 Uniform Requirements were first adopted by DOJ on December 26, 2014.  If this FY 2018 award supplements funds previously awarded by OJP under the same award number (e.g., funds awarded during or before December 2014), the Part 200 Uniform Requirements apply with respect to all funds under that award number (regardless of the award date, and regardless of whether derived from the initial award or a supplemental award) that are obligated on or after the acceptance date of this FY 2018 award.

    For more information and resources on the Part 200 Uniform Requirements as they relate to OJP awards and subawards ("subgrants"), see the OJP website at https://ojp.gov/funding/Part200UniformRequirements.htm.

    Record retention and access:  Records pertinent to the award that the recipient (and any subrecipient ("subgrantee") at any tier) must retain -- typically for a period of 3 years from the date of submission of the final expenditure report (SF 425), unless a different retention period applies -- and to which the recipient (and any subrecipient ("subgrantee") at any tier) must provide access, include performance measurement information, in addition to the financial records, supporting documents, statistical records, and other pertinent records indicated at 2 C.F.R. 200.333.

    In the event that an award-related question arises from documents or other materials prepared or distributed by OJP that may appear to conflict with, or differ in some way from, the provisions of the Part 200 Uniform Requirements, the recipient is to contact OJP promptly for clarification.

OJP FORM 4000/2 (REV. 4-88)



| | | | |
|---|---|---|---|
| | U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE   3   OF   23 |

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

3. Compliance with DOJ Grants Financial Guide

References to the DOJ Grants Financial Guide are to the DOJ Grants Financial Guide as posted on the OJP website (currently, the "DOJ Grants Financial Guide" available at https://ojp.gov/financialguide/DOJ/index.htm), including any updated version that may be posted during the period of performance.   The recipient agrees to comply with the DOJ Grants Financial Guide.

4. Reclassification of various statutory provisions to a new Title 34 of the United States Code

On September 1, 2017, various statutory provisions previously codified elsewhere in the U.S. Code were editorially reclassified to a new Title 34, entitled "Crime Control and Law Enforcement." The reclassification encompassed a number of statutory provisions pertinent to OJP awards (that is, OJP grants and cooperative agreements), including many provisions previously codified in Title 42 of the U.S. Code.

Effective as of September 1, 2017, any reference in this award document to a statutory provision that has been reclassified to the new Title 34 of the U.S. Code is to be read as a reference to that statutory provision as reclassified to Title 34. This rule of construction specifically includes references set out in award conditions, references set out in material incorporated by reference through award conditions, and references set out in other award requirements.

5. Required training for Point of Contact and all Financial Points of Contact

Both the Point of Contact (POC) and all Financial Points of Contact (FPOCs) for this award must have successfully completed an "OJP financial management and grant administration training" by 120 days after the date of the recipient's acceptance of the award.  Successful completion of such a training on or after January 1, 2016, will satisfy this condition.

In the event that either the POC or an FPOC for this award changes during the period of performance, the new POC or FPOC must have successfully completed an "OJP financial management and grant administration training" by 120 calendar days after-- (1) the date of OJP's approval of the "Change Grantee Contact" GAN (in the case of a new POC), or (2) the date the POC enters information on the new FPOC in GMS (in the case of a new FPOC).  Successful completion of such a training on or after January 1, 2016, will satisfy this condition.

A list of OJP trainings that OJP will consider "OJP financial management and grant administration training" for purposes of this condition is available at https://www.ojp.gov/training/fmts.htm.  All trainings that satisfy this condition include a session on grant fraud prevention and detection.

The recipient should anticipate that OJP will immediately withhold ("freeze") award funds if the recipient fails to comply with this condition.  The recipient's failure to comply also may lead OJP to impose additional appropriate conditions on this award.

6. Requirements related to "de minimis" indirect cost rate

A recipient that is eligible under the Part 200 Uniform Requirements and other applicable law to use the "de minimis" indirect cost rate described in 2 C.F.R. 200.414(f), and that elects to use the "de minimis" indirect cost rate, must advise OJP in writing of both its eligibility and its election, and must comply with all associated requirements in the Part 200 Uniform Requirements.  The "de minimis" rate may be applied only to modified total direct costs (MTDC) as defined by the Part 200 Uniform Requirements.



| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE  4  OF  23 |
|---|---|---|

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

7.  Requirement to report potentially duplicative funding

If the recipient currently has other active awards of federal funds, or if the recipient receives any other award of federal funds during the period of performance for this award, the recipient promptly must determine whether funds from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items for which funds are provided under this award.  If so, the recipient must promptly notify the DOJ awarding agency (OJP or OVW, as appropriate) in writing of the potential duplication, and, if so requested by the DOJ awarding agency, must seek a budget-modification or change-of-project-scope grant adjustment notice (GAN) to eliminate any inappropriate duplication of funding.

8.  Requirements related to System for Award Management and Universal Identifier Requirements

The recipient must comply with applicable requirements regarding the System for Award Management (SAM), currently accessible at https://www.sam.gov/.  This includes applicable requirements regarding registration with SAM, as well as maintaining the currency of information in SAM.

The recipient also must comply with applicable restrictions on subawards ("subgrants") to first-tier subrecipients (first-tier "subgrantees"), including restrictions on subawards to entities that do not acquire and provide (to the recipient) the unique entity identifier required for SAM registration.

The details of the recipient's obligations related to SAM and to unique entity identifiers are posted on the OJP web site at https://ojp.gov/funding/Explore/SAM.htm (Award condition:  System for Award Management (SAM) and Universal Identifier Requirements), and are incorporated by reference here.

This condition does not apply to an award to an individual who received the award as a natural person (i.e., unrelated to any business or non-profit organization that he or she may own or operate in his or her name).

9.  Requirement to report actual or imminent breach of personally identifiable information (PII)

The recipient (and any "subrecipient" at any tier) must have written procedures in place to respond in the event of an actual or imminent "breach" (OMB M-17-12) if it (or a subrecipient)-- 1) creates, collects, uses, processes, stores, maintains, disseminates, discloses, or disposes of "personally identifiable information (PII)" (2 CFR 200.79) within the scope of an OJP grant-funded program or activity, or 2) uses or operates a "Federal information system" (OMB Circular A-130).  The recipient's breach procedures must include a requirement to report actual or imminent breach of PII to an OJP Program Manager no later than 24 hours after an occurrence of an actual breach, or the detection of an imminent breach.

10.  All subawards ("subgrants") must have specific federal authorization

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements for authorization of any subaward.  This condition applies to agreements that -- for purposes of federal grants administrative requirements -- OJP considers a "subaward" (and therefore does not consider a procurement "contract").

The details of the requirement for authorization of any subaward are posted on the OJP web site at https://ojp.gov/funding/Explore/SubawardAuthorization.htm (Award condition:  All subawards ("subgrants") must have specific federal authorization), and are incorporated by reference here.



| U.S. Department of Justice | AWARD CONTINUATION | |
|---|---|---|
| Office of Justice Programs | SHEET | PAGE 5 OF 23 |
| **Bureau of Justice Assistance** | **Grant** | |

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

11. Specific post-award approval required to use a noncompetitive approach in any procurement contract that would exceed $150,000

   The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements to obtain specific advance approval to use a noncompetitive approach in any procurement contract that would exceed the Simplified Acquisition Threshold (currently, $150,000). This condition applies to agreements that -- for purposes of federal grants administrative requirements -- OJP considers a procurement "contract" (and therefore does not consider a subaward).

   The details of the requirement for advance approval to use a noncompetitive approach in a procurement contract under an OJP award are posted on the OJP web site at https://ojp.gov/funding/Explore/NoncompetitiveProcurement.htm (Award condition: Specific post-award approval required to use a noncompetitive approach in a procurement contract (if contract would exceed $150,000)), and are incorporated by reference here.

12. Requirements pertaining to prohibited conduct related to trafficking in persons (including reporting requirements and OJP authority to terminate award)

   The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements (including requirements to report allegations) pertaining to prohibited conduct related to the trafficking of persons, whether on the part of recipients, subrecipients ("subgrantees"), or individuals defined (for purposes of this condition) as "employees" of the recipient or of any subrecipient.

   The details of the recipient's obligations related to prohibited conduct related to trafficking in persons are posted on the OJP web site at https://ojp.gov/funding/Explore/ProhibitedConduct-Trafficking.htm (Award condition: Prohibited conduct by recipients and subrecipients related to trafficking in persons (including reporting requirements and OJP authority to terminate award)), and are incorporated by reference here.

13. Compliance with applicable rules regarding approval, planning, and reporting of conferences, meetings, trainings, and other events

   The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable laws, regulations, policies, and official DOJ guidance (including specific cost limits, prior approval and reporting requirements, where applicable) governing the use of federal funds for expenses related to conferences (as that term is defined by DOJ), including the provision of food and/or beverages at such conferences, and costs of attendance at such conferences.

   Information on the pertinent DOJ definition of conferences and the rules applicable to this award appears in the DOJ Grants Financial Guide (currently, as section 3.10 of "Postaward Requirements" in the "DOJ Grants Financial Guide").

14. Requirement for data on performance and effectiveness under the award

   The recipient must collect and maintain data that measure the performance and effectiveness of work under this award. The data must be provided to OJP in the manner (including within the timeframes) specified by OJP in the program solicitation or other applicable written guidance. Data collection supports compliance with the Government Performance and Results Act (GPRA) and the GPRA Modernization Act of 2010, and other applicable laws.

15. OJP Training Guiding Principles

   Any training or training materials that the recipient -- or any subrecipient ("subgrantee") at any tier -- develops or delivers with OJP award funds must adhere to the OJP Training Guiding Principles for Grantees and Subgrantees, available at https://ojp.gov/funding/Implement/TrainingPrinciplesForGrantees-Subgrantees.htm.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE   6   OF   23

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |

*SPECIAL CONDITIONS*

16. Effect of failure to address audit issues

   The recipient understands and agrees that the DOJ awarding agency (OJP or OVW, as appropriate) may withhold
   award funds, or may impose other related requirements, if (as determined by the DOJ awarding agency) the recipient
   does not satisfactorily and promptly address outstanding issues from audits required by the Part 200 Uniform
   Requirements (or by the terms of this award), or other outstanding issues that arise in connection with audits,
   investigations, or reviews of DOJ awards.

17. Potential imposition of additional requirements

   The recipient agrees to comply with any additional requirements that may be imposed by the DOJ awarding agency
   (OJP or OVW, as appropriate) during the period of performance for this award, if the recipient is designated as "high-
   risk" for purposes of the DOJ high-risk grantee list.

18. Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 42

   The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28
   C.F.R. Part 42, specifically including any applicable requirements in Subpart E of 28 C.F.R. Part 42 that relate to an
   equal employment opportunity program.

19. Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 54

   The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28
   C.F.R. Part 54, which relates to nondiscrimination on the basis of sex in certain "education programs."

20. Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 38

   The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28
   C.F.R. Part 38, specifically including any applicable requirements regarding written notice to program beneficiaries and
   prospective program beneficiaries.

   Among other things, 28 C.F.R. Part 38 includes rules that prohibit specific forms of discrimination on the basis of
   religion, a religious belief, a refusal to hold a religious belief, or refusal to attend or participate in a religious practice.
   Part 38 also sets out rules and requirements that pertain to recipient and subrecipient ("subgrantee") organizations that
   engage in or conduct explicitly religious activities, as well as rules and requirements that pertain to recipients and
   subrecipients that are faith-based or religious organizations.

   The text of the regulation, now entitled "Partnerships with Faith-Based and Other Neighborhood Organizations," is
   available via the Electronic Code of Federal Regulations (currently accessible at https://www.ecfr.gov/cgi-
   bin/ECFR?page=browse), by browsing to Title 28-Judicial Administration, Chapter 1, Part 38, under e-CFR "current"
   data.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE  7  OF  23

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

21. Restrictions on "lobbying"

In general, as a matter of federal law, federal funds awarded by OJP may not be used by the recipient, or any subrecipient ("subgrantee") at any tier, either directly or indirectly, to support or oppose the enactment, repeal, modification, or adoption of any law, regulation, or policy, at any level of government.  See 18 U.S.C. 1913.  (There may be exceptions if an applicable federal statute specifically authorizes certain activities that otherwise would be barred by law.)

Another federal law generally prohibits federal funds awarded by OJP from being used by the recipient, or any subrecipient at any tier, to pay any person to influence (or attempt to influence) a federal agency, a Member of Congress, or Congress (or an official or employee of any of them) with respect to the awarding of a federal grant or cooperative agreement, subgrant, contract, subcontract, or loan, or with respect to actions such as renewing, extending, or modifying any such award.  See 31 U.S.C. 1352.  Certain exceptions to this law apply, including an exception that applies to Indian tribes and tribal organizations.

Should any question arise as to whether a particular use of federal funds by a recipient (or subrecipient) would or might fall within the scope of these prohibitions, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.

22. Compliance with general appropriations-law restrictions on the use of federal funds (FY 2018)

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable restrictions on the use of federal funds set out in federal appropriations statutes. Pertinent restrictions, including from various "general provisions" in the Consolidated Appropriations Act, 2018, are set out at https://ojp.gov/funding/Explore/FY18AppropriationsRestrictions.htm, and are incorporated by reference here.

Should a question arise as to whether a particular use of federal funds by a recipient (or a subrecipient) would or might fall within the scope of an appropriations-law restriction, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.

23. Reporting Potential Fraud, Waste, and Abuse, and Similar Misconduct

The recipient and any subrecipients ("subgrantees") must promptly refer to the DOJ Office of the Inspector General (OIG) any credible evidence that a principal, employee, agent, subrecipient, contractor, subcontractor, or other person has, in connection with funds under this award -- (1) submitted a claim that violates the False Claims Act; or (2) committed a criminal or civil violation of laws pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct.

Potential fraud, waste, abuse, or misconduct involving or relating to funds under this award should be reported to the OIG by-- (1) mail directed to: Office of the Inspector General, U.S. Department of Justice, Investigations Division, 1425 New York Avenue, N.W. Suite 7100, Washington, DC 20530; and/or (2) the DOJ OIG hotline: (contact information in English and Spanish) at (800) 869-4499 (phone) or (202) 616-9881 (fax).

Additional information is available from the DOJ OIG website at https://oig.justice.gov/hotline.



| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE  8  OF  23 |
|---|---|---|

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

24.   Restrictions and certifications regarding non-disclosure agreements and related matters

No recipient or subrecipient ("subgrantee") under this award, or entity that receives a procurement contract or subcontract with any funds under this award, may require any employee or contractor to sign an internal confidentiality agreement or statement that prohibits or otherwise restricts, or purports to prohibit or restrict, the reporting (in accordance with law) of waste, fraud, or abuse to an investigative or law enforcement representative of a federal department or agency authorized to receive such information.

The foregoing is not intended, and shall not be understood by the agency making this award, to contravene requirements applicable to Standard Form 312 (which relates to classified information), Form 4414 (which relates to sensitive compartmented information), or any other form issued by a federal department or agency governing the nondisclosure of classified information.

1.  In accepting this award, the recipient--

a.  represents that it neither requires nor has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

b.  certifies that, if it learns or is notified that it is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.

2.  If the recipient does or is authorized under this award to make subawards ("subgrants"), procurement contracts, or both--

a.  it represents that--

(1)  it has determined that no other entity that the recipient's application proposes may or will receive award funds (whether through a subaward ("subgrant"), procurement contract, or subcontract under a procurement contract) either requires or has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

(2)  it has made appropriate inquiry, or otherwise has an adequate factual basis, to support this representation; and

b.  it certifies that, if it learns or is notified that any subrecipient, contractor, or subcontractor entity that receives funds under this award is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds to or by that entity, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.



U.S. Department of Justice

Office of Justice Programs

**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE 9 OF 23

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

25. Compliance with 41 U.S.C. 4712 (including prohibitions on reprisal; notice to employees)

The recipient (and any subrecipient at any tier) must comply with, and is subject to, all applicable provisions of 41 U.S.C. 4712, including all applicable provisions that prohibit, under specified circumstances, discrimination against an employee as reprisal for the employee's disclosure of information related to gross mismanagement of a federal grant, a gross waste of federal funds, an abuse of authority relating to a federal grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal grant.

The recipient also must inform its employees, in writing (and in the predominant native language of the workforce), of employee rights and remedies under 41 U.S.C. 4712.

Should a question arise as to the applicability of the provisions of 41 U.S.C. 4712 to this award, the recipient is to contact the DOJ awarding agency (OJP or OVW, as appropriate) for guidance.

26. Encouragement of policies to ban text messaging while driving

Pursuant to Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," 74 Fed. Reg. 51225 (October 1, 2009), DOJ encourages recipients and subrecipients ("subgrantees") to adopt and enforce policies banning employees from text messaging while driving any vehicle during the course of performing work funded by this award, and to establish workplace safety policies and conduct education, awareness, and other outreach to decrease crashes caused by distracted drivers.

27. Requirement to disclose whether recipient is designated "high risk" by a federal grant-making agency outside of DOJ

If the recipient is designated "high risk" by a federal grant-making agency outside of DOJ, currently or at any time during the course of the period of performance under this award, the recipient must disclose that fact and certain related information to OJP by email at OJP.ComplianceReporting@ojp.usdoj.gov. For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the recipient's past performance, or other programmatic or financial concerns with the recipient. The recipient's disclosure must include the following: 1. The federal awarding agency that currently designates the recipient high risk, 2. The date the recipient was designated high risk, 3. The high-risk point of contact at that federal awarding agency (name, phone number, and email address), and 4. The reasons for the high-risk status, as set out by the federal awarding agency.

28. Cooperating with OJP Monitoring

The recipient agrees to cooperate with OJP monitoring of this award pursuant to OJP's guidelines, protocols, and procedures, and to cooperate with OJP (including the grant manager for this award and the Office of Chief Financial Officer (OCFO)) requests related to such monitoring, including requests related to desk reviews and/or site visits. The recipient agrees to provide to OJP all documentation necessary for OJP to complete its monitoring tasks, including documentation related to any subawards made under this award. Further, the recipient agrees to abide by reasonable deadlines set by OJP for providing the requested documents. Failure to cooperate with OJP's monitoring activities may result in actions that affect the recipient's DOJ awards, including, but not limited to: withholdings and/or other restrictions on the recipient's access to award funds; referral to the DOJ OIG for audit review; designation of the recipient as a DOJ High Risk grantee; or termination of an award(s).

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET

Grant**

PAGE  10  OF  23

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

29.  FFATA reporting:  Subawards and executive compensation

The recipient must comply with applicable requirements to report first-tier subawards ("subgrants") of $25,000 or more and, in certain circumstances, to report the names and total compensation of the five most highly compensated executives of the recipient and first-tier subrecipients (first-tier "subgrantees") of award funds.  The details of recipient obligations, which derive from the Federal Funding Accountability and Transparency Act of 2006 (FFATA), are posted on the OJP web site at https://ojp.gov/funding/Explore/FFATA.htm (Award condition: Reporting Subawards and Executive Compensation), and are incorporated by reference here.

This condition, including its reporting requirement, does not apply to-- (1) an award of less than $25,000, or (2) an award made to an individual who received the award as a natural person (i.e., unrelated to any business or non-profit organization that he or she may own or operate in his or her name).

30.  Required monitoring of subawards

The recipient must monitor subawards under this award in accordance with all applicable statutes, regulations, award conditions, and the DOJ Grants Financial Guide, and must include the applicable conditions of this award in any subaward. Among other things, the recipient is responsible for oversight of subrecipient spending and monitoring of specific outcomes and benefits attributable to use of award funds by subrecipients. The recipient agrees to submit, upon request, documentation of its policies and procedures for monitoring of subawards under this award.

31.  Use of program income

Program income (as defined in the Part 200 Uniform Requirements) must be used in accordance with the provisions of the Part 200 Uniform Requirements.  Program income earnings and expenditures both must be reported on the quarterly Federal Financial Report, SF 425.

32.  Justice Information Sharing

Information sharing projects funded under this award must comply with DOJ's Global Justice Information Sharing Initiative (Global) guidelines. The recipient (and any subrecipient at any tier) must conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https:// it.ojp.gov/ gsp_grantcondition. The recipient (and any subrecipient at any tier) must document planned approaches to information sharing and describe compliance with the GSP and appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

33.  Avoidance of duplication of networks

To avoid duplicating existing networks or IT systems in any initiatives funded by BJA for law enforcement information sharing systems which involve interstate connectivity between jurisdictions, such systems shall employ, to the extent possible, existing networks as the communication backbone to achieve interstate connectivity, unless the recipient can demonstrate to the satisfaction of BJA that this requirement would not be cost effective or would impair the functionality of an existing or proposed IT system.

34.  Compliance with 28 C.F.R. Part 23

With respect to any information technology system funded or supported by funds under this award, the recipient (and any subrecipient at any tier) must comply with 28 C.F.R. Part 23, Criminal Intelligence Systems Operating Policies, if OJP determines this regulation to be applicable. Should OJP determine 28 C.F.R. Part 23 to be applicable, OJP may, at its discretion, perform audits of the system, as per the regulation. Should any violation of 28 C.F.R. Part 23 occur, the recipient may be fined as per 34 U.S.C. 10231(c)-(d).  The recipient may not satisfy such a fine with federal funds.

OJP FORM 4000/2 (REV. 4-88)



| | | | |
|---|---|---|---|
| | U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE  11  OF  23 |

| | | | |
|---|---|---|---|
| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE    11/16/2018 | |

*SPECIAL CONDITIONS*

35.   Protection of human research subjects

The recipient (and any subrecipient at any tier) must comply with the requirements of 28 C.F.R. Part 46 and all OJP policies and procedures regarding the protection of human research subjects, including obtainment of Institutional Review Board approval, if appropriate, and subject informed consent.

36.   Confidentiality of data

The recipient (and any subrecipient at any tier) must comply with all confidentiality requirements of 34 U.S.C. 10231 and 28 C.F.R. Part 22 that are applicable to collection, use, and revelation of data or information. The recipient further agrees, as a condition of award approval, to submit a Privacy Certificate that is in accord with requirements of 28 C.F.R. Part 22 and, in particular, 28 C.F.R. 22.23.

37.   Verification and updating of recipient contact information

The recipient must verify its Point of Contact(POC), Financial Point of Contact (FPOC), and Authorized Representative contact information in GMS, including telephone number and e-mail address.  If any information is incorrect or has changed, a Grant Adjustment Notice (GAN) must be submitted via the Grants Management System (GMS) to document changes.

38.   Law enforcement task forces - required training

Within 120 days of award acceptance, each current member of a law enforcement task force funded with award funds who is a task force commander, agency executive, task force officer, or other task force member of equivalent rank, must complete required online (internet-based) task force training. Additionally, all future task force members must complete this training once during the period of performance for this award, or once every four years if multiple OJP awards include this requirement.

The required training is available free of charge online through the BJA-funded Center for Task Force Integrity and Leadership (www.ctfli.org). The training addresses task force effectiveness, as well as other key issues including privacy and civil liberties/rights, task force performance measurement, personnel selection, and task force oversight and accountability. If award funds are used to support a task force, the recipient must compile and maintain a task force personnel roster, along with course completion certificates.

Additional information regarding the training is available through BJA's web site and the Center for Task Force Integrity and Leadership (www.ctfli.org).

39.   Justification of consultant rate

Approval of this award does not indicate approval of any consultant rate in excess of $650 per day. A detailed justification must be submitted to and approved by the OJP program office prior to obligation or expenditure of such funds.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE  12  OF  23

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

40.   Submission of eligible records relevant to the National Instant Background Check System

Consonant with federal statutes that pertain to firearms and background checks -- including 18 U.S.C. 922 and 34
U.S.C. ch. 409 -- if the recipient (or any subrecipient at any tier) uses this award to fund (in whole or in part) a specific
project or program (such as a law enforcement, prosecution, or court program) that results in any court dispositions,
information, or other records that are "eligible records" (under federal or State law) relevant to the National Instant
Background Check System (NICS), or that has as one of its purposes the establishment or improvement of records
systems that contain any court dispositions, information, or other records that are "eligible records" (under federal or
State law) relevant to the NICS, the recipient (or subrecipient, if applicable) must ensure that all such court
dispositions, information, or other records that are "eligible records" (under federal or State law) relevant to the NICS
are promptly made available to the NICS or to the "State" repository/database that is electronically available to (and
accessed by) the NICS, and -- when appropriate -- promptly must update, correct, modify, or remove such NICS-
relevant "eligible records".

In the event of minor and transitory non-compliance, the recipient may submit evidence to demonstrate diligent
monitoring of compliance with this condition (including subrecipient compliance).  DOJ will give great weight to any
such evidence in any express written determination regarding this condition.

41.   Certification of Compliance with 8 U.S.C. 1373 and 1644 (within the funded "program or activity") required for valid
award acceptance by a "State"

In order validly to accept this award, the prospective recipient must submit the required "State or Local Government:
FY 2018 Certification of Compliance with 8 U.S.C. 1373 and 1644" (executed by the chief legal officer of the State).
Unless that executed certification either-- (1) is submitted to OJP together with the fully-executed award document, or
(2) is uploaded in OJP's GMS no later than the day the signed award document is submitted to OJP, any submission by
a State that purports to accept the award is invalid.

If an initial award-acceptance submission by the recipient is invalid, once the State does submit the necessary
certification regarding 8 U.S.C. 1373 and 1644, the State may submit a fully-executed award document executed by
the State on or after the date of that certification.



| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE  13  OF  23 |
|---|---|---|

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

42.   Noninterference (within the funded "program or activity") with federal law enforcement: 8 U.S.C. 1373 and 1644; ongoing compliance

1. With respect to the "program or activity" funded in whole or part under this award (including any such program or activity of any subrecipient at any tier), throughout the period of performance, no State or local government entity, -agency, or -official may prohibit or in any way restrict-- (1) any government entity or -official from sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. 1373(a); or (2) a government entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration status as described in either 8 U.S.C. 1373(b) or 1644. Any prohibition (or restriction) that violates this condition is an "information-communication restriction" under this award.

2. Certifications from subrecipients. The recipient may not make a subaward to a State, a local government, or a "public" institution of higher education, unless it first obtains a certification of compliance with 8 U.S.C. 1373 and 1644, properly executed by the chief legal officer of the government or educational institution that would receive the subaward, using the appropriate form available at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm. Also, the recipient must require that no subrecipient (at any tier) may make a further subaward to a State, a local government, or a public institution of higher education, unless it first obtains a certification of compliance with 8 U.S.C. 1373 and 1644, properly executed by the chief legal officer of the government or institution that would receive the further subaward, using the appropriate OJP form.

3. The recipient's monitoring responsibilities include monitoring of subrecipient compliance with the requirements of this condition.

4. Allowable costs. Compliance with these requirements is an authorized and priority purpose of this award. To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) that the recipient, or any subrecipient at any tier that is a State, a local government, or a public institution of higher education, incurs to implement this condition.

5. Rules of Construction

A. For purposes of this condition:

(1) "State" and "local government" include any agency or other entity thereof, but not any institution of higher education or any Indian tribe.

(2) A "public" institution of higher education is defined as one that is owned, controlled, or directly funded (in whole or in substantial part) by a State or local government. (Such a public institution is considered to be a "government entity," and its officials to be "government officials.")

(3) "Program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. 2000d-4a).

(4) "Immigration status" means what it means under 8 U.S.C. 1373 and 8 U.S.C. 1644; and terms that are defined in 8 U.S.C. 1101 mean what they mean under that section 1101, except that "State" also includes American Samoa.

(5) Pursuant to the provisions set out at (or referenced in) 8 U.S.C. 1551 note ("Abolition ... and Transfer of Functions"), references to the "Immigration and Naturalization Service" in 8 U.S.C. 1373 and 1644 are to be read as references to particular components of the Department of Homeland Security (DHS).

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, any public institution of higher education, or any other entity (or individual) to violate any federal law, including any applicable civil rights or nondiscrimination law.

IMPORTANT NOTE: Any questions about the meaning or scope of this condition should be directed to OJP, before

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE  14  OF  23

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

award acceptance.

43.   Authority to obligate award funds contingent on noninterference (within the funded "program or activity") with federal law enforcement (8 U.S.C. 1373 and 1644); unallowable costs; notification

1. If the recipient is a "State," a local government, or a "public" institution of higher education:

A. The recipient may not obligate award funds if, at the time of the obligation, the "program or activity" of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that is funded in whole or in part with award funds is subject to any "information-communication restriction."

B. In addition, with respect to any project costs it incurs "at risk," the recipient may not obligate award funds to reimburse itself if -- at the time it incurs such costs -- the program or activity of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that would be reimbursed in whole or in part with award funds was subject to any information-communication restriction.

C. Any drawdown of award funds by the recipient shall be considered, for all purposes, to be a material representation by the recipient to OJP that, as of the date the recipient requests the drawdown, the recipient and each subrecipient (regardless of tier) that is a State, local government, or public institution of higher education, is in compliance with the award condition entitled "Noninterference (within the funded 'program or activity') with federal law enforcement: 8 U.S.C. 1373 and 1644 and ongoing compliance."

D. The recipient must promptly notify OJP (in writing) if the recipient, from its requisite monitoring of compliance with award conditions or otherwise, has credible evidence that indicates that the funded program or activity of the recipient, or of any subrecipient at any tier that is either a State or a local government or a public institution of higher education, may be subject to any information-communication restriction. In addition, any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must require prompt notification to the entity that made the subaward, should the subrecipient have such credible evidence regarding an information-communication restriction.

2. Any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must provide that the subrecipient may not obligate award funds if, at the time of the obligation, the program or activity of the subrecipient (or of any further such subrecipient at any tier) that is funded in whole or in part with award funds is subject to any information-communication restriction.

3. Absent an express written determination by DOJ to the contrary, based upon a finding by DOJ of compelling circumstances (e.g., a small amount of award funds obligated by the recipient at the time of a subrecipient's minor and transitory non-compliance, which was unknown to the recipient despite diligent monitoring), any obligations of award funds that, under this condition, may not be made shall be unallowable costs for purposes of this award. In making any such determination, DOJ will give great weight to evidence submitted by the recipient that demonstrates diligent monitoring of subrecipient compliance with the requirements set out in the "Noninterference ... 8 U.S.C. 1373 and 1644 and ongoing compliance" award condition.

4. Rules of Construction

A. For purposes of this condition "information-communication restriction" has the meaning set out in the "Noninterference ... 8 U.S.C. 1373 and 1644 and ongoing compliance" condition.

B. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference ... 8 U.S.C. 1373 and 1644 and ongoing compliance" condition are incorporated by reference as though set forth here in full.



| U.S. Department of Justice Office of Justice Programs **Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET** **Grant** | PAGE  15  OF  23 |
|---|---|---|

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

44.   Noninterference (within the funded "program or activity") with federal law enforcement: No public disclosure of certain law enforcement sensitive information

SCOPE. This condition applies with respect to the "program or activity" that is funded (in whole or in part) by the award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance. Its provisions must be among those included in any subaward (at any tier).

1. Noninterference: No public disclosure of federal law enforcement information in order to conceal, harbor, or shield

Consistent with the purposes and objectives of federal law enforcement statutes and federal criminal law (including 8 U.S.C. 1324 and 18 U.S.C. chs. 1, 49, 227), no public disclosure may be made of any federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 -- without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. 1071 or 1072 or of 8 U.S.C. 1324(a).

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

4. Rules of construction

A. For purposes of this condition--

(1) the term "alien" means what it means under section 101 of the Immigration and Nationality Act (see 8 U.S.C. 1101(a)(3));

(2) the term "federal law enforcement information" means law enforcement sensitive information communicated or made available, by the federal government, to a State or local government entity, -agency, or -official, through any means, including, without limitation-- (1) through any database, (2) in connection with any law enforcement partnership or -task-force, (3) in connection with any request for law enforcement assistance or -cooperation, or (4) through any deconfliction (or courtesy) notice of planned, imminent, commencing, continuing, or impending federal law enforcement activity;

(3) the term "law enforcement sensitive information" means records or information compiled for any law enforcement purpose; and

(4) the term "public disclosure" means any communication or release other than one-- (a) within the recipient, or (b) to any subrecipient (at any tier) that is a government entity.

B. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference (within the funded 'program or activity') with federal law enforcement: 8 U.S.C. 1373 and 1644 and ongoing compliance" award condition are incorporated by reference as though set forth here in full.



| | U.S. Department of Justice | **AWARD CONTINUATION SHEET** | |
|---|---|---|---|
| | Office of Justice Programs | | PAGE  16  OF  23 |
| | **Bureau of Justice Assistance** | **Grant** | |

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

45.  Noninterference (within the funded "program or activity") with federal law enforcement: Interrogation of certain aliens

SCOPE. This condition applies with respect to the "program or activity" that is funded (in whole or in part) by this award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award.  Its provisions must be among those included in any subaward (at any tier).

1. Noninterference with statutory law enforcement access to correctional facilities

Consonant with federal law enforcement statutes and regulations -- including 8 U.S.C. 1357(a), under which certain federal officers and employees "have power without warrant ... to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," and 8 C.F.R. 287.5(a), under which that power may be exercised "anywhere in or outside the United States" -- within the funded program or activity, no State or local government entity, -agency, or -official may interfere with the exercise of that power to interrogate "without warrant" (by agents of the United States acting under color of federal law) by impeding access to any State or local government (or government-contracted) correctional facility by such agents for the purpose "interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States."

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

4. Rules of construction

A. For purposes of this condition:

(1) The term "alien" means what it means under section 101 of the Immigration and Nationality Act (INA) (see 8 U.S.C. 1101(a)(3)).

(2) The term "correctional facility" means what it means under the title I of the Omnibus Crime Control and Safe Streets Act of 1968 (see 34 U.S.C. 10251(a)(7)).

(3) The term "impede" includes taking or continuing any action, or implementing or maintaining any law, policy, rule, or practice, that--

(a) is designed to prevent or to significantly delay or complicate, or

(b) has the effect of preventing or of significantly delaying or complicating.

B. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference (within the funded 'program or activity') with federal law enforcement: 8 U.S.C. 1373 and 1644 and ongoing compliance" award condition are incorporated by reference as though set forth here in full.

OJP FORM 4000/2 (REV. 4-88)



| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE  17  OF  23 |
|---|---|---|

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

46.   Noninterference (within the funded "program or activity") with federal law enforcement: Notice of scheduled release

SCOPE. This condition applies with respect to the "program or activity" that is funded (in whole or in part) by the award, as of the date the recipient accepts the award, and throughout the remainder of the period of performance. Its provisions must be among those included in any subaward at any tier.

1. Noninterference with "removal" process: Notice of scheduled release date and time

Consonant with federal law enforcement statutes -- including 8 U.S.C. 1231 (for an alien incarcerated by a State or local government, a 90-day "removal period" during which the federal government "shall" detain and then "shall" remove an alien from the U.S. "begins" no later than "the date the alien is released from ... confinement"; also, the federal government is expressly authorized to make payments to a "State or a political subdivision of the State ... with respect to the incarceration of [an] undocumented criminal alien"); 8 U.S.C. 1226 (the federal government "shall take into custody" certain criminal aliens "when the alien is released"); and 8 U.S.C. 1366 (requiring an annual DOJ report to Congress on "the number of illegal alien[ felons] in Federal and State prisons" and programs underway "to ensure the prompt removal" from the U.S. of removable "criminal aliens") -- within the funded program or activity, no State or local government entity, -agency, or -official (including a government-contracted correctional facility) may interfere with the "removal" process by failing to provide -- as early as practicable (see para. 4.C. below) -- advance notice to DHS of the scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from DHS a formal written request pursuant to the INA that seeks such advance notice.

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

4. Rules of construction

A. For purposes of this condition:

(1) The term "alien" means what it means under section 101 of the INA (see 8 U.S.C. 1101(a)(3)).

(2) The term "correctional facility" means what it means under the title I of the Omnibus Crime Control and Safe Streets Act of 1968 (see 34 U.S.C. 10251(a)(7)).

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity or individual to maintain (or detain) any individual in custody beyond the date and time the individual otherwise would have been released.

C.   Applicability

(1) Current DHS practice is ordinarily to request advance notice of scheduled release "as early as practicable (at least 48 hours, if possible)." (See DHS Form I-247A (3/17)). If (e.g., in light of the date DHS made such request) the scheduled release date and time for an alien are such as not to allow for the advance notice that DHS has requested, it shall NOT be a violation of this condition to provide only as much advance notice as practicable.

(2) Current DHS practice is to use the same form for a second, distinct purpose -- to request that an individual be



| | | | |
|---|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE  18  OF  23 | |

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

detained for up to 48 hours AFTER the scheduled release. This condition does NOT encompass such DHS requests for detention.

D. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference (within the funded 'program or activity') with federal law enforcement: 8 U.S.C. 1373 and 1644 and ongoing compliance" award condition are incorporated by reference as though set forth here in full.

47.  Requirement to collect certain information from subrecipients

The recipient may not make a subaward to a State, a local government, or a "public" institution of higher education, unless it first obtains from the proposed subrecipient responses to the questions identified in the program solicitation as "Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)." All subrecipient responses must be collected and maintained by the recipient, consistent with regular document retention requirements, and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

48.  "Methods of Administration" - monitoring compliance with civil rights laws and nondiscrimination provisions

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with applicable federal civil rights laws and nondiscrimination provisions.  Within 90 days of the date of award acceptance, the recipient must submit to OJP's Office for Civil Rights (at CivilRightsMOA@usdoj.gov) written Methods of Administration ("MOA") for subrecipient monitoring with respect to civil rights requirements.  In addition, upon request by OJP (or by another authorized federal agency), the recipient must make associated documentation available for review.

The details of the recipient's obligations related to Methods of Administration are posted on the OJP web site at https://ojp.gov/funding/Explore/StateMethodsAdmin-FY2017update.htm (Award condition: "Methods of Administration" - Requirements applicable to States (FY 2017 Update)), and are incorporated by reference here.

49.  Required attendance at BJA-sponsored events

The recipient (and its subrecipients at any tier) must participate in BJA-sponsored training events, technical assistance events, or conferences held by BJA or its designees, upon BJA's request.



| | | | |
|---|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE 19 OF 23 | |

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

50. Compliance with National Environmental Policy Act and related statutes

Upon request, the recipient (and any subrecipient at any tier) must assist BJA in complying with the National Environmental Policy Act (NEPA), the National Historic Preservation Act, and other related federal environmental impact analyses requirements in the use of these award funds, either directly by the recipient or by a subrecipient. Accordingly, the recipient agrees to first determine if any of the following activities will be funded by the grant, prior to obligating funds for any of these purposes. If it is determined that any of the following activities will be funded by the award, the recipient agrees to contact BJA.

The recipient understands that this condition applies to new activities as set out below, whether or not they are being specifically funded with these award funds. That is, as long as the activity is being conducted by the recipient, a subrecipient, or any third party, and the activity needs to be undertaken in order to use these award funds, this condition must first be met. The activities covered by this condition are:

a. New construction;

b. Minor renovation or remodeling of a property located in an environmentally or historically sensitive area, including properties located within a 100-year flood plain, a wetland, or habitat for endangered species, or a property listed on or eligible for listing on the National Register of Historic Places;

c. A renovation, lease, or any proposed use of a building or facility that will either (a) result in a change in its basic prior use or (b) significantly change its size;

d. Implementation of a new program involving the use of chemicals other than chemicals that are (a) purchased as an incidental component of a funded activity and (b) traditionally used, for example, in office, household, recreational, or education environments; and

e. Implementation of a program relating to clandestine methamphetamine laboratory operations, including the identification, seizure, or closure of clandestine methamphetamine laboratories.

The recipient understands and agrees that complying with NEPA may require the preparation of an Environmental Assessment and/or an Environmental Impact Statement, as directed by BJA. The recipient further understands and agrees to the requirements for implementation of a Mitigation Plan, as detailed at https://bja.gov/Funding/nepa.html, for programs relating to methamphetamine laboratory operations.

Application of This Condition to Recipient's Existing Programs or Activities:  For any of the recipient's or its subrecipients' existing programs or activities that will be funded by these award funds, the recipient, upon specific request from BJA, agrees to cooperate with BJA in any preparation by BJA of a national or program environmental assessment of that funded program or activity.

51. Establishment of trust fund

If award funds are being drawn down in advance, the recipient (or a subrecipient, with respect to a subaward) is required to establish a trust fund account. Recipients (and subrecipients) must maintain advance payments of federal awards in interest-bearing accounts, unless regulatory exclusions apply (2 C.F.R. 200.305(b)(8)). The trust fund, including any interest, may not be used to pay debts or expenses incurred by other activities beyond the scope of the Edward Byrne Memorial Justice Assistance Grant Program (JAG). The recipient also agrees to obligate the award funds in the trust fund (including any interest earned) during the period of performance for the award and expend within 90 days thereafter. Any unobligated or unexpended funds, including interest earned, must be returned to OJP at the time of closeout.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

| | **AWARD CONTINUATION SHEET** | |
| --- | --- | --- |
| | **Grant** | PAGE 20 OF 23 |

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
| --- | --- | --- | --- |

*SPECIAL CONDITIONS*

52. Prohibition on use of award funds for match under BVP program

JAG funds may not be used as the 50% match for purposes of the DOJ Bulletproof Vest Partnership (BVP) program.

53. Certification of body armor "mandatory wear" policies

The recipient agrees to submit a signed certification that all law enforcement agencies receiving body armor purchased with funds from this award have a written "mandatory wear" policy in effect. The recipient must keep signed certifications on file for any subrecipients planning to utilize funds from this award for ballistic-resistant and stab-resistant body armor purchases. This policy must be in place for at least all uniformed officers before any funds from this award may be used by an agency for body armor. There are no requirements regarding the nature of the policy other than it be a mandatory wear policy for all uniformed officers while on duty.

54. Body armor - compliance with NIJ standards and other requirements

Ballistic-resistant and stab-resistant body armor purchased with JAG award funds may be purchased at any threat level, make or model, from any distributor or manufacturer, as long as the body armor has been tested and found to comply with applicable National Institute of Justice ballistic or stab standards and is listed on the NIJ Compliant Body Armor Model List (https://nij.gov/topics/technology/body-armor/Pages/compliant-ballistic-armor.aspx). In addition, ballistic-resistant and stab-resistant body armor purchased must be made in the United States and must be uniquely fitted, as set forth at 34 U.S.C. 10202(c)(1)(A). The latest NIJ standard information can be found here: https://nij.gov/topics/technology/body-armor/pages/safety-initiative.aspx.

55. Reporting requirements

The recipient must submit quarterly Federal Financial Reports (SF-425) and semi-annual performance reports through OJP's GMS (https://grants.ojp.usdoj.gov). Consistent with the Department's responsibilities under the Government Performance and Results Act (GPRA) and the GPRA Modernization Act of 2010, the recipient must provide data that measure the results of its work. The recipient must submit quarterly performance metrics reports through BJA's Performance Measurement Tool (PMT) website (www.bjaperformancetools.org). For more detailed information on reporting and other JAG requirements, refer to the JAG reporting requirements webpage. Failure to submit required JAG reports by established deadlines may result in the freezing of grant funds and future High Risk designation.

56. Required data on law enforcement agency training

Any law enforcement agency receiving direct or sub-awarded funding from this JAG award must submit quarterly accountability metrics data related to training that officers have received on the use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public.

57. Expenditures prohibited without waiver

No funds under this award may be expended on the purchase of items prohibited by the JAG program statute, unless, as set forth at 34 U.S.C. 10152, the BJA Director certifies that extraordinary and exigent circumstances exist, making such expenditures essential to the maintenance of public safety and good order.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE  21  OF  23

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
| --- | --- | --- | --- |

*SPECIAL CONDITIONS*

58.   Authorization to obligate (federal) award funds to reimburse certain project costs incurred on or after October 1, 2017

The recipient may obligate (federal) award funds only after the recipient makes a valid acceptance of the award.  As of the first day of the period of performance for the award (October 1, 2017), however, the recipient may choose to incur project costs using non-federal funds, but any such project costs are incurred at the recipient's risk until, at a minimum-- (1) the recipient makes a valid acceptance of the award, and (2) all applicable withholding conditions are removed by OJP (via a Grant Adjustment Notice).  (A withholding condition is a condition in the award document that precludes the recipient from obligating, expending, or drawing down all or a portion of the award funds until the condition is removed.)

Except to the extent (if any) that an award condition expressly precludes reimbursement of project costs incurred "at-risk," if and when the recipient makes a valid acceptance of this award and OJP removes each applicable withholding condition through a Grant Adjustment Notice, the recipient is authorized to obligate (federal) award funds to reimburse itself for project costs incurred "at-risk" earlier during the period of performance (such as project costs incurred prior to award acceptance or prior to removal of an applicable withholding condition), provided that those project costs otherwise are allowable costs under the award.

Nothing in this condition shall be understood to authorize the recipient (or any subrecipient at any tier) to use award funds to "supplant" State or local funds in violation of the recipient's certification (executed by the chief executive of the State or local government) that federal funds will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

59.   Use of funds for DNA testing; upload of DNA profiles

If award funds are used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System ("CODIS," the DNA database operated by the FBI) by a government DNA laboratory with access to CODIS.

No profiles generated under this award may be entered or uploaded into any non-governmental DNA database without prior express written approval from BJA.

Award funds may not be used for the purchase of DNA equipment and supplies unless the resulting DNA profiles may be accepted for entry into CODIS.

60.   Three percent set-aside for NIBRS compliance

The recipient must ensure that at least 3 percent of the total amount of this award is dedicated to achieving full compliance with the FBI's National Incident-Based Reporting System (NIBRS), unless the FBI has certified that the recipient state is already NIBRS compliant, and evidence of this has been submitted to and approved by BJA.  The recipient will be required  by BJA to make revisions to budgets that do not clearly indicate what projects will be supported by this 3 percent set-aside, unless the evidence of NIBRS compliance has been submitted to and approved by BJA. (This condition does not apply to awards to the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, or American Samoa).

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE  22  OF  23

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
| --- | --- | --- | --- |

*SPECIAL CONDITIONS*

61. Encouragement of submission of "success stories"

BJA strongly encourages the recipient to submit annual (or more frequent) JAG success stories. To submit a success story, sign in to a My BJA account at https:// www.bja.gov/ Login.aspx to access the Success Story Submission form. If the recipient does not yet have a My BJA account, please register at https:// www.bja.gov/ profile.aspx. Once registered, one of the available areas on the My BJA page will be "My Success Stories." Within this box, there is an option to add a Success Story. Once reviewed and approved by BJA, all success stories will appear on the BJA Success Story web page at https:// www.bja.gov/ SuccessStoryList.aspx.

62. Withholding of funds: Required certification from the chief executive of the applicant government

The recipient may not obligate, expend, or draw down any award funds until the recipient submits the required "Certifications and Assurances by the Chief Executive of the Applicant Government," properly-executed (as determined by OJP), and a Grant Adjustment Notice (GAN) has been issued to remove this condition.

63. Recipient integrity and performance matters:  Requirement to report information on certain civil, criminal, and administrative proceedings to SAM and FAPIIS

The recipient must comply with any and all applicable requirements regarding reporting of information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either this OJP award or any other grant, cooperative agreement, or procurement contract from the federal government.  Under certain circumstances, recipients of OJP awards are required to report information about such proceedings, through the federal System for Award Management (known as "SAM"), to the designated federal integrity and performance system (currently, "FAPIIS").

The details of recipient obligations regarding the required reporting (and updating) of information on certain civil, criminal, and administrative proceedings to the federal designated integrity and performance system (currently, "FAPIIS") within SAM are posted on the OJP web site at https://ojp.gov/funding/FAPIIS.htm (Award condition: Recipient Integrity and Performance Matters, including Recipient Reporting to FAPIIS), and are incorporated by reference here.

64. Withholding of funds: NIBRS set-aside

The recipient may not obligate, expend, or draw down any award funds until the recipient submits, and BJA reviews and accepts, a budget that clearly dedicates at least 3 percent of the total amount of the award to NIBRS compliance activities or documentation showing that the recipient has been certified as NIBRS compliant, and a Grant Adjustment Notice (GAN) has been issued to remove this condition.

OJP FORM 4000/2 (REV. 4-88)



| | U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE 23 OF 23 |
|---|---|---|---|

| PROJECT NUMBER | 2018-DJ-BX-0744 | AWARD DATE | 11/16/2018 |
|---|---|---|---|

*SPECIAL CONDITIONS*

65. Withholding of funds:  Certification with respect to federal taxes

The recipient may not obligate, expend, or draw down any funds under this award until it has submitted to the program manager, in a format acceptable to OJP, a formal written certification directed to OJP and executed by an official with authority to sign on behalf of the recipient, that the recipient-- (1) has filed all Federal tax returns required for the three tax years immediately preceding the tax year in which the certification is made; (2) has not been convicted of a criminal offense under the Internal Revenue Code of 1986; and (3) has not, more than 90 days prior to this certification, been notified of any unpaid federal tax assessment for which the liability remains unsatisfied, unless the assessment is the subject of an installment agreement or offer in compromise that has been approved by the Internal Revenue Service and is not in default, or the assessment is the subject of a non-frivolous administrative or judicial proceeding; and until a Grant Adjustment Notice (GAN) has been issued to remove this condition.

The certification must be dated, and must indicate the full name and title of the signer, as well as the full legal name of the recipient.

66. Withholding of funds:  Budget narrative or information

The recipient may not obligate, expend, or draw down any award funds until the recipient submits, and OJP reviews and accepts, the required budget information or narrative for the award, and a Grant Adjustment Notice (GAN) has been issued to remove this condition.

67. Withholding of funds: Disclosure of pending applications

The recipient may not obligate, expend, or draw down any award funds until: (1) it has provided to the grant manager for this OJP award either an "applicant disclosure of pending applications" for federal funding or a specific affirmative statement that no such pending applications (whether direct or indirect) exist, in accordance with the detailed instructions in the program solicitation, (2) OJP has completed its review of the information provided and of any supplemental information it may request, (3) the recipient has made any adjustments to the award that OJP may require to prevent or eliminate any inappropriate duplication of funding (e.g., budget modification, project scope adjustment), (4) if appropriate adjustments to a discretionary award cannot be made, the recipient has agreed in writing to any necessary reduction of the award amount in any amount sufficient to prevent duplication (as determined by OJP), and (5) a Grant Adjustment Notice has been issued to remove this condition.

68. SORNA final agency decision - Appeals

The recipient acknowledges the final agency decision made by DOJ that recipient's jurisdiction did not substantially implement the Sex Offender Registration and Notification Act (Public Law 109-248, "SORNA") before the deadline, and understands that, as a result of that final agency decision, the amount of this JAG award was reduced, pursuant to 34 U.S.C. 20927.  By accepting this specific award, the recipient voluntarily agrees that if it elects to file a judicial appeal of that final agency decision, which was integral in determining this particular funding amount, no such appeal may commence more than 6 months after the date of acceptance of this award.

69. Recipient may not obligate, expend or drawdown funds until the Bureau of Justice Assistance, Office of Justice Programs has received and approved the required application attachment(s) and has issued a Grant Adjustment Notice (GAN) releasing this special condition.



**U.S. Department of Justice**

Office of Justice Programs

*Bureau of Justice Assistance*

---

*Washington, D.C. 20531*

**Memorandum To:**   Official Grant File

**From:**   Orbin Terry, NEPA Coordinator

**Subject:**   Incorporates NEPA Compliance in Further Developmental Stages for California
Board of State and Community Corrections

The Edward Byrne Memorial Justice Assistance Grant Program (JAG) allows states and local governments to
support a broad range of activities to prevent and control crime and to improve the criminal justice system, some of
which could have environmental impacts.  All recipients of JAG funding must assist BJA in complying with NEPA
and other related federal environmental impact analyses requirements in the use of grant funds, whether the funds
are used directly by the grantee or by a subgrantee or third party.  Accordingly, prior to obligating funds for any of
the specified activities, the grantee must first determine if any of the specified activities will be funded by the
grant.

The specified activities requiring environmental analysis are:
a. New construction;
b. Any renovation or remodeling of a property located in an environmentally or historically sensitive area,
including properties located within a 100-year flood plain, a wetland, or habitat for endangered species, or a
property listed on or eligible for listing on the National Register of Historic Places;
c.  A renovation, lease, or any proposed use of a building or facility that will either (a) result in a change in its basic
prior use or (b) significantly change its size;
d.  Implementation of a new program involving the use of chemicals other than chemicals that are (a) purchased as
an incidental component of a funded activity and (b) traditionally used, for example, in office, household,
recreational, or education environments; and
e. Implementation of a program relating to clandestine methamphetamine laboratory operations, including the
identification, seizure, or closure of clandestine methamphetamine laboratories.

Complying with NEPA may require the preparation of an Environmental Assessment and/or an Environmental
Impact Statement, as directed by BJA.  Further, for programs relating to methamphetamine laboratory operations,
the preparation of a detailed Mitigation Plan will be required.  For more information about Mitigation Plan
requirements, please see https://www.bja.gov/Funding/nepa.html.

Please be sure to carefully review the grant conditions on your award document, as it may contain more specific
information about environmental compliance.



| U.S. Department of Justice<br>Office of Justice Programs<br><br>Bureau of Justice Assistance | **GRANT MANAGER'S MEMORANDUM, PT. I:<br>PROJECT SUMMARY**<br><br>**Grant** |
|---|---|

| PROJECT NUMBER<br><br>2018-DJ-BX-0744 | PAGE  1  OF  1 |
|---|---|

This project is supported under FY18(BJA - JAG State & JAG Local) Title I of Pub. L. No. 90-351 (generally codified at 34 U.S.C. 10101 - 10726), including subpart I of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a)

| 1. STAFF CONTACT (Name & telephone number)<br><br>Linda Hill-Franklijn<br>(202) 514-0712 | 2. PROJECT DIRECTOR (Name, address & telephone number)<br><br>Daryle McDaniel<br>Field Representative<br>2590 Venture Oaks Way, Suite 200<br>2590 Venture Oaks Way, Suite 200<br>Sacramento, CA 95833-3288<br>(916) 341-7392 |
|---|---|

| 3a. TITLE OF THE PROGRAM<br><br>BJA FY 18 Edward Byrne Memorial Justice Assistance Grant (JAG) Program - State Solicitation | 3b. POMS CODE (SEE INSTRUCTIONS<br>ON REVERSE) |
|---|---|

| 4. TITLE OF PROJECT<br><br>2018 JAG Program |
|---|

| 5. NAME & ADDRESS OF GRANTEE<br><br>California Board of State and Community Corrections<br>2590 Venture Oaks Way, Ste. 200<br>Sacramento, CA 95833-3288 | 6. NAME & ADRESS OF SUBGRANTEE |
|---|---|

| 7. PROGRAM PERIOD<br><br>FROM:      10/01/2017    TO:   09/30/2021 | 8. BUDGET PERIOD<br><br>FROM:      10/01/2017    TO:   09/30/2021 |
|---|---|

| 9. AMOUNT OF AWARD<br><br>$ 18,056,180 | 10. DATE OF AWARD<br><br>11/16/2018 |
|---|---|

| 11. SECOND YEAR'S BUDGET | 12. SECOND YEAR'S BUDGET AMOUNT |
|---|---|

| 13. THIRD YEAR'S BUDGET PERIOD | 14. THIRD YEAR'S BUDGET AMOUNT |
|---|---|

15. SUMMARY DESCRIPTION OF PROJECT (See instruction on reverse)

The Edward Byrne Memorial Justice Assistance Grant Program (JAG) allows states and units of local government, including tribes, to support a broad range of activities to prevent and control crime based on their own state and local needs and conditions. Grant funds can be used for state and local initiatives, technical assistance, training, personnel, equipment, supplies, contractual support, and information systems for criminal justice, including for any one or more of the following program areas: 1) law enforcement programs; 2) prosecution and court programs; 3) prevention and education programs; 4) corrections and community corrections programs; 5) drug treatment and enforcement programs; 6) planning, evaluation, and technology improvement programs; and 7) crime victim and witness programs (other than compensation) and 8) mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

This State JAG award will be used to support criminal justice initiatives that fall under one or more of the allowable program areas above. Funded programs or

OJP FORM 4000/2 (REV. 4-88)

initiatives may include multijurisdictional drug and gang task forces, crime prevention and domestic violence programs, courts, corrections, treatment, justice information sharing initiatives, or other programs aimed at reducing crime and enhancing public and officer safety.

NCA/NCF

Exhibit 4

OMB No. 1121-0329
**Approval Expires 11/30/2020**

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



The U.S. Department of Justice (DOJ), Office of Justice Programs (OJP), Bureau of Justice Assistance (BJA) is seeking applications for the Edward Byrne Memorial Justice Assistance Grant (JAG) Program. This program furthers the Department's mission by assisting state, local, and tribal efforts to prevent or reduce crime and violence.

# Edward Byrne Memorial
# Justice Assistance Grant (JAG) Program

# FY 2018 State Solicitation

## Applications Due: August 22, 2018

## Eligibility

Only states may apply under this solicitation. By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa. (Throughout this solicitation, each reference to a state or states includes all 56 jurisdictions.)

A JAG application is not complete, and a state may not access award funds, unless the chief executive of the applicant state (e.g., the governor) properly executes, and the state submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix A.

In addition, as discussed further below, in order to validly accept a fiscal year (FY) 2018 JAG award, the chief legal officer of the applicant state must properly execute, and the state must submit, the specific certifications regarding compliance with certain federal laws attached to this solicitation as Appendix B and Appendix C. (The text of the relevant federal laws appears in Appendix D.)

The expected allocations by state for the FY 2018 JAG Program can be found at: https://www.bja.gov/funding/FY18-State-JAG-Web-Allocations.pdf.

All recipients and subrecipients must forgo any profit or management fee.

1

# Deadline

Applicants must register in the OJP Grants Management System (GMS) at https://grants.ojp.usdoj.gov/ prior to submitting an application under this solicitation. All applicants must register, even those that previously registered in GMS. Select the "Apply Online" button associated with the solicitation title. All registrations and applications are due by 5:00 p.m. eastern time on August 22, 2018.

For additional information, see How to Apply in Section D. Application and Submission Information.

# Contact Information

For technical assistance with submitting an application, contact the Grants Management System Support Hotline at 888–549–9901, option 3, or via email at GMS.HelpDesk@usdoj.gov. The GMS Support Hotline operates 24 hours a day, 7 days a week, including on federal holidays.

An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline must email the National Criminal Justice Reference Service (NCJRS) Response Center at grants@ncjrs.gov **within 24 hours after the application deadline** in order to request approval to submit its application. Additional information on reporting technical issues appears under "Experiencing Unforeseen GMS Technical Issues" in How to Apply in Section D. Application and Submission Information.

For assistance with any other requirement of this solicitation, applicants may contact the NCJRS Response Center by telephone at 1–800–851–3420; via TTY at 301–240–6310 (hearing impaired only); by email at grants@ncjrs.gov; by fax to 301–240–5830, or by web chat at https://webcontact.ncjrs.gov/ncjchat/chat.jsp. The NCJRS Response Center hours of operation are 10:00 a.m. to 6:00 p.m. eastern time, Monday through Friday, and 10:00 a.m. to 8:00 p.m. eastern time on the solicitation close date. Applicants also may contact the appropriate BJA State Policy Advisor.

Release date: July 20, 2018

2

# Contents

A. Program Description .......................................................................................... 5

  Overview ..............................................................................................................5

  Program-specific Information ...............................................................................5

    Permissible uses of JAG Funds – In general ..........................................5

    Limitations on the use of JAG funds .......................................................6

    State obligations regarding use of JAG funds and units of local government .........10

    Required compliance with applicable federal laws .................................10

    Potential funding reductions for noncompliance with PREA and SORNA .............11

    BJA Areas of Emphasis ..........................................................................12

  Objectives and Deliverables ...............................................................................14

  Evidence-based Programs or Practices ..............................................................14

  Information Regarding Potential Evaluation of Programs and Activities....................14

B. Federal Award Information ............................................................................... 15

  Type of Award ....................................................................................................15

  Financial Management and System of Internal Controls......................................16

  Budget and Financial Information........................................................................17

  Cost Sharing or Match Requirement ..................................................................17

  Pre-agreement Costs (also known as Pre-award Costs) .....................................17

  Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs .......18

  Costs Associated with Language Assistance (if applicable)..................................18

C. Eligibility Information ...................................................................................... 18

D. Application and Submission Information ......................................................... 19

  What an Application Should Include.....................................................................19

  How to Apply ......................................................................................................32

E. Application Review Information ....................................................................... 34

  Review Process ..................................................................................................34

F. Federal Award Administration Information........................................................ 35

  Federal Award Notices........................................................................................35

  Statutory and Regulatory Requirements; Award Conditions ......................................36

  General Information about Post-federal Award Reporting Requirements .................37

G. Federal Awarding Agency Contact(s) ............................................................. 38

H. Other Information ........................................................................................... 38

  Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)..38

  Provide Feedback to OJP ....................................................................................39

3

Appendix A: Certifications and Assurances by the Chief Executive ...........................40

Appendix B: Certification of Compliance with 8 U.S.C. §§ 1373 and 1644 ...............42

Appendix C: Certification of Compliance with 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3) .......................................................................44

Appendix D: Certain relevant federal laws, as in effect on June 7, 2018 ..................46

Appendix E: Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE).......................52

Appendix F: Additional Award Purposes ..................................................................53

Appendix G: Application Checklist ...........................................................................56

# Edward Byrne Memorial
# Justice Assistance Grant (JAG) Program
# FY 2018 State Solicitation
# CFDA #16.738

## A. Program Description

**Overview**

The Edward Byrne Memorial Justice Assistance Grant (JAG) Program is the primary provider of federal criminal justice funding to states and units of local government. BJA will award JAG Program funds to eligible states under this FY 2018 JAG Program State Solicitation. (A separate solicitation will be issued for applications to BJA directly from units of local government.)

**Statutory Authority:** The JAG Program statute is Subpart I of Part E of Title I of the Omnibus Crime Control and Safe Streets Act of 1968. Title I of Public Law No. 90-351 (generally codified at 34 U.S.C. 10151-10158), including subpart 1 of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a).

**Program-specific Information**

**Permissible uses of JAG Funds – In general**

In general, JAG funds awarded to a state under this FY 2018 solicitation may be used to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for **criminal justice**, including for any one or more of the following:

- Law enforcement programs
- Prosecution and court programs
- Prevention and education programs
- Corrections and community corrections programs
- Drug treatment and enforcement programs
- Planning, evaluation, and technology improvement programs
- Crime victim and witness programs (other than compensation)
- Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams

Additionally, JAG funds awarded to a state under this FY 2018 solicitation may be used for any purpose indicated in Appendix F.

In connection with the all of the above purposes (including those indicated in the appendix), it should be noted that the statute defines "criminal justice" as "activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to apprehend criminals, including juveniles, activities of courts having criminal jurisdiction, and related agencies (including but not

5

limited to prosecutorial and defender services, juvenile delinquency agencies and pretrial service or release agencies), activities of corrections, probation, or parole authorities and related agencies assisting in the rehabilitation, supervision, and care of criminal offenders, and programs relating to the prevention, control, or reduction of narcotic addiction and juvenile delinquency."

Under the JAG Program, states may use award funds for broadband deployment and adoption activities as they relate to criminal justice activities.

**Limitations on the use of JAG funds**
*Prohibited uses of funds* – JAG funds may not be used (whether directly or indirectly) for any purpose prohibited by federal statute or regulation, including those purposes specifically prohibited by the JAG Program statute as set out at 34 U.S.C. § 10152.

JAG funds may not be used (directly or indirectly) for security enhancements or equipment for nongovernmental entities not engaged in criminal justice or public safety. Additionally, **JAG funds may not be used (directly or indirectly) to pay for any of the following items unless the BJA Director certifies that extraordinary and exigent circumstances exist,** making them essential to the maintenance of public safety and good order:
- Vehicles, vessels, or aircraft*
- Luxury items
- Real estate
- Construction projects (other than penal or correctional institutions)
- Any similar items

**\*Police cruisers, police boats, and police helicopters are allowable vehicles under JAG and do not require BJA certification.**

For information about requesting a waiver to obtain BJA certification for a listed prohibited item, or for examples of allowable vehicles that do not require BJA certification, refer to the JAG FAQs.

*Cap on use of JAG award funds for administrative costs* – Up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award.

*Prohibition of supplanting; prohibition on use of JAG funds as match* – JAG funds may not be used to supplant state or local funds but must be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities. See the JAG FAQs for examples of supplanting.

Although supplanting is prohibited, as discussed under What An Application Should Include, leveraging of federal funding is encouraged.

Absent specific federal statutory authority to do so, JAG award funds may not be used as a match for the purposes of other federal awards.

*Other restrictions on use of funds* – If a state chooses to use its FY 2018 JAG funds for particular, defined types of expenditures, it must satisfy certain preconditions.

- Body-Worn Cameras (BWCs)
  A state that proposes to use FY 2018 JAG award funds to purchase BWC equipment, or to implement or enhance BWC programs, must provide to OJP a certification(s) that each state law enforcement agency receiving the equipment or implementing the program has policies and procedures in place related to BWC equipment usage, data storage and access, privacy considerations, and training. The certification form related to BWC policies and procedures can be found at https://www.bja.gov/Funding/BodyWornCameraCert.pdf.

  A state that proposes to use JAG funds for BWC-related expenses will have funds withheld until the required certification is submitted and approved by OJP. If the state proposes to change project activities to utilize JAG funds for BWC-related expenses after the award is accepted, the state must submit the signed certification to OJP at that time.

  Further, before making any subaward for BWC-related expenses, the state JAG recipient must collect a completed BWC certification from the proposed subrecipient. Any such certifications must be maintained by the state JAG recipient, and made available to OJP upon request.

  **The BJA BWC Toolkit provides model BWC policies and best practices to assist criminal justice departments in implementing BWC programs.**

  Apart from the JAG Program, BJA provides funds under the Body-Worn Camera Policy and Implementation (BWC) Program. The BWC Program allows jurisdictions to develop and implement policies and practices required for effective program adoption, and to address program factors including the purchase, deployment, and maintenance of camera systems and equipment; data storage and access; and privacy considerations. Interested states may wish to refer to the BWC Program web page for more information. States should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BWC Program.

- Body Armor
  Body armor purchased with FY 2018 JAG funds may be purchased at any threat level designation, make, or model from any distributor or manufacturer, as long as the body armor has been tested and found to comply with the latest applicable National Institute of Justice (NIJ) ballistic or stab standards. Further, body armor or armor vests purchased with FY 2018 JAG funds must also be "uniquely fitted vests" as this term is used in the context of the Bulletproof Vest Partnership (BVP) Program (see 34 U.S.C. § 10202(c)(1)(A)) requiring that grantees using JAG funds to purchase armor vests or body armor comply with requirements established for BVP grants. For these purposes, "uniquely fitted vests" means protective (ballistic or stab-resistant) armor vests that conform to the individual wearer to provide the best possible fit and coverage, through a combination of: (1) correctly sized panels and carrier, determined through appropriate measurement, and (2) properly adjusted straps, harnesses, fasteners, flaps, or other adjustable features. The requirement that body armor be "uniquely fitted" does **not** require body armor that is individually manufactured based on the measurements of an individual wearer. In support of OJP's efforts to improve officer safety, the American Society for Testing and Materials (ASTM) International has made available the Standard Practice for Body Armor Wearer Measurement and Fitting of Armor (Active Standard ASTM E3003) available at no cost. The Personal Armor Fit Assessment checklist is excerpted from ASTM E3003.

A state that proposes to use FY 2018 JAG award funds to purchase body armor must provide OJP with a certification(s) that each state law enforcement agency receiving body armor has a written "mandatory wear" policy in effect. *See* 34 U.S.C. § 10202(c). The certification form related to mandatory wear can be found at www.bja.gov/Funding/BodyArmorMandatoryWearCert.pdf.

A state that proposes to use JAG funds to purchase body armor will have funds withheld until the required certification is submitted and approved by OJP. If the state proposes to change project activities to utilize JAG funds to purchase body armor after the award is accepted, the state must submit the signed certification to OJP at that time.

Further, before making any subaward for the purchase of body armor, the state JAG recipient must collect a completed mandatory wear certification from the proposed subrecipient. Any such certifications must be maintained by the state JAG recipient, and made available to OJP upon request.

A mandatory wear concept and issues paper and a model policy are available at the BVP Customer Support Center, at vests@usdoj.gov or toll free at 1–877–758–3787. Additional information and FAQs related to the mandatory wear policy and certifications can be found at https://www.bja.gov/Funding/JAGFAQ.pdf.

Apart from the JAG Program, BJA provides funds under the Bulletproof Vest Partnership (BVP) Program. The BVP Program is designed to provide a critical resource to state and local law enforcement agencies for the purchase of ballistic-resistant and stab-resistant body armor. For more information on the BVP Program, including eligibility and application, refer to the BVP web page. States should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BVP Program.

- Interoperable Communications
  States (and any subrecipients) that use FY 2018 JAG funds to support emergency communications activities (including the purchase of interoperable communications equipment and technologies such as Voice over Internet Protocol bridging or gateway devices, or equipment to support the build out of wireless broadband networks in the 700 MHz public safety band under the Federal Communications Commission [FCC] Waiver Order) should review 2018 SAFECOM Guidance. SAFECOM Guidance is updated annually to provide current information on emergency communications policies, eligible costs, best practices, and technical standards for state, local, tribal, and territorial grantees investing federal funds in emergency communications projects. Additionally, emergency communications projects funded with FY 2018 JAG funds should support the Statewide Communication Interoperability Plan (SCIP) and be coordinated with the full-time Statewide Interoperability Coordinator (SWIC) in the state of the project. As the central coordination point for a state's interoperability effort, the SWIC plays a critical role, and can serve as a valuable resource. SWICs are responsible for the implementation of SCIP through coordination and collaboration with the emergency response community. The U.S. Department of Homeland Security Office of Emergency Communications maintains a list of SWICs for each of the states and territories. Contact OEC@hq.dhs.gov for more information. All communications equipment purchased with FY 2018 JAG Program funding should be identified during quarterly performance metrics reporting.

Further, information-sharing projects funded with FY 2018 JAG funds must comply with DOJ's Global Justice Information Sharing Initiative guidelines, as applicable, in order to promote information sharing and enable interoperability among disparate systems across the justice and public safety community. Recipients (and subrecipients) must conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https://www.it.ojp.gov/gsp_grantcondition. Recipients (and subrecipients) will be required to document planned approaches to information sharing and describe compliance with GSP and an appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

For JAG applicants considering implementing communications technology projects, it is worthwhile to consider the First Responder Network Authority (FirstNet) Program. The Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. §§ 1401 *et seq.*) established the First Responder Network Authority (FirstNet) as an independent authority within the National Telecommunications and Information Administration (NTIA). FirstNet's statutory mission is to take all actions necessary to ensure the establishment of a nationwide public safety broadband network (NPSBN). The NPSBN will use the 700 MHz D block spectrum to provide Long-Term Evolution (LTE)-based broadband services and applications to public safety entities. The network is based on a single, national network architecture that will evolve with technological advances and initially consist of a core network and radio access network. While mission critical voice communications will continue to occur on land mobile radio (LMR), in time, FirstNet is expected to provide public safety entities with mission critical broadband data capabilities and services including, but not limited to: messaging; image sharing; video streaming; group text; voice; data storage; applications; location-based services; and quality of service, priority and preemption. This reliable, highly secure, interoperable, and innovative public safety communications platform will bring 21st century tools to public safety agencies and first responders, allowing them to get more information quickly and helping them to make faster and better decisions. For more information on FirstNet services, the unique value of the FirstNet network to public safety, and how to subscribe for the FirstNet service should your state or territory opt in, please visit www.FirstNet.gov. To learn about FirstNet's programs and activities, including its consultation and outreach with public safety, the state plans process, FirstNet's history and promise, and how it plans to ensure that the FirstNet network meets the needs of public safety, please visit www.FirstNet.gov or contact info@firstnet.gov.

- DNA Testing of Evidentiary Materials and Upload of DNA Profiles to a Database
  If JAG Program funds are to be used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System (CODIS, the national DNA database operated by the FBI) by a government DNA lab with access to CODIS. No profiles generated with JAG funding may be entered into any other non-governmental DNA database without prior expressed written approval from BJA.

  In addition, funds may not be used for purchase of DNA equipment and supplies when the resulting DNA profiles from such technology are not acceptable for entry into CODIS.

- Entry of Records into State Repositories
  As appropriate and to the extent consistent with law, a condition may be imposed that would require the following: with respect to any "program or activity" that receives federal financial assistance under this solicitation that is likely to generate or upgrade court dispositions or other records that are relevant to National Instant Background Check

System (NICS) determinations (which includes any dispositions or records whatsoever that involve any "alien [who] is illegally or unlawfully in the United States" (18 U.S.C. § 922(g)(5)(A) (generally prohibiting any such alien to possess any firearm or ammunition)), a system must be in place to ensure that all such NICS-relevant dispositions or records that are generated or upgraded are made available in timely fashion to state repositories/databases that are accessed by NICS.

**State obligations regarding use of JAG funds and units of local government**
A state that applies for and receives an FY 2018 JAG award must:

- Pass through a predetermined percentage of funds to units of local government. (For purposes of the JAG Program, a "unit of local government" includes a city, county, township, town, and certain federally recognized Indian tribes.) This predetermined percentage (often referred to as the "variable pass-through" or VPT) is calculated by OJP's Bureau of Justice Statistics (BJS), based on the total criminal justice expenditures by a state and its units of local government. The variable pass-through percentages that will apply to an FY 2018 award to a recipient state can be found at: https://www.bja.gov/jag/pdfs/VPT-for-SAAs-updated-June-2017.pdf. (If a state believes the VPT percentage has been calculated incorrectly, the state may provide pertinent, verifiable data to BJA and ask OJP to reconsider.)

- Appropriately use or distribute the amount of funds that are **added** to the state's FY 2018 award because certain units of local government within the state are ineligible for a direct FY 2018 award of JAG funds due to their small size. (These small size units of local government are referred to as "less-than-$10,000 jurisdictions.") The state must provide these additional funds included in its FY 2018 award to state police departments that provide criminal justice services to the "less-than-$10,000 jurisdictions" within the state and/or subaward the funds to such jurisdictions.

**Required compliance with applicable federal laws**
By law, the chief executive (e.g., the governor) of each state that applies for an FY 2018 JAG award must certify that the state will "comply with all provisions of [the JAG program statute] and all other applicable Federal laws." To satisfy this requirement, each state applicant must submit three properly executed certifications, using the forms shown in Appendices A, B, and C.

All applicants should understand that OJP awards, including certifications provided in connection with such awards, are subject to review by DOJ, including by OJP and by the DOJ Office of the Inspector General. Applicants also should understand that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in a certification submitted to OJP in support of an application may be the subject of criminal prosecution, and also may result in civil penalties and administrative remedies for false claims or otherwise. Administrative remedies that may be available to OJP with respect to an FY 2018 award include suspension or termination of the award, placement on the DOJ high risk grantee list, disallowance of costs, and suspension or debarment of the recipient.

**National Incident-Based Reporting System (NIBRS) 3 Percent Set-aside**
In FY 2016, the Federal Bureau of Investigation (FBI) formally announced its intention to sunset the Uniform Crime Reporting (UCR) Program's traditional Summary Reporting System (SRS) and replace it with the UCR Program's National Incident-Based Reporting System (NIBRS). By January 1, 2021, the FBI intends for NIBRS to be the law enforcement crime data reporting standard for the nation.

By statute, JAG Program awards are calculated using summary Part 1 violent crime data from the FBI's UCR Program. (See 34 U.S.C. § 10156.) Once SRS has been replaced by NIBRS, JAG award amounts will be calculated using NIBRS data. In preparation for the FBI's 2021 NIBRS compliance deadline, beginning in FY 2018, BJA is requiring, through the application of a special condition, direct JAG award recipients not certified by the FBI as NIBRS compliant to dedicate 3 percent of their JAG award toward achieving full compliance with the FBI's NIBRS data submission requirements under the UCR Program. The 3 percent requirement will assist state and local jurisdictions in working toward compliance, to ensure they continue to have critical criminal justice funding available through JAG when SRS is replaced by NIBRS in FY 2021.

The requirement for a NIBRS set-aside will not be applied to subawards from states. Rather, state JAG recipients must ensure that at least 3 percent of the total award amount is used toward NIBRS compliance, unless the FBI has certified that the state is already NIBRS compliant. States must clearly indicate in their application narratives and budgets what projects will be supported with this 3 percent set-aside.

The following are examples of costs and projects that relate to NIBRS implementation at the state or local level that could be funded under the JAG Program: software, hardware, and labor that directly support or enhance a state or agency's technical capacity for collecting, processing, and analyzing data reported by local law enforcement (LE) agencies and then submitting NIBRS data to the FBI; training personnel responsible for the state's Incident Based Reporting (IBR) program on receiving, processing, analyzing, and validating incident-based data from local LE agencies in their state; training local agencies in how to collect and submit NIBRS data; and technical assistance for LE agency personnel responsible for (1) managing the agency's crime incident data, (2) processing and validating the data, and (3) extracting and submitting IBR data to the state UCR Program according to the states and/or directly to the FBI according to the NIBRS standard.

BJA will waive the set-aside requirement for states that have been certified as NIBRS compliant by the FBI as of the posting date of this solicitation. States for which the FBI certifies NIBRS compliance after that date may request a waiver of the set-aside requirement from the BJA Director. The waiver request from an appropriate state official must clearly state that the state has been certified as NIBRS compliant by the FBI, and should be submitted with the application, or, as appropriate, through a request for a Grant Adjustment Notice after an award is made. In any instance in which a waiver request is submitted, the state must retain documentation on file that demonstrates the FBI certification of NIBRS compliance. Such documentation must be made available for BJA review, upon request. The BJA Director will review all requests for waivers. If approved, states will not be subject to the 3 percent set-aside requirement.

Note: U.S. territories and tribal jurisdictions will not be subject to the 3 percent set-aside for NIBRS compliance until FY 2019. Tribal jurisdictions and the five U.S. territories will be strongly encouraged to dedicate a portion of JAG funding to NIBRS conversion; however, this is not a requirement for FY 2018 JAG funding. Utilizing this phased-in approach will allow the territories and tribal jurisdictions to plan for the change in funding direction and provide BJA with time to coordinate or provide technical assistance.

**Potential funding reductions for noncompliance with PREA and SORNA**
<u>Prison Rape Elimination Act of 2003 (PREA).</u> In 2012, DOJ published the National PREA Standards, which were promulgated to prevent, detect, and respond to sexual victimization and abuse in confinement settings. The PREA Standards are set out at 28 C.F.R. Part 115, and

apply to confinement facilities including adult prisons and jails, juvenile facilities, and police lockups.

Under PREA, if a state's chief executive (e.g., governor) does not certify full compliance with the National PREA Standards, the state is subject to the loss of five percent of certain DOJ grant funds, including JAG award funds, unless: (1) the chief executive submits an assurance to DOJ that no less than five percent of such funds will be used solely for the purpose of enabling the state to achieve and certify full compliance with the PREA Standards in future years; or (2) the chief executive requests that the affected funds be held in abeyance by DOJ. See 34 U.S.C. § 30307(e)(2).

A reduction of a JAG award to a state under the provisions of PREA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

For additional information concerning PREA implementation, send inquiries to the PREA Management Office at PREACompliance@usdoj.gov and/or review the PREA FAQs.

Sex Offender Registration and Notification Act (SORNA). SORNA, which is Title I of the Adam Walsh Child Protection and Safety Act of 2006, mandates a 10 percent reduction in a JAG award to a state that has failed to substantially implement SORNA. Further, states that have substantially implemented SORNA have an ongoing obligation to maintain that status each year. A JAG reduction will be applied for each year a jurisdiction has failed to have substantially implemented SORNA.

A reduction of a JAG award to a state under the provisions of SORNA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

For additional information regarding SORNA implementation, including requirements and a list of states that will be affected in FY 2018 by the 10 percent reduction to the JAG award, send inquiries to AskSMART@usdoj.gov. Additional SORNA guidance can be found within the SORNA FAQs.

**BJA Areas of Emphasis**

BJA recognizes that many state and local criminal justice systems currently face challenging fiscal environments and that an important, cost-effective way to relieve those pressures is to share or leverage resources through cooperation among federal, state, and local law enforcement. BJA intends to focus much of its work on the areas of emphasis described below, and encourages each state recipient of an FY 2018 JAG award to join federal law enforcement agencies across the board in addressing these challenges.

Reducing Violent Crime – Recognizing that crime problems, including felonious possession and use of a firearm and/or gang violence, illegal drug sales and distribution, human trafficking, and other related violent crime, vary from community to community, BJA encourages states to tailor their programs to the local crime issues, and to be data-informed in their work. States should consider investing JAG funds in programs to combat firearms violence, and to improve the process for ensuring that persons prohibited from purchasing firearms (see, e.g., 18 U.S.C. § 922(g)) are prevented from doing so, by utilizing technology such as eTrace and NIBIN to analyze evidence, as well as by enhancing complete, accurate, and timely reporting to the FBI's NICS. States are also encouraged to coordinate with the United States Attorneys and Project Safe Neighborhood (PSN) grantees in order to leverage funding for violence reduction projects, and to coordinate their law enforcement activities with those of federal law

enforcement agencies such as the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Drug Enforcement Administration, and the Department of Homeland Security.

Officer Safety and Wellness – The issue of law enforcement safety and wellness is an important priority for BJA and DOJ. According to the *Preliminary 2017 Law Enforcement Officer Fatalities Report*, released by the National Law Enforcement Officers Memorial Fund (NLEOMF), as of December 28, 2017, there were 128 law enforcement line-of-duty deaths nationwide in 2017. Firearms-related deaths were the second leading cause of law enforcement deaths (44) in 2017, according to the NLEOMF report. Of those deaths, the leading circumstance was officers shot while responding to a domestic disturbance (7), followed by traffic enforcement, investigative activities, and dealing with a suspicious person or vehicle—6 instances in each circumstance. Additionally, deaths due to circumstances other than firearms- or traffic-related deaths increased by 61 percent in 2017 with 37 deaths compared to 23 in 2016. Sixteen of those deaths were due to job-related illnesses, including 10 deaths due to heart attacks.

Based on the latest reports (2016 and 2015) from the FBI's Law Enforcement Officers Killed and Assaulted (LEOKA) data, there appeared to be a continuing increase in assaults between 2015 and 2016. There were 57,180 assaults in 2016 versus 50,212 in 2015. Of those, 16,535 resulted in officer injuries in 2016 compared to 14,281 in 2015. The 2016 LEOKA data show that there were 17 officers killed in ambush situations, which is an increase from 2015 when 4 officers were killed in ambush situations.

BJA sees a vital need to focus not only on tactical officer safety concerns but also on health and wellness, as they affect officer performance and safety. It is important for law enforcement to have the tactical skills necessary, and also to be physically and mentally well, to perform, survive, and be resilient in the face of the demanding duties of the profession. BJA encourages states to use JAG funds to address these needs by providing training, and paying for tuition and travel expenses related to attending trainings such as those available through the BJA VALOR Initiative, as well as funding for health and wellness programs for law enforcement officers.

Border Security – Securing U.S. borders (and internationally accessible waterways and airports) is critically important to the reduction and prevention of transnational drug-trafficking networks and combating all forms of human trafficking within the United States (including sex and labor trafficking of foreign nationals and U.S. citizens of all sexes and ages). Smuggling and trafficking operations to, from, and within the United States contribute to a significant increase in violent crime and U.S. deaths. BJA encourages states to enhance border, waterway, and port security by using JAG funds to support law enforcement hiring, training, and technology enhancement, as well as cooperation and coordination among federal, state, local, and tribal law enforcement agencies.

Collaborative Prosecution and Law Enforcement – BJA supports strong partnerships between prosecutors and law enforcement, at all levels of government, in order to help take violent offenders off the street. BJA strongly encourages state and local law enforcement agencies to foster strong partnerships with federal law enforcement agencies, and with their own prosecutors, as well as federal prosecutors, to adopt new, cost-effective, collaborative strategies to reduce crime, particularly violent crime. (BJA's Innovative Prosecution Solutions Program is a related effort to promote partnerships between prosecutors and researchers to develop and deliver effective, data-driven, evidence-based strategies to solve chronic problems and fight crime.)

**Objectives and Deliverables**
In general, the FY 2018 JAG Program is designed to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice. Although the JAG Program provides assistance directly to states, through pass-through (and similar) requirements, the JAG Program also is designed to assist units of local government with respect to criminal justice.

As discussed in more detail in the General Information about Post-federal Award Reporting Requirements discussion, a state that receives an FY 2018 JAG award will be required to produce various types of reports and to submit data related to performance measures and accountability. The objectives and deliverables are directly related to the JAG Program accountability measures described at https://bjapmt.ojp.gov/help/jagdocs.html.

**Evidence-based Programs or Practices**
OJP strongly emphasizes the use of data and evidence in policy making and program development in criminal justice, juvenile justice, and crime victim services. OJP is committed to:

- Improving the quantity and quality of evidence OJP generates.
- Integrating evidence into program, practice, and policy decisions within OJP and the field.
- Improving the translation of evidence into practice.

OJP considers programs and practices to be evidence-based when their effectiveness has been demonstrated by causal evidence, generally obtained through one or more outcome evaluations. Causal evidence documents a relationship between an activity or intervention (including technology) and its intended outcome, including measuring the direction and size of a change, and the extent to which a change may be attributed to the activity or intervention. Causal evidence depends on the use of scientific methods to rule out, to the extent possible, alternative explanations for the documented change. The strength of causal evidence, based on the factors described above, will influence the degree to which OJP considers a program or practice to be evidence-based. The OJP CrimeSolutions.gov website at https://www.crimesolutions.gov/ is one resource that applicants may use to find information about evidence-based programs in criminal justice, juvenile justice, and crime victim services.

A useful matrix of evidence-based policing programs and strategies is available through BJA's Matrix Demonstration Project. BJA offers a number of program models designed to effectively implement promising and evidence-based strategies through the BJA Innovation Suite of programs including Innovations in Policing, Prosecution, Supervision, Reentry, and others (see https://www.bja.gov/Programs/CRPPE/innovationssuite.html). BJA encourages states to use JAG funds to support these crime innovation strategies, including effective partnerships with universities and research partners and with non-traditional criminal justice partners.

**Information Regarding Potential Evaluation of Programs and Activities**
The Department of Justice has prioritized the use of evidence-based programming and deems it critical to continue to build and expand the evidence informing criminal and juvenile justice programs and crime victim services to reach the highest level of rigor possible. Therefore, applicants should note that OJP may conduct or support an evaluation of the programs and activities funded under this solicitation. Recipients and sub-recipients will be expected to cooperate with program-related assessments or evaluation efforts, including through the collection and provision of information or data requested by OJP (or its designee) for the assessment or evaluation of any activities and/or outcomes of those activities funded under this

14

solicitation. The information or data requested may be in addition to any other financial or performance data already required under this program.

**BJA Success Stories**
The BJA-sponsored Success Stories web page features projects that have demonstrated success or shown promise in reducing crime and positively impacting communities. This web page is a valuable resource for states, localities, territories, tribes, and criminal justice professionals who seek to identify and learn about JAG and other successful BJA-funded projects linked to innovation, crime reduction, and evidence-based practices. **BJA strongly encourages the submission of success stories annually (or more frequently).**

If a state has a success story it would like to submit, it may be submitted through the My BJA account, using "Add a Success Story" and the Success Story Submission form. Register for a My BJA account using this registration link.

# B. Federal Award Information

BJA expects to make up to 56 awards of up to $176,700,000.

BJA plans to make awards for a 4-year period of performance, to begin on October 1, 2017. An extension should not exceed 12 months. An extension beyond this period may be made on a case-by-case basis, at the discretion of BJA, and must be justified by circumstances beyond the control of the recipient and subrecipient, as well as requested via GMS, no fewer than 30 days prior to the end of the period for performance.

The expected allocations by state for the FY 2018 JAG program can be found at: https://www.bja.gov/funding/FY18-State-JAG-Web-Allocations.pdf.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by statute.

**Type of Award**
BJA expects that any award under this solicitation will be in the form of a grant. See Statutory and Regulatory Requirements; Award Conditions, under Section F. Federal Award Administration Information, for a brief discussion of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants.

JAG awards are based on a statutory formula as described below:

Once each fiscal year's overall JAG Program funding level is determined, BJA works with BJS to begin a four-step grant award calculation process, which, in general, consists of:

(1) Computing an initial JAG allocation for each state, based on its share of violent crime and population (weighted equally).

(2) Reviewing the initial JAG allocation amount to determine if the state allocation is less than the minimum award amount defined in the JAG legislation (0.25 percent of the total). If this is the case, the state is funded at the minimum level, and the funds required for this are deducted from the overall pool of JAG funds. Each of the remaining states

15

receives the minimum award plus an additional amount based on its share of violent crime and population.

(3) Dividing each state's final award amount (except for the territories and District of Columbia) between the state and its units of local governments at a rate of 60 and 40 percent, respectively.

(4) Determining unit of local government award allocations, which are based on their proportion of the state's 3-year violent crime average. If the "eligible award amount" for a particular unit of local government, as determined on this basis, is $10,000 or more, then the unit of local government is eligible to apply directly to OJP (under the JAG Local solicitation) for a JAG award. If the "eligible award amount" to a particular unit of local government, as determined on this basis, would be less than $10,000, however, the funds are not made available for a direct award to that particular unit of local government, but instead are added to the amount that otherwise would have been awarded to the state. (The state's obligations with respect to this additional amount for the "less-than-$10,000 jurisdictions" are summarized above.)

**Financial Management and System of Internal Controls**

Award recipients and subrecipients (including recipients or subrecipients that are pass-through entities[1]) must, as described in the Part 200 Uniform Requirements[2] as set out at 2 C.F.R. 200.303:

(a) Establish and maintain effective internal control over the federal award that provides reasonable assurance that [the recipient (and any subrecipient)] is managing the federal award in compliance with federal statutes, regulations, and the terms and conditions of the federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework", issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(b) Comply with federal statutes, regulations, and the terms and conditions of the federal awards.

(c) Evaluate and monitor [the recipient's (and any subrecipient's)] compliance with statutes, regulations, and the terms and conditions of federal awards.

(d) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

(e) Take reasonable measures to safeguard protected personally identifiable information and other information the federal awarding agency or pass-through entity designates as sensitive or [the recipient (or any subrecipient)] considers

---

[1] For purposes of this solicitation, the phrase "pass-through entity" includes any recipient or subrecipient that provides a subaward ("subgrant") to carry out part of the funded award or program.

[2] The "Part 200 Uniform Requirements" refers to the DOJ regulation at 2 C.F.R Part 2800, which adopts (with certain modifications) the provisions of 2 C.F.R. Part 200.

16

sensitive consistent with applicable federal, state, local, and tribal laws regarding privacy and obligations of confidentiality.

To help ensure that applicants understand administrative requirements and cost principles, OJP encourages prospective applicants to enroll, at no charge, in the DOJ Grants Financial Management Online Training, available at https://ojpfgm.webfirst.com/. (This training is required for all OJP award recipients.)

Also, applicants should be aware that OJP collects information from applicants on their financial management and systems of internal controls (among other information) which is used to make award decisions. Under Section D. Application and Submission Information, applicants may access and review the OJP Financial Management and System of Internal Controls Questionnaire (http://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf) that OJP requires **all** applicants (other than an individual applying in his/her personal capacity) to download, complete, and submit as part of the application.

**Budget and Financial Information**
Trust Fund – State administering agencies (SAAs) may draw down JAG funds either in advance or on a reimbursement basis. Non-federal entities must maintain advance payments of federal awards in interest-bearing accounts, unless regulatory exclusions apply (2 CFR 200.305(b)(8)). Subrecipients that draw down JAG funds in advance are subject to the same requirement and must first establish an interest-bearing account.

Tracking and reporting regarding JAG funds used for state administrative costs – As indicated earlier, up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award. Administrative costs (when utilized) must be tracked separately; a recipient must report in separate financial status reports (SF-425) those expenditures that specifically relate to each particular JAG Award during any particular reporting period.

No commingling – Both the state recipient and all subrecipients of JAG funds are prohibited from commingling funds on a program-by-program or project-by-project basis. **For this purpose, use of the administrative JAG funds to perform work across all active awards in any one year is not considered commingling.**

**Cost Sharing or Match Requirement**
The JAG Program does not require a match. However, if a successful application proposes a voluntary match amount, and OJP approves the budget, the total match amount incorporated into the approved budget becomes mandatory and subject to audit.

For additional cost sharing and match information, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm..

**Pre-agreement Costs (also known as Pre-award Costs)**
Pre-agreement costs are costs incurred by the applicant prior to the start date of the period of performance of the grant award.

OJP does **not** typically approve pre-agreement costs. An applicant must request and obtain the prior written approval of OJP for any such costs. All such costs incurred prior to award and prior to approval of the costs are incurred *at the sole risk* of the applicant. (Generally, no applicant

17

should incur project costs *before* submitting an application requesting federal funding for those costs.) Should there be extenuating circumstances that make it appropriate for OJP to consider approving pre-agreement costs, the applicant may contact the point of contact listed on the title page of this solicitation for the requirements concerning written requests for approval. If approved in advance by OJP, award funds may be used for pre-award costs, consistent with the recipient's approved budget and applicable cost principles. See the section on "Costs Requiring Prior Approval" in the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm for more information.

**Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs**
OJP strongly encourages every applicant that proposes to use award funds for any conference-, meeting-, or training-related activity (or similar event) to review carefully—before submitting an application—the OJP and DOJ policy and guidance on approval, planning, and reporting of such events, available at https://www.ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm. OJP policy and guidance (1) encourage minimization of conference, meeting, and training costs; (2) require prior written approval (which may affect project timelines) of most conference, meeting, and training costs for cooperative agreement recipients, as well as some conference, meeting, and training costs for grant recipients; and (3) set cost limits, which include a general prohibition of all food and beverage costs.

**Costs Associated with Language Assistance (if applicable)**
If an applicant proposes a program or activity that would deliver services or benefits to individuals, the costs of taking reasonable steps to provide meaningful access to those services or benefits for individuals with limited English proficiency may be allowable. Reasonable steps to provide meaningful access to services or benefits may include interpretation or translation services, where appropriate.

For additional information, see the "Civil Rights Compliance" section under "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.


# C. Eligibility Information

For eligibility information, see the title page.

For information on cost sharing or match requirements, see Section B. Federal Award Information.

Note that, as discussed in more detail below, the certifications regarding compliance with certain federal laws (see Appendices B and C) must be executed and submitted before a state can make a valid award acceptance. Also, a state may not access award funds (and its award will include a condition that withholds funds) until it submits a properly executed "Certifications and Assurances by Chief Executive of Applicant Government" (see Appendix A).

# D. Application and Submission Information

**What an Application Should Include**
This section describes in detail what an application should include. An applicant should anticipate that if it fails to submit an application that contains all of the specified elements, it may negatively affect the review of its application; and, should a decision be made to make an award, it may result in the inclusion of award conditions that preclude the recipient from accessing or using award funds until the recipient satisfies the conditions and OJP makes the funds available.

An applicant may combine the Budget Narrative and the Budget Detail Worksheet in one document. If an applicant submits only one budget document, however, it must contain **both** narrative and detail information. Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

**NOTE:** OJP has combined the Budget Detail Worksheet and Budget Narrative in a single document collectively referred to as the Budget Detail Worksheet. See "Budget Information and Associated Documentation" below for more information about the Budget Detail Worksheet and where it can be accessed.

OJP strongly recommends that applicants use appropriately descriptive file names (e.g., "Program Narrative," "Budget Detail Worksheet," "Timelines," "Memoranda of Understanding," "Résumés") for all attachments. Also, OJP recommends that applicants include résumés in a single file.

Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

**In general, if a state fails to submit the required information or documents, OJP either will return the state's application in the Grants Management System (GMS) for submission of the missing information or documents or will attach a condition to the award that will withhold award funds until the necessary information and documents are submitted. (As discussed elsewhere in this solicitation, the certifications regarding compliance certain federal laws—which are set out at Appendix B and Appendix C—will be handled differently. Unless and until those certifications are submitted, the state will be unable to make a valid acceptance of the award.)**

1. **Information to Complete the Application for Federal Assistance (SF-424)**
   The SF-424 is a required standard form used as a cover sheet for submission of pre-applications, applications, and related information. GMS takes information from the applicant's profile to populate the fields on this form.

   To avoid processing delays, an applicant must include an accurate legal name on its SF-424. On the SF-424, current OJP award recipients, when completing the field for "Legal Name" (box 5), should use the same legal name that appears on the prior year award document (which is also the legal name stored in OJP's financial system.) Also, these applicants should enter the Employer Identification Number (EIN) in box 6 exactly as it appears on the prior year award document. An applicant with a current, active award(s) must ensure that its GMS profile is current. If the profile is not current, the applicant should

submit a Grant Adjustment Notice updating the information on its GMS profile prior to applying under this solicitation.

A new applicant entity should enter its official legal name, its address, its EIN, and its Data Universal Numbering System (DUNS). A new applicant entity should attach official legal documents to its application (e.g., articles of incorporation, 501(c)(3) status documentation, organizational letterhead) to confirm the legal name, address, and EIN entered into the SF-424. OJP will use the System for Award Management (SAM) to confirm the legal name and DUNS number entered in the SF-424; therefore, an applicant should ensure that the information entered in the SF-424 matches its current registration in SAM. See the How to Apply section for more information on SAM and DUNS numbers.

**Intergovernmental Review:**
This solicitation ("funding opportunity") **is** subject to Executive Order 12372. An applicant may find the names and addresses of State Single Points of Contact (SPOCs) at the following website: https://www.whitehouse.gov/wp-content/uploads/2017/11/Intergovernmental_-Review-_SPOC_01_2018_OFFM.pdf. If the state appears on the SPOC list, the applicant must contact the state SPOC to find out about, and comply with, the state's process under E.O. 12372. In completing the SF-424, an applicant whose state appears on the SPOC list is to make the appropriate selection in response to question 16 once the applicant has complied with its state E.O. 12372 process. (An applicant whose state does not appear on the SPOC list should answer question 16 by selecting the response that the "Program is subject to E.O. 12372 but has not been selected by the state for review.")

2. **Project Identifiers**
   Applications should identify at least three and no more than 10 project identifiers that would be associated with the proposed project activities. The list of identifiers can be found at www.bja.gov/funding/JAGidentifiers.pdf.

3. **Program Narrative**
   The following sections **should** be included as part of the program narrative[3]:

   a. Description of the Issue – Identify the state's strategy/funding priorities for the FY 2018 JAG funds, the subgrant award process and timeline, and a description of the programs to be funded over the 4-year grant period. States are strongly encouraged to prioritize the funding of evidence-based projects and the data used to determine these priorities and data needed for comprehensive planning efforts. The state should describe any barriers to accessing these data, opportunities to improve cross system information sharing, and progress or challenges the state has faced in NIBRS implementation.

   b. Project Design and Implementation – Describe the state's process for engagement of stakeholders from across the justice continuum and how that input informs priorities. This should include a description of how local communities are engaged in the planning process, how state and local planning efforts are coordinated, and challenges faced in coordination. It should identify the stakeholders representing each purpose area who are participating in the strategic planning process, the gaps in the state's needed resources for criminal justice purposes, plans to improve the administration of the criminal justice

---

[3] For information on subawards (including the details on proposed subawards that should be included in the application), see "Budget and Associated Documentation" under Section D. Application and Submission Information.

system, and how JAG funds will be coordinated with state and related justice funds. States are strongly encouraged to utilize an evidence-informed approach to funding decisions and evidence-informed approaches to addressing and preventing (violent) crime. This includes providing support to subrecipients as they develop data-driven practices and programs.

c. <u>Capabilities and Competencies</u> – Describe any additional strategic planning/coordination efforts in which the state participates with other criminal justice criminal/juvenile justice agencies in the state. Please provide an overview of any evidence-informed programs that have been implemented successfully and how that program might inform implementation of plan priorities.

d. <u>Plan for Collecting the Data Required for this Solicitation's Performance Measures</u> – OJP will require each successful applicant to submit specific performance data that demonstrate the results of the work carried out under the award (see "<u>General Information about Post-Federal Award Reporting Requirements</u>" in <u>Section F. Federal Award Administration Information</u>). The performance data correlate to the objectives and deliverables identified under "<u>Objectives and Deliverables</u>" in <u>Section A. Program Description</u>. Post award, recipients will be required to submit quarterly performance metrics through BJA's PMT, located at <u>https://bjapmt.ojp.gov</u>. The application should describe the applicant's plan for collection of all of the performance measures data listed in the JAG Program accountability measures at: <u>https://bjapmt.ojp.gov/help/jagdocs.html</u>.

Applicants should visit OJP's performance measurement page at <u>www.ojp.gov/performance</u> for an overview of performance measurement activities at OJP.

BJA does not require applicants to submit performance measures data with their application. Performance measures are included as an alert that BJA will require successful applicants to submit specific performance data as part of their reporting requirements. For the application, applicants should indicate an understanding of these requirements and discuss how they will gather the required data, should they receive funding.

**Note on Project Evaluations**

An applicant that proposes to use award funds through this solicitation to conduct project evaluations should be aware that certain project evaluations (such as systematic investigations designed to develop or contribute to generalizable knowledge) may constitute "research" for purposes of applicable DOJ human subjects protection regulations. However, project evaluations that are intended only to generate internal improvements to a program or service, or are conducted only to meet OJP's performance measure data reporting requirements, likely do not constitute "research." Each applicant should provide sufficient information for OJP to determine whether the particular project it proposes would either intentionally or unintentionally collect and/or use information in such a way that it meets the DOJ regulatory definition of research that appears at 28 C.F.R. Part 46 ("Protection of Human Subjects").

Research, for the purposes of human subjects protection for OJP-funded programs, is defined as "a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge." 28 C.F.R. 46.102(d).

21

For additional information on determining whether a proposed activity would constitute research for purposes of human subjects protection, applicants should consult the decision tree in the "Research and the Protection of Human Subjects" section of the "Requirements related to Research" web page of the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" available through the OJP Funding Resource Center at https://ojp.gov/funding/index.htm. Every prospective applicant whose application may propose a research or statistical component also should review the "Data Privacy and Confidentiality Requirements" section on that web page.

4. **Budget and Associated Documentation**
   The Budget Detail Worksheet and the Budget Narrative are now combined in a single document collectively referred to as the Budget Detail Worksheet. The Budget Detail Worksheet is a user-friendly, fillable, Microsoft Excel-based document designed to calculate totals. Additionally, the Excel workbook contains worksheets for multiple budget years that can be completed as necessary. **All applicants should use the Excel version when completing the proposed budget in an application, except in cases where the applicant does not have access to Microsoft Excel or experiences technical difficulties.** If an applicant does not have access to Microsoft Excel or experiences technical difficulties with the Excel version, then the applicant should use the 508-compliant accessible Adobe Portable Document Format (PDF) version.

   Both versions of the Budget Detail Worksheet can be accessed at https://ojp.gov/funding/Apply/Forms/BudgetDetailWorksheet.htm.

   a. **Budget Detail Worksheet**
      The Budget Detail Worksheet should provide the detailed computation for each budget line item, listing the total cost of each and showing how it was calculated by the applicant. For example, costs for personnel should show the annual salary rate and the percentage of time devoted to the project for each employee paid with grant funds. The Budget Detail Worksheet should present a complete itemization of all proposed costs.

      For questions pertaining to budget and examples of allowable and unallowable costs, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm.

   b. **Budget Narrative**
      The budget narrative should thoroughly and clearly describe **every** category of expense listed in the proposed budget detail worksheet. OJP expects proposed budgets to be complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for project activities). **This narrative should include a full description of all costs, including funds set aside for NIBRS project(s) and administrative costs (if applicable).**

      An applicant should demonstrate in its budget narrative how it will maximize cost effectiveness of award expenditures. Budget narratives should generally describe cost effectiveness in relation to potential alternatives and the objectives of the project. For example, a budget narrative should detail why planned in-person meetings are necessary, or how technology and collaboration with outside organizations could be used to reduce costs, without compromising quality.

The budget narrative should be mathematically sound and correspond clearly with the information and figures provided in the Budget Detail Worksheet. The narrative should explain how the applicant estimated and calculated all costs, and how those costs are necessary to the completion of the proposed project. The narrative may include tables for clarification purposes, but need not be in a spreadsheet format. As with the Budget Detail Worksheet, the budget narrative should describe costs by year.

c. **Information on Proposed Subawards (if any), as well as on Proposed Procurement Contracts (if any)**

Applicants for OJP awards typically may propose to make *subawards*. Applicants also may propose to enter into procurement *contracts* under the award.

Whether an action—for federal grants administrative purposes—is a subaward or procurement contract is a critical distinction as significantly different rules apply to subawards and procurement contracts. If a recipient enters into an agreement that is a subaward of an OJP award, specific rules apply—many of which are set by federal statutes and DOJ regulations; others by award conditions. These rules place particular responsibilities on an OJP recipient for any subawards the OJP recipient may make. The rules determine much of what the written subaward agreement itself must require or provide. The rules also determine much of what an OJP recipient must do both before and after it makes a subaward. If a recipient enters into an agreement that is a procurement contract under an OJP award, a substantially different set of federal rules applies.

OJP has developed the following guidance documents to help clarify the differences between subawards and procurement contracts under an OJP award and outline the compliance and reporting requirements for each. This information can be accessed online at https://ojp.gov/training/training.htm.

- Subawards under OJP Awards and Procurement Contracts under Awards: A Toolkit for OJP Recipients.
- Checklist to Determine Subrecipient or Contractor Classification.
- Sole Source Justification Fact Sheet and Sole Source Review Checklist.

In general, the central question is the relationship between what the third-party will do under its agreement with the recipient and what the recipient has committed (to OJP) to do under its award to further a public purpose (e.g., services the recipient will provide, products it will develop or modify, research or evaluation it will conduct). If a third party will provide some of the services the recipient has committed (to OJP) to provide, will develop or modify all or part of a product the recipient has committed (to OJP) to develop or modify, or conduct part of the research or evaluation the recipient has committed (to OJP) to conduct, OJP will consider the agreement with the third party a subaward for purposes of federal grants administrative requirements.

This will be true **even if** the recipient, for internal or other non-federal purposes, labels or treats its agreement as a procurement, a contract, or a procurement contract. Neither the title nor the structure of an agreement determines whether the agreement—for purposes of federal grants administrative requirements—is a *subaward* or is instead a procurement *contract* under an award. The substance of the relationship should be given

23

greater consideration than the form of agreement between the recipient and the outside entity.

**(1) Information on proposed subawards and required certification regarding certain federal laws from certain subrecipients**

General requirement for federal authorization of any subaward; statutory authorizations of subawards under the JAG Program statute.
Generally, a recipient of an OJP award may not make subawards ("subgrants") unless the recipient has specific federal authorization to do so. Unless an applicable statute or DOJ regulation specifically authorizes (or requires) particular subawards, a recipient must have authorization from OJP before it may make a subaward.

**JAG subawards that are required or specifically authorized by statute (see 34 U.S.C. § 10152(a) and 34 U.S.C. § 10156) do not require prior approval to authorize subawards. This includes subawards made by states under the JAG Program.**
A particular subaward may be authorized by OJP because the recipient included a sufficiently detailed description and justification of the proposed subaward in the application as approved by OJP. If, however, a particular subaward is not authorized by federal statute or regulation, and is not sufficiently described and justified in the application as approved by OJP, the recipient will be required, post-award, to request and obtain written authorization from OJP before it may make the subaward.

If an applicant proposes to make one or more subawards to carry out the federal award and program, and those subawards are not specifically authorized (or required) by statute or regulation, the applicant should: (1) identify (if known) the proposed subrecipient(s), (2) describe in detail what each subrecipient will do to carry out the federal award and federal program, and (3) provide a justification for the subaward(s), with details on pertinent matters such as special qualifications and areas of expertise. Pertinent information on subawards should appear not only in the Program Narrative but also in the Budget Detail Worksheet and budget narrative.

**Required certifications, generally relating to various federal statutes, from any proposed subrecipient that is a state or local government entity.** Before a state may subaward FY 2018 award funds to a unit of local government or to a public institution of higher education, it will be required (by specific award condition, the terms of which will govern) to obtain a properly executed certification, generally relating to various specific federal laws, from the proposed subrecipient. (This requirement regarding these federal laws will not apply to subawards to Indian tribes). The specific certification the state must require from a unit of local government will vary somewhat from the specific certification it must require from a public institution of higher education. The forms will be posted and available for download at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.

**(2) Information on proposed procurement contracts (with specific justification for proposed noncompetitive contracts over $150,000)**
Unlike a recipient contemplating a subaward, a recipient of an OJP award generally does not need specific prior federal authorization to enter into an agreement that—for purposes of federal grants administrative requirements—is considered a procurement contract, **provided that** (1) the recipient uses its own documented procurement

procedures and (2) those procedures conform to applicable federal law, including the Procurement Standards of the (DOJ) Part 200 Uniform Requirements (as set out at 2 C.F.R. 200.317 - 200.326). The Budget Detail Worksheet and budget narrative should identify proposed procurement contracts. (As discussed above, subawards must be identified and described separately from procurement contracts.)

The Procurement Standards in the Part 200 Uniform Requirements, however, reflect a general expectation that agreements that (for purposes of federal grants administrative requirements) constitute procurement "contracts" under awards will be entered into on the basis of full and open competition. All noncompetitive (sole source) procurement contracts must meet the OJP requirements outlined at https://ojp.gov/training/subawards-procurement.htm. If a proposed procurement contract would exceed the simplified acquisition threshold—currently, $150,000—a recipient of an OJP award may not proceed without competition unless and until the recipient receives specific advance authorization from OJP to use a non-competitive approach for the procurement. An applicant that (at the time of its application) intends—without competition—to enter into a procurement contract that would exceed $150,000 should include a detailed justification that explains to OJP why, in the particular circumstances, it is appropriate to proceed without competition.

If the applicant receives an award, sole source procurements that do not exceed the Simplified Acquisition Threshold (currently $150,000) must have written justification for the noncompetitive procurement action maintained in the procurement file. If a procurement file does not have the documentation that meets the criteria outlined in 2 C.F.R. 200, the procurement expenditures may not be allowable. Sole source procurement over the $150,000 Simplified Acquisition Threshold must have prior approval from OJP using a Sole Source Grant Adjustment Notice (GAN). Written documentation justifying the noncompetitive procurement must be submitted with the GAN and maintained in the procurement file.

**d.  Pre-agreement Costs**
For information on pre-agreement costs, see Section B. Federal Award Information.

**5.  Indirect Cost Rate Agreement (if applicable)**
Indirect costs may be charged to an award only if:

(a)  The recipient has a current (unexpired), federally approved indirect cost rate; or
(b)  The recipient is eligible to use, and elects to use, the "de minimis" indirect cost rate described in the (DOJ) Part 200 Uniform Requirements, as set out at 2 C.F.R. 200.414(f).

An applicant with a current (unexpired) federally approved indirect cost rate is to attach a copy of the indirect cost rate agreement to the application. An applicant that does not have a current federally approved rate may request one through its cognizant federal agency, which will review all documentation and approve a rate for the applicant entity, or, if the applicant's accounting system permits, applicants may propose to allocate costs in the direct cost categories.

For assistance with identifying the appropriate cognizant federal agency for indirect costs, please contact the Office of the Chief Financial Officer (OCFO) Customer Service Center at

25

1–800–458–0786 or at ask.ocfo@usdoj.gov. If DOJ is the cognizant federal agency, applicants may obtain information needed to submit an indirect cost rate proposal at www.ojp.gov/funding/Apply/Resources/IndirectCosts.pdf.

Certain OJP recipients have the option of electing to use the "de minimis" indirect cost rate. An applicant that is eligible to use the "de minimis" rate that wishes to use the "de minimis" rate should attach written documentation to the application that advises OJP of both-- (1) the applicant's eligibility to use the "de minimis" rate, and (2) its election to do so. If an eligible applicant elects the "de minimis" rate, costs must be consistently charged as either indirect or direct costs, but may not be double charged or inconsistently charged as both. The "de minimis" rate may no longer be used once an approved federally-negotiated indirect cost rate is in place. (No entity that ever has had a federally-approved negotiated indirect cost rate is eligible to use the "de minimis" rate.) For the "de minimis" rate requirements (including additional information on eligibility to elect to use the rate), see Part 200 Uniform Requirements, at 2 C.F.R. 200.414(f).

6. **Financial Management and System of Internal Controls Questionnaire (including applicant disclosure of high-risk status)**
   Every state is required to download, complete, and submit the OJP Financial Management and System of Internal Controls Questionnaire (Questionnaire) located at https://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf as part of its application. The Questionnaire helps OJP assess the financial management and internal control systems, and the associated potential risks of an applicant as part of the pre-award risk assessment process.

   The Questionnaire should only be completed by financial staff most familiar with the applicant's systems, policies, and procedures in order to ensure that the correct responses are recorded and submitted to OJP. The responses on the Questionnaire directly impact the pre-award risk assessment and should accurately reflect the applicant's financial management and internal control system at the time of the application. The pre-award risk assessment is only one of multiple factors and criteria used in determining funding. However, a pre-award risk assessment that indicates that an applicant poses a higher risk to OJP may affect the funding decision and/or result in additional reporting requirements, monitoring, special conditions, withholding of award funds, or other additional award requirements.

   Among other things, the form requires each applicant to disclose whether it currently is designated "high risk" by a federal grant-making agency outside of DOJ. For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the applicant's past performance, or other programmatic or financial concerns with the applicant. If an applicant is designated high risk by another federal awarding agency, the applicant must provide the following information:

   • The federal awarding agency that currently designates the applicant high risk.
   • The date the applicant was designated high risk.
   • The high risk point of contact at that federal awarding agency (name, phone number, and email address).
   • The reasons for the high risk status, as set out by the federal awarding agency.

26

OJP seeks this information to help ensure appropriate federal oversight of OJP awards. An applicant that is considered "high risk" by another federal awarding agency is not automatically disqualified from receiving an OJP award. OJP may, however, consider the information in award decisions, and may impose additional OJP oversight of any award under this solicitation (including through the conditions that accompany the award document).

7. **Disclosure of Lobbying Activities**
   Each applicant must complete and submit a Disclosure of Lobbying Activities form (SF-LLL). An applicant that expends any funds for lobbying activities is to provide all of the information requested on the form. An applicant that does not expend any funds for lobbying activities is to enter "N/A" in the text boxes for item 10 ("a. Name and Address of Lobbying Registrant" and "b. Individuals Performing Services").

8. **Certifications and Assurances by the Chief Executive of the Applicant Government**
   A JAG application is not complete, and a state may not access award funds, unless the chief executive of the applicant state (e.g., the governor) properly executes, and the state submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix A.

   OJP will not deny an application for an FY 2018 award for failure to submit these "Certifications and Assurances by the Chief Executive of the Applicant Government" by the application deadline, but a state will not be able to access award funds (and its award will include a condition that withholds funds) until it submits these certifications and assurances, properly-executed by the chief executive of the state (e.g., the governor).

9. **Certifications by the Chief Legal Officer of the Applicant Government**
   The chief legal officer of an applicant state (e.g., the attorney general of the state) is to carefully review the two certifications attached to this solicitation as Appendix B and Appendix C. If the chief legal officer determines that he or she may execute the certifications, the state is to submit the certifications as part of its application.

   As discussed further in the Federal Award Notices section, a state applicant will be **unable to make a valid award acceptance** of an FY 2018 JAG award unless and until both properly executed certifications by its chief legal officer are received by OJP on or before the day the state submits an executed award document.

10. **Additional Attachments**

    a. **Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**
       Each applicant must provide responses to the following questions as an attachment to the application:
       (1) Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
       (2) Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?
       (3) If yes to either:
           - Please provide a copy of each law or policy.
           - Please describe each practice.

27

- Please explain how the law, policy, or practice complies with section 1373.

See Appendix E for a template that applicants may use to prepare this attachment.

Note: Responses to these questions must be provided by the applicant as part of the JAG application. Further, the requirement to provide this information applies to all tiers of JAG funding and for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of JAG funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

OJP will not deny an application for an FY 2018 award for failure to submit these required responses by the application deadline, but a state will not receive award funds (and its award will include a condition that withholds funds) until it submits these responses.

**b. Applicant Disclosure of Pending Applications**
Each applicant is required to disclose whether it has (or is proposed as a subrecipient under) any pending applications for federally funded grants or cooperative agreements that (1) include requests for funding to support the same project being proposed in the application under this solicitation, and (2) would cover identical cost items outlined in the budget submitted to OJP as part of the application under this solicitation. The applicant is required to disclose applications made directly to federal awarding agencies, and also applications for subawards of federal funds (e.g., applications to state agencies that will subaward ("subgrant") federal funds).

OJP seeks this information to help avoid any inappropriate duplication of funding. Leveraging multiple funding sources in a complementary manner to implement comprehensive programs or projects is encouraged and is not seen as inappropriate duplication.

Each applicant that has one or more pending applications as described above is to provide the following information about pending applications submitted within the last 12 months:

- The federal or state funding agency.
- The solicitation name/project name.
- The point of contact information at the applicable federal or state funding agency.

| Federal or State Funding Agency | Solicitation Name/Project Name | Name/Phone/Email for Point of Contact at Federal or State Funding Agency |
|---|---|---|
| DOJ/Office of Community Oriented Policing Services (COPS) | COPS Hiring Program | Jane Doe, 202/000-0000; jane.doe@usdoj.gov |

| Health & Human Services/ Substance Abuse & Mental Health Services Administration | Drug-Free Communities Mentoring Program/ North County Youth Mentoring Program | John Doe, 202/000-0000; john.doe@hhs.gov |
|---|---|---|

Each applicant should include the table as a separate attachment to its application. The file should be named "Disclosure of Pending Applications." The applicant Legal Name on the application must match the entity named on the disclosure of pending applications statement.

Any applicant that does not have any pending applications as described above is to submit, as a separate attachment, a statement to this effect: "[Applicant Name on SF-424] does not have (and is not proposed as a subrecipient under) any pending applications submitted within the last 12 months for federally-funded grants or cooperative agreements (or for subawards under federal grants or cooperative agreements) that request funding to support the same project being proposed in this application to OJP and that would cover identical cost items outlined in the budget submitted as part of this application."

**c. Research and Evaluation Independence and Integrity (if applicable)**
If an application involves research (including research and development) and/or evaluation, the applicant must demonstrate research/evaluation independence and integrity, including appropriate safeguards, before it may receive award funds. The applicant must demonstrate independence and integrity regarding both this proposed research and/or evaluation, and any current or prior related projects.

Each application should include an attachment that addresses **both** i. and ii. below.

    i.   For purposes of this solicitation, each applicant is to document research and evaluation independence and integrity by including one of the following two items:

        a.  A specific assurance that the applicant has reviewed its application to identify any actual or potential apparent conflicts of interest (including through review of pertinent information on the principal investigator, any co-principal investigators, and any subrecipients), and that the applicant has identified no such conflicts of interest—whether personal or financial or organizational (including on the part of the applicant entity or on the part of staff, investigators, or subrecipients) —that could affect the independence or integrity of the research, including the design, conduct, and reporting of the research.

<div align="center">OR</div>

        b.  A specific description of actual or potential apparent conflicts of interest that the applicant has identified—including through review of pertinent information on the principal investigator, any co-principal investigators,

29

and any subrecipients—that could affect the independence or integrity of the research, including the design, conduct, or reporting of the research. These conflicts may be personal (e.g., on the part of investigators or other staff), financial, or organizational (related to the applicant or any subrecipient entity). Some examples of potential investigator (or other personal) conflict situations are those in which an investigator would be in a position to evaluate a spouse's work product (actual conflict), or an investigator would be in a position to evaluate the work of a former or current colleague (potential apparent conflict). With regard to potential organizational conflicts of interest, as one example, generally an organization would not be given an award to evaluate a project, if that organization had itself provided substantial prior technical assistance to that specific project or a location implementing the project (whether funded by OJP or other sources), because the organization in such an instance might appear to be evaluating the effectiveness of its own prior work. The key is whether a reasonable person understanding all of the facts would be able to have confidence that the results of any research or evaluation project are objective and reliable. Any outside personal or financial interest that casts doubt on that objectivity and reliability of an evaluation or research product is a problem and must be disclosed.

ii.  In addition, for purposes of this solicitation, each applicant is to address possible mitigation of research integrity concerns by including, at a minimum, one of the following two items:

a.  If an applicant reasonably believes that no actual or potential apparent conflicts of interest (personal, financial, or organizational) exist, then the applicant should provide a brief narrative explanation of how and why it reached that conclusion. The applicant also is to include an explanation of the specific processes and procedures that the applicant has in place, or will put in place, to identify and prevent (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OR

b.  If the applicant has identified actual or potential apparent conflicts of interest (personal, financial, or organizational) that could affect the independence and integrity of the research, including the design, conduct, or reporting of the research, the applicant is to provide a specific and robust mitigation plan to address each of those conflicts. At a minimum, the applicant is expected to explain the specific processes and procedures that the applicant has in place, or will put in place, to identify and eliminate (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding

30

organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OJP will assess research and evaluation independence and integrity based on considerations such as the adequacy of the applicant's efforts to identify factors that could affect the objectivity or integrity of the proposed staff and/or the applicant entity (and any subrecipients) in carrying out the research, development, or evaluation activity; and the adequacy of the applicant's existing or proposed remedies to control any such factors.

**d. State Governing Body Review**

Applicants must submit information via the Certification and Assurances by the Chief Executive (see Appendix A), which documents that the JAG application was made available for review by the governing body of the state, or to an organization designated by that governing body, for a period that was not less than 30 days before the application was submitted to BJA. The same Chief Executive Certification will also specify that an opportunity to comment on this application was provided to citizens prior to the application submission to the extent applicable law or established procedures make such opportunity available. In the past, this has been accomplished via submission of specific review dates; now OJP will only accept a governor's certification to attest to these facts. States may continue to submit actual dates of review should they wish to do so, in addition to the submission of the Chief Executive Certification.

**e. State Strategic Plan (if applicable)**

For 2018 JAG applications, states are strongly encouraged to use JAG funding to implement programs identified in an existing statewide strategic plan. An applicant state should attach a current version of the state strategic plan to its application, if one exists. If a state does not have such a plan, the program narrative should describe the

---

**ALERT**: *A recent amendment to the JAG Program statute requires that states create and submit a strategic plan with their FY 2019 JAG grant applications. The plan must be developed with input from a broad range of identified stakeholders; must describe evidence-based approaches used for planning, program implementation, and evaluation; and illustrate how the state will allocate funding. By law, strategic plans are to be reviewed annually and updated every 5 years.*

---

state's timeline and process for developing such a strategic plan. The state strategic plan should describe how grants received will be used to improve the administration of the criminal justice system and should contain the following elements: needs statement, priorities to be addressed with JAG funding, objectives, action steps to achieve the objectives, stakeholders engaged, process used to select programs and services to fund, data necessary to support priorities for funding and accomplish identified objectives, outcomes expected, plans for program and services evaluation, and a detailed budget. The plan may also address barriers the state and its subrecipients face to collecting and using data, and to implementing and evaluating evidence informed approaches to preventing and reducing crime. Training and technical assistance (TTA) is

available from BJA's TTA providers to assist states with the development of their strategic planning processes and plans.

To help ensure that states consider the impact of JAG funding decisions across the entire criminal justice system, BJA strongly encourages each state to involve all criminal justice system stakeholders in the strategic planning process. The strategic planning process should reflect input from all segments of the criminal justice system including local governments, judges, prosecutors, law enforcement and corrections personnel, providers of indigent defense services, victim services, juvenile justice and delinquency prevention programs, parole and probation services, and reentry services. For more information, see the National Criminal Justice Association Justice Planning website at http://www.ncja.org/ncja-services.

**How to Apply**
An applicant must submit its application through the Grants Management System (GMS), which provides support for the application, award, and management of awards at OJP. Each applicant entity **must register in GMS for each specific funding opportunity.** Although the registration and submission deadlines are the same, OJP urges each applicant entity to **register promptly**, especially if this is the first time the applicant is using the system. Find complete instructions on how to register and submit an application in GMS at www.ojp.gov/gmscbt/. An applicant that experiences technical difficulties during this process should email GMS.HelpDesk@usdoj.gov or call 888-549-9901 (option 3), 24 hours every day, including during federal holidays. OJP recommends that each applicant **register promptly** to prevent delays in submitting an application package by the deadline.

**Note on File Types: GMS does not accept executable file types as application attachments**. These disallowed file types include, but are not limited to, the following extensions: ".com," ".bat," ".exe," ".vbs," ".cfg," ".dat," ".db," ".dbf," ".dll," ".ini," ".log," ".ora," ".sys," and ".zip." GMS may reject applications with files that use these extensions. It is important to allow time to change the type of file(s) if the application is rejected.

**Unique Entity Identifier (DUNS Number) and System for Award Management (SAM)**
Every applicant entity must comply with all applicable System for Award Management (SAM) and unique entity identifier (currently, a Data Universal Numbering System [DUNS] number) requirements. SAM is the repository for certain standard information about federal financial assistance applicants, recipients, and subrecipients. A DUNS number is a unique nine-digit identification number provided by the commercial company Dun and Bradstreet. More detailed information about SAM and the DUNS number is in the numbered sections below.

If an applicant entity has not fully complied with the applicable SAM and unique identifier requirements by the time OJP makes award decisions, OJP may determine that the applicant is not qualified to receive an award and may use that determination as a basis for making the award to a different applicant.

If the applicant entity already has an Employer Identification Number (EIN), the SAM registration will take **up to two weeks to process**. If the entity does not have an EIN, then **the applicant should allow two to five weeks for obtaining the information from IRS when requesting the EIN via phone, fax, mail or Internet**. For more information about EIN, visit https://www.irs.gov/individuals/international-taxpayers/taxpayer-identification-numbers-tin.

**Registration and Submission Steps**
All applicants should complete the following steps:

1. **Acquire a unique entity identifier (currently, a DUNS number).** In general, the Office of Management and Budget requires every applicant for a federal award (other than an individual) to include a "unique entity identifier" in each application, including an application for a supplemental award. Currently, a DUNS number is the required unique entity identifier.

   This unique entity identifier is used for tracking purposes, and to validate address and point of contact information for applicants, recipients, and subrecipients. It will be used throughout the life cycle of an OJP award. Obtaining a DUNS number is a free, one-time activity. Call Dun and Bradstreet at 866–705–5711 to obtain a DUNS number or apply online at www.dnb.com/. A DUNS number is usually received within 2 business days.

2. **Acquire or maintain registration with SAM.** Any applicant for an OJP award creating a **new** entity registration (or updating or renewing a registration) in SAM.gov must submit an original, signed notarized letter appointing the authorized Entity Administrator within thirty (30) days of the registration activation. **Notarized letters must be submitted via U.S. Postal Service Mail. Read the Alert at www.sam.gov to learn more about what is required in the notarized letter, and read the Frequently Asked Questions (FAQs) at www.gsa.gov/samupdate to learn more about this process change.**

   All applicants for OJP awards (other than individuals) with current registration in SAM must maintain current registrations in the SAM database. Applicants will need the authorizing official of the organization and an Employer Identification Number (EIN).

   Information about SAM registration procedures can be accessed at www.sam.gov.

3. **Acquire a GMS username and password**. New users must create a GMS profile by selecting the "First Time User" link under the sign-in box of the GMS home page. For more information on how to register in GMS, go to www.ojp.gov/gmscbt. Previously registered applicants should ensure, prior to applying, that the user profile information is up-to-date in GMS (including, but not limited to, address, legal name of agency and authorized representative) as this information is populated in any new application.

4. **Verify the SAM (formerly CCR) registration in GMS.** OJP requires each applicant to verify its SAM registration in GMS. Once logged into GMS, click the "CCR Claim" link on the left side of the default screen. Click the submit button to verify the SAM (formerly CCR) registration.

5. **Search for the funding opportunity on GMS.** After logging into GMS or completing the GMS profile for username and password, go to the "Funding Opportunities" link on the left side of the page. Select "BJA" and "**FY 18 Edward Byrne Memorial Justice Assistance Grant (JAG) Program**."

6. **Register by selecting the "Apply Online" button associated with the funding opportunity title.** The search results from step 5 will display the "funding opportunity" (solicitation) title along with the registration and application deadlines for this solicitation. Select the "Apply Online" button in the "Action" column to register for this solicitation and create an application in the system.

33

7. **Follow the directions in GMS to submit an application consistent with this solicitation.** Once the application is submitted, GMS will display a confirmation screen stating the submission was successful. **Important:** In some instances, an applicant must wait for GMS approval before submitting an application. OJP urges each applicant to submit its application **at least 72 hours prior** to the application due date.

**Note: Application Versions**
If an applicant submits multiple versions of the same application, OJP will review **only** the most recent system-validated version submitted.

**Experiencing Unforeseen GMS Technical Issues**
An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline may contact the GMS Help Desk or the SAM Help Desk (Federal Service Desk) at https://www.fsd.gov/fsd-gov/home.do to report the technical issue and receive a tracking number. The applicant is expected to email the NCJRS Response Center identified in the Contact Information section on the title page **within 24 hours after the application deadline** to request approval to submit its application after the deadline. The applicant's email must describe the technical difficulties, and must include a timeline of the applicant's submission efforts, the complete grant application, the applicant's DUNS number, and any GMS Help Desk or SAM tracking number(s).

**Note: OJP does not automatically approve requests to submit a late application.** After OJP reviews the applicant's request, and contacts the GMS Help Desk to verify the reported technical issues, OJP will inform the applicant whether the request to submit a late application has been approved or denied. If OJP determines that the untimely application submission was due to the applicant's failure to follow all required procedures, OJP will deny the applicant's request to submit its application.

The following conditions generally are insufficient to justify late submissions to OJP solicitations:

- Failure to register in SAM or GMS in sufficient time (SAM registration and renewal can take as long as 10 business days to complete).
- Failure to follow GMS instructions on how to register and apply as posted on the GMS website.
- Failure to follow each instruction in the OJP solicitation.
- Technical issues with the applicant's computer or information technology environment, such as issues with firewalls.

# E. Application Review Information

**Review Process**
OJP is committed to ensuring a fair and open process for making awards. BJA reviews the application to make sure that the information presented is reasonable, understandable, measurable, and achievable, as well as consistent with the solicitation. BJA will also review applications to help ensure that JAG program-statute requirements have been met.

Pursuant to the Part 200 Uniform Requirements, before award decisions are made, OJP also reviews information related to the degree of risk posed by applicants. Among other things, to

34

help assess whether an applicant that has one or more prior federal awards has a satisfactory record with respect to performance, integrity, and business ethics, OJP checks whether the applicant is listed in SAM as excluded from receiving a federal award.

In addition, if OJP anticipates that an award will exceed $150,000 in federal funds, OJP also must review and consider any information about the applicant that appears in the non-public segment of the integrity and performance system accessible through SAM (currently, the Federal Awardee Performance and Integrity Information System; "FAPIIS").

**Important note on FAPIIS:** An applicant, at its option, may review and comment on any information about itself that currently appears in FAPIIS and was entered by a federal awarding agency. OJP will consider any such comments by the applicant, in addition to the other information in FAPIIS, in its assessment of the risk posed by the applicant. The evaluation of risks goes beyond information in SAM, however. OJP itself has in place a framework for evaluating risks posed by applicants. OJP takes into account information pertinent to matters such as:

(1) Applicant financial stability and fiscal integrity
(2) Quality of the management systems of the applicant, and the applicant's ability to meet prescribed management standards, including those outlined in the DOJ Grants Financial Guide
(3) Applicant's history of performance under OJP and other DOJ awards (including compliance with reporting requirements and award conditions), as well as awards from other federal agencies
(4) Reports and findings from audits of the applicant, including audits under the (DOJ) Part 200 Uniform Requirements
(5) Applicant's ability to comply with statutory and regulatory requirements, and to effectively implement other award requirements

Absent explicit statutory authorization or written delegation of authority to the contrary, the Assistant Attorney General will make all final award decisions.


# F. Federal Award Administration Information

**Federal Award Notices**
Award notifications are expected to be made by September 30, 2018. OJP sends award notification by email through GMS to the individuals listed in the application as the point of contact and the authorizing official. The email notification includes detailed instructions on how to access and view the award documents, and steps to take in GMS to start the award acceptance process. GMS automatically issues the notifications at 9:00 p.m. eastern time on the award date.

**NOTE:** In order to validly accept an award under the FY 2018 JAG Program, a state must submit to GMS the certifications by its chief legal officer regarding compliance with certain federal laws, executed using the forms that appear in Appendices B and C. (The forms also may be downloaded at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.) Unless the executed certifications either (1) are submitted to OJP together with the signed award document or (2) are uploaded in GMS no later than the day the signed award document is

35

submitted, **OJP will reject as invalid** any submission by a state that purports to accept an award under this solicitation.

Rejection of an initial submission as an invalid award acceptance is not a denial of the award. Consistent with award requirements, once the state **does** submit the necessary certifications regarding compliance with certain federal laws, the state **will** be permitted to submit an award document executed by the state on or after the date of those certifications.

Also, in order for a state applicant to validly accept an award under the FY 2018 JAG Program, an individual with the necessary authority to bind the applicant will be required to log in; execute a set of legal certifications and a set of legal assurances; designate a financial point of contact; thoroughly review the award, including **all** award conditions; and sign and accept the award. The award acceptance process requires physical signature of the award document by the authorized representative and the scanning of the fully executed award document (along with the required certifications regarding compliance with certain federal laws, if not already uploaded in GMS) to OJP.

**Statutory and Regulatory Requirements; Award Conditions**
If selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with award conditions, as well as all applicable requirements of federal statutes and regulations (including applicable requirements referred to in the assurances and certifications executed at the time of award acceptance). OJP strongly encourages prospective applicants to review information on post-award legal requirements and common OJP award conditions **prior** to submitting an application.

OJP strongly encourages prospective applicants to review information on post-award legal requirements generally applicable to FY 2018 OJP awards and common OJP award conditions **prior** to submitting an application.

Applicants should consult the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards", available in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm. In addition, applicants should examine the following two legal documents, as each successful applicant must execute both documents before it may receive any award funds. (An applicant is not required to submit these documents as part of an application.)

- Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements
- Certified Standard Assurances

The web pages accessible through the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" are intended to give applicants for OJP awards a general overview of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants and cooperative agreements awarded in FY 2018. Individual OJP awards typically also will include additional award conditions. Those additional conditions may relate to the particular statute, program, or solicitation under which the award is made; to the substance of the funded application; to the recipient's performance under other federal awards; to the recipient's legal status (e.g., as a for-profit entity); or to other pertinent considerations.

Individual FY 2018 awards made pursuant to this solicitation will, as appropriate and to the extent consistent with law, include conditions that will require the recipient (and any subrecipient) that accepts the award to do various things, with respect to the "program or activity" that would receive federal financial assistance thereunder. **Although the specific terms of each of those conditions are what will govern the awards**, included among such conditions will be some that, **generally speaking**, will require the recipient (and any subrecipient) that accepts the award to do some or all of the following:

- Not to violate 8 U.S.C. § 1373 (prohibiting restrictions on—
    (1) communication to/from the Department of Homeland Security ("DHS") of information regarding the citizenship or immigration status of any individual; and
    (2) maintaining, or exchanging with any government entity, information regarding the immigration status of any individual).

- Not to violate 8 U.S.C. § 1644 (prohibiting restrictions on communication to/from DHS of information regarding the immigration status of an alien).

- Not to violate, or aid or abet any violation of, 8 U.S.C. § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal, harbor, or shield from detection, or attempt to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts. . ."or aid or abet the commission of any of the preceding acts").

- Not to impede the exercise of the authority of the federal government under 8 U.S.C. § 1266(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released") and 8 U.S.C. § 1231(a)(4) (relating to removal from the United States of aliens after detention/confinement at the federal, state, and local level), specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act.

- Not to impede the exercise by DHS agents, "anywhere in or outside the United States" (8 C.F.R. § 287.5(a)(1)), of their authority under 8 U.S.C. § 1357(a)(1) to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," specifically by requiring such recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States.

The reasonable costs (to the extent not reimbursed under any other federal program) of complying with these conditions, including honoring any duly authorized request from DHS that is encompassed by these conditions, will be allowable costs under the award.

**General Information about Post-federal Award Reporting Requirements**
In addition to the deliverables described in Section A. Program Description, any recipient of an award under this solicitation will be required to submit the following reports and data.

<u>Required reports</u>. Recipients typically must submit quarterly financial status reports, semi-annual progress reports, final financial and progress reports, and, if applicable, an annual audit report in accordance with the Part 200 Uniform Requirements or specific award conditions. Future awards and fund drawdowns may be withheld if reports are delinquent. (In appropriate cases, OJP may require additional reports.)

Awards that exceed $500,000 will include an additional condition that, under specific circumstances, will require the recipient to report (to FAPIIS) information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either the OJP award or any other grant, cooperative agreement, or procurement contract from the federal government. Additional information on this reporting requirement appears in the text of the award condition posted on the OJP website at https://ojp.gov/funding/FAPIIS.htm.

<u>Data on performance measures</u>. In addition to required reports, each award recipient also must provide data that measure the results of the work done under the award. To demonstrate program progress and success, as well as to assist DOJ with fulfilling its responsibilities under the Government Performance and Results Act of 1993 (GPRA), Public Law 103-62, and the GPRA Modernization Act of 2010, Public Law 111–352, OJP will require any award recipient, post award, to provide performance data as part of regular progress reporting. Successful applicants will be required to access OJP's performance measurement page at www.ojp.gov/performance for an overview of performance measurement activities at OJP.

Accountability metrics data must be submitted through BJA's Performance Measurement Tool (PMT), available at https://bjapmt.ojp.gov. The accountability measures are available at: https://bjapmt.ojp.gov/help/jagdocs.html. (Note that if a law enforcement agency receives JAG funds from a state, the state must submit quarterly accountability metrics data related to training that officers have received on use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public.)

OJP may restrict access to award funds if a recipient of an OJP award fails to report required performance measure data in a timely manner.

## G. Federal Awarding Agency Contact(s)

For OJP contact(s), see the title page of this solicitation.

For contact information for GMS, see the title page.

## H. Other Information

**Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)**
All applications submitted to OJP (including all attachments to applications) are subject to the federal Freedom of Information Act (FOIA) and to the Privacy Act. By law, DOJ may withhold information that is responsive to a request pursuant to FOIA if DOJ determines that the responsive information either is protected under the Privacy Act or falls within the scope of one of nine statutory exemptions under FOIA. DOJ cannot agree in advance of a request pursuant to FOIA not to release some or all portions of an application.

In its review of records that are responsive to a FOIA request, OJP will withhold information in those records that plainly falls within the scope of the Privacy Act or one of the statutory exemptions under FOIA. (Some examples include certain types of information in budgets, and names and contact information for project staff other than certain key personnel.) In appropriate circumstances, OJP will request the views of the applicant/recipient that submitted a responsive document.

For example, if OJP receives a request pursuant to FOIA for an application submitted by a nonprofit or for-profit organization or an institution of higher education, or for an application that involves research, OJP typically will contact the applicant/recipient that submitted the application and ask it to identify—quite precisely—any particular information in the application that applicant/recipient believes falls under a FOIA exemption, the specific exemption it believes applies, and why. After considering the submission by the applicant/recipient, OJP makes an independent assessment regarding withholding information. OJP generally follows a similar process for requests pursuant to FOIA for applications that may contain law-enforcement sensitive information.

**Provide Feedback to OJP**
To assist OJP in improving its application and award processes, OJP encourages applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. Provide feedback to OJPSolicitationFeedback@usdoj.gov.

**IMPORTANT:** This email is for feedback and suggestions only. OJP does **not** reply to messages it receives in this mailbox. A prospective applicant that has specific questions on any program or technical aspect of the solicitation **must** use the appropriate telephone number or email listed on the front of this solicitation document to obtain information. These contacts are provided to help ensure that prospective applicants can directly reach an individual who can address specific questions in a timely manner.

If you are interested in being a reviewer for other OJP grant applications, please email your résumé to ojpprsupport@usdoj.gov. (Do not send your résumé to the OJP Solicitation Feedback email account.) **Note:** Neither you nor anyone else from your organization or entity can be a peer reviewer in a competition in which you or your organization/entity has submitted an application.

**Appendix A**

**Certifications and Assurances by the Chief Executive of the Applicant Government**

**Template for use by the chief executive of the state (e.g., the governor)**

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

**Note:** By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa.

40

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**Edward Byrne Justice Assistance Grant Program FY 2018 State Solicitation**

**Certifications and Assurances**
**by the Chief Executive of the Applicant Government**

On behalf of the applicant "State" named below, in support of that State's application for an award under the FY 2018 Edward Byrne Justice Assistance Grant ("JAG") Program, and further to 34 U.S.C. § 10153(a), I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief executive of the applicant State named below, and I have the authority to make the following representations on my own behalf and on behalf of the applicant State. I understand that these representations will be relied upon as material in any OJP decision to make an award, under the application described above, to the applicant State.

2. I certify that no federal funds made available by the award (if any) that OJP makes based on the application described above will be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

3. I assure that the application described above (and any amendment to that application) was submitted for review to the governing body of the State (e.g., the State legislature), or to an organization designated by that governing body, not less than 30 days before the date of this certification.

4. I assure that, before the date of this certification— (a) the application described above (and any amendment to that application) was made public; and (b) an opportunity to comment on that application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure made such an opportunity available.

5. I assure that, for each fiscal year of the award (if any) that OJP makes based on the application described above, the applicant State will maintain and report such data, records, and information (programmatic and financial), as OJP may reasonably require.

6. I certify that— (a) the programs to be funded by the award (if any) that OJP makes based on the application described above meet all the requirements of the JAG Program statute (34 U.S.C. §§ 10151-10158); (b) all the information contained in that application is correct; (c) in connection with that application, there has been appropriate coordination with affected agencies; and (d) in connection with that award (if any), the applicant State will comply with all provisions of the JAG Program statute and all other applicable federal laws.

7. I have examined certification entitled "State or Local Government: FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government.

8. I have examined certification entitled "State or Local Government: FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1357(a), & 1366(1) & (3)" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government.

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it "supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant State to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____          _____
Signature of Chief Executive of the Applicant "State"          Date of Certification

_____          _____
Printed Name of Chief Executive          Title of Chief Executive

_____
Name of Applicant State

41

**Appendix B**

**State or Local Government:**

**Certification of Compliance with 8 U.S.C. §§ 1373 and 1644**

Template for use by the chief legal officer of the state (e.g., the attorney general)

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

42

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**State Government:  FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644**

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

(1)  I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP).  I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

(2)  I have carefully reviewed 8 U.S.C. §§ 1373(a) & (b), and 1644, including the prohibitions on certain actions by State and local government entities, -agencies, and -officials regarding information on citizenship and immigration status. I also have reviewed the provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition … and Transfer of Functions"), pursuant to which references to the "Immigration and Naturalization Service" in 8 U.S.C. §§ 1373 & 1644 are to be read, as a legal matter, as references to particular components of the U.S. Department of Homeland Security.

(3)  I (and also the applicant entity) understand that the U.S. Department of Justice will require States and local governments (and agencies or other entities thereof) to comply with 8 U.S.C. §§ 1373 & 1644, with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program.

(4)  I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (*see* 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (*cf.* 34 U.S.C. § 10251(a)(2)). Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (*i.e.*, one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

(5)  I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

   (a)  the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

   (b)  any prohibitions or restrictions potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. §§ 1373(a) & (b), and 1644, whether imposed by a State or local government entity, -agency, or -official.

(6)  As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. §§ 1373(a) & 1644; or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (with respect to the entities) described in 8 U.S.C. § 1373(b).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____          _____
Signature of Chief Legal Officer of the Jurisdiction          Printed Name of Chief Legal Officer

_____          _____
Date of Certification          Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (*i.e.*, the applicant to the FY 2018 OJP Program identified below)

*FY 2018 OJP Program*:  **Byrne Justice Assistance Grant (JAG) Program: State**

43

**Appendix C**

**State or Local Government:**

**Certification of Compliance with 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3)**

Template for use by the chief legal officer of the state (e.g., the attorney general)

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**State or Local Government:  FY 2018 Certification Relating to**
**8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3)**

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1.  I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP). I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

2.  I have carefully reviewed each of the following sections of title 8, United States Code:

    a.  § 1226(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released");

    b.  § 1231(a)(4) (federal government may not "remove an alien who is sentenced to imprisonment until the alien is released from imprisonment");

    c.  § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts … or aid[] or abet[] the commission of any of the preceding acts");

    d.  § 1357(a) (authorizing immigration officers, "anywhere in or outside the United States" (see 8 C.F.R. § 287.5(a)), to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"); and

    e.  § 1366(1) & (3) (requiring the Attorney General annually to submit to Congress "a report detailing … (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense; [and] (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal").

3.  I (and also the applicant entity) understand that USDOJ will require States and local governments (including State and local government entities, -agencies, and -officials), with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program, not to violate, or to aid or abet any violation of, 8 U.S.C. § 1324(a), and not to impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a) or relating to 8 U.S.C. § 1366(1) & (3) or 8 U.S.C. § 1226(a) & (c).

4.  I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)).  Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

5.  I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

    a.  the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

    b.  any laws, rules, policies, or practices potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that implicate any of the requirements relating to 8 U.S.C. §§ 1226(a) & (c), 1324(a), 1357(a), & 1366(1) & (3) that are described in ¶ 3 of this certification, whether imposed by a State or local government entity, -agency, or -official.

6.  As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that would or does— (1) violate, or aid or abet any violation of, 8 U.S.C. § 1324(a); (2) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); (3) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3); or, (4) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) & (c).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812).  I also acknowledge that OJP awards, including associated certifications, are subject to review by USDOJ, including by OJP and the USDOJ Office of the Inspector General.

_____                    _____
Signature of Chief Legal Officer of the Jurisdiction            Printed Name of Chief Legal Officer

_____ _____   _____
Date of Certification                                           Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below

*FY 2018 OJP Program*:  **Byrne Justice Assistance Grant (JAG) Program: State**

45

**Appendix D**

**Certain relevant federal laws, as in effect on June 7, 2018**

**8 U.S.C. § 1373**

**Communication between government agencies and the Immigration and Naturalization Service**

**(a) In general**
Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional authority of government entities**
Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
**(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
**(2)** Maintaining such information.
**(3)** Exchanging such information with any other Federal, State, or local government entity.

**(c) Obligation to respond to inquiries**
The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**8 U.S.C. § 1644**

**Communication between State and local government agencies and Immigration and Naturalization Service**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**8 U.S.C. § 1226(a) & (c)**

**Apprehension and detention of aliens**
(a) Arrest, detention, and release
On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--

46

(1) may continue to detain the arrested alien; and

(2) may release the alien on--

    (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

    (B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

\*\*\*

(c) Detention of criminal aliens

    (1) Custody

The Attorney General shall take into custody any alien who--

    (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

    (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

    (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence1 to a term of imprisonment of at least 1 year, or

    (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

    (2) Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

## 8 U.S.C. § 1231(a)(4)

(a) Detention, release, and removal of aliens ordered removed

\*\*\*

### 4) Aliens imprisoned, arrested, or on parole, supervised release, or probation

#### (A) In general

Except as provided in section 259(a) of title 42 and paragraph (2), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

47

**(B) Exception for removal of nonviolent offenders prior to completion of sentence of imprisonment**

The Attorney General is authorized to remove an alien in accordance with applicable procedures under this chapter before the alien has completed a sentence of imprisonment-

  i. in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 1101(a)(43)(B), (C), (E), (I), or (L) of this title and (II) the removal of the alien is appropriate and in the best interest of the United States; or

  ii. in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 1101(a)(43)(C) or (E) of this title), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

**(C) Notice**

Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

**(D) No private right**

No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.


**8 U.S.C. § 1324(a)**

**Bringing in and harboring certain aliens**

(a) Criminal penalties

  (1)(A) Any person who—

    i. knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

    ii. knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

    iii. knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

BJA-2018-13625

     iv.    encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

     v.    (v)(I) engages in any conspiracy to commit any of the preceding acts, or

     vi.    (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

     I.    in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under title 18, imprisoned not more than 10 years, or both;

     II.    in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, imprisoned not more than 5 years, or both;

     III.    in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365 of title 18) to, or places in jeopardy the life of, any person, be fined under title 18, imprisoned not more than 20 years, or both; and

     IV.    in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under title 18, or both.

(C) It is not a violation of clauses (ii) or (iii) of subparagraph (A), or of clause (iv) of subparagraph (A) except where a person encourages or induces an alien to come to or enter the United States, for a religious denomination having a bona fide nonprofit, religious organization in the United States, or the agents or officers of such denomination or organization, to encourage, invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, notwithstanding the provision of room, board, travel, medical assistance, and other basic living expenses, provided the minister or missionary has been a member of the denomination for at least one year.

(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs-

     (A) be fined in accordance with title 18 or imprisoned not more than one year, or both; or

     (B) in the case of-

      (i) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,

      (ii) an offense done for the purpose of commercial advantage or private financial gain, or

      (iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

be fined under title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of

subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

(3)(A) Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18 or imprisoned for not more than 5 years, or both.
(B) An alien described in this subparagraph is an alien who-
(i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and
(ii) has been brought into the United States in violation of this subsection.

(4) In the case of a person who has brought aliens into the United States in violation of this subsection, the sentence otherwise provided for may be increased by up to 10 years if-
(A) the offense was part of an ongoing commercial organization or enterprise;
(B) aliens were transported in groups of 10 or more; and
(C)(i) aliens were transported in a manner that endangered their lives; or
(ii) the aliens presented a life-threatening health risk to people in the United States.


## 8 U.S.C. § 1357(a)

### Powers of immigration officers and employees

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
**(1)** to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
**(2)** to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;
**(3)** within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;
**(4)** to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and
**(5)** to make arrests-
**(6)** for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

50

**(7)** for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

**(8)** if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.


**8 U.S.C. § 1366(1) & (3)**

**Annual report on criminal aliens**
Not later than 12 months after September 30, 1996, and annually thereafter, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing—
  (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense;
  \*\*\*
  (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal;
  \*\*\*.

BJA-2018-13625

**Appendix E**


**Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**

Each applicant must provide responses to the following questions as an attachment to the application:

(1)  Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?

(2)  Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?

(3)  If yes to either:
- Please provide a copy of each law or policy;
- Please describe each practice; and
- Please explain how the law, policy, or practice complies with section 1373.

**Note:** Responses to these questions must be provided by the applicant to BJA as part of the JAG application. Further, the requirement to provide this information applies to all tiers of JAG funding, for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of JAG funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

**Appendix F**

Additional purposes for which JAG funds awarded to a state under this FY 2018 solicitation may be used:

    **(a)**     To enforce state and local laws that establish offenses similar to offenses established in 21 U.S.C. § 801 et seq., to improve the functioning of the **criminal justice** system, with emphasis on violent crime and serious offenders, by means including providing additional personnel, equipment, training, technical assistance, and information systems for the more widespread apprehension, prosecution, adjudication, detention, and rehabilitation of persons who violate these laws, and to assist the victims of such crimes (other than compensation), including—

        (1)     demand-reduction education programs in which law enforcement officers participate;

        (2)     multi-jurisdictional task-force programs that integrate federal, state, and local drug-law-enforcement agencies and prosecutors for the purpose of enhancing inter-agency co-ordination and intelligence, and facilitating multi-jurisdictional investigations;

        (3)     programs designed to target the domestic sources of controlled and illegal substances, such as precursor chemicals, diverted pharmaceuticals, clandestine laboratories, and cannabis cultivations;

        (4)     providing community and neighborhood programs that assist citizens in preventing and controlling crime, including special programs that address the problems of crimes committed against the elderly and special programs for rural jurisdictions;

        (5)     disrupting illicit commerce in stolen goods and property;

        (6)     improving the investigation and prosecution of white-collar crime, organized crime, public-corruption crimes, and fraud against the government, with priority attention to cases involving drug-related official corruption;

        (7)(A)     improving the operational effectiveness of law enforcement through the use of crime-analysis techniques, street-sales enforcement, schoolyard-violator programs, and gang-related and low-income-housing drug-control programs; and

        (B)     developing and implementing anti-terrorism plans for deep-draft ports, international airports, and other important facilities;

        (8)     career-criminal prosecution programs, including the development of proposed model drug-control legislation;

        (9)     financial investigative programs that target the identification of money-laundering operations and assets obtained through illegal drug trafficking, including the development of proposed model legislation, financial investigative training, and financial information-sharing systems;

        (10)     improving the operational effectiveness of the court process, by expanding prosecutorial, defender, and judicial resources, and implementing court-delay-reduction programs;'

        (11)     programs designed to provide additional public correctional resources and improve the corrections system, including treatment in prisons and jails, intensive-supervision programs, and long-range corrections and sentencing strategies;

        (12)     providing prison-industry projects designed to place inmates in a realistic working and training environment that will enable them to acquire

marketable skills and to make financial payments for restitution to their victims, for support of their own families, and for support of themselves in the institution;

(13)     providing programs that identify and meet the treatment needs of adult and juvenile drug-dependent and alcohol-dependent offenders;

(14)     developing and implementing programs that provide assistance to jurors and witnesses, and assistance (other than compensation) to victims of crimes;

(15)(A) developing programs to improve drug-control technology, such as pretrial drug-testing programs, programs that provide for the identification, assessment, referral to treatment, case-management and monitoring of drug-dependent offenders, and enhancement of state and local forensic laboratories; and

(B)     developing programs to improve **criminal justice** information systems (including automated fingerprint identification systems) to assist law enforcement, prosecution, courts, and corrections organizations;

(16)     innovative programs that demonstrate new and different approaches to enforcement, prosecution, and adjudication of drug offenses and other serious crimes;

(17)     addressing the problems of drug trafficking and the illegal manufacture of controlled substances in public housing;

(18)     improving the criminal and juvenile justice system's response to domestic and family violence, including spouse abuse, child abuse, and abuse of the elderly;

(19)     drug-control evaluation programs that the state and units of local government may utilize to evaluate programs and projects directed at state drug-control activities;

(20)     providing alternatives to prevent detention, jail, and prison for persons who pose no danger to the community;

(21)     programs of which the primary goal is to strengthen urban enforcement and prosecution efforts targeted at street drug sales;

(22)     programs for the prosecution of driving while intoxicated charges and the enforcement of other laws relating to alcohol use and the operation of motor vehicles;

(23)     programs that address the need for effective bindover systems for the prosecution of violent 16- and 17-year-old juveniles, in courts with jurisdiction over adults, for the crimes of—

(A)     murder in the first degree;
(B)     murder in the second degree;
(C)     attempted murder;
(D)     armed robbery when armed with a firearm;
(E)     aggravated battery or assault when armed with a firearm;
(F)     criminal sexual penetration when armed with a firearm; and
(G)     drive-by shootings as described 18 U.S.C. § 36;

(24)     law-enforcement and prevention programs relating to gangs or to youth who are involved or at risk of involvement in gangs;

(25)     developing or improving, in a forensic laboratory, a capability to analyze DNA for identification purposes; and

(26)     developing and implementing anti-terrorism training programs and procuring equipment for use by local law-enforcement authorities; and

54

**(b)**　　　To reduce crime and improve public safety, including but not limited to, the following:

(1)(A)　　　hiring, training, and employing on a continuing basis new, additional law enforcement officers and necessary support personnel;

(B)　　　paying overtime to presently-employed law enforcement officers and necessary support personnel for the purpose of increasing the number of hours worked by such personnel; and

(C)　　　procuring equipment, technology, and other material directly related to basic law-enforcement functions;

(2)　　　enhancing security measures—

(A)　　　in and around schools; and

(B)　　　in and around any other facility or location that is considered by the unit of local government to have a special risk for incidents of crime;

(3)　　　establishing crime-prevention programs that may, though not exclusively, involve law-enforcement officials and that are intended to discourage, disrupt, or interfere with the commission of criminal activity, including neighborhood-watch and citizen-patrol programs, sexual-assault and domestic-violence programs, and programs intended to prevent juvenile crime;

(4)　　　establishing or supporting drug courts;

(5)　　　establishing early-intervention and -prevention programs for juveniles, in order to reduce or eliminate crime;

(6)　　　enhancing the adjudication process of cases involving violent offenders, including violent juvenile offenders;

(7)　　　enhancing programs under **(a)**, above;

(8)　　　establishing co-operative task forces between adjoining units of local government to work co-operatively to prevent and combat criminal activity, particularly criminal activity that is exacerbated by drug- or gang-related involvement; and

(9)　　　establishing a multi-jurisdictional task force, particularly in rural areas, composed of law-enforcement officials representing units of local government, that works with Federal law-enforcement officials to prevent and control crime.

**Appendix G
Application Checklist**

**Edward Byrne Memorial Justice Assistance Grant (JAG) Program:**

**FY 2018 State Solicitation**

This application checklist has been created as an aid in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in GMS:*
\_\_\_\_\_ Acquire a DUNS Number                                              (see page 32)
\_\_\_\_\_ Acquire or renew registration with SAM                             (see page 33)
*To Register with GMS*:
\_\_\_\_\_ For new users, acquire a GMS username and password*               (see page 33)
\_\_\_\_\_ For existing users, check GMS username and password* to ensure account access
                                                                          (see page 33)
\_\_\_\_\_ Verify SAM registration in GMS                                    (see page 33)
\_\_\_\_\_ Search for correct funding opportunity in GMS                     (see page 33)
\_\_\_\_\_ Select correct funding opportunity in GMS                         (see page 33)
\_\_\_\_\_ Register by selecting the "Apply Online" button associated with the funding opportunity
        title                                                             (see page 33)
 \_\_\_\_\_ Read OJP policy and guidance on conference approval, planning, and reporting
        available at ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm
                                                                          (see page 18)
\_\_\_\_\_ If experiencing technical difficulties in GMS, contact the NCJRS Response Center
                                                                          (see pages 2 and 34)

*Password Reset Notice – GMS users are reminded that while password reset capabilities exist, this function is only associated with points of contact designated within GMS at the time the account was established. Neither OJP nor the GMS Help Desk will initiate a password reset unless requested by the authorized official or a designated point of contact associated with an award or application.

**Overview of Post-Award Legal Requirements:**

\_\_\_\_\_ Review the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.

**Scope Requirement:**

\_\_\_\_\_ The federal amount requested is within the allowable limit(s) of the FY 2018 JAG Allocations List as listed on BJA's JAG web page.

**Eligibility Requirement:**

Only states may apply under this solicitation. By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa. (Throughout this solicitation, each reference to a state or states includes all 56 jurisdictions.)

**What an Application Should Include:**

\_\_\_\_\_ Application for Federal Assistance (SF-424)      (see page 19)
\_\_\_\_\_ Intergovernmental Review      (see page 20)
\_\_\_\_\_ Program Narrative      (see page 20)
\_\_\_\_\_ Budget Detail Worksheet      (see page 22)
\_\_\_\_\_ Budget Narrative      (see page 22)
\_\_\_\_\_ Indirect Cost Rate Agreement (if applicable)      (see page 22)
\_\_\_\_\_ Financial Management and System of Internal Controls Questionnaire      (see page 25)
\_\_\_\_\_ Disclosure of Lobbying Activities (SF-LLL) (if applicable)      (see page 26)
\_\_\_\_\_ Certifications and Assurances by Chief Executive      (see page 27)
\_\_\_\_\_ Certification of Compliance with 8 U.S.C. § 1373 by Chief Legal Officer      (see page 27)
\_\_\_\_\_ State Strategic Plan (if applicable)      (see page 31)
\_\_\_\_\_ Additional Attachments
     \_\_\_\_\_ Applicant Disclosure of Pending Applications      (see page 28)
     \_\_\_\_\_ Research and Evaluation Independence and Integrity (if applicable)
              (see page 29)

BJA-2018-13625

Exhibit 5



**U.S. Department of Justice**

Office of Justice Programs

---

Office of the Assistant Attorney General          *Washington, D.C.  20531*

September 18, 2019

Ms. Kathleen Howard
California Board of State and Community Corrections
2590 Venture Oaks Way, Ste. 200
Sacramento, CA 95833-3288

Dear Ms. Howard:

On behalf of Attorney General William P. Barr, it is my pleasure to inform you that the Office of Justice Programs has
approved your application for funding under the FY 19 Edward Byrne Memorial Justice Assistance Grant (JAG) Program -
State Solicitation in the amount of $17,860,765 for California Board of State and Community Corrections.

Enclosed you will find the Grant Award and Special Conditions documents.  This award is subject to all administrative and
financial requirements, including the timely submission of all financial and programmatic reports, resolution of all interim
audit findings, and the maintenance of a minimum level of cash-on-hand.  Should you not adhere to these requirements, you
will be in violation of the terms of this agreement and the award will be subject to termination for cause or other administrative
action as appropriate.

If you have questions regarding this award, please contact:

-    Program Questions, Linda Hill-Franklin, Program Manager at (202) 514-0712; and

-    Financial Questions, the Office of the Chief Financial Officer, Customer Service Center (CSC) at
     (800) 458-0786, or you may contact the CSC at ask.ocfo@usdoj.gov.

Congratulations, and we look forward to working with you.

Sincerely,

Katharine T. Sullivan
Principal Deputy Assistant Attorney General

Enclosures



**U.S. Department of Justice**

Office of Justice Programs

*Office of Civil Rights*

_____

*Washington, DC 20531*

September 18, 2019

Ms. Kathleen Howard
California Board of State and Community Corrections
2590 Venture Oaks Way, Ste. 200
Sacramento, CA 95833-3288

Dear Ms. Howard:

Congratulations on your recent award!  The Office for Civil Rights (OCR), Office of Justice Programs (OJP), U.S. Department of Justice (DOJ) has been delegated the responsibility for ensuring that recipients of federal financial assistance from the OJP, the Office of Community Oriented Policing Services (COPS), and the Office on Violence Against Women (OVW) are not engaged in discrimination prohibited by law.  Several federal civil rights laws, such as Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, require recipients of federal financial assistance to give assurances that they will comply with those laws.  In addition to those civil rights laws, many grant program statutes contain nondiscrimination provisions that require compliance with them as a condition of receiving federal financial assistance.  For a complete review of these civil rights laws and nondiscrimination requirements, in connection with OJP and other DOJ awards, see https://ojp.gov/funding/Explore/LegalOverview/CivilRightsRequirements.htm

Under the delegation of authority, the OCR investigates allegations of discrimination against recipients from individuals, entities, or groups.  In addition, the OCR conducts limited compliance reviews and audits based on regulatory criteria.  These reviews and audits permit the OCR to evaluate whether recipients of financial assistance from the Department are providing services in a non-discriminatory manner to their service population or have employment practices that meet equal-opportunity standards.

If you are a recipient of grant awards under the Omnibus Crime Control and Safe Streets Act or the Juvenile Justice and Delinquency Prevention Act and your agency is part of a criminal justice system, there are two additional obligations that may apply in connection with the awards:  (1) complying with the regulation relating to Equal Employment Opportunity Programs (EEOPs); and (2) submitting findings of discrimination to OCR.  For additional information regarding the EEOP requirement, see 28 CFR Part 42, subpart E, and for additional information regarding requirements when there is an adverse finding, see 28 C.F.R. §§ 42.204(c), .205(c)(5).  Please submit information about any adverse finding to the OCR at the above address.

We at the OCR are available to help you and your organization meet the civil rights requirements that are associated with OJP and other DOJ grant funding.  If you would like the OCR to assist you in fulfilling your organization's civil rights or nondiscrimination responsibilities as a recipient of federal financial assistance, please do not hesitate to let us know.

Sincerely,

Michael L. Alston
Director

cc:   Grant Manager
        Financial Analyst

U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**Grant**

PAGE  1   OF 31

| | |
|---|---|
| 1. RECIPIENT NAME AND ADDRESS (Including Zip Code)<br><br>California Board of State and Community Corrections<br>2590 Venture Oaks Way, Ste. 200<br>Sacramento, CA 95833-3288 | 4. AWARD NUMBER:   2019-DJ-BX-0068<br><br>5. PROJECT PERIOD: FROM   10/01/2018   TO   09/30/2022<br><br>   BUDGET PERIOD: FROM   10/01/2018   TO   09/30/2022 |

| | | |
|---|---|---|
| | 6. AWARD DATE   09/18/2019 | 7. ACTION |
| 2a. GRANTEE IRS/VENDOR NO.<br>680282717 | 8. SUPPLEMENT NUMBER<br>00 | Initial |
| 2b. GRANTEE DUNS NO.<br>949095731 | 9. PREVIOUS AWARD AMOUNT | $ 0 |
| 3. PROJECT TITLE<br>2019 JAG State Wide Program | 10. AMOUNT OF THIS AWARD | $ 17,860,765 |
| | 11. TOTAL AWARD | $ 17,860,765 |

12. SPECIAL CONDITIONS

THE ABOVE GRANT PROJECT IS APPROVED SUBJECT TO SUCH CONDITIONS OR LIMITATIONS AS ARE SET FORTH
ON THE ATTACHED PAGE(S).

13. STATUTORY AUTHORITY FOR GRANT

This project is supported under FY19(BJA - JAG State and JAG Local) Title I of Pub. L. No. 90-351 (generally codified at 34 U.S.C. 10151-10726), including
subpart 1 of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a).

14 . CATALOG OF DOMESTIC FEDERAL ASSISTANCE (CFDA Number)

16.738 - Edward Byrne Memorial Justice Assistance Grant Program

15. METHOD OF PAYMENT

GPRS

| AGENCY APPROVAL | GRANTEE ACCEPTANCE |
|---|---|
| 16. TYPED NAME AND TITLE OF APPROVING OFFICIAL<br><br>Katharine T. Sullivan<br><br>Principal Deputy Assistant Attorney General | 18. TYPED NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL<br><br>Kathleen Howard<br>Executive Officer |
| 17. SIGNATURE OF APPROVING OFFICIAL | 19. SIGNATURE OF AUTHORIZED RECIPIENT OFFICIAL | 19A. DATE |

| AGENCY USE ONLY | |
|---|---|
| 20. ACCOUNTING CLASSIFICATION CODES | 21.  UDJUGT0384 |

| FISCAL YEAR | FUND CODE | BUD. ACT. | OFC. | DIV. REG. | SUB. | POMS | AMOUNT |
|---|---|---|---|---|---|---|---|
| X | B | DJ | 80 | 00 | 00 | 00 | 6976908 |
| X | B | DJ | 80 | 00 | 00 | | 10883857 |

OJP FORM 4000/2 (REV. 5-87) PREVIOUS EDITIONS ARE OBSOLETE.

OJP FORM 4000/2 (REV. 4-88)



| U.S. Department of Justice Office of Justice Programs **Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET** **Grant** | PAGE  2  OF  31 |
|---|---|---|

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

1.   Requirements of the award; remedies for non-compliance or for materially false statements

The conditions of this award are material requirements of the award.  Compliance with any assurances or certifications submitted by or on behalf of the recipient that relate to conduct during the period of performance also is a material requirement of this award.  By signing and accepting this award on behalf of the recipient, the authorized recipient official accepts all material requirements of the award, and specifically adopts all such assurances or certifications as if personally executed by the authorized recipient official.

Failure to comply with any one or more of these award requirements -- whether a condition set out in full below, a condition incorporated by reference below, or an assurance or certification related to conduct during the award period - - may result in the Office of Justice Programs ("OJP") taking appropriate action with respect to the recipient and the award.  Among other things, the OJP may withhold award funds, disallow costs, or suspend or terminate the award. The U.S. Department of Justice ("DOJ"), including OJP, also may take other legal action as appropriate.

Any materially false, fictitious, or fraudulent statement to the federal government related to this award (or concealment or omission of a material fact) may be the subject of criminal prosecution (including under 18 U.S.C. 1001 and/or 1621, and/or 34 U.S.C. 10271-10273), and also may lead to imposition of civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. 3729-3730 and 3801-3812).

Should any provision of a requirement of this award be held to be invalid or unenforceable by its terms, that provision shall first be applied with a limited construction so as to give it the maximum effect permitted by law.  Should it be held, instead, that the provision is utterly invalid or -unenforceable, such provision shall be deemed severable from this award.

2.   Applicability of Part 200 Uniform Requirements

The Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted and supplemented by DOJ in 2 C.F.R. Part 2800 (together, the "Part 200 Uniform Requirements") apply to this FY 2019 award from OJP.

The Part 200 Uniform Requirements were first adopted by DOJ on December 26, 2014.  If this FY 2019 award supplements funds previously awarded by OJP under the same award number (e.g., funds awarded during or before December 2014), the Part 200 Uniform Requirements apply with respect to all funds under that award number (regardless of the award date, and regardless of whether derived from the initial award or a supplemental award) that are obligated on or after the acceptance date of this FY 2019 award.

For more information and resources on the Part 200 Uniform Requirements as they relate to OJP awards and subawards ("subgrants"), see the OJP website at https://ojp.gov/funding/Part200UniformRequirements.htm.

Record retention and access:  Records pertinent to the award that the recipient (and any subrecipient ("subgrantee") at any tier) must retain -- typically for a period of 3 years from the date of submission of the final expenditure report (SF 425), unless a different retention period applies -- and to which the recipient (and any subrecipient ("subgrantee") at any tier) must provide access, include performance measurement information, in addition to the financial records, supporting documents, statistical records, and other pertinent records indicated at 2 C.F.R. 200.333.

In the event that an award-related question arises from documents or other materials prepared or distributed by OJP that may appear to conflict with, or differ in some way from, the provisions of the Part 200 Uniform Requirements, the recipient is to contact OJP promptly for clarification.



U.S. Department of Justice

Office of Justice Programs

**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE  3  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
| --- | --- | --- | --- |

*SPECIAL CONDITIONS*

3. Compliance with DOJ Grants Financial Guide

References to the DOJ Grants Financial Guide are to the DOJ Grants Financial Guide as posted on the OJP website (currently, the "DOJ Grants Financial Guide" available at https://ojp.gov/financialguide/DOJ/index.htm), including any updated version that may be posted during the period of performance.  The recipient agrees to comply with the DOJ Grants Financial Guide.

4. Reclassification of various statutory provisions to a new Title 34 of the United States Code

On September 1, 2017, various statutory provisions previously codified elsewhere in the U.S. Code were editorially reclassified (that is, moved and renumbered) to a new Title 34, entitled "Crime Control and Law Enforcement." The reclassification encompassed a number of statutory provisions pertinent to OJP awards (that is, OJP grants and cooperative agreements), including many provisions previously codified in Title 42 of the U.S. Code.

Effective as of September 1, 2017, any reference in this award document to a statutory provision that has been reclassified to the new Title 34 of the U.S. Code is to be read as a reference to that statutory provision as reclassified to Title 34. This rule of construction specifically includes references set out in award conditions, references set out in material incorporated by reference through award conditions, and references set out in other award requirements.

5. Required training for Point of Contact and all Financial Points of Contact

Both the Point of Contact (POC) and all Financial Points of Contact (FPOCs) for this award must have successfully completed an "OJP financial management and grant administration training" by 120 days after the date of the recipient's acceptance of the award.  Successful completion of such a training on or after January 1, 2017, will satisfy this condition.

In the event that either the POC or an FPOC for this award changes during the period of performance, the new POC or FPOC must have successfully completed an "OJP financial management and grant administration training" by 120 calendar days after -- (1) the date of OJP's approval of the "Change Grantee Contact" GAN (in the case of a new POC), or (2) the date the POC enters information on the new FPOC in GMS (in the case of a new FPOC).  Successful completion of such a training on or after January 1, 2017, will satisfy this condition.

A list of OJP trainings that OJP will consider "OJP financial management and grant administration training" for purposes of this condition is available at https://www.ojp.gov/training/fmts.htm.  All trainings that satisfy this condition include a session on grant fraud prevention and detection

The recipient should anticipate that OJP will immediately withhold ("freeze") award funds if the recipient fails to comply with this condition.  The recipient's failure to comply also may lead OJP to impose additional appropriate conditions on this award.

6. Requirements related to "de minimis" indirect cost rate

A recipient that is eligible under the Part 200 Uniform Requirements and other applicable law to use the "de minimis" indirect cost rate described in 2 C.F.R. 200.414(f), and that elects to use the "de minimis" indirect cost rate, must advise OJP in writing of both its eligibility and its election, and must comply with all associated requirements in the Part 200 Uniform Requirements.  The "de minimis" rate may be applied only to modified total direct costs (MTDC) as defined by the Part 200 Uniform Requirements.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE   4   OF   31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |

*SPECIAL CONDITIONS*

7.  Requirement to report potentially duplicative funding

    If the recipient currently has other active awards of federal funds, or if the recipient receives any other award of federal
    funds during the period of performance for this award, the recipient promptly must determine whether funds from any
    of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the
    identical cost items for which funds are provided under this award.  If so, the recipient must promptly notify the DOJ
    awarding agency (OJP or OVW, as appropriate) in writing of the potential duplication, and, if so requested by the DOJ
    awarding agency, must seek a budget-modification or change-of-project-scope grant adjustment notice (GAN) to
    eliminate any inappropriate duplication of funding.

8.  Requirements related to System for Award Management and Universal Identifier Requirements

    The recipient must comply with applicable requirements regarding the System for Award Management (SAM),
    currently accessible at https://www.sam.gov/.  This includes applicable requirements regarding registration with SAM,
    as well as maintaining the currency of information in SAM.

    The recipient also must comply with applicable restrictions on subawards ("subgrants") to first-tier subrecipients
    (first-tier "subgrantees"), including restrictions on subawards to entities that do not acquire and provide (to the
    recipient) the unique entity identifier required for SAM registration.

    The details of the recipient's obligations related to SAM and to unique entity identifiers are posted on the OJP web site
    at https://ojp.gov/funding/Explore/SAM.htm (Award condition:  System for Award Management (SAM) and Universal
    Identifier Requirements), and are incorporated by reference here.

    This condition does not apply to an award to an individual who received the award as a natural person (i.e., unrelated to
    any business or non-profit organization that he or she may own or operate in his or her name).

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE  5  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

9.  Employment eligibility verification for hiring under the award

1. The recipient (and any subrecipient at any tier) must--

A. Ensure that, as part of the hiring process for any position within the United States that is or will be funded (in whole or in part) with award funds, the recipient (or any subrecipient) properly verifies the employment eligibility of the individual who is being hired, consistent with the provisions of 8 U.S.C. 1324a(a)(1) and (2).

B. Notify all persons associated with the recipient (or any subrecipient) who are or will be involved in activities under this award of both--

(1) this award requirement for verification of employment eligibility, and

(2) the associated provisions in 8 U.S.C. 1324a(a)(1) and (2) that, generally speaking, make it unlawful, in the United States, to hire (or recruit for employment) certain aliens.

C. Provide training (to the extent necessary) to those persons required by this condition to be notified of the award requirement for employment eligibility verification and of the associated provisions of 8 U.S.C. 1324a(a)(1) and (2).

D. As part of the recordkeeping for the award (including pursuant to the Part 200 Uniform Requirements), maintain records of all employment eligibility verifications pertinent to compliance with this award condition in accordance with Form I-9 record retention requirements, as well as records of all pertinent notifications and trainings.

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions designed to ensure compliance with this condition.

4. Rules of construction

A. Staff involved in the hiring process

For purposes of this condition, persons "who are or will be involved in activities under this award" specifically includes (without limitation) any and all recipient (or any subrecipient) officials or other staff who are or will be involved in the hiring process with respect to a position that is or will be funded (in whole or in part) with award funds.

B. Employment eligibility confirmation with E-Verify

For purposes of satisfying the requirement of this condition regarding verification of employment eligibility, the recipient (or any subrecipient) may choose to participate in, and use, E-Verify (www.e-verify.gov), provided an appropriate person authorized to act on behalf of the recipient (or subrecipient) uses E-Verify (and follows the proper E-Verify procedures, including in the event of a "Tentative Nonconfirmation" or a "Final Nonconfirmation") to confirm employment eligibility for each hiring for a position in the United States that is or will be funded (in whole or in part) with award funds.

C. "United States" specifically includes the District of Columbia, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands.

D. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, or

OJP FORM 4000/2 (REV. 4-88)



| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE   6   OF  31 |
|---|---|---|

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

any person or other entity, to violate any federal law, including any applicable civil rights or nondiscrimination law.

E. Nothing in this condition, including in paragraph 4.B., shall be understood to relieve any recipient, any subrecipient at any tier, or any person or other entity, of any obligation otherwise imposed by law, including 8 U.S.C. 1324a(a)(1) and (2).

Questions about E-Verify should be directed to DHS.  For more information about E-Verify visit the E-Verify website (https://www.e-verify.gov/) or email E-Verify at E-Verify@dhs.gov.  E-Verify employer agents can email E-Verify at E-VerifyEmployerAgent@dhs.gov.

Questions about the meaning or scope of this condition should be directed to OJP, before award acceptance.

10.   Requirement to report actual or imminent breach of personally identifiable information (PII)

The recipient (and any "subrecipient" at any tier) must have written procedures in place to respond in the event of an actual or imminent "breach" (OMB M-17-12) if it (or a subrecipient) -- (1) creates, collects, uses, processes, stores, maintains, disseminates, discloses, or disposes of "personally identifiable information (PII)" (2 CFR 200.79) within the scope of an OJP grant-funded program or activity, or (2) uses or operates a "Federal information system" (OMB Circular A-130).  The recipient's breach procedures must include a requirement to report actual or imminent breach of PII to an OJP Program Manager no later than 24 hours after an occurrence of an actual breach, or the detection of an imminent breach.

11.   All subawards ("subgrants") must have specific federal authorization

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements for authorization of any subaward.  This condition applies to agreements that -- for purposes of federal grants administrative requirements -- OJP considers a "subaward" (and therefore does not consider a procurement "contract").

The details of the requirement for authorization of any subaward are posted on the OJP web site at https://ojp.gov/funding/Explore/SubawardAuthorization.htm (Award condition:  All subawards ("subgrants") must have specific federal authorization), and are incorporated by reference here.

12.   Specific post-award approval required to use a noncompetitive approach in any procurement contract that would exceed $250,000

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements to obtain specific advance approval to use a noncompetitive approach in any procurement contract that would exceed the Simplified Acquisition Threshold (currently, $250,000).  This condition applies to agreements that -- for purposes of federal grants administrative requirements -- OJP considers a procurement "contract" (and therefore does not consider a subaward).

The details of the requirement for advance approval to use a noncompetitive approach in a procurement contract under an OJP award are posted on the OJP web site at https://ojp.gov/funding/Explore/NoncompetitiveProcurement.htm (Award condition:  Specific post-award approval required to use a noncompetitive approach in a procurement contract (if contract would exceed $250,000)), and are incorporated by reference here.



U.S. Department of Justice

Office of Justice Programs

**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE 7 OF 31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

13. Unreasonable restrictions on competition under the award; association with federal government

SCOPE. This condition applies with respect to any procurement of property or services that is funded (in whole or in part) by this award, whether by the recipient or by any subrecipient at any tier, and regardless of the dollar amount of the purchase or acquisition, the method of procurement, or the nature of any legal instrument used. The provisions of this condition must be among those included in any subaward (at any tier).

1. No discrimination, in procurement transactions, against associates of the federal government

Consistent with the (DOJ) Part 200 Uniform Requirements -- including as set out at 2 C.F.R. 200.300 (requiring awards to be "manage[d] and administer[ed] in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements") and 200.319(a) (generally requiring "[a]ll procurement transactions [to] be conducted in a manner providing full and open competition" and forbidding practices "restrictive of competition," such as "[p]lacing unreasonable requirements on firms in order for them to qualify to do business" and taking "[a]ny arbitrary action in the procurement process") -- no recipient (or subrecipient, at any tier) may (in any procurement transaction) discriminate against any person or entity on the basis of such person or entity's status as an "associate of the federal government" (or on the basis of such person or entity's status as a parent, affiliate, or subsidiary of such an associate), except as expressly set out in 2 C.F.R. 200.319(a) or as specifically authorized by USDOJ.

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions designed to ensure compliance with this condition.

4. Rules of construction

A. The term "associate of the federal government" means any person or entity engaged or employed (in the past or at present) by or on behalf of the federal government -- as an employee, contractor or subcontractor (at any tier), grant recipient or -subrecipient (at any tier), agent, or otherwise -- in undertaking any work, project, or activity for or on behalf of (or in providing goods or services to or on behalf of) the federal government, and includes any applicant for such employment or engagement, and any person or entity committed by legal instrument to undertake any such work, project, or activity (or to provide such goods or services) in future.

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, or any person or other entity, to violate any federal law, including any applicable civil rights or nondiscrimination law.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET

Grant**

PAGE   8   OF   31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

14. Requirements pertaining to prohibited conduct related to trafficking in persons (including reporting requirements and OJP authority to terminate award)

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements (including requirements to report allegations) pertaining to prohibited conduct related to the trafficking of persons, whether on the part of recipients, subrecipients ("subgrantees"), or individuals defined (for purposes of this condition) as "employees" of the recipient or of any subrecipient.

The details of the recipient's obligations related to prohibited conduct related to trafficking in persons are posted on the OJP web site at https://ojp.gov/funding/Explore/ProhibitedConduct-Trafficking.htm (Award condition:  Prohibited conduct by recipients and subrecipients related to trafficking in persons (including reporting requirements and OJP authority to terminate award)), and are incorporated by reference here.

15. Determination of suitability to interact with participating minors

SCOPE. This condition applies to this award if it is indicated -- in the application for the award (as approved by DOJ)(or in the application for any subaward, at any tier), the DOJ funding announcement (solicitation), or an associated federal statute -- that a purpose of some or all of the activities to be carried out under the award (whether by the recipient, or a subrecipient at any tier) is to benefit a set of individuals under 18 years of age.

The recipient, and any subrecipient at any tier, must make determinations of suitability before certain individuals may interact with participating minors.  This requirement applies regardless of an individual's employment status.

The details of this requirement are posted on the OJP web site at https://ojp.gov/funding/Explore/Interact-Minors.htm (Award condition:  Determination of suitability required, in advance, for certain individuals who may interact with participating minors), and are incorporated by reference here.

16. Compliance with applicable rules regarding approval, planning, and reporting of conferences, meetings, trainings, and other events

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable laws, regulations, policies, and official DOJ guidance (including specific cost limits, prior approval and reporting requirements, where applicable) governing the use of federal funds for expenses related to conferences (as that term is defined by DOJ), including the provision of food and/or beverages at such conferences, and costs of attendance at such conferences.

Information on the pertinent DOJ definition of conferences and the rules applicable to this award appears in the DOJ Grants Financial Guide (currently, as section 3.10 of "Postaward Requirements" in the "DOJ Grants Financial Guide").

17. Requirement for data on performance and effectiveness under the award

The recipient must collect and maintain data that measure the performance and effectiveness of work under this award. The data must be provided to OJP in the manner (including within the timeframes) specified by OJP in the program solicitation or other applicable written guidance.  Data collection supports compliance with the Government Performance and Results Act (GPRA) and the GPRA Modernization Act of 2010, and other applicable laws.

18. OJP Training Guiding Principles

Any training or training materials that the recipient -- or any subrecipient ("subgrantee") at any tier -- develops or delivers with OJP award funds must adhere to the OJP Training Guiding Principles for Grantees and Subgrantees, available at https://ojp.gov/funding/Implement/TrainingPrinciplesForGrantees-Subgrantees.htm.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE   9   OF   31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |

*SPECIAL CONDITIONS*

19.   Effect of failure to address audit issues

The recipient understands and agrees that the DOJ awarding agency (OJP or OVW, as appropriate) may withhold award funds, or may impose other related requirements, if (as determined by the DOJ awarding agency) the recipient does not satisfactorily and promptly address outstanding issues from audits required by the Part 200 Uniform Requirements (or by the terms of this award), or other outstanding issues that arise in connection with audits, investigations, or reviews of DOJ awards.

20.   Potential imposition of additional requirements

The recipient agrees to comply with any additional requirements that may be imposed by the DOJ awarding agency (OJP or OVW, as appropriate) during the period of performance for this award, if the recipient is designated as "high-risk" for purposes of the DOJ high-risk grantee list.

21.   Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 42

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 42, specifically including any applicable requirements in Subpart E of 28 C.F.R. Part 42 that relate to an equal employment opportunity program.

22.   Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 54

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 54, which relates to nondiscrimination on the basis of sex in certain "education programs."

23.   Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 38

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 38 (as may be applicable from time to time), specifically including any applicable requirements regarding written notice to program beneficiaries and prospective program beneficiaries.

Currently, among other things, 28 C.F.R. Part 38 includes rules that prohibit specific forms of discrimination on the basis of religion, a religious belief, a refusal to hold a religious belief, or refusal to attend or participate in a religious practice.  Part 38, currently, also sets out rules and requirements that pertain to recipient and subrecipient ("subgrantee") organizations that engage in or conduct explicitly religious activities, as well as rules and requirements that pertain to recipients and subrecipients that are faith-based or religious organizations.

The text of 28 C.F.R. Part 38 is available via the Electronic Code of Federal Regulations (currently accessible at https://www.ecfr.gov/cgi-bin/ECFR?page=browse), by browsing to Title 28-Judicial Administration, Chapter 1, Part 38, under e-CFR "current" data.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE  10  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
| --- | --- | --- | --- |

*SPECIAL CONDITIONS*

24. Restrictions on "lobbying"

In general, as a matter of federal law, federal funds awarded by OJP may not be used by the recipient, or any subrecipient ("subgrantee") at any tier, either directly or indirectly, to support or oppose the enactment, repeal, modification, or adoption of any law, regulation, or policy, at any level of government.  See 18 U.S.C. 1913.  (There may be exceptions if an applicable federal statute specifically authorizes certain activities that otherwise would be barred by law.)

Another federal law generally prohibits federal funds awarded by OJP from being used by the recipient, or any subrecipient at any tier, to pay any person to influence (or attempt to influence) a federal agency, a Member of Congress, or Congress (or an official or employee of any of them) with respect to the awarding of a federal grant or cooperative agreement, subgrant, contract, subcontract, or loan, or with respect to actions such as renewing, extending, or modifying any such award.  See 31 U.S.C. 1352.  Certain exceptions to this law apply, including an exception that applies to Indian tribes and tribal organizations.

Should any question arise as to whether a particular use of federal funds by a recipient (or subrecipient) would or might fall within the scope of these prohibitions, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.

25. Compliance with general appropriations-law restrictions on the use of federal funds (FY 2019)

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable restrictions on the use of federal funds set out in federal appropriations statutes.  Pertinent restrictions, including from various "general provisions" in the Consolidated Appropriations Act, 2019, are set out at https://ojp.gov/funding/Explore/FY19AppropriationsRestrictions.htm, and are incorporated by reference here.

Should a question arise as to whether a particular use of federal funds by a recipient (or a subrecipient) would or might fall within the scope of an appropriations-law restriction, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.

26. Reporting potential fraud, waste, and abuse, and similar misconduct

The recipient and any subrecipients ("subgrantees") must promptly refer to the DOJ Office of the Inspector General (OIG) any credible evidence that a principal, employee, agent, subrecipient, contractor, subcontractor, or other person has, in connection with funds under this award -- (1) submitted a claim that violates the False Claims Act; or (2) committed a criminal or civil violation of laws pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct.

Potential fraud, waste, abuse, or misconduct involving or relating to funds under this award should be reported to the OIG by--(1) online submission accessible via the OIG webpage at https://oig.justice.gov/hotline/contact-grants.htm (select "Submit Report Online"); (2) mail directed to: Office of the Inspector General, U.S. Department of Justice, Investigations Division, 1425 New York Avenue, N.W. Suite 7100, Washington, DC 20530; and/or (3) by facsimile directed to the DOJ OIG Fraud Detection Office (Attn:  Grantee Reporting) at (202) 616-9881 (fax).

Additional information is available from the DOJ OIG website at https://oig.justice.gov/hotline.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE  11  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

27.   Restrictions and certifications regarding non-disclosure agreements and related matters

No recipient or subrecipient ("subgrantee") under this award, or entity that receives a procurement contract or subcontract with any funds under this award, may require any employee or contractor to sign an internal confidentiality agreement or statement that prohibits or otherwise restricts, or purports to prohibit or restrict, the reporting (in accordance with law) of waste, fraud, or abuse to an investigative or law enforcement representative of a federal department or agency authorized to receive such information.

The foregoing is not intended, and shall not be understood by the agency making this award, to contravene requirements applicable to Standard Form 312 (which relates to classified information), Form 4414 (which relates to sensitive compartmented information), or any other form issued by a federal department or agency governing the nondisclosure of classified information.

1.  In accepting this award, the recipient--

a.  represents that it neither requires nor has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

b.  certifies that, if it learns or is notified that it is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.

2.  If the recipient does or is authorized under this award to make subawards ("subgrants"), procurement contracts, or both--

a.  it represents that--

(1)  it has determined that no other entity that the recipient's application proposes may or will receive award funds (whether through a subaward ("subgrant"), procurement contract, or subcontract under a procurement contract) either requires or has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

(2)  it has made appropriate inquiry, or otherwise has an adequate factual basis, to support this representation; and

b.  it certifies that, if it learns or is notified that any subrecipient, contractor, or subcontractor entity that receives funds under this award is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds to or by that entity, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.



| | | | |
|---|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE 12 OF 31 |

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

28. Compliance with 41 U.S.C. 4712 (including prohibitions on reprisal; notice to employees)

The recipient (and any subrecipient at any tier) must comply with, and is subject to, all applicable provisions of 41 U.S.C. 4712, including all applicable provisions that prohibit, under specified circumstances, discrimination against an employee as reprisal for the employee's disclosure of information related to gross mismanagement of a federal grant, a gross waste of federal funds, an abuse of authority relating to a federal grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal grant.

The recipient also must inform its employees, in writing (and in the predominant native language of the workforce), of employee rights and remedies under 41 U.S.C. 4712.

Should a question arise as to the applicability of the provisions of 41 U.S.C. 4712 to this award, the recipient is to contact the DOJ awarding agency (OJP or OVW, as appropriate) for guidance.

29. Encouragement of policies to ban text messaging while driving

Pursuant to Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," 74 Fed. Reg. 51225 (October 1, 2009), DOJ encourages recipients and subrecipients ("subgrantees") to adopt and enforce policies banning employees from text messaging while driving any vehicle during the course of performing work funded by this award, and to establish workplace safety policies and conduct education, awareness, and other outreach to decrease crashes caused by distracted drivers.

30. Requirement to disclose whether recipient is designated "high risk" by a federal grant-making agency outside of DOJ

If the recipient is designated "high risk" by a federal grant-making agency outside of DOJ, currently or at any time during the course of the period of performance under this award, the recipient must disclose that fact and certain related information to OJP by email at OJP.ComplianceReporting@ojp.usdoj.gov. For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the recipient's past performance, or other programmatic or financial concerns with the recipient. The recipient's disclosure must include the following: 1. The federal awarding agency that currently designates the recipient high risk, 2. The date the recipient was designated high risk, 3. The high-risk point of contact at that federal awarding agency (name, phone number, and email address), and 4. The reasons for the high-risk status, as set out by the federal awarding agency.



| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE 13 OF 31 |
|---|---|---|

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

31.  Noninterference (within the funded "program or activity") with federal law enforcement: 8 U.S.C. 1373 and 1644;
ongoing compliance

1. With respect to the "program or activity" funded in whole or part under this award (including any such program or
activity of any subrecipient at any tier), throughout the period of performance, no State or local government entity, -
agency, or -official may prohibit or in any way restrict-- (1) any government entity or -official from sending or
receiving information regarding citizenship or immigration status as described in 8 U.S.C. 1373(a); or (2) a government
entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration
status as described in either 8 U.S.C. 1373(b) or 1644. Any prohibition (or restriction) that violates this condition is an
"information-communication restriction" under this award.

2. The recipient's monitoring responsibilities include monitoring of subrecipient compliance with the requirements of
this condition.

3. Allowable costs. Compliance with these requirements is an authorized and priority purpose of this award. To the
extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the
reasonable, necessary, and allocable costs (if any) that the recipient, or any subrecipient at any tier that is a State, a
local government, or a public institution of higher education, incurs to implement this condition.

4. Rules of Construction

A. For purposes of this condition:

(1) "State" and "local government" include any agency or other entity thereof, but not any institution of higher
education or any Indian tribe.

(2) A "public" institution of higher education is defined as one that is owned, controlled, or directly funded (in whole or
in substantial part) by a State or local government. (Such a public institution is considered to be a "government entity,"
and its officials to be "government officials.")

(3) "Program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. 2000d-4a).

(4) "Immigration status" means what it means under 8 U.S.C. 1373 and 8 U.S.C. 1644; and terms that are defined in 8
U.S.C. 1101 mean what they mean under that section 1101, except that "State" also includes American Samoa.

(5) Pursuant to the provisions set out at (or referenced in) 8 U.S.C. 1551 note ("Abolition ... and Transfer of
Functions"), references to the "Immigration and Naturalization Service" in 8 U.S.C. 1373 and 1644 are to be read as
references to particular components of the Department of Homeland Security (DHS).

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any
State or local government, any public institution of higher education, or any other entity (or individual) to violate any
federal law, including any applicable civil rights or nondiscrimination law.

IMPORTANT NOTE: Any questions about the meaning or scope of this condition should be directed to OJP, before
award acceptance.



U.S. Department of Justice

Office of Justice Programs

**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE  14  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

32.   No use of funds to interfere with federal law enforcement: 8 U.S.C. 1373 and 1644; ongoing compliance

1. Throughout the period of performance, no State or local government entity, -agency, or -official may use funds under this award (including under any subaward, at any tier) to prohibit or in any way restrict-- (1) any government entity or -official from sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. 1373(a); or (2) a government entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration status as described in either 8 U.S.C. 1373(b) or 1644. Any prohibition (or restriction) that violates this condition is an "information-communication restriction" under this award.

2. The recipient's monitoring responsibilities include monitoring of subrecipient compliance with the requirements of this condition.

3. Allowable costs. Compliance with these requirements is an authorized and priority purpose of this award. To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) that the recipient, or any subrecipient at any tier that is a State, a local government, or a public institution of higher education, incurs to implement this condition.

4. Rules of Construction. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference (within the funded "program or activity") with federal law enforcement: 8 U.S.C. 1373 and 1644; ongoing compliance" condition are incorporated by reference as though set forth here in full.



| | U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE  15  OF  31 |
|---|---|---|---|

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

33. Authority to obligate award funds contingent on noninterference (within the funded "program or activity") with federal law enforcement: 8 U.S.C. 1373 and 1644; unallowable costs; notification

1. If the recipient is a "State," a local government, or a "public" institution of higher education:

A. The recipient may not obligate award funds if, at the time of the obligation, the "program or activity" of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that is funded in whole or in part with award funds is subject to any "information-communication restriction."

B. In addition, with respect to any project costs it incurs "at risk," the recipient may not obligate award funds to reimburse itself if -- at the time it incurs such costs -- the program or activity of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that would be reimbursed in whole or in part with award funds was subject to any information-communication restriction.

C. Any drawdown of award funds by the recipient shall be considered, for all purposes, to be a material representation by the recipient to OJP that, as of the date the recipient requests the drawdown, the recipient and each subrecipient (regardless of tier) that is a State, a local government, or public institution of higher education, is in compliance with the award condition entitled "Noninterference (within the funded 'program or activity') with federal law enforcement: 8 U.S.C. 1373 and 1644; ongoing compliance."

D. The recipient must promptly notify OJP (in writing) if the recipient, from its requisite monitoring of compliance with award conditions or otherwise, has credible evidence that indicates that the funded program or activity of the recipient, or of any subrecipient at any tier that is a State or a local government or a public institution of higher education, may be subject to any information-communication restriction. In addition, any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must require prompt notification to the entity that made the subaward, should the subrecipient have such credible evidence regarding an information-communication restriction.

2. Any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must provide that the subrecipient may not obligate award funds if, at the time of the obligation, the program or activity of the subrecipient (or of any further such subrecipient at any tier) that is funded in whole or in part with award funds is subject to any information-communication restriction.

3. Absent an express written determination by DOJ to the contrary, based upon a finding by DOJ of compelling circumstances (e.g., a small amount of award funds obligated by the recipient at the time of a subrecipient's minor and transitory non-compliance, which was unknown to the recipient despite diligent monitoring), any obligations of award funds that, under this condition, may not be made shall be unallowable costs for purposes of this award. In making any such determination, DOJ will give great weight to evidence submitted by the recipient that demonstrates diligent monitoring of subrecipient compliance with the requirements set out in the "Noninterference ... 8 U.S.C. 1373 and 1644; ongoing compliance" award condition.

4. Rules of Construction

A. For purposes of this condition "information-communication restriction" has the meaning set out in the "Noninterference ... 8 U.S.C. 1373 and 1644; ongoing compliance" condition.

B. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference ... 8 U.S.C. 1373 and 1644; ongoing compliance" condition are incorporated by reference as though set forth here in full.



| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE 16 OF 31 |
|---|---|---|

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

34.   Authority to obligate award funds contingent on no use of funds to interfere with federal law enforcement: 8 U.S.C. 1373 and 1644; unallowable costs; notification

1. If the recipient is a "State," a local government, or a "public" institution of higher education:

A. The recipient may not obligate award funds if, at the time of the obligation, the "program or activity" of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that is funded in whole or in part with award funds is subject to any "information-communication restriction."

B. In addition, with respect to any project costs it incurs "at risk," the recipient may not obligate award funds to reimburse itself if -- at the time it incurs such costs -- the program or activity of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that would be reimbursed in whole or in part with award funds was subject to any information-communication restriction.

C. Any drawdown of award funds by the recipient shall be considered, for all purposes, to be a material representation by the recipient to OJP that, as of the date the recipient requests the drawdown, the recipient and each subrecipient (regardless of tier) that is a State, local government, or public institution of higher education, is in compliance with the award condition entitled "No use of funds to interfere with federal law enforcement: 8 U.S.C. 1373 and 1644; ongoing compliance."

D. The recipient must promptly notify OJP (in writing) if the recipient, from its requisite monitoring of compliance with award conditions or otherwise, has credible evidence that indicates that the funded program or activity of the recipient, or of any subrecipient at any tier that is either a State or a local government or a public institution of higher education, may be subject to any information-communication restriction. In addition, any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must require prompt notification to the entity that made the subaward, should the subrecipient have such credible evidence regarding an information-communication restriction.

2. Any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must provide that the subrecipient may not obligate award funds if, at the time of the obligation, the program or activity of the subrecipient (or of any further such subrecipient at any tier) that is funded in whole or in part with award funds is subject to any information-communication restriction.

3. Absent an express written determination by DOJ to the contrary, based upon a finding by DOJ of compelling circumstances (e.g., a small amount of award funds obligated by the recipient at the time of a subrecipient's minor and transitory non-compliance, which was unknown to the recipient despite diligent monitoring), any obligations of award funds that, under this condition, may not be made shall be unallowable costs for purposes of this award. In making any such determination, DOJ will give great weight to evidence submitted by the recipient that demonstrates diligent monitoring of subrecipient compliance with the requirements set out in the "No use of funds to interfere … 8 U.S.C. 1373 and 1644; ongoing compliance" award condition.

4. Rules of Construction.  The "Rules of Construction" set out in the "Authority to obligate award funds contingent on noninterference (within the funded "program or activity") with federal law enforcement: 8 U.S.C. 1373 and 1644; unallowable costs; notification" condition are incorporated by reference as though set forth here in full.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE  17  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

35.   Noninterference (within the funded "program or activity") with federal law enforcement: No public disclosure of certain law enforcement sensitive information

SCOPE. This condition applies with respect to the "program or activity" that is funded (in whole or in part) by the award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance. Its provisions must be among those included in any subaward (at any tier).

1. Noninterference: No public disclosure of federal law enforcement information in order to conceal, harbor, or shield

Consistent with the purposes and objectives of federal law enforcement statutes and federal criminal law (including 8 U.S.C. 1324 and 18 U.S.C. chs. 1, 49, 227), no public disclosure may be made of any federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 -- without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. 1071 or 1072 or of 8 U.S.C. 1324(a).

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

4. Rules of construction

A. For purposes of this condition--

(1) the term "alien" means what it means under section 101 of the Immigration and Nationality Act (see 8 U.S.C. 1101(a)(3));

(2) the term "federal law enforcement information" means law enforcement sensitive information communicated or made available, by the federal government, to a State or local government entity, -agency, or -official, through any means, including, without limitation-- (1) through any database, (2) in connection with any law enforcement partnership or -task-force, (3) in connection with any request for law enforcement assistance or -cooperation, or (4) through any deconfliction (or courtesy) notice of planned, imminent, commencing, continuing, or impending federal law enforcement activity;

(3) the term "law enforcement sensitive information" means records or information compiled for any law enforcement purpose; and

(4) the term "public disclosure" means any communication or release other than one-- (a) within the recipient, or (b) to any subrecipient (at any tier) that is a government entity.

B. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference (within the funded 'program or activity') with federal law enforcement: 8 U.S.C. 1373 and 1644 and ongoing compliance" award condition are incorporated by reference as though set forth here in full.



| | | | |
|---|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE  18  OF  31 |

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

36. No use of funds to interfere with federal law enforcement: No public disclosure of certain law enforcement sensitive information

SCOPE. This condition applies as of the date the recipient accepts this award, and throughout the remainder of the period of performance. Its provisions must be among those included in any subaward (at any tier).

1. No use of funds to interfere: No public disclosure of federal law enforcement information in order to conceal, harbor, or shield

Consistent with the purposes and objectives of federal law enforcement statutes and federal criminal law (including 8 U.S.C. 1324 and 18 U.S.C. chs. 1, 49, 227), no funds under this award may be used to make any public disclosure of any federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 -- without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. 1071 or 1072 or of 8 U.S.C. 1324(a).

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

4. Rules of construction.

The "Rules of Construction" set out in the "Noninterference (within the funded "program or activity") with federal law enforcement: No public disclosure of certain law enforcement sensitive information" award condition are incorporated by reference as though set forth here in full.



| | | |
|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE 19 OF 31 |

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

37. Noninterference (within the funded "program or activity") with federal law enforcement: Interrogation of certain aliens

SCOPE. This condition applies with respect to the "program or activity" that is funded (in whole or in part) by this award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award. Its provisions must be among those included in any subaward (at any tier).

1. Noninterference with statutory law enforcement access to correctional facilities

Consonant with federal law enforcement statutes and regulations -- including 8 U.S.C. 1357(a), under which certain federal officers and employees "have power without warrant ... to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," and 8 C.F.R. 287.5(a), under which that power may be exercised "anywhere in or outside the United States" -- within the funded program or activity, no State or local government entity, -agency, or -official may interfere with the exercise of that power to interrogate "without warrant" (by agents of the United States acting under color of federal law) by impeding access to any State or local government (or government-contracted) correctional facility by such agents for the purpose of "interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States."

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

4. Rules of construction

A. For purposes of this condition:

(1) The term "alien" means what it means under section 101 of the Immigration and Nationality Act (INA) (see 8 U.S.C. 1101(a)(3)).

(2) The term "correctional facility" means what it means under the title I of the Omnibus Crime Control and Safe Streets Act of 1968 (see 34 U.S.C. 10251(a)(7)).

(3) The term "impede" includes taking or continuing any action, or implementing or maintaining any law, policy, rule, or practice, that—

(a) is designed to prevent or to significantly delay or complicate, or

(b) has the effect of preventing or of significantly delaying or complicating.

B. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference (within the funded 'program or activity') with federal law enforcement: 8 U.S.C. 1373 and 1644 and ongoing compliance" award condition are incorporated by reference as though set forth here in full.

OJP FORM 4000/2 (REV. 4-88)



| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE 20 OF 31 |
|---|---|---|

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

38. No use of funds to interfere with federal law enforcement: Interrogation of certain aliens

SCOPE. This condition applies as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award. Its provisions must be among those included in any subaward (at any tier).

1. No use of funds to interfere with statutory law enforcement access to correctional facilities

Consonant with federal law enforcement statutes and regulations -- including 8 U.S.C. 1357(a), under which certain federal officers and employees "have power without warrant ... to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," and 8 C.F.R. 287.5(a), under which that power may be exercised "anywhere in or outside the United States" -- no State or local government entity, -agency, or -official may use funds under this award to interfere with the exercise of that power to interrogate "without warrant" (by agents of the United States acting under color of federal law) by impeding access to any State or local government (or government-contracted) correctional facility by such agents for the purpose of "interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States."

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

4. Rules of construction.

The "Rules of Construction" set out in the "Noninterference (within the funded "program or activity") with federal law enforcement: Interrogation of certain aliens" award condition are incorporated by reference as though set forth here in full.

OJP FORM 4000/2 (REV. 4-88)



| U.S. Department of Justice | **AWARD CONTINUATION SHEET** | |
|---|---|---|
| Office of Justice Programs | | PAGE 21 OF 31 |
| **Bureau of Justice Assistance** | **Grant** | |

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

39. Noninterference (within the funded "program or activity") with federal law enforcement: Notice of scheduled release

SCOPE. This condition applies with respect to the "program or activity" that is funded (in whole or in part) by the award, as of the date the recipient accepts the award, and throughout the remainder of the period of performance. Its provisions must be among those included in any subaward at any tier.

1. Noninterference with "removal" process: Notice of scheduled release date and time

Consonant with federal law enforcement statutes -- including 8 U.S.C. 1231 (for an alien incarcerated by a State or local government, a 90-day "removal period" during which the federal government "shall" detain and then "shall" remove an alien from the U.S. "begins" no later than "the date the alien is released from ... confinement"; also, the federal government is expressly authorized to make payments to a "State or a political subdivision of the State ... with respect to the incarceration of [an] undocumented criminal alien"); 8 U.S.C. 1226 (the federal government "shall take into custody" certain criminal aliens "when the alien is released"); and 8 U.S.C. 1366 (requiring an annual DOJ report to Congress on "the number of illegal alien[ felons] in Federal and State prisons" and programs underway "to ensure the prompt removal" from the U.S. of removable "criminal aliens") -- within the funded program or activity, no State or local government entity, -agency, or -official (including a government-contracted correctional facility) may interfere with the "removal" process by failing to provide -- as early as practicable (see para. 4.C. below) -- advance notice to DHS of the scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from DHS a formal written request pursuant to the INA that seeks such advance notice.

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

4. Rules of construction

A. The "Rules of Construction" set out in the "Noninterference (within the funded "program or activity") with federal law enforcement: Interrogation of certain aliens" award condition are incorporated by reference as though set forth here in full.

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity or individual to maintain (or detain) any individual in custody beyond the date and time the individual otherwise would have been released.

C. Applicability

(1) Current DHS practice is ordinarily to request advance notice of scheduled release "as early as practicable (at least 48 hours, if possible)." (See DHS Form I-247A (3/17).) If (e.g., in light of the date DHS made such request) the scheduled release date and time for an alien are such as not to allow for the advance notice that DHS has requested, it shall NOT be a violation of this condition to provide only as much advance notice as practicable.

(2) Current DHS practice is to use the same form for a second, distinct purpose -- to request that an individual be detained for up to 48 hours AFTER the scheduled release. This condition does NOT encompass such DHS requests for detention.

OJP FORM 4000/2 (REV. 4-88)



| | | | |
|---|---|---|---|
| | U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE  22  OF  31 |

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

40.  No use of funds to interfere with federal law enforcement: Notice of scheduled release

SCOPE. This condition applies as of the date the recipient accepts the award, and throughout the remainder of the period of performance. Its provisions must be among those included in any subaward at any tier.

1. No use of funds to interfere with "removal" process: Notice of scheduled release date and time

Consonant with federal law enforcement statutes -- including 8 U.S.C. 1231 (for an alien incarcerated by a State or local government, a 90-day "removal period" during which the federal government "shall" detain and then "shall" remove an alien from the U.S. "begins" no later than "the date the alien is released from ... confinement"; also, the federal government is expressly authorized to make payments to a "State or a political subdivision of the State ... with respect to the incarceration of [an] undocumented criminal alien"); 8 U.S.C. 1226 (the federal government "shall take into custody" certain criminal aliens "when the alien is released"); and 8 U.S.C. 1366 (requiring an annual DOJ report to Congress on "the number of illegal alien[ felons] in Federal and State prisons" and programs underway "to ensure the prompt removal" from the U.S. of removable "criminal aliens") -- no State or local government entity, -agency, or -official (including a government-contracted correctional facility) may use funds under this award to interfere with the "removal" process by failing to provide -- as early as practicable (see para. 4.C. below) -- advance notice to DHS of the scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from DHS a formal written request pursuant to the INA that seeks such advance notice.

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

4. Rules of construction.

The "Rules of Construction" set out in the "Noninterference (within the funded "program or activity") with federal law enforcement: Notice of scheduled release" award condition are incorporated by reference as though set forth here in full.

41.  Requirement to collect certain information from subrecipients

Except as provided in this condition, the recipient may not make a subaward to a State, a local government, or a "public" institution of higher education, unless it first obtains from the proposed subrecipient responses to the questions identified in the program solicitation as "Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)." All subrecipient responses must be collected and maintained by the recipient, consistent with document retention requirements, and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE  23  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |

*SPECIAL CONDITIONS*

42. Cooperating with OJP Monitoring

The recipient agrees to cooperate with OJP monitoring of this award pursuant to OJP's guidelines, protocols, and procedures, and to cooperate with OJP (including the grant manager for this award and the Office of Chief Financial Officer (OCFO)) requests related to such monitoring, including requests related to desk reviews and/or site visits. The recipient agrees to provide to OJP all documentation necessary for OJP to complete its monitoring tasks, including documentation related to any subawards made under this award. Further, the recipient agrees to abide by reasonable deadlines set by OJP for providing the requested documents. Failure to cooperate with OJP's monitoring activities may result in actions that affect the recipient's DOJ awards, including, but not limited to: withholdings and/or other restrictions on the recipient's access to award funds; referral to the DOJ OIG for audit review; designation of the recipient as a DOJ High Risk grantee; or termination of an award(s).

43. FFATA reporting:  Subawards and executive compensation

The recipient must comply with applicable requirements to report first-tier subawards ("subgrants") of $25,000 or more and, in certain circumstances, to report the names and total compensation of the five most highly compensated executives of the recipient and first-tier subrecipients (first-tier "subgrantees") of award funds. The details of recipient obligations, which derive from the Federal Funding Accountability and Transparency Act of 2006 (FFATA), are posted on the OJP web site at https://ojp.gov/funding/Explore/FFATA.htm (Award condition: Reporting Subawards and Executive Compensation), and are incorporated by reference here.

This condition, including its reporting requirement, does not apply to-- (1) an award of less than $25,000, or (2) an award made to an individual who received the award as a natural person (i.e., unrelated to any business or non-profit organization that he or she may own or operate in his or her name).

44. Required monitoring of subawards

The recipient must monitor subawards under this award in accordance with all applicable statutes, regulations, award conditions, and the DOJ Grants Financial Guide, and must include the applicable conditions of this award in any subaward. Among other things, the recipient is responsible for oversight of subrecipient spending and monitoring of specific outcomes and benefits attributable to use of award funds by subrecipients. The recipient agrees to submit, upon request, documentation of its policies and procedures for monitoring of subawards under this award.

45. Use of program income

Program income (as defined in the Part 200 Uniform Requirements) must be used in accordance with the provisions of the Part 200 Uniform Requirements. Program income earnings and expenditures both must be reported on the quarterly Federal Financial Report, SF 425.

46. Justice Information Sharing

Information sharing projects funded under this award must comply with DOJ's Global Justice Information Sharing Initiative (Global) guidelines. The recipient (and any subrecipient at any tier) must conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https://it.ojp.gov/gsp_grantcondition. The recipient (and any subrecipient at any tier) must document planned approaches to information sharing and describe compliance with the GSP and appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE  24  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
| --- | --- | --- | --- |

*SPECIAL CONDITIONS*

47.   Avoidance of duplication of networks

To avoid duplicating existing networks or IT systems in any initiatives funded by BJA for law enforcement information sharing systems which involve interstate connectivity between jurisdictions, such systems shall employ, to the extent possible, existing networks as the communication backbone to achieve interstate connectivity, unless the recipient can demonstrate to the satisfaction of BJA that this requirement would not be cost effective or would impair the functionality of an existing or proposed IT system.

48.   Compliance with 28 C.F.R. Part 23

With respect to any information technology system funded or supported by funds under this award, the recipient (and any subrecipient at any tier) must comply with 28 C.F.R. Part 23, Criminal Intelligence Systems Operating Policies, if OJP determines this regulation to be applicable. Should OJP determine 28 C.F.R. Part 23 to be applicable, OJP may, at its discretion, perform audits of the system, as per the regulation. Should any violation of 28 C.F.R. Part 23 occur, the recipient may be fined as per 34 U.S.C. 10231(c)-(d).  The recipient may not satisfy such a fine with federal funds.

49.   Protection of human research subjects

The recipient (and any subrecipient at any tier) must comply with the requirements of 28 C.F.R. Part 46 and all OJP policies and procedures regarding the protection of human research subjects, including obtainment of Institutional Review Board approval, if appropriate, and subject informed consent.

50.   Confidentiality of data

The recipient (and any subrecipient at any tier) must comply with all confidentiality requirements of 34 U.S.C. 10231 and 28 C.F.R. Part 22 that are applicable to collection, use, and revelation of data or information. The recipient further agrees, as a condition of award approval, to submit a Privacy Certificate that is in accord with requirements of 28 C.F.R. Part 22 and, in particular, 28 C.F.R. 22.23.

51.   Verification and updating of recipient contact information

The recipient must verify its Point of Contact(POC), Financial Point of Contact (FPOC), and Authorized Representative contact information in GMS, including telephone number and e-mail address.  If any information is incorrect or has changed, a Grant Adjustment Notice (GAN) must be submitted via the Grants Management System (GMS) to document changes.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

| **AWARD CONTINUATION SHEET** **Grant** | PAGE 25 OF 31 |

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |

*SPECIAL CONDITIONS*

52. Law enforcement task forces - required training

Within 120 days of award acceptance, each current member of a law enforcement task force funded with award funds who is a task force commander, agency executive, task force officer, or other task force member of equivalent rank, must complete required online (internet-based) task force training. Additionally, all future task force members must complete this training once during the period of performance for this award, or once every four years if multiple OJP awards include this requirement.

The required training is available free of charge online through the BJA-funded Center for Task Force Integrity and Leadership (www.ctfli.org). The training addresses task force effectiveness, as well as other key issues including privacy and civil liberties/rights, task force performance measurement, personnel selection, and task force oversight and accountability. If award funds are used to support a task force, the recipient must compile and maintain a task force personnel roster, along with course completion certificates.

Additional information regarding the training is available through BJA's web site and the Center for Task Force Integrity and Leadership (www.ctfli.org).

53. Justification of consultant rate

Approval of this award does not indicate approval of any consultant rate in excess of $650 per day. A detailed justification must be submitted to and approved by the OJP program office prior to obligation or expenditure of such funds.

54. Submission of eligible records relevant to the National Instant Background Check System

Consonant with federal statutes that pertain to firearms and background checks -- including 18 U.S.C. 922 and 34 U.S.C. ch. 409 -- if the recipient (or any subrecipient at any tier) uses this award to fund (in whole or in part) a specific project or program (such as a law enforcement, prosecution, or court program) that results in any court dispositions, information, or other records that are "eligible records" (under federal or State law) relevant to the National Instant Background Check System (NICS), or that has as one of its purposes the establishment or improvement of records systems that contain any court dispositions, information, or other records that are "eligible records" (under federal or State law) relevant to the NICS, the recipient (or subrecipient, if applicable) must ensure that all such court dispositions, information, or other records that are "eligible records" (under federal or State law) relevant to the NICS are promptly made available to the NICS or to the "State" repository/database that is electronically available to (and accessed by) the NICS, and -- when appropriate -- promptly must update, correct, modify, or remove such NICS-relevant "eligible records".

In the event of minor and transitory non-compliance, the recipient may submit evidence to demonstrate diligent monitoring of compliance with this condition (including subrecipient compliance). DOJ will give great weight to any such evidence in any express written determination regarding this condition.

U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**
**Grant**

PROJECT NUMBER 2019-DJ-BX-0068 AWARD DATE 09/18/2019

*SPECIAL CONDITIONS*

55. "Methods of Administration" - monitoring compliance with civil rights laws and nondiscrimination provisions

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with applicable federal civil rights laws and nondiscrimination provisions. Within 90 days of the date of award acceptance, the recipient must submit to OJP's Office for Civil Rights (at CivilRightsMOA@usdoj.gov) written Methods of Administration ("MOA") for subrecipient monitoring with respect to civil rights requirements. In addition, upon request by OJP (or by another authorized federal agency), the recipient must make associated documentation available for review.

The details of the recipient's obligations related to Methods of Administration are posted on the OJP web site at https://ojp.gov/funding/Explore/StateMethodsAdmin-FY2017update.htm (Award condition: "Methods of Administration" - Requirements applicable to States (FY 2017 Update)), and are incorporated by reference here.

56. Required attendance at BJA-sponsored events

The recipient (and its subrecipients at any tier) must participate in BJA-sponsored training events, technical assistance events, or conferences held by BJA or its designees, upon BJA's request.



| | | | |
|---|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE 27 OF 31 |

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

57. Compliance with National Environmental Policy Act and related statutes

Upon request, the recipient (and any subrecipient at any tier) must assist BJA in complying with the National Environmental Policy Act (NEPA), the National Historic Preservation Act, and other related federal environmental impact analyses requirements in the use of these award funds, either directly by the recipient or by a subrecipient. Accordingly, the recipient agrees to first determine if any of the following activities will be funded by the grant, prior to obligating funds for any of these purposes. If it is determined that any of the following activities will be funded by the award, the recipient agrees to contact BJA.

The recipient understands that this condition applies to new activities as set out below, whether or not they are being specifically funded with these award funds. That is, as long as the activity is being conducted by the recipient, a subrecipient, or any third party, and the activity needs to be undertaken in order to use these award funds, this condition must first be met. The activities covered by this condition are:

a. New construction;

b. Minor renovation or remodeling of a property located in an environmentally or historically sensitive area, including properties located within a 100-year flood plain, a wetland, or habitat for endangered species, or a property listed on or eligible for listing on the National Register of Historic Places;

c. A renovation, lease, or any proposed use of a building or facility that will either (a) result in a change in its basic prior use or (b) significantly change its size;

d. Implementation of a new program involving the use of chemicals other than chemicals that are (a) purchased as an incidental component of a funded activity and (b) traditionally used, for example, in office, household, recreational, or education environments; and

e. Implementation of a program relating to clandestine methamphetamine laboratory operations, including the identification, seizure, or closure of clandestine methamphetamine laboratories.

The recipient understands and agrees that complying with NEPA may require the preparation of an Environmental Assessment and/or an Environmental Impact Statement, as directed by BJA. The recipient further understands and agrees to the requirements for implementation of a Mitigation Plan, as detailed at https://bja.gov/Funding/nepa.html, for programs relating to methamphetamine laboratory operations.

Application of This Condition to Recipient's Existing Programs or Activities:  For any of the recipient's or its subrecipients' existing programs or activities that will be funded by these award funds, the recipient, upon specific request from BJA, agrees to cooperate with BJA in any preparation by BJA of a national or program environmental assessment of that funded program or activity.

58. Establishment of trust fund

If award funds are being drawn down in advance, the recipient (or a subrecipient, with respect to a subaward) is required to establish a trust fund account. Recipients (and subrecipients) must maintain advance payments of federal awards in interest-bearing accounts, unless regulatory exclusions apply (2 C.F.R. 200.305(b)(8)). The trust fund, including any interest, may not be used to pay debts or expenses incurred by other activities beyond the scope of the Edward Byrne Memorial Justice Assistance Grant Program (JAG). The recipient also agrees to obligate the award funds in the trust fund (including any interest earned) during the period of performance for the award and expend within 90 days thereafter. Any unobligated or unexpended funds, including interest earned, must be returned to OJP at the time of closeout.



| | | | |
|---|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE  28  OF  31 | |

| | | | |
|---|---|---|---|
| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |

*SPECIAL CONDITIONS*

59. Prohibition on use of award funds for match under BVP program

    JAG funds may not be used as the 50% match for purposes of the DOJ Bulletproof Vest Partnership (BVP) program.

60. Certification of body armor "mandatory wear" policies

    If recipient uses funds under this award to purchase body armor, the recipient must submit a signed certification that law enforcement agencies receiving body armor purchased with funds from this award have a written "mandatory wear" policy in effect. The recipient must keep signed certifications on file for any subrecipients planning to utilize funds from this award for ballistic-resistant and stab-resistant body armor purchases. This policy must be in place for at least all uniformed officers before any funds from this award may be used by an agency for body armor. There are no requirements regarding the nature of the policy other than it be a mandatory wear policy for all uniformed officers while on duty.

61. Body armor - compliance with NIJ standards and other requirements

    Ballistic-resistant and stab-resistant body armor purchased with JAG award funds may be purchased at any threat level, make or model, from any distributor or manufacturer, as long as the body armor has been tested and found to comply with applicable National Institute of Justice ballistic or stab standards and is listed on the NIJ Compliant Body Armor Model List (https://nij.gov/topics/technology/body-armor/Pages/compliant-ballistic-armor.aspx). In addition, ballistic-resistant and stab-resistant body armor purchased must be made in the United States and must be uniquely fitted, as set forth in 34 U.S.C. 10202(c)(1)(A). The latest NIJ standard information can be found here: https:/ / nij.gov/ topics/ technology/ body-armor/ pages/ safety-initiative.aspx.

62. Reporting requirements

    The recipient must submit quarterly Federal Financial Reports (SF-425) and semi-annual performance reports through OJP's GMS (https://grants.ojp.usdoj.gov). Consistent with the Department's responsibilities under the Government Performance and Results Act (GPRA) and the GPRA Modernization Act of 2010, the recipient must provide data that measure the results of its work. The recipient must submit quarterly performance metrics reports through BJA's Performance Measurement Tool (PMT) website (www.bjaperformancetools.org). For more detailed information on reporting and other JAG requirements, refer to the JAG reporting requirements webpage. Failure to submit required JAG reports by established deadlines may result in the freezing of grant funds and future High Risk designation.

63. Required data on law enforcement agency training

    Any law enforcement agency receiving direct or sub-awarded funding from this JAG award must submit quarterly accountability metrics data related to training that officers have received on the use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public.

64. Expenditures prohibited without waiver

    No funds under this award may be expended on the purchase of items prohibited by the JAG program statute, unless, as set forth at 34 U.S.C. 10152, the BJA Director certifies that extraordinary and exigent circumstances exist, making such expenditures essential to the maintenance of public safety and good order.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE  29  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

65.  Authorization to obligate (federal) award funds to reimburse certain project costs incurred on or after October 1, 2018

The recipient may obligate (federal) award funds only after the recipient makes a valid acceptance of the award.  As of the first day of the period of performance for the award (October 1, 2018), however, the recipient may choose to incur project costs using non-federal funds, but any such project costs are incurred at the recipient's risk until, at a minimum-- (1) the recipient makes a valid acceptance of the award, and (2) all applicable withholding conditions are removed by OJP (via a Grant Adjustment Notice).  (A withholding condition is a condition in the award document that precludes the recipient from obligating, expending, or drawing down all or a portion of the award funds until the condition is removed.)

Except to the extent (if any) that an award condition expressly precludes reimbursement of project costs incurred "at-risk," if and when the recipient makes a valid acceptance of this award and OJP removes each applicable withholding condition through a Grant Adjustment Notice, the recipient is authorized to obligate (federal) award funds to reimburse itself for project costs incurred "at-risk" earlier during the period of performance (such as project costs incurred prior to award acceptance or prior to removal of an applicable withholding condition), provided that those project costs otherwise are allowable costs under the award.

Nothing in this condition shall be understood to authorize the recipient (or any subrecipient at any tier) to use award funds to "supplant" State or local funds in violation of the recipient's certification (executed by the chief executive of the State or local government) that federal funds will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

66.  Use of funds for DNA testing; upload of DNA profiles

If award funds are used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System ("CODIS," the DNA database operated by the FBI) by a government DNA laboratory with access to CODIS.

No profiles generated under this award may be entered or uploaded into any non-governmental DNA database without prior express written approval from BJA.

Award funds may not be used for the purchase of DNA equipment and supplies unless the resulting DNA profiles may be accepted for entry into CODIS.

67.  Encouragement of submission of "success stories"

BJA strongly encourages the recipient to submit annual (or more frequent) JAG success stories. To submit a success story, sign in to a My BJA account at https:/ / www.bja.gov/ Login.aspx to access the Success Story Submission form. If the recipient does not yet have a My BJA account, please register at https:/ / www.bja.gov/ profile.aspx. Once registered, one of the available areas on the My BJA page will be "My Success Stories." Within this box, there is an option to add a Success Story. Once reviewed and approved by BJA, all success stories will appear on the BJA Success Story web page at https:/ / www.bja.gov/ SuccessStoryList.aspx.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

| **AWARD CONTINUATION SHEET** | |
|---|---|
| **Grant** | PAGE  30  OF  31 |

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

68.  Recipient integrity and performance matters:  Requirement to report information on certain civil, criminal, and administrative proceedings to SAM and FAPIIS

The recipient must comply with any and all applicable requirements regarding reporting of information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either this OJP award or any other grant, cooperative agreement, or procurement contract from the federal government.  Under certain circumstances, recipients of OJP awards are required to report information about such proceedings, through the federal System for Award Management (known as "SAM"), to the designated federal integrity and performance system (currently, "FAPIIS").

The details of recipient obligations regarding the required reporting (and updating) of information on certain civil, criminal, and administrative proceedings to the federal designated integrity and performance system (currently, "FAPIIS") within SAM are posted on the OJP web site at https://ojp.gov/funding/FAPIIS.htm (Award condition: Recipient Integrity and Performance Matters, including Recipient Reporting to FAPIIS), and are incorporated by reference here.

69.  Withholding of funds: Required certification from the chief executive of the applicant government

The recipient may not obligate, expend, or draw down any award funds until the recipient submits the required "Certifications and Assurances by the Chief Executive of the Applicant Government," properly-executed (as determined by OJP), and a Grant Adjustment Notice (GAN) has been issued to remove this condition.

70.  Withholding of funds:  Budget narrative or information

The recipient may not obligate, expend, or draw down any award funds until the recipient submits, and OJP reviews and accepts, the required budget information or narrative for the award, and a Grant Adjustment Notice (GAN) has been issued to remove this condition.

71.  The recipient may not obligate, expend, or draw down any award funds for indirect costs, unless and until either -- (1) the recipient submits to OJP a current, federally-approved indirect cost rate agreement, or (2) the recipient determines that it is eligible under the Part 200 Uniform Requirements to use the "de minimis" indirect cost rate described in 2 C.F.R. 200.414(f), and advises OJP in writing of both its eligibility and its election.

OJP will release this condition through a Grant Adjustment Notice (GAN), following receipt of a satisfactory submission.

72.  Withholding of funds:  Disclosure of lobbying

The recipient may not obligate, expend, or draw down any funds under this award until it has provided to the grant manager for this OJP award a complete Disclosure of Lobbying Activities (SF-LLL) form, and OJP has issued a Grant Adjustment Notice to remove this special condition.

73.  Withholding - DHS question attachment

The recipient may not obligate, expend or draw down funds until the Office of Justice Programs has received and approved the required application attachment(s) described in the program solicitation as "Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)," and has issued a Grant Adjustment Notice (GAN) releasing this special condition.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET

Grant**

PAGE  31  OF  31

| PROJECT NUMBER | 2019-DJ-BX-0068 | AWARD DATE | 09/18/2019 |

*SPECIAL CONDITIONS*

74.   Withholding of funds:  Certification with respect to federal taxes

The recipient may not obligate, expend, or draw down any funds under this award until it has submitted to the program manager, in a format acceptable to OJP, a formal written certification directed to OJP and executed by an official with authority to sign on behalf of the recipient, that the recipient (unless an exemption applies by operation of law, as described below)-- (1) has filed all Federal tax returns required for the three tax years immediately preceding the tax year in which the certification is made; (2) has not been convicted of a criminal offense under the Internal Revenue Code of 1986; and (3) has not, more than 90 days prior to this certification, been notified of any unpaid federal tax assessment for which the liability remains unsatisfied, unless the assessment is the subject of an installment agreement or offer in compromise that has been approved by the Internal Revenue Service and is not in default, or the assessment is the subject of a non-frivolous administrative or judicial proceeding; and until a Grant Adjustment Notice (GAN) has been issued to remove this condition.

The certification must be dated, and must indicate the full name and title of the signer, as well as the full legal name of the recipient.

A recipient that is exempt from any legal requirement to file or pay federal taxes (such as a government entity exempt from federal income tax), and to which the elements of the above-specified certification would not apply, must advise OJP in writing -- in lieu of submitting the above-specified certification -- that it is not subject to any legal requirement to file or pay federal taxes.

75.   SORNA final agency decision - Appeals

The recipient acknowledges the final agency decision made by DOJ that recipient's jurisdiction did not substantially implement the Sex Offender Registration and Notification Act (Public Law 109-248, "SORNA") before the deadline, and understands that, as a result of that final agency decision, the amount of this JAG award was reduced, pursuant to 34 U.S.C. 20927.  By accepting this specific award, the recipient voluntarily agrees that if it elects to file a judicial appeal of that final agency decision, which was integral in determining this particular funding amount, no such appeal may commence more than 6 months after the date of acceptance of this award.

76.   Withholding of funds: Required State Strategic Plan submission

The recipient may not obligate, expend, or draw down any award funds until the recipient submits a sufficient Statewide Strategic Plan (to include an Annual Report in each year in which the Statewide Strategic Plan is not fully updated), and a Grant Adjustment Notice (GAN) has been issued to remove this condition.

77.   Withholding of funds: Disclosure of pending applications

The recipient may not obligate, expend, or draw down any award funds until: (1) it has provided to the grant manager for this OJP award either an "applicant disclosure of pending applications" for federal funding or a specific affirmative statement that no such pending applications (whether direct or indirect) exist, in accordance with the detailed instructions in the program solicitation, (2) OJP has completed its review of the information provided and of any supplemental information it may request, (3) the recipient has made any adjustments to the award that OJP may require to prevent or eliminate any inappropriate duplication of funding (e.g., budget modification, project scope adjustment), (4) if appropriate adjustments to a discretionary award cannot be made, the recipient has agreed in writing to any necessary reduction of the award amount in any amount sufficient to prevent duplication (as determined by OJP), and (5) a Grant Adjustment Notice has been issued to remove this condition.



**U.S. Department of Justice**

Office of Justice Programs

*Bureau of Justice Assistance*

---

*Washington, D.C.  20531*

**Memorandum To:**   Official Grant File

**From:**   Orbin Terry, NEPA Coordinator

**Subject:**   Incorporates NEPA Compliance in Further Developmental Stages for California
Board of State and Community Corrections

The Edward Byrne Memorial Justice Assistance Grant Program (JAG) allows states and local governments to
support a broad range of activities to prevent and control crime and to improve the criminal justice system, some of
which could have environmental impacts.  All recipients of JAG funding must assist BJA in complying with NEPA
and other related federal environmental impact analyses requirements in the use of grant funds, whether the funds
are used directly by the grantee or by a subgrantee or third party.  Accordingly, prior to obligating funds for any of
the specified activities, the grantee must first determine if any of the specified activities will be funded by the
grant.

The specified activities requiring environmental analysis are:
a. New construction;
b. Any renovation or remodeling of a property located in an environmentally or historically sensitive area,
including properties located within a 100-year flood plain, a wetland, or habitat for endangered species, or a
property listed on or eligible for listing on the National Register of Historic Places;
c.  A renovation, lease, or any proposed use of a building or facility that will either (a) result in a change in its basic
prior use or (b) significantly change its size;
d.  Implementation of a new program involving the use of chemicals other than chemicals that are (a) purchased as
an incidental component of a funded activity and (b) traditionally used, for example, in office, household,
recreational, or education environments; and
e. Implementation of a program relating to clandestine methamphetamine laboratory operations, including the
identification, seizure, or closure of clandestine methamphetamine laboratories.

Complying with NEPA may require the preparation of an Environmental Assessment and/or an Environmental
Impact Statement, as directed by BJA.  Further, for programs relating to methamphetamine laboratory operations,
the preparation of a detailed Mitigation Plan will be required.  For more information about Mitigation Plan
requirements, please see https://www.bja.gov/Funding/nepa.html.

Please be sure to carefully review the grant conditions on your award document, as it may contain more specific
information about environmental compliance.



U.S. Department of Justice

Office of Justice Programs

Bureau of Justice Assistance

**GRANT MANAGER'S MEMORANDUM, PT. I: PROJECT SUMMARY**

**Grant**

| PROJECT NUMBER<br><br>2019-DJ-BX-0068 | PAGE   1   OF   1 |
|---|---|

This project is supported under FY19(BJA - JAG State and JAG Local) Title I of Pub. L. No. 90-351 (generally codified at 34 U.S.C. 10151-10726), including subpart 1 of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a).

| 1. STAFF CONTACT (Name & telephone number)<br><br>Linda Hill-Franklin<br>(202) 514-0712 | 2. PROJECT DIRECTOR (Name, address & telephone number)<br><br>Daryle McDaniel<br>Field Representative<br>2590 Venture Oaks Way, Ste. 200<br>Sacramento, CA 95833-3288<br>(916) 341-7392 |
|---|---|

| 3a. TITLE OF THE PROGRAM<br><br>BJA FY 19 Edward Byrne Memorial Justice Assistance Grant (JAG) Program - State Solicitation | 3b. POMS CODE (SEE INSTRUCTIONS ON REVERSE)<br><br>00, |
|---|---|

**4. TITLE OF PROJECT**

2019 JAG State Wide Program

| 5. NAME & ADDRESS OF GRANTEE<br><br>California Board of State and Community Corrections<br>2590 Venture Oaks Way, Ste. 200<br>Sacramento, CA 95833-3288 | 6. NAME & ADRESS OF SUBGRANTEE |
|---|---|

| 7. PROGRAM PERIOD<br><br>FROM:        10/01/2018        TO:   09/30/2022 | 8. BUDGET PERIOD<br><br>FROM:        10/01/2018        TO:   09/30/2022 |
|---|---|

| 9. AMOUNT OF AWARD<br><br>$ 17,860,765 | 10. DATE OF AWARD<br><br>09/18/2019 |
|---|---|

| 11. SECOND YEAR'S BUDGET | 12. SECOND YEAR'S BUDGET AMOUNT |
|---|---|

| 13. THIRD YEAR'S BUDGET PERIOD | 14. THIRD YEAR'S BUDGET AMOUNT |
|---|---|

15. SUMMARY DESCRIPTION OF PROJECT (See instruction on reverse)

The Edward Byrne Memorial Justice Assistance Grant Program (JAG) allows states and units of local government, including tribes, to support a broad range of activities to prevent and control crime based on their own state and local needs and conditions. Grant funds can be used for state and local initiatives, technical assistance, training, personnel, equipment, supplies, contractual support, and information systems for criminal justice, including for any one or more of the following program areas: 1) law enforcement programs; 2) prosecution and court programs; 3) prevention and education programs; 4) corrections and community corrections programs; 5) drug treatment and enforcement programs; 6) planning, evaluation, and technology improvement programs; and 7) crime victim and witness programs (other than compensation) and 8) mental health programs and related law enforcement and corrections programs.

This State JAG award will be used to support criminal justice initiatives that fall under one or more of the allowable program areas above. Funded programs or initiatives may include multijurisdictional drug and gang task forces, crime prevention and domestic violence programs, courts, corrections, treatment, justice

OJP FORM 4000/2 (REV. 4-88)

information sharing initiatives, or other programs aimed at reducing crime and/or enhancing public/officer safety.

NCA/NCF

Exhibit 6

# Edward Byrne Memorial Justice Assistance Grant (JAG) Program Fiscal Year 2019 State Solicitation

June 18, 2019

This solicitation has been changed to correct an appendix reference. Thank you for your attention to this update.

OMB No. 1121-0329
**Approval Expires 11/30/2020**

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



---

# Edward Byrne Memorial Justice Assistance Grant (JAG) Program Fiscal Year 2019 State Solicitation

**CFDA #16.738**

**Solicitation Release Date: April 23, 2019**

**Application Deadline: 11:59 p.m. eastern time on June 25, 2019**

---

The U.S. Department of Justice (DOJ)*,* Office of Justice Programs (OJP)*,* Bureau of Justice Assistance (BJA) is seeking applications for the Edward Byrne Memorial Justice Assistance Grant (JAG) Program. This program furthers the Department's mission by assisting state, local, and tribal law enforcement efforts to prevent or reduce crime and violence.

This solicitation incorporates the OJP Grant Application Resource Guide by reference. The OJP Grant Application Resource Guide provides guidance to applicants for the preparation and submission to OJP of applications for funding. **If this solicitation expressly modifies any provision in the OJP Grant Application Resource Guide, the applicant is to follow the guidelines in this solicitation as to that provision.**

This solicitation expressly modifies the OJP Grant Application Resource Guide by not incorporating the "Limitation on Use of Award Funds for Employee Compensation; Waiver" provisions in the "Financial Information" section of the OJP Grant Application Resource Guide.

## Eligibility
Only states may apply under this solicitation. By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa. (Throughout this solicitation, each reference to a "state" or "states" includes all 56 jurisdictions.)

A JAG application is not complete, and a state may not access award funds, unless the chief executive of the applicant state (e.g., the governor) properly executes, and the state submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix A.

The expected allocations by state for the fiscal year (FY) 2019 JAG Program can be found at: https://www.bja.gov/funding/FY18-State-JAG-Web-Allocations.pdf.

All recipients and subrecipients (including any for-profit organization) must forgo any profit or management fee.

**Contact information**

For technical assistance with submitting an application, contact the Grants Management System (GMS) Support Hotline at 888–549–9901, option 3, or via email at GMS.HelpDesk@usdoj.gov. The GMS Support Hotline operates 24 hours a day, 7 days a week, including on federal holidays.

An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline must email the National Criminal Justice Reference Service (NCJRS) Response Center at grants@ncjrs.gov **within 24 hours after the application deadline** in order to request approval to submit its application after the deadline. For information on reporting technical issues, see "Experiencing Unforeseen GMS Technical Issues" under **How to Apply (GMS)** in the OJP Grant Application Resource Guide.

For assistance with any other requirement of this solicitation, applicants may contact the NCJRS Response Center by telephone at 1–800–851–3420; via TTY at 301–240–6310 (hearing impaired only); by email at grants@ncjrs.gov; by fax to 301–240–5830; or by web chat at https://webcontact.ncjrs.gov/ncjchat/chat.jsp. The NCJRS Response Center hours of operation are 10:00 a.m. to 6:00 p.m. eastern time, Monday through Friday, and 10:00 a.m. to 8:00 p.m. eastern time on the solicitation close date. Applicants also may contact the appropriate BJA State Policy Advisor.

**Post-Award Legal Requirements Notice**

If selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with all award conditions, and all applicable requirements of federal statutes and regulations (including applicable requirements referred to in the assurances and certifications executed in connection with award acceptance). OJP strongly encourages prospective applicants to review information on post-award legal requirements and common OJP award conditions **prior** to submitting an application.

For additional information on these legal requirements, see the "Administrative, National Policy, and Other Legal Requirements" section in the OJP Grant Application Resource Guide.

**Deadline details**

Applicants must register in the OJP Grants Management System (GMS) at https://grants.ojp.usdoj.gov/ prior to submitting an application under this solicitation. All applicants must register, even those that previously registered in GMS. Select the "Apply Online" button associated with the solicitation title. All registrations and applications are due by 11:59 p.m. eastern time on June 25, 2019.

For additional information, see the "**How to Apply (GMS)**" section in the OJP Grant Application Resource Guide.

# Contents

**A. Program Description** ....................................................................................**5**

   Overview .........................................................................................................5

      Permissible uses of JAG Funds – In general ..........................................5

      Limitations on the use of JAG funds .........................................................6

      State obligations regarding use of JAG funds and units of local government ..............10

      Required compliance with applicable federal laws...................................10

      Potential statutory funding reductions.....................................................11

      BJA Areas of Emphasis ...........................................................................13

   Objectives .......................................................................................................15

   Evidence-based Programs or Practices ..........................................................15

   Information Regarding Potential Evaluation of Programs and Activities..........15

**B. Federal Award Information** ......................................................................**16**

   Type of Award .................................................................................................16

   Financial Management and System of Internal Controls .................................17

   Budget Information ..........................................................................................17

   Cost Sharing or Match Requirement ...............................................................17

   Pre-agreement Costs (also known as Pre-award Costs) ................................18

   Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs............18

   Costs Associated with Language Assistance (if applicable)............................18

**C. Eligibility Information** ..............................................................................**18**

**D. Application and Submission Information**................................................**18**

   What an Application Should Include.................................................................18

   How to Apply ...................................................................................................24

**E. Application Review Information** ...............................................................**24**

   Review Process ..............................................................................................24

**F. Federal Award Administration Information** ...........................................**25**

   Federal Award Notices....................................................................................25

   Administrative, National Policy, and Other Legal Requirements .....................25

   Information Technology (IT) Security Clauses ................................................25

   General Information about Post-federal Award Reporting Requirements ........26

**G. Federal Awarding Agency Contact(s)**....................................................**27**

**H. Other Information** ...............................................................................................**27**

Freedom of Information and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a) ..............27

Provide Feedback to OJP ......................................................................................27

Appendix A: Certifications and Assurances by the Chief Executive .................................28

Appendix B: Certain relevant federal laws, as in effect on April 8, 2019 .........................30

Appendix C: information regarding communication with the Department of Homeland Security and/or Immigration and Customs Enforcement ....................................................36

Appendix D: Additional Award Purposes..........................................................................37

Appendix E: Application Checklist.....................................................................................40

# Edward Byrne Memorial
# Justice Assistance Grant (JAG) Program
# FY 2019 State Solicitation
# CFDA #16.738

## A. Program Description

**Overview**

The Edward Byrne Memorial Justice Assistance Grant (JAG) Program is the primary provider of federal criminal justice funding to states and units of local government. BJA will award JAG Program funds to eligible states under this FY 2019 JAG Program State Solicitation. (BJA will issue a separate solicitation for applications from units of local government.)

**Statutory Authority:** The JAG Program is authorized by Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (Public Law No. 90-351) (generally codified at 34 U.S.C. 10151-10726), including subpart 1 of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a).

**Program-specific Information**

**Permissible uses of JAG Funds – In general**

In general, JAG funds awarded to a state under this FY 2019 solicitation may be used to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for **criminal justice**, including for any one or more of the following:

      Law enforcement programs
      Prosecution and court programs
      Prevention and education programs
      Corrections and community corrections programs
      Drug treatment and enforcement programs
      Planning, evaluation, and technology improvement programs
      Crime victim and witness programs (other than compensation)
      Mental health programs and related law enforcement and corrections programs

Additionally, JAG funds awarded to a state under this FY 2019 solicitation may be used for any purpose indicated in Appendix D.

In connection with the all of the above purposes (including those indicated in the appendix), it should be noted that the statute defines "criminal justice" as "activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to apprehend criminals, including juveniles, activities of courts having criminal jurisdiction, and related agencies (including but not

limited to prosecutorial and defender services, juvenile delinquency agencies and pretrial service or release agencies), activities of corrections, probation, or parole authorities and related agencies assisting in the rehabilitation, supervision, and care of criminal offenders, and programs relating to the prevention, control, or reduction of narcotic addiction and juvenile delinquency."

**Limitations on the use of JAG funds**

<u>Prohibited uses of funds</u> – JAG funds may not be used (whether directly or indirectly) for any purpose prohibited by federal statute or regulation, including those purposes specifically prohibited by the JAG Program statute as set out at 34 U.S.C. § 10152.

JAG funds may not be used (directly or indirectly) for security enhancements or equipment for nongovernmental entities not engaged in criminal justice or public safety. Additionally, **JAG funds may not be used (directly or indirectly) to pay for any of the following items unless the BJA Director certifies that extraordinary and exigent circumstances exist,** making them essential to the maintenance of public safety and good order:

- Vehicles, vessels, or aircraft*
- Luxury items
- Real estate
- Construction projects (other than penal or correctional institutions)
- Any similar items

*Police cruisers, police boats, and police helicopters are allowable vehicles under JAG and do not require BJA certification.

**For information about requesting BJA certification for a listed prohibited item (including UA, UAV and/or UAS purchases) or for examples of allowable vehicles that do not require BJA certification, refer to the <u>JAG FAQs</u>.**

***Cap on use of JAG award funds for administrative costs*** – Up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award.

***Prohibition of supplanting; prohibition on use of JAG funds as*** <u>match</u> – JAG funds may not be used to supplant state or local funds but must be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities. See the <u>JAG FAQs</u> for examples of supplanting.

Although supplanting is prohibited, as discussed under <u>What An Application Should Include</u>, leveraging of federal funding is encouraged.

Absent specific federal statutory authority to do so, JAG award funds may not be used as a match for the purposes of other federal awards.

***Other restrictions on use of funds*** – If a state chooses to use its FY 2019 JAG funds for particular, defined types of expenditures, it must satisfy certain preconditions.

- <u>Body-Worn Cameras (BWCs)</u> – A state that proposes to use FY 2019 JAG award funds to purchase BWC equipment or to implement or enhance BWC programs, must provide to OJP a certification(s) that each state law enforcement agency receiving the equipment or

implementing the program has policies and procedures in place related to BWC equipment usage, data storage and access, privacy considerations, and training. The certification form related to BWC policies and procedures can be found at https://www.bja.gov/Funding/BodyWornCameraCert.pdf.

A state that proposes to use JAG funds for BWC-related expenses will have funds withheld until the required certification is submitted and approved by OJP. If the state proposes to change project activities to utilize JAG funds for BWC-related expenses after the award is accepted, the state must submit the signed certification to OJP at that time.

Further, before making any subaward for BWC-related expenses, the state JAG recipient must collect a completed BWC certification from the proposed subrecipient. Any such certifications must be maintained by the state JAG recipient and made available to OJP upon request.

**The BJA BWC Toolkit provides model BWC policies and best practices to assist criminal justice departments in implementing BWC programs.**

Apart from the JAG Program, BJA provides funds under the Body-Worn Camera Policy and Implementation Program (BWC PIP). BWC PIP allows jurisdictions to develop and implement policies and practices required for effective program adoption, and to address program factors including the purchase, deployment, and maintenance of camera systems and equipment; data storage and access; and privacy considerations. Interested states may wish to refer to the BWC Program web page for more information. States should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BWC Program.

- Body Armor – Body armor purchased with JAG funds may be purchased at any threat level, make, or model from any distributor or manufacturer, as long as the following requirements are met: The body armor must have been tested and found to comply with the latest applicable National Institute of Justice (NIJ) ballistic or stab standards. In addition, body armor purchased must be made in the United States. Finally, body armor purchased with JAG funds must be "uniquely fitted vests," which means protective (ballistic or stab-resistant) armor vests that conform to the individual wearer to provide the best possible fit and coverage, through a combination of: (1) correctly sized panels and carrier, determined through appropriate measurement and (2) properly adjusted straps, harnesses, fasteners, flaps, or other adjustable features. The requirement that body armor be "uniquely fitted" does not necessarily require body armor that is individually manufactured based on the measurements of an individual wearer. In support of OJP's efforts to improve officer safety, the American Society for Testing and Materials (ASTM) International has made available the *Standard Practice for Body Armor Wearer Measurement and Fitting of Armor* (Active Standard ASTM E3003) available at no cost. The Personal Armor Fit Assessment checklist is excerpted from ASTM E3003.

A state that proposes to use FY 2019 JAG award funds to purchase body armor must provide OJP with a certification(s) that each state law enforcement agency receiving body armor has a written "mandatory wear" policy in effect. *See* 34 U.S.C. § 10202(c).

The certification form related to mandatory wear can be found at
www.bja.gov/Funding/BodyArmorMandatoryWearCert.pdf.

A state that proposes to use JAG funds to purchase body armor will have funds withheld
until the required certification is submitted and approved by OJP. If the state proposes to
change project activities to utilize JAG funds to purchase body armor after the award is
accepted, the state must submit the signed certification to OJP at that time.

Further, before making any subaward for the purchase of body armor, the state JAG
recipient must collect a completed mandatory wear certification from the proposed
subrecipient. Any such certifications must be maintained by the state JAG recipient and
made available to OJP upon request.

A mandatory wear concept and issues paper and a model policy are available at the
BVP Customer Support Center, at vests@usdoj.gov or toll free at 1–877–758–3787.
Additional information and FAQs related to the mandatory wear policy and certifications
can be found at https://www.bja.gov/Funding/JAGFAQ.pdf.

Apart from the JAG Program, BJA provides funds under the Bulletproof Vest Partnership
(BVP) Program. The BVP Program is designed to provide a critical resource to state and
local law enforcement agencies for the purchase of ballistic-resistant and stab-resistant
body armor. For more information on the BVP Program, including eligibility and
application, refer to the BVP web page. States should note, however, that JAG funds may
not be used as any part of the 50 percent match required by the BVP Program.

- Interoperable Communications – States (and any subrecipients) that use FY 2019 JAG funds
  to support emergency communications activities (including the purchase of interoperable
  communications equipment and technologies such as Voice over Internet Protocol bridging or
  gateway devices, or equipment to support the build out of wireless broadband networks in the
  700 MHz public safety band under the Federal Communications Commission [FCC] Waiver
  Order) should review current SAFECOM guidance at: https://www.dhs.gov/safecom. This
  guidance is updated annually to provide current information on emergency communications
  policies, eligible costs, best practices, and technical standards for state, local, tribal, and
  territorial grantees investing federal funds in emergency communications projects.
  Additionally, emergency communications projects funded with FY 2019 JAG funds should
  support the Statewide Communication Interoperability Plan (SCIP) and be coordinated with
  the full-time statewide interoperability coordinator (SWIC) in the state of the project. As the
  central coordination point for a state's interoperability effort, the SWIC plays a critical role and
  can serve as a valuable resource. SWICs are responsible for the implementation of SCIP
  through coordination and collaboration with the emergency response community. The U.S.
  Department of Homeland Security Office of Emergency Communications maintains a list of
  SWICs for each of the states and territories. Contact OEC@hq.dhs.gov for more information.
  All communications equipment purchased with FY 2019 JAG Program funding should be
  identified during quarterly performance metrics reporting.

  Further, information-sharing projects funded with FY 2019 JAG funds must comply with
  DOJ's Global Justice Information Sharing Initiative guidelines, as applicable, in order to
  promote information sharing and enable interoperability among disparate systems
  across the justice and public safety community. Recipients (and subrecipients) must

conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https://it.ojp.gov/gsp_grantcondition. Recipients (and subrecipients) will be required to document planned approaches to information sharing and describe compliance with GSP and an appropriate privacy policy that protects shared information or provide detailed justification for why an alternative approach is recommended.

For JAG applicants considering implementing communications technology projects, it is worthwhile to consider the First Responder Network Authority (FirstNet) Program. The Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. §§ 1401 *et seq.*) established FirstNet as an independent authority within the National Telecommunications and Information Administration (NTIA). FirstNet's statutory mission is to take all actions necessary to ensure the establishment of a nationwide public safety broadband network (NPSBN). NPSBN will use the 700 MHz D block spectrum to provide Long-Term Evolution (LTE)-based broadband services and applications to public safety entities. The network is based on a single, national network architecture that will evolve with technological advances and initially consist of a core network and radio access network. While mission critical voice communications will continue to occur on land mobile radio (LMR), in time, FirstNet is expected to provide public safety entities with mission critical broadband data capabilities and services including, but not limited to: messaging, image sharing, video streaming, group text, voice, data storage, applications, location-based services, and quality of service, priority, and preemption. This reliable, highly secure, interoperable, and innovative public safety communications platform will bring 21st century tools to public safety agencies and first responders, allowing them to get more information quickly and helping them to make faster and better decisions. For more information on FirstNet services, the unique value of the FirstNet network to public safety, and how to subscribe for the FirstNet service, should your state or territory opt in, visit www.FirstNet.gov. To learn about FirstNet's programs and activities, including its consultation and outreach with public safety, the state plan's process, FirstNet's history and promise and how it plans to ensure that the FirstNet network meets the needs of public safety, visit www.FirstNet.gov or contact info@firstnet.gov.

- DNA Testing of Evidentiary Materials and Uploading DNA Profiles to a Database– If JAG Program funds are to be used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System (CODIS, the national DNA database operated by the Federal Bureau of Investigation [FBI]) by a government DNA lab with access to CODIS. No profiles generated with JAG funding may be entered into any other non-governmental DNA database without prior expressed written approval from BJA.

  In addition, funds may not be used to purchase DNA equipment and supplies when the resulting DNA profiles from such technology are not acceptable for entry into CODIS.

- Entry of Records into State Repositories – As appropriate and to the extent consistent with law, a condition will be imposed that would require the following: with respect to any "program or activity" that receives federal financial assistance under this solicitation that is likely to generate or upgrade court dispositions or other records that are relevant to National Instant Background Check System (NICS) determinations (which includes any dispositions or records whatsoever that involve any "alien [who] is illegally or unlawfully in the United States" (18

U.S.C. § 922(g)(5)(A) (generally prohibiting any such alien to possess any firearm or ammunition)), a system must be in place to ensure that all such NICS-relevant dispositions or records that are generated or upgraded are made available in timely fashion to state repositories/databases that are accessed by NICS.

**State obligations regarding use of JAG funds and units of local government**
A state that applies for and receives an FY 2019 JAG award must:

- Pass through a predetermined percentage of funds to units of local government. (For purposes of the JAG Program, a "unit of local government" includes a city, county, township, town, and certain federally recognized Indian tribes.) This predetermined percentage (often referred to as the "variable pass-through" or "VPT") is calculated by OJP's Bureau of Justice Statistics (BJS), based on the total criminal justice expenditures by a state and its units of local government. The variable pass-through percentages that will apply to an FY 2019 award to a recipient state can be found at: https://www.bja.gov/jag/pdfs/VPT-for-SAAs-updated-June-2017.pdf. (If a state believes the VPT percentage has been calculated incorrectly, the state may provide pertinent, verifiable data to BJA and ask OJP to reconsider.)

- Appropriately use or distribute the amount of funds that are **added** to the state's FY 2019 award because certain units of local government within the state are ineligible for a direct FY 2019 award of JAG funds due to their small size. (These small size units of local government are referred to as "less-than-$10,000 jurisdictions.") The state must provide these additional funds included in its FY 2019 award to state police departments that provide criminal justice services to the "less-than-$10,000 jurisdictions" within the state and/or subaward the funds to such jurisdictions.

**Required compliance with applicable federal laws**
By law, the chief executive (e.g., the governor) of each state that applies for an FY 2019 JAG award must certify that the state will "comply with all provisions of [the JAG program statute] and all other applicable Federal laws." To satisfy this requirement, each state applicant must submit a properly executed certification, using the form shown in Appendix A.

All applicants should understand that OJP awards, including certifications provided in connection with such awards, are subject to review by DOJ, including by OJP and by the DOJ Office of the Inspector General. Applicants also should understand that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in a certification submitted to OJP in support of an application may be the subject of criminal prosecution, and also may result in civil penalties and administrative remedies for false claims or otherwise. Administrative remedies that may be available to OJP with respect to an FY 2019 award include suspension or termination of the award, placement on the DOJ high-risk grantee list, disallowance of costs, and suspension or debarment of the recipient.

**National Incident-Based Reporting System (NIBRS) 3 Percent Set-aside**
In FY 2016, the FBI formally announced its intention to sunset the Uniform Crime Reporting (UCR) Program's traditional Summary Reporting System (SRS) and replace it with the UCR Program's National Incident-Based Reporting System (NIBRS). By January 1, 2021, the FBI intends for NIBRS to be the law enforcement crime data reporting standard for the nation.

By statute, JAG Program awards are calculated using summary Part 1 violent crime data from the FBI's UCR Program. (See 34 U.S.C. § 10156.) Once SRS has been replaced by NIBRS, JAG award amounts will be calculated using NIBRS data. In preparation for the FBI's 2021 NIBRS compliance deadline, beginning in FY 2018, BJA requires, through the application of a special condition, direct JAG award recipients not certified by the FBI as NIBRS compliant to dedicate 3 percent of their JAG award toward achieving full compliance with the FBI's NIBRS data submission requirements under the UCR Program. The 3 percent requirement will assist state and local jurisdictions in working toward compliance, to ensure they continue to have critical criminal justice funding available through JAG when SRS is replaced by NIBRS in FY 2021.

The requirement for a NIBRS set-aside will not be applied to subawards from states. Rather, state JAG recipients must ensure that at least 3 percent of the total award amount is used toward NIBRS compliance, unless the FBI has certified that the state is already NIBRS compliant. States must clearly indicate in their application narratives and budgets what projects will be supported with this 3 percent set-aside.

The following are examples of costs and projects that relate to NIBRS implementation at the state or local level that could be funded under the JAG Program: software, hardware, and labor that directly support or enhance a state or agency's technical capacity for collecting, processing, and analyzing data reported by local law enforcement (LE) agencies and then submitting NIBRS data to the FBI; training personnel responsible for the state's Incident Based Reporting (IBR) program on receiving, processing, analyzing, and validating incident-based data from local LE agencies in their state; training local agencies in how to collect and submit NIBRS data; and technical assistance for LE agency personnel responsible for (1) managing the agency's crime incident data, (2) processing and validating the data, and (3) extracting and submitting IBR data to the state UCR Program according to the states and/or directly to the FBI according to the NIBRS standard.

BJA will waive the set-aside requirement for states that have been certified as NIBRS compliant by the FBI as of the posting date of this solicitation. States that achieve full compliance with NIBRS after receiving an award should email evidence of NIBRS compliance (written documentation from the FBI that certifies NIBRS compliance) to their State Policy Advisor listed in OJP's Grants Management System (GMS). Upon review of the documentation submitted, BJA will confirm the NIBRS compliance and then issue a Grant Adjustment Notice (GAN) to clear any withholding special condition associated with the NIBRS set-aside requirement. States must retain documentation on file that demonstrates the FBI certification of NIBRS compliance. Such documentation must be made available for BJA review, upon request. If approved, states will not be subject to the 3 percent set-aside requirement.

Note: In FY 2018, U.S. Territories and tribal jurisdictions were not subject to the 3 percent set-aside for NIBRS compliance to allow the territories and tribal jurisdictions to plan for the change in funding direction and provide BJA with time to coordinate or provide any necessary technical assistance. **In FY 2019 and forward, this requirement is applicable, meaning U.S. Territories and tribal jurisdictions must set aside the 3 percent for NIBRS compliance.**

**Potential statutory funding reductions**

- Prison Rape Elimination Act of 2003 (PREA) – In 2012, DOJ published the National

PREA Standards, which were promulgated to prevent, detect, and respond to sexual victimization and abuse in confinement settings. The PREA Standards are set out at 28 C.F.R. Part 115, and apply to confinement facilities, including adult prisons and jails, juvenile facilities, and police lockups.

Under PREA, if a state's chief executive (e.g., governor) does not certify full compliance with the National PREA Standards, the state is subject to the loss of 5 percent of certain DOJ grant funds, including JAG award funds, unless: (1) the chief executive submits an assurance to DOJ that no less than 5 percent of such funds will be used solely for the purpose of enabling the state to achieve and certify full compliance with the PREA Standards in future years; or (2) the chief executive requests that the affected funds be held in abeyance by DOJ. See 34 U.S.C. § 30307(e)(2).

A reduction of a FY 2019 JAG award to a state under the provisions of PREA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

For additional information concerning PREA implementation, send inquiries to the PREA Management Office at PREACompliance@usdoj.gov and/or review the PREA FAQs.

- Sex Offender Registration and Notification Act (SORNA) – SORNA, which is Title I of the Adam Walsh Child Protection and Safety Act of 2006, mandates a 10 percent reduction in a JAG award to a state that has failed to substantially implement SORNA. Further, states that have substantially implemented SORNA have an ongoing obligation to maintain that status each year. A JAG reduction is applied for each year a jurisdiction has failed to have substantially implemented SORNA.

  A reduction of a FY 2019 JAG award to a state under the provisions of SORNA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

  > IMPORTANT NOTICE
  > Be advised that beginning in FY 2020, OJP will calculate the 10 percent SORNA penalty on the initial allocation to the state (i.e., State's initial allocation x 10% = SORNA penalty).

  For additional information regarding SORNA implementation, including requirements and a list of states that will be affected in FY 2019 by the 10 percent reduction to the JAG award, send inquiries to AskSMART@usdoj.gov. Additional SORNA guidance can be found within the SORNA FAQs.

**Death in Custody Reporting Act (DCRA)**
Beginning in FY 2019, BJA will require reporting from states pursuant to the Death in Custody Reporting Act (DCRA). The Death in Custody Reporting Act requires states and federal law enforcement agencies to report certain information to the Attorney General regarding the death of any person occurring during interactions with law enforcement officers or while in custody. All reporting for DCRA will be submitted via the BJA Performance Management Tool (PMT), located at https://bjapmt.ojp.gov.

For each quarter in a fiscal year, states must either (1) identify all reportable deaths that occurred in

their jurisdictions during the corresponding quarter and provide basic information about the circumstances of the death, or (2) affirm that no reportable death occurred in the state during the reporting period.

A state must complete the required questions related to deaths in custody in the PMT and submit it by the reporting deadline. The reporting deadline to submit the Quarterly Summary is the last day of the month following the close of the quarter. For each quarter, BJA will send two reminders prior to the reporting deadline.

For each reportable death, a state must enter into the PMT:
- The decedent's name, date of birth, gender, race, and ethnicity
- The date, time, and location of the death
- The law enforcement or correctional agency involved
- Manner of death

States must answer all questions in the PMT before they can submit their quarterly reports. If the state does not have sufficient information to complete one of the questions, then the state may select the "unknown" answer, if available, and then identify when the information is anticipated to be obtained.

**A state that fails to comply may, *at the discretion of the Attorney General*, be subject to not more than a 10-percent reduction of the funds that would otherwise be allocated for that fiscal year to the state under the Byrne JAG program. The Department will review the implementation of the penalty in future years.**

**BJA Areas of Emphasis**

BJA recognizes that many state and local criminal justice systems currently face challenging fiscal environments and that an important, cost-effective way to relieve those pressures is to share or leverage resources through cooperation among federal, state, and local law enforcement. BJA intends to focus much of its work on the areas of emphasis described below, and encourages each state recipient of an FY 2019 JAG award to join federal law enforcement agencies across the board in addressing these challenges.

Reducing Violent Crime – Recognizing that crime problems, including felonious possession and use of a firearm and/or gang violence, illegal drug sales and distribution, human trafficking, and other related violent crime, vary from community to community, BJA encourages states to tailor their programs to the local crime issues, and to be data-informed in their work. States should consider investing JAG funds in programs to combat illegal firearms violence, and to improve the process for ensuring that persons prohibited from purchasing firearms (see, e.g., 18 U.S.C. § 922(g)) are prevented from doing so, by using technology such as eTrace and NIBIN to analyze evidence and by enhancing complete, accurate, and timely reporting to the FBI's NICS. States are also encouraged to coordinate with the United States Attorneys and Project Safe Neighborhood (PSN) grantees in order to leverage funding for violence reduction projects, and to coordinate their law enforcement activities with those of federal law enforcement agencies such as the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Drug Enforcement Administration, the United States Marshals Service, and the Department of Homeland Security.

Officer Safety and Wellness – The issue of law enforcement safety and wellness is an important priority for BJA and DOJ. According to the *2018 Preliminary End-of-Year Law Enforcement Fatalities Report*, released by the National Law Enforcement Officers Memorial Fund (NLEOMF), 2018 saw 144 law enforcement law enforcement line-of-duty deaths nationwide. This is a 12 percent increase over 2017, which had 129 line-of-duty deaths. Firearms-related deaths were the leading cause of law enforcement deaths (52) – a 13 percent increase when compared to 2017. Among those deaths, 14 occurred during an attempt to arrest a suspect, 8 while conducting an investigative activity, 6 while responding to a domestic or public disturbance, and 5 as a result of being ambushed. Additionally, there were 50 traffic-related deaths. Forty-two officers died due to circumstances other than firearms or traffic, the majority being job-related illnesses.

Based on the latest report (2017) from the FBI's Law Enforcement Officers Killed and Assaulted (LEOKA) data, there appeared to be a continuing increase in assaults against law enforcement officers between 2016 and 2017. In 2017 there were 60,211 assaults versus 57,180 assaults in 2016. Of those assaulted, 17,476 were injured compared to 16,535 injured in 2016. The 2017 LEOKA data show that 21 officers died as a result of investigative or enforcement duties—6 during pursuits, and 5 were ambushed.

BJA sees a vital need to continue to focus on tactical officer safety concerns and on the health and wellness of law enforcement as they may have a direct effect on officer performance and safety. It is important for law enforcement to have the necessary tactical skills, and also be physically and mentally well, to perform, survive, and be resilient in the face of the demanding duties of the profession. BJA encourages states to use JAG funds to address these needs by providing training, and paying for tuition and travel expenses related to attending trainings such as those available through the BJA VALOR Initiative and soon to be available through the National Officer Safety Initiatives Program, and funding for health and wellness programs for law enforcement officers. JAG funding may also be used for attendance to officer safety and wellness conferences to enhance law enforcement education and awareness with the goal of preventing officer injury and/or death.

Southwest Border Rural Law Enforcement – Securing U.S. borders (and internationally accessible waterways and airports) is critically important to the reduction, intervention, and prevention of transnational drug-trafficking networks, gangs, and combating all forms of human trafficking and related sexual assaults within the United States (including sex and labor trafficking of foreign nationals and U.S. citizens of all sexes and ages). Smuggling and trafficking operations to, from, and within the United States contribute to a significant increase in violent crime and U.S. deaths, to include law enforcement. BJA encourages states using JAG funds to support law enforcement hiring, training, and technology enhancement and information sharing, cooperation, and coordination among federal, state, local, tribal, and territorial law enforcement agencies to help address these problems.

Responding to the Opioid Crisis – The opioid crisis is a public health emergency and responding to the crisis is one of DOJ's top priorities. In 2017, more than 72,000 Americans lost their lives to drug overdoses, according to the Centers for Disease Control and Prevention. In 2016, 63,632 Americans died from fatal drug overdoses and 52,404 died in 2015 (CDC). The majority of these deaths can be attributed to opioids. Law enforcement

plays a vital role in efforts to stem overdoses, save lives, and fight illegal opioid distribution and abuse. BJA encourages local governments to use JAG funds to support law enforcement actions to fight the opioid epidemic such as addressing the supply of both diverted prescription drugs and illegal drugs, and supporting first responders when encountering overdoses. JAG funds can also be used for training and safety measures to prepare for potential encounters with synthetic opioids such as fentanyl. This may include covering the cost of providing naloxone to all officers and the cost of fentanyl detection testing.

**Objectives**

In general, the FY 2019 JAG Program is designed to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice. Although the JAG Program provides assistance directly to states, through pass-through (and similar) requirements, the JAG Program also is designed to assist units of local government with respect to criminal justice.

As discussed in more detail in the General Information about Post-federal Award Reporting Requirements discussion, a state that receives an FY 2019 JAG award will be required to produce various types of reports and to submit data related to performance measures and accountability. The objectives and deliverables are directly related to the JAG Program accountability measures described at https://bjapmt.ojp.gov/help/jagdocs.html.

The Objectives are directly related to the performance measures that demonstrate the results of the work completed, as discussed under What an Application Should Include.

**Evidence-based Programs or Practices**

OJP strongly emphasizes the use of data and evidence in policy making and program development in criminal justice, juvenile justice, and crime victim services. For additional information and resources on evidence-based programs or practices, see the OJP Grant Application Resource Guide.

A useful matrix of evidence-based policing programs and strategies is available through the BJA-supported Matrix Demonstration Project. It offers a number of program models designed to effectively implement promising and evidence-based strategies through the BJA Innovation Suite of programs including Innovations in Policing, Prosecution, Supervision, Reentry, and others (see https://www.bja.gov/Programs/CRPPE/innovationssuite.html). BJA encourages states to use JAG funds to support these crime innovation strategies, including effective partnerships with universities and research partners and with nontraditional criminal justice partners.

**Information Regarding Potential Evaluation of Programs and Activities**

Applicants should note OJP may conduct or support an evaluation of the programs and activities funded under this solicitation. For additional information, see the OJP Grant Application Resource Guide section, entitled, "Information Regarding Potential Evaluation of Programs and Activities."

**BJA Success Stories**

The BJA-sponsored Success Stories web page features projects that have demonstrated success or shown promise in reducing crime and positively impacting communities. This web

page is a valuable resource for states, localities, territories, tribes, and criminal justice professionals who seek to identify and learn about JAG and other successful BJA-funded projects linked to innovation, crime reduction, and evidence-based practices. **BJA strongly encourages the submission of success stories annually (or more frequently).**

If a state has a success story it would like to submit, it may be submitted through the My BJA account, using "Add a Success Story" and the Success Story Submission form. Register for a My BJA account using this registration link.

## B. Federal Award Information

| | |
|---|---|
| Maximum number of awards BJA expects to make | 56 |
| Estimated maximum dollar amount for each award | up to $18,056,180 |
| Total amount anticipated to be awarded under solicitation | $176,700,000 |
| Period of Performance start date | October 1, 2018 |
| Period of Performance duration | 4 years |

Recipients have the option to request a one-time, up to 12 month extension. An extension beyond this period may be made on a case-by-case basis, at the discretion of BJA, and must be justified by circumstances beyond the control of the recipient. The extension must be requested via GMS no fewer than 30 days prior to the end of the period for performance.

The expected allocations by state for the FY 2019 JAG program can be found at: https://www.bja.gov/funding/FY18-State-JAG-Web-Allocations.pdf.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by statute.

**Type of Award[2]**
BJA expects to make any award under this solicitation in the form of a grant. See the "Administrative, National Policy, and Other Legal Requirements" section of the OJP Grant Application Resource Guide for a brief discussion of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants (and cooperative agreements).

JAG awards are based on a statutory formula as described below:

Once each fiscal year's overall JAG Program funding level is determined, BJA works with BJS to begin a four-step grant award calculation process, which, in general, consists of:

(1)   Computing an initial JAG allocation for each state, based on its share of violent crime and population (weighted equally).

(2)   Reviewing the initial JAG allocation amount to determine if the state allocation is less than the minimum award amount defined in the JAG legislation (0.25 percent of the total). If this is the case, the state is funded at the minimum level, and the funds required

---

[2] For purposes of this solicitation, the phrase "pass-through entity" includes any recipient or subrecipient that provides a subaward ("subgrant") to carry out part of the funded award or program.

for this are deducted from the overall pool of JAG funds. Each of the remaining states receives the minimum award plus an additional amount based on its share of violent crime and population.

(3)    Dividing each state's final award amount (except for the territories and District of Columbia) between the state and its units of local governments at a rate of 60 and 40 percent, respectively.

(4)    Determining unit of local government award allocations, which are based on their proportion of the state's 3-year violent crime average. If the "eligible award amount" for a particular unit of local government, as determined on this basis, is $10,000 or more, then the unit of local government is eligible to apply directly to OJP (under the JAG Local solicitation) for a JAG award. If the "eligible award amount" to a particular unit of local government, as determined on this basis, would be less than $10,000, however, the funds are not made available for a direct award to that particular unit of local government, but instead are added to the amount that otherwise would have been awarded to the state. (The state's obligations with respect to this additional amount for the "less-than-$10,000 jurisdictions" are summarized above.)

**Financial Management and System of Internal Controls**
Award recipients and subrecipients (including recipients or subrecipients that are pass-through entities) must, as described in the Part 200 Uniform Requirements[3] as set out at 2 C.F.R. 200.303, comply with standards for financial and program management. See OJP Grant Application Resource Guide for additional information.

**Budget Information**

Trust Fund – State administering agencies (SAAs) may draw down JAG funds either in advance or on a reimbursement basis. Nonfederal entities must maintain advance payments of federal awards in interest-bearing accounts, unless regulatory exclusions apply (2 CFR 200.305(b)(8)). Subrecipients that draw down JAG funds in advance are subject to the same requirement and must first establish an interest-bearing account.

Tracking and reporting regarding JAG funds used for state administrative costs – As indicated earlier, up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award. Administrative costs (when utilized) must be tracked separately; a recipient must report in separate financial status reports (SF-425) those expenditures that specifically relate to each particular JAG Award during any particular reporting period.

No commingling – Both the state recipient and all subrecipients of JAG funds are prohibited from commingling funds on a program-by-program or project-by-project basis. **For this purpose, use of the administrative JAG funds to perform work across all active awards in any one year is not considered commingling.**

**Cost Sharing or Match Requirement**
The JAG Program does not require a match. However, if a successful application proposes a

---

[3] The "Part 200 Uniform Requirements" means the DOJ regulation at 2 C.F.R Part 2800, which adopts (with certain modifications) the provisions of 2 C.F.R. Part 200.

voluntary match amount, and OJP approves the budget, the total match amount incorporated into the approved budget becomes mandatory and subject to audit.

For additional cost sharing and match information, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm..

**Pre-agreement Costs (also known as Pre-award Costs)**
Pre-agreement costs are costs incurred by the applicant prior to the start date of the period of performance of the federal award.

OJP does **not** typically approve pre-agreement costs. An applicant must request and obtain the prior written approval of OJP for any such costs. All such costs incurred prior to award and prior to approval of the costs are incurred *at the sole risk* of the applicant. (Generally, no applicant should incur project costs **before** submitting an application requesting federal funding for those costs.) Should there be extenuating circumstances that make it appropriate for OJP to consider approving pre-agreement costs, the applicant may contact the point of contact listed on the title page of this solicitation for the requirements concerning written requests for approval. If approved in advance by OJP, award funds may be used for pre-agreement costs, consistent with the recipient's approved budget and applicable cost principles. See the section on "Costs Requiring Prior Approval" in the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm for more information.

**Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs**
OJP strongly encourages every applicant that proposes to use award funds for any conference-, meeting-, or training-related activity (or similar event) to review carefully—before submitting an application—the OJP and DOJ policy and guidance on approval, planning, and reporting of such events. See OJP Grant Application Resource Guide for information.

**Costs Associated with Language Assistance (if applicable)**
See the OJP Grant Application Resource Guide for information on costs associated with language assistance that may be allowable.

# C. Eligibility Information

For eligibility information, see the title page.

For information on cost sharing or match requirements, see Section B. Federal Award Information.

# D. Application and Submission Information

**What an Application Should Include**
See the "Application Elements and Formatting Instructions" section of the OJP Grant Application Resource Guide for information on, among other things, what happens to an application that does not contain all the specified elements.  (This solicitation expressly modifies the "Application Elements and Formatting Instructions" section of the OJP Grant Application Resource Guide by not incorporating paragraph two of that section (referring to nonresponsive applications or applications missing critical elements not "[proceeding] to peer review").)

1. **Complete the Application for Federal Assistance (Standard Form (SF)-424)**

   The SF-424 is a required standard form used as a cover sheet for submission of pre-applications, applications, and related information. See the OJP Grant Application Resource Guide for additional information on completing the SF-424.

   **Intergovernmental Review:**

   This solicitation ("funding opportunity") **is** subject to Executive Order 12372. An applicant may find the names and addresses of State Single Points of Contact (SPOCs) at the following website: https://www.whitehouse.gov/wp-content/uploads/2017/11/Intergovernmental_-Review-_SPOC_01_2018_OFFM.pdf. If the applicant's state appears on the SPOC list, the applicant must contact the State SPOC to find out about, and comply with, the state's process under E.O. 12372. In completing the SF-424, an applicant whose state appears on the SPOC list is to make the appropriate selection in response to question 19, once the applicant has complied with its State E.O. 12372 process. (An applicant whose state does not appear on the SPOC list should answer question 19 by selecting the response that the: "Program is subject to E.O. 12372, but has not been selected by the State for review.").

2. **Project Identifiers**

   Applications should identify at least three and no more than 10 project identifiers that would be associated with the proposed project activities. The list of identifiers can be found at www.bja.gov/funding/JAGIdentifiers.pdf.

3. **Program Narrative**

   The following sections **should** be included as part of the program narrative[3]:

   (a) <u>Description of the Issue</u> – Identify the state's strategy/funding priorities for the FY 2019 JAG funds, the subgrant award process and timeline, and a description of the programs to be funded over the 4-year grant period. States are strongly encouraged to prioritize the funding of evidence-based projects, the data used to determine these priorities, and data needed for comprehensive planning efforts. The state should describe any barriers to accessing these data, opportunities to improve cross system information sharing, and progress or challenges the state has faced in NIBRS implementation.

   (b) <u>Project Design and Implementation</u> – Describe the state's process for engaging stakeholders from across the justice continuum and how that input informs priorities. This should include a description of how local communities are engaged in the planning process, how state and local planning efforts are coordinated, and the challenges faced in coordination. The applicant should identify the stakeholders representing each purpose area who are participating in the strategic planning process, the gaps in the state's needed resources for

   ---

   [3] For information on subawards (including the details on proposed subawards that should be included in the application), see "Budget and Associated Documentation" under Section D. Application and Submission Information.

   criminal justice purposes, plans to improve the administration of the criminal justice system, and how JAG funds will be coordinated with state and related justice funds. States are strongly encouraged to use an evidence-informed approach to funding decisions and evidence-informed approaches to addressing and preventing violent crime. This includes providing support to subrecipients as they develop data-driven practices and programs.

(c) <u>Capabilities and Competencies</u> – Describe any additional strategic planning/coordination efforts in which the state participates with other criminal justice criminal/juvenile justice agencies in the state. Please provide an overview of any evidence-informed programs that have been implemented successfully and how those programs might inform implementation of plan priorities.

(d) <u>Plan for Collecting the Data Required for this Solicitation's Performance Measures</u> – OJP will require each successful applicant to submit specific performance data that demonstrate the results of the work carried out under the award. The performance data directly relate to the objectives identified under " Objectives" in <u>Section A. Program Description</u>.

Post award, recipients will be required to submit quarterly performance metrics through BJA's PMT, located at <u>https://bjapmt.ojp.gov</u>. The application should describe the applicant's plan for collection of all of the performance measures data listed in the JAG Program accountability measures at: <u>https://bjapmt.ojp.gov/help/jagdocs.html</u>.

Applicants should visit OJP's performance measurement page at <u>www.ojp.gov/performance</u> for an overview of performance measurement activities at OJP.

The application should demonstrate the applicant's understanding of the performance data reporting requirements for this grant program and detail how the applicant will gather the required data should it receive funding.

Please note that applicants are not required to submit performance data with the application. Performance measures information is included as an alert that successful applicants will be required to submit performance data as part of the reporting requirements under an award.

**Note on Project Evaluations**
An applicant that proposes to use award funds through this solicitation to conduct project evaluations should follow the guidance under Note on Project Evaluations in the <u>OJP Grant Application Resource Guide</u>.

**4. Budget Information and Associated Documentation**

See the Budget Preparation and Submission Information section of the <u>OJP Grant Application Resource Guide</u> for details on the Budget Detail Worksheet, and on budget information and associated documentation, such as information on proposed subawards, proposed procurement contracts under awards, and pre-agreement costs. **Please note that the budget narrative should include a full description of all costs, including funds set aside for NIBRS project(s) and administrative costs (if applicable).**

<u>General requirement for federal authorization of any subaward; statutory authorizations of subawards under the JAG Program statute.</u>
Generally, a recipient of an OJP award may not make subawards ("subgrants") unless the recipient has specific federal authorization to do so. Unless an applicable statute or DOJ regulation specifically authorizes (or requires) particular subawards, a recipient

must have authorization from OJP before it may make a subaward.

**JAG subawards that are required or specifically authorized by statute (see 34 U.S.C. § 10152(a) and 34 U.S.C. § 10156) do not require prior approval to authorize subawards. This includes subawards made by states under the JAG Program.** A particular subaward may be authorized by OJP because the recipient included a sufficiently detailed description and justification of the proposed subaward in the application as approved by OJP. If, however, a particular subaward is not authorized by federal statute or regulation, and is not sufficiently described and justified in the application as approved by OJP, the recipient will be required, post-award, to request and obtain written authorization from OJP before it may make the subaward.

If an applicant proposes to make one or more subawards to carry out the federal award and program, and those subawards are not specifically authorized (or required) by statute or regulation, the applicant should: (1) identify (if known) the proposed subrecipient(s), (2) describe in detail what each subrecipient will do to carry out the federal award and federal program, and (3) provide a justification for the subaward(s), with details on pertinent matters such as special qualifications and areas of expertise. Pertinent information on subawards should appear not only in the Program Narrative but also in the Budget Detail Worksheet and budget narrative.

5. **Indirect Cost Rate Agreement (if applicable)**

   See the Budget Preparation and Submission Information section of the OJP Grant Application Resource Guide for information.

6. **Financial Management and System of Internal Controls Questionnaire (including applicant disclosure of high-risk status)**
   Every OJP applicant (other than an individual applying in his or her personal capacity) is required to download, complete, and submit the OJP Financial Management and System of Internal Controls Questionnaire (Questionnaire) at https://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf as part of its application. See the OJP Grant Application Resource Guide for additional information and submission instructions for this Questionnaire.

7. **Disclosure of Lobbying Activities**
   Each applicant must complete and submit this information. See the OJP Grant Application Resource Guide for additional information and submission instructions for this disclosure.

8. **Certifications and Assurances by the Chief Executive of the Applicant Government** A A JAG application is not complete, and a state may not access award funds, unless the chief executive of the applicant state (e.g., the governor) properly executes, and the state submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix A.

   Please note that this certification takes the place of the review narrative attachment and contains assurances that the governing body notification and public comment requirements, which are required under the JAG statute (at 34 U.S.C. § 10153(a)(2)), have been satisfied.

OJP will not deny an application for an FY 2019 award for failure to submit these "Certifications and Assurances by the Chief Executive of the Applicant Government" by the application deadline, but a state will not be able to access award funds (and its award will include a condition that withholds funds) until it submits these certifications and assurances, properly executed by the chief executive of the state (e.g., the governor).

9.  **Applicant Disclosure of Pending Applications**

    Each applicant is to disclose whether it has (or is proposed as a subrecipient under) any pending applications for federally funded grants or cooperative agreements that (1) include requests for funding to support the same project being proposed in the application under this solicitation, and (2) would cover any identical cost items outlined in the budget submitted to OJP as part of the application under this solicitation. For additional information on the submission requirements for this disclosure, see the OJP Grant Application Resource Guide.

10. **Applicant Disclosure and Justification – DOJ High Risk Grantees**[4] **(if applicable)**

    An applicant that is designated as a DOJ High Risk Grantee is to submit in GMS, as a separate attachment to its application, information that OJP will use, among other pertinent information, to determine whether it will consider or select the application for an award under this solicitation. The file should be named "DOJ High Risk Grantee Applicant Disclosure and Justification." (See, also, "Review Process," below, under Section E. Application Review Information, for a brief discussion of how such information may considered in the application review process.) See the OJP Grant Application Resource Guide for additional information and submission instructions for this disclosure.

11. **Research and Evaluation Independence and Integrity**

    If an application proposes research (including research and development) and/or evaluation, the applicant must demonstrate research/evaluation independence and integrity, including appropriate safeguards, before it may receive award funds. For additional information regarding demonstrating research/evaluation independence and integrity, including appropriate safeguards, see the OJP Grant Application Resource Guide.

12. **Additional Attachments**

    (a) **Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**

        Each applicant must provide responses to the following questions as an attachment to the application:
        (1) Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
        (2) Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?
        (3) If yes to either:
            • Please provide a copy of each law or policy.
            • Please describe each practice.

---

[4] A "DOJ High Risk Grantee" is a recipient that has received a DOJ High-Risk designation based on a documented history of unsatisfactory performance, financial instability, management system or other internal control deficiencies, or noncompliance with award terms and conditions on prior awards, or that is otherwise not responsible.

- Please explain how the law, policy, or practice complies with 8 U.S.C. § 1373. See

  Appendix C for a template that applicants may use to prepare this attachment.

Note: Responses to these questions must be provided by the applicant as part of the application. Further, the requirement to provide this information applies to all tiers of funding and for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

OJP will not deny an application for an FY 2019 award for failure to submit these required responses by the application deadline, but a recipient will not receive award funds (and its award will include a condition that withholds funds) until it submits these responses.

**(b) State Governing Body Review**
Applicants must submit a properly executed Certification and Assurances by the chief executive (see Appendix A), which documents that the JAG application was made available for review by the governing body of the state, or to an organization designated by that governing body, for a period that was not less than 30 days before the application was submitted to BJA. The same Chief Executive Certification will also specify that an opportunity to comment on this application was provided to citizens prior to the application submission to the extent applicable law or established procedures make such opportunity available. In the past, applicants were required to submit specific review dates; now, OJP will only accept a governor's certification to attest to these facts. States may continue to submit actual dates of review, should they wish to do so, in addition to the submission of the Chief Executive Certification.

(c) **State Strategic Plan and Annual Report (required for FY 2019)**
For 2019, states must submit a comprehensive Statewide Strategic Plan with their application. Additionally, in any year in which the Statewide Strategic Plan is not fully updated, states must also submit a brief "Annual Report" with their application.

The Statewide Strategic Plan, which must be updated at least every 5 years, should:

- Be designed in consultation with local governments and representatives of all segments of the criminal justice system, including judges, prosecutors, law enforcement personnel, corrections personnel, and providers of indigent defense services, victim services, juvenile justice delinquency prevention programs, community corrections, and reentry services.
- Include details of how grants will be used to improve the administration of the criminal justice system.
- Include a description of how the state will allocate funding within and among each of the JAG Program areas.
- Describe the process used by the state for gathering data and developing and using evidence-based and evidence-gathering approaches in support of funding decisions.
- Describe the barriers at the state and local levels for accessing data and implementing evidence-based approaches to preventing and reducing crime and recidivism.

The Annual Report (required in the years between full Statewide Strategic Plan updates), intended to provide a summary update of program implementation efforts as detailed in the Statewide Strategic Plan, should:

- Discuss changing circumstances in the state, if any, since the strategic plan was adopted.
- Describe how the state plans to adjust funding within and among each of the JAG Program areas.
- Provide an ongoing assessment of need.
- Discuss the accomplishment of goals identified in the strategic plan.
- Reflect how the plan influenced funding decisions in the previous year.

States that submit incomplete or minimal Statewide Strategic Plans with their applications will be recommended by BJA for training and technical assistance. If no plan is attached, an annual report is missing, or a submitted strategic plan or annual report clearly fails to discuss the required elements described above, technical assistance will be required and funds may be withheld until a minimally sufficient strategic plan and/or annual report is submitted.

Training and technical assistance (TTA) is available from The National Criminal Justice Association to assist states with the development of their strategic planning processes and plans. To help ensure that states consider the impact of JAG funding decisions across the entire criminal justice system, BJA strongly encourages each state to involve all criminal justice system stakeholders in the strategic planning process. The strategic planning process should reflect input from all segments of the criminal justice system including local governments, judges, prosecutors, law enforcement and corrections personnel, providers of indigent defense services, victim services, juvenile justice and delinquency prevention programs, parole and probation services, and reentry services. For more information, see the National Criminal Justice Association Justice Planning website at http://www.ncja.org/ncja-services.

**How to Apply**
An applicant must submit its application through the Grants Management System (GMS), which provides support for the application, award, and management of awards at OJP. Find information, registration and submission steps on how to apply in GMS in response to this solicitation under **How to Apply (GMS)** in the OJP Grant Application Resource Guide.

# E. Application Review Information

**Review Process**
OJP is committed to ensuring a fair and open process for making awards. BJA reviews the application to make sure that the information presented is reasonable, understandable, measurable, and achievable, as well as consistent with the solicitation. See the OJP Grant Application Resource Guide for information on the application review process for this solicitation.

In addition, if OJP anticipates that an award will exceed $250,000 in federal funds, OJP also must review and consider any information about the applicant that appears in the non-public segment of the integrity and performance system accessible through SAM (currently, the Federal Awardee

Performance and Integrity Information System, FAPIIS).

**Important note on FAPIIS:** An applicant, at its option, may review and comment on any information about itself that currently appears in FAPIIS and was entered by a federal awarding agency. OJP will consider any such comments by the applicant, in addition to the other information in FAPIIS, in its assessment of the risk posed by the applicant.

Absent explicit statutory authorization or written delegation of authority to the contrary, the Assistant Attorney General will make all final award decisions.

# F. Federal Award Administration Information

**Federal Award Notices**
See the OJP Grant Application Resource Guide for information on award notifications and instructions.

**Administrative, National Policy, and Other Legal Requirements**
OJP strongly encourages prospective applicants to review information on post-award legal requirements and common OJP award conditions **prior** to submitting an application. See the OJP Grant Application Resource Guide for additional information on administrative, national policy, and other legal requirements.

**Information Technology (IT) Security Clauses**
An application in response to this solicitation may require inclusion of information related to information technology security. See the OJP Grant Application Resource Guide for information on information technology security.

**Statutory and Regulatory Requirements; Award Conditions**
If selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with award conditions and all applicable requirements of federal statutes and regulations (including applicable requirements referred to in the assurances and certifications executed at the time of award acceptance).

OJP strongly encourages prospective applicants to review information on post-award legal requirements generally applicable to FY 2019 OJP awards and common OJP award conditions **prior** to submitting an application.

Individual FY 2019 awards made pursuant to this solicitation will, as appropriate and to the extent consistent with law, include conditions that will require the recipient (and any subrecipient) that accepts the award to do various things, with respect to the "program or activity" that would receive federal financial assistance thereunder. **Although the specific terms of each of those conditions are what will govern the awards**, included among such conditions will be some that, **generally speaking**, will require the recipient (and any subrecipient) that accepts the award to do some or all of the following:

- Not to violate 8 U.S.C. § 1373 (prohibiting restrictions on—
    (1) communication to/from the Department of Homeland Security ("DHS") of
        information regarding the citizenship or immigration status of any individual; and

    (2) maintaining, or exchanging with any government entity, information regarding
      the immigration status of any individual).

- Not to violate 8 U.S.C. § 1644 (prohibiting restrictions on communication to/from DHS of information regarding the immigration status of an alien).

- Not to publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield certain individuals from detection, including in violation of 18 U.S.C. §§ 1071 or 1072, or 8 U.S.C. § 1324(a).

- Not to impede the exercise of the authority of the Federal government under 8 U.S.C. § 1266(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released") and 8 U.S.C. § 1231(a)(4) (relating to removal from the United States of aliens after detention/confinement at the federal, state, and local level), specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act.

- Not to impede the exercise by DHS agents, "anywhere in or outside the United States" (8 C.F.R. § 287.5(a)(1)), of their authority under 8 U.S.C. § 1357(a)(1) to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," specifically by requiring such recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States.

The reasonable costs (to the extent not reimbursed under any other federal program) of complying with these conditions, including honoring any duly authorized request from DHS that is encompassed by these conditions, will be allowable costs under the award.

**General Information about Post-federal Award Reporting Requirements**
In addition to the objectives described in Section A. Program Description, any recipient of an award under this solicitation will be required to submit the following reports and data.

Required reports. Recipients typically must submit quarterly financial status reports, semi-annual progress reports, final financial and progress reports, and, if applicable, an annual audit report in accordance with the Part 200 Uniform Requirements or specific award conditions. Future awards and fund drawdowns may be withheld if reports are delinquent. (In appropriate cases, OJP may require additional reports.)

See the OJP Grant Application Resource Guide for additional information on specific post-award reporting requirements, including performance measures data.

Accountability metrics data must be submitted through BJA's Performance Measurement Tool (PMT), available at https://bjapmt.ojp.gov. The accountability measures are available at: https://bjapmt.ojp.gov/help/jagdocs.html. (Note that if a law enforcement agency receives JAG funds from a state, the state must submit quarterly accountability metrics data related to training that officers have received on use of force, racial and ethnic bias, de-escalation of conflict, and

constructive engagement with the public.)

OJP may restrict access to award funds if a recipient of an OJP award fails to report required performance measure data in a timely manner.

# G. Federal Awarding Agency Contact(s)

For OJP contact(s), see page 2 of this solicitation.

For contact information for GMS, see page 2.

# H. Other Information

**Freedom of Information and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)**
All applications submitted to OJP (including all attachments to applications) are subject to the federal Freedom of Information Act (FOIA) and to the Privacy Act. See the OJP Grant Application Resource Guide for information on DOJ and OJP processes with regard to application information requested pursuant to FOIA.

**Provide Feedback to OJP**
To assist OJP in improving its application and award processes, OJP encourages applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. See the OJP Grant Application Resource Guide for information on providing solicitation feedback to OJP

**Appendix A**

**Certifications and Assurances by the Chief Executive of the Applicant Government**

**Template for use by the chief executive of the state (e.g., the governor)**

Visit https://www.bja.gov/Funding/FY2019StateJAGCEOCertification.pdf  to download the most up-to-date version.

**Note:** By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa.

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**Edward Byrne Justice Assistance Grant Program FY 2019 State Solicitation**

**Certifications and Assurances**
**by the Chief Executive of the Applicant Government**

On behalf of the applicant "State" named below, in support of that State's application for an award under the FY 2019 Edward Byrne Justice Assistance Grant ("JAG") Program, and further to 34 U.S.C. § 10153(a), I certify to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1.  I am the chief executive of the applicant State named below, and I have the authority to make the following representations on my own behalf as chief executive and on behalf of the applicant State. I understand that these representations will be relied upon as material in any OJP decision to make an award, under the application described above, to the applicant State.

2.  I certify that no federal funds made available by the award (if any) that OJP makes based on the application described above will be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

3. I assure that the application described above (and any amendment to that application) was submitted for review to the governing body of the State (e.g., the State legislature), or to an organization designated by that governing body, not less than 30 days before the date of this certification.

4.  I assure that, before the date of this certification— (a) the application described above (and any amendment to that application) was made public; and (b) an opportunity to comment on that application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure made such an opportunity available.

5.  I assure that, for each fiscal year of the award (if any) that OJP makes based on the application described above, the applicant State will maintain and report such data, records, and information (programmatic and financial), as OJP may reasonably require.

6.  I have carefully reviewed 34 U.S.C. § 10153(a)(5), and, with respect to the programs to be funded by the award (if any), I hereby make the certification required by section 10153(a)(5), as to each of the items specified therein..

_____          _____
Signature of Chief Executive of the Applicant "State"          Date of Certification

_____          _____
Printed Name of Chief Executive          Title of Chief Executive

_____          _____
Name of Applicant State

**Rev. March 6, 2019**

Appendix B

**Certain relevant federal laws, as in effect on April 8, 2019**

**U.S.C. § 1373**

**Communication between government agencies and the Immigration and Naturalization Service**

  **(a)**      **In general**
Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

  **(b)**      **Additional authority of government entities**
Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
    **(1)**    Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
    **(2)**    Maintaining such information.
    **(3)**    Exchanging such information with any other Federal, State, or local government entity.

  **(c)**      **Obligation to respond to inquiries**
The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**8 U.S.C. § 1644**

**Communication between State and local government agencies and Immigration and Naturalization Service**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**8 U.S.C. § 1226(a) & (c)**

**Apprehension and detention of aliens**
  (a)      Arrest, detention, and release
On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--

(1) may continue to detain the arrested alien; and

    (2) may release the alien on--

        (A)    bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

        (B)    conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

(c)Detention of criminal aliens

    (1)  Custody

The Attorney General shall take into custody any alien who--

        (A)  is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

        (B)  is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

        (C)  is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence to a term of imprisonment of at least 1 year, or

        (D)  is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

    (2)  Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

### 8 U.S.C. § 1231(a)(4)

(a)      Detention, release, and removal of aliens ordered removed
***

### (4) Aliens imprisoned, arrested, or on parole, supervised release, or probation

### (A)  In general

Except as provided in section 259(a) of title 42 and paragraph (2), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

**(B) Exception for removal of nonviolent offenders prior to completion of sentence of imprisonment**

The Attorney General is authorized to remove an alien in accordance with applicable procedures under this chapter before the alien has completed a sentence of imprisonment-

> (i) in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 1101(a)(43)(B), (C), (E), (I), or (L) of this title and (II) the removal of the alien is appropriate and in the best interest of the United States; or
>
> (ii) in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 1101(a)(43)(C) or (E) of this title), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

**(C) Notice**

Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

**(D) No private right**

No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.


**8 U.S.C. § 1324(a)**

**Bringing in and harboring certain aliens**

(a)          **Criminal penalties**

(1)(A) Any person who—

> (i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;
>
> (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;
>
> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

i.      (v)(I) engages in any conspiracy to commit any of the preceding acts, or

ii.     (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

(B)  A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

(i) in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under title 18, imprisoned not more than 10 years, or both;

(ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, imprisoned not more than 5 years, or both;

(iii) in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365 of title 18) to, or places in jeopardy the life of, any person, be fined under title 18, imprisoned not more than 20 years, or both; and

(iv) in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under title 18, or both.

(C) It is not a violation of clauses (ii) or (iii) of subparagraph (A), or of clause (iv) of subparagraph (A) except where a person encourages or induces an alien to come to or enter the United States, for a religious denomination having a bona fide nonprofit, religious organization in the United States, or the agents or officers of such denomination or organization, to encourage, invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, notwithstanding the provision of room, board, travel, medical assistance, and other basic living expenses, provided the minister or missionary has been a member of the denomination for at least one year.

(2)     Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs-

(A)     be fined in accordance with title 18 or imprisoned not more than one year, or both; or

(B)     in the case of-

(i)      an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,

(ii)     an offense done for the purpose of commercial advantage or private financial gain, or

(iii)    an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

be fined under title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of

subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

(3)(A) Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18 or imprisoned for not more than 5 years, or both.

> (B)     An alien described in this subparagraph is an alien who-
>> (i)   is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and
>> (ii)  has been brought into the United States in violation of this subsection.

(4)     In the case of a person who has brought aliens into the United States in violation of this subsection, the sentence otherwise provided for may be increased by up to 10 years if-

> (A) the offense was part of an ongoing commercial organization or enterprise;
> (B) aliens were transported in groups of 10 or more; and
> (C)(i) aliens were transported in a manner that endangered their lives; or
> (ii) the aliens presented a life-threatening health risk to people in the United States.


## 8 U.S.C. § 1357(a)

### Powers of immigration officers and employees

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

> **(1)**     to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
> **(2)**     to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;
> **(3)**     within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;
> **(4)**     to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and
> **(5)**     to make arrests-

(A) for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

(B) for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.

**8 U.S.C. § 1366(1) & (3)**

**Annual report on criminal aliens**
Not later than 12 months after September 30, 1996, and annually thereafter, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing—

(1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense;

\*\*\*

(3)      programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal; . . . .

**Appendix C**


**Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**

Each applicant must provide responses to the following questions as an attachment to the application:

> (1)      Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
>
> (2)      Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?
>
> (3)      If yes to either:
> - Please provide a copy of each law or policy;
> - Please describe each practice; and
> - Please explain how the law, policy, or practice complies with section 1373.

**Note:** Responses to these questions must be provided by the applicant to BJA as part of the JAG application. Further, the requirement to provide this information applies to all tiers of JAG funding, for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of JAG funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

**Appendix D**

Additional purposes for which JAG funds awarded to a state under this FY 2019 solicitation may be used:

**(a)**           To enforce state and local laws that establish offenses similar to offenses established in 21 U.S.C. § 801 et seq., to improve the functioning of the **criminal justice** system, with emphasis on violent crime and serious offenders, by means including providing additional personnel, equipment, training, technical assistance, and information systems for the more widespread apprehension, prosecution, adjudication, detention, and rehabilitation of persons who violate these laws, and to assist the victims of such crimes (other than compensation), including—

>           (1)           demand-reduction education programs in which law enforcement officers participate;
>           (2)           multi-jurisdictional task-force programs that integrate federal, state, and local drug-law-enforcement agencies and prosecutors for the purpose of enhancing inter-agency co-ordination and intelligence, and facilitating multi-jurisdictional investigations;
>           (3)           programs designed to target the domestic sources of controlled and illegal substances, such as precursor chemicals, diverted pharmaceuticals, clandestine laboratories, and cannabis cultivations;
>           (4)           providing community and neighborhood programs that assist citizens in preventing and controlling crime, including special programs that address the problems of crimes committed against the elderly and special programs for rural jurisdictions;
>           (5)           disrupting illicit commerce in stolen goods and property;
>           (6)           improving the investigation and prosecution of white-collar crime, organized crime, public-corruption crimes, and fraud against the government, with priority attention to cases involving drug-related official corruption;
>           (7)      (A)           improving the operational effectiveness of law enforcement through the use of crime-analysis techniques, street-sales enforcement, schoolyard-violator programs, and gang-related and low-income-housing drug-control programs; and
> >           (B)           developing and implementing anti-terrorism plans for deep-draft ports, international airports, and other important facilities;
>           (8)           career-criminal prosecution programs, including the development of proposed model drug-control legislation;
>           (9)           financial investigative programs that target the identification of money-laundering operations and assets obtained through illegal drug trafficking, including the development of proposed model legislation, financial investigative training, and financial information-sharing systems;
>           (10)           improving the operational effectiveness of the court process, by expanding prosecutorial, defender, and judicial resources, and implementing court-delay-reduction programs;'
>           (11)           programs designed to provide additional public correctional resources and improve the corrections system, including treatment in prisons and jails, intensive-supervision programs, and long-range corrections and sentencing strategies;

providing prison-industry projects designed to place inmates in a realistic

working and training environment that will enable them to acquire marketable skills and to make financial payments for restitution to their victims, for support of their own families, and for support of themselves in the institution;

(12)      providing programs that identify and meet the treatment needs of adult and juvenile drug-dependent and alcohol-dependent offenders;

(13)      developing and implementing programs that provide assistance to jurors and witnesses, and assistance (other than compensation) to victims of crimes;

(15)(A) developing programs to improve drug-control technology, such as pretrial drug-testing programs, programs that provide for the identification, assessment, referral to treatment, case-management and monitoring of drug- dependent offenders, and enhancement of state and local forensic laboratories; and

> (B)      developing programs to improve **criminal justice** information systems (including automated fingerprint identification systems) to assist law enforcement, prosecution, courts, and corrections organizations;

(16)      innovative programs that demonstrate new and different approaches to enforcement, prosecution, and adjudication of drug offenses and other serious crimes;

(17)      addressing the problems of drug trafficking and the illegal manufacture of controlled substances in public housing;

(18)      improving the criminal and juvenile justice system's response to domestic and family violence, including spouse abuse, child abuse, and abuse of the elderly;

(19)      drug-control evaluation programs that the state and units of local government may utilize to evaluate programs and projects directed at state drug-control activities;

(20)      providing alternatives to prevent detention, jail, and prison for persons who pose no danger to the community;

(21)      programs of which the primary goal is to strengthen urban enforcement and prosecution efforts targeted at street drug sales;

(22)      programs for the prosecution of driving while intoxicated charges and the enforcement of other laws relating to alcohol use and the operation of motor vehicles;

(23)      programs that address the need for effective bindover systems for the prosecution of violent 16- and 17-year-old juveniles, in courts with jurisdiction over adults, for the crimes of—

> (A)   murder in the first degree;
> (B)   murder in the second degree;
> (C)   attempted murder;
> (D)   armed robbery when armed with a firearm;
> (E)   aggravated battery or assault when armed with a firearm;
> (F)   criminal sexual penetration when armed with a firearm; and
> (G)   drive-by shootings as described 18 U.S.C. § 36;

(24)      law-enforcement and prevention programs relating to gangs or to youth who are involved or at risk of involvement in gangs;

(25)      developing or improving, in a forensic laboratory, a capability to analyze DNA for identification purposes; and

**(b)** developing and implementing anti-terrorism training programs and procuring equipment for use by local law-enforcement authorities; and To reduce crime and improve public safety, including but not limited to, the following:

(1)(A) hiring, training, and employing on a continuing basis new, additional law enforcement officers and necessary support personnel;

(B) paying overtime to presently-employed law enforcement officers and necessary support personnel for the purpose of increasing the number of hours worked by such personnel; and

(C) procuring equipment, technology, and other material directly related to basic law-enforcement functions;

(2) enhancing security measures—

(A) in and around schools; and

(B) in and around any other facility or location that is considered by the unit of local government to have a special risk for incidents of crime;

(3) establishing crime-prevention programs that may, though not exclusively, involve law-enforcement officials and that are intended to discourage, disrupt, or interfere with the commission of criminal activity, including neighborhood-watch and citizen-patrol programs, sexual-assault and domestic-violence programs, and programs intended to prevent juvenile crime;

(4) establishing or supporting drug courts;

(5) establishing early-intervention and -prevention programs for juveniles, in order to reduce or eliminate crime;

(6) enhancing the adjudication process of cases involving violent offenders, including violent juvenile offenders;

(7) enhancing programs under **(a)**, above;

(8) establishing co-operative task forces between adjoining units of local government to work co-operatively to prevent and combat criminal activity, particularly criminal activity that is exacerbated by drug- or gang-related involvement; and establishing a multi-jurisdictional task force, particularly in rural areas, composed of law-enforcement officials representing units of local government, that works with federal law-enforcement officials to prevent and control crime.

**Appendix E**
**Application Checklist**

**Edward Byrne Memorial Justice Assistance Grant (JAG)**
**Program: FY 2019 State Solicitation**

This application checklist has been created as an aid in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in GMS:*
_____ Acquire a DUNS Number                    (see the OJP
Grant Application Resource Guide)
_____ Acquire or renew registration with SAM                    (see the OJP
Grant Application Resource Guide)
*To Register with GMS*:
_____ For new users, acquire a GMS username and password*                    (see the OJP
Grant Application Resource Guide)
_____ For existing users, check GMS username and password* to ensure account access
(see the OJP Grant Application Resource Guide)
_____ Verify SAM registration in GMS                    (see the OJP
Grant Application Resource Guide)
_____ Search for correct funding opportunity in GMS                    (see the OJP
Grant Application Resource Guide)
_____ Select correct funding opportunity in GMS                    (see the OJP
Grant Application Resource Guide)
_____ Register by selecting the "Apply Online" button associated with the funding opportunity
title    (see the OJP Grant Application Resource Guide)
_____ Read OJP policy and guidance on conference approval, planning, and reporting
available at ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm
(see page 18)
_____ If experiencing technical difficulties in GMS, contact the NCJRS Response Center
(see page 2)

*Password Reset Notice – GMS users are reminded that while password reset capabilities exist,
this function is only associated with points of contact designated within GMS at the time the
account was established. Neither OJP nor the GMS Help Desk will initiate a password reset
unless requested by the authorized official or a designated point of contact associated with an
award or application.

**Overview of Post-Award Legal Requirements:**

_____ Review the "Overview of Legal Requirements Generally Applicable to OJP Grants and
Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at
https://ojp.gov/funding/index.htm.

**Scope Requirement:**

_____ The federal amount requested is within the allowable limit(s) of the FY 2019 JAG Allocations List as listed on BJA's JAG web page.

**Eligibility Requirement:**

Only states may apply under this solicitation. By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa. (Throughout this solicitation, each reference to a state or states includes all 56 jurisdictions.)

**What an Application Should Include:**

_____ Application for Federal Assistance (SF-424)                      (see page 18)
_____ Intergovernmental Review                                         (see page 18)
_____ Program Narrative                                                (see page 19)
_____ Budget Detail Worksheet                                          (see page 20)
_____ Budget Narrative                                                 (see page 20)
_____ Indirect Cost Rate Agreement (if applicable)                     (see page 21)
_____ Financial Management and System of Internal Controls Questionnaire    (see page 21)
_____ Disclosure of Lobbying Activities (SF-LLL) (if applicable)       (see page 21)
_____ Certifications and Assurances by Chief Executive                 (see page 21)
_____ Applicant Disclosure of Pending Applications          (see page 21)
_____ Applicant Disclosure and Justification – DOJ High Risk Grantees (if applicable)
      (see page 22)
_____ Research and Evaluation Independence and Integrity (if applicable)    (see page 29)

Additional Attachments
_____Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)                 (see page 22)
_____State Governing Body Review                           (see page 22)
_____ State Strategic Plan (if applicable)                 (see page 23)

Exhibit 7



**U.S. Department of Justice**

Office of Justice Programs

---

Office of the Assistant Attorney General          *Washington, D.C. 20531*

September 24, 2019

Ms. Kathleen Howard
California Board of State and Community Corrections
2590 Venture Oaks Way, Ste. 200
Sacramento, CA 95833-3200

Dear Ms. Howard:

On behalf of Attorney General William P. Barr, it is my pleasure to inform you that the Office of Justice Programs has
approved your application for funding under the FY 19 Title II in the amount of $4,532,679 for California Board of State and
Community Corrections.

Enclosed you will find the Grant Award and Special Conditions documents.  This award is subject to all administrative and
financial requirements, including the timely submission of all financial and programmatic reports, resolution of all interim
audit findings, and the maintenance of a minimum level of cash-on-hand.  Should you not adhere to these requirements, you
will be in violation of the terms of this agreement and the award will be subject to termination for cause or other administrative
action as appropriate.

If you have questions regarding this award, please contact:

-   Program Questions, Ricco Hall, Program Manager at (202) 616-3807; and

-   Financial Questions, the Office of the Chief Financial Officer, Customer Service Center (CSC) at
    (800) 458-0786, or you may contact the CSC at ask.ocfo@usdoj.gov.

Congratulations, and we look forward to working with you.

Sincerely,

Katharine T. Sullivan
Principal Deputy Assistant Attorney General

Enclosures



**U.S. Department of Justice**

Office of Justice Programs

*Office of Civil Rights*

_____

*Washington, DC 20531*

September 24, 2019

Ms. Kathleen Howard
California Board of State and Community Corrections
2590 Venture Oaks Way, Ste. 200
Sacramento, CA 95833-3200

Dear Ms. Howard:

Congratulations on your recent award!  The Office for Civil Rights (OCR), Office of Justice Programs (OJP), U.S. Department of Justice (DOJ) has been delegated the responsibility for ensuring that recipients of federal financial assistance from the OJP, the Office of Community Oriented Policing Services (COPS), and the Office on Violence Against Women (OVW) are not engaged in discrimination prohibited by law.  Several federal civil rights laws, such as Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, require recipients of federal financial assistance to give assurances that they will comply with those laws.  In addition to those civil rights laws, many grant program statutes contain nondiscrimination provisions that require compliance with them as a condition of receiving federal financial assistance.  For a complete review of these civil rights laws and nondiscrimination requirements, in connection with OJP and other DOJ awards, see https://ojp.gov/funding/Explore/LegalOverview/CivilRightsRequirements.htm

Under the delegation of authority, the OCR investigates allegations of discrimination against recipients from individuals, entities, or groups.  In addition, the OCR conducts limited compliance reviews and audits based on regulatory criteria.  These reviews and audits permit the OCR to evaluate whether recipients of financial assistance from the Department are providing services in a non-discriminatory manner to their service population or have employment practices that meet equal-opportunity standards.

If you are a recipient of grant awards under the Omnibus Crime Control and Safe Streets Act or the Juvenile Justice and Delinquency Prevention Act and your agency is part of a criminal justice system, there are two additional obligations that may apply in connection with the awards:  (1) complying with the regulation relating to Equal Employment Opportunity Programs (EEOPs); and (2) submitting findings of discrimination to OCR.  For additional information regarding the EEOP requirement, see 28 CFR Part 42, subpart E, and for additional information regarding requirements when there is an adverse finding, see 28 C.F.R. §§ 42.204(c), .205(c)(5).  Please submit information about any adverse finding to the OCR at the above address.

We at the OCR are available to help you and your organization meet the civil rights requirements that are associated with OJP and other DOJ grant funding.  If you would like the OCR to assist you in fulfilling your organization's civil rights or nondiscrimination responsibilities as a recipient of federal financial assistance, please do not hesitate to let us know.

Sincerely,

Michael L. Alston
Director

cc:   Grant Manager
       Financial Analyst

| | | |
|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Office of Juvenile Justice and Delinquency Prevention** | **Grant** | PAGE  1   OF  18 |

| | |
|---|---|
| 1. RECIPIENT NAME AND ADDRESS (Including Zip Code)<br><br>California Board of State and Community Corrections<br>2590 Venture Oaks Way, Ste. 200<br>Sacramento, CA 95833-3200 | 4. AWARD NUMBER:   2019-JX-FX-0026<br><br>5. PROJECT PERIOD: FROM       10/01/2019   TO   09/30/2023<br><br>      BUDGET PERIOD: FROM       10/01/2019   TO   09/30/2023 |

| | | |
|---|---|---|
| | 6. AWARD DATE   09/24/2019 | 7. ACTION |
| 2a. GRANTEE IRS/VENDOR NO.<br>680282717 | 8. SUPPLEMENT NUMBER<br>00 | Initial |
| 2b. GRANTEE DUNS NO.<br>949095731 | 9. PREVIOUS AWARD AMOUNT | $ 0 |
| 3. PROJECT TITLE<br>FY19 Title II Grant Program | 10. AMOUNT OF THIS AWARD | $ 4,532,679 |
| | 11. TOTAL AWARD | $ 4,532,679 |

12. SPECIAL CONDITIONS

THE ABOVE GRANT PROJECT IS APPROVED SUBJECT TO SUCH CONDITIONS OR LIMITATIONS AS ARE SET FORTH
ON THE ATTACHED PAGE(S).

13. STATUTORY AUTHORITY FOR GRANT

This project is supported under FY19(OJJDP - Part B – Formula award to State – may include prior year) 34 USC 11131; title I of Public Law 90-351 (generally
codified at 34 USC ch. 101); 28 USC 530C(a)

14 . CATALOG OF DOMESTIC FEDERAL ASSISTANCE (CFDA Number)

16.540 - Juvenile Justice and Delinquency Prevention_Allocation to States

15. METHOD OF PAYMENT

GPRS

| AGENCY APPROVAL | GRANTEE ACCEPTANCE |
|---|---|
| 16. TYPED NAME AND TITLE OF APPROVING OFFICIAL<br><br>Katharine T. Sullivan<br><br>Principal Deputy Assistant Attorney General | 18. TYPED NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL<br><br>Kathleen Howard<br>Executive Director) |

| 17. SIGNATURE OF APPROVING OFFICIAL | 19. SIGNATURE OF AUTHORIZED RECIPIENT OFFICIAL | 19A. DATE |
|---|---|---|
| | | |

AGENCY USE ONLY

| 20. ACCOUNTING CLASSIFICATION CODES | 21.  UJXTGT0158 |
|---|---|

| FISCAL<br>YEAR | FUND<br>CODE | BUD.<br>ACT. | OFC. | DIV.<br>REG. | SUB. | POMS | AMOUNT |
|---|---|---|---|---|---|---|---|
| X | F | JX | 70 | 00 | 00 | | 4532679 |

OJP FORM 4000/2 (REV. 5-87) PREVIOUS EDITIONS ARE OBSOLETE.

OJP FORM 4000/2 (REV. 4-88)

|  | U.S. Department of Justice<br>Office of Justice Programs<br>**Office of Juvenile Justice and Delinquency Prevention** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE  2  OF  18 |
|---|---|---|---|

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |

*SPECIAL CONDITIONS*

1. Requirements of the award; remedies for non-compliance or for materially false statements

The conditions of this award are material requirements of the award.  Compliance with any assurances or certifications submitted by or on behalf of the recipient that relate to conduct during the period of performance also is a material requirement of this award.  By signing and accepting this award on behalf of the recipient, the authorized recipient official accepts all material requirements of the award, and specifically adopts all such assurances or certifications as if personally executed by the authorized recipient official.

Failure to comply with any one or more of these award requirements -- whether a condition set out in full below, a condition incorporated by reference below, or an assurance or certification related to conduct during the award period -- may result in the Office of Justice Programs ("OJP") taking appropriate action with respect to the recipient and the award.  Among other things, the OJP may withhold award funds, disallow costs, or suspend or terminate the award.  The U.S. Department of Justice ("DOJ"), including OJP, also may take other legal action as appropriate.

Any materially false, fictitious, or fraudulent statement to the federal government related to this award (or concealment or omission of a material fact) may be the subject of criminal prosecution (including under 18 U.S.C. 1001 and/or 1621, and/or 34 U.S.C. 10271-10273), and also may lead to imposition of civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. 3729-3730 and 3801-3812).

Should any provision of a requirement of this award be held to be invalid or unenforceable by its terms, that provision shall first be applied with a limited construction so as to give it the maximum effect permitted by law.  Should it be held, instead, that the provision is utterly invalid or -unenforceable, such provision shall be deemed severable from this award.

2. Applicability of Part 200 Uniform Requirements

The Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted and supplemented by DOJ in 2 C.F.R. Part 2800 (together, the "Part 200 Uniform Requirements") apply to this FY 2019 award from OJP.

The Part 200 Uniform Requirements were first adopted by DOJ on December 26, 2014.  If this FY 2019 award supplements funds previously awarded by OJP under the same award number (e.g., funds awarded during or before December 2014), the Part 200 Uniform Requirements apply with respect to all funds under that award number (regardless of the award date, and regardless of whether derived from the initial award or a supplemental award) that are obligated on or after the acceptance date of this FY 2019 award.

For more information and resources on the Part 200 Uniform Requirements as they relate to OJP awards and subawards ("subgrants"), see the OJP website at https://ojp.gov/funding/Part200UniformRequirements.htm.

Record retention and access:  Records pertinent to the award that the recipient (and any subrecipient ("subgrantee") at any tier) must retain -- typically for a period of 3 years from the date of submission of the final expenditure report (SF 425), unless a different retention period applies -- and to which the recipient (and any subrecipient ("subgrantee") at any tier) must provide access, include performance measurement information, in addition to the financial records, supporting documents, statistical records, and other pertinent records indicated at 2 C.F.R. 200.333.

In the event that an award-related question arises from documents or other materials prepared or distributed by OJP that may appear to conflict with, or differ in some way from, the provisions of the Part 200 Uniform Requirements, the recipient is to contact OJP promptly for clarification.



| | | | |
|---|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Office of Juvenile Justice and<br>Delinquency Prevention** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE   3   OF   18 | |

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

3. Compliance with DOJ Grants Financial Guide

References to the DOJ Grants Financial Guide are to the DOJ Grants Financial Guide as posted on the OJP website (currently, the "DOJ Grants Financial Guide" available at https://ojp.gov/financialguide/DOJ/index.htm), including any updated version that may be posted during the period of performance.   The recipient agrees to comply with the DOJ Grants Financial Guide.

4. Reclassification of various statutory provisions to a new Title 34 of the United States Code

On September 1, 2017, various statutory provisions previously codified elsewhere in the U.S. Code were editorially reclassified (that is, moved and renumbered) to a new Title 34, entitled "Crime Control and Law Enforcement." The reclassification encompassed a number of statutory provisions pertinent to OJP awards (that is, OJP grants and cooperative agreements), including many provisions previously codified in Title 42 of the U.S. Code.

Effective as of September 1, 2017, any reference in this award document to a statutory provision that has been reclassified to the new Title 34 of the U.S. Code is to be read as a reference to that statutory provision as reclassified to Title 34. This rule of construction specifically includes references set out in award conditions, references set out in material incorporated by reference through award conditions, and references set out in other award requirements.

5. Required training for Point of Contact and all Financial Points of Contact

Both the Point of Contact (POC) and all Financial Points of Contact (FPOCs) for this award must have successfully completed an "OJP financial management and grant administration training" by 120 days after the date of the recipient's acceptance of the award.  Successful completion of such a training on or after January 1, 2017, will satisfy this condition.

In the event that either the POC or an FPOC for this award changes during the period of performance, the new POC or FPOC must have successfully completed an "OJP financial management and grant administration training" by 120 calendar days after -- (1) the date of OJP's approval of the "Change Grantee Contact" GAN (in the case of a new POC), or (2) the date the POC enters information on the new FPOC in GMS (in the case of a new FPOC).  Successful completion of such a training on or after January 1, 2017, will satisfy this condition.

A list of OJP trainings that OJP will consider "OJP financial management and grant administration training" for purposes of this condition is available at https://www.ojp.gov/training/fmts.htm.  All trainings that satisfy this condition include a session on grant fraud prevention and detection

The recipient should anticipate that OJP will immediately withhold ("freeze") award funds if the recipient fails to comply with this condition.  The recipient's failure to comply also may lead OJP to impose additional appropriate conditions on this award.

6. Requirements related to "de minimis" indirect cost rate

A recipient that is eligible under the Part 200 Uniform Requirements and other applicable law to use the "de minimis" indirect cost rate described in 2 C.F.R. 200.414(f), and that elects to use the "de minimis" indirect cost rate, must advise OJP in writing of both its eligibility and its election, and must comply with all associated requirements in the Part 200 Uniform Requirements.  The "de minimis" rate may be applied only to modified total direct costs (MTDC) as defined by the Part 200 Uniform Requirements.



| U.S. Department of Justice | AWARD CONTINUATION | |
|---|---|---|
| Office of Justice Programs | SHEET | PAGE 4 OF 18 |
| **Office of Juvenile Justice and Delinquency Prevention** | **Grant** | |

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

7. Requirement to report potentially duplicative funding

   If the recipient currently has other active awards of federal funds, or if the recipient receives any other award of federal funds during the period of performance for this award, the recipient promptly must determine whether funds from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items for which funds are provided under this award. If so, the recipient must promptly notify the DOJ awarding agency (OJP or OVW, as appropriate) in writing of the potential duplication, and, if so requested by the DOJ awarding agency, must seek a budget-modification or change-of-project-scope grant adjustment notice (GAN) to eliminate any inappropriate duplication of funding.

8. Requirements related to System for Award Management and Universal Identifier Requirements

   The recipient must comply with applicable requirements regarding the System for Award Management (SAM), currently accessible at https://www.sam.gov/. This includes applicable requirements regarding registration with SAM, as well as maintaining the currency of information in SAM.

   The recipient also must comply with applicable restrictions on subawards ("subgrants") to first-tier subrecipients (first-tier "subgrantees"), including restrictions on subawards to entities that do not acquire and provide (to the recipient) the unique entity identifier required for SAM registration.

   The details of the recipient's obligations related to SAM and to unique entity identifiers are posted on the OJP web site at https://ojp.gov/funding/Explore/SAM.htm (Award condition: System for Award Management (SAM) and Universal Identifier Requirements), and are incorporated by reference here.

   This condition does not apply to an award to an individual who received the award as a natural person (i.e., unrelated to any business or non-profit organization that he or she may own or operate in his or her name).

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice

Office of Justice Programs

**Office of Juvenile Justice and Delinquency Prevention**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE   5   OF   18

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

9.   Employment eligibility verification for hiring under the award

1. The recipient (and any subrecipient at any tier) must--

A. Ensure that, as part of the hiring process for any position within the United States that is or will be funded (in whole or in part) with award funds, the recipient (or any subrecipient) properly verifies the employment eligibility of the individual who is being hired, consistent with the provisions of 8 U.S.C. 1324a(a)(1) and (2).

B. Notify all persons associated with the recipient (or any subrecipient) who are or will be involved in activities under this award of both--

(1) this award requirement for verification of employment eligibility, and

(2) the associated provisions in 8 U.S.C. 1324a(a)(1) and (2) that, generally speaking, make it unlawful, in the United States, to hire (or recruit for employment) certain aliens.

C. Provide training (to the extent necessary) to those persons required by this condition to be notified of the award requirement for employment eligibility verification and of the associated provisions of 8 U.S.C. 1324a(a)(1) and (2).

D. As part of the recordkeeping for the award (including pursuant to the Part 200 Uniform Requirements), maintain records of all employment eligibility verifications pertinent to compliance with this award condition in accordance with Form I-9 record retention requirements, as well as records of all pertinent notifications and trainings.

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions designed to ensure compliance with this condition.

4. Rules of construction

A. Staff involved in the hiring process

For purposes of this condition, persons "who are or will be involved in activities under this award" specifically includes (without limitation) any and all recipient (or any subrecipient) officials or other staff who are or will be involved in the hiring process with respect to a position that is or will be funded (in whole or in part) with award funds.

B. Employment eligibility confirmation with E-Verify

For purposes of satisfying the requirement of this condition regarding verification of employment eligibility, the recipient (or any subrecipient) may choose to participate in, and use, E-Verify (www.e-verify.gov), provided an appropriate person authorized to act on behalf of the recipient (or subrecipient) uses E-Verify (and follows the proper E-Verify procedures, including in the event of a "Tentative Nonconfirmation" or a "Final Nonconfirmation") to confirm employment eligibility for each hiring for a position in the United States that is or will be funded (in whole or in part) with award funds.

C. "United States" specifically includes the District of Columbia, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands.

D. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, or



| U.S. Department of Justice Office of Justice Programs **Office of Juvenile Justice and Delinquency Prevention** | **AWARD CONTINUATION SHEET** **Grant** | PAGE  6  OF  18 |
| --- | --- | --- |

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
| --- | --- | --- | --- |

*SPECIAL CONDITIONS*

any person or other entity, to violate any federal law, including any applicable civil rights or nondiscrimination law.

E. Nothing in this condition, including in paragraph 4.B., shall be understood to relieve any recipient, any subrecipient at any tier, or any person or other entity, of any obligation otherwise imposed by law, including 8 U.S.C. 1324a(a)(1) and (2).

Questions about E-Verify should be directed to DHS.  For more information about E-Verify visit the E-Verify website (https://www.e-verify.gov/) or email E-Verify at E-Verify@dhs.gov.  E-Verify employer agents can email E-Verify at E-VerifyEmployerAgent@dhs.gov.

Questions about the meaning or scope of this condition should be directed to OJP, before award acceptance.

10.    Requirement to report actual or imminent breach of personally identifiable information (PII)

The recipient (and any "subrecipient" at any tier) must have written procedures in place to respond in the event of an actual or imminent "breach" (OMB M-17-12) if it (or a subrecipient) -- (1) creates, collects, uses, processes, stores, maintains, disseminates, discloses, or disposes of "personally identifiable information (PII)" (2 CFR 200.79) within the scope of an OJP grant-funded program or activity, or (2) uses or operates a "Federal information system" (OMB Circular A-130).  The recipient's breach procedures must include a requirement to report actual or imminent breach of PII to an OJP Program Manager no later than 24 hours after an occurrence of an actual breach, or the detection of an imminent breach.

11.    All subawards ("subgrants") must have specific federal authorization

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements for authorization of any subaward.  This condition applies to agreements that -- for purposes of federal grants administrative requirements -- OJP considers a "subaward" (and therefore does not consider a procurement "contract").

The details of the requirement for authorization of any subaward are posted on the OJP web site at https://ojp.gov/funding/Explore/SubawardAuthorization.htm (Award condition:  All subawards ("subgrants") must have specific federal authorization), and are incorporated by reference here.

12.    Specific post-award approval required to use a noncompetitive approach in any procurement contract that would exceed $250,000

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements to obtain specific advance approval to use a noncompetitive approach in any procurement contract that would exceed the Simplified Acquisition Threshold (currently, $250,000).  This condition applies to agreements that -- for purposes of federal grants administrative requirements -- OJP considers a procurement "contract" (and therefore does not consider a subaward).

The details of the requirement for advance approval to use a noncompetitive approach in a procurement contract under an OJP award are posted on the OJP web site at https://ojp.gov/funding/Explore/NoncompetitiveProcurement.htm (Award condition:  Specific post-award approval required to use a noncompetitive approach in a procurement contract (if contract would exceed $250,000)), and are incorporated by reference here.



U.S. Department of Justice

Office of Justice Programs

**Office of Juvenile Justice and
Delinquency Prevention**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE   7   OF   18

| PROJECT NUMBER | 2019-JX-FX-0026 | | AWARD DATE | 09/24/2019 |
| --- | --- | --- | --- | --- |

*SPECIAL CONDITIONS*

13.   Unreasonable restrictions on competition under the award; association with federal government

SCOPE. This condition applies with respect to any procurement of property or services that is funded (in whole or in part) by this award, whether by the recipient or by any subrecipient at any tier, and regardless of the dollar amount of the purchase or acquisition, the method of procurement, or the nature of any legal instrument used. The provisions of this condition must be among those included in any subaward (at any tier).

1. No discrimination, in procurement transactions, against associates of the federal government

Consistent with the (DOJ) Part 200 Uniform Requirements -- including as set out at 2 C.F.R. 200.300 (requiring awards to be "manage[d] and administer[ed] in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements") and 200.319(a) (generally requiring "[a]ll procurement transactions [to] be conducted in a manner providing full and open competition" and forbidding practices "restrictive of competition," such as "[p]lacing unreasonable requirements on firms in order for them to qualify to do business" and taking "[a]ny arbitrary action in the procurement process") -- no recipient (or subrecipient, at any tier) may (in any procurement transaction) discriminate against any person or entity on the basis of such person or entity's status as an "associate of the federal government" (or on the basis of such person or entity's status as a parent, affiliate, or subsidiary of such an associate), except as expressly set out in 2 C.F.R. 200.319(a) or as specifically authorized by USDOJ.

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

3. Allowable costs

To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions designed to ensure compliance with this condition.

4. Rules of construction

A. The term "associate of the federal government" means any person or entity engaged or employed (in the past or at present) by or on behalf of the federal government -- as an employee, contractor or subcontractor (at any tier), grant recipient or -subrecipient (at any tier), agent, or otherwise -- in undertaking any work, project, or activity for or on behalf of (or in providing goods or services to or on behalf of) the federal government, and includes any applicant for such employment or engagement, and any person or entity committed by legal instrument to undertake any such work, project, or activity (or to provide such goods or services) in future.

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, or any person or other entity, to violate any federal law, including any applicable civil rights or nondiscrimination law.



U.S. Department of Justice
Office of Justice Programs
**Office of Juvenile Justice and Delinquency Prevention**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE  8  OF  18

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

14. Requirements pertaining to prohibited conduct related to trafficking in persons (including reporting requirements and OJP authority to terminate award)

    The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements (including requirements to report allegations) pertaining to prohibited conduct related to the trafficking of persons, whether on the part of recipients, subrecipients ("subgrantees"), or individuals defined (for purposes of this condition) as "employees" of the recipient or of any subrecipient.

    The details of the recipient's obligations related to prohibited conduct related to trafficking in persons are posted on the OJP web site at https://ojp.gov/funding/Explore/ProhibitedConduct-Trafficking.htm (Award condition:  Prohibited conduct by recipients and subrecipients related to trafficking in persons (including reporting requirements and OJP authority to terminate award)), and are incorporated by reference here.

15. Determination of suitability to interact with participating minors

    SCOPE. This condition applies to this award if it is indicated -- in the application for the award (as approved by DOJ)(or in the application for any subaward, at any tier), the DOJ funding announcement (solicitation), or an associated federal statute -- that a purpose of some or all of the activities to be carried out under the award (whether by the recipient, or a subrecipient at any tier) is to benefit a set of individuals under 18 years of age.

    The recipient, and any subrecipient at any tier, must make determinations of suitability before certain individuals may interact with participating minors.  This requirement applies regardless of an individual's employment status.

    The details of this requirement are posted on the OJP web site at https://ojp.gov/funding/Explore/Interact-Minors.htm (Award condition:  Determination of suitability required, in advance, for certain individuals who may interact with participating minors), and are incorporated by reference here.

16. Compliance with applicable rules regarding approval, planning, and reporting of conferences, meetings, trainings, and other events

    The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable laws, regulations, policies, and official DOJ guidance (including specific cost limits, prior approval and reporting requirements, where applicable) governing the use of federal funds for expenses related to conferences (as that term is defined by DOJ), including the provision of food and/or beverages at such conferences, and costs of attendance at such conferences.

    Information on the pertinent DOJ definition of conferences and the rules applicable to this award appears in the DOJ Grants Financial Guide (currently, as section 3.10 of "Postaward Requirements" in the "DOJ Grants Financial Guide").

17. Requirement for data on performance and effectiveness under the award

    The recipient must collect and maintain data that measure the performance and effectiveness of work under this award. The data must be provided to OJP in the manner (including within the timeframes) specified by OJP in the program solicitation or other applicable written guidance.  Data collection supports compliance with the Government Performance and Results Act (GPRA) and the GPRA Modernization Act of 2010, and other applicable laws.

18. OJP Training Guiding Principles

    Any training or training materials that the recipient -- or any subrecipient ("subgrantee") at any tier -- develops or delivers with OJP award funds must adhere to the OJP Training Guiding Principles for Grantees and Subgrantees, available at https://ojp.gov/funding/Implement/TrainingPrinciplesForGrantees-Subgrantees.htm.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Office of Juvenile Justice and Delinquency Prevention**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE  9  OF  18

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

19.   Effect of failure to address audit issues

The recipient understands and agrees that the DOJ awarding agency (OJP or OVW, as appropriate) may withhold award funds, or may impose other related requirements, if (as determined by the DOJ awarding agency) the recipient does not satisfactorily and promptly address outstanding issues from audits required by the Part 200 Uniform Requirements (or by the terms of this award), or other outstanding issues that arise in connection with audits, investigations, or reviews of DOJ awards.

20.   Potential imposition of additional requirements

The recipient agrees to comply with any additional requirements that may be imposed by the DOJ awarding agency (OJP or OVW, as appropriate) during the period of performance for this award, if the recipient is designated as "high-risk" for purposes of the DOJ high-risk grantee list.

21.   Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 42

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 42, specifically including any applicable requirements in Subpart E of 28 C.F.R. Part 42 that relate to an equal employment opportunity program.

22.   Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 54

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 54, which relates to nondiscrimination on the basis of sex in certain "education programs."

23.   Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 38

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 38 (as may be applicable from time to time), specifically including any applicable requirements regarding written notice to program beneficiaries and prospective program beneficiaries.

Currently, among other things, 28 C.F.R. Part 38 includes rules that prohibit specific forms of discrimination on the basis of religion, a religious belief, a refusal to hold a religious belief, or refusal to attend or participate in a religious practice.  Part 38, currently, also sets out rules and requirements that pertain to recipient and subrecipient ("subgrantee") organizations that engage in or conduct explicitly religious activities, as well as rules and requirements that pertain to recipients and subrecipients that are faith-based or religious organizations.

The text of 28 C.F.R. Part 38 is available via the Electronic Code of Federal Regulations (currently accessible at https://www.ecfr.gov/cgi-bin/ECFR?page=browse), by browsing to Title 28-Judicial Administration, Chapter 1, Part 38, under e-CFR "current" data.



| | U.S. Department of Justice | **AWARD CONTINUATION SHEET** | |
|---|---|---|---|
| | Office of Justice Programs | | PAGE  10  OF  18 |
| | **Office of Juvenile Justice and Delinquency Prevention** | **Grant** | |

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

24.   Restrictions on "lobbying"

In general, as a matter of federal law, federal funds awarded by OJP may not be used by the recipient, or any subrecipient ("subgrantee") at any tier, either directly or indirectly, to support or oppose the enactment, repeal, modification, or adoption of any law, regulation, or policy, at any level of government.  See 18 U.S.C. 1913.  (There may be exceptions if an applicable federal statute specifically authorizes certain activities that otherwise would be barred by law.)

Another federal law generally prohibits federal funds awarded by OJP from being used by the recipient, or any subrecipient at any tier, to pay any person to influence (or attempt to influence) a federal agency, a Member of Congress, or Congress (or an official or employee of any of them) with respect to the awarding of a federal grant or cooperative agreement, subgrant, contract, subcontract, or loan, or with respect to actions such as renewing, extending, or modifying any such award.  See 31 U.S.C. 1352.  Certain exceptions to this law apply, including an exception that applies to Indian tribes and tribal organizations.

Should any question arise as to whether a particular use of federal funds by a recipient (or subrecipient) would or might fall within the scope of these prohibitions, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.

25.   Compliance with general appropriations-law restrictions on the use of federal funds (FY 2019)

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable restrictions on the use of federal funds set out in federal appropriations statutes.  Pertinent restrictions, including from various "general provisions" in the Consolidated Appropriations Act, 2019, are set out at https://ojp.gov/funding/Explore/FY19AppropriationsRestrictions.htm, and are incorporated by reference here.

Should a question arise as to whether a particular use of federal funds by a recipient (or a subrecipient) would or might fall within the scope of an appropriations-law restriction, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.

26.   Reporting potential fraud, waste, and abuse, and similar misconduct

The recipient and any subrecipients ("subgrantees") must promptly refer to the DOJ Office of the Inspector General (OIG) any credible evidence that a principal, employee, agent, subrecipient, contractor, subcontractor, or other person has, in connection with funds under this award -- (1) submitted a claim that violates the False Claims Act; or (2) committed a criminal or civil violation of laws pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct.

Potential fraud, waste, abuse, or misconduct involving or relating to funds under this award should be reported to the OIG by--(1) online submission accessible via the OIG webpage at https://oig.justice.gov/hotline/contact-grants.htm (select "Submit Report Online"); (2) mail directed to: Office of the Inspector General, U.S. Department of Justice, Investigations Division, 1425 New York Avenue, N.W. Suite 7100, Washington, DC 20530; and/or (3) by facsimile directed to the DOJ OIG Fraud Detection Office (Attn:  Grantee Reporting) at (202) 616-9881 (fax).

Additional information is available from the DOJ OIG website at https://oig.justice.gov/hotline.



| U.S. Department of Justice | AWARD CONTINUATION | |
|---|---|---|
| Office of Justice Programs | SHEET | PAGE  11  OF  18 |
| **Office of Juvenile Justice and Delinquency Prevention** | Grant | |

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

27. Restrictions and certifications regarding non-disclosure agreements and related matters

No recipient or subrecipient ("subgrantee") under this award, or entity that receives a procurement contract or subcontract with any funds under this award, may require any employee or contractor to sign an internal confidentiality agreement or statement that prohibits or otherwise restricts, or purports to prohibit or restrict, the reporting (in accordance with law) of waste, fraud, or abuse to an investigative or law enforcement representative of a federal department or agency authorized to receive such information.

The foregoing is not intended, and shall not be understood by the agency making this award, to contravene requirements applicable to Standard Form 312 (which relates to classified information), Form 4414 (which relates to sensitive compartmented information), or any other form issued by a federal department or agency governing the nondisclosure of classified information.

1.  In accepting this award, the recipient--

a.  represents that it neither requires nor has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

b.  certifies that, if it learns or is notified that it is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.

2.  If the recipient does or is authorized under this award to make subawards ("subgrants"), procurement contracts, or both--

a.  it represents that--

(1)  it has determined that no other entity that the recipient's application proposes may or will receive award funds (whether through a subaward ("subgrant"), procurement contract, or subcontract under a procurement contract) either requires or has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

(2)  it has made appropriate inquiry, or otherwise has an adequate factual basis, to support this representation; and

b.  it certifies that, if it learns or is notified that any subrecipient, contractor, or subcontractor entity that receives funds under this award is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds to or by that entity, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.

OJP FORM 4000/2 (REV. 4-88)



| U.S. Department of Justice | **AWARD CONTINUATION SHEET** | |
| Office of Justice Programs | | PAGE 12 OF 18 |
| **Office of Juvenile Justice and Delinquency Prevention** | **Grant** | |

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |

*SPECIAL CONDITIONS*

28. Compliance with 41 U.S.C. 4712 (including prohibitions on reprisal; notice to employees)

The recipient (and any subrecipient at any tier) must comply with, and is subject to, all applicable provisions of 41 U.S.C. 4712, including all applicable provisions that prohibit, under specified circumstances, discrimination against an employee as reprisal for the employee's disclosure of information related to gross mismanagement of a federal grant, a gross waste of federal funds, an abuse of authority relating to a federal grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal grant.

The recipient also must inform its employees, in writing (and in the predominant native language of the workforce), of employee rights and remedies under 41 U.S.C. 4712.

Should a question arise as to the applicability of the provisions of 41 U.S.C. 4712 to this award, the recipient is to contact the DOJ awarding agency (OJP or OVW, as appropriate) for guidance.

29. Encouragement of policies to ban text messaging while driving

Pursuant to Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," 74 Fed. Reg. 51225 (October 1, 2009), DOJ encourages recipients and subrecipients ("subgrantees") to adopt and enforce policies banning employees from text messaging while driving any vehicle during the course of performing work funded by this award, and to establish workplace safety policies and conduct education, awareness, and other outreach to decrease crashes caused by distracted drivers.

30. Requirement to disclose whether recipient is designated "high risk" by a federal grant-making agency outside of DOJ

If the recipient is designated "high risk" by a federal grant-making agency outside of DOJ, currently or at any time during the course of the period of performance under this award, the recipient must disclose that fact and certain related information to OJP by email at OJP.ComplianceReporting@ojp.usdoj.gov.  For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the recipient's past performance, or other programmatic or financial concerns with the recipient. The recipient's disclosure must include the following: 1. The federal awarding agency that currently designates the recipient high risk, 2. The date the recipient was designated high risk, 3. The high-risk point of contact at that federal awarding agency (name, phone number, and email address), and 4. The reasons for the high-risk status, as set out by the federal awarding agency.

31. The recipient agrees that, consistent with applicable State law, staff directly associated with administration of the OJJDP Formula Grants Program will attend and participate in conferences, workshops, training sessions and other national or regional meetings deemed by OJJDP to be critical to the administration of this Program.  OJJDP will determine which staff and the number of staff that should attend each meeting, consistent with the scope and subject matter of the meeting. Cost of attendance will be borne by the recipient as an administrative cost to the grant or paid from State Advisory Group set aside funds under Section 222(d), as appropriate.

32. The recipient agrees to comply with all Formula Grants Program requirements as outlined in the Juvenile Justice and Delinquency Prevention Act of 2002, the applicable guidelines, the Certified Assurances; and the most recent OJJDP Formula Grants Consolidated Regulation (28 CFR Part 31), to the extent that those regulations are not in conflict with the above.



U.S. Department of Justice

Office of Justice Programs

**Office of Juvenile Justice and Delinquency Prevention**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE  13  OF  18

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

33.   Recipient agrees that, as required by federal law [31 U.S.C. 1301(a)], the funds allocated to support its State Advisory Group (SAG) pursuant to 42 U.S.C. 5632(d) must be expended in a manner consistent with the purposes set forth at 42 U.S.C. 5633(a)(3)(B), (C), and (D).  If recipient's SAG chooses to use a portion of its limited formula grant set-aside for organizational membership fees, such costs are only allowable if those costs meet the requirements of OMB Circular A-87.  Accordingly, organizational membership fees paid with federal formula grant funds are permissible expenditures only to the extent that such membership advances State or local (as opposed to national) interests.  The use of federal funds for 1) cash or in-kind contributions, 2) donations, or 3) payment of membership fees in organizations substantially engaged in lobbying , is specifically prohibited by OMB Circular A-87, Attachment B.

34.   Pursuant to Section 223(a)(3)(A)(iii) of the Juvenile Justice and Delinquency Prevention Act of 1974, as amended (42 U.S.C. § 5601, et seq.), the chairperson of the State Advisory Group cannot be a full-time employee of the Federal, State, or local government.  This prohibition applies also to an Acting Chair, or other person assuming the duties and responsibilities of the Chair, whether permanently or on a temporary basis.

35.   The recipient agrees to submit its Annual Performance Report for the prior federal fiscal year, no later than December 30 of each year, to the Office of Justice Programs, Grants Management System.

36.   The recipient agrees that it will submit quarterly financial status reports to OJP on-line (at https://grants.ojp.usdoj.gov) using the SF 425 Federal Financial Report form (available for viewing at https://www.gsa.gov/forms-library/federal-financial-report), not later than 30 days after the end of each calendar quarter.  The final report shall be submitted not later than 90 days following the end of the award period.

37.   FFATA reporting:  Subawards and executive compensation

The recipient must comply with applicable requirements to report first-tier subawards ("subgrants") of $25,000 or more and, in certain circumstances, to report the names and total compensation of the five most highly compensated executives of the recipient and first-tier subrecipients (first-tier "subgrantees") of award funds.  The details of recipient obligations, which derive from the Federal Funding Accountability and Transparency Act of 2006 (FFATA), are posted on the OJP web site at https://ojp.gov/funding/Explore/FFATA.htm (Award condition: Reporting Subawards and Executive Compensation), and are incorporated by reference here.

This condition, including its reporting requirement, does not apply to-- (1) an award of less than $25,000, or (2) an award made to an individual who received the award as a natural person (i.e., unrelated to any business or non-profit organization that he or she may own or operate in his or her name).



| U.S. Department of Justice | AWARD CONTINUATION SHEET | |
| Office of Justice Programs | | PAGE 14 OF 18 |
| **Office of Juvenile Justice and Delinquency Prevention** | **Grant** | |

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |

*SPECIAL CONDITIONS*

38. Noninterference (within the funded "program or activity") with federal law enforcement: 8 U.S.C. 1373; ongoing compliance

1. With respect to the "program or activity" funded in whole or part under this award (including any such program or activity of any subrecipient at any tier), throughout the period of performance, no State or local government entity, -agency, or -official may prohibit or in any way restrict-- (1) any government entity or -official from sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. 1373(a); or (2) a government entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration status as described in 8 U.S.C. 1373(b). Any prohibition (or restriction) that violates this condition is an "information-communication restriction" under this award.

2. The recipient's monitoring responsibilities include monitoring of subrecipient compliance with the requirements of this condition.

3. Allowable costs. Compliance with these requirements is an authorized and priority purpose of this award. To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) that the recipient, or any subrecipient at any tier that is a State, a local government, or a public institution of higher education, incurs to implement this condition.

4. Rules of Construction

A. For purposes of this condition:

(1) "State" and "local government" include any agency or other entity thereof, but not any institution of higher education or any Indian tribe.

(2) A "public" institution of higher education is defined as one that is owned, controlled, or directly funded (in whole or in substantial part) by a State or local government. (Such a public institution is considered to be a "government entity," and its officials to be "government officials.")

(3) "Program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. 2000d-4a).

(4) "Immigration status" means what it means under 8 U.S.C. 1373; and terms that are defined in 8 U.S.C. 1101 mean what they mean under that section 1101, except that "State" also includes American Samoa.

(5) Pursuant to the provisions set out at (or referenced in) 8 U.S.C. 1551 note ("Abolition ... and Transfer of Functions"), references to the "Immigration and Naturalization Service" in 8 U.S.C. 1373 are to be read as references to particular components of the Department of Homeland Security (DHS).

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, any public institution of higher education, or any other entity (or individual) to violate any federal law, including any applicable civil rights or nondiscrimination law.

IMPORTANT NOTE: Any questions about the meaning or scope of this condition should be directed to OJP, before award acceptance.



| | | | |
|---|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Office of Juvenile Justice and Delinquency Prevention** | **AWARD CONTINUATION SHEET**<br>**Grant** | *PAGE 15 OF 18* |

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

39.   No use of funds to interfere with federal law enforcement: 8 U.S.C. 1373; ongoing compliance

1. Throughout the period of performance, no State or local government entity, -agency, or -official may use funds under this award (including under any subaward, at any tier) to prohibit or in any way restrict-- (1) any government entity or -official from sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. 1373(a); or (2) a government entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration status as described in 8 U.S.C. 1373(b). Any prohibition (or restriction) that violates this condition is an "information-communication restriction" under this award.

2. The recipient's monitoring responsibilities include monitoring of subrecipient compliance with the requirements of this condition.

3. Allowable costs. Compliance with these requirements is an authorized and priority purpose of this award. To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) that the recipient, or any subrecipient at any tier that is a State, a local government, or a public institution of higher education, incurs to implement this condition.

4. Rules of Construction. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference (within the funded "program or activity") with federal law enforcement: 8 U.S.C. 1373; ongoing compliance" condition are incorporated by reference as though set forth here in full.

OJP FORM 4000/2 (REV. 4-88)



| U.S. Department of Justice<br>Office of Justice Programs<br>**Office of Juvenile Justice and<br>Delinquency Prevention** | **AWARD CONTINUATION<br>SHEET**<br>**Grant** | PAGE  16  OF  18 |
|---|---|---|

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

40.   Authority to obligate award funds contingent on noninterference (within the funded "program or activity") with federal law enforcement: 8 U.S.C. 1373; unallowable costs; notification

1. If the recipient is a "State," a local government, or a "public" institution of higher education:

A. The recipient may not obligate award funds if, at the time of the obligation, the "program or activity" of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that is funded in whole or in part with award funds is subject to any "information-communication restriction."

B. In addition, with respect to any project costs it incurs "at risk," the recipient may not obligate award funds to reimburse itself if -- at the time it incurs such costs -- the program or activity of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that would be reimbursed in whole or in part with award funds was subject to any information-communication restriction.

C. Any drawdown of award funds by the recipient shall be considered, for all purposes, to be a material representation by the recipient to OJP that, as of the date the recipient requests the drawdown, the recipient and each subrecipient (regardless of tier) that is a State, local government, or public institution of higher education, is in compliance with the award condition entitled "Noninterference (within the funded 'program or activity') with federal law enforcement: 8 U.S.C. 1373; ongoing compliance."

D. The recipient must promptly notify OJP (in writing) if the recipient, from its requisite monitoring of compliance with award conditions or otherwise, has credible evidence that indicates that the funded program or activity of the recipient, or of any subrecipient at any tier that is either a State or a local government or a public institution of higher education, may be subject to any information-communication restriction. In addition, any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must require prompt notification to the entity that made the subaward, should the subrecipient have such credible evidence regarding an information-communication restriction.

2. Any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must provide that the subrecipient may not obligate award funds if, at the time of the obligation, the program or activity of the subrecipient (or of any further such subrecipient at any tier) that is funded in whole or in part with award funds is subject to any information-communication restriction.

3. Absent an express written determination by DOJ to the contrary, based upon a finding by DOJ of compelling circumstances (e.g., a small amount of award funds obligated by the recipient at the time of a subrecipient's minor and transitory non-compliance, which was unknown to the recipient despite diligent monitoring), any obligations of award funds that, under this condition, may not be made shall be unallowable costs for purposes of this award. In making any such determination, DOJ will give great weight to evidence submitted by the recipient that demonstrates diligent monitoring of subrecipient compliance with the requirements set out in the "Noninterference ... 8 U.S.C. 1373; ongoing compliance" award condition.

4. Rules of Construction

A. For purposes of this condition "information-communication restriction" has the meaning set out in the "Noninterference ... 8 U.S.C. 1373; ongoing compliance" condition.

B. Both the "Rules of Construction" and the "Important Note" set out in the "Noninterference ... 8 U.S.C. 1373; ongoing compliance" condition are incorporated by reference as though set forth here in full.



| U.S. Department of Justice<br>Office of Justice Programs<br>**Office of Juvenile Justice and Delinquency Prevention** | **AWARD CONTINUATION SHEET**<br>**Grant** | PAGE  17  OF  18 |
|---|---|---|

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

41.  Authority to obligate award funds contingent on no use of funds to interfere with federal law enforcement: 8 U.S.C. 1373; unallowable costs; notification

1. If the recipient is a "State," a local government, or a "public" institution of higher education:

A. The recipient may not obligate award funds if, at the time of the obligation, the "program or activity" of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that is funded in whole or in part with award funds is subject to any "information-communication restriction."

B. In addition, with respect to any project costs it incurs "at risk," the recipient may not obligate award funds to reimburse itself if -- at the time it incurs such costs -- the program or activity of the recipient (or of any subrecipient at any tier that is a State, a local government, or a public institution of higher education) that would be reimbursed in whole or in part with award funds was subject to any information-communication restriction.

C. Any drawdown of award funds by the recipient shall be considered, for all purposes, to be a material representation by the recipient to OJP that, as of the date the recipient requests the drawdown, the recipient and each subrecipient (regardless of tier) that is a State, local government, or public institution of higher education, is in compliance with the award condition entitled "No use of funds to interfere with federal law enforcement: 8 U.S.C. 1373; ongoing compliance."

D. The recipient must promptly notify OJP (in writing) if the recipient, from its requisite monitoring of compliance with award conditions or otherwise, has credible evidence that indicates that the funded program or activity of the recipient, or of any subrecipient at any tier that is either a State or a local government or a public institution of higher education, may be subject to any information-communication restriction. In addition, any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must require prompt notification to the entity that made the subaward, should the subrecipient have such credible evidence regarding an information-communication restriction.

2. Any subaward (at any tier) to a subrecipient that is a State, a local government, or a public institution of higher education must provide that the subrecipient may not obligate award funds if, at the time of the obligation, the program or activity of the subrecipient (or of any further such subrecipient at any tier) that is funded in whole or in part with award funds is subject to any information-communication restriction.

3. Absent an express written determination by DOJ to the contrary, based upon a finding by DOJ of compelling circumstances (e.g., a small amount of award funds obligated by the recipient at the time of a subrecipient's minor and transitory non-compliance, which was unknown to the recipient despite diligent monitoring), any obligations of award funds that, under this condition, may not be made shall be unallowable costs for purposes of this award. In making any such determination, DOJ will give great weight to evidence submitted by the recipient that demonstrates diligent monitoring of subrecipient compliance with the requirements set out in the "No use of funds to interfere … 8 U.S.C. 1373; ongoing compliance" award condition.

4. Rules of Construction.  The "Rules of Construction" set out in the "Authority to obligate award funds contingent on noninterference (within the funded "program or activity") with federal law enforcement: 8 U.S.C. 1373; unallowable costs; notification" condition are incorporated by reference as though set forth here in full.

42.  The award recipient agrees, as a condition of award approval, to comply with the requirements of 28 CFR Part 22, including the requirement to submit a properly executed Privacy Certificate that is in accordance with the requirements of 28 CFR Section 22.23 to OJJDP for approval.  The award recipient will also monitor and appropriately manage any subrecipients and/or subcontracts to ensure compliance with 28 CFR Section 22.23.



| U.S. Department of Justice<br>Office of Justice Programs<br>**Office of Juvenile Justice and Delinquency Prevention** | **AWARD CONTINUATION SHEET**<br><br>**Grant** | PAGE 18 OF 18 |
|---|---|---|

| PROJECT NUMBER | 2019-JX-FX-0026 | AWARD DATE | 09/24/2019 |
|---|---|---|---|

*SPECIAL CONDITIONS*

43. The award recipient agrees, as a condition of award approval, to comply with the requirements of 28 CFR Part 46 and all other Department of Justice/ Office of Justice Programs policies and procedures regarding the protection of human research subjects, including informed consent procedures and obtainment of Institutional Review Board (IRB) approval, if appropriate. The award recipient will also monitor and appropriately manage any subrecipients and/or subcontracts to ensure compliance with 28 CFR Part 46.

44. The recipient may not obligate, expend, or draw down funds until the recipient has submitted a revised budget and budget narrative reflecting the total amount of this award, and a Grant Adjustment Notice has been issued to remove this special condition.

45. Recipient integrity and performance matters: Requirement to report information on certain civil, criminal, and administrative proceedings to SAM and FAPIIS

    The recipient must comply with any and all applicable requirements regarding reporting of information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either this OJP award or any other grant, cooperative agreement, or procurement contract from the federal government. Under certain circumstances, recipients of OJP awards are required to report information about such proceedings, through the federal System for Award Management (known as "SAM"), to the designated federal integrity and performance system (currently, "FAPIIS").

    The details of recipient obligations regarding the required reporting (and updating) of information on certain civil, criminal, and administrative proceedings to the federal designated integrity and performance system (currently, "FAPIIS") within SAM are posted on the OJP web site at https://ojp.gov/funding/FAPIIS.htm (Award condition: Recipient Integrity and Performance Matters, including Recipient Reporting to FAPIIS), and are incorporated by reference here.

OJP FORM 4000/2 (REV. 4-88)



**U.S. Department of Justice**

Office of Justice Programs

*Office of Juvenile Justice and Delinquency Prevention*

---

*Washington, D.C.  20531*

**Memorandum To:**  Official Grant File

**From:**  Lou Ann Holland, OJJDP NEPA Coordinator

**Subject:**  Incorporates NEPA Compliance in Further Developmental Stages for California
Board of State and Community Corrections

The Title II Part B Formula Grant Program supports state and local efforts to plan, establish, operate, coordinate
and evaluate policies and projects, directly or through grants and contracts with public and private agencies, for the
development of more effective education, training, research, prevention, diversion, treatment, and rehabilitation
programs in the area of juvenile delinquency and programs to improve the juvenile justice system. All recipients of
Title II funding must assist OJJDP in complying with NEPA and other related federal environmental impact
analyses requirements in the use of grant funds, whether the funds are used directly by the grantee or by a
subgrantee or third party. Accordingly, prior to obligating funds under this award for any of the specified activities,
the grantee must first confer with OJJDP to determine if further environmental analysis is required.

The specified activities requiring environmental analysis are:
a. New construction*;
b. Any renovation or remodeling of a property located in an environmentally or historically sensitive area,
including properties located within a 100-year flood plain, a wetland, or habitat for endangered species, or a
property listed on or eligible for listing on the National Register of Historic Places;
c. A renovation, lease, or any proposed use of a building or facility that will either (a) result in a change in its basic
prior use or (b) significantly change its size;
d. Research and technology whose anticipated and future application could be expected to have an effect on the
environment; and
e. Implementation of a program involving the use of chemicals other than chemicals that are (a) purchased as an
incidental component of a funded activity and (b) traditionally used, for example, in office, household, recreational,
or education environments.

Complying with NEPA may require the preparation of an Environmental Assessment and/or an Environmental
Impact Statement, as directed by OJJDP.

Please be sure to carefully review the grant conditions on your award document, as they may contain more specific
information about environmental compliance.

*Use of Formula Grant funds for construction is generally prohibited, pursuant to 42 U.S.C.5674(b), except for the
construction of an innovative community-based facility for fewer than 20 persons which, in the judgment of the
OJJDP Administrator, is necessary to carry out the purposes of the Formula Grant Program. "Construction" is
defined at 42 U.S.C.103(10) as "acquisition, expansion, remodeling, and alteration of existing buildings, and initial
equipment of any such buildings, or any combination of such activities (including architects' fees but not the cost
of acquisition of land for buildings..."



U.S. Department of Justice

Office of Justice Programs

Office of Juvenile Justice and
Delinquency Prevention

**GRANT MANAGER'S MEMORANDUM, PT. I:**
**PROJECT SUMMARY**

**Grant**

| PROJECT NUMBER<br><br>2019-JX-FX-0026 | PAGE   1   OF   1 |
|---|---|

This project is supported under FY19(OJJDP - Part B – Formula award to State – may include prior year) 34 USC 11131; title I of Public Law 90-351 (generally codified at 34 USC ch. 101); 28 USC 530C(a)

| 1. STAFF CONTACT (Name & telephone number)<br><br>Ricco Hall<br>(202) 616-3807 | 2. PROJECT DIRECTOR (Name, address & telephone number)<br><br>Timothy Polasik<br>Field Representative<br>2590 Venture Oaks Way, Ste. 200<br>Sacramento, CA 95833-3200<br>(916) 621-2853 |
|---|---|

| 3a. TITLE OF THE PROGRAM<br><br>Category2: Compliance | 3b. POMS CODE (SEE INSTRUCTIONS<br>    ON REVERSE) |
|---|---|

**4. TITLE OF PROJECT**

FY19 Title II Grant Program

| 5. NAME & ADDRESS OF GRANTEE<br><br>California Board of State and Community Corrections<br>2590 Venture Oaks Way, Ste. 200<br>Sacramento, CA 95833-3200 | 6. NAME & ADRESS OF SUBGRANTEE |
|---|---|

| 7. PROGRAM PERIOD<br><br>FROM:        10/01/2019     TO:   09/30/2023 | 8. BUDGET PERIOD<br><br>FROM:        10/01/2019     TO:   09/30/2023 |
|---|---|

| 9. AMOUNT OF AWARD<br><br>$ 4,532,679 | 10. DATE OF AWARD<br><br>09/24/2019 |
|---|---|

| 11. SECOND YEAR'S BUDGET | 12. SECOND YEAR'S BUDGET AMOUNT |
|---|---|

| 13. THIRD YEAR'S BUDGET PERIOD | 14. THIRD YEAR'S BUDGET AMOUNT |
|---|---|

15. SUMMARY DESCRIPTION OF PROJECT (See instruction on reverse)

The Formula Grants Program is authorized under the Juvenile Justice and Delinquency Prevention (JJDP) Act. The purpose of this program is to support state and local delinquency prevention and intervention efforts and juvenile justice system improvements. Supported activities and efforts may include: planning and administration; state advisory group allocation; compliance monitoring; disproportionate minority contact; juvenile justice issues for Native American Indian tribes; prevention of substance abuse by juveniles; prevention of serious and violent crimes by juveniles; prevention of juvenile gang involvement and illegal youth gang activities; prevention of delinquent acts and identification of youth at risk of delinquency; and improvement of juvenile justice system operations, policies, and procedures including establishing a system of graduated sanctions, treatment programs, and aftercare as found in section 223(a) of the JJDP Act.

The California Board of State and Community Corrections will use funding to support: Aftercare/Reentry, Alternatives to Detention, Community-Based Programs and Services, Mental Health Services, Mentoring, Counseling and Training Programs, Compliance Monitoring, DMC/RED, Diversion, Indian Tribe Programs, and

OJP FORM 4000/2 (REV. 4-88)

State Advisory Group.  NCA/NCF

1   Xavier Becerra
    Attorney General of California
2   Michael L. Newman
    Senior Assistant Attorney General
3   Sarah E. Belton
    Supervising Deputy Attorney General
4   Kristi Gudoski Cook
    Lisa C. Ehrlich
5   Xiyun Yang
    Lee I. Sherman (SBN 272271)
6   Deputy Attorneys General
      300 S. Spring St., Suite 1702
7     Los Angeles, CA  90013
      Telephone:  (213) 269-6404
8   Fax:  (213) 897-7605
      E-mail:  Lee.Sherman@doj.ca.gov
9   *Attorneys for the State of California*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

13

| | |
|---|---|
| 14 **CITY AND COUNTY OF SAN FRANCISCO,** | Case No.  3:17-cv-00485-WHO |
| 15 | **[PROPOSED] ORDER GRANTING STATE OF CALIFORNIA'S ADMINISTRATIVE MOTION TO RELATE CASES** |
| 16                              Plaintiff, | |
| 17              v. | |
| 18 | Action Filed:        January 31, 2017 |
| 19 **DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, ELAINE DUKE, Acting Secretary of United States Department of Homeland Security, JEFFERSON B. SESSION III, Attorney General of the United States, DOES 1-100,** | |
| 20 | |
| 21 | |
| 22 | |
| 23                              Defendants. | |

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

On October 2, 2019, the State of California filed an Administrative Motion to Consider Whether Cases Should Be Related under Civil Local Rule 3-12.  Having considered the papers and pleadings on file, the Court GRANTS the Administrative Motion to Consider Whether Cases Should Be Related and ORDERS that the following cases be related:

• *State of California v. Sessions et al.*, Case No. 18-cv-5169.

• *State of California v. Barr et al.*, Case No. 19-cv-6189.


**IT IS SO ORDERED.**

DATED:  _____

_____

HON. WILLIAM H. ORRICK
United States District Court Judge

1