# EXHIBIT 1

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Telephone:     (415) 355-3308
Facsimile:     (415) 437-4644
E-Mail:        karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:     (408) 299-5900
Facsimile:     (408) 292-7240
E-Mail:        tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

*[additional counsel on signature page]*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN,<br><br>    Plaintiffs,<br><br>    vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, PAMELA BONDI, Attorney General of the United States, EMIL BOVE, Acting Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI NOEM, Secretary of United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, DOES 1-100,<br><br>    Defendants. | Case No. 25-1350<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      Defendant President Donald J. Trump is intent on ignoring the rule of law and punishing all who would disagree with him. In his new Administration, the President is again trampling established law limiting the extent of federal power over state and local governments. He appears emboldened to do what the courts thwarted him from doing before and penalize "sanctuary jurisdictions" that do not bend to his will. This action seeks to check this abuse of power.

2.      During his first term in office, President Trump sought to force local authorities to carry out federal civil immigration efforts. In January 2017, he issued Executive Order 13,768, which directed his Administration to withhold funds from and pursue enforcement actions against so-called "sanctuary jurisdictions" that limit local entanglement with federal immigration authorities. Federal courts, including the Ninth Circuit, roundly rejected these efforts as a blatantly unconstitutional usurpation of legislative authority. *See, e.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018). President Trump's Department of Justice ("DOJ") also tried to condition various DOJ funds on local jurisdictions' agreement to enforce federal immigration law. Again, federal courts, including the Ninth Circuit, struck down these funding restrictions. *See City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020).

3.      Undaunted by court rulings holding these efforts blatantly illegal, President Trump renewed his assault on these jurisdictions immediately upon taking office for a second term. On the same day he was inaugurated, he issued an Executive Order that purports to reinstate Executive Order 13,768. He then underscored his intent to punish jurisdictions that do not enforce his immigration policy priorities by issuing a second Executive Order, No. 14,159. That order returns to his 2017 playbook by directing Defendant Attorney General Pam Bondi and Defendant Department of Homeland Security Secretary Kristi Noem to withhold all federal funds from jurisdictions that refuse to use their local resources to carry out his immigration agenda. His administration has doubled down on these tactics, with the DOJ issuing a memo on February 5, 2025 stating their position that "State and local jurisdictions must comply with applicable immigration-related federal laws" and "state and local actors may not . . . fail to comply with lawful immigration-related directives." The memo

threatens not only termination of funding but also civil and criminal prosecution of any jurisdiction that refuses to comply.

4. In flagrant disregard of the law, President Trump seeks once again to punish those who disagree with him, coerce local authorities, and commandeer them into carrying out his agenda.

5. His actions fly in the face of foundational constitutional principles. They violate plain statutory language and numerous court orders. And they force local governments that have made deliberate decisions about how to make their communities safer and where to spend their own resources into an impossible choice—to relinquish their autonomy and independence and abandon their valid laws and policies, or face the sudden and devastating loss of federal funding and civil and criminal enforcement actions.

6. By this action, Plaintiffs challenge each of these related Executive actions. President Trump's Executive Order 14,159 and the DOJ's related memo violate the Tenth Amendment, Separation of Powers, the Spending Clause, and the Due Process Clause. DOJ's memo is additionally unlawful because it is arbitrary and capricious, contrary to constitutional rights, and issued in excess of its statutory jurisdiction.

7. Plaintiffs are not going to stand in the way of lawful federal immigration enforcement. But neither are they going to be bullied into abandoning their laws that have made their communities safer or doing what the federal government cannot compel them to do—actively assist the federal government in enforcing federal immigration laws.

8. For all of these reasons, as detailed below, Plaintiffs respectfully request the court to declare that these Executive actions are unlawful and to enjoin Defendants from enforcing the challenged provisions of the Executive Order and the DOJ's memo.

## JURISDICTION AND VENUE

9. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq.*

10. Venue properly lies within the Northern District of California because Plaintiffs City & County of San Francisco and County of Santa Clara reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. §1391(e)(1).

**INTRA-DISTRICT ASSIGNMENT**

11.     Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions that give rise to this action occurred in the City and County of San Francisco.

**PARTIES**

12.     Plaintiff the City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

13.     Plaintiff the County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California.

14.     Plaintiff the City of Portland ("Portland") is a municipal corporation of the State of Oregon duly organized and existing under the laws of the State of Oregon.

15.      Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

16.     Plaintiff the City of New Haven ("New Haven") is a municipal corporation organized and existing under the laws of the State of Connecticut.

17.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

18.     Defendant United States of America is sued under 28 U.S.C. § 1346.

19.     Defendant United States Department of Justice ("DOJ") is an executive department of the United States federal government. 28 U.S.C. § 501. DOJ is responsible for the governmental actions at issue in this lawsuit.

20.     Defendant Pamela Bondi is the Attorney General of the United States, the highest ranking official in DOJ, and is responsible for the decisions of DOJ. She is sued in her official capacity.

21.     Defendant Emil Bove is the Acting Deputy Attorney General, the second-ranking official within DOJ, and therefore responsible for the decisions of DOJ. He is sued in his official capacity.

22.     Defendant United States Department of Homeland Security ("DHS") is an executive department of the United States federal government. 6 U.S.C. § 111. DHS is responsible for enacting some of the governmental actions at issue in this lawsuit.

23.     Defendant Kristi Noem is the Secretary of Homeland Security, the highest ranking official in DHS, and responsible for the decisions of DHS. She is sued in her official capacity.

24.     Doe 1 through Doe 100 are sued under fictitious names. Plaintiffs do not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

### I.      Plaintiffs' Laws and Policies

25.     Plaintiffs have each made the lawful decision to limit the use of their local resources to assist with federal civil immigration enforcement. In general, these laws and policies limit cooperation with U.S. Immigration & Customs Enforcement ("ICE") and other immigration enforcement authorities with respect to civil immigration detainer requests and administrative warrants, the sharing of confidential personal information (such as contact information) of individuals served by local officials, the sharing with ICE of release dates of individuals in local custody, and the collection of immigration or citizenship information about communities served by local officials.

26.     These local policy choices are not designed to, and do not, interfere with federal law enforcement, but instead ensure that all residents of Plaintiffs' communities—regardless of immigration status—feel safe reporting crimes, going to schools, seeking medical care, and accessing critical public services.

27.     These local policies also preserve scarce local resources. For example, a civil immigration detainer request is distinct from a criminal warrant, which Plaintiffs honor. A detainer request is not issued by a judge based on a finding of probable cause. It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them. Complying with detainer requests requires municipalities to commit scarce law enforcement personnel and resources to track and respond to requests, detain individuals in holding cells, and supervise and

feed individuals during the prolonged detention. And the federal government has made clear that the local agency bears the financial burden of the detention, providing that "[n]o detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the Department." 8 C.F.R. § 287.7(e).

28.     Further, courts have held that complying with civil immigration detainer requests, in the absence of a probable cause determination, violates the Fourth Amendment to the United States Constitution and could subject Plaintiffs to civil liability. *See Hernandez v. United States*, 939 F.3d 191, 200–01 (2nd Cir. 2019); *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-02317-ST, 2014 WL 1414305, at *9 (D. Or. Apr. 11, 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000–01 (9th Cir. 2012) (applying the Fourth Amendment to immigration arrests).

29.     While "sanctuary" is not a legally defined term—and some Plaintiffs like Santa Clara do not use the term "sanctuary" to describe their policies or consider themselves to be "sanctuary jurisdictions"—Defendants have characterized all jurisdictions with policies like those adopted by Plaintiffs to be so-called "sanctuary jurisdictions."

## A.     San Francisco

30.     San Francisco has designated itself a Sanctuary City since 1989. In the 1980s, thousands of Central American refugees fled their countries in the midst of violent civil wars to seek legal protection in the United States. Against the backdrop of this humanitarian crisis, San Francisco began enacting the ordinances that, as later amended, make up San Francisco's Sanctuary City laws.

31.     Today, San Francisco's body of Sanctuary City law is contained in two chapters of San Francisco's Administrative Code: Chapters 12H and 12I. Importantly, these chapters do not shield criminals or prevent individuals from being prosecuted for illegal acts. Instead, they protect children by ensuring that their parents feel safe taking them to playgrounds, to schools, and to hospitals. They support family stability and community engagement. And they protect the safety and health of all residents of San Francisco by helping to ensure that everyone, including undocumented immigrants, feels safe reporting crimes, cooperating with police investigations, and seeking medical care.

32. San Francisco Administrative Code Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by Federal or state law.

33. San Francisco Administrative Code Chapter 12I prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the Federal government.

34. Chapter 12I also prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released, unless the individual in question meets certain criteria. *See* S.F. Admin. Code § 12I.3(c), (d).

35. Finally, as relevant here, Chapter 12I provides that "[l]aw enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws." *See* Section 12I.3(e). "Personal information" is defined as "any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information." *See* Section 12I.2.

36. San Francisco's Sanctuary City laws arise from San Francisco's commitment and responsibility to ensure public safety and welfare. The Board of Supervisors, as San Francisco's legislative body, found that public safety is "founded on trust and cooperation of community residents and local law enforcement." Section 12I.1. Citing a study by the University of Illinois, which found that at least 40% of Latinos surveyed were less likely to provide information to police because they feared exposing themselves, family, or friends to a risk of deportation, the Board stated that "civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies." *Id*.; *see also id*. ("The City has enacted numerous

laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.").

37.     The legislative findings set forth in Chapter 12I evidence the legitimate local purpose of San Francisco's Sanctuary City laws. For example, the Board declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all. (*See* Section 12I.2.)

38.     The Board of Supervisors also had a public health purpose for its decision to restrict disclosure of confidential information: "To carry out public health programs, the City must be able to reliably collect confidential information from all residents . . . . Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody." Section 12I.1.

39.     Finally, the Board of Supervisors determined that enforcing immigration detainer requests would require San Francisco to redirect scarce local law enforcement personnel and resources—noting that the costs of "responding to a civil immigration detainer can include, but [are] not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer." Section 12I.1. In short, the Board of Supervisors concluded that "[c]ompliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City." *Id.*

40.     San Francisco departments have adopted and implemented policies consistent with Chapters 12H and 12I.

### B. Santa Clara

41.     Plaintiff Santa Clara is home to one of the largest and most diverse populations in the United States. With nearly two million residents, Santa Clara is the sixth largest county in California and more populous than twelve states. More than 40 percent—numbering upwards of 750,000—of Santa Clara's residents are foreign-born. This is the highest percentage of any county in California and one of the highest of any county nationally. Santa Clara's foreign-born population includes naturalized citizens; lawful permanent residents; refugees, asylees, student- and work-visa holders; victims of human trafficking or other crimes who have assisted law enforcement and hold T or U visas; and residents who lack lawful immigration status.

42.     Santa Clara is governed by an elected Board of Supervisors, which has repeatedly expressed its position that fostering a relationship of trust, respect, and open communication between and among Santa Clara officials and community members is critical to successfully achieving Santa Clara's mission of protecting community health and wellbeing and ensuring public safety.

43.     Santa Clara's elected Sheriff and District Attorney echo the same sentiment in their roles as Santa Clara's top law enforcement officials, expressing and instructing their employees that to encourage the reporting of crime and cooperation in criminal investigations, *all* community members, regardless of their immigration status, must feel safe and secure when contacting members of local public safety agencies; and must not fear that making contact will lead to an immigration inquiry or proceeding against them or a loved one. Their leaders have stated publicly many times not only that their crime prevention, prosecution, and investigation services are available to all, but that the full participation of the community as victims and witnesses—buoyed by Santa Clara's policies of separation from federal civil immigration enforcement and the confidence and trust they engender— has been critical to solving specific crimes.

