# EXHIBIT 4

JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
NANCY L. FINEMAN (SBN 124870)
nfineman@cpmlegal.com
ALEXANDRA P. SUMMER (SBN 266485)
asummer@cpmlegal.com
CAMILO ARTIGA-PURCELL (SBN 273229)
cartigapurcell@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

BRUCE REED GOODMILLER (SBN 121491)
Bruce_goodmiller@ci.richmond.ca.us
RACHEL H. SOMMOVILLA (SBN 231529)
rachel_sommovilla@ci.richmond.ca.us
**CITY OF RICHMOND**
450 Civic Center Plaza
P.O. Box 4046
Richmond, CA 94804
Telephone: (510) 620-6509
Facsimile: (510) 620-6518

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CITY OF RICHMOND, a municipal corporation,** | Case No. |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF CONCERNING FEDERAL EXECUTIVE ORDER 13768, for** |
| vs. | |
| **DONALD J. TRUMP, President of the United States, JOHN F. KELLY, Secretary of the United States Department of Homeland Security, JEFFERSON B. SESSIONS, Attorney General of the United States, and the UNITED STATES OF AMERICA** | 1. **VIOLATION OF THE TENTH AMENDMENT;** <br><br> 2. **VIOLATION OF THE SEPARATION OF POWERS AND SPENDING CLAUSES;** <br><br> 3. **VIOLATION OF THE FOURTH AMENDMENT;** |
| Defendants. | 4. **VIOLATION OF THE DUE PROCESS CLAUSE BECAUSE OF VAGUENESS; AND** <br><br> 5. **RULING THAT RICHMOND COMPLIES WITH 8 U.S.C. § 1373.** |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

# Table of Contents

                                                                                                                    **Page**

I.    **INTRODUCTION**.................................................................................................1

II.   **JURISDICTION AND VENUE**.......................................................................4

III.  **PARTIES**.............................................................................................................4

IV.  **FACTUAL ALLEGATIONS**...........................................................................5

     A.     RICHMOND IS A CITY OF IMMIGRANTS AND IMMIGRANTS' TRUST IN LAW ENFORCEMENT IS CRITICAL TO THE SAFETY OF THE COMMUNITY ........................................................5

     B.     IMMIGRANTS MAKE RICHMOND STRONG ................................10

     C.     FEDERAL LAW DOES NOT REQUIRE RICHMOND TO COMPLY WITH DETAINER REQUESTS ISSUED BY ICE ........................................10

     D.     THE EXECUTIVE ORDER....................................................................14

     E.     THE EXECUTIVE ORDER IS UNCONSTITUTIONAL BECAUSE IT EXCEEDS THE AUTHORITY OF THE PRESIDENT AND CONGRESS .......18

          1.     The President Does Not Have the Authority to Issue the Executive Order ....................................................................18

          2.     Congress Does Not Have the Authority to Take the Actions in the Executive Order ....................................................18

          3.     The Executive Order Is Unconstitutional Because It Violates the Tenth and Fourth Amendments........................................20

     F.     INJURY TO RICHMOND CAUSED BY THE EXECUTIVE ORDER.............21

     G.     THE COURT SHOULD DECLARE THE EXECUTIVE ORDER UNCONSTITUTIONAL AND ENJOIN ENFORCEMENT ..................................22

V.   **CLAIMS FOR RELIEF** ................................................................................23

VI.  **PRAYER FOR RELIEF**..............................................................................29

# I.   **INTRODUCTION**

1.     On January 25, 2017, President Donald J. Trump issued an **Executive Order**, No. 13768 entitled "**Enhancing Public Safety in the Interior of the United States,**" 82 Fed. Reg. 8799 (Jan. 25, 2017) ("Executive Order"), which, in violation of the Constitution, seeks to force local police departments, such as the Richmond Police Department, to enforce federal immigration law.  A copy of the Executive Order is attached as **Exhibit 1**.

2.     The ability of the Richmond police to effectively combat crime will be severely curtailed by this Executive Order.  In order to safeguard the safety of its residents and community, the City of Richmond, California ("Richmond"), the plaintiff in this action, engages in community policing.  As its Police Chief Allwyn Brown recently explained:  The Richmond Police are:

> **"Committed to a proven effective community policing model that knows the unmistakable truth, that community safety is a responsibility for everyone, and not just a job for the police.  This requires active, engaged, and empowered neighborhood residents who freely interact with police without reservations."**

3.     The Executive Order is in direct violation of the U.S. Constitution because it allows the Attorney General and Secretary of Homeland Security, based upon their discretion, to withhold federal funds from public entities that are jurisdictions who "willfully refuse" to comply with 8 U.S.C. 1373, a statute which seeks to regulate state and local jurisdictions' response to immigration requests, and for the Attorney General to take enforcement actions against any jurisdiction that violates federal law.  Our U.S. Supreme Court has said that this use of an Executive Order to coerce Richmond through a threat of the loss of all federal funds is unconstitutional.  *Nat'l Fed'n of Indep. Bus v. Sebelius,* 567 U.S. 519, 132 S. Ct. 2566, 2602-04 (2012).  "When, for example, such conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the states to accept policy changes."  132 S. Ct. at 2604.

4.     The term "sanctuary jurisdiction" is not defined in the Executive Order or in any federal statute or regulation.  While many public entities, including Richmond, have been referred to as "Sanctuary Cities" and Richmond is proud to support its immigrants, the policies

of the different jurisdictions differ substantially. It is unclear if Richmond will be considered a "sanctuary jurisdiction" subject to the loss of all federal funds. The Executive Order provides no guidance to Richmond on how to make this determination and there is no legal precedent for Richmond to consult to make this determination. Based upon statements made by President Trump and others, Richmond believes it may be swept up as a sanctuary jurisdiction under the Executive Order. The Executive Order violates the Due Process Clause because it is unconstitutionally vague and unenforceable against a city like Richmond, California. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298 (1972).

5.     Moreover, the Executive Order does not define what actions or inaction can be considered by the Attorney General and Secretary of Homeland Security as a willful refusal to comply with 8 U.S.C. § 1373 and there is no legal precedent defining what constitutes a willful refusal to comply with 8 U.S.C. § 1373. Richmond does comply with 8 U.S.C. § 1373. This is an additional reason that the Executive Order is unconstitutionally vague and unenforceable pursuant to Supreme Court precedent.

6.     Given the vagueness of the Executive Order and the discretion it provides to the Attorney General and Secretary of Homeland Security to withhold federal funds, Richmond faces imminent danger of losing all federal funding because of legislation that it enacted twenty-five years ago to foster trust between its police department and residents. Richmond has already been harmed by the uncertainty caused by the Executive Order. The Defendants intend to immediately begin enforcing the Executive Order, and the Executive Order does not provide any policies or procedures to challenge the findings of the Attorney General or Secretary of Homeland Security. Accordingly, this Court is the only vehicle for Richmond to obtain relief to stop the calamitous effects that the Executive Order will have on Richmond.

