# EXHIBIT 8

XAVIER BECERRA
Attorney General of California
MICHAEL NEWMAN
Senior Assistant Attorney General
SATOSHI YANAI
Supervising Deputy Attorney General
SARAH E. BELTON
LEE I. SHERMAN (SBN 272271)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 269-6404
  Fax:  (213) 897-7605
  E-mail:  Lee.Sherman@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, ex rel, XAVIER BECERRA, in his official capacity as Attorney General of the State of California,**<br><br>Plaintiff,<br><br>v.<br><br>**JEFFERSON B. SESSIONS, in his official capacity as Attorney General of the United States; LAURA L. ROGERS, in her official capacity as Acting Assistant Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; and DOES 1-100,**<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF** |

1.   Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General ("Plaintiff" or "California"), brings this complaint to protect California from the latest attempt by the Trump Administration to strip law enforcement funding from the State unless the State and local governments in California agree to participate in the Administration's immigration enforcement program.

2.   Congress has appropriated $28.9 million in law enforcement funding to California and its political subdivisions pursuant to the Edward Byrne Memorial Justice Assistance Grant ("JAG") program.  The United States Department of Justice ("USDOJ"), led by Attorney General Jefferson B. Sessions III, and the Office of Justice Programs ("OJP"), led by Acting Assistant Attorney General Laura L. Rogers (collectively, with USDOJ and Attorney General Sessions, the "Defendants"), are responsible for administering these grants.  JAG awards are provided to each state, and certain local jurisdictions within each state, to, among other things, support law enforcement programs, reduce recidivism, conduct crime prevention and education programs for at-risk youth, and support programs for crime victims and witnesses.  Every state is entitled by law to a share of these funds.

3.   In fiscal year (FY) 2017, Defendants added unprecedented immigration enforcement conditions to JAG funding.  Courts across the country have struck those conditions down as unconstitutional.  *See Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018); *Chicago v. Sessions*, No. 17-cv-5720, ---F. Supp. 3d.---, 2018 WL 3608564, at *12 (N.D. Ill. July 27, 2018), *appeal docketed*, 18-2649 (7th Cir. Aug. 1, 2018); *Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018), *appeal docketed*, 18-2648 (3d Cir. July 26, 2018).

4.   Rather than re-consider the lawfulness of the conditions, in the JAG FY 2018 Solicitations for state and local jurisdictions,[1] Defendants have maintained a requirement that the chief law officer of the jurisdiction applying for funding (the Attorney General in the case of the State) must certify compliance with 8 U.S.C. § 1373, which prohibits restrictions on certain

---

[1] U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY 2018 State Solicitation (2018) ("JAG State Solicitation) (attached as Ex. A); *see also* U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY 2018 Local Solicitation (2018) ("JAG Local Solicitation," collectively with the JAG State Solicitation, "JAG Solicitations") (attached as Ex. B).

Complaint for Declaratory, Injunctive, and Mandamus Relief

exchanges of information regarding a person's immigration or citizenship status.  Three federal courts have recently called into question the legality of § 1373 or declared it unconstitutional.  In order to receive FY 2018 JAG funding, Defendants also require that jurisdictions certify compliance with 8 U.S.C. § 1644, certify to not violating or aiding or abetting a violation of 8 U.S.C. § 1324(a), and certify to not "imped[ing] the exercise by federal officers of authority" under or relating to 8 U.S.C. §§ 1226(a) & (c), 1357(a), and 1366(1) & (3).  Plaintiff refers to these requirements collectively as the "Certification Requirements."

5.      Defendants claim that these are "applicable Federal laws."  But jurisdictions have never been required to certify compliance with any of the laws that have been added to the FY 2018 JAG Solicitations.  Congress has not tied any of these laws, including § 1373, to federal grant-making.  Most of these laws have no applicability to state and local governments.  In addition, these requirements conflict with Congress's intent to not condition federal funding on immigration enforcement related activities.

6.      In addition, since Congress did not attach these requirements to federal funding, Defendants lack authority under the JAG authorizing statute to interpret "applicable Federal laws" in a manner that would result in commandeering state and local government functions in violation of the Tenth Amendment of the U.S. Constitution.  These Certification Requirements intrude on the sovereignty of California and its local jurisdictions by interpreting federal law to prevent the State from declining participation in federal immigration enforcement.

7.      Defendants have exceeded constitutional limits under the Spending Clause of the United States Constitution.  The Certification Requirements are not sufficiently related to the federal purpose areas of the JAG funding scheme designed by Congress and are too ambiguous to provide clear notice to the State or its political subdivisions as to what is needed to comply. These Certification Requirements are so vague that it is unclear whether to comply with the Certification Requirements, law enforcement agencies ("LEAs") would have to comply with detainer holds that require jurisdictions to hold persons in custody beyond their ordinary release. Courts throughout the country have found detainer holds violate the Fourth Amendment because they are typically not supported by the requisite probable cause.  If Defendants read the

1  Certification Requirements as requiring jurisdictions to comply with detainer holds, or requiring

2  that state and local governments allow their law enforcement officers to comply with detainer

3  holds, then the Certification Requirements are unconstitutional for this additional reason.

4          8.    The Certification Requirements also violate the Administrative Procedure Act

5  ("APA") because of their constitutional infirmities, and because Defendants acted in excess of

6  their statutory authority and in an arbitrary and capricious manner.

7          9.    California complies with all of the requirements identified in the JAG authorizing

8  statute, and that apply to federal grantees under federal law.  While California's laws comply with

9  the Immigration and Nationality Act ("INA"), since the Certification Requirements are

10  ambiguous and exceed what may be required under "applicable Federal law," California will

11  most certainly face an enforcement action if it agrees to the Certification Requirements.

12  Defendants have already withheld JAG awards from all state entities and local jurisdictions in

13  California because under their theory, California does not comply with § 1373.  The United States

14  already sued California in the Eastern District of California, unsuccessfully claiming that Senate

15  Bill 54, which consists of the Amended Transparency and Responsibility Using State Tools Act

16  ("TRUST Act"), Cal. Gov't Code §§ 7282-7282.5, and the California Values Act, Cal. Gov't

17  Code §§ 7284-7284.12, "impedes" federal immigration officials in violation of federal law.

18  However, as that court found, California's laws do not stand as an obstacle to prevent

19  immigration authorities from doing their jobs using their own resources.  Instead, California's

20  laws are designed to foster community trust between law enforcement and the communities they

21  serve, and to allocate limited law enforcement resources in a manner that is in the best interest of

22  the State's public safety.  Defendants cannot enforce the "applicable Federal laws" in the manner

23  that they intend to because such an erroneous interpretation of these federal laws would allow the

24  federal government to commandeer the State's direction of its law enforcement.

25         10.   Not only are these Certification Requirements unlawful, but agreeing to them will

26  cause California harm by requiring that the State and local jurisdictions terminate their public

27  safety oriented laws and policies.  This means that the State and its localities will lose control of

28  their ability to focus their resources on fighting crime and instead will devote resources to federal

Complaint for Declaratory, Injunctive, and Mandamus Relief

1   immigration enforcement.  The trust and cooperation that the State's laws and local ordinances

2   are intended to build between law enforcement and immigrant communities will be eroded.

3   Alternatively, if the State refuses to comply with the Certification Requirements, important public

4   safety programs that JAG is intended to fund will likely need to be cut to the detriment of state

5   and local law enforcement agencies and their budgets.

6        11.    For these reasons, and those discussed below, the Court should declare the

7   Certification Requirements are unconstitutional and/or a violation of the APA, enjoin their

8   imposition, and pursuant to 28 U.S.C. § 1361 require that Defendants issue JAG awards and

9   funding to the State and its local jurisdictions that comply with the requirements enumerated by

10  Congress.

11                 **JURISDICTION AND VENUE**

12        12.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this case

13  involves a civil action arising under the Constitution and the laws of the United States.  The Court

14  also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the federal

15  government founded upon the Constitution and an Act of Congress.  Jurisdiction is proper under

16  the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-06.  The

17  Court has authority to provide relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and

18  the Mandamus Statute, 28 U.S.C. § 1361.

19        13.    Pursuant to 28 U.S.C. § 1391(e)(1), venue is proper in the Northern District of

20  California because the Attorney General and the State of California have offices at 455 Golden

21  Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and

22  Defendants have offices at 450 Golden Gate Avenue, San Francisco, California.

23                **INTRADISTRICT ASSIGNMENT**

24        14.    Assignment to the San Francisco Division of this District is proper pursuant to Civil

25  Local Rule 3-2(c)-(d) because Plaintiff, the State of California, and Defendants both maintain

26  offices in the District in San Francisco.

