# EXHIBIT 9

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   SARAH E. BELTON
    Supervising Deputy Attorney General
4   KRISTI GUDOSKI COOK
    LISA C. EHRLICH
5   XIYUN YANG
    LEE I. SHERMAN (SBN 272271)
6   Deputy Attorneys General
      300 S. Spring St., Suite 1702
7     Los Angeles, CA  90013
      Telephone:  (213) 269-6404
8     Fax:  (213) 897-7605
      E-mail:  Lee.Sherman@doj.ca.gov
9   *Attorneys for Plaintiff State of California*

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14

| | |
|---|---|
| **STATE OF CALIFORNIA,** | Case No.  19-cv-6189 |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF** |
| **WILLIAM P. BARR, in his official capacity as Attorney General of the United States; KATHARINE SULLIVAN, in her official capacity as Principal Deputy Assistant Attorney General; DARLENE HUTCHINSON BIEHL, in her official capacity as Director of the Office for Victims of Crime; CAREN HARP, in her official capacity as the Administrator of the Office of Juvenile Justice and Delinquency Prevention; and UNITED STATES DEPARTMENT OF JUSTICE,** | |
| Defendants. | |

26

27

28

1.    Plaintiff State of California (Plaintiff, California, or State), brings this complaint to prevent the Trump Administration from illegally using a wide variety of formula grant programs totaling $327.7 million to coerce the State into satisfying this Administration's aggressive immigration enforcement demands.  The grants that Defendants have attached these conditions to provide critical support and assistance for victims of crime and sexual assault, state and local law enforcement, juvenile justice, and the criminal justice system generally.  These conditions are part of Defendants' escalating effort to unilaterally and fundamentally remake formula grant structures created by Congress into discretionary funding streams to be exploited for the Administration's immigration enforcement priorities.  The conditions placed on these grants are unauthorized by Congress and are unrelated to the purposes of these otherwise salutary programs.  The imposition of all of these immigration enforcement requirements in contravention of congressional intent is unlawful and unconstitutional, and should be halted.

2.    Previously, a court in the Northern District of California (Northern District Court) concluded that Defendant U.S. Department of Justice (USDOJ) exceeded its statutory authority and violated the U.S. Constitution and the Administrative Procedure Act (APA), 5 U.S.C. § 706, when it sought to impose immigration enforcement requirements on $28.3 million worth of Edward Byrne Memorial Justice Assistance Grants (JAG) awarded to California and its political subdivisions in fiscal year (FY) 2017, and $28.9 million in JAG awards in FY 2018.  JAG awards are provided to each state, and certain local jurisdictions within each state, to, among other things, support law enforcement programs, reduce recidivism, conduct crime prevention and education programs for at-risk youth, and support programs for crime victims and witnesses.  Every state is entitled by law to a share of these funds.  On October 5, 2018, the Northern District Court struck down all of the immigration enforcement requirements added to FY 2017 JAG funding.  *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018), *appeal docketed*, Nos. 18-17308 & 18-17311 (9th Cir. Dec. 4, 2018).  Courts across the country have likewise unanimously found these funding conditions to be unconstitutional.[1]  In FY 2018, Defendants

---

[1] *See City of Philadelphia v. Attorney Gen. of the United States*, 916 F.3d 276 (3d Cir. 2019); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018); *Oregon v. Trump*, No. 18-cv-

1

imposed the same and additional immigration enforcement requirements on JAG. The Northern

District Court again struck down all of the immigration enforcement requirements. *City & Cty. of*

*San Francisco v. Sessions*, 372 F. Supp. 3d 928 (N.D. Cal. 2019), *appeal docketed* Nos. 19-15947

& 19-15950 (9th Cir. May 3, 2019). Other courts have as well.[2]

3. Undaunted, Defendants seek to impose the same funding conditions—the JAG

Immigration Enforcement Requirements—on $28.6 million in FY 2019 JAG funding that the

State and its political subdivisions are expected to receive—disregarding the decisions of this and

other courts.[3] Also, in FY 2019, Defendants impose a requirement to comply with 8 U.S.C.

§ 1373 (§ 1373) on JAG and the State's $4.5 million Title II juvenile justice formula grant (Title

II Grant).[4] The Northern District Court, and other courts, have already determined that a

requirement to comply with § 1373 was unlawful for JAG, and that § 1373 is unconstitutional on

its face under the Tenth Amendment's anti-commandeering doctrine. *See, e.g.*, *San Francisco*,

349 F. Supp. 3d at 949-53. The Northern District Court specifically enjoined Defendants from

requiring compliance with § 1373 as a grant condition on the basis of it being an "applicable

Federal law" or on the basis of § 1373's "independent statutory obligations." Amended Judgment

and Order, *State of California ex rel. Becerra v. Sessions* (*Becerra I*), No. 17-cv-4701 (N.D. Cal.

Nov. 20, 2018), ECF No. 154 at 3. The imposition of the § 1373 compliance condition on the

---

1959, 2019 WL 3716932 (D. Or. Aug. 7, 2019); *City of Providence v. Barr*, No. 385 F. Supp. 3d 160 (D. R.I. 2019), *appeal docketed*, No. 19-1802 (1st Cir. Aug. 15, 2019); *New York v. Dep't of Justice*, 343 F. Supp. 3d 213 (S.D. N.Y. 2018), *appeal docketed*, No. 19-275 (2nd Cir. Jan. 28, 2019); *City of Los Angeles v. Sessions*, No. 17-cv-7215, 2018 WL 6071071 (C.D. Cal. Sept. 17, 2018), *appeal docketed*, No. 18-56292 (9th Cir. Oct. 1, 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) *appeal docketed*, No. 18-2885 (7th Cir. Aug. 28, 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018).

[2] *City of Chicago v. Barr*, No. 18-cv-6859, 2019 WL 4511546 (N.D. Ill. Sept. 19, 2019); *City of Los Angeles v. Sessions*, No. 18-cv-7347, 2019 WL 1957966 (C.D. Cal. Feb. 15, 2019) *appeal docketed*, No. 19-55314 (9th Cir. Mar. 13, 2019).

[3] U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2019 State Solicitation (2019) (JAG State Solicitation) (attached as Exhibit A); *see also* U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2019 Local Solicitation (2019) (JAG Local Solicitation, collectively with the JAG State Solicitation, JAG Solicitations) (attached as Ex. B). California's FY 2019 JAG award is attached as Ex. C.

[4] U.S. Dep't of Justice, Office of Juvenile Justice and Delinquency Prevention FY 2019 Title II Formula Grants Program Solicitation (2019) (attached as Ex. D). California's FY 2019 Title II award is attached as Ex. E.

1  State's Title II Grant (1373 Title II Requirement) is unlawful and unconstitutional for the same

2  reasons.[5]

3       4.   Separately, Defendants seek to impose a new requirement on "all (or virtually all)

4  awards made in FY 2019" by the Office of Justice Programs (OJP) and the Office of Violence

5  Against Women (OVW).  Under this new requirement, grant recipients and subrecipients must

6  "[e]nsure that, as part of the hiring process for any position within the United States that is or will

7  be funded (in whole or in part) with award funds [that they] properly verif[y] the employment

8  eligibility of the individual who is being hired, consistent with the provisions of 8 U.S.C.

9  1324a(a)(1) and (2)" (1324a Requirement, and together with the JAG Immigration Enforcement

10  Requirements and the 1373 Title II Requirement, the FY 2019 Immigration Enforcement

11  Requirements).[6]  The 1324a Requirement imposes obligations on the grant recipient to notify and

12  train individuals involved in the hiring process for the grantee and subgrantees about 8 U.S.C.

13  § 1324a (§ 1324a) and the funding condition, and to monitor subgrantee compliance with the

14  1324 Requirement.

15       5.   Thus far, OJP has awarded $446 million in grants to entities in California, mostly to

16  state and local governments agencies.[7]  Specifically, USDOJ has sought to impose the 1324a

17  Requirement on $327.7 million on the following ten formula grants that the State receives and

18  that the State and/or its governmental and non-profit subgrantees use toward the "fund[ing]" of

19  employees[8]:

20       [5] The JAG Immigration Enforcement Requirements and the 1373 Title II Requirement are
also in violation of the Amended Judgment and Order in *Becerra I* and the Judgment and Order
21  Granting Plaintiffs' Motions for Summary Judgment in *State of California ex rel. Becerra v.
Sessions* (*Becerra II*), No. 18-cv-5160 (N.D. Cal. Mar. 26, 2019).  California reserves its right to
22  move to enforce the final judgments in those cases, but brings claims challenging these conditions
here to raise all issues with respect to the JAG and Title II Grants in one complaint.
23       [6] U.S. Dep't of Justice, OJP, "General Conditions" for OJP Awards in FY 2019,
Employment eligibility verification for hiring under the award (Aug. 2019),
24  https://ojp.gov/funding/Explore/LegalOverview2019/MandatoryTermsConditions.htm.
       [7] A list from OJP's website identifying the grants that have been issued to entities in
25  California as of the filing of this complaint is attached as Ex. F.  This chart does not include grant
awards that have been made by OVW.
26       [8] California does not raise in this complaint Defendants' authority to impose the 1324a
Requirement on those grants that the State of California has received that will not be used toward
27  the funding, in whole or in part, of employees.  California does not concede Defendants have
authority to impose the 1324 Requirement to those grants, and California expressly reserves its

28

- Victims of Crime Act (VOCA) Assistance and Compensation formula grants totaling $282.4 million that the State uses to fund subgrants to local jurisdictions and service providers to provide compensation and critical assistance to crime victims;[9]

- The State's $17.8 million JAG award (discussed above);

- Violence Against Women Act (VAWA) formula grants totaling $15.9 million that the State uses to combat violent crimes against women and to develop and strengthen victim services in cases involving domestic violence, dating violence, sexual assault, and stalking;[10]

- The State's $4.5 million Title II Grant (discussed above);

- A $2.264 million Paul Coverdell Forensic Science Improvement Grant (Coverdell Grant) that the State uses to improve its forensic science services;[11]

- A $2.219 million Residential Substance Abuse Treatment (RSAT) Grant that the State uses to provide substance abuse programs to inmates in local detention facilities during incarceration and upon reentry into the community;[12]

- A $2.059 million DNA Capacity Enhancement and Backlog Reduction Grant (DNA Backlog Reduction Grant) that the State uses to increase the State's capacity and efficiency in handling, screening, analyzing, and reviewing DNA samples for criminal justice purposes;[13] and

right to challenge Defendants' authority to impose the 1324a Requirement on those grants if Defendants seek to enforce the condition against the State, or if Defendants impose this condition in the future as to those grants.

[9] U.S. Dep't of Justice, Office for Victims of Crime FY 2019 VOCA Victim Assistance Solicitation (2019) (attached as Ex. G); U.S. Dep't of Justice, Office for Victims of Crime FY 2019 VOCA Victim Compensation Solicitation (2019) (attached as Ex. H).  California's FY 2019 VOCA Assistance and Compensation awards are attached as Exs. I and J, respectively.

[10] U.S. Dep't of Justice, OVW Fiscal Year 2019 STOP Formula Grant Program Solicitation (2019) (attached as Ex. K); U.S. Dep't of Justice, OVW Fiscal Year 2019 SASP Formula Program Solicitation (2019) (attached as Ex. L).  California's FY 2019 STOP Formula Grant Program and SASP Formula Program awards are attached as Exs. M and N, respectively.

[11] U.S. Dep't of Justice, Paul Coverdell Forensic Science Improvement Grants Program - Formula (2019) (attached as Ex. O).  California's FY 2019 Coverdell Grant award is attached as Ex. P).

[12] U.S. Dep't of Justice, Residential Substance Abuse Treatment (RSAT) for State Prisoners Program FY 2019 Formula Grant Announcement (2019) (attached as Ex. Q).  California's FY 2019 RSAT award is attached as Ex. R.

[13] U.S. Dep't of Justice, FY 2019 DNA Capacity Enhancement for Backlog Reduction

4

- $407,813 Prison Rape Elimination Act (PREA) funding that the State uses toward PREA compliance.[14]

6.   The 1324a Requirement, like the immigration enforcement requirements that Defendants have added to JAG and the Title II Grant, was not created by Congress.  There is no requirement in federal law for grant recipients to comply with § 1324a to receive these formula grants.  Federal law delineates specific monetary penalties for violations of § 1324a that range from $559 per violation to $22,363 per violation for repeat offenders.  The 1324a Requirement subverts that statutory scheme by subjecting the State to the possible withholding of *hundreds of millions of dollars* of grant funding for failing to comply with § 1324a.  Further, when designing the formula grant structure for these grants, Congress explicitly set out the conditions for grant recipients.  It did not delegate authority to Defendants to impose their own requirements that do not advance these grants' purposes.

7.   Defendants have also exceeded constitutional limits under the Spending Clause in Article I, Section 8 of the U.S. Constitution.  The FY 2019 Immigration Enforcement Requirements are not sufficiently related to the federal purposes that Congress designed for the funding schemes named above, and are too ambiguous to provide clear notice to the State or its political subdivisions as to what is needed to comply.  The sudden imposition of the 1324a Requirement on hundreds of millions of dollars of "virtually all" USDOJ grants that have never been subject to this condition also violates the Spending Clause for being impermissibly coercive.

8.   For all of these reasons, and because they are arbitrary and capricious, the FY 2019 Immigration Enforcement Requirements violate the APA as well.

9.   To be sure, California complies with all of the requirements identified in the authorizing statues for each of the grants, and the requirements that generally apply to grantees under federal law.  California state law also complies with § 1324a; employers in California are

_____

(CEBR) Program (Formula) (2019) (attached as Ex. S).  California's FY 2019 DNA Backlog Grant award is attached as Ex. T.

[14] U.S. Dep't of Justice, FY 2019 Guidance for Invited Applications for Prison Rape Elimination Act (PREA) Reallocation Funds, Edward Byrne Memorial Justice Assistance Grant (JAG) Program (2019) (attached as Ex. U).  California's FY 2019 PREA award is attached as Ex. V.

5

authorized to: (a) verify employees' eligibility to be employed in the United States as required under federal law, and (b) re-verify that eligibility when required to do so under federal law. But, the federal government has previously made clear that it is not satisfied with California following federal law. Specifically, the federal government has claimed that a predecessor version of California Labor Code § 1019.2, which restricts employers from re-verifying employees' eligibility to be employed in the United States beyond what is required by federal law, actually conflicts with § 1324a(a)(2). In the federal government's stated view of § 1324a(a)(2), the 1324a Requirement would seek to impose an obligation on the State to reverify its employees even when not required under federal law, making California's obligations under the new condition unclear. Because California law does not allow for unnecessary reverification (nor must it), the federal government's erroneous view of federal law raises doubt as to whether Defendants will find the State to be in compliance with this new condition

10.     Not only are the FY 2019 Immigration Enforcement Requirements unlawful, but agreeing to them will harm California. As part of the State's police powers, California has enacted laws to regulate the health, welfare, and public safety of its residents, and to manage the State's workplaces. The JAG Immigration Enforcement Requirements would require that the State and local jurisdictions terminate their public safety oriented laws and policies. The Trump Administration's increased targeting of immigrant populations has intensified fear among immigrant communities, making it more difficult for California and its political subdivisions to build trust with the State's over 10 million immigrant residents. Agreeing to the JAG Immigration Enforcement Requirements will only exacerbate this challenge. It would mean that the State and its localities will lose control of their ability to focus their resources on fighting crime and instead will devote resources to federal immigration enforcement. The trust and cooperation that the State's laws and local ordinances are intended to build between law enforcement and immigrant communities will be eroded.

11.     Agreeing to the 1324a Requirement as interpreted by the federal government will impermissibly force the State to abandon its statutory workplace protections designed to protect authorized employees against discrimination, retaliation, and harassment by employers who

exceed the reverification requirements mandated by federal law. Like other Trump Administration immigration enforcement actions, the Administration's expanded focus on workplace immigration raids has precipitated fear among immigrants. California's statutory protections provide some modest measure of security to authorized immigrant workers by restricting employers from engaging in unjustified reverification that goes beyond the requirements of federal law. The 1324a Requirement, as interpreted by the federal government, bars the State from complying with its own laws and will erode the trust between the State and its employees, undermining the State's ability to construct relationships with its employees, a fundamental element of its sovereignty. Aside from the 1324 Requirement's impact on the State's laws, through its monitoring obligations, the 1324a Requirement seeks to conscript the State to oversee hundreds of public and non-profit entities' compliance with a federal immigration law regarding employment verification.

12. Alternatively, if the State refuses to comply with the FY 2019 Immigration Enforcement Requirements, or if Defendants refuse to provide funding to California on the basis of these unlawful requirements, critical programs will likely need to be cut to the detriment of state and local governments, the criminal justice system, and crime victims throughout California.

13. For these reasons, and those discussed below, the Court should declare the FY 2019 Immigration Enforcement Requirements are unconstitutional, ultra vires, and/or a violation of the APA, enjoin their imposition, require that Defendants issue JAG, VOCA, VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA grant awards and funding to the State and its local jurisdictions that comply with the requirements enumerated by Congress, and prohibit Defendants from withholding funding on the basis of Labor Code § 1019.2.

## **JURISDICTION AND VENUE**

14. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this case arises under the Constitution and the laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the federal government founded upon the U.S. Constitution and acts of Congress. Jurisdiction is proper under the judicial review provisions of

7

1    the APA, 5 U.S.C. §§ 701-706.  The Court has authority to provide relief under the Declaratory

2    Judgment Act, 28 U.S.C. § 2201, and the Mandamus Statute, 28 U.S.C. § 1361.

3         15.    Under 28 U.S.C. § 1391(e)(1), venue is proper in the Northern District of California

4    because the State of California and its Attorney General have offices at 455 Golden Gate Avenue,

5    San Francisco, California, and at 1515 Clay Street, Oakland, California, and Defendants have

6    offices at 450 Golden Gate Avenue, San Francisco, California.

7                            **INTRADISTRICT ASSIGNMENT**

8         16.    Assignment to the San Francisco Division of this District is proper pursuant to Civil

9    Local Rule 3-2(c)-(d) because Plaintiff and Defendants both maintain offices in the District in

10   San Francisco.

11                                    **PARTIES**

12        17.    Plaintiff State of California is a sovereign state in the United States of America.