44.     Santa Clara employees do not impede or prevent ICE officials from carrying out their own enforcement activities relating to federal civil immigration laws. However, under Santa Clara's longstanding policies, employees do not use Santa Clara's *own* facilities, resources, or staff time to assist.

45.     Santa Clara's policy of not expending local law enforcement resources to assist with federal civil immigration enforcement is set forth in Board of Supervisors Policy 3.54 ("Board Policy 3.54"). Board Policy 3.54 prohibits jail administration from honoring ICE civil detainer requests; provides that the Sheriff may, in their discretion, facilitate transfers of incarcerated individuals to ICE custody *only* under the auspices of a signed judicial warrant or court order; and prohibits Santa Clara staff from using local resources or local facilities to support civil immigration enforcement activities, including by "communicating with ICE regarding individuals' incarceration status or release dates." Board Policy 3.54, by its express terms, does not in any way hamper local law enforcement officers' cooperation with other agencies in any *criminal* law enforcement activities. In full, Board Policy 3.54 states:

> It is the policy of the County of Santa Clara that County officials and employees may cooperate with United States Immigration and Customs Enforcement (ICE) only as follows:
>
> (A)     Consistent with longstanding County policy, the California Values Act (Gov. Code, §§ 7284-7284.12), and the Fourth Amendment to the United States Constitution, the County does not, under any circumstances, honor civil detainer requests from ICE by holding inmates on ICE's behalf for additional time after they would otherwise be released from County custody.
>
> (B)     It is the policy of the County that the Sheriff may exercise discretion to facilitate the transfer of an adult inmate to ICE custody if an ICE agent presents a valid arrest warrant signed by a federal or state judicial officer, or other signed writ or order from a federal or state judicial officer authorizing ICE's arrest of the inmate. An administrative warrant signed by an agent or official of ICE or of the Department of Homeland Security (such as a Form I-200) is not a judicial warrant and will not be honored. The Sheriff and Chief of Correction shall jointly develop transfer procedures to implement this paragraph.
>
> (C)     Except as permitted by this Policy, the County shall not provide assistance or cooperation to ICE in its civil immigration enforcement efforts, including by giving ICE agents access to individuals or allowing them to use County facilities for investigative interviews or other purposes, expending County time or resources responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates, or otherwise participating in any civil immigration enforcement activities. This Policy does not limit or prohibit giving assistance with the investigative activities of any local, state, or federal law enforcement agency relating to suspected violations of criminal laws.

46.     The requirements of subsections (A) and (C) of Board Policy 3.54 have been in place since 2011, and subsection (B) was added when the Board of Supervisors amended the policy in 2019.

### C.   Portland

47.   In 1987, the Oregon State Legislature passed legislation prohibiting the use of state and local law enforcement resources to detect or apprehend persons whose only violation was being in the country without documentation. The bipartisan bill passed nearly unanimously and was codified in ORS 181A.820. In the years since, the state has added to the policy, and, in 2017, Portland adopted a resolution affirming its commitment to those state laws. These laws are instrumental in promoting a relationship of trust between law enforcement and immigrant communities, ensuring that victims report crimes to law enforcement so that perpetrators are apprehended before harming others.

48.   The current iteration of the Oregon Law is codified in ORS 180.805 and ORS 181A.820-829. ORS 180.805 provides, in relevant part, that:

a.   "Except as required by state or federal law, a public body may not disclose, for the purpose of enforcement of federal immigration laws," a person's address, workplace or hours of work, school or school hours, contact information, known associates or relatives, or the date and time of a person's hearings or other proceedings with a public body.

b.   "Except as required by state or federal law, or as necessary to determine eligibility for a benefit a person is seeking, a public body may not inquire about or request information concerning a person's citizenship or immigration status."

c.   "If a public body collects information concerning a person's citizenship or immigration status, the public body shall decline to disclose the information unless disclosure is required by" State or federal law, a court order, or a warrant authorized by a court.

d.   The above may be enforced through a civil action.

49.   ORS 181A.820-829 provide, in relevant part, that:

a.   Law enforcement agencies may not use agency money, equipment or personnel to enforce federal immigration law and may not enter into immigration-related detention agreements with federal immigration authorities.

b.   "Public facilities, property, moneys, equipment, technology or personnel may not be used for the purpose of investigating, detecting, apprehending, arresting, detaining or holding individuals for immigration enforcement."

c.      Violations of these provisions may be reported through a formal reporting process and may be enforced through civil action.

50.      Portland's Resolution NO. 37277 expresses the city's commitment to adhering to federal and state law. As such, in relevant part, it prohibits the city from using city resources to enforce federal immigration law except where required to do so by state or federal law, prohibits the Portland Police Bureau from cooperating with ICE except as expressly required by federal law, and resolves to take other action that support the city's immigrant community.

51.      In 2017 and 2018, the first Trump Administration attempted to require Oregon and Portland to cooperate with federal authorities on enforcement of federal immigration law as a condition of receiving funds awarded under the Byrne JAG formula grant program. A federal district court held that the Attorney General lacked the authority to impose these conditions and issued a permanent injunction, *Oregon v. Trump*, 406 F. Supp. 3d 940, 963 (D. Or. 2019). The Ninth Circuit affirmed this ruling. *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022).

**D.      King County**

52.      King County is the largest county in Washington and the twelfth most populous county in the nation. More than 25% of King County residents are foreign-born and contribute to making it a vibrant center for aerospace manufacturing, technological innovation, cutting-edge medical research, education, agriculture, and other industries.

53.      King County is subject to state and local laws that make the county a welcoming place for immigrants. Under the Keep Washington Working Act (KWW), Laws of 2019 ch. 440, E2SB 5497 (May 21, 2019), all local governments in the state are precluded from using local resources to assist in federal immigration enforcement efforts. *See id.* Sec. 1 (KWW purpose is "ensuring the state of Washington remains a place where the rights and dignity of all residents are maintained and protected in order to keep Washington working"). Under KWW, state and local law enforcement officers may not "[i]nquire into or collect information about an individual's immigration or citizenship status, or place of birth unless there is a connection between such information and an investigation into a violation of state or local criminal law" or "[p]rovide information pursuant to notification requests from federal immigration authorities for the purposes of civil immigration enforcement, except as

required by law." RCW 10.93.160. KWW similarly prevents local jurisdictions from honoring immigration detainers unless accompanied by a judicial warrant. *Id.*

54.     Under King County Code (KCC) 2.15.010, county officials are generally precluded from inquiring about immigration status or using county resources to assist with enforcement of federal immigration laws. In particular, "[a]n agent of King County or a county employee shall not expend any time, moneys or other resources on facilitating the civil enforcement of federal immigration law or participating in civil immigration enforcement operations, except where state or federal law, regulation, or court order shall so require." KCC 2.15.010.

55.     King County has remained steadfast in its compliance with KWW and KCC 2.15. The King County Executive, Dow Constantine, directed King County's 16,000+ work force on February 4, 2024 that "[w]e remain committed to enforcing state law and local ordinances protecting the rights of immigrants." Policies in effect from various King County Departments, including the King County Sheriff and the Department of Adult and Juvenile Detention, reflect the county's determination to follow state and local law.

**E.      New Haven**

56.     The Mayor of the City of New Haven issued a Welcoming City Executive Order on July 23, 2020. That Order limits the City's entanglement with federal civil immigration enforcement as part of New Haven's "commitment to promoting the safety of all who live here and in recognition of the fact that all persons need to feel comfortable in their interactions with City officials." Pursuant to the Order, New Haven City employees and local law enforcement are generally prohibited from asking about a person's immigration status. The Order further prohibits local law enforcement from detaining a person solely on the belief that they have committed a civil immigration violation or detaining or arresting a person based solely on a civil detainer request or administrative warrant issued by ICE.

**II.    Defendants' Efforts to Defund and Threaten Sanctuary Jurisdictions**

    **A.    President Trump's Executive Orders**

        **1.    The First Trump Administration's Unsuccessful Efforts to Defund Sanctuary Jurisdictions**

57.     President Trump's efforts to threaten and coerce municipalities like Plaintiffs that limit cooperation with federal civil immigration enforcement is not new. Days into his first term in January 2017, he issued Executive Order 13,768. 82 Fed. Reg. 8799 (Jan. 25, 2017). That Executive Order declared that sanctuary jurisdictions were jurisdictions that "willfully violate Federal law in an attempt to shield aliens from removal from the United States," and declared it the policy of the executive branch to ensure that sanctuary jurisdictions "that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.*

58.     To effectuate this policy, the Executive Order directed the Attorney General and Secretary of Homeland Security that any jurisdictions "that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." 82 Fed. Reg. at 8801.

59.     The Attorney General was further directed to "take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." *Id.*

60.     With Executive Order 13,768, President Trump and his administration sought to coerce states, counties, and cities to go against their considered judgments about how best to use their own law enforcement resources to serve their communities, and abandon their policies of non-cooperation with federal civil immigration enforcement. In some cases, the threat had its desired effect, with local governments like Miami-Dade County quickly announcing they were letting go of their policies in order to keep their federally funded programs and services.

61.     Plaintiffs City and County of San Francisco and County of Santa Clara challenged Executive Order 13,768 as unconstitutional. This Court granted San Francisco and Santa Clara's motion for preliminary injunction, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017), and later granted their motion for summary judgment, issuing a permanent injunction enjoining enforcement of Executive Order 13,768, *Cnty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201 (N.D.

Cal. 2017). The Ninth Circuit affirmed this Court's ruling that the Executive Order was unconstitutional. *City & Cnty. of S.F.*, 897 F.3d at 1235. This Court then entered a final judgment and order enjoining the Trump Administration from enforcing the relevant section of Executive Order No. 13,768 within the State of California. *See* Stipulation and Final Judgment and Order, ECF No. 235, *City & Cnty. of S.F. v. Trump*, No. 17-cv-00485 (N.D. Cal. Aug. 15, 2019).

62.     The first Trump Administration then tried another approach to cut funds to jurisdictions that the administration considered "sanctuary jurisdictions." DOJ tried to condition funding under the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG") on local cooperation with federal civil immigration enforcement priorities. Those conditions too were swiftly and successfully challenged, including before this Court and the Ninth Circuit. *See, e.g.*, *City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *City & Cnty. of S.F. v. Sessions*, 372 F. Supp. 3d 928 (N.D. Cal. 2019); *Oregon v. Trump*, 406 F. Supp. 3d 940, 963 (D. Or. 2019); *City and Cnty. of S.F. v. Barr*, 965 F.3d 753, 757 (9th Cir. 2020); *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022). Those lawsuits resulted in injunctions here and elsewhere prohibiting the DOJ from withholding Byrne JAG funds based on the challenged immigration-related conditions. Notably, the United States District Court for the Northern District of Illinois issued an order that "applie[d] to the Attorney General's imposition of the Challenged Conditions *and any materially identical conditions on the Byrne JAG grant program in FY 2018 and all future grant years*." Am. Final Judgment & Order at 3, ECF No. 183, *City of Chicago v. Garland*, No. 18-cv-06859 (N.D. Ill. Mar. 8, 2022) (emphasis added). The court also specified that the order's "effects run to the benefit of all Byrne JAG applicants and recipients and are not limited to the City of Chicago and its sub-grantees." *Id.*

63.     Ultimately, when President Joseph R. Biden took office, he issued Executive Order 13993, which rescinded President Trump's Executive Order 13,768. *See* 86 Fed. Reg. 7051 (Jan. 20, 2021).

### 2. The Current Trump Administration Renews Efforts to Unlawfully Target Sanctuary Jurisdictions

#### a. President Trump Issues Executive Orders on Sanctuary Jurisdictions

64. Immediately upon taking office for his second term on January 20, 2025, President Trump issued a slew of Executive Orders vilifying immigrants and renewing his efforts to target sanctuary jurisdictions.