7.     Richmond directly receives federal funds each year and also receives State funds, most of which are passed through federal funds. The funds are used to fund vital services, and only a small amount are used for law enforcement or immigration. Most are used for housing and infrastructure improvements. The loss of these funds will have a direct and substantial effect on Richmond and its citizens. None of the grants of money by the federal government to

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**     2

Richmond were conditioned on Richmond's compliance with any immigration law. The Executive Order seeks to retroactively tie the receipt of federal funds to Richmond's compliance with the Executive Order, and specifically immigration laws, which is unconstitutional on its face.

8. While Presidents have the ability to issue executive orders, the President's power "must stem either from any act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S. Ct. 863, 866 (1952). There is no authority from an act of Congress or from the Constitution for President Trump to have issued the Executive Order.

9. The Executive Order is an impermissible and illegal order because:

   **(1)** the Executive Order violates the Tenth Amendment of the United States Constitution;

   **(2)** the Executive Order seeks to give two Cabinet members the unfettered discretion to take away all federal funding from Richmond, a power that no branch of the federal government has;

   **(3)** the Executive Order impermissibly usurps the rights of the Legislative branch regarding appropriating and spending monies thus violating the separation of powers clause of the Constitution;

   **(4)** the Executive Order violates the due process clause because it is unconstitutionally vague in its definition of "sanctuary jurisdiction," "willful refusal to comply," and the unfettered enforcement discretion it gives to the Attorney General and Secretary of Homeland Security;

   **(5)** the Executive Order exposes Richmond to liability under the Fourth Amendment of the United States Constitution for improperly detaining people; and

   **(6)** the Executive Order imposes additional costs on Richmond to comply with the Executive Order, which costs the federal government will not reimburse.

10.     In order to protect its residents, Richmond brings this action to have this Court declare that the Executive Order is unconstitutional to find that Richmond complies with 8 U.S.C. § 1373, and to enjoin the Executive Order from being enforced against Richmond.

## II.     JURISDICTION AND VENUE

13.     The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq*.

14.     Venue properly lies within the Northern District of California because Plaintiff, Richmond, is a public entity in this judicial district and a substantial part of the events or omissions giving rise to this action will occur or have occurred in this District. 28 U.S.C. § 1391(e).

## III.     PARTIES

15.     Plaintiff **City of Richmond** is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a Charter Law city.  Its population is just over 100,000 people.  Under its charter, it has the power to exercise police powers and make all necessary police regulations.  Richmond Charter Art. II, § 1, ¶ 6.

16.     Defendant **Donald J. Trump** has been since January 20, 2017, the President of the United States.  He is sued in his official capacity.  As a candidate, he railed against sanctuary cities and promised to punish them, and has consistently made insensitive and false statements about immigrants.  When he announced his candidacy in June 2015, for example, he stated: "The U.S. has become a dumping ground for everybody else's problems. Thank you. It's true, and these are the best and the finest.  When Mexico sends its people, they're not sending their best. They're not sending you.  They're not sending you.  They're sending people that have lots of problems, and they're bringing those problems to us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."  There was no factual support for this statement.

17.     Defendant **John F. Kelly** is the Secretary of the Department of Homeland Security, a cabinet department of the United States government with the primary mission of

securing borders of the United States. Pursuant to the Executive Order at issue here, Secretary Kelly is responsible for executing relevant provisions of the Executive Order. He is sued in his official capacity.

18.    Defendant **Jefferson B. Sessions** is the Attorney General, a cabinet department of the United States Government overseeing the Department of Justice. Attorney General Sessions is responsible for executing relevant provisions of the Executive Order. Attorney General Sessions is sued in his official capacity.

19.    Defendant **United States of America** is sued under 28 U.S.C. Section 1346.

## IV.    FACTUAL ALLEGATIONS

### A.    RICHMOND IS A CITY OF IMMIGRANTS AND IMMIGRANTS' TRUST IN LAW ENFORCEMENT IS CRITICAL TO THE SAFETY OF THE COMMUNITY

20.    Incorporated in 1905, Richmond has been a place where people from all over the world have come to seek a better life for themselves and their families and to contribute to the society in the Bay Area. According to the American Community Survey, in 2015, over 30% of Richmond residents were born in foreign counties.

21.    Richmond, like the rest of the United States, is strong and successful because of the diversity of the immigrants who have come to this country. Their hard work and innovation have made the United States one of the greatest, if not the greatest, countries in the world. The contributions of immigrants are too numerous to even try to list. Most economists agree that immigrants, including those who are undocumented, are good for the U.S. economy. In March 2017, the Institution of Taxation & Economic Policy estimated that undocumented workers pay $111.74 billion in taxes each year. In March 2017, the Pew Research Center issued a report demonstrating that immigrants and their U.S.-born children are expected to drive growth in the U.S. working-age population. http://www.pewresearch.org/fact-tank/2017/03/08/immigration-projected-to-drive-growth-in-u-s-working-age-population-through-at-least-2035/. Since the Baby Boomer generation (people born after World War II and before 1965) is heading towards

retirement, there is a potential for the labor force to slow down without immigrants and their children being part of the work force.  Richmond and the Bay Area need this work force.

22.     Richmond has always welcomed newcomers.  In the 1940s, for example, people came from all over the United States to help with the war effort by working in Richmond facilities such as the Kaiser shipyards.  They and their families stayed and have made positive contributions to Richmond.

23.     In the late 1980s, Richmond experienced an increase of immigrants arriving from Central America.  They sought sanctuary from the violence and political instability in their native countries.  Many of these immigrants had been the victims of political persecution.  Since they came to Richmond, they and their families have contributed to the success of Richmond. Based upon their experience in their native countries, many of these immigrants were fearful of law enforcement.  They were easy prey for criminals who knew the immigrants were unlikely to report crimes against them for fear that if they reported crimes or provided assistance to law enforcement, they would be deported.  It is critical to the safety of the community that everyone, no matter their immigration status, trust law enforcement and provide information to keep Richmond safe and free from crime.

24.     In response to these immigrants' concerns and to increase public safety, in 1990, over 25 years ago, the Richmond City Council unanimously enacted Ordinance No. 29-90, an ordinance whose purpose was to "foster an atmosphere of trust and cooperation between the Richmond Police Department and all persons, regardless of immigration status, residing in the City of Richmond; …"  A true and correct copy of the Ordinance is attached as **Exhibit 2**.

25.     Further, Ordinance No. 29-90 provided in pertinent part:

> Section 2.  In order to address the fears expressed by the immigrant and refugee community in the City of Richmond concerning Immigration and Naturalization Service activities in the City of Richmond while preserving the ability of the Richmond Police Department to utilize all available resources to fight criminal activity, the Council of the City of Richmond hereby adopts the following policy:

> 1.     All officers and employees of the City of Richmond, while acting in their official capacities, who receive any oral or written request from the Immigration and Naturalization Service for information, cooperation or assistance shall refer such request to the City Manager or the Chief of

Police. The City Manager or Chief of Police shall decide whether such information shall be given or whether such cooperation or assistance shall be provided to the Immigration and Naturalization Service. In exercising their discretion, the City Manager and Chief of Police shall consider the possible disruption and inconvenience that may be experienced by the immigrant and refugee community in the City of Richmond and any requirements of any federal, state or local law or court decision. Nothing delineated in the foregoing policy shall be construed to prevent the City Manager or the Chief of Police from providing information, assistance or cooperation to the Immigration and Naturalization Service regarding the criminal violation of any federal, state or local law.