27                       **PARTIES**

28        15.    Plaintiff State of California is a sovereign state in the United States of America.

4

16.     California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its sovereignty as a State caused by the challenged federal actions. The inclusion of unconstitutional and unlawful Certification Requirements as part of the JAG award impairs the State's exercise of its police power in a manner it deems necessary to protect the public safety.  The Certification Requirements burden California's exercise of its sovereign power to enforce its laws, and place a regulatory burden on California as a funding recipient, obligating the State to continuously monitor compliance of all subgrantees throughout the State, which will result in increased staff time and expenses.

17.     As a result of Defendants' unconstitutional and unlawful actions, the State of California, including its political subdivisions, is in imminent danger of losing $28.9 million this fiscal year, including $18 million that is owed to the State itself.

18.     Plaintiff Attorney General Xavier Becerra is the chief law officer of the State and the head of the California Department of Justice.  Cal. Const., art. V, § 13; Cal. Gov't Code § 12510. Attorney General Becerra, on behalf of California, has standing to bring this action because funding for law enforcement throughout the State is at stake.  *See Pierce v. Super. Ct.*, 1 Cal.2d 759, 761-62 (1934) (Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests.").  As the Chief Law Officer, the Attorney General is responsible for ensuring that the laws of the State are enforced.  Cal. Const., art. V, § 13.  The Certification Requirements undermine California statutes.  In addition, the Attorney General has standing on the basis of the requirement that he personally agree to the Certification Requirements.

19.     Defendant U.S. Department of Justice ("USDOJ") is an executive department of the United States of America pursuant to 5 U.S.C. § 101, and a federal agency within the meaning of 28 U.S.C. § 2671.  As such, it engages in agency action within the meaning of 5 U.S.C. § 702, and is named as a defendant in this action pursuant to 5 U.S.C. § 702.  USDOJ is responsible for administering the JAG funds appropriated by Congress.

20.     Defendant Jefferson B. Sessions III, is Attorney General of the United States, and oversees USDOJ, including the Office of Justice Programs ("OJP").  He is sued in his official capacity pursuant to 5 U.S.C. § 702.

21.     Defendant Laura L. Rogers is Acting Assistant Attorney General in charge of OJP, which administers JAG funding.  She is sued in her official capacity pursuant to 5 U.S.C. § 702.

22.     Each of the Defendants named in this Complaint are acting in their official capacity for the United States government bearing responsibility, in whole or in part, for the acts enumerated in this Complaint.

23.     The true names and capacities of Defendants identified as DOES 1-100 are unknown to Plaintiff, and Plaintiff will amend this Complaint to insert the true names and capacities of those fictitiously named Defendants when they are ascertained.

## FACTUAL ALLEGATIONS

I.     **CALIFORNIA'S LAWS SEEK TO PROTECT THE SAFETY AND WELFARE OF THE STATE'S RESIDENTS BY FOCUSING LAW ENFORCEMENT ON CRIMINAL ACTIVITY AND BUILDING TRUST BETWEEN LAW ENFORCEMENT AND COMMUNITIES**

24.     California state and local law enforcement agencies ("LEAs"), guided by the duly enacted laws of the State and ordinances of local jurisdictions, are tasked with effectively policing, protecting, and serving all residents, including more than 10 million foreign-born individuals who live in the State.  California's laws implicated in this suit are a valid exercise of the State's police power to regulate regarding the health, welfare, and public safety of its residents.  These laws strengthen community policing efforts by encouraging undocumented victims to report crimes to local law enforcement so that perpetrators are apprehended before harming others.

25.     The purpose of these California laws is to ensure that law enforcement resources are focused on a core public safety mission and to build trust and cooperation between law enforcement and the State's immigrant communities.  When local and state LEAs engage in immigration enforcement, as Defendants contemplate, vulnerable victims and witnesses are less likely to come forward to report crimes.

Complaint for Declaratory, Injunctive, and Mandamus Relief

26.     California's laws are not unique.  Many jurisdictions across the country, including local jurisdictions in California, have policies that define the circumstances under which local law enforcement personnel may expend time and resources in furtherance of federal immigration enforcement.  Those jurisdictions variously impose limits on compliance with Immigration and Customs Enforcement ("ICE") detainer requests, ICE notification requests about release dates, and ICE's access to detainees, or provide additional procedural protections for individuals prior to an interview with immigration authorities.

## A.    The TRUST Act

27.     In 2013, California enacted the TRUST Act, Cal. Gov't Code §§ 7282-7282.5. The TRUST Act defined the circumstances under which local LEAs may detain an individual at the request of federal immigration authorities.  The TRUST Act went into effect on January 1, 2014.

28.     The TRUST Act was intended to address numerous public safety concerns regarding the federal practice of issuing detainers to local law enforcement.  Among the Legislature's concerns were that federal courts have concluded that detainer requests do not provide sufficient probable cause to satisfy the requirements of the Fourth Amendment, and data showing that detainer requests "have erroneously been placed on United States citizens, as well as immigrants who are not deportable."  Assem. Bill No. 4, 1st Reg. Sess. (Cal. 2013) § 1(c).

29.     The TRUST Act previously set forth two conditions that local law enforcement must meet to have discretion to detain a person pursuant to an "immigration hold" (also known as a "detainer request" or "detainer hold"), which is when an immigration authority requests that the law enforcement official "maintain custody of the individual for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays."  Cal. Gov't Code § 7282(c) (prior to amendments codified on Oct. 5, 2017).  First, the detention could not "violate any federal, state, or local law, or any local policy," which includes the Fourth Amendment of the U.S. Constitution.  *Id.* § 7282.5(a) (prior to amendments codified on Oct. 5, 2017).  Second, law enforcement could only detain someone with certain, specified criminal backgrounds, an individual on the California Sex and Arson Registry, or a person charged with a serious or violent felony who was the subject of a probable cause determination from a magistrate judge.  *Id.* § 7282.5(a)(1)-(6) (prior to

7

amendments codified on Oct. 5, 2017). Only when both of these conditions were met could local law enforcement detain an individual "on the basis of an immigration hold after the individual becomes eligible for release from custody." *Id.* § 7282.5(b).

### B. The TRUTH Act

30. In 2016, California enacted the TRUTH Act, Cal. Gov't Code §§ 7283-7283.2, which took effect on January 1, 2017. The purpose of the TRUTH Act is to increase transparency about immigration enforcement and "to promote public safety and preserve limited local resources because entanglement between local law enforcement and ICE undermines community policing strategies and drains local resources." Assem. Bill No. 2792, Reg. Sess. (Cal. 2016) § 2(a)-(c), (g)-(i).

31. Under the TRUTH Act, prior to ICE interviewing someone being held in custody, a law enforcement officer must provide the detained individual with a "written consent form that explains the purpose of the interview, that the interview is voluntary, and that he or she may decline to be interviewed or may choose to be interviewed only with his or her attorney present." Cal. Gov't Code § 7283.1(a). In addition, when a LEA receives a detainer, notification, or transfer request, the LEA must "provide a copy of the request to the [detained] individual and inform him or her whether the law enforcement agency intends to comply with the request." *Id.* § 7283.1(b). If the LEA complies with ICE's request to notify ICE as to when the individual will be released, it must also "promptly provide the same notification in writing to the individual and to his or her attorney or to one additional person who the individual shall be permitted to designate." *Id.*

### C. The California Values Act

32. On October 5, 2017, Governor Edmund G. Brown Jr. signed into law the California Values Act, Cal. Gov't Code §§ 7284-7284.12, which took effect on January 4, 2018. In conjunction with this measure, California amended the TRUST Act.

33. The Values Act sets the parameters under which California law enforcement agencies may participate in immigration enforcement. The California Department of Corrections and

8

1  Rehabilitation ("CDCR") is not considered a "California law enforcement agency" for purposes

2  of the Values Act.  Cal. Gov't Code § 7284.4(a).