13   California is aggrieved by the actions of Defendants and has standing to bring this action because

14   of the injury to its sovereignty as a state caused by the challenged federal actions.  The inclusion

15   of unconstitutional and unlawful FY 2019 Immigration Enforcement Requirements impairs the

16   State's exercise of its police powers in a manner it deems necessary to protect the public safety

17   and manage its workplaces.  The FY 2019 Immigration Enforcement Requirements burden

18   California's exercise of its sovereign power to enforce its laws.  They also place a regulatory

19   burden on California as a funding recipient, obligating the State to continuously monitor

20   compliance of all subgrantees throughout the State, which will result in increased staff time and

21   expenses.

22        18.    As a result of Defendants' unconstitutional and unlawful actions, and their erroneous

23   interpretation of federal law, the State of California's Governor's Office of Emergency Services

24   (Cal OES), Board of State and Community Corrections (BSCC), California Victims

25   Compensation Board (Cal VCB), California Department of Justice (Cal DOJ), and the California

26   Department of Corrections and Rehabilitation (CDCR) are, collectively, at risk of losing $327.7

27   million in federal funding for this fiscal year.

28

19.     The State of California, and its local jurisdictions that rely upon these grants, spend millions of dollars from these grants, in part, to fund employees who assist in the administration of the programs that these grants support.  The loss of these funds will harm public safety and the criminal justice system in the State.  Otherwise, agreeing to the FY 2019 Immigration Enforcement Requirements, as interpreted by Defendants, undermines California's statutes.

20.     Defendant USDOJ is an executive department of the United States of America pursuant to 5 U.S.C. § 101, a federal agency within the meaning of 28 U.S.C. § 2671, and engages in agency action within the meaning of 5 U.S.C. § 702.  USDOJ is responsible for administering the JAG, VOCA, VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA grant funds appropriated by Congress.

21.     Defendant William P. Barr, is Attorney General of the United States, and oversees USDOJ, including the OJP and OVW.  He is sued in his official capacity pursuant to 5 U.S.C. § 702.

22.     Defendant Katharine Sullivan is Principal Deputy Assistant Attorney General in charge of OJP, which oversees the JAG, VOCA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA grant funds at issue in this complaint.  She is sued in her official capacity pursuant to 5 U.S.C. § 702.

23.     Defendant Darlene Hutchinson Biehl is the Director of the Office for Victims of Crime (OVC), which is specifically responsible for the VOCA grants at issue in this complaint. She is sued in her official capacity pursuant to 5 U.S.C. § 702.

24.     Defendant Caren Harp is the Administrator of the Office of Juvenile Delinquency and Prevention (OJJDP), which is specifically responsible for the Title II Grant at issue in this complaint.  She is sued in her official capacity pursuant to 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

### I.    CALIFORNIA'S LAWS SEEK TO PROTECT THE SAFETY AND WELFARE OF THE STATE'S RESIDENTS

25.     California state and local law enforcement agencies (LEAs), guided by the duly enacted laws of the State and ordinances of local jurisdictions, are tasked with effectively

9

policing, protecting, and serving all residents, including more than 10 million foreign-born individuals who live in the State.  In their relations with employees, California state and local agencies are also guided by state law designed to prevent discrimination in the workplace and promote trust between employers and their employees.  The California laws implicated in this suit are a valid exercise of the State's police power to regulate regarding the health, welfare, and public safety of its residents, and to manage the State's relationships with its employees.

**A.  California's Public Safety Laws Focus Law Enforcement on Criminal Activity and Build Trust Between Law Enforcement and the Communities They Serve**

26.  California has adopted laws that strengthen community policing efforts by encouraging undocumented victims to report crimes to local law enforcement so that perpetrators are apprehended before harming others.  These laws ensure that law enforcement resources are focused on a core public safety mission and used to build trust and cooperation between law enforcement and the State's immigrant communities.  When local and state LEAs engage in immigration enforcement, as Defendants contemplate, vulnerable victims and witnesses are less likely to come forward to report crimes.

27.  California's laws are not unique.  Many jurisdictions across the country, including local jurisdictions in California, have policies that define the circumstances under which local law enforcement personnel may expend time and resources in furtherance of federal immigration enforcement.  Those jurisdictions impose limits on compliance with Immigration and Customs Enforcement (ICE) detainer requests, ICE notification requests about release dates, and ICE's access to detainees, or provide additional procedural protections for individuals prior to an interview with immigration authorities.

**1.  The TRUST Act**

28.  In 2013, California enacted the TRUST Act, Cal. Gov't Code §§ 7282-7282.5, that sought to address numerous public safety concerns regarding the federal practice of issuing detainers to local law enforcement.  The TRUST Act defined the circumstances under which local LEAs may detain an individual at the request of federal immigration authorities.  The TRUST Act previously set forth two conditions that local law enforcement must meet to have discretion to

10

1   detain a person pursuant to an "immigration hold" (also known as a "detainer request" or

2   "detainer hold"), which is when an immigration authority requests that the law enforcement

3   official "maintain custody of the individual for a period not to exceed 48 hours, excluding

4   Saturdays, Sundays, and holidays." Cal. Gov't Code § 7282(c) (prior to amendments codified on

5   Oct. 5, 2017). First, the detention could not "violate any federal, state, or local law, or any local

6   policy." *Id.* § 7282.5(a) (prior to amendments codified on Oct. 5, 2017). Second, law

7   enforcement could only detain someone with certain, specified criminal backgrounds, an

8   individual on the California Sex and Arson Registry, or a person charged with a serious or violent

9   felony who was the subject of a probable cause determination from a magistrate judge. *Id.* §

10   7282.5(a)(1)-(6) (prior to amendments codified on Oct. 5, 2017).

11          **2.**     **The TRUTH Act**

12        29.    In 2016, California enacted the TRUTH Act, Cal. Gov't Code §§ 7283-7283.2, to

13   increase transparency about immigration enforcement and "to promote public safety and preserve

14   limited local resources because entanglement between local law enforcement and ICE undermines

15   community policing strategies and drains local resources." Assem. Bill No. 2792, Reg. Sess.

16   (Cal. 2016) § 2(a)-(c), (g)-(i). Under the TRUTH Act, prior to ICE interviewing someone being

17   held in the custody of a California local LEA, a local law enforcement officer must provide the

18   detained individual with a "written consent form that explains the purpose of the interview, that

19   the interview is voluntary, and that he or she may decline to be interviewed or may choose to be

20   interviewed only with his or her attorney present." Cal. Gov't Code § 7283.1(a). In addition,

21   when an LEA receives a detainer, notification, or transfer request, the LEA must "provide a copy

22   of the request to the [detained] individual and inform him or her whether the law enforcement

23   agency intends to comply with the request." *Id.* § 7283.1(b). If the LEA complies with ICE's

24   request to notify ICE as to when the individual will be released, it must also "promptly provide

25   the same notification in writing to the individual and to his or her attorney or to one additional

26   person who the individual shall be permitted to designate." *Id.*

27        30.    Although the TRUTH Act does not restrict communications with immigration

28   authorities or prohibit LEAs from providing immigration authorities with access to detention

facilities, the federal government has indicated that it views the TRUTH Act as conflicting with federal law. On June 13, 2017, then-Acting Director of ICE, Thomas Homan, testified before Congress that jurisdictions that "have some sort of policy where they don't . . . allow [ICE] access to the jails" violate 8 U.S.C. § 1373 (§ 1373). Former U.S. Attorney General Jefferson Sessions separately asserted that "the State of California . . . [has] enacted statutes . . . designed to specifically prohibit or hinder ICE from enforcing immigration law by . . . denying requests by ICE officers and agents to enter prisons and jails to make arrests."

### 3. The California Values Act

31.     On October 5, 2017, California enacted Senate Bill 54 (SB 54), known as the California Values Act, Cal. Gov't Code §§ 7284-7284.12, which also amended the TRUST Act. The Values Act sets the parameters under which California LEAs may participate in immigration enforcement. The California Department of Corrections and Rehabilitation (CDCR) is not considered a "California law enforcement agency" for purposes of the Values Act. Cal. Gov't Code § 7284.4(a).

32.     The Legislature emphasized that "[a] relationship of trust between California's immigrant community and state and local agencies is central to the public safety of the people of California." *Id.* § 7284.2(b). The Legislature recognized "[t]his trust is threatened when state and local agencies are entangled with federal immigration enforcement, with the result that immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, seeking basic health services, or attending school, to the detriment of public safety and the well-being of all Californians." *Id.* § 7284.2(c). The Legislature declared that the focus of the Values Act is "to ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments." *Id.* § 7284.2(f).

33.     Among other things, the Values Act: (a) expands upon the limitations contained in the prior iteration of the TRUST Act by prohibiting compliance with detainer requests, *see id.* § 7284.6(a)(1)(B); (b) defines when LEAs may comply with requests by immigration authorities seeking the release date and time of a person in custody in advance of the person's release, i.e.,

12

notification requests, to those instances when the individual in custody meets the criteria in California Government Code § 7282.5 or when the release date information is available to the public, *id* § 7284.6(a)(1)(C);[15] and (c) prohibits LEAs from using agency or department money or personnel to "[p]rovid[e] personal information, as defined in Section 1798.3 of the Civil Code, about an individual" "for immigration enforcement purposes," unless that information available to the public, *id.* § 7284.6(a)(1)(D).

34.     The Values Act expressly authorizes compliance with all aspects of § 1373 and 8 U.S.C. § 1644 (§ 1644).  Cal. Gov't Code § 7284.6(e).

35.     The Values Act, like the TRUTH Act, does not prohibit a jurisdiction from allowing immigration authorities to access its jails to interview inmates.  The Values Act explicitly reaffirms the absence of any such restriction, and requires only that state and local law enforcement, including CDCR, comply with the requirements in the TRUTH Act when providing such access to immigration authorities.  *Id.* §§ 7284.6(b)(5), 7284.10(a).

36.     On March 6, 2018, the United States filed a lawsuit against the State of California in the Eastern District of California affirmatively seeking to block specific provisions of SB 54 [the Values Act], including the provisions regulating the sharing of release dates and personal information for immigration enforcement purposes, on the grounds that they are preempted by federal law and violate § 1373.  *See* Complaint, *United States v. California*, No. 18-cv-490 (E.D. Cal. Mar. 6, 2018), ECF No. 1, ¶ 65.  In its motion to preliminarily enjoin those provisions of SB 54, the United States argued that the provisions "impede[]" the United States's enforcement of the immigration laws.  Plaintiff's Motion for Preliminary Injunction and Memorandum of Law in Support, *United States v. California*, No. 18-v-490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 at 4, 27, 29, 32, 35, 37.

37.     The United States's request for an injunction was rejected by the district court and affirmed by the Ninth Circuit.  *United States v. California*, 921 F.3d 865, 886-93 (9th Cir. 2019); *United States v. California*, 314 F. Supp. 3d 1077, 1098-1110 (E.D. Cal. 2018).  The district court

---

[15] Notification requests are made by immigration authorities on the I-247A form that also includes a detainer request.  Department of Homeland Security, Immigration Detainer - Notice of Action (Mar. 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

subsequently dismissed the United States's claim against the Values Act.  Order re: State of California's Motion to Dismiss, *United States v. California*, No. 18-cv-490 (E.D. Cal. July 9, 2018), ECF No. 197 at 5, 7.

**B.  California's Workplace Protections Seek to Curtail Fear, Discrimination, Harassment, and Retaliation in the Workplace**

38.  It is the policy of the State of California to make employment protections available for all employees regardless of immigration status where permitted under federal law.  Cal. Labor Code § 1171.5.  In furtherance of this policy to provide workplace protections for immigrant employees, in 2017, the Legislature enacted Assembly Bill 450 (AB 450), which went into effect on January 1, 2018.  AB 450 was adopted to ensure that all workers in California will enjoy the rights and protections afforded to them under California law without fear of harassment, detention, or deportation.  Assem. Bill No. 450, Assem. Appropriations Committee, 1st Reg. Sess., at 2 (May 17, 2017).  AB 450 was informed by the effect of immigration enforcement actions in the workplace to "drive down wages and labor conditions for all workers, regardless of immigration status," "interfere with workers' ability to freely exercise their workplace rights," and "undermine" the enforcement of state labor and employment laws.  Assem. Bill No. 450, Sen. Labor and Indus. Relations Comm., 1st Reg. Sess., at 7 (June 28, 2017) (internal quotations omitted).

39.  Relevant to this complaint is California Labor Code § 1019.2, which was added by AB 450.  That section directs, "[e]xcept as otherwise required by federal law," that a public or private employer "shall not reverify the employment eligibility of a current employee at a time or in a manner not required by Section 1324a(b) of Title 8 of the United States Code."  Cal. Lab. Code § 1019.2(a).  Employers who violate this provision are subject to a civil penalty of up to $10,000.  *Id.* § 1019.2(b)(1).  The Legislature found this provision is needed because "[l]imiting unnecessary reverification reduces the likelihood that reverification will be misused to intimidate, retaliate, or discriminate against employees who are lawfully authorized to be employed in the United States."  Senate Bill No. 112, Reg. Sess., (Cal. 2019) § 1(d).  Labor Code § 1019.2 is

intended to "foster[] trust between employers and their employees" and "further[] California's interest in promoting a diverse workforce." Senate Bill No. 112, Reg. Sess., (Cal. 2019) § 1(d).

40. On September 13, 2019, the Legislature amended Labor Code § 1019.2 to clarify that the law "is not in any way intended to interfere with any employer's obligations under federal law" or "prohibit employer actions that may be authorized under federal law." Senate Bill No. 112, Reg. Sess, (Cal. 2019) § 1(f). Amended Labor Code § 1019.2 states that the section "shall be interpreted and applied consistent with federal law and regulation." Cal. Lab. Code § 1019.2(c). The amendment was signed into law on September 27, 2019, and went into effect immediately.

41. Amended Labor Code § 1019.2 directs that the section "shall be interpreted and applied consistent with federal law and regulation" and expressly "does not prohibit" employers from taking any of the following actions: (1) reverifying an employee's employment authorization in a "time and manner consistent with" 8 C.F.R. § 274a.2(b)(1)(vii); (2) "[t]aking any lawful action to review the employment authorization of an employee upon knowing that the employee is, or has become, unauthorized to be employed in the United States, consistent with" § 1324a(a)(2); (3) "[r]eminding an employee, at least 90 days before the date reverification is required," that the employee will be required to provide documentation to establish his or her work authorization; and (4) "[t]aking any lawful action to correct errors or omissions in a missing or incomplete I-9 Employment Eligibility Form." Cal. Lab. Code § 1019.2(c). The amended state law adopts the federal definition of the term "knowing" in 8 C.F.R. § 274a.1(l), and the terms "reverify" or "reverifying" are defined to encompass the actions described in 8 C.F.R. § 274a.2(b)(1)(vii). Cal. Lab. Code §§ 1019.2(e), 1019.4. These terms "shall be interpreted consistently with any applicable federal rules, regulations, and controlling federal case law." *Id.*

42. Labor Code § 1019.2 does not in any way conflict with federal law. The federal Immigration Reform and Control Act of 1986 (IRCA) prohibits employers from employing an individual knowing that the person is unauthorized to be employed in the United States and requires that employers verify that employee's eligibility to be employed in the United States

1  (which is done through a Form I-9).[16]  8 U.S.C. § 1324a(a)-(b).  Section 1324a(a)(1) provides that

2  it is unlawful for a person or entity to hire "for employment in the United States an alien knowing

3  the alien is an unauthorized alien . . . with respect to such employment," and to hire an individual

4  without following the verification requirements identified in 8 U.S.C. § 1324a(b).  Section

5  1324a(a)(2) makes it "unlawful for a person or other entity, after hiring an alien for employment

6  in accordance with paragraph (1), to continue to employ the alien in the United States knowing

7  the alien is (or has become) an unauthorized alien with respect to such employment."

8       43.    Consistent with IRCA, California law authorizes employers to verify employees upon

9  hiring and to decline to hire or terminate an employee if he or she does not have lawful

10  employment authorization.  Cal. Lab. Code § 1019.2(d) (authorizing compliance with federal E-

11  Verify memorandum of understanding); Cal. Gov. Code § 19585(c) (directing termination to be

12  carried out under this section if a state employee is no longer authorized to be employed in the

13  United States under IRCA).  Labor Code § 1019.2 restricts reverification only when reverification

14  is not required under federal law.  The statute prevents employers from using unnecessary

15  reverification as a mechanism to gain an unfair advantage over employees—for instance, when

16  employers selectively reverify an employee's employment eligibility in response to an employee

17  "engag[ing] in union organizing or enforcement of labor or health and safety protections."

18  Assem. Bill No. 450, Assem. Labor and Employment Comm., 1st Reg. Sess., at 4 (Apr. 19,

19  2017).

20       44.    These limitations on reverification are consistent with federal law that prohibits

21  certain unlawful immigration-related employment practices, such as discrimination on the basis

22  of national origin and immigration status, intimidation, and retaliation.  8 U.S.C. § 1324b(a).  No

23  provision in IRCA prevents states from adopting more expansive employee workplace

24  protections, and indeed, IRCA was not intended to "undermine or diminish" labor protections.

25  H.R. Rep. No. 99-682(I), at 58 (1986).  Furthermore, federal law "does not intend to impose a

26  continuing verification obligation on employers."  *Id.* at 57.

27

28  [16] Department of Homeland Security, Employment Eligibility Verification, Form I-9 (July 17, 2017), https://www.uscis.gov/system/files_force/files/form/i-9-paper-version.pdf.

45.     Labor Code § 1019.2 is also consistent with federal guidance, including from Defendant USDOJ, that reverification under certain circumstances can constitute discrimination in violation of federal law.  For example, USDOJ has informed employers that they "may be discriminating in the e-verify process" if they "use[] E-Verify to confirm the continuing employment authorization of non-U.S. citizen workers who are not subject to reverification."[17] USDOJ instructs employers to "not reverify U.S. citizens' documents, U.S. nationals' documents, Permanent Resident Cards, or List B documents for Section 3" of the I-9 Form.[18]  USDOJ has provided reverification guidance to employers who receive a letter from the Social Security Administration claiming that there is no match for the social security number provided by the employee, i.e., a no match notice.  USDOJ has directed employers to not "[a]ttempt to immediately reverify the employee's employment eligibility by requesting the completion of a new Form I-9 based solely on the no-match notice."