65. First, the President issued Executive Order 14,148, entitled "Initial Rescissions of Harmful Executive Orders and Actions." 90 Fed. Reg. 8237 (Jan. 20, 2025). In relevant part, Executive Order 14,148 revoked Executive Order 13,993—and purported to reverse the revocation of President Trump's Executive Order 13,768. 90 Fed. Reg. at 8237.

66. Second, the President doubled down on his efforts to compel sanctuary jurisdictions to do his bidding by issuing Executive Order 14,159, entitled "Protecting the American People Against Invasion." 90 Fed. Reg. 8443 (Jan. 20, 2025) (Exhibit A). Executive Order 14,159 repeats the xenophobic rhetoric common to this Administration, asserting without factual basis that "[m]any . . . aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans," are "engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and "have abused the generosity of the American people." 90 Fed. Reg. at 8443.

67. Section 17 of Executive Order 14,159 provides as follows:

> *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law. 90 Fed. Reg. at 8446.

68. Like Executive Order 13,768 before it, Executive Order 14,159 contains both a restriction on funding (contained in sentence one) and an enforcement directive (contained in sentence

two) against jurisdictions they deem "sanctuary jurisdictions."

69.     The funding restriction in the Order requires the Attorney General and DHS Secretary to withhold all "Federal funds" from sanctuary jurisdictions "to the maximum extent permissible by law." 90 Fed. Reg. at 8446.

70.     The enforcement directive in the Executive Order directs the Attorney General and DHS Secretary to evaluate and pursue "criminal or civil" legal action against any sanctuary jurisdiction based on any practices deemed to "interfere with the enforcement of Federal law." *Id.*

71.     Notably, the Administration's definition of "sanctuary jurisdictions" is even broader than under Executive Order 13,768. Where Executive Order 13,768 defined sanctuary jurisdictions by reference to compliance with 8 U.S.C. § 1373, Executive Order 14,159 simply defines sanctuary jurisdictions as those "seek[ing] to interfere with the lawful exercise of Federal law enforcement operations" in the Administration's view. *Id.*

72.     Executive Order 14,159 is an attempt to circumvent this Court's permanent injunction entered against Section 9 of Executive Order 13,768. In substance, both orders are the same—each directs the Attorney General or the Secretary of Homeland Security to withhold federal funds from sanctuary jurisdictions. Executive Order 14,159 fails to cabin its reach to any subset of federal funds, and so, on its face, it is as expansive as Executive Order 13,768. Neither order attempts advance a clear definition of what constitutes a sanctuary jurisdiction, nor is there any semblance of congressional authority to support either order.

### b.     DOJ Implements Executive Order 14,159

73.     On January 21, 2025, a day after Executive Order 14,159 was issued, Defendant Acting Deputy Attorney General Bove issued a memorandum to all DOJ employees entitled "Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement" ("Bove Memo") (Exhibit B).

74.     The Bove Memo implements Executive Order 14,159, including the enforcement directive related to sanctuary jurisdictions. Ex. B at p.3. The memo states the position of DOJ that "[t]he Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives." *Id.* Immigration enforcement initiatives are

not defined. On information and belief, Defendants seek to unlawfully compel localities across the country, including Plaintiffs, and in contravention of court orders and precedent, to participate and assist with aggressive immigration enforcement measures announced by the Trump Administration.

75. The Bove Memo further states DOJ's view that state and local actors violate federal law if they "fail[] to comply with lawful immigration-related commands and requests" pursuant to a non-exhaustive and vague list of authorities, including the President's "extensive Article II authority with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act." *Id.*

76. The Bove Memo also concludes that jurisdictions with laws that "prohibit[] disclosures of information to federal authorities engaged in immigration-enforcement activities" "threaten to impede Executive Branch immigration initiatives" and "threaten public safety and national security." *Id.*

77. The scope of immigration-related "commands" and "requests" is not defined, nor does the Bove Memo describe what information must be disclosed to immigration authorities. In fact, Defendants appear to interpret federal law to require that local jurisdictions comply with civil detainer requests, notification requests, civil administrative warrants, and request for personal information (including contact information and release dates) about undocumented residents in Plaintiffs' jurisdictions, despite court orders and precedent foreclosing Defendants' understanding of federal law. See Part II.C, infra.

78. The Bove Memo directs U.S. Attorney's Offices to investigate incidents of local actors failing to comply with immigration enforcement initiatives, commands, or requests for prosecution under 18 U.S.C. § 371, 8 U.S.C. § 1324, and 8 U.S.C. § 1373.

79. Plaintiffs' decision to decline to participate in federal immigration enforcement efforts is not a crime under any of the cited statutes. 8 U.S.C. § 1324 makes it a felony to, *inter alia*, knowingly or recklessly conceal, harbor, or shield an undocumented immigrant from detection or encourage or induce an undocumented immigrant to come to, enter, or reside in the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(iii), (iv). A violation of these provisions, without any aggravating

circumstances, is subject to fines and a sentence of up to five years in prison for each person involved. *Id.* § 1324(a)(1)(B).

80.     Declining to provide local resources to assist with all federal immigration initiatives, commands, and requests does not constitute a violation of § 1324. As discussed above, and consistent with Ninth Circuit precedent, Plaintiffs' laws do not and are not intended to interfere with federal law enforcement or shield or conceal undocumented immigrants from federal immigration authorities, but are instead a lawful exercise of authority to preserve scarce local resources to address matters of local concern and to build trust between government and the local community.

81.     8 U.S.C. § 1373 makes it unlawful for any jurisdiction to "prohibit, or in any way restrict," any government entity or official from sending "citizenship or immigration status" information about an individual to federal immigration authorities, or receiving such information from immigration authorities.

82.     This Court and the Ninth Circuit have held that § 1373 does not require jurisdictions to share non-immigration-status information (such as custody status, release date, and contact information) with immigration authorities. *See City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924, 969 (N.D. Cal. 2018); *United States v. California*, 921 F.3d 865, 891–93 (9th Cir. 2019); *City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020). Any interpretation of § 1373 that would require assistance more broadly squarely conflicts with this precedent.

83.     18 U.S.C. § 371 makes it a crime to conspire to commit an offense against or defraud the United States. If the underlying offense is a felony, a violation of this provision is subject to financial penalties and/or a sentence of up to five years in prison. For the reasons stated above, Plaintiffs do not believe that their policies violate federal law or constitute an offense against the United States.

84.     In addition to threatening prosecution under these statutes, the Bove Memo announces that a newly established "Sanctuary Cities Enforcement Working Group" will "identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives" and take legal action to challenge these laws. Ex. B at p.3.

19                    n:\cxlit\li2025\250739\01818697.docx

85.     In the context of other contemporaneous actions taken by the Administration, Defendants' directive that local actors must "comply" with immigration-related "initiatives" and "requests" under threat of prosecution is extraordinarily vague and could effectively require local jurisdictions in every state to administer federal immigration laws, in contravention of the text of federal statutes, constitutional principles, and precedent foreclosing such a view.

86.     For example, on January 23, 2025 the then-acting DHS Secretary issued an order entitled "Finding of Mass Influx of Aliens" ("DHS Order"). In that Order, the acting Secretary invoked his authority under the INA and 28 C.F.R. § 65.83 to "request assistance from a State or local government in the administration of the immigration laws of the United States," *inter alia*, when "there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of a State or locality," including an "actual or imminent mass influx of aliens" arriving at the border. 28 C.F.R. § 65.83(b), (d)(1).

87.     Citing various statistics about the number of undocumented immigrants crossing the southern border, the acting DHS Secretary concluded there was "an actual or imminent mass influx of aliens" at the southern border and that this "influx" threatens all 50 states.

88.     On this account, the acting DHS Secretary formally invoked his authority under the INA and implementing regulations to "request the assistance of State and local governments in all 50 States" to administer federal immigration law.

89.     While the DHS Order is phrased as a "request," the Bove Memo provides that states and local jurisdictions are *required* to comply with the Executive Branch's "initiatives" and "requests."

**B.     DOJ Freezes Federal Funding for Sanctuary Jurisdictions and Orders Investigations and Prosecutions of These Jurisdictions**

**1.     The Funding Restriction in Executive Order 14,159 is Temporarily Paused**

90.     On January 27, 2025, the Office of Management and Budget ("OMB") issued Memo 25-13 ("OMB Memo") announcing a pause on "all Federal financial assistance" in order to review and implement the funding conditions in several of President Trump's Executive Orders, including the Funding Restriction in Executive Order 14,159.

91.     The OMB Memo was immediately challenged in at least two cases. *See Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239 (D.D.C. filed Jan. 28, 2025); *New York v. Trump*, No. 25-CV-39 (D.R.I. filed Jan. 28, 2025). The DOJ and the then Acting Attorney General were named in the *New York* lawsuit. The federal court in that case issued a Temporary Restraining Order directing that the defendants (including DOJ) may not "pause, freeze, impede, block, cancel, or terminate" federal financial assistance to the States as directed by the OMB Memo "except on the basis of the applicable authorizing statutes, regulations, and terms." TRO at 11, ECF No. 50, *New York* (Jan. 31, 2025). Defendants were further enjoined from "giving effect to the OMB Directive under any other name or title or through any other Defendants." *Id.* at 12.

### 2.     DOJ Issues its Own Freeze on Funding

92.     On February 5, 2025, Defendant Attorney General Bondi issued a memo to all DOJ employees entitled "Sanctuary Jurisdiction Directives" ("Bondi Memo") (Exhibit C).

93.     Consistent with the direction of Executive Order 14,159, the Bondi Memo states that DOJ announced its own funding restriction to "ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department." Ex. C at p.1.

94.     The Attorney General also proscribes that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." Ex. C at p.1. Rather than relying on the (enjoined) Funding Restriction in Executive Order 14,159, the Attorney General purports to invoke DOJ's "own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations." *Id.* The memo further states that certain DOJ grants will be conditioned on compliance with 8 U.S.C. § 1373, and that future grants may be tailored "to promote a lawful system of immigration" and to "reduce efforts by state or local jurisdictions to undermine a lawful system of immigration." *Id.* at 2.

95.     To effectuate this unlawful order, the Attorney General directs that the Department of Justice "shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate." Ex. C at p.1. The Attorney General purports

to justify this measure as "[c]onsistent with applicable statutes, regulations, court orders, and terms." *Id.*

96. The Bondi Memo defines a "sanctuary jurisdiction" as "includ[ing]" any jurisdiction that refuses to comply with 8 U.S.C. § 1373 or "willfully fail[s] to comply with other applicable federal immigration laws." *Id.* at p.2.

97. Contrary to law and express precedent, Defendants interpret § 1373 to preclude local jurisdictions from preventing their employees from asking individuals about citizenship or immigration status information or limiting sharing of non-immigration status information (such as custody status, release date, and contact information) with immigration authorities.

98. Consistent with the enforcement directive in Executive Order 14,159 and the Bove Memo, the Bondi Memo provides that state and local actors "may not" "fail to comply with lawful immigration-related directives." Ex. C at p.3. It also states that jurisdictions with policies that "impede lawful federal immigration operations" will be challenged. efforts to enforce immigration law." *Id.*

99. The Memo then repeats the instruction to DOJ staff to investigate and prosecute such conduct under 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373, and for the Sanctuary Cities Enforcement Working Group to bring legal actions challenging sanctuary policies. *Id.*

**C.  DOJ Takes Enforcement Action Against Sanctuary Jurisdictions**

100. The enforcement directive in Executive Order 14,159, and the Bove and Bondi Memos, are not idle threats.

101. On February 6, 2025 the United States filed a lawsuit against the State of Illinois, the City of Chicago, Cook County, and various local officials alleging that these jurisdictions' laws violated federal law. Compl., *United States v. State of Illinois*, ECF No. 1, No. 25-cv-01285 (N.D. Ill.) (*Illinois* Compl.). The lawsuit explicitly invokes Executive Order 14,159. *Illinois* Compl. ¶ 1.