26. On February 6, 2007, in Resolution No. 11-07, the Richmond City Council reaffirmed its commitment to its residents that the City "welcomes and values all of its residents and supports them to live and work free from discrimination, hostility, abuse, violence, exploitation and fear of local, state and federal law enforcement; …" A true and correct copy of the Resolution is attached as **Exhibit 3**. In this resolution, the City of Richmond "reaffirms the terms of ordinance No. 20-90 ordering all officers and employees of this City not to inform, assist or cooperate with the Immigration and Customs Enforcement (ICE) formerly known as Immigration and Naturalization Service, without the specific authorization of the Richmond City Manager or the Chief of Police; …"

27. The ordinance and regulation were not to prevent the exchange of information between the federal government and Richmond regarding immigration matters, but instead to increase the trust between Richmond law enforcement and the community, thereby increasing public safety. Federal immigration raids, like the 2003 raid on the Richmond home of Porfirio Quintano, an immigrant from Honduras and his family, is but one example of the fear and distrust in the immigrant community caused by improper immigration enforcement. As Quintano explained in the *San Francisco Chronicle*: "'We are victims,' said Quintano, adding that his wife and two daughters, then ages 4 and 10, live in fear of another raid, even though all four family members are U.S. citizens. 'They were looking for somebody unrelated to us, but they lined us up against the wall and held us for an hour. It was terrifying, especially for our daughters.'" *San Francisco Chronicle* (Apr. 23, 2007).

28.     In the 25 years since the enactment of Ordinance 29-90, the federal government has taken no action until now to stop the Richmond policy, and the policy has served Richmond and the nation well.  The Richmond policy co-existed with the immigration policies of both Bush administrations as well as those of Presidents Clinton and Obama.  Studies show that trust between law enforcement and those that they serve is key to decreasing crime and to making communities safe.  See e.g. Bill O. Hing, "Immigration Sanctuary Policies:  Constitutional and Representative of Good Policing and Good Public Policy, 2 *U.C. Irvine L. Rev.* 247 (2012).  The final report of the President's Task Force on 21st Century Policy (May 2015) explains:

> Immigrants often fear approaching police officers when they are victims of and witnesses to crimes and when local police are entangled with federal immigration enforcement.  At all levels of government, it is important that laws, policies, and practices not hinder the ability of local law enforcement to build the strong relationships necessary to public safety and community well-being.  It is the view of this task force that whenever possible, state and local enforcement should not be involved in immigration enforcement.

The United States Department of Justice, Community Oriented Policy Services (COPS), published a report "Policy in New Immigrant Communities" by Matthew Alysalcowski, Albert Anthony Pearsall III and Jill Pope.  The report provides suggestions to law enforcement about better serving the community, focusing on building trust and mutual respect between law enforcement and new immigrants.  The report states that putting fears to rest is one of the most useful things law enforcement can do.  "For many immigrants, reassurance that they will not be detained or deported removes the fear of reporting crimes."  Report at 11.

29.     Richmond is not the only public entity to enact laws regarding the relationship between the public entity and ICE.  Numerous other California counties and cities, such as Alameda County, Berkeley, Los Angeles County, Los Angeles, Monterey County, Napa County, Orange County, Riverside County, Sacramento County, San Bernardino County, San Diego County, San Francisco City and County, San Mateo County, Santa Ana, Santa Clara County, Santa Cruz County, and Sonoma County, have enacted similar laws.  Other cities in the United States, such as Boston, Chicago, Houston, New York, Philadelphia, and Washington D.C., to name a few, have also enacted similar laws.  Even though they are similar, they are not identical.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                    8

There is no way to determine by the language of the Executive Order if any of these jurisdictions are "sanctuary jurisdictions."

30.    The State of California also has enacted legislation, specifically Government Code sections 7282 and 7282.5 both effective January 1, 2014, regarding information that law enforcement can provide federal immigration officials.  Section 7282.5 provides that a "law enforcement official shall have discretion to cooperate with federal immigration officials by detaining an individual on the basis of an immigration hold after that individual becomes eligible for release from custody only if the continued detention of the individual on the basis of the immigration hold would not violate any federal, state, or local law, or any local policy, and only under …." certain specified circumstances.  The notes to section 7282, which provides definitions for the chapter, sets forth the Legislative Findings for these statutes.

> SECTION 1. The Legislature finds and declares all of the following:
>
> (a) The United States Immigration and Customs Enforcement's (ICE) Secure Communities program shifts the burden of federal civil immigration enforcement onto local law enforcement. To operate the Secure Communities program, ICE relies on voluntary requests, known as ICE holds or detainers, to local law enforcement to hold individuals in local jails for additional time beyond when they would be eligible for release in a criminal matter.
>
> (b) State and local law enforcement agencies are not reimbursed by the federal government for the full cost of responding to a detainer, which can include, but is not limited to, extended detention time and the administrative costs of tracking and responding to detainers.

31.    The Department of Justice, under the previous administration, has already identified the State of California as a jurisdiction that does not fully comply with federal immigration enforcement priorities.  Memorandum from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen. for the Office of Justice Programs, "Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients," at 13 (May 31, 2016), https://oig.justice.gov/reports/2016/1607.pdf ("Horowitz Memorandum").  Since Richmond receives federal funds that are passed through the State of California,

Richmond faces the loss of funds under the Executive Order even if it complies with all requirements of the Executive Order.

**B.     IMMIGRANTS MAKE RICHMOND STRONG**

32.     Immigrants have been, since the establishment of our country, critical to the United States and specifically Richmond.  The same false statements being made today about immigrants were made about Italians, Irish, Jews, and other ethnicities in the late 1800's and early 1900's.

33.     In April of 2016, the U.S. Chamber of Commerce published a report entitled Immigration Myths and Faces, www.uschamber.com/reports/immigration-myths.  The report demonstrates that most common negative contentions regarding immigrants are false.

34.     For example, with citation to evidence, the Chamber of Commerce demonstrates that immigrants do not take away jobs from U.S. citizens, do not drive down the wages of the U.S. workers, but to the contrary, immigrants are necessary for the U.S. economy.

35.     The Chamber also demonstrates that immigrants, even undocumented immigrants, pay taxes.  Undocumented immigrants are not eligible for federal public benefit programs like Social Security, Medicaid, Medicare, and food stamps.