3       34.    Consistent with the Legislature's purpose in passing the TRUST and TRUTH Acts, in

4  its findings, the Legislature emphasized that "[a] relationship of trust between California's

5  immigrant community and state and local agencies is central to the public safety of the people of

6  California." *Id.* § 7284.2(b).  The Legislature recognized "[t]his trust is threatened when state and

7  local agencies are entangled with federal immigration enforcement, with the result that immigrant

8  community members fear approaching police when they are victims of, and witnesses to, crimes,

9  seeking basic health services, or attending school, to the detriment of public safety and the well-

10  being of all Californians." *Id.* § 7284.2(c).  The Legislature declared that the focus of the Values

11  Act is "to ensure effective policing, to protect the safety, well-being, and constitutional rights of

12  the people of California, and to direct the state's limited resources to matters of greatest concern

13  to state and local governments." *Id.* § 7284.2(f).

14       35.    The Values Act generally prohibits California law enforcement agencies from using

15  agency money or personnel to ask an individual about his or her immigration status for

16  immigration enforcement purposes.  *Id.* § 7284.6(a)(1)(A).

17       36.    The Values Act, expanding upon the limitations contained in the prior iteration of the

18  TRUST Act, prohibits compliance with detainer requests.  *See id.* § 7284.6(a)(1)(B).  In doing so,

19  the Legislature recognized that federal courts have found state and local law enforcement

20  compliance with detainer holds to be in violation of the Fourth Amendment when the detainer

21  holds are not supported by the requisite probable cause.  *See id.* § 7284.2(e).  Presently, it is ICE

22  policy to attach an administrative warrant to a detainer hold.[2]  However, that administrative

23  warrant is signed by an administrative officer, and not a federal judge.  *See id.*  The administrative

24  warrant only provides "probable cause . . . that the subject is an alien who is removable from the

25  United States," but does not provide probable cause that the subject of the detainer hold is

26  believed to have violated a criminal offense.  *Id.*

27        [2] U.S. Immigration and Customs Enforcement, Issuance of Immigration Detainers by ICE
Immigration Officers, § 2.4 (Mar. 24, 2017),

28  https://www.ice.gov/sites/default/files/documents/2017/10074-2.pdf.

37.     In conjunction with the passage of the Values Act, the TRUST Act was amended to identify the circumstances when local law enforcement has discretion to respond to notification requests. *Id.* § 7282.5(a).  "Notification request[s]" are requests by an immigration authority asking that a law enforcement official inform it "of the release date and time in advance of the public of an individual in its custody." *Id.* §§ 7282(c), 7283(f).  Notification requests are made by immigration authorities on the I-247A form that also includes a detainer request.[3]

38.     Under the Values Act, LEAs have discretion to comply with notification requests if doing so would not "violate any federal, state, or local law, or local policy."  Cal. Gov't Code § 7282.5(a); *see id.* § 7284.6(a)(1)(C).  In addition, the Values Act allows LEAs to comply with notification requests under one of two scenarios.  First, LEAs may respond to notification requests regarding someone who was previously convicted of one or more of a multitude of felonies or misdemeanors identified in the TRUST Act, a person charged with one or more of an array of felonies who was subject to a probable cause determination from a magistrate judge, or an individual on the California Sex and Arson Registry. *Id.* § 7282.5.  Alternatively, LEAs may comply with a notification request if the information requested is already "available to the public." *Id.* § 7284.6(a)(1)(C).

39.     The Values Act prohibits LEAs from using agency or department money or personnel to "[p]rovid[e] personal information, as defined in Section 1798.3 of the Civil Code, about an individual" "for immigration enforcement purposes," unless that information is publicly available. *Id.* § 7284.6(a)(1)(D).  "Personal information" is defined in the Civil Code as any information "that identifies or describes an individual, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history" and "includes statements made by, or attributed to, the individual."  Cal. Civ. Code § 1798.3(a).

40.     The Values Act also limits when a LEA may transfer an individual to immigration authorities.  Cal. Gov't Code § 7284.6(a)(4).  Under the Values Act, LEAs may transfer a person

---

[3] Department of Homeland Security, Immigration Detainer - Notice of Action, https://www.ice.gov/sites/default/files/documents/2017/I-247A.pdf.

to immigration authorities under two scenarios. First, the LEA may transfer a person to immigration authorities if the immigration authority presents a judicial warrant or judicial probable cause determination by a federal judge or a federal magistrate judge for a violation of federal criminal immigration law. *Id.* §§ 7284.4(h) & (i), 7284.6(a)(4). Second, LEAs may respond to transfer requests regarding someone who was previously convicted of one or more of a multitude of felonies or misdemeanors identified in the TRUST Act, or an individual on the California Sex and Arson Registry. *Id.* § 7282.5(a).

41.     The Values Act expressly authorizes compliance with all aspects of §§ 1373 and 1644. *Id.* § 7284.6(e).

42.     Neither the Values nor TRUTH Acts prohibit a jurisdiction from allowing ICE to access its jails to interview inmates. The Values Act explicitly reaffirms the absence of any such restriction, and requires only that state and local law enforcement, including CDCR, comply with the TRUTH Act when providing such access to immigration authorities. *Id.* §§ 7284.6(b)(5), 7284.10(a).

## II. CONGRESS DID NOT INTEND JAG TO BE CONDITIONED ON STATE AND LOCAL LAW ENFORCEMENT ASSISTING IN FEDERAL IMMIGRATION ENFORCEMENT

43.     JAG is administered by OJP within USDOJ. JAG funding is authorized by Congress under 34 U.S.C. §§ 10151-10158. The authorizing statute has been amended numerous times since its inception in 1988, evolving into the JAG program as it exists today.

44.     The Anti-Drug Abuse Act of 1988 amended the Omnibus Crime Control and Safe Streets Act of 1968 to create the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs grants ("Byrne Grants") "to assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system." Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4328 (1988) (repealed 2006). Congress placed a "special emphasis" on programs that support national drug control priorities across states and jurisdictions. *Id.* Congress identified 21 "purpose areas" for which Byrne Grants could be used. Many of the purpose areas

1    relate to the investigation, enforcement, and prosecution of drug offenses.  *See id.*  Immigration

2    enforcement was never specified in any of the grant purpose areas.

3        45.    In amendments between 1994 and 2000, Congress identified eight more purpose areas

4    for which Byrne funding could be used, bringing the total to 29.  42 U.S.C. § 3751(b) (as it

5    existed on Dec. 21, 2000) (repealed 2006).  Immigration enforcement was not specified in any of

6    these eight additional purpose areas.

7        46.    For FY 1996, Congress separately authorized Local Law Enforcement Block Grants

8    ("LLEBG") that directed payment to units of local government for the purpose of hiring more

9    police officers or "reducing crime and improving public safety."  Local Government Law

10   Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995).  Congress identified nine

11   "purpose areas" for LLEBG, none of which were immigration enforcement.  *Id.*

12       47.    The Byrne Grant and LLEBG programs were then merged to eliminate duplication,

13   improve their administration, and to provide state and local governments "more flexibility to

14   spend money for programs that work for them rather than to impose a 'one size fits all' solution"

15   to local law enforcement.  H.R. Rep. No. 109-233, at 89 (2005); *see also* Pub. L. No. 108-447,

16   118 Stat. 2809, 2863 (2004); 34 U.S.C. § 10151(a), (b)(1).

17       48.    Currently, the JAG authorizing statute enumerates eight purpose areas for: (A) law

18   enforcement programs; (B) prosecution and court programs; (C) prevention and education

19   programs; (D) corrections and community corrections programs; (E) drug treatments and

20   enforcement programs; (F) planning, evaluation, and technology improvement programs; (G)

21   crime victim and witness programs; and (H) mental health programs related to law enforcement

22   and corrections.  34 U.S.C. § 10152(a)(1).

23       49.    The purpose areas for these grants are to support criminal justice programs.

24   Immigration enforcement and removal procedures, however, are generally civil in nature.  *See*

25   *Arizona v. U.S.*, 567 U.S. 387, 396 (2012).  Immigration enforcement was never specified in the

26   purpose areas for any of these grants throughout this entire legislative history.

27       50.    In 2006, Congress repealed the only immigration enforcement related requirement

28   that had ever existed for JAG funding, a requirement that the chief executive officer of the state

receiving JAG funding provide certified records of criminal convictions of "aliens."  *See* Immigration Act of 1990, Pub. L. No. 101-649, tit. V, § 507(a), 104 Stat. 4978, 5050-51 (1990); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, tit. III, § 306(a)(6), 105 Stat. 1733, 1751 (1991) (repealed 2006).  This is consistent with the statutory scheme that does not include a purpose area connected to immigration enforcement  The repeal of this provision also evidences Congress' intent *not* to condition JAG funding on immigration enforcement related activities.