46.     In its preemption lawsuit, *United States v. California*, *see supra*, the federal government argued that an earlier version of Labor Code § 1019.2, as applied to private employers, violated federal law on the ground that it conflicted with § 1324a(a)(2).  Plaintiff's Motion for Preliminary Injunction Plaintiff's and Memorandum of Law in Support, *United States v. California*, No. 18-cv-490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 at 17-18.  The district court preliminarily enjoined the predecessor version of 1019.2 as applied to private employers, but with the "caveat" that the court's conclusion might change based on additional "information on how the verification system currently works in practice and how the new [state] law does or does not change those practices."  *California*, 314 F. Supp. 3d at 1098.

47.     The *United States v. California* court has not considered the amended Labor Code § 1019.2 because the district court proceedings are stayed pending the United States's appeal of the parts of California law where the district court denied its motion for preliminary injunction.

---

[17] U.S. Dep't of Justice, Civil Rights Division, Office of Special Counsel for Immigration-Related Unfair Employment Practices, *Citizenship/Immigration Status and National Origin Discrimination in Employment*  (June 16, 2014), at 3, https://www.justice.gov/sites/default/files/crt/legacy/2014/06/16/Factpatterns_2.pdf.

[18] U.S. Dep't of Justice, Immigrant & Employee Rights Section, Civil Rights Division, *How Employers Can Avoid Discrimination in the Form I-9 and E-Verify Process* (Jan. 2019), at 2, https://www.justice.gov/crt/page/file/1132606/download.

Labor Code § 1019.2 remains preliminarily enjoined as applied to private employers, and in force as applied to public employers. The question of Labor Code § 1019.2's application to public employers or funding restrictions is not presented in *United States v. California*.

**II. THE FY 2019 IMMIGRATION ENFORCEMENT REQUIREMENTS IMPACT $327.7 MILLION IN FORMULA GRANTS THAT CALIFORNIA RECEIVES**

48. The FY 2019 Immigration Enforcement Requirements impact $327.7 million in formula grants that the State of California receives. While the statutory authority is different for each of these grants, they each share common features—(a) Congress designed a formula setting a minimum and, oftentimes, precise amount that each state jurisdiction must receive; (b) Congress delineated the eligibility requirements for grantees; (c) Congress limited Defendants' discretion to impose their own conditions on the grants; and (d) Congress has not made immigration enforcement a purpose for any of these grants.

**A. California Annually Receives JAG and PREA Funding Pursuant to the Formula Designed by Congress**

49. JAG is administered by the Bureau of Justice Assistance (BJA), a component of OJP within USDOJ. JAG funding is authorized by Congress under 34 U.S.C. §§ 10151-10158. The authorizing statute has been amended numerous times since its inception in 1988, evolving into the JAG program as it exists today.

50. The Anti-Drug Abuse Act of 1988 amended the Omnibus Crime Control and Safe Streets Act of 1968 to create the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs grants (Byrne Grants) "to assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system." Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4328 (1988) (repealed 2006). Congress placed a "special emphasis" on programs that support national drug control priorities across states and jurisdictions. *Id.* Congress identified twenty "purpose areas" for which Byrne Grants could be used. Many of the purpose areas relate to the investigation, enforcement, and prosecution of drug offenses. *See id.* Immigration enforcement was never specified in any of the grant purpose areas.

18

51.     In amendments between 1994 and 2000, Congress identified eight more purpose areas for which Byrne Grants funding could be used, bringing the total to 28.  42 U.S.C. § 3751(b) (as it existed on Dec. 20, 2000) (repealed 2006).  Immigration enforcement was not specified in any of these eight additional purpose areas.

52.     For FY 1996, Congress separately authorized Local Law Enforcement Block Grants ("LLEBG") that directed payment to units of local government for the purpose of hiring more police officers or "reducing crime and improving public safety."  Local Government Law Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995).  Congress identified nine "purpose areas" for LLEBG, none of which were immigration enforcement.  *Id.*

53.     In 2006, the Byrne Grant and LLEBG programs were merged to eliminate duplication, improve their administration, and to provide state and local governments "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" to local law enforcement.  H.R. Rep. No. 109-233, at 89 (2005); *see also* Pub. L. No. 108-447, 118 Stat. 2809, 2863 (2004); 34 U.S.C. § 10151(a)-(b)(1).

54.     When creating the merged JAG funding structure in 2006, Congress set a formula to apportion JAG funds to state and local jurisdictions.  34 U.S.C. § 10156.  Population and violent crime rates are used to calculate each state's allocation.  *Id.* § 10156(a)(1).  Congress guarantees to each state a minimum allocation of JAG funds.  *Id.* § 10156(a)(2).

55.     In addition to determining the amount of money received by grantees within each state, Congress set forth how that money is to be shared between state and local jurisdictions.  Under the statutory formula, sixty percent of the total allocation to a state must be given directly to the state.  *Id.* § 10156(b)(1).  The statutory formula provides that forty percent of the total allocation to a state must be given to local governments within the state.  *Id.* § 10156(b)(2), (d)(1).  Each unit of local government receives funds based on its violent crime rate.  *Id.* § 10156(d)(2)(A).

56.     According to the funding scheme created by Congress, states and local governments that apply for JAG funds are required to make limited certifications and assurances.  The chief executive officer of each applicant must certify that: (1) the law enforcement programs to be

19

funded meet all requirements of the JAG authorizing statute; (2) all information in the application is correct; (3) there was coordination with affected agencies; and (4) the applicant will comply with all provisions of the JAG authorizing statute and all other applicable Federal laws. *Id.* § 10153(a)(5). The requirement for applicants to comply with "all other applicable Federal laws" was part of the statute that created Byrne-JAG in 1988. Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4332-33 (1988). The JAG statute does not allow Defendants to impose their own independent funding conditions on JAG awards.

57. Currently, the JAG authorizing statute enumerates eight purpose areas for which JAG funds may be used. They are: (1) law enforcement programs; (2) prosecution and court programs; (3) prevention and education programs; (4) corrections and community corrections programs; (5) drug treatment and enforcement programs; (6) planning, evaluation, and technology improvement programs; (7) crime victim and witness programs; and (8) mental health programs related to law enforcement and corrections. 34 U.S.C. § 10152(a)(1).

58. Congress identified the discrete circumstances under which the Attorney General is authorized to depart from JAG's formula structure. For instance, under PREA, the State's grant amount is reduced by five percent unless the chief executive officer of the State submits a proof of compliance with PREA or an assurance that the State "intends to adopt and achieve full compliance" with PREA. *Id.* § 30307(e)(2)(A). Defendants have identified JAG as one of the USDOJ programs subject to PREA. *See* Ex. U. If the State provides an assurance of its intent to comply with PREA, the statute provides that the State may choose to use no less than five percent of its JAG formula allocation toward PREA compliance. 34 U.S.C. § 30307(e)(2)(A)(ii)(I). The statute specifies the requirements for receiving PREA reallocation funding; they are all tied to demonstrating how the State will use the funds to achieve PREA compliance, and how the State will conduct audits to measure compliance. *Id.* § 30307(e)(2)(B)-(C), (F). Neither the JAG nor PREA statutes allow Defendants to impose their own independent funding conditions on recipients of PREA funding.

59. Based on the formula prescribed by statute, $28.6 million in JAG funding is allocated to California in FY 2019, with $17.8 million going to the Board of State and Community

20

Corrections (BSCC), the entity that receives the JAG funds that are allocated to the State. Of this amount, the BSCC expects to use $654,863 to partially or fully fund the salaries and benefits for twelve BSCC employees who assist in the administration of JAG.

60.     The BSCC subgrants JAG funds predominately to local jurisdictions throughout California to fund programs that meet the purpose areas identified in the JAG authorizing statute. BSCC selects subgrantees on three-year cycles. For the current JAG cycle, which will run from October 1, 2019 through September 30, 2022, the BSCC is funding 27 local jurisdictions and Cal DOJ. During that cycle, 24 local jurisdictions plan to use their JAG subgrants from the BSCC to, collectively, partially or fully fund 89 employees for a total of approximately $18.3 million.

61.     The BSCC prioritizes subgrants to those jurisdictions that focus on education and crime prevention programs, law enforcement programs, and court programs, including indigent defense. Some examples of California jurisdictions' purpose-driven use of JAG funds include: (1) expanding a multi-systemic model to support neighborhood vitality and public safety; (2) establishing an innovative interdisciplinary defense system that focuses on early intervention for individuals at the time of first police contact; (3) providing evidence-based case management services for gang suppression activities that includes education, employment, and support services for young adults to reduce gang involvement; (4) creating a Juvenile Trauma Response Court to reduce juvenile recidivism and delinquency; (5) supporting a multi-disciplinary program aimed at increasing high school graduation rates; (6) creating evidence-based models to reduce serious violent crime among youth; and (7) developing a comprehensive multi-agency school safety program that features school threat assessment, bullying prevention and juvenile delinquency intervention.

62.     In accordance with the formula for JAG and PREA, California is allocated $407,813 for PREA compliance. The BSCC is the state entity that administers PREA funds. For FY 2019, the BSCC has represented that it will use its PREA allocation to issue a subgrant to CDCR to conduct training of its staff to ensure the safety and wellbeing of the transgender population in custody. CDCR will utilize its PREA allocation to offset overtime coverage for its staff to attend this training.

21

63.     The BSCC does not, and has not, used JAG or PREA awards for immigration enforcement.  The BSCC has received JAG funds every year since 2012 when it was designated the State administering agency for JAG, and California has never been denied JAG funds for which it applied.  The BSCC has also received its PREA reallocation award every year that it has been eligible to receive PREA funding.

**B.     California Annually Receives Victims of Crime Act Funding Pursuant to a Formula Designed by Congress**

64.     In 1984, Congress adopted the Victims of Crime Act (VOCA), through which Congress created the Crime Victims Fund to make funds available to the states for providing assistance and compensation for victims of crime.  Pub. L. No. 98-473, § 1402, 98 Stat. 1837, 2170 (1984).  The Crime Victims Fund is financed by fines and penalties that are paid by convicted offenders.  Congress determined that "many State compensation and assistance programs [were] currently encountering problems due to inadequate funding," resulting in the creation of the Crime Victims Fund to provide needed funding to the states.  S. Rep. No. 98-497, at 3 (1984).

65.     The underlying purpose of VOCA is to address this funding shortage with federal dollars to the States "with minimal bureaucratic 'strings attached,' for direct compensation and service programs to assist victims of crime, including victims of Federal crime."  *Id.* at 1.  The Senate made clear that "[u]nlike some past compensation bills," the Victims of Crime Act was "intended to keep conditions on Federal Aid to a bare minimum."  *Id.* at 9.  The "[c]onditions imposed [by Congress] [were] essentially designed to further legitimate Federal interests or to maximize the amount of funds available to victims."  *Id.*

66.     To carry out these purposes, after setting aside funds for select programs, the VOCA authorizing statute directs the OVC Director to distribute from the Crime Victims Funds: (1) two formula grants to the states; and (2) several OVC-designed non-formula, i.e. discretionary, victim assistance grants.  34 U.S.C. § 20101(d).  At issue in this complaint are the two formula grants that California receives from the Crime Victims Fund: the VOCA crime victim compensation formula grant program (VOCA Compensation Formula Grants), which is authorized under 34

22

U.S.C. § 20102, and the VOCA crime victim assistance formula grant program (VOCA Assistance Formula Grants), which is authorized under 34 U.S.C. § 20103(a).

67.  After financing certain programs, Congress directs OVC to distribute the remaining balance of the Crime Victim Fund as follows: (1) 47.5 percent to the VOCA Compensation Formula Grants; (2) 47.5 percent, plus any funds not used for the VOCA Compensation Formula Grants, to the VOCA Assistance Formula Grants; and (3) five percent to the OVC-designed discretionary grants authorized by 34 U.S.C. § 20103(c)) (OVC Discretionary Assistance Grants). *Id.* §§ 20101(d)(4), 20103(a)(1).

68.  Of the amount available for VOCA Compensation Formula Grants, "the [OVC] Director shall make an annual grant" to eligible state crime victim compensation programs equal to sixty percent of what the state program disbursed to victims of crime in the previous year, other than amounts awarded for property damage. *Id.* § 20102(a)(1).  If the sums available are insufficient to provide grants equal to sixty percent of what the state program disbursed to victims of crime the prior year, the OVC Director shall make a grant to eligible state victim compensation programs "so that all such programs receive the same percentage of the amounts awarded by such program during the preceding fiscal year." *Id.* § 20102(a)(2).

69.  The VOCA authorizing statute enumerates the requirements that grantees must satisfy in order to receive VOCA Compensation Formula Grants.  Grantees must: (1) compensate victims of criminal violence for medical expenses, loss of wages, and funeral expenses; (2) promote victim cooperation with reasonable law enforcement requests; (3) not use these VOCA federal funds to supplant state funds; (4) not discriminate between residents and nonresidents of the state; (5) not discriminate between victims of state crimes and victims of federal crimes; (6) compensate residents of states that do not have victim compensation programs; (7) not deny victim compensation based on the victim's relationship or shared residence with the offender; (8) not compensate an individual who has been convicted of a federal offense, but has not paid their monetary penalty; and (9) provide "such other information and assurances related to the purposes of this section as the Director may reasonably require." *Id.* § 20102(b).

70.     Of the amount available for VOCA Assistance Formula Grants, the OVC Director "shall make an annual grant . . . to the chief executive of each State for the financial support of eligible crime victim assistance programs."  *Id.* § 20103(a)(1).  Each state receives a base amount of $500,000 and an additional amount based on each state's population relative to the population of all states.  *Id.* § 20103(a)(3), (5).  If the amount available is insufficient to provide the base amount to each state, the "funds available shall be distributed equally among the States."  *Id.* § 20103(a)(4).

71.     As with the VOCA Compensation Formula Grants, Congress set clear requirements for VOCA Assistance Formula Grants.  In order to be an eligible program, the grant recipient must: (1) operate as a public agency, a nonprofit organization or both and provide victim services; (2) demonstrate a record of providing effective victim services and financial support from other sources, or it must receive substantial financial support from other sources; (3) utilize volunteers, unless this requirement is waived by the governor for compelling reasons; (4) promote and coordinate joint public-private efforts to help crime victims; (5) assist victims to seek compensation benefits; and (6) not discriminate against victims who disagree with the way the State prosecutes the criminal case.  *Id.* § 20103(b)(1).  The chief executive of each state must: (1) certify that VOCA funds will be used to prioritize programs assisting victims of sexual assault, spousal abuse, or child abuse; (2) certify that VOCA funds will be made available to serve previously underserved populations of victims of violent crime; (3) certify VOCA funds will not supplant state funds; and (4) "provide such other information and assurances related to the purposes of this section as the Director may reasonably require."  *Id.* § 20103(a)(2).

72.     The VOCA authorizing statute states that the "[t]he Director may establish such rules, regulations, guidelines, and procedures as are necessary to carry out any function of the Director under this subchapter."  *Id.* § 20110(a).  Those functions are set forth as the "Duties of Director" in 34 U.S.C. § 20111(c).  With regard to the VOCA Assistance and Compensation Formula Grants, the OVC Director's duties consist of "[p]roviding funds to eligible States pursuant to sections 20102 and 20103 of this title," which the VOCA Director is required to do under the formula created by Congress.  *Id.* § 20111(c)(2).

73.     Conversely, the Director's duties for the OVC Discretionary Assistance Grants consist of "[e]stablishing programs in accordance with section 20103(c) of this title on terms and conditions determined by the Director to be consistent with that subdivision," *id.* § 20111(c)(3). Section 20103(c) only governs OVC Discretionary Assistance Grants, and not VOCA Assistance and Compensation Formula Grants.  There is no comparable provision in the VOCA authorizing statute that allows the OVC Director to set terms and conditions on the VOCA Assistance and Compensation Formula Grants.

74.     None of these statutory requirements for VOCA Compensation or Assistance Formula Grants relate to the enforcement of immigration laws.  *See id.* §§ 20102(b), 20103(b). Never has Congress made immigration enforcement a requirement for VOCA Compensation or Assistance Formula Grants, nor indicated that immigration enforcement is a purpose of the grant program.

75.     California has received both formula grants every year since the inception of the Crime Victims Fund in 1984.  Cal VCB receives and administers the State's VOCA Compensation Formula Grant.  Based on the formula prescribed by statute, for FY 2019, $15.75 million in VOCA Compensation Formula Grant funding is allocated for the State of California.

76.     Cal VCB uses the VOCA Compensation Formula Grant to reimburse victims of violent crimes, their families, and service providers for crime related expenses like medical and funeral expenses; and to partially fund the salaries and benefits for approximately 27 public employees at three California county governments who review victim compensation applications and conduct other related administrative tasks.  Cal VCB does not, and has not, used its VOCA Compensation Formula Grant for immigration enforcement purposes.

77.     In FY 2018, California's VOCA Compensation Formula Grant reimbursed 26,681 applications from victims of assault, homicide, child abuse, and other crimes for funeral, medical, mental health, relocation and other costs incurred as a result of the crime.  For FY 2019, Cal VCB plans to use VOCA Compensation Formula Grants for these same purposes.

78.     Cal OES receives and administers the VOCA Assistance Formula Grant.  Based on the formula prescribed by statute, for FY 2019, $266.78 million in VOCA Assistance Formula Grant funding is allocated for the State of California.

79.     Cal OES uses VOCA Assistance Formula Grants to distribute subgrants on multi-year cycles in accordance with nationally recognized best practices in victim services, and based on the expectation that Cal OES will annually receive grant funds in accordance with the formula created by Congress.  Indeed, Congress has structured VOCA to provide "greater certainty" that the states' funding "will not wax and wane with events. . . . [The States] need to be able to plan and hire and have a sense of stability if these measures are to achieve their fullest potential."  S. Rep. No. 104-179, at 29 (1995).  Numerous Cal OES VOCA programs are currently in the middle of their grant cycle.