102. The lawsuit reveals the sheer breadth of power that Defendants claim they can assert over state and local policies, despite court orders and precedent to the contrary.

103. The federal government's complaint challenges provisions of the Illinois jurisdictions' laws that prohibit state and local officials from (1) detaining an individual on the basis of a detainer or civil administrative warrant, *Illinois* Compl. ¶ 42, 48, 54; (2) assisting with federal civil immigration

enforcement or detaining individual for federal civil immigration violations, *id.* ¶ 43; (3) inquiring about the citizenship or immigration status of any individual, *id.* ¶ 44; (4) providing immigration authorities access to individuals in local custody for investigative interviews, *id.* ¶ 48; and (5) providing immigration authorities with information regarding an individual's release date, *id.* ¶ 48; *see generally id.* ¶¶ 8–10.

104.    The federal government asserts that such provisions violate 8 U.S.C. § 1373 because, *inter alia*, they (1) prevent state and local actors from expending resources to respond to immigration enforcement inquiries about "custody status, release date, or contact information," and (2) preclude local officials from requesting or maintaining the immigration status of any individual. *Id.* ¶ 66.

105.    The government further asserts that provisions of these jurisdictions' laws violate federal law, including the Supremacy Clause, by limiting compliance with immigration detainers or civil administrative warrants, limiting access to individuals in local custody, and limiting the sharing of personal and release date information with immigration authorities. *Id.* ¶¶ 68–70.

106.    As discussed above, Plaintiffs have many of the same policies that the federal government claims to be illegal or unconstitutional. *See* Part I, *supra*.

## III. Defendants' Actions are Blatantly Unconstitutional and Violate Federal Law

### A.    Tenth Amendment

107.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

108.    This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992). This doctrine recognizes that the federal government has limited enumerated powers, and does not have "the power to issue direct orders to the governments of the States." *N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453, 471 (2018).

109.    Under the anti-commandeering doctrine, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. Otherwise, the federal government could invade the sovereign power reserved to the states and

1    simply "shift[] the costs of regulation to the States." *N.J. Thoroughbred Horsemen's Ass'n*, 584 U.S. at

2    474.

3    110.    The Executive Order and the Bondi Memo's restrictions on federal funding and threats

4    of civil and criminal enforcement violate the anti-commandeering principle inherent in the Tenth

5    Amendment by effectively coercing state and local governments to administer and enforce federal law.

6    111.    First, as discussed further below, the Executive Order and Bondi Memo commandeer

7    state and local governments by attempting to use the Spending Power to coerce them into acting as

8    arms of the federal government.

9    112.    Second, the Executive Order and Bondi Memo compel state and local jurisdictions to

10   administer federal immigration law, on penalty of civil and criminal enforcement.

11   113.    Executive Order 14,159 directs the Attorney General and DHS to undertake civil and

12   criminal enforcement actions against any jurisdiction for practices that they deem, in their discretion,

13   to "interfere with the enforcement of Federal law."

14   114.    The Bove Memo, which implements Executive Order 14,159, states that "prohibiting

15   disclosures of information to federal authorities engaged in immigration-enforcement activities"

16   "impede[s] Executive Branch immigration initiatives" and directs the Sanctuary Cities Enforcement

17   Working Group to take legal action to challenge "state and local laws, policies, and activities that are

18   inconsistent with Executive Branch immigration initiatives." It also states that local officials who fail

19   to comply with "lawful immigration related commands and requests" violate federal law. The memo

20   directs that DOJ employees investigate "incidents involving such misconduct" for criminal

21   prosecution under 8 U.S.C. § 371 and 18 U.S.C. §§ 1324 and 1373.

22   115.    The Bondi Memo further affirms Defendants' view that local jurisdictions that fail to

23   respond to immigration-related "directives" violate federal law and impede federal immigration

24   operations and reiterates Defendants' commitment to seek criminal and civil legal sanction against

25   such jurisdictions.

26   116.    As the federal government's lawsuit against the State of Illinois, the City of Chicago,

27   and Cook County demonstrates, Defendants seek to compel localities, including Plaintiffs, to enforce

28   federal immigration laws, including using local resources to hold individuals pursuant to civil

immigration detainers and administrative warrants and to share confidential personal information, such as release dates for individuals in custody, with immigration authorities.

117.    By limiting the use of local resources in aiding the execution of federal civil immigration enforcement, Plaintiffs have exercised lawful authority reserved to them under the Tenth Amendment. Defendants' actions—compelling state and local governments to enforce and administer federal immigration law at the behest of the federal government under threat of civil and criminal punishment and the withholding of critical funding—violates the Tenth Amendment.

118.    The Ninth Circuit has held that nothing in the Supremacy Clause or in any federal statute imposes an obligation on state or local governments to enforce federal immigration laws, and that to hold otherwise would violate the Tenth Amendment. *See United States v. California*, 921 F.3d at 890–91 (involving a challenge to SB 54, a California law that limits cooperation with immigration enforcement). In direct response to Defendants' assertions that limiting local cooperation with immigration enforcement may frustrate the federal government's immigration enforcement, the Ninth Circuit held:

> SB 54 may well frustrate the federal government's immigration enforcement efforts. However, whatever the wisdom of the underlying policy adopted by California, that frustration is permissible, because California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts. The United States stresses that, in crafting the INA, Congress expected cooperation between states and federal immigration authorities. That is likely the case. But when questions of federalism are involved, we must distinguish between expectations and requirements. In this context, the federal government was free to expect as much as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment. *Id.*

**B.    Separation of Powers**

119.    By purporting to restrict funds to sanctuary jurisdictions, the Executive Order and the Bondi Memo seek to exercise spending power that Article I, Section 8 of the Constitution grants exclusively to Congress.

120.    The Executive Order violates the separation of powers by creating a penalty for limiting cooperation with immigration enforcement that Congress did not authorize, without regard to statutory rules on grant programs put in place by Congress.

121.     The Bondi Memo likewise violates the separation of powers by conditioning federal funding administered by DOJ on compliance with "applicable federal immigration law," without regard to statutory rules on DOJ grant programs enacted by Congress.

122.     Through the Executive Orders and the Bondi Memo, Defendants also effectively legislate a new sanction for failing to comply with the Executive Branch's immigration enforcement priorities. The unilateral imposition of this new sanction and condition on spending is not supported by the INA, or any other act of Congress, or by the Constitution.

123.     Defendants may not unilaterally impose new restrictions on jurisdictions' eligibility for federal funding. Any restriction on eligibility for federal funds must be imposed—clearly, unambiguously, and in advance—by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). When Congress has not imposed such a restriction by statute, the President may not do so by fiat. The President does not have "unilateral power to change the text of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 447 (1998).

124.     Congress has consistently and repeatedly rejected the imposition of funding restrictions for sanctuary jurisdictions that limit cooperation with federal civil immigration enforcement. *See City & Cnty. of S.F.*, 897 F.3d at 1234 n.4 (listing numerous failed Congressional bills to withhold funds from sanctuary jurisdictions); *see also* No Bailout for Sanctuary Cities Act, H.R. 5717, 118th Cong. (2024); Stop Dangerous Sanctuary Cities Act, S. 3452, 117th Cong. (2021); Mobilizing Against Sanctuary Cities Act, H.R. 94, 117th Cong. (2021); No Tax Breaks for Sanctuary Cities Act, H.R. 894, 117th Cong. (2021); Ending Sanctuary Cities Act of 2021, H.R. 3195, 117th Cong. (2021). Where the President "takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

125.     By imposing conditions or limitations on federal spending without express statutory authority, the Executive Order and Bondi Memo also unlawfully exceed the President's powers under other provisions of the Constitution that establish the separation of powers among the branches of our government, including: (i) the President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5 (Take Care Clause), and (ii) the limitation that Congressional

enactments must "be presented to the President of the United States," who then may sign that enactment or veto it, but has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7, cls. 2-3 (Presentment Clause).

126.    The Ninth Circuit has held that the President violates the constitutional separation of powers by attempting to withhold federal funds from jurisdictions that limit cooperation with ICE where Congress has not tied such funding to compliance with immigration enforcement or delegated authority to the Executive to impose such conditions. *See City & Cnty. of S.F.*, 897 F.3d at 1234–35 (upholding injunction against Executive Order 13,768 on separation-of-powers grounds).

## C.    Spending Clause

127.    Further, the Executive Order and Bondi Memo purport to exercise spending power in ways that even Congress could not.

128.    First, Defendants' actions violate the Spending Clause by imposing vague new funding conditions on existing appropriations of federal funds. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," in advance. *Pennhurst*, 451 U.S. at 17. "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" Congress's conditions. *Id.* "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* Once a State has accepted funds pursuant to a federal spending program, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012).

129.    Defendants' actions also violate the Spending Clause by imposing funding conditions that are not germane to the purpose of the funds. "[T]he imposition of conditions under the spending power" must be "germane" or "related" to the purpose of federal funding. *South Dakota v. Dole*, 483 U.S. 203, 208-09 & n.3 (1987); *see also Massachusetts v. United States*, 435 U.S. 444, 461 (1978). Here, Defendants have conditioned eligibility for federal funding on compliance with Defendants' immigration enforcement priorities and efforts, without regard to whether that purpose is germane to any federal funds at issue.

130. In addition, Defendants' actions impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion." *Sebelius*, 567 U.S. at 579 (opinion of Roberts, C.J.); *New York*, 505 U.S. at 175. The Executive Order's conditioning of all funding on compliance with the federal government's demands regarding cooperation with its civil immigration enforcement efforts "is much more than 'relatively mild encouragement'—it is a gun to the head." *Sebelius*, 567 U.S. at 581 (opinion of Roberts, C.J.). *See* Part IV.B, *infra.* Threats of this magnitude, and to such critical programs, constitute "economic dragooning that leaves the States with no real option but to acquiesce" to federal dictates. *Id.* at 582.

131. Finally, by compelling state and local jurisdictions to enforce immigration laws, Defendants seek to impose conditions that would require Plaintiffs to act unconstitutionally. Under the Fourth Amendment, generally, detention of an individual must be supported by a determination of probable cause. *See Morales*, 793 F.3d at 215–17; *Miranda-Olivares*, 2014 WL 1414305. Requiring state and local governments to establish blanket policies of compliance with immigration detainers could thus cause them to violate the Fourth Amendment. But Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. And state and local governments, generally lack authority to make warrantless arrests under the Federal government's civil immigration laws. *See Arizona v. United States*, 567 U.S. 387, 408 (2012).

### D. Due Process

132. The Fifth Amendment protects against federal laws that are so vague they fail to provide fair notice of what is prohibited or so standardless that they permit discriminatory enforcement. *United States v. Williams*, 553 U.S. 285, 304 (2008).

133. Under the Fifth Amendment, the federal government may not work a deprivation of money or property without due process of law.

134. Executive Order 14,159 and the Bondi Memo fail to meaningfully define key terms underlying their enforcement, including "sanctuary jurisdictions," "Federal funds," or "practices that interfere with the lawful exercise of Federal law." Having such a "practice" subjects a jurisdiction to

"criminal or civil" enforcement action, yet what such a practice might be is left undefined, and therefore subject to executive whim.

135.    Similarly, Executive Order 14,159 and the Bondi Memo deny procedural due process because they grant the Executive Branch unfettered, undefined, and standardless discretion to withhold funds from "sanctuary jurisdictions" in which those jurisdictions have a cognizable property interest.