36.     The Chamber report demonstrates that the premise of the Executive Order, that undocumented immigrants commit crimes, is contradicted by the facts.  FBI data demonstrates that as the number of undocumented immigrants, tripled from 1990 violent crime declined 48% and property crime declined 41%.  A report from the conservative Americas Majority Foundation found that crime rates are lowest in states with the highest immigration growth rates. Immigrants are less likely than people born in the United States to commit crimes or be incarcerated.

**C.     FEDERAL LAW DOES NOT REQUIRE RICHMOND TO COMPLY WITH DETAINER REQUESTS ISSUED BY ICE**

37.     ICE is an agency in the Department of Homeland Security and enforces federal immigration law.  Federal law provides specific rules regarding the detention and removal of people who do not have the legal right to be in this country.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                    10

38.     Not all people living in the United States who are undocumented are subjected to deportation.  See e.g. 8 U.S.C. § 1229b(a) (providing Attorney General with discretion to cancel removal of an undocumented immigrant who is otherwise inadmissible or subject to deportation if he or she meets specified requirements); § 1229b(b)(2) (providing Attorney General with discretion to cancel removal and adjust status of an undocumented immigrant who is a victim of domestic violence).  There are also other ways that undocumented immigrants can legally stay in the United States.

39.     ICE often asks local jurisdictions for information about people who have been arrested.  Richmond does not have a policy against and would not refuse to categorically to honor these requests, but requires that any request be brought to the attention of the City Manager or Chief of Police, who make a determination about what information will be provided. Richmond Ordinance No. 29-90, Resolution No. 11-07.

40.     ICE also often issues "detainer requests" to local jurisdictions.  These detainer requests ask local law enforcement agencies to continue to detain an immigrant inmate for up to 48 additional hours after his or her regularly scheduled release date so that ICE can decide whether to take that individual into custody and initiate removal proceedings.  A detainer request is different than a criminal warrant because a detainer request is not issued by a judge based upon a finding of probable cause.

41.     A public entity has discretion in how it complies with immigration holds.  As stated by *Flores v. City of Baldwin Park*, No. CV 14-9290-MWF(JCx), 2015 U.S. Dist. LEXIS 22149, at *11-12 (C.D. Cal. Feb. 23, 2015):  "[F]ederal law leaves compliance with immigration holds wholly within the discretion of states and localities.  See *Galarza v. Szalczyk*, 745 F.3d 634, 640-43 (3d Cir. 2014) (holding that 'immigration detainers are requests and not mandatory orders' and observing that 'all federal agencies and departments having an interest in the matter have consistently described such detainers as requests'); Immigration Law, 127 *Harv. L. Rev.* [2593] at, 2596-97 [June 2014] ('And even if ICE wanted to make detainer enforcement mandatory, prevailing Tenth Amendment jurisprudence—which prohibits 'command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal

regulatory program'—indicates that it could not do so.  States are thus free to decide for themselves whether to limit—or even prohibit—the enforcement of detainers.')"  (bracket materials added).  As a general matter, ICE has not directed detainer requests to Richmond.

42.     The fact that a person is an undocumented immigrant does not mean that the person is subject to detention.  Most of the time, people who are suspected of being removable are not arrested; arrests only occur in certain circumstances and are only performed by federal officers specifically trained in immigration law.  As the Supreme Court has explained:

> As a general rule, it is not a crime for a removable alien to remain present in the United States. See *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984). If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent. When an alien is suspected of being removable, a federal official issues an administrative document called a Notice to Appear. See 8 U. S. C. § 1229(a); 8 CFR § 239.1(a) (2012). The form does not authorize an arrest. Instead, it gives the alien information about the proceedings, including the time and date of the removal hearing. See 8 U. S. C. § 1229(a)(1). If an alien fails to appear, an in absentia order may direct removal. § 1229a(b)(5)(A).

> The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." 8 U. S. C. § 1226(a); see Memorandum from John Morton, Director, ICE, to All Field Office Directors *et al.*, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011) (hereinafter 2011 ICE Memorandum) (describing factors informing this and related decisions). And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR § 241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. See §§ 241.2(b), 287.5(e)(3). If no federal warrant has been issued, those officers have more limited authority. See 8 U. S. C. § 1357(a). They may arrest an alien for being "in the United States in violation of any [immigration] law or regulation," for example, but only where the alien "is likely to escape before a warrant can be obtained." § 1357(a)(2).

*Arizona v. United States*, 567 U.S. 387, 132 S. Ct. 2492, 2505-06 (2012).

43.     Even though Supreme Court precedent is clear, the Department of Justice, under the prior Presidential Administration, opined that failure to comply with detainer requests violates federal law.  Horowitz Memorandum at 7.

44.     The Richmond Police Department Policy Manual, Policy 428 specifically addresses Immigration Violations.  A true and correct copy of the policy is attached hereto as

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                    12

**Exhibit 4**.  It provides that it is the "policy of the Richmond Police Department (RPD) to foster trust and cooperation with all people of the city and to encourage them to communicate with RPD officers without fear of inquiry regarding their immigration status."  *Id*. § 428.1.  "It is also department policy, consistent with its obligations under state and federal law, to adhere to the City of Richmond Ordinance 29-90.  This ordinance prohibits the use of City resources to assist in the enforcement of federal immigration laws without the specific authorization of the City Manager or the Chief of Police."  *Id.*

45.     The policy does not prohibit assisting ICE.  "When assisting ICE at its specific request, or when suspected criminal violations are discovered as a result of inquiry or investigation based on probable cause originating from activities other than the isolated violations of 8 USC § 1304; 8 USC § 1324; 8 USC § 1325 and 8 USC § 1326, the department may assist in the enforcement of federal immigration laws."  *Id.*, § 428.2.  The policy provides that the Richmond Police Department "does not conduct immigration 'sweeps' or engage in other concerted efforts to identify or detain suspected undocumented individuals."  *Id.*, § 428.2.1; see also *id.*, § 428.2.2.

46.     The policy reiterates the police department's concern "for the safety of local citizens and thus detection of criminal behavior is of primary interest in dealing with any person."  *Id.*, § 428.4.  Arrests should be based upon probable cause and not on arbitrary characteristics, such as race or ethnicity and "all individuals, regardless of their immigration status, must feel secure that contacting law enforcement will not make them vulnerable to deportation."  *Id.*

47.     The policy is explicit that:  "Nothing in this policy is intended to restrict officers from exchanging legitimate law enforcement information with any other federal, state or local government entity (8 USC § 1373; 8 USC § 1644).  *Id.*

48.     Thus, Richmond has made a policy decision that the safety of its residents requires trust between its policy department and all residents, whether they are United States citizens, legal residents, or undocumented.  Additionally, Richmond's policy is to comply with all laws, including 8 U.S.C. § 1373.  Since ICE has not in the past asked Richmond for

information or issued detainer requests, Richmond has not violated 8 U.S.C. § 1373 or any other federal law.