51.    In addition, more recently, Congress has considered but repeatedly declined to adopt legislation that would penalize cities for setting their own law enforcement priorities and attempt to impose conditions similar to those here.[4]

## III.    JAG'S STRUCTURE REQUIRES THAT STATE AND LOCAL JURISDICTIONS RECEIVE FORMULA GRANTS

### A.    The JAG Formula Structure and Conditions

52.    When creating the merged JAG funding structure in 2006, Congress set a formula to apportion JAG funds to state and local jurisdictions.  34 U.S.C. § 10156.  Population and violent crime rates are used to calculate each state's allocation.  *Id.* § 10156(a)(1).  Congress guarantees to each state a minimum allocation of JAG funds.  *Id.* § 10156(a)(2).

53.    In addition to determining the amount of money received by grantees within each state, Congress set forth how that money is to be shared between state and local jurisdictions.  Under the statutory formula, 60 percent of the total allocation to a state must be given directly to the state.  *Id.* § 10156(b)(1).

54.    The statutory formula also provides that 40 percent of the total allocation to a state must be given to local governments within the state.  *Id.* § 10156(d)(1).  Each unit of local government receives funds based on its crime rate.  *Id.* § 10156(d)(2)(A).

---

[4] *See* Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018) (voted down by the House by a vote of 231-193); *see also, e.g.*, No Sanctuary for Criminals Act, H.R. 3003, 115th Cong. (2017); Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015); Sanctuary City All Funding Elimination Act of 2015, H.R. 3073, 114th Cong. (2015).

55.     According to Congress's JAG funding scheme, states and local governments that apply for JAG funds are required to make limited certifications and assurances.  Beyond ministerial requirements identified in the authorizing statute, the chief executive officer of each applicant must certify that: (A) the law enforcement programs to be funded meet all requirements of the JAG authorizing statute; (B) all information in the application is correct; (C) there was coordination with affected agencies; and (D) the applicant will comply with all provisions of the JAG authorizing statute and all other applicable Federal laws.  *Id.* § 10153(a)(5).

**B.     California's Allocation and Use of the JAG Award**

56.     Based on the formula prescribed by statute, California is expected to receive approximately $28.9 million in JAG funding in FY 2018, with $18 million going to the Board of State and Community Corrections ("BSCC"), the entity that receives the formula grant funds that are allocated to the State.

57.     The BSCC has disbursed JAG funding using subgrants predominately to local jurisdictions throughout California to fund programs that meet the purpose areas identified in the JAG authorizing statute.  Between Fiscal Years 2015-17, the BSCC funded 32 local jurisdictions and the California Department of Justice.

58.     In the past, the BSCC prioritized subgrants to those jurisdictions that focus on education and crime prevention programs, law enforcement programs, and court programs, including indigent defense.  Some examples of California jurisdictions' purpose-driven use of JAG funds include: (a) implementing programs to improve educational outcomes, increase graduation rates, and curb truancy; (b) providing youth and adult gang members with multi-disciplinary education, employment, treatment, and other support services to prevent gang involvement, reduce substance abuse, and curtail delinquency and recidivism; (c) implementing school-wide prevention and intervention initiatives for high-risk students; (d) providing comprehensive post-dispositional advocacy and reentry services to improve outcomes and reduce recidivism for juvenile probationers; (e) providing a continuum of detention alternatives to juvenile offenders who do not require secure detention, which includes assessment, referral, case advocacy, home detention, reporting centers, intensive case management, and wraparound family

support services; and (f) funding diversion and re-entry programs for both minors and young

adult offenders.

**IV.  DEFENDANTS' ESCALATING ADDITION OF IMMIGRATION ENFORCEMENT REQUIREMENTS TO JAG**

**A.  The Addition of the § 1373 Certification Requirements and Subsequent Actions to Withhold Funding from the State**

59.    In FY 2016, OJP first announced that 8 U.S.C. § 1373 was an "applicable Federal

law" under JAG, and would be a required condition for grantees receiving JAG funds.  Section

1373(a) provides:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration enforcement authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

60.    Section 1373(b) prohibits any "person or agency" from restricting federal, state, or

local government entities from "requesting" information regarding a person's immigration status,

"maintaining" such information, or "exchanging" such information with federal, state, or local

government entities.

61.    For FY 2016, OJP required that the BSCC submit a legal opinion validating its

compliance with § 1373.  On April 21, 2017, OJP sent a letter to the BSCC, as well as eight other

jurisdictions nationwide, demanding that it submit that legal opinion.[5]  On June 29, 2017, the

BSCC submitted the requested legal opinion explaining that the State's laws, including the

TRUST and TRUTH Acts, do not violate § 1373.

62.    On July 25, 2017, OJP announced the FY 2017 State JAG Solicitation, and on August

3, 2017, OJP announced the FY 2017 JAG Local Solicitation.  For the first time, the Solicitations

required that state and local jurisdictions make the following certifications with respect to § 1373

in order to receive a grant or subgrant:

- The chief law officer of the jurisdiction, including the California Attorney General in the

---

[5] Press Release, U.S. Dep't of Justice, *Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373* (Apr. 21, 2017), https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373.

case of California, must sign an affidavit certifying compliance with § 1373 on behalf of the State and "any entity, agency, or official" of the State as applicable to the "program or activity" to be funded.

- The chief executive officer of the jurisdiction, including the Governor of the State of California, must sign an affidavit making a number of assurances, including that the chief executive adopts the chief law officer's certification of compliance with § 1373.

- The subrecipients must certify compliance with § 1373, as applicable to the program and award to be funded, and assure that they will comply with all award conditions.

63. On August 25, 2017, the BSCC submitted the State's application for JAG. In that application, the BSCC stated that it "withholds any commitment at this time concerning new grant conditions, pending receipt of the award documents."

64. On November 1, 2017, after the enactment of the Values Act, OJP sent the State a preliminary compliance assessment letter asserting that three provisions of the Values Act may "violate 8 U.S.C. § 1373, depending on how [the State] interprets and applies them." Those are the provisions regulating: (i) inquiries into an individual's immigration status (Cal. Gov't Code § 7284.6(a)(1)(A)); (ii) responses to notification requests (*id.* § 7284.6(a)(1)(C)); and (iii) the sharing of "personal information" (*id.* § 7284.6(a)(1)(D)). As to the first provision, OJP said that to comply with § 1373, the State must certify that it interprets that provision as "not restrict[ing] California officers and employees from requesting information regarding immigration status from federal immigration officers." For the notification request and personal information provisions to comply with § 1373, OJP said the State must certify that "it interprets and applies these provisions to not restrict California officers from sharing information regarding immigration status with federal immigration officers, including information regarding release date[s] and home address[es]." If the State cannot so "certify," then "[USDOJ] has determined that these provisions violate [Section 1373]." OJP further "reserve[d] [its] right to identify additional bases of potential violation of 8 U.S.C. § 1373."

16

Complaint for Declaratory, Injunctive, and Mandamus Relief

65.    On November 13, 2017, the BSCC responded and certified that the Values Act does not restrict law enforcement from inquiring about an individual's immigration status with other governmental entities.  The BSCC could not provide the requested certification as to the other two provisions, and informed OJP that the Values Act regulates the sharing of release date information and home addresses because that information is not covered by § 1373.

66.    On January 24, 2018, OJP responded that it still has concerns about the State's compliance with § 1373, and asked the BSCC, and simultaneously, eight other local jurisdictions in California, to produce by February 23, under threat of subpoena, "orders, directives instructions, or guidance to your law enforcement employees" about communicating with USDOJ, the Department of Homeland Security ("DHS"), and ICE.[6]  The BSCC responded to that letter asserting that it is not a law enforcement agency, so has limited requested documents, but produced the documents that were responsive.  In the meantime, the State filed a lawsuit challenging, among other things, the FY 2017 § 1373 Certification Requirement as unconstitutional and unlawful, and seeking a declaration that the State's laws comply with § 1373.  Am. Compl. for Decl. and Inj. Relief, *State of California v. Sessions*, No. 17-cv-4701 (N.D. Cal.  Oct. 13, 2017), ECF No. 11.