80.     Between October 1, 2017 and September 30, 2018, the VOCA Assistance Formula Grant funded the operational costs of domestic violence shelters and rape crisis centers; it paid for the salaries and benefits of lawyers, social workers, and victim advocates to provide 817,534 crime victims, including victims of sexual assault, child abuse, and human trafficking, with emotional support, safety planning, and legal services.  For FY 2019, Cal OES plans on issuing over 900 subawards to 382 unique state and local government or non-profit subrecipients for these same purposes.

81.     The VOCA Assistance Formula Grant partially or fully funds the salaries of approximately 1,260 state and local employees in California.  In FY 2019, Cal OES plans on using its VOCA Assistance Formula Grant to fund the salaries and benefits for 86 employees at Cal OES.  Most of these Cal OES employees administer the grant by working with subrecipients to maintain compliance with federal and state laws and regulations and to meet program deadlines and goals.

82.     Cal OES does not, and has not, used its VOCA Assistance Formula Grant for immigration enforcement purposes.

### C. California Annually Receives Violence Against Women Act Funding Pursuant to a Formula Designed by Congress

83.     California receives two grants authorized by VAWA that are at issue here: the VAWA Services, Training, Officers, Prosecutors Program (VAWA STOP Grant), created in 1994, and the VAWA Sexual Assault Services Program (VAWA SASP Grant), created in 2005. Congress first authorized VAWA in 1994 as a comprehensive legislative package aimed at ending violence against women. Violent Crime Control and Law Enforcement Act of 1994, Title IV, Pub. L. No. 103-322, 108 Stat. 1796 (1994). VAWA was designed to improve criminal justice system responses to domestic violence, sexual assault, and stalking, and to increase the availability of services for victims of these crimes. S. Rep. No. 103-138, at 38 (1993). VAWA was reauthorized and amended in 2000, 2005, and 2013. Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. No. 106-386, Division B, 114 Stat 1464 (2000); Violence Against Women and Department of Justice Reauthorization Act, Pub. L. No. 109-162, 119 Stat. 2960 (2006); Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (2013).

84.     The original 1994 VAWA statute authorized four grant programs administered by the OVW, including VAWA STOP Grants. Violent Crime Control and Law Enforcement Act § 40121(a)(3). Since 1994, the purpose of VAWA STOP Grants has been "to assist States, State and local courts (including juvenile courts), Indian tribal governments, tribal courts, and units of local government to develop and strengthen effective law enforcement and prosecution strategies to combat violent crimes against women, and to develop and strengthen victim services in cases involving violent crimes against women." 34 U.S.C. § 10441; *see also* S. Rep. No. 103-138, at 57 (1993) (same).

85.     After financing certain programs, Congress has directed that the Attorney General "shall" use available funds to make VAWA STOP Grants to the States through a formula "in an amount that bears the same ratio to the amount of remaining funds as the population of the State bears to the population of all of the states that results from distribution among the States on the

27

basis of each State's population in relation to the population of all States."  34 U.S.C.
§ 10446(b)(6).

86.    The statute currently sets out twenty specific purpose areas for which VAWA STOP
Grants may be used.  These areas include the development, training, and hiring of law
enforcement officers, prosecutors, judges, and other court personnel to specifically target violent
crimes against women; the training of sexual assault forensic medical personnel; and the
provision of core support services for victims and their families.  *Id.* § 10441(b).

87.    The VAWA authorizing statute enumerates both application requirements and
"qualification" requirements for VAWA STOP grants.  *Id.* § 10446(c)-(d).  The applicant must
provide proof of compliance with specific statutory requirements regarding payment of forensic
medical examinations, court costs for domestic violence and protection order cases, requirements
prohibiting polygraph examinations of victims of sexual assault, an implementation plan that
meets enumerated statutory requirements, and other documentation the Attorney General may
require.  *Id.* § 10446(d).  To "qualify" for VAWA STOP Grants, grantees must: (1) use the funds
for a specific purpose as described in the statute; (2) develop a detailed implementation plan for
the funds after consultation and coordination with identified stakeholders; (3) allocate at least 25
percent of the funds for law enforcement, 25 percent for prosecutors, thirty percent for victim
services, and five percent for courts; (4) not use VAWA STOP federal funds to supplant state
funds; and (5) allocate not less than twenty percent of funds to programs that address sexual
assault.  *Id.* § 10446(c).  The statute directs the Attorney General to promulgate VAWA STOP
regulations for the specific purpose of ensuring that States will: (1) prioritize areas with the
greatest showing of need; (2) determine the amount of subgrants based on the population and
geographic area to be served; (3) equitably distribute funds on a geographic basis; and (4)
recognize and meaningfully respond to the needs of underserved populations and allocate funds
equitably among those populations.  *Id.* § 10446(e)(2).  And the statute points to a detailed list of
conditions that apply to the grant.  *Id.* §§ 10447, 12291(b).

88.    In furtherance of that elaborate statutory scheme, in 2013, Congress provided that the
Attorney General may "impose reasonable conditions on grant awards to ensure that the States

28

1    meet statutory, regulatory, and other program requirements." *Id.* § 10446(e)(3); Violence Against

2    Women Reauthorization Act of 2013, § 3.  In 2016, after Congress authorized the Attorney

3    General to "impose reasonable conditions on grant awards," OVW promulgated updated

4    regulations to incorporate and expand upon the specific grant conditions required to meet the new

5    statutory requirements. *Id.*; 28 C.F.R. §§ 90.10-.25 (2016).   The 1324a Requirement was not part

6    of any of those regulations.

7         89.     In 2005, Congress created a different formula grant to provide assistance to the

8    States: The Sexual Assault Services Program (VAWA SASP Grant).  The VAWA SASP Grants

9    are designed to assist States in providing intervention, advocacy, accompaniment, and support

10   services for victims of sexual assault and their families, and to provide technical assistance and

11   training on sexual assault to legal, healthcare, and nonprofit entities.  Violence Against Women

12   and Department of Justice Reauthorization Act—Technical Corrections, Pub. L. No. 109-271,

13   § 3(b), 120 Stat. 750 (2006); 34 U.S.C. § 12511(a); H.R. Rep. No. 109-233, at 111 (2005).  To

14   achieve these purposes, the statute authorizes grants to States "to support the establishment,

15   maintenance, and expansion of rape crisis centers and other nongovernmental and tribal programs

16   and projects to assist individuals who have been victimized by sexual assault, without regard to

17   the age of the individual."  34 U.S.C. § 12511(b)(1).

18        90.     The VAWA statute delineates a formula for the portion of money that each state

19   "shall" receive pursuant to VAWA SASP.  Each state must receive a "minimum amount" "not

20   less than 1.50 percent of the total amount appropriated in a fiscal year for grants under this

21   section," with certain U.S. territories receiving 0.25 percent of the total appropriations.  *Id.*

22   § 12511(b)(4).  Congress directs that any remaining funds are allocated based on a ratio of the

23   population of each state or territory to the total population of the country.  *Id.*

24        91.     Under the statute, states that apply for VAWA SASP Grants are required to make

25   limited certifications and assurances.  Specifically, the state application must set forth procedures

26   designed to ensure meaningful involvement of the state sexual assault coalition and

27   representatives of underserved communities in the application development and program

28   implementation, and that an equitable distribution of grants is made between urban and rural

29

areas. *Id.* § 12511(b)(3)(B)(i)-(iii). The statute provides limited authority for the Attorney General to structure the application to require States to meet other such requirements "necessary to carry out the purposes and provisions of this section." *Id.* § 12511(b)(3)(B)(iv). No provision in the VAWA authorizing statute, however, allows the Attorney General to impose his own independent conditions on the VAWA SASP grant awards that are not necessary to carry out the purpose of assisting victims of sexual assault.

92. None of the purposes and statutory requirements for VAWA STOP and SASP Grants relate to enforcement of immigration laws. *Id.* §§ 10441, 10446-51, 12511. Congress has never made immigration enforcement a requirement of VAWA STOP and SASP Grants, nor indicated that immigration enforcement is a purpose of these grant programs through all of Congress's reauthorizations of VAWA.

93. In contrast, VAWA STOP is intended to protect immigrant victims of violence. *Id.* § 10441(b)(1), (10). This includes "providing assistance to victims of domestic violence and sexual assault in immigration matters," and "training law enforcement officer, judges, other court personnel, and prosecutors to more effectively identify and respond to violent crimes against women, including the crimes of domestic violence, dating violence, sexual assault, and stalking, including the appropriate use of nonimmigrant status under subparagraphs (T) and (U) of section 1101(a)(15) of Title 8." *Id.* § 10441(b)(10), (1). Likewise, for VAWA SASP, the VAWA statute requires coordination with "underserved populations," otherwise defined to include those potentially underserved due to "language barriers" or "alienage status." *Id.* §§ 12511, 12291(a)(39).

94. California has received VAWA STOP and VAWA SASP Grants every year since the inception of the program. Based on the formula prescribed by statute, for FY 2019, $14.9 million is allocated for California in VAWA STOP Grant funding, and $996,924 is allocated for California in VAWA SASP Grant funding.

95. Cal OES receives and administers the VAWA STOP and VAWA SASP Grants. Cal OES uses VAWA STOP and VAWA SASP Grants to distribute subgrants on multi-year cycles in accordance with nationally recognized best practices in victim services, and based on the

30

1    expectation that the Cal OES will annually receive grant funds in accordance with the formula

2    created by Congress.  Multiple Cal OES VAWA programs are currently in the middle of their

3    grant cycle.

4         96.    Cal OES uses the VAWA STOP Formula Grant to fund training for district attorney

5    and law enforcement offices, specialized sexual assault law enforcement and prosecution units,

6    domestic violence and sexual assault victim services at local non-profit and health organizations,

7    rape crisis centers, and campus sexual assault and teen dating violence prevention programs.  For

8    FY 2019, Cal OES plans to distribute 63 VAWA STOP subgrants to 54 unique state and local

9    governmental and nonprofit subrecipients for these same purposes.

10         97.    The VAWA STOP grant partially or fully funds the salaries and benefits of 68 state

11    and local employees in California, including 17 employees at Cal OES.  As with VOCA, most of

12    these employees help administer the grant by ensuring compliance with federal and state law and

13    regulations, and program objectives and deadlines.

14         98.    For VAWA SASP, in FY 2019, Cal OES plans to issue subgrants to six community

15    based organizations to fund rape crisis response centers, all of whom use VAWA SASP funds to

16    partially or fully fund employees.

17         99.    Cal OES does not, and has not, used its VAWA STOP or SASP Grants for

18    immigration enforcement purposes.

19    **D.    California Annually Receives a Title II Grant Pursuant to a Formula Designed by Congress**

20

21         100.    Title II Grants are awarded by the Administrator of the Office of Juvenile Justice and

22    Delinquency Prevention (OJJDP), a component of OJP, and are authorized under Title II of the

23    Juvenile Justice and Delinquency Prevention Act of 1974 (JJDPA), codified under 34 U.S.C.

24    §§ 11131-33.  Pub. L. No. 93-415, 88 Stat. 1109 (1974).  Congress passed the JJDPA "to provide

25    a comprehensive, coordinated approach to the problems of juvenile delinquency." *Id*.

26         101.    To that end, the JJDPA authorizes grants to states and local governments "to

27    encourage the development of comprehensive programs and services designed to prevent juvenile

28    delinquency, to divert juveniles from the juvenile justice system, and to provide community-

31

based alternatives to traditional detention and correctional facilities used for the confinement of juveniles." S. Rep. No. 93-1011, at 5283-84 (1974). These grants are intended "to increase the capacity of state and local governments . . . to conduct effective juvenile justice and delinquency prevention and rehabilitation programs and to provide research, evaluation, and training services in the field of juvenile delinquency prevention." JJDPA, § 102(a)(7)(b)(4).

102. While the JJDPA has been amended numerous times over the years, most recently in 2018, Title II has remained a formula grant throughout all of those amendments. Juvenile Justice Reform Act of 2018, Pub. L. No. 115-385, 132 Stat. 5123, 5127 (2018). Congress directed that the Administrator "shall" allocate annually to each state a grant by formula "on the basis of relative population of people under 18 years of age [and] based on the most recent data available from the Bureau of the Census." 34 U.S.C. § 11132(a)(1). The formula guarantees that each state is to receive a minimum amount. *Id.* § 11132(a)(2). Congress intends that these "block grants" be distributed to the states by the formula for them to be spent "according to criteria and priorities determined by the States . . . themselves." S. Rep. No. 93-1101, at 5300 (1974).

103. Defendants are required to make a grant to the State so long as it "has an approved comprehensive plan which conforms with the purposes and requirements of the Act and with rules, regulations, and procedures established by [the agency] consistent with the Act." *Id.* The authorizing statute, in 33 subsections that contain numerous subparts, sets out the requirements for that state plan in extensive detail. 34 U.S.C. § 11133(a)(1)-(33). Among those requirements are four core mandates: (1) deinstitutionalization of status offenders; (2) separation of juveniles from adult inmates in secure facilities; (3) removal of juveniles from adult jails and lockups; and (4) reduction of disproportionate minority contact with the juvenile justice system. S. Rep. No. 102-393, at 23 (1992); *see also* 34 U.S.C. §§ 11103(30), 11133(a)(11)-(13), (15). The authorizing statute does not allow Defendants to impose their own independent funding conditions on Title II Grant awards.

104. None of these requirements relate to immigration enforcement. The only requirement that touches upon immigrants is one prohibiting the state from placing a non-citizen minor who has not been charged with any offense in a secure detention or correction facility. 34 U.S.C.

32

§ 11133(a)(11). This requirement is designed to protect immigrant youth rather than require Title II participants to enforce federal immigration laws against youth.

105. The statute identified the specific circumstances in which a state's formula allocation could be reduced. A state's share may be reduced by no less than twenty percent for each core requirement that has not been satisfied. *Id.* § 11133(c)(1)(A). Even then, a state may still receive its allocation if it agrees to spend half of the state's allocation toward compliance with the core requirement or if the OJJDP Administrator determines that the state has achieved substantial compliance or has committed to full compliance with the core requirement. *Id.* § 11133(c)(1)(B). The Administrator may also reallocate a state's allocation if the state does not submit a state plan, fails to submit a plan, or submits a plan that does not meet the requirements of the section. *Id.* § 11133(d).

106. The statute authorizes the Administrator "to establish such rules, regulations, guidance, and procedures as are *necessary* for the exercise of the functions of the Office and only to the extent *necessary* to ensure that there is compliance with the specific requirements of this subchapter or to respond to requests for clarification and guidance relating to such compliance." *Id.* § 11182(d)(1) (emphasis added). The Administrator is required to consult with representatives of states and local governments before issuing any guidance and procedures. *Id.*

107. The regulations governing the Title II Grants are designed to ensure compliance with those statutory requirements that govern the grant and that apply to grantees under federal law. *See* 28 C.F.R. §§ 31.200-31.203, 31.300-31.304, 31.400-31.404. Among those requirements is one that requires "[t]he applicant State [to] further assure and certify that the State and its subgrantees and contractors will adhere to other applicable Federal laws, orders, and OMB circulars" as described in a particular USDOJ grant manual. *Id.* § 31.401.

108. The BSCC receives and administers the State's Title II Grant. Based on the formula prescribed by statute, California is allocated $4.5 Title II Grant funding in FY 2019. Of this amount, the BSCC expects to use $692,875 to partially or fully fund the salaries and benefits for 22 BSCC employees. These employees assist in the administration of the grant and are critical to monitoring California's compliance with the four core requirements of Title II.

33

109.   The BSCC subgrants Title II funds to local LEAs and community based organizations.  BSCC selects subgrantees on four-year cycles.  For the 2015-19 cycle that just ended, the BSCC funded twelve subgrantees, including five LEAs that used their Title II subgrants to partially or fully fund fifty employees totaling approximately $4,456,691 million.  $689,813 was used toward six employees from public entities.

110.   The BSCC prioritizes subgrants to those entities that focus on aftercare and re-entry, alternatives to detention, community-based programs and services, diversion, mental health services, and mentoring and counseling.  Some examples include: (1) expanding a restorative justice program for youth; (2) structuring employment opportunities for court involved teenagers; (3) designing or enhancing an aftercare and reentry system for youth transitioning from juvenile halls and treatment centers back to their home communities; (4) expanding direct intervention, diversion, and intensive case management services to keep youth out of the criminal justice system; (5) providing a trauma-informed services program to reduce juvenile offending; and (6) offering mental health treatment services for youth in the juvenile justice system and their families.

111.   The BSCC does not, and has not, used Title II Grant awards for immigration enforcement.  The BSCC and its predecessor, the Corrections Standards Authority (CSA), received Title II Grant funds every year since 2004 when it was designated the State administering agency for the grant.  Neither the BSCC nor the CSA has ever been denied Title II Grant funds for which it applied.

**E.   California Annually Receives a Coverdell Grant Pursuant to a Formula Designed by Congress**

112.   USDOJ's National Institute of Justice (NIJ) administers Coverdell Grants under its authority in the Paul Coverdell National Forensic Sciences Improvement Act of 2000.  *See* 34 U.S.C. §§ 10561-10566; Paul Coverdell National Forensic Sciences Improvements Act of 2000, Pub. L. No. 106-561, 114 Stat. 2787 (2000).  The purpose of the grant program is "to improve the quality, timeliness, and credibility of the forensic science services for criminal justice purposes . . . ."  *Id*.  Eighty-five percent of grant funds "shall be allocated to each State" that meets the

34

application requirements pursuant to a population-based formula, while the Attorney General may distribute the remaining fifteen percent of funds as discretionary grants.  34 U.S.C § 10563(a).  At issue here is California's allotment of funds under the formula grant program.

113.   States "shall" use these grant funds for certain enumerated statutory purposes, including: (1) carrying out all or a substantial part of a program intended to improve the quality and timeliness of forensic science or medical examiner services; (2) eliminating a backlog in the analysis of forensic science evidence; (3) training, assisting, and employing forensic laboratory personnel; (4) addressing emerging forensic science issues and technology; (5) educating and training forensic pathologists; (6) and funding medicolegal death investigation systems and accreditation and certification of investigators and offices.  *Id.* § 10564(a).  Grant funds may only be used for expenses relating to "facilities, personnel, computerization, equipment, supplies, accreditation, certification, education, and training," and cannot be used for "any general law enforcement or nonforensic investigatory function."  *Id.* § 10564(b).