136.    The lack of definition, notice, or procedures associated with designation as a "sanctuary jurisdiction" and the withholding of funding pose obvious constitutional infirmities, especially in an environment in which DOJ is now prosecuting jurisdictions for their non-cooperation ordinances and policies.

### E.    Administrative Procedure Act

137.    The Administrative Procedure Act ("APA") governs the process of federal agency decision-making. Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi Memo is therefore an agency action subject to review under the APA. Defendant DOJ's action in promulgating the Bondi Memo violates the APA in numerous respects.

138.    As discussed above, Defendant DOJ's action is in excess of statutory authority and contrary to fundamental constitutional principles. *See* 5 U.S.C. § 706(2)(B), (C).

139.    In addition, the APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Bondi Memo is an abuse of discretion and not in accordance with law because it is unsupported by constitutional or statutory authority.

140.    In addition, the Bondi Memo is arbitrary and capricious because it fails entirely to offer a reasonable explanation for the breadth of funding withheld and the basis for withholding funds already appropriated, and fails entirely to consider the reasonable and inevitable reliance by Plaintiffs on now-suddenly frozen funding, the expectation of reimbursement from already appropriated funds, and the need for clarity by local governments about funding streams to provide day-to-day services relied on by their citizens.

IV.     **Plaintiffs Face Serious Harm from Defendants' Unconstitutional and Unlawful Actions**

    A.     **Plaintiffs Each Have Laws and Policies That Defendants Consider "Sanctuary" Policies**

141.    Executive Order 14,159 defines sanctuary jurisdictions as any jurisdiction that "seek[s] to interfere with the lawful exercise of Federal law enforcement operations."

142.    The Bove Memo concludes that limiting compliance with federal "immigration enforcement initiatives" and "requests," and "prohibiting disclosures of information" to immigration authorities, impedes federal civil immigration enforcement and violates federal law.

143.    The Bondi Memo defines sanctuary jurisdictions as any jurisdictions that "refuse to comply with 8 U.S.C. § 1373" or other "applicable federal immigration laws." It concludes that jurisdictions must comply with applicable "immigration-related directives."

144.    The *Illinois* lawsuit makes clear that for purposes of Executive Order 14,159, and consistent with the Bove and Bondi Memos, Defendants have concluded that jurisdictions violate federal law, including 8 U.S.C. § 1373, and interfere with federal immigration enforcement operations, if they limit or prohibit officials from: (1) detaining an individual on the basis of a detainer or civil administrative warrant, *Illinois* Compl. ¶ 42, 48, 54; (2) assisting with federal civil immigration enforcement or detaining an individual for federal civil immigration violations, *id.* ¶ 43; (3) inquiring about the citizenship or immigration status of any individual, *id.* ¶ 44; (4) providing immigration authorities access to individuals in local custody for investigative interviews, *id.* ¶ 48; and (5) providing immigration authorities with information regarding an individual's release date, *id.* ¶ 48; *see generally id.* ¶¶ 8-10.

145.    Plaintiffs have the kinds of laws and policies that Defendants have deemed unlawful "sanctuary" policies.

146.    For example, each of Plaintiff's laws and policies limits compliance with civil immigration detainer requests or administrative warrants. Likewise, Plaintiffs each generally prohibits the use of their localities' resources to assist in federal civil immigration enforcement and restricts the disclosure to immigration authorities of personal information about any individual or compliance with a notification request for the release date of someone in custody, except in very limited circumstances.

**B.      Plaintiffs Face Devastating Budgetary Injury**

147.      The Bondi Memo expressly threatens Plaintiffs with the loss of federal funds that they use to provide essential services for supporting children and families, law enforcement activities and agencies and victims of violent crimes in their communities. The threatened cuts are unrelated to immigration enforcement and run counter to the goals of public safety sought to be advanced by the Administration and would have far reaching consequences. Plaintiffs face immediate injury from DOJ's freezing of federal funds and its withholding and condition of federal funding on local cooperation with federal immigration policies.

**1.      San Francisco**

148.      In Fiscal Year 2024-25, San Francisco received at least $8.7 million in funds administered by the DOJ, either directly or through state pass-through funding. These funds support a myriad of critical public safety and other services, including:

- San Francisco's District Attorney's Office Victim Witness Program from the Department of Justice, Office for Victims of Crimes pursuant to the Victims of Crime Act of 1984, 34 U.S.C. § 20103(a) and (b), that supports San Francisco in providing comprehensive services to victims and survivors of all types of violent crime;

- The San Francisco Police Department Regional Vehicle Interdiction Desk Project, a multijurisdictional project to combat carjacking. The law enforcement activities funded by this grant include tactical casework in support of carjacking investigations and prosecutions and use of carjacking vehicles in organized crime;

- Law Enforcement Assisted Diversion, an innovative approach that seeks to accomplish the goals of reduced criminal behavior and improved public safety by connecting appropriate low-level drug offenders with services;

- Focused Drug Deterrence, short-and-long term proactive activities including targeted investigations and enforcement and social network analysis to increase the identification of individuals involved in high-level drug markets;

- Drug Court Prosecution, which seeks to connect criminal defendants who suffer from a substantial substance abuse problem to treatment services in the community in order to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

31

n:\cxlit\li2025\250739\01818697.docx

enhance public safety, reduce recidivism, and to find appropriate dispositions to the criminal charges;

- Targeted Drug Treatment for Underserved Populations, a treatment intervention conducted by the Sheriff's Department for individuals in custody;

- Intensive Probation Supervision, a targeted caseload of probationers with substance abuse and/or mental health issues;

- Reentry Social Work through the Public Defender's Office, which provides legal and wraparound support to help indigent clients charged with felony drug cases and other felony offenses successfully exit the criminal justice system;

- Citywide Justice-Involved Youth Planning, which examines current criminal justice trends impacting youth and young adults and strengthens partnerships and collaboration at various levels to create a continuum of support for youth and young adults.

149.    These programs are funded by grants that are statutorily authorized by Congress, which did not impose immigration-related conditions upon the award or use of the funds. See e.g., 42 U.S.C. § 3752(a)(5)(D) (Byrne JAG provisions directing that recipients simply must use funds for a program or  activity that falls within one of the several statutory purposes, and certify that they will "comply with all provisions of this [statutory] part and all other applicable Federal laws." ); see also Victims of Crime Act authorizing Victim Witness Program grants 34 U.S.C. § 20103 ("Subject to the availability of money in the Fund, the Director shall make an annual grant from any portion of the Fund made available...")

150.    San Francisco currently faces a significant budget deficit for FY 2026 and 2027 and the Mayor has directed City departments to propose ongoing cuts of 15% from their general fund budgets. The federal funds frozen by the Bondi Memo and subject to unlawful immigration-related conditions are funds that are currently anticipated and relied upon by San Francisco. The expectation for these funds is part of San Francisco's currently approved budget and even if it were to immediately cease all activities by laying off staff and notifying contractors to stop work, San Francisco would still be obligated to pay for work done, adding to its current budget shortfall. If San Francisco were deprived of its DOJ funding, it would be forced to make difficult choices on sustaining the DOJ-funded

programs that serve children, crime victims, and critical law enforcement services through local

funding sources or cutting these or other critical services.

151. The Executive Order threatens an even greater impact on San Francisco's fiscal

situation. San Francisco's current budget includes nearly $3.1 billion in federal funds for a myriad of

critical services such as health care reimbursement, housing, capital projects, emergency services, and

public infrastructure. Losing all, or even a fraction, of that amount would trigger a fiscal crisis that

would require drastic reductions in critical municipal services.

### 2. Santa Clara

152. Upon information or belief, Santa Clara estimates that it receives $6 to $7 million in

grants that originate with DOJ, either directly or passed through the State of California. This DOJ

funding supports a range of important programs and services provided by Santa Clara's Office of the

Sheriff, Office of the District Attorney, Probation Department, and other departments and agencies to

crime victims, child abuse survivors, justice-involved youth, and the entire Santa Clara County

community. These programs and services include, but are not limited to:

- Direct services to trafficking survivors and other victims of crime;

- The Psychiatric Emergency Response Team, which is a joint effort among Santa Clara's
  Behavioral Health Services Department and law enforcement agencies in which
  multidisciplinary law enforcement and clinician teams respond to 911 calls that involve both a
  mental health crisis and a law enforcement issue;

- Data analysts for the Office of the District Attorney's Gun Related Intelligence Program,
  which uses ballistic evidence to link shootings and solve gun crimes, through DOJ's Crime
  Gun Intelligence Center grant;

- Services of Santa Clara's Crime Laboratory, an internationally accredited forensic laboratory
  that handles controlled substance analysis, firearms examination, latent fingerprint processing,
  digital evidence, fire debris and explosives analysis, DNA and toxicology analysis, and more,
  through DOJ's Paul Coverdell Forensic Science Improvement Grants Program, which supports
  improvements in forensic science; and DOJ's DNA Capacity Enhancement for Backlog

Reduction Program, which aims to increase the capacity of government-run forensic laboratories to process DNA samples and reduce backlogs that delay justice;

- Through DOJ's Improving the Investigation and Prosecution of Child Abuse and the Regional and Local Children's Advocacy Centers Program, efforts to improve techniques for investigating and prosecuting child abuse; to enhance coordination among community-based providers and law enforcement, child welfare, and medical and mental health professionals involved in investigation, prosecution, intervention, and prevention work; and to serve child abuse victims and their non-offending family members through Santa Clara's Children's Advocacy Center; and

- Services to improve public safety and reach youth involved in serious violent or weapons-related crimes, as well as youth at risk of justice involvement—including a collaboration with the University of Cincinnati Corrections Institute to implement a phased process of youth-centered design and programming enhancements at the Probation Department's a rehabilitative youth facility, with associated training and coaching for Probation staff.

153.    Not a single one of these programs relates to immigration enforcement or any community member's immigration status. Instead, they relate more broadly to protecting the entire Santa Clara County community—including vulnerable children, trafficking victims, and sexual assault survivors—from harm; and enhancing the ability of local police agencies and prosecutors to do their core work of preventing and addressing crime.

154.    Santa Clara, like entities across California and the nation, is facing budget deficits. To meet Santa Clara's obligation to deliver a balanced budget, Santa Clara's departments, agencies, and executive leadership made very difficult choices in the most recent fiscal year to close a $250 million budget deficit while maintaining critical services for the community. If Santa Clara were deprived of its DOJ funding, it would struggle to sustain its DOJ-funded programs that serve children, crime victims, and vitally important forensic and law enforcement services through local funding sources. It would be forced to make impossible choices about cutting either these programs, or the other safety-net programs that Santa Clara provides.

155.    Beyond the millions of dollars of funding immediately threatened by the Bondi Memo, the Executive Order, which is not expressly limited to DOJ grant dollars, threatens the approximately $3.5 billion in total federal funding that Santa Clara County received or will receive in the current fiscal year. In total, federal funding comprises 31 percent of Santa Clara County's revenue.

156.    These funds support healthcare, safety-net programs and social services for children and families, and other essential government functions, such as public health, infrastructure, emergency response and public safety. Many of the program supported by federal funds require Santa Clara to advance the cost of services before seeking reimbursement from the federal government. Without these federal funds, Santa Clara would be forced to make extraordinary cuts to critical services—and in some cases totally eliminate key services and functions. The elimination, or even reduction, of federal funding would require Santa Clara to fundamentally and globally reallocate funds and services.