**D.     THE EXECUTIVE ORDER**

49.     On January 25, 2017, defendant President Donald J. Trump issued **Executive Order 13768**, entitled "**Enhancing Public Safety in the Interior of the United States**." That Executive Order was published in the Federal Register on January 30, 2017, at 82 Fed. Reg. 8799.  It is available on the White House public website (https://www.whitehouse.gov/the-press-office/2017/01/25/Presidential-executive-order-enhancing-public-safety-interior-united), and is attached hereto as **Exhibit 1**.

50.     The Executive Order declares, "Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic."

51.     To address the purported harm caused by Sanctuary Cities, the Executive Order establishes the policy that "jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law."

52.     Specifically, Section 9(a) of the Executive Order states: "It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373."  8 U.S.C. § 1373 prohibits local jurisdictions from prohibiting the exchange of information with ICE regarding citizenship or immigration status.

53.     Section 9(a) of the Executive Order establishes a **funding restriction**:

> In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. *Id*.

/ / /

/ / /

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                    14

54.     Section 9(a) of the Executive Order also mandates **enforcement action** for violations:

> The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law. *Id*.

55.     Defendant John F. Kelly, the Secretary of Homeland Security has already begun implementing the Executive Order.  On February 20, 2017, he issued two memoranda to implement the Executive Order.  The first memorandum is entitled "Enforcement of the Immigration Law to Serve the National Interest."  A true and correct copy of this memorandum, which will be referred to as the "Enforcement Memorandum" can be found at https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf and is attached hereto as **Exhibit 5**.  The second memorandum is entitled "Implementing the President's Border Security and Immigration Enforcement Improvement Policies."  A true and correct copy of this memorandum, which will be referred to as the "Implementation Memorandum" can be found at https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf and is attached hereto as **Exhibit 6**.

56.     The Enforcement Memorandum does not reference "sanctuary jurisdictions" or provide any guidance about how the Secretary of Homeland Security will use its discretion to determine that a local jurisdiction should lose all federal funds because of that jurisdictions' "failure to comply with applicable Federal Law."

57.     The Enforcement Memorandum states that it will be expanding the INA section 287(g) Program.  This program "allows a qualified state or local law enforcement officer to be designated as an 'immigration officer' for purposes of enforcing federal immigration law.  Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized by under the INA, under the direction and supervision of the

1   Department." The program is voluntary; currently 32 law enforcement agencies in 16 states

2   participate.

3        58.    The Enforcement Memorandum further provides that: "Department personnel

4   have full authority to arrest or apprehend an alien whom an immigration officer has probable

5   cause to believe is in violation of immigration laws."

6        59.    The Enforcement Memorandum also provides: "I direct the Director of ICE to

7   immediately reallocate any and all resources that are currently used to advocate on behalf of

8   illegal aliens (except as necessary to comply with a judicial order) to the new VOICE [Victims

9   of Immigration Crime Engagement] Office, and to immediately terminate the provision of such

10   outreach or advocacy services to illegal aliens." [bracketed materials added]

11        60.    The Implementation Memorandum primarily deals with the building of a wall

12   between the United States and Mexico, the hiring of additional Border Patrol Agents, and

13   expediting undocumented immigrants to their native countries. The Implementation

14   Memorandum does not provide any guidance regarding the implementation of the Executive

15   Order as it applies to Richmond.

16        61.    Since the Executive Order, the Enforcement and Implementation Memoranda,

17   and federal law and regulations do not provide any guidelines to State and local jurisdictions

18   regarding the criteria that will be used to determine when federal funds will be taken away or

19   enforcement actions will be taken, Richmond must try to glean this information from other

20   public statements of Defendants.

21        62.    Based upon the public statements of Defendants, they intend to broadly define

22   jurisdictions that do not comply with federal immigration law and to punish those jurisdictions

23   with the withdrawal of all federal funds. Since as early as 2015, when he was a candidate for the

24   Republican nominee for President, Donald Trump railed against "Sanctuary Cities." As set

25   forth, *supra*, he called Mexican immigrants rapists, which statement is not supported by the

26   evidence. He promised to punish these jurisdictions.

27        63.    Since President Trump's inauguration, his office has reaffirmed these statements.

28   For example, on January 25, 2017, when announcing the issuance of the Executive Order, the

President's Press Secretary said: "We are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws."

64.     A press release from the White House on January 28, 2017 stated that the executive order was going to halt federal funding for "sanctuary cities." The reference to "sanctuary cities in the Press Release implies that the President considers "sanctuary cities" to be the same as "sanctuary jurisdictions," which is the term used in the Executive Order. The same conflation between "sanctuary cities" and "sanctuary jurisdictions" occurred in a press release issued by the White house on February 1, 2017 and the term "sanctuary cities" is on the White House website: http://wwwwhitehouse.gov/law-enforcement-community.

65.     President Trump, during an interview with Bill O'Reilly on February 5, 2017, also referenced "sanctuary cities" rather than "sanctuary jurisdictions" when referring to the Executive Order. He also specifically referred to proposed legislation by the California legislature regarding immigration as "ridiculous" and referred to the "tremendous amounts of money" the federal government gives to California.

66.     Immediately prior to becoming the Attorney General, Defendant Jefferson B. Sessions, was a U.S. Senator. In July of 2015, he introduced Senate Bill 1842, the "Protecting American Lives Act." With regards to the bill and in other statements regarding immigration, Attorney General Sessions indicated an intent to punish local jurisdictions, such as Richmond, which had enacted ordinances which demonstrated concern for immigrants.

67.     Based upon the evidence, it appears there is a substantial probability that Defendants, and each of them, will seek to enforce the unconstitutional Executive Order against Richmond based upon its enactment of Ordinances No. 29-90 and Resolution No. 11-07, Richmond being referred to as a "sanctuary city," and its large Latino population. While Richmond does not believe that it has willfully refused to follow any federal law, the statements by Defendants imply that simply enacting an ordinance like Ordinance No. 29-90 and Resolution No. 11-07 will provide the basis for Defendants to enforce the Executive Order against Richmond.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**          17

**E.    THE EXECUTIVE ORDER IS UNCONSTITUTIONAL BECAUSE IT EXCEEDS THE AUTHORITY OF THE PRESIDENT AND CONGRESS**

**1.    The President Does Not Have the Authority to Issue the Executive Order**

68.    The federal system is a system of checks and balances.  Our founders wanted to stop the President from being able to exercise unbridled discretion like the King from whom they had just won their freedom.  Therefore, the Constitution limits the power of the President.  Under Article I, section 8, clause 1 of the United States Constitution, Congress, not the President, has the authority to appropriate and spend federal monies.  President Trump exceeded his constitutional authority by the enactment of the Executive Order because it is not authorized by any act of Congress or the Constitution.  Hence, the Executive Order is unconstitutional.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S. Ct. 863, 866 (1952).

69.    The President may also not unilaterally impose new restrictions on jurisdictions' eligibility for federal funding because any restrictions on federal funds must be done so in advance by Congress.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 171 101 S. Ct. 1531 (1981).  The President may not on his own impose restrictions when Congress has not acted.  The President does not have "unilateral power to change the text of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 447 (1998).