67.    On March 6, 2018, the United States filed a lawsuit against the State of California in the Eastern District of California alleging that the provisions of SB 54 [the Values Act] that regulate compliance with notification requests, restrict the sharing of personal information for immigration enforcement purposes, and limit transfers of individuals to immigration authorities are preempted under federal immigration law, and that the notification request and personal information provisions also violate § 1373.  *See* Compl., *United States v. California*, No. 18-cv-490, ECF No. 1, ¶ 65 (E.D. Cal. Mar. 6, 2018).  In its motion to preliminarily enjoin SB 54, the United States argued that these provisions "impede[]" the United States' enforcement of the

---

[6] Press Release, U.S. Dep't of Justice, *Justice Department Demands Documents and Threatens to Subpoena 23 Jurisdictions As Part of 8 U.S.C. § 1373 Compliance Review* (Jan. 24, 2018), https://www.justice.gov/opa/pr/justice-department-demands-documents-and-threatens-subpoena-23-jurisdictions-part-8-usc-1373.

1    immigration laws.  Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Supp., *United States v.*

2    *California*, No. 18-cv-490, ECF No. 2-1 at 4, 27, 29, 32, 35, 37 (E.D. Cal. Mar. 6, 2018).

3          68.    The Eastern District court disagreed.  In denying the federal government's motion to

4    enjoin the Values Act, Judge Mendez concluded that § 1373 does not encompass addresses and

5    release dates, "Section 1373 and the information sharing provisions of SB 54 do not directly

6    conflict," and SB 54 was not an obstacle to the federal government's goals because "[s]tanding

7    aside does not equate to standing in the way."  *United States v. California*, No. 18-cv-490, --- F.

8    Supp. 3d ---, 2018 WL 3301414, at *15-18 (E.D. Cal. July 5, 2018), *appeal docketed*, No. 18-

9    16496 (9th Cir. Aug. 9, 2018).  The court found the constitutionality of § 1373 "highly suspect,"

10   *id.* at *14, and "that a Congressional mandate prohibiting states from restricting their law

11   enforcement agencies' involvement in immigration enforcement activities—apart from, perhaps a

12   narrowly drawn information sharing provision—would likely violate the Tenth Amendment . . . .

13   If Congress lacks the authority to direct state action in this manner, then preemption cannot and

14   should not be used to achieve the same result."  *Id.* at *21.  The court further dismissed the United

15   States' claim against the Values Act without leave to amend.  Order re: State of California's Mot.

16   to Dismiss, *United States v. California*, No. 18-cv-490, ECF No. 197 at 5, 7 (E.D. Cal. July 9,

17   2018).

18         69.    Two other federal courts, when considering challenges to the FY 2017 § 1373 JAG

19   Condition, declared § 1373 unconstitutional on its face, and thus, held that the statute cannot be

20   an "applicable federal law" for JAG funding.  *Chicago*, 2018 WL 3608564, at *7-11;

21   *Philadelphia*, 309 F. Supp. 3d at 329-31.

22         70.    Nonetheless, in June 2018, when Defendants issued FY 2017 JAG awards to state and

23   local jurisdictions, Defendants withheld awards from the BSCC and local jurisdictions throughout

24   California because of Defendants' view that the Values Act does not comply with § 1373.  As of

25   the date of this Complaint, Plaintiff is not aware of any jurisdiction in California that has received

26   FY 2017 JAG funds.

27

28

**B.    The Addition of the Access and Notification Requirements to JAG Funding**

71.    In addition to the requirement that jurisdictions certify compliance with § 1373, for the first time in FY 2017, OJP announced two substantive "special conditions" related to federal immigration enforcement.  To receive a JAG award, a jurisdiction must:

- permit personnel of DHS to access any correctional or detention facility in order to meet with an "alien" (or an individual believed to be an "alien") and inquire as to his or her right to be or remain in the United States (the "Access Condition"); and

- provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an "alien" in the jurisdiction's custody when DHS requests such notice in order to take custody of the individual pursuant to the INA (the "Notification Condition").

Defendants later identified what the final award conditions would consist of in court filings, which confirmed the imposition of the Access and Notification Conditions for FY 2017 JAG funding.  *See, e.g., State of California v. Sessions*, No. 17-cv-4701, ECF No. 125-2, ¶ 55(1) (July 31, 2018).

72.    Paragraph 56 of the represented final conditions impose similar obligations on local government recipients and subrecipients.  Recipients that disburse funding to subrecipients must "monitor[] subrecipient compliance with the requirements of this condition."  *Id.* ¶ 55(2).

73.    Two federal district courts have determined that the Access and Notification Conditions are unconstitutional because USDOJ exceeded its statutory authority in imposing them.  *Chicago*, 2018 WL 3608564, at *12; *Philadelphia*, 309 F. Supp. 3d at 321.  The Seventh Circuit affirmed the district court's decision to preliminarily enjoin the Access and Notification Conditions.  *Chicago*, 888 F.3d. at 293 (7th Cir. 2018).  California is currently challenging the FY 2017 Access and Notification Conditions, as well as the § 1373 Condition, in *California v. Sessions*.

**C.    FY 2018 JAG State and Local Solicitations**

74.    On July 20, 2018, Defendants released the FY 2018 JAG Solicitations.  The Chief Legal Officer of the jurisdiction must execute two certifications in order for that jurisdiction to receive JAG funding.  The first certification is entitled "FY 2018 Certification of Compliance

19

with 8 U.S.C. §§ 1373 & 1644." As with FY 2017, the first certification requires each grant recipient's Chief Legal Officer to sign a standard affidavit, affirming compliance with § 1373 on behalf of the State and "any entity, agency, or official" of the State as applicable to the "program or activity to be funded." Ex. A, Appx B; Ex. B, App. B. Unlike last year, applicants must also submit an answer to the following questions surrounding the jurisdiction's "Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)":

- Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
- Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meets the description in question 1?
- If yes to either:
    o Please provide a copy of each law or policy.
    o Please describe each practice.
    o Please explain how the law, policy, or practice complies with section 1373.

Ex. A at 27-28; Ex. B at 27-28. A jurisdiction will "not receive award funds (and its award will include a condition that withholds funds) until it submits these responses." Ex. A at 28; Ex. B at 28.[7]

75.    In this first certification, for the first time this year, the Chief Legal Officer must certify compliance with 8 U.S.C. § 1644. Ex. A, Appx B; Ex. B, Appx. B. Section 1644 exists in a chapter within the INA for "Restricting Welfare and Public Benefits for Aliens." Like § 1373, § 1644 prohibits state and local governments from restricting the "sending to or receiving" from immigration authorities "information regarding the immigration status" of "an alien."

76.    Also, for the first time this year, Defendants require that the Chief Legal Officer separately execute a second certification entitled "FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3)." While removing the Access

---

[7] For purposes of this action, these required responses are part of the Certification Requirements that California is challenging.

1    Condition that has been struck down by the courts, Defendants add a requirement that the Chief

2    Legal Officer certify that the jurisdiction does not have in effect or is bound to any law, rule,

3    policy, or practice, applicable to the "program or activity" to be funded, which "impede the

4    exercise by federal officers of authority under 8 U.S.C. § 1357(a)."  Ex. A, Appx. C; Ex. B,

5    Appx. C.  The certification describes § 1357(a) as providing authority to immigration officers to

6    "interrogate any alien or person believed to be an alien as to his right to be or to remain in the

7    United States."  *Id.*  The JAG Solicitations describe the certification as "requiring . . . recipients to

8    permit DHS agents to have access to any correctional facility in order to meet with an alien (or an

9    individual believed to be an alien) and inquire as to his right to be or remain in the United States."

10   Ex. A at 37; Ex. B at 37.

11        77.      While removing the Notification Condition that has been struck down by the courts,

12   in this second certification, Defendants add a requirement that the Chief Legal Officer certify that

13   the jurisdiction does not have in effect or is bound to any law, rule, policy, or practice, applicable

14   to the "program or activity" to be funded, which "impede[s] the exercise by federal officers of

15   authority relating to 8 U.S.C. § 1226(a) & (c)."  Ex. A, Appx. C; Ex. B, Appx. C.  Section 1226

16   directs the Attorney General to take custody of inadmissible and deportable persons after they

17   have committed certain offenses or have been sentenced to a term of imprisonment.  The

18   certification also identifies 8 U.S.C. § 1231(a)(4), which the certification represents as limiting

19   the federal government from "remov[ing] an alien who is sentenced to imprisonment until the

20   alien is released from imprisonment."  *Id.*  The JAG Solicitations describe the certification as

21   "requiring . . . recipients to provide (where feasible) at least 48 hours' advance notice to DHS

22   regarding the scheduled release date and time of an alien in the recipient's custody when DHS

23   requests such notice in order to take custody of the alien pursuant to the Immigration and

24   Nationality Act."  Ex. A at 37; Ex. B at 36-37.[8]

25        78.      That second certification requires that the Chief Legal Officer certify for the first time