114.   To apply for a grant under the program, a state must: (1) certify the State has developed a plan for forensic science laboratories compliant with the statutory purposes set out above; (2) certify that any laboratory or office receiving grant fund must use generally accepted laboratory practices and procedures and is accredited; (3) provide a specific description of any new facility to be construction as part of the program; and (4) certify that a government entity exists and an appropriate process is in place to conduct independent external investigations into allegations of serious negligence or misconduct substantially affecting the integrity of the forensic results produced by a funded facility.  *Id.* § 10562.

115.   The Attorney General may promulgate guidelines, regulations, and procedures "as may be *necessary* to carry out this subchapter, including guidelines, regulations, and procedures relating to the submission and review of applications for grants under section 10562 of this title."  *Id.* § 10565(a) (emphasis added).

116.   No provision in the authorizing statute allows the Attorney General to impose his own independent funding conditions on recipients of Coverdell Grants.  And immigration enforcement has never been one of the purposes of the grant.

35

117.   Cal OES receives and administers the Coverdell Grant.  Based on the formula prescribed by statue, for FY 2019, $2,264,423 in Coverdell Grant funding is allocated to California, $234,490 of which is used to partially fund Cal OES employees to assist in the administration of the Coverdell Grant.

118.   Cal OES plans to use the funds to issue 26 subgrants to law enforcement agencies throughout the State, including Cal DOJ, to support their forensic laboratories.  The subgrantees use funds for, among other purposes, to reduce backlogged forensic cases and to improve the turnaround time for case analysis.  Cal DOJ and five other subgrantees use Coverdell subgrants to partially or fully fund salaries or benefits for employees.

**F.     California Annually Receives a Residential Substance Abuse Treatment Grant Pursuant to a Formula Designed by Congress**

119.   RSAT is administered by the BJA within USDOJ and OJP.  RSAT funding is authorized by Congress under 34 U.S.C. §§ 10421-10426, and was created by the Violent Crime Control and Law Enforcement Act of 1994.  Pub. L. No. 103-322, § 32101, 108 Stat. 1898 (1994).  RSAT was developed based on findings that "the link between substance abuse and crime is well established[,]" and "[s]ubstance abuse treatment for incarcerated individuals is a powerful tool for reducing recidivism, easing overcrowding in correctional facilities, and ultimately preventing crime."  H.R. Rep. No. 103-323, at 5 (1993).

120.   Congress set a formula to apportion RSAT funds to states.  Under the statute, 0.4 percent of the total amount appropriated for RSAT is allocated to each participating state.  34 U.S.C. § 10424(a).  The remaining funds are allocated to each participating state based on the ratio of that state's prison population to the total prison population of all participating states.  *Id*. The state must use at least ten percent of the total amount allocated in any fiscal year to make grants to local correctional and detention facilities within the state to assist jail-based substance abuse treatment programs established by the local facilities.  *Id*. § 10424(c).

121.   Under the RSAT authorizing statute, the Attorney General is authorized to make grants to states that may be used by state and local governments, for three enumerated purposes: (1) to develop and implement residential substance abuse treatment programs in state correctional

36

1    facilities and local correctional and detention facilities; (2) to encourage establishment and

2    maintenance of drug-free prisons and jails; and (3) to develop and implement specialized

3    residential substance abuse treatment programs that identify and treat inmates who have both

4    mental health and substance abuse disorders. *Id.* § 10421(a).

5        122. Under the statute, states and local governments that apply for RSAT funds must

6    submit an application "in such form and containing such information as the Attorney General

7    may reasonably require." *Id.* § 10422(a)(1). Applicants must also: (1) assure that RSAT funds

8    will not supplant state funds, (2) coordinate the design and implementation of treatment programs

9    between state correctional representatives and the state alcohol and drug abuse agency; and (3)

10   describe how RSAT funds "will be coordinated with Federal assistance for substance abuse

11   treatment and aftercare services currently provided by the Department of Health and Human

12   Services' Substance Abuse and Mental Health Services Administration." *Id.* § 10422(a)(2), (d).

13   To be eligible for funding, the State must: (1) agree to require periodic and random substance

14   abuse testing of program participants at proscribed junctures; and (2) ensure participants in the

15   substance abuse treatment program are provided aftercare services, as described in the statute,

16   with providers approved or licensed by the applicable state or local agency to provide medical

17   treatment or other health services. *Id.* § 10422(b)-(c).

18       123. No provision in the RSAT authorizing statute allows the Attorney General to impose

19   his own independent conditions on RSAT grant awards. And immigration enforcement has never

20   been a purpose of RSAT.

21       124. The BSCC has received RSAT funds every year since FY 2012 when it became the

22   designated state administering agency for RSAT. The BSCC awards RSAT funds through a

23   competitive bid process to approximately four subgrantee local adult detention facilities to assist

24   them in providing substance abuse programs to inmates during incarceration and upon reentry

25   into the community. The BSCC does not, and has not, used RSAT funds for immigration

26   enforcement.

27       125. The BSCC selects subgrantees on a three-year cycle. The BSCC started a new three-

28   year grant cycle in FY 2018.

37

126.   According to the RSAT statutory formula, $2,219,442 is allocated to California for FY 2019.  Of this amount, the BSCC expects to use $180,576 to partially fund the salaries and benefits for seven BSCC employees who assist in the administration of RSAT.

**G.    California Annually Receives a DNA Backlog Reduction Grant Pursuant to the Formula Set by Congress**

127.   NIJ within USDOJ administers the DNA Capacity Enhancement and Backlog Reduction Program Grant (the DNA Backlog Reduction Grant) under the Debbie Smith DNA Backlog Grant Program.  *See* 34 U.S.C. § 40701.  The purpose of this grant program is "to eliminate the substantial backlog of DNA samples collected from crime scenes and convicted offenders, to improve and expand the DNA testing capacity of Federal, State, and local crime laboratories, to increase research and development of new DNA testing technologies, to develop new training programs regarding the collection and use of DNA evidence . . . ."  H.R. Rep. No. 108-711, at 1 (2004).

128.   The Attorney General is authorized to make grants to eligible states or units of local governments for nine purposes, consistent with that mission of DNA backlog reduction and improving and expanding DNA testing.  34 U.S.C. § 40701(a).  Congress has directed that "[t]he Attorney General shall distribute grant amounts" pursuant to "a formula or formulas that are designed to effectuate a distribution of funds among eligible States and units of local governments" to achieve the following objectives: (1) maximizing effectiveness of DNA technology to solve crimes and protect public safety; and (2) "fairly and efficiently" allocating money to jurisdictions with significant backlogs by considering the size of the backlog, the population, and the number of part 1 violent crimes in the jurisdiction.  *Id.* § 40701(c)(1).  Immigration enforcement has never been a purpose of this grant.

129.   "The Attorney General shall allocate to each State not less than 0.5 percent of the total amount appropriated in a fiscal year for grants under this section…."  *Id.* § 40701(c)(2).  The Attorney General may "establish appropriate grant conditions" that are "in conformity" with the formula intended by Congress.  *Id.* § 40701(c)(1)

130.   Under the statute, states and local governments that apply for DNA Backlog Reduction Grants funds are required to make limited certifications and assurances that: (1) the grantee will implement a DNA analysis plan within 120 days of the application in accordance with the section; (2) each DNA analysis will be carried out pursuant to the privacy protections delineated in 34 U.S.C. § 12592(b)(3); (3) the grantee has determined which offenses are to be treated as qualifying state offenses for purposes of the section; (4) the grantee will specify the allocation of grant funds that will be used for select purposes identified in § 470701(a); and (5) local government grantees take all necessary steps to ensure they are eligible to include their DNA samples in the national DNA database.  *Id.* § 40701(b).  The statute imposes specific restrictions on the use of grant funds for supplanting and administrative costs, and imposes certain administrative requirements.  *Id.* § 40701(e), (f), (h).

131.   After USDOJ sets the formula allocation for California, the California Association of Crime Laboratory Directors directs how funds will be distributed within California based on its review of crime statistics for every crime laboratory in the State.  Based on information and belief, USDOJ then makes grants to California LEAs consistent with both the grant's formula and the distribution scheme proposed by the California Association of Crime Laboratory Directors.

132.   Cal DOJ's Bureau of Forensic Services (BFS) has received a DNA Backlog Reduction Grant every year since 2008.  BFS is the scientific arm of Cal DOJ and employs forensic scientists to collect, analyze, and compare physical evidence from suspected crimes and to testify in state and federal criminal trials about their analyses.

133.   BFS uses the DNA Backlog Reduction Grant to pay employee overtime to perform DNA analysis, to purchase and maintain necessary equipment and software, and to fund continuing education for DNA analysts.  For FY 2019, BFS requested $2,059,373 to fund the analysis of an additional 330 cases and decrease turnaround time for each case.  BFS estimates that $330,054 will be used for overtime salaries and benefits to more quickly process, record, screen, and analyze DNA samples.  During the last fiscal year, there were 41 different BFS employees whose overtime payments were funded by this grant.  Their work in analyzing DNA samples resulted in the reduction of the State's DNA backlog by 365 cases.

134.   Local LEAs throughout California directly receive DNA Backlog Reduction Grants as part of the formula allocated to California.  In FY 2019, 17 California local LEAs have received DNA Backlog Reduction Grants totaling $7.5 million.

**III.   DEFENDANTS' ESCALATING USE OF IMMIGRATION ENFORCEMENT REQUIREMENT ON FEDERAL GRANTS TO TARGET "SANCTUARY JURISDICTIONS"**

135.   The conduct that California challenges in this complaint is part of a systematic effort by the Trump Administration to withhold funding from jurisdictions that it believes do not cooperate in immigration enforcement to the degree it desires.  Every time that the Trump Administration has attempted to impose immigration enforcement requirements on substantial amounts of federal funding, including every time that the Trump Administration has imposed immigration enforcement requirements on formula grants, courts have held that the Administration cannot add such requirements without statutory authority.

**A.   The Trump Administration's Executive Order Seeking to Withhold Funding from Sanctuary Jurisdictions**

136.   Throughout his presidential campaign, President Trump repeated his intention to withhold funding from what he called "sanctuary jurisdictions."  On January 25, 2017, days after being sworn into office, President Trump signed an Executive Order that announced the policy of the Trump Administration to "[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law."  Exec. Order No. 13,768, 82 Fed. Reg. 8799, § 2(c) (2017).  President Trump directed the Attorney General and the Department of Homeland Security (DHS) Secretary "to ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary."  *Id.* § 9(a).  Days after signing the Executive Order, President Trump specifically threatened to use de-funding "as a weapon" against California, which he views as a "sanctuary" jurisdiction.[19]

---

[19] Donald Trump Super Bowl interview transcript with Fox News' Bill O' Reilly, SBNation (Feb. 5, 2017), https//www.sbnation.com/2017/2/5/14516156/donald-trump-interview-transcript-bill-oreilly-super-bowl-2017.

40

137.   The City and County of San Francisco and the County of Santa Clara filed lawsuits challenging the constitutionality of the Executive Order.  The Northern District Court preliminarily enjoined the Trump Administration from enforcing the Executive Order to withhold federal funds from jurisdictions that the Trump Administration deems as "sanctuary jurisdictions." *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 508 (N.D. Cal. 2017).  The Northern District Court determined that the Executive Order violates the separation of powers principles because it "purports to give the Attorney General and the Secretary the power to place a new condition on federal funds . . . not provided for by Congress." *Id.* at 531.  The Northern District Court later granted the counties' motion for summary judgment on the same basis. *Cty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1219 (N.D. Cal. 2017).

138.   The Ninth Circuit affirmed the Northern District Court's injunction as it applies to California jurisdictions, holding that "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.  Because Congress did not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).

139.   In the litigation surrounding the Executive Order, Defendant USDOJ represented that the Executive Order only affected three federal grants, JAG, Community Oriented Policing Services (COPS) grants, and the State Criminal Alien Assistance Program (SCAAP). *Cty. of Santa Clara*, 250 F. Supp. 3d. at 515.  The Northern District Court determined it would be an unreasonable interpretation of the plain language of the Order to interpret it so narrowly. *Id.* at 516-17.  Indeed, between 2017 and 2018, USDOJ added a requirement to comply with § 1373 and other additional immigration enforcement requirements to at least six other grant programs that OJP administers.[20]

---

[20] U.S. Dep't of Justice, Office of Justice Programs, Forms: Certifications relating to 8 U.S.C. § 1373 and certain other federal statutes related to immigration (Nov. 2018), https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.

41

**B.     The Addition of the § 1373 Requirement on JAG and Subsequent Actions to Withhold Funding from California**

140.   In FY 2016, OJP first announced that § 1373 was an "applicable Federal law" under JAG, the compliance of which would be a required condition for grantees receiving JAG funds. Section 1373(a) provides:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration enforcement authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. § 1373(a).  Section 1373(b) prohibits any "person or agency" from restricting any federal, state, or local government entity from "requesting" information regarding a person's immigration status, "maintaining" such information, or "exchanging" such information with federal, state, or local government entities.  *Id.* § 1373(b).

141.   For FY 2016, OJP required that the BSCC, the state entity that receives JAG funds, submit a legal opinion validating its compliance with § 1373.  On April 21, 2017, OJP sent a letter to the BSCC demanding that it submit that legal opinion.[21]  On June 29, 2017, the BSCC submitted the requested legal opinion explaining that the State's laws, including the TRUST and TRUTH Acts, do not violate § 1373.

142.   On July 25, 2017, OJP released the FY 2017 State JAG Solicitation, and on August 3, 2017, OJP released the FY 2017 JAG Local Solicitation.  For the first time, the Solicitations required that the chief law officer of the jurisdiction sign an affidavit certifying compliance with § 1373 on behalf of the State.  The chief executive officer of the jurisdiction was required to sign an affidavit making a number of assurances, including that the chief executive adopts the chief law officer's certification of compliance with § 1373.  This new requirement applied both to the grant recipient and subgrantees.

---

[21] Press Release, U.S. Dep't of Justice, Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373 (Apr. 21, 2017), https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373.

42

143. On November 1, 2017, after the enactment of the Values Act and after the BSCC submitted its FY 2017 JAG application, OJP sent the State a preliminary compliance assessment letter asserting that three provisions of the Values Act may "violate 8 U.S.C. § 1373, depending on how [the State] interprets and applies them." Relevant here, OJP stated that the State must certify that "it interprets and applies" the Values Act "to not restrict California officers from sharing information regarding immigration status with federal immigration officers, including information regarding release date[s] and home address[es]." If the State could not so "certify," then "[USDOJ] ha[d] determined that these provisions violate [§ 1373]." On November 13, 2017, the BSCC responded and stated that it could not provide the requested certification as to these two provisions, and informed OJP that the Values Act regulates the sharing of release date information and home addresses because that information is not covered by § 1373.

144. On January 24, 2018, OJP responded that it still had concerns about the State's compliance with § 1373, and asked the BSCC, and simultaneously, eight other local jurisdictions in California, to produce by February 23, under threat of subpoena, "orders, directives instructions, or guidance to your law enforcement employees" about communicating with USDOJ, DHS, and ICE.[22] The BSCC responded to that letter asserting that it is not a law enforcement agency, so has limited requested documents, but it produced the documents that were responsive.

145. The State filed a lawsuit challenging, among other things, the § 1373 Requirement as unconstitutional and unlawful, and seeking a declaration that the State's laws comply with § 1373. Amended Complaint for Declaratory and Injunctive Relief, *Becerra I*, No. 17-cv-470 (N.D. Cal. Oct. 13, 2017), ECF No. 11. After the State filed its lawsuit, as discussed above, the United States filed its own lawsuit against the State of California in the Eastern District of California alleging that the provisions of the Values Act that regulate compliance with notification requests and restrict the sharing of personal information for immigration enforcement

---

[22] Press Release, U.S. Dep't of Justice, Justice Department Demands Documents and Threatens to Subpoena 23 Jurisdictions As Part of 8 U.S.C. § 1373 Compliance Review (Jan. 24, 2018), https://www.justice.gov/opa/pr/justice-department-demands-documents-and-threatens-subpoena-23-jurisdictions-part-8-usc-1373.

43

1     purposes conflict with § 1373.  Complaint, *United States v. California*, No. 18-cv-490 (E.D. Cal.

2     Mar. 6, 2018), ECF No. 1.  Both the Northern District and Eastern District courts found the

3     Values Act complies with § 1373.  *San Francisco*, 349 F. Supp. 3d at 968; *California*, 314 F.

4     Supp. 3d at 1104.  The Northern District Courts also determined that § 1373 is unconstitutional

5     on its face, and ordered Defendants to issue FY 2017 JAG awards to the BSCC and all California

6     political subdivisions that applied for JAG.  *San Francisco*, 349 F. Supp. 3d at 953, 974.  Since

7     that time, the Ninth Circuit in *United States v. California* affirmed the district court's

8     determination that the Values Act complies with § 1373.  *California*, 921 F.3d at 893.  And

9     several courts have determined that § 1373 is unconstitutional.[23]

10         **C.    The Addition of the Access and Notification Requirements to JAG Funding**

11         146.   In addition to the requirement that jurisdictions certify compliance with § 1373, for

12    the first time in FY 2017, OJP announced two "special conditions" requiring grant recipients and

13    subrecipients to: (i) permit personnel of DHS to access any correctional or detention facility in

14    order to meet with an "alien" (or an individual believed to be an "alien") and inquire as to his or

15    her right to be or remain in the United States (the Access Requirement); and (ii) provide at least

16    48 hours' advance notice to DHS regarding the scheduled release date and time of an "alien" in

17    the jurisdiction's custody when DHS requests such notice in order to take custody of the

18    individual pursuant to the Immigration and Nationality Act (INA) (the Notification Requirement).