157.    Because Santa Clara is continuing to operate federally-funded programs on a daily basis, it needs to know whether to (1) continue incurring hundreds of millions of dollars in costs that may never be reimbursed by the federal government, (2) discontinue basic safety-net services delivered to its most vulnerable residents, or (3) in an attempt to avoid either of these outcomes, be effectively conscripted into using local law enforcement and other resources to assist the federal government in its immigration enforcement efforts.

### 3.    Portland

158.    Today, the City of Portland has over $10 million in 12 active grants from different Department of Justice grant programs. This funding has already been awarded to Portland, but most of it has not yet been disbursed. Among these threatened grants are funding for essential services under the Byrne JAG program and the National Sexual Assault Kit Initiative (SAKI) – which is supporting Portland's effort to tackle its backlog of rape kits for victims of sexual assault. This funding is critical to maintaining public safety.

159.    In total, Portland currently has over $340 million in awarded federal grants which may be implicated by the Executive Order's broad sweeping scope.

160.     In addition, Portland faces a potential $100M budget shortfall for fiscal year 2025-2026. The Mayor and City Council are actively working to budget during these very difficult financial times. As city leaders and employees work to ensure essential services continue for its residents, even a temporary pause could cause untold harm. The federal government's threats to not only limit future funding, but to stop funding or renegotiate hundreds of millions of dollars in grants that the city has already been awarded only exacerbates the already serious budget crisis.

### 4.     King County

161.     The 2025 King County operating budget includes roughly $200 million in federal funding for operations. An additional $500 million is allocated to multi-year capital projects. Federal grants and appropriations fund numerous critical public safety projects and include ear-marked funds designated by congress for anti-terrorism counter measures related to the 2026 World Cup. The loss of this funding based on King County's decision to limit cooperation with federal civil immigration enforcement would have a devastating impact on public safety and emergency preparedness.

162.     Defendant Bondi's purported freeze on DOJ funds directly impacts King County. Currently, the county has approximately $5.5 million in direct and indirect funding from the DOJ including over $3 million in funding for local law enforcement initiatives. King County also has plans to seek future DOJ grants to enhance both public safety and officer safety. DOJ's actions in freezing existing grant funds and precluding King County from future grants is especially impactful in the current budget cycle, where King County is facing a substantial short fall in its general fund. DOJ's actions, if allowed to proceed, will directly and negatively impact public safety by decreasing resources precisely when they are needed the most.

### 5.     New Haven

163.     New Haven relies heavily on federal funding to deliver public services.

164.     Over the last few years, New Haven has received approximately $104,222,265 in direct federal grants.

165.     New Haven also relies specifically on funding from DOJ, with $6,409,071 in DOJ federal grants awarded over the last few years. These funds support critical public safety needs, including various violence prevention programs, improved training and equipment for police officers,

mental health professionals to work with police officers in crisis response, purchase and installation of public safety technology and safety gear for police protection, and other public-safety related initiatives.

166. The freezing and withholding of these funds based on New Haven's decision to limit local involvement in federal civil immigration enforcement will have a grave impact on New Haven's ability to keep its residents safe.

### C. Plaintiffs Face Operational Harms in Serving Their Communities

167. Despite court orders and precedent foreclosing Defendants' understanding of the law, Defendants' actions have fostered an atmosphere of fear and distrust between undocumented immigrants and local government officials in Plaintiffs' jurisdictions. The threats of criminal and civil prosecution leveled at local officials, combined with recent ICE activity in Plaintiffs' communities, and compounded by the Trump Administration's statements about immigration enforcement, have also generated a maelstrom of fear and confusion and have left local agencies unsure of whether efforts to serve the undocumented community will be treated as grounds for prosecution.

168. By heightening undocumented immigrants' concerns that any interaction with local officials will lead to their information being turned over to ICE, the Executive Order discourages undocumented immigrants from reporting crimes, seeking public health services, and otherwise engaging with programs and services provided by Plaintiffs. This threat harms public safety, public health, and Plaintiffs' ability to act in what they have determined to be the best interest of their residents, consistent with federal and state law.

169. The Executive Order undermines Plaintiffs' ability to provide critical services not just to undocumented immigrants, but to all residents. When witnesses and crime victims will not talk to the police, law enforcement suffers and the entire community is less safe. When children are not vaccinated or the sick are not treated for communicable diseases, illness spreads throughout the community.

170. At the same time, the repeated threats of criminal and civil prosecution, in the Executive Order, the Bove and Bondi Memos, and in repeated statements from Trump Administration

officials, has left local officials fearful that complying with Plaintiffs' laws and serving undocumented residents will subject them to civil or criminal prosecution.

171.    These threats and fears fall disproportionately on public servants on the front lines of providing critical public safety and public health needs for residents of Plaintiffs' jurisdictions. For example, the Executive Order and the Bondi Memo have already started to cause confusion and harm to Portland. Portland and its employees are required to follow both Oregon and federal law. Threats of prosecution impact front-line workers—police officers, firefighters, front desk staff at community centers—who will be required to make decisions in an interaction with immigration-enforcement officers that is consistent with all those laws. Threats of prosecution by the DOJ do nothing to resolve the legal and policy disputes between local leaders and the federal government. Instead, they instill fear and uncertainty in public servants—employees simply trying to do their jobs consistent with the laws.

172.    Portland has been forced to consider ways to protect and assist such employees, promulgate additional guidance, and manage confusion surrounding the Executive Orders and the Bondi Memo.

173.    Similarly, Defendants' threats to prosecute employees of so-called sanctuary jurisdictions has caused considerable distress and consternation within the King County work force. King County has been forced to dedicate resources toward creating and adopting new protocols to mitigate the federal threat to frontline workers while continuing to enforce KWW and KCC 2.15. King County has expended sums placing a federal criminal defense attorney on retainer in anticipation of a federal prosecution.

174.    These operational concerns are further exacerbated by the federal government's lawsuit against the State of Illinois, the City of Chicago, and Cook County challenging many of the very same requirements that officials in Plaintiffs' jurisdictions are required to comply with under applicable local laws.

## CAUSES OF ACTION
## COUNT ONE
## TENTH AMENDMENT

175.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

176.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend X. This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz*, 521 U.S. at 925 ("the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.").

177.    Neither the Supremacy Clause, the INA, nor any federal statute displaces Plaintiffs' Tenth Amendment interest in refraining from deploying local resources to enforce federal immigration law. *United States v. California*, 921 F.3d at 890–91.

178.    As described above and in the Third Cause of Action below, Defendants violate the Tenth Amendment and seek to commandeer Plaintiffs because Executive Order 14,159 and the Bondi Memo attempt to use the spending power to coerce them into acting as arms of the federal government.

179.    The Executive Order and the Bondi Memo also require Plaintiffs to enforce federal immigration law—including using local resources to hold individuals pursuant to civil immigration detainers and administrative warrants and share confidential personal information, including release dates for individuals in custody, with immigration authorities—on penalty of civil or criminal prosecution.

180.    By restricting funding and directing enforcement against Plaintiffs for limiting cooperation with federal immigration authorities, Defendants seek to commandeer Plaintiffs in furtherance of a federal regulatory program in violation of the Tenth Amendment to the United States Constitution.

## COUNT TWO

## SEPARATION OF POWERS

181.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

182.    The Constitution vests Congress with legislative powers, see U.S. Const. art. 1, § 1, and the spending power, see U.S. Const. art. 1, § 8, cl. 1. Absent a statutory provision or an express delegation, only Congress is entitled to attach conditions to federal funds.

183.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

184.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L.Ed. 253 (1825)).

185.    The separation of powers doctrine thus represents perhaps the central tenet of our constitution, *see, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24, *Seila Law LLC*, 591 U.S. at 227, and consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring).

186.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234.

187.    Congress has not conditioned the provision of federal funding on compliance with Defendants' immigration enforcement policies and requests.

188.    Congress has not delegated to Defendants the authority to impose immigration-enforcement conditions on federal funds.

189.    Through Executive Order 14,159 and the Bondi Memo, Defendants are unilaterally imposing new conditions on federal funding without authorization from Congress.

190.    In addition, through these actions, Defendants are legislating new sanctions for failure to comply with immigration enforcement authorities that are unsupported by any act of Congress, including under the INA, or by the Constitution.

191.    For these reasons, Defendants' conditioning of federal funding on local governments' cooperation with immigration enforcement violates principles of separation of powers.

## COUNT THREE
### SPENDING CLAUSE

192.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

193.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

194.    As described above, Defendants violate separation of powers principles because the funding restrictions in Executive Order 14,159 and the Bondi Memo are not authorized by Congress, expressly or impliedly, and therefore violate the Spending Clause as well.

195.    Even if Congress had delegated its authority to impose conditions on federal funds, the funding restrictions in Executive Order 14,159 and the Bondi Memo would violate the Spending Clause by:

a.    imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17 ("The legitimacy of Congress' power to legislate under the spending power…rests on whether the State voluntarily and knowingly accepts [Congress' conditions]…  There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to

<table>
<tr><td>1</td><td>ascertain what is expected of it…[I]f Congress intends to impose a condition on the</td></tr>
<tr><td>2</td><td>grant of federal moneys, it must do so unambiguously.”);</td></tr>
<tr><td>3</td><td>b.    imposing conditions that are not germane to the stated purpose of the [program name]</td></tr>
<tr><td>4</td><td>funds, see <em>Dole</em>, 483 U.S. at 207 (“[C]onditions on federal grants might be illegitimate</td></tr>
<tr><td>5</td><td>if they are unrelated ‘to the federal interest in particular national projects or</td></tr>
<tr><td>6</td><td>programs.’”);</td></tr>
<tr><td>7</td><td>c.    imposing conditions that are so severe as to coerce Plaintiffs, <em>see Sebelius</em>, 567 U.S. at</td></tr>
<tr><td>8</td><td>579 (opinion of Roberts, C.J.) (Congress may not impose conditions so severe that they</td></tr>
<tr><td>9</td><td>“cross[] the line distinguishing encouragement from coercion.”); and</td></tr>
<tr><td>10</td><td>d.    imposing conditions that would require Plaintiffs to act unconstitutionally by detaining</td></tr>
<tr><td>11</td><td>individuals based on civil detainers without a finding of probable cause, <em>Dole</em>, 483 U.S.</td></tr>
<tr><td>12</td><td>at 210 (Congress’s spending power “may not be used to induce the States to engage in</td></tr>
<tr><td>13</td><td>activities that would themselves be unconstitutional.”).</td></tr>
</table>

**COUNT FOUR**

**FIFTH AMENDMENT DUE PROCESS: VOID FOR VAGUENESS**

196.    Under the Fifth Amendment to the United States Constitution, a federal law is unconstitutionally vague if it “fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.” <em>Williams</em>, 553 U.S. at 304.

197.    The constitutional vagueness standard applies with full force to executive orders. <em>See United States v. Soussi</em>, 316 F.3d 1095, 1101 (10th Cir. 2002). When an executive order contains terms that are not “susceptible of a clear meaning,” nor “mitigate the vagueness of the term by supplying any definition,” then the provision “lends itself to subjective interpretation” and is unconstitutional. <em>Humanitarian Law Project v. U.S. Dep’t of Treasury</em>, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006).

198.    Section 17 of Executive Order 14,159, which refers to “sanctuary jurisdictions,” fails to meaningfully define key terms, such as “sanctuary jurisdictions,” “Federal funds,” or “practices that interfere with the lawful exercise of Federal law.” 90 Fed. Reg. at 8446. Nonetheless, having such a “practice” subjects a jurisdiction to “criminal or civil” actions, which could be draconian in nature. <em>Id.</em>

What such a practice might be is left undefined, and subject to the Executive Branch's unbridled discretion.

199.    While court orders and precedent clearly define the limits of what the federal government can demand, the Executive Branch has already demonstrated its eagerness to exercise this unbridled discretion to reach into states and local jurisdictions to interfere with their ordinances, operations, and processes. Such a vast, standardless, and overbroad power invites arbitrary, subjective, and discriminatory enforcement.