**2.    Congress Does Not Have the Authority to Take the Actions in the Executive Order**

70.    The Executive Order is also unconstitutional because not even Congress would have the authority to enact the Executive Order as legislation.

71.    Once Congress has authorized money to a State, county or city and it has been accepted, Congress cannot impose new conditions on the receipt of the monies.  The taking away of funds violates the Spending Clause by imposing new funding conditions on existing appropriations of federal funds.  "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," in advance.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531 (1981) "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" Congress's conditions.  *Id.*  "There can, of course, be no knowing acceptance if a State

1    is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* The Executive

2    Order thus violates the Spending Clause because it seeks to take away monies already

3    authorized and accepted by Richmond.

4         72.    Further, even if Congress enacted legislation paralleling the Executive Order, the

5    legislation would be unconstitutional because Congress cannot impose conditions to the

6    acceptance of federal funds when those conditions are unrelated to the purpose for which the

7    funds are given.  See *South Dakota v. Dole*, 483 U.S. 203, 208-09 & n.3 (1987) ("[T]he imposition

8    of conditions under the spending power" must be 'germane' or 'related' to the purpose of federal

9    funding.").  The Executive Order threatens the loss of all federal funds, not only those related to the

10   purposes of the Executive Order, which purpose is related to immigration.

11        73.    The Executive Order's threat to strip Richmond of all federal funds and bring

12   enforcement actions against it for violation of Federal laws is also unconstitutional.  Congress

13   also cannot use coercion or a "power akin to undue influence" to force States, counties or cities

14   to act in accordance with federal policies.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519,

15   132 S. Ct. 2566, 2602 (2012).

16        74.    Under the United States' Constitution, Congress cannot compel state officials to

17   execute federal law.  *Printz v. United States*, 521 U.S. 898, 138 L. Ed. 2d 914, 117 S. Ct. 2365

18   (1997).  "In providing for a stronger central government, therefore, the Framers explicitly chose

19   a Constitution that confers upon Congress the power to regulate individuals, not States. As we

20   have seen, the Court has consistently respected this choice. We have always understood that

21   even where Congress has the authority under the Constitution to pass laws requiring or

22   prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit

23   those acts."  *New York v. United States*, 505 U.S. 144, 166, 112 S. Ct. 2408, 2423 (1992).  The

24   Executive Order violates these principles of federalism and state sovereignty and is

25   unconstitutional.

26   / / /

27   / / /

28

### 3. The Executive Order Is Unconstitutional Because It Violates the Tenth and Fourth Amendments

75.     The Executive Order is also unconstitutional because it violates the Tenth Amendment of the Constitution.  The Tenth Amendment provides:  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  This Amendment preserves the sovereignty of the States and local governments, but the Executive Order seeks to interfere with the States' and local jurisdictions' sovereignty.

76.     The Executive Order is also unconstitutional because it forces jurisdictions to keep people in custody who otherwise would be released, thus potentially exposing the jurisdictions to liability under the Fourth Amendment.  This is not an idle concern.  Public entities may be liable under the Fourth Amendment for honoring an ICE civil detainer request. *Miranda-Olivares v. Clackamas Cty.*, No. 3:12-cv-02317-ST, 2014 U.S. Dist. LEXIS 50340 (D. Or. Apr. 11, 2014); see *Morales v. Chadbourne*, 793 F.3d 208, 215-216 (1st Cir. 2015); *Orellana v. Nobles Cnty.*, No. 15-3852 ADM/SER, 2017 U.S. Dist. LEXIS 2438, at *23-24 (D. Minn. Jan. 6, 2017); *Mendia v. Garcia*, 165 F. Supp. 3d 861, 887 (N.D. Cal. 2016).

77.     The federal government has made clear that the local agency bears the financial burden of the detention, providing that "[n]o detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the Department." 8 C.F.R. § 287.7(e).  The federal government also will not indemnify local governments or its officials against constitutional claims, even when they arise directly out of actions the local government has taken at the direction of the federal government.

78.     The Executive Order is unconstitutional because it coerces Richmond to implement federal immigration policy.  The Executive Order provides that federal funds will be withheld from jurisdictions that failed to comply with federal law, including specifically 8 U.S.C. § 1373.  Executive Order, § 9(a).  However, nothing in 8 U.S.C. § 1373 conditions any federal funding on complying with 8 U.S.C. § 1373 and no federal funds which Richmond receives are conditioned with Richmond complying with 8 U.S.C. § 1373.  In fact, in light of the

plain language of the statute, there can be no requirement that as a condition of receiving federal funds, a jurisdiction comply with 8 U.S.C. § 1373. If the Executive Order is allowed to stand, its implementation would impermissibly intrude on Richmond's exercise of powers conferred upon it by the State of California, and would unlawfully restrict Richmond's ability to shape local government according to Richmond's needs and policy mandates of its residents.

**F.      INJURY TO RICHMOND CAUSED BY THE EXECUTIVE ORDER**

79.     The Executive Order has created fear and confusion regarding the actions that Defendants Attorney General Sessions and Secretary of Homeland Security Kelly, acting on behalf of Defendant United States, will take against state and local governments, like Richmond, who have enacted ordinances to promote trust between law enforcement and the community.

80.     Richmond has been forced to expend resources as a result of the Executive Order because the Executive Order has created an atmosphere of fear and distrust in the immigrant community. The positive effects created by Ordinance No. 29-90 and Resolution No. 11-07 in the relationship between law enforcement and the immigrant community have started to dissipate as a result of the Executive Order. The Executive Order has the effect of discouraging immigrants from reporting crimes and cooperating with law enforcement, which harms public safety.

81.     Richmond has also been forced to expend resources to determine how it will provide vital municipal services if Defendant Attorney General Sessions and/or Defendant Secretary of Homeland Security Kelly, acting on behalf of Defendant United States, use their unbridled discretion, and determine that Richmond is a "sanctuary jurisdiction," which has willfully violated federal law, and then withhold federal funds.

82.     Richmond is dependent on federal and state funds to provide critical services to its residents. From July 1, 2013 through June 30, 2014, it received over $28 million in federal funds. For the same period, it received over $18 million in state funds, many of these funds are pass-through federal funds. In a report prepared by the California State Controller in July 2016, found at http://www.sco.ca.gov/Files AUD/07_2016_richmond_state_and_federal_expenditures.pdf, the Controller breaks down the federal funds.

83.     For fiscal year 2016-2017, Richmond has been granted federal grants for street improvements, community oriented policing, low income public housing, housing choice voucher programs, home repairs, and other services.

84.     Richmond's fiscal year runs from July 1 until June 30.  Richmond begins its mid-year budget review in February of each year and holds its first budget hearings for the upcoming year in March.  The City Council reviews and discusses the budget in May and June with final approval of the budget in early July.  Thus, Richmond is in the midst of its budget process.  Richmond is already facing budget issues and the potential that Richmond may be declared a "sanctuary jurisdiction" and have **all** federal funding stopped is causing uncertainty to Richmond's budget.  Richmond is facing the prospect of sweeping cuts if federal funding ends.  Richmond has no alternative source of funding or reserves to make-up for the loss of federal funding and, therefore, the loss of federal funding would be immediate and devastating to Richmond and its residents.