26   that the jurisdiction does not have in effect or is bound to any law, rule, policy, or practice,

27        _____
             [8] The JAG Solicitations identify "8 U.S.C. § 1266(a) & (c)" on this page, but since that
28   law does not exist, and does not appear anywhere else in the Solicitations, California presumes
     that Defendants meant to cite to 8 U.S.C. § 1226 here instead.

applicable to the "program or activity" to be funded," which "impede[s] the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3)." Ex. A, Appx. C; Ex. B, Appx. C. The 8 U.S.C. § 1366 certification requirement is not described anywhere else in the JAG Solicitations, and Defendants do not explain why they are adding this statute as an "applicable law." The Certification describes § 1366 as "requiring the Attorney General annually to submit to Congress 'a report detailing . . . (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense, [and] (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal.'" *Id.*

79.     That second certification also requires that the Chief Legal Officer certify that the jurisdiction does not have in effect or is bound to any law, rule, policy, or practice, applicable to the "program or activity" to be funded, which "violate[s], or aid[s] or abets any violation of, 8 U.S.C. § 1324(a)." Ex. A, Appx. C; Ex. B, Appx. C. The certification describes § 1324(a) as "forbidding any 'person,' in 'knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law,' to 'conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation' or to 'engage in any conspiracy to commit any of the preceding acts . . . or aid[] or abet[] the commission of any of the preceding acts.'" *Id.*

80.     8 U.S.C. § 1324(a) does not apply to states.  The INA defines "person" as an "individual" or an "organization."  8 U.S.C. § 1101(b)(3).  A "State" is defined separately in 8 U.S.C. § 1101(a)(36), and the term "State" is not in any way part of 8 U.S.C. § 1324(a).

81.     The Chief Executive of the Applicant Government, identified as the Governor for states, must execute a separate certification acknowledging that the Chief Executive examined the Certification of Compliance with 8 U.S.C. § 1373 & 1644 and the Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3), and "adopt th[e] certification[s] as my own on behalf of that government."  Ex. A, Appx A; Ex. B, Appx. A.

82.     The Chief Legal Officer and the Chief Executive must make the following acknowledgement in connection with the certifications for each of these laws:

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and or 34 U.S.C. § 10271-10273), and also may subject me and the applicant [entity] to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812).

Ex. A, Appx A-C; Ex. B, Appx. A-C.

83.    The JAG State Solicitation provides that "in order to validly accept a fiscal year (FY) 2018 JAG award, the chief legal officer of the applicant state must properly execute, and the state must submit, the specific certifications regarding compliance with certain federal laws attached to this solicitation as Appendix B and Appendix C." Ex. A at 1, 18, 27, 35-36.  The same applies to local governments.  Ex. B at 1, 18, 27, 35.  The State is required to collect these certifications from all subrecipients.  Ex. A at 24.

84.    Underneath the FY 2018 JAG Solicitations on the OJP website, there is a link to Frequently Asked Questions with respect to the § 1373 Certification.[9]  These represent that the certification "must be signed by the jurisdiction's chief legal officer, who may not delegate, assign, or designate the task to another."[10]  The document states that the "State 'Attorney General' typically will be the title of the chief legal officer." *Id.* No. 9.

85.    OJP anticipates that it will issue award notifications by September 30, 2018.  Ex. A at 35; Ex. B at 35.  The USDOJ Financial Guide explains that jurisdictions "have 45 days from the award date to accept [an] OJP . . . award document or the award may be rescinded."[11]

86.    Defendants have provided no explanation as to how the new Certification Requirements are consistent with Congress's intent in adopting and authorizing funds for JAG.

87.    On August 21, 2018, the BSCC submitted a FY 2018 JAG application.  As part of that application, the BSCC is required to certify compliance that "the Applicant will comply with

---

[9] *See* Office of Justice Programs, BJA Edward Byrne Memorial Justice Assistance Grant Program, https://www.bja.gov/jag/.

[10] Bureau of Justice Assistance, Questions & Answers related to 8 U.S.C. § 1373 and new express conditions on Department of Homeland Security Access and Notice Requirements, No. 8, https://www.bja.gov/publications/8U.S.C.1373QuestionsandAnswers.pdf.

[11] U.S. Dep't of Justice, *2015 DOJ Grants Financial Guide,* § 2.2, https://www.justice.gov/ovw/file/892031/download.

. . . all federal statutes and regulations applicable to the award" and that it will "require all subrecipients to comply with all applicable award requirements and all applicable federal statutes and regulations."  OJP informed the BSCC that it had to make that certification at the time of application.  In a supplemental document, the BSCC stated that it would so certify as to any laws that were lawfully identified as applicable laws.  But the BSCC disavowed the inclusion of the new Certification Requirements, and asserted that it was not making any "certifications or assurances about any federal statutes that have been selected by the Office of Justice Programs (OJP) as 'applicable' to the JAG program and imposed unlawfully."  The BSCC continued that it "does not agree to comply with any other unlawfully imposed award conditions or requirements."

## V.   THE CERTIFICATION REQUIREMENTS ARE UNCONSTITUTIONAL AND UNLAWFUL

### A.   Defendants Lack Statutory Authority to Impose the Certification Requirements

88.     JAG's authorizing statute provides no authority for OJP to impose the Certification Requirements.  Interpreting OJP's authority to permit it to impose these substantive conditions with respect to formula grants, like JAG, beyond what is allowed under federal law conflicts with congressional intent in establishing a prescribed formula grant structure.  Congress designed JAG so that "*each State*" receives an allocation according to a precise statutory formula.  34 U.S.C. § 10156(a) (emphasis added).  Likewise, Congress's formula provides allocation to "*each* unit of local government." *Id.* § 10156(d)(2) (emphasis added).  As such, if USDOJ makes grants from funds that Congress appropriated to JAG, OJP must disburse the funds according to the statutory formula enacted by Congress so long as the jurisdiction complies with the conditions that exist in federal law.

89.     The Certification Requirements are also contrary to congressional intent as immigration enforcement has never been a purpose area for JAG funding, and Congress has repeatedly rejected numerous attempts to attach immigration enforcement requirements to receipt of JAG funding.

90.     Defendants claim that all of the statutes identified in the certification are "applicable Federal laws" that applicants must comply with under 34 U.S.C. § 10153(a)(5) in the JAG

24

1    authorizing statute.  *See* Ex. A at 10; Ex. B. at 10.  The JAG authorizing statute does not permit

2    Defendants to add these statutes as "applicable Federal laws."

3        91.    8 U.S.C. §§ 1373 and 1644 cannot be "applicable Federal laws" because they are

4    unconstitutional under the Tenth Amendment's anti-commandeering doctrine, and thus,

5    Defendants lack the statutory authority to identify those statutes as "applicable laws."

6        92.    8 U.S.C. §§ 1226, 1231, 1357, and 1366 are not "applicable Federal laws" as they are

7    not laws that are applicable to applicant state and local jurisdictions.  These laws only impose

8    obligations on the federal government.  In addition, 8 U.S.C. § 1324 only applies to individuals

9    and organizations, not to state and local jurisdictions.

10       93.    None of the federal laws identified in the certifications are "applicable" because the

11   term "other applicable Federal laws" is best understood as referring to laws that are expressly

12   connected to federal grant-making.  Prior to 2016, the only laws that USDOJ identified as

13   "applicable" were those that specifically address the administration of federal funding in the text

14   of the statute.  There is no provision in the INA, or any federal law, that requires jurisdictions to

15   assist with otherwise voluntary immigration enforcement related activities in order to receive

16   these federal funds.

17       94.    Defendants exceed their statutory authority by adding the Certification Requirements

18   because these purported "applicable Federal laws" cannot be constitutionally applied to

19   California's laws under the anti-commandeering doctrine.  Defendants exceed their statutory

20   authority by interpreting statutes such as 8 U.S.C. §§ 1226, 1231, and 1357(a), as requiring state

21   and local jurisdictions to comply with notification requests or allowing immigration authorities

22   access to detention facilities, although those statutes impose no requirements on state and local

23   jurisdictions.  *See* Ex. A at 37; Ex. B at 36-37.

24       95.    These Certification Requirements are further undercut by 34 U.S.C. § 10228(a),

25   which is codified in the same chapter as the JAG authorizing statute, and prohibits the use of

26   federal law enforcement grants to exercise "any direction, supervision, or control over any police

27   force or any other criminal justice agency of any State or any political subdivision thereof."