19    *See, e.g.*, Defendants' Request for Judicial Notice, Ex. B, *Becerra I* (N.D. Cal. July 31, 2018),

20    ECF No. 125-2, ¶ 55(1).

21         147.   The Northern District Court concluded that the Access and Notification

22    Requirements, as well as the FY 2017 § 1373 Requirement, violate separation of powers

23    principles, the Spending Clause, and the APA.  *San Francisco*, 349 F. Supp. 3d at 975.  As

24    discussed above, six other federal district courts, and the Third and Seventh Circuits, have

25    determined that the Access and Notification Requirements are unlawful, at minimum, because

26    USDOJ exceeded its statutory authority in imposing them.  *See supra* n.1.

27

28         [23] *Oregon*, 2019 WL 3716932, at *18-19; *New York*, 343 F. Supp. 3d at 237; *Chicago*, 321
      F. Supp. 3d at 872-73; *Philadelphia*, 309 F. Supp. 3d at 286-288.

44

**D.    FY 2018 JAG Immigration Enforcement Requirements**

148.    On or about July 20, 2018, Defendants released the FY 2018 JAG Solicitations, and on or about November 16, 2018, Defendants released JAG awards to California and its political subdivisions.  Those awards contained substantially similar requirements to the § 1373, Notice, and Access Requirements, that Defendants sought to add to FY 2017 JAG awards.  In connection with those requirements, Defendants also identified 8 U.S.C. §§ 1226, 1231, 1357, 1366, and 1644[24] as "applicable federal laws" under the JAG authorizing statue.  *See, e.g.*, First Amended Complaint for Declaratory, Injunctive, and Mandamus Relief, Ex. A, *Becerra II*, No. 18-cv-5169 (N.D. Cal. Nov. 1, 2018), ECF No. 20-1 at 11, 41-52.

149.    Defendants added two new requirements as well.  First, Defendants sought to require applicants to respond to questions about the jurisdiction's laws and policies around "Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)."  *Id.* at 28-29, 53.  Second, Defendants sought to require that JAG recipient jurisdictions, with respect to any "program or activity" funded, "not . . . publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield certain individuals from detection, whether or not in violation of 8 U.S.C. § 1324(a) or other laws." Defendants' Request for Judicial Notice, Ex. D, *Becerra II* (N.D. Cal. Dec. 3, 2018), ECF No. 25-1, ¶ 44.  Defendants also identified 8 U.S.C. § 1324 as an "applicable federal law."  *See, e.g.*, First Amended Complaint for Declaratory, Injunctive, and Mandamus Relief, Ex. A, *Becerra II* (N.D. Cal. Nov. 1, 2018), ECF No. 20-1 at 11, 41, 45, 48-50.

150.    Like in FY 2017, the chief law officer of the jurisdiction was required to certify compliance with all applicable laws, and the chief executive officer was required to execute a separate certification acknowledging that he or she adopted the chief law officer's certification. *Id.* at 41-45.

151.    California filed a lawsuit challenging all of these FY 2018 JAG Immigration Enforcement Requirements.  The Northern District Court granted California's motion for

---

[24] Section 1644, like § 1373, prohibits restrictions on the sending to or receiving of information regarding immigration status information between state and local government entities and immigration authorities.

45

summary judgment, concluded that all of the FY 2018 JAG Immigration Enforcement

Requirements violated separation of powers principles, the Spending Clause, and the APA, and

enjoined Defendants' enforcement of the challenged conditions.  *See generally San Francisco*,

372 F. Supp. 3d at 940-56.

**IV.   DEFENDANTS IMPOSE IMMIGRATION ENFORCEMENT REQUIREMENTS ON VARIOUS FY 2019 GRANTS**

**A.   Defendants Imposed Substantially Similar Immigration Enforcement Requirements on JAG that have Been Struck Down by This and Other Courts**

152.   On or about April 24, 2019, Defendants released the FY 2019 JAG State Solicitation,

and on or about July 25, 2019, Defendants released the FY 2019 JAG Local Solicitations.  Both

Solicitations are substantively similar.  *See* Exs. A-B.

153.   As they did last year, Defendants again require applicants to provide answers to the

following questions "regarding Communication with the Department of Homeland Security

(DHS) and/or Immigration and Customs Enforcement (ICE)" (1373 Addendum):

- Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
- Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meets the description in question 1?
- If yes to either:
  - Please provide a copy of each law or policy.
  - Please describe each practice.
  - Please explain how the law, policy, or practice complies with Section 1373.

Ex. A at 22-23; Ex. B at 21-22.  A jurisdiction "will not receive award funds (and its award will

include a condition that withholds funds) until it submits these responses." Ex. A at 23.

154.   The FY 2019 JAG Solicitations indicated that JAG awards would include

immigration enforcement requirements similar to those that Defendants have tried to impose on

FY 2017 and 2018 JAG awards.  Those requirements are: (1) not violating 8 U.S.C. §§ 1373 or

1644 (1373/1644 Requirement); (2) not "publicly disclos[ing] federal law enforcement

46

information in an attempt to conceal, harbor, or shield certain individuals from detection,
including in violation of 18 U.S.C. §§ 1071, 1072, or 8 U.S.C. § 1324(a)" (Harboring
Requirement) (3) "provid[ing] (where feasible) at least 48 hours' advance notice to DHS
regarding the scheduled release date and time of an alien in the recipient's custody when DHS
requests such notice in order to take custody of the alien pursuant to the Immigration and
Nationality Act" (Notification Requirement); and (4) "permit[ing] DHS agents to have access to
any correctional facility in order to meet with an alien (or an individual believed to be an alien)
and inquire as to his right to be or remain in the United States" (Access Requirement). Ex. A at
25-26; Ex. B at 23-24.

155. Like last year's solicitations, the FY 2019 JAG Solicitations indicate that recipients
are required to comply with "all applicable requirements of federal statutes and regulations." Ex.
A at 25; Ex. B at 23. In connection with the JAG Immigration Enforcement Requirements,
Defendants identify various statutes within the INA that they identify as "relevant" to JAG,
namely, 8 U.S.C. §§ 1226(a) & (c); 1231(a)(4); 1324(a), 1357(a)(1), 1366, 1373, and 1644. Ex.
A at 25-26, 30-35; Ex. B at 23-24, 27-32. In addition to requiring compliance with §§ 1373 and
1644, Defendants connect compliance with the Harboring Requirement to § 1324(a) (Ex. A at 26;
Ex. B at 23); frame the Notification Requirement as a requirement to "[n]ot . . . impede the
exercise of the authority of the Federal government" under 8 U.S.C. § 1226(a) & (c) and 8 U.S.C.
§ 1231(a)(4) (Ex. A at 26, 30-31; Ex. B at 23, 27-28);[25] and frame the Access Requirement as a
requirement to "[n]ot . . . impede the exercise of DHS agents" of their authority under 8 U.S.C.
§ 1357(a)(1). Ex. A at 26; Ex. B at 23-24. Defendants also identify 8 U.S.C. § 1366(1) & (3) as a
"relevant" law, but the Solicitations do not connect that law to any particular immigration
enforcement funding requirement. Ex. A at 35; Ex. B at 32.

156. The FY 2019 JAG Solicitations require that the chief executive of the applicant
government submit a certification representing, among other things, that the chief executive has
"carefully reviewed 34 U.S.C. § 10153(a)(5), and with respect to the programs to be funded" and

---

[25] The FY 2019 State JAG Solicitations identify '8 U.S.C. § 1266(a) & (c)," but since that
law does not exist, and does not appear anywhere else in the Solicitation, California presumes that
Defendants meant to cite to 8 U.S.C. § 1226 here instead. Ex. A at 26; Ex. B at 23.

"make the certification required by section 10153(a)(5), as to each of the items specified therein." Ex. A at 29; Ex. B at 26.

157. Under § 10153, the chief executive must certify that "the applicant will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). It is unclear whether Defendants still consider 8 U.S.C. §§ 1226, 1231, 1324, 1357, 1366, 1373, and 1644 "applicable Federal laws" for purposes of that section. None of these provisions apply to federal grant-making, and 8 U.S.C. §§ 1226, 1231, 1324, 1357, and 1366 are not "applicable" to states at all.

158. On August 7, 2019, the BSCC submitted its FY 2019 JAG application. As part of that application, the BSCC expressly "made no certifications or assurances about any federal statutes that have been unlawfully identified by the Office of Justice Programs (OJP) as 'applicable' to JAG." The BSCC continued that it "does not agree to comply with any other unlawfully imposed award requirements."

159. On or about September 18, 2019, the BSCC received its $17.8 million FY 2019 JAG award, which formalized the JAG Immigration Enforcement Requirements described in the Solicitations. Ex. C. The 1373/1644, 1373 Addendum, Access, Notification, and Harboring Requirements in the FY 2019 JAG awards—the JAG Immigration Enforcement Requirements— contain materially the same language as appears in the FY 2018 awards, while also prohibiting use of JAG funds to violate each of the conditions. *Compare* Ex. C ¶¶ 31-41 *with* Defendants' Request for Judicial Notice, Ex. D, *Becerra II* (N.D. Cal. Dec. 3, 2018), ECF No. 25-1, ¶¶ 41-47.

160. The USDOJ Financial Guide explains that jurisdictions "have 45 days from the award date to accept [an] OJP . . . award document or the award may be rescinded."[26]

161. Defendants have not provided any explanation as to how the JAG Immigration Enforcement Requirements are consistent with Congress's intent in adopting and authorizing funds for JAG. The JAG Immigration Enforcement Requirements are also ambiguous and do not provide the State with fair notice about what is required to comply with them.

---

[26] U.S. Dep't of Justice, DOJ Grants Financial Guide, § 2,2, https://ojp.gov/financialguide/doj/pdfs/DOJ_FinancialGuide.pdf.

**B.   Defendants Impose the 1373 Requirement on Title II Grants**

162.   In August 2018, Defendants released the FY 2019 Title II Grant Solicitation.  Ex. D. In that Solicitation, Defendants indicated that they would include a requirement that "will require the recipient (and any subrecipient) that accepts the award not to violate (with regard to criminal aliens) 8 U.S.C. § 1373."  *Id.* at 27.

163.   The BSCC applied for its FY 2019 Title II Grant on March 6, 2019.  As part of that application, the BSCC expressly reserved its rights to challenge any unlawful conditions and made "no certifications or assurances about any federal statutes that have been selected or will be selected by the Office of Justice Programs (OJP) as 'applicable' to the Title II program and imposed unlawfully."

164.   On or about September 24, 2019, the BSCC received its $4.5 million FY 2019 Title II Grant award.  The award contains the same requirements to comply with § 1373 as exists in the FY 2019 JAG award with little variation in language.  *Compare* Ex. C ¶¶ 31-34 *with* Ex. E ¶¶ 38-41.[27]  There is no language in the condition indicating that it only applies to "criminal aliens."

165.   As with JAG, the BSCC understands that it has 45 days from the date of the award to accept the Title II Grant.[28]

166.   Defendants have not provided any explanation as to how the 1373 Title II Requirement for Title II Grants is consistent with the authorizing statute.  The 1373 Title II Requirement is also ambiguous and does not provide the State with fair notice about what is required to comply with it.

**C.   Defendants Impose the 1324a Requirement on USDOJ Grants**

167.   As discussed above, Defendants released the FY 2019 Title II Grant Solicitation in August 2018, Ex. D, and the FY 2019 JAG State and Local Solicitations in April and July 2019, respectively, Exs. A, B.  In February 2019, Defendants released the FY 2019 RSAT Solicitation, Ex. Q, and the BSCC submitted its application for RSAT on April 26, 2019.  In July 2019,

[27] The only difference is that while the JAG award requires compliance with § 1644, the Title II Grant does not.  *Compare* Ex. C ¶¶ 31-34 *with* Ex. E ¶¶ 38-41.
[28] U.S. Dep't of Justice, DOJ Grants Financial Guide, § 2,2, https://ojp.gov/financialguide/doj/pdfs/DOJ_FinancialGuide.pdf.

Defendants released the FY 2019 PREA Solicitation, and the BSCC submitted its application for PREA on August 19, 2019. USDOJ did not indicate in any of those solicitations that it would be imposing the 1324a Requirement on these grants, and thus, the applications for these grants by the BSCC were submitted before Defendants indicated their intent to require compliance with § 1324a(a)(2) as a condition of the grants.

168. In March 2019, Defendants released the FY 2019 VAWA SASP and STOP Grant Solicitations. Exs. K, L. USDOJ did not indicate in the solicitations that it would be imposing the 1324a Requirement on either VAWA grant. *See id*. On April 19, 2019, Cal OES submitted its application for the VAWA SASP Grant and on May 3, 2019, Cal OES submitted its application for the VAWA STOP Grant. These applications were submitted before Defendants indicated their intent to require compliance with § 1324a(a)(2) as a condition of the grants.

169. Defendants released the FY 2019 VOCA Compensation Formula Grant Solicitation in March 2019, Ex. H, the FY 2019 Paul Coverdell Grant Solicitation in April 2019, Ex. O, and the FY 2019 VOCA Assistance Formula Grant and FY 2019 DNA Backlog Reduction Grant in May 2019, Exs. G, S. In each of those solicitations, Defendants indicated that the awards will include a condition requiring recipients "to verify the employment eligibility of any individual hired under the award, consonant with 8 U.S.C. § 1324a(1)." Ex. H at 20, Ex. O at 36, Ex. G at 26, Ex. S at 40. But none of those solicitations specifies that awards would include a condition requiring compliance with § 1324a(a)(2).

170. On April 23, 2019, Cal VCB submitted its application for a VOCA Compensation Formula Grant. On May 13, 2019, Cal OES submitted its application for the Coverdell Grant, and on July 29, 2019, Cal OES submitted its application for a VOCA Assistance Formula Grant. On May 10, 2019, Cal DOJ submitted its application for the DNA Backlog Reduction Grant. These applications were submitted before Defendants indicated their intent to require compliance with § 1324a(a)(2) as a condition of those grants.

171. On or about August 23 and August 26, 2019, Cal OES received its FY 2019 $996,924 VAWA SASP Grant award and $14.9 million VAWA STOP Grant award, respectively. Both of

these awards contain the 1324a Requirement surrounding "[e]mployment eligibility verification for hiring under the award" providing:

> The recipient must ensure that, as part of the hiring process for any position within the United States that is or will be funded (in whole or in part) with award funds, the recipient (or any subrecipient) properly verifies the employment eligibility of the individual who is being hired, consistent with the provisions of 8 U.S.C. 1324a(a)(1) and (2).

Ex. M ¶ 5, Ex. N ¶ 5.

172. On or about September 12, 2019, Cal OES received its $2.264 million Coverdell Grant award, and Cal DOJ received its FY 2019 $2.059 million DNA Backlog Reduction Grant award. On or about September 13, 2019 Cal VCB received its FY 2019 $15.75 million VOCA Compensation Formula Grant award to Cal VCB, and Cal OES received its FY 2019 $266.68 million VOCA Assistance Formula Grant award. The BSCC received its FY 2019 $17.8 million JAG award on or about September 18, 2019, its FY 2019 $407,813 PREA award on or about September 23, 2019, its FY 2019 Title II Grant on or about September 24, 2019, and its $2.219 million RSAT Grant award on or about September 28, 2019. Each of these grants contain the 1324a Requirement as appears in the State's VAWA grants. Ex. C ¶ 9, Ex. E ¶ 9, Ex. I ¶ 9, Ex. J ¶ 9, Ex. P ¶ 9, Ex. R ¶ 9, Ex. T ¶ 9, Ex. V ¶ 9. In addition, the 1324a Requirement on these grants includes additional requirements that do not appear in the VAWA awards. The 1324a Requirement for these grants requires that the recipient notify and "[p]rovide training (to the extent necessary)" about the 1324a Requirement and the underlying requirements of § 1324a(a)(1) and (2) to all persons who are involved in the hiring process for the recipient and subrecipients. *Id.* The recipient is required to maintain records of all I-9 forms, notifications, and trainings in connection with this condition. *Id.* And the 1324a Requirement imposes on recipients "monitoring responsibilities" surrounding subgrantee compliance with the condition. *Id.*

173.   As discussed above with respect to JAG and the Title II Grants, Cal OES, Cal VCB, BSCC, and Cal DOJ understand that they have 45 days from the award date to accept the awards with the 1324a Requirement or the awards may be rescinded.[29]

174.   On information and belief, before FY 2019 Defendants had never included a grant condition requiring compliance with § 1324a.  Defendants have provided no explanation as to how the 1324a Requirement is consistent with Congress's intent for each of the grants.

## V.   THE FY 2019 IMMIGRATION ENFORCEMENT REQUIREMENTS ARE UNLAWFUL

### A.   The JAG Immigration Enforcement Requirements and 1373 Title II Requirement Are Unlawful

175.   The JAG and Title II authorizing statutes do not authorize the JAG Immigration Enforcement Requirements or the 1373 Title II Requirement added to those grants.  Interpreting Defendants' authority to permit them to impose these substantive conditions with respect to formula grants, like JAG and Title II, beyond what is allowed under federal law, conflicts with the prescribed formula grant structure intended by Congress.  Congress designed JAG and Title II so that "*each State*" receives an allocation according to a precise statutory formula.  34 U.S.C. §§ 10156(a), 11132(a) (emphasis added).  Likewise, for JAG, Congress's formula provides allocation to "*each* unit of local government." *Id.* § 10156(d)(2) (emphasis added).  As such, if Defendants make grants from funds that Congress appropriated to JAG and Title II, they must disburse the funds according to the statutory formula enacted by Congress so long as the jurisdiction complies with the conditions that exist for grantees under federal law.

176.   The JAG Immigration Enforcement Requirements and 1373 Title II Requirement are also contrary to congressional intent as immigration enforcement has never been a purpose for those grants.  The purpose areas for JAG are to support criminal justice programs.  Immigration enforcement and removal procedures, however, are generally civil in nature.  *See Arizona v. United States*, 567 U.S. 387, 396 (2012).  Immigration enforcement has never been specified as a purpose area throughout this entire history for JAG, and Congress has repeatedly rejected

---

[29] U.S. Dep't of Justice, DOJ Grants Financial Guide, § 2,2, https://ojp.gov/financialguide/doj/pdfs/DOJ_FinancialGuide.pdf.

1    numerous attempts to attach immigration enforcement requirements to receipt of JAG funding.[30]

2    The purpose of Title II Grants is to improve the juvenile justice system, not immigration

3    enforcement.