200.    Executive Order 14,159 purports to grant the Attorney General and the Secretary of Homeland Security unfettered discretion to decide which states or local governments are "sanctuary jurisdictions" that are now subject to criminal or civil action, and will have their funding paused, terminated, and/or clawed back.

201.    Other portions of Executive Order 14,159 are equally vague. Section 8, for example, requires assessment of "fines and penalties" against "aliens unlawfully present in the United States" but also anyone who "facilitate[s] such aliens' presence in the United States." 90 Fed. Reg. at 8445. It is unclear what Defendants understand "facilitate" to mean in this context, and the Order could be read to apply to employees of Plaintiffs who provide undocumented persons with basic, safety-net services, or landlords, employers, friends, family, churches or non-profit organizations that assist undocumented persons. Not only does this standardless provision exceed the President's authority by legislating through executive order, but it also encourages and sanctions arbitrary, subjective, and discriminatory enforcement.

202.    The DOJ memos are equally vague and lean into the unfettered discretion purportedly granted to them by the Executive Order. The Bove Memo directs "the newly established Sanctuary Cities Enforcement Working Group … to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives," but does not define what would be encompassed within the expansive phrase "inconsistent with Executive Branch immigration initiatives."

203.    The Bondi Memo purports to define "[s]o-called 'sanctuary jurisdictions'" to "include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance

with § 1373, or willfully fail to comply with other applicable federal immigration laws." But this definition is circular and fails to provide any more "fair notice of what is prohibited" than Executive Order 14,159 does. *Williams*, 553 U.S. at 304. Crucially, the Memo "does not make clear what conduct might subject a state or local jurisdiction to defunding or enforcement action, making it impossible for jurisdictions to determine how to modify their conduct, if at all, to avoid … penalties." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 535. Furthermore, use of the word "include" suggests that even a jurisdiction that does comply with Section 1373 could still be considered a "sanctuary jurisdiction" subject to defunding and prosecution under Executive Order 14,159 and the Bondi Memo.

204.    The lack of notice or procedure for how a local government is to be designated a "sanctuary jurisdiction" is particularly problematic when DOJ appears to have very recently taken on an expansive reinterpretation of 8 U.S.C. § 1373 that is likely contrary to how courts have interpreted the law. In other words, DOJ is now prosecuting jurisdictions for their ordinances and policies, when courts have previously held similar ordinances to be lawful and *not* in conflict with federal immigration enforcement laws. *See United States v. State of Illinois*, No. 1:25-cv-1285 (N.D. Ill. filed Feb. 6, 2025); *compare Barr*, 965 F.3d at 764 ("Plaintiffs' respective sanctuary laws comply with 8 U.S.C. § 1373."); *Steinle v. City & Cnty. of S.F.*, 919 F.3d 1154, 1164 (9th Cir. 2019) (local policy not to share release date information of an inmate who is also an alien not preempted under the plain language of 8 U.S.C. § 1373); *United States v. California*, 921 F.3d at 891 (state law restricting information sharing with federal immigration enforcement officials did not conflict with 8 U.S.C. § 1373); *see also Garland*, 42 F.4th at 1085–86 (Oregon's laws conserving use of state resources from being used to enforce federal immigration laws did not conflict with 8 U.S.C. § 1373).

205.    The reversal of policy effectuated by the Bondi Memo, without explanation, and without heed to the fact that it is *not* the province of the Executive Branch to say what the law is, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388–89 (2024), also violates fair notice requirements of the Fifth Amendment. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012).

# COUNT FIVE

## FIFTH AMENDMENT DUE PROCESS: PROCEDURAL DUE PROCESS

206. Under the Fifth Amendment to the United States Constitution, the federal government may not deprive Plaintiffs of money or property without "due process of law."

207. Plaintiffs each have a constitutionally protectable property interest in the federal funds they rely on to provide essential services to their residents. Plaintiffs' property interest in those federal funds is established and governed by rules and mutually explicit understandings with the federal government.

208. Section 17 of Executive Order 14,159 and the Bondi Memo deprive the Plaintiffs of their procedural due process rights under the Fifth Amendment because they grant the Attorney General, DOJ, and the DHS Secretary unfettered discretion to "ensure that" so-called "'sanctuary jurisdictions'" do not receive access to Federal funds from the Department."

209. The Bondi Memo's thin reference that DOJ, when terminating or clawing back funds from awardees it has deemed to be sanctuary jurisdictions, "shall comply with any notice and procedural requirements in the award, agreement, or other instrument" does not insulate the Memo's defunding threats from a Fifth Amendment challenge. Notwithstanding any notice or procedures pursuant to terms of awarded funding that this sentence refers to, local jurisdictions have no way to know if or when they have been designated by the DOJ a "sanctuary jurisdiction" in the first place, or have an opportunity to be heard to dispute that designation prior to initiation of proceedings against a jurisdiction's funding or against the jurisdiction itself. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 536.

210. Moreover, the Bondi Memo's directive to "[a]ll litigating components of the Department of Justice and each U.S. Attorneys' Office" to take action against local governments, appears designed to chill lawful ordinances and policies that limit the use of local resources to assist with federal immigration enforcement, and to coerce jurisdictions into abandoning those policies. The Bondi Memo provides no mechanism by which a state or local government may review, challenge, or even obtain notice that it has been designated a "sanctuary jurisdiction."

45

211.    The Bondi Memo's self-serving statements that the defunding and enforcement actions contemplated will be "consistent with" the law do not shield the Administration from the Fifth Amendment.  *See Doe v. Harris*, 772 F.3d 563, 580–81 (9th Cir. 2014); *see also United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."); *City & Cty. of S.F. v. Trump*, 897 F.3d at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."). These statements are also likely illusory, given the several actions that the Administration has taken, particularly with respect to federal funding, since January 20, 2025 that have already been held to be unconstitutional by courts across the country. *See, e.g.*, Mem. Op. & Order, ECF No. 30, *Nat'l Council of Nonprofits* (D.D.C. Feb. 3, 2025) (TRO against OMB directive); ECF No. 50, *New York* (D.R.I. filed Jan. 28, 2025) (same); Preliminary Injunction, ECF No. 114, *State of Washington v. Trump*, No. 25-cv-00127 (W.D. Wash. Feb. 6, 2025) (granting preliminary injunction against Executive Order ending birthright citizenship for children born to certain noncitizen parents).

212.    Because the Executive Order deprives the Plaintiffs of a cognizable property interest while providing no notice, no pre-deprivation opportunity to be heard, and no post-deprivation opportunity to be heard, it violates the Fifth Amendment's due process clause.

## COUNT SIX

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)

#### (ARBITRARY AND CAPRICIOUS)

213.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

214.    Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi Memo is an agency action subject to review under the APA.

215.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

216. The Bondi Memo is a final agency action because it announces a final decision to pause funding on a blanket basis at a certain time and thus marks the consummation of the DOJ's decision-making process.

217. Further, the Bondi Memo is an action determining rights or obligations or from which legal consequences will flow because it exercises a purported authority held by DOJ to stop funding directed by Congress that would be provided but for the Bondi Memo.

218. Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

219. "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

220. As described above, the Bondi Memo provides no reasoned explanation for the extreme breadth of the withholding of funding to Plaintiffs or precipitous timing of that withholding.

221. The Bondi Memo provides no reasoned basis for withholding funds Congress appropriated for disbursement, including via formula grants, except to the extent they make clear that the Executive Order enacts the President's policy desires in place of Congress's intent.

222. The Bondi Memo also ignores essential aspects of the "problem" it purports to address, including the reasonable and inevitable reliance by Plaintiffs on now-suddenly frozen funding, the expectation of reimbursement from already appropriated funds, and the need for clarity by local governments about funding streams to provide day-to-day services relied on by their citizens.

223. Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi Memo violates the APA because it is arbitrary and capricious; vacate the Bondi Memo

47

under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi Memo.

**COUNT SEVEN**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)**

(CONTRARY TO CONSTITUTION)

224.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

225.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

226.    As described above, the Bondi Memo violates bedrock constitutional provisions and principles including the separation of powers between the president and Congress, the Spending Clause, the Take Care Clause, the Presentment Clause and the Tenth Amendment.

227.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi Memo violates the APA because it is contrary to constitutional rights, powers, privileges, or immunities; vacate the Bondi Memo under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi Memo.

**COUNT EIGHT**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2) (C)**

(IN EXCESS OF STATUTORY AUTHORITY)

228.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

229.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

230.    Defendants may exercise only authority granted to them by statute.

231.     No law or provision of the Constitution authorizes DOJ to withdraw properly obligated federal funds or to impose extra-statutory conditions not authorized by Congress.

232.     Defendants have no authority to withhold funding from Plaintiffs without considering the statutes, regulations, and terms governing each source of funding. The blanket freeze of DOJ funding is blatantly illegal.

233.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi Memo violates the APA because it is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; vacate the Bondi Memo under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi Memo.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that the Court grant the following relief:

1.     A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid on its face;

2.     A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid as applied to the laws and policies of Plaintiffs identified in this complaint;

3.     A preliminary and permanent injunction enjoining Defendants from enforcing Section 17 of Executive Order 14,159, or taking any other action in furtherance of any withholding or conditioning of federal funds based on Section 17 of Executive Order 14,159 or taking enforcement actions against Plaintiffs based on the laws and policies identified in this complaint;

4.     A preliminary and permanent injunction enjoining Defendants from implementing the funding pause or the unlawful funding conditions directed by the Bondi Memo, or taking enforcement action against Plaintiffs based on the laws and policies identified in this complaint;

5.     Award Plaintiffs reasonable costs and attorneys' fees; and

6.     Grant any other further relief that the Court deems fit and proper.

Dated:  February 7, 2025

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS
KARUN A. TILAK
Deputy City Attorneys

By:  /s/David Chiu
DAVID CHIU
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO


TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
STEFANIE L. WILSON
RAJIV NARAYAN
Deputy County Counsels

By:  /s/Tony LoPresti
TONY LOPRESTI
County Counsel

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

ROBERT TAYLOR
Portland City Attorney

By: */s/ Naomi Sheffield*
NAOMI SHEFFIELD*
Chief Deputy City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Naomi.Sheffield@portlandoregon.gov

By: */s/ Jill Habig*
JILL HABIG (CA Bar No. 268770)
NAOMI TSU*
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
jill@publicrightsproject.org
naomi@publicrightsproject.org

* Application for admission pro hac vice forthcoming

Attorneys for Plaintiff
CITY OF PORTLAND

1
2
3
4

DOW CONSTANTINE
King County Executive

By: DAVID J. HACKETT*
General Counsel to King County Executive
Chinook Building
401 5th Avenue, Suite 800
Seattle, Washington, 98104
(206) 477-9483
David.hackett@kingcounty.gov
PAUL J. LAWRENCE*
Pacifica Law Group
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1708
Paul.Lawrence@pacificalawgroup.com

* Application for admission pro hac vice forthcoming

Attorney for Plaintiff
MARTIN LUTHER KING, JR. COUNTY


PATRICIA KING
New Haven Corporation Counsel

By: /s/Patricia King
PATRICIA KING*
Office of the Corporation Counsel
City of New Haven
165 Church Street-4th Floor
New Haven, CT 06510
Tel:  203-946-7951
Cell: 203-668-9282
Fax:  203-946-7942
pking@newhavenct.gov

*Application for admission pro hac vice forthcoming

Attorney for Plaintiff
CITY OF NEW HAVEN

**FILER'S ATTESTATION**

I, DAVID CHIU, am the ECF user whose identification and password are being used to file this COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

# EXHIBIT A

# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9.** *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10.** *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11.** *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12.** *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13.** *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19.** *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20.** *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21.** *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22.** *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

# EXHIBIT B

**U.S. Department of Justice**

Office of the Deputy Attorney General

_____

*Washington, DC 20530*

January 21, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:           THE ACTING DEPUTY ATTORNEY GENERAL

SUBJECT:       Interim Policy Changes Regarding Charging, Sentencing, And
Immigration Enforcement

       Following President Trump's second inauguration yesterday, I write regarding interim decisions and policy changes pending confirmation of the Attorney General.[1] These interim changes are necessary as an initial response to Executive Orders that President Trump issued yesterday, critical to the Justice Department's mission, and part of the response to three of the most serious threats facing the American people. First, Cartels and other Transnational Criminal Organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS-13), are a scourge on society resulting in an unstable and unsafe border and huge flows of illegal immigration in violation of U.S. law. Second, brutal and intolerable violent crime by members of these organizations and illegal aliens is escalating rapidly across the country. Third, the fentanyl crisis and opioid epidemic are poisoning our communities and have inflicted an unprecedented toll of addiction, suffering, and death.