85.     The Executive Order's threat to cut federal funds is manifestly coercive and, therefore unconstitutional.  The Executive Order's direction to the Attorney General to take "appropriate enforcement action against any entity … which has in effect a statute, policy or practice that prevents or hinders the enforcement of Federal law" presents an immediate harm to Richmond.  Richmond needs to make budget decisions regarding next year's budget without having any direction about whether it complies with the Executive Order or whether the Executive Order will be enforced against Richmond and, if so, in what manner.

## G.     THE COURT SHOULD DECLARE THE EXECUTIVE ORDER UNCONSTITUTIONAL AND ENJOIN ENFORCEMENT

86.     There exists a present controversy between Defendants and Richmond because, based upon statements made by Defendants, Defendants, for purposes of enforcing the Executive Order, consider Richmond a sanctuary jurisdiction which is willfully violating the law.  Richmond has been considered a Sanctuary City, but it believes that its ordinances comply with the law and permissibly use the discretion granted to Richmond by the United States Constitution and judicial precedent to make decisions regarding the safety of its community.  Richmond

believes it complies with 8 U.S.C. § 1373. The Executive Order is unconstitutionally vague in that it fails to tell Richmond what it must do or not do to retain federal funds. There are no administrative remedies that Richmond can seek under the Executive Order. Therefore, Richmond seeks a declaration that the Executive Order is unconstitutional and unenforceable and also that Richmond believes it complies with 8 U.S.C. § 1373. This judicial declaration is necessary and appropriate at this time because of the imminent and irreparable harm that Richmond will face if the Executive Order is implemented against Richmond and all federal funds are cut off.

87. Richmond has no adequate or speedy remedy at law to stop the conduct of Defendants because the Executive Order provides no procedure for review or appeal. This action is Richmond's only way of securing prospective relief. Richmond has suffered actual harm by the issuance of the Executive Order and will continue to suffer extreme hardship and impending irreparable injury if the Executive Order is enforced because the Executive Order is unconstitutional and impermissibly seeks to take away Richmond's federal funding. The loss of federal funding on Richmond would be devastating. Therefore, Richmond seeks a temporary, preliminary, and permanent injunction enjoining the enforcement of the Executive Order against Richmond.

## V. CLAIMS FOR RELIEF
### (All Claims Are Against All Defendants)

### FIRST CLAIM FOR RELIEF

#### For Injunctive and Declaratory Relief Based on Violation of the Tenth Amendment

88. Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

89. The Tenth Amendment preserves state's and local government's sovereignty and limits the federal government's ability to control local governments' actions. Under the Tenth Amendment, "Congress may not simply commandeer the legislative process of the States by directly compelling them to enact and enforce a federal regulatory program." *New York v. United States*, 505 U.S. 144, 161, 112 S. Ct. 2408 (1992) (internal quotation omitted). "The

1    commandeering cases involve attempts by Congress to direct states to perform certain functions,

2    command state officers to administer federal regulatory programs, or to compel states to adopt

3    specific legislation." *Raich v. Gonzales*, 500 F.3d 850, 867 n. 17 (9th Cir. 2007). The Executive

4    Order violates the Tenth Amendment.

5        90. The Tenth Amendment applies to Richmond. *Printz v. United States*, 521 U.S.

6    898, 931, n. 15, 138 L. Ed. 2d 914, 117 S. Ct. 2365 (1997); *City of Santa Cruz v. Gonzales*, No.

7    C 03-01802 JF, 2007 U.S. Dist. LEXIS 66414 (N.D. Cal. Aug. 30, 2007).

8        91. The Executive Order exceeds the power of the President or any federal branch of

9    government because the Executive Order requires state and local governments to affirmatively

10   assist federal immigration officials by, *inter alia*, complying, at their own expense, with ICE

11   detainer requests. In Section 9(a) of the Executive Order, the "Attorney General shall take

12   appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, or which has in

13   effect a statute, policy, or practice that prevents or hinders the enforcement of Federal Law." By

14   demanding that state and local governments, including Richmond, detain individuals who may

15   be subject to removal at the request of federal officials even if those individuals would otherwise

16   be subject to release from custody and by ordering the Attorney General to take enforcement

17   action against state and local governments which do not comply, the Executive Order

18   commandeers state and local officials in furtherance of a federal regulatory program in violation

19   of the Tenth Amendment to the United States Constitution.

20       92. The Executive Order also requires that state and local governments take action to

21   avoid preventing or hindering the federal government in the enforcement of Federal law.

22   Executive Order, § 9(a). This requirement forces local officials to act as an arm of the federal

23   government, which violates the Tenth Amendment. The federal government cannot use the

24   appropriation of money as a threat to coerce Richmond to act in a certain way. This use of an

25   Executive Order to coerce Richmond through a threat of the loss of all federal funds is

26   unconstitutional. *Nat'l Fed'n of Indep. Bus v. Sebelius,* 567 U.S. 519, 132 S. Ct. 2566, 2602-04

27   (2012).

28

93.     The Executive Order further impermissibly seeks to interfere with Richmond's policy decisions in enacting Ordinance No. 29-90 and Resolution No. 11-07, which further legitimate local concerns and interests.  This federal interference impermissibly penalizes state and local governments that are deemed to "prevent or hinder" the enforcement of federal law and thus impermissibly coerces state and local governments to adopt policies and practices that support the Executive Order to the subordination of state and local government interests.

94.     The Executive Order additionally interferes with Richmond's ability to budget.  If it is forced to keep people in custody as a result of an ICE detention request, Richmond must pay for these additional costs to detain.  These costs are hundreds of dollars per day.  If Richmond is forced to incur these costs, it will have less money to spend on services for its residents.

95.     Accordingly, the Executive Ordinance is unconstitutional and Richmond seeks a declaration that the Executive Order is unconstitutional, and a temporary, preliminary, and permanent injunction enjoining the enforcement of the Executive Order against Richmond.

WHEREFORE, Richmond prays for relief as hereinafter set forth.

## SECOND CLAIM FOR RELIEF

### For Injunctive and Declaratory Relief Based on the Separation of Powers And Spending Clauses

96.     Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

97.     The Executive Order Section 2(c) states: "It is the policy of the executive branch to . . . Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law."  It further states in Section 9 that: "It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373."

98.     If defendant Attorney General Sessions or defendant Secretary of Homeland Security Kelly, in the discretion of either one of them, determines that a "sanctuary jurisdiction" who fully refuses to comply with 8 U.S.C. § 1373, they must ensure that the jurisdiction is not

"eligible to receive federal grants, except as deemed necessary for law enforcement purposes." Executive Order § 9.

99.    The Executive Order provides that the Attorney General "shall take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373 or has in effect a statute policy or practice that prevents or hinders the enforcement of Federal law." Executive Order § 9.