28

**B.    The Certification Requirements do not Provide Jurisdictions with Clear Notice of what they Require**

96.    It is ambiguous what the Certification Requirements mandate or prohibit grant recipients from doing.  For example, it is unclear what activities Defendants perceive as "impeding" federal immigration officials.  Federal law does not prohibit state and local jurisdictions from limiting their law enforcement officers from engaging in immigration enforcement.  However, the federal government, in another litigation, has staked its position that it views such practices as "impeding" immigration officials.  It is, therefore, uncertain what actions that jurisdictions must take in order to satisfy the federal government's view of these requirements, when there is no federal law that broadly prohibits jurisdictions from "impeding" immigration officials.  It is just as unclear what Defendants consider to be "aid[ing] or abet[ing]" a violation of 8 U.S.C. § 1324(a).

97.    It is ambiguous whether the requirement to certify that grant recipients "permit DHS agents to have access to any correctional facility in order to meet with an alien . . . and inquire as to his right to be or remain in the United States" prohibits grant recipients from informing inmates of their right to have a lawyer present or decline an interview with ICE, which would implicate the notice requirements in the TRUTH Act.  It is also ambiguous as to whether the Certification Requirements prohibit jurisdictions from restricting their employees from asking a person about his or her immigration status, or complying with requests to hold a person after his or her ordinary release, activities which are both generally prohibited under the Values Act.

**C.    Interpreting the Certification Requirements as Requiring Jurisdictions to Hold an Individual Past His or Her Ordinary Release would mean Defendants are Conditioning Funding on Unconstitutional Activities**

98.    If Defendants interpret the ambiguous Certification Requirements as requiring jurisdictions to hold an individual beyond his or her scheduled release date and time in order to comply, Defendants would be forcing jurisdictions to violate the Fourth Amendment of the U.S. Constitution in order to receive federal funding.  That is because jurisdictions would be required to detain individuals beyond when they would otherwise be eligible for release even if a jurisdiction lacks the probable cause to do so.

26

99.    As a matter of practice, when issuing a I-247A detainer form to a local jurisdiction, ICE merely checks a box identifying whether: (a) there is a final order of removal; (b) removal proceedings are pending as to the individual; (c) "[b]iometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law;" and/or (d) "[s]tatements made by the alien to an immigration officer and/or reliable evidence that affirmatively indicate that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law."[12]

100.    The I-247A form alone does not provide a jurisdiction with any individually particularized information about the alleged basis for removability.  Detainer requests are typically only accompanied by an ICE administrative warrant, which has not been reviewed and approved by a neutral magistrate.  As federal courts throughout the country have determined, jurisdictions that hold individuals beyond their ordinary release date pursuant to ICE detainer requests violate the Fourth Amendment if the detainer requests are not supported by independent probable cause or a judicial warrant.  *See, e.g.*, *Roy v. Cty. of L.A.*, No. 12-cv-9012, 2018 WL 914773, *23-24 (C.D. Cal. Feb. 7, 2018); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 510-11 (N.D. Cal. 2017).

101.    It is unclear whether Defendants consider jurisdictions that limit compliance with detainer requests as "imped[ing]" immigration officials.  To cure this ambiguity and the Fourth Amendment problems with the Certification Requirements, Defendants would need to explicitly state that jurisdictions do not need to detain an individual beyond his or her ordinary release in order to comply with the Certification Requirements.

## VI.    THE IMPOSITION OF THE CERTIFICATION REQUIREMENTS CREATE IRREPARABLE HARM TO THE STATE AND ITS LOCAL JURISDICTIONS

102.    These Certification Requirements mean that the State and its local jurisdictions will have to decide whether they can or should accept their JAG awards under these ambiguous and

---

[12] *See* Department of Homeland Security, Immigration Detainer – Notice of Action, Form I-247A, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

1    unlawful requirements.  If the State and its local jurisdictions cannot accept the awards, the State

2    will lose $28.9 million in critical funds that would otherwise go toward programs throughout the

3    State that reduce recidivism for at-risk youth, counter the distribution of illegal drugs, advance

4    community policing, and improve educational outcomes.

5         103.   It is likely that in order for the State and many of its localities to accept the funding,

6    they will have to change their public safety oriented laws and policies in order to ensure they are

7    viewed as complying with these ambiguous Certification Requirements.  Abandoning these

8    policies that law enforcement has found to be effective in their communities would divert

9    resources away from fighting crime and erode trust between the State and local governments and

10   their immigrant communities that the TRUST, TRUTH, and Values Acts, as well as local

11   ordinances, are intended to build.

12        104.   By their actions, Defendants are compelling state and local governments to make a

13   decision about whether to modify or abandon public safety policies or forego federal funding

14   without providing clarity about the scope of the conditions.  This forces jurisdictions to sign an

15   unqualified certification within 45 days of receiving final award conditions despite the

16   ambiguities the Defendants have created.  California and its local jurisdictions must make this

17   decision under the shadow of the federal government's actions that they have already taken and

18   threats they have made against California on the basis of the State's laws.  In addition to suing the

19   State for adopting laws that the United States alleges "impede" immigration authorities, after the

20   Values Act went into effect, then-ICE Acting Director Thomas Homan called for USDOJ to

21   "charge" elected officials for jurisdictions with policies like California for violating 8 U.S.C. §

22   1324(a) if they do not meet the Administration's immigration enforcement demands.[13]  The DHS

23   Secretary Kirstjen Nielsen later confirmed in congressional testimony that USDOJ was

24   "reviewing" ways to charge state and local official as Acting Director Homan suggested.  By

25   trying to make § 1324(a) an "applicable Federal law" through this Certification Requirement,

26

27        [13] Fox News Interview with Thomas Homan, *Acting ICE director: California made a foolish decision* (Jan. 2, 2018), http://www.foxnews.com/transcript/2018/01/02/acting-ice-director-california-made-foolish-decision.html.

28

1  Defendants are unlawfully attempting to force elected officials to make representations, under the

2  threat of criminal prosecutions, about that federal statute.

3      105.   The State should not be faced with this Hobson's Choice of agreeing to these

4  unconstitutional Certification Requirements and facing a certain enforcement action, or not

5  agreeing to these Certification Requirements and losing critical public safety dollars to the

6  detriment of the State's communities.  Defendants' scheme undermines public safety, is

7  unconstitutional, and should be halted.

8                          **FIRST CLAIM FOR RELIEF**

9              **VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

10     106.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

11     107.   Article I, Section I of the United States Constitution enumerates that "[a]ll legislative

12  Powers herein granted shall be vested in [the] Congress."

13     108.   Article I, Section VIII of the United States Constitution vests exclusively in Congress

14  the spending power to "provide for . . . the General Welfare of the United States."

15     109.   Defendants have exceeded congressional authority by adding substantive

16  Certification Requirements that are not conferred by the JAG authorizing statute or any other

17  federal law.  *See* 34 U.S.C. §§ 10151-58.  The new Certification Requirements therefore

18  unlawfully exceed the Executive Branch's powers and intrude upon the powers of Congress.

19     110.   For the reasons stated herein, the Certification Requirements in the JAG Solicitations

20  are unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201.  Additionally,

21  Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue

22  California's FY 2018 JAG award without the Certification Requirements, and disbursal of

23  California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

24                         **SECOND CLAIM FOR RELIEF**

25                              **ULTRA VIRES**

26  **(The Laws in the Certification Requirements are not "Applicable Federal Laws" within the
   Meaning of the JAG Authorizing Statute)**

27     111.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

28

29

112. An agency acts ultra vires when it exceeds its statutory authority conferred by Congress.

113. None of the identified laws in the Certification Requirements are "applicable Federal laws" within the meaning of the JAG authorizing statute because they do not govern by their express terms the administration of federal funding.

114. Additionally, 8 U.S.C. §§ 1226, 1231, 1324, and 1366 cannot be applicable laws for applicants to JAG funding because these laws impose no obligations on state and local jurisdictions.

115. Alternatively, even if these statutes were deemed to be "applicable Federal laws," Defendants exceed their authority under the JAG authorizing statute by imposing requirements on state and local governments that are not found in these federal statutes. For example, Defendants seek to "require[] . . . recipients to provide (where feasible) at least 48 hours' notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act," although there is no such requirement in federal law. Similarly, Defendants "requir[e] . . . recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States," which again is not a requirement that exists in federal law.