4        177.    Defendants seem to claim that all of the statutes identified in the certification are

5    "applicable Federal laws" that applicants must comply with under § 10153(a)(5) in the JAG

6    authorizing statute.  *See* Ex. A at 10; Ex. B. at 10.  The JAG authorizing statute does not permit

7    Defendants to add these provisions as "applicable Federal laws."  Sections 1373 and 1644 cannot

8    be "applicable Federal laws" because they are unconstitutional under the Tenth Amendment's

9    anti-commandeering doctrine, and thus, Defendants lack the statutory authority to identify those

10   statutes as "applicable laws."  And 8 U.S.C. §§ 1226, 1231, 1324, 1357, and 1366 are not

11   "applicable Federal laws" as they are not laws that are applicable to the State.

12       178.    None of the federal laws identified by Defendants are "applicable" because the term

13   "other applicable Federal laws" is best understood as referring to laws that are expressly

14   connected to federal grant-making.  Prior to 2016, the only laws that USDOJ identified as

15   "applicable" were those that specifically address the administration of federal funding in the text

16   of the statute.  There is no provision in the INA, or any federal law, that requires jurisdictions to

17   comply with any of the federal laws identified by Defendants in order to receive these federal

18   funds.

19       179.    Because of its unconstitutionality and because it is not federal law connected to the

20   administration of grant funding, § 1373 is not an "applicable Federal law" for Title II Grants

21   either.  *See* 28 C.F.R. § 31.401.

22       180.    Defendants also cannot rely on OJP's authority to add "special conditions on all

23   grants," 34 U.S.C. § 10102(a)(6), as a basis for adding the JAG Immigration Enforcement

24   Requirements and the 1373 Title II Requirement.  Section 10102(a)(6) does not provide

25   _____

26   [30] *See, e.g.*, Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018)
     (voted down by the House by a vote of 231-193); *see also, e.g.*, No Sanctuary for Criminals Act,
27   H.R. 3003, 115th Cong. (2017); Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong.
     (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Sanctuary
28   Policies and Protect Americans Act, S. 2146, 114th Cong. (2015); Sanctuary City All Funding
     Elimination Act of 2015, H.R. 3073, 114th Cong. (2015).

53

1   independent authority for Defendants to add conditions to grants. *See, e.g.*, *San Francisco*, 372 F.

2   Supp. 3d at 942-43; *San Francisco*, 349 F. Supp. 3d at 947-48. Rather, in 2006, when this

3   provision was amended to create its current language, the term "special conditions" had a precise

4   meaning. According to a USDOJ regulation in place at the time, the agency could impose

5   "special grant or subgrant conditions" on "high-risk grantees" if the grant applicant: (1) had a

6   history of poor performance; (2) was not financially stable; (3) had a management system that did

7   not meet certain federal standards; (4) had not conformed to the terms and conditions of a

8   previous grant award; or (5) was not otherwise responsible. 28 C.F.R. § 66.12 (removed

9   December 25, 2014).

10      181.   The JAG Immigration Enforcement Requirements are further undercut by 34 U.S.C.

11   § 10228(a), which is codified in the same chapter as the JAG authorizing statute, and prohibits the

12   use of federal law enforcement grants to exercise "any direction, supervision, or control over any

13   police force or any other criminal justice agency of any State or any political subdivision

14   thereof."

15      182.   The JAG Immigration Enforcement Requirements and 1373 Title II Requirement are

16   ambiguous as they fail to provide the State with clear notice of what is required to comply with

17   them. In particular, the Harboring Condition is ambiguous as to what type of public disclosure of

18   law enforcement information would constitute an "indirect attempt to conceal, harbor, or shield"

19   non-citizens, and whether Defendants would consider California law and policies to conflict with

20   this condition. Ex. C ¶¶ 35-36. For instance, in order to promote trust in law enforcement and

21   foster a safe and welcoming environment in K-12 schools, California law requires that law

22   enforcement and school personnel disclose to community members certain requests made by

23   immigration authorities in specific circumstances.[31] These laws and policies reflect the State's

24   considered view on the appropriate use of state and local government resources to preserve the

25   State's relationships with immigrant communities and safeguard the right of immigrant families'

26   _____

27   [31] California Attorney General, *Promoting a Safe and Secure Learning Environment for All: Guidance and Model Policies to Assist California's K-12 Schools in Responding to Immigration Issues* 20, 31 (April 2018), available at

28   https://oag.ca.gov/sites/all/files/agweb/pdfs/bcj/school-guidance-model-k12.pdf.

1   to access a free public education for their children.  Due to the ambiguity of the Harboring

2   Condition, however, it is unclear whether the State would have to revise such state laws and

3   policies that foster transparency and community trust.

4       **B.   The Imposition of the 1324a Requirement on Formula Grants Is Unlawful**

5       183.   Defendants lack authority to impose the 1324a Requirement on VOCA, JAG,

6   VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA formula grant funding.

7   As with JAG and Title II, *see supra*, for each of these grants, Congress directed that Defendants

8   "shall" make an annual grant to each of the states subject to the precise formula set by Congress.

9   *See* 34 U.S.C. §§ 10423(a), 10446(b), 10563(a)(1), 12511(b)(4), 20102(a)(1), 20103(a)(1),

10  40701(c)(1).  As such, Defendants must disburse these grants to the State according to the

11  statutory formula created by Congress so long as the State complies with the requirements that

12  exist for grantees under federal law.

13      184.   These grants are designed to provide support to victims of crime and sexual assault,

14  improve the State's criminal justice system, develop and implement residential substance abuse

15  treatment programs for inmates, improve the State's forensic services capacity, and assist the

16  State in becoming PREA compliant.  Immigration enforcement has never been a purpose of any

17  of these grants, and the 1324a Requirement does not advance the objectives of these grants.

18      185.   VOCA, JAG, Title II, Coverdell, RSAT, VAWA SASP, and PREA grants do not

19  provide any authority for Defendants to impose their own funding conditions.  For example, the

20  VOCA authorizing statute provides discretion to the OVC Director to set the "terms and

21  conditions" for *discretionary grants* under her purview, *i.e.*, the OVC Discretionary Assistance

22  Grants.  34 U.S.C. § 20111(c)(3).  But in the immediately preceding subprovision detailing the

23  OVC Director's authority with regard to VOCA Assistance and Compensation Formula Grants,

24  the statute provides only that the OVC Director shall "provid[e] funds to eligible States pursuant

25  to sections 20102 and 20103 of this title," without providing any authority to impose funding

26  conditions.  *Id.* § 20111(c)(2).

27      186.   While Defendants possess some authority to add funding conditions to VAWA STOP

28  and DNA Backlog Reduction Grants, *id.* §§ 10446(e)(3), 40701(c)(1), that authority is also

limited. The VAWA STOP Program includes many detailed and specific programmatic requirements. *Id.* §§ 10446(c), (d), (h), and (i), 10447, 12291. To meet these program purposes and requirements set out in the statute and any implementing regulations, the Attorney General may "impose reasonable conditions on grant awards to ensure that the States meet statutory, regulatory, and other programmatic requirements." *Id.* § 10446(e)(3). These authorized conditions are targeted explicitly at the specific and detailed statutory requirements as set by Congress, and do not include requirements not related to the statutory aims of protecting victims of sexual assault and other forms of violence against women. Likewise, for DNA Backlog Reduction Grants, the Attorney General may "establish appropriate grant conditions . . . in conformity with a formula or formulas that are designed to effectuate a distribution of funds among eligible States and units of local government" to achieve the objectives of that section. *Id.* § 40701(c)(1). Neither statute provides authority to unilaterally impose additional conditions that are not tethered to the purposes of those grants.

187. To the extent Defendants rely on § 10102(a)(6) as a basis for adding the 1324a Requirement, as discussed above, § 10102(a)(6) does not provide independent authority to add conditions to grants, and thus does not authorize the imposition of the 1324a Requirement.

188. Not only is the 1324a Requirement incompatible with the formula structure that Congress created in the authorizing statue for each of these grants, it also runs afoul of § 1324a itself. Congress has never required grantees to comply with § 1324a as a condition for receiving USDOJ grants. An employer who violates § 1324a(a)(1)(A) or (a)(2) is subject to an administrative hearing, where an administrative judge may issue a cease and desist order with civil monetary penalties. 8 U.S.C. § 1324a(e)(3) & (4). Those monetary penalties are set in statue, and have been adjusted for inflation by regulation ranging from $559-$4,473 for a first-time offender's violation to $6,709-$22,363 for a repeat offender's violation. *See id.*; 28 C.F.R. § 85.5. Tying § 1324a compliance to *hundreds of millions of dollars* in grant funding contravenes congressional intent.

189. And, in recent years, Congress has considered numerous bills authorizing federal agencies to "consider[] for debarment from the receipt of Federal contracts, grants, or cooperative

56

1  agreements," for a person or entity who is a repeat violator of § 1324a(a)(1)(A) or (a)(2). All of

2  those bills failed.[32]

3      190.   The 1324a Requirement is also ambiguous. For example, although the 1324a

4  Requirement indicates that it seeks only to govern verification "as part of the hiring process," the

5  1324a Requirement invokes § 1324a(a)(2) which governs employers' actions "*after* hiring" an

6  employee. § 1324a(a)(2) (emphasis added). The reference to § 1324a(a)(2), thus, appears to

7  broaden the scope of the condition to apply not only to funds that are used for the hiring of an

8  employee, but to any funds that are used toward an employee. The conflicting language in the

9  condition, therefore, makes it unclear what a grantee or subgrantee must do to comply with the

10  condition. It is further unclear what a grantee must do to "monitor" subgrantee compliance with

11  the condition.

12      191.   In addition, the United States argued in *United States v. California* that an employer's

13  obligations under § 1324a(a)(2) encompass reverification. The 1324a Requirement is unclear

14  about whether the condition requires grant recipients to "reverify" employees' eligibility after

15  hiring an employee, and if so, how often and when.

16      192.   The federal government's conflicting messages about how to comply with

17  § 1324a(a)(2) create additional ambiguities. As discussed above, USDOJ has instructed

18  employers not to reverify an employee's eligibility to be employed in the United States under

19      [32] *See, e.g.*, Accountability Through Electronic Verification Act, H.R. 1399, 116th Cong.
20  (2019) (referred to subcommittee on Immigration and Citizenship; no further action);
    Accountability Through Electronic Verification Act, S. 556, 116th Cong. (2019) (referred to the
21  Committee on the Judiciary; no further action); Legal Workforce Act, H.R. 250, 116th Cong.
    (2019) (referred to subcommittee on Immigration and Citizenship; no further action); AG and
22  Legal Workforce Act, H.R. 6417, 115th Cong. (2018) (referred to the Subcommittee on
    Immigration and Border Security; no further action); Securing America's Future Act of 2018,
23  H.R. 4760, 115th Cong. (2018) (voted down by House 231 to 193); American LAWS Act, H.R.
    4340, 115th Cong. (2017) (referred to the Subcommittee on Immigration and Border Security; no
24  further action); Legal Workforce Act, H.R. 3711, 115th Cong. (2017) (ordered to be reported out
    of committee; no further action); Accountability Through Electronic Verification Act, H.R. 2461,
25  115th Cong. (2017) (referred to the Subcommittee on Social Security; no further action taken);
    Accountability Through Electronic Verification Act, S. 179, 115th Cong. (2017) (referred to the
26  Committee on the Judiciary; no further action); Immigration for a Competitive America Act of
    2016, H.R. 5398, 114th Cong. (2016) (referred to the Subcommittee on Border and Maritime
27  Security; no further action); Accountability Through Electronic Verification Act, S. 1032, 114th
    Cong. (2015) (referred to the Committee on the Judiciary; no further action taken); Legal
28  Workforce Act, H.R. 1147, 114th Cong. (2015) (referred to the Subcommittee on Social Security;
    no further action).

57

certain circumstances. But, in *United States v. California*, the federal government argued Labor Code § 1019.2 conflicts with § 1324a(a)(2) because it "prohibit[s] employers from reverifying work authorization when they deem it appropriate to remain in compliance with the law," even though it authorizes employers to reverify when required by federal law. Plaintiff's Motion for Preliminary Injunction and Memorandum of Law in Support, *United States v. California*, No. 18-cv-490 (E. D. Cal. Mar. 6, 2018), ECF No. 2-1 at 17-18. The federal government has incorrectly indicated that under federal law employers must reverify based on "a suspicion" that, for whatever reason, an employee may not be permitted to work there. And although federal law makes clear that there is no continuing obligation to reverify under federal law, H.R. Rep. No. 99-682(I), at 57 (1986), the federal government has suggested that there are some continuing obligations on employers, which could include reverification.

193. Although federal law is clear as to when employers must reverify an employee, the federal government's statements in *United States v. California* obscure what recipients must do to comply with the 1324a Requirement. It is likewise unclear as to how the State will provide the "training" required by the funding condition in light of Defendants' erroneous and unclear interpretation of § 1324a(a)(2).

194. The 1324a Requirement is coercive as well. Never has this funding condition been a requirement on any USDOJ grant; yet (at once), Defendants impose this new condition, with, at most, limited warning, on "virtually all" of its formula grants that the State has received for years, and upon which the State depends. This immigration enforcement requirement placed on hundreds of millions of dollars of existing grants, unrelated to immigration enforcement, "pass[es] the point at which pressure turns into compulsion." *South Dakota v. Dole*, 483 U.S. 207, 211 (1987) (internal quotation marks omitted).

## VI. THE IMPOSITION OF THE FY 2019 IMMIGRATION ENFORCEMENT REQUIREMENTS CREATE IRREPARABLE HARM TO THE STATE AND ITS LOCAL JURISDICTIONS

195. The FY 2019 Immigration Enforcement Requirements present an impermissible dilemma to the State: it has to decide whether it can or should accept $327.7 million in federal funds that are subject to unlawful and unconstitutional requirements. If the State cannot accept

58

JAG or Title II awards, or if Defendants withhold funding from the State on the basis of the JAG Immigration Enforcement Requirements, 1373 Title II Requirement, or the 1324a Requirement, the State will lose $22.3 million in critical funds that would otherwise go toward programs throughout the State that reduce recidivism for at-risk youth, support gang suppression activities, advance community policing, boost educational outcomes, and improve the juvenile justice system. If the State cannot accept the VOCA Assistance and Compensation Formula Grant awards on the basis of the 1324a Requirement, the State will lose $282.4 million that would otherwise go toward assisting and compensating victims of crime. If the State cannot accept the VAWA STOP and SASP Grant awards on the basis of the 1324a Requirement, the State will lose $15.9 million that would otherwise go toward assisting victims of violence against women and sexual assault. If the State cannot accept the Coverdell and DNA Backlog Reduction Grants, the State will lose $4.3 million that would otherwise go toward enhancing the State's forensic science services capabilities to solve crimes and improve the criminal justice system. If the State cannot accept the RSAT Grant, the State will lose $2.219 million that would otherwise go toward providing needed substance abuse programs to inmates during incarceration and upon reentry into the community. And if the State cannot accept its PREA funding, the State will lose over $400,000 that would otherwise go toward staff training to ensure the safety and wellbeing of transgender inmates in State custody.

196.  For JAG and Title II, it is likely that in order for the State and many of its localities to accept the funding, they will have to change their public safety oriented laws and policies in order to ensure they are viewed as complying with the JAG Immigration Enforcement Requirements and 1373 Title II Requirement, as well as Defendants' erroneous view of § 1373. Abandoning these policies that law enforcement has found to be effective in their communities would divert resources away from fighting crime and erode the trust between the State and local governments and their immigrant communities that state laws like the TRUST, TRUTH, and Values Acts, as well as local ordinances, are intended to build.

197.  Likewise, for all of the grants, the State faces the dilemma of whether to change its workplace protection law, Labor Code § 1019.2, in order to ensure it is perceived by Defendants

59

as complying with the 1324a Requirement and Defendants' erroneous interpretation of § 1324a, or risk losing hundreds of millions of dollars in grant funding. Abandoning this law will undermine the State's ability to ensure those who are authorized to be employed in the United States will not face discrimination, retaliation, or harassment in the workplace. Moreover, to require public agencies to reverify their employees' work authorization (or at minimum, require that the State allow public employers to reverify employees' work authorization) even when the employer does not possess actual or constructive knowledge that the employee no longer has work authorization, is an excessive interference with a critical aspect of the State's sovereignty—the management of its relationships with its employees.

198. Separate and apart from the State law, the 1324a Requirement imposes on the State the obligation to monitor and train hundreds of subgrantees throughout the State about compliance with § 1324a, forcing the State into the role of immigration enforcement monitors for the federal government, which is another infringement on the State's sovereignty.

199. California and its local jurisdictions must make their decision about whether to accept these grant funds under the shadow of the federal government's past actions and threats it has made against California on the basis of the State's laws. The United States sued California claiming that the Values Act conflicts with § 1373 and "impede[s]" immigration authorities, and that Labor Code § 1019.2 is preempted under IRCA, and specifically, § 1324a. Then-ICE Acting Director Thomas Homan called for USDOJ to "charge" elected officials for jurisdictions with policies like California's for violating 8 U.S.C. § 1324(a) if they do not meet the Administration's immigration enforcement demands.[33] Former DHS Secretary Kirstjen Nielsen later confirmed in congressional testimony that USDOJ was "reviewing" ways to charge state and local officials as Acting Director Homan suggested.

200. The State understands that Defendants will not accept a qualified acceptance of the grant awards. The State submitted a supplemental statement in connection with its acceptance of

---

[33] Fox News Interview with Thomas Homan, *Acting ICE director: California made a foolish decision* (Jan. 2, 2018), http://www.foxnews.com/transcript/2018/01/02/acting-ice-director-california-made-foolish-decision.html.

one USDOJ grant award containing the 1324a Requirement making clear that it would not be using the award in whole or in part to fund an employee. USDOJ rejected the State's submission and said the State was required to submit that award without any supplemental statement. The State should not be faced with this Hobson's Choice of agreeing to these unconstitutional Immigration Enforcement Requirements, or not agreeing to these Requirements and losing funding critical to the State's communities.

### **FIRST CLAIM FOR RELIEF**

**VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

**(JAG Immigration Enforcement Requirements and 1373 Title II Requirement)**

201. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

202. Article I, Section I of the U.S. Constitution enumerates that "[a]ll legislative Powers herein granted shall be vested in [the] Congress."