       The Justice Department must, and will, work to eradicate these threats. Indeed, it is the responsibility of the Justice Department to defend the Constitution and, accordingly, to lawfully execute the policies that the American people elected President Trump to implement. The Justice Department's responsibility, proudly shouldered by each of its employees, includes aggressive enforcement of laws enacted by Congress, as well as vigorous defense of the President's actions on behalf of the United States against legal challenges. The Department's personnel must come together in the offices that taxpayers have funded to do this vitally important work.

## I.    Core Principle: Pursuing The Most Serious, Readily Provable Offense

       Interim changes to the Justice Department's policy regarding charging and sentencing are necessary in order to implement policies articulated in President Trump's January 20, 2025 Executive Orders relating to the elimination of Cartels and other Transnational Criminal Organizations, and securing our borders against illegal immigration and drug trafficking. Therefore, effective today, the Justice Department's interim policy regarding charging and

_____

[1] This interim guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

sentencing is set forth in the May 10, 2017 Memorandum entitled, "Department Charging and Sentencing Policy," which applies to all charging decisions at the Department of Justice and the U.S. Attorney's Offices. Any inconsistent previous policy of the Department of Justice relating to charging and sentencing policy is rescinded, effective today.[2]

Specifically, in the absence of unusual facts, prosecutorial discretion at the Department of Justice and the U.S. Attorney's Offices is bounded by the core principle that prosecutors should charge and pursue the most serious, readily provable offenses. The most serious offenses are those punishable by death where applicable, and offenses with the most significant mandatory minimum sentences (including under the Armed Career Criminal Act and 21 U.S.C. § 851) and the most substantial recommendation under the Sentencing Guidelines.

Each United States Attorney and Assistant Attorney General is responsible for ensuring that this interim policy is implemented and followed. Any deviations from the interim policy's core principle require significant extenuating circumstances, shall be carefully considered, and must be approved consistent with the process described in the May 10, 2017 Memorandum.

## II.    Faithful Execution of the Immigration Laws

Consistent with President Trump's January 20, 2025 Executive Order entitled, "Protecting The American People Against Invasion," the Department of Justice will take all steps necessary to protect the public and secure the American border by removing illegal aliens from the Country and prosecuting illegal aliens for crimes committed within U.S. jurisdiction. These steps shall include, but not be limited to, the following:

Consistent with the core principle of pursuing the most serious, readily provable offense, U.S. Attorney's Offices and the other components shall pursue charges relating to criminal immigration-related violations when such violations are presented by federal, state, or local law enforcement or the Intelligence Community. *See, e.g.*, 8 U.S.C. §§ 1324(c), 1252c (authorizing certain immigration-related arrests by State and local law enforcement officials). This includes, where supported by evidence, prosecutions for violations of 8 U.S.C. §§ 1304, 1306, 1324-1328, 1373 and 18 U.S.C. § 922(g)(5). Each U.S. Attorney's Office shall coordinate as appropriate with the federal courts to inform the courts of this interim policy and develop processes for handling the increased number of prosecutions that will result. Declination decisions relating to immigration-related conduct shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130. On a quarterly basis, the U.S. Attorney's Offices shall report statistics to EOUSA, broken down by law enforcement agency, regarding the number of immigration-related cases referred to the Office, the number of pending immigration-related investigations and prosecutions, the number of immigration-related convictions, and the resulting sentences and removals.

---

[2] The previous policies and guidance rescinded include: "General Department Policies Regarding Charging, Pleas, and Sentencing" (December 16, 2022); "Interim Guidance on Prosecutorial Discretion, Charging, and Sentencing" (January 29, 2021); "Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases" (August 12, 2013); and "Guidance Regarding § 851 Enhancements in Plea Negotiations" (September 24, 2014).

The Organized Crime Drug Enforcement Task Force (OCDETF) and the Project Safe Neighborhoods (PSN) program shall establish national initiatives to provide focused resources and attention to immigration-related prosecutions at the federal, state, and local levels. OCDETF and PSN will focus on facilitating access by U.S. Attorney's Offices to existing structures in which the Justice Department participates, such as Joint Task Force Vulcan, which targets MS-13 and will be expanded to target TdA, and Joint Task Force Alpha, which targets human trafficking. The regional OCDETF Strike Forces shall prioritize the investigation and prosecution of immigration offenses, including by requiring OCDETF-funded AUSAs to devote significant time and attention to the investigation and prosecution of these crimes. The new OCDETF and PSN national initiatives shall also prioritize enhanced statistical tracking of these efforts.

Pending implementation of the Homeland Security Task Forces announced by President Trump on January 20, 2025, the FBI's Joint Terrorism Task Forces are directed to coordinate with DHS, as well as state and local members, to assist in the execution of President Trump's immigration-related initiatives. The FBI, DEA, ATF, USMS, and BOP shall review their files for identifying information and/or biometric data relating to non-citizens located illegally in the United States. All such information and data shall be disclosed to DHS, for the sole purpose of facilitating appropriate removals, enforcement actions, and immigration-related investigations and prosecutions, unless the agency possessing the information and data determines that a particular disclosure would compromise a significant law enforcement investigation and the U.S. Attorney's Office participating in the investigation concurs in writing with the agency's non-disclosure determination. The agencies' reviews and disclosures shall be completed in 60 days. Concurrences by U.S. Attorney's Offices in non-disclosure determinations shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

The Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives. Federal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests pursuant to, for example, the President's extensive Article II authority with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act. The U.S. Attorney's Offices and litigating components of the Department of Justice shall investigate incidents involving any such misconduct for potential prosecution, including for obstructing federal functions in violation of 18 U.S.C. § 371, and violations of other statutes, such as 8 U.S.C. §§ 1324, 1373. Declination decisions with respect to resistance, obstruction, or other non-compliance with lawful immigration-related commands and requests from federal authorities shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

Finally, laws and actions that threaten to impede Executive Branch immigration initiatives, including by prohibiting disclosures of information to federal authorities engaged in immigration-enforcement activities, threaten public safety and national security. The Civil Division shall work with the newly established Sanctuary Cities Enforcement Working Group, within the Office of the Associate Attorney General, to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws.

# EXHIBIT C



# Office of the Attorney General
## Washington, D. C. 20530

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:          THE ATTORNEY GENERAL

SUBJECT:      SANCTUARY JURISDICTION DIRECTIVES[1]

Unlawful border crossings and illegal migration into the United States have reached record levels, resulting in a substantial and unacceptable threat to our national security and public safety. To protect the American people from the effects of unlawful mass migration, President Trump has prioritized securing our Nation's borders and enforcing federal immigration laws. In furtherance of that objective, the Department of Justice will ensure that, consistent with law, "sanctuary jurisdictions" do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate.[2] In carrying out this directive, each component shall comply with any notice and procedural requirements in the award, agreement, or other instrument.

## I.    End Funding to State and Local Jurisdictions That Unlawfully Interfere with Federal Law Enforcement Operations

Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice. The Department will exercise its own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations. *See New York v. Dep't of Justice*, 951 F.3d 84, 111 (2d Cir. 2020) ("Because 8 U.S.C. § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to impose the challenged Certification Condition and did not violate either the APA or separation of powers by doing so.").

Federal law provides that state and local jurisdictions "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officers] information regarding the citizenship or immigration status, lawful or unlawful, of any

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

[2] This memorandum rescinds, effective today, any inconsistent previous memoranda, policies, or guidance documents of the Department of Justice.

individual." 8 U.S.C. § 1373(a). So-called "sanctuary jurisdictions" include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws. Consistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a). Within 30 days, the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to which this requirement applies.

Additionally, to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration, and to reduce efforts by state or local jurisdictions to undermine a lawful system of immigration. The Department will also seek to take any appropriate enforcement action where state or local practices violate federal laws, regulations, or grant conditions.

## II.    Identify and Evaluate All Funding Agreements with Non-Governmental Organizations That Provide Support to Illegal Aliens

All Department components that provide federal funding to non-governmental organizations shall immediately identify all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens. For any such agreement, each component shall, to the extent consistent with applicable statutes, regulations, court orders, and terms:

(1) Pause any further distribution of funds for 60 days after complying with any notice and procedural requirements.

(2) Identify non-governmental organization(s) receiving funding from the Department and describe the support or services provided. The component shall direct each organization to report whether the disbursed funds: (a) were provided in accordance with applicable laws; (b) resulted in the provision of any funds or services to removable or illegal aliens; (c) resulted in or were the subject of waste, fraud, or abuse; and (d) promoted or facilitated violations of our immigration laws. The component shall further direct each organization to certify that it will not use any remaining funds to promote or facilitate the violation of Federal immigration law.

(3) Compile information set forth at (2) above and submit it to the Associate Attorney General within 45 days of this memorandum.

Upon completion of this process, the Associate Attorney General, in consultation with the Deputy Attorney General, shall determine which (if any) agreements to terminate and whether to resume funding of any remaining agreements, consistent with applicable statutes, regulations, and terms.

Effective immediately, consistent with applicable law, the Department of Justice shall not enter into any new contract, grant, or other agreement to provide Federal funding to non-

governmental organizations that support or provide services, either directly or indirectly (*e.g.*, through sub-contracting or other arrangements), to removable or illegal aliens.

### III.    Pursue Enforcement Actions Against Jurisdictions That Facilitate Violations of Federal Immigration Laws or Impede Lawful Federal Immigration Operations

Actions that impede federal efforts to enforce immigration law threaten public safety and national security. State and local jurisdictions must comply with applicable immigration-related federal laws. State and local actors may not impede, obstruct, or otherwise fail to comply with lawful immigration-related directives pursuant to the President's Article II authority to ensure national security, the Immigration and Nationality Act, or other authorities.

All litigating components of the Department of Justice and each U.S. Attorney's Office shall investigate incidents involving any such misconduct and shall, where supported by the evidence, prosecute violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373. All declination decisions with respect to any effort to obstruct or fail to comply with a lawful immigration-related directive from the Executive Branch shall be promptly reported pursuant to Justice Manual § 1-13.130.

The Civil Division shall, in coordination with the Sanctuary Cities Enforcement Working Group, identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations. Where appropriate, the Civil Division shall take legal action to challenge such laws, policies, or practices. Attorneys tasked to the Sanctuary Cities Enforcement Working Group shall regularly report to the Associate Attorney General and the Deputy Attorney General their progress regarding the review of state and local laws, policies, and practices, and shall promptly report any decisions not to pursue enforcement actions against state and local jurisdictions found to be facilitating violations of federal immigration laws or impeding lawful federal immigration operations.