100.    The President does not have the authority to issue the Executive Order because the Executive Order is not authorized by the Constitution or Congress.

101.    Accordingly, the Executive Ordinance is unconstitutional and Richmond seeks a declaration that the Executive Order is unconstitutional, and a temporary, preliminary, and permanent injunction enjoining the enforcement of the Executive Order against Richmond.

WHEREFORE, Richmond prays for relief as hereinafter set forth.

### THIRD CLAIM FOR RELIEF

**For Injunctive and Declaratory Relief Based on Violation of Fourth Amendment**

102.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

103.    The Fourth Amendment prohibits unreasonable search and seizure, which includes keeping people in custody who otherwise would be released.

104.    The Executive Order requires Richmond to keep people in custody who would otherwise be released.  Richmond and its law enforcement officials will not have probable cause to keep these people in custody.

105.    Therefore, Richmond may be liable under the Fourth Amendment for honoring an ICE civil detention request.  *Miranda-Olivares v. Clackamas Cty.*, No. 3:12-cv-02317-ST, 2014 U.S. Dist. LEXIS 50340 (D. Or. Apr. 11, 2014); see *Morales v. Chadbourne*, 793 F.3d 208, 215-216 (1st Cir. 2015); *Orellana v. Nobles Cnty.*, No. 15-3852 ADM/SER, 2017 U.S. Dist. LEXIS 2438, at *23-24 (D. Minn. Jan. 6, 2017); *Mendia v. Garcia*, 165 F. Supp. 3d 861, 887 (N.D. Cal. 2016).  Further, the federal government has made clear that Richmond will bear all responsibility for the additional detention costs and potential liability.

106.    Accordingly, the Executive Ordinance is unconstitutional and Richmond seeks a declaration that the Executive Order is unconstitutional, and a temporary, preliminary, and permanent injunction enjoining the enforcement of the Executive Order against Richmond.

WHEREFORE, Richmond prays for relief as hereinafter set forth.

## FOURTH CLAIM FOR RELIEF

**For Injunctive and Declaratory Relief Based on Violation of Due Process Clause Because of Vagueness**

107.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

108.    The Executive Order is *unconstitutionally vague* in violation of the Due Process Claim, the Fifth Amendment of the Constitution.

109.    A federal law is *unconstitutionally vague* if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.  *United States v. Williams*, 553 U.S. 285, 304, 128 S. Ct. 1830, 1845 (2008).  This standard applies to Executive Orders.  See *United States v. Soussi*, 316 F.3d 1095, 1101 (10th Cir. 2002).  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298 (1972); see also *Desertrain v. City of L.A.*, 754 F.3d 1147, 1155-56 (9th Cir. 2014).

110.    The Executive Order is unconstitutionally vague and, therefore, unconstitutional. It fails to define key terms, such as "sanctuary jurisdiction" and the term is not defined in any federal law or regulation.  Although Richmond and numerous other jurisdictions have been referred to as "sanctuary cities," there is no common definition of a sanctuary city and there are differences between the ordinances and policies of the different jurisdictions referred to as "sanctuary cities."  The fact that a public entity has been referred to as a sanctuary city or that it has enacted legislation about immigration policies does not mean that it is a "sanctuary jurisdiction" under the Executive Order.  No jurisdiction can determine by the language of the Executive Order if it is a "sanctuary jurisdiction" subject to the Executive Order.

111.     The Executive Order is also unconstitutionally vague and, therefore, unconstitutional, because it does not define what actions or inactions constitute "willful refusal to comply with 8 U.S.C. § 1373."  The Executive Order gives unfettered discretion to the Attorney General and Secretary of Homeland Security without providing any rules or guidance on how that discretion should be exercised.  The Executive Order is, therefore unconstitutionally vague.  *United States v. Williams*, 553 U.S. at 304; *Grayned v. City of Rockford*, 408 U.S. at 108.  The Executive Order is impermissibly vague because it allows resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.  See *Grayned v. City of Rockford*, 408 U.S. at 109.

112.     An additional reason that the Executive Order is unconstitutionally vague is that it does not define what is meant by the phrase:  "Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law."  Richmond does not know, with respect to the Executive Order, what "applicable Federal law means."  There is no way for Richmond to know whether the "applicable Federal law" is only 8 U.S.C. § 1373, all immigration laws or all federal laws.

113.     Accordingly, the Executive Ordinance is unconstitutional and Richmond seeks a declaration that the Executive Order is unconstitutional, and a temporary, preliminary, and permanent injunction enjoining the enforcement of the Executive Order against Richmond.

WHEREFORE, Richmond prays for relief as hereinafter set forth.

## FIFTH CLAIM FOR RELIEF

### For a Declaration that Richmond Complies With 8 U.S.C. § 1373

114.     Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

115.     Richmond contends that it complies with 8 U.S.C. § 1373.  Specifically, the Richmond Police Department Policy Manual provides that nothing in Section 428 of the Manual regarding immigration violations "is intended to restrict officers from exchanging legitimate law enforcement information with other federal, state or local government entity (8 U.S.C. § 1373; 8 U.S.C. § 1644)."

116. Richmond believes that Defendants contend that Richmond does not comply with 8 U.S.C. § 1373.

117. An actual controversy thus presently exists between Richmond and Defendants about whether Richmond complies with 8 U.S.C. § 1373. A judicial determination resolving this controversy is necessary and appropriate at this time.

WHEREFORE, Richmond prays for relief as hereinafter set forth.

## VI.    **PRAYER FOR RELIEF**

Wherefore, the City of Richmond prays for the following relief:

1. For a declaration that the Executive Order is unconstitutional because it violates the Tenth Amendment, violates the separation of powers clause of the U.S. Constitution, violates the spending clause of the U.S. Constitution, is unconstitutionally coercive, violates the Fourth Amendment of the U.S. Constitution, and/or is unconstitutionally vague;

2. For a declaration that Richmond complies with 8 U.S.C. § 1373;

3. Temporarily, preliminarily and permanently enjoin the named Defendants from enforcing the Executive Order against the City of Richmond;

4. Award the City of Richmond reasonable costs and attorney's fees; and

5. Grant any other further relief that the Court deems fit and proper.

Dated: March 21, 2017                     **COTCHETT, PITRE & McCARTHY, LLP**


By:    _/s/ Joseph W. Cotchett_

JOSEPH W. COTCHETT
*Attorneys for Plaintiff*

Dated: March 21, 2017                     **CITY OF RICHMOND**


By:    _/s/ Bruce Reed Goodmiller_

BRUCE REED GOODMILLER
*Attorneys for Plaintiff*

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                     29

**ATTESTATION OF FILING**

I, Nancy L. Fineman, hereby attest, pursuant to Northern District of California, Local Rule 5-1(i)(3) that concurrence to the filing of this document has been obtained from each signatory hereto.

/s/ Nancy L. Fineman
_____

NANCY L. FINEMAN
*Attorney for Plaintiff*

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**