116. For the reasons stated herein, the Certification Requirements in the JAG Solicitations are ultra vires, and should be set aside under 28 U.S.C. § 2201. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

## **THIRD CLAIM FOR RELIEF**

### **ULTRA VIRES/ANTI-COMMANDEERING**
**(The Certification Requirements Cannot be Constitutionally Applied to California's Laws under the Tenth Amendment of the Constitution)**

117. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

118.   Defendants' basis for adding the Certification Requirements are that they are premised on being "applicable Federal laws."  If the laws identified in the Certification Requirements are "applicable Federal laws," then the breadth of what Congress permitted Defendants to condition funding on is confined to what the "applicable laws" require or prohibit, as limited by the Tenth Amendment, and nothing more.

119.   The Tenth Amendment prohibits the federal government from requiring states and localities "to govern according to Congress's instructions," *New York v. United States*, 505 U.S. 144, 162 (1992), or "command[ing] the State's officers . . . to administer or enforce a federal regulatory program."  *Printz v. United States*, 521 U.S. 898, 935 (1997).  Specifically, where the "whole object" of a provision of a federal statute is to "direct the functioning" of state and local governments, that provision is unconstitutional.  *Id.* at 932.

120.   The Tenth Amendment guarantees that states have a "legitimate choice" to "decline to administer the federal program."  *New York*, 505 U.S. at 177, 185.  Prohibitions that "unequivocally dictate[] what a state legislature may and may not do" violate the anti-commandeering doctrine as much as affirmative commands.  *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018).

121.   Two of the laws that are part of the Certification Requirements, 8 U.S.C. §§ 1373 and 1644, violate the Tenth Amendment on their face or as applied under Defendants' interpretation of them.  Therefore, those laws are invalid and cannot be identified as "applicable Federal laws."  *See Chicago*, 2018 WL 3608564, at 7-11; *Philadelphia*, 309 F. Supp. 3d at 329-31.

122.   In *United States v. California*, the United States has already made clear its view that the Values and TRUST Acts "impede" immigration authorities, which would run afoul of the Certification Requirements.  As was found in that case, an interpretation of federal law that "prohibit[s] states from restricting their law enforcement agencies' involvement in immigration activities—apart from, perhaps, a narrowly drawn information sharing provision—would likely violate the Tenth Amendment."  *California*, 2018 WL 3301414, at *21.

123.   Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants do not possess the statutory authority to apply the Certification Requirements as to the TRUST,

1  TRUTH, and Values Acts, as to do so, Defendants would be applying federal law in a manner

2  that violates the Tenth Amendment of the Constitution.  Defendants' statutory authority to use

3  funding conditions to commandeer the State is also limited by 34 U.S.C. § 10228(a), which

4  prohibits the use of federal law enforcement grants to exercise "any direction, supervision, or

5  control over any police force or any other criminal justice agency."

6      124.   For the reasons stated herein, the Certification Requirements in the JAG Solicitations

7  are ultra vires, and should be set aside, or alternatively, should be set aside as to California and its

8  local jurisdictions.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. §

9  1361 to compel Defendants to issue California's FY 2018 JAG award without the Certification

10  Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula

11  in the JAG authorizing statute.

12                          **FOURTH CLAIM FOR RELIEF**

13                              **SPENDING CLAUSE**

14      125.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

15      126.   Congress' spending power is not unlimited.  When "Congress desires to condition the

16  States' receipt of federal funds," it must do so (a) "unambiguously . . ., enabl[ing] the States to

17  exercise their choice knowingly, cognizant of the consequences of their participation;" (b) by

18  placing conditions that are related "to the federal interest in particular national projects or

19  programs;" and (c) to not "induce the States to engage in activities that would themselves be

20  unconstitutional."  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citation omitted).

21      127.   To the extent that Congress delegated its authority to impose conditions on JAG

22  funding (which Plaintiff does not concede), the Certification Requirements violate the Spending

23  Clause of the U.S. Constitution.

24      128.   The Certification Requirements are unrelated to the "federal interest in particular

25  national projects or programs" for which Congress intended JAG funding to be used.

26      129.   The Certification Requirements violate the Spending Clause because they are

27  ambiguous and do not provide the State with notice to make a "choice knowingly" of whether to

28  comply.

130. Additionally, if the Certification Requirements mandate that jurisdictions hold (or not prohibit the holding of) individuals beyond their ordinary release, that requirement would also violate the independent constitutional bar prong of the Spending Clause by requiring law enforcement to comply even when doing so would violate the Fourth Amendment of the U.S. Constitution.

131. For the reasons stated herein, the Certification Requirements in the JAG Solicitation are unlawful, and should be set aside under 28 U.S.C. § 2201. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

## FIFTH CLAIM FOR RELIEF

### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (Constitutional Violations and Excess of Statutory Authority)

132. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

133. Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the JAG Solicitations are "agency action[s]" under the APA, *id.* § 551(13).

134. The JAG Solicitations constitute "[a]gency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

135. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)-(C).

136. Defendants' imposition of the Certification Requirements in the JAG Solicitations is unconstitutional because Defendants overstepped their powers by exercising lawmaking authority that is solely reserved to Congress under Article I, Section I of the U.S. Constitution. Also, Defendants' imposition of the Certification Requirements was ultra vires in excess of their statutory authority. Furthermore, the Certification Requirements violate the Spending Clause

33

1    because they are unrelated to the federal purpose of the grant, ambiguous, and/or tied to

2    unconstitutional activities.

3        137.   Because Defendants acted unconstitutionally and in excess of their statutory authority

4    through the JAG Solicitations, these actions are unlawful and should be set aside under 5 U.S.C. §

5    706.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel

6    Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and

7    disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG

8    authorizing statute.

9                                **SIXTH CLAIM FOR RELIEF**

10                      **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
                                    **(Arbitrary and Capricious)**
11

12       138.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

13       139.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the JAG

14   Solicitations are "agency action[s]" under the APA, *id.* § 551(13).

15       140.   The JAG Solicitations constitute "[a]gency action[s] made reviewable by statute and

16   final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

17       141.   The APA requires that a court "hold unlawful and set aside agency action, findings,

18   and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

19   accordance with law." *Id.* § 706(2)(A).

20       142.   The imposition of the Certification Requirements is arbitrary and capricious and an

21   abuse of discretion because Defendants have relied on factors that Congress did not intend, failed

22   to consider an important aspect of the program the agency is addressing, and has offered no

23   explanation for adding the Certification Requirements that is consistent with the evidence that is

24   before the agency.  *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*,

25   463 U.S. 29, 43 (1983).

26       143.   For the reasons discussed herein, the Certification Requirements in the JAG

27   Solicitations are unlawful and should be set aside under 5 U.S.C. § 706 for being arbitrary and

28   capricious and an abuse of discretion.  Additionally, Plaintiff is entitled to a writ of mandamus

                                                   34

under 28 U.S.C. § 1361 to compel Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds, in accordance with the formula in the JAG authorizing statute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the State of California, respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1. Issue a declaration that the Certification Requirements in the JAG Solicitations are unconstitutional and/or unlawful because: (a) they violate the separation of powers; (b) they exceed congressional authority conferred to the Executive Branch and are ultra vires on their face and as applied to the TRUST, TRUTH, and Values Acts; (c) to the extent there is congressional authority, they exceed Congress's spending powers under Article I of the Constitution; and/or (d) they violate the Administrative Procedure Act;

2. Permanently enjoin Defendants from using the Certification Requirements for FY 2018 JAG funding;

3. Permanently enjoin Defendants from withholding, terminating, disbarring, or making any state entity or local jurisdiction ineligible for JAG funding on account of the TRUST, TRUTH, and Values Acts;

4. Issue a writ of mandamus compelling Defendants to issue California's FY 2018 JAG award without the Certification Requirements, and disbursal of California's FY 2018 JAG funds; and

5. Award the State costs and grant such other relief as the Court may deem just and proper.

Complaint for Declaratory, Injunctive, and Mandamus Relief

Dated: August 23, 2018                           Respectfully Submitted,

                                                 XAVIER BECERRA
                                                 Attorney General of California
                                                 MICHAEL NEWMAN
                                                 Senior Assistant Attorney General
                                                 SATOSHI YANAI
                                                 Supervising Deputy Attorney General

                                                 */s/ Lee I. Sherman*
                                                 */s/ Sarah E. Belton*

                                                 LEE I. SHERMAN
                                                 SARAH E. BELTON
                                                 Deputy Attorneys General
                                                 *Attorneys for Plaintiff*
                                                 *State of California*

Complaint for Declaratory, Injunctive, and Mandamus Relief