203. Article I, Section VIII of the U.S. Constitution vests exclusively in Congress the spending power to "provide for . . . the general Welfare of the United States."

204. Defendants have exceeded congressional authority by adding substantive immigration enforcement requirements that are not conferred by the JAG authorizing statute, 34 U.S.C. §§ 10151-58, the Title II authorizing statute, 34 U.S.C. §§ 11131-33, or any other federal law. The JAG Immigration Enforcement Requirements and 1373 Title II Requirement therefore unlawfully exceed the executive branch's powers and intrude upon the powers of Congress.

205. For the reasons stated herein, the JAG Immigration Enforcement Requirements and 1373 Title II Requirement are unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 JAG awards to the State and its political subdivisions without the JAG Immigration Enforcement Requirements and 1373 Tittle II Requirement, and disburse FY 2019 JAG and Title II funds in accordance with the formulas in the JAG and Title II authorizing statutes.

# **SECOND CLAIM FOR RELIEF**

## **ULTRA VIRES**

### (**JAG Immigration Enforcement Requirements and 1373 Title II Requirement**)

206.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

207.   An agency acts ultra vires when it exceeds its statutory authority conferred by Congress.

208.   There is no statutory authority that authorizes the imposition of the JAG Immigration Enforcement Requirements.  Further, Congress has not delegated to Defendants the authority to impose the JAG Immigration Enforcement Requirements.

209.   In particular, none of the identified laws in the JAG Immigration Enforcement Requirements are "applicable Federal laws" within the meaning of the JAG authorizing statute. Additionally, 8 U.S.C. §§ 1226, 1231, 1324, 1357, and 1366 cannot be applicable laws for applicants to JAG funding because these laws impose no obligations on state and local jurisdictions.  For the same reasons, § 1373 cannot be an "applicable Federal law" for Title II Grants.

210.   Two of the laws that are part of the JAG Immigration Enforcement Requirements and the 1373 Title II Requirement, 8 U.S.C. §§ 1373 and 1644, violate the Tenth Amendment's anti-commandeering doctrine.  Therefore, those laws are invalid and cannot be identified as "applicable Federal laws." *See, e.g.*, *San Francisco*, 349 F. Supp. 3d at 953-54.

211.   For the reasons stated herein, the JAG Immigration Enforcement Requirements and 1373 Title II Requirement are ultra vires, and should be set aside under 28 U.S.C. § 2201. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 JAG and Title II awards to the State and its political subdivisions without the JAG Immigration Enforcement Requirements and 1373 Title II Requirement, and disburse FY 2019 JAG and Title II funds in accordance with the formulas in the JAG and Title II authorizing statutes.

# **THIRD CLAIM FOR RELIEF**

## **SPENDING CLAUSE**

### (**JAG Immigration Enforcement Requirements and 1373 Tile II Requirement**)

212.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

213.   Congress' spending power is not unlimited.  When "Congress desires to condition the States' receipt of federal funds," it must do so (a) "unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation;" and (b) by placing conditions that are related "to the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207 (internal citation omitted).

214.   To the extent that Congress delegated its authority to impose conditions on JAG and Title II funding (which it has not), the JAG Immigration Enforcement Requirements and 1373 Title II Requirement violate the Spending Clause of the U.S. Constitution.  The JAG Immigration Enforcement Requirements and 1373 Title II Requirement are unrelated to the "federal interest in particular national projects or programs" for which Congress intended JAG and Title II funding to be used.

215.   The JAG Immigration Enforcement Requirements and 1373 Title II Requirement also violate the Spending Clause because Congress has not unambiguously imposed the funding condition and it does not provide the State and local jurisdictions with the requisite notice so the State can make a "choice knowingly" of how to comply with the condition.

216.   For the reasons stated herein, the JAG Immigration Enforcement Requirements and 1373 Title II Requirement are unlawful, and should be set aside under 28 U.S.C. § 2201. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 JAG and Title II awards to the State and its political subdivisions without the JAG Immigration Enforcement Requirements and 1373 Title II Requirement, and disburse FY 2019 JAG and Title II funds in accordance with the formulas in the JAG and Title II authorizing statutes.

# FOURTH CLAIM FOR RELIEF

## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT

### (JAG Immigration Enforcement Requirements and 1373 Title II Requirement - Constitutional Violations and Excess of Statutory Authority)

217. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

218. Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the imposition of the JAG Immigration Enforcement Requirements and the 1373 Title II Requirement are "agency action[s]" under the APA, *id.* § 551(13).

219. The imposition of the JAG Immigration Enforcement Requirements and 1373 Title II Requirement constitute "[a]gency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

220. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)-(C).

221. Defendants' imposition of the JAG Immigration Enforcement Requirements and 1373 Title II Requirement is unconstitutional because Defendants overstepped their powers by exercising lawmaking authority that is solely reserved to Congress under Article I, Section I of the Constitution. Also, Defendants' imposition of the JAG Immigration Enforcement Requirements and 1373 Title II Requirement is in excess of their statutory authority. Furthermore, the JAG Immigration Enforcement Requirements and 1373 Title II Requirement violate the Spending Clause because they are unrelated to the federal purpose of the grant and/or fail the clause's unambiguous requirement.

222. Because Defendants acted unconstitutionally and in excess of their statutory authority in the imposition of the JAG Immigration Enforcement Requirements and 1373 Title II Requirement, these actions are unlawful and should be set aside under 5 U.S.C. § 706. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 JAG and Title II awards to the State and its political subdivisions

64

without the JAG Immigration Enforcement Requirements and 1373 Title II Requirement, and disburse FY 2019 JAG and Title II funds in accordance with the formulas in the JAG and Title II authorizing statutes.

## FIFTH CLAIM FOR RELIEF

### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
**(JAG Immigration Enforcement Requirements and 1373 Title II Requirement- Arbitrary and Capricious)**

223.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

224.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the imposition of the Immigration Enforcement Requirements and the 1373 Title II Requirement are "agency action[s]" under the APA, *id.* § 551(13).

225.   The imposition of the JAG Immigration Enforcement Requirements and 1373 Title II Requirement constitute "[a]gency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

226.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

227.   The imposition of the JAG Immigration Enforcement Requirements and 1373 Title II Requirement is arbitrary and capricious and an abuse of discretion because Defendants have relied on factors that Congress did not intend, failed to consider an important aspect of the program the agency is addressing, and has offered no explanation for adding the JAG Immigration Enforcement Requirements and 1373 Title II Requirement that is consistent with the evidence that is before the agency.  *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

228.   For the reasons discussed herein, the JAG Immigration Enforcement Requirements and the Title II 1373 Requirement are unlawful and should be set aside under 5 U.S.C. § 706 for being arbitrary and capricious and an abuse of discretion.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 JAG and Title

65

II awards to the State and its political subdivisions without the JAG Immigration Enforcement Requirements and 1373 Title II Requirement, and disburse FY 2019 JAG and Title II funds in accordance with the formulas in the JAG and Title II authorizing statutes.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS

### (1324a Requirement)

229.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

230.   Defendants have exceeded congressional authority by adding the 1324a Requirement without authority to do so in the VOCA authorizing statute, 34 U.S.C. §§ 20101-11, the JAG authorizing statute, 34 U.S.C. §§ 10151-58, the VAWA authorizing statutes, 34 U.S.C. §§ 10441-51, 12511, the Title II authorizing statute, 34 U.S.C. §§ 11131-33, the Coverdell authorizing statute, 34 U.S.C. §§ 10561-10566, the RSAT authorizing statute, 34 U.S.C. §§ 10421-26, the DNA Backlog Reduction authorizing statute, 34 U.S.C. § 40701, the PREA authorizing statute, 34 U.S.C. § 30307, or any other federal law.  The 1324a Requirement also runs afoul of the specific penalty structure created by Congress in § 1324a and the refusal by Congress to tie § 1324a compliance to receipt of federal grants.  The 1324a Requirement therefore unlawfully exceeds the executive branch's powers and intrudes upon the powers of Congress in violation of the constitutional separation of powers.

231.   For the reasons stated herein, the 1324a Requirement is unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 grant awards to California and its local jurisdictions without the 1324a Requirement, and disburse FY 2019 grant funds, without regard to Labor Code § 1019.2, in accordance with the formula in each grant's authorizing statutes.

## SEVENTH CLAIM FOR RELIEF

### ULTRA VIRES

### (1324a Requirement)

232.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

66

1   233.   Defendants have acted ultra vires in imposing the 1324a Requirement.  There is no

2   statutory authority that authorizes the imposition of the 1324a Requirement on the VOCA, JAG,

3   VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA Grants.  Further,

4   Congress has not delegated to Defendants the authority to impose the 1324a Requirement on

5   these grants.

6   234.   For the reasons stated herein, the 1324a Requirement is unlawful, unconstitutional,

7   and should be set aside under 28 U.S.C. § 2201.  Additionally, Plaintiff is entitled to a writ of

8   mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 grant awards to

9   California and its local jurisdictions without the 1324a Requirement, and disburse grant funds,

10   without regard to Labor Code § 1019.2, in accordance with the formula in each grant's

11   authorizing statutes.

12                            **EIGHTH CLAIM FOR RELIEF**

13                                **SPENDING CLAUSE**

14                              **(1324a Requirement)**

15   235.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

16   236.   To the extent that Congress delegated its authority to impose the 1324a Requirement

17   on the grants (which it has not), the 1324a Requirement violates the Spending Clause of the

18   Constitution.

19   237.   The 1324a Requirement is unrelated to the "federal interest in particular national

20   projects or programs" for which Congress intended VOCA funding to be used: to provide

21   assistance and compensation for victims of crime.  The 1324a Requirement is likewise unrelated

22   to the federal interest in VAWA funding, which is to improve criminal justice system responses

23   to domestic violence, sexual assault, and stalking, and to increase the availability of services for

24   victims of these crimes.  The 1324a Requirement is unrelated to the criminal justice purposes of

25   JAG and the juvenile justice purposes of Title II.  The 1324a Requirement is unrelated to the

26   purposes of improving forensic science and DNA sampling capabilities for the Coverdell and

27   DNA Backlog Reduction Grants.  The 1324a Requirement is unrelated to the purposes of RSAT

28

1  to provide substance abuse treatment for people in custody and upon re-entry into the community.

2  And the 1324a Requirement is unrelated to PREA compliance.

3  238. The 1324a Requirement violates the Spending Clause because Congress has not

4  unambiguously imposed the funding condition and its vagueness does not provide the State and

5  local jurisdictions with the requisite notice so the State can make a "choice knowingly" of how to

6  comply with the condition.

7  239. The 1324a Requirement also violates the Spending Clause because the manner in

8  which Defendants have tied hundreds of millions of dollars to compliance with the 1324a

9  Requirement is "so coercive as to pass the point at which pressure turns into compulsion." *Nat'l*

10  *Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) (quoting *Dole*, 483 U.S. at 211)

11  (internal quotation marks omitted)).

12  240. For the reasons stated herein, the 1324a Requirement is unlawful, and should be set

13  aside under 28 U.S.C. § 2201. Additionally, Plaintiff is entitled to a writ of mandamus under 28

14  U.S.C. § 1361 to compel Defendants to issue FY 2019 grant awards to California and its local

15  jurisdictions without the 1324a Requirement, and disburse grant funds, without regard to Labor

16  Code § 1019.2, in accordance with the formula in each grant's authorizing statutes.

17  ### NINTH CLAIM FOR RELIEF

18  ### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
19  **(1324a Requirement - Constitutional Violations and Excess of Statutory Authority)**

20  241. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

21  242. Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the

22  imposition of the 1324a Requirement is an "agency action" under the APA, *id.* § 551(13).

23  243. The imposition of the 1324a Requirement on each of the grants constitute "[a]gency

24  action[s] made reviewable by statute and final agency action for which there is no other adequate

25  remedy in a court." *Id.* § 704.

26  244. The APA requires that a court "hold unlawful and set aside agency action, findings,

27  and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity,"

28

1    or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.*

2    § 706(2)(B)-(C).

3        245.   Defendants' imposition of the 1324a Requirement is unconstitutional because

4    Defendants overstepped their powers by exercising lawmaking authority that is solely reserved to

5    Congress under Article I, Section I of the Constitution.  Also, Defendants' imposition of the

6    1324a Requirement is in excess of their statutory authority.  Furthermore, the 1324a Requirement

7    violates the Spending Clause because it is unrelated to the federal purpose of the grants, fails the

8    clause's unambiguous requirement, and/or is impermissibly coercive.

9        246.   Because Defendants acted unconstitutionally and in excess of their statutory authority

10   in the imposition of the 1324a Requirement, these actions are unlawful and should be set aside

11   under 5 U.S.C. § 706.  Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C.

12   § 1361 to compel Defendants to issue FY 2019 grant awards to California and its local

13   jurisdictions without the 1324a Requirement, and disburse FY 2019 grant funds, without regard to

14   Labor Code § 1019.2, in accordance with the formula in each of the grant's authorizing statutes.

**TENTH CLAIM FOR RELIEF**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
**(1324a Requirement - Arbitrary and Capricious)**

18       247.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

19       248.   Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the

20   imposition of the 1324a Requirement is an "agency action" under the APA, *id.* § 551(13).

21       249.   The imposition of the 1324a Requirement on each of the grants constitute "[a]gency

22   action[s] made reviewable by statute and final agency action for which there is no other adequate

23   remedy in a court."  *Id.* § 704.

24       250.   The APA requires that a court "hold unlawful and set aside agency action, findings,

25   and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

26   accordance with law."  *Id.* § 706(2)(A).

69

251. The imposition of the 1324a Requirement is arbitrary and capricious and an abuse of discretion because Defendants have relied on factors that Congress did not intend, failed to consider an important aspect of the program the agency is addressing, and has offered no explanation for adding the 1324a Requirement that is consistent with the evidence that is before the agency. *See State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43.

252. For the reasons discussed herein, the 1324a Requirement is unlawful and should be set aside under 5 U.S.C. § 706 for being arbitrary and capricious and an abuse of discretion. Additionally, Plaintiff is entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue FY 2019 grant awards to California and its local jurisdictions without the 1324a Requirement, and disburse FY 2019 grant funds, without regard to Labor Code § 1019.2, in accordance with the formula in each of the grant's authorizing statutes.

## ELEVENTH CLAIM FOR RELIEF

### DECLARATORY RELIEF

**(Labor Code § 1019.2 Complies with 8 U.S.C. § 1324a for purposes of the 1324a Requirement Imposed on Grants to California and its Political Subdivisions)**

253. Plaintiff incorporates the allegations of the preceding paragraphs by reference.

254. An actual controversy exists as to whether the State of California can comply with the 1324a Requirement on the basis of Labor Code § 1019.2. Although California law complies with § 1324a, Defendants' statements and actions create a credible threat that they will determine that California cannot comply with the 1324a Requirement.

255. Labor Code § 1019.2 does not in any way restrict employers from verifying an employee's eligibility to be employed in the United States. Labor Code § 1019.2 also does not affect an employer's obligations to reverify an employee's eligibility to be employed in the United States when required to do so under federal law. Labor Code § 1019.2 only prohibits employers from reverifying an employee's eligibility to be employed in the United States when they are not required to do so under federal law.

256. Labor Code § 1019.2 is consistent with and expands upon the anti-discrimination provisions in federal law. IRCA does not preempt a state from adopting more robust employee

70

workplace protections, so long as those employee protections do not conflict with federal law. Therefore, there is no conflict between Labor Code § 1019.2 and 8 U.S.C. § 1324a.

257.   For the reasons stated herein, pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Labor Code § 1019.2, as applied to public employers, complies with 8 U.S.C. § 1324a as a matter of law, and thus, should not be a basis for withholding and terminating federal funding, or disbarring and making any state entity or local jurisdiction ineligible for federal funding.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the State of California, respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.   Issue a declaration that the JAG Immigration Enforcement Requirements and the 1373 Title II Requirement are unconstitutional and/or unlawful because: (a) they violate the separation of powers; (b) they exceed congressional authority conferred to the Executive Branch and are ultra vires on their face; (c) to the extent there is congressional authority, they exceed Congress's spending powers under Article I of the Constitution; and/or (d) they violate the APA;

2.   Issue a declaration that the 1324a Requirement imposed on VOCA, JAG, VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA Grants is unconstitutional and/or unlawful because: (a) it violates the separation of powers; (b) it exceeds congressional authority conferred to the Executive Branch and is ultra vires on its face and as applied to Labor Code § 1019.2; (c) to the extent there is congressional authority, it exceeds Congress's spending powers under Article I of the Constitution; and/or (d) it violates the APA;

3.   Permanently enjoin Defendants from using the JAG Immigration Enforcement and 1373 Title II Requirements;

4.   Permanently enjoin Defendants from using the 1324a Requirement imposed on VOCA, JAG VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA Grants;

5.   Permanently enjoin Defendants from withholding and terminating federal funding, including VOCA, JAG, VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA

71

Grants, or disbarring and making any state entity or local jurisdiction ineligible for federal funding on account of the Labor Code § 1019.2;

6. Issue a writ of mandamus compelling Defendants to issue California and its political subdivisions' FY 2019 JAG and Title II awards and disburse funds without the JAG Immigration Enforcement Requirements and the 1373 Title II Requirement;

7. Issue a writ of mandamus compelling Defendants to issue California and its political subdivisions' FY 2019 VOCA, JAG, VAWA, Title II, Coverdell, RSAT, DNA Backlog Reduction, and PREA Grants without the 1324a Requirement, and disbursing FY 2019 funds pursuant to those grants to the State and its political subdivisions, without regard to Labor Code § 1019.2;

8. In the alternative, issue a declaration that Labor Code § 1019.2 as applied to public employers, complies with 8 U.S.C. § 1324a as a matter of law;

9. Award attorney's fees and costs as appropriate; and

10. Grant such other relief as the Court may deem just and proper.

Dated: September 30, 2019          Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
SARAH E. BELTON
Supervising Deputy Attorney General
KRISTI GUDOSKI COOK
LISA C. EHRLICH
XIYUN YANG

*/s/ Lee I. Sherman*

LEE I. SHERMAN
Deputy Attorneys General
*Attorneys for Plaintiff*
*State of California